STEPHEN M. TILLERY (*pro hac vice to be filed*)
  stillery@koreintillery.com
GARRETT R. BROSHUIS (*pro hac vice to be filed*)
  gbroshuis@koreintillery.com
GIUSEPPE S. GIARDINA (*pro hac vice to be filed*)
  ggiardina@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

GEORGE A. ZELCS (*pro hac vice to be filed*)
  gzelcs@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750

BRUCE L. SIMON (Bar No. 96241)
  bsimon@pswlaw.com
THOMAS K BOARDMAN (Bar No. 276313)
  tboardman@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 7433-9008

DANIEL L. WARSHAW (Bar No. 185365)
  dwarshaw@pswlaw.com
BOBBY POUYA (Bar No. 245527)
  bpouya@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104

Attorneys for Plaintiffs Aaron Senne, Michael Liberto and Oliver Odle, individually and on behalf of all those similarly situated

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| AARON SENNE, MICHAEL LIBERTO, and OLIVER ODLE, Individually and on Behalf of All Those Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as MAJOR LEAGUE BASEBALL; ALLAN HUBER "BUD" SELIG; KANSAS CITY ROYALS BASEBALL CORP.; MIAMI MARLINS, L.P.; and SAN FRANCISCO BASEBALL ASSOCIATES LLC, <br><br> Defendants. | CASE NO. <br><br> <u>**CLASS ACTION**</u> <br><br> **COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS** <br><br> **JURY TRIAL DEMANDED** |

1

## TABLE OF CONTENTS

2
**Page**

3

4   I.      NATURE AND BACKGROUND OF SUIT ................................................................1

5   II.     PARTIES.................................................................................................................4

6   III.    CLASS ACTION ALLEGATIONS.........................................................................8

7   IV.     COLLECTIVE ACTION ALLEGATIONS........................................................... 12

8   V.      JURISDICTION, VENUE, AND COMMERCE................................................... 12

9   VI.     FACTUAL ALLEGATIONS................................................................................. 14

10  VII.    FEDERAL WAGE AND HOUR VIOLATIONS ................................................. 30

11  VIII.   STATE WAGE AND HOUR VIOLATIONS ...................................................... 32

12  IX.     PRAYER FOR RELIEF........................................................................................ 46

13  X.      DEMAND FOR JURY TRIAL............................................................................. 47

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.  NATURE AND BACKGROUND OF SUIT

1. The collective Defendants[1] are either members of or govern the cartel known as Major League Baseball ("MLB"). The organization traces its roots to the nineteenth century. Unfortunately for many of its employees, its wage and labor practices remain stuck there.

2. MLB's longstanding exemption from the United States' antitrust laws allows it to openly collude on the working conditions for the development of its chief commodity: young baseball players.[2]

3. MLB has a long, infamous history of labor exploitation dating to its inception. To hoard players and depress salaries during its early years, the cartel inserted a provision (known as the reserve clause) into players' contracts that allowed teams to retain the contractual rights to players for their entire careers. Moreover, it quickly quashed any rival leagues, which preserved MLB's system of artificially low salaries and nonexistent contractual mobility.

4. Players at the highest level of the game ("major leaguers") eventually unionized to counteract MLB's collusive power. Since negotiating sports' first collective bargaining agreement in 1968, major leaguers have enjoyed increased contractual mobility and an explosion in salaries. For instance, the most recent collective bargaining agreement negotiated by the union representing major leaguers—the Major League Baseball Players' Association ("MLBPA")—requires Defendants to pay major leaguers a minimum of $500,000 per season.

5. Unlike the major leaguers, players in the minor leagues ("minor leaguers") have no union, even though they comprise the overwhelming majority of baseball players employed by the Defendants. The MLBPA does not represent the interests of minor leaguers.

6. Efforts to unionize minor leaguers have been unsuccessful because minor leaguers fear retaliation by the seemingly omnipotent Defendants. Striving towards a lifelong dream of playing in the major leagues, minor leaguers are reluctant to upset the status quo. As one minor leaguer, Dan

---

[1] The term "Defendants" applies to all defendants named in this Complaint.
[2] Plaintiffs' Complaint does not allege violations of antitrust laws.

1
COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1   Peltier, testified before Congress not long ago, "[W]hat minor league player is going to jeopardize his

2   career by challenging the system?"[3]

3      7. Mr. Peltier further testified:

4      [It is] very much like the indentured servitude of the 1700's. When you first sign, you
       are owned by that team for basically 7 seasons. A team can buy you, sell you, send you

5      to another country, or fire you whenever they want. They can cut you if you get hurt.
       A player, on the other hand, cannot try to play for someone else. He can't try out for

6      his home team. You have to play for the team that drafted you even if they are loaded
       at your position….[T]his obsession with making the majors should not be a

7      justification for the current treatment of minor league players, and I certainly hope it
       would not be used as an excuse to give major league and minor league owners a legal

8      blank check.[4]

9      8. The Defendants have preyed upon minor leaguers, who are powerless to combat the

10   collusive power of the MLB cartel. MLB continues to actively and openly collude on many aspects of

11   minor leaguers' working conditions, including, but not limited to, wages, contract terms, drug testing,

12   and discipline. For example, while major leaguers' salaries have increased by more than 2,000 percent

13   since 1976, minor leaguers' salaries have, on average, increased only 75 percent since that time.

14   Meanwhile inflation has risen by more than 400 percent over that same time period.

15      9. Through this collective exercise of power, MLB has suppressed minor leaguers' wages in

16   violation of federal and state law. Most minor leaguers earn between around $3,000 and $7,500 for *the*

17   *entire year* despite routinely working over 50 hours per week (and sometimes 70 hours per week) during

18   the roughly five-month championship season. They receive no overtime pay, and instead routinely

19   receive less than minimum wage during the championship season.

20      10. Worse still, the Defendants have conspired to pay no wages at all for significant periods of

21   minor leaguers' work. Consistent with MLB's rules,[5] the Defendants do not pay minor leaguers their

22   salaries during spring training, even though the Defendants require minor leaguers to often work over

23   fifty hours per week during spring training. Similarly, the Defendants do not pay salaries during other

24

---

25   [3] *Major League Baseball Antitrust Reform, Hearing on S. 53 Before the S. Comm. on the Judiciary*, 105th Cong.
     13–15 (June 17, 1997) (Testimony of Dan Peltier, Former Baseball Player).

26   [4] *Id.*

27   [5] *See* Exhibit A, Major League Rules ("MLR") Attachment 3, UPC ¶ VII.D.

28

                                    2

1    training periods such as instructional leagues[6] and winter training.

2        11. Recent government investigations illustrate that MLB's illegal wage and labor practices are

3    rampant. In 2013, one of the Defendants settled a U.S. Department of Labor ("DOL") action for

4    illegally compensating clubhouse employees. The DOL is currently conducting other investigations

5    for similar conduct across the industry. In addition to the government investigations, private litigation

6    has been instituted against MLB for wage and hour violations involving the use of unpaid employees.

7        12. According to a recent MLB memo, the DOL has stated that wage and hour violations "are

8    endemic to [the] industry."[7] Recognizing the effect of the Defendants' centralized power on employee

9    wages, the DOL made a presentation to the Defendants at their 2013 Winter Meetings concerning the

10   Franchises' possible violations of federal and state wage and hour laws.

11       13. The Defendants have been on notice that they are not exempt from federal minimum

12   wage and overtime requirements since at least 1995 and 1998, when the Sixth Circuit issued a pair of

13   decisions making clear that the industry is not exempt.[8] Yet wage abuses continue, as the Defendants

14   continue to misclassify workers and willfully violate federal and state laws.

15       14. Congress passed the Fair Labor Standards Act[9] ("FLSA") in 1938 to protect workers from

16   the types of wage and labor abuses experienced by minor leaguers. As President Franklin D.

17   Roosevelt said prior to its passage, "[The Act must] protect workers unable to protect themselves

18   from excessively low wages and excessively long hours . . . . [and] should reiterate the oft-repeated

19   pledge of political parties that labor is not a mere commodity."[10]

20   _____

21   [6] At the end of each championship season, each MLB Franchise selects around 30–45 players to
22   participate in an instructional league to further hone the minor leaguers' skills. The Franchises
     generally host the instructional league at their spring training sites. It usually lasts around one month.

23   [7] *See* Memorandum from Robert D. Manfred Jr. to All Presidents and Club Counsel, Sept. 12, 2013,
24   *available at* http://www.fairwarning.org/wp-content/uploads/2013/10/Sept.-12memo.pdf.

     [8] *See Bridewell v. The Cincinnati Reds*, 68 F.3d 136, 139 (6th Cir. 1995), *cert. denied*, 516 U.S. 1172 (1996);
25   *Bridewell v. The Cincinnati Reds*, 155 F.3d 828, 829 (6th Cir. 1998).

26   [9] 29 U.S.C. §§ 201 *et seq.*

27   [10]*See* Message from the President of the United States to the Congress of the United States, Nov. 15,
     1937, at 3, 6.

28

15. As is permitted by the FLSA, many states have also passed wage and hour laws to further these protections.[11]

16. This suit seeks to recoup the damages sustained by minor leaguers as a result of MLB's illegal wage and labor practices. It seeks to recover damages through a nationwide FLSA collective action. It also seeks to recover complementary class action damages under the state laws of California (where five of the Defendants are located; where an entire minor league, the California League, operates; and where hundreds of minor leaguers work during the winter), as well as Florida, Arizona,[12] North Carolina, and New York.[13]

17. Moreover, this suit seeks to enjoin the cartel known as MLB from subjecting future minor leaguers to Defendants' illegal wage and labor practices.

## II. PARTIES

### 1. Plaintiffs

18. Plaintiff and representative plaintiff Aaron Senne is a former minor leaguer who worked in the Florida Marlins' organization from 2010 to 2013. Mr. Senne is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Senne currently resides in Rochester, Minnesota. Mr. Senne is a representative plaintiff for the Minor League Collective, the Florida Class, the North Carolina Class, and the New York Class.

19. Plaintiff and representative plaintiff Michael Liberto is a former minor leaguer who worked in the Kansas City Royals' organization from 2010 to 2013. Mr. Liberto is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Liberto currently resides in The Woodlands, Texas. Mr. Liberto is a representative plaintiff for the Minor League

---

[11] The Act contains a savings clause that allows states to enact more protective wage and hour laws. 29 U.S.C. § 218(a). Consequently, actions may be brought simultaneously under both state and federal law. *See Busk v. Integrity Staffing Solutions, Inc.*, 713 F.3d 525, 528–30 (9th Cir. 2013) (stating that both a collective action under the FLSA and a class action under state law may be brought in the same action).

[12] All members of the cartel maintain spring training sites in Florida and Arizona and many minor league teams operate within these two states.

[13] Minor league work occurs in New York and North Carolina.

4

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

Collective and the Arizona Class.

20. Plaintiff and representative plaintiff Oliver Odle is a former minor leaguer who worked in the San Francisco Giants' organization from 2007 to 2011. Mr. Odle is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Odle currently resides in Pryor, Oklahoma.   Mr. Odle is a representative plaintiff for the Minor League Collective, the California Class, and the Arizona Class.

### 2.      Defendants

21. **The Office of the Commissioner of Baseball, d/b/a MLB.** The Office of the Commissioner of Baseball, doing business as MLB, is an unincorporated association comprised of the thirty Major League baseball clubs ("the Franchises").[14] MLB has unified operation and common control over the Franchises, as well as agent corporations such as Major League Baseball Properties, Inc. and Major League Baseball Enterprises, Inc.[15] All do business as MLB.

22. Under the broad meaning of "employ" used by the FLSA and the applicable state laws, MLB employed (and/or continues to employ) Plaintiffs, all similarly situated employees, and all employees of the proposed classes. As described more thoroughly below, the Defendants' cartel has developed a unified constitution and unified rules to closely control many fundamental aspects of the minor leaguers' employment, including, *inter alia*, hiring, contracts, wages, periods of wage payment and nonpayment, other working conditions, and control over the minor leaguers before, during, and after the championship season.

23. **Allan Huber "Bud" Selig.** Since 1998, Allan Huber "Bud" Selig has served as the Commissioner of Baseball. Mr. Selig is the former owner of an MLB Franchise.

---

[14] *See* Exhibit B, Major League Constitution ("MLC"), Art. II § 1; *see also* ECF No. 25, *City of San Jose*, et al. v. *Officer of the Commissioner of Baseball*, et al., No. 13-cv-02787-RMW, at n. 2 (N.D. Cal. August 7, 2013).

[15] These entities are not named as Defendants at this time but Plaintiffs reserve the right to name these entities as Defendants if information obtained during the course of this lawsuit connects these entities to the illegal conduct alleged.

24. The Commissioner is the "Chief Executive Officer of Major League Baseball."[16] Serving in this capacity, Mr. Selig has the power to, among other things, discipline players, announce rules and procedures, and preside over meetings.[17]

25. Mr. Selig also has "executive responsibility for labor relations,"[18] meaning that Mr. Selig is the chief bargaining agent for the owners during negotiations with the major league union.

26. Since he oversees all labor matters, Mr. Selig is also assumedly the chief agent for the owners when it comes to forming labor practices involving minor leaguers, and he owes a duty to the owners to act in their best interest. Moreover, Mr. Selig implements, enforces, and often directs the development of MLB's rules, guidelines, and policies concerning the employment of minor league players.

27. Mr. Selig also serves as MLB's agent in numerous other areas. For instance, Mr. Selig serves as "the fiscal agent of the Major League Central Fund"; has the power to "negotiate and enter into settlement agreements" for nationwide broadcasting rights; can receive funds "made payable to the Commissioner as agent for the Clubs"; and can even invest central funds on behalf of the Defendants.[19]

28. The MLB owners elect the Commissioner of Baseball by a vote.[20] They also pay the Commissioner's salary.[21]

29. Under the broad meaning of "employ" and "employer" used by the FLSA and the applicable state laws, which allow a chief executive to be held jointly and severally liable, Mr. Selig employed (and/or continues to employ) Plaintiffs, all similarly situated employees, and all employees of the proposed classes. As described later in this complaint, Mr. Selig oversees and closely controls

---

[16] MLC Art. II § 2.

[17] MLC Art. II §§ 2, 3.

[18] MLC Art. II § 2.

[19] MLC Art. X; *see also* MLR 30 (saying that all funds in the hands of the Commissioner are joint funds of the MLB Clubs).

[20] MLC Art. II §§ 8, 9.

[21] MLC Art. II § 8.

1  many aspects central to the minor leaguers' employment, including, *inter alia*, hiring, contract terms,

2  discipline and firing, amount of wages, on-field work rules, and when wages are to be paid.[22]

3      30. Upon information and belief, and as described more fully below, Mr. Selig also had direct

4  involvement in the formation of programs affecting working conditions for minor leaguers, such as

5  the unilateral implementation of drug testing in 2001 and HGH testing in 2010, as well as the

6  implementation of a system to suppress signing bonuses for minor leaguers entering MLB's

7  developmental system for the first time. The Commissioner also has implemented and oversees a

8  tobacco policy, and all minor leaguers must abide by the policy.[23]

9      31. **Franchise Defendants.** The below named MLB franchises are defendants in this lawsuit

10  and referred to collectively as the "Franchise Defendants":

11      32. *Kansas City Royals.* Kansas City Royals Baseball Corp. (d/b/a "Kansas City Royals") is an

12  MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the

13  Kansas City Royals employed (and/or continue to employ) Plaintiffs, similarly situated employees,

14  and employees of the Proposed Classes.

15      33. *Miami Marlins.* Miami Marlins, L.P. (d/b/a "Miami Marlins") is an MLB Franchise. As a

16  member of Major League Baseball, acting jointly and on its own behalf, the Miami Marlins employed

17  (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed

18  Classes. The Miami Marlins were known and operated as the Florida Marlins until changing its name

19  in 2012. Plaintiffs are informed and believe that the Miami Marlins is the successor in interest to the

20

21  ---

22  [22] *See* MLR Attachment 3, Minor League Uniform Player Contract ("UPC") ¶¶ VI (describing the conditions of employment), VII (payment of salaries), XXIII (granting Commissioner right to

23  suspend the contract), XXVI (requiring approval by the Commissioner for the contract to have effect); *see also, e.g.*, Addendum C to MLR Attachment 3 (salary form requiring approval by the

24  Commissioner); MLR 4 (giving Commissioner power to oversee the amateur draft, one of the chief avenues of hiring players); MLR 13 (giving Commissioner the power to suspend players); MLR 3(e)

25  (requiring all contracts to be approved by the Commissioner); MLR 14 (giving Commissioner power to accept or deny an application for retirement); MLR 15 (giving Commissioner power to place

26  players on an Ineligible List for misconduct, or to take any other disciplinary action in the best interest of baseball).

27  [23] MLR Attachment 3, UPC ¶ VI.E.

28

1  Florida Marlins franchise.

2  34. *San Francisco Giants.* San Francisco  Baseball Associates LLC (d/b/a "San Francisco

3  Giants") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own

4  behalf, the San Francisco Giants employed (and/or continue to employ) Plaintiffs, similarly situated

5  employees, and employees of the Proposed Classes.

6                              **III.  CLASS ACTION ALLEGATIONS**

7  35. Plaintiffs bring the state law claims, Counts 3 through 20 of this action, as class actions

8  under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves

9  and all others similarly situated. The classes (collectively "Proposed Classes") are as follows:

10  36. **California Class.** For Counts 3 through 5 and 7 through 9 (violations of California wage

11  and labor laws and quantum meruit under California law), the California Class is defined as follows: all

12  minor leaguers employed by Defendants under initial uniform player contracts ("UPC") who worked,

13  will work, and/or continue to work as minor leaguers in the state of California at any time four years

14  before the filing of this action until its resolution, but who had no service time in the major leagues at

15  the time of performing work as a minor leaguer in California. Excluded from the California Class are

16  Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at

17  any time during the class period has had, a controlling interest in Defendants. Also excluded are the

18  Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons

19  who submit timely and proper requests for exclusion from the California Class.

20  37. *California Waiting Time Subclass.* Count 6 of this complaint seeks waiting time penalties

21  under California Labor Code § 203 for the withholding of wages after employment ceases.

22  Consequently, Count 6 requires a subclass within the California Class. The California Waiting Time

23  Subclass will consist of the following: all Plaintiffs and members of the California Class whose

24  employment relationship with the Defendants has already ceased, and/or ceases during the course of

25  this action.

26  38. **Florida Class.** For Count 10 (which seeks quantum meruit under Florida law), the Florida

27  Class is defined as follows: all minor leaguers employed by Defendants under initial UPCs who

28  worked, will work, and/or continue to work as minor leaguers in the state of Florida at any time five

years before the filing of this action until its resolution, but who had no service time in the major leagues at the time of performing work as a minor leaguer in Florida. Excluded from the Florida Class are Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper requests for exclusion from the Florida Class.

39. **Arizona Class.** For Counts 11 to 13 (violations of Arizona wage laws and quantum meruit under Arizona law), the Arizona Class is defined as follows: all minor leaguers employed by Defendants under initial UPCs who worked, will work, and/or continue to work as minor leaguers in the state of Arizona at any time three years before the filing of this action until its resolution, but who had no service time in the major leagues at the time of performing work as a minor leaguer in Arizona. Excluded from the Arizona Class are Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper requests for exclusion from the Arizona Class.

40. **North Carolina Class.** For Counts 14 to 16 (violations of North Carolina's wage laws and quantum meruit under North Carolina law), the North Carolina Class is defined as follows: all minor leaguers employed by Defendants under initial  UPCs who worked, will work, and/or continue to work as minor leaguers in the state of North Carolina at any time two years before the filing of this action until its resolution, but who had no service time in the major leagues at the time of performing work as a minor leaguer in North Carolina. Excluded from the North Carolina Class are Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper requests for exclusion from the North Carolina Class.

41. **New York Class.** For Counts 17 to 20 (violations of New York's wage laws and quantum meruit under New York law), the New York Class is defined as follows: all minor leaguers employed

9

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

by Defendants under initial  UPCs who worked, will work, and/or continue to work as minor league players in the state of New York at any time six years before the filing of this action until its resolution, but who had no service time in the major leagues at the time of performing work as a minor leaguer in New York. Excluded from the New York Class are Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper requests for exclusion from the New York Class.

42. *Common characteristics of the Proposed Classes.* All of the Proposed Classes share the following characteristics, making them all optimal for class resolution:

43. Each of the Proposed Classes is so numerous that joinder of all members is impracticable. While the exact number of Class members in each Class is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that several hundred (and in the case of the Florida and Arizona Classes several thousand) geographically-dispersed Class members worked, will work, and continue to work as minor leaguers in each of the applicable states, either during spring training, at promotional events, during other training and work periods, or during championship seasons occurring within the states.

44. Plaintiffs' claims are typical of the claims of the other members of each of the Proposed Classes. Plaintiffs and the members of the Proposed Classes were subject to the same or similar compensation practices arising out of Defendants' common course of conduct in violation of the federal and state laws as alleged herein. Plaintiffs and the Proposed Classes have sustained similar types of damages as a result of these common practices.

45. Plaintiffs will fairly and adequately protect the interests of the members of all members of the Proposed Classes because they possess the same interests and suffered the same general injuries as class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including wage and hour class action litigation.

46. Common questions of law and fact exist as to all members of the Proposed Classes and predominate over any questions affecting solely individual members of the Class. Among the many

questions of law and fact common to the Proposed Classes are:

    (a)    whether Defendants set wages at a rate below the minimum wages required under the applicable laws;

    (b)    whether Defendants paid and continue to pay no wages at all during certain pay periods, contrary to the requirements of applicable laws;

    (c)    whether any exemptions apply to the industry or to minor leaguers;

    (d)    whether Defendants require all minor leaguers to sign the same UPC, which controls minor leaguers' pay and pay periods and enables the unlawful practices;

    (e)    whether all minor leaguers signed substantially the same UPC;

    (f)    whether Defendants willfully, or with reckless disregard, carried out their unlawful practices;

    (g)    the compensability of certain work periods and the appropriate method of measuring damages for the injuries sustained by Plaintiffs and other members of the Proposed Classes as a result of Defendants' unlawful activities; and

    (h)    Whether Defendants have acted or refused to act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive or declaratory relief appropriate with respect to the Plaintiff Class as a whole.

47. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members in each of the Proposed Classes is impracticable. The prosecution of separate actions by individual members of the Proposed Classes would impose heavy burdens on the courts and the parties, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

11

48. The interest of members of each of the Proposed Classes in individually controlling the prosecution of separate actions is highly limited and impractical. Each of the Proposed Classes has a high degree of cohesion and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are often not great individually. As individuals, the class members would lack the resources to vigorously litigate against the ample and powerful resources of the Defendants' cartel. Importantly, many of the Class members are current minor league players and would not bring an individual action out of fear of retaliation. Lastly, Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## IV. COLLECTIVE ACTION ALLEGATIONS

49. Plaintiffs bring Counts I and II, the FLSA claims, on behalf of themselves and all persons similarly situated since three years before the filing of this action until its resolution (the "Minor League Collective").

50. The Defendants are liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiffs and the members of the Minor League Collective. The Minor League Collective consists of thousands of similarly situated individuals who have been, will be, and/or continue to be underpaid during certain work periods and not paid at all during other work periods. This Collective would benefit from the issuance of a court-supervised notice of the lawsuit and the opportunity to join the lawsuit.

51. The members of the Minor League Collective are known to Defendants, are readily identifiable, and can be located through Defendants' records. Notice should be sent to the members of the Collective pursuant to 29 U.S.C. § 216(b).

## V. JURISDICTION, VENUE, AND COMMERCE

52. This Court has subject matter jurisdiction with respect to Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1337, and jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

53. Plaintiffs' state law claims are so closely related to Plaintiffs' claims under the FLSA that they form part of the same case or controversy under Article III of the United States Constitution.

54. Additionally and/or alternatively, this Court has jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1332 because the amount in controversy for the Proposed Classes exceeds $5,000,000 and there are members of the Proposed Classes who are citizens of a different state than Defendants, as well as members of the Proposed Classes who are citizens of a foreign state.

55. This Court also has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 216(b).

56. All Defendants are subject to personal jurisdiction in California since all Defendants transact a significant amount of business in California.

57. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce. The Defendants host baseball games, operate baseball leagues, and transact business in multiple states. The Defendants routinely use instruments of interstate commerce, such as interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to carry out their operations.

58. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District. All the Defendants transact business in the Northern District of California; one of the plaintiffs was employed by the San Francisco Giants and worked for a significant period of time at the Giants' minor league affiliate in San Jose, California. Additionally, two MLB Franchises are located in the Northern District of California, and it is believed that one of MLB's officers resides within this District.

59. Upon information and belief, each Franchise employs minor leaguers from California, which routinely ranks as the number one provider of minor leaguers in the United States.

60. In the last three years, California averaged 221 draft picks per year (compared to, for instance, an average of 32 per year for New York over the same time span). Since most minor leaguers return home during the offseason, where they continue to work for the Franchises without pay, this complaint alleges that all Defendants employ minor leaguers in the state of California in violation of California law.

61. Moreover, five Franchises are located in California, and an entire minor league is located

within the state.

62. All causes of action asserted in this Complaint are closely related to one another and each accrued under the same common set of facts and share a common nucleus of operative facts. Each cause of action emanates from the same uniform contract, from the same policies and practices, as applied to the same group of employees.

## VI.   FACTUAL ALLEGATIONS

### 1.        The Booming Business of MLB

63. MLB is the preeminent baseball league in the world. Its games are broadcast in 233 countries and territories in 17 different languages.[24] During the 2013 season, over 74 million fans paid to attend MLB games.

64. In 2012, revenue for MLB and its thirty teams reached $7.5 billion, an increase of 257 percent since 1995. Annual revenue will continue to climb as new television contracts begin to perform and is expected to reach $9 billion dollars by 2014.[25]

65. Franchise values for the thirty MLB teams have grown as well. In 2012 alone, Franchise values increased by 23 percent. The New York Yankees are now the most valuable sports franchise in the United States with an estimated value of $2.3 billion; the average value of the thirty Franchises stands at $744 million each.[26]

66. The baseball players employed by the Defendants sustain this rise in revenue, as they comprise the chief product offered by MLB and its teams. Without baseball players, MLB and its teams would not exist. Yet MLB and its Franchises pay most players—the minor leaguers—wages that fall well below minimum wage. They also fail to pay required overtime pay, and often fail to pay

---

[24] *MLB International*, MLB.com, http://mlb.mlb.com/mlb/international/mlbi_index.jsp (last visited Dec. 16, 2013).

[25] *See* Maury Brown, *MLB Revenues $7.5B for 2012, Could Approach $9B by 2014*, Biz of Baseball (Dec. 10, 2012), http://www.bizofbaseball.com/?catid=30:mlb-news&id=5769:mlb-revenues-75b-for-2012-could-approach-9b-by-2014&Itemid=42&option=com_content&view=article.

[26] Mike Ozanian, *Baseball Team Valuations 2013: Yankees on Top at $2.3 Billion*, Forbes (Mar. 27, 2013), http://www.forbes.com/sites/mikeozanian/2013/03/27/baseball-team-valuations-2013-yankees-on-top-at-2-3-billion/.

1   wages at all for work performed, allowing many—if not most—minor leaguers to fall below federal

2   poverty levels.

3       **2.    Minor Leaguers' Uniform, Adhesive Contracts**

4       67. Since the 1920s, all MLB teams have used an extensive "farm system" to develop players.

5   MLB teams employ a small number of major leaguers that perform in MLB stadiums at the game's

6   highest level. Rules allow Franchises to only maintain 25 major leaguers on an "active roster" and a

7   few additional players reserved on the "40-man" roster. A few more players are inevitably on the

8   major league disabled list, so each Franchise employs a little over 40 major leaguers.

9       68. But each Franchise simultaneously stockpiles around 150 to 250 minor leaguers that

10  perform at the minor league levels of baseball. It is estimated that, at any given time, the Defendants

11  collectively employ around 6,000 minor leaguers total. The Defendants employ this high number of

12  minor leaguers in their farm systems, hoping they eventually develop into major leaguers.

13      69. MLB and its thirty teams enjoy a longstanding antitrust exemption. This exemption allows

14  the Defendants to operate as a single organization when establishing rules for employing minor

15  leaguers. Moreover, the exemption significantly increases the level of bargaining power the

16  Defendants collectively exercise over the minor leaguers.

17      70. While major leaguers have formed a union that successfully combats the Defendants'

18  collusive bargaining power, minor leaguers have no union. Without a union to counteract MLB's

19  power, MLB and its teams have exploited minor leaguers by, among other things, continuing to

20  promulgate and impose oppressive rules on minor leaguers' entry into the industry and on contracts,

21  salaries, and other working conditions.

22      71. The MLB teams acquire minor leaguers in one of two ways: through an amateur draft or

23  through free agency.

24      72. The amateur draft, known as MLB's Rule 4 draft,[27] occurs in June of each year. The

25  genesis of the Rule 4 draft is instructive on the Commissioner's involvement in developing and

26  _____

27  [27] MLR 4.

28

1    enforcing MLB's policies on payments to major leaguers. Since at least World War II, the Defendants

2    have sought to suppress signing bonuses for the most talented amateur players.[28] Various solutions

3    were proposed, but none seemed to work.

4         73. In 1965, Commissioner Ford Frick oversaw the development and implementation of what

5    is now the Rule 4 draft. By forcing amateur players to participate in the draft, MLB and its

6    Commissioner limited those players seeking to enter MLB's developmental system to only negotiating

7    with a single team. Thus, signing bonuses declined.

8         74. Upon information and belief, Bud Selig sought to further curb signing bonuses for

9    draftees in the late 1990s. Acting in his capacity as chief labor agent,[29] he directed the development

10   and implementation of an informal "slotting" system with recommended signing bonuses for each

11   high level pick. To enforce the mechanism, Mr. Selig required a Franchise's scouting director to call

12   the Commissioner's office prior to exceeding the recommended slot level. This requirement of

13   approval is an outgrowth of MLB's rules, which require all minor league contracts to be filed with and

14   approved by Mr. Selig.[30]

15        75. Not satisfied with an informal slotting system, Mr. Selig sought the implementation of a

16   more formal, mandatory slotting system. At his direction, a new, stricter system was instituted in 2012.

17   The current system places limits on the amounts Franchises can spend on signing bonuses.

18        76. MLB's current Rule 4 draft, as developed and enforced by the Commissioner, requires all

19   amateur players from the United States, Canada, and Puerto Rico to participate in the draft in order to

20   sign with an MLB team.[31] Beginning with the worst MLB team from the previous season, teams select

21   previously amateur players over the course of forty rounds.

22   _____

23   [28] MLB teams offer large signing bonuses to the most talented amateur players as an incentive to
     forego college. Only the very top amateurs, however, receive large signing bonuses. The majority of
24   amateurs signed through the draft receive quite small signing bonuses, usually around $2500.

25   [29] MLC Art. II § 2.

26   [30] *See* MLR 3(e) (requiring all contracts to be approved by the Commissioner); MLR Attachment 3,
     UPC ¶ XXVI (requiring approval by the Commissioner for the contract to have effect).

27   [31] MLR 4(a).

28

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

77. Players selected in the Rule 4 draft are between the ages of 18 and 22 (with the exception of a few players who are 23). Once selected by a Franchise, a player cannot bargain with any other Franchise, as MLB's rules grant the drafting Franchise exclusive rights to the player.[32]

78. While some highly talented players retain agents (or advisors) to assist them with negotiations, the National Collegiate Athletic Association—the governing body for college baseball players and prospective college baseball players—prohibits amateur athletes from employing agents or attorneys during contract negotiations.[33] Moreover, the less talented amateurs, who receive small signing bonuses, offer little incentive for agents to represent them. Also, the Defendants' scouts often discourage the use of attorneys/agents. Thus, many—and likely most—minor leaguers are unrepresented when drafted and initially signing UPCs.

79. In addition to the draft, teams acquire previously amateur Latin American players through free agency. The Dominican Republic, followed by Venezuela, produces the most Latin American players. MLB rules allow the Franchises to sign the players as early as age sixteen, so most Latinos are either sixteen or seventeen when signing with a Franchise.[34]

80. Most Latino minor leaguers come from poor families and have only the equivalent of an eighth grade education. Before signing, many are only represented by similarly-educated "buscones"—usually former players who maintain training facilities for young amateur players. Some of the Franchises' scouts have been reprimanded in recent years for participating in bribes and kickback schemes with the buscones, and the FBI has even investigated the exploitative practices.[35] These Latino signees comprise over forty percent of minor leaguers.

---

[32] MLR 4(e).

[33] *See* 2012–2013 NCAA Division I Manual, Article 12 Amateurism, at 68, *available at* http://grfx.cstv.com/photos/schools/bc/genrel/auto_pdf/2012-13/misc_non_event/12_13_NCAA_Manual.pdf ("A lawyer may not be present during discussions of a contract offer with a professional organization or have any direct contact…with a professional sports organization on behalf of the individual.").

[34] *See* MLR 3(a).

[35] *See* Jorge L. Ortiz, *Exploitation, steroids hitting home in Dominican Republic*, USA Today (Mar. 26, 2009), http://usatoday30.usatoday.com/sports/baseball/2009-03-26-dominican-republic-cover_N.htm.

81. Similar to the slotting system, Mr. Selig also personally oversaw the development of bonus pools for Latino players in an effort to curtail Latino signing bonuses. Instituted in 2012, Mr. Selig's plan allows each Franchise a certain amount to spend on signing bonuses for Latino players.

82. Teams also sign additional players from the United States, Canada, and Puerto Rico who were not drafted in the Rule 4 draft.[36] MLB rules place limits on when such free agent acquisitions can occur. Since they were not selected in the draft, they are viewed as less skilled amateur players and, even as free agents, have no bargaining power.

83. MLB rules, as implemented and enforced by the Defendants and the Commissioner, require all teams to use the same uniform player contract ("UPC") when signing these previously amateur players. MLR 3(b)(2) states:

> To preserve morale among Minor League players and to produce the similarity of conditions necessary for keen competition, all contracts…shall be in the form of the Minor League Uniform Player Contract that is appended to these Rules as Attachment 3. All Minor League Uniform Player Contracts between either a Major or a Minor League Club and a player who has not previously signed a contract with a Major or Minor League Club shall be for a term of seven Minor League playing seasons….The minimum salary in each season covered by a Minor League Uniform Player Contract shall be the minimum amount established from time to time by the Major League Clubs….

84. Moreover, "[a]ll contracts shall be in duplicate," and "[a]ll…must be filed with the Commissioner…for approval."[37] No contract can vary any term without the approval of the Commissioner.[38] A minor leaguer cannot work for an MLB team without signing the UPC because a "player's refusal to sign a formal contract shall disqualify the player from playing with the contracting Club or entering the service of any Major or Minor League Club."[39]

85. Thus, the UPC grants the MLB team the exclusive rights to the minor leaguer for seven championship seasons (about seven years).[40] During that time period, the MLB team may assign the

---

[36] MLR 4(i).

[37] MLR 3(b)(3); *see also* MLR 3(b)(4) (saying that a player cannot play until the UPC is signed).

[38] MLR 3(b)(3).

[39] MLR 3(d).

[40] MLR 3(b)(2); MLR Attachment 3, UPC ¶ VI.A.

1  minor leaguer's rights to any other team, and the MLB team may terminate the agreement at any time
2  for almost any reason.[41]

3      86. But the minor leaguer cannot leave voluntarily to play for another baseball team—even
4  outside of MLB, and even outside of the United States.[42] A player doing so "shall be subject to the
5  discipline of the Commissioner."[43] Retirement from baseball during the seven-year term even requires
6  the Commissioner's approval.[44] Thus, minor leaguers possess very little (and one-sided) contractual
7  mobility.

8      87. The one-sided mobility often traps a player in the minor leagues of a single organization. A
9  minor leaguer selected in the amateur draft can only sign with the MLB team that drafted him. For the
10  next seven years, the MLB team controls the minor leaguer's rights. By the expiration of the contract,
11  much of the value of the minor leaguer as a young prospect has expired because the player has aged.

12      88. The MLB cartel uses a vertically integrated system of development for these minor
13  leaguers. Players begin at the lowest levels of MLB's developmental system, levels known as Rookie
14  and Short-Season A. Ideally they then advance to higher levels: Class-A, Advanced Class-A, Double-
15  A, and Triple-A (one step from the major leagues). Each level acts as a funnel, though, with many
16  minor leaguers never advancing past Class-A, and the vast majority never reaching the major leagues.

17      89. Since the signing of a 1962 Player Development Plan, MLB requires MLB Franchises to
18  maintain a certain number of minor league teams. Commissioner Frick oversaw this requirement,
19  even testifying before Congress about the need for maintaining a high number of minor league teams.
20  Currently, all MLB teams have minor league teams at all the levels of the minor leagues, with most
21  having either seven or eight minor league teams.

22      90. Often the MLB Franchises do not operate the minor league stadium but instead sign
23  agreements with owners of minor league teams. These agreements are known as Player Development

24  _____

25  [41] MLR 9; MLR Attachment 3, UPC ¶ XVIII.
26  [42] MLR 18; MLR Attachment 3, UPC ¶ XVI.
    [43] MLR 18.
27  [44] MLR 14.

28

Contracts ("PDC"), and the teams are affiliates of the MLB Franchises.

91. MLB rules make clear that MLB and its Franchises remain the employers of minor leaguers at all times when using PDCs. MLR 56(g) states:

> The players so provided shall be under contract exclusively to the Major League Club and reserved only to the Major League Club. The Minor League Club shall respect, be bound by, abide by and not interfere with all contracts between the Major League Club and the players that it has provided to the Minor League Club.

92. Moreover, MLB requires the MLB Franchise to pay the salaries of the minor league players at all times and allows the MLB Franchise the ability to control assignments.[45]

93. MLB's rules also mandate that the Franchises "select and employ" and "compensate and provide benefits for" the minor league "managers, coaches, instructors and trainers" at all times during a PDC agreement.[46] These coaches and instructors, directed by MLB and MLB's Franchises and working under MLB's rules, oversee the daily work of the players. The MLB Franchise consequently "makes all decisions related to player development, including selecting the coaching staff and deciding which players to assign to the team."[47]

94. The minor league party to the PDC, on the other hand, has little control over players. MLR 56(g) merely requires the minor league party to furnish uniforms, share in the cost of bats and balls, and maintain the minor league stadium.

**3.      The Illegal Minor League Salaries**

95. Since minor leaguers do not belong to a union, nothing has prevented the Defendants from artificially and illegally depressing minor league wages. Indeed, MLB's exemption from antitrust laws has only made it easier. Given that MLB carefully controls the entryway into the highest levels of baseball, and given the young minor leaguer's strong desire to enter the industry, MLB and the Defendants have exploited minor leaguers by paying salaries below minimum wage, by not paying overtime wages, and by often paying no wages at all.

---

[45] MLR 56(g).

[46] MLR 56(g).

[47] *MiLB.com Frequently Asked Questions*, MiLB.com, http://www.milb.com/milb/info/faq.jsp?mc=business#3 (last visited Dec. 17, 2013).

96. Plaintiffs are informed and believe that MLB and the Commissioner issue minor league salary guidelines for players signed to an initial UPC, and teams deviate very little from these guidelines. After all, MLR 3(c) requires that all first-year minor leaguers earn "the amount established by" MLB.[48] It is currently believed that all first-year minor leaguers employed by the Defendants must earn $1100 per month.

97. Salaries beyond the first year are very similar across all Franchises. It is believed that discussions regarding minor league salaries (and other working conditions concerning minor leaguers) occur when MLB hosts its quarterly owner meetings that all Defendants attend.

98. While salary guidelines are not publicly available, the Plaintiffs are informed and believe, based on the salaries paid by the Defendants across the minor leagues, that MLB currently recommends the following salaries, paid only during the championship season:

- $1,100 per month for Rookie and Short-Season A;
- $1,250 per month for Class-A;
- $1,500 per month for Class-AA; and
- $2,150 for Class-AAA.

99. Beyond the first year, the UPC required by MLB, and enforced by Mr. Selig, purports to allow salary negotiation by the minor leaguer, as the UPC states that salaries will be set out in an addendum to the UPC and subject to negotiation.[49] But the same UPC provision states that if the Franchise and minor leaguer do not agree on salary terms, the Franchise may unilaterally set the salary and the minor leaguer must agree to it.[50]

100. In truth, then, the UPC—and Mr. Selig as enforcer—does not allow for minor league salary negotiations. It is believed that the Franchises simply follow MLB's salary guidelines, and the minor leaguers must accept them. As the 2013 Miami Marlins Minor League Player Guide states,

---

[48] As the 2013 Miami Marlins Minor League Player Guide states, "all first-year players receive $1,100 per month regardless of playing level per the terms of the [UPC]."

[49] MLR Attachment 3, UPC ¶ VII.A.

[50] MLR Attachment 3, UPC ¶ VII.A.

"This salary structure will be strictly adhered to; therefore, once a salary figure has been established and sent to you, there will be NO negotiations."

101. The UPC required by MLB, and enforced by Mr. Selig, states that salaries are only to be paid during the championship season, which, for most players, lasts about five months out of the year.[51] Due to the funneling that occurs at each level, significantly more minor leaguers perform at the lower levels of the minor leagues than at the upper two levels of the minor leagues (Class-AA and Class-AAA), so Plaintiffs believe that most minor leaguers earn less than $7,500 per calendar year. Some earn $3,000 or less.

102. Despite only being compensated during the championship season, MLB's UPC "obligates Player to perform professional services on a calendar year basis, regardless of the fact that salary payments are to be made only during the actual championship playing season."[52] Consistent with that obligation, the UPC states that "Player therefore understands and agrees that Player's duties and obligations under this Minor League Uniform Player Contract continue in full force throughout the calendar year."

103. MLB's UPC, and the Defendants' application of the UPC, requires the minor leaguer to participate in spring training.[53] Again, the UPC does not allow for salaries during this period since spring training falls outside the championship season, so minor leaguers work without earning a paycheck. The spring training season usually lasts around one month, during the month of March, but it sometimes lasts longer.

104. Around 30–50 minor leaguers per MLB Franchise do not earn a roster spot on a minor league team at the end of spring; they instead remain at the Franchise's spring training site in "extended spring training." Since they are not participating in a championship season, MLB's UPC

---

[51] MLR Attachment 3, UPC ¶ VII.B. ("Obligation to make such payments to Player shall start with the beginning of Club's championship playing season…[and] end with the termination of Club's championship playing season….").

[52] MLR Attachment 3, UPC ¶ VI.B.

[53] *See* MLR Attachment 3, UPC ¶ VI.B. (saying that the UPC applies to the "Club's training season").

again does not require salaries to be paid.[54] Upon information and belief, most of these players will not earn paychecks until the end of June, when the Rookie and Short-Season A leagues begin. Thus, many minor leaguers are not paid for work performed during March, April, May, and most of June.

105. At the end of the championship season, around 30–45 minor leaguers per MLB Franchise are also selected to participate in an instructional league to further hone their skills. Again, MLB's UPC—as approved and enforced by Mr. Selig—requires minor leaguers to perform this work without pay since it is outside the championship season, so the minor leaguers receive no paychecks during the instructional league.[55] The instructional leagues usually last around one month.

106. MLB's UPC also requires minor leaguers to maintain "first-class" conditioning throughout the calendar year[56] because the player's "physical condition is important to…the success of the Club."[57] Consequently, a "Club may require Player to maintain Player's playing condition and weight during the off-season and to report for practice and condition at such times and places as Club may determine."[58] If the player fails to meet these requirements, the "Club may impose a reasonable fine upon Player…."[59]

107. Carrying out this provision of MLB's UPC, the Defendants therefore require players to perform extensive training and conditioning during the winter off-season. It is believed that all Franchises direct the winter work by issuing training packets to all the players. Many, and perhaps all, Franchises monitor workouts and punish players for not performing off-season workouts. Per MLB's required UPC, as approved by Mr. Selig, minor leaguers receive no wages during this training period because it is outside the championship season.[60]

---

[54] MLR Attachment 3, UPC ¶ VII.B.

[55] MLR Attachment 3, UPC ¶ VII.B.

[56] MLR Attachment 3, UPC ¶ XII.

[57] MLR Attachment 3, UPC ¶ VI.D.

[58] MLR Attachment 3, UPC ¶ VI.D.

[59] MLR Attachment 3, UPC ¶ VI.D.

[60] *See* MLR Attachment 3, UPC ¶ VII.B.

23

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

108. In sum, the Defendants, as directed by Mr. Selig, pay illegally low wages during the championship season, no overtime wages, and no wages for work performed outside the championship season. As demonstrated below, the cartel requires players to work very long hours, further demonstrating the illegality of the wage scheme.

### 4.    The Long Hours Worked By Minor Leaguers

109. During the roughly five-month championship season, minor league teams play games either six or seven days per week. The minor leaguer enjoys a day off on average only once every 2–3 weeks.

110. For Monday through Saturday games, minor leaguers must participate in mandatory pregame activities: stretching, batting practice, fielding practice, throwing, conditioning, etc. With games averaging around three hours in length, minor leaguers usually work around eight mandatory hours at the stadium on these days. For Sunday workdays, players also perform significant amounts of work.

111. In a seven-day workweek—which is typical—the minor leaguer consequently works well in excess of forty hours at the stadium. If the minor leaguer enjoys a rare off day during a week, the minor leaguer still works in excess of forty hours per week at the stadium during the altered six-day workweek.

112. As part of the maintenance of first-class conditioning required by MLB's UPC, players must also regularly perform strength and conditioning workouts during the season. These workouts are devised and supervised by strength coaches employed by MLB's Franchises. The required workouts thus add additional compensable time onto the minor leaguers' work schedule.

113. Additionally, minor leaguers are required to perform protracted travel, usually by a team bus. Half of the games are played away from home, and the usual road trip often entails a handful of bus rides each lasting several hours..

114. The minor leaguer arrives to the home stadium before beginning the trip; packs belongings, bats, uniforms, gloves, and other things; loads the bus with these belongings and other items required by the team on the trip; and then proceeds on the trip. The minor leaguer performs a similar process prior to beginning each trip and reverses the process upon returning to the home

24

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1   stadium from the trip.

2       115. This required team travel adds considerable amounts of work onto the player's workweek

3   when on the road.

4       116. Consequently, when strength and conditioning work and required travel work are added

5   onto the workweek, minor leaguers often work over 60–70 hours per week during the season in

6   Plaintiffs' experience.

7       117. As stated above, minor leaguers also perform extensive work outside the championship

8   season for which they earn no salary.

9       118. Spring training usually lasts four weeks or more.  Minor leaguers normally work seven

10  days a week, as minor leaguers do not enjoy a day off during the spring training period unless rain

11  renders the baseball fields unplayable.

12      119. Minor leaguers perform considerable amounts of work during spring training,

13  sometimes—and perhaps usually—exceeding forty hour workweeks. Again, MLB's UPC does not

14  allow players to earn salaries during this time, much less overtime wages.[61]

15      120. The 30–45 minor leaguers selected for instructional leagues perform a work schedule

16  similar to that performed during spring training. A similar number of players often also attend a pre-

17  spring training minicamp that involves similar work hours. And again, the minor leaguer earns no

18  salary for this work.

19      121. During the winter months of the off-season, minor leaguers work a few hours per day

20  performing required training. This work is performed 4–6 days per week, depending on the month,

21  and results in considerable unpaid hours. This training is not only required by the Franchises but also

22  required by MLB's UPC.[62]

23

24

25  _____

26  [61] *See* MLR Attachment 3, UPC ¶ VII.B.

27  [62] *See* MLR Attachment 3, UPC ¶¶ VI.D., XXII.

28

5.      **The Careers of the Class Representatives: Aaron Senne, Michael Liberto, and Oliver Odle**

      **5.1 Aaron Senne**

122. In June of 2010, Aaron Senne was drafted by the Florida Marlins (now the Miami Marlins) in the tenth round of MLB's 2010 Rule 4 draft.

123. Less than a week later, Mr. Senne agreed to terms without seeing a written contract. On or around June 15, he traveled to Jupiter, Florida, site of the Marlins' training facilities. Once there, he underwent a physical, took a drug test, and signed a contract.

124. The contract was a UPC, as required by MLB, but the Marlins did not point out or explain the provisions of the contract. Mr. Senne was unrepresented throughout the process.

125. Mr. Senne received $25,000 as a one-time bonus for signing his seven-year contract. He also received two semesters in a college scholarship fund as an incentive for signing.

126. The Marlins sent Mr. Senne to Jamestown, New York, site of the Marlins' Short-Season A team (the Jamestown Jammers), where he played for the rest of the 2010 championship season.

127. Mr. Senne worked at the Marlins' spring training site in Jupiter for the entire 2011 season. In 2012, he worked the entire championship season in Greensboro, North Carolina. In 2013, he worked in Jupiter.

128. Consistent with MLB's guidelines, the Marlins paid Mr. Senne around $1,100 per month for his work in Jamestown. Thus, for the entire championship season in 2010, Mr. Senne believes he earned about $3,000. Similarly, Mr. Senne believes he earned slightly in excess of $3,000 in 2011; around $7,000 in 2012; and around $3,000 in 2013. Thus, the Marlins failed to meet minimum wage standards.

129. Throughout each of these championship seasons, Mr. Senne routinely worked in excess of forty hours per week but received no overtime pay.

130. Mr. Senne remained property of the Marlins throughout each of these championship seasons, and, consistent with MLB rules, the Marlins' coaching staff and front office made all work-

1 related decisions.[63]

2     131. After each season ended, the Marlins allowed Mr. Senne to travel to his home. A short

3 time later, he began conditioning in order to maintain the first-class conditioning required by his UPC.

4 The Marlins provided a training packet for each winter off-season period.

5     132. As stipulated in MLB's required UPC, Mr. Senne was not paid at all for this winter work,

6 even though the Marlins required it to be performed.

7     133. Before each championship season, Mr. Senne worked at the Marlins' spring training site.

8 The Marlins directed and required all of the work Mr. Senne performed during spring, and Mr. Senne

9 often exceeded forty hours of work per week.

10     134. Consistent with MLB's required UPC, Mr. Senne received no paycheck during this spring

11 work.

12     135. Mr. Senne retired from the game of baseball around June 11, 2013. Per MLB's UPC, it is

13 believed that Mr. Selig approved his retirement.[64] Also per MLB's UPC, he cannot play for another

14 baseball organization, foreign or domestic—or even play another recreational sport—until the

15 expiration of his contract, even though he has retired.[65]

16     136. To summarize, Mr. Senne, like all minor leaguers working under the direction of MLB,

17 the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite

18 routinely working overtime hours, and often worked for no pay.

19       **5.2 Michael Liberto**

20     137. Like Mr. Senne, Mr. Liberto was selected in the June, 2010 Rule 4 draft. The Kansas City

21 Royals selected him in the twenty-first round.

22     138. Immediately after being drafted, an employee of the Royals contacted Mr. Liberto. He

23 said he would quickly bring a contract to Mr. Liberto and that Mr. Liberto would receive a one-time

24 $1,000 signing bonus for signing his seven-year UPC.

25 

26 [63] *See* MLR 56(g).

27 [64] *See* MLR 14.

    [65] *See* MLR Attachment 3, UPC ¶ XVI.

28 

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

139. A short time later, the Royals' employee arrived at Mr. Liberto's house and did not allow any negotiations to occur. He presented a contract, which was a UPC as required by MLB's rules. The employee did not explain any provisions of the contract other than the incentive bonus plan, and instead merely instructed Mr. Liberto where to sign. Mr. Liberto was unrepresented during the process, which took only a few minutes.

140. Mr. Liberto then traveled to Surprise, Arizona, site of the Royals' training camp. He underwent a physical and drug test, and he participated in a minicamp.

141. At the conclusion of minicamp, Mr. Liberto remained in Surprise for the beginning of the Rookie ball season. Around July 20 of 2010, the Royals moved Mr. Liberto to Burlington, Iowa, site of their Single-A affiliate. In mid-August of 2010, the Royals moved Mr. Liberto to Burlington, North Carolina, site of one of its Short-Season A teams. The Burlington season ended in early September, and the Royals allowed Mr. Liberto to travel home. The day Mr. Liberto arrived home, the Royals called Mr. Liberto and asked him to work at Idaho Falls, Idaho, site of the Royals' other Short-Season A team. Mr. Liberto left the next day and worked in Idaho Falls until the season ended around September 9.

142. During the 2011 championship season, Mr. Liberto split time between extended spring training in Arizona; Kane County (in Illinois, home of the Royals' Class-A affiliate); Idaho Falls; and Wilmington, Delaware (site of the Royals' Advanced Class-A affiliate). For the 2012 championship season, Mr. Liberto split time between Wilmington and Northwest Arkansas (site of the Royals' Double-A affiliate). The Royals released Mr. Liberto around the end of the 2013 spring training.

143. Similar to Mr. Senne, and consistent with what are believed to be MLB's guidelines, Mr. Liberto received $1,100 per month during his first championship season. He believes he received around $3,000 total in 2010, and believes he earned no more than around $7,500 total during subsequent championship seasons. Thus, he received below the minimum wage.

144. Like Mr. Senne and all similarly-situated minor leaguers, Mr. Liberto routinely worked in excess of forty hours per week but received no overtime pay throughout these championship seasons.

145. After each season ended, the Royals allowed Mr. Liberto to travel to his home. A short time later, he began conditioning in order to maintain the first-class conditioning required by his UPC.

28
COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1    The Royals provided a training packet for this winter off-season work.

2    146. As stipulated in MLB's required UPC, Mr. Liberto was not paid at all for this work, even

3    though the Royals required it to be performed.

4    147. Before each championship season, Mr. Liberto worked at the Royals' spring training site.

5    The Royals directed and required all of the work Mr. Liberto performed during spring, and Mr.

6    Liberto often exceeded forty hours of work per week.

7    148. Consistent with MLB's required UPC, Mr. Liberto received no paycheck for this spring

8    work.

9    149. To summarize, Mr. Liberto, like all minor leaguers working under the direction of MLB,

10   the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime pay despite

11   routinely working overtime hours, and often worked for no pay at all.

12   **5.3    Oliver Odle**

13   150. Around June 5, 2007, Oliver Odle was drafted by the San Francisco Giants in the 22nd

14   round of the 2007 Rule 4 draft.

15   151. Shortly after selecting Mr. Odle, a Giants employee called Mr. Odle and asked him if he

16   could quickly sign a contract and fly to the Giants' spring training complex the next day.

17   152. The Giants arranged for Mr. Odle to arrive to their spring complex in Scottsdale,

18   Arizona, on or around June 11. Before arriving, Mr. Odle had not seen a contract and the Giants did

19   not permit any negotiations to occur.

20   153. A Giants employee quickly instructed Mr. Odle to sign his contract, which, as required by

21   MLB's rules, was a UPC. The employee did not explain any provisions other than the signing bonus

22   and incentive bonus schedule. Mr. Odle signed the contract and received a one-time signing bonus of

23   $2,500 for signing the seven-year contract. Like Mr. Senne and Mr. Liberto, he was unrepresented

24   throughout the contractual process.

25   154. Mr. Odle worked at the Giants' Rookie-Level Arizona League team for most of the 2007

26   championship season, though the Giants also required him to work in Salem, Oregon (site of their

27   Short-Season A team) for a brief time.

28   155. The Giants required Mr. Odle to work the entire 2008 season in Augusta, Georgia, site of

its Class-A affiliate. Mr. Odle spent most of the 2009 and 2010 season working in San Jose, California (site of the Giants' Advanced Class-A team), though he spent very brief periods working for the Giants' team in Fresno, California. Mr. Odle was released during the 2011 spring training.

156. Consistent with all first-year minor leaguers—including Mr. Senne and Mr. Liberto—Mr. Odle believes he received around $1100 per month during the first championship season. He believes the Giants paid him between around $3,000 and around $7,500 total per championship season. Thus, the Giants failed to meet minimum wage standards.

157. Throughout these championship seasons, Mr. Odle routinely worked in excess of forty hours per week but received no overtime pay.

158. After each season ended, the Giants allowed Mr. Odle to travel to his home. A short time later, he began conditioning in order to maintain the first-class conditioning required by his UPC. The Giants provided a training packet for this winter off-season period.

159. As stipulated in MLB's required UPC, Mr. Odle was not paid at all for this work, even though the Giants required it to be performed.

160. Before each championship season, Mr. Odle worked at the Giants' spring training site. The Giants directed and required all of the work Mr. Odle performed during spring, and Mr. Odle often exceeded forty hours of work per week.

161. Consistent with MLB's required UPC, Mr. Odle did not receive a paycheck for this spring work.

162. To summarize, Mr. Odle, like all minor leaguers working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

## VII.  FEDERAL WAGE AND HOUR VIOLATIONS

### Count 1: FLSA Minimum Wage and Overtime Violations

(Plaintiffs and the Minor League Collective Against All Defendants)

163. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

164. As detailed above, the Defendants have engaged in a long-standing and widespread violation of the FLSA. The FLSA's minimum wage and overtime requirements, 29 U.S.C. §§ 201 et

30

1    seq., and the supporting regulations, apply to all Defendants and protect Plaintiffs and the class

2    members.

3        165. At all relevant times, Plaintiffs and all the minor leaguers of the proposed class were

4    (and/or continue to be) employees within the meaning of 29 U.S.C. § 203(e), and were (and/or

5    continue to be) employed by covered enterprises and/or entities engaged in commerce and/or the

6    production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 203(e), (r) and (s). The

7    work also regularly involves interstate commerce.

8        166. At all relevant times, the Defendants jointly employed (and/or continue to employ)

9    Plaintiffs and all similarly-situated minor leaguers within the broad meaning of 29 U.S.C. §§ 203(d)

10   and (g).

11       167. The Defendants constructed, implemented, and engaged in a policy and/or practice of

12   failing to pay Plaintiffs and all similarly-situated minor leaguers the applicable minimum wage for all

13   hours the minor leaguers worked on behalf of Defendants, and continue to engage in such a policy

14   and practice.

15       168. Further, the Defendants constructed, implemented, and engaged in a policy and practice

16   that failed to pay Plaintiffs and all similarly-situated minor leaguers the applicable overtime wage for

17   all hours minor leaguers worked beyond the normal, forty-hour workweek, and continue to engage in

18   such a policy and practice.

19       169. Defendants also implemented and engaged in the policy and/or practice of failing to pay

20   Plaintiffs and all similarly-situated minor leaguers any wages at all for many hours the minor leaguers

21   worked on behalf of Defendants, and continue to engage in such policies and practices.

22       170. As a result of these minimum wage and overtime violations, Plaintiffs and all similarly-

23   situated minor leaguers have suffered and continue to suffer damages in amounts to be determined at

24   trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest,

25   attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

26       171. The Defendants' pattern of unlawful conduct was and continues to be willful and

27   intentional, or the Defendants at least acted with reckless disregard. The Defendants were and are

28   aware, or should have been aware, that the practices described in this Complaint are unlawful. The

1    Defendants have not made a good-faith effort to comply with the FLSA with respect to the

2    compensation of Plaintiffs and all similarly-situated minor leaguers. Instead, the Defendants

3    knowingly and/or recklessly disregarded federal wage and hour laws.

4        172. All similarly-situated minor leaguers are entitled to collectively participate in this action by

5    choosing to "opt-in" and submitting written Consents to Join this action. 29 U.S.C. § 216(b).

6                          **Count 2: FLSA Recordkeeping Requirements**

7                   (Plaintiffs and the Minor League Collective Against All Defendants)

8        173. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

9        174. The Defendants failed (and continue to fail) to make, keep, and preserve accurate records

10   with respect to Plaintiffs and all similarly-situated minor leaguers, including hours worked each

11   workday and total hours worked each workweek, as required by the FLSA, 29 U.S.C. § 211(c), and

12   supporting federal regulations.

13       175. The lack of recordkeeping has harmed the Plaintiffs and creates a rebuttable presumption

14   that the employees' estimates of hours worked are accurate.[66]

15                      **VIII.  STATE WAGE AND HOUR VIOLATIONS**

16       176. The state Counts seek to recover for all minor league work performed by the Proposed

17   Classes, including (but not limited to) winter off-season work. Plaintiffs are informed and believe that,

18   during the winter work periods, most minor leaguers return to the state where they were drafted,

19   where they work without pay.

20       177. The states enumerated in the Proposed Classes routinely produce high numbers of minor

21   leaguers.[67] Thus, Plaintiffs are informed and believe that all Defendants employed and continue to

22   employ minor leaguers in each of the states enumerated in the Proposed Classes during the relevant

23   _____

24   [66] *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946).

25   [67] For instance, California averaged 221 draft picks per year during the last Rule 4 drafts; Florida
     averaged 141 per year; North Carolina averaged 51 per year; Arizona averaged 46 per year; and New
26   York averaged 32 per year. *See All-time Draft Database*, Baseball America,
     http://www.baseballamerica.com/all-time-draft-db/ (last visited Feb. 6, 2013) (providing a database
27   that allows searches of draft picks by state, which allows for counting draft picks).

28

1   time periods. Upon information and belief, Plaintiffs further allege that each of the Defendants

2   violated the laws in each of the states enumerated in the Proposed Classes due to uncompensated

3   winter off-season work and/or work performed during other portions of the year.

4   **Count 3: California Minimum Wage Violations**

5   (Oliver Odle and the California Class Against All Defendants)

6   178. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

7   179. Pursuant to California law, the Defendants are and were required to pay Plaintiffs and the

8   California Class a minimum wage set by California state law. Cal. Lab. Code §§ 1182 et seq. and 1197.

9   The state's minimum wage requirements apply to the Defendants and protect Plaintiffs and the

10  California Class.

11  180. The Defendants constructed, implemented, and engaged in a policy and/or practice of

12  failing to pay Plaintiffs and all of the California Class the applicable minimum wage for all hours they

13  suffered or permitted the minor leaguers to work in the state, and they continue to engage in such

14  practices.

15  181. As a result of these minimum wage violations, Plaintiffs and the California Class have

16  suffered (and continue to suffer) damages in amounts to be determined at trial, and are entitled to

17  recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other

18  compensation pursuant to California Labor Code §§ 1194 and 1194.2.

19  182. The Defendants pattern of unlawful conduct was and continues to be willful and

20  intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

21  that the practices described in this Complaint are unlawful. The Defendants have not made a good-

22  faith effort to comply with California's minimum wage requirements with respect to the

23  compensation of Plaintiffs and the California Class, and instead knowingly and/or recklessly

24  disregarded state law.

25  **Count 4: California Unpaid Overtime Violations**

26  (Oliver Odle and the California Class Against All Defendants)

27  183. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

28  184. The laws of California require the Defendants to pay overtime compensation for work in

1   excess of eight hours in a day or forty hours in a week, at a rate of one and one-half times the regular

2   rate of pay for the employee. Cal. Lab. Code § 510. The laws of California further require employees

3   to be compensated at twice the regular rate of pay for work in excess of twelve hours in one day. The

4   state's overtime requirements apply to the Defendants and protect Plaintiffs and the California Class

5   members.

6       185. Throughout the California Class period, Plaintiffs and the California Class routinely

7   worked (and continue to work) in excess of 8 hours per workday, sometimes work(ed) in excess of 12

8   hours in a workday, routinely work(ed) in excess of 40 hours in a workweek, usually work(ed) 7 days

9   in a workweek and sometimes in excess of 8 hours on the seventh day of the workweek.

10      186. The Defendants failed and continue to fail to pay Plaintiffs and the California Class

11  overtime wages as required by California Labor Code § 510.

12      187. As a result of these violations, Plaintiffs and the California Class have suffered and

13  continue to suffer damages in amounts to be determined at trial, and are entitled to recover such

14  amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation

15  pursuant to California Labor Code § 1194.

16      188. As a result of these violations, and pursuant to California Labor Code § 558, Plaintiffs

17  and the California Class are also entitled to recover civil penalties in the amount of $50 per employee

18  per violative pay period for initial violations and $100 per employee per violative pay period for

19  subsequent violations.

20      189. The Defendants pattern of unlawful conduct was and continues to be willful and

21  intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

22  that the practices described in this Complaint are unlawful. The Defendants have not made a good-

23  faith effort to comply with California's overtime requirements with respect to the compensation of

24  Plaintiffs and the California Class, and instead knowingly and/or recklessly disregarded state law.

25                      **Count 5: Violation of California "Payday" Requirements**

26                          (Oliver Odle and the California Class Against All Defendants)

27      190. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

28      191. California law requires employers to pay employees on designated days at least twice per

1  calendar month. Cal. Lab. Code § 204. Overtime wages must be paid no later than the payday

2  following the payroll period during which overtime wages are earned. These requirements apply to the

3  Defendants and protect Plaintiffs and the California Class members.

4      192. The Defendants failed and continue to fail to pay overtime wages in a timely manner as

5  required by California Labor Code § 204.

6      193. As a result of these violations, Plaintiffs and the California Class have suffered and

7  continue to suffer damages in amounts to be determined at trial, and are entitled to recover penalties

8  in the amount of $100 per pay period per employee for first-time violations and $200 per pay period

9  per employee for subsequent violations, along with attorneys' fees and any other damages permitted

10  by statute.

11                    **Count 6: California Waiting Time Penalties**

12              (Oliver Odle and the California Waiting Time Subclass Against All Defendants)

13      194. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

14      195. California Labor Code §§ 201 and 202 require Defendants to pay their employees all

15  wages due immediately upon discharge. California Labor Code § 203 states that if an employer fails to

16  pay any wages to an employee who is discharged or quits, wages continue to accrue as a penalty for up

17  to thirty days.

18      196. The Defendants failed and continue to fail to pay minimum wages and overtime wages

19  for work performed in California. These wages remained unpaid at the time Plaintiffs and other

20  members of the California Waiting Time Subclass were discharged or quit. Further, the Defendants

21  failed to pay the wages within the time required by California Labor Code §§ 201 and 202 and

22  continue to remain unpaid today.

23      197. As a result of the Defendants conduct, the wages continue to accrue as a penalty for up

24  to 30 days, as required by § 203. Plaintiffs and members of the California Waiting Time Subclass are

25  entitled to recover from Defendant this statutory penalty for each day unpaid up to the thirty-day

26  maximum, together with interest, attorneys' fees, and costs.

27

28

**Count 7: California Itemized Wage Statement Violations**

(Oliver Odle and the California Class Against All Defendants)

198. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

199. California Labor Code § 226 requires Defendants to provide Plaintiffs and the California Class with regular, written statements showing, among other things, total hours worked, all applicable hourly rates during the pay period, and the corresponding number of hours worked at each rate by the employee. Defendants knowingly and intentionally failed and continue to fail to provide timely, accurate itemized wage statements including this required information.

200. Under § 226(e), an employee suffering injury as a result of a knowing and intentional violation of § 226(a) is entitled to recover the greater of all actual damages or $50 for the initial violative pay period and $100 for each subsequent violative pay period (up to a maximum of $4,000 per employee).

201. As a result of these violations, Plaintiffs and the California Class have been injured (and continue to be injured) by, among other things, not being paid all wages due, not knowing how many hours were worked, and not knowing the relevant wage rate. Thus, Plaintiffs and the California Class suffered and continue to suffer damages in amounts to be calculated at trial, and are entitled to recover the penalties, prejudgment interest, attorneys' fees, costs, and other damages pursuant to California Labor Code § 226.

**Count 8: Unfair Business Practices Under California Law**

(Oliver Odle and the California Class Against All Defendants)

202. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

203. Plaintiffs bring this cause of action on behalf of themselves and others similarly situated, seeking restitution of all unpaid wages as described above, including interest, for the four-year period preceding the filing of this complaint until the resolution of this action.

204. The Defendants' conduct constitutes an unfair and unlawful business practice under Business and Professions Code §§ 17200, et seq. Defendants conducted and continue to conduct business activities while failing to comply with California's legal mandates for employment. Plaintiffs and others similarly situated suffered and continue to suffer injury in fact and lost and continue to

1    lose money as a result of Defendants' unfair competition.

2        205. Plaintiffs and others similarly situated are entitled to restitution of the uncompensated

3    pay that has accrued and continues to accrue, as well as costs, fees, and any other relief that the Court

4    determines is proper.

5                    **Count 9: Quantum Meruit Under California Common Law**

6                    (Oliver Odle and the California Class Against All Defendants)

7        206. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

8        207. Although the parties operated and/or continue to operate under express contracts, many

9    of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable.

10   Quantum meruit may be used as a substitute for the unenforceable contract provisions.

11       208. In employing the minor leaguers as baseball players, the Defendants requested that the

12   minor leaguers perform work. Much of this work occurred and continues to occur in California.

13       209. The California Class of minor leaguers performed and continues to perform this work

14   and expects to be compensated for these services. They were not amateurs and expect to be paid for

15   all work performed. By not receiving payment for all services, they were (and continue to be)

16   impoverished.

17       210. The Defendants benefited and continue to benefit from these services because the minor

18   leaguers perform in the Defendants' developmental system for baseball players. The Defendants'

19   developmental system yields the Defendants' chief product of major league players and allows the

20   Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor

21   leaguers at all during some periods of services and conspired to pay below-market salaries during

22   other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

23       211. Under quantum meruit, the Defendants owe the California Class of minor leaguers the

24   salaries that the parties would expect in the open market, in a system in which minor leaguers could

25   freely negotiate with any team.[68]

26   _____

27   [68] The quantum meruit measurement of damages demonstrates that statutory damages at law would
     be an inadequate remedy by, among other things, failing to yield complete relief.

28

## Count 10: Quantum Meruit Under Florida Common Law

(Aaron Senne and the Florida Class Against All Defendants)

212. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

213. Although the parties operated and/or continue to operate under express contracts, many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable. Quantum meruit may be used as a substitute for the unenforceable contract provisions.

214. In employing the minor leaguers as baseball players, the Defendants acquiesced to the provision of services by directing, controlling, and allowing the minor leaguers to work. Much of this work occurred and continues to occur in Florida.

215. The Florida Class of minor leaguers expected (and continue to expect) to be compensated for these services. They were not amateurs and expected (and continue to expect) to be paid for all work performed.

216. The Defendants benefited and continue to benefit from these services because the minor leaguers perform in the Defendants' developmental system for baseball players. The Defendants' developmental system yields the Defendants' chief product of major league players and allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor leaguers at all during some periods of services and conspired to pay below-market salaries during other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

217. Under quantum meruit, the Defendants owe the minor leaguers the salaries that the parties would expect in the open market, in a system in which minor leaguers could freely negotiate with any team.[69]

## Count 11: Arizona Minimum Wage and Wage Law Violations

(Michael Liberto, Oliver Odle, and the Arizona Class Against All Defendants)

218. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

219. Pursuant to Arizona law, the Defendants are and were required to pay Plaintiffs and the

---

[69] The quantum meruit measurement of damages demonstrates that statutory damages at law would be an inadequate remedy by, among other things, failing to yield complete relief.

Arizona Class a minimum wage set by Arizona state law. Ariz. Rev. Stat. §§ 23-363, 23-364. The state's minimum wage requirements apply to the Defendants and protect Plaintiffs and the Arizona Class members.

220. The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay Plaintiffs and all of the Arizona Class the applicable minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and they continue to engage in such practices.

221. As a result of these minimum wage violations, Plaintiffs and the Arizona Class have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to Section 23-364.

222. The Defendants' pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with Arizona's minimum wage requirements with respect to the compensation of Plaintiffs and the Arizona Class, and instead knowingly and/or recklessly disregarded state law.

223. Under Arizona's Wage Law, §§ 23-351 et seq., Defendants have also willfully failed to pay wages to Plaintiffs and the Arizona Proposed Class for work performed. Thus, the Plaintiffs and the Arizona Proposed Class are also entitled to treble the amount of wages unpaid. § 23-355(A).

**Count 12: Arizona Recordkeeping Requirements**

(Michael Liberto, Oliver Odle, and the Arizona Class Against All Defendants)

224. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

225. The Defendants failed (and continue to fail) to make, keep, and preserve accurate records with respect to Plaintiffs and the Arizona Class, including hours worked each workday and total hours worked each workweek, as required by the Arizona Minimum Wage Law, Ariz. Rev. Stat. § 23-364, and supporting state regulations.

226. The failure to maintain such records "shall raise a rebuttable presumption that the employer did not pay the required minimum wage rate." § 23-364.

## Count 13: Quantum Meruit Under Arizona Common Law

(Michael Liberto, Oliver Odle, and the Arizona Class Against All Defendants)

227. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

228. Although the parties operated and/or continue to operate under express contracts, many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable. Quantum meruit may be used as a substitute for the unenforceable contract provisions.

229. In employing the minor leaguers as baseball players, the Defendants acquiesced to the provision of services by directing, controlling, and allowing the minor leaguers to work. Much of this work occurred in Arizona.

230. The Arizona Class of minor leaguers expected (and continues to expect) to be compensated for these services. They are and were not amateurs and expect to be paid for all work performed. By not receiving payment for all services, they were (and continue to be) impoverished.

231. The Defendants benefited (and continue to benefit) from these services because the minor leaguers perform in the Defendants' developmental system for baseball players. The Defendants' developmental system yields the Defendants' chief product of major league players and allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor leaguers at all during some periods of services and conspired to pay below-market salaries during other periods of services. Thus, the Defendants were and continue to be unjustly enriched.

232. Under quantum meruit, the Defendants owe the minor leaguers the salaries that the parties would expect in the open market, in a system in which minor leaguers could freely negotiate with any team.[70]

## Count 14: North Carolina Minimum Wage Violations

(Aaron Senne and the North Carolina Class Against All Defendants)

233. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

234. Pursuant to North Carolina law, the Defendants are and were required to pay Plaintiffs

---

[70] The quantum meruit measurement of damages demonstrates that statutory damages at law would be an inadequate remedy by, among other things, failing to yield complete relief.

and the North Carolina Class a minimum wage at least as high as that set by federal law. N.C. Gen. Stat. § 95-25.3. The state's minimum wage requirements apply to the Defendants and protect Plaintiffs and the North Carolina Class members.

235. The Defendants were also required to pay all wages accrued on the regular payday, and were not allowed to withhold wages in contravention of the applicable laws. §§ 95-25.6, 95-25.8.

236. The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay Plaintiffs and all of the North Carolina Class the applicable minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and they continue to engage in such practices. The Defendants also failed to pay all wages accrued on the regular payday and wrongfully withheld some wages.

237. As a result of these minimum wage violations, Plaintiffs and the North Carolina Class have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to section 95-25.22.

238. The Defendants' pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with North Carolina's minimum wage requirements with respect to the compensation of Plaintiffs and the North Carolina Class, and instead knowingly and/or recklessly disregarded state law.

### Count 15: North Carolina Overtime Violations

(Aaron Senne and the North Carolina Class Against All Defendants)

239. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

240. The laws of North Carolina require the Defendants to pay overtime compensation. N.C. Gen. Stat. § 95-25.4. The state's overtime requirements apply to the Defendants and protect Plaintiffs and the North Carolina Class members.

241. The Defendants were also required to pay all wages accrued on the regular payday, and were not allowed to withhold wages in contravention of the applicable laws. §§ 95-25.6, 95-25.8.

242. Throughout the North Carolina Class Period, Plaintiffs and the North Carolina Class routinely worked (and continue to work) far more than 40 hours in a workweek. The Defendants failed and continue to fail to pay Plaintiffs and the North Carolina Class overtime wages as required. § 95-25.4. The Defendants also failed to pay all wages accrued on the regular payday and wrongfully withheld some wages.

243. As a result of these violations, Plaintiffs and the North Carolina Class have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to section 95-25.22.

244. The Defendants pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with North Carolina's overtime requirements with respect to the compensation of Plaintiffs and the North Carolina Class, and instead knowingly and/or recklessly disregarded state law.

### Count 16: Quantum Meruit Under North Carolina Common Law

(Aaron Senne and the North Carolina Class Against All Defendants)

245. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

246. Although the parties operated and/or continue to operate under express contracts, many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable. Quantum meruit may be used as a substitute for the unenforceable contract provisions.

247. In employing the minor leaguers as baseball players, the Defendants requested that the minor leaguers perform work that occurred and continues to occur in North Carolina.

248. The North Carolina Class of minor leaguers performed and continues to perform this work and expects to be compensated for these services. They were not amateurs and expect to be paid for all work performed. By not receiving payment for all services, they were (and continue to be) impoverished.

249. The Defendants benefited and continue to benefit from these services because the minor

42

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

leaguers perform in the Defendants' developmental system for baseball players. The Defendants' developmental system yields the Defendants' chief product of major league players and allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor leaguers at all during some periods of services and conspired to pay below-market salaries during other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

250. Under quantum meruit, the Defendants owe the North Carolina Class of minor leaguers the salaries that the parties would expect in the open market, in a system in which minor leaguers could freely negotiate with any team.[71]

### Count 17: New York Minimum Wage Violations

(Aaron Senne and the New York Class Against All Defendants)

251. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

252. Pursuant to New York law, the Defendants are and were required to pay Plaintiffs and the New York Class a minimum wage set by New York state law. N.Y. Lab. Law § 652. The state's minimum wage requirements apply to the Defendants and protect Plaintiffs and the New York Class members.

253. The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay Plaintiffs and all of the New York Class the applicable minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and they continue to engage in such practices.

254. As a result of these minimum wage violations, Plaintiffs and the New York Class have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to New York Labor Law § 663.

255. The Defendants' pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

---

[71] The quantum meruit measurement of damages demonstrates that statutory damages at law would be an inadequate remedy by, among other things, failing to yield complete relief.

that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with New York's minimum wage requirements with respect to the compensation of Plaintiffs and the New York Class, and instead knowingly and/or recklessly disregarded state law.

**Count 18: New York Overtime Violations**

(Aaron Senne and the New York Class Against All Defendants)

256. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

257. The laws of New York require the Defendants to pay overtime compensation. 12 N.Y.C.R.R. § 142-2.2. The state's overtime requirements apply to the Defendants and protect Plaintiffs and the New York Class members.

258. Throughout the New York Class Period, Plaintiffs and the New York Class routinely worked (and continue to work) in excess of 40 hours in a workweek. The Defendants failed and continue to fail to pay Plaintiffs and the New York Class overtime wages as required by New York law. 12 N.Y.C.R.R. § 142-2.2.

259. As a result of these violations, Plaintiffs and the New York Class have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to New York Labor Law § 663.

260. The Defendants pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with New York's overtime requirements with respect to the compensation of Plaintiffs and the New York Class, and instead knowingly and/or recklessly disregarded state law.

**Count 19: New York Wage Statement Violations**

(Aaron Senne and the New York Class Against All Defendants)

261. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

262. New York Labor Law § 195.3 requires Defendants to provide Plaintiffs and the New York Class with regular, written statements showing, among other things, deductions, the regular rate

1   of pay, the overtime rate of pay, and the corresponding number of hours worked at each rate by the

2   employee. Defendants knowingly and intentionally failed and continue to fail to provide timely,

3   accurate itemized wage statements including this required information.

4   263. Under New York's Wage Theft and Prevention Act, Plaintiffs and the members of the

5   New York Class who suffered injury as a result of a violation of § 195.3 are entitled to recover in a

6   civil suit $100 per pay period, up to a maximum of $2500 per employee.

7   264. As a result of these violations, Plaintiffs and the New York Class have been injured (and

8   continue to be injured) by, among other things, not being paid all wages due, not knowing how many

9   hours were worked, and not knowing the relevant wage rate. Thus, Plaintiffs and the New York Class

10   suffered and continue to suffer damages in amounts to be calculated at trial.

11   **Count 20: Quantum Meruit Under New York Common Law**

12   (Aaron Senne and the New York Class Against All Defendants)

13   265. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

14   266. Although the parties operated and/or continue to operate under express contracts, many

15   of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable.

16   Quantum meruit may be used as a substitute for the unenforceable contract provisions.

17   267. In employing the minor leaguers as baseball players, the Defendants requested that the

18   minor leaguers perform work that occurred and continues to occur in New York.

19   268. The New York Class of minor leaguers performed and continues to perform this work

20   and expects to be compensated for these services. They were not amateurs and expect to be paid for

21   all work performed. By not receiving payment for all services, they were (and continue to be)

22   impoverished.

23   269. The Defendants benefited and continue to benefit from these services because the minor

24   leaguers perform in the Defendants' developmental system for baseball players. The Defendants'

25   developmental system yields the Defendants' chief product of major league players and allows the

26   Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor

27   leaguers at all during some periods of services and conspired to pay below-market salaries during

28   other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

270. Under quantum meruit, the Defendants owe the New York Class of minor leaguers the salaries that the parties would expect in the open market, in a system in which minor leaguers could freely negotiate with any team.[72]

## IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own and on behalf of all other similarly situated persons, seek the following relief:

- That at the earliest possible time, Plaintiffs be allowed to give notice of this collective action, or that the Court issue such notice, to members of the Minor League Collective, as defined above. Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied (and/or continue to be denied) proper wages;

- Unpaid minimum wages and overtime wages, that have accrued and continue to accrue until the resolution of this action, and an additional and an equal amount as liquidated damages pursuant to the FLSA and the supporting regulations;

- Unpaid wages and pay pursuant to Arizona, Florida, California, North Carolina, and New York state law, that have accrued and continue to accrue until the resolution of this action, and liquidated damages pursuant to state law and supporting regulations;

- Statutory damages for Defendants' recordkeeping violations pursuant to federal and state law;

- Certification of the Proposed Classes, as set forth above, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

- A determination that Defendants violated and continue to violate California Labor Code § 204 payday requirements, and an award of appropriate damages for the violations that have accrued and continue to accrue until the resolution of this action;

- A determination that Defendants violated and continue to violate California Labor

---

[72] The quantum meruit measurement of damages demonstrates that statutory damages at law would be an inadequate remedy by, among other things, failing to yield complete relief.

1  Code §§ 201, 202, and 203 for withholding compensation at the time of termination of

2  Plaintiffs and the California Waiting Time Subclass, and an award of appropriate

3  damages for the violations that have accrued and continue to accrue until the

4  resolution of this action;

5  • A determination that Defendants violated and continue to violate the itemized wage

6  statement requirements of California Labor Code § 226 as to Plaintiffs and the

7  California Class, and an award of appropriate damages for the violations that have

8  accrued and continue to accrue until the resolution of this action;

9  • A determination that Defendants violated and continue to violate the itemized wage

10  statement requirements of New York Labor Law § 195.3 as to Plaintiffs and the New

11  York Class, and an award of appropriate damages for the violations that have accrued

12  and continue to accrue until the resolution of this action;

13  • An award of quantum meruit under California, Arizona, Florida, North Carolina, and

14  New York common law;

15  • Designation of Plaintiffs as class representatives of the Classes, designation of counsel

16  of record as Class Counsel, and a reasonable incentive payment to Plaintiffs;

17  • Pre-judgment and post-judgment interest as permitted by law;

18  • An injunction requiring Defendants to pay all statutorily required wages pursuant to

19  state and federal law and an order enjoining Defendants from continuing or reinstating

20  their unlawful policies and practices as described within this Complaint;

21  • Reasonable attorneys' fees and costs of the action; and

22  • Such other relief as this Court shall deem just and proper.

23  ## X.  DEMAND FOR JURY TRIAL

24  Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as

25  to all issues triable by a jury.

26

27

28

1   DATED: February 7, 2014                   **PEARSON, SIMON & WARSHAW, LLP**
                                              BRUCE L. SIMON
2                                             DANIEL L. WARSHAW
                                              BOBBY POUYA
3                                             THOMAS K. BOARDMAN

4                                             **KOREIN TILLERY, LLC**
5                                             STEPHEN M. TILLERY
                                              GARRETT R. BROSHUIS
6                                             GIUSEPPE S. GIARDINA
                                              GEORGE A. ZELCS

7

8

9                                             By:    _____/s/ Daniel L. Warshaw_____
10                                                      DANIEL L. WARSHAW
                                              Attorneys for Plaintiffs' Aaron Senne, Michael Liberto
11                                            and Oliver Odle, individually and on behalf of all those
                                              similarly situated
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28