Pages 1 - 23

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Elizabeth Laporte, Chief Magistrate Judge

```
SENNE,                              )
                                    )
            Plaintiff,              )
                                    )
VS.                                 )      NO. C-14-00608 RS
                                    )
OFFICE OF THE COMMISSIONER          )
OF BASEBALL,                        )
                                    )
            Defendant.              )
_____)
```

SAN FRANCISCO, CALIFORNIA
TUESDAY, SEPTEMBER 23, 2014

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING (FTR TIME: 10:04 - 10:24 AND 11:24 - 11:32)**

**APPEARANCES:**

| | | |
|---|---|---|
| For Plaintiff: | | Pearson Simon & Warshaw, LLP |
| | | 44 Montgomery Street, Suite 2450 |
| | | San Francisco, CA 94104 |
| | BY: | **BRUCE SIMON, ATTORNEY AT LAW** |
| For Plaintiff: | | Korein Tillery |
| | | 505 N. 7th Street, Suite 3600 |
| | | St. Louis, MO 63101 |
| | BY: | **GARRETT BROSHUIS, ATTORNEY AT LAW** |
| For Defendant: | | Proskauer Rose LLP |
| | | Eleven Times Square |
| | | New York, NY 10036-8299 |
| | BY: | **ELISE BLOOM, ATTORNEY AT LAW** |
| | | **ADAM LUPION, ATTORNEY AT LAW** |
| | | **JACQUELYN WEISMAN, ATTORNEY AT LAW** |
| For Defendant: | | Rifkin Weiner Livingston Levitan Silver |
| | | 7979 Old Georgetown Road, Suite 400 |
| | | Bethesda, MD 20814 |
| | BY: | **M. CELESTE BRUCE, ATTORNEY AT LAW** |

```
Transcribed:            Carrie E. McKee-Parks
                        Transcriber 510-637-9897
                        McKee-Parks65@att.net
```

```
 1    Tuesday, September 23, 2014                    10:04 a.m.

 2                      P R O C E E D I N G S

 3                         ---oOo---

 4         THE CLERK:  Now calling case 14 CV 608 RS; Senne, et

 5    al v.  Office of the Commissioner of Baseball, et al.

 6       Counsel, approach the podium to state your appearances for

 7    the record.

 8              (Inaudible discussion off the record.)

 9         MR. SIMON:  Good morning, your Honor.  Bruce Simon,

10    Pearson, Simon & Warshaw, on behalf of plaintiffs here with my

11    co-counsel.

12         MR. BROSHUIS:  Morning, your Honor.  Garrett

13    Broshuis, Korein Tillery, on behalf of all the plaintiffs.

14         MS. BLOOM:  Good morning, your Honor.  Elise Bloom on

15    behalf of all the defendants, except for the Baltimore Orioles.

16    My co-counsel?

17         MS. BRUCE:  Celeste Bruce on behalf of the BOI

18    Baltimore Orioles, Inc, and Baltimore Orioles Limited.

19              THE COURT:  So we have the women defending baseball.

20    At least it's not football this week.  All right.

21              MS. BLOOM:  The issues are a little lighter.

22              THE COURT:  Fortunately, yes.

23       All right.  Well, there's -- there's a lot of -- a great

24    deal of issues that have been raised in -- I think in general,

25    plaintiff seems to be -- I think the opening brief seemed to be
```

1    assuming that the plaintiff wasn't pursuing specific

2    jurisdiction, but now it's clear that they are; or at least a

3    lot of it was more geared toward that; to general jurisdiction.

4        And on the one hand, all sorts of context can be relevant

5    to general jurisdiction, but general jurisdiction is also very

6    hard to establish; however -- and I -- you know, it's not up to

7    me to decide that.  That's going to be Judge Seeborg.

8        But it appears the plaintiffs may have more of a chance

9    if -- if -- if at all, of getting specific jurisdiction to the

10   extent there's things like -- I think a lot of the things that

11   are asked for could be relevant to that; they may not end up

12   adding up to specific jurisdiction; but if they're recruiting

13   individuals to the minor league and then they know that they're

14   living in California or have reason to believe that they may be

15   living in California because they say that's their address and

16   say send them packets saying we want you to be working out of

17   the gym five hours a day during off season, but we're not

18   paying you for that; things of that nature could potentially

19   add up to specific jurisdiction because they would relate to

20   the gravamen of this case; that there wasn't minimum wage over

21   time, etc., etc.

22       So those kind of things, which are some of the disputes, I

23   think that the plaintiffs are entitled to.  A lot of the issues

24   though end up requiring not so much whether it's a yes or no

25   there's some relevance, but does the burden outweigh the

1    benefit.  And plaintiffs have done some things to try to reduce

2    the burden by taking interrogatories.

3         But, for example, every time anybody traveled to

4    California, it still seems to be -- I think defendants have the

5    point that that is too burdensome for what it's worth; however,

6    seems to me that they're probably ways that that could be -- if

7    there'd been -- or maybe now that there could be a more robust

8    meet and confer to narrow that down.

9         For example, you know, who are the people that were -- you

10   know, the 10 or 100; whatever the relevant number is; who would

11   most have only involved in recruiting people in California and

12   have them take a look at their -- see if they have calendars.

13        But in other words, it's not a dragnet.  You don't get the

14   target the areas use -- you know, you target efforts where

15   they're most likely to produce some useful information.  And

16   even though you don't get everything, it also reduces the

17   burden because I think to ask for some of these are too broad.

18        And just traveling to California, you know, in general is

19   not as important, I think probably, as the people, again, who

20   were actually recruiting or actually interacting with the minor

21   league people who are members of the class.

22        I'm not that -- that brings up a legal issue, which I don't

23   know what the plaintiffs' viewpoint is.  There are -- there is

24   some -- a little bit of law that seems to suggest that contacts

25   with absent class members is not -- there has to be sufficient

1    just on the named plaintiffs and you concentrate on them.

2    That -- but it's borrowed from venue law as -- and I'm not

3    really sure it applies to jurisdiction and it doesn't seem --

4    seems to me counterintuitive.

5         It also arises in a case, unlike this one, where the

6    named -- there was one named plaintiff, for example, and that

7    person wasn't from California.  Here, some of the plaintiffs

8    are from California -- I think many of them perhaps -- and some

9    aren't.

10        But I'd be -- I'm a little puzzled by that legal issue, but

11   that is a point and I think that defendants raise and there's

12   some authority though and that convinces directly on point on

13   that.

14        On the revenue sharing and so on, it's true there are a

15   number of cases that say in the circumstances of those

16   particular cases, I think they're decided in other courts and

17   in general lower courts.  They're not binding on me, but

18   they're ultimately ruling on the merits that after the

19   discovery, this amount of revenue; that amount of revenue

20   that's shared through the national organization and so on

21   doesn't confer general jurisdiction.

22        I think, again though for me, it's -- the issue is not

23   whether any of the plaintiffs are going to win that argument,

24   but do they get discovery of that.  And it's -- since the Ninth

25   Circuit says no one thing is conclusive one way or the other,

1    you kind of add it altogether.  Shouldn't they be able to get

2    some of that information and I think that they should.

3        I don't think the tax argument is at all persuasive.  It's

4    totally different purposes and we're not -- you know, we don't

5    take whatever some particular states tax code treatment is and

6    say that determines the jurisdictional issue.  So I'm not

7    persuaded by that at all.

8        On the lawsuits and worker's comp claim; I mean, it seems

9    quite overbroad and I'm really not sure what the worker's comp

10   has to do with anything; whether there are some litigation

11   possibly, but I'm really -- it's too much of a dragnet, I

12   think; and especially the worker's comp I'm not inclined to

13   grant so those are the generals.

14       I mean, I -- you know, I'm concerned that this -- you know,

15   if we go through this request by request by request, we'll be

16   here all day.  I've got people who are waiting for their case

17   management conferences and I wonder whether with that kind of

18   guidance, you couldn't have a more productive discussion,

19   but --

20            MS. BLOOM:  Your Honor, if I may for a moment?

21            THE COURT:  Uh-huh.

22            MS. BLOOM:  A couple of things that you raised.

23       With respect to people traveling to California and you

24   specifically said that in your mind, it would be relevant if

25   they were recruiting people out of California.

1           THE COURT:  Uh-huh.

2           MS. BLOOM:  We've already provided the plaintiffs

3    with a list of all of the scouts that were located in

4    California.  We've also provided them with information for each

5    of the teams as to individuals whose principle place of

6    employment was here.

7           THE COURT:  Yeah, but I don't think it's -- that's

8    the problem I have.  I don't think that you can limit it to

9    people who lived in California or worked in California

10   principally or were the main scouts in California if there were

11   other people who engaged in significant scouting, but they

12   happen to be coming from somewhere else.

13       I don't know how that actually works, but it wouldn't

14   surprise me if there's somebody on the east coast who, given

15   modern transportation, can get on a plane and go recruit in

16   California.  So the just -- I thought that was too limited.

17           MS. BLOOM:  Okay.  I guess the place where I'm not --

18   I guess the disconnect for me is that if the information that

19   we give them is as to the scouts that are responsible for

20   California; if that's not enough to accomplish jurisdiction,

21   then if there was an individual who traveled on a random time

22   to California and happened to see somebody who they then

23   recruited, that wouldn't put them over in terms of --

24           THE COURT:  Well, I don't -- I'm just not clear

25   on whether -- if you're saying that -- if anybody -- there

1    wouldn't be anybody on the list that -- you're saying that the

2    list is 100 percent and there might be one or two stragglers

3    beyond that who in some rare circumstance they came to watch

4    their kid's baseball game and saw something else, but that that

5    would be completely unusual; then maybe it's not justified.

6    But that wasn't in the papers and I don't know how it works.

7         But if there are people based elsewhere who do have

8    something other than a once in a lifetime thing, then they do

9    something more regular than that; even though they're not based

10   in California; they're not on the list; then you got to

11   disclose that.

12             MS. BLOOM:  Okay.  Our intent was -- and I'm --

13   Mr. Lupion had something you want to add that that -- but our

14   intent was to provide the information as to the scouts that

15   were scouting here in California.

16             THE COURT:  Right.

17             MR. BROSHUIS:  Your Honor, if I might elucidate how

18   the system works a little bit.  So they provided a list of the

19   scouts that are based in California.  But the teams also have

20   these cross-checkers and they have assistant general managers

21   and it's their job to participate in the recruitment and the

22   scouting of these amateur players that become future minor

23   leaguers.

24             THE COURT:  So you're saying there's other people;

25   assistant general managers and cross-checkers; is that what

1     you're saying?

2              MR. BROSHUIS:  Correct.

3              MR. LUPION:  Your Honor, I believe you started with

4     the premise that these contacts would be relevant to specific

5     jurisdiction, but did -- the point to keep in mind this is a

6     wage an hour case; that they're alleging claims that they

7     weren't paid minimum wage and overtime for work performed.

8         So whether a scout came to observe a player in California,

9     it is too attenuated of a contact whether that player was then

10    drafted by that club and then signed a contract with that club

11    and then performed work outside of California; that that's

12    alleged in the complaint.  So our position is that the context

13    that they're --

14             THE COURT:  Well, and they're also pursuing general

15    jurisdiction, which -- I mean, the case law is sort of you

16    can't -- there's no one talismanic thing.  You have to add it

17    all up.  And it may in the end you're right, but you're asking

18    me to rule for you that there can't be general jurisdiction

19    before they get the discovery and I can't do that.

20        I mean, if -- so the question is I'm willing to try to

21    arrive at something that is proportionate, which is what I've

22    been trying to tell you all, but I'm not going to say zero on

23    that score.

24             MS. BLOOM:  So --

25             THE COURT:  Unless there was zero, essentially.  In

1    other words, he's just said no; it's more systematic.  There

2    are other people who are systematically involved.

3        But, you know, Judge Seeborg will have to be the one, after

4    there's discovery, to decide does it add up to enough or not.

5    I'm guessing that this more likely they'll have a better shot

6    at the specific, but they're pursuing both.

7            MS. BLOOM:  So with regard to specific -- and I

8    believe you were referring to the *Coca-Cola* case.  I mean,

9    there are a lot of named plaintiffs in this case and so to the

10   extent that we are asked to furnish additional information, we

11   think that information should be with regard to the named

12   plaintiffs.

13           THE COURT:  Well, you haven't addressed this issue

14   yet; that legal issue.

15           MR. BROSHUIS:  Your Honor, the *Ambriz v. Coca-Cola*

16   (phonetic) case.  You're correct.  It's a venue case.

17       You know, on the briefing they say it's a well-established

18   principle; but in fact, it's not a well-established principle.

19       And in fact, the case law and jurisdiction is clear that it

20   is rising under or relates for specific jurisdiction.  And so

21   the contacts that relate to the cause of action matter.

22       There are cases outside of the Ninth Circuit who say this

23   and there's the California case of Bristol Myers (phonetic)

24   that indicates that contacts --

25           THE COURT:  Right.

1          MR. BROSHUIS:  -- with the non-parties in the matter.

2       The other thing I would add on that is that some of the

3    cases that seem to discuss this issue deal with class actions

4    of defendant classes versus plaintiff classes, which was an

5    entirely different matter.

6       You deal with a different due process concerns when you're

7    dealing with defendant class actions instead of plaintiff class

8    actions.

9          THE COURT:  Yeah.  I mean, I'm -- I'm skeptical of

10   that position and that you only get jurisdiction discovery of

11   the named plaintiffs.

12      And again, you know, if I'm wrong or if Judge Seeborg

13   disagrees, then he won't be persuaded by it.  I am trying to,

14   though, address your burden concerns and I have really made no

15   progress on that and it's now 10:18.

16      You know, that's how I'm going to come out.  So it would be

17   better -- I'm not going to grant your motion I can tell you so

18   the question is their motion.  So I'm going to grant that, at

19   least in part; the question is can you all -- now, with that

20   guidance -- can I send you to the jury room and you can meet

21   and confer and come up with some better proposal that's more

22   narrowly tailored because I think you're still overbroad, but

23   it gives you what's important.

24          MR. BROSHUIS:  One issue on the revenue to make

25   clear; the MLB revenue you found is a relevant issue.

```
1              THE COURT:  I do.  Yes, I do.  I mean, again, I'm not
2      the one who's deciding that.
3              MR. BROSHUIS:  Right.
4              THE COURT:  That's up to enough.
5          You know, there's a lot of case law that says you have some
6      uphill battle on that, but -- but I think you're entitled to
7      get it.
8              MS. BLOOM:  Your Honor, could there be --
9              THE COURT:  And I don't think that's particularly
10     burdensome.  I mean, those records -- those --
11             MS. BLOOM:  Well the question --
12             THE COURT:  Summary documents or something like that.
13             MS. BLOOM:  It actually is.  The question is what
14     exactly is it that they're talking about because I think the
15     case law -- the case law that exists makes clear that with
16     regard to sports teams; things like sharing revenue for a
17     broadcasting; sharing revenue for merchandise that is sold;
18     that will not be sufficient contacts in order to establish
19     jurisdiction.
20         I mean, if they're talking to when a team travels here to
21     play a game; well, the visiting team doesn't get any revenue
22     from playing here in California.  The same way that if a
23     team -- if a California team comes to New York to play the
24     Yankees, the California team doesn't get any revenue from the
25     game played in New York.
```

```
1          So it's very -- it's unclear exactly what it is that

2      they're looking for and the request drafted is incredibly

3      overbroad.

4              THE COURT:  Well, then it should be narrowed.

5              MR. SIMON:  Your Honor, Bruce Simon on behalf of

6      plaintiffs.  We hear you loud and clear and we've tried this

7      several times, but we'll try again.  And we take advantage of

8      using your jury room or whatever to try to do it while counsel

9      is here to save time.

10             THE COURT:  Yeah, I mean --

11             MR. SIMON:  We have tried thought.

12             THE COURT:  What I'm ordering you to do now is to

13     come up with positive suggestions of what more you will give

14     them.  And if it -- I consider that enough, then I will let you

15     not give them everything.

16         However, if you want to say this is just too much and not

17     come up with anything additional, then I'll just have to grant

18     the relief they've asked for because you've given me no

19     stopping point.  It's just been a no and I'm not -- I'm much

20     more sympathetic to -- I think you're sort of assuming that

21     they're going to lose; and therefore, they shouldn't get any

22     information.  Because, in your opinion, you know it won't add

23     up to being enough.  Maybe you're right about that, but I think

24     they -- our discovery system and get a chance to test it out.

25         What they don't get to do though is run up a
```

1        disproportionately high, enormous expenses, and burdensome.

2              But you're the one who knows what you have and what you can

3        give them in addition along the lines that I've said that would

4        be more cost effective.  And so that's why I think I'm asking

5        you -- and if not, I'll order you to come up with something

6        that fits those parameters.

7              MS. BRUCE:  Your Honor, if I may.  I'm -- we're all

8        in the same position so I'm not taking any different view.

9              About the revenue question, I've been on the phone with the

10       meet and confers because they have to include me.  And I hear

11       what counsel is saying and I appreciate the overture; however,

12       we spent a great deal of time discussing the revenue question.

13       I put it out there.  I said tell me what revenue you want us to

14       turn over.  Show me what you want so I can go back and consider

15       it.  And what we were left with was well, we just want all the

16       revenue.

17             And so I hear what your Honor is saying and I appreciate

18       the position that you're in.  And I think where we end up is

19       when I asked the very specific question I want to know what

20       they think the Baltimore Orioles should turn over in order to

21       demonstrate that I generate revenue in the State of California.

22             I provided to plaintiff my information on what I pay in

23       taxes to California.

24             THE COURT:  Yeah, I don't think the taxes --

25             MS. BRUCE:  Well --

1          THE COURT:  At least the way they're calculated here

2     I don't think relates to the jurisdictional question.

3          MS. BRUCE:  It doesn't.  But what it relates to, your

4     Honor, is what some -- in other words, I don't -- I, Baltimore

5     Orioles, don't calculate what I, the Baltimore Orioles, earn in

6     California.

7          THE COURT:  Right.

8          MS. BRUCE:  Somebody hands me a K1 and says here's

9     what you should pay based on this; what we at Major League

10    baseball, think should be allocated from revenue from the State

11    of California.

12      I can't tell plaintiffs how that was calculated.  I can't

13    tell plaintiffs what went into that.  Money is fungible and so

14    once all 30 Major League Baseball clubs pay in to say the

15    Revenue Sharing Program, I don't know where my money as the

16    Baltimore Orioles comes from.  And so all I can do is take what

17    a K1 is and say this is what I have; but for me to go any

18    further --

19          THE COURT:  Well -- okay.  I think what you're saying

20    is you're -- you're in a somewhat different position than the

21    MLB.  I think most of this information is the MLB information.

22    I don't know if there's anything even coming from the Baltimore

23    Orioles.

24          MR. BROSHUIS:  Yeah, I think Ms. Bruce illustrates

25    our point that so much of this goes through the financial

```
 1    conduit that is MLB.

 2              THE COURT:  So maybe you don't get anything more the

 3    Orioles or individual teams.  You just concentrate on the MLB.

 4              UNIDENTIFIED SPEAKER:  And we --

 5              THE COURT:  And you're all telling me more than I

 6    really want to know about the Baseball District.

 7              MR. SIMON:  I'd like to -- your Honor, how would you

 8    like us to report back?  You say you need to rule.

 9              THE COURT:  When you're ready, I'm going to go in the

10    jury room now.  We'll move on to my case management

11    conferences.  And when you're ready, you've hopefully reached

12    agreement, we'll put it on the record.

13              MR. SIMON:  Thank you.

14              MS. BLOOM:  Thank you, Judge.

15              MS. BRUCE:  Thank you.

16              THE CLERK:  Court is now in recess.

17                (Whereupon the Court was in recess.)

18                (Whereupon there was a discussion off the record.)

19              THE CLERK:  Recalling case 14 CV 608 RS; Senne, et al

20    v. Office of the Commissioner of Baseball, et al.

21         Counsel, please restate your appearances for the record.

22              MR. BROSHUIS:  Garrett Broshuis, Korein Tillery, on

23    behalf of plaintiffs.

24              MR. SIMON:  Bruce Simon, Pearson Simon & Warshaw, on

25    behalf of plaintiffs, your Honor.
```

1          MS. BLOOM:  Your Honor, Elise Bloom, Proskauer Rose,

2     on behalf of all the defendants, except for Baltimore.

3          MS. BRUCE:  Celeste Bruce on behalf of the Baltimore

4     plaintiffs -- I mean, defendants.

5          THE COURT:  Right.  All right.  So where do we stand?

6          MR. SIMON:  We made quite a bit of progress, your

7     Honor.

8          THE COURT:  Good.

9          MR. SIMON:  We have three on which we have agreed and

10    one on which we're going to continue to meet and confer, but on

11    a fairly short fuse so that we know where we stand in a short

12    period of time.

13         MS. BLOOM:  And I'm prepared to explain to the Court

14    what we've agreed to do.

15         THE COURT:  Yes.  Thank you.

16         MS. BLOOM:  So with regard to the question about

17    scouting and recruiting, we have agreed to inquire of the clubs

18    for -- to identify those individuals who, to the best of their

19    knowledge, traveled to California for the purpose of recruiting

20    amateur players.  And this would be in the timeframe of

21    January 1st, 2008.

22        And for those people that are identified; to the extent the

23    clubs are able; they will provide the duration of the trip and

24    the number of trips.

25         THE COURT:  All right.  The time period from 2008

1          until the present?

2                    MS. BLOOM:  Correct.

3                    THE COURT:  Okay.  All right.

4                    MS. BLOOM:  The second agreement was that for the

5          time period of January 1st, 2008 to the present, that the

6          personal jurisdiction clubs -- and I should have said that as

7          to the first one, it's the personal jurisdiction clubs; not the

8          other clubs.

9               The personal jurisdiction clubs will identify any actions

10         defined as lawsuit, counterclaim, or cross-claims that they

11         have filed in California.

12              Then, this one is a little bit more complicated.  This has

13         to do with the offseason questions.  With regard to

14         offseason -- and I'm going to say training packet, but we

15         understand that that may also include a formal communication as

16         to some offseason activity related to minor league play.

17              For those clubs that mailed offseason packets or the formal

18         communications that I've just described; those clubs being

19         personal jurisdiction defendants; from January 1st, 2008 to the

20         present will provide the number of minor league players that

21         were mailed offseason packets in California by year; by club.

22              And then with regard to the substance of what was mailed;

23         and although, we have a disagree as to whether the substance

24         would be appropriate at this juncture; what we've agreed to is

25         an exemplar, which would consist of anything within the

1    category I defined that was mailed to the named plaintiffs.  So

2    it would be a formal mailing relating to alleged offseason

3    work.

4              THE COURT:  All right.

5              MS. BLOOM:  Did I -- I'm just going to ask my

6    co-counsel anything that I -- before we talk about the last

7    issue.

8              MR. LUPION:  I think with respect to -- it was the

9    number of players -- for the personal jurisdiction clubs, the

10   number of players who maintained a California --

11             MS. BLOOM:  California --

12             MR. LUPION:  -- residence.

13             MS. BLOOM:  I'm sorry.

14             MR. LUPION:  Not necessarily that they received a

15   mailing there, but we would give them the numbers for those

16   clubs who identified in their response that they had, at times,

17   mailed materials to players.

18             MR. SIMON:  That's right.  The only thing I would

19   add, your Honor --

20             THE COURT:  Sorry.

21             MR. SIMON:  -- it's -- to the extent they have it and

22   they're not -- they have to inquire about what the extent of

23   what they have is and there's going to be a -- when we get

24   further information on the next category about here, we're

25   going to get additional information on that about what exactly

1    we're looking at.

2         MS. BLOOM:  He's talking about with regard to the

3    actual information that was mailed.  The clubs may or may not

4    still have that information that was mailed to the named

5    plaintiffs.  And we suggested they also ask their clients for

6    that, but we'll certainly be getting back to them.

7         And we said that we would also produce on a rolling basis.

8    We've set October 7th as the target date, but we've explained

9    to them that maybe we don't have all the information from all

10   the clubs at that time as to the offseason issue.

11        THE COURT:  When you say rolling basis, so you're

12   hoping to start producing before October 7th?

13        MS. BLOOM:  Yeah, it should be -- yes.  We're going

14   to -- when we go back to the office, we're doing to inquire as

15   to each of the clubs.  It's obviously a separate inquiry.  Some

16   of the clubs respond faster than other clubs so that's why it

17   may be on a rolling basis.  We're not going -- we're certainly

18   not going to wait until we hear from all of the clubs.

19        MR. LUPION:  We have to ask 29 different clients.

20   There's not one person we can ask who maintains this central --

21        THE COURT:  Right.

22        MS. BLOOM:  And the last issue was this issue of

23   revenue.

24        THE COURT:  Uh-huh.

25        MS. BLOOM:  And here's where we are on that issue.

1    We've narrowed it and made some agreement, but we're not able

2    to come to a full agreement yet.  And we've agreed to further

3    meet and confer.

4        But what we have so far been able to narrow is that we're

5    not talking about information from any of the particular teams.

6    We're talking about some kind of revenue information on a

7    national basis that's allocated to California.

8        And we've agreed that we will see -- we have to go back and

9    talk with our clients; see what might be able to fit within

10   that category; and that we'll continue to meet and confer it,

11   but we will be able to provide them with an answer to what that

12   would be by October 7th.  And that date was chosen because of

13   the intervening holidays.

14        MR. SIMON:  And the intent of us going through this

15   process is that -- to identify how they allocate revenues to

16   California; where they come from; and hopefully be able to do

17   it in some sort of summary fashion that has the income

18   allocated to California.

19        And they've given us some details about how they do it and

20   we don't need to put that on the record, but we need some more

21   additional information about that.

22        THE COURT:  What do you mean by income allocated to

23   California?

24        MR. SIMON:  The Major League Baseball takes a portion

25   of the income gross receipts for all the teams from whatever

1       source and allocates it as being attributed to California.

2           So it's basically that amount from -- we just don't know

3       the sources and that's what they're going to go back and ask

4       about.

5               MS. BLOOM:  The only place where I don't -- I just

6       want to be clear -- the how is not encompassed by either the

7       discovery request or what -- the information that we're going

8       to give.

9               MR. LUPION:  I --

10              MS. BLOOM:  I think we're in agreement on that.

11              MR. SIMON:  We are.  I just -- there's certain

12      categories -- potential revenues -- that may or may not be

13      within a particular way they allocate.  It might be outside of

14      that.  And we just need an understanding as to what's in

15      whatever they're giving us and what's outside of it because we

16      may ask or not come to an agreement on what's outside.

17              THE COURT:  Not the methodology, but is it included

18      or not.

19              MR. LUPION:  Right.

20              MS. BLOOM:  That's correct.  And we will continue to

21      meet and confer and --

22              THE COURT:  Okay.

23              MS. BLOOM:  -- by October 7th, we'll either know that

24      we're in agreement or not on that.

25              THE COURT:  Okay.  All right.

```
1              MS. BLOOM:  But otherwise, I think we've disposed of
2      the motion.
3              THE COURT:  And if you're not in agreement, I guess
4      it kind of depending somewhat on what -- what the problems are.
5      But I take it you'll want me to resolve that?
6              MR. SIMON:  Yes, your Honor.  We have a date with
7      Judge Seeborg on the 9th to address the motion to consolidate
8      and the motion for lead counsel and we're applying for leave.
9      And perhaps if your Honor has any time on that day?
10             THE COURT:  I don't think I do.  I don't think I'm
11     here.
12             MR. SIMON:  Okay.  Well, we'll come up with a way to
13     report back to you --
14             THE COURT:  Yeah.
15             MR. SIMON:  -- and tell you what you need to decide,
16     if anything.
17             THE COURT:  Yeah.  I mean, it might be a joint letter
18     with a proposed resolution of what each side is proposing.
19     And, you know, be careful because I may just pick one or the
20     other.
21             MS. BLOOM:  Got it.  Okay.
22             THE COURT:  I think they call it baseball
23     arbitration.
24             MR. SIMON:  Very good.
25             THE COURT:  All right.  Thank you.
```

1            MS. BLOOM:  Thank you, very much, your Honor.

2            MR. SIMON:  Thank you, your Honor.

3            MR. LUPION:   Thank you, your Honor.

4            MS. BRUCE:  Thank you, your Honor.

5            THE CLERK:  Court is now adjourned.

6              (Proceedings concluded at 11:32 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**CERTIFICATE OF REPORTER**

     I certify that the foregoing is a true and correct transcript, to the best of my ability, of the pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

     I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____ DATE 9-27-14

         Carrie McKee-Parks          Date
      McKee-Parks65@att.net
        510-637-9897