STEPHEN M. TILLERY (*pro hac vice*)
  stillery@koreintillery.com
GARRETT R. BROSHUIS (*pro hac vice*)
  gbroshuis@koreintillery.com
GIUSEPPE S. GIARDINA (*pro hac vice*)
  ggiardina@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

GEORGE A. ZELCS (*pro hac vice*)
  gzelcs@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750

BRUCE L. SIMON (Bar No. 96241)
  bsimon@pswlaw.com
BENJAMIN E. SHIFTAN (Bar No. 265767)
  bshiftan@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 7433-9008

DANIEL L. WARSHAW (Bar No. 185365)
  dwarshaw@pswlaw.com
BOBBY POUYA (Bar No. 245527)
  bpouya@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104

Plaintiffs' Interim Co-Lead Class Counsel

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| AARON SENNE, MICHAEL LIBERTO, OLIVER ODLE, BRAD MCATEE, CRAIG BENNIGSON, MATT LAWSON, KYLE WOODRUFF, RYAN KIEL, KYLE NICHOLSON, BRAD STONE, MATT DALY, AARON MEADE, JUSTIN MURRAY, JAKE KAHAULELIO, RYAN KHOURY, DUSTIN PEASE, JEFF NADEAU, JON GASTON, BRANDON HENDERSON, TIM PAHUTA, LES SMITH, JOSEPH NEWBY, RYAN HUTSON, MATT FREVERT, ROBERTO ORTIZ, WITER JIMENEZ, KRIS WATTS, MITCH HILLIGOSS, MATT GORGEN, BRETT NEWSOME, JAKE OPITZ, DANIEL BRITT, JOEL WEEKS, and GASPAR SANTIAGO, Individually and on Behalf of All Those Similarly Situated, | CASE NO. 3:14-cv-00608-RS (consolidated with 3:14-cv-03289-RS) <br><br> <u>**CLASS ACTION**</u> <br><br> **CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS** <br><br> **JURY TRIAL DEMANDED** |

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1              Plaintiffs,

2        vs.

3   OFFICE OF THE COMMISSIONER OF
BASEBALL, an unincorporated association

4   doing business as MAJOR LEAGUE
BASEBALL; ALLAN HUBER "BUD" SELIG;

5   KANSAS CITY ROYALS BASEBALL CORP.;
MIAMI MARLINS, L.P.; SAN FRANCISCO

6   BASEBALL ASSOCIATES LLC; BOSTON
RED SOX BASEBALL CLUB L.P.; ANGELS

7   BASEBALL LP; CHICAGO WHITE SOX
LTD.; ST. LOUIS CARDINALS, LLC;

8   COLORADO ROCKIES BASEBALL CLUB,
LTD.; THE BASEBALL CLUB OF

9   SEATTLE, LLLP; THE CINCINNATI REDS,
LLC; HOUSTON BASEBALL PARTNERS

10   LLC; ATHLETICS INVESTMENT GROUP,
LLC; ROGERS BLUE JAYS BASEBALL

11   PARTNERSHIP; CLEVELAND INDIANS
BASEBALL CO., L.P.; CLEVELAND

12   INDIANS BASEBALL CO., INC.; PADRES
L.P.; SAN DIEGO PADRES BASEBALL

13   CLUB, L.P.; MINNESOTA TWINS, LLC;
WASHINGTON NATIONALS BASEBALL

14   CLUB, LLC; DETROIT TIGERS, INC.; LOS
ANGELES DODGERS LLC; LOS ANGELES

15   DODGERS HOLDING COMPANY LLC;
STERLING METS L.P.; ATLANTA

16   NATIONAL LEAGUE BASEBALL CLUB,
INC.; AZPB L.P.; BALTIMORE ORIOLES,

17   INC.; BALTIMORE ORIOLES, L.P.; THE
PHILLIES; PITTSBURGH ASSOCIATES,

18   LP,; NEW YORK YANKEES P'SHIP;
TAMPA BAY RAYS BASEBALL LTD.;

19   RANGERS BASEBALL EXPRESS, LLC;
RANGERS BASEBALL, LLC; CHICAGO

20   CUBS BASEBALL CLUB, LLC;
MILWAUKEE BREWERS BASEBALL

21   CLUB, INC.; MILWAUKEE BREWERS
BASEBALL CLUB, L.P.;

22

23              Defendants.

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

# TABLE OF CONTENTS

**Page**

I. NATURE AND BACKGROUND OF SUIT ................................................................1

II. PARTIES ................................................................................................................5

III. CLASS ACTION ALLEGATIONS ....................................................................18

IV. COLLECTIVE ACTION ALLEGATIONS ........................................................24

V. JURISDICTION, VENUE, AND COMMERCE ..................................................24

VI. FACTUAL ALLEGATIONS ..............................................................................26

VII. FEDERAL WAGE AND HOUR VIOLATIONS ...............................................72

VIII. STATE WAGE AND HOUR VIOLATIONS ...................................................74

IX. PRAYER FOR RELIEF .......................................................................................98

X. DEMAND FOR JURY TRIAL ...........................................................................100

# I.  NATURE AND BACKGROUND OF SUIT

1. The collective Defendants[1] are either members of or govern the cartel known as Major League Baseball ("MLB"). The organization traces its roots to the nineteenth century. Unfortunately for many of its employees, its wage and labor practices remain stuck there.

2. MLB's longstanding exemption from the United States' antitrust laws allows it to openly collude on the working conditions for the development of its chief commodity: young baseball players.[2] This antitrust exemption, however, in no way provides an exemption from the federal and state wage and hour laws that the Defendants routinely violate.

3. MLB has a long, infamous history of labor exploitation dating to its inception. To hoard players and depress salaries during its early years, the cartel inserted a provision (known as the reserve clause) into players' contracts that allowed teams to retain the contractual rights to players for their entire careers. Moreover, it quickly quashed any rival leagues, which preserved MLB's system of artificially low salaries and nonexistent contractual mobility.

4. Players at the highest level of the game ("major leaguers") eventually unionized to counteract MLB's collusive power. Since negotiating sports' first collective bargaining agreement in 1968, major leaguers have enjoyed increased contractual mobility and an explosion in salaries. For instance, the most recent collective bargaining agreement negotiated by the union representing major leaguers—the Major League Baseball Players' Association ("MLBPA")—requires Defendants to pay major leaguers a minimum of $500,000 per season.

5. Unlike the major leaguers, players in the minor leagues ("minor leaguers") have no union, even though they comprise the overwhelming majority of baseball players employed by the Defendants. The MLBPA does not represent the interests of minor leaguers.

6. Efforts to unionize minor leaguers have been unsuccessful because minor leaguers fear retaliation by the seemingly omnipotent Defendants. Striving towards a lifelong dream of playing in

---

[1] The term "Defendants" applies to all defendants named in this Complaint.

[2] Plaintiffs' Complaint does not allege violations of antitrust laws.

1
COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1   the major leagues, minor leaguers are reluctant to upset the status quo. As one minor leaguer, Dan

2   Peltier, testified before Congress not long ago, "[W]hat minor league player is going to jeopardize his

3   career by challenging the system?"[3]

4       7. Mr. Peltier further testified:

5       [It is] very much like the indentured servitude of the 1700's. When you first sign, you
   are owned by that team for basically 7 seasons. A team can buy you, sell you, send you

6       to another country, or fire you whenever they want. They can cut you if you get hurt.
   A player, on the other hand, cannot try to play for someone else. He can't try out for

7       his home team. You have to play for the team that drafted you even if they are loaded
   at your position….[T]his obsession with making the majors should not be a

8       justification for the current treatment of minor league players, and I certainly hope it
   would not be used as an excuse to give major league and minor league owners a legal

9       blank check.[4]

10      8. The Defendants have preyed upon minor leaguers, who are powerless to combat the

11  collusive power of the MLB cartel. MLB continues to actively and openly collude on many aspects of

12  minor leaguers' working conditions, including, but not limited to, wages, contract terms, drug testing,

13  and discipline. For example, while major leaguers' salaries have increased by more than 2,000 percent

14  since 1976, minor leaguers' salaries have, on average, increased only 75 percent since that time.

15  Meanwhile inflation has risen by more than 400 percent over that same time period.

16      9. Through this collective exercise of power, MLB has suppressed minor leaguers' wages in

17  violation of federal and state law. Most minor leaguers earn between around $3,000 and $7,500 for *the*

18  *entire year* despite routinely working over 50 hours per week (and sometimes 70 hours per week) during

19  the roughly five-month championship season. They receive no overtime pay, and instead routinely

20  receive less than minimum wage during the championship season.

21      10. Worse still, the Defendants have conspired to pay no wages at all for significant periods of

22  minor leaguers' work. Consistent with MLB's rules,[5] the Defendants do not pay minor leaguers their

23  salaries during spring training, even though the Defendants require minor leaguers to often work over

24  _____

25  [3] *Major League Baseball Antitrust Reform, Hearing on S. 53 Before the S. Comm. on the Judiciary*, 105th Cong.
   13–15 (June 17, 1997) (Testimony of Dan Peltier, Former Baseball Player).

26  [4] *Id.*

27  [5] *See* Exhibit A, Major League Rules ("MLR") Attachment 3, UPC ¶ VII.D.

28

861070.1

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1  fifty hours per week during spring training. Similarly, the Defendants do not pay salaries during other

2  training periods such as instructional leagues[6] and winter training.

3      11. These wage violations force many minor leaguers to live in poverty. The minor leaguers

4  sometimes cram 5 or 6 players—occasionally with wives and children—into a small apartment, often

5  using air mattresses or couches as beds. Other minor leaguers live in the basements of host families

6  during the season, sleeping on futons.

7      12. Recent government investigations illustrate that MLB's illegal wage and labor practices are

8  rampant. In 2013, one of the Defendants settled a U.S. Department of Labor ("DOL") action for

9  illegally compensating clubhouse employees. The DOL is currently conducting other investigations

10  for similar conduct across the industry. In addition to the government investigations, private litigation

11  has been instituted against MLB for wage and hour violations involving the use of unpaid employees.

12      13. According to a recent MLB memo, the DOL has stated that wage and hour violations "are

13  endemic to [the] industry."[7] Recognizing the effect of the Defendants' centralized power on employee

14  wages, the DOL made a presentation to the Defendants at their 2013 Winter Meetings concerning the

15  Franchises' possible violations of federal and state wage and hour laws.

16      14. The Defendants have been on notice that they are not exempt from federal minimum

17  wage and overtime requirements since at least 1995 and 1998, when the Sixth Circuit issued a pair of

18  decisions making clear that the industry is not exempt.[8] Yet wage abuses continue, as the Defendants

19  continue to misclassify workers and willfully violate federal and state laws.

20      15. Congress passed the Fair Labor Standards Act[9] ("FLSA") in 1938 to protect workers from

21  the types of wage and labor abuses experienced by minor leaguers. As President Franklin D.

22  _____

23  [6] At the end of each championship season, each MLB Franchise selects around 30–45 players to participate in an instructional league to further hone the minor leaguers' skills. The Franchises

24  generally host the instructional league at their spring training sites. It usually lasts around one month.

25  [7] *See* Memorandum from Robert D. Manfred Jr. to All Presidents and Club Counsel, Sept. 12, 2013, *available at* http://www.fairwarning.org/wp-content/uploads/2013/10/Sept.-12memo.pdf.

26  [8] *See Bridewell v. The Cincinnati Reds*, 68 F.3d 136, 139 (6th Cir. 1995), *cert. denied*, 516 U.S. 1172 (1996);
*Bridewell v. The Cincinnati Reds*, 155 F.3d 828, 829 (6th Cir. 1998).

27  [9] 29 U.S.C. §§ 201 *et seq.*

28

1    Roosevelt said prior to its passage, "[The Act must] protect workers unable to protect themselves

2    from excessively low wages and excessively long hours . . . . [and] should reiterate the oft-repeated

3    pledge of political parties that labor is not a mere commodity."[10]

4            16. As is permitted by the FLSA, many states have also passed wage and hour laws to further

5    these protections.[11]

6            17. This suit seeks to recoup the damages sustained by minor leaguers as a result of MLB's

7    illegal wage and labor practices. It seeks to recover damages through a nationwide FLSA collective

8    action. It also seeks to recover complementary class action damages under the state laws of California

9    (where five of the Defendants are located; where an entire minor league, the California League,

10   operates; and where hundreds of minor leaguers work during the winter), as well as Florida, Arizona,[12]

11   North Carolina, New York, Pennsylvania, Maryland, and Oregon.[13]

12           18. Moreover, this suit seeks to enjoin the cartel known as MLB from subjecting future minor

13   leaguers to Defendants' illegal wage and labor practices.

14

15

16

17

18

19

20

---

[10] *See* Message from the President of the United States to the Congress of the United States, Nov. 15, 1937, at 3, 6.

[11] The Act contains a savings clause that allows states to enact more protective wage and hour laws. 29 U.S.C. § 218(a). Consequently, actions may be brought simultaneously under both state and federal law. *See Busk v. Integrity Staffing Solutions, Inc.*, 713 F.3d 525, 528–30 (9th Cir. 2013) (stating that both a collective action under the FLSA and a class action under state law may be brought in the same action).

[12] All members of the cartel maintain spring training sites in Florida and Arizona and many minor league teams operate within these two states.

[13] Minor league work occurs in these states.

## II.  PARTIES

### 1.        Plaintiffs

19. Plaintiff and representative plaintiff Aaron Senne is a former minor leaguer who worked in the Florida Marlins' organization from 2010 to 2013. Mr. Senne is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Senne currently resides in Rochester, Minnesota. Mr. Senne is a representative plaintiff for the Minor League Collective, the Florida Class, the North Carolina Class, and the New York Class.

20. Plaintiff and representative plaintiff Michael Liberto is a former minor leaguer who worked in the Kansas City Royals' organization from 2010 to 2013. Mr. Liberto is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Liberto currently resides in The Woodlands, Texas. Mr. Liberto is a representative plaintiff for the Minor League Collective and the Arizona Class.

21. Plaintiff and representative plaintiff Oliver Odle is a former minor leaguer who worked in the San Francisco Giants' organization from 2007 to 2011. Mr. Odle is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Odle currently resides in Pryor, Oklahoma. Mr. Odle is a representative plaintiff for the Minor League Collective, the California Class, and the Arizona Class.

22. Plaintiff and representative plaintiff Brad McAtee is a former minor leaguer who worked in the Colorado Rockies' organization from 2008 to 2011. Mr. McAtee is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. McAtee currently resides in Brooklyn, New York. Mr. McAtee is a representative plaintiff for the Minor League Collective, the California Class, the New York Class, and the Arizona Class.

23. Plaintiff and representative plaintiff Craig Bennigson is a former minor leaguer who worked in the Colorado Rockies' organization from 2008 to 2013. Mr. Bennigson is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Bennigson currently resides in Benicia, California. Mr. Bennigson is a representative plaintiff for the Minor League Collective, the California Class, the North Carolina Class, and the Arizona Class.

24. Plaintiff and representative plaintiff Matt Lawson is a minor leaguer who worked in the

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1 Texas Rangers' organization from 2007 to 2010; the Seattle Mariners' organization from 2010 to 2011;

2 and the Cleveland Indians' organization from 2011 to present. Mr. Lawson is a covered employee

3 within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Lawson currently

4 resides in Springfield, Missouri. Mr. Lawson is a representative plaintiff for the Minor League

5 Collective and the Arizona Class.

6      25. Plaintiff and representative plaintiff Kyle Woodruff is a former minor leaguer who worked

7 in the San Francisco Giants' organization from 2008 to 2011. Mr. Woodruff is a covered employee

8 within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Woodruff currently

9 resides in San Jose, California. Mr. Woodruff is a representative plaintiff for the Minor League

10 Collective, the California Class, and the Arizona Class.

11      26. Plaintiff and representative plaintiff Ryan Kiel is a former minor leaguer who worked in

12 the Seattle Mariners' organization from 2010 to 2012 and the Cincinnati Reds' organization in 2012.

13 Mr. Kiel is a covered employee within the meaning of the FLSA and the applicable state wage and

14 hour laws. Mr. Kiel currently resides in Melbourne, Florida. Mr. Kiel is a representative plaintiff for

15 the Minor League Collective, the California Class, the Florida Class, and the Arizona Class.

16      27. Plaintiff and representative plaintiff Kyle Nicholson is a former minor leaguer who

17 worked in the San Francisco Giants' organization from 2007 to 2011. Mr. Nicholson is a covered

18 employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr.

19 Nicholson currently resides in Benton, Louisiana. Mr. Nicholson is a representative plaintiff for the

20 California Class.

21      28. Plaintiff and representative plaintiff Brad Stone is a former minor leaguer who worked in

22 the Miami Marlins' organization from 2006 to 2011. Mr. Stone is a covered employee within the

23 meaning of the FLSA and the applicable state wage and hour laws. Mr. Stone currently resides in St.

24 Louis, Missouri. Mr. Stone is a representative plaintiff for the Minor League Collective and the Florida

25 Class.

26      29. Plaintiff and representative plaintiff Matt Daly is a former minor leaguer who worked in

27 the Toronto Blue Jays' organization from 2008 to 2013. Mr. Daly is a covered employee within the

28 meaning of the FLSA and the applicable state wage and hour laws. Mr. Daly currently resides in

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1  Colorado Springs, Colorado. Mr. Daly is a representative plaintiff for the Minor League Collective, the

2  California Class, the New York Class, and the Florida Class.

3       30. Plaintiff and representative plaintiff Aaron Meade is a former minor leaguer who worked

4  in the Los Angeles Angels of Anaheim's organization from 2010 to 2013. Mr. Meade is a covered

5  employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Meade

6  currently resides in Springfield, Missouri. Mr. Meade is a representative plaintiff for the Minor League

7  Collective, the California Class, and the Arizona Class.

8       31. Plaintiff and representative plaintiff Justin Murray is a former minor leaguer who worked

9  in the Oakland Athletics' organization from 2008 to 2011. Mr. Murray is a covered employee within

10  the meaning of the FLSA and the applicable state wage and hour laws. Mr. Murray currently resides in

11  Galva, Kansas. Mr. Murray is a representative plaintiff for the Minor League Collective, the California

12  Class, and the Arizona Class.

13       32. Plaintiff and representative plaintiff Jake Kahaulelio is a former minor leaguer who worked

14  in the Cincinnati Reds' organization from 2007 to 2011. Mr. Kahaulelio is a covered employee within

15  the meaning of the FLSA and the applicable state wage and hour laws. Mr. Kahaulelio is a resident of

16  Windsor, California. Mr. Kahaulelio is a representative plaintiff for the Minor League Collective, the

17  California Class, and the Florida Class.

18       33. Plaintiff and representative plaintiff Ryan Khoury is a former minor leaguer who worked

19  in the Boston Red Sox' organization from 2006 to 2011. Mr. Khoury is a covered employee within the

20  meaning of the FLSA and the applicable state wage and hour laws. Mr. Khoury currently resides in

21  Salt Lake City, Utah. Mr. Khoury is a representative plaintiff for the Minor League Collective, the

22  New York Class, and the Florida Class.

23       34. Plaintiff and representative plaintiff Dustin Pease is a former minor leaguer who worked in

24  the San Diego Padres' organization from 2011 to 2013. Mr. Pease is a covered employee within the

25  meaning of the FLSA and the applicable state wage and hour laws. Mr. Pease currently resides in

26  Frederick, Maryland. Mr. Pease is a representative plaintiff for the Minor League Collective, the

27  California Class, and the Arizona Class.

28       35. Plaintiff and representative plaintiff Jeff Nadeau is a former minor leaguer who worked in

7

1  the St. Louis Cardinals' organization from 2010 to 2012. Mr. Nadeau is a covered employee within the
2  meaning of the FLSA and the applicable state wage and hour laws. Mr. Nadeau currently resides in
3  Westminster, Colorado. Mr. Nadeau is a representative plaintiff for the Minor League Collective and
4  the Florida Class.

5  36. Plaintiff and representative plaintiff Jon Gaston is a former minor leaguer who worked in
6  the Houston Astros' organization from 2008 to 2012 and the Chicago White Sox' organization in
7  2012. Mr. Gaston is a covered employee within the meaning of the FLSA and the applicable state
8  wage and hour laws. Mr. Gaston currently resides in Boise, Idaho. Mr. Gaston is a representative
9  plaintiff for the Minor League Collective, the Florida Class, the New York Class, and the Arizona
10 Class.

11 37. Plaintiff and representative plaintiff Brandon Henderson is a former minor leaguer who
12 worked in the Minnesota Twins' organization from 2010 to 2011. Mr. Henderson is a covered
13 employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently
14 resides in Madera, California. Mr. Henderson is a representative plaintiff for the Minor League
15 Collective, the Florida Class, and the California Class.

16 38. Plaintiff and representative plaintiff Tim Pahuta is a former minor leaguer who worked in
17 the Washington Nationals' organization from 2005 to 2012. Mr. Pahuta is a covered employee within
18 the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in
19 Whitehouse Station, New Jersey. Mr. Pahuta is a representative plaintiff for the Minor League
20 Collective, the Florida Class, and the Pennsylvania Class.

21 39. Plaintiff and representative plaintiff Les Smith is a former minor leaguer who worked in
22 the Detroit Tigers' organization from 2010 to 2012. Mr. Smith is a covered employee within the
23 meaning of the FLSA and the applicable state wage and hour laws. He currently resides in
24 Murfreesboro, Tennessee. Mr. Smith is a representative plaintiff for the Minor League Collective and
25 the Florida Class.

26 40. Plaintiff and representative plaintiff Joseph Newby is a former minor leaguer who worked
27 in the Oakland Athletics' organization from 2004 to 2007; the Seattle Mariners' organization in 2009;
28 and the Los Angeles Dodgers' organization in 2011. Mr. Newby is a covered employee within the

1  meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Evans,
2  Colorado. Mr. Newby is a representative plaintiff for the Minor League Collective, the California
3  Class, and the Arizona Class.

4      41. Plaintiff and representative plaintiff Ryan Hutson is a former minor leaguer who worked
5  in the New York Mets' organization from 2011 to 2012. Mr. Hutson is a covered employee within the
6  meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Leander,
7  Texas. Mr. Hutson is a representative plaintiff for the Minor League Collective and the Florida Class.

8      42. Plaintiff and representative plaintiff Matt Frevert is a former minor leaguer who worked in
9  the St. Louis Cardinals' organization from 2008 to 2011 and the Atlanta Braves' organization in 2011.
10  Mr. Frevert is a covered employee within the meaning of the FLSA and the applicable state wage and
11  hour laws. He currently resides in Fayette, Missouri. Mr. Frevert is a representative plaintiff for the
12  Minor League Collective and the Florida Class.

13      43. Plaintiff and representative plaintiff Roberto Ortiz is a former minor leaguer who worked
14  in the Arizona Diamondbacks' organization from 2008 to 2012 and the Baltimore Orioles'
15  organization in 2012. Mr. Ortiz is a covered employee within the meaning of the FLSA and the
16  applicable state wage and hour laws. He currently resides in Bayamon, Puerto Rico. Mr. Ortiz is a
17  representative plaintiff for the Minor League Collective, the Arizona Class, the Florida Class, and the
18  Maryland Class.

19      44. Plaintiff and representative plaintiff Witer Jimenez is a former minor leaguer who worked
20  in the Philadelphia Phillies' organization from 2010 to 2011. Mr. Jimenez is a covered employee
21  within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in
22  Monroeton, Pennsylvania. Mr. Jimenez is a representative plaintiff for the Minor League Collective
23  and the Florida Class.

24      45. Plaintiff and representative plaintiff Kris Watts is a former minor leaguer who worked in
25  the Pittsburgh Pirates' organization from 2006 to 2012 and the Washington Nationals' organization
26  from 2012 to 2013. Mr. Watts is a covered employee within the meaning of the FLSA and the
27  applicable state wage and hour laws. He currently resides in Fremont, California. Mr. Watts is a
28  representative plaintiff for the Minor League Collective, the California Class, the New York Class, the

1   Arizona Class, the Florida Class, and the Pennsylvania Class.

2       46. Plaintiff and representative plaintiff Mitch Hilligoss is a former minor leaguer who worked

3   in the New York Yankees' organization from 2006 to 2010 and the Texas Rangers' organization from

4   2010 to 2011. Mr. Hilligoss is a covered employee within the meaning of the FLSA and the applicable

5   state wage and hour laws. He currently resides in Windsor, Illinois. Mr. Hilligoss is a representative

6   plaintiff for the Minor League Collective, the California Class, the Arizona Class, and the Florida

7   Class.

8       47. Plaintiff and representative plaintiff Matt Gorgen is a former minor leaguer who worked in

9   the Tampa Bay Rays' organization from 2008 to 2010 and the Arizona Diamondbacks' organization

10  from 2010 to 2013. Mr. Gorgen is a covered employee within the meaning of the FLSA and the

11  applicable state wage and hour laws. He currently resides in Scottsdale, Arizona. Mr. Gorgen is a

12  representative plaintiff for the Minor League Collective, the New York Class, the California Class, the

13  Arizona Class, and the Florida Class.

14      48. Plaintiff and representative plaintiff Brett Newsome is a former minor leaguer who

15  worked in the Washington Nationals' organization from 2008 to 2013. Mr. Newsome is a covered

16  employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently

17  resides in Chicago, Illinois. Mr. Newsome is a representative plaintiff for the Minor League Collective,

18  the Florida Class, and the Maryland Class.

19      49. Plaintiff and representative plaintiff Jake Opitz is a former minor leaguer who worked in

20  the Chicago Cubs' organization from 2008 to 2012 and in the Philadelphia Phillies' organization in

21  2012. Mr. Opitz is a covered employee within the meaning of the FLSA and the applicable state wage

22  and hour laws. He currently resides in Centennial, Colorado. Mr. Opitz is a representative plaintiff for

23  the Minor League Collective, the Arizona Class, and the Florida Class.

24      50. Plaintiff and representative plaintiff Daniel Britt is a former minor leaguer who worked in

25  the Milwaukee Brewers' organization from 2010 to 2011. Mr. Britt is a covered employee within the

26  meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Chadbourn,

27  North Carolina. Mr. Britt is a representative plaintiff for the Minor League Collective and the Arizona

28  Class.

51. Plaintiff and representative plaintiff Joel Weeks is a former minor leaguer who worked in the San Francisco Giants' organization from 2008 to 2012. Mr. Weeks is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Torrance, California. Mr. Weeks is a representative plaintiff for the Minor League Collective, the Arizona Class, the California Class, and the Oregon Class.

52. Plaintiff and representative plaintiff Gaspar Santiago is a former minor leaguer who worked in the San Francisco Giants' organization from 2010 to 2013. Mr. Santiago is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Puerto Rico. Mr. Santiago is a representative plaintiff for the Minor League Collective, the Arizona Class, and the Oregon Class.

### 2. Defendants

53. **The Office of the Commissioner of Baseball, d/b/a MLB.** The Office of the Commissioner of Baseball, doing business as MLB, is an unincorporated association comprised of the thirty Major League baseball clubs ("the Franchises").[14] MLB has unified operation and common control over the Franchises, as well as agent corporations such as Major League Baseball Properties, Inc. and Major League Baseball Enterprises, Inc.[15] All do business as MLB.

54. Under the broad meaning of "employ" used by the FLSA and the applicable state laws, MLB employed (and/or continues to employ) Plaintiffs, all similarly situated employees, and all employees of the proposed classes. As described more thoroughly below, the Defendants' cartel has developed a unified constitution and unified rules to closely control many fundamental aspects of the minor leaguers' employment, including, *inter alia*, hiring, contracts, wages, periods of wage payment and nonpayment, other working conditions, and control over the minor leaguers before, during, and

---

[14] *See* Exhibit B, Major League Constitution ("MLC"), Art. II § 1; *see also* ECF No. 25, *City of San Jose, et al. v. Officer of the Commissioner of Baseball*, et al., No. 13-cv-02787-RMW, at n. 2 (N.D. Cal. August 7, 2013).

[15] These entities are not named as Defendants at this time but Plaintiffs reserve the right to name these entities as Defendants if information obtained during the course of this lawsuit connects these entities to the illegal conduct alleged.

after the championship season.

55. **Allan Huber "Bud" Selig.** Since 1998, Allan Huber "Bud" Selig has served as the Commissioner of Baseball. Mr. Selig is the former owner of an MLB Franchise.

56. The Commissioner is the "Chief Executive Officer of Major League Baseball."[16] Serving in this capacity, Mr. Selig has the power to, among other things, discipline players, announce rules and procedures, and preside over meetings.[17]

57. Mr. Selig also has "executive responsibility for labor relations,"[18] meaning that Mr. Selig is the chief bargaining agent for the owners during negotiations with the major league union.

58. Since he oversees all labor matters, Mr. Selig is also assumedly the chief agent for the owners when it comes to forming labor practices involving minor leaguers, and he owes a duty to the owners to act in their best interest. Moreover, Mr. Selig implements, enforces, and often directs the development of MLB's rules, guidelines, and policies concerning the employment of minor league players.

59. Mr. Selig also serves as MLB's agent in numerous other areas. For instance, Mr. Selig serves as "the fiscal agent of the Major League Central Fund"; has the power to "negotiate and enter into settlement agreements" for nationwide broadcasting rights; can receive funds "made payable to the Commissioner as agent for the Clubs"; and can even invest central funds on behalf of the Defendants.[19]

60. The MLB owners elect the Commissioner of Baseball by a vote.[20] They also pay the Commissioner's salary.[21]

61. Under the broad meaning of "employ" and "employer" used by the FLSA and the

---

[16] MLC Art. II § 2.

[17] MLC Art. II §§ 2, 3.

[18] MLC Art. II § 2.

[19] MLC Art. X; *see also* MLR 30 (saying that all funds in the hands of the Commissioner are joint funds of the MLB Clubs).

[20] MLC Art. II §§ 8, 9.

[21] MLC Art. II § 8.

1    applicable state laws, which allow a chief executive to be held jointly and severally liable, Mr. Selig

2    employed (and/or continues to employ) Plaintiffs, all similarly situated employees, and all employees

3    of the proposed classes. As described later in this complaint, Mr. Selig oversees and closely controls

4    many aspects central to the minor leaguers' employment, including, *inter alia*, hiring, contract terms,

5    discipline and firing, amount of wages, on-field work rules, and when wages are to be paid.[22]

6       62. Upon information and belief, and as described more fully below, Mr. Selig also had direct

7    involvement in the formation of programs affecting working conditions for minor leaguers, such as

8    the unilateral implementation of drug testing in 2001 and HGH testing in 2010, as well as the

9    implementation of a system to suppress signing bonuses for minor leaguers entering MLB's

10    developmental system for the first time. The Commissioner also has implemented and oversees a

11    tobacco policy, and all minor leaguers must abide by the policy.[23]

12       63. **Franchise Defendants.** The below named MLB franchises are defendants in this lawsuit

13    and referred to collectively as the "Franchise Defendants":

14       64. *Kansas City Royals.* Kansas City Royals Baseball Corp. (d/b/a "Kansas City Royals") is an

15    MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the

16    Kansas City Royals employed (and/or continue to employ) Plaintiffs, similarly situated employees,

17    and employees of the Proposed Classes.

18       65. *Miami Marlins.* Miami Marlins, L.P. (d/b/a "Miami Marlins") is an MLB Franchise. As a

19    member of Major League Baseball, acting jointly and on its own behalf, the Miami Marlins employed

20

21    ───────────────

22    [22] *See* MLR Attachment 3, Minor League Uniform Player Contract ("UPC") ¶¶ VI (describing the conditions of employment), VII (payment of salaries), XXIII (granting Commissioner right to suspend the contract), XXVI (requiring approval by the Commissioner for the contract to have

23    effect); *see also, e.g.,* Addendum C to MLR Attachment 3 (salary form requiring approval by the Commissioner); MLR 4 (giving Commissioner power to oversee the amateur draft, one of the chief

24    avenues of hiring players); MLR 13 (giving Commissioner the power to suspend players); MLR 3(e) (requiring all contracts to be approved by the Commissioner); MLR 14 (giving Commissioner

25    power to accept or deny an application for retirement); MLR 15 (giving Commissioner power to place

26    players on an Ineligible List for misconduct, or to take any other disciplinary action in the best interest of baseball).

27    [23] MLR Attachment 3, UPC ¶ VI.E.

28

(and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes. The Miami Marlins were known and operated as the Florida Marlins until changing its name in 2012. Plaintiffs are informed and believe that the Miami Marlins is the successor in interest to the Florida Marlins franchise.

66. *San Francisco Giants.* San Francisco Baseball Associates LLC (d/b/a "San Francisco Giants") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the San Francisco Giants employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

67. *Boston Red Sox.* Boston Red Sox Baseball Club L.P. (d/b/a "Boston Red Sox") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Red Sox employed (and/or continue to employ) Plaintiffs, similarly situated employees, and/or employees of the Proposed Classes.

68. *Toronto Blue Jays.* Rogers Blue Jays Baseball Partnership (d/b/a "Toronto Blue Jays") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Toronto Blue Jays employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

69. *Chicago White Sox.* Chicago White Sox Ltd. (d/b/a "Chicago White Sox") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Chicago White Sox employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

70. *Cleveland Indians.* Cleveland Indians Baseball Co., L.P., and Cleveland Indians Baseball Co, Inc., (d/b/a "Cleveland Indians") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Cleveland Indians employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

71. *Houston Astros.* Houston Baseball Partners LLC (d/b/a "Houston Astros") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Houston Astros employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

72. *Los Angeles Angels of Anaheim.* Angels Baseball LP (d/b/a "Los Angeles Angels of Anaheim") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Los Angeles Angels of Anaheim employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

73. *Oakland Athletics.* Athletics Investment Group, LLC (d/b/a "Oakland Athletics") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Oakland Athletics employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

74. *Seattle Mariners.* The Baseball Club of Seattle, LLLP (d/b/a "Seattle Mariners") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Seattle Mariners employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

75. *Cincinnati Reds.* The Cincinnati Reds, LLC (d/b/a "Cincinnati Reds") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Cincinnati Reds employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

76. *St. Louis Cardinals.* St. Louis Cardinals, LLC (d/b/a "St. Louis Cardinals") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the St. Louis Cardinals employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

77. *Colorado Rockies.* Colorado Rockies Baseball Club, Ltd. (d/b/a "Colorado Rockies") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Colorado Rockies employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

78. *San Diego Padres.* Padres L.P., and the San Diego Padres Baseball Club, L.P. (d/b/a "San Diego Padres") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the San Diego Padres employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

79. *Minnesota Twins.* Minnesota Twins, LLC (d/b/a "Minnesota Twins") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Minnesota Twins employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

80. *Washington Nationals.* Washington Nationals Baseball Club, LLC (d/b/a "Washington Nationals") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Washington Nationals employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

81. *Detroit Tigers.* Detroit Tigers, Inc. (d/b/a "Detroit Tigers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Detroit Tigers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

82. *Los Angeles Dodgers.* Los Angeles Dodgers LLC and Los Angeles Dodgers Holding Company LLC., (d/b/a "Los Angeles Dodgers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Los Angeles Dodgers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

83. *New York Mets.* Sterling Mets L.P. (d/b/a "New York Mets") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the New York Mets employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

84. *Atlanta Braves.* Atlanta National League Baseball Club, Inc. (d/b/a "Atlanta Braves") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Atlanta Braves employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

85. *Arizona Diamondbacks.* AZPB L.P. (d/b/a "Arizona Diamondbacks") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Arizona Diamondbacks employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

86. *Baltimore Orioles.* Baltimore Orioles, Inc., and Baltimore Orioles, L.P., (d/b/a "Baltimore Orioles") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Baltimore Orioles employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

87. *Philadelphia Phillies.* The Phillies L.P. (d/b/a "Philadelphia Phillies") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Philadelphia Phillies employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

88. *Pittsburgh Pirates.* Pittsburgh Associates, LP, (d/b/a "Pittsburgh Pirates") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Pittsburgh Pirates employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

89. *New York Yankees.* New York Yankees Partnership (d/b/a "New York Yankees") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the New York Yankees employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

90. *Tampa Bay Rays.* Tampa Bay Rays Baseball Ltd. (d/b/a "Tampa Bay Rays") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Tampa Bay Rays employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

91. *Chicago Cubs.* Chicago Cubs Baseball Club, LLC(d/b/a "Chicago Cubs") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Chicago Cubs employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

92. *Milwaukee Brewers.* Milwaukee Brewers Baseball Club, Inc., and Milwaukee Brewers Baseball Club, L.P., (d/b/a "Milwaukee Brewers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Milwaukee Brewers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

93. *Texas Rangers.* Rangers Baseball Express, LLC, and Rangers Baseball, LLC, (d/b/a "Texas Rangers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Texas Rangers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

### III.  CLASS ACTION ALLEGATIONS

94. Plaintiffs bring the state law claims, Counts 3 through 22 of this action, as class actions under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated. The classes (collectively "Proposed Classes") are as follows:

95. **California Class.** For Counts 3 through 5 and 7 through 10 (violations of California wage and labor laws and quantum meruit under California law), the California Class is defined as follows: all minor leaguers employed by Defendants under uniform player contracts ("UPC") who worked, will work, and/or continue to work as minor leaguers in the state of California at any time four years before the filing of this action until its resolution, but who had no service time in the major leagues at the time of performing work as a minor leaguer in California. Excluded from the California Class are Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper requests for exclusion from the California Class.

96. The California Class Representatives consist of Plaintiffs Aaron Meade, Oliver Odle, Kyle Woodruff, Kyle Nicholson, Brandon Henderson, Brad McAtee, Craig Bennigson, Ryan Kiel, Jake Kahaulelio, Justin Murray, Dustin Pease, Mitch Hilligoss, Joseph Newby, Matt Gorgen, Joel Weeks, Matt Daly and Kris Watts.

97. *California Waiting Time Subclass.* Count 6 of this complaint seeks waiting time penalties under California Labor Code § 203 for the withholding of wages after employment ceases. Consequently, Count 6 requires a subclass within the California Class. The California Waiting Time Subclass will consist of the following: all Plaintiffs and members of the California Class whose employment relationship with the Defendants has already ceased, and/or ceases during the course of this action.

98. **Florida Class.** For Counts 11 and 12 (violations of Florida's Minimum Wage Law and quantum meruit under Florida common law), the Florida Class is defined as follows: all minor leaguers employed by Defendants under UPCs who worked, will work, and/or continue to work as minor leaguers in the state of Florida at any time five years before the filing of this action until its resolution, but who had no service time in the major leagues at the time of performing work as a minor leaguer in Florida. Excluded from the Florida Class are Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper requests for exclusion from the Florida Class.

99. The Florida Class Representatives consist of Plaintiffs Ryan Khoury, Brandon Henderson, Jeff Nadeau, Ryan Kiel, Jake Kahaulelio, Jon Gaston, Tim Pahuta, Matt Daly, Aaron Senne, Brad Stone, Mitch Hilligoss, Witer Jimenez, Jake Opitz, Ryan Hutson, Les Smith, Matt Frevert, Roberto Ortiz, Brett Newsome, Kris Watts, and Matt Gorgen.

100. **Arizona Class.** For Counts 13 to 15 (violations of Arizona wage laws and quantum meruit under Arizona law), the Arizona Class is defined as follows: all minor leaguers employed by Defendants under UPCs who worked, will work, and/or continue to work as minor leaguers in the state of Arizona at any time three years before the filing of this action until its resolution, but who had no service time in the major leagues at the time of performing work as a minor leaguer in Arizona. Excluded from the Arizona Class are Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper requests for exclusion from the Arizona Class.

101. The Arizona Class Representatives consist of Plaintiffs Aaron Meade, Jon Gaston, Oliver Odle, Kyle Woodruff, Brad McAtee, Craig Bennigson, Matt Lawson, Ryan Kiel, Justin Murray, Dustin Pease, Michael Liberto, Jake Opitz, Joseph Newby, Mitch Hilligoss, Kris Watts, Roberto Ortiz, Daniel Britt, Joel Weeks, Gaspar Santiago, and Matt Gorgen.

102. **North Carolina Class.** For Counts 16 to 18 (violations of North Carolina's wage laws and quantum meruit under North Carolina law), the North Carolina Class is defined as follows: all minor leaguers employed by Defendants under UPCs who worked, will work, and/or continue to work as minor leaguers in the state of North Carolina at any time two years before the filing of this action until its resolution, but who had no service time in the major leagues at the time of performing work as a minor leaguer in North Carolina. Excluded from the North Carolina Class are Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper requests for exclusion from the North Carolina Class.

103. The North Carolina Class Representatives consist of Craig Bennigson and Aaron Senne.

104. **New York Class.** For Counts 19 to 22 (violations of New York's wage laws and quantum meruit under New York law), the New York Class is defined as follows: all minor leaguers employed by Defendants under UPCs who worked, will work, and/or continue to work as minor league players in the state of New York at any time six years before the filing of this action until its resolution, but who had no service time in the major leagues at the time of performing work as a minor leaguer in New York. Excluded from the New York Class are Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper requests for exclusion from the New York Class.

105. The New York Class Representatives consist of Ryan Khoury, Brad McAtee, Jon Gaston, Matt Daly, Aaron Senne, Kris Watts, and Matt Gorgen.

106. **Pennsylvania Class.** For Counts 23 to 25 (violations of Pennsylvania's wage and hour laws and quantum meruit under Pennsylvania Law) the Pennsylvania Class is defined as follows: all minor leaguers employed by Defendants under UPCs who worked, will work, and/or continue to work as minor league players in the state of Pennsylvania at any time three years before the filing of this action until its resolution, but who had no service time in the major leagues at the time of

1    performing work as a minor leaguer in Pennsylvania. Excluded from the Pennsylvania Class are

2    Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at

3    any time during the class period has had, a controlling interest in Defendants. Also excluded are the

4    Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons

5    who submit timely and proper requests for exclusion from the Pennsylvania Class.

6        107. The Pennsylvania Class Representatives consist of Tim Pahuta and Kris Watts.

7        108. **Maryland Class.** For Counts 26 to 28 (violations of Maryland's wage and hour laws and

8    quantum meruit under Maryland Law), the Maryland Class is defined as follows: all minor leaguers

9    employed by Defendants under UPCs who worked, will work, and/or continue to work as minor

10   league players in the state of Maryland at any time three years before the filing of this action until its

11   resolution, but who had no service time in the major leagues at the time of performing work as a

12   minor leaguer in Maryland. Excluded from the Maryland Class are Defendants and their officers,

13   directors, assigns, and successors, or any individual who has, or who at any time during the class

14   period has had, a controlling interest in Defendants. Also excluded are the Court and any members of

15   the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper

16   requests for exclusion from the Maryland Class.

17       109. The Maryland Class Representatives consist of Roberto Ortiz and Brett Newsome.

18       110. **Oregon Class.** For Counts 29 to 31 (violations of Oregon wage and hour laws and

19   quantum meruit under Oregon Law), the Oregon Class is defined as follows: all minor leaguers

20   employed by Defendants under UPCs who worked, will work, and/or continue to work as minor

21   league players in the state of Oregon at any time six years before the filing of this action until its

22   resolution, but who had no service time in the major leagues at the time of performing work as a

23   minor leaguer in Oregon. Excluded from the Oregon Class are Defendants and their officers,

24   directors, assigns, and successors, or any individual who has, or who at any time during the class

25   period has had, a controlling interest in Defendants. Also excluded are the Court and any members of

26   the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper

27   requests for exclusion from the Oregon Class.

28       111. The Oregon Class Representatives consist of Joel Weeks and Gaspar Santiago.

112. *Common characteristics of the Proposed Classes.* All of the Proposed Classes share the following characteristics, making them all optimal for class resolution:

113. Each of the Proposed Classes is so numerous that joinder of all members is impracticable. While the exact number of Class members in each Class is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that several hundred (and in the case of the Florida and Arizona Classes several thousand) geographically-dispersed Class members worked, will work, and continue to work as minor leaguers in each of the applicable states, either during spring training, at promotional events, during other training and work periods, or during championship seasons occurring within the states.

114. Plaintiffs' claims are typical of the claims of the other members of each of the Proposed Classes. Plaintiffs and the members of the Proposed Classes were subject to the same or similar compensation practices arising out of Defendants' common course of conduct in violation of the federal and state laws as alleged herein. Plaintiffs and the Proposed Classes have sustained similar types of damages as a result of these common practices.

115. Plaintiffs will fairly and adequately protect the interests of the members of all members of the Proposed Classes because they possess the same interests and suffered the same general injuries as class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including wage and hour class action litigation.

116. Common questions of law and fact exist as to all members of the Proposed Classes and predominate over any questions affecting solely individual members of the Class. Among the many questions of law and fact common to the Proposed Classes are:

    (a)    whether Defendants set wages at a rate below the minimum wages required under the applicable laws;

    (b)    whether Defendants paid and continue to pay no wages at all during certain pay periods, contrary to the requirements of applicable laws;

    (c)    whether any exemptions apply to the industry or to minor leaguers;

(d)    whether Defendants require all minor leaguers to sign the same UPC, which controls minor leaguers' pay and pay periods and enables the unlawful practices;

(e)    whether all minor leaguers signed substantially the same UPC;

(f)    whether Defendants willfully, or with reckless disregard, carried out their unlawful practices;

(g)    the compensability of certain work periods and the appropriate method of measuring damages for the injuries sustained by Plaintiffs and other members of the Proposed Classes as a result of Defendants' unlawful activities; and

(h)    Whether Defendants have acted or refused to act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive or declaratory relief appropriate with respect to the Plaintiff Class as a whole.

117. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members in each of the Proposed Classes is impracticable. The prosecution of separate actions by individual members of the Proposed Classes would impose heavy burdens on the courts and the parties, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

118. The interest of members of each of the Proposed Classes in individually controlling the prosecution of separate actions is highly limited and impractical. Each of the Proposed Classes has a high degree of cohesion and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are often not great individually. As individuals, the class members would lack the resources to vigorously litigate against the ample and powerful resources of the Defendants' cartel. Importantly, many of the Class members are current minor league players and would not bring an individual action out of fear

23

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1    of retaliation. Lastly, Plaintiffs do not anticipate any difficulty in the management of this action as a

2    class action.

3    ## IV.  COLLECTIVE ACTION ALLEGATIONS

4    119. Plaintiffs bring Counts I and II, the FLSA claims, on behalf of themselves and all persons

5    similarly situated since three years before the filing of this action until its resolution (the "Minor

6    League Collective").

7    120. The Defendants are liable under the FLSA for, *inter alia*, failing to properly compensate

8    Plaintiffs and the members of the Minor League Collective. The Minor League Collective consists of

9    thousands of similarly situated individuals who have been, will be, and/or continue to be underpaid

10   during certain work periods and not paid at all during other work periods. This Collective would

11   benefit from the issuance of a court-supervised notice of the lawsuit and the opportunity to join the

12   lawsuit.

13   121. The members of the Minor League Collective are known to Defendants, are readily

14   identifiable, and can be located through Defendants' records. Notice should be sent to the members

15   of the Collective pursuant to 29 U.S.C. § 216(b).

16   ## V.  JURISDICTION, VENUE, AND COMMERCE

17   122. This Court has subject matter jurisdiction with respect to Plaintiffs' federal claims

18   pursuant to 28 U.S.C. §§ 1331 and 1337, and jurisdiction over Plaintiffs' state law claims pursuant to

19   28 U.S.C. § 1367 (supplemental jurisdiction).

20   123. Plaintiffs' state law claims are so closely related to Plaintiffs' claims under the FLSA that

21   they form part of the same case or controversy under Article III of the United States Constitution.

22   124. Additionally and/or alternatively, this Court has jurisdiction over Plaintiffs' state law

23   claims under 28 U.S.C. § 1332 because the amount in controversy for the Proposed Classes exceeds

24   $5,000,000 and there are members of the Proposed Classes who are citizens of a different state than

25   Defendants, as well as members of the Proposed Classes who are citizens of a foreign state.

26   125. This Court also has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29

27   U.S.C. § 216(b).

28   126. All Defendants are subject to personal jurisdiction in California since all Defendants

1    transact a significant amount of business in California.

2        127. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on

3    interstate commerce. The Defendants host baseball games, operate baseball leagues, and transact

4    business in multiple states. The Defendants routinely use instruments of interstate commerce, such as

5    interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to carry out their

6    operations.

7        128. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)

8    and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this

9    District. All the Defendants transact business in the Northern District of California; two MLB

10   Franchises are located in the Northern District of California; five of the Plaintiffs were employed by

11   the San Francisco Giants and four worked for a significant period of time at the Giants' minor league

12   affiliate in San Jose, California; and two plaintiffs were employed by the Oakland Athletics.

13   Additionally, it is believed that one of MLB's officers resides within this District.

14       129. Upon information and belief, each Franchise employs minor leaguers from California,

15   which routinely ranks as the number one provider of minor leaguers in the United States.

16       130. In the last three years, California averaged 221 draft picks per year (compared to, for

17   instance, an average of 32 per year for New York over the same time span). Since most minor

18   leaguers return home during the offseason, where they continue to work for the Franchises without

19   pay, this complaint alleges that all Defendants employ minor leaguers in the state of California in

20   violation of California law.

21       131. Moreover, five Franchises are located in California, and an entire minor league is located

22   within the state.

23       132. All causes of action asserted in this Complaint are closely related to one another and each

24   accrued under the same common set of facts and share a common nucleus of operative facts. Each

25   cause of action emanates from the same uniform contract, from the same policies and practices, as

26   applied to the same group of employees.

27

28

861070.1

25

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

# VI.  FACTUAL ALLEGATIONS

## 1.        The Booming Business of MLB

133. MLB is the preeminent baseball league in the world. Its games are broadcast in 233 countries and territories in 17 different languages.[24] During the 2013 season, over 74 million fans paid to attend MLB games.

134. In 2012, revenue for MLB and its thirty teams surpassed $7.5 billion, an increase of 257 percent since 1995. Annual revenue will continue to climb as new television contracts begin to perform and is expected to reach $9 billion dollars in 2014.[25]

135. Franchise values for the thirty MLB teams have grown as well. In 2012 alone, Franchise values increased by 23 percent. The New York Yankees are now the most valuable sports franchise in the United States with an estimated value of $2.3 billion; the average value of the thirty Franchises stands at $744 million each.[26]

136. The baseball players employed by the Defendants sustain this rise in revenue, as they comprise the chief product offered by MLB and its teams. Without baseball players, MLB and its teams would not exist. Yet MLB and its Franchises pay most players—the minor leaguers—wages that fall well below minimum wage. They also fail to pay required overtime pay, and often fail to pay wages at all for work performed, allowing many—if not most—minor leaguers to fall below federal poverty levels.

---

[24] *MLB International*, MLB.com, http://mlb.mlb.com/mlb/international/mlbi_index.jsp (last visited Dec. 16, 2013).

[25] *See* Maury Brown, *MLB Revenues $7.5B for 2012, Could Approach $9B by 2014*, Biz of Baseball (Dec. 10, 2012), http://www.bizofbaseball.com/?catid=30:mlb-news&id=5769:mlb-revenues-75b-for-2012-could-approach-9b-by-2014&Itemid=42&option=com_content&view=article.

[26] Mike Ozanian, *Baseball Team Valuations 2013: Yankees on Top at $2.3 Billion*, Forbes (Mar. 27, 2013), http://www.forbes.com/sites/mikeozanian/2013/03/27/baseball-team-valuations-2013-yankees-on-top-at-2-3-billion/.

### 2.        Minor Leaguers' Uniform, Adhesive Contracts

137. Since the 1920s, all MLB teams have used an extensive "farm system" to develop players. MLB teams employ a small number of major leaguers that perform in MLB stadiums at the game's highest level. Rules allow Franchises to only maintain 25 major leaguers on an "active roster" and a few additional players reserved on the "40-man" roster. A few more players are inevitably on the major league disabled list, so each Franchise employs a little over 40 major leaguers.

138. But each Franchise simultaneously stockpiles around 150 to 250 minor leaguers that perform at the minor league levels of baseball. It is estimated that, at any given time, the Defendants collectively employ around 6,000 minor leaguers total. The Defendants employ this high number of minor leaguers in their farm systems, hoping they eventually develop into major leaguers.

139. MLB and its thirty teams enjoy a longstanding antitrust exemption. This exemption allows the Defendants to operate as a single organization when establishing rules for employing minor leaguers. Moreover, the exemption significantly increases the level of bargaining power the Defendants collectively exercise over the minor leaguers.

140. While major leaguers have formed a union that successfully combats the Defendants' collusive bargaining power, minor leaguers have no union. Without a union to counteract MLB's power, MLB and its teams have exploited minor leaguers by, among other things, continuing to promulgate and impose oppressive rules on minor leaguers' entry into the industry and on contracts, salaries, and other working conditions.

141. The MLB teams acquire minor leaguers in one of two ways: through an amateur draft or through free agency.

142. The amateur draft, known as MLB's Rule 4 draft,[27] occurs in June of each year. The genesis of the Rule 4 draft is instructive on the Commissioner's involvement in developing and enforcing MLB's policies on payments to major leaguers. Since at least World War II, the Defendants

---

[27] MLR 4.

1  have sought to suppress signing bonuses for the most talented amateur players.[28] Various solutions

2  were proposed, but none seemed to work.

3       143. In 1965, Commissioner Ford Frick oversaw the development and implementation of

4  what is now the Rule 4 draft. By forcing amateur players to participate in the draft, MLB and its

5  Commissioner limited those players seeking to enter MLB's developmental system to only negotiating

6  with a single team. Thus, signing bonuses declined.

7       144. Upon information and belief, Bud Selig sought to further curb signing bonuses for

8  draftees in the late 1990s. Acting in his capacity as chief labor agent,[29] he directed the development

9  and implementation of an informal "slotting" system with recommended signing bonuses for each

10  high level pick. To enforce the mechanism, Mr. Selig required a Franchise's scouting director to call

11  the Commissioner's office prior to exceeding the recommended slot level. This requirement of

12  approval is an outgrowth of MLB's rules, which require all minor league contracts to be filed with and

13  approved by Mr. Selig.[30]

14       145. Not satisfied with an informal slotting system, Mr. Selig sought the implementation of a

15  more formal, mandatory slotting system. At his direction, a new, stricter system was instituted in 2012.

16  The current system places limits on the amounts Franchises can spend on signing bonuses.

17       146. MLB's current Rule 4 draft, as developed and enforced by the Commissioner, requires all

18  amateur players from the United States, Canada, and Puerto Rico to participate in the draft in order to

19  sign with an MLB team.[31] Beginning with the worst MLB team from the previous season, teams select

20  previously amateur players over the course of forty rounds.

21       147. Players selected in the Rule 4 draft are between the ages of 18 and 22 (with the exception

22  _____

23  [28] MLB teams offer large signing bonuses to the most talented amateur players as an incentive to

24  forego college. Only the very top amateurs, however, receive large signing bonuses. The majority of
amateurs signed through the draft receive quite small signing bonuses, usually around $2500.

25  [29] MLC Art. II § 2.

26  [30] *See* MLR 3(e) (requiring all contracts to be approved by the Commissioner); MLR Attachment 3,
UPC ¶ XXVI (requiring approval by the Commissioner for the contract to have effect).

27  [31] MLR 4(a).

28

of a few players who are 23). Once selected by a Franchise, a player cannot bargain with any other Franchise, as MLB's rules grant the drafting Franchise exclusive rights to the player.[32]

148. While some highly talented players retain agents (or advisors) to assist them with negotiations, the National Collegiate Athletic Association—the governing body for college baseball players and prospective college baseball players—prohibits amateur athletes from employing agents or attorneys during contract negotiations.[33] MLB teams have even cooperated with the NCAA to enforce the rule, with suspensions resulting.

149. Moreover, the less talented amateurs, who receive small signing bonuses, offer little incentive for agents to represent them. Also, the Defendants' scouts often discourage the use of attorneys/agents. Thus, many—and likely most—minor leaguers are unrepresented when drafted and initially signing UPCs.

150. In addition to the draft, teams acquire previously amateur Latin American players through free agency. The Dominican Republic, followed by Venezuela, produces the most Latin American players. MLB rules allow the Franchises to sign the players as early as age sixteen, so most Latinos are either sixteen or seventeen when signing with a Franchise.[34]

151. Most Latino minor leaguers come from poor families and have only the equivalent of an eighth grade education. Before signing, many are only represented by similarly-educated "buscones"—usually former players who maintain training facilities for young amateur players. Some of the Franchises' scouts have been reprimanded in recent years for participating in bribes and kickback schemes with the buscones, and the FBI has even investigated the exploitative practices.[35]

_____

[32] MLR 4(e).

[33] *See* 2012–2013 NCAA Division I Manual, Article 12 Amateurism, at 68, *available at* http://grfx.cstv.com/photos/schools/bc/genrel/auto_pdf/2012-13/misc_non_event/12_13_NCAA_Manual.pdf ("A lawyer may not be present during discussions of a contract offer with a professional organization or have any direct contact…with a professional sports organization on behalf of the individual.").

[34] *See* MLR 3(a).

[35] *See* Jorge L. Ortiz, *Exploitation, steroids hitting home in Dominican Republic*, USA Today (Mar. 26, 2009), http://usatoday30.usatoday.com/sports/baseball/2009-03-26-dominican-republic-cover_N.htm.

1   These Latino signees comprise over forty percent of minor leaguers.

2   152. Similar to the slotting system, Mr. Selig also personally oversaw the development of

3   bonus pools for Latino players in an effort to curtail Latino signing bonuses. Instituted in 2012, Mr.

4   Selig's plan allows each Franchise a certain amount to spend on signing bonuses for Latino players.

5   153. Teams also sign additional players from the United States, Canada, and Puerto Rico who

6   were not drafted in the Rule 4 draft.[36] MLB rules place limits on when such free agent acquisitions can

7   occur. Since they were not selected in the draft, they are viewed as less skilled amateur players and,

8   even as free agents, have no bargaining power.

9   154. MLB operates a scouting service known as the Major League Baseball Scouting Bureau

10   that evaluates amateur players on the behalf of all the Defendants. MLB owners created the

11   centralized service in 1974, and it operates under the umbrella of the Office of the Commissioner.

12   The Scouting Bureau routinely hosts tryouts for amateur players seeking to enter the industry, and its

13   scouts attend amateur games throughout the entire country and in Latin America to develop reports

14   on amateur players. The Scouting Bureau additionally requests that amateur players fill out

15   informational cards and, sometimes, psychological tests. All the Franchises have access to these

16   evaluations, and it is believed that they use them when making draft and free agent acquisitions.

17   155. MLB rules, as implemented and enforced by the Defendants and the Commissioner,

18   require all teams to use the same uniform player contract ("UPC") when signing these previously

19   amateur players. MLR 3(b)(2) states:

20   > To preserve morale among Minor League players and to produce the similarity of
   > conditions necessary for keen competition, all contracts…shall be in the form of the
21   > Minor League Uniform Player Contract that is appended to these Rules as Attachment
   > 3. All Minor League Uniform Player Contracts between either a Major or a Minor
22   > League Club and a player who has not previously signed a contract with a Major or
   > Minor League Club shall be for a term of seven Minor League playing seasons….The
23   > minimum salary in each season covered by a Minor League Uniform Player Contract
   > shall be the minimum amount established from time to time by the Major League
24   > Clubs….

25   156. Moreover, "[a]ll contracts shall be in duplicate," and "[a]ll…must be filed with the

26   _____

27   [36] MLR 4(i).

28

Commissioner…for approval."[37] No contract can vary any term without the approval of the Commissioner.[38] A minor leaguer cannot work for an MLB team without signing the UPC because a "player's refusal to sign a formal contract shall disqualify the player from playing with the contracting Club or entering the service of any Major or Minor League Club."[39]

157. Thus, the UPC grants the MLB team the exclusive rights to the minor leaguer for seven championship seasons (about seven years).[40] During that time period, the MLB team may assign the minor leaguer's rights to any other team, and the MLB team may terminate the agreement at any time for almost any reason.[41]

158. But the minor leaguer cannot leave voluntarily to play for another baseball team—even outside of MLB, and even outside of the United States.[42] A player doing so "shall be subject to the discipline of the Commissioner."[43] Retirement from baseball during the seven-year term even requires the Commissioner's approval.[44] Thus, minor leaguers possess very little (and one-sided) contractual mobility.

159. The one-sided mobility often traps a player in the minor leagues of a single organization. A minor leaguer selected in the amateur draft can only sign with the MLB team that drafted him. For the next seven years, the MLB team controls the minor leaguer's rights. By the expiration of the contract, much of the value of the minor leaguer as a young prospect has expired because the player has aged.

160. The MLB cartel uses a vertically integrated system of development for these minor leaguers. Players begin at the lowest levels of MLB's developmental system, levels known as Rookie

---

[37] MLR 3(b)(3); *see also* MLR 3(b)(4) (saying that a player cannot play until the UPC is signed).

[38] MLR 3(b)(3).

[39] MLR 3(d).

[40] MLR 3(b)(2); MLR Attachment 3, UPC ¶ VI.A.

[41] MLR 9; MLR Attachment 3, UPC ¶ XVIII.

[42] MLR 18; MLR Attachment 3, UPC ¶ XVI.

[43] MLR 18.

[44] MLR 14.

and Short-Season A. Ideally they then advance to higher levels: Class-A, Advanced Class-A, Double-A, and Triple-A (one step from the major leagues). Each level acts as a funnel, though, with many minor leaguers never advancing past Class-A, and the vast majority never reaching the major leagues.

161. Since the signing of a 1962 Player Development Plan, MLB requires MLB Franchises to maintain a certain number of minor league teams. Commissioner Frick oversaw this requirement, even testifying before Congress about the need for maintaining a high number of minor league teams. Currently, all MLB teams have minor league teams at all the levels of the minor leagues, with most having either seven or eight minor league teams.

162. Often the MLB Franchises do not operate the minor league stadium but instead sign agreements with owners of minor league teams. These agreements are known as Player Development Contracts ("PDC"), and the teams are affiliates of the MLB Franchises.

163. MLB rules make clear that MLB and its Franchises remain the employers of minor leaguers at all times when using PDCs. MLR 56(g) states:

> The players so provided shall be under contract exclusively to the Major League Club and reserved only to the Major League Club. The Minor League Club shall respect, be bound by, abide by and not interfere with all contracts between the Major League Club and the players that it has provided to the Minor League Club.

164. Moreover, MLB requires the MLB Franchise to pay the salaries of the minor league players at all times and allows the MLB Franchise the ability to control assignments.[45]

165. MLB's rules also mandate that the Franchises "select and employ" and "compensate and provide benefits for" the minor league "managers, coaches, instructors and trainers" at all times during a PDC agreement.[46] These coaches and instructors, directed by MLB and MLB's Franchises and working under MLB's rules, oversee the daily work of the players. The MLB Franchise consequently "makes all decisions related to player development, including selecting the coaching staff and deciding which players to assign to the team."[47]

---

[45] MLR 56(g).

[46] MLR 56(g).

[47] *MiLB.com Frequently Asked Questions*, MiLB.com, http://www.milb.com/milb/info/faq.jsp?mc (footnote continued)

166. The minor league party to the PDC, on the other hand, has little control over players. MLR 56(g) merely requires the minor league party to furnish uniforms, share in the cost of bats and balls, and maintain the minor league stadium.

### 3.     The Illegal Minor League Salaries

167. Since minor leaguers do not belong to a union, nothing has prevented the Defendants from artificially and illegally depressing minor league wages. Indeed, MLB's exemption from antitrust laws has only made it easier. Given that MLB carefully controls the entryway into the highest levels of baseball, and given the young minor leaguer's strong desire to enter the industry, MLB and the Defendants have exploited minor leaguers by paying salaries below minimum wage, by not paying overtime wages, and by often paying no wages at all.

168. Plaintiffs are informed and believe that MLB and the Commissioner issue minor league salary guidelines for players signed to an initial UPC, and teams deviate very little from these guidelines. After all, MLR 3(c) requires that all first-year minor leaguers earn "the amount established by" MLB.[48] It is currently believed that all first-year minor leaguers employed by the Defendants must earn $1,100 per month.

169. Salaries beyond the first year are very similar across all Franchises. It is believed that discussions regarding minor league salaries (and other working conditions concerning minor leaguers) occur when MLB hosts its quarterly owner meetings that all Defendants attend.

170. While salary guidelines are not publicly available, the Plaintiffs are informed and believe, based on the salaries paid by the Defendants across the minor leagues, that MLB currently recommends the following salaries, paid only during the championship season:

- $1,100 per month for Rookie and Short-Season A;
- $1,250 per month for Class-A;
- $1,500 per month for Class-AA; and

---

=business#3 (last visited Dec. 17, 2013).

[48] As the 2013 Miami Marlins Minor League Player Guide states, "all first-year players receive $1,100 per month regardless of playing level per the terms of the [UPC]."

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1         •   $2,150 for Class-AAA.

2       171. Beyond the first year, the UPC required by MLB, and enforced by Mr. Selig, purports to

3 allow salary negotiation by the minor leaguer, as the UPC states that salaries will be set out in an

4 addendum to the UPC and subject to negotiation.[49] But the same UPC provision states that if the

5 Franchise and minor leaguer do not agree on salary terms, the Franchise may unilaterally set the salary

6 and the minor leaguer must agree to it.[50]

7       172. In truth, then, the UPC—and Mr. Selig as enforcer—does not allow for minor league

8 salary negotiations. It is believed that the Franchises simply follow MLB's salary guidelines, and the

9 minor leaguers must accept them. As the 2013 Miami Marlins Minor League Player Guide states,

10 "This salary structure will be strictly adhered to; therefore, once a salary figure has been established

11 and sent to you, there will be NO negotiations."

12       173. MLB also centrally controls when and how minor leaguers are paid. During the

13 championship season, the Franchises must pay minor leaguers "in two (2) semi-monthly installments

14 on the 15th day and last day of the month."[51]

15       174. The UPC required by MLB, and enforced by Mr. Selig, further states that salaries are only

16 to be paid during the championship season, which, for most players, lasts about five months out of

17 the year.[52] Due to the funneling that occurs at each level, significantly more minor leaguers perform at

18 the lower levels of the minor leagues than at the upper two levels of the minor leagues (Class-AA and

19 Class-AAA), so Plaintiffs believe that most minor leaguers earn less than $7,500 per calendar year.

20 Some earn $3,000 or less. Despite only being compensated during the championship season, MLB's

21 UPC "obligates Player to perform professional services on a calendar year basis, regardless of the fact

22

23 _____

24 [49] MLR Attachment 3, UPC ¶ VII.A.

25 [50] MLR Attachment 3, UPC ¶ VII.A.

    [51] MLR Attachment 3, UPC ¶ VII.B.

26 [52] MLR Attachment 3, UPC ¶ VII.B. ("Obligation to make such payments to Player shall start with

27 the beginning of Club's championship playing season…[and] end with the termination of Club's
championship playing season….").

28

1    that salary payments are to be made only during the actual championship playing season."[53] Consistent

2    with that obligation, the UPC states that "Player therefore understands and agrees that Player's duties

3    and obligations under this Minor League Uniform Player Contract continue in full force throughout

4    the calendar year."

5        175. MLB's UPC, and the Defendants' application of the UPC, requires the minor leaguer to

6    participate in spring training.[54] Again, the UPC does not allow for salaries during this period since

7    spring training falls outside the championship season, so minor leaguers work without earning a

8    paycheck. The spring training season usually lasts around one month, during the month of March, but

9    it sometimes lasts longer.

10       176. Around 30–50 minor leaguers per MLB Franchise do not earn a roster spot on a minor

11   league team at the end of spring; they instead remain at the Franchise's spring training site in

12   "extended spring training." Since they are not participating in a championship season, MLB's UPC

13   again does not require salaries to be paid.[55] Upon information and belief, many of these players will

14   not earn paychecks until the end of June, when the Rookie and Short-Season A leagues begin. Thus,

15   many minor leaguers are not paid for work performed during March, April, May, and most of June.

16       177. At the end of the championship season, around 30–45 minor leaguers per MLB

17   Franchise are also selected to participate in an instructional league to further hone their skills. Again,

18   MLB's UPC—as approved and enforced by Mr. Selig—requires minor leaguers to perform this work

19   without pay since it is outside the championship season, so the minor leaguers receive no paychecks

20   during the instructional league.[56] The instructional leagues usually last around one month.

21       178. MLB's UPC also requires minor leaguers to maintain "first-class" conditioning

22   throughout the calendar year[57] because the player's "physical condition is important to…the success

23   _____

24   [53] MLR Attachment 3, UPC ¶ VI.B.

25   [54] *See* MLR Attachment 3, UPC ¶ VI.B. (saying that the UPC applies to the "Club's training season").

26   [55] MLR Attachment 3, UPC ¶ VII.B.

27   [56] MLR Attachment 3, UPC ¶ VII.B.

     [57] MLR Attachment 3, UPC ¶ XII.

28

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

of the Club."[58] Consequently, a "Club may require Player to maintain Player's playing condition and weight during the off-season and to report for practice and condition at such times and places as Club may determine."[59] If the player fails to meet these requirements, the "Club may impose a reasonable fine upon Player…."[60]

179. Carrying out this provision of MLB's UPC, the Defendants therefore require players to perform extensive training and conditioning during the winter off-season. It is believed that all Franchises direct the winter work by issuing training packets to all the players. Many, and perhaps all, Franchises monitor workouts and punish players for not performing off-season workouts. Per MLB's required UPC, as approved by Mr. Selig, minor leaguers receive no wages during this training period because it is outside the championship season.[61]

180. In sum, the Defendants, as directed by Mr. Selig, pay illegally low wages during the championship season, no overtime wages, and no wages for work performed outside the championship season. As demonstrated below, the cartel requires players to work very long hours, further demonstrating the illegality of the wage scheme.

### 4.      The Long Hours Worked By Minor Leaguers

181. During the roughly five-month championship season, minor league teams play games either six or seven days per week. The minor leaguer enjoys a day off on average only once every 2–3 weeks.

182. For Monday through Saturday games, minor leaguers must participate in mandatory pregame activities: stretching, batting practice, fielding practice, throwing, conditioning, etc. With games averaging around three hours in length, minor leaguers usually work around eight mandatory hours at the stadium on these days. For Sunday workdays, players also perform significant amounts of work.

---

[58] MLR Attachment 3, UPC ¶ VI.D.

[59] MLR Attachment 3, UPC ¶ VI.D.

[60] MLR Attachment 3, UPC ¶ VI.D.

[61] *See* MLR Attachment 3, UPC ¶ VII.B.

183. In a seven-day workweek—which is typical—the minor leaguer consequently works well in excess of forty hours at the stadium. If the minor leaguer enjoys a rare off day during a week, the minor leaguer still works in excess of forty hours per week at the stadium during the altered six-day workweek.

184. As part of the maintenance of first-class conditioning required by MLB's UPC, players must also regularly perform strength and conditioning workouts during the season. These workouts are devised and supervised by strength coaches employed by MLB's Franchises. The required workouts thus add additional compensable time onto the minor leaguers' work schedule.

185. Additionally, minor leaguers are required to perform protracted travel, usually by a team bus. Half of the games are played away from home, and the usual road trip often entails a handful of bus rides each lasting several hours.

186. The minor leaguer arrives to the home stadium before beginning the trip; packs belongings, bats, uniforms, gloves, and other things; loads the bus with these belongings and other items required by the team on the trip; and then proceeds on the trip. The minor leaguer performs a similar process prior to beginning each trip and reverses the process upon returning to the home stadium from the trip.

187. This required team travel adds considerable amounts of work onto the player's workweek when on the road.

188. Consequently, when strength and conditioning work and required travel work are added onto the workweek, minor leaguers often work over 60–70 hours per week during the season in Plaintiffs' experience.

189. As stated above, minor leaguers also perform extensive work outside the championship season for which they earn no salary.

190. Spring training usually lasts four weeks or more. Minor leaguers normally work seven days a week, as minor leaguers do not enjoy a day off during the spring training period unless rain renders the baseball fields unplayable.

191. Minor leaguers perform considerable amounts of work during spring training, sometimes—and perhaps usually—exceeding forty hour workweeks. Again, MLB's UPC does not

37

1   allow players to earn salaries during this time, much less overtime wages.[62]

2       192. The 30–45 minor leaguers selected for instructional leagues perform a work schedule

3   similar to that performed during spring training. A similar number of players often also attend a pre-

4   spring training minicamp that involves similar work hours. And again, the minor leaguer earns no

5   salary for this work.

6       193. During the winter months of the off-season, minor leaguers work a few hours per day

7   performing required training. This work is performed 4–6 days per week, depending on the month,

8   and results in considerable unpaid hours. This training is not only required by the Franchises but also

9   required by MLB's UPC.[63]

10      **5.      The Careers of the Class Representatives.**

11          **5.1 Aaron Senne**

12      194. In June of 2010, Aaron Senne was drafted by the Florida Marlins (now the Miami

13  Marlins) in the tenth round of MLB's 2010 Rule 4 draft.

14      195. Less than a week later, Mr. Senne agreed to terms without seeing a written contract. On

15  or around June 15, he traveled to Jupiter, Florida, site of the Marlins' training facilities. Once there, he

16  underwent a physical, took a drug test, and signed a contract.

17      196. The contract was a UPC, as required by MLB, but the Marlins did not point out or

18  explain the provisions of the contract. Mr. Senne was unrepresented throughout the process.

19      197. Mr. Senne received $25,000 as a one-time bonus for signing his seven-year contract. He

20  also received two semesters in a college scholarship fund as an incentive for signing.

21      198. The Marlins sent Mr. Senne to Jamestown, New York, site of the Marlins' Short-Season

22  A team (the Jamestown Jammers), where he played for the rest of the 2010 championship season.

23      199. Mr. Senne worked at the Marlins' spring training site in Jupiter for the entire 2011 season.

24  In 2012, he worked the entire championship season in Greensboro, North Carolina. In 2013, he

25

26  [62] *See* MLR Attachment 3, UPC ¶ VII.B.

27  [63] *See* MLR Attachment 3, UPC ¶¶ VI.D., XXII.

28

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

worked in Jupiter.

200. Consistent with MLB's guidelines, the Marlins paid Mr. Senne around $1,100 per month for his work in Jamestown. Thus, for the entire championship season in 2010, Mr. Senne believes he earned about $3,000. Similarly, Mr. Senne believes he earned slightly in excess of $3,000 in 2011; around $7,000 in 2012; and around $3,000 in 2013. Thus, the Marlins failed to meet minimum wage standards.

201. Throughout each of these championship seasons, Mr. Senne routinely worked in excess of forty hours per week but received no overtime pay.

202. Like all minor leaguers, Mr. Senne remained property of the Franchise (the Marlins) throughout each of these championship seasons and throughout the contract, and, consistent with MLB rules, the Franchise's coaching staff and front office made all work-related decisions no matter where Mr. Senne worked throughout the year.[64]

203. A short time after each season ended, he began conditioning in order to maintain the first-class conditioning required by his UPC. The Marlins provided a training packet for each winter off-season period.

204. As stipulated in MLB's required UPC, Mr. Senne was not paid at all for this winter work, even though the Marlins required it to be performed.

205. Before each championship season, Mr. Senne worked at the Marlins' spring training site. The Marlins directed and required all of the work Mr. Senne performed during spring, and Mr. Senne often exceeded forty hours of work per week.

206. Consistent with MLB's required UPC, Mr. Senne received no paycheck during this spring work.

207. Mr. Senne retired from the game of baseball around June 11, 2013. Per MLB's UPC, it is believed that Mr. Selig approved his retirement.[65] Also per MLB's UPC, he cannot play for another

---

[64] *See* MLR 56(g).

[65] *See* MLR 14.

1 baseball organization, foreign or domestic—or even play another recreational sport—until the

2 expiration of his contract, even though he has retired.[66]

3      208. To summarize, Mr. Senne, like all Class Members working under the direction of MLB,

4 the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite

5 routinely working overtime hours, and often worked for no pay.

6      **5.2 Michael Liberto**

7      209. Like Mr. Senne, Mr. Liberto was selected in the June, 2010 Rule 4 draft. The Kansas City

8 Royals selected him in the twenty-first round.

9      210. Immediately after being drafted, an employee of the Royals contacted Mr. Liberto. He

10 said he would quickly bring a contract to Mr. Liberto and that Mr. Liberto would receive a one-time

11 $1,000 signing bonus for signing his seven-year UPC.

12      211. A short time later, the Royals' employee arrived at Mr. Liberto's house and did not allow

13 any negotiations to occur. He presented a contract, which was a UPC as required by MLB's rules. The

14 employee did not explain any provisions of the contract other than the incentive bonus plan, and

15 instead merely instructed Mr. Liberto where to sign. Mr. Liberto was unrepresented during the

16 process, which took only a few minutes.

17      212. Mr. Liberto then traveled to Surprise, Arizona, site of the Royals' training camp. He

18 underwent a physical and drug test, and he participated in a minicamp.

19      213. At the conclusion of minicamp, Mr. Liberto remained in Surprise for the beginning of

20 the Rookie ball season. Around July 20 of 2010, the Royals moved Mr. Liberto to Burlington, Iowa,

21 site of their Single-A affiliate; they later moved him to Burlington, North Carolina, site of one of its

22 Short-Season A teams, and Idaho Falls, Idaho, site of another Short-Season A team.

23      214. During the 2011 championship season, Mr. Liberto split time between extended spring

24 training in Arizona; Kane County (in Illinois, home of the Royals' Class-A affiliate); Idaho Falls; and

25 Wilmington, Delaware (site of the Royals' Advanced Class-A affiliate). For the 2012 championship

26 _____

27 [66] *See* MLR Attachment 3, UPC ¶ XVI.

28

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

season, Mr. Liberto split time between Wilmington and Northwest Arkansas (site of the Royals' Double-A affiliate). The Royals released Mr. Liberto around the end of the 2013 spring training.

215. Similar to Mr. Senne, and consistent with what are believed to be MLB's guidelines, Mr. Liberto received $1,100 per month during his first championship season. He believes he received around $3,000 total in 2010, and believes he earned no more than around $7,500 total during subsequent championship seasons. Thus, he received below the minimum wage.

216. Like Mr. Senne and all similarly-situated minor leaguers, Mr. Liberto routinely worked in excess of forty hours per week but received no overtime pay throughout these championship seasons.

217. Shortly after each season ended, Mr. Liberto began conditioning in order to maintain the first-class conditioning required by his UPC. The Royals provided a training packet for this winter off-season work.

218. As stipulated in MLB's required UPC, Mr. Liberto was not paid at all for this work, even though the Royals required it to be performed.

219. Before each championship season, Mr. Liberto worked at the Royals' spring training site. The Royals directed and required all of the work Mr. Liberto performed during spring, and Mr. Liberto often exceeded forty hours of work per week.

220. Consistent with MLB's required UPC, Mr. Liberto received no paycheck for this spring work.

221. To summarize, Mr. Liberto, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime pay despite routinely working overtime hours, and often worked for no pay at all.

**5.3     Oliver Odle**

222. Around June 5, 2007, Oliver Odle was drafted by the San Francisco Giants in the 22nd round of the 2007 Rule 4 draft.

223. Shortly after selecting Mr. Odle, a Giants employee called Mr. Odle and asked him if he could quickly sign a contract and fly to the Giants' spring training complex the next day.

224. The Giants arranged for Mr. Odle to arrive to their spring complex in Scottsdale, Arizona, on or around June 11. Before arriving, Mr. Odle had not seen a contract and the Giants did

41

not permit any negotiations to occur.

225. A Giants employee quickly instructed Mr. Odle to sign his contract, which, as required by MLB's rules, was a UPC. The employee did not explain any provisions other than the signing bonus and incentive bonus schedule. Mr. Odle signed the contract and received a one-time signing bonus of $2,500 for signing the seven-year contract. Like Mr. Senne and Mr. Liberto, he was unrepresented throughout the contractual process.

226. Mr. Odle worked at the Giants' Rookie-Level Arizona League team for most of the 2007 championship season, though the Giants also required him to work in Salem, Oregon (site of their Short-Season A team) for a brief time.

227. The Giants required Mr. Odle to work the entire 2008 season in Augusta, Georgia. He worked most of the 2009 and 2010 seasons in San Jose, California (site of the Giants' Advanced Class-A team), though he spent very brief periods working for the Giants' team in Fresno, California. Mr. Odle was released during the 2011 spring training.

228. Consistent with all first-year minor leaguers—including Mr. Senne and Mr. Liberto—Mr. Odle believes he received around $1,100 per month during the first championship season. He believes the Giants paid him between around $3,000 and around $7,500 total per championship season. Thus, the Giants failed to meet minimum wage standards.

229. Throughout these championship seasons, Mr. Odle routinely worked in excess of forty hours per week but received no overtime pay.

230. Shortly after each season ended, Mr. Odle began conditioning in order to maintain the first-class conditioning required by his UPC. The Giants provided a training packet for this winter off-season period.

231. As stipulated in MLB's required UPC, Mr. Odle was not paid at all for this work, even though the Giants required it to be performed.

232. Before each championship season, Mr. Odle worked at the Giants' spring training site. The Giants directed and required all of the work Mr. Odle performed during spring, and Mr. Odle often exceeded forty hours of work per week.

233. Consistent with MLB's required UPC, Mr. Odle did not receive a paycheck for this

1  spring work.

2  234. To summarize, Mr. Odle, like all Class Members working under the direction of MLB,

3  the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite

4  routinely working overtime hours, and often worked for no pay.

5  **5.4    Brad McAtee**

6  235. In June of 2008, the Colorado Rockies drafted Brad McAtee in the 45th round of the

7  Rule 4 draft. He quickly signed a UPC a few days later, and the Rockies only pointed out a couple of

8  the UPC's provisions to him—focusing on the salary provisions.

9  236. Mr. McAtee played the 2008, 2009, and 2010 seasons at the Rockies' short-season team

10  in Pasco, Washington. He also spent significant portions of time working at extended spring training

11  at the Rockies' site in Arizona. During the season, Mr. McAtee believes he routinely worked more

12  than 50 hours per week.

13  237. Mr. McAtee went to at least one instructional league and several spring trainings at the

14  Rockies' site in Arizona. He did not earn a salary for this work, even though he often worked full

15  workdays, 7 days per week.

16  238. Mr. McAtee spent much of his off-seasons in California, though he also spent some time

17  in New York. The Rockies provided an off-season training manual, and he performed significant off-

18  season training without being paid.

19  239. Mr. McAtee was only paid his salary during the season, and his salary began at around

20  $1,100 per month. He believes he earned around $3,000 in salary during his first year, and believes he

21  never earned more than around $6,000 in salary during any year that he played. He was released in

22  June of 2011.

23  240. To summarize, Mr. McAtee, like all Class Members working under the direction of MLB,

24  the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite

25  routinely working overtime hours, and often worked for no pay.

26  / / /

27  / / /

28  / / /

861070.1

43

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

### 5.5    Craig Bennigson

241. Also in June of 2008, the Colorado Rockies drafted Craig Bennigson in the 9th round of the Rule 4 draft. A few days later he signed a UPC. The Rockies only pointed out the salary provisions of the UPC to him.

242. Mr. Bennigson worked the 2008 season at the Rockies' short-season team in Casper, Wyoming; the 2009 season at extended spring training and at Pasco, Washington; the 2010 season at extended spring training, Pasco, Washington, and Tulsa, Oklahoma; the 2011 season at Asheville, North Carolina and Pasco, Washington; and the 2012 season at Asheville and Modesto, California. During the season, Mr. Bennigson believes he routinely worked more than 50 hours per week.

243. Mr. Bennigson worked several spring trainings at the Rockies' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

244. Mr. Bennigson performed work for the Rockies during the off-seasons, mostly in the Bay Area. The Rockies provided an off-season training manual, and he performed significant off-season work without being paid.

245. Mr. Bennigson was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his first year, and believes he never earned more than around $7,500 in salary during any year that he worked.

246. Because of these salaries, Mr. Bennigson often either stayed with host families or with many players crammed into a small apartment during the season. At times he lived with five players in a two-bedroom apartment, sleeping on an air mattress.

247. He was released on March 28, 2013.

248. To summarize, Mr. Bennigson, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.6    Matt Lawson

249. The Texas Rangers drafted Matt Lawson in the 14th round of the 2007 Rule 4 draft. A few days later he signed a UPC without the help of an agent or attorney. The Rangers only pointed out a couple of the UPC's provisions to him.

250. Mr. Lawson worked the 2007 season at the Rangers' short-season team in Spokane, Washington; the 2008 season at Clinton, Iowa; the 2009 season at Bakersfield, California; and part of the 2010 season at Frisco, Texas.

251. In July of 2010, the Rangers traded Mr. Lawson to the Seattle Mariners. He finished the season working at the Mariners' affiliated in West Tennessee.

252. In March of 2011, the Mariners traded Mr. Lawson to the Cleveland Indians. He worked the 2011 and 2012 seasons at the Indians' affiliate in Akron, Ohio. He worked the 2013 season in Akron and Columbus, Ohio.

253. Whether working for the Rangers, Mariners, or Indians, Mr. Lawson worked the same hours and believes he routinely worked well in excess of 50 hours per week during the seasons.

254. Mr. Lawson worked several spring trainings at the Rangers' site in Arizona. He also worked at the Indians' spring training site in Arizona during the springs of 2011, 2012, and 2013. While working for either team, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

255. During the off-seasons, Mr. Lawson performed work for the Franchises, mostly in Springfield, Missouri. He believes each of his employer Franchises provided an off-season training manual, and each off-season he performed significant work without being paid.

256. No matter the Franchise, Mr. Lawson was only paid his salary during the season, and his salary began at around $1,100 per month. He believes his pay did not change when he changed teams. He believes he earned around $3,000 in salary during his first year, and believes he never earned more than around $11,000 in salary during any year that he worked.

257. Because of these salaries, Mr. Lawson often either stayed with host families or with many guys crammed into a small apartment during the season. At one point he stayed with six guys in a small apartment and slept on an air mattress.

258. Mr. Lawson is still under contract with the Indians but is no longer performing work for them.

259. To summarize, Mr. Lawson, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.7     Kyle Woodruff**

260. In June of 2008, the San Francisco Giants drafted Kyle Woodruff in the 27th round of the Rule 4 draft. A few days later he signed a UPC. No agent or attorney represented him, and no negotiations occurred. The Giants only pointed out a couple of the UPC's provisions to him.

261. Mr. Woodruff worked the 2008 season at the Giants' complex in Scottsdale, Arizona; the 2009 season at extended spring training in Arizona and at Augusta, Georgia; and the 2010 season at extended spring training and Augusta, Georgia. During the season, Mr. Woodruff believes he routinely worked more than 50 hours per week.

262. Mr. Woodruff worked several spring trainings at the Giants' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

263. Mr. Woodruff performed work for the Giants during the off-seasons, mostly in San Jose, California, though he performed some work for the Giants in Arizona. The Giants provided an off-season training manual, and he performed significant off-season work without being paid.

264. Mr. Woodruff was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his first year, and believes he never earned more than around $5,500 in salary during any year that he worked.

265. Because of these salaries, Mr. Woodruff often stayed with many crammed guys into a small apartment, sleeping on air mattresses during the season. At one point seven guys lived with him in a single apartment.

266. He was released on March 15, 2011.

267. To summarize, Mr. Woodruff, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

/ / /

/ / /

1

### 5.8    Ryan Kiel

2    268. The Seattle Mariners drafted Ryan Kiel in the 37th round of the 2010 Rule 4 draft. He

3    quickly signed a UPC without negotiations. The Mariners only pointed out a couple of the UPC's

4    provisions to him, specifically the salary and bonus provisions.

5    269. Mr. Kiel worked the 2010 season at the Mariners' short-season team in Pulaski, Virginia;

6    he worked the 2011 season at the Mariners' extended spring training, the Mariners' Arizona League

7    team, and at Clinton, Iowa. The Mariners released Mr. Kiel in the spring of 2012.

8    270. In April of 2012, the Cincinnati Reds signed Mr. Kiel. He played the 2012 season at the

9    Reds' extended spring training in Arizona, and at their affiliates in Dayton, Ohio, and Bakersfield,

10    California.

11    271. For both the Reds and Mariners, Mr. Kiel believes he routinely worked more than 50

12    hours per week during the season.

13    272. Mr. Kiel worked several spring trainings at the Mariners' site in Arizona. He did not earn

14    a salary for this work, even though he often worked full workdays, 7 days per week.

15    273. Mr. Kiel performed work for the Franchises during the off-seasons, mostly in Los Gatos,

16    California. He was provided an off-season training manual, and he performed significant off-season

17    work without being paid.

18    274. Mr. Kiel was only paid his salary during the season, and his salary began at around $1,100

19    per month. He believes he earned around $3,000 in salary during his first year, and believes he never

20    earned more than around $4,500 in salary during any year that he played.

21    275. His career ended in late July of 2012.

22    276. To summarize, Mr. Kiel, like all Class Members working under the direction of MLB, the

23    Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely

24    working overtime hours, and often worked for no pay.

25

26

27

28

### 5.9    Kyle Nicholson

277. In June of 2007, the San Francisco Giants drafted Kyle Nicholson in the 7th round of the Rule 4 draft. A short time later, he signed a UPC; the Giants did not draw attention to any of the UPC's provisions to him.

278. Mr. Nicholson worked the 2007 season at the Giants' complex in Scottsdale, Arizona; the 2008 season in Scottsdale and briefly at Salem, Oregon; the 2009 season at Augusta, Georgia, and San Jose, California; and the 2010 season in San Jose, California. During the season, Mr. Nicholson believes he routinely worked more than 50 hours per week.

279. Mr. Nicholson worked several spring trainings at the Giants' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

280. Mr. Nicholson performed work for the Giants during the off-seasons, mostly in Texas, though he performed some work for the Giants in Arizona, especially during his first offseason. The Giants provided an off-season training manual, and he performed significant off-season work without being paid.

281. Mr. Nicholson was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned between around $3,000 and $7,000 in salary each year that he worked.

282. Mr. Nicholson retired sometime after the 2010 season.

283. To summarize, Mr. Nicholson, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.10    Brad Stone

284. The Marlins drafted Brad Stone in the 12th round of the 2006 Rule 4 draft. A few days later he signed a UPC. The Marlins failed to draw attention to any details in the contract other than the signing bonus and salary.

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1     285. Mr. Stone worked the 2006 season at Jamestown, New York, and Greensboro, North

2  Carolina; the 2007 season at Greensboro; the 2008 season at Greensboro and Jupiter, Florida; the

3  2009 season in Jupiter, Jacksonville, and New Orleans; and the 2010 season at the Marlins' spring

4  training site and at Jacksonville. During the season, Mr. Stone believes he routinely worked more than

5  50 hours per week.

6     286. Mr. Stone worked several spring trainings at the Marlins' site in Florida. He did not earn

7  a salary for this work, even though he often worked full workdays, 7 days per week.

8     287. Mr. Stone performed work for the Marlins during the off-seasons, mostly in St. Louis.

9  The Marlins provided an off-season training manual, and he performed significant off-season work

10  without being paid.

11     288. Mr. Stone was only paid his salary during the season, and his salary began at around

12  $1,100 per month. He believes he earned around $3,000 in salary during his first year, and believes he

13  never earned more than around $12,000 in salary during any year that he played—even while in

14  Triple-A.

15     289. Because of these salaries, Mr. Stone often stayed with many crammed guys into a small

16  apartment, sleeping on air mattresses during the season.

17     290. He was released on March 28, 2011.

18     291. To summarize, Mr. Stone, like all Class Members working under the direction of MLB,

19  the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite

20  routinely working overtime hours, and often worked for no pay.

21  **5.11    Matt Daly**

22     292. The Toronto Blue Jays drafted Matt Daly in the 13th round of the 2008 Rule 4 draft. He

23  quickly signed a UPC, and the Blue Jays failed to thoroughly explain all the provisions in the contract.

24     293. Mr. Daly first worked briefly at the Blue Jays' Florida site, and he worked the rest of the

25  2008 season in Auburn, New York. He worked the 2009 season at affiliates in Lansing, Michigan, and

26  Dunedin, Florida; the 2010 season in Dunedin; the 2011 season in Dunedin and New Hampshire; and

27  the 2012 season in New Hampshire. During the season, Mr. Daly believes he routinely worked more

28  than 50 hours per week.

294. He worked several spring trainings at the Blue Jays' site in Florida, and worked at least one instructional league. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

295. Mr. Daly performed work for the Blue Jays during the off-seasons, mostly in California but also in Colorado. The Blue Jays provided an off-season training manual and even used online tracking to monitor off-season work. He performed significant off-season work without being paid.

296. He was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned less than $3,000 in salary his first season, and he believes he never made more than around $8,500 in any subsequent season that he worked for the Blue Jays.

297. He was released on March 19, 2013.

298. To summarize, Mr. Daly, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.12    Aaron Meade**

299. In June of 2010, the Anaheim Angels drafted Aaron Meade in the 10th round of the Rule 4 draft. He quickly signed a UPC, and the Angels failed to thoroughly explain all the provisions in the contract.

300. Mr. Meade first worked at a minicamp at the Angels' Arizona site, and worked the rest of the 2010 season in Orem, Utah. He worked the 2011 season at Arizona and Orem, and he worked at Cedar Rapids, Iowa, and San Bernardino, California, during the 2012 season. During the season, Mr. Meade believes he routinely worked more than 50 hours per week.

301. He worked several spring trainings at the Angels' site in Arizona, and worked at least one instructional league. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

302. Mr. Meade performed work for the Angels during the off-seasons, mostly in Missouri. The Angels provided an off-season training manual, and he performed significant off-season work without being paid.

50

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

303. He was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned less than $3,000 in salary his first season, and he believes he never made more than around $7,000 in any subsequent season that he worked for the Angels.

304. He was released on March 26, 2013.

305. To summarize, Mr. Meade, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.13    Justin Murray

306. In June of 2008, the Oakland Athletics drafted Justin Murray in the 29th round of the Rule 4 draft. Later that summer, he signed a UPC. The Athletics only pointed out a couple of the UPC's provisions to him.

307. Mr. Murray worked the 2008 season at the Athletics' complex in Arizona and at Midland, Texas; the 2009 season at Stockton, California and Kane County, Illinois; the 2010 season at Stockton and Midland; and the 2011 season also at Stockton and Midland. During the season, Mr. Murray believes he routinely worked more than 50 hours per week.

308. Mr. Murray worked several spring trainings at the Athletics' site in Arizona and worked at least one instructional league. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

309. Mr. Murray performed offseason work for the Athletics in Manhattan, Kansas. The Athletics provided an off-season training manual, and he performed significant off-season work without being paid.

310. Mr. Murray was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned less than $2,000 in salary during his first year, and believes he never earned more than around $7,500 in salary during any year that he worked.

311. Because of these salaries, Mr. Murray often stayed with many guys crammed into a small apartment, sleeping on air mattresses during the season. He also stayed with host families.

312. He was released on May 16, 2011.

51

313. To summarize, Mr. Murray, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.14    Jake Kahaulelio**

314. The Cincinnati Reds drafted Jake Kahaulelio in the 20th round of the 2007 Rule 4 draft. A few days later he signed a UPC. No agent or attorney represented him, and the Reds did not allow negotiations to occur. The Reds only pointed out a couple of the UPCs' provisions to him.

315. Mr. Kahaulelio worked the 2007 season mostly at the Reds' complex in Sarasota, Florida; the 2008 season in Dayton, Ohio; the 2009 season in Sarasota and Zebulon, North Carolina; the 2010 season in Zebulon; and the 2011 season in Bakersfield, California and Zebulon. During the season, he believes he routinely worked more than 50 hours per week.

316. Mr. Kahaulelio worked several spring trainings at the Reds' site in Florida. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

317. He performed work for the Reds during the off-seasons, mostly in California. The Reds provided an off-season training manual, and he performed significant off-season work without being paid.

318. Mr. Kahaulelio was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his first year, and believes he never earned more than around $9,000 in salary during any year that he worked.

319. Because of these salaries, he often stayed with many guys crammed into a small apartment, sleeping on air mattresses during the season. At one point he and three other guys lived in a single room with a host family.

320. He was released on October 26, 2011.

321. To summarize, Mr. Kahaulelio, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.15    Ryan Khoury

322. In June of 2006, the Boston Red Sox drafted Ryan Khoury in the 12th round of the Rule 4 draft. A few days later he signed a UPC after very few negotiations. The Red Sox did not draw attention to any of the UPC's provisions.

323. Mr. Khoury worked the 2006 season at the Red Sox' affiliates in Lowell, Massachusetts; Greenville, South Carolina; and Pawtucket, Rhode Island. He worked the 2007 season at Lancaster, California; the 2008 season at Lowell and Portland, Maine; the 2009 season at Portland; and the 2010 season at Portland and Pawtucket.

324. The Red Sox released Mr. Khoury on March 31, 2011 but re-signed him on June 21, 2011. He worked the rest of the 2011 season at Portland and Pawtucket.

325. During the season, Mr. Khoury believes he routinely worked far in excess of 50 hours per week.

326. Mr. Khoury worked several spring trainings at the Red Sox' site in Florida. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

327. Mr. Khoury performed work for the Red Sox during the off-seasons, mostly in Utah, though he performed some work for the Red Sox in Florida. The Red Sox provided an off-season training manual, and he performed significant off-season work without being paid.

328. He was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his first year despite spending significant time at Triple-A, and believes he never earned more than around $10,000 in salary during any year that he played.

329. Because of these salaries, Mr. Khoury often stayed with many other guys in a small apartment during the season. He also stayed with host families.

330. He was granted free agency by the Red Sox on November 2, 2011.

331. To summarize, Mr. Khoury, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.16   Dustin Pease

332. The San Diego Padres signed Dustin Pease as an undrafted free agent out of independent ball in February of 2011. He received no signing bonus and signed a UPC. No agent or attorney represented him, and no negotiations occurred. The Padres only pointed out a couple of the UPC's provisions to him, focusing on the salaries.

333. Mr. Pease worked the 2011 season in Lake Elsinore, California, and he worked the 2012 season at San Antonio. During the season, Mr. Pease believes he routinely worked more than 50 hours per week.

334. He worked several spring trainings at the Padres' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

335. Mr. Pease performed work for the Padres during the off-seasons, mostly in Maryland. The Padres provided an off-season training manual, and he performed significant off-season work without being paid.

336. While playing independent ball, Mr. Pease worked as a minister during the off-seasons. But given the Padres' extensive work requirements (which mirror all the Franchises' requirements), Mr. Pease could not work at this off-season job after he began working for the Padres.

337. He was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned between $6,000 and $8,000 in salary each year that he worked for the Padres.

338. Because of these salaries, Mr. Pease struggled to survive. He searched for host families on his own because he could not afford rent.

339. He was released on March 20, 2013.

340. To summarize, Mr. Pease, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.17    Jeff Nadeau

341. In the 38th round of the 2010 Rule 4 draft, the St. Louis Cardinals drafted Jeff Nadeau. He quickly signed a UPC, and he believes that the Cardinals only explained the salary provisions of the contract to him.

342. Mr. Nadeau worked the 2010 season at the Cardinals' facility in Jupiter, Florida, and at an affiliate in Johnson City, Tennessee. Due to an injury, he worked the entire 2011 season at Jupiter. During the season, he believes he routinely worked more than 50 hours per week, and even worked overtime hours for the Cardinals while injured.

343. He worked several spring trainings at the Cardinals' site in Florida, and also spent time in extended spring training. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

344. Mr. Nadeau performed work for the Cardinals during the off-seasons, either in Arizona, Florida, or Colorado. The Cardinals provided an off-season training manual, and he performed significant off-season work without being paid.

345. He remained in Jupiter for almost the entire 2011–2012 offseason, where the Cardinals directed his rehabilitation and training. He was not paid his salary for this work.

346. He was only paid his salary during the season, and he believes he received less than $3,000 in salary for the entire 2010 and 2011 seasons (each season).

347. He was released in April of 2012.

348. To summarize, Mr. Nadeau, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.18    Jon Gaston

349. The Houston Astros drafted Jon Gaston in the 7th round of the 2008 Rule 4 draft. Once his collegiate season ended, he signed a UPC. The Astros only pointed out a couple of the UPC's provisions to him, focusing on the salary and bonus provisions.

350. Mr. Gaston worked the 2008 season at the Astros' affiliate in Albany, New York; the 2009 season in Lancaster, California; and the 2010 and 2011 seasons in Corpus Christi, Texas. The Astros released Mr. Gaston on March 27, 2012.

351. On May 25, 2012, the Chicago White Sox signed Mr. Gaston. He worked for the White Sox' affiliate in Birmingham, Alabama, until they released him on June 21, 2012.

352. For both the Astros and White Sox, Mr. Gaston believes he routinely worked more than 50 hours per week during the season.

353. Mr. Gaston worked several spring trainings at the Astros' site in Florida. He also worked at least one instructional league and minicamp in Florida. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

354. Mr. Gaston performed work for the Astros during the off-seasons, mostly in Idaho. The Astros provided an off-season training manual, and he performed significant off-season work without being paid.

355. He was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he was paid less than $3,000 in salary his first season, and he believes he never earned more than $8,000 in salary during subsequent seasons.

356. To summarize, Mr. Gaston, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.19    Brandon Henderson**

357. In June of 2010, the Minnesota Twins drafted Brandon Henderson in the 27th round of the 2010 draft. He had no agent or representative, and he quickly signed a UPC. The Twins only pointed out a couple of the UPC's provisions to him, focusing on the salaries.

358. Mr. Henderson worked most of the 2010 season at the Twins' affiliate in Tennessee, though he spent some time at the Twins' site in Florida. He worked the 2011 season in both Florida and Tennessee. During the season, Mr. Henderson believes he routinely worked more than 50 hours per week.

359. He worked one spring training at the Twins' site in Florida. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

360. Mr. Henderson performed work for the Twins during the off-seasons, mostly in California. The Twins provided an off-season training manual, and he performed significant off-season work without being paid.

361. He was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned around $3,000 or less in salary each year that he worked for the Twins.

362. He was released on October 21, 2011.

363. To summarize, Mr. Henderson, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.20    Tim Pahuta**

364. The Washington Nationals drafted Tim Pahuta in the 18th round of the 2005 Rule 4 draft. He did not have an agent, and he quickly signed a UPC. The Nationals focused only on the salary provisions when presenting Mr. Pahuta with the UPC.

365. He worked the 2005 season at the Nationals' site in Florida; the 2006 season at the Nationals' affiliate in Savannah, Georgia; the 2007 season at the Florida site; the 2008 season at Hagerstown, Maryland; the 2009 season at Woodbridge, Virginia; the 2010 season at Woodbridge and Harrisburg, Pennsylvania; and the 2011 and 2012 seasons at Harrisburg. During the season, Mr. Pahuta believes he routinely worked more than 50 hours per week.

366. He worked several spring trainings at the Nationals' site in Florida. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

367. Mr. Pahuta performed work for the Nationals during the off-seasons, mostly in New Jersey but sometimes in Florida. The Nationals provided an off-season training manual, and he performed significant off-season work without being paid.

368. He was only paid his salary during the season, and his salary began at around $1,100 or less per month. He believes he earned less than $3,000 in salary during his first season, and he earned less than $10,000 in salary during his last season governed by his initial UPC.

369. His initial UPC expired after the 2011 season, and the Nationals re-signed him for a slight salary increase. He believes he made around $20,000 in salary for the 2012 season, but, again, was only paid his salary during the season.

370. Because of these salaries, Mr. Pahuta struggled to live. He often lived with host families, or he lived with several other players crammed in a small apartment. He often slept on air mattresses during the season.

371. He has not worked for the Nationals since the expiration of his second contract following the 2012 season.

372. To summarize, Mr. Pahuta, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.21   Les Smith

373. The Detroit Tigers drafted Les Smith in the 27th round of the 2010 Rule 4 draft. He did not have an agent, and he quickly signed a UPC. The Tigers failed to explain all the various provisions of the UPC to Mr. Smith.

374. Mr. Smith worked the 2010 season at the Tigers' site in Florida and at the Tigers' short-season affiliate in Connecticut, moving from one level to the next on a moment's notice. During the 2011 season, he again split time between the Tigers' site in Florida (spending significant time in extended spring training) and their affiliate in Connecticut. During the season, Mr. Smith believes he routinely worked more than 50 hours per week.

375. He worked multiple spring trainings at the Tigers' site in Florida. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

376. Mr. Smith performed work for the Tigers during the off-seasons, mostly in Tennessee. The Tigers provided an off-season training manual, and he performed significant off-season work without being paid.

377. He was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his first season, and he earned only slightly more during the entire 2011 season.

378. Because of these salaries, Mr. Smith struggled to live. He struggled to buy sufficient food, sometimes lived in dorms during the season, and lived with his parents during the off-seasons.

379. The Tigers released Mr. Smith on March 27, 2012.

380. To summarize, Mr. Smith, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.22    Joseph Newby**

381. In June of 2004, Joseph Newby signed with the Oakland Athletics as a non-drafted free agent. He did not have an agent, and he quickly signed a UPC. The Athletics failed to thoroughly explain all the UPC's provisions. After performing about two years of work for the Athletics, they released him in May of 2007.

382. In February of 2009, the Seattle Mariners signed Mr. Newby to a UPC. Mr. Newby worked the 2009 season at Mariners' affiliates in High Desert (California), West Tennessee, and Tacoma, Washington, moving between the affiliates at a moment's notice. The Mariners granted Mr. Newby free agency in November of 2009.

383. In February of 2011, the Los Angeles Dodgers signed Mr. Newby to a UPC. Mr. Newby split time during the 2011 season between the Dodgers' affiliates in Chattanooga and Albuquerque. The Dodgers granted Mr. Newby free agency in November of 2011.

384. While working for all three of these Franchises, Mr. Newby worked similar hours, and believes he routinely worked more than 50 hours per week during the seasons.

385. He worked several spring trainings at the Athletics' site in Arizona; worked a spring training at the Mariners' site in Arizona; and worked a spring training at the Dodgers' site in Arizona. While working during spring training for these three Franchises, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

386. Mr. Newby performed work for the Franchises during the off-seasons, often in Alaska or Colorado. The Franchises provided off-season training manuals, and he performed significant off-season work without being paid.

59

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

387. No matter which Franchise employed him, he was only paid his salary during the season, and he believes his salary began at less than $1,100 per month. He believes he earned less than $3,000 in salary during his first season, and his salary remained low during subsequent seasons. As is customary, the Franchises also required him to pay clubhouse dues during the season, sometimes as much as $14 per day, to pay for food and clubhouse services.

388. Because of these salaries, Mr. Newby struggled to live. At one point while working for the Athletics, he stayed with a host family that only provided a piece of plywood, two cinder blocks, and an eggshell pad for a bed. While working for the other Franchises, he often slept on an air mattress on the floor of a living room since several teammates crammed into a small apartment to save on rent.

389. To summarize, Mr. Newby, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.23   Ryan Hutson**

390. The New York Mets drafted Ryan Hutson in the 36th round of the 2011 Rule 4 draft. He did not have an agent, no negotiations took place, and he quickly signed a UPC.

391. He worked the 2011 season at the Mets' site in Florida, and he also worked the 2012 season at the Mets' site in Florida while in extended spring training. During the season, Mr. Hutson believes he routinely worked more than 50 hours per week.

392. Mr. Hutson performed work for the Mets during the off-seasons, mostly in Texas. The Mets provided an off-season training manual, and he performed significant off-season work without being paid.

393. He was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his entire first season in 2011, and he believes he earned no more than that in 2012. Because of these salaries, Mr. Hutson struggled to live.

394. The Mets released Mr. Hutson in June of 2012.

395. To summarize, Mr. Hutson, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.24 Matt Frevert**

396. In June of 2008, the St. Louis Cardinals drafted Matt Frevert in the 28th round of the Rule 4 draft. He quickly signed a UPC, and the Cardinals did not thoroughly explain all the UPC's provisions.

397. Mr. Frevert worked the 2008 season at the Cardinals' affiliates in Tennessee and Iowa; the 2009 season at the Cardinals' site in Florida (in extended spring training) and at their affiliate in Iowa; the 2010 season at their advanced Class A affiliate in Florida; and the beginning of the 2011 season at their Double-A affiliate in Missouri. The Cardinals released Mr. Frevert in May of 2011.

398. Also in May of 2011, the Atlanta Braves signed Mr. Frevert to a UPC shortly after the Cardinals released him. He worked for the Braves at their affiliate in Lynchburg, Virginia, before retiring in July of 2011.

399. While working for either Franchise, Mr. Frevert worked similar hours, and believes he routinely worked more than 50 hours per week during the seasons.

400. He worked several spring trainings at the Cardinals' site in Florida. While working during spring training, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

401. Mr. Frevert performed work for the Cardinals during the off-seasons, usually in Missouri. The Cardinals provided an off-season training manual, and he performed significant off-season work without being paid.

402. No matter which Franchise employed him, he was only paid his salary during the season, and he believes his salary began at $1,100 per month. He believes he earned around $3,000 in salary during his first season and his salary remained low during subsequent seasons. As is customary across all teams, the Franchises also required him to pay clubhouse dues during the season to pay for food and clubhouse services.

403. Because of these salaries, Mr. Frevert struggled to live. At one point while working for the Cardinals, he and several teammates were forced to live in the clubhouse—sleeping on couches, the floor, or air mattresses—for a short period of time during a season. At other times, he and several teammates often crammed 4 or 5 players into a 2-bedroom apartment to save on rent.

404. To summarize, Mr. Frevert, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.25    Roberto Ortiz

405. The Arizona Diamondbacks signed Roberto Ortiz in 2008 as a non-drafted free agent. He did not have an agent, and he quickly signed a UPC without any negotiations. The Diamondbacks failed to thoroughly explain all the UPC's provisions.

406. Mr. Ortiz  worked the 2009 season at the Diamondbacks' site in the Dominican Republic; the 2010 at their site in the Dominican Republic and at their affiliate in Yakima, Washington; and the 2011 season at their site in Arizona (in extended spring training) and at their affiliate in South Bend, Indiana. The Diamondbacks released him on March 23, 2012.

407. In May of 2012, the Baltimore Orioles signed Mr. Ortiz to a UPC. Mr. Ortiz worked the 2012 season at the Orioles' site in Florida (in extended spring training) and at their affiliate in Aberdeen, Maryland. The Orioles released Mr. Ortiz around July 16, 2012.

408. While working for either Franchise, Mr. Ortiz worked similar hours, and he believes he routinely worked more than 50 hours per week during the seasons.

409. He worked multiple spring trainings at the Diamondbacks' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week. He also does not believe he earned his salary during extended spring training.

410. Mr. Ortiz performed work for the Diamondbacks during the off-seasons, often in Puerto Rico. The Diamondbacks provided off-season training manuals, and he performed significant off-season work without being paid.

411. No matter which Franchise employed him, he was only paid his salary during the season. While working at the Diamondbacks' site in the Dominican Republic, he believes his salary began at around $500 per month. He believes he earned around $1100 per month while working at the Diamondbacks' affiliates within the United States, and believes he earned only slightly more while working for the Orioles in Aberdeen. The most Mr. Ortiz believes he ever made in salary during a season was around $4,000.

412. Because of these salaries, Mr. Ortiz struggled to live. He often lived with host families during the season, but when host families were not available, he had to ask his mom for assistance to help pay for an apartment.

413. To summarize, Mr. Ortiz, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.26    Witer Jimenez**

414. In May of 2010, the Philadelphia Phillies signed Witer Jimenez as an international free agent. He quickly signed a UPC, and the Phillies failed to thoroughly explain all the UPC's provisions.

415. Mr. Jimenez worked the 2010 season at the Phillies' site in the Dominican Republic. He worked the 2011 season at their site in Florida (both at extended spring training and during the Rookie season) and at their affiliate in Williamsport, Pennsylvania. The Phillies released Mr. Jimenez in October of 2011.

416. While working for the Phillies, Mr. Jimenez believes he routinely worked more than 50 hours per week during the seasons.

417. He worked during spring training at the Phillies' site in Florida. While working during spring training, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week. He also does not believe he earned a salary while in extended spring training.

418. Mr. Jimenez performed work for the Phillies during the off-seasons, often in the Dominican Republic. The Phillies expected him to perform this work, and he performed significant off-season work without being paid.

63

419. He was only paid his salary during the season. While working at the Phillies' site in the Dominican Republic in 2010, he believes his salary began at around $500 per month. While working at the Phillies' affiliates in the United States during the 2011 championship season, he believes he only made around $1100 per month.

420. Because of these salaries, Mr. Jimenez struggled to live. At one point during the season, he and several teammates crammed six players into a 2-bedroom apartment to save on rent.

421. To summarize, Mr. Jimenez, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.27    Kris Watts**

422. The Pittsburgh Pirates drafted Kris Watts in the 16th round of the 2006 Rule 4 draft. He quickly signed a UPC. He did not have an agent, and the Pirates did not thoroughly explain all the UPC's provisions.

423. Mr. Watts worked the 2006 season at the Pirates' affiliate in Williamsport, Pennsylvania; the 2007 season at their affiliate in Hickory, North Carolina; the 2008 season at their affiliates in Altoona, Pennsylvania and Lynchburg, Virginia; the 2009 season in Lynchburg; the 2010 season in Altoona; the 2011 season in Altoona and at their affiliate in Indianapolis; and part of the 2012 season in Indianapolis. The Pirates traded Mr. Watts to the Washington Nationals in June of 2012.

424. After being traded, Mr. Watts worked the rest of the 2012 season at the Nationals' affiliate in Harrisburg, Pennsylvania. His contract expired in November of 2012, and the Nationals re-signed him to another UPC. He worked the 2013 season at Harrisburg and at the Nationals' affiliate in Syracuse, New York. The Nationals released Mr. Watts in September of 2013.

425. While working for either Franchise, Mr. Watts worked similar hours, and believes he routinely worked more than 50 hours per week during the seasons.

426. He worked several spring trainings at the Pirates' site in Florida, and he worked one spring training at the Nationals' site in Florida. While working during spring training for either team, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

427. Mr. Watts performed work for the Franchises during the off-seasons, often in California but also in Arizona during the later years of his career. Both Franchises provided off-season training manuals, and he performed significant off-season work without being paid.

428. No matter which Franchise employed him, he was only paid his salary during the season, and he believes his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his first season, and his salary remained low in subsequent years.

429. Because of these salaries, Mr. Watts struggled to live. He at times lived with host families, and at other times he lived with many guys crammed into a small apartment. He often slept on a cheap air mattress during the season.

430. To summarize, Mr. Watts, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.28    Mitch Hilligoss**

431. In June of 2006, the New York Yankees drafted Mitch Hilligoss in the 6th round of the Rule 4 draft. He quickly signed a UPC, and the Yankees did not thoroughly explain all the UPC's provisions.

432. Mr. Hilligoss worked the 2006 season at the Yankees' affiliate in Staten Island; the 2007 season at their affiliate in Charleston, South Carolina; the 2008 season at their site in Tampa; and the 2009 season in Tampa. He was traded to the Texas Rangers in January of 2010.

433. After being traded, Mr. Hilligoss worked the 2010 season at the Rangers' affiliates in Bakersfield, California and Frisco, Texas. He worked the 2011 season at their affiliates in Frisco and Myrtle Beach, South Carolina, though he also worked some at their site in Arizona in extended spring training. The Rangers released him in December of 2011.

434. While working for either Franchise, Mr. Hilligoss worked similar hours, and believes he routinely worked more than 50 hours per week during the seasons.

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

435. He worked several spring trainings at the Yankees' site in Florida. He also worked two spring trainings at the Rangers' site in Arizona. While working during spring training for either Franchise, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

436. He also worked at two instructional leagues while with the Yankees which took place at the Yankees site in Florida (the same site as spring training, which is customary). He performed a workload similar to that in spring training alongside around 40 or 45 teammates. Like spring training, he did not earn a salary for this work.

437. Mr. Hilligoss performed work for the Franchises during the off-seasons, usually in Illinois. The Franchises both provided off-season training manuals, and he performed significant off-season work without being paid.

438. No matter which Franchise employed him, he was only paid his salary during the season, and he believes his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his first season, and his salary remained low throughout his career.

439. Because of these salaries, Mr. Hilligoss struggled to live. He states that he almost always slept on a cheap air mattress during the season, and he almost always lived with many other players crammed in a small apartment during the season.

440. To summarize, Mr. Hilligoss, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.29   Matt Gorgen

441. The Tampa Bay Rays selected Matt Gorgen in the 16th round of the 2008 Rule 4 draft. He quickly signed a UPC at his home in Northern California, and the Rays focused mainly on the UPC provisions pertaining to salaries and signing bonus.

442. Mr. Gorgen worked the 2008 season at the Rays' affiliate in Hudson Valley, New York; the 2009 season at their affiliates in Port Charlotte, Florida and Montgomery, Alabama; and the 2010 season in Montgomery. The Rays traded Mr. Gorgen to the Diamondbacks in September of 2010.

443. Mr. Gorgen spent the 2011 season working at the Diamondbacks site in Arizona since he was injured. He worked the 2012 and 2013 seasons while splitting time at the Diamondbacks' affiliates in Reno, Nevada and Mobile, Alabama. The Diamondbacks released Mr. Gorgen in October of 2013.

444. While working for either Franchise, Mr. Gorgen worked similar hours, and believes he routinely worked more than 50 hours per week during the seasons.

445. He worked several spring trainings at the Rays' site in Florida and at the Diamondbacks' site in Arizona. While working for either Franchise during spring training, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

446. Mr. Gorgen performed work for the Franchises during the off-seasons, usually in California. The Franchises provided an off-season training manual, and he performed significant off-season work without being paid.

447. No matter which Franchise employed him, he was only paid his salary during the season, and he believes his salary began at $1,100 per month. He believes he earned around $3,000 in salary during his first season, and his salary remained low throughout his career. As is customary, he paid clubhouse dues during the season to pay for food and clubhouse services.

448. Because of these salaries, Mr. Gorgen struggled to live. Like many others in the minor leagues, he often slept on cheap air mattresses during the season.

449. To summarize, Mr. Gorgen, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.30   Brett Newsome**

450. The Washington Nationals signed Brett Newsome as a non-drafted free agent in June of 2008. He quickly signed a UPC at the Nationals' complex in Florida, and the Nationals failed to fully explain all the UPC's various provisions.

451. Mr. Newsome worked the 2008 season at the Nationals' site in Florida (at the Rookie level); the 2009 season at their site in Florida (at the Rookie level and in extended spring training) and at their affiliate in Hagerstown, Maryland; and the 2010, 2011, and 2012 seasons in Hagerstown.  The Nationals released Mr. Newsome in January of 2013.

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

452. While working for the Nationals, Mr. Newsome believes he routinely worked more than 50 hours per week during the seasons.

453. He worked several spring trainings at the Nationals' site in Florida. While working during spring training, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week. Mr. Newsome also went to the Nationals' instructional league in 2009 (which took place at the Nationals' training site in Florida); worked similar hours to those worked during spring training; and, like spring training, did not earn a salary. He also believes he did not get paid his salary while working during extended spring training.

454. Mr. Newsome performed work for the Nationals during the off-seasons, usually in Illinois. The Nationals provided an off-season training manual, and he performed significant off-season work without being paid.

455. He was only paid his salary during the season, and he believes his salary began at $1,100 per month. He believes he earned around $3,000 in salary during his first season, and his salary remained low throughout his career.

456. Because of these salaries, Mr. Newsome struggled to live. He often lived with many other players crammed in a small apartment—with guys often sleeping on air mattresses in the living room and dining room—in order to save money. He also lived with host families at times.

457. To summarize, Mr. Newsome, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.31    Jake Opitz**

458. In June of 2008, the Chicago Cubs selected Jake Opitz in the 12th round of the Rule 4 draft. He quickly signed a UPC, and the Cubs did not fully explain all the UPC's various provisions to him.

459. Mr. Opitz worked the 2008 season at the Cubs' affiliates in Boise, Idaho and Peoria, Illinois; the 2009 season at their affiliate in Daytona, Florida; the 2010 season at their affiliates in Daytona and in Knoxville, Tennessee; and the 2011 season at Daytona and at their site in Arizona (in extended spring training while injured). The Cubs released Mr. Opitz in March of 2012.

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

460. The Philadelphia Phillies signed Mr. Opitz to a UPC in the summer of 2012. Mr. Opitz worked the rest of that season at their affiliates in Reading, Pennsylvania and Allentown, Pennsylvania. They granted him free agency in November of 2012.

461. While working for either Franchise, Mr. Opitz worked similar hours, and believes he routinely worked more than 50 hours per week during the seasons.

462. He worked several spring trainings at the Cubs' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week. He also went to the Cubs' instructional league one year (at the Cubs' training site in Arizona); worked similar hours as those worked during spring training; and, like spring training, did not earn a salary for the work.

463. Mr. Opitz performed work for the Franchises during the off-seasons, usually in Colorado, but sometimes in Nebraska or Arizona. The Franchises provided an off-season training manual, and he performed significant off-season work without being paid. Moreover, he worked considerable time for the Cubs in Arizona during the 2009–2010 off-season while recovering from an injury; as is customary across the industry, he and many other Cubs' minor leaguers (some injured and some not injured) trained at the Cubs' site in Arizona that off-season. As usual, he did not receive a salary for this off-season work.

464. No matter which Franchise employed him, he was only paid his salary during the season, and he believes his salary began at $1,100 per month. He believes he earned around $3,000 in salary during his first season, and his salary remained low throughout his career.

465. Because of these salaries, Mr. Opitz struggled to live. Like many others in the minor leagues, he lived with many other players crammed into a small apartment and sometimes slept on a cheap air mattress during the season.

466. To summarize, Mr. Opitz, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

### 5.32    Daniel Britt

467. In June of 2010, the Milwaukee Brewers drafted Daniel Britt in the 29th round of the Rule 4 draft. He quickly signed a UPC, and the Brewers did not fully explain all the UPC's various provisions to him.

468. Mr. Britt worked the 2010 season at the Brewers' site in Arizona, and he worked the 2011 season at their affiliate in Wisconsin. The Brewers released Mr. Britt in November of 2011.

469. While working for the Brewers, Mr. Britt routinely worked more than 50 hours per week during the seasons.

470. He worked one spring training at the Brewers' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

471. Mr. Britt performed work for the Brewers during the off-seasons, usually in North Carolina but also in Arizona. The Brewers provided an off-season training manual, and he performed significant off-season work without being paid.

472. Mr. Britt was only paid his salary during the season, and he believes his salary began at $1,100 per month. He believes he earned around $3,000 in salary during his first season, and his salary remained low throughout his career.

473. Because of these salaries, Mr. Britt struggled to live. Like many others in the minor leagues, he lived in either a small apartment or with a host family.

474. To summarize, Mr. Britt, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.33 Joel Weeks

475. The San Francisco Giants signed Joel Weeks as a non-drafted free agent in June of 2008. He quickly signed a UPC without having the opportunity to negotiate the terms.

476. Mr. Weeks worked the 2008 season at the Giants' site in Arizona; the 2009 season at the Giants' affiliates in Salem, Oregon and Augusta, Georgia; the 2010 season at the Giants' affiliate in San Jose; the 2011 season at affiliates in Augusta and Richmond, Virginia; and the 2012 season in Richmond. Mr. Weeks voluntarily retired before the 2013 season.

477. While working for the Giants, Mr. Weeks routinely worked more than 50 hours per week during the seasons.

478. He worked several spring trainings at the Giants' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

479. Mr. Weeks performed work for the Giants during the off-seasons, usually in California. The Giants provided an off-season training manual, and he performed significant off-season work without being paid.

480. Mr. Weeks was only paid his salary during the season. He believes he earned around $3,000 in salary during his first season, and his salary remained low throughout his career. Because of these salaries, Mr. Weeks struggled to live.

481. To summarize, Mr. Weeks, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.34 Gaspar Santiago**

482. In June of 2010, the San Francisco Giants drafted Gaspar Santiago in the 28th round of the Rule 4 draft. He quickly signed a UPC without having the opportunity to negotiate the terms.

483. Mr. Santiago worked the 2010 season at the Giants' site in Arizona; the 2011 season at their affiliate in Augusta, Georgia; and the 2012 season at their site in Arizona (in extended spring training) and at their affiliate in Salem, Oregon. The Giants released Mr. Santiago in March of 2013.

484. While working for the Giants, Mr. Santiago routinely worked more than 50 hours per week during the seasons.

485. He worked several spring trainings at the Giants' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week. Mr. Santiago also went to the Giants' instructional league (which took place at the Giants' training site in Arizona); worked similar hours to those worked during spring training; and, like spring training, did not earn a salary. He also believes he did not get paid his salary while working during extended spring training.

486. Mr. Santiago performed work for the Giants during the off-seasons, usually in Puerto Rico. The Giants provided an off-season training manual, and he performed significant off-season work without being paid.

487. Mr. Santiago was only paid his salary during the season. He believes he earned around $3,000 in salary during his first season, and his salary remained low throughout his career. Because of these salaries, Mr. Santiago struggled to live.

488. To summarize, Mr. Santiago, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

## VII.  FEDERAL WAGE AND HOUR VIOLATIONS

### Count 1: FLSA Minimum Wage and Overtime Violations

(Plaintiffs and the Minor League Collective Against All Defendants)

489. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

490. As detailed above, the Defendants have engaged in a long-standing and widespread violation of the FLSA. The FLSA's minimum wage and overtime requirements, 29 U.S.C. §§ 201 et seq., and the supporting regulations, apply to all Defendants and protect Plaintiffs the class members.

491. At all relevant times, Plaintiffs and all the minor leaguers of the proposed class were (and/or continue to be) employees within the meaning of 29 U.S.C. § 203(e), and were (and/or continue to be) employed by covered enterprises and/or entities engaged in commerce and/or the production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 203(e), (r) and (s). The work also regularly involves interstate commerce.

492. At all relevant times, the Defendants jointly employed (and/or continue to employ) Plaintiffs and all similarly-situated minor leaguers within the broad meaning of 29 U.S.C. §§ 203(d) and (g).

493. The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay Plaintiffs and all similarly-situated minor leaguers the applicable minimum wage for all hours the minor leaguers worked on behalf of Defendants, and continue to engage in such a policy

1   and practice.

2   494. Further, the Defendants constructed, implemented, and engaged in a policy and practice

3   that failed to pay Plaintiffs and all similarly-situated minor leaguers the applicable overtime wage for

4   all hours minor leaguers worked beyond the normal, forty-hour workweek, and continue to engage in

5   such a policy and practice.

6   495. Defendants also implemented and engaged in the policy and/or practice of failing to pay

7   Plaintiffs and all similarly-situated minor leaguers any wages at all for many hours the minor leaguers

8   worked on behalf of Defendants, and continue to engage in such policies and practices.

9   496. As a result of these minimum wage and overtime violations, Plaintiffs and all similarly-

10  situated minor leaguers have suffered and continue to suffer damages in amounts to be determined at

11  trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest,

12  attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

13  497. The Defendants' pattern of unlawful conduct was and continues to be willful and

14  intentional, or the Defendants at least acted with reckless disregard. The Defendants were and are

15  aware, or should have been aware, that the practices described in this Complaint are unlawful. The

16  Defendants have not made a good-faith effort to comply with the FLSA with respect to the

17  compensation of Plaintiffs and all similarly-situated minor leaguers. Instead, the Defendants

18  knowingly and/or recklessly disregarded federal wage and hour laws.

19  498. All similarly-situated minor leaguers are entitled to collectively participate in this action by

20  choosing to "opt-in" and submitting written Consents to Join this action. 29 U.S.C. § 216(b).

21  **Count 2: FLSA Recordkeeping Requirements**

22  (Plaintiffs and the Minor League Collective Against All Defendants)

23  499. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

24  500. The Defendants failed (and continue to fail) to make, keep, and preserve accurate records

25  with respect to Plaintiffs and all similarly-situated minor leaguers, including hours worked each

26  workday and total hours worked each workweek, as required by the FLSA, 29 U.S.C. § 211(c), and

27  supporting federal regulations.

28  501. The lack of recordkeeping has harmed the Plaintiffs and creates a rebuttable presumption

1    that the employees' estimates of hours worked are accurate.[67]

2    ## VIII.  STATE WAGE AND HOUR VIOLATIONS

3    502. The state Counts seek to recover for all minor league work performed by the Proposed

4    Classes, including (but not limited to) winter off-season work. Plaintiffs are informed and believe that,

5    during the winter work periods, most minor leaguers return to the state where they were drafted,

6    where they work without pay.

7    503. The states enumerated in the Proposed Classes routinely produce high numbers of minor

8    leaguers.[68] Thus, Plaintiffs are informed and believe that all Defendants employed and continue to

9    employ minor leaguers in each of the states enumerated in the Proposed Classes during the relevant

10   time periods. Upon information and belief, Plaintiffs further allege that each of the Defendants

11   violated the laws in each of the states enumerated in the Proposed Classes due to uncompensated

12   winter off-season work and/or work performed during other portions of the year.

13   ### Count 3: California Minimum Wage Violations

14   (The California Class Representatives and the California Class Against All Defendants)

15   504. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

16   505. Pursuant to California law, the Defendants are and were required to pay the California

17   Class Representatives and the California Class a minimum wage set by California state law. Cal. Lab.

18   Code §§ 1182 et seq. and 1197. The state's minimum wage requirements apply to the Defendants and

19   protect the California Class Representatives and the California Class.

20   506. The Defendants constructed, implemented, and engaged in a policy and/or practice of

21   failing to pay the California Class Representatives and all of the California Class the applicable

22   minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and

---

24   [67] *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946).

25   [68] For instance, California averaged 221 draft picks per year during the last Rule 4 drafts; Florida
26   averaged 141 per year; North Carolina averaged 51 per year; Arizona averaged 46 per year; and New
     York averaged 32 per year. *See All-time Draft Database*, Baseball America,
27   http://www.baseballamerica.com/all-time-draft-db/ (last visited Feb. 6, 2013) (providing a database
     that allows searches of draft picks by state, which allows for counting draft picks).

1   they continue to engage in such practices.

2       507. As a result of these minimum wage violations, the California Class Representatives and

3   the California Class have suffered (and continue to suffer) damages in amounts to be determined at

4   trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest,

5   attorneys' fees, costs, and other compensation pursuant to California Labor Code §§ 1194 and 1194.2.

6       508. The Defendants pattern of unlawful conduct was and continues to be willful and

7   intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

8   that the practices described in this Complaint are unlawful. The Defendants have not made a good-

9   faith effort to comply with California's minimum wage requirements with respect to the

10  compensation of the California Class Representatives and the California Class, and instead knowingly

11  and/or recklessly disregarded state law.

12                      **Count 4: California Unpaid Overtime Violations**

13          (The California Class Representatives and the California Class Against All Defendants)

14      509. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

15      510. The laws of California require the Defendants to pay overtime compensation for work in

16  excess of eight hours in a day or forty hours in a week, at a rate of one and one-half times the regular

17  rate of pay for the employee. Cal. Lab. Code § 510. The laws of California further require employees

18  to be compensated at twice the regular rate of pay for work in excess of twelve hours in one day. The

19  state's overtime requirements apply to the Defendants and protect the California Class

20  Representatives and the California Class members.

21      511. Throughout the California Class period, the California Class Representatives and the

22  California Class routinely worked (and continue to work) in excess of 8 hours per workday,

23  sometimes work(ed) in excess of 12 hours in a workday, routinely work(ed) in excess of 40 hours in a

24  workweek, usually work(ed) 7 days in a workweek and sometimes in excess of 8 hours on the seventh

25  day of the workweek.

26      512. The Defendants failed and continue to fail to pay the California Class Representatives

27  and the California Class overtime wages as required by California Labor Code § 510.

28      513. As a result of these violations, the California Class Representatives and the California

75

1   Class have suffered and continue to suffer damages in amounts to be determined at trial, and are

2   entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and

3   other compensation pursuant to California Labor Code § 1194.

4   514. As a result of these violations, and pursuant to California Labor Code § 558, the

5   California Class Representatives and the California Class are also entitled to recover civil penalties in

6   the amount of $50 per employee per violative pay period for initial violations and $100 per employee

7   per violative pay period for subsequent violations.

8   515. The Defendants pattern of unlawful conduct was and continues to be willful and

9   intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

10  that the practices described in this Complaint are unlawful. The Defendants have not made a good-

11  faith effort to comply with California's overtime requirements with respect to the compensation of

12  the California Class Representatives and the California Class, and instead knowingly and/or recklessly

13  disregarded state law.

14  **Count 5: Violation of California "Payday" Requirements**

15  (The California Class Representatives and the California Class Against All Defendants)

16  516. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

17  517. California law requires employers to pay employees on designated days at least twice per

18  calendar month. Cal. Lab. Code § 204. Overtime wages must be paid no later than the payday

19  following the payroll period during which overtime wages are earned. These requirements apply to the

20  Defendants and protect the California Class Representatives and the California Class members.

21  518. The Defendants failed and continue to fail to pay overtime wages in a timely manner as

22  required by California Labor Code § 204.

23  519. As a result of these violations, the California Class Representatives and the California

24  Class have suffered and continue to suffer damages in amounts to be determined at trial, and are

25  entitled to recover penalties in the amount of $100 per pay period per employee for first-time

26  violations and $200 per pay period per employee for subsequent violations, along with attorneys' fees

27  and any other damages permitted by statute.

28

**Count 6: California Waiting Time Penalties**

(The California Class Representatives and the California Waiting Time

Subclass Against All Defendants)

520. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

521. California Labor Code §§ 201 and 202 require Defendants to pay their employees all wages due immediately upon discharge. California Labor Code § 203 states that if an employer fails to pay any wages to an employee who is discharged or quits, wages continue to accrue as a penalty for up to thirty days.

522. The Defendants failed and continue to fail to pay minimum wages and overtime wages for work performed in California. These wages remained unpaid at the time the California Class Representatives and other members of the California Waiting Time Subclass were discharged or quit. Further, the Defendants failed to pay the wages within the time required by California Labor Code §§ 201 and 202 and continue to remain unpaid today.

523. As a result of the Defendants conduct, the wages continue to accrue as a penalty for up to 30 days, as required by § 203. The California Class Representatives and members of the California Waiting Time Subclass are entitled to recover from Defendant this statutory penalty for each day unpaid up to the thirty-day maximum, together with interest, attorneys' fees, and costs.

**Count 7: California Itemized Wage Statement Violations**

(The California Class Representatives and the California Class Against All Defendants)

524. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

525. California Labor Code § 226 requires Defendants to provide the California Class Representatives and the California Class with regular, written statements showing, among other things, total hours worked, all applicable hourly rates during the pay period, and the corresponding number of hours worked at each rate by the employee. Defendants knowingly and intentionally failed and continue to fail to provide timely, accurate itemized wage statements including this required information.

526. Under § 226(e), an employee suffering injury as a result of a knowing and intentional violation of § 226(a) is entitled to recover the greater of all actual damages or $50 for the initial

1   violative pay period and $100 for each subsequent violative pay period (up to a maximum of $4,000

2   per employee).

3       527. As a result of these violations, the California Class Representatives and the California

4   Class have been injured (and continue to be injured) by, among other things, not being paid all wages

5   due, not knowing how many hours were worked, and not knowing the relevant wage rate. Thus, the

6   California Class Representatives and the California Class suffered and continue to suffer damages in

7   amounts to be calculated at trial, and are entitled to recover the penalties, prejudgment interest,

8   attorneys' fees, costs, and other damages pursuant to California Labor Code § 226.

9   <div align="center">**Count 8: Unfair Business Practices Under California Law**</div>

10   <div align="center">(The California Class Representatives and the California Class Against All Defendants)</div>

11       528. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

12       529. The California Class Representatives bring this cause of action on behalf of themselves

13   and others similarly situated, seeking restitution of all unpaid wages as described above, including

14   interest, for the four-year period preceding the filing of this complaint until the resolution of this

15   action.

16       530. The Defendants' conduct constitutes an unfair and unlawful business practice under

17   Business and Professions Code §§ 17200, et seq. Defendants conducted and continue to conduct

18   business activities while failing to comply with California's legal mandates for employment. The

19   California Class Representatives and others similarly situated suffered and continue to suffer injury in

20   fact and lost and continue to lose money as a result of Defendants' unfair competition.

21       531. The California Class Representatives and others similarly situated are entitled to

22   restitution of the uncompensated pay that has accrued and continues to accrue, as well as costs, fees,

23   and any other relief that the Court determines is proper.

24   <div align="center">**Count 9: Recovery under California's Private Attorney General Act**</div>

25   <div align="center">(Craig Bennigson and All Those Similarly Situated Against All Defendants)</div>

26       532. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

27       533. The Defendants' conduct violated (and continues to violate) many sections of California's

28   Labor Code, including but not limited to §§ 201, 202, 203, 204, 208, 226, 510, 1194, and 1197.

534. Mr. Bennigson, as an aggrieved employee, seeks recovery of civil penalties as required by the Labor Code Private Attorney General Act of 2004. Mr. Bennigson seeks these penalties on behalf of himself and other current and former employees of the Defendants against whom one or more of the violations of the Labor Code were committed.

535. In accordance with Labor Code § 2699.3, on January 30, 2014, written notice was sent by certified mail detailing the Labor Code violations to the California Labor and Workforce Development Agency ("LWDA"), and the same notice was sent to all Defendants.[69] Plaintiffs have not received written notification by the LWDA of an intention to investigate the allegations set forth in the notice letter, or written notice of cure, by March 3, 2014.

### Count 10: Quantum Meruit Under California Common Law

(The California Class Representatives and the California Class Against All Defendants)

536. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

537. Although the parties operated and/or continue to operate under express contracts, many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable. Quantum meruit may be used as a substitute for the unenforceable contract provisions.

538. In employing the minor leaguers as baseball players, the Defendants requested that the minor leaguers perform work. Much of this work occurred and continues to occur in California.

539. The California Class of minor leaguers performed and continues to perform this work and expects to be compensated for these services. They were not amateurs and expect to be paid for all work performed. By not receiving payment for all services, they were (and continue to be) impoverished.

540. The Defendants benefited and continue to benefit from these services because the minor leaguers perform in the Defendants' developmental system for baseball players. The Defendants' developmental system yields the Defendants' chief product of major league players and allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor

---

[69] *See* Exhibit C. The same notice letter was sent to MLB and all thirty Franchises.

1  leaguers at all during some periods of services and conspired to pay below-market salaries during

2  other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

3      541. Under quantum meruit, the Defendants owe the California Class of minor leaguers the

4  salaries that the parties would expect in the open market, in a system in which minor leaguers could

5  freely negotiate with any team.[70]

6                          **Count 11: Florida Minimum Wage Law Violations**

7               (The Florida Class Representatives and the Florida Class Against All Defendants)

8      542. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

9      543. Pursuant to Article X, Section 24 of the Florida Constitution, and pursuant to state

10  statute, Fla. Stat. § 448.01 *et seq.*, the Defendants are and were required to pay the Florida Class

11  Representatives and the Florida Class a minimum wage set by Florida state law. The state's minimum

12  wage requirements apply to the Defendants and protect the Florida Class Representatives and the

13  Florida Class.

14      544. The Defendants constructed, implemented, and engaged in a policy and/or practice of

15  failing to pay the Florida Class Representatives and all of the Florida Class the applicable minimum

16  wage for all hours they suffered or permitted the minor leaguers to work in the state, and they

17  continue to engage in such policies and practices.

18      545. Before instituting this claim, all Defendants were served with the statutory notice

19  required by Section 448.110, which alerted Defendants of the intent to bring this action.[71] Defendants

20  refused to pay the unpaid wages or otherwise satisfactorily settle the claim within fifteen days of

21  receiving the notice.

22      546. As a result of these minimum wage violations, the Florida Class Representatives and the

23  Florida Class have suffered and continue to suffer damages in amounts to be determined at trial, and

24  are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees,

25  ─────────────────────────

26  [70] The quantum meruit measurement of damages demonstrates that statutory damages at law would
     be an inadequate remedy by, among other things, failing to yield complete relief.

27  [71] *See* Exhibit D. The same notice letter was sent to MLB and all thirty Franchises.

28

861070.1

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

costs, and other compensation pursuant to Article X, Section 24 of the Florida Constitution and Section 448.110 of the Florida Statutes.

547. Through the Defendants' pattern of unlawful conduct, the Defendants acted and continue to act willfully and intentionally, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with Florida's minimum wage requirements with respect to the compensation of the Florida Class Representatives and the Florida Class, and instead knowingly and/or recklessly disregarded state law.

548. Article X, Section 24 of the Florida Constitution, and Section 448.110 of the Florida Statutes, entitles members of the Florida Class to bring this action as a class action.

### Count 12: Quantum Meruit Under Florida Common Law

(The Florida Class Representatives and the Florida Class Against All Defendants)

549. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

550. Although the parties operated and/or continue to operate under express contracts, many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable. Quantum meruit may be used as a substitute for the unenforceable contract provisions.

551. In employing the minor leaguers as baseball players, the Defendants acquiesced to the provision of services by directing, controlling, and allowing the minor leaguers to work. Much of this work occurred and continues to occur in Florida.

552. The Florida Class of minor leaguers expected (and continue to expect) to be compensated for these services. They were not amateurs and expected (and continue to expect) to be paid for all work performed.

553. The Defendants benefited and continue to benefit from these services because the minor leaguers perform in the Defendants' developmental system for baseball players. The Defendants' developmental system yields the Defendants' chief product of major league players and allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor leaguers at all during some periods of services and conspired to pay below-market salaries during other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

554. Under quantum meruit, the Defendants owe the minor leaguers the salaries that the parties would expect in the open market, in a system in which minor leaguers could freely negotiate with any team.[72]

### Count 13: Arizona Minimum Wage and Wage Law Violations

(The Arizona Class Representatives and the Arizona Class Against All Defendants)

555. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

556. Pursuant to Arizona law, the Defendants are and were required to pay the Arizona Class Representatives and the Arizona Class a minimum wage set by Arizona state law. Ariz. Rev. Stat. §§ 23-363, 23-364. The state's minimum wage requirements apply to the Defendants and protect the Arizona Class Representatives and the Arizona Class members.

557. The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay the Arizona Class Representatives and all of the Arizona Class the applicable minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and they continue to engage in such practices.

558. As a result of these minimum wage violations, the Arizona Class Representatives and the Arizona Class have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to Section 23-364.

559. The Defendants' pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with Arizona's minimum wage requirements with respect to the compensation of the Arizona Class Representatives and the Arizona Class, and instead knowingly and/or recklessly disregarded state law.

560. Under Arizona's Wage Law, §§ 23-351 et seq., Defendants have also willfully failed to pay

---

[72] The quantum meruit measurement of damages demonstrates that statutory damages at law would be an inadequate remedy by, among other things, failing to yield complete relief.

wages to the Arizona Class Representatives and the Arizona Proposed Class for work performed. Thus, the Arizona Class Representatives and the Arizona Proposed Class are also entitled to treble the amount of wages unpaid. § 23-355(A).

### Count 14: Arizona Recordkeeping Requirements

(The Arizona Class Representatives and the Arizona Class Against All Defendants)

561. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

562. The Defendants failed (and continue to fail) to make, keep, and preserve accurate records with respect to the Arizona Class Representatives and the Arizona Class, including hours worked each workday and total hours worked each workweek, as required by the Arizona Minimum Wage Law, Ariz. Rev. Stat. § 23-364, and supporting state regulations.

563. The failure to maintain such records "shall raise a rebuttable presumption that the employer did not pay the required minimum wage rate." § 23-364.

### Count 15: Quantum Meruit Under Arizona Common Law

(The Arizona Class Representatives and the Arizona Class Against All Defendants)

564. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

565. Although the parties operated and/or continue to operate under express contracts, many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable. Quantum meruit may be used as a substitute for the unenforceable contract provisions.

566. In employing the minor leaguers as baseball players, the Defendants acquiesced to the provision of services by directing, controlling, and allowing the minor leaguers to work. Much of this work occurred in Arizona.

567. The Arizona Class of minor leaguers expected (and continues to expect) to be compensated for these services. They are and were not amateurs and expect to be paid for all work performed. By not receiving payment for all services, they were (and continue to be) impoverished.

568. The Defendants benefited (and continue to benefit) from these services because the minor leaguers perform in the Defendants' developmental system for baseball players. The Defendants' developmental system yields the Defendants' chief product of major league players and allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay

1    minor leaguers at all during some periods of services and conspired to pay below-market salaries

2    during other periods of services. Thus, the Defendants were and continue to be unjustly enriched.

3        569. Under quantum meruit, the Defendants owe the minor leaguers the salaries that the

4    parties would expect in the open market, in a system in which minor leaguers could freely negotiate

5    with any team.[73]

6    <div align="center">**Count 16: North Carolina Minimum Wage Violations**</div>

7    <div align="center">(The North Carolina Class Representatives and the North Carolina Class Against All Defendants)</div>

8        570. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

9        571. Pursuant to North Carolina law, the Defendants are and were required to pay the North

10   Carolina Class Representatives and the North Carolina Class a minimum wage at least as high as that

11   set by federal law. N.C. Gen. Stat. § 95-25.3. The state's minimum wage requirements apply to the

12   Defendants and protect the North Carolina Class Representatives and the North Carolina Class

13   members.

14       572. The Defendants were also required to pay all wages accrued on the regular payday, and

15   were not allowed to withhold wages in contravention of the applicable laws. §§ 95-25.6, 95-25.8.

16       573. The Defendants constructed, implemented, and engaged in a policy and/or practice of

17   failing to pay the North Carolina Class Representatives and all of the North Carolina Class the

18   applicable minimum wage for all hours they suffered or permitted the minor leaguers to work in the

19   state, and they continue to engage in such practices. The Defendants also failed to pay all wages

20   accrued on the regular payday and wrongfully withheld some wages.

21       574. As a result of these minimum wage violations, the North Carolina Class Representatives

22   and the North Carolina Class have suffered and continue to suffer damages in amounts to be

23   determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment

24   interest, attorneys' fees, costs, and other compensation pursuant to section 95-25.22.

25       575. The Defendants' pattern of unlawful conduct was and continues to be willful and

26   ────────────────────

27   [73] The quantum meruit measurement of damages demonstrates that statutory damages at law would
be an inadequate remedy by, among other things, failing to yield complete relief.

28

1   intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

2   that the practices described in this Complaint are unlawful. The Defendants have not made a good-

3   faith effort to comply with North Carolina's minimum wage requirements with respect to the

4   compensation of the North Carolina Class Representatives and the North Carolina Class, and instead

5   knowingly and/or recklessly disregarded state law.

6   <center>**Count 17: North Carolina Overtime Violations**</center>

7   <center>(The North Carolina Class Representatives and the North Carolina Class Against All Defendants)</center>

8   576. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

9   577. The laws of North Carolina require the Defendants to pay overtime compensation. N.C.

10  Gen. Stat. § 95-25.4. The state's overtime requirements apply to the Defendants and protect the

11  North Carolina Class Representatives and the North Carolina Class members.

12  578. The Defendants were also required to pay all wages accrued on the regular payday, and

13  were not allowed to withhold wages in contravention of the applicable laws. §§ 95-25.6, 95-25.8.

14  579.  Throughout the North Carolina Class Period, the North Carolina Class Representatives

15  and the North Carolina Class routinely worked (and continue to work) far more than 40 hours in a

16  workweek. The Defendants failed and continue to fail to pay the North Carolina Class

17  Representatives and the North Carolina Class overtime wages as required. § 95-25.4. The Defendants

18  also failed to pay all wages accrued on the regular payday and wrongfully withheld some wages.

19  580. As a result of these violations, the North Carolina Class Representatives and the North

20  Carolina Class have suffered and continue to suffer damages in amounts to be determined at trial, and

21  are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs,

22  and other compensation pursuant to section 95-25.22.

23  581. The Defendants pattern of unlawful conduct was and continues to be willful and

24  intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

25  that the practices described in this Complaint are unlawful. The Defendants have not made a good-

26  faith effort to comply with North Carolina's overtime requirements with respect to the compensation

27  of the North Carolina Class Representatives and the North Carolina Class, and instead knowingly

28  and/or recklessly disregarded state law.

<center>85</center>

**Count 18: Quantum Meruit Under North Carolina Common Law**

(The North Carolina Class Representatives and the North Carolina Class Against All Defendants)

582. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

583. Although the parties operated and/or continue to operate under express contracts, many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable. Quantum meruit may be used as a substitute for the unenforceable contract provisions.

584. In employing the minor leaguers as baseball players, the Defendants requested that the minor leaguers perform work that occurred and continues to occur in North Carolina.

585. The North Carolina Class of minor leaguers performed and continues to perform this work and expects to be compensated for these services. They were not amateurs and expect to be paid for all work performed. By not receiving payment for all services, they were (and continue to be) impoverished.

586. The Defendants benefited and continue to benefit from these services because the minor leaguers perform in the Defendants' developmental system for baseball players. The Defendants' developmental system yields the Defendants' chief product of major league players and allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor leaguers at all during some periods of services and conspired to pay below-market salaries during other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

587. Under quantum meruit, the Defendants owe the North Carolina Class of minor leaguers the salaries that the parties would expect in the open market, in a system in which minor leaguers could freely negotiate with any team.[74]

**Count 19: New York Minimum Wage Violations**

(The New York Class Representatives and the New York Class Against All Defendants)

588. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

589. Pursuant to New York law, the Defendants are and were required to pay the New York

---

[74] The quantum meruit measurement of damages demonstrates that statutory damages at law would be an inadequate remedy by, among other things, failing to yield complete relief.

1  Class Representatives and the New York Class a minimum wage set by New York state law. N.Y. Lab.

2  Law § 652. The state's minimum wage requirements apply to the Defendants and protect the New

3  York Class Representatives and the New York Class members.

4  590. The Defendants constructed, implemented, and engaged in a policy and/or practice of

5  failing to pay the New York Class Representatives and all of the New York Class the applicable

6  minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and

7  they continue to engage in such practices.

8  591. As a result of these minimum wage violations, the New York Class Representatives and

9  the New York Class have suffered and continue to suffer damages in amounts to be determined at

10  trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys'

11  fees, costs, and other compensation pursuant to New York Labor Law § 663.

12  592. The Defendants' pattern of unlawful conduct was and continues to be willful and

13  intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

14  that the practices described in this Complaint are unlawful. The Defendants have not made a good-

15  faith effort to comply with New York's minimum wage requirements with respect to the

16  compensation of the New York Class Representatives and the New York Class, and instead

17  knowingly and/or recklessly disregarded state law.

18  **Count 20: New York Overtime Violations**

19  (The New York Class Representatives and the New York Class Against All Defendants)

20  593. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

21  594. The laws of New York require the Defendants to pay overtime compensation. 12

22  N.Y.C.R.R. § 142-2.2. The state's overtime requirements apply to the Defendants and protect the

23  New York Class Representatives and the New York Class members.

24  595. Throughout the New York Class Period, the New York Class Representatives and the

25  New York Class routinely worked (and continue to work) in excess of 40 hours in a workweek. The

26  Defendants failed and continue to fail to pay the New York Class Representatives and the New York

27  Class overtime wages as required by New York law. 12 N.Y.C.R.R. § 142-2.2.

28  596. As a result of these violations, the New York Class Representatives and the New York

1  Class have suffered and continue to suffer damages in amounts to be determined at trial, and are

2  entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and

3  other compensation pursuant to New York Labor Law § 663.

4       597. The Defendants pattern of unlawful conduct was and continues to be willful and

5  intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

6  that the practices described in this Complaint are unlawful. The Defendants have not made a good-

7  faith effort to comply with New York's overtime requirements with respect to the compensation of

8  the New York Class Representatives and the New York Class, and instead knowingly and/or

9  recklessly disregarded state law.

10                    **Count 21: New York Wage Statement Violations**

11          (The New York Class Representatives and the New York Class Against All Defendants)

12       598. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

13       599. New York Labor Law § 195.3 requires Defendants to provide the New York Class

14  Representatives and the New York Class with regular, written statements showing, among other

15  things, deductions, the regular rate of pay, the overtime rate of pay, and the corresponding number of

16  hours worked at each rate by the employee. Defendants knowingly and intentionally failed and

17  continue to fail to provide timely, accurate itemized wage statements including this required

18  information.

19       600. Under New York's Wage Theft and Prevention Act, the New York Class Representatives

20  and the members of the New York Class who suffered injury as a result of a violation of § 195.3 are

21  entitled to recover in a civil suit $100 per pay period, up to a maximum of $2500 per employee.

22       601. As a result of these violations, the New York Class Representatives and the New York

23  Class have been injured (and continue to be injured) by, among other things, not being paid all wages

24  due, not knowing how many hours were worked, and not knowing the relevant wage rate. Thus, the

25  New York Class Representatives and the New York Class suffered and continue to suffer damages in

26  amounts to be calculated at trial.

27

28

**Count 22: Quantum Meruit Under New York Common Law**

(The New York Class Representatives and the New York Class Against All Defendants)

602. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

603. Although the parties operated and/or continue to operate under express contracts, many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable. Quantum meruit may be used as a substitute for the unenforceable contract provisions.

604. In employing the minor leaguers as baseball players, the Defendants requested that the minor leaguers perform work that occurred and continues to occur in New York.

605. The New York Class of minor leaguers performed and continues to perform this work and expects to be compensated for these services. They were not amateurs and expect to be paid for all work performed. By not receiving payment for all services, they were (and continue to be) impoverished.

606. The Defendants benefited and continue to benefit from these services because the minor leaguers perform in the Defendants' developmental system for baseball players. The Defendants' developmental system yields the Defendants' chief product of major league players and allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor leaguers at all during some periods of services and conspired to pay below-market salaries during other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

607. Under quantum meruit, the Defendants owe the New York Class of minor leaguers the salaries that the parties would expect in the open market, in a system in which minor leaguers could freely negotiate with any team.[75]

**Count 23: Pennsylvania Minimum Wage Violations**

(The Pennsylvania Class Representatives and the Pennsylvania Class Against All Defendants)

608. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

609. Pursuant to Pennsylvania law, the Defendants are and were required to pay the

---

[75] The quantum meruit measurement of damages demonstrates that statutory damages at law would be an inadequate remedy by, among other things, failing to yield complete relief.

Pennsylvania Class Representatives and the Pennsylvania Class a minimum wage in accordance with Pennsylvania State Law. *See* 43 Penn. Stat. § 333.104. The state's minimum wage requirements apply to the Defendants and protect the Pennsylvania Class Representatives and the Pennsylvania Class members.

610. The Defendants were also required to pay all wages accrued on the regular payday, and were not allowed to withhold wages in contravention of the applicable laws. 43 Penn. Stat. § 260.3.

611. The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay the Pennsylvania Class Representatives and all of the Pennsylvania Class the applicable minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and they continue to engage in such practices. The Defendants also failed to pay all wages accrued on the regular payday and wrongfully withheld some wages.

612. As a result of these minimum wage violations, the Pennsylvania Class Representatives and the Pennsylvania Class have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 43 Penn. Stat. §§ 260.9a, 260.10, 333.112, 333.113, or otherwise permitted by law.

613. The Defendants' pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with Pennsylvania's minimum wage requirements with respect to the compensation of the Pennsylvania Class Representatives and the Pennsylvania Class, and instead knowingly and/or recklessly disregarded state law.

## Count 24: Pennsylvania Overtime Violations

(The Pennsylvania Class Representatives and the Pennsylvania Class Against All Defendants)

614. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

615. The laws of Pennsylvania require the Defendants to pay overtime compensation. The laws of Pennsylvania require the Defendants to pay overtime compensation. *See* 43 P.S. § 333.104. The state's minimum wage requirements apply to the Defendants and protect the Pennsylvania Class

1   Representatives and the Pennsylvania Class members.

2   616. The Defendants were also required to pay all wages accrued on the regular payday, and

3   were not allowed to withhold wages in contravention of the applicable laws. 43 Penn. Stat. § 260.3.

4   617. Throughout the Pennsylvania Class Period, the Pennsylvania Class Representatives and

5   the Pennsylvania Class routinely worked (and continue to work) far more than 40 hours in a

6   workweek. The Defendants failed and continue to fail to pay the Pennsylvania Class Representatives

7   and the Pennsylvania Class overtime wages as required. The Defendants also failed to pay all wages

8   accrued on the regular payday and wrongfully withheld some wages.

9   618. As a result of these violations, the Pennsylvania Class Representatives and the

10  Pennsylvania Class have suffered and continue to suffer damages in amounts to be determined at trial,

11  and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees,

12  costs, and other compensation pursuant to 43 P.S. §§ 260.9a, 260.10, 333.112, 333.113, or otherwise

13  permitted by law.

14  619. The Defendants pattern of unlawful conduct was and continues to be willful and

15  intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

16  that the practices described in this Complaint are unlawful. The Defendants have not made a good-

17  faith effort to comply with Pennsylvania's overtime requirements with respect to the compensation of

18  the Pennsylvania Class Representatives and the Pennsylvania Class, and instead knowingly and/or

19  recklessly disregarded state law.

20  **Count 25: Quantum Meruit Under Pennsylvania Common Law**

21  (The Pennsylvania Class Representatives and the Pennsylvania Class Against All Defendants)

22  620. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

23  621. Although the parties operated and/or continue to operate under express contracts, many

24  of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable.

25  Quantum meruit may be used as a substitute for the unenforceable contract provisions.

26  622. In employing the minor leaguers as baseball players, the Defendants requested that the

27  minor leaguers perform work that occurred and continues to occur in Pennsylvania.

28  623. The Pennsylvania Class of minor leaguers performed and continues to perform this work

1   and expects to be compensated for these services. They were not amateurs and expect to be paid for

2   all work performed. By not receiving payment for all services, they were (and continue to be)

3   impoverished.

4       624. The Defendants benefited and continue to benefit from these services because the minor

5   leaguers perform in the Defendants' developmental system for baseball players. The Defendants'

6   developmental system yields the Defendants' chief product of major league players and allows the

7   Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor

8   leaguers at all during some periods of services and conspired to pay below-market salaries during

9   other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

10       625. Under quantum meruit, the Defendants owe the Pennsylvania Class of minor leaguers

11   the salaries that the parties would expect in the open market, in a system in which minor leaguers

12   could freely negotiate with any team.[76]

13       **Count 26: Maryland Minimum Wage Violations**

14       (The Maryland Class Representatives and the Maryland Class Against All Defendants)

15       626. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

16       627. Pursuant to Maryland law, the Defendants are and were required to pay the Maryland

17   Class Representatives and the Maryland Class a minimum wage in accordance with Maryland State

18   Law. *See* Md. Code Lab. & Empl. § 3-413. The state's minimum wage requirements apply to the

19   Defendants and protect the Maryland Class Representatives and the Maryland Class members.

20       628. The Defendants were also required to pay all wages accrued on the regular payday, and

21   were not allowed to withhold wages in contravention of the applicable laws. Md. Code Lab. & Empl.

22   § 3-502.

23       629. The Defendants constructed, implemented, and engaged in a policy and/or practice of

24   failing to pay the Maryland Class Representatives and all of the Maryland Class the applicable

25   minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and

26    

27   [76] The quantum meruit measurement of damages demonstrates that statutory damages at law would be an inadequate remedy by, among other things, failing to yield complete relief.

28    

1  they continue to engage in such practices. The Defendants also failed to pay all wages accrued on the

2  regular payday and wrongfully withheld some wages.

3      630. As a result of these minimum wage violations, the Maryland Class Representatives and

4  the Maryland Class have suffered and continue to suffer damages in amounts to be determined at trial,

5  and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees,

6  costs, and other compensation pursuant to Md. Code Lab. & Empl. §§ 3-427, 3-428, 3-508, or

7  otherwise permitted by law.

8      631. The Defendants' pattern of unlawful conduct was and continues to be willful and

9  intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

10  that the practices described in this Complaint are unlawful. The Defendants have not made a good-

11  faith effort to comply with Maryland's minimum wage requirements with respect to the compensation

12  of the Maryland Class Representatives and the Maryland Class, and instead knowingly and/or

13  recklessly disregarded state law.

**Count 27: Maryland Overtime Violations**

15  (The Maryland Class Representatives and the Maryland Class Against All Defendants)

16      632. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

17      633. The laws of Maryland require the Defendants to pay overtime compensation. The laws of

18  Maryland require the Defendants to pay overtime compensation. *See* Md. Code Lab. & Empl. § 3-415.

19  The state's minimum wage requirements apply to the Defendants and protect the Maryland Class

20  Representatives and the Maryland Class members.

21      634. The Defendants were also required to pay all wages accrued on the regular payday, and

22  were not allowed to withhold wages in contravention of the applicable laws. Md. Code Lab. & Empl.

23  .§ 3-502.

24      635. Throughout the Maryland Class Period, the Maryland Class Representatives and the

25  Maryland Class routinely worked (and continue to work) far more than 40 hours in a workweek. The

26  Defendants failed and continue to fail to pay the Maryland Class Representatives and the Maryland

27  Class overtime wages as required. The Defendants also failed to pay all wages accrued on the regular

28  payday and wrongfully withheld some wages.

636. As a result of these violations, the Maryland Class Representatives and the Maryland Class have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to Md. Code Lab. & Empl. §§ 3-427, 3-428, 3-508, or otherwise permitted by law.

637. The Defendants pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with Maryland's overtime requirements with respect to the compensation of the Maryland Class Representatives and the Maryland Class, and instead knowingly and/or recklessly disregarded state law.

### Count 28: Quantum Meruit Under Maryland Common Law

(The Maryland Class Representatives and the Maryland Class Against All Defendants)

638. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

639. Although the parties operated and/or continue to operate under express contracts, many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable. Quantum meruit may be used as a substitute for the unenforceable contract provisions.

640. In employing the minor leaguers as baseball players, the Defendants requested that the minor leaguers perform work that occurred and continues to occur in Maryland.

641. The Maryland Class of minor leaguers performed and continues to perform this work and expects to be compensated for these services. They were not amateurs and expect to be paid for all work performed. By not receiving payment for all services, they were (and continue to be) impoverished.

642. The Defendants benefited and continue to benefit from these services because the minor leaguers perform in the Defendants' developmental system for baseball players. The Defendants' developmental system yields the Defendants' chief product of major league players and allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor leaguers at all during some periods of services and conspired to pay below-market salaries during

1    other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

2        643. Under quantum meruit, the Defendants owe the Maryland Class of minor leaguers the

3    salaries that the parties would expect in the open market, in a system in which minor leaguers could

4    freely negotiate with any team.[77]

5                    **Count 29: Oregon Minimum Wage Violations**

6              (The Oregon Class Representatives and the Oregon Class Against All Defendants)

7        644. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

8        645. Pursuant to Oregon law, the Defendants are and were required to pay the Oregon Class

9    Representatives and the Oregon Class a minimum wage in accordance with Oregon State Law. *See*

10   O.R.S. § 653.010 *et seq.*  The state's minimum wage requirements apply to the Defendants and protect

11   the Oregon Class Representatives and the Oregon Class members.

12       646. The Defendants were also required to pay all wages accrued on the regular payday, and

13   were not allowed to withhold wages in contravention of the applicable laws.  *See* O.R.S. § 652.010 *et*

14   *seq.*

15       647. The Defendants constructed, implemented, and engaged in a policy and/or practice of

16   failing to pay the Oregon Class Representatives and all of the Oregon Class the applicable minimum

17   wage for all hours they suffered or permitted the minor leaguers to work in the state, and they

18   continue to engage in such practices. The Defendants also failed to pay all wages accrued on the

19   regular payday and wrongfully withheld some wages.

20       648. As a result of these minimum wage violations, the Oregon Class Representatives and the

21   Oregon Class have suffered and continue to suffer damages in amounts to be determined at trial, and

22   are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs,

23   and other compensation pursuant to O.R.S. § 653.991 or otherwise permitted by law.

24       649. The Defendants' pattern of unlawful conduct was and continues to be willful and

25   intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

---

[77] The quantum meruit measurement of damages demonstrates that statutory damages at law would
be an inadequate remedy by, among other things, failing to yield complete relief.

that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with Oregon's minimum wage requirements with respect to the compensation of the Oregon Class Representatives and the Oregon Class, and instead knowingly and/or recklessly disregarded state law.

### Count 30: Oregon Overtime Violations

(The Oregon Class Representatives and the Oregon Class Against All Defendants)

650. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

651. The laws of Oregon require the Defendants to pay overtime compensation. The laws of Oregon require the Defendants to pay overtime compensation. *See* O.R.S. § 653.261 *et seq*. The state's minimum wage requirements apply to the Defendants and protect the Oregon Class Representatives and the Oregon Class members.

652. The Defendants were also required to pay all wages accrued on the regular payday, and were not allowed to withhold wages in contravention of the applicable laws. *See* O.R.S. § 652.010 *et seq*.

653. Throughout the Oregon Class Period, the Oregon Class Representatives and the Oregon Class routinely worked (and continue to work) far more than 40 hours in a workweek. The Defendants failed and continue to fail to pay the Oregon Class Representatives and the Oregon Class overtime wages as required. The Defendants also failed to pay all wages accrued on the regular payday and wrongfully withheld some wages.

654. As a result of these violations, the Oregon Class Representatives and the Oregon Class have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to O.R.S. § 653.991 or otherwise permitted by law.

655. The Defendants pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with Oregon's overtime requirements with respect to the compensation of the Oregon Class Representatives and the Oregon Class, and instead knowingly and/or recklessly

1  disregarded state law.

2  **Count 31: Quantum Meruit Under Oregon Common Law**

3  (The Oregon Class Representatives and the Oregon Class Against All Defendants)

4  656. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

5  657. Although the parties operated and/or continue to operate under express contracts, many

6  of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable.

7  Quantum meruit may be used as a substitute for the unenforceable contract provisions.

8  658. In employing the minor leaguers as baseball players, the Defendants requested that the

9  minor leaguers perform work that occurred and continues to occur in Oregon.

10  659. The Oregon Class of minor leaguers performed and continues to perform this work and

11  expects to be compensated for these services. They were not amateurs and expect to be paid for all

12  work performed. By not receiving payment for all services, they were (and continue to be)

13  impoverished.

14  660. The Defendants benefited and continue to benefit from these services because the minor

15  leaguers perform in the Defendants' developmental system for baseball players. The Defendants'

16  developmental system yields the Defendants' chief product of major league players and allows the

17  Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor

18  leaguers at all during some periods of services and conspired to pay below-market salaries during

19  other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

20  661. Under quantum meruit, the Defendants owe the Oregon Class of minor leaguers the

21  salaries that the parties would expect in the open market, in a system in which minor leaguers could

22  freely negotiate with any team.[78]

23

24

25

26  ───────────────

27  [78] The quantum meruit measurement of damages demonstrates that statutory damages at law would be an inadequate remedy by, among other things, failing to yield complete relief.

28

# IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own and on behalf of all other similarly situated persons, seek the following relief:

- That at the earliest possible time, Plaintiffs be allowed to give notice of this collective action, or that the Court issue such notice, to members of the Minor League Collective, as defined above. Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied (and/or continue to be denied) proper wages;

- Unpaid minimum wages and overtime wages, that have accrued and continue to accrue until the resolution of this action, and an additional and an equal amount as liquidated damages pursuant to the FLSA and the supporting regulations;

- Unpaid wages and pay pursuant to Arizona, Florida, California, North Carolina, New York, Pennsylvania, Maryland and Oregon state law, that have accrued and continue to accrue until the resolution of this action, and liquidated damages pursuant to state law and supporting regulations;

- Statutory damages for Defendants' recordkeeping violations pursuant to federal and state law;

- Certification of the Proposed Classes, as set forth above, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

- A determination that Defendants violated and continue to violate California Labor Code § 204 payday requirements, and an award of appropriate damages for the violations that have accrued and continue to accrue until the resolution of this action;

- A determination that Defendants violated and continue to violate California Labor Code §§ 201, 202, and 203 for withholding compensation at the time of termination of the California Class Representatives and the California Waiting Time Subclass, and an award of appropriate damages for the violations that have accrued and continue to accrue until the resolution of this action;

- A determination that Defendants violated and continue to violate the itemized wage

statement requirements of California Labor Code § 226 as to the California Class Representatives and the California Class, and an award of appropriate damages for the violations that have accrued and continue to accrue until the resolution of this action;

- A determination that the relevant claims may be maintained as a representative action under California's Private Attorney General Act, § 2698 *et seq.*, and a determination that Defendants violated and continue to violate many of the Labor Code sections identified in § 2699.5, and an award of appropriate damages for the violations that have accrued and continue to accrue until the resolution of this action;

- A determination that Defendants violated and continue to violate the itemized wage statement requirements of New York Labor Law § 195.3 as to the New York Class Representatives and the New York Class, and an award of appropriate damages for the violations that have accrued and continue to accrue until the resolution of this action;

- An award of quantum meruit under California, Arizona, Florida, North Carolina, New York, Pennsylvania, Maryland, and Oregon common law;

- Designation of Plaintiffs as class representatives of the Classes, designation of counsel of record as Class Counsel, and a reasonable incentive payment to Plaintiffs;

- Pre-judgment and post-judgment interest as permitted by law;

- An injunction requiring Defendants to pay all statutorily required wages pursuant to state and federal law and an order enjoining Defendants from continuing or reinstating their unlawful policies and practices as described within this Complaint;

- Reasonable attorneys' fees and costs of the action; and

- Such other relief as this Court shall deem just and proper.

1

## X.  DEMAND FOR JURY TRIAL

2    Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as

3 to all issues triable by a jury.

4 Dated: October 24, 2014

5               */s/ Daniel L. Warshaw*

6          **PEARSON, SIMON & WARSHAW, LLP**
           Bruce L. Simon

7           Daniel L. Warshaw
           Bobby Pouya

8           Benjamin E. Shiftan

9          **KOREIN TILLERY, LLC**

10          Stephen M. Tillery
           Garrett R. Broshuis

11          Giuseppe S. Giardina
           George A. Zelcs

12

13          *Plaintiffs' Interim Co-Lead Class Counsel*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

# EXHIBIT A

MLC—MAJOR LEAGUE CONSTITUTION
PBA—PROFESSIONAL BASEBALL AGREEMENT
MLR—MAJOR LEAGUE RULES

**– A –**

**ACTIVE LIST** ........................................................ MLR 2(c)
    Numerical limits........................................... MLR 2(c)(2), 2(j)

**AGENTS**
    Acting as, when prohibited ........................... MLR 20(b)
    Payments to, prohibited................................ MLR 3(j)(4)
    Control of Club ............................................ MLR 54(a)(5)(B)

**ALL-STAR GAME (SEE ALSO ALL-STAR GAME MANUAL)**
    Supervision by Commissioner ..................... MLC IX(5),
    .................................................................. MLR 18(d)
    All-Star break.............................................. MLR 32(a)(2)
    Futures Game, Minor League....................... PBA X(B)
    Revenues and expenses ................................ MLC X(2)
    Votes relating to........................................... MLC V(2)(a)(3)
    World Series, home-field advantage ............ MLR 37(a)(3)

**AMATEUR DRAFT (SEE FIRST-YEAR PLAYER DRAFT)**

**AMENDMENTS**
    To Major League Constitution ..................... MLC V(2)(b)(7)
    To Major League Rules................................ MLC III(2)(d),
    .................................................................. PBA VI(C)

**ASSIGNMENT OF PLAYER CONTRACTS** ................... MLR 9
    Minor League, restrictions on ..................... MLR 9(b)
    On disciplinary lists ................................... MLR 15(i)
    Temporary.................................................... MLR 9A
    Uniformity of ............................................... MLR 50(c)
    Veteran Players, consent required................ MLR 9(e)

**– B –**

**BARNSTORMING** ................................................ MLR 18
    Prohibited to Winter League participants..... MLR 18(b)
    Prohibited to World Series participants ....... MLR 47

**BEREAVEMENT LIST**........................................... MLR 2(n)
    Waiver of player prohibited ......................... MLR 10(e)(7)

MLC─MAJOR LEAGUE CONSTITUTION
PBA─PROFESSIONAL BASEBALL AGREEMENT
MLR─MAJOR LEAGUE RULES

**BEST INTERESTS OF BASEBALL**
　　　　Authority of Commissioner to act ................................ MLC II(3)-(6), PBA
　　　　.............................................................................. II(B)-(C)

**BETTING ON GAMES PROHIBITED** .............................. MLR 21(d)

**BONUSES** ...................................................................... MLR 3(c)(4)
　　　　College Scholarship Plan .......................................... MLR 3(c)(4)(D)
　　　　Incentive Bonus Plan ................................................ MLR 3(c)(4)(C)
　　　　None contingent on Club standing .............................. MLR 3(b)(5)
　　　　None contingent on skill ............................................ MLR 3(b)(5)
　　　　Responsibility for in event of assignment ................... MLR 9(c)
　　　　World Series, prohibited ............................................ MLR 46

**BROADCASTS**
　　　　Agreements as control interest transfer, Minor League
　　　　Clubs ....................................................................... MLR 54(a)(5)(B)
　　　　Copyright royalties, Major League Clubs ................... MLC X(4)
　　　　Major League Club practices ..................................... MLC X(3)
　　　　Minor League transaction .......................................... MLR 54(a)(3),
　　　　.............................................................................. 54(b)(1)
　　　　Proceeds of, Major League ........................................ MLC X(4)
　　　　Votes relating to ....................................................... MLC V(2)(a)(5)

**BULLETINS** .................................................................. MLC XI(3), MLR
　　　　.............................................................................. 31

**– C –**

**CENTRAL FUND (SEE MAJOR LEAGUE CENTRAL FUND)**

**CIRCUITS**
　　　　Change of Major League circuits ................................ MLC V(2)(b), MLR
　　　　.............................................................................. 1(a)
　　　　Of Major Leagues ..................................................... MLC VIII(8), MLR
　　　　.............................................................................. Attachment 52
　　　　Of Minor Leagues ..................................................... MLR 52, MLR
　　　　.............................................................................. Attachment 52
**CLAIMS, DISPUTES** ...................................................... MLC VI, MLR 22
　　　　Affecting umpires ...................................................... MLR 19(e)

MLC—MAJOR LEAGUE CONSTITUTION
PBA—PROFESSIONAL BASEBALL AGREEMENT
MLR—MAJOR LEAGUE RULES

**CLOSED PERIODS**
Assignment of player contracts .................................... MLR 9(b)
First-Year Player Draft, before ................................... MLR 4(f)
Optional assignments .................................................. MLR 11(e)

**COACHES**
Eligibility for World Series......................................... MLR 40(b)
Limit of six permitted................................................. MLR 2(m)(4)(1)(D)
Minor League............................................................. MLR 56(g)(4)
Player-coach restrictions ............................................ MLR 2(m)
Re-signing as player.................................................... MLR 2(*l*)

**COLLEGE RULE** ....................................................... MLR 3(a)(3)

**COLLEGE SCHOLARSHIP PLAN**................................. MLR 3(c)(4)(D)

**COMMISSIONER** ................................................... MLC II, PBA II
Arbitration by .......................................................... MLC VI
Budget of office ....................................................... MLC II(7), MLR
.................................................................................. 30(c)
Bulletins ................................................................... MLR 31
Diminution of compensation or powers prohibited...... MLC II(8)(c)
Discipline of Minor League players............................. MLR 56(g)(6)
Election of.................................................................. MLC II(8)(a)-(b),
.................................................................................. II(9)
Enforcement of rules.................................................. MLR 50(a)
Functions of ............................................................. MLC II(2)
Jurisdiction of............................................................ MLC II(3), VI,
.................................................................................. PBA II, MLR 22
Schedule, responsibility for........................................ MLC IX(1), MLR
.................................................................................. 37
Supervises World Series ............................................ MLR 35
Supervision of Minor League Club transactions .......... MLR 54(a)(8)
Term of ................................................................... MLC II(8)(a)

**CONFLICTS OF INTEREST**............................................ MLR 20, 50(c),
.................................................................................. 54(a)(5)(B)

**CONTROL INTEREST TRANSFER (SEE TRANSFER OF CLUB)**

**MLC—MAJOR LEAGUE CONSTITUTION**
**PBA—PROFESSIONAL BASEBALL AGREEMENT**
**MLR—MAJOR LEAGUE RULES**

**CONSIDERATION—FOR PLAYER TRANSFER**

Must be in definite terms.............................................. MLR 12(e)(1)
Performance bonuses ................................................. MLR 9(c), MLR
.............................................................................. 12(e)(1)(B)

**CONTRACTS (SEE ALSO UNIFORM PLAYER CONTRACTS)**

Acceptance............................................................... MLR 3(d)
   False information in................................................ MLR 3(a)(1)(E)-(G)
In violation of Rules.................................................. MLR 3(f)
Managers.................................................................. MLR 3(i)
Of first-year players ................................................. MLR 3(c), 17(a)
Performance bonuses ................................................. MLR 9(c), 12(e)(1)
Reporting and filing .................................................. MLR 3(e)
Submit to jurisdiction of Commissioner,
   requirement to....................................................... MLC VI(3),
.............................................................................. PBA II(A)
Tender and renewal of .............................................. MLR 3(h)
Tender to drafted player ............................................ MLR 4(e), MLR
.............................................................................. Attachment 4
Termination.............................................................. MLR 7
Uniform player.......................................................... MLR 3(b), MLR
.............................................................................. Attachment 3

**CONTRACTION (SEE ALSO TERMINATION OF FRANCHISE)**

Major Leagues .......................................................... MLC V(2)(b)(1),
.............................................................................. MLC VIII(2)
Minor Leagues .......................................................... MLR 53(a)(1)

**CROSS-OWNERSHIP OF CLUBS**.................................... MLR 20(a),
.............................................................................. MLR 50(c)
Minor League............................................................. MLR 54(a)(5)(B)

**– D –**

**DEBT SERVICE RULE (SEE FISCAL RESPONSIBILITY)**

**DEFINITIONS** ....................................................... MLR 60

**DESIGNATED PLAYER RULE** ......................................... MLR 2(k)

**MLC─MAJOR LEAGUE CONSTITUTION**
**PBA─PROFESSIONAL BASEBALL AGREEMENT**
**MLR─MAJOR LEAGUE RULES**

**DISABLED LISTS** ..................................................... MLR 2(g), 2(h)
    Injury rehabilitation ..................................................... MLR 9(f)
    Major League ................................................................. MLR 2(g)
    Minor League.................................................................. MLR 2(h)
    Standard form of diagnosis required ........................... MLR 2(g)
    Waiver of player on ...................................................... MLR 10(e)(8)

**DISASTER PLAN** ......................................................... MLR 29
    Other relief to Disabled Club ...................................... MLR 29(b)(4)
    Restocking Draft ........................................................... MLR 29(b)(3)
    Triggering event............................................................ MLR 29(a)

**DISCIPLINARY LISTS** ...................................... MLR 13, 15

**DISCIPLINE**
    Jurisdiction of Commissioner....................................... MLC II(2)(f), MLR
    .................................................................................. 21

**DISPUTES (SEE CLAIMS, DISPUTES)** ............................ MLR 22
    Arbitration of by Commissioner ................................... MLC VI, PBA
    .................................................................................. II(D), II(E), MLR
    .................................................................................. 22
    Arbitration of by President of National Association .... PBA II(D)
    Compensation for drafted territories ............................ PBA IX
    Relating to umpires ....................................................... MLR 19(e)
    Relating to votes ........................................................... MLC V(2)(d)

**DISQUALIFIED LIST**............................................... MLR 2(d), 15
    Assignment of player on ............................................... MLR 15(i)
    Effect on player limits.................................................. MLR 15(f)
    Reinstatement of player from........................................ MLR 16
    Reservation of player on ............................................... MLR 15(g)
    Status of player on ........................................................ MLR 15(e)
    Waiver of player, prohibited ........................................ MLR 10(e)(7)

**DIVISION SERIES (SEE POST-SEASON)**

**DIVISIONS**
    Major League ................................................................. MLC VIII(1)

MLC─MAJOR LEAGUE CONSTITUTION
PBA─PROFESSIONAL BASEBALL AGREEMENT
MLR─MAJOR LEAGUE RULES

Realignment of, Major League.....................................MLC V(2)(B)(4)-(5), VIII(2)
Tie-breaking procedures...............................................MLR 33(c)

**DRAFTED PLAYERS**
Assignment prohibited for one year .............................MLR 3(b)(6)
Effect on limits............................................................MLR 2(i), 4(g)
Eligibility ....................................................................MLR 3(a)

**DRAFTED TERRITORIES**
Compensation for .......................................................PBA IX

**DRAFT-EXCLUDED PLAYERS**
Defined........................................................................MLR 6(e)
Waivers restricted .......................................................MLR 10(e)(6)

**– E –**

**EXECUTIVE COUNCIL** ....................................................MLC III
Acts for Commissioner in event of vacancy.................MLC II(9)
Composition of.............................................................MLC III(1)
Jurisdiction of ..............................................................MLC III(2)
Meetings, when............................................................MLC III(4)
Quorum ........................................................................MLC III(1)

**EXHIBITION GAMES**
Commissioner's approval required ...............................MLC IX(1)
Hall of Fame Game ......................................................MLR 18(e)
Other than for Club ......................................................MLR 18(b)
Penalty for unauthorized play ......................................MLR 18(c)
Post-season..................................................................MLR 47
Minor League Clubs......................................................PBA X(C), MLR 56(d)(6)-(7), 56(h)

**EXPANSION**
Major League ...............................................................MLC V(2)(b)(1), MLC VIII(2)
Minor League...............................................................MLR 53(a)

**MLC—MAJOR LEAGUE CONSTITUTION**
**PBA—PROFESSIONAL BASEBALL AGREEMENT**
**MLR—MAJOR LEAGUE RULES**

**– F –**

**FACILITIES**
Restriction on changes, Major League ......................... MLC IX(3)
Standards, Minor League ............................................. MLR 58, MLR
................................................................................... Attachment 58

**FINANCES**
Commissioner's Office ................................................. MLC II(7), X(5)(b),
................................................................................... MLR 30
Minor League Clubs.................................................... MLR 54(a)(5)(C),
................................................................................... 54(b), MLR
................................................................................... Attachment 54

**FINES**
Imposed by Commissioner............................................ MLC II(3), PBA
................................................................................... II(c),  MLR 46(b),
................................................................................... 50(a), 50(b)
Payment of .................................................................. MLR 50(b)

**FIRST-YEAR PLAYER DRAFT**.................................... MLR 4
Closed period, exception.............................................. MLR 4(f)
Effect of selection ....................................................... MLR 4(d)
Effect of signing on player limits................................. MLR 2(i), 4(g)
Interpretation............................................................... MLR 4(k)
Negotiation rights........................................................ MLR 4(e)
Order of selection........................................................ MLR 4(c)
Players eligible for selection ....................................... MLR 3(a), 4(a), 4(j)
Player not selected ...................................................... MLR 4(i), 4(j)
Process for .................................................................. MLR 4(b)
Selection limits............................................................ MLR 4(b)
Supplemental selections .............................................. MLR 4(c)(2)
Tender of contract ....................................................... MLR 4(e), MLR
................................................................................... Attachment 4
Transfer of right to select prohibited........................... MLR 4(b)
Unsigned selected player.............................................. MLR 4(h)

**FIRST-YEAR PLAYERS**
Contracts ..................................................................... MLR 3(c)
Signed for future services............................................ MLR 2(j)

MLC—MAJOR LEAGUE CONSTITUTION
PBA—PROFESSIONAL BASEBALL AGREEMENT
MLR—MAJOR LEAGUE RULES

**FISCAL RESPONSIBILITY**
 Assets-to-liabilities, Minor League Clubs .................... MLR 54(b)
 Debt Service Rule, Major League Clubs ..................... MLC XI(1)

**FRANCHISE**
 Pledge prohibited without approval ............................ MLR 54(a)(1)

**FREE AGENTS**
 Annual selection of amateurs ....................................... MLR 4
 Failure to tender or renew contract ............................. MLR 3(h)
 When subject to Rule 5 Draft ...................................... MLR 5(c)
 Future services of free agents ...................................... MLR 2(j)
 Minor League ............................................................... MLR 55

**– G –**

**GAMBLING** ................................................................ MLR 21(d),
 .................................................................................. 54(a)(5)(F),
 .................................................................................. 54(a)(6)

**GATE RECEIPTS** .................................................... MLR 26

**GIFTS, IMPROPER** ................................................ MLR 3(j), 21(b),
 .................................................................................. 21(c)

**– H –**

**HALL OF FAME GAME** ......................................... MLR 18(e)

**HIGH SCHOOL RULES** ......................................... MLR 3(a)(2)

**HOLIDAYS** .............................................................. MLR 23

**– I –**

**INDEBTEDNESS**
 Of Minor League Club ................................................ MLR 59

**INDEMNIFICATION**
 Of officials ................................................................... MLC XI(2)

**MLC―MAJOR LEAGUE CONSTITUTION**
**PBA―PROFESSIONAL BASEBALL AGREEMENT**
**MLR―MAJOR LEAGUE RULES**

**INELIGIBILITY**
    As penalty for misconduct ............................................. MLR 21

**INELIGIBLE LIST** ................................................................. MLR 15(c)
    Effect on player limits ................................................ MLR 2(d), 15(f)
    Release of player on ..................................................... MLR 8(c)(1)
    Reinstatement of player on ........................................... MLR 15(d), 16
    Reservation of player on .............................................. MLR 15(g)
    Waiver of player prohibited ......................................... MLR 10(e)(7)

**INJURY REHABILITATION** ............................................. MLR 9(f)

**INTERNET (SEE VIDEO MEDIA)**

**– J –**

**JAPAN, JAPANESE BASEBALL** ....................................... MLR 18(f)

**JOINT MAJOR LEAGUE MEETINGS (SEE MAJOR LEAGUE MEETINGS)**

**JUNIOR COLLEGE RULE** ................................................. MLR 3(a)(4)

**– K –**

**KOREA, KOREAN BASEBALL** ......................................... MLR 18(g)

**– L –**

**LEAGUE CHAMPIONSHIP SERIES (SEE POST-SEASON)**

**LIEN**
    On territory of Minor League Club .............................. MLR 59

**LOANS**
    Prohibited (of money) ................................................. MLR 20(b), 20(c),
    ............................................................................. 20(d)
    Prohibited (of players) ................................................ MLR 11(i)

**– M –**

**MAIL VOTE OF MAJOR LEAGUES** ............................... MLC V(1)

**MLC—MAJOR LEAGUE CONSTITUTION**
**PBA—PROFESSIONAL BASEBALL AGREEMENT**
**MLR—MAJOR LEAGUE RULES**

**MAJOR LEAGUE CENTRAL FUND** ................................ MLC X
    Payments from ............................................. MLC X(5)
    Termination of ............................................. MLC X(5)-(6)

**MAJOR LEAGUE CONSTITUTION**
    Superseding effect of  ................................. MLC VII

**MAJOR LEAGUE MEETINGS**
    Notice for .................................................... MLC V(1)(b)
    Quorum ....................................................... MLC V(1)(a)
    Special Major League Meetings.................... MLC V(3)
    When held ................................................... MLC V(1)(A)
    Voting requirements..................................... MLC V(2)

**MAJOR LEAGUE REGULATIONS** .................................. MLC XI(3)

**MAJOR LEAGUE RULES**
    Amendments to ............................................ MLC III(2)(d),
    .................................................................. V(2)(c),
    .................................................................. PBA VI(C)
    Binding upon all Clubs ................................ MLC IV, MLR 50
    Penalties for violations................................ MLR 50(a)

**MANAGERS**
    Contracts for................................................ MLR 3(i)
    Minor League................................................ MLR 56(g)(4)
    Player-manager restrictions.......................... MLR 2(m)
    Player-managers and professional draft ....... MLR 5(e)
    Re-signing as Player.................................... MLR 2(*l*)

**MARKETING**
    Minor Leagues, cooperation with................ PBA X(E)

**MEETINGS**
    Executive Council....................................... MLC III
    Major League.............................................. MLC V
    Rule 5 Selection Meeting............................ MLR 5

**MLC—MAJOR LEAGUE CONSTITUTION**
**PBA—PROFESSIONAL BASEBALL AGREEMENT**
**MLR—MAJOR LEAGUE RULES**

**MILITARY LIST** ................................................... MLR 2(e)
    Release of player on ..................................... MLR 8(c)(1)
    Waiver of player prohibited ......................... MLR 10(e)(7)

**MINOR LEAGUES (SEE ALSO NATIONAL ASSOCIATION)**
    All-Star Games ............................................ PBA X(B),
    .................................................................. MLR 32(b)(6)
    Change in classifications or League affiliations ........... MLR 53(c)
    Classification of leagues ............................... MLR 51(a)
    Finances, Club ............................................. MLR 54,
    .................................................................. MLR Attachment 54
    Free agents ................................................. MLR 55
    Lien on territory ......................................... MLR 59
    Marketing cooperation ................................. PBA X(E)
    Player Development Contracts ..................... MLR 56,
    .................................................................. MLR Attachment 56
    Player limits, length of service ..................... MLR 51(b)
    Playing facilities ......................................... MLR 56(i), 58,
    .................................................................. MLR Attachment 58
    Playoffs ...................................................... MLR 32(b)(5), 40(c)
    Regulation of franchises .............................. MLR 54
    Schedules ................................................... MLR 32(b)
    Statistics .................................................... PBA X(A)
    Telecast rights ............................................ PBA X(D)
    Territories ................................................... MLR 52,
    .................................................................. MLR Attachment 52
    Transfer of Club ......................................... MLR 54
    Transportation, travel standards ................... MLR 57

**MISCONDUCT** ................................................... MLR 13(a), 21

**MOVING EXPENSES**
    On assignment ............................................ MLR 9(a)

**– N –**

**NATIONAL ASSOCIATION (SEE ALSO MINOR LEAGUES;**
**NATIONAL ASSOCIATION AGREEMENT)** ................. PBA
    Admission of new leagues ............................ MLR 53(d)
    Minor League Alignment Committee ......................... PBA III(C)
    Joint Committee with Major Leagues .......................... PBA III(B)

**MLC━MAJOR LEAGUE CONSTITUTION**
**PBA━PROFESSIONAL BASEBALL AGREEMENT**
**MLR━MAJOR LEAGUE RULES**

Jurisdiction of Commissioner ........................................ PBA II
Payment to Major Leagues Central Fund .................... PBA VII(F)

**NEGOTIATION LIST** ........................................................ MLR 4(d), 4(e)

**NOTICES** ......................................................................... MLR 24
Assignment of player, form .......................................... MLR Attachment 12

**– O –**

**OPTIONAL AGREEMENTS** ........................................... MLR 11
Closed period .............................................................. MLR 11(e)
Form of notice .............................................................. MLR Attachment 12
Player loan prohibited .................................................. MLR 11(i)
Reacquiring player, option charged ............................. MLR 11(j)
Recall ........................................................................... MLR 11(b)
Salary, responsibility for .............................................. MLR 11(f), 11(g),
....................................................................................... 11(h)
Three season maximum ................................................ MLR 11(c)
Total permitted per Club .............................................. MLR 11(d)
Waivers required, when ................................................ MLR 10(b)(3)

**OUTRIGHT ASSIGNMENTS**
Form of notice .............................................................. MLR Attachment 12
Generally ...................................................................... MLR 9
Option charged, when .................................................. MLR 11(j)
Waivers required .......................................................... MLR 10(b)(2)

**OWNERSHIP AND AFFILIATIONS**
Information to be submitted annually,
Major Leagues ............................................................. MLR 20(h)
Information to be submitted annually,
Minor Leagues ............................................................. MLR 54(b)(2)

**– P –**

**PAYMENTS**
Certain Payments Forbidden ........................................ MLR 3(j)

**PENNANTS AND MEMENTOS** ........................................ MLR 36

MLC—MAJOR LEAGUE CONSTITUTION
PBA—PROFESSIONAL BASEBALL AGREEMENT
MLR—MAJOR LEAGUE RULES

**PLAYER DEVELOPMENT CONTRACT** ......................... PBA VII, MLR 56
 Assignability ................................................... MLR 56(f)
 Duration and termination .............................. MLR 56(c)
 Filing of........................................................... MLR 56(n)
 Form of ............................................................ MLR Attachment 56
 Rights and obligations.................................... MLR 56(g)
 Negotiation of affiliations ............................. MLR 56(d), 56(e)

**PLAYER LIMITS** ................................................. MLR 2
 Active lists ...................................................... MLR 2(c)
 Designated player rule ................................... MLR 2(k), 10(h)
 Effect of Bereavement List ............................ MLR 2(n)
 Effect of Disabled List placement ................ MLR 2(g), 2(h)
 Effect of Disqualified List placement .......... MLR 15(f)
 Effect of First-Year Player Draft player....... MLR 2(i), 4(g)
 Effect of future services ................................ MLR 2(j)
 Effect of Ineligible List placement............... MLR 15(f)
 Effect of injury rehabilitation assignment ... MLR 9(f)
 Effect of Military List placement ................. MLR 2(e)
 Effect of reinstatement of player .................. MLR 16(d)
 Effect of Restricted List placement .............. MLR 15(f)
 Effect of request for unconditional release waivers ..... MLR 8(d)
 Effect of Suspended List placement............. MLR 2(f)
 Effect of Temporary Assignment.................. MLR 9A(g)
 Effect of Temporarily Inactive List.............. MLR 2(h)
 Effect of Voluntary Retired List placement ........ MLR 15(f)
 Player-coach restrictions ............................... MLR 2(m)
 Player-manager restrictions........................... MLR 2(m)
 Players not included ....................................... MLR 2(d)
 Reserve lists ................................................... MLR 2(a), 2(b)

**PLAYING FACILITIES**
 Minor League................................................. MLR 56(i), 58,
 ........................................................................ MLR Attachment 58
 World Series .................................................. MLR 43

**PLAYING RULES** ............................................... MLC IX(2), PBA V,
 ........................................................................ MLR 25

**MLC─MAJOR LEAGUE CONSTITUTION**
**PBA─PROFESSIONAL BASEBALL AGREEMENT**
**MLR─MAJOR LEAGUE RULES**

Amendment of................................................... MLC V(2)(a)(4),
.................................................................... MLR 25(c)
Official Scoring Rules Committee ............................. MLR 25(d)
Playing Rules Committee............................................ MLR 25(b)

**PLEDGE**
Of Minor League franchise prohibited........................ MLR 54(a)(1)

**POST-SEASON (SEE ALSO POST-SEASON MANUAL)**
Administration of, by Commissioner ........................... MLC IX(4), MLR 35
Division Series.............................................. MLR 34(a), 37(a)(1)
Eligibility, coaches............................................ MLR 40(b)
Eligibility, Major League players ............................... MLR 40(a)
Eligibility, Minor League players ............................... MLR 40(c)
Expenses ..................................................... MLR 42
Facilities..................................................... MLR 43
League Championship Series........................................ MLR 34(b), 37(a)(2)
Playing rules ................................................. MLR 39
Qualification for.............................................. MLR 33
Receipts, division of............................................ MLR 45
Schedule...................................................... MLR 37
Tickets....................................................... MLR 44
Tie-breaking procedures............................................ MLR 33(c)
Votes relating to ............................................. MLC V(2)(a)(3)
Wild Card..................................................... MLR 33(b)

**PRESIDENTS, LEAGUE**
Major League, appointment of..................................... MLC II(2)(e)

**PROFESSIONAL BASEBALL AGREEMENT**
Conflicts with Major League Rules prohibited ............ PBA VI(B)
Purpose....................................................... PBA I
Term.......................................................... PBA III(A)

**PROFESSIONAL BASEBALL**
**EXECUTIVE COUNCIL** ...................................... PBA IV

MLC─MAJOR LEAGUE CONSTITUTION
PBA─PROFESSIONAL BASEBALL AGREEMENT
MLR─MAJOR LEAGUE RULES

**– Q –**

**QUORUM**
      Executive Council........................................................... MLC III(1)
      Joint Major League Meetings....................................... MLC V(1)(a)

**– R –**

**RADIO (SEE BROADCASTS)**

**REACQUISITION OF PLAYER CONTRACT**
      Generally....................................................................... MLR 11(j)

**REALIGNMENT (SEE DIVISIONS)**

**REGULATED TRANSACTION**
      Minor League................................................................ MLR 54(a), 54(b)(1)

**RELEASE, UNCONDITIONAL** ....................................... MLR 8
      Form of notice............................................................... MLR Attachment 12
      Notice required.............................................................. MLR 8(f), 8(g)
      Re-signing by releasing club ....................................... MLR 2(*l*), 8(i)
      Salary obligations.......................................................... MLR 8(h)
      Waiver price................................................................... MLR 8(e)
      Waiver procedures ........................................................ MLR 8(b)
      Waivers required ........................................................... MLR 8(a)

**RELOCATION OF FRANCHISE**
      Major League ................................................................ MLC V(2)(b)(3),
      ................................................................................... MLR 1(a)
      Minor League ................................................................ MLR 53, 56(j)

**RESERVE LISTS**................................................................ MLR 2(a), 2(b)
      Maximum number of reserved players......................... MLR 2(b), 2(j)

**RESTRICTED LIST** ........................................................ MLR 2(d), 15(a)
      Assignment of player on ............................................. MLR 15(i)
      Effect on player limits................................................. MLR 15(f)
      Reinstatement of player ............................................... MLR 16
      Reservation of player on ............................................. MLR 15(g)
      Waiver of player prohibited ........................................ MLR 10(e)(7)

MLC—MAJOR LEAGUE CONSTITUTION
PBA—PROFESSIONAL BASEBALL AGREEMENT
MLR—MAJOR LEAGUE RULES

**REVENUE SHARING**
    Votes relating to ............................................................ MLC V(2)(b)(6)

**– S –**

**SALARIES OF PLAYERS** ............................................... MLR 3(c)(2)(A), 17
    Minor Leagues ............................................................... MLR 3(c)(2)(B)

**SALE OF CLUB (SEE TRANSFER OF CLUB)**

**SCHEDULES**
    Major Leagues ............................................................... MLC IX(1), MLR
    ............................................................................................. 32(a)
    Minor Leagues ............................................................... MLR 32(b), 56(h)
    Post-season ...................................................................... MLR 37
    Votes relating to ............................................................ MLC V(2)(a)(2)

**SCORERS**
    Duties and control by Commissioner ............................ MLR 19(d)

**SCORING RULES COMMITTEE** .................................... MLR 25(d)

**SEASON OF SERVICE**
    Defined for option purposes ......................................... MLR 11(c)

**SELECTED PLAYER** ........................................................ MLR 5, 6
    Salary liability for ......................................................... MLR 6(d)

**SELECTION OF PROFESSIONAL PLAYER**
**CONTRACTS** ...................................................................... MLR 5, 6
    "Covering up" prohibited .............................................. MLR 5(f)
    "Draft-excluded player," defined ................................. MLR 6(e)
    "Full trial" of, required ................................................. MLR 6(a), 6(c)
    Method of selection ....................................................... MLR 5(b)
    Offer of assignment ....................................................... MLR 6(b)
    Player-manager contract ................................................ MLR 5(e)
    Payment for .................................................................... MLR 5(d)
    Players subject .............................................................. MLR 5(c)
    Return.............................................................................. MLR 6

**MLC─MAJOR LEAGUE CONSTITUTION**
**PBA─PROFESSIONAL BASEBALL AGREEMENT**
**MLR─MAJOR LEAGUE RULES**

**SUMMER MEETING (SEE FIRST-YEAR PLAYER DRAFT)**

**SUSPENDED LIST** ............................................. MLR 2(f), 13
    Appeal of suspension ................................... MLR 13(c)
    Waiver of player prohibited ........................ MLR 10(e)(7)

**SUSPENDED PERSONNEL** ............................... MLR 24
    Appeal of suspension ................................... MLR 24(b)
    Effect of suspension .................................... MLR 24(c)

**– T –**

**TAIWAN, TAIWANESE BASEBALL** .............................. MLR 18(h)

**TAMPERING** ........................................................ MLR 3(k)

**TELEVISION (SEE ALSO BROADCASTS)**
    Minor League telecasts ................................. PBA X(D)
    Territories.................................................... MLC VIII(9)

**TEMPORARILY INACTIVE LIST** ................................... MLR 2(h)(2)

**TEMPORARY ASSIGNMENTS** ......................... MLR 9A

**"TEN-AND-FIVE" PLAYER** ............................... MLR 9(e)

**TERMINATION OF FRANCHISE**
    Effect of, Major League ............................... MLC VIII(6)-(7)
    Involuntary, Major League ........................... MLC VIII(4)
    Procedure, Major League .............................. MLC VIII(5)
    Voluntary, Major League .............................. MLC VIII(3)
    Votes relating to ......................................... MLC V(2)(b)(8)

**TERRITORIES**
    Compensation for, Major League................... MLR 1(a)(4)
    Compensation for, Minor League ................... PBA IX
    Protection of, Major League ......................... MLC VIII(8), MLR
    .................................................................... 1(a), 1(b), 52
    Protection of, Minor League ......................... PBA IX, MLR 52,
    .................................................................... MLR Attachment 52
    Liens on....................................................... MLR 59

**MLC—MAJOR LEAGUE CONSTITUTION**
**PBA—PROFESSIONAL BASEBALL AGREEMENT**
**MLR—MAJOR LEAGUE RULES**

List of ......................................................... MLC VIII(8), MLR
........................................................................ Attachment 52
Television................................................... MLC VIII(9)

**TRANSFER AGREEMENTS** .............................. MLR 12
Filing of.................................................... MLR 12(d)
Form of notice........................................... MLR Attachment 12
Penalties for improper................................ MLR 12(b)
Salary responsibility.................................. MLR 12(g)
Transportation........................................... MLR 12(h)
Void, when................................................ MLR 12(f)

**TRANSFER OF CLUB**
Continuity of assignments, agreements and
    transactions........................................... MLR 50(c)
Major League votes relating to .................... MLC V(2)(b)(2)
Minor League Club .................................... MLR 54

**TRANSPORTATION**
Minor Leagues .......................................... MLR 57
Transferred players ................................... MLR 12(h)

**TRYOUTS FOR AMATEUR PLAYERS** ......................... MLR 3(g)

**– U –**

**UMPIRES** ...................................................... MLR 19
Acting as scouts, prohibited ........................ MLR 19(f)
Assault upon, prohibited ............................. MLR 21(e)
Claims affecting, jurisdiction of Commissioner.......... MLR 19(e)
Duties and control by Commissioner ........................ MLR 19(a)-(c)
Gifts to, prohibited.................................... MLR 21(c)
Umpire Development Program .................................... PBA VIII

**UNCONDITIONAL RELEASE  (SEE RELEASE, UNCONDITIONAL)**

**UNIFORM PLAYER CONTRACT** ..................................... MLR 3(b)
Form for Minor League ................................ MLR Attachment 3
Must be signed before playing ..................... MLR 3(b)(4)

**MLC─MAJOR LEAGUE CONSTITUTION**
**PBA─PROFESSIONAL BASEBALL AGREEMENT**
**MLR─MAJOR LEAGUE RULES**

## – V –

**VIDEO MEDIA**
    Votes relating to ............................................................ MLC V(2)(A)(5)

**VOLUNTARILY RETIRED LIST** ...................................... MLR 2(d), 14
    Application for ............................................................... MLR 14(a)
    Effect of player limits ................................................... MLR 15(f)
    No playing while retired ............................................... MLR 14(b)
    Reinstatement of player................................................. MLR 16
    Release of player on ..................................................... MLR 8(c)(2)
    Waiver of player prohibited ........................................ MLR 10(e)(7)

**VOTING REQUIREMENTS** ............................................... MLC V(2)
    Collective bargaining matters....................................... MLC V(2)(a)(1)
    Commissioner, election of............................................. MLC II(9)
    Major League Meetings ................................................ MLC V(2)
    Minor League Amendments........................................... MLR 28

## – W –

**WAIVERS, GENERALLY**................................................... MLR 10
    Assignment waivers, definition.................................... MLR 10(a)(6)
    Awarding of contract .................................................... MLR 10(d)(4)
    Claims ............................................................................ MLR 10(d)
    Definitions ..................................................................... MLR 10(a)
    For return of selected player ........................................ MLR 6
    Irrevocable, when.......................................................... MLR 8(b), 10(e)(4)
    Optional assignment waivers, definition ...................... MLR 10(a)(4)
    Outright assignment waivers, definition....................... MLR 10(a)(3)
    Penalties ........................................................................ MLR 10(g)
    Procedures ..................................................................... MLR 8(b), 10(c)
    Restrictions on .............................................................. MLR 10(e)
    Request for..................................................................... MLR 10(c)(1)
    Trade assignment waivers, definition........................... MLR 10(a)(2)
    Types of ......................................................................... MLR 10(a)
    Unconditional release.................................................... MLR 8(a), 10(a)(5)
    Waiver periods............................................................... MLR 10(c)(4)
    Waiver price................................................................... MLR 8(e), 10(d)(5)
    When required for assignment ...................................... MLR 10(b)
    Withdrawal of request................................................... MLR 10(d)(3)

**MLC─MAJOR LEAGUE CONSTITUTION**
**PBA─PROFESSIONAL BASEBALL AGREEMENT**
**MLR─MAJOR LEAGUE RULES**

**WINTER LEAGUES** ............................................................ MLR 18(a), 60(t)
    Conflicts of interest....................................................... MLR 20(f)

**WORLD SERIES (SEE ALSO POST-SEASON MANUAL)** MLR 34(c)-48
    Administration by Commissioner ................................ MLR 35, 38(b)
    Bonus prohibited............................................................ MLR 46
    Conclusion of ................................................................. MLR 38
    Playing Rules ................................................................. MLR 39
    Rings, mementos............................................................ MLR 36
    Schedule.......................................................................... MLR 37(a)(3)
    Votes relating to ............................................................ MLC V(2)(a)(3)

**MAJOR LEAGUE RULES**
**MLR 1(a) to 1(b)**

**IMPORTANT NOTE: TO THE EXTENT OF ANY CONFLICT BETWEEN THE PROVISIONS OF THESE RULES AND THE PROVISIONS OF THE CURRENTLY EFFECTIVE BASIC AGREEMENT BETWEEN THE MAJOR LEAGUE CLUBS AND THE MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, THE BASIC AGREEMENT SHALL IN ALL RESPECTS CONTROL.**

## Rule 1

## CIRCUITS

**(a) CONDITIONS TO RELOCATION TO ANOTHER CLUB'S TERRITORY.** A Major League Club, in order to relocate within the home territory of another Major League Club, must comply with the following conditions:

**(1)** The Major League Club intending to so relocate shall give notice of such intention to the Commissioner not later than midnight of October 31 of the year next preceding the first year it proposes to operate a second Major League Club in such home territory.

**(2)** Such Major League Club shall satisfy the Commissioner as to the bona fides of such Club's intention to operate in such home territory on a long-term basis and as to the financial ability and character of the owners of such Club to maintain such Club for a period of five years.

**(3)** Any park owned or occupied by such second Major League Club in such home territory shall be located not less than five air miles distant from the park of the Club first located in such home territory, unless the two Clubs mutually agree otherwise.

**(4)** Such second Major League Club, before commencing its first year of operation in such home territory, shall pay to the Club already located in such home territory such sum of money as the Commissioner deems appropriate under the circumstances and in addition shall pay to the latter Club one-half of all sums paid by the latter Club to Minor Leagues or Clubs as compensation for inclusion of such home territory in a Major League. Any disputes as to the amounts paid as such compensation shall be determined by the Commissioner.

**(b) NUMBER OF CLUBS.** In no event shall any home territory in either Major League circuit have more than two Major League Clubs.

# MAJOR LEAGUE RULES
## MLR 1(c) to 2(a)

**(c)  NOTICE.**

**(1)**  A Major League Club desiring to locate in a home territory in which a Minor League Club is operating must file notice of its intention to do so with the Commissioner between October 1 and October 31 (both inclusive) next preceding the first season it proposes to operate in such city.

**(2)**  If a Major League Club transfers its location to another home territory after approval is obtained under the Major League Constitution, such Club shall notify the Commissioner of the transfer as soon as the agreements or proceedings necessary to effect such transfer and relocation have been completed.  Fifteen days after delivery of such notice, but in no event later than February 1 next preceding the first season such Club proposes to operate in its new location, the Major League circuits set forth in the Major League Constitution shall be deemed amended to reflect such relocation and the city from which such Major League Club transferred shall be deemed vacated by such Club unless another Major League Club has located in such home territory prior to the expiration of 15 days after the delivery of such notice.

**(d)  DEFINITION.** For the purposes of this Rule 1, "home territory" shall refer to the operating territories described in Article VIII, Section 8 of the Major League Constitution, and in Attachment 52 to these Rules in the case of Minor League Clubs.

## Rule 2

## PLAYER LIMITS AND RESERVE LISTS

**(a)  RESERVE LISTS.**

**(1)**  Filing of Reserve Lists.  On a date designated by the Commissioner or the Commissioner's designee (which shall be no later than November 20, or the last business day preceding November 20, if November 20 is not a business day), each Major League Club shall file Major League and Minor League Reserve Lists with the Commissioner or the Commissioner's designee.  A Major League Club shall include on its Major League Reserve List all players, player-managers and player-coaches who are currently under Major League Uniform Player's Contracts (unless they have been assigned outright to a Minor League Club) or who have been promoted to Major League status and must be tendered a Major League Uniform Player's Contract for the following championship season by December 12.

**MAJOR LEAGUE RULES**
**MLR 2(a)**

A Major League Club also must file a separate Minor League Reserve List for each Minor League classification in which it desires to reserve Minor League players. A Major League Club, however, may reserve players only in classifications in which it owned or had a PDC with a Minor League Club during the previous season. The Minor League Reserve Lists filed by a Major League Club must contain all players, player-managers and player-coaches that it has under Minor League Uniform Player Contracts, including players whose Major League Uniform Player's Contracts have been assigned outright to Minor League Clubs. The composition of each Minor League Reserve List shall comply with the length of prior Minor League service limitations described in Rule 51(b) (Composition). All players on one of the Minor League Reserve Lists filed by a Major League Club shall be reserved only to the Major League Club, which shall have the exclusive contractual right to the services of the players on such a list.

On the same date designated by the Commissioner for the filing of Minor League Reserve Lists by Major League Clubs, each independent Minor League Club shall file with the Commissioner or the Commissioner's designee a Minor League Reserve List containing the names of all players, player-managers and player-coaches that it has under Minor League Uniform Player Contracts. The composition of each Minor League Reserve List shall comply with the length of prior Minor League service limitations described in Rule 51(b) (Composition). A Minor League Club that is party to a PDC may not file a Minor League Reserve List and/or retain any sort of reserve or contractual rights to a player.

**(2)** Maintenance of and Changes to Reserve Lists. The Commissioner or the Commissioner's designee shall continuously maintain and update the Reserve Lists filed by Major League and Minor League Clubs. As part of this process, the Commissioner or the Commissioner's designee shall promptly record any transactions or player transfers permitted by these Rules and shall make them available to all Major League and Minor League Clubs through computer terminals and/or other means of electronic communication. Both Major League and Minor League Clubs shall immediately notify the Commissioner or the Commissioner's designee of any changes to their Reserve Lists. Such Reserve List changes shall not take effect until approved by the Commissioner or the Commissioner's designee and the Commissioner may establish procedures for notifying the Commissioner or the Commissioner's designee of such changes. Except for outright assignments from the Major League Reserve List in accordance with Rule 9 (Assignment of Player Contracts), outright assignments of players not subject to selection at the next Rule 5 Selection Meeting or the addition of players signed as Major League or Minor League free agents, Minor League Reserve Lists may not be amended during the period between the latest date

# MAJOR LEAGUE RULES
## MLR 2(a) to 2(b)

designated by the Commissioner for filing Minor League Reserve Lists and the conclusion of the Rule 5 Selection Meeting.

**(3)**   Effect of Placement on Reserve List.  No player on a Reserve List filed by a Major League or Minor League Club shall be eligible to play or negotiate with any other Major League or Minor League Club until the player is removed from the Reserve List because the player's contract has been terminated or assigned.

**(b)  MAXIMUM NUMBER OF RESERVED PLAYERS.**

**(1)**   Major League Club Limits.  A Major League Club may place a maximum number of

**(A)**  40 players on its Major League Reserve List;

**(B)**  38 players on its Class AAA Reserve List for each Class AAA Club that it owned or with which it had a PDC during the previous season;

**(C)**  37 players on its Class AA Reserve List for each Class AA Club that it owned or with which it had a PDC during the previous season;

**(D)**  35 players on its Class A Reserve List for each Class A or Short-Season A Club that it owned or with which it had a PDC during the previous season; and

**(E)**  35 players on its Rookie Reserve List for each Rookie classification Club that it owned or with which it had a PDC during the previous season.

If two or more Major League Clubs shared a PDC with a single Minor League Club during the previous season, those Major League Clubs may place additional players on their Minor League Reserve Lists for the shared Minor League Club's classification.  The number of players so reserved by each Major League Club sharing a PDC, however, shall not exceed the number of players that each Major League Club had placed on the Active and Inactive Lists of the shared Minor League Club as of the last day of the most recently concluded championship season.

**(2)**   Minor League Club Limits.  If a Minor League Club is not owned by a Major League Club and is not party to a PDC, the maximum number of players that it may place on its Minor League Reserve List shall be the same as the maximum number of players that a Major League Club could place on a Minor

**MAJOR LEAGUE RULES**
**MLR 2(b) to 2(c)**

League Reserve List in the same classification for each Minor League Club that it owned or with which it had a PDC.

**(3)**  Reserve List Limits.  As used in these Rules, the maximum limits on the number of players that a Major League or Minor League Club may place on the various Major and Minor League Reserve Lists shall be referred to as "Reserve List" limits.  A Major or Minor League Reserve List may contain more than the maximum number of players if the additional players are on a List (Voluntarily Retired, Disqualified, Restricted, Ineligible, or Military) that does not count against the Reserve List limits or these Rules otherwise provide that such additional players in excess of the maximum number may be placed on a Major or Minor League Reserve List.  See Rule 2(g)(3) (Major League Disabled List; Effect on Limits), Rule 2(j)(1) (Players Signed for Future Services) and Rule 4(g) (Effect on Player Limits).

**(c)**  **ACTIVE LISTS.**

**(1)**  Filing and Maintenance.  Each Major League Club must file and maintain an Active List with the Commissioner or the Commissioner's designee for the Major League Club itself and for all Minor League Clubs that it owns or with which it has a PDC.  If a Minor League Club is not owned by a Major League Club and does not have a PDC, it must file its own Active List with the Commissioner or the Commissioner's designee.  The Active List of a Minor League Club owned by a Major League Club or under a PDC may include only players who are reserved to and under Major League Uniform Player's Contracts or Minor League Uniform Player Contracts with a Major League Club.

An Active List must include all players who are currently eligible to play in a championship season game for the Major League or the Minor League Club for which the list was filed.  All Major League Active Lists must be filed by such time or times on the opening date of the Major League championship season as the Commissioner or the Commissioner's designee may set forth, provided, however, that any such filing time shall be no later than one hour before the scheduled start of the first game of the championship season on such opening date.  All Minor League Active lists must be filed by the opening date of the championship season of the Minor League Club to which the list applies.

An optional player who has been recalled shall not be counted against the Major League Active List until the player physically reports to the recalling Club.

**MAJOR LEAGUE RULES**
**MLR 2(c) to 2(d)**

**(2)**   Numerical Limits.

**(A)**  The maximum number of players who may be placed on an Active List for a Major League Club shall be 25 from opening day until midnight on August 31 of the same championship season, at which time the number of players on the Active List of a Major League Club may be increased to 40.

**(B)**  The maximum number of players on the Active List of a Class AAA Club shall be 24.

**(C)**  The maximum number of players on the Active List of a Class AA Club shall be 24.

**(D)**  The maximum number of players on the Active List of a Class A Club shall be 25.

**(E)**  The maximum number of players on the Active List of a Short-Season A Club shall be 30, only 25 of whom may be in uniform and eligible to play in any given game.

**(F)**  The maximum number of players on the Active List of a Rookie Club shall be 35, only 30 of whom may be in uniform and eligible to play in any given game.

**(3)**   For purposes of applying the limits in Rule 2(c)(2) (Numerical Limits), a player-manager or player-coach shall be considered an active player.

**(d) VOLUNTARILY RETIRED, RESTRICTED, DISQUALIFIED AND INELIGIBLE LISTS**.  Players on the Voluntarily Retired, Restricted, Disqualified or Ineligible Lists shall not count against either the Reserve List or Active List limits.  A player under a Major League Uniform Player's Contract or Minor League Uniform Player Contract who has been reserved for two consecutive years on the Voluntarily Retired, Restricted, Disqualified or Ineligible Lists shall be omitted from further Reserve Lists and shall not be eligible to play until the player is first reinstated in accordance with Rule 16 (Reinstatement of Players).  Upon reinstatement, the Major League or Minor League Club to which the player is reserved shall restore the player to the same status that the player had at the time when the player retired or became ineligible.

**MAJOR LEAGUE RULES**
**MLR 2(e)**

**(e)  MILITARY LIST.** Players under reserve to Major or Minor League Clubs may be placed on the Military List subject to conditions and strictures set forth in this Rule 2(e).

**(1)** If a player has received definite orders to report for military service, the player may be placed on the Military List within 15 days of the date on which the player is to report. A player may not be placed on the Military List, however, unless the player has left the player's Major League or Minor League Club in preparation for reporting for military service.

**(2)** A player on the Military List shall not count against any Reserve List or Active List limits as of the date the player commences active military service if the player and the player's Major or Minor League Club advise the Commissioner or the Commissioner's designee in writing of the exact date that the player began active military service, the unit with which the player is serving and the player's serial number.

**(3)** Upon discharge from military service a player will count against Reserve List and Active List limits after the player has completed a 15-day trial period or has participated in a championship season game, whichever comes first. This trial period shall begin when the player physically reports during either spring training or the championship season to the Major or Minor League Club for which the player has been directed to perform. A player on the Military List who is discharged from military service after the Rule 5 Selection Meeting, however, shall not count against any Reserve List or Active List limit until the opening day of the following championship season and such a player shall not count against any Reserve List limit in any event until the player has had a trial period of at least 15 days or has played in a championship season game.

**(4)** Upon learning that a player has been separated from military service, the Major or Minor League Club to which the player is under reserve must immediately transmit such information to the Commissioner or the Commissioner's designee.

**(5)** A player who is required to return for additional military service, but who may be available to the player's Major or Minor League Club while still in military service, shall be counted against the player's Club's Active List limit from the day the player participates in a championship season game and for the balance of the season. Any time accumulated by such player during spring training or the championship season shall be charged against the 15-day trial period that the player's Club must give the player.

## MAJOR LEAGUE RULES
### MLR 2(f) to 2(g)

**(f)   SUSPENDED LIST.**

**(1)**   Major League.   A player on the Suspended List shall count against both Reserve List and Active List limits.

**(2)**   Minor League.   A player on the Suspended List of a Minor League Club shall count against Reserve List limits and not against Active List limits.

**(g)   MAJOR LEAGUE DISABLED LIST.**   Upon written application to the Commissioner or the Commissioner's designee, a Major League Club may request that a player on its Major League Active List, who is unable to render services because of a specific injury or ailment, be placed on one of the Disabled Lists set forth in this Rule 2(g).   The application shall be accompanied by a Standard Form of Diagnosis completed by the Major League Club physician, and a copy of this completed form shall be given to the player.   At the time of the request, the player's Club must designate the specific list on which the player is to be placed.   The Commissioner or the Commissioner's designee may approve such requests after having received the Standard Form of Diagnosis.

**(1)**   Lists.   The Major League Disabled Lists shall consist of 15-day and 60-day lists, which shall be the minimum period of inactivity for a player placed on such a list.   There shall be no limit on the number of players placed on either list, but a player may not be placed on or transferred to the 60-day list unless the player's Club's Major League Reserve List is at the maximum limit of 40 or the player's Club acquires a player by waiver claim for its Major League Reserve List who otherwise would cause the 40-player Reserve List limit to be exceeded.   A player placed on the 15-day Disabled List during spring training shall serve no less than six days on such Disabled List during the championship season.   For the effect of the minimum activity period on post-season rosters, see Rule 40(a)(2) (Submission of Rosters).

**(2)**   Transfers.   Subject to the restriction above, a player may be transferred from the 15-day list to the 60-day list, and the time spent on the 15-day list prior to such transfer shall count towards the 60-day minimum inactivity period.   Players placed on (but not players transferred to) the 60-day list after August 1 shall remain there for the balance of the season, shall not be eligible for post-season play unless their minimum period of inactivity has been completed prior to the scheduled start of a post-season series, and, notwithstanding their eligibility status for post-season play, shall not be eligible to be replaced under Rule 40 (Players Eligible).

**MAJOR LEAGUE RULES**
**MLR 2(g)**

**(3)**   Effect on Limits.  Players on the 15-day list shall count against the Reserve List limits, but not against the Active List limits.  Players on the 60-day list shall not count against either limit.

**(4)**   Recertifications.   The Club physician must complete and submit the Standard Form of Diagnosis for Recertification for a player on the 15-day Disabled List when the player first becomes eligible for reinstatement to active status, and then every 15 days following the date upon which the player first becomes eligible for reinstatement.  No recertification shall be required for players on the 60-day Disabled List.

**(5)**   Disposition of Disabled Players.  A Major League Club may not direct, assign or otherwise transfer a player on a Major League Disabled List to a Minor League Club, except for the purpose of injury rehabilitation as provided in Rule 9(f) (Injury Rehabilitation).   A Major League player undergoing injury rehabilitation pursuant to Rule 9(f) shall not count against the Active List limit of either the Major or the Minor League Club to which the player is assigned but shall continue to count against the Reserve List limit for the Major League Reserve List unless the player is on the 60-day Disabled List.

Notwithstanding the foregoing, a player who is injured may be assigned outright to a Minor League Club, provided that:

**(A)**  the player has less than three years of Major League service;

**(B)**  the contemplated assignment would not be the player's second (or subsequent) career outright assignment since March 19, 1990;

**(C)**  the player had no Major League service in the prior championship season;

**(D)**  the player was not selected by the assignor Major League Club in the immediately preceding Rule 5 Selection Meeting; and

**(E)**  the assignment is not made in the period commencing with the 16th day prior to the start of a championship season and ending with the close of that championship season.

**MAJOR LEAGUE RULES**
**MLR 2(h)**

**(h)  MINOR LEAGUE DISABLED LIST AND TEMPORARILY INACTIVE LIST.**

**(1)**    If a Minor League Player is unable to render services because of a specific injury, the player may be placed on the Disabled List for that particular Minor League Club.  If the Minor League Club is not owned by a Major League Club and is not party to a PDC, the Minor League Club may submit a written application to the President of its Minor League Association requesting that a player on its active list be placed on the Disabled List. The two lists a Minor League player may be placed on during the championship season are:

**(A)** Regular Disabled List.  Minimum period of placement on a Minor League Disabled List shall be seven consecutive days.

**(B)** Emergency Disabled List.  Minimum period of placement on an Emergency Disabled List shall be 60 consecutive days.  A player on this list shall not count against either a Minor League Club's Active or Reserve List limit.

Effect on Limits:  A player on a Regular Minor League Disabled List shall count against the player's Minor League Club's Reserve List limit but not against the Club's Active List limit.  A player assigned on rehabilitation while on the Disabled List shall count towards the Reserve List limit of the assignor Club and shall not count against the player limits of the assignee Club.

**(2)**    Placement on Temporarily Inactive List.  If a Minor League player is

**(A)**  not in position to render active service to the player's Club due to any of the following:

**(i)**   necessary temporary absence during the playing season on account of a family member's bona-fide illness;

**(ii)**  absence excused for the performance of any personal obligation; or

**(iii)** the player not being in condition to render services as a result of an absence described in Rules 2(h)(2)(A) or 2(h)(2)(B), or as a result of having reported recently for service in that season; or

**(B)** awaiting completion of the player's unconditional release for the purpose of allowing the player to sign with a club in a foreign league,

**MAJOR LEAGUE RULES**
**MLR 2(h) to 2(j)**

provided the player's Club submits documentation of the transaction with the foreign club satisfactory to the Commissioner or the Commissioner's designee,

the player may be placed on the Minor League Club's Temporarily Inactive List. If the placement is pursuant to Rule 2(h)(2)(A), the Player's salary entitlement shall be at the Club's discretion until such player returns to the Club in physical condition to render services. A Player may not be placed on the Temporarily Inactive List prior to the start of the championship season.

The minimum period of placement on the Temporarily Inactive List shall be three consecutive days, during which the player will not be allowed in uniform during a game. No assignment of a Temporarily Inactive List player shall be permitted until after reinstatement, following expiration of the minimum period. However, a Temporarily Inactive List player may be unconditionally released at any time, provided the player has first been reinstated from the Temporarily Inactive List.

Effect on Limits: A Temporarily Inactive player shall not be counted on a Minor League Club's Active List, but the player shall be included in the Reserve List limit. Written notice of placement upon the Temporarily Inactive List must be given to the player. A player cannot be carried on the Reserve List as Temporarily Inactive.

**(i) PLAYERS SIGNED AFTER SELECTION.** Players who are signed after selection in the Rule 4 draft shall count against Reserve List and Active List limits only as provided in Rule 4(g) (Effect on Player Limits).

**(j) PLAYERS SIGNED FOR FUTURE SERVICES.** No Major or Minor League Club may sign an eligible player if the player has no previous Major or Minor League experience and if the contract is for services to commence after the current calendar year, except as provided for in subparagraphs (1) or (2) of this Rule 2(j).

**(1)** A Major League Club may sign, after July 1, a player who has no previous Major or Minor League experience to a contract for the succeeding year, provided, however, that the number of players so signed shall not exceed 12 for each Class A, Short-Season A or Rookie League Club that the Major League Club owns or with which it has a PDC during the current season. Each such additional player signed to a Minor League Uniform Player Contract shall be placed on either a Class A, Short-Season A or Rookie Reserve List, but the player shall not count against Reserve List or Active List limits until the opening day of the succeeding championship season of the Club to which the player is assigned. The Club shall

11                                                                    **3/08**

**MAJOR LEAGUE RULES**
**MLR 2(j) to 2(*l*)**

be obligated to take such player to its spring training camp (Major League, Minor League or a combination of both) for a minimum 15-day trial period. Each such additional player signed to a Major League Uniform Player's Contract shall be placed on a Major League Reserve List, shall count against such Reserve List limits immediately, shall be directed not to report until Major League spring training camp and shall not count against Active List limits until the opening day of the succeeding championship season of the Club to which the player is assigned. The Club shall be obligated to take such player to its spring training camp (Major League, Minor League or a combination of both) for a minimum 15-day trial period.

**(2)** A player who has no previous Major or Minor League experience and who is in the Armed Services may contract, regardless of the date on which the player is scheduled to be discharged, for either the current or the next succeeding season if the player is signed between the Rule 4 draft and the Winter Meetings, or for the season following the Winter Meetings if the player is signed between the Winter Meetings and the next Rule 4 draft. A player so signed shall not be eligible for placement on the Military List and shall be counted against the signing Club's Major or Minor League Reserve List limits. Players signed pursuant to this Rule 2(j)(2) shall not be charged for player classification purposes with any time between the date of the contract and the date of reporting.

**(k) DESIGNATED PLAYERS**. When the Active List and/or Reserve List limits of a particular Major League Club have been reached, and the Club desires to acquire, sign, transfer, recall from an optional assignment or reinstate an additional player, notice must first be given to the Commissioner or the Commissioner's designee of the Club's intention to release or assign an equal number of designated players. The player(s) so designated shall be released or their contracts assigned within 10 days after such notice is given, and they shall not be eligible to participate in a championship season game after having been so designated until they are released or assigned to another Major or Minor League Club. No player obtained from a waiver claim award may be designated if such designation would violate Rule 10(h) (Player Limit).

**(*l*) RE-SIGNING OF COACH OR MANAGER AS PLAYER**. Any Major League Reserve List player who has been unconditionally released and signed as a coach or manager after midnight on August 1 of any championship season cannot be re-signed as a player by the releasing Major League Club until May 15 of the following championship season.

## MAJOR LEAGUE RULES
### MLR 2(m)

**(m) LIMITATIONS ON COACHES, PLAYER-COACHES AND PLAYER-MANAGERS**.

    **(1)** Major League.

        **(A)** A person employed as a coach shall not count against the Reserve List or Active List limits unless and until the person signs a contract as a player. Upon signing as a player the person cannot be re-employed as a coach during the same season, unless any applicable waivers are first secured and the person is unconditionally released as a player.

        **(B)** A person signed as a player or a player-manager cannot be re-employed as a manager or coach until any applicable waivers are first secured and the person is unconditionally released as a player. If the person is then employed under a coach's or manager's contract, a Major League Club cannot release the person as coach or manager and subsequently re-sign the person as a player during the same championship season.

        **(C)** No contract shall be approved unless a Major League Club indicates in the contract whether the person is to be employed as a player or as a coach.

        **(D)** From opening day through August 31 and during the post-season, a Major League Club shall be permitted no more than six on-field uniformed coaches, instructors or bullpen coaches during an official Major League Baseball game. From September 1 through the conclusion of the championship season, a Major League Club shall be permitted one additional on-field uniformed coach, instructor or bullpen coach during an official Major League Baseball game, so long as such additional coach was, for the entire championship season, a uniformed manager, coach or instructor of a Minor League Club or Clubs affiliated with that Major League Club and so long as the Major League Club provides such coach's name to the Commissioner or the Commissioner's designee before such coach appears in uniform during a Major League game. A Major League Club may designate a different additional coach from game to game, so long as the Major League Club complies with all other requirements of this Rule 2(m)(1)(D). There shall be no limit, however, on the number of coaches or instructors who may work with players during any pre-game or post-game practice.

**MAJOR LEAGUE RULES**
**MLR 2(m) to 2(n)**

**(2)** Minor League.

**(A)** A person employed as a manager or coach shall not count against the Reserve List or Active List limits unless and until the person signs a contract as a player. Upon signing as a player the person cannot be re-employed as a manager or coach during the same season, unless the person is unconditionally released as a player. During the same championship season, a manager or coach who has been signed and subsequently released as a player may not be re-signed as a player.

**(B)** A person signed as a player, player-manager or player-coach cannot be re-employed as a manager or coach until the person is unconditionally released as a player. If the person is then employed under a coach's or manager's contract, a Major or Minor League Club cannot release the person as coach or manager of a Minor League Club and subsequently re-sign the person as a player during the same championship season.

**(C)** No contract shall be approved unless a Major or Minor League Club indicates in the contract whether the person is to be employed as a player or as a manager or coach.

**(n) MAJOR LEAGUE BEREAVEMENT LIST.** Upon written application to the Commissioner or the Commissioner's designee, a Major League Club may request that a player be placed on the Major League Bereavement List. No player may be placed on the Major League Bereavement List unless such player is unable to render services because of the serious or severe illness or death of a member of such player's immediate family (spouse, parent, grandparent, sibling, child or grandchild) or a member of such player's spouse's immediate family (parent, grandparent, sibling, child or grandchild).

A player on the Major League Bereavement List shall be paid salary while on such List. For each day that the player receives salary while on the Major League Bereavement List, the player shall receive one day of Major League service.

The minimum period of placement on the Major League Bereavement List shall be three consecutive days and the maximum period of placement shall be seven consecutive days, during which placement the player is not permitted to be with the player's Club. No assignment of a Major League Bereavement List player shall be permitted until after reinstatement. However, a Major League Bereavement List player may be unconditionally released with the prior approval of the Commissioner or the Commissioner's designee.

MAJOR LEAGUE RULES
MLR 2(n) to 3(a)

If a player's absence from the player's Major League Club continues past the maximum period of Major League Bereavement List placement, the player's Club may submit written application to the Commissioner or the Commissioner's designee to place the player on the Restricted List.  See Rule 15(a) (Restricted, Disqualified and Ineligible Lists).

Effect on Limits:  A Major League Bereavement List player shall not be counted on a Major League Club's Active List, but the player shall be included in the Reserve List limit.  Written notice of placement upon the Major League Bereavement List  must be given to the player.  A player may not be carried on the Major League Bereavement List after the conclusion of the championship season.

**Rule 3**

**ELIGIBILITY TO SIGN CONTRACT, CONTRACT TERMS,
AND CONTRACT TENDERS**

**(a) ELIGIBILITY TO SIGN MAJOR LEAGUE OR MINOR LEAGUE CONTRACTS**.

**(1)** General Rules.  Subject to the High School, College and Junior College Rules listed in this Rule 3(a), a Major or Minor League Club may contract with a player under the conditions and restrictions set forth in this Rule 3.  A player may be subject to one or more of the following Rules and may contract with a Major or Minor League Club only if the conditions and restrictions of all Rules applicable to the player are satisfied.  It is the responsibility of the contracting Club to determine that a player is eligible to sign in accordance with this Rule 3.  For purposes of this Rule 3, the term "United States" shall mean the 50 States of the United States of America, the District of Columbia, Puerto Rico, and any other Commonwealth, Territory or Possession of the United States of America.

**(A)** A player who has not previously contracted with a Major or Minor League Club, and who is a resident of the United States or Canada, may be signed to a contract only after having been eligible for selection in the First-Year Player draft.  A player shall be considered a "resident of the United States" if the player enrolls in a United States high school or college or establishes a legal residence in the United States on the date of the player's contract or within one year prior to that date.  A player who is selected in a First-Year Player Draft and who does not sign a Major or Minor League Contract with the selecting Club before being removed from the selecting Club's Negotiation List pursuant to any of Rules 4(d)(2), 4(d)(3) and 4(d)(5)

15                                    **3/08**

# MAJOR LEAGUE RULES
## MLR 3(a)

(Effect of Selection on Player) may not sign with any Major or Minor League Club until after the next First-Year Player Draft for which the player is eligible for selection.

**(B)** A player who has not previously contracted with a Major or Minor League Club, who is not a resident of the United States or Canada, and who is not subject to the High School, College or Junior College Rules, may be signed to a contract if the player:

> **(i)**   is at least 17 years old at the time of signing, or

> **(ii)**   is 16 at the time of signing, but will attain age 17 prior to either the end of the effective season for which the player has signed or September 1 of such effective season, whichever is later.

Proof of age in the form of a birth certificate or other appropriate documentation, issued by an appropriate government agency, shall accompany the filing of such player's first Major or Minor League contract. Notwithstanding any other provision of the Major League Rules (including, but not limited to, Rule 3(f)(1) (Contracts in Violation)), any Minor League Uniform Player Contract made in violation of this Rule 3(a)(1)(B) may be declared null and void only in the discretion of the Commissioner or the Commissioner's designee, and the Major or Minor League Club and the official, scout or employee of the offending Major or Minor League Club who participated in the violation shall be subject to such penalties or such other action as the Commissioner or the Commissioner's designee may from time to time deem appropriate under the circumstances.  A Major League or Minor League Club that recruits such a player may not sign or encourage such a player to sign a professional baseball contract other than with a Major or Minor League Club.

**(C)** A player who has previously contracted with a Major or Minor League Club, and is currently reserved by such Club or by another assignee Club, may be signed to a contract only by the Club that currently holds reservation rights to the player's contract.

**(D)** A player who has previously contracted with a Major or Minor League Club, but who is no longer subject to reservation by that Club, may contract with any Major or Minor League Club subject to the limitations on re-signing with a prior Club in Rule 8(i) (Re-Signing of Released Players).

## MAJOR LEAGUE RULES
### MLR 3(a)

**(E)**  No player is permitted to, directly or indirectly, provide to a Major or Minor League Club, or to the Commissioner or the Commissioner's designee, any false material information or documentation in regard to the player's age, identity, citizenship, residence or scholastic standing in connection with the player signing with a Major or Minor League Club. Any player found to have violated this Rule 3(a)(1)(E) shall be declared ineligible to sign with any Major or Minor League Club for a period of one year, if the player does not have an approved contract with a Major or Minor League Club, or shall be placed on the Disqualified List for a period of one year, if the player does have an approved Minor League Uniform Player Contract with a Major or Minor League Club.  The Commissioner or the Commissioner's designee shall have the discretion to reduce the mandatory sanctions described in this Rule 3(a)(1)(E) only if the Commissioner or the Commissioner's designee concludes that extraordinary circumstances exist that call for the exercise of such discretion.  If a complaint is first made to the Commissioner or the Commissioner's designee more than one year following the player's first appearance in a game in a Major or Minor League in the United States or Canada and the Commissioner or the Commissioner's designee concludes that a player has violated this Rule 3(a)(1)(E), then the mandatory sanctions described in this Rule 3(a)(1)(E) shall not apply and, instead, the Commissioner or the Commissioner's designee may impose such sanctions as may be deemed appropriate, in the discretion of the Commissioner or the Commissioner's designee.  If the false information or documentation is in regard to a Major League Uniform Player's Contract, or if the disclosure of evidence of false information or documentation in regard to a player is made to the Commissioner or the Commissioner's designee while such player is on a Major League Reserve List, whether or not the false information or documentation is in regard to a Minor League Uniform Player Contract, then the mandatory sanctions described in this Rule 3(a)(1)(E) shall not apply and, instead, Rule 21(f) (Other Misconduct) shall apply.  Any person employed by or affiliated with any Major or Minor League Club who participates in, aids or abets any violation of this Rule 3(a)(1)(E) shall be subject to such sanctions as may be deemed appropriate, in the discretion of the Commissioner or the Commissioner's designee.

**(F)**  The mandatory sanctions described in Rule 3(a)(1)(E) shall neither abrogate nor supersede any rights or remedies a Club may have, whether under a Minor League Uniform Player Contract, under a Major League Uniform Player's Contract, at law, in equity or otherwise, against a player who has engaged in conduct prohibited by Rule 3(a)(1)(E). Rule 3(a)(1)(E) shall not be admissible in any arbitration or other litigation involving a Club

**MAJOR LEAGUE RULES**
**MLR 3(a)**

contention that a player induced the Club to execute a Major League Uniform Player's Contract by, among other things, providing false information or documentation in regard to the player's age, identity, citizenship, residence or scholastic standing.

**(G)** The mandatory sanctions described in Rule 3(a)(1)(E) shall not apply to any player who reveals, to the player's Club or to the Commissioner or the Commissioner's designee, on or before May 1, 2008, the falsification of information or documentation proscribed by Rule 3(a)(1)(E).

**(2)**   High School Rules.

**(A)**   United States and Canada.  Except as noted in this Rule 3(a)(2), no high school student in the United States or Canada shall be signed to a contract by a Major or Minor League Club during any period the student is eligible for participation in high school athletics.  Any student who drops out of high school prior to expiration of the player's athletic eligibility and continues to remain out for at least one year (365 days including the date of withdrawal) may thereafter be signed, subject to all provisions of this Rule 3(a).

A player may be signed to a contract if the player's eligibility has expired prior to graduation:

**(i)**   because of the player's age;

**(ii)** because the player has completed the maximum number of semesters of attendance; or

**(iii)** because the maximum number of seasons in which the player was eligible to participate in any major sport has passed.

Such contract may not obligate the player to report for service prior to the normal graduation of the class with which the player originally entered high school (i.e., the original graduation date based on the semester requirements of the local high school education system).

**(B)**   Proof of Completion.  For all players subject to the High School Rule for Canada, Puerto Rico and any other Commonwealth, Territory or Possession of the United States, a certificate evidencing completion of a high school curriculum shall accompany the filing with the Commissioner and/or the Commissioner's designee of such player's first Major or Minor League contract.

18                                                              **3/08**

**MAJOR LEAGUE RULES**
**MLR 3(a)**

**(3)** College Players.

**(A)** Definition of "College." For the purposes of this Rule 3, the word "college" shall mean any university or other institution of higher education located in the United States or Canada that confers degrees upon students following completion of sufficient credit hours to equal a four-year course. To fall within this definition, the institution must be represented by a baseball team which participates in inter-collegiate competition. This definition includes but is not limited to all members of the National Collegiate Athletic Association ("NCAA") and the National Association of Intercollegiate Athletics ("NAIA").

**(B)** Except as set forth in Rule 3(a)(3)(E) (Exceptions), a player who is a member (or, if a freshman, a prospective member) of a baseball team that represents a college in intercollegiate competition may not be signed by a Major or Minor League Club during the period beginning with the date the player attends the first class in the player's freshman year and ending with the graduation of the class with which the player originally entered college or with the graduation of the college's undergraduate class in a later year, if the player retains eligibility to play baseball at the player's college in such later year.

**(C)** A college student shall be considered to be a member of the baseball team of the student's college if:

**(i)** the student is a freshman in a college (regardless of whether or not the student's college has an intercollegiate freshman baseball program); or

**(ii)** the student is a sophomore (second scholastic year), junior (third scholastic year), or senior (fourth or later scholastic year), and is a member (or prospective member) of the varsity baseball squad.

**(D)** NCAA and NAIA Tournaments. A college player whose team is eligible for the national tournaments conducted by the NCAA and NAIA may not be signed until the day after the player's team has been eliminated from such tournament.

**(E)** Exceptions. Rule 3(a)(3)(B) shall not apply to any player:

**MAJOR LEAGUE RULES**
**MLR 3(a) to 3(b)**

**(i)** who is at least 21 years old and is currently between school years;

**(ii)** who has completed junior year and is currently between school years;

**(iii)** who has completed the full period of eligibility for intercollegiate baseball;

**(iv)** whose association with the player's college has been terminated by reason of scholastic deficiency; or

**(v)** who withdraws from college and remains out for at least 120 days (including the date of withdrawal).

**(F)** Procedures.

**(i)** A college player who desires to sign a contract because the player qualifies under Rule 3(a)(3)(E)(iv), or because the player is not a member of a team as set forth in this Rule 3, shall make written application to the Commissioner describing the details of the player's case and requesting that the college player be authorized to sign. If the Commissioner decides that an exception is warranted, the player and all Major and Minor League Clubs will be so notified.

**(ii)** A college player who is qualified to sign a contract under Rules 3(a)(3)(E)(i), (ii), (iii) or (v) may do so without permission of any baseball or college official, following the Rule 4 draft.

**(4)** Junior College Players. A student at a junior college in the United States or Canada may not be signed during the period commencing with the day the student attends the first class of the fall semester of the institution in which the student enrolls and ending after the conclusion of the next First-Year Player Draft.

**(b) UNIFORM CONTRACTS.**

**(1)** Uniform Contract for Major League Players. To preserve morale among Major League players and to produce the similarity of conditions necessary for keen competition, the contracts between all Major League Clubs and their players on the Major League Reserve List shall be in the form prescribed by any Basic Agreement in effect between the Major Leagues and the Major League Baseball Players Association.

**MAJOR LEAGUE RULES**
**MLR 3(b)**

**(2)**    Uniform Contract for Minor League Players.  To preserve morale among Minor League players and to produce the similarity of conditions necessary for keen competition, all contracts between either Major or Minor League Clubs and players on Minor League Reserve Lists shall be in the form of the Minor League Uniform Player Contract that is appended to these Rules as Attachment 3.  All Minor League Uniform Player Contracts between either a Major or a Minor League Club and a player who has not previously signed a contract with a Major or Minor League Club shall be for a term of seven Minor League playing seasons. A Minor League Uniform Player Contract between either a Major or a Minor League Club and a player who has previously signed a contract with a Major or Minor League Club may be for any term not to exceed seven Minor League playing seasons that is mutually acceptable to the signing Club and the player. The minimum salary in each season covered by a Minor League Uniform Player Contract shall be the minimum amount established from time to time by the Major League Clubs for each Minor League classification or League.

**(3)**    Except with the written approval of the Commissioner, no Major or Minor League Club shall enter into a contract with a player that differs from the Major League Uniform Player's Contracts or Minor League Uniform Player Contracts. All contracts shall be in duplicate and the player shall retain a counterpart original. All Major League Uniform Player's Contracts and all Minor League Uniform Player Contracts must be filed with the Commissioner or the Commissioner's designee for approval.

**(4)**    No player shall participate in any championship season game until the player has signed a contract in the form prescribed by this Rule 3(b) for services during the current season.  Use of an ineligible player shall subject the offending Club to such penalties as the Commissioner may impose, including, without limitation, forfeiture of any game won by the Club that uses an ineligible player.

**(5)**    No Major League Uniform Player's Contract or Minor League Uniform Player Contract shall be approved if it contains a bonus for playing, pitching or batting skill or if it provides for the payment of a bonus contingent on the standing of the signing Club at the end of the championship season.

**(6)**    The contract of a first-year player (i.e., a player who has not previously contracted with a Major or Minor League Club) selected in the Rule 4 draft may not be assigned to another non-affiliated Major or Minor League Club until a period of one year has passed from the date of the player's original contract.

**MAJOR LEAGUE RULES**
**MLR 3(c)**

**(c) CONTRACT TERMS FOR FIRST-YEAR PLAYER CONTRACTS.**

**(1)** First Contract Season. First-year players must contract for either the current or the following season.

**(2)** Salary Rates.

**(A)** Major League Uniform Player's Contracts. The minimum salary for Major League service in all Major League Uniform Player's Contracts with first-year players shall be the minimum salary for Major League service required by the Basic Agreement.

**(B)** Minor League Uniform Player Contracts. The salary in each Minor League Uniform Player Contract between a Major League Club and a first-year player shall be the amount established by the Major Leagues for each Minor League classification or League. The salary in each Minor League Uniform Player Contract between an independent Minor League Club and a first-year player shall be the amount established by the Minor League Association for each Minor League classification or League. On a pro rata basis, a first-year player must receive the minimum salary in a particular Minor League classification for each day that the player spends on the Active List or Disabled List in that classification.

**(3)** Trial Period. Each player must receive a trial of 15 days during the championship season if the player signs for the current season or during the spring training period if the player signs for the succeeding season. Participation in any Instructional League shall not count against the 15-day trial period.

**(4)** Permissible Special Covenants. A Minor League Uniform Player Contract with a first-year player may include no special covenants, except the following:

**(A)** Bonus Payments for Signing Contract. All payments due the player or any other person in connection with the player's signing shall be set forth in the contract, must be stated in a fixed dollar amount at the time of the signing of the contract and must be paid before the conclusion of the calendar year following the date of the contract. Such signing payments, however, may be made in installments extending no more than five years following the date of the contract if

**(i)** the player and Club agree that the player shall be permitted to participate in or shall refrain from participating in specified professional or amateur sports during the period of the installment payments; and

**MAJOR LEAGUE RULES**
**MLR 3(c)**

**(ii)** the Commissioner determines, in the Commissioner's sole discretion, that the player has the legitimate potential to become a professional athlete in at least one of the sports specified by the player and Club in the Minor League Uniform Player Contract, pursuant to Rule 3(c)(4)(A)(i).

**(B)** Contingent Payments. A first-year player may be offered a specified sum of no more than $2,500 contingent upon the player's being retained by the signing Major or Minor League Club for a period that may not exceed 90 days of the Club's playing season(s). If a player whose contract contains such a contingent bonus provision is selected under Rule 5 (Annual Selection of Players) before the date the bonus becomes payable, the bonus shall become due immediately and shall be paid by the Club from which the contract was selected.

**(C)** Incentive Bonus Plan. A Major or Minor League Club may agree to make standard "incentive bonus payments" in a contract with a first-year player if such payments are conditioned on the player being on the Active List in a certain classification for 90 days of any one championship season, including any official play-off or other post-season series in which the player might be eligible to participate. The amount of such incentive bonus payments and the classification in which they are to be paid shall be as follows:

**(i)** the sum of $1,000 for the Class AA classification;

**(ii)** the sum of $1,500 for the Class AAA classification; and,

**(iii)** the sum of $5,000 for the Major League level.

Time spent on any Inactive List shall not count toward the 90 days to be served before an incentive bonus payment becomes payable. However, a player shall be credited with Disabled List time if the player is placed on the Disabled List after the player has accumulated 60 or more days of service in any particular season.

A player who has received the incentive bonus payment applicable to a particular classification shall not be entitled to another such payment for service in the same classification, regardless of whether such service occurs in the same or a subsequent season. A player who qualifies for the Major League or Class AAA incentive bonus payment shall also receive the

23                                                                          **3/08**

**MAJOR LEAGUE RULES**
**MLR 3(c)**

incentive payment(s) for the lower classification(s) if the player has not previously received the incentive payment(s) for that classification(s). The Major or Minor League Club that holds a player's contract at the time an incentive bonus payment becomes due shall pay the bonus to the player. An unconditional release or free agency shall terminate the incentive bonus plan for the player.

**(D)** College Scholarship Plan. A Major or Minor League Club may agree through the College Scholarship Plan to pay on behalf of a first-year player any dollar amount incident to the player's attendance in pursuit of an undergraduate degree at an accredited college or university of the player's choice for tuition, room, board, books and fees. Such amount, however, may not exceed the actual cost of such attendance. The amount also shall be stated per semester or quarter, shall be allocated into two categories (one for the cost of tuition, fees and textbooks and the other for the cost of room and board) and shall state the number of semesters, not to exceed eight, or quarters, not to exceed 12. A Club shall reimburse a player after the end of any semester or quarter for room and board expenses that the player actually incurs during such semester or quarter (less withholding for applicable income and employment taxes), subject to such uniform requirements that the Commissioner or the Commissioner's designee may require to be set forth in the College Scholarship Plan special covenant of the player's contract. If a payment is made for a semester or quarter (or portion of a semester or quarter, for part-time attendance), any amount remaining for such semester or quarter (or portion of a semester or quarter, for part-time attendance) shall be forfeited and may not be carried over to any future semester or quarter. The Commissioner or the Commissioner's designee may establish procedures to convert semester allowances to quarter allowances and vice-versa, should the player attend a college or university with an academic calendar that differs from the type of calendar described in the player's Minor League Uniform Player Contract, and the amount available to the player shall be pro-rated accordingly. The Commissioner or the Commissioner's designee may unilaterally amend the College Scholarship Plan to the extent that the Commissioner or the Commissioner's designee determines is necessary or appropriate to comply with any applicable law (including any tax law), so long as such amendment does not reduce the aggregate amount payable to a player under the College Scholarship Plan.

    **(i)** Players Eligible. Payments shall be made only for players who are:

**MAJOR LEAGUE RULES**
**MLR 3(c)**

(aa) Enrolled in a full-time course (a minimum of 10 credit hours if on a quarter system or 12 credit hours if on a bi-semester system) in pursuit of an undergraduate degree at an accredited college or university; or

(bb) Enrolled in a part-time course (minimum of five credit hours if on a quarter system or six credit hours if on a bi-semester system) in pursuit of an undergraduate degree at an accredited college or university. Based on a 12-credit-hour semester system or a 10-credit-hour quarter system, if the amount is expressed per quarter, the Club shall make a pro-rata reduction in the remaining semesters or quarters of eligibility and maximum bonus payments allowable for each credit hour in a part-time enrollment.

(ii) Tuition Allowance. For a player under the College Scholarship Plan, a Club shall make (or cause to be made) payments or reimburse such player for the cost that such player actually incurs for tuition, fees and textbooks (less withholding for applicable income and employment taxes) for any covered semester, up to the tuition allowance for such covered semester, if the following requirements are satisfied for such covered semester:

(aa) The first day of such covered semester must begin before the Club is relieved of its obligation to make payments pursuant to the College Scholarship Plan;

(bb) For such covered semester, the player must be enrolled at an accredited college or university, either:

(I) as a full-time student (minimum of 10 credit hours if on the quarter system; or 12 credit hours if on the bi-semester system) in pursuit of an undergraduate degree; or

(II) part-time in courses (minimum of five credit hours if on a quarter system; or six credit hours if on a bi-semester system) in pursuit of an undergraduate degree. Based on a 12-credit-hour semester system (or 10-credit-hour quarter system), a Club shall make a pro-rata reduction in the remaining covered semesters and tuition allowance for each credit hour in a part-time enrollment; and

**MAJOR LEAGUE RULES**
**MLR 3(c)**

**(cc)** The courses for which the player seeks reimbursement must be required as part of an undergraduate degree program or satisfy an elective requirement for an undergraduate degree.

A Club shall not be required to reimburse the player for any amount that is paid or reimbursed by an outside source, such as another scholarship.

**(iii)** Living Allowance.  For a player under the College Scholarship Plan, the player shall be reimbursed after the end of any semester for room and board expenses that the player actually incurs during such semester (less withholding for applicable income and employment taxes), up to the living allowance for such semester (and subject to the limits set forth below), if the following requirements are satisfied for such semester:

**(aa)** The first day of such semester must occur before

**(I)**   the Club is relieved of its obligation to make payments pursuant to the College Scholarship Plan; and

**(II)**  the 10th anniversary of the date the player executes the Major League Uniform Player contract or Minor League Uniform Player's Contract containing the College Scholarship Program special covenant;

**(bb)** The expenses to be reimbursed must be for room and board to live away from the home (or homes) of the player's parents (custodial and noncustodial) and/or guardian for the purpose of attending classes;

**(cc)** For such semester, the player must complete a minimum of six credit hours (or five credit hours if on the quarter system) toward an undergraduate degree and not finish the semester on academic probation.  If the player is enrolled less than full-time (based on a 12-credit-hour semester system or 10-credit-hour quarter system) for any semester, the Club shall make a pro-rata reduction in the living allowance for such semester; and

**(dd)** the player must request reimbursement in writing, and provide a copy of the receipt for each reimbursable expense, within 90 days after the last day of such semester.

**MAJOR LEAGUE RULES**
**MLR 3(c)**

If a player lives off campus for a semester, such player's living allowance for such semester shall not exceed the cost of living on campus.  If a player attends a college that does not have facilities for on-campus residence, such player's living allowance shall not exceed the per diem amount established by the Commissioner or the Commissioner's designee from time to time.

A Club shall not be required to reimburse a player for any amount that is paid or reimbursed by an outside source, such as another scholarship.

A Club shall pay any reimbursement of room and board expenses for any semester within 90 days after the later of

**(ee)** the last day of such semester; or

**(ff)** the date the player submits the player's written request for reimbursement (with all required documentation).

**(iv)** Non-covered Expenses.  In no case shall a player be reimbursed for, among other things,  transportation, parking charges, medical insurance or infirmary charges, laundry or garment cleaning, clothing, umbrellas, furniture, lamps, calculators, book bags, computer hardware or software, typewriters, or any other tools or supplies (other than textbooks) that a player may keep after completing the applicable course.

**(v)** When Club Is Relieved of the Obligation to Make Payments.  An unconditional release of the player or the player's placement on the Military List shall not relieve the Club of the obligation to make such payments but the Club shall be relieved of such obligations under the following circumstances:

**(aa)** if the player fails to commence studies within two years after the date the player ceases to be reserved by a Major League or Minor League Club, voluntarily retires or is reserved on an Inactive List, whichever comes first, unless the player again becomes reserved to a Major League or Minor League Club (not on an Inactive List) within such two-year period;

**MAJOR LEAGUE RULES**
**MLR 3(c)**

**(bb)** if, after commencement of studies and after the player retires or is released by a Major League or Minor League Club and is not signed again as a player by a Major League or Minor League Club within the two years following the player's release, the player fails to attend college within two consecutive years of the player's most recent college enrollment;

**(cc)** if the player is placed on the Ineligible List; or

**(dd)** a Major League player for whom there is in effect on or after January 1, 1989 a valid and unexpired scholarship under the College Scholarship Plan may commence or resume studies under the Plan at any time within two years after the player's last day of Major League service. If the player's college studies have not commenced under the Plan by that date, the player's scholarship shall terminate. If the player has commenced studies by that date, the player's scholarship shall continue unless the player shall fail to attend college for more than two consecutive years after that date, without proper reason. Participation in Winter League or Instructional League play shall constitute proper reason for tolling the time limitation in the preceding sentence.

In addition, a Club shall not be obligated to make payments for room and board for any semester or quarter that starts after the 10th anniversary of the date the player executes the Minor League Uniform Player Contract.

**(vi)** Liability for Payment. The original signatory Club shall continue to be liable to make College Scholarship Plan payments even if the player's contract is selected by, or assigned to, another Club; provided, however, that, in case of assignment otherwise than by selection or on waiver claim, the assignee Club may agree, through a statement set forth in the assignment agreement, to undertake to make any payments that accrue subsequent to the date of such assignment. For purposes of the College Scholarship Plan, all rights and obligations of "Club" shall be held and borne by the Club liable for payments in accordance with this Rule 3(c)(4)(D)(vi).

All payments made under the College Scholarship Plan shall be made by the Club liable for the payments in accordance with this Rule 3(c)(4)(D)(vi). To the extent possible, all payments under the College Scholarship Plan shall be made to the college attended by the player.

**MAJOR LEAGUE RULES**
**MLR 3(c) to 3(d)**

**(vii)** Procedure.  A Club that agrees to the participation of a player in the College Scholarship Plan shall include as a special covenant such College Scholarship Plan provisions as may be prescribed by the Commissioner or the Commissioner's designee, consistent with this Rule 3(c)(4)(D).  Upon receipt of notification that the contract has been approved, the Club shall notify the player of the procedures to be followed.

**(viii)** Coordination of Benefits.  In the event that a first-year player contract contains both an Incentive Bonus Plan and a College Scholarship Plan, the following coordination of benefits shall apply:

> **(aa)** If a player receives a payment under the Incentive Bonus Plan, the player's aggregate remaining allowance for tuition, fees and textbooks shall be reduced by the amount of such Incentive Bonus payment.  Such reduction shall be allocated on a pro rata basis to each of the player's remaining covered semesters or quarters.

> **(bb)** If a player receives one or more payments under the College Scholarship Plan, any amount subsequently due under the Incentive Bonus Plan shall be reduced sequentially by the aggregate amount of payments that the player received under the College Scholarship Plan.  Any remaining Incentive Bonus Plan balance earned by the player in excess of the payments received under the College Scholarship Plan shall be paid directly to the player.

> It is the intent of this coordination of benefits provision that, to the extent earned, the cumulative benefits received under either the College Scholarship Plan or the Incentive Bonus Plan (before withholding) will offset any cumulative amounts due under the other Plan.

**(d)  ACCEPTANCE**.  Any agreement for service between a Major or Minor League Club and a player, evidenced by either written acceptance, whether by letter or telegram, or by the player's receipt of money advanced to the player to bind the player to such an agreement, shall be construed to be a contract and held to be binding if the player declines to enter into a formal contract.  The player's refusal to sign a formal contract shall disqualify the player from playing with the contracting Club or entering

**MAJOR LEAGUE RULES**
**MLR 3(d) to 3(f)**

the service of any Major or Minor League Club unless the player is released or assigned.

**(e)   REPORTING AND FILING OF CONTRACTS**.

> **(1)**    Reporting.  The terms of any agreement between a Major or Minor League Club and a player must be reported to the Commissioner or the Commissioner's designee within 24 hours of the time the agreement is reached.  In addition, the terms of any agreement between an independent Minor League Club and a player must be reported to the President of the Minor League Association.

> **(2)**    Filing.  The validity of any contract, arrangement or agreement for service between a Major or Minor League Club and a player not on its Reserve List(s) will not be recognized unless written proof thereof is submitted to the Commissioner or the Commissioner's designee within 20 days after such agreement is made, for promulgation in the next official bulletin, and unless the agreement is actually approved.  A Minor League player who is not on a Major League Reserve List and whose contract, arrangement or agreement for service with a Major or Minor League Club is not received by the Commissioner or the Commissioner's designee within 20 days after such agreement is made may be declared a free agent, in the sole discretion of the Commissioner.  Transmission of such contract, arrangement or agreement to the Commissioner or the Commissioner's designee by facsimile or other electronic means shall not be sufficient.  In addition, written proof of any contract, arrangement or agreement for service between an independent Minor League Club and a player must be reported to the President of the Minor League Association.

**(f)   CONTRACTS IN VIOLATION**.

> **(1)**    Any written or oral contract made in violation of these Rules (including any agreement between a Major or Minor League Club and a player that is not embodied in a Major League Uniform Player's Contract or Minor League Uniform Player Contract) shall be declared null and void, and the official, scout or employee of the offending Major or Minor League Club who participated in the violation shall be subject to such penalties as the Commissioner or the Commissioner's designee may impose.

> **(2)**    In addition, if the violation is of the High School, College or Junior College Rule, the offending Club shall be prohibited from signing such player for a period of three years from the date that such contract is declared void, and shall be fined by the Commissioner or the Commissioner's designee.

**MAJOR LEAGUE RULES**
**MLR 3(g)**

**(g)  CONTACTS AND TRYOUTS**.  The following rules shall govern contacts with and tryouts of all amateur players:

**(1)**    Contacts.  Nothing herein shall be construed as prohibiting any Major or Minor League Club, or its officers, agents or employees, from talking to any player, who is not on another Club's Negotiation List, at any time concerning a career in professional baseball and discussing the merits of the player's contracting, when eligible, with any particular Club.  However, no discussions shall be held with players during practice sessions or during the progress of games.

Any Club or Club official, employee, agent or representative who suggests, procures or otherwise influences a student to withdraw from high school, college or junior college, or to refrain from playing high school, college or junior college baseball, other than in connection with negotiations to sign such student to a contract that are permitted under these Rules, or to transfer to another school, shall be held in violation of this Rule 3(g) and subject to penalties.

**(2)**    Tryouts.  Tryouts may be held in accordance with the following:

**(A)**  High School Students.

**(i)**   During Summer Vacation and One Week Prior to First-Year Player Draft.  "Tryouts" of high school students may be conducted during the summer vacation period and during the one-week period immediately preceding the first day of the First-Year Player Draft by any Major or Minor League Club without permission of any high school official or other restriction.

**(ii)**  During School Year.   Except during the one-week period immediately preceding the first day of the First-Year Player Draft, for which Rule 3(g)(2)(A)(i) applies, a student may be invited to a tryout during the school year, provided that

**(aa)** the principal of the player's high school, if not employed by the Major or Minor League Club conducting the tryout, shall have approved such participation in writing; and

**(bb)** any such tryout is limited to not more than five high school students, unless the tryout occurs within 30 days prior to the first day of the First-Year Player Draft, in which case there shall be no restriction on the number of students at the tryout.

**MAJOR LEAGUE RULES**
**MLR 3(g)**

**(B)** College and Junior College Players.

**(i)** During Summer Vacation. Tryouts of college players by Major and Minor League Clubs may be conducted during the summer vacation periods falling between school years, without the permission of any college official or other restriction.

**(ii)** During School Year. Major or Minor League Clubs may not try out college players during the school year but may observe players in intercollegiate competition as frequently as they desire.

**(iii)** Participation in Summer Baseball. Consistent with the principle that this Rule 3 protects the eligibility of college players during the college year and at the same time affords such players every opportunity to develop for possible future professional play, a College Player Committee is hereby empowered to act on behalf of professional baseball to:

> **(aa)** survey and investigate the existence of and conditions in summer amateur baseball leagues available to college players;

> **(bb)** cooperate with the NCAA and NAIA or committees representing those bodies; and

> **(cc)** recommend action or legislation to the Commissioner or the Commissioner's designee, all with the objective of extending, liberalizing, and improving the summer amateur baseball program for college age players in the United States and Canada.

**(C)** Player on Negotiation List. If a Major League Club selects a player in the Rule 4 Draft who was eligible for selection pursuant to Rule 3(a)(2) (High School Rules), and if the player has not yet enrolled in a college, the Major League Club may pay for the expenses of the player in connection with a tryout with the Major League Club, provided that the tryout visit is no longer than 48 hours.

**(D)** Prohibition of Expense Payments and Future Service Agreements. Unless Rule 3(g)(2)(C) (Player on Negotiation List) applies, no Major or Minor League Club shall

3/08

**MAJOR LEAGUE RULES**
**MLR 3(g) to 3(h)**

**(i)**   reimburse, directly or indirectly, any amateur player for any travel expenditure in connection with a tryout unless the player is signed at the tryout;

**(ii)**   pay or give anything whatsoever to any high school, college or junior college student, directly or indirectly, in connection with any tryout; or

**(iii)**   enter into an agreement for the future services of any high school, college or junior college student unless such student is eligible to sign at the tryout.

Notwithstanding the prohibition in Rule 3(g)(2)(D)(i), a Club may advance to, or reimburse, a player who is not a resident of the United States or Canada within the meaning of Rule 3(a) (Eligibility to Sign Major League or Minor League Contracts) or a high school, college or junior college student within the meaning of Rule 3(a) (Eligibility to Sign Major League or Minor League Contracts) for

**(iv)**   ground transportation in connection with a tryout at a Club facility outside the United States and Canada, in an amount not to exceed a maximum amount set forth from time to time by the Commissioner or the Commissioner's designee; and

**(v)**   air transportation in connection with a tryout at a Club facility in the Dominican Republic or Venezuela, so long as such Club has obtained the prior approval of the Commissioner or the Commissioner's designee and so long as such player is not yet eligible to sign a player contract pursuant to Rule 3(a)  (Eligibility to Sign Major League or Minor League Contracts) but is eligible to participate in a program at a Club facility pursuant to regulations set forth from time to time by the Commissioner or the Commissioner's designee.

**(h)   TENDER OF CONTRACT RENEWALS OR SALARY ADDENDUMS.**

**(1)**   Major League Tenders.  On or before December 12 (or if a Sunday, then on the preceding business day), each Major League Club must tender a Major League Uniform Player's Contract to each player on its Major League Reserve List.  A Major League Club must tender a contract to each player on its Major League Reserve List who is on the Restricted List as a result of either failing to report to the player's Club or failing to contract with it, or is on a Disqualified List for failure to render services to a Club.  Should a Club fail to so tender or renew a

**MAJOR LEAGUE RULES**
**MLR 3(h)**

contract, the player shall become a free agent without any restrictions or qualifications, and the player automatically shall be removed from the Restricted or Disqualified List.

With regard to any player who is on a Disqualified List for a reason other than that stated in the preceding paragraph or who is on a Suspended, Ineligible, Voluntarily Retired or Military List, a Club shall not be obligated to tender or renew a contract until the player is removed from such list and reinstated to active status.  If a player is removed from such list during a period beginning on December 2 and extending through the next championship season, the Club shall tender a contract to the player within 10 days following such removal. Thereafter, should the Club and the player fail to agree upon the terms of a new contract within 10 days after the player's receipt of the tendered contract, the Club shall be obligated, within the next five days, to renew the player's prior Major League Contract, provided, however, that if the tender is made during the period beginning on December 2 and ending on the next March 1, the renewal period shall be as set forth in paragraph 10(a) of the Major League Uniform Player's Contract.  Should a Club fail to tender or renew a contract as provided in this paragraph, the Player shall become a free agent without any restrictions or qualifications.

**(2)**   Minor League Tenders and Salary Addendums.

**(A)**  Between the conclusion of the Rule 5 Selection Meeting and January 15 (or if a Sunday, then on the preceding business day), each Major League Club must tender a Minor League Uniform Player Contract to each player who has been assigned outright to a Minor League Club and who has either not previously signed a Minor League Uniform Player Contract or has previously signed a Minor League Uniform Player Contract that has expired. Such tender may be made to the player in person or by mail addressed to the player's last address of record with the Major League Club.

**(B)**  Between the conclusion of the Rule 5 Selection Meeting and March 1 (or, if a Sunday, then on the preceding business day), each Major or Minor League Club must tender a Salary Addendum to each player on its Minor League Reserve Lists.

A Club shall not tender an addendum to a player whose name appears on its Minor League Reserve Lists as a Voluntarily Retired, Ineligible, Disqualified or Restricted List Player, but a Club may, at its discretion, tender a contract to a player on the Military List.

## MAJOR LEAGUE RULES
### MLR 3(h) to 3(j)

**(C)** No player shall participate in any championship season game until the player has signed an addendum in the form prescribed by this Rule 3(h) for services during the current season. (See Rule 3(b)(4) (Uniform Contracts)).

**(i) UNIFORM MANAGER'S AND EMPLOYEE'S CONTRACTS**. Managers, coaches, trainers and salaried scouts must sign contracts on forms prescribed by the Commissioner before rendering services to a Major or Minor League Club. (So-called "Bird Dog" scouts and scouts whose compensation is conditional upon performance of players are not required to sign one of the uniform contracts. However, such "Bird Dog" and sub-scouts are required to be signed to a contract or agreement drafted by the Major or Minor League Club.) An executed copy of each uniform manager's or employee's contract shall be filed with the Commissioner or the Commissioner's designee for approval within 10 days after the execution of the contract.

**(j) CERTAIN PAYMENTS FORBIDDEN**.

**(1)** Gift to Employee for Securing Employment. No scout, player, employee or official of any Major or Minor League Club, or any umpire, employee or official of any Major or Minor League, or any other person with any relationship to any of the aforementioned persons, shall demand or receive any money or other valuable consideration, whether gratuitous or otherwise, for or because of services rendered, or to be rendered, or supposed to have been rendered, in securing the employment of any person with any Major or Minor League Club. Such money or other valuable consideration shall be returned immediately upon its receipt, and if not so returned, the Commissioner may impose such penalties, including ineligibility, as the Commissioner may deem proper.

**(2)** Payment to Player's Trainer. No Major or Minor League Club shall make any payment or convey anything of value to any firm or person for services provided to a player in connection with preparing such player for professional baseball.

**(3)** Payment of Finder's Fee. No Major or Minor League Club shall make any payment or convey anything of value to any firm or person not retained or employed by such Club for bringing such player to the attention of such Club as a prospective player. Any firm or person who is retained or employed by a Major or Minor League Club and who brings unsigned players to the attention of such Club as prospective players (for example, as a so-called "Bird Dog" scout) shall disclose to any player the relationship with the Club, shall not act as agent or representative for any player and shall not establish or maintain with

**MAJOR LEAGUE RULES**
**MLR 3(j) to 4(b)**

more than one Club at a time any relationship with respect to scouting or signing players.

**(4)** Payment to Player's Representative. No Major or Minor League Club shall make any payment or convey anything of value to any firm or person for legal, representational or other services provided by such firm or person to a player in connection with the negotiation of a contract between the signing Club and the player.

**(k) TAMPERING**. To preserve discipline and competition, and to prevent the enticement of players, coaches, managers and umpires, there shall be no negotiations or dealings respecting employment, either present or prospective, between any player, coach or manager and any Major or Minor League Club other than the Club with which the player is under contract, or acceptance of terms, or by which the player is reserved or which has the player on its Negotiation List, or between any umpire and any baseball employer other than the baseball employer with which the umpire is under contract, or acceptance of terms, unless the Club or baseball employer with which the person is connected shall have, in writing, expressly authorized such negotiations or dealings prior to their commencement.

**Rule 4**

**FIRST-YEAR PLAYER DRAFT**

**(a) PLAYERS SUBJECT**. A Major League or Minor League Club may contract with a player who is a resident of the United States or Canada and who has not previously contracted with a Major League or Minor League Club, only in accordance with this Rule 4 and the provisions of any applicable High School, College or Junior College Rules. For purposes of this Rule 4, the term "United States" shall mean the 50 states of the United States of America, the District of Columbia, Puerto Rico, and any other Commonwealth, Territory or Possession of the United States of America. Players who are eligible to contract on the date of the First-Year Player Draft, or within 45 days thereafter, may be selected.

**(b) SELECTION MEETING.** One selection meeting shall be conducted each year in June and shall be known as the First-Year Player Draft or the Rule 4 draft. The Commissioner or the Commissioner's designee shall, before August 31 each year, announce the date of the commencement of the next year's First-Year Player Draft. The Commissioner or the Commissioner's designee shall choose the place where each First-Year Player Draft shall be conducted and may determine that such First-Year Player Draft be conducted by telephone conference or electronic means. Only Major

36                                                                    3/08

## MAJOR LEAGUE RULES
### MLR 4(b) to 4(c)

League Clubs may make selections at the First-Year Player Draft. The Commissioner shall preside over all selections at the First-Year Player Draft and shall resolve all procedural questions in connection with the First-Year Player Draft, including, but not limited to, all questions regarding eligibility.

The First-Year Player Draft shall conclude after 50 selection rounds. Selections made pursuant to Rule 4(c)(2) (Supplemental Selections) shall not constitute a selection round. Selections made between rounds as compensation selections pursuant to any Basic Agreement in effect between the Major League Clubs and the Major League Baseball Players Association shall not constitute a selection round. Each Major League Club shall designate a representative to act on its behalf. As the Major League Club's turn is called in each selection round, such representative may select a player for the Major League Club's Negotiation List.

The Commissioner or the Commissioner's designee may impose time limits for the exercise of a selection. A Major League Club shall forfeit its right to make a particular selection in the event that it is the Club's turn to select and the Club fails to respond to a call within the time limit announced by the Commissioner or the Commissioner's designee, after having received a warning from the Commissioner or the Commissioner's designee. If a Major League Club announces a "pass" when it is such Club's turn to select, such Club shall forfeit its right to make that selection as well as any subsequent selections in that First-Year Player Draft.

The selecting Major League Club shall be responsible for determining the eligibility of selected players. No Major League Club may transfer to another Club its right to select.

**(c) ORDER OF SELECTION.** The following order of priorities shall govern the Major League Clubs' selections at each First-Year Player Draft.

**(1)** Standard Selection Order. The Major League Clubs shall be placed in the reverse order of their percentages of games won at the close of the preceding championship season. For purposes of this Rule 4(c)(1), each Club's winning percentage at the close of the preceding championship season shall be determined by the percentage of games won in the championship season, without regard to standings within any Division or League and without regard to post-season results. If two or more Clubs had an identical winning percentage at the close of the preceding championship season, the selection order of those Clubs shall be determined by the percentage of games won in the next prior championship season, with any remaining ties resolved by continuing to examine the tied Clubs' respective championship season winning percentages in each preceding prior year, until the tie is broken. The Commissioner or the

**MAJOR LEAGUE RULES**
**MLR 4(c) to 4(d)**

Commissioner's designee shall announce to the Major League Clubs the standard selection order produced by operation of this Rule 4(c), and that order shall govern each round.

**(2)**    Supplemental Selections.  If a Major League Club selects a player before the fourth round of a First-Year Player Draft (other than a player selected with a supplemental selection pursuant to this Rule 4(c)(2)) and such Club fails to sign such player before such player is removed from such Club's Negotiation List pursuant to Rule 4(d)(3) or 4(d)(4) (Effect of Selection on Player), then such Club shall have the right to make an additional selection, called a supplemental selection, in the next First-Year Player Draft, as follows:

> **(A)** If the unsigned player had been selected before the third round of the First-Year Player Draft, the supplemental selection awarded shall be exercised immediately after the numbered position overall that corresponds with the numbered position overall at which the unsigned player had been selected in the previous First-Year Player Draft.  For example, if the unsigned player had been the 30th selection in the First-Year Player Draft, the supplemental selection awarded shall be the 31st selection in the next First-Year Player Draft.

> **(B)** If the unsigned player had been selected in the third round of the First-Year Player Draft, the supplemental selection awarded shall be exercised after the completion of the third round.  If more than one Club is in this category, the supplemental selections shall be made in the same order as the selections giving rise to the supplemental selections had been made in the previous First-Year Player Draft.

**(d)  EFFECT OF SELECTION ON PLAYER.**  A selected player shall be placed on the Major League Club's Negotiation List and shall remain on such Negotiation List until:

**(1)**    such player signs a Major or Minor League contract that is approved at any time by the Commissioner or the Commissioner's designee pursuant to Rule 3(e)(2);

**(2)**    such player is removed because of ineligibility for selection;

**(3)**    August 16 at 12:01 a.m., Eastern Time, if such player has not utilized all of such player's potential college eligibility to play baseball;

**MAJOR LEAGUE RULES**
**MLR 4(d) to 4(e)**

**(4)** such player is removed because the Major League Club's Negotiation Right has been revoked under Rule 4(e) (Negotiation Rights); or

**(5)** the start of the next year's Closed Period, as defined in Rule 4(f), if such player has utilized all of such player's potential college eligibility to play baseball.

If the Commissioner or the Commissioner's designee disapproves a Major or Minor League contract that a player on a Negotiation List and the Club that had selected such player each signed before August 16, the player and Club shall have the opportunity to cure any defect in the contract, resubmit such contract for approval and continue to have such contract deemed signed before August 16 for purposes of this Rule 4(d), so long as the contract originally submitted contained the material permissible special covenants, if any, of the agreement between the player and Club. It is the intent of this paragraph not to permit a player and Club to extend the August 15 deadline by submitting an incomplete contract in order to continue negotiations after August 15.

Players who join the Armed Forces while on the Negotiation List shall continue to be subject to this Rule 4 in the same manner as all other selected players. A Major League Club shall have the exclusive right to contract with a player on its Negotiation List and negotiations must be conducted by the selecting Club in accordance with Rule 3 (Eligibility to Sign Contract, Contract Terms, and Contract Tenders). A Major League Club may not transfer its Negotiation Right to any other Club. Players on the Negotiation List shall not count against any player limits.

**(e) NEGOTIATION RIGHTS.**

**(1)** Tender of Contract. Not later than 15 days after the close of the First-Year Player Draft, the Major League Club that has selected the right to negotiate exclusively with a player must commence negotiations by providing the player, either in person or by certified mail, return receipt requested (or its equivalent, such as private overnight courier), to the player's last known address, with the following:

**(A)** written notice that the player has been selected;

**(B)** a copy of Major League Rules 3(c) (Contract Terms for First-Year Player Contracts), 4(d) (Effect of Selection on Player) and 4(e) (Negotiation Rights); and

**(C)** three identical, executed Minor League Uniform Player Contracts, two of which are to be returned to the Major League Club for approval

**MAJOR LEAGUE RULES**
**MLR 4(e)**

processing after execution by the player.  For each copy of the Minor
League Uniform Player Contract,

> **(i)**   Addendum A must be completed and signed by a Major League
> Club official;

> **(ii)**   Addendum B must be completed, or the word "NONE" must be
> entered; and

> **(iii)**   Addendum C must be completed and signed by a Major League
> Club official.

A Major League Club may comply with this Rule 4(e)(1) by placing the required
items in the mail, certified and return receipt requested (or its equivalent, such as
private overnight courier), within the 15-day period.  If a selecting Major League
Club provides the Commissioner with a receipt from the postal service (or private
courier) indicating delivery or attempted delivery, such receipt shall be conclusive
evidence that the Club has satisfied the contract tender requirements to the selected
player as set forth in this Rule 4(e)(1).

If a selecting Major League Club provides the Commissioner with a Player's
Acknowledgment of Receipt of Contract Tender signed by the selected player in
the form prescribed in Attachment 4(a), or with a Declaration of Club Official in
the form prescribed in Attachment 4(b), then such Acknowledgment or
Declaration shall be conclusive evidence that the Club has satisfied the contract
tender requirements to the selected player as set forth in this Rule 4(e)(1).

**(2)**   Notice of Defective Tender.  If a selecting Major League Club sends a
selected player a Minor League Uniform Player Contract that contains incorrect or
incomplete information, or otherwise does not conform with the requirements set
forth in Rule 4(e)(1)(C), the selected player may notify the Major League Club of
the specific omission, defect or defects by certified mail within 15 days of the
player's receipt of the contract or within 15 days of the player's receipt of a copy of
the Rules described in Rule 4(e)(1)(B), whichever is later.  Failure by the selected
player to provide timely notice of the specific omission, defect or defects shall
preclude the selected player from asserting that the Major League Club has failed
to comply with the requirements of Rule 4(e)(1)(C).  Any omission, defect or
defects by a selecting Major League Club in tendering a contract pursuant to Rule
4(e)(1)(C) shall be deemed waived by the selected player unless described with
specificity in a timely notice by the selected player to the Major League Club, as
set forth in this Rule 4(e)(2).

**MAJOR LEAGUE RULES**
**MLR 4(e) to 4(f)**

**(3)**     Correction of Defective Tender.  Within 15 days of receipt from a selected player of a notice of omission, defect or defects pursuant to Rule 4(e)(2), the Major League Club may correct such deficiency or deficiencies by providing the selected player, in person or by certified mail, with a contract, executed by a Major League Club official, that corrects the specific deficiency or deficiencies pointed out to the Major League Club in the selected player's timely notice pursuant to Rule 4(e)(2).  A Major League Club may comply with this Rule 4(e)(3) by placing a corrected contract in the mail, certified and return receipt requested (or its equivalent, such as private overnight courier) within the 15-day period.

**(4)**     Penalty for Failure to Tender or for Defective Tender.  If a Major League Club fails to

> **(A)**  provide in a timely manner to a selected player the items described in Rules 4(e)(1)(A) or 4(e)(1)(B);

> **(B)**  tender in a timely manner any Minor League contract to a selected player; or

> **(C)**  provide a corrected contract, pursuant to Rule 4(e)(3), after a selected player has notified the Major League Club, pursuant to Rule 4(e)(2), of a defective contract tender,

then the selected player may request that the Commissioner void the selecting Major League Club's Negotiation Right.  If the Commissioner determines that the selecting Major League Club did not comply with this Rule 4(e), then the Commissioner shall void the Negotiation Right and the player shall be free to sign with any Major League Club 15 days after the Commissioner notifies all Major League Clubs that the Negotiation Right has been voided.  Such player shall remain eligible for signing until the start of the next Closed Period, unless such player becomes ineligible to sign at an earlier date by operation of the applicable High School, College or Junior College Rule.

**(f)  CLOSED PERIOD.**  The period of time beginning at 12:01 a.m. Eastern Time of the seventh day prior to the date of a First-Year Player Draft and concluding with the beginning of such First-Year Player Draft shall be called the Closed Period.  The right to contract with a player selected at the preceding First-Year Player Draft, who is not subject to the signing deadline set forth in Rule 4(d)(3), or with a player eligible to sign who was not selected at the preceding First-Year Player Draft shall terminate at the beginning of the Closed Period.

**MAJOR LEAGUE RULES**
**MLR 4(g) to 4(h)**

**(g)  EFFECT ON PLAYER LIMITS.**

**(1)**    Major League.  A player who signs a Major League contract with a Major League Club following the player's selection at the First-Year Player Draft shall count immediately against the Major League Club's Reserve List limit and shall count against the Active List limit of the Major League Club or Minor League Club for which the player is directed to play in accordance with Rule 2 (Player Limits and Reserve Lists).

**(2)**    Minor League.  A player who signs a Minor League contract for the current season with a Major League Club following the player's selection at the First-Year Player Draft shall be excluded from the Minor League under control limits of the signing Major League Club until the date for filing of Reserve Lists.  The signed player, however, shall count against the active player limit of the Minor League Club for which player is directed to play when 15 days have elapsed from date of the contract or when the player has appeared in a championship season game, whichever occurs first.

A player who signs a Minor League contract for the succeeding season with a Major League Club following the player's selection at the First-Year Player Draft (see Rule 2(j)(1) (Players Signed for Future Services)) shall count against the Minor League under control limits of the signing Major League Club when 15 days have elapsed from the date of contract.  However, if the signing Major League Club places the player on one of its under control lists in the Class A, Short-Season A or Rookie classifications, the player may be carried as one of the 12 "extra" players that a Major League Club may place on under control lists in those classifications under Rule 2(b) (Maximum Number of Reserved Players) and Rule 2(j)(1) (Players Signed for Future Services).

**(h)  IF SELECTED PLAYER DOES NOT SIGN.**  A player who is selected at a First-Year Player Draft and who does not sign a Major or Minor League contract before being removed from the selecting Club's Negotiation List, see Rule 4(d) (Effect of Selection on Player), shall be subject to selection at the next First-Year Player Draft at which the player is eligible for selection.  The Commissioner shall send to all Major League Clubs at the earliest possible date a list of all such players who were selected at the First-Year Player Draft, who did not sign a Major or Minor League contract and who returned to school with potential eligibility to play college baseball.  The list shall indicate which players will be subject to selection at the next First-Year Player Draft. A selected player who does not sign may not be selected by the same Major League Club at any subsequent First-Year Player Draft unless the player has notified the Commissioner or the Commissioner's designee in writing that the player has no objection to such re-selection.

**MAJOR LEAGUE RULES**
**MLR 4(i) to 5(b)**

**(i)   IF PLAYER IS NOT SELECTED.**  A player who is eligible for selection and who is not selected may be signed by any Major League or Minor League Club after the conclusion of the First-Year Player Draft.  Such player shall remain eligible for signing until the start of the next Closed Period, unless such player becomes ineligible to sign at an earlier date by operation of the applicable High School, College or Junior College Rule.

**(j)   OTHER NEW PLAYERS.**  The provisions of Rule 3(c)(3) (Trial Period) and 3(c)(4) (Permissible Special Covenants) shall apply to the contracts of:

> **(1)**   players who are not subject to selection under Rule 4(a); and

> **(2)**   players who were subject to selection under Rule 4(a) at the First-Year Player Draft preceding the date of signing but who were not selected; and,

> **(3)**   players who were selected but for whom the selecting Major League Club's Negotiation Rights were voided pursuant to the first paragraph of Rule 4(e) (Negotiation Rights).

**(k)   INTERPRETATION.**  Official interpretations of this Rule 4 may be made from time to time by the Commissioner or the Commissioner's designee.

## Rule 5

### ANNUAL SELECTION OF PLAYERS

**(a)   MEETINGS.**  A selection meeting shall be held each year at such time and place as the Commissioner shall designate and shall be known as the Rule 5 Selection Meeting.  At the Rule 5 Selection Meeting, Major League Clubs may claim the contracts of players who are on Minor League Reserve Lists (filed pursuant to Rule 2) and who are subject to selection as set forth in this Rule 5.  If any Major League or Minor League Club shall fail to file Minor League Reserve Lists in accordance with Major League Rule 2, its players on Minor League Reserve Lists shall be subject to selection under this Rule 5 without any restrictions.  The Commissioner shall decide all procedural questions that may arise during the Rule 5 Selection Meeting.

**(b)   METHOD AND PRIORITY OF SELECTIONS.**  Selections under this Rule 5 shall be made in three separate phases:  the Major League phase, the Class AAA phase and the Class AA phase.  A player selected in one of the three phases must be placed on the Major League Club's Reserve List in the same classification of the phase in which

**MAJOR LEAGUE RULES**
**MLR 5(b)**

the player was selected. Within each phase, only players from a Reserve List of a lower classification Club are eligible for selection. Thus, a player selected from a Class AAA Reserve List must be placed on the Major League Reserve List of the selecting Major League Club. Similarly, a player selected from a Class AA Reserve List must be placed on either the Major League or Class AAA Reserve List of the selecting Major League Club, and a player selected from a Class A, Short-Season A or Rookie Reserve List must be placed on either the Major League, Class AAA, or Class AA Reserve List of the selecting Major League Club.

Within each phase, selections shall be made according to the following order and conditions:

**(1)** Major League Clubs shall select in reverse order of their winning percentages at the close of the preceding championship season, without regard to standings within any Division or League and without regard to post-season results. If two or more Clubs had an identical percentage of games won at the close of the preceding championship season, the selection order of those Clubs shall be determined by the percentage of games won in the next prior championship season, with any remaining ties resolved by continuing to examine the tied Clubs' respective championship season winning percentages in each preceding prior year, until the tie is broken.

**(2)** As called in the above order of priority in a phase, each Major League Club shall have a right to select one player subject to selection under this Rule 5. If a Club does not exercise its right of selection when called, or if its right of selection in that phase has ceased because its Reserve List(s) for the classification covered by the phase has reached the allowable limit under Rule 2, the next Club in order shall be called. When a round has been completed, the process of selection shall be repeated until all Major League Clubs have no further right of selection in that phase. A Club having announced its selection in proper order cannot later cancel the selection.

**(3)** In any year in which one or more new members have been admitted to a Major League for operations in the next championship season, each such new member may select player contracts under this Rule 5. The procedures and regulations governing such selections shall be as agreed upon by the Major League Clubs.

**(4)** Any Major League Club may authorize (in writing or by telegram) any employee, the Commissioner, or an employee of the Commissioner's Office to announce its selection or selections at the meeting. Such authorized selections shall be as binding and effective as if announced by a Major League Club official.

## MAJOR LEAGUE RULES
## MLR 5(c)

**(c) PLAYERS SUBJECT TO SELECTION.** All players on the Minor League Reserve Lists of Major League and Minor League Clubs, except players on the Voluntarily Retired, Disqualified or Ineligible Lists, shall be subject to selection by other Major League Clubs at the Rule 5 Selection Meeting in accordance with the following:

**(1)** A player without previous Major or Minor League service who signs with a Major League or independent Minor League Club shall be subject to selection based on the following:

**(A)** if 18 years of age or under on the June 5 immediately preceding the player's signing, the player shall be subject to selection at the fifth Rule 5 Selection Meeting that follows the signing date of the player's first Major or Minor League contract, unless Rule 5(c)(1)(C) applies;

**(B)** if 19 years of age or over on the June 5 immediately preceding the player's signing, the player shall be subject to selection at the fourth Selection Meeting that follows the signing date of the player's first Major or Minor League contract, unless Rule 5(c)(1)(C) applies;

**(C)** if the signing date of a player's first Major or Minor League contract is between

**(i)** the conclusion of the championship season for the Major or Minor League Club to which the player is assigned on such contract and

**(ii)** the next Rule 5 Selection Meeting,

then the player shall be deemed to have signed after the next Rule 5 Selection Meeting, for purposes of this Rule 5(c)(1).

**(2)** A player who is re-signed by a Club within one year from the date the Club released the player or voided the player's contract pursuant to the terms of such contract shall be subject to draft at the Rule 5 Selection Meeting following the date of the latest contract with that Club.

**(3)** A player who has been subject to draft at a Rule 5 Selection Meeting shall be subject to draft at any subsequent Rule 5 Selection Meeting if the player is on a Minor League Reserve List (filed pursuant to Rule 2 (Player Limits and Reserve Lists)) at the time of the Rule 5 Selection Meeting.

# MAJOR LEAGUE RULES
## MLR 5(c) to 5(d)

**(4)** A player

**(A)** whose contract has been assigned outright by a Major League Club to a Minor League Club,

**(B)** who has been signed as a free agent to a Minor League Uniform Player Contract for services in the following year and is otherwise subject to selection pursuant to Rule 5(c)(1) or Rule 5(c)(2), or

**(C)** who has been released unconditionally from a Minor League roster and is otherwise subject to selection pursuant to Rule 5(c)(1) or Rule 5(c)(2),

shall be subject to selection at any subsequent Rule 5 Selection Meeting if the player is on a Minor League Reserve List (filed pursuant to Rule 2 (Player Limits and Reserve Lists)) at the time of the Rule 5 Selection Meeting.

**(5)** A Major League or independent Minor League Club may designate any player on one of its Minor League Reserve Lists to be subject to selection who otherwise would not be selectable under this Rule 5.

**(d) CONSIDERATION, PAYMENT, AND RESPONSIBILITY.** The consideration for a selection under this Rule 5 shall be as follows:

**(1)** $50,000, if the selected player is placed on a Major League Reserve List;

**(2)** $12,000, if the selected player is placed on a Class AAA Reserve List;

**(3)** $ 4,000, if the selected player is placed on a Class AA Reserve List.

In addition to the compensation set forth in this paragraph, an independent Minor League Club shall be reimbursed by a selecting Major League Club for all compensation (including salary, bonuses and benefits) that it has paid to a selected player if the player is selected at the first selection meeting following the first year of the player's initial Minor League Uniform Player Contract.

Payment of the consideration due the selectee Club shall be made in the same manner as provided in Rule 12 (Transfer Agreements) regarding other assignments of player contracts.

**MAJOR LEAGUE RULES**
**MLR 5(d) to 6(b)**

The selector Major League Club must assume all responsibility for the player's physical condition and for the player's reporting.

**(e) PLAYER-MANAGERS.** A Player-Manager shall be subject to selection if the player would otherwise be selectable under Rule 5(c) (Players Subject to Selection). However, a player-manager shall be subject to selection as a player only and the player-manager selected may reject such selection by giving written or telegraphic notification of such rejection to the Commissioner within 30 days from the date that the player-manager receives notification of such selection from the Commissioner. A player-manager contract that has been executed within 30 days before the close of the season shall not be changed to a player contract during the season following execution of such player-manager contract unless the Commissioner approves such a change in writing.

**(f) COVERING UP.** No agreement shall be made for the purpose or with the effect of covering up a player from selection. If the Commissioner shall be of opinion that any such agreement has been made, the Commissioner may impose a fine upon each party to such an agreement.

**Rule 6**

**SELECTED PLAYERS**

**(a) RESTRICTIONS**. From the date of selection to the close of the subsequent Major League championship season, no player selected in the Major League phase of the Rule 5 Selection Meeting shall be released or directed to perform for or otherwise transferred to any Minor League Club until:

**(1)** the player has received a 15-day trial period during spring training;

**(2)** Outright Assignment waivers have first been granted on the player's contract in accordance with Rule 10 (Major League Waivers) (see, e.g., Rule 10(e)(5) (Restrictions on Waiver Requests)); and

**(3)** outright assignment of the player has then been offered to and rejected by the Major or Minor League Club from which the player's contract was selected.

**(b) OFFER OF OUTRIGHT ASSIGNMENT—PROCEDURES.** An offer of outright assignment to the Major or Minor League Club from which a player's contract was selected shall be made through the Commissioner and the consideration shall be 50 percent of the price paid for the selection. Upon receiving notice of the selecting Major League Club's intention to make such an offer, the Commissioner or the

## MAJOR LEAGUE RULES
### MLR 6(b) to 6(d)

Commissioner's designee shall communicate by telegraph or other electronic means to the Major or Minor League Club from which the player was selected that it has

**(1)**  72 hours from the time of dispatch of the telegram or other electronic message to accept or reject assignment of the contract, unless Rule 6(b)(2) applies. Sundays and national holidays shall not be counted in computing said 72 hours; or

**(2)**  24 hours after the Club from which the player was selected is notified by the Commissioner or the Commissioner's designee of the selected player's decision whether to accept the proposed return assignment, if the player was selected to a Major League Reserve List and has the right to elect free agency after an outright assignment.

Failure to accept the offer within such period shall constitute a rejection.  Should such an offer be rejected, all obligations of the selecting Major League Club to the Major or Minor League Club from which the player was selected shall be fulfilled.

If the player was selected to a Major League Reserve List and if such player has the right to elect free agency after an outright assignment, the selecting Club shall provide the player any written notice of the contemplated outright assignment to the player's former Minor League Club that the collective bargaining agreement with the players' union may require and shall provide a copy of such notice to the Club from which the player's contract was selected.  If the selecting Club fails to provide the selected player with such written notice, and the selected player elects free agency in lieu of the return outright assignment, then the selecting Club may be subject to a fine by the Commissioner or the Commissioner's designee, which the Commissioner or the Commissioner's designee may order to be paid, in whole or in part, to the Club from which the player's contract was selected.  The selecting Club shall communicate immediately to the Commissioner or the Commissioner's designee the player's decision whether to accept the return outright assignment, and the Commissioner or the Commissioner's designee shall communicate such decision promptly to the Club from which the player's contract was selected.

**(c)  ACTIVE LIST RESTRICTIONS.**  If the selected player is not carried on the Active List of the selecting Major League Club for 90 days of the season following the selection, the restrictions in Rule 6(a) shall continue to apply until the player has been on the Active List for an aggregate of 90 days during a championship season or seasons.

**(d)  SALARY ON RETURN.**  If a selected player was under a Minor League Uniform Player's Contract for the entire championship season before the player's selection, a Major League Club that returns such a player through tender of an

## MAJOR LEAGUE RULES
### MLR 6(d) to 7

outright assignment to the Major or Minor League Club from which the player was selected shall be liable for any salary set forth in its Major League Uniform Player's Contract with the player in excess of the salary amount in the player's Minor League Uniform Player Contract for the season before selection.

If a selected player was under a Major League Uniform Player's Contract for all or part of the season preceding the player's selection, a Major League Club that returns such a player to the Major or Minor League Club from which the player was selected shall be liable for any salary set forth in its Major League Uniform Player's Contract with the player in excess of the total salary the player received (under both a Major League Uniform Player's Contract and a Minor League Uniform Player Contract) for the previous championship season.

**(e) DRAFT-EXCLUDED PLAYERS.** A player who is excluded from selection in a Rule 5 Selection Meeting because the player was promoted to a Major League Reserve List after August 15 of the championship season preceding the selection meeting and remains on a Major League Reserve List through the conclusion of such selection meeting shall be referred to as a "draft-excluded player." A draft-excluded player shall not be directed to perform for, assigned to, or otherwise transferred to a Minor League Club unless the player first receives a trial with the player's Major League Club lasting until 20 days before the opening day of the following Major League season. See Rule 10(e)(6) (Restrictions on Waiver Requests) for rules concerning when waivers may be requested on a player who would become a draft-excluded player and Rule 10(d)(5)(B) (Consideration for Assignment of Player; Selected or Draft-Excluded Player) for rules concerning the waiver claim price for a draft-excluded player.

### Rule 7

### TERMINATION OF PLAYER-CLUB RELATION

The relation between a Club and a player created by contract may be terminated before the expiration of the specified term either by the Club (by release or assignment or, in the case of a Minor League Uniform Player Contract, by other termination) or by the player as provided in the contract.

MAJOR LEAGUE RULES
MLR 8(a) to 8(e)

### Rule 8

### MAJOR LEAGUE UNCONDITIONAL RELEASE

**(a)  WAIVER REQUIREMENTS.**  No Major League Club may unconditionally release a player unless it has tendered and received a waiver of the contract from all other Major League Clubs.

**(b)  PROCEDURES FOR OBTAINING WAIVERS.**  The procedures for obtaining unconditional release waivers are as follows:

**(1)**    A waiver request may be made at any time during the year, and must state that it is for the purpose of unconditional release.

**(2)**    Waiver requests will be processed in accordance with the procedures in Rule 10 (Major League Waivers) and may not be withdrawn after being registered with the Commissioner or the Commissioner's designee.

**(3)**    Waiver claims must be entered in accordance with Rule 10(d) (Waiver Claims and Awarding of Contracts).

**(c)  RESTRICTIONS ON UNCONDITIONAL RELEASE WAIVER REQUESTS.**

**(1)**    No Major League Club may release a player on the Military or Ineligible Lists unless the player is first reinstated from such list to the Active List.

**(2)**    No Major League Club may release a player on the Voluntarily Retired List without first having obtained the approval of the Commissioner.

**(d)  EFFECT ON PLAYER LIMITS.**  On the day of the waiver request, the player shall be advised in writing that the Major League Club has requested waivers for the purpose of unconditional release and the date on which the waiver request will expire. The player shall be removed from all player limits at the time that the waiver request is transmitted to the Commissioner or the Commissioner's designee.

**(e)  WAIVER CLAIMS AND CONSIDERATION.**  Any other Major League Club may claim the contract at a waiver price of $1 and the priority of claim shall be determined in accordance with Rule 10(d)(4) (Waiver Claims and Awarding of Contracts).

MAJOR LEAGUE RULES
MLR 8(f) to 8(h)

**(f)   NOTICE TO PLAYER OF WAIVER CLAIMS, AND RIGHT OF PLAYER TO TERMINATE CONTRACT.**  At the expiration of the waiver period, the player may make a collect call to the Major League Club to determine whether the player's contract has been claimed.

If the player's contract is claimed, the Major League Club shall promptly and before any assignment notify the player that the contract has been claimed.

Within five days after receipt of notice from a Major League Club that a player's contract has been claimed, the player shall be entitled by written notice to the Major League Club to terminate the player's contract on the date of the player's notice of termination.  If the player fails to notify the Major League Club, the player's contract shall be assigned to the claiming Major League Club entitled to the assignment under Rule 10(d)(4) (Waiver Claims and Awarding of Contracts).

**(g)   NOTICE OF TERMINATION IF NO CLAIMS.**  If the player's contract is not claimed, the player is a free agent, and the Major League Club shall give the player notice of termination.

**(1)**   Telephone notice shall be effective immediately upon communication with the player.

**(2)**   Written notice, if handed to the player personally, shall be effective immediately upon delivery to the player.

**(3)**   Telegraphic notice shall be effective on the date it is filed with Western Union if filed by 6:00 p.m. local time, or the next day if filed after 6:00 p.m.

**(4)**   Written notice, if mailed to the player, shall be effective three days from the date of mailing to the last address that the player has supplied to the Major League Club.

Other procedures for unconditional release may be agreed upon from time to time and set out in the current Basic Agreement between the Major League Clubs and the Players Association.

**(h)   SALARY OBLIGATIONS.**  If a contract is terminated by the player, as provided in Rule 8(f) (Notice to Player of Waiver Claims, and Right of Player to Terminate Contract), the player shall be entitled to compensation through the date of the player's notice of termination and not thereafter.

## MAJOR LEAGUE RULES
### MLR 8(h) to 9(a)

If the player's contract is not claimed, upon effective termination of the contract according to Rule 8(g) (Notice of Termination If No Claims), the player shall be entitled to termination pay in accordance with the terms of the contract.

If the player's contract is claimed and not terminated by the player, the Major League Club shall give notice to the player of the assignment of the player's contract. The assignee Major League Club shall be liable to the player for payments accruing after the date of such notice of assignment.

**(i)   RE-SIGNING OF RELEASED PLAYERS.**  A player may be re-signed by the releasing Major League Club, except that:

**(1)**   A player released during the playing season shall not again be placed on the active player limits of the Major League Club during the 30-day period that starts on the date of the waiver request, unless the Major League Club has had less than the full complement of active players at all times during those 30 days; and,

**(2)**   Any player who has been unconditionally released between midnight, August 31 of any championship season and the opening day of the following championship season, may not be re-signed to a Major League Uniform Player's Contract by the releasing Major League Club until May 15 of that following championship season.


### Rule 9

### ASSIGNMENT OF PLAYER CONTRACTS

**(a)   NOTICE.**  A Club may assign to another Club an existing contract with a player. The player, upon receipt of written notice of such assignment, is by the player's contract bound to serve the assignee Club.

The date of assignment shall be deemed to be the date upon which notice of assignment is delivered to the player.

After the date of such assignment, all rights and obligations of the assignor Club thereunder shall become the rights and obligations of the assignee Club, except as otherwise provided in Rule 3 (Eligibility to Sign Contract, Contract Terms, and Contract Tenders), and the assignee Club shall be liable to the player for payments accruing from the date of assignment and shall not be liable (but the assignor Club shall remain liable) for payments accrued prior to and including that date.

## MAJOR LEAGUE RULES
### MLR 9(a)

In the event that a player physically reports to the assignee Club on the same date as the player's assignment, the assignee Club shall be responsible for salary starting with that date and the assignor Club shall not be required to pay salary for that day. EXCEPTION:  In the event the player plays or is available to play for the assignor Club on the day of assignment, the assignor shall pay the player's salary for that day.

If at any time the assignee is a Major League Club, it shall be liable to pay the player at the full rate stipulated in the player's contract for the remainder of the term thereof and all prior assignors and assignees shall be relieved of liability for any payment during the remainder of the player's contract, except as otherwise provided in Rule 3 (Eligibility to Sign Contract, Contract Terms, and Contract Tenders).

Unless the assignor and assignee Clubs agree otherwise, if the assignee Club is a Minor League Club, the assignee Club shall be liable only to pay the player at the rate usually paid by said assignee Club to its players of similar skill and ability in its classification and the assignor Club shall be liable to pay the player for the remainder of the player's contract the difference between the amount payable to the player under the player's contract and the amount paid to the player by the assignee Club.

If a player's contract is assigned by a Major League Club to another Major League Club during the championship season, the assignee Club shall pay the player, for all moving and other expenses resulting from such assignment, the sum of $850 if the distance between the home ballparks of the assignor and assignee Clubs is 1,000 air miles or less; the sum of $1,150 if the distance between the home ballparks of the assignor and assignee Clubs is greater than 1,000 but less than 2,000 air miles; and the sum of $1,450 if the distance between the home ballparks of the assignor and assignee Clubs is equal to, or greater than 2,000 air miles.

This allowance will be paid to the player automatically at the time of the assignment.

This advance payment will be credited against the reimbursement for reasonable and actual moving expenses should the player elect to claim such expenses in accordance with the provisions of this Rule 9.

If a player is assigned to another Major League Club located within 50 miles of the assignor Club's home city, the player shall not receive any moving allowance under this Rule 9, subject to the following exception.  If a player is assigned to another Major League Club and moves from a residence located further than 25 miles from the assignee Club's home ballpark to a residence located closer to, and within 50 miles of, such ballpark, the player shall receive the moving allowance in accordance with this Rule 9.

**MAJOR LEAGUE RULES**
**MLR 9(a)**

A player may elect, within two years after the date of the assignment of the player's contract, regardless of when the player's contract is assigned or whether the assignment is between Major League Clubs or a Major League Club and a Minor League Club, to be reimbursed for

**(1)**  the reasonable and actual moving expenses of the player and the player's immediate family resulting therefrom, including first-class jet air transportation for the player and the player's immediate family, provided that, if the player relocates more than one year from the date of the assignment, the player must relocate in the assignee Club's home city and the player must still be playing for the assignee Club at the time the player incurs such expenses, and

**(2)**  all rental payments for living quarters in the city from which the player is transferred (and/or spring training location, if applicable), for which the player is legally obligated after the date of assignment and for which the player is not otherwise reimbursed.  Such rental payments shall not include any period beyond the end of a season or prior to the start of spring training.  The Club paying reimbursement for rent shall have use of and/or the right to rent such living quarters for the period covered by the rental reimbursement.

In the event a player is required to report to a Major League Club from a Minor League Club in any year on or after September 1, the foregoing subparagraph shall not apply.

Reimbursement shall be made by the assignee Club, except, should a player's contract be assigned from a Major League Club to a Minor League Club, reimbursement shall be made by the assignor Major League Club.

If a player's contract is assigned by a Major League Club to another Major League Club during the championship season or after the 16th day prior to the start of the championship season, the assignee Club shall pay to the player an in-season supplemental moving allowance for the player's first seven days in the assignee Club's home city, up to a maximum of $500.  This in-season supplemental allowance will reimburse the player, based upon valid expense vouchers or receipts, for the following expenses:  car rental and/or local transportation, motel/hotel lodging and meals.

In the event such player is unconditionally released by the Minor League Club to which the player's contract has been assigned and the player would have been entitled to severance pay had the player been so released under the player's contract with the assignor (Major League Club), then the assignor is liable to pay the player an additional amount equal to the termination pay provided for in the player's Major League contract

**MAJOR LEAGUE RULES**
**MLR 9(a) to 9(d)**

and the reasonable travelling expenses of the player, including first-class jet air fare and meals en route, to the player's home city.

Written notice of assignment of a player's contract shall be given to a player. Such notice shall not be given until the Club has been formally advised by the Commissioner or the Commissioner's designee that waivers have been granted by all Clubs entitled to claim the player as set forth in these Rules, and if notice is given prior to the granting of all waivers, the notice shall be void and the Commissioner shall collect a fine from the Club giving such void notice.

**(b)   TIME LIMIT**.  No Minor League Club shall assign a player contract to any other professional baseball club during the period commencing at 11:59 p.m. Eastern Time, October 19 and ending at 12:01 a.m. Eastern Time of the second day of the annual meeting of its Minor League Association.  If October 19 or 20 falls on a Sunday, the restricted period shall commence at 12:01 a.m. Eastern Time, October 21. EXCEPTION:  In any year where the World Series is scheduled to end on or after October 12, or where inclement weather delays the playing of the final game to or beyond October 12, the Commissioner may designate later final dates than those set forth in this Rule 9(b) for the filing of Reserve Lists.

No contract of a Major League player shall be assigned to a Club of lower classification during the period from 5:00 p.m. Eastern Time of the third day prior to the start of the Rule 5 Selection Meeting until the Rule 5 Selection Meeting has been concluded.

**(c)   ASSIGNEE CLUB'S RESPONSIBILITY FOR BONUS PROVISIONS IN PLAYER'S CONTRACT**.  If a Major League player's contract is assigned to another Major League Club and there are unearned bonuses in the player's Major League Uniform Player's Contract at the time of the assignment, the standard-form Major League Uniform Player's Contract sets forth the allocation of responsibility between the assignor and assignee Clubs for payment of such bonuses, when such bonuses are earned.  The assignor and assignee Clubs may include cash consideration in a transfer agreement that is contingent upon whether such bonuses become earned.  See MLR 12(e)(1)(B) (Consideration Must Be in Definite Terms).

**(d)   VETERAN PLAYERS**.  The contract of a player with five or more years of Major League service, not including service while on the Military List (or seven or more years of Major League service, including service while on the Military List) shall not, without the player's written consent, be assigned other than to another Major League Club.  In ascertaining such service, part-season shall be computed at the rate of 172 days to a full season.  Service preceding or succeeding a championship season shall not be included.

**MAJOR LEAGUE RULES**
**MLR 9(e) to 9A(a)**

**(e) CONSENT TO ASSIGNMENT**.  The contract of a player with 10 or more years of Major League service, the last five of which have been with one Club, shall not be assignable to another Major League Club without the player's written consent.

**(f) INJURY REHABILITATION**.

**(1)** Major League.  With the written consent of the player and the prior approval of the Commissioner or the Commissioner's designee, the contract of a Major League player on a Disabled List may be assigned to a Minor League Club for the purpose of injury rehabilitation for a maximum period of 20 days in the case of non-pitchers and 30 days in the case of pitchers.  A player so assigned shall continue to receive the player's Major League salary.  The rights and benefits of such player that do and do not follow the player to the Minor League Club shall be in accordance with past practices.  Any such service with a Minor League Club shall be deemed to be Major League service.  An assignment made under the provisions of this Rule 9(f) shall not be counted as an optional assignment under Rule 11 (Optional Agreements).  Waivers, pursuant to Rule 10, shall not be required for assignments made under this Rule 9(f).

**(2)** Minor League.  The contract of a Minor League player on a Disabled List in a higher classification may be assigned to a Club in the Short-Season A, Rookie or Rookie-Advanced classification, for the purpose of rehabilitation of an injury; provided, however, there shall not be more than three such players on a Short-Season A, Rookie or Rookie-Advanced Club at any one time and a player on a Disabled List of a Rookie-Advanced Club may not be assigned for the purpose of injury rehabilitation.  Rehabilitation assignments, per disability, shall not exceed 20 days in the case of non-pitchers or 30 days in the case of pitchers.  Effect on Limits:  The player shall continue to be counted towards the Reserve List limit of the assignor Club and will continue to receive salary and benefits as such.  The player shall not count against the player limits of the assignee Club.

**Rule 9A**

**TEMPORARY ASSIGNMENTS**

**(a) PURPOSE: TERMINATION**.  To enable Active List players who are in reserve units of branches of the Armed Forces to meet their drill requirements with such units without undue hardship to the Clubs on whose rosters the players appear, the Temporary Assignments created under this Rule 9A shall be permissible until the end

## MAJOR LEAGUE RULES
### MLR 9A(a) to 9A(e)

of the current emergency, as determined by the Commissioner, or until repeal of this Rule 9A.

**(b) DEFINITION**. A "Temporary Assignment" shall be the assignment of the contract of an Active List player by a Minor League Club to a Club of higher classification, including a Major League Club, for the number of days specified in an agreement, following which the contract shall automatically revert to the assignor Club, the player to assume, upon such return, the same status as applied to the player prior to the Temporary Assignment.

**(c) FILING: NOTICE TO PLAYER**. Agreements covering each Temporary Assignment shall be processed in the usual manner, each agreement to include the name of the player whose contract is the subject of the Temporary Assignment, the name of the player that the player is replacing due to reserve drill requirements and the date upon which the contract of the assigned player is to be returned to the original assignor, such date to correspond with the date the drill requirement has been fulfilled plus necessary travel time. Agreements need not be filed to cover return of the contract, but the returning Club shall give the appropriate executive office and the Commissioner of the Commissioner's designee written or telegraphic notification of the return.

The assignor Club shall give the player written or telegraphic notification of the assignment, such notification to state, "Your contract has this date been assigned to the (assignee) Club on a temporary basis, and will revert to this Club on (date) or on such other date as you may be notified."

**(d) WHEN PERMISSIBLE**. Temporary Assignments may be in effect during the following period:

To Major League Clubs—from the opening day of the championship season until August 31, both inclusive.

**(e) LIMITATIONS.**

**(1)** On Major League Clubs. There shall be no limit upon the number of players who may be on Temporary Assignment to any one Major League Club but such assignments may be in effect only on such days as more than one Active List players are unavailable to the particular Club due to temporary service with a reserve unit. One such Temporary Assignment shall be allowed for each player in excess of one who is unavailable to a Club due to temporary service with a reserve unit.

## MAJOR LEAGUE RULES
### MLR 9A(e) to 10(a)

**(2)**   On Minor League Clubs.   No Temporary Assignments may be made between Minor League Clubs.

**(f)   PROHIBITIONS DISREGARDED**.   Any and all provisions of the Major League Rules, the Minor League Association governing document or the rules of any League that would prohibit or qualify assignment of the particular player's contract on an outright or optional basis, such as the active player limit rule, the reacquisition rule, the waiver rule, the rule requiring retention of a recalled optional player for 10 days, shall be disregarded in connection with Temporary Assignments.

**(g)   GENERAL PROVISIONS**.

**(1)**   Notice of Departure.   Each Club shall report to the appropriate executive office and to the Commissioner or the Commissioner's designee the name of each player who, during the period described in Rule 9A(d), must be absent in order to perform temporary training services with a reserve unit, such notice to include the date the player is to depart, the days the player is scheduled to be with the reserve unit, the name and address of the unit and the date the player is scheduled to return to the Club.

**(2)**   Consideration.   The consideration to be paid for a Temporary Assignment shall be $100 if the assignment is made by a Club that is not affiliated with the assignee.

**(3)**   Player Limits.   A player who is absent from a Club due to drill requirements with a reserve unit shall continue to count against the player limit of the player's Club, but any player obtained to replace the player through a Temporary Assignment shall count only against the Active List of the assignor Club.

### Rule 10

### MAJOR LEAGUE WAIVERS

**(a)   DEFINITIONS**.

**(1)**   Generally.   A waiver is a permission granted for certain assignments of player contracts or for the unconditional release of a Major League player (see Rule 8).   There are four types of waivers: Trade assignment waivers, Outright assignment waivers, Optional assignment waivers and Unconditional Release waivers.

# MAJOR LEAGUE RULES
## MLR 10(a)

**(2)**    Trade Assignment Waivers.  Trade assignment waivers must be sought and obtained in order for a Major League Club to assign a Major League player to another Major League Club, during the period set forth in Rule 10(b)(1).  A Trade assignment waiver request may be revocable or irrevocable, as set forth in Rule 10(e)(4) (Restrictions on Waiver Requests).  Once obtained during a waiver period set forth in Rule 10(c)(4) (Grant of Waivers and Effective Periods), Trade assignment waivers are effective for that entire waiver period, unless the player is on an optional assignment.  See Rule 10(c)(4)(d) (Grant of Waivers and Effective Periods).

**(3)**    Outright Assignment Waivers.  Outright assignment waivers must be sought and obtained in order for a Major League Club to assign a Major League player outright (i.e., without right of recall) to a Minor League Club during the period set forth in Rule 10(b)(2).    An Outright assignment waiver request is always irrevocable.  See Rule 10(e)(4)(B) (Restrictions on Waiver Requests).  Once obtained during a waiver period set forth in Rule 10(c)(4) (Grant of Waivers and Effective Periods), outright assignment waivers are effective either for that entire waiver period or for seven days (depending upon the time the waivers are obtained), unless the player is on an optional assignment.  See Rule 10(c)(4)(d) (Grant of Waivers and Effective Periods).

**(4)**    Optional Assignment Waivers.  Optional assignment waivers must be sought and obtained in order for a Major League Club to assign a Major League player optionally (i.e., with right of recall) to a Minor League Club, if required by Rule 10(b)(3).    An Optional assignment waiver request may be revocable or irrevocable, as set forth in Rule 10(e)(4) (Restrictions on Waiver Requests).  Once obtained during a waiver period set forth in Rule 10(c)(4) (Grant of Waivers and Effective Periods), Optional assignment waivers are effective for that entire waiver period.

**(5)**    Unconditional Release Waivers.  Unconditional Release waivers must be sought and obtained in order for a Major League Club to unconditionally release a Major League player at any time.  See Rule 8 (Major League Unconditional Release).    Unconditional Release waivers are always irrevocable.    Once Unconditional Release waivers are obtained, the player is released in accordance with Rule 8(g) (Notice of Termination If No Claims).

**(6)**    Assignment Waivers.  Trade assignment waivers, Outright assignment waivers and Optional assignment waivers may be referred to, collectively, as Assignment waivers.

MAJOR LEAGUE RULES
MLR 10(a) to 10(b)

With regard to Assignment waivers, such permission is granted for a specific period, noted in Rule 10(c)(4) (Grant of Waivers and Effective Periods), and only after each Major League Club has been given the opportunity to accept the assignment of that player contract, and none has filed a claim requesting assignment of that contract. Waivers may be requested and obtained in regard to a player who is on an optional assignment, without the requesting Club having to recall such player. Any waiver request in regard to a player on an optional assignment shall include a notation that the player is on an optional assignment.

**(b)  WHEN WAIVERS ARE REQUIRED FOR ASSIGNMENT**.

**(1)**  Trade assignment waivers. Trade assignment waivers are required for any assignment of a player from a Major League Club to another Major League Club during the period commencing 4:00 p.m. Eastern Time on July 31 and ending at the close of the championship season. Trade assignment waivers may not be obtained between the close of a championship season and 4:00 p.m. Eastern Time on the following July 31.

**(2)**  Outright assignment waivers. Outright assignment waivers are required for any outright assignment of a player from a Major League Club to a Minor League Reserve List.

**(3)**  Optional assignment waivers. Optional assignment waivers are required for an optional assignment from a Major League Club to a Minor League Club only if the date of assignment is three or more years after the date the player first reported to a Major League Club during a championship season. One year shall be deducted from the above three-year period for each season in which the player may have been charged with an option prior to the championship season in which the player first reports to a Major League Club. Notwithstanding any other provision of this Rule 10(b)(3), Optional assignment waivers shall not be required in the following circumstances:

**(A)** The Major League Club is seeking to assign the player to a Minor League Club on a fourth optional assignment. See Rule 11(c) (Limitations on Optional Assignments) for players subject to a fourth option.

**(B)** The assignor Club is making an assignment with the right of recall, the assignment is being made within 24 hours of having acquired the player in a trade from another Major League Club, the player had been on an optional assignment at the time the player was recalled by the other Major League Club for the purpose of such acquisition and the acquiring Club does not

**MAJOR LEAGUE RULES**
**MLR 10(b) to 10(c)**

place the acquired player on its Major League Active List during such 24-hour period.

**(c)  THE PROCEDURES FOR OBTAINING WAIVERS.**   The procedures for obtaining waivers are as follows:

**(1)**   Request.   A Club desiring a waiver notifies the Commissioner or the Commissioner's designee, in writing or by approved electronic means, by 2:00 p.m. Eastern Time during any permissible day, as set forth in Rules 10(c)(1)(A) and 10(c)(1)(B), designating in its notice which of the four types of waivers (Trade, Outright, Optional or Unconditional Release) it is requesting.   No Club may give notice of its request by telephone.   Once registered with the Commissioner or the Commissioner's designee, no waiver request may be canceled except in accordance with Rule 10(d)(3) (Withdrawal of Request).   See Rule 10(e) for certain restrictions on waiver requests.

**(A)**  All Times Other Than a Certain Period in Spring Training.   Except as provided for in Rule 10(c)(1)(B), a permissible day, within the meaning of Rule 10(c)(1), shall be any Monday to Friday.   Notices received after 2:00 p.m. on Friday shall be considered as received on Monday morning.   Waiver requests shall not be accepted on Saturdays, Sundays or holidays as published by notice from the Commissioner's Office.   Such requests shall be deemed received the morning of the following business day.

**(B)** During a Certain Period in Spring Training.   During the period beginning with the earliest date that a Major League Club is permitted to invite a Major League player to spring training pursuant to the Basic Agreement with the Major League Baseball Players Association and ending with the fourth day prior to the first day of the championship season for any Major League Club, inclusive, any day, including Saturdays, Sundays and holidays, shall be a permissible day, within the meaning of Rule 10(c)(1).

**(2)**   Notification to Clubs.   The Commissioner or the Commissioner's designee shall notify all other Major League Clubs of the request for waivers, noting which of the four types of waivers (Trade, Outright, Optional or Unconditional Release) are being requested.

**(3)**   Claiming Period.   The period in which a Club may claim a player on whom waivers have been sought is as follows:

**MAJOR LEAGUE RULES**
**MLR 10(c)**

**(A)** All Times Other Than a Certain Period in Spring Training. Except as provided for in Rule 10(c)(3)(B), the period in which a Club may claim a player on whom waivers have been sought is as follows:

| Waivers Requested by 2:00 p.m. Eastern Time on: | Waiver Claim Must Be Entered by 1:00 p.m. Eastern Time on: |
| --- | --- |
| Monday | Wednesday |
| Tuesday | Thursday |
| Wednesday | Friday |
| Thursday | Monday |
| Friday | Tuesday |

**(B)** During a Certain Period in Spring Training. When waivers are requested during the period set forth in Rule 10(c)(1)(B) (The Procedures for Obtaining Waivers; Request; During a Certain Period in Spring Training), the period in which a Club may claim a player on whom waivers have been sought is as follows:

| Waivers Requested by 2:00 p.m. Eastern Time on: | Waiver Claim Must Be Entered by 1:00 p.m. Eastern Time on: |
| --- | --- |
| Monday | Wednesday |
| Tuesday | Thursday |
| Wednesday | Friday |
| Thursday | Saturday |
| Friday | Sunday |
| Saturday | Monday |
| Sunday | Tuesday |

The Commissioner's Office may publish a notice of holidays for which the waiver claiming period may be extended, if the last date on which a waiver claim may be entered would otherwise fall on such a holiday.

**(4)** Grant of Waivers and Effective Periods. In the event no claims are made before the deadline, waivers of the type requested are obtained, and the Commissioner or the Commissioner's designee shall so notify the requesting Club. Such waivers shall be in effect as follows:

**(A)** Trade waivers obtained on and after August 1 shall be in effect until the conclusion of the championship season.

## MAJOR LEAGUE RULES
### MLR 10(c)

**(B)**   Optional waivers obtained on and after

**(i)**   February 16 shall be in effect until the 30th day (as determined by the first scheduled championship season game) of the following championship season.  Such waivers shall expire at 5:00 p.m. Eastern Time on such 30th day;

**(ii)**   the 31st day of the championship season shall be in effect until July 31, inclusive.  Such waivers shall expire at 5:00 p.m. Eastern Time on July 31; and

**(iii)**  August 1 shall be in effect until October 1.  Such waivers shall expire at 5:00 p.m. Eastern Time on October 1.  No player may be assigned on an optional assignment during the closed period set forth in Rule 11(e) (Closed Period).

**(C)**   Outright assignment waivers obtained on and after

**(i)**   November 11 shall be in effect until 1:00 p.m. Eastern Time on the seventh day after the date they were obtained, or until 5:00 p.m. Eastern Time on February 15, whichever comes first;

**(ii)**   February 16 shall be in effect until 1:00 p.m. Eastern Time on the seventh day after the date they were obtained, or until 5:00 p.m. Eastern Time on the 30th day (as determined by the first scheduled championship season game) of the following championship season, whichever comes first;

**(iii)**  the 31st day of the championship season shall be in effect until July 31, inclusive.  Such waivers shall expire at 5:00 p.m. Eastern Time on July 31;

**(iv)**  August 1 shall be in effect until midnight, Eastern Time on August 31, inclusive.  Such waivers shall expire at midnight Eastern Time on August 31; and

**(v)**   September 1 shall be in effect until 1:00 p.m. Eastern Time on the seventh day after the date they were obtained, or until 5:00 p.m. Eastern Time on November 10, whichever comes first.

**MAJOR LEAGUE RULES**
**MLR 10(c)**

**(D)** Notwithstanding the provisions of Rules 10(c)(4)(A) through 10(c)(4)(C), waivers obtained while a player is on an optional assignment shall be in effect only until 72 hours after the expiration of the waiver claiming period.

The expiration date of Assignment waivers shall be stated in the waiver notice.

The following table summarizes the expiration of different types of assignment waivers that are obtained, organized by the time period in which they were obtained (all times are Eastern Time):

**Duration of Assignment Waivers Obtained**

| Time period: | Trade | Optional | Outright |
|---|---|---|---|
| 11/11 through 2/15 | Not applicable | Not applicable* | 1 p.m. on 7th day, or 5 p.m. on 2/15** |
| 2/16 through 30th day of season | Not applicable | 5 p.m., 30th day of season | 1 p.m. on 7th day, or 5 p.m. on 30th day of season** |
| 31st day of season through July 31 | Not applicable | 5 p.m., 7/31 | 5 p.m., 7/31 |
| 8/1 through 8/31 | End of season | 5 p.m., 10/1*** | Midnight, 8/31 |
| 9/1 through end of season | End of season | 5 p.m., 10/1*** | 1 p.m. on 7th day, or 5 p.m. on 11/10** |
| Day following end of season through 11/10 | Not applicable | Not applicable* | 1 p.m. on 7th day, or 5 p.m. on 11/10** |

*See Rule 11(e) (Closed Period), which provides that no player may be transferred on an optional assignment during the off-season.
**Whichever comes first.
*** See Rule 11(a) (Definition), which provides that the recall of a player on an Optional assignment must occur on or before October 1.

**MAJOR LEAGUE RULES**
**MLR 10(c) to 10(d)**

Notwithstanding the table above, waivers obtained while a player is on an optional assignment shall be in effect only until 72 hours after the expiration of the waiver claiming period.  <u>See</u> Rule 10(c)(4)(D) (Grant of Waivers and Effective Periods).

**(d)  WAIVER CLAIMS AND AWARDING OF CONTRACTS**.

    **(1)**  Notice of Claim by Club.  A Club desiring assignment of a player contract on which waivers have been requested shall notify the Commissioner or the Commissioner's designee, in writing or by approved electronic means, of its claim before the claiming deadline published in the waiver bulletin in which the player's name appeared.  No Club may give notice of its claim by telephone.  Once a claim is registered with the Commissioner or the Commissioner's designee, it may not be canceled.

    **(2)**  Notice to Requesting Club.  At the conclusion of the claiming period, the Commissioner or the Commissioner's designee shall notify the requesting Club of any claims.

    **(3)**  Withdrawal of Request.  In the event of one or more claims, unless otherwise prohibited by these Rules, the Commissioner or the Commissioner's designee shall enter a withdrawal automatically, on behalf of the requesting Club, at the conclusion of the withdrawal period, unless the requesting Club has notified the Commissioner or the Commissioner's designee, in writing or by approved electronic means, before the expiration of the withdrawal period that the requesting Club does not wish the request to be withdrawn.  (See schedule below.) In the case of a withdrawal, the claim is null and void.  If a Club has notified the Commissioner or the Commissioner's designee pursuant to this Rule 10(d)(3) that it does not wish the request to be withdrawn, the Club may not rescind such notice and the contract shall be assigned pursuant to Rule 10(d)(4) for the consideration described in Rule 10(d)(5) (Consideration).  No Club may give notice by telephone that it does not wish the request to be withdrawn.  Requests for waivers on a player may not be withdrawn more than once on behalf of the same Club during any one waiver period (see Rule 10(c)(4) (Grant of Waivers and Effective Periods)).  The period after which the Commissioner or the Commissioner's designee shall, on behalf of the requesting Club (unless notified to the contrary pursuant to the requirements of this Rule 10(d)(3)), withdraw a waiver request is as follows:

        **(A)**  All Times Other Than a Certain Period in Spring Training.  Except as provided for in Rule 10(d)(3)(B), the period after the Commissioner or the Commissioner's designee shall, on behalf of the requesting Club (unless

## MAJOR LEAGUE RULES
## MLR 10(d)

notified to the contrary pursuant to the requirements of this Rule 10(d)(3)), withdraw a waiver request is as follows:

| If Claim Notice Is Given by 1:00 p.m. Eastern Time on: | Withdrawal (If Any) Shall Be Entered by the Commissioner's Designee at 1:30 p.m. Eastern Time on: |
|---|---|
| Monday | Wednesday |
| Tuesday | Thursday |
| Wednesday | Friday |
| Thursday | Monday |
| Friday | Tuesday |

**(B)**   During a Certain Period in Spring Training.   When waivers are requested during the period set forth in Rule 10(c)(1)(B) (The Procedures for Obtaining Waivers; Request; During a Certain Period in Spring Training), the period after the Commissioner or the Commissioner's designee shall, on behalf of the requesting Club (unless notified to the contrary pursuant to the requirements of this Rule 10(d)(3)), withdraw a waiver request is as follows:

| If Claim Notice Is Given by 1:00 p.m. Eastern Time on: | Withdrawal (If Any) Shall Be Entered by the Commissioner's Designee at 1:30 p.m. Eastern Time on: |
|---|---|
| Monday | Wednesday |
| Tuesday | Thursday |
| Wednesday | Friday |
| Thursday | Saturday |
| Friday | Sunday |
| Saturday | Monday |
| Sunday | Tuesday |

The Commissioner's Office may publish a notice of holidays for which the waiver withdrawal period may be extended, if the withdrawal entry date would otherwise fall on such a holiday.

**(4)**   Assignment of Player If No Withdrawal.   If a waiver claim is made, and the request is not withdrawn, the contract shall be assigned in the following manner:

# MAJOR LEAGUE RULES
## MLR 10(d)

**(A)**  If only one claim is entered, assignment shall be made to that claiming Club.

**(B)**  If the waiver request is for Trade assignment waivers and more than one Club makes a claim, assignment shall be to the claiming Club in the League of the requesting Club with the lowest percentage of games won, or, if all claims are from Clubs in the other League, assignment shall be to the claiming Club in such other League with the lowest percentage of games won.  Percentages of games won shall be based on the result of play through the date prior to the expiration of the claiming period.

If two or more claiming Clubs within a League are tied with the lowest percentage of games won, the Commissioner or the Commissioner's designee shall make the award to the tied Club with the lower percentage of games won in the prior championship season, without regard to post-season results.  If the tied Clubs had an identical percentage of games won at the close of the preceding championship season, the award shall be made to the tied Club with the lower percentage of games won in the next prior championship season, without regard to post-season results, with any remaining ties resolved by continuing to examine the tied Clubs' respective championship season winning percentages in each preceding prior year, until the tie is broken.

**(C)**  If the waiver request is for Outright assignment waivers, Optional assignment waivers or Unconditional Release waivers, and more than one Club makes a claim, assignment shall be to the Club with the lowest winning percentage among the claiming Clubs, without regard to the League of the claiming Clubs.

During the first 30 days of a championship season (as determined by the date of the first game scheduled for either Major League in that season), percentages of games won at the close of the preceding championship season, without regard to post-season results, shall be used instead of the current championship season percentages of games won.  At all other times during the championship season, percentages of games won shall be based on the result of play through the date prior to the expiration of the claiming period.  During the off-season, the final percentages of games won at the close of the last preceding championship season shall control, without regard to post-season results.

## MAJOR LEAGUE RULES
## MLR 10(d)

If two or more claiming Clubs are tied with the lowest percentage of games won, the Commissioner or the Commissioner's designee shall make the award

**(i)** to the tied Club that is in the same League as the Club making the waiver request; or,

**(ii)** if the tied Clubs are in the same League, then to the tied Club with the lower percentage of games won at the close of the prior championship season, without regard to post-season results. If the tied Clubs had an identical percentage of games won at the close of the preceding championship season, the award shall be made to the tied Club with the lower percentage of games won in the next prior championship season, without regard to post-season results, with any remaining ties resolved by continuing to examine the tied Clubs' respective championship season winning percentages in each preceding prior year, until the tie is broken.

**(5)** Consideration for Assignment of Player.

**(A)** When Unconditional Release Waivers Are Requested. The consideration for a player claimed after Unconditional Release waivers are requested shall be the consideration set forth in Rule 8(e) (Waiver Claims and Consideration).

**(B)** Selected or Draft-Excluded Player. The consideration to be paid for an award on waiver claim, when such claim is not an Unconditional Release waiver claim, of the contract of a player selected at the preceding Rule 5 Selection Meeting or excluded from draft at such meeting in accordance with Rule 6(e) shall be 50 percent of the price paid for selection under Rule 5.

**(C)** Other Player. The consideration for the assignment on waiver claim of any player contract other than ones described in Rules 10(d)(5)(A) (When Unconditional Release Waivers Are Requested) and 10(d)(5)(B) (Selected or Draft-Excluded Player) shall be $20,000, if the waiver request was irrevocable, and shall be set by agreement between the assignor and assignee Clubs if the waiver request was revocable, provided, however, that the consideration (if no player contracts are assigned from the claiming Club as all or part of the consideration in the waiver claim transaction) shall be at least $20,000 and, in the absence of any agreement, the waiver price shall be $20,000.

## MAJOR LEAGUE RULES
## MLR 10(e)

**(e) RESTRICTIONS ON WAIVER REQUESTS**. The following restrictions on waiver requests shall apply:

**(1)** A Club shall not request any type of waivers on more than seven players on any one day.

**(2)** No optional assignment waivers may be requested during the period starting on October 1 and ending on February 15. See Rule 11(e) (Closed Period).

**(3)** When a request for Trade assignment or Optional assignment waivers is withdrawn on any player under the provisions of Rule 10(d) (Waiver Claims and Awarding of Contracts), no Assignment waivers on that player may again be requested by the same Club until 30 days after the withdrawal date of such waiver request.

**(4)** A waiver request shall state that it is irrevocable and that it may not be withdrawn in response to a claim by another Club if

**(A)** the request follows a request on the same player that had been previously withdrawn by the same Club in the same waiver period (see Rule 10(c)(4) (Grant of Waivers and Effective Periods)); or

**(B)** the request is for Outright assignment waivers.

Any request for Unconditional Release waivers is irrevocable.

**(5)** Assignment waivers may not be requested on the contract of a player selected pursuant to Rule 5 during the period beginning with the player's selection and ending 25 days prior to the opening of the championship season of the year following the player's selection. If waivers are obtained, no assignment may be made pursuant to such waivers until 20 days prior to the opening of the championship season of said year.

**(6)** Assignment waivers may not be requested on the contract of a player who stands to become a draft-excluded player, as described in Rule 6(e), during the period beginning five days following the last day of the World Series and ending 25 days prior to the opening of the championship season of the year following the year the player became a draft-excluded player. If waivers are obtained, no assignment may be made pursuant to such waivers until 20 days prior to the opening of the championship season of said year.

**MAJOR LEAGUE RULES**
**MLR 10(e) to 10(h)**

**(7)** Assignment waivers may not be requested on a player who appears on the Military, Voluntarily Retired, Bereavement, Restricted, Suspended, Disqualified or Ineligible List until the player has been reinstated to the Active List of the player's Club. See Rule 8(c) for restrictions on Unconditional Release waiver requests.

**(8)** Assignment waivers may not be requested on a Major League Disabled List player unless the minimum period of inactivity as prescribed in Rule 2 (Player Limits and Reserve Lists) has expired and the requesting Club guarantees that the player has recovered from the player's ailment and is capable of performing at the player's accustomed level. If waivers are obtained on such a player, the requesting Club shall, within 72 hours, assign the player either outright or with right of recall (assuming such assignment is otherwise permissible with respect to such player), or restore the player to its Active List. If a claim is entered and a request is withdrawn, the player shall immediately be placed on the Club's Active List.

**(9)** Assignment waivers of the same type, as defined in Rule 10(a) (Definitions), shall not be requested on a player during any period in which waivers are already in effect, with the exception that waivers may be requested two business days prior to the date on which such existing waivers expire, so that waivers, if secured, will be in effect as early as possible in the subsequent waiver period. A waiver claim made on any waiver request permitted by this Rule 10(e)(9) shall immediately cancel the waivers existing when the subsequent waiver request was made.

**(f) EFFECT ON WAIVERS OF TRANSFER OF OPTIONAL ASSIGNMENT.** No waivers are required when a Major League Club assigns a player who is on an optional assignment from one Minor League Club to another Minor League Club.

**(g) PENALTIES**. The waiver rules are for the benefit of the players as well as the Clubs. No Club, therefore, shall solicit another Club, directly or indirectly, to claim or not to claim a player on whom waivers have been requested or to withdraw a request for waivers that has been made, nor shall a Club otherwise act in concert with any Club or Clubs in the operation of the waiver system. In addition to any remedy that players injured by a violation of this Rule 10(g) may be awarded pursuant to remedies afforded by a collective bargaining agreement between players and Major League Clubs, the Commissioner shall have authority to impose penalties for such conduct.

**(h) PLAYER LIMIT**.

**(1)** In the case of award of a player on waiver claim to another Club already having the limit of players prescribed by Rule 2(b) (Maximum Number of

## MAJOR LEAGUE RULES
### MLR 10(h) to 11(b)

Reserved Players), such Club must immediately upon notice of award give notice of its intention to release or assign the contract of a designated player or players in accordance with Rule 2(k) (Designated Players) or transfer to or place on the 60-day Disabled List, in accordance with Rule 2(g), a disabled player, or a combination thereof. Such designated player or players may not be the same player obtained from the waiver claim award.

**(2)** In the case of award of a player on waiver claim to another Club already having the limit of players prescribed by Rule 2(c) (Active Lists), such Club must, upon the reporting of the player claimed, give notice of its intention to release or assign the contract of a designated player(s) in accordance with Rule 2(k) (Designated Players). Such designated player may not be the same player obtained from the waiver claim award.

## Rule 11

### OPTIONAL AGREEMENTS

**(a) DEFINITION.** An assignment of a player contract must in general be an absolute assignment, but in a limited number of cases, as specified in Rule 11(c), the assignor Club may reserve the right to recall, which must be exercised on or before October 1 next ensuing. Such an assignment shall be designated as an optional assignment and is permitted between a Major League Club and a Minor League Club. An optional assignment must be filed with and approved by the Commissioner.

**(b) LIMITATIONS ON RECALL.**

**(1)** Ten-Day Rule. A Major League Club may not recall a player who is on optional assignment until 10 days of the championship season have elapsed from the date the player had physically reported to the optionee Club after the optional assignment, unless the Club obtains prior approval from the Commissioner or the Commissioner's designee <u>and</u> one of the following conditions applies:

**(A)** the optional player's contract is being recalled for the purpose of replacing on a Club's Active List a player placed on a Major League Disabled List, the Major League Bereavement List or the Restricted List pursuant to the Major or Minor League Drug Treatment and Prevention Programs subsequent to the date the optional player's contract had been assigned to the optionee Club;

**MAJOR LEAGUE RULES**
**MLR 11(b) to 11(c)**

**(B)**  the optionee Club's season, including any playoffs, has concluded prior to the expiration of the 10-day period;

**(C)**  the optional player is being assigned to the Active List of another Major League Club; or

**(D)**  the Major League Club had assigned the player on the optional assignment within 24 hours after having acquired the player in a trade from another Major League Club, the player had been on optional assignment with the other Major League Club at the time of the trade and the Major League Club had not placed the player on its Major League Active List during the 24-hour period following the trade.  See MLR 10(b)(3)(B) (When Waivers Are Required for Assignment).

**(2)**    Certain Optionee Clubs.  The recall of an optional player for immediate service during the optionee's championship season shall be prohibited in any case in which the recalling Club owns or is otherwise affiliated with any other Club in the League of which the optionee Club is a member, unless the Commissioner approves the recall.

**(3)**    Waivers.   The recall of an optional player's contract for purposes of requesting waivers under Rule 10 is not required.  Waivers may be requested in regard to a player on an optional assignment, see Rule 10(a) (Definitions), without requiring recall of the player and without making the player ineligible to participate in games for the Minor League Club to which such player is assigned.

**(4)**    Recall Not to Report.  A Major League Club may recall a player not to report for the purpose of assigning such player to another Major League Club. A Major League Club may recall a player not to report after the conclusion of the championship season of the Minor League Club to which the player is on optional assignment but no later than October 1.  See Rule 11(a) (Definition).

**(5)**    Notice to Player.  A Major League Club recalling an optioned player shall give the player, in person or by registered mail, written notice of such recall.  The notice shall be on a form approved by the Major League Executive Council.  A copy of such notices shall be given to the Commissioner or the Commissioner's designee.

**(c)  LIMITATIONS ON OPTIONAL ASSIGNMENTS**.  An optional assignment of a player contract shall be permitted for not more than three seasons between Major League Clubs and Minor League Clubs; provided that if the player is optioned for less than a total of 20 days in one season, as determined by the date(s) of the optional

## MAJOR LEAGUE RULES
### MLR 11(c) to 11(f)

assignment(s) and recall(s), respectively, the player shall not be charged with an optional transfer in connection with the foregoing limitation.

EXCEPTION: Contracts of Major League players who, prior to commencement of the current season, have been credited with less than five seasons in the Major and Minor Leagues (excluding service on the Military, Disqualified, Restricted, Voluntarily Retired and Ineligible Lists) shall be eligible for a fourth optional assignment, without waivers, during that season. For purposes of this Rule 11(c), 90 days or more on the Active List during a championship season shall constitute a "season of service." While time spent on any Inactive List shall not be counted toward the 90 days required before a season's service is credited, if a player is placed on the Disabled List after the player has been credited with 60 or more days of service in any particular season, the Disabled List time shall be counted to the player's credit.

No optional agreement shall be permitted between Major League Clubs. No optional assignment shall be permitted for a player unless the player is under contract for service in the season for which the optional agreement is effective.

If, prior to an optional assignment, a player had at least three months active service in a Minor League classification, the player may not be optionally assigned to a lower classification unless the player is paid at the salary rate for the higher classification from which the player entered the Major Leagues.

**(d) NUMBER**. The maximum number of optional agreements that any Major League Club may have in effect at any one time shall be 16. In addition, players who sign following selection under Rule 4 may be assigned optionally by the signing Club during the player's first season without counting against the Club's limit of optional players, but players so assigned shall count immediately against the Active List of the optionee Club.

**(e) CLOSED PERIOD.** No player shall be transferred to a Minor League Club on an optional assignment during the period from the close of the regularly scheduled season of the optionee Club, including playoffs, and the first permissible date in Spring training for the next season as determined under the terms of the basic agreement.

Nothing herein nor in the rules of any Minor League shall be construed as prohibiting a Major League Club from assigning a player's contract to a Minor League Club at any time for the purpose of injury rehabilitation as provided in Rule 9(f).

**(f) SALARY ARREARS**. A Club assigning the contract of a player optionally shall be responsible to such player for salary due to the player.

## MAJOR LEAGUE RULES
### MLR 11(g) to 11(j)

**(g) SALARY ON OPTION OR RECALL**. Upon optional assignment, a player shall be paid at the rate stated in the player's Major League contract for Minor League service, or at the minimum Minor League service rate set forth in the Basic Agreement, whichever is applicable. Upon the recall of an optional player, the player's contract with the recalling Club, which was the subject of the optional assignment, shall be in full force and effect as to all of its terms and conditions.

**(h) SALARY BETWEEN SEASON OPENINGS**. A Club that, after contracting with a player for a season, makes an optional assignment of such contract to a Minor League Club whose championship season commences after that of the assigning Club must pay the player at the rate of the player's assigned contract from the time it would have become effective (but for the assignment) up to the day the player's salary starts with the player's new Club, provided the player promptly reports and gives service to the Club to which the player's contract is assigned. A Club that assigns a player's contract optionally to a Minor League Club whose championship season commences prior to start of the assignor Club's season must pay the player at the rate of salary for service with the assignee from the date the player reports to the assignee Club.

**(i) PLAYER LOANS.**

    **(1)** Prohibited at Major League Level. All right or claim of a Major League Club to a player, unless it is under an optional agreement approved by the Commissioner, shall cease upon outright assignment to another organization. No arrangement between Clubs for the loan or return of a player shall be binding between the parties to it or recognized by other Clubs. This Rule 11(i) does not authorize the selection of such players, or other players, from an owned or affiliated Club under Rule 5.

    **(2)** Permitted at Minor League Level. With the prior approval of the Commissioner, Clubs may arrange for the loan and return, prior to September 30 of the same year, for players under Minor League contracts during the championship season.

**(j) REACQUIRING PLAYER**.

    **(1)** If the player's contract has been assigned outright by a Major League Club to a Minor League Club, the player's contract may be reacquired at any time during the year by the assignor Major League Club without restrictions, except:

        **(A)** during the closed period set forth in Rule 9(b) (Time Limit); or

# MAJOR LEAGUE RULES
## MLR 11(j)

**(B)** within 10 days from the date of the outright assignment to the Minor League Club, if the assignment was made during the championship season.

**(2)**  The restriction in Rule 11(j)(1)(B) shall not apply, and a Major League Club may reacquire for immediate service the contract of an outrighted player prior to the expiration of the 10-day period from the date the player had physically reported to the assignee Club, if the Major League Club obtains prior approval from the Commissioner or the Commissioner's designee <u>and</u> one of the following conditions applies:

**(A)** the outrighted player's contract is being reacquired for the purpose of replacing on a Club's Active List a player placed on a Major League Disabled List or the Major League Bereavement List subsequent to the date the outrighted player's contract had been assigned to the assignee Club;

**(B)** the assignee Club's season, including any playoffs, has concluded prior to the expiration of the 10-day period; or

**(C)** the outrighted player is being assigned to the Active List of another Major League Club.

**(3)**  In the event that a player has Major League options remaining at the time of the player's assignment to a Minor League Club and the contract is reacquired by the assignor Club after 20 or more days of the Major League championship season have elapsed from the date of the assignment, such player shall be credited with a Major League option.

**(4)**  A player will not be credited with a year's optional service until commencement of that year's closed period prohibiting optional assignment of player contracts, regardless of the number of times the player's contract may be optioned during that year.

**(5)**  No player shall be credited with more than one season of optional service in a single season regardless of the number of times the player's contract may be assigned optionally for service in a single season.

**(6)**  No Club shall be charged with more than one optional assignment of a player's contract regardless of the number of times the contract is optionally assigned for service in a single season.

**MAJOR LEAGUE RULES**
**MLR 12(a) to 12(d)**

**Rule 12**

**TRANSFER AGREEMENTS**

**(a) REQUIREMENTS**. The Commissioner or the Commissioner's designee shall prescribe the form of assignments and of the optional agreements between Major League Clubs and Minor League Clubs and no such transaction shall be recognized as valid unless within 15 days after execution a counterpart original of the document is filed with and approved by the Commissioner or the Commissioner's designee.

**(b) PENALTIES**. Penalties may be imposed in case anything except the actual consideration, terms and conditions are stipulated or in case agreements are made that are not embodied in the document as filed. Penalties shall also be imposed in the event a player plays in a game for the assignor Club after notice of the player's assignment or pending assignment on any basis has been given to the press for announcement. Such penalties shall be imposed by the Commissioner and the amount shall be subject to the Commissioner's judgment.

**(c) PROMULGATION**. Assignments and optional agreements shall be promulgated by the Commissioner or the Commissioner's designee.

Assignment agreements shall be executed whenever title to a player's services is transferred from one Club to another under any condition—outright, optionally, by waiver claim, by selection, by recall of an optional player, or by injury rehabilitation assignment. Official notice of such transfer, and in the case of unconditional release, shall in each instance promptly be given by the Club to the player, the President of the Minor League Association in the case of a Minor League player and the Commissioner or the Commissioner's designee in case of a Major League player.

**(d) FILING—PAYMENT**. There shall be five counterpart originals of all assignments and optional agreements, of which one is to be retained by each of the parties and the others mailed to the Commissioner or the Commissioner's designee, who will mail one copy each to the President of the Minor League Association and the President of the Minor League to which the player's contract is assigned, if the player is being assigned to a Minor League Club. The counterpart originals sent to the Commissioner or the Commissioner's designee shall be accompanied by a check for the consideration, which check, in the case of a payment due a Minor League Club, shall be payable to the order of the Minor League Association. If said agreements are not filed with the Commissioner or the Commissioner's designee within 15 days after the transfer is effected, the Commissioner or the Commissioner's designee shall collect a penalty from the Club responsible, or from each of the parties if both Clubs are responsible for such failure to file.

**MAJOR LEAGUE RULES**
**MLR 12(d) to 12(e)**

Payment by the claiming Club must accompany agreement papers on all transactions in which a player's contract has been assigned on waiver claim.  Failure to include this payment shall result in a fine of not less than $50.

In all other transactions, payment must also be made by the Club at the time the agreement papers are filed with the Commissioner's Office unless it is stipulated in the papers that the payment will be deferred.  Payment may not be deferred for more than one year from the date of assignment.  Failure to make payments as due shall result in a fine of not less than $50.  Any agreement providing for the deferral of payment beyond one year shall subject the offending parties to such penalties as the Commissioner in the Commissioner's judgment shall deem proper.

**(e)  CONSIDERATION MUST BE IN DEFINITE TERMS**.

**(1)**  **(A)**  Every transfer agreement shall express the consideration for the transfer in definite terms, unless Rule 12(e)(1)(B) applies.

**(B)**  If a transfer agreement includes the assignment of a Major League Uniform Player's Contract that includes unearned performance bonuses, then the assignor and assignee Club may include in such transfer agreement cash consideration that is contingent upon the player earning all or a portion of such performance bonuses.  The transfer agreement must state with specificity all performance-bonus contingencies.  The assignor and assignee Club are not permitted to alter their respective responsibilities to the player to pay performance bonuses.  Such responsibilities to the player are covered by the standard-form Major League Uniform Player's Contract.  See MLR 9(c) (Assignee Club's Responsibility for Bonus Provisions in Player's Contract).

**(2)**  A transfer agreement may provide for the assignment of the contract of an unnamed player, provided:

**(A)**  the assignment must be made on or before a specified date, which shall be within six months from the date of the agreement;

**(B)**  the agreement permits a stated cash consideration in lieu of the assignment; and

**(C)**  the player has not been on the Active List of any Major League Club during any part of a championship season between the date of the agreement and the date of the assignment.

MAJOR LEAGUE RULES
MLR 12(f) to 13(a)

**(f) TRANSFERS—WHEN VOID.** The death or permanent incapacitation of a player following assignment of the player's contract, or the player's failure to report to the assignee Club, shall not void the assignment, unless the agreement provides otherwise.

In the event of the bona fide retirement of a player following assignment of the player's contract, the player shall be placed on the Voluntarily Retired List of the assignee Club, unless the agreement provides otherwise.

A player who enters the Armed Forces after assignment of the player's contract and before the date the player normally would report to the assignee Club shall be placed on the Military List of the Assignee Club, unless the agreement provides otherwise.

**(g) SALARY BETWEEN SEASON OPENINGS.** A Club that, after commencement of its championship season, assigns a player's contract to a Club whose season commences after that of the assigning Club, must pay the player at the rate of the player's assigned contract up to the day the player's salary with the player's new Club begins, provided the player promptly reports to the latter.

**(h) TRANSPORTATION.** A Club assigning the contract of a player in its active service to another Major League Club or to a Minor League Club shall, at the time of notifying the player of the assignment, deliver to the player transportation to the city designated by the assignee Club and the assignee Club shall reimburse the assignor within 10 days for the cost of such transportation.

## Rule 13

### SUSPENDED PLAYERS

**(a) MISCONDUCT OR INSUBORDINATION.**

**(1)** Suspension by Club. A Major or Minor League Club may suspend a player that it has under a Major League Uniform Player's Contract or Minor League Uniform Player Contract for insubordination or other misconduct or for violation by the player of any regulation or other provision of the player's contract. At its discretion, the Major or Minor League Club with which the player is under contract may impose a reasonable fine and deduct the amount of the fine from the player's salary or may suspend the player without salary for a period not exceeding 30 days, or both. Written notice of the fine, or suspension,

## MAJOR LEAGUE RULES
### MLR 13(a) to 14(a)

or both, and of the reason for the fine and/or suspension shall in every case be given to the player. During the period of suspension the player shall be ineligible to play with any other Major or Minor League Club.

**(2)** Suspension by Minor League or Minor League Association. A Minor League or Minor League Association may discipline a player assigned to such Minor League if authorized by the Commissioner or the Commissioner's designee to consider discipline as a general matter in such circumstances, including, without limitation, pursuant to any on-field behavior policy promulgated by the Commissioner or the Commissioner's designee. Such discipline may include a fine and/or suspension. Written notice of the fine, or suspension, or both, and of the reason for the fine and/or suspension shall in every case be given to the player. During the period of suspension the player shall be ineligible to play with any other Minor League Club.

**(b) PLAYER NOT IN CONDITION**. A player under a Major League Uniform Player's Contract or Minor League Uniform Player Contract who fails to get into playing condition within 60 days after the commencement of the training season of the player's Club may be suspended without pay until the player is in condition to play.

**(c) APPEAL**. A player suspended by a Major or Minor League Club or a Major or Minor League for a term longer than 10 days shall have the right to appeal to the Commissioner or the Commissioner's designee. The Commissioner or the Commissioner's designee may order the player's reinstatement and afford the player adequate redress if the Commissioner or the Commissioner's designee holds that the punishment is excessive or not merited.


### Rule 14

### RETIRED PLAYERS

**(a) APPLICATION**. A player under a Major League Uniform Player's Contract or a Minor League Uniform Player Contract who desires to retire from the profession shall make written application to the player's Major or Minor League Club, stating fully the player's reasons for retiring. The Major League Club shall forward the application and the Club's recommendation to the Commissioner or the Commissioner's designee. If the Commissioner or the Commissioner's designee deems it proper to do so, the Commissioner or the Commissioner's designee may grant an application for voluntary retirement upon the conditions set forth in this Rule 14 and upon such other terms and conditions as the facts and circumstances may warrant, in the judgment of the Commissioner or the Commissioner's designee. However, no player shall be reinstated

**MAJOR LEAGUE RULES**
**MLR 14(a) to 15(b)**

within 60 calendar days of the championship season or seasons from the date that the player filed the application for voluntary retirement with the Commissioner or the Commissioner's designee.

**(b) PLAYING WHILE RETIRED**.  If a voluntarily retired player, during the player's retirement, shall desire to play baseball for hire, otherwise than for the Major or Minor League Club entitled to the player's services, the player shall first obtain written consent of the player's Club.  The player then must file an application with the Commissioner or the Commissioner's designee requesting permission to play otherwise than for the Major or Minor League Club to which the player is under contract.  The player's application shall specify the teams with and against which the player desires to play, and their locations, and shall be transmitted with the player's Club's consent to the Commissioner for approval or denial.

**Rule 15**

**RESTRICTED, DISQUALIFIED AND INELIGIBLE LISTS**

**(a) RESTRICTED LIST.**  If, without permission from a player's Major or Minor League Club, a player fails, within 10 days of the opening of the player's Club's championship season, to report to, or contract with, the player's Club, the player may be reported by the Club to the Commissioner or the Commissioner's designee for placement on the "Restricted List."  A player on the Restricted List shall not be eligible to play for any Major or Minor League Club.

Before the start of the championship season but not before January 1, a Major or Minor League Club also may report for placement on the Restricted List any player, whether or not under contract for the current season, who has given the Club written or telegraphic notification that the player will not report until 30 days or more after the opening of the championship season.  Requests to the Commissioner or the Commissioner's designee shall be accompanied by the notification which the Club received from the player.

The Commissioner or the Commissioner's designee may place a Major or Minor League Reserve List player on the Restricted List if the player's Club certifies that unusual circumstances exist.

**(b) DISQUALIFIED LIST.**  A player who violates a player contract or reservation may be reported to the Commissioner or the Commissioner's designee for placement on the "Disqualified List."  A player on the Disqualified List shall not be eligible to play

## MAJOR LEAGUE RULES
### MLR 15(b) to 15(e)

with any Major or Minor League Club. In addition, a player shall be placed on the Disqualified List pursuant to Rule 15(c)(2) (Ineligible List).

**(c) INELIGIBLE LIST.**

**(1)** A player or other person found guilty of misconduct or other acts mentioned in Rule 21, or convicted of a crime involving moral turpitude, may be placed on the "Ineligible List" by the Commissioner or the Commissioner's designee. A player or other person on the Ineligible List shall not be eligible to play or associate with any Major or Minor League Club.

**(2)** No Major or Minor League player shall knowingly play with or against a team with which, during the current season, any ineligible player or person has had any connection. Should a player knowingly play with or against any such team, the player shall be placed on the Disqualified List.

**(d) ACTION BY COMMISSIONER OR THE COMMISSIONER'S DESIGNEE.** In all cases the Commissioner or the Commissioner's designee may determine, at any time, either on his or her own motion or at the request of a Major or Minor League, Major or Minor League Club or player, that the best interests of Baseball require that a player, Club or League official or employee, or other person, be placed on the Ineligible List and may also, in his or her sole discretion and upon such terms and conditions as he or she may deem proper, reinstate any such person from the Ineligible List or transfer the person from the Ineligible List to the Disqualified List.

**(e) PLAYER STATUS.** With respect to a player under a Major League Uniform Player's Contract:

**(1)** A Club's obligations to tender and renew a contract, as set forth in paragraph 10(a) of the Major League Uniform Player's Contract, shall apply with regard to any player who, at the applicable time, is on the Restricted List for either failing to report to the player's Club or failing to contract with it, or is on the Disqualified List for failure to render the player's services to the Club. Should a Club fail to so tender or renew a contract, the player shall become a free agent without any restrictions or qualifications, and the player shall be removed from the Restricted or Disqualified List.

**(2)** With regard to any player who is on the Disqualified List for a reason other than stated in Rule 15(e)(1), or is on a Suspended, Ineligible, Voluntarily Retired or Military List, a Club shall not be obligated to tender or renew a contract until the player is removed from such list and reinstated to active status. If a player is removed from such list during a period beginning on December 10 and extending

**MAJOR LEAGUE RULES**
**MLR 15(e) to 15(i)**

through the next championship season, the Club shall tender a contract to the player within 10 days following such removal.  Thereafter, should the Club and the player agree upon the terms of a new contract within 10 days after the player's receipt of the tendered contract, the Club shall be obligated, within the next five days, to renew the player's prior Major League contract, provided, however, that is the tender is made during the period beginning on December 10 and ending on the next March 1, the renewal period shall be as set forth in paragraph 10(a) of the Major League Uniform Player's Contract.  Should a Club fail to tender or renew a contract as provided in this paragraph, the player shall become a free agent without any restrictions or qualifications.

(3)   A player on the Restricted, Disqualified or Ineligible List (A) shall not be unconditionally released, and (B) shall not be entitled to salary while on any such list, nor after reinstatement from any such list, until such date (not exceeding 30 days after reinstatement) as the player is in condition to participate in championship games to the satisfaction of the player's Club.

**(f)   EFFECT ON PLAYER LIMITS.**   A player on the Voluntarily Retired, Restricted, Disqualified or Ineligible List shall be excluded from all player limits until the player is reinstated.

**(g)   RESERVATIONS.**   A player on the Restricted, Disqualified or Ineligible List may be reserved as such for two consecutive years.  At the expiration of that two-year period, the player need not be reported on the player's Major or Minor League Club's annual Reserve List and will automatically be transferred to a General Restricted List, General Disqualified List or General Ineligible List.

**(h)   PROMULGATION.**   Whenever a player is placed on the Restricted, Disqualified or Ineligible List, such fact shall be promulgated by the Commissioner or the Commissioner's designee to all Major League Clubs in the form of a transaction bulletin.

**(i)   ASSIGNMENT.**   The contract of a player on the Restricted or Disqualified List may be assigned, but the assignee Club shall assume all responsibility for the player's reporting.  The contract of a player on the Ineligible List may not be assigned except with the permission of the Commissioner or the Commissioner's designee.

MAJOR LEAGUE RULES
MLR 16(a) to 16(d)

### Rule 16

### REINSTATEMENT OF PLAYERS

**(a) APPLICATION.** Any player on the Voluntarily Retired, Restricted, Disqualified or Ineligible List may apply for reinstatement, or to have the player's status changed, upon the conditions stated in this Rule 16. Any Major or Minor League Club having a player on the Restricted List may apply for the player's reinstatement. Such application shall be filed with the Commissioner or the Commissioner's designee. An application for reinstatement may be granted upon such terms and conditions as the facts may warrant in the judgment of the Commissioner or the Commissioner's designee.

If a player files an application for reinstatement from the Voluntarily Retired, Disqualified or Ineligible Lists after February 1 of any year, the player's Major or Minor League Club shall be entitled to 30 days' written notice prior to the player's reinstatement. No application for reinstatement shall be received from a Voluntarily Retired player within 60 playing days of the player's retirement. No Major League player on the Voluntarily Retired, Disqualified or Ineligible Lists shall be reinstated during the period from August 1 to and including October 31. No Major League player on the Restricted List shall be reinstated during the period from August 1 to and including October 31, unless the Restricted List, placement had followed a Bereavement List placement pursuant to Rule 2(n) (Major League Bereavement List) or had been made pursuant to the Major or Minor League Drug Treatment and Prevention Programs. No Minor League player on the Voluntarily Retired, Restricted, Disqualified or Ineligible Lists shall be reinstated during the period from August 1 until the conclusion of the Minor League championship season and playoffs, unless the Restricted List placement had been made pursuant to the Major or Minor League Drug Treatment and Prevention Programs.

**(b) PLAYER ON RESTRICTED LIST.** A Restricted List player shall be reinstated immediately upon receipt of written or telegraphic application for reinstatement from the player's Major or Minor League Club.

**(c) PLAYER ON VOLUNTARILY RETIRED, DISQUALIFIED OR INELIGIBLE LIST.** Upon proper application, a player on the Voluntarily Retired, Disqualified or Ineligible List may be reinstated by the Commissioner or the Commissioner's designee. However, in the case of an Ineligible List player, no such application may be made until after the lapse of one year from date of placement on the Ineligible List.

**(d) PLAYER LIMITS.** A player reinstated from the Voluntarily Retired, Restricted, Disqualified or Ineligible List during the championship season shall not count against

## MAJOR LEAGUE RULES
### MLR 16(d) to 17(d)

the player limits of the Major or Minor League Club to which the player is reinstated until such date (not exceeding 30 days after reinstatement) as the player is in condition to participate in championship games to the satisfaction of the player's Club. A player reinstated from such a List between championship seasons shall not count against the player limits of the Major or Minor League Club to which the player is reinstated until the opening date of the next season after the date of reinstatement. However, should the contract of a player so reinstated be assigned to another Major or Minor League Club, the player shall immediately count against the player limits of the assignee Club.

**(e) REINSTATEMENT BEFORE RELEASE.** A Player on the Military, Restricted, Disqualified or Ineligible Lists must be reinstated before the player can be released unconditionally. A player on the Voluntarily Retired List may be unconditionally released if both approval of the Commissioner and any applicable waivers are first obtained.

### Rule 17

### PLAYER SALARIES

**(a) FIRST-YEAR PLAYER**. If a Club is assigned a non-drafted player without previous Major or Minor League experience within the first season of the player's service and the Club does not assume the salary stipulated in the player's original contract to the close of the contract's term, the player shall be declared a free agent.

**(b) PART-SEASON SALARY**. A player who is in the service of a Club for part of a season only, under a contract fixing a salary at a stipulated rate for the season, shall receive such proportion of the stipulated season's salary as the number of days of the player's actual employment bears to the number of days in the Club's championship season.

**(c) DELAY IN REPORTING**. A player who fails to report for spring training as directed by the player's Club in accordance with the player's contract shall be required to get in playing condition to the satisfaction of the team manager, and at his own expense, before the player's salary shall commence.

**(d) MINIMUM SALARY**. The minimum rate of payment to each player for each day of service during the Major League season shall be as agreed in the current Basic Agreement between the Major League Clubs and the Players Association.

## MAJOR LEAGUE RULES
### MLR 17(d) to 18(b)

Minimum rates of payment for a player under a Major League Uniform Player's Contract assigned to a Minor League Club for service shall be as set forth in the current Basic Agreement.

**(e) RENEWAL OF CONTRACT**. Upon request by a Major League player to the Commissioner, the Commissioner may, on such conditions as he stipulates, consent to such player accepting a renewal of his contract at a salary rate less than eighty (80) percent of the rate stipulated for the preceding year, providing the salary rate is mutually agreed upon between the club and the player prior to January 10 and providing the request for consent to accept such salary is made by the player and received by the Commissioner prior to January 10.

### Rule 18

### PLAYING OTHERWISE THAN FOR CLUB

**(a) WINTER LEAGUES**. The Major League Clubs may establish one or more Winter Leagues. The Commissioner or the Commissioner's designee may, on behalf of the Major League Clubs, enter into an agreement or agreements with one or more Winter Leagues or associations of Winter Leagues. Such agreements shall set forth the relationship between the Major League Clubs and such Winter Leagues and Winter League clubs and shall set forth the terms and conditions under which Major League players and Minor League players under contract to Major League Clubs may participate in Winter League play.

**(b) EXHIBITION GAMES**. No player shall participate in any exhibition game during the period between the close of the Major League championship season and the following training season, except that, with the consent of the player's Club and permission of the Commissioner, a player may participate in exhibition games for a period of not less than 30 days, such period to be designated annually by the Commissioner. Players who participate in barnstorming during this period cannot engage in any Winter League activities.

Player conduct, on and off the field, in connection with such post-season exhibition games shall be subject to the discipline of the Commissioner. The Commissioner shall not approve of more than three players of any one Club on the same team. The Commissioner shall not approve of more than three players from the joint membership of the World Series participants playing in the same game.

No player shall participate in any exhibition game with or against any team which, during the current season or within one year, has had any ineligible player or which is

**MAJOR LEAGUE RULES**
**MLR 18(b) to 18(g)**

or has been during the current season or within one year, managed and controlled by an ineligible player or by any person who has listed an ineligible player under an assumed name or who otherwise has violated, or attempted to violate, any exhibition game contract; or with or against any team which, during said season or within one year, has played against teams containing such ineligible players, or so managed or controlled. Any player who participates in such a game in violation of this Rule 18 shall be fined not less than $50 nor more than $500, except that in no event shall such fine be less than the consideration received by such player for participating in such game.

No Club shall participate in any exhibition game with any club that has been expelled or terminated from membership in a Major or Minor League.

**(c) PENALTY**. A player who, during the championship season, participates in a game of Baseball with a Club other than the one with which the player has contracted, shall be fined such amount as may be determined by the Commissioner.

**(d) ALL-STAR GAME**. No Major League player shall participate in any all-star game, except the official Major League All-Star Game, in the period from the beginning of the training period to the end of the regular season.

No exhibition games shall be played by any Club following the Sunday immediately preceding the All-Star Game until the day following the completion of the All-Star Game.

**(e) HALL OF FAME GAME**. Each year on a date designated by the Directors of the National Baseball Hall of Fame Museum, Inc., and approved by the Commissioner, two Major League Clubs shall play in an exhibition game at Cooperstown, New York, under the auspices of the National Baseball Hall of Fame and Museum, Inc. The participating Clubs shall be selected by the Commissioner. Each participating Club's reasonable expenses incurred as a result of the Club's having played the Hall of Fame game shall be reimbursed by the Office of the Commissioner.

**(f) IN JAPAN**. Provisions covering a player's participation in Japan (or a Japanese player's participation in the Major or Minor Leagues) are embodied in an agreement available in Clubs' offices. Details may also be obtained from the Commissioner's Office.

**(g) IN KOREA**. Provisions covering a player's participation in Korea (or a Korean player's participation in the Major or Minor Leagues) are embodied in an agreement available in Clubs' offices. Details may also be obtained from the Commissioner's Office.

## MAJOR LEAGUE RULES
### MLR 18(h) to 19(d)

**(h) IN TAIWAN**.  Provisions covering a player's participation in Taiwan (or a Taiwanese player's participation in the Major or Minor Leagues) are embodied in an agreement available in Clubs' offices.  Details may also be obtained from the Commissioner's Office.

### Rule 19

### UMPIRES AND OFFICIAL SCORERS

**(a) STAFFING.**  The Commissioner shall employ a staff of umpires to officiate Major League games.  Each Major League Club shall accept the umpire or umpires assigned by the Commissioner or the Commissioner's designee for any game.

**(b) DUTIES.**  The umpires assigned by the Commissioner or the Commissioner's designee shall be responsible for the conduct of all championship season, Division Series, League Championship Series and World Series games, as well as the All-Star Game, according to the Official Baseball Rules, as described in Rule 25.  The umpires shall know thoroughly and obey meticulously the instructions of the Commissioner or the Commissioner's designee as to the mechanics and manner of performing their duties.  The umpires shall be thoroughly familiar with and alert to the duties and responsibilities placed on the umpires by the Major League Rules and shall know and follow the interpretations of the Official Baseball Rules of the Commissioner or the Commissioner's designee.

**(c) CONTROL OF EMPLOYMENT.**  All Major League umpires shall be under the sole control and direction of the Commissioner.  They shall receive from the Commissioner or the Commissioner's designee all assignments to duty and all instructions regarding the interpretation of the Official Baseball Rules and performance of their duties.  If an umpire does not perform an assignment, the Commissioner or the Commissioner's designee may impose such penalty as the Commissioner or the Commissioner's designee may deem adequate.

**(d) OFFICIAL SCORERS.**  The Commissioner or the Commissioner's designee shall appoint official scorers for each Major League Club.  The official scorer for each Major League game shall observe the game from a position in the press box.  Subject to the Official Baseball Rules, the official scorer shall have sole authority to make all decisions involving judgment, such as whether a batter's advance to first base is the result of a hit or an error.  The official scorer shall communicate such decisions to the press box and broadcasting booths and shall advise the ballpark public address announcer of such decisions, if requested.

## MAJOR LEAGUE RULES
### MLR 19(d) to 20(a)

After each Major League game, including drawn and forfeited games, the official scorer shall prepare a report listing the date of the game, where it was played, the names of the competing Clubs and the umpires, the full score of the games, and all records of individual players compiled according to the system specified in the Official Baseball Rules.  The official scorer shall forward this report to the Commissioner's Office statistician within 36 hours after the game ends.  The official scorer shall forward the report of any suspended game within 36 hours after the game has been completed, or after it becomes an official game because it cannot be completed.

Official scorers shall be paid such fees as the Commissioner or the Commissioner's designee may determine.  The Commissioner or the Commissioner's designee shall have authority to discipline or remove any official scorer.

**(e)  UMPIRE CLAIMS**.  The Commissioner shall have jurisdiction to hear and determine finally any claim affecting a Major League umpire's contract or salary upon appeal by the umpire.  The Commissioner or the Commissioner's designee shall also have jurisdiction to hear and determine finally any controversy respecting title to an umpire's services.

**(f)  UMPIRES ACTING AS SCOUTS**.  No Major or Minor League umpire shall receive or be offered money or other valuable consideration for services rendered or to be rendered, or supposed to be or to have been rendered, in connection with the acquisition of players by any Club.  An umpire or Club violating this Rule 19 shall be fined double the amount received or offered, but in no event shall such fine be less than $500.

## Rule 20

### CONFLICTING INTERESTS

**(a)  OWNERSHIP AND FINANCIAL INTERESTS.**  No Club, or owner, stockholder, officer, director or employee (including manager or player) of a Club, shall, directly or indirectly, own stock or any other proprietary interest or have any financial interest in any other Club in its League, provided, however, that any owner or stockholder of a Major League Club (who is not also an officer, director or employee of a Club) whose interest does not exceed 5% of such Club and whose interest does not constitute a control interest (as defined in Article V, Section 2(b)(2) of the Major League Constitution) may own a non-control interest not exceeding 5% of any other Club or Clubs in its League, unless the Commissioner determines that such ownership would not be in the best interests of Baseball.

## MAJOR LEAGUE RULES
### MLR 20(b) to 20(h)

**(b)  LOANS TO AND RELATIONSHIPS WITH PLAYERS.**  No Club, or owner, stockholder, officer, director or employee (including manager or player) of a Club, shall, directly or indirectly, loan money to or become surety or guarantor for a player of any other Club in any League, nor be an agent or representative of any player in any League.

**(c)  LOANS TO CLUBS AND OTHER INDIVIDUALS.**  No Club, or owner, stockholder, officer, director or employee (including manager or player) of a Club shall, directly or indirectly, loan money to or become surety or guarantor for any Club, officer, employee or umpire of its, his or her League, unless all facts of the transaction shall first have been fully disclosed to all other Clubs in that League, and also to the Commissioner, and the transaction has been approved by them.

**(d)  LEAGUE OFFICIALS.**  No officer, employee or umpire of a League shall, directly or indirectly, own stock or any other proprietary interest or have any financial interest in any Club of his or her League, or loan money to or become surety or guarantor for any such Club.

**(e)  WITHIN CLUB.**  No manager or player on a Club shall, directly or indirectly, own stock or any other proprietary interest or have any financial interest in the Club by which the manager or player is employed except under an agreement approved by the Commissioner, which agreement shall provide for the immediate sale (and the terms thereof) of such stock or other proprietary interest or financial interest in the event of the manager or player's transfer (if a player or playing manager) to or joining another Club.  A manager or player having any such interest in the Club by which the manager or player is employed shall be ineligible to play for or manage any other Club in that League while, in the opinion of the Commissioner, such interest is retained by or for the manager or player, directly or indirectly.

**(f)  WINTER LEAGUES.**  No Major League Club or Minor League Club shall, directly or indirectly, own stock or have any other proprietary or financial interest in a Winter League or Winter League Club, nor may any Major League or Minor League Club loan money to or become a surety or guarantor for any Club, officer, employee or umpire of a Winter League Club or of a Winter League itself.

**(g)  APPLICATION TO MAJOR LEAGUE CLUBS.**  As used in this Rule 20, with respect to a Major League or Major League Club, "League" shall mean both the American League and the National League.

**(h)  INFORMATION TO COMMISSIONER.**  On or before the first day of the playing season and on such subsequent dates as the information may be requested, each Club shall certify in writing the following information, to the Commissioner:

## MAJOR LEAGUE RULES
## MLR 20(h)

**(1)**    A list of the name, address and amount of ownership interest of each owner of stock or other proprietary interest in the filing Club.  If the filing Club is a corporation, the list shall state the number of shares of stock held by each stockholder.

**(2)**    A list of the names and addresses of the officers and directors of the filing Club.

**(3)**    A list (or an indication on the list of stockholders or owners of the filing Club) stating the kind and amount of each ownership of stock or other proprietary or financial interest in the filing Club by any other Club or by any stockholder, owner, officer, director or employee (including manager or player) of any other Club, to the best knowledge and belief of the filing Club.

**(4)**    A list stating the kind and amount of each ownership of stock or other proprietary or financial interest in any other Club by the filing Club or by any stockholder, owner, officer, director or employee (including manager or player) of the filing Club, to the best knowledge and belief of the filing Club.

**(5)**    Each and every agreement and understanding covering the operation of any other Club either in whole or in part by the filing Club, with a certified copy of such agreement.

**(6)**    Each and every agreement and understanding covering the operation of the filing Club in whole or to any extent by any other Club.

**(7)**    Each and every agreement and understanding covering payment by the filing Club to any other Club, of any loss or deficits or share of the profits of any Club.

**(8)**    Each and every agreement and understanding giving any other Club the right to acquire the contract of any player on the filing Club or to be consulted respecting the player's transfer or release, unless such right be covered by a regulation form optional agreement duly filed.

## MAJOR LEAGUE RULES
### MLR 21(a) to 21(c)

### Rule 21

### MISCONDUCT

**(a) MISCONDUCT IN PLAYING BASEBALL**. Any player or person connected with a Club who shall promise or agree to lose, or to attempt to lose, or to fail to give his best efforts towards the winning of any baseball game with which he is or may be in any way concerned, or who shall intentionally lose or attempt to lose, or intentionally fail to give his best efforts towards the winning of any such baseball game, or who shall solicit or attempt to induce any player or person connected with a Club to lose or attempt to lose, or to fail to give his best efforts towards the winning of any baseball game with which such other player or person is or may be in any way concerned, or who, being solicited by any person, shall fail to inform the Commissioner (in the case of a player or person associated with a Major League Club) or the President of the Minor League Association (in the case of a player or person associated with an independent Minor League Club) immediately of such solicitation, and of all facts and circumstances connected therewith, shall be declared permanently ineligible.

**(b) GIFT FOR DEFEATING COMPETING CLUB**. Any player or person connected with a Club who shall offer or give any gift or reward to a player or person connected with another Club for services rendered or supposed to be or to have been rendered in defeating or attempting to defeat a competing Club, and any player or person connected with a Club who shall solicit or accept from a player connected with another Club any gift or reward for any such services rendered, or supposed to have been rendered, or who, having been offered any such gift or reward, shall fail to inform the Commissioner or the President of the Minor League Association, as the case may be, immediately of such offer, and of all facts and circumstances connected therewith, shall be declared ineligible for not less than three years.

**(c) GIFTS TO UMPIRES**. Any player or person connected with a Club who shall give, or offer to give, any gift or reward to an umpire for services rendered, or supposed to be or to have been rendered, in defeating or attempting to defeat a competing Club, or for the umpire's decision on anything connected with the playing of a baseball game, and any umpire who shall render, or promise or agree to render, any such decision otherwise than on its merits, or who shall solicit or accept such gift or reward for any such service or decision, or who, having been offered any such gift or reward, or, having been solicited to render any such decision otherwise than on its merits, shall fail to inform the Commissioner or the President of the Minor League Association, as the case may be, immediately of such offer or solicitation, and all facts and circumstances connected therewith, shall be declared permanently ineligible.

**MAJOR LEAGUE RULES**
**MLR 21(d) to 22(b)**

**(d) BETTING ON BALL GAMES.**

**(1)** Any player, umpire, or Club or League official or employee, who shall bet any sum whatsoever upon any baseball game in connection with which the bettor has no duty to perform, shall be declared ineligible for one year.

**(2)** Any player, umpire, or Club or League official or employee, who shall bet any sum whatsoever upon any baseball game in connection with which the bettor has a duty to perform, shall be declared permanently ineligible.

**(e) VIOLENCE OR MISCONDUCT**. In case of any physical attack or other violence upon an umpire by a player, or by an umpire upon a player, or of other misconduct by an umpire or a player, during or in connection with any Major or Minor League game or any exhibition game of a Major or Minor League Club, the Commissioner shall impose upon the offender or offenders such fine, suspension, ineligibility or other penalty, as the facts may warrant in the judgment of the Commissioner.

**(f) OTHER MISCONDUCT**. Nothing herein contained shall be construed as exclusively defining or otherwise limiting acts, transactions, practices or conduct not to be in the best interests of Baseball; and any and all other acts, transactions, practices or conduct not to be in the best interests of Baseball are prohibited and shall be subject to such penalties, including permanent ineligibility, as the facts in the particular case may warrant.

**(g) RULE TO BE KEPT POSTED**. A printed copy in English and Spanish of this Rule 21 shall be kept posted in each clubhouse.

**Rule 22**

**CLAIM PRESENTATION**

**(a) DISCIPLINE.** All Clubs and players shall submit themselves to the discipline of the Commissioner as provided in the Major League Constitution and accept the Commissioner's decisions rendered in accordance with the Major League Constitution and these Rules.

**(b) DISPUTES.** All disputes between players and Clubs shall be referred to the Commissioner and the Commissioner's decisions shall be accepted by all parties as final. Negotiations between player and Club regarding the player's compensation under the player's contract shall not be referable to the Commissioner.

## MAJOR LEAGUE RULES
### MLR 22(c) to 24(a)

**(c)  TIME FOR PRESENTATION.**  Any disputed monetary claim, claim for free agency or complaint which any party may desire to submit for consideration, action or decision by the Commissioner must be presented within one year from the date the claim arose.

## Rule 23

### HOLIDAYS

Whenever, by the terms of a player's contract, or of the Major League Constitution or Rules, a particular act or thing is required to be done on or before a designated date, and said date falls on a Sunday, or on a January 1, Memorial Day, July 4, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, Christmas or any legal holiday, the following business day shall be substituted.

## Rule 24

### SUSPENDED PERSONNEL

**(a)  DISCIPLINE**.

**(1)**  By the Commissioner or a Club.  Both the Commissioner and a Club are entitled to discipline any manager, trainer, coach, scout, or other personnel who is not a player, in case of a violation of contract, the Major League Constitution, the Major League Rules, the Commissioner's regulations, or other rules, policies and guidelines.  Such discipline may include fining, dismissing, releasing, suspending or expelling the offender.  Any Club dismissing, releasing, suspending or expelling any such person shall at once notify the Commissioner's Office in writing stating the cause of such action.

**(2)**  By a Minor League or Minor League Association.  A Minor League or Minor League Association may discipline any manager, trainer, coach or other personnel who is not a player and who is assigned to such Minor League if so authorized by the Commissioner or the Commissioner's designee to consider discipline as a general matter in such circumstances, including, without limitation, pursuant to any on-field behavior policy promulgated by the Commissioner or the Commissioner's designee.  Such discipline may include a fine and/or suspension.  Written notice of the fine, or suspension, or both, and

## MAJOR LEAGUE RULES
### MLR 24(a) to 25(b)

of the reason for the fine and/or suspension shall in every case be given to the person disciplined.

**(b) APPEALS.** In the event a Club, Minor League or Minor League Association suspends a person who is not a player for a period in excess of 10 days, or fines such a person in excess of $10,000, such person shall have the right to appeal to the Commissioner. The appealing person must exercise this right to appeal, if at all, within 30 days of the Club action, by filing a written statement with the Commissioner stating that an appeal is being taken and describing the reasons in support of the appeal. The decision of the Commissioner on the appeal shall be final and unappealable.

**(c) EFFECT.** Unless prior approval of the Commissioner is granted, no person who has been suspended or otherwise declared ineligible shall perform any function for any Club or any other entity related to the Clubs during the duration of the suspension or period of ineligibility.

### Rule 25

### UNIFORM PLAYING RULES

**(a) OFFICIAL BASEBALL RULES.** Major League and Minor League Clubs shall play all games according to the provisions of the Official Baseball Rules as Recodified, Amended and Adopted at New York City, December 21, 1949, and thereafter amended by the Playing Rules Committee.

**(b) PLAYING RULES COMMITTEE.** The Playing Rules Committee shall consist of nine members, with three members representing the American League, three members representing the National League, two at-large members and one member representing the Minor League Association. The Commissioner shall appoint the six Major League and the two at-large representatives and the President of the Minor League Association shall appoint the Minor League representative on the Playing Rules Committee. The Commissioner or the Commissioner's designee and the President of the Minor League Association shall certify the names to the committee members to each other on or before December 15 of each year. Should any Committee member be unable to attend a Committee meeting, or vote upon a mail or telegraphic proposal, the Commissioner or the President of the Minor League Association, as the case may be, shall appoint a substitute to act in the member's stead.

## MAJOR LEAGUE RULES
## MLR 25(c)

**(c)  DUTIES OF PLAYING RULES COMMITTEE.**

**(1)**  Meetings. The Playing Rules Committee shall meet, upon call by the Commissioner, the Commissioner's designee or the President of a Minor League Association.  Any Official Baseball Rule may be revised, repealed, or adopted by a two-thirds vote of the Playing Rules Committee.  The Chairman of the Committee shall certify to the Commissioner any action taken at any meeting, stipulating the date on which such revision, adoption or repeal shall become effective.

**(2)**  Mail or Telegraphic Vote.  If, in the judgment of the Commissioner, a situation arises between meetings of the Playing Rules Committee under which it appears desirable to consider an amendment to an Official Playing Rule, the Commissioner shall direct the Chairman to conduct a mail or telegraphic vote. Upon receipt of such direction, the Chairman shall contact each Committee member (by mail or by telegram, as directed by the Commissioner), with a request that the member vote within a specified number of days (not to exceed 14) on adoption of the proposed amendment.  The affirmative vote of seven members of the Playing Rules Committee shall be required to adopt an amendment by mail or telegraphic vote.

**(3)**  Experimental Rulings.  The Playing Rules Committee, by affirmative vote of not less than seven of its members, may authorize a League or Leagues to adopt a rule that does not conform to the Official Playing Rules.  Such authorizations shall be known as "experimental rulings" and shall be subject to the following:

**(A)** An application for an experimental ruling must be certified by

**(1)**  the Commissioner, in the case of a Major League, as reflecting the desire of not less than three-fourths of the Clubs making up the League; or

**(2)**  the President of the League concerned, in the case of a Minor League, as reflecting the desire of not less than three-fourths of the Club Members of the League;

**(B)**  Such an application must be received by the Playing Rules Committee before January 1 of the year such experimental ruling is to be effective;

**(C)**  Not more than one experimental ruling shall be in effect in any one League at any one time; and

MAJOR LEAGUE RULES
**MLR 25(c) to 26(b)**

**(D)** The Playing Rules Committee shall fix or extend the period of time during which the experimental ruling is to be effective; however, an experimental ruling that is not adopted as a permanent rule after the expiration of such period must be re-submitted to the Playing Rules Committee by any League or Leagues wishing its continuance.

**(d) OFFICIAL SCORING RULES COMMITTEE.** The Official Scoring Rules Committee shall be a subcommittee of the Playing Rules Committee. It shall consist of seven members: the Chairman of the Playing Rules Committee, five members to be appointed by the Commissioner, and one member to be appointed by the President of the Minor League Association.

**(e) DUTIES OF OFFICIAL SCORING RULES COMMITTEE.** The Official Scoring Rules Committee shall determine which batting, fielding and pitching records of players, teams and Leagues shall be included in the official statistical records of the Major Leagues and the Minor Leagues, and prescribe minimum standards of performance for individual batting, fielding and pitching champions of the Major Leagues and the Minor Leagues.

**(f) COPYRIGHT AND PUBLICATION.** The Official Baseball Rules and all amendments thereto shall be copyrighted by the Commissioner who, each year, shall publish or authorize the publication of an official edition of the Official Baseball Rules.


**Rule 26**

**GATE RECEIPTS**

**(a) PAID ATTENDANCE.** "Paid attendance receipts" shall be defined as the total sum of gross receipts from tickets sold to each championship season or post-season game, less any admission tax, sales tax or use tax levied on such game tickets. Only taxes that are directly assessed on individual admissions or gate receipts, and paid by the customer as part of that ticket price, are deductible. Taxes on general sources of Club income are not deductible.

**(b) ASSESSMENT OF PAID ATTENDANCE RECEIPTS.** Each Club shall pay to the Commissioner's Office a percentage of paid attendance receipts for each of its home games in both the championship season and the post-season. Subject to the approval of the Major League Executive Council, the Commissioner shall annually set the percentage to be assessed and establish a reporting and payment process that provides sufficient cash flow to support all umpire-related obligations of the Commissioner's Office.

**3/08**

**MAJOR LEAGUE RULES**
**MLR 26(c) to 26(d)**

**(c)  ESTABLISHING ADMISSIONS TOTAL.**  Self-registering turnstiles, of a style approved by the Commissioner or the Commissioner's designee, shall be installed at every entrance to a Major League ballpark on the day a championship game or post-season game is scheduled.  Each entrance and its turnstiles shall be numbered for identification.  At each turnstile shall be a ticket box or appropriate electronic device.

Police personnel assigned to duty in the ballpark; employees (including managers and players) of the two contesting Major League Clubs; umpires and persons having business with either Club may enter the ballpark on the day of a game through an office entrance, but all other persons, including those entitled to free admission, shall pass in through a turnstile gate.  At each paid admission gate, a portion of each patron's ticket shall be deposited in the ticket box or registered with an appropriate electronic device.

Before the gates are opened, the home Club shall make a record of the number registered on each turnstile.  When the home Club stops selling tickets for the current day's game, all gates shall be closed, and the home Club shall make a record of the number then registered on each turnstile.  The home Club shall prepare a statement listing each gate opened for the day's game; the "opening number" and "closing number" on each turnstile; the number of admissions thus indicated at each gate, and the total number of paid admissions and free admissions.  Copies of this statement shall be furnished to the visiting Club and to the Commissioner's Office.

The visiting Club shall have the right to inspect all turnstiles before the gates are opened and to record the "opening number" on each turnstile register.   The visiting Club shall have access to all entrances at all times to verify which gates are open.  The visiting Club shall have the right to record the "closing number" on each turnstile register.  The visiting Club shall have the right to open the ticket boxes and count the retained portions of admission tickets as a check against the turnstile count or for any other reason.

**(d)  FREE ADMISSIONS.**  The home Club may offer free admission to any championship game to such individuals or groups as it may choose.  Any person presenting a pass shall be admitted free.  The home Club may admit such persons absolutely free or may impose a service charge.  Neither the visiting Club nor the Commissioner's Office shall be paid for such free admissions.  Should the visiting Club believe that the number of free admissions is excessive, it may ask the Commissioner to investigate the circumstances, and the Commissioner shall take such action as the Commissioner deems advisable.

## MAJOR LEAGUE RULES
### MLR 26(d) to 29(a)

A special entrance gate or gates shall be provided for all persons admitted free.

Should any such person admitted free enter through a paid admission gate, inadvertently or otherwise, the visiting Club and the Commissioner shall be paid their shares on such admission.  Under no circumstances shall a paid ticket holder be admitted through a free turnstile.

### Rule 27

**[Reserved]**

### Rule 28

### VOTING

Notwithstanding the provisions of the Major League Constitution, an amendment to any agreement between the Major League Clubs and a Minor League(s) and/or a Minor League Association(s) that has been adopted by the Minor League(s) and/or Minor League Association(s) need not be approved by the Major League Executive Council before submission to the Major League Clubs and shall be submitted to the Major League Clubs immediately upon such adoption for a vote in accordance with Article V, Section 2 of the Major League Constitution.

### Rule 29

### MAJOR LEAGUE DISASTER PLAN

**(a)  EVENT QUALIFYING AS A DISASTER.**  If a common accident, epidemic illness or other common event (referred to in this Rule 29 as an "occurrence") causes the death, dismemberment or permanent disability from playing professional baseball of

**(1)**    at least five players on a Major League Club's Active, Disabled or Suspended Lists during the period beginning with the opening date of such Club's championship season through the conclusion of such Club's playing season (including any post-season series); or

**(2)**    at least six players on a Major League Club's Major League Reserve List during the period beginning with the conclusion of such Club's playing season

## MAJOR LEAGUE RULES
### MLR 29(a) to 29(b)

(including any post-season series) up to the opening date of such Club's next championship season

then this Rule 29 shall apply and the affected Major League Club shall be a "Disabled Club."

**(b) PROCEDURES.**  The following policies and procedures shall govern in the event that there is a Disabled Club or Clubs:

**(1)**  Mourning Period.  The Commissioner may, after consultation with the Major League Baseball Players Association ("Players Association"), establish a mourning period following the occurrence that leads to a Club becoming a Disabled Club, during which Major League games may be postponed or cancelled.

**(2)**  Continuation of Disabled Club's Season.  The Commissioner shall, after consultation with the Players Association, determine whether the Disabled Club is able to continue play until the conclusion of the championship season and post-season, taking into account the date of the occurrence, the standing of the Disabled Club at the time of the occurrence, the Disabled Club's wishes and the integrity of the game of Baseball. The Commissioner and the Players Association shall jointly resolve all scheduling issues that may arise from prolonged interruption or cancellation of the Disabled Club's season.

**(3)**  Restocking Draft.  The Commissioner may, after consultation with the Players Association, conduct a selection meeting, at which a Disabled Club may claim the contracts of players from other Major League Clubs.  Such selection meeting shall be known as a Restocking Draft or Rule 29 draft.  In the event the Commissioner decides to conduct a Restocking Draft, the Commissioner or the Commissioner's designee shall fix the time of such Restocking Draft and the procedures described in Rules 29(b)(3)(A) through 29(b)(3)(C) shall apply.

**(A)** Players Available.

**(i)**  Number.  Each Major League Club that is not a Disabled Club shall, on a date determined by the Commissioner or the Commissioner's designee, submit a list of five players who shall be made available for selection by the Disabled Club at a Restocking Draft.  Such lists shall be submitted by each non-Disabled Club to the Commissioner or the Commissioner's designee, who promptly shall make such lists available to the Disabled Club.  If the Restocking Draft is in response to an in-season occurrence, as described in Rule

## MAJOR LEAGUE RULES
### MLR 29(b)

29(a)(1), then each non-Disabled Club shall choose the five players to make available from among such Club's Major League Active List as of the date of the Disabled Club's accident, or as of a date determined by the Commissioner or the Commissioner's designee in the event of an occurrence that is not a common accident. If the Restocking Draft is in response to an off-season occurrence, as described in Rule 29(a)(2), then each non-Disabled Club shall choose the five players to make available from among such Club's Major League Reserve List as of the date of the Disabled Club's accident, or as of a date determined by the Commissioner or the Commissioner's designee in the event of an occurrence that is not a common accident.

**(ii)** Positions. Unless otherwise ordered by the Commissioner or the Commissioner's designee, after consultation with the Players Association, each Club's list of available players for a Restocking Draft shall include one pitcher, one catcher, one outfielder, one infielder and a fifth player of any position. The Commissioner or the Commissioner's designee may, after consultation with the Players Association, modify the playing positions at which the Clubs must make players available for a Restocking Draft, depending upon the playing positions of the players lost by the Disabled Club. Notwithstanding any other provisions of this Rule 29(b)(3)(A)(ii), no Club shall be required to make available in a Restocking Draft any player who is primarily a catcher if such Club had, as of the date of the Disabled Club's accident (or as of the date determined by the Commissioner or the Commissioner's designee in the event of an occurrence that is not a common accident), fewer than three catchers who are otherwise eligible to be made available for selection.

**(iii)** Service. Subject to paragraph (b)(3)(A)(i) above, each Club that is not a Disabled Club shall include in its list of available players for a Restocking Draft at least as many players who have accrued no less than 60 days of Major League service time as of August 31 of the season preceding such Restocking Draft as the Disabled Club lost.

**(iv)** No-Trade Rights. Any player with a right to consent to an assignment to another Major League Club, including a player

 **(aa)** with a contractual provision that prohibits an assignment to the Club that has become a Disabled Club;

**MAJOR LEAGUE RULES**
**MLR 29(b)**

**(bb)** with a contractual provision that lists Clubs to which the player may be assigned and the Club that has become a Disabled Club is not on such list; or

**(cc)** who has a right to consent to an assignment pursuant to Article XIX(A)(1) of the Basic Agreement (Consent to Assignment),

may not be made available for selection at a Restocking Draft, unless such player has waived such rights in writing and in accordance with the provisions of Article XIX(A)(1) of the Basic Agreement, prior to the time the lists described in Rule 29(b)(3)(A) are required to be submitted. The Club shall provide a copy of the Player's consent to the Players Association contemporaneously upon the Club's receipt of such consent.

**(v)** Availability. Each Club warrants that each player it makes available for selection at a Restocking Draft is physically fit, not on a Suspended, Restricted, Disqualified, or Ineligible List and capable of playing immediately upon selection by a Disabled Club.

**(B)** Conduct of Restocking Draft. The Commissioner or the Commissioner's designee shall fix the time and place of each Restocking Draft. A Restocking Draft may be conducted by telephone conference or other electronic means, as the Commissioner or the Commissioner's designee may announce in advance of such Restocking Draft. The Players Association shall have an opportunity to have a representative at any Restocking Draft. A Disabled Club shall be entitled to select as many players as it lost in the occurrence, provided that the Disabled Club may select no more than one player from each of the other Major League Clubs.

**(C)** Effect of Selection. Each player selected in response to an in-season occurrence, as described in Rule 29(a)(1), shall be assigned to the Major League Active List of the selecting Disabled Club. Each player selected in response to an off-season occurrence, as described in Rule 29(a)(2), shall be assigned to the Major League Reserve List of the selecting Disabled Club. Within 48 hours of selection of a player in a Restocking Draft, the Disabled Club may, in its discretion, conduct a physical examination of such player. If the player is deemed by the Disabled Club's physician not fit to play, the Disabled Club may return the player to the Club from which the player was selected and select, from among

**MAJOR LEAGUE RULES**
**MLR 29(b) to 30(a)**

the lists submitted pursuant to Rule 29(b)(3)(A), a different player from that Club or from any other Major League Club from which the Disabled Club has yet to make a selection. If a player is returned pursuant to this Rule 29(b)(3)(C), the Club from which the player had been selected may be fined and otherwise sanctioned by the Commissioner or the Commissioner's designee for having made available for selection a physically unfit player.

**(D)** Confidentiality. The Commissioner or the Commissioner's designee shall make available only to the Disabled Club and the Players Association the names of the players whose contracts are available for selection in the Restocking Draft. The names of the players whose contracts are not thereafter selected shall be considered privileged material, and shall not be divulged by the Commissioner (or his designee), the Disabled Club or the Players Association at any time whatsoever.

**(4)** The Commissioner and the Players Association may agree that it is appropriate to provide other relief to a Disabled Club, including, for example, the awarding of additional selections in subsequent Rule 4 or Rule 5 drafts, priority on waiver claims for a set period of time and the modification of the deadline for naming a post-season roster.

**(c) INSURANCE.** The Office of the Commissioner shall exercise best efforts to maintain appropriate insurance to assist in the financial rehabilitation of a Disabled Club and other Major League Clubs affected by the occurrence giving rise to the Disabled Club. The Commissioner shall have sole discretion over the allocation of any resulting insurance proceeds and may elect to distribute such proceeds, in whole or in part, to a Disabled Club, to Clubs that lose a player in a Restocking Draft and to other Clubs whose operations may be affected by an interruption in a Disabled Club's season.

## Rule 30

### FINANCES

**(a) CHECKS**. All money received by the Commissioner in the Commissioner's official capacity shall be deposited in such accounts as the Major League Executive Council may direct and the terms of every such deposit shall be such that no check can be honored unless it shall bear the signatures of two persons from a list of employees of the Commissioner's Office approved by the Major League Executive Council, which list shall include the Commissioner; provided, however, that the Major League

### MAJOR LEAGUE RULES
### MLR 30(a) to 31

Executive Council may authorize a deposit account for petty disbursements subject to the check of one person from such list.

**(b)  AUDIT**.  The audited financial statements of the Office of the Commissioner required by Article II, Section 7 of the Major League Constitution shall be prepared by a certified public accountant to be designated by the Commissioner, and a copy of such statements shall be sent by the Commissioner to each Club president.

**(c)  BUDGET**.  The proposed budget for the Office of the Commissioner required by Article II, Section 7 of the Major League Constitution shall include all items of administrative expense for the ensuing year, the salaries of the Commissioner and all general and special employees, office rent, equipment, accessories and supplies, traveling expenses, printing, postage, telegrams and World Series expenses, and reasonable contingencies.  Checks duly countersigned may be drawn for such of these purposes and for additional amounts as shall be approved by the Major League Executive Council or as the Commissioner shall be required, by law or pre-existing contract, to pay.

**(d)  FUNDS.** All funds in the hands of the Commissioner in the Commissioner's official capacity shall be deemed the joint funds of the Major League Clubs, and the Major League Clubs shall, by such means as they shall from time to time decide upon, supply the Commissioner with money needed to meet authorized expenditures to the extent that the funds otherwise available may at any time prove inadequate.


### Rule 31


### BULLETINS


The Commissioner or the Commissioner's designee shall transmit bulletins of information covering all releases of players, assignment of players' contracts and all other matters of Major League interest or concern.  These bulletins shall be transmitted periodically to all Major League Clubs.

MAJOR LEAGUE RULES
MLR 32(a) to 32(b)

**Rule 32**

**SCHEDULES**

**(a)  MAJOR LEAGUES.**

**(1)**  Preparation of Schedules.  In each year the Commissioner shall prepare or cause to be prepared a draft schedule of championship season games showing proposed game start times.  The draft schedule for the next championship season of both Leagues shall be prepared by no later than June 30 of each year so that copies can be provided to the Major League Baseball Players Association by no later than July 1.  The Commissioner shall then issue the official schedule for the following season by no later than November 15 and no change shall thereafter be made in the official schedule without the consent of the Commissioner.

**(2)**  All-Star Break.  No Major League games shall be scheduled on the day immediately preceding and the day immediately following the All-Star Game.

**(b)  MINOR LEAGUES.**  According to its classification, the schedule of each Minor League and Minor League Club shall comply with the standards set forth in this Rule 32(b), unless exceptions are granted to a League by majority vote of the Farm Directors of Major League Clubs with PDCs in the League or that own a Club in the Minor League.  Each Minor League shall, for the purpose of soliciting Farm Director input, submit a final draft of its schedule to the Farm Directors of Major League Clubs with PDCs in the Minor League, or that own a Club in the Minor League, a minimum of 10 business days prior to the adoption of the schedule for such Minor League.  Such draft schedule shall indicate, for each game, whether such game is to be a day game (with a start time earlier than 4 p.m.) or a night game.  After a schedule is adopted, a day game may be changed to a night game, or a night game may be changed to a day game, so long as the Farm Directors of the Major League Clubs with PDCs with the Minor League Clubs scheduled to play in the changed game or that own a Minor League Club scheduled to play in the changed game are given notice at least three days in advance of the change and so long as the changed schedule complies with the requirements of this Rule 32(b) and Rule 57 (Travel Standards for Minor League Clubs).  In the event that the proposed schedule change would cause the schedule to not comply with either this Rule 32(b) or with Rule 57 (Travel Standards for Minor League Clubs), then the schedule change may not be made without the consent of both Farm Directors of the two Major League Clubs involved in the game whose time is proposed to be changed.  A Minor League adopting a schedule in violation of this Rule 32(b) shall be subject to a fine imposed at the discretion of the President of the League's Minor League Association and shall revise such schedule as soon as practicable to comply with the requirements of this Rule 32(b).

## MAJOR LEAGUE RULES
## MLR 32(b)

**(1)** Number of Games.  The maximum number of scheduled games per Club during the championship season shall be 140 in Class AAA, AA and A Leagues, 76 in Short-Season A Leagues, 68 in Rookie-Advanced Leagues and 60 in Rookie Leagues.

**(2)** Doubleheaders.  No Minor League Club's schedule may contain more than three doubleheaders on its final schedule if playing a "straight-through" season, or two per half if playing a split season, and no such doubleheaders may be scheduled during the final 20 days of a season or half.  Additional doubleheaders may be scheduled only with the prior permission of all Farm Directors of Major League Clubs whose players will be affected.  No split doubleheader may be scheduled in a Minor League.  Minor League Clubs shall not play more than two consecutive doubleheaders or three doubleheaders in a seven-day period.  One split doubleheader may be scheduled as a result of a postponement without Farm Director approval, but no Minor League Club may play a second split doubleheader in a season without the approval of the Farm Director of the Major League Club that has a PDC with the Minor League Club, or that owns the Minor League Club.

**(3)** Day Games After Travel.  No Minor League Club's schedule may contain a day game (with a start time earlier than 4 p.m. local time) following a night game after which the Minor League Club has had to travel by bus more than 150 road miles.

**(4)** Opening and Closing Dates.  The opening and closing dates for each Minor League's season shall comply with the following standards:

    **(A)** Class AAA, Class AA, Class A-Advanced, and Full-Season Class A: The opening date for all such Clubs shall be no earlier than the first Thursday after a Major League Club is scheduled to play its first championship season game in its regular home ballpark.  The closing date for all such Clubs shall be on or before Labor Day.

    **(B)** Short-Season A, Rookie-Advanced, and Rookie:  The opening date for all such Clubs shall be no earlier than 14 days after the first day of the Rule 4 draft.

**(5)** Playoff Games.  Playoffs in each Minor League shall be conducted as follows:

**(A)** Class AAA, Class AA, and Class A-Advanced:  Each League may choose its own format.  All playoff series must be completed within 12 days after the end of the season.

**(B)** Full-Season A:  Each League may choose its own format.  If the playoffs are to consist of one tier or series only, it shall be a best-of-five game series to be completed within seven days after the end of the season. If the playoffs are to consist of two tiers, the first round shall consist of best-of-three game series, and the latter round shall be a best-of-five game series, all of which must be completed within 12 days after the end of the season.

**(C)** Short-Season A:  The playoff series, if any, shall be a best-of-five game series, to be completed within seven days after the end of the season.

**(D)** Rookie-Advanced:  The playoff series, if any, shall be a best-of-three game series, to be completed no later than five days after the end of the season.

**(E)** Rookie:  No playoffs shall be conducted.

**(6)** All-Star Games.  Each Minor League shall be permitted to schedule and play no more than one All-Star Game per season, whether interleague or intraleague.

**(7)** Consecutive Games.  No Minor League Club shall be scheduled, or rescheduled if practicable, to play more than 30 consecutive dates without an open day.

## Rule 33

### QUALIFICATION FOR POST-SEASON SERIES

**(a) DIVISION CHAMPIONS.**  The Commissioner's Office shall maintain a tabulated record of championship season games won and lost by each Major League Club as reported by the official scorers.  The Commissioner shall award the championship of each Division to the Club in that Division that won the highest percentage of its games during the championship season.  If two or more Clubs in a Division are tied in winning percentage at the close of the championship season as scheduled, the championship season may be extended by the playing of a tie-breaking game or games, as provided in Rule 33(c).  Tie games shall not count as games played, won or lost for purposes of calculating the percentage of games won and lost during the championship season.

**MAJOR LEAGUE RULES**
**MLR 33(b) to 33(c)**

**(b)  WILD CARD.**  The Commissioner shall award a position in one Division Series in each Major League to the Club that won the highest percentage of its games during the championship season among the Clubs that were not Division champions.  Such Club shall be referred to as the Wild Card Club in its League.

**(c)  TIE-BREAKING PROCEDURES.**  Any additional game played to break a tie pursuant to this Rule 33(c) shall be a championship season game.  Statistics from any such game shall count in the official League championship season statistics.  Paid attendance for any such game shall be included in the official paid attendance records for the championship season.  The Commissioner may determine the procedures to break any ties that are not otherwise provided for in this Rule 33(c).

    **(1)**    Division Championship.

        **(A)**  Two-Club Tie.  If two Clubs are tied for first place in a Division with an identical winning percentage at the conclusion of the championship season as originally scheduled, including all rescheduled games, the Commissioner shall award the Division championship as follows:

            **(i)**  If the winning percentage of the two Clubs tied for first-place is higher than the winning percentage of each of the second-place Clubs in the same League, then the Commissioner shall award the Division championship

                **(aa)** to the tied Club with the higher winning percentage in head-to-head competition between the two tied Clubs during the championship season; or

                **(bb)** if the Clubs remain tied, then to the tied Club with the higher winning percentage in intradivision games during the championship season; or

                **(cc)**  if the Clubs remain tied, then to the tied Club with the higher winning percentage in the last half of intraleague games during the championship season; or

                **(dd)** if the Clubs remain tied, then to the tied Club with the higher winning percentage in the last half plus one of intraleague games during the championship season, provided that such additional game was not a game between the tied Clubs.

**MAJOR LEAGUE RULES**
**MLR 33(c)**

If the Clubs remain tied, then the procedure described in Rule 33(c)(1)(A)(i)(dd) of adding the immediately preceding game played by each Club, provided that such added game was not between the tied Clubs, and then considering the winning percentages of the tied Clubs over the period from that game through the end of the championship season, shall be continued until one Club emerges with a better winning percentage in that span of games, and the Club with such better winning percentage shall be awarded the Division championship.

In any event, if a tie is broken pursuant to this Rule 33(c)(1)(A)(i), the tied Club that is not awarded the Division championship shall qualify for a Division Series as the Wild Card Club.

**(ii)**   If the winning percentage of the two tied Clubs is equal to or lower than the winning percentage of at least one of the second-place Clubs in the same League, then the championship season shall be extended to include one additional game between the two Clubs tied for first-place in their Division.   Such game shall be played the day after the championship season as originally scheduled.  The site of the game may be determined by mutual agreement among the Clubs and the Commissioner to keep travel at a minimum.   In the absence of such an agreement, the Commissioner shall determine the site of the additional game between the tied Clubs by one toss of a coin.  The Commissioner shall award the Division championship to the winner of the additional game.

**(B)**   Three-Club Tie.  If three Clubs are tied for first place in a Division with an identical winning percentage at the conclusion of the championship season as originally scheduled, including all rescheduled games, the Commissioner shall schedule additional championship season games in order to determine the Division championship, as follows:

**(i)**   If the three tied Clubs have identical records against one another in the championship season, the Commissioner shall supervise a draw that results in the Clubs' being designated Club "A," "B," or "C," for purposes of Rule 33(c)(1)(B)(ii).  If the tied Clubs do not have identical records against one another in the championship season, their designations as Club "A," "B," or "C" shall be determined as follows:

**(aa)** If Club 1 has a better record against each of Clubs 2 and 3, and Club 2 has a better record against Club 3, then Club 1 shall

108                                               **3/08**

## MAJOR LEAGUE RULES
## MLR 33(c)

choose a designation as Club "A," "B," or "C," and Club 2 shall choose a designation from the remaining two designations.  Club 3 shall be assigned the remaining designation.

**(bb)** If Club 1 has a better record against each of Clubs 2 and 3, and Club 2 and Club 3 have the same record against each other, then Club 1 shall choose a designation as Club "A," "B," or "C," and the Commissioner shall supervise a draw between teams 2 and 3, the winner of which shall choose one of the remaining two designations.  The remaining Club shall be assigned the remaining designation.

**(cc)** If Club 1 and Club 2 have the same record against each other but each has a better record against Club 3, then the Commissioner shall supervise a draw between Clubs 1 and 2, the winner of which shall chose a designation as Club "A," "B," or "C."  The Club losing the draw shall choose a designation from the remaining two designations.  Club 3 shall be assigned the remaining designation.

**(dd)** If Club 1 has a better record against Club 2, Club 2 has a better record against Club 3, and Club 3 has a better record against Club 1, then the three Clubs shall be ranked on the basis of overall winning percentage within that three-Club group, and the Club with the highest winning percentage from among that three-Club group shall have first choice among designations as Club "A," "B," or "C," the Club with the next highest winning percentage from among that three-Club group shall have the next choice between the two remaining designations, and the Club with the lowest winning percentage from among that three-Club group shall be assigned the remaining designation.  If two or more of the Clubs within such three-Club group have the same winning percentage among the group, the Commissioner shall supervise a draw between the Clubs so tied to determine priority of selection among the designations.

**(ii)** Club "A" shall play Club "B" at the ballpark of Club "A" the day after the conclusion of the championship season as originally scheduled.  The following day, the winner of that first game shall be the home Club in a second game, against Club "C."  The site of each game instead may be determined by mutual agreement among the Clubs involved and the Commissioner to keep travel at a minimum.  The Commissioner shall award the Division championship to the winner of

**MAJOR LEAGUE RULES**
**MLR 33(c)**

the game between Club "C" and the Club that won the game between Club "A" and Club "B."

**(C)** Four-Club Tie. If four Clubs are tied for first place in a Division with an identical winning percentage at the conclusion of the championship season as originally scheduled, including all rescheduled games, the Commissioner shall schedule additional championship season games in order to determine the Division championship, as follows:

**(i)** The Commissioner shall supervise a draw that results in the Clubs' being designated Club "A," "B," "C," and "D" for purposes of Rule 33(c)(1)(C)(ii).

**(ii)** Club "B" shall play one game at the ballpark of Club "A." Club "D" shall play one game at the ballpark of Club "C." Each of these two games shall be played on the day after the conclusion of the championship season as originally scheduled. The following day, the winning Clubs of each of those two games shall play one game, at the ballpark of Club "A" or Club "B," whichever has won the game between the two. The site of each game instead may be determined by mutual agreement among the Clubs involved and the Commissioner to keep travel at a minimum. The Commissioner shall award the Division championship to the winner of the third game, which is contested between the winners of the respective first two games.

**(2)** Division and Wild Card Ties. If three or more Clubs in a League are tied with identical winning percentages at the conclusion of the championship season as originally scheduled and two or more of those tied Clubs are from the same Division and are also tied for first place in that Division, the Division champion shall first be determined pursuant to Rule 33(c)(1). For purposes of Rules 33(c)(3)(A), 33(c)(3)(B), and 33(c)(3)(C), any games played pursuant to Rule 33(c)(1) to determine a Division champion shall not count in determining which Clubs are deemed tied for a Wild Card designation. Clubs that were originally tied with a Club or Clubs for a Wild Card designation shall still be considered tied, notwithstanding any wins or losses occurring in games played under Rule 33(c)(1). Games played for the Division championship pursuant to Rule 33(c)(1) shall nevertheless be included in the final Club standings and in all statistics, as provided for in the first paragraph of this Rule 33(c).

**(3)** Wild Card. If two or more Clubs in a League are tied in determining the Wild Card Club with identical winning percentages at the conclusion of the championship season as originally scheduled, including all rescheduled games and

**MAJOR LEAGUE RULES**
**MLR 33(c)**

discounting additional games to determine the Division champion, as set forth in Rule 33(c)(2), the Commissioner shall determine the Wild Card Club as follows:

**(A)** Two-Club Tie.  If two Clubs are tied for the Wild Card designation then the championship season shall be extended to include one additional game between such Clubs.  Such game shall be played the day after the conclusion of the championship season as originally scheduled.  The site of the game may be determined by mutual agreement among the Clubs and the Commissioner to keep travel at a minimum.  In the absence of such an agreement, the Commissioner shall determine the site of the additional game between the tied Clubs by one toss of a coin.  The Commissioner shall declare the winner of the additional game to be the Wild Card Club.

**(B)** Three-Club Tie.  If three Clubs are tied for the Wild Card designation the Commissioner shall schedule additional championship season games in order to determine the Wild Card Club, as follows:

    **(i)**   If the three tied Clubs have identical records against one another in the championship season, the Commissioner shall supervise a draw that results in the Clubs being designated Club "A," "B," and "C," for purposes of Rule 33(c)(3)(B)(ii).  If the tied Clubs do not have identical records against one another in the championship season, their designations as Club "A," "B," and "C" shall be determined according to the procedures described in Rules 33(c)(1)(B)(i)(aa) through (dd).

    **(ii)**  Club "A" shall play Club "B" at the ballpark of Club "A" the day after the conclusion of the championship season, as originally scheduled.  The following day, the winner of that first game shall be the home Club in a second game against Club "C." The site of each game instead may be determined by mutual agreement among the Clubs involved and the Commissioner to keep travel at a minimum.  The Commissioner shall declare the winner of the game between Club "C" and the Club that won the game between Club "A" and Club "B" to be the Wild Card Club.

**(C)** Four-Club Tie.  If four Clubs are tied for the Wild Card designation, the Commissioner shall schedule additional championship season games in order to determine the Wild Card Club, as follows:

    **(i)**   The Commissioner shall supervise a draw that results in the Clubs being designated Club "A," "B," "C," and "D" for purposes of Rule 33(c)(3)(C)(ii).

**MAJOR LEAGUE RULES**
**MLR 33(c) to 34(a)**

**(ii)** Club "B" shall play one game at the ballpark of Club "A." Club "D" shall play one game at the ballpark of Club "C." Each of these two games shall be played on the day after the conclusion of the championship season as originally scheduled. The following day, the winning Clubs of each of those two games shall play one game, at the ballpark of Club "A" or Club "B," whichever has won the game between the two. The site of each game instead may be determined by mutual agreement among the Clubs involved and the Commissioner to keep travel at a minimum. The Commissioner shall declare the winner of the third game, which is contested between the winners of the respective first two games, to be the Wild Card Club.

**Rule 34**

**POST-SEASON SERIES**

**(a) DIVISION SERIES.** Two Division Series in each Major League shall take place after the conclusion of the championship season of each year. Each Division Series shall be a best-of-five-games format. In each Major League, the three Division Champions and the Wild Card Club shall qualify for a Division Series. The Division Series matchups within each Major League shall be:

**(1)** The Club with the best percentage of games won and lost in the championship season versus

**(A)** the Wild Card Club, so long as those two Clubs are not members of the same Division; or

**(B)** if the Wild Card Club is from the same Division as the Club with the best winning percentage in the League, then the one of the two other Division champions that has the lower winning percentage of games won and lost in the championship season.

**(2)** The two remaining Clubs that have qualified for a Division Series.

**(3)** For purposes of determining Division Series matchups pursuant to this Rule 34(a) and scheduling pursuant to Rules 37(a)(1) (Division Series) and 37(a)(2) (League Championship Series), if two or more Clubs are tied with identical percentages of games won and lost during the championship season, then the tie shall be broken as follows:

## MAJOR LEAGUE RULES
## MLR 34(a)

**(A)** Two-Club Tie. The Club deemed to have the higher winning percentage shall be

> **(i)** the tied Club with the higher winning percentage in head-to-head competition between the two tied Clubs during the championship season; or

> **(ii)** if the Clubs remain tied, then the tied Club with the higher winning percentage in intradivision games during the championship season; or

> **(iii)** if the Clubs remain tied, then the tied Club with the higher winning percentage in intraleague games during the championship season; or

> **(iv)** if the Clubs remain tied, then the tied Club with the higher winning percentage in the last half of intraleague games during the championship season; or

> **(v)** if the Clubs remain tied, then the tied Club with the higher winning percentage in the last half plus one of intraleague games during the championship season.

If the Clubs remain tied, then the procedure described in Rule 34(a)(3)(A)(v) of adding the immediately preceding intraleague game played by each Club and then considering the intraleague winning percentages of the tied Clubs over the period from that game through the end of the championship season, shall be continued until one Club emerges with a better winning percentage in that span of games, and that Club shall be deemed to have the higher winning percentage for purposes of determining Division Series matchups pursuant to this Rule 34(a) and scheduling pursuant to Rules 37(a)(1) (Division Series) and 37(a)(2) (League Championship Series).

**(B)** Three-Club Ties. The Club deemed to have the higher winning percentage shall be the tied Club that has a better record against both of the other Division champions during the championship season, in which case the tie between the two remaining Clubs shall be broken by the procedures set forth in Rule 34(a)(3)(A). If none of the three tied Clubs has a better record against both of the other Division champions during the championship season, then the Club deemed to have the higher winning percentage shall be

3/08

**MAJOR LEAGUE RULES**
**MLR 34(a) to 34(c)**

**(i)** the tied Club with the higher winning percentage in head-to-head competition among the tied Clubs during the championship season; or

**(ii)** if the Clubs remain tied, then the tied Club with the higher winning percentage in intradivision games during the championship season; or

**(iii)** if the Clubs remain tied, then the tied Club with the higher winning percentage in intraleague games during the championship season; or

**(iv)** if the Clubs remain tied, then the tied Club with the higher winning percentage in the last half of intraleague games during the championship season; or

**(v)** if the Clubs remain tied, then the tied Club with the higher winning percentage in the last half plus one of intraleague games during the championship season.

If the Clubs remain tied, then the procedure described in Rule 34(a)(3)(B)(v) of adding the immediately preceding intraleague game played by each Club and then considering the intraleague winning percentages of the tied Clubs over the period from that game through the end of the championship season, shall be continued until one Club emerges with a better winning percentage in that span of games, and that Club shall be deemed to have the higher winning percentage for purposes of determining Division Series matchups pursuant to this Rule 34(a) and scheduling pursuant to Rules 37(a)(1) (Division Series) and 37(a)(2) (League Championship Series).

Upon determination of the Club deemed to have the higher winning percentage, the sequence of procedures set forth in Rule 33(a)(3)(A) shall be applied to the two remaining tied Clubs in order to determine which of them shall be deemed to have the better winning percentage for purposes of determining Division Series matchups pursuant to this Rule 34(a) and scheduling pursuant to Rules 37(a)(1) (Division Series) and 37(a)(2) (League Championship Series).

**(b) LEAGUE CHAMPIONSHIP SERIES.** One League Championship Series shall be contested in each League between the winners of the two Division Series in that League. Each League Championship Series shall be a best-of-seven-games format.

**(c) WORLD SERIES.** The World Series shall take place at the end of the League Championship Series each year. The World Series shall be a best-of-seven-games format.

MAJOR LEAGUE RULES
MLR 35(a) to 37(a)

### Rule 35

### POST-SEASON SUPERVISION BY THE COMMISSIONER

**(a)**  The games in each post-season series shall be played under the supervision, control and direction of the Commissioner.

**(b)**  All questions arising out of the playing of the World Championship not provided for herein, nor covered by the Official Baseball Rules, shall be dealt with and decided by the Commissioner.

### Rule 36

### PENNANT AND MEMENTO

**(a)  WORLD SERIES.**  The emblem of the World Series championship shall be a pennant, to be presented to the victorious World Series Club each year, and an appropriate memento shall be awarded to each player, the manager, each coach and the general manager of the victorious Club. Both the pennant and the memento shall be selected by the Commissioner.  The cost of the mementos for the World Series winner shall not exceed $1,500 each, including tax.

**(b)  PRESENTATION.**  The World Series pennant and mementos shall be presented to the victorious Club and its players, each year, by the Commissioner, who is authorized to arrange for all of the details of such presentation.

**(c)  LEAGUE CHAMPIONS.**  The victorious Club in each season's League Championship Series shall be entitled to display a pennant symbolizing the Club's League championship.

### Rule 37

### POST-SEASON SCHEDULE

**(a)  ORDER OF GAMES.**  The Commissioner shall promulgate a schedule for the Division Series, the League Championship Series and the World Series.

## MAJOR LEAGUE RULES
### MLR 37(a) to 37(b)

**(1)**    Division Series.   Games 1, 2 and 5 of each Division Series shall be scheduled to be played in the ballpark of the Club with the higher percentage than its Division Series opponent of games won and lost in the championship season; provided, however, that Games 1, 2 and 5 shall be scheduled in the ballpark of the opponent of the Wild Card Club, notwithstanding the percentage of games won and lost by such Wild Card Club.  Games 3 and 4 shall be scheduled to be played in the ballpark of the Club that is the visiting Club in Games 1, 2 and 5.

**(2)**    League Championship Series.   Games 1, 2, 6 and 7 of each League Championship Series shall be scheduled to be played in the ballpark of the Club with the higher percentage than its League Championship Series opponent of games won and lost in the championship season; provided, however, that Games 1, 2, 6 and 7 shall be scheduled in the ballpark of the opponent of a Wild Card Club in the League Championship Series, notwithstanding the percentage of games won and lost by such Wild Card Club.  Games 3, 4 and 5 shall be scheduled to be played in the ballpark of the Club that is the visiting Club in Games 1, 2, 6 and 7.

**(3)**    World Series.  Games 1, 2, 6 and 7 shall be scheduled in the city of the Club whose League was the winner of that season's All-Star Game, and games 3, 4 and 5 shall be scheduled in the city of the other Club.

**(4)**    Home-field Advantage for Tied Clubs.   In the event two Clubs have identical winning percentages in the championship season, then for purposes of Rules 37(a)(1) (Division Series) and 37(a)(2) (League Championship Series), the Club that shall be scheduled to host the majority of games in the applicable series shall be the Club deemed to have the higher winning percentage pursuant to the procedures set forth Rule 34(a)(3).

**(b) POSTPONED GAMES**.  A scheduled Division Series, League Championship Series or World Series game that is a tie game, is postponed for legal cause or is called before it becomes a regulation game shall, unless the schedule explicitly provides to the contrary, be played off on the grounds for which it was scheduled before the succeeding scheduled game for the other city shall be contested, and the date assigned for subsequent games shall thereupon be moved forward.  The schedule shall also provide for the time and place of playing off, if necessary, any game or games terminating with the score tied.  Official Baseball Rule 4.12 on Suspended Games shall not be in effect during the Division Series, League Championship Series, or World Series.  The Commissioner or the Commissioner's designee, after consultation with officials of the home Club, shall determine whether, on account of wet grounds, darkness, rain, snow, inclement weather, or other conditions, a Division Series, League Championship Series, or World Series game shall not be played.

MAJOR LEAGUE RULES
MLR 38(a) to 40(a)

## Rule 38

### POST-SEASON SERIES TERMINATION

**(a)  BY VICTORY**.   The Clubs participating in the Division Series, League Championship Series, or World Series shall play each day according to the authorized schedule until one of them has won the required number of victories at which time the series shall end.  The required number of victories shall be three in the case of each Division Series and four in the case of each League Championship Series or the World Series.

**(b)  BY COMMISSIONER**.  The Commissioner shall have the right to terminate a post-season series at any time that the Commissioner deems the interest of Baseball demands it, and to declare one of the contesting Clubs the winner of that series regardless of previous performances.

## Rule 39

### POST-SEASON PLAYING RULES

The games shall be conducted according to the playing rules governing competition for the League pennants.  If the playing rules of the two Major Leagues differ, then the playing rules used for each game of the World Series shall be the playing rules of the League of the Club in whose ballpark such World Series game is scheduled to be played.

## Rule 40

### PLAYERS ELIGIBLE FOR POST-SEASON

**(a)  PLAYERS ELIGIBLE**.

**(1)**   Major League Roster Players.  To be eligible to play for a Major League Club in a Division Series, League Championship Series, or the World Series, a player must

**(A)** have been on a Major League Active, Disabled (subject to the exception in Rule 2(g)(2) (Major League Disabled List; Transfers)), Bereavement, Suspended or Military List of such Major League Club as

**MAJOR LEAGUE RULES**
**MLR 40(a)**

of Midnight Eastern Time on August 31, or on such date be under control, but not yet reported, on assignment from another Major League organization; and

**(B)** have remained reserved to such Major League Club (at the Major or Minor League levels) through the beginning of the applicable post-season series,

unless the player is replacing an injured player pursuant to Rule 40(a)(3).

**(2)** Submission of Rosters. Each Major League Club that participates in a post-season series must establish for each such series, from its complement of eligible players, an active roster of no more than 25 (and no less than 24) players and transmit such active roster to the Office of the Commissioner at such time before the scheduled start of each post-season series as the Commissioner or the Commissioner's designee may set. Each player named to the roster for a series must be expected to be physically able to perform at some point in such series. No player on the Disabled List whose minimum period of inactivity has not yet expired before the scheduled start of the post-season series may be named to the roster for such series. Except as permitted in Rule 40(a)(4), there shall be no substitutions made during a post-season series following a Major League Club's submission of its active roster for that series.

**(3)** Replacements for Injured Players Before a Series. With the express consent of the Commissioner or the Commissioner's designee prior to the start of a post-season series, a Club may name a player in its organization to a roster for such series in order to replace an injured Major League player. A Club will not be permitted to name such a replacement unless

**(A)** the injured Major League player is eligible under Rule 40(a)(1);

**(B)** the injured Major League player is unable to render service in such series because of a specific injury or ailment;

**(C)** the injured Major League player's Club has submitted written proof of the player's disability; and

**(D)** the injured Major League player's Club has requested permission from the Commissioner or the Commissioner's designee to name such a replacement.

**MAJOR LEAGUE RULES**
**MLR 40(a)**

If the Commissioner or the Commissioner's designee grants permission to the injured Major League player's Club to make such a replacement, the player named to the roster for the series as a replacement must also be an eligible player pursuant to Rule 40(a)(1) or must

**(E)** have been on a Minor League Active, Disabled, Temporarily Inactive, Suspended or Military List of such Major League Club as of Midnight Eastern Time on August 31, or on such date be designated for assignment or under control, but not yet reported, on assignment from another Major League organization;

**(F)** have remained reserved to such Major League Club (at the Major or Minor League levels) through the time of replacement; and

**(G)** be placed on the Club's Major League Reserve List.

**(4)** Replacements for Injured Players During a Series.  A Club may request permission from the Commissioner or the Commissioner's designee to replace on the Club's active roster for the remainder of a post-season series a player who is unable to render service in such post-season series because of a specific injury or ailment that occurred after the Club's roster for such series had been submitted, provided that the Club submits written proof of the disability to the Commissioner or the Commissioner's designee.  The Commissioner or the Commissioner's designee may approve or disapprove a request for a roster substitution and may make whatever investigation the Commissioner or the Commissioner's designee deems appropriate in exercising such discretion.  The Commissioner or the Commissioner's designee's exercise of discretion may include disapproval of the request for a roster substitution if the Commissioner or the Commissioner's designee determines that the request was not made in a reasonable amount of time in advance of a game to allow for investigation of the facts and circumstances.  If the Commissioner or the Commissioner's designee gives express approval for the substitution,

**(A)** the player added to the roster must also be an eligible player pursuant to Rule 40(a)(1) or Rules 40(a)(3)(E) through (G);

**(B)** a pitcher may be replaced only by a pitcher and a player other than a pitcher may be replaced only by a player other than a pitcher; and

**(C)** the injured player being replaced shall be ineligible to play for the remainder of such series, as well as the next subsequent post-season series that year.

## MAJOR LEAGUE RULES
### MLR 40(b) to 42(b)

**(b)  COACHES ELIGIBLE**.  To be eligible for a Division Series or a League Championship Series or the World Series, a coach must be a bona fide member of a qualifying team on and after August 31 to the end of the season of the year in which the series is played, under contract or terms of acceptance approved and promulgated by the Commissioner.  No additional coaches will be permitted, but coaches may be substituted for, subject to the approval of the Commissioner.

**(c)  PLAYERS ELIGIBLE—MINOR LEAGUE POST-SEASON.**  Each Minor League Club that participates in post-season playoffs must establish for such playoffs, from its complement of eligible players, an active roster of no more than the maximum number of Active List players set forth in Rule 2(c)(2) as of the end of the championship season for such Minor League Club's classification.  Each Minor League Club that participates in post-season playoffs shall transmit such active roster to the Office of the Commissioner and the president of such Club's Minor League no later than noon local time of the first scheduled date of such playoffs for such Club.


### Rule 41

**[Reserved]**


### Rule 42

### POST-SEASON EXPENSES

**(a)  PAID BY COMMISSIONER.**  The expenses of the Commissioner pertaining to these games, the compensation of the umpires, scorers, business representatives, and other miscellaneous and contingent expenses in connection with these games shall be met by the Commissioner.  The Commissioner shall also pay expenses incurred by a Club not participating in the Series in the printing of tickets for such a Series, when such printing has been authorized previously by the Commissioner.

**(b)  CLUBS' EXPENSES.**  The expenses of both Clubs, such as hotel bills and traveling expenses, baseballs, advertising, printing of all tickets, policing of grounds, ticket sellers and takers, incidentals, etc., shall be paid by the Club incurring the same. Should any difference arise at any time as to the latter expense, the same shall be submitted to the Commissioner for adjudication, and the Commissioner's findings shall be conclusive.

MAJOR LEAGUE RULES
MLR 43 to 44(c)

### Rule 43

### POST-SEASON PLAYING GROUNDS

Spectators will not be permitted to encroach or stand on the playing field at any time during a Division Series, League Championship Series, or World Series game, unless the Commissioner grants special authority to do so. A Club that plans to accommodate patrons in excess of the regular seating capacity of its plant is required to erect, with the approval of the municipal authorities and permission of the Commissioner, safe temporary stands or seats with a strong railing in front thereof, extending from the grandstand or skirting the outfield.

### Rule 44

### POST-SEASON ADMISSIONS

**(a) RATES**. The rates of admission and the conditions governing the same for Division Series, League Championship Series and World Series games shall be fixed by and under the control of the Major League Executive Council.

**(b) FREE LIST SUSPENDED**. The free list shall be suspended during Division Series, League Championship Series and World Series games, except to representatives of the press and official guests of the Commissioner.

**(c) TICKETS**. The sale, distribution of and settlement for tickets for Division Series, League Championship Series and World Series games will be conducted as follows:

**(1)** Each Club shall provide its reserved seat and general admission tickets with rain checks attached.

**(2)** Reserved seat coupon tickets for home games of the selling Club shall be sold and distributed prior to the opening of the series at a time and in a manner annually approved by the Commissioner, to meet local conditions.

**(3)** Clubs shall print post-season tickets if and when the Commissioner or the Commissioner's designee so directs, in a form and manner the Commissioner or the Commissioner's designee may determine. A Club printing post-season tickets shall pay for them in such manner as the Commissioner or the Commissioner's designee may direct.

# MAJOR LEAGUE RULES
## MLR 44(d) to 44(f)

**(d)  SEAT DIAGRAM**.  Prior to the day of the first scheduled game of each Division Series, League Championship Series or World Series in its city, each contesting Club shall furnish the representatives of the Commissioner with a numbered diagram of all its reserved seats, whether in permanent or temporary stands, and the settlement therefor by the Club with the representatives of the Commissioner shall be on the basis of the difference between the number of unsold tickets and the number listed on such diagram.  The count of all tickets sold for each such game shall be compared by the Commissioner's representatives with the turnstile registers, and the home Club shall settle for the larger number.

**(e)  TICKET PRIORITIES**.  The order in which requests for reserved seat tickets for the World Series shall be filed is as follows:

> **(1)**    Visiting Club.  Five hundred reserved seat tickets for each game to the visiting club, for accommodations of its officials and guests, the same to be paid for by the visiting Club.

> **(2)**    Players.  Five tickets for each eligible player of the visiting team, which shall be delivered to and paid for by each player through the business manager of the player's Club.

> **(3)**    Commissioner's Office and Club Officials.    Requests filed by the Commissioner's Office and Major League Club officials or parties of prominence with the Commissioner.

> **(4)**    Major League Clubs.  Major League Clubs (other than the visiting Club), 100 reserved seat tickets, 16 of which shall be box seats.  Eight of the 16 box seats shall be grouped together in the lower deck between first and third base, and 20 of the remaining 84 reserved seats shall be so situated.

**(f)  DAILY SETTLEMENT**.  A settlement shall be made by the home Club with the representatives of the Commissioner after the close of each Division Series, League Championship Series or World Series game, by turning over to them within 24 hours one check for the gross paid attendance receipts, as defined in Rule 26(a) (Paid Attendance), the same being made payable to the Commissioner's Office.

## MAJOR LEAGUE RULES
### MLR 45(a) to 45(b)

### Rule 45

### DIVISION OF POST-SEASON RECEIPTS

The gate receipts from the World Series, from the first four games of each League Championship Series, and from the first three games of each Division Series (which shall be remitted by the participating Clubs to the Office of the Commissioner within 24 hours after the completion of each game) shall be divided as follows:

**(a) COMMISSIONER.** Fifteen percent from all World Series games shall be paid to the Office of the Commissioner. A percentage set annually by the Commissioner, and approved by the Major League Executive Council, in accordance with Rule 26(b) (Assessment of Paid Attendance Receipts), from all League Championship Series games shall be paid to the Office of the Commissioner.

**(b) PLAYERS.**

    **(1)** Creation of Pool. One players' pool shall be created from the World Series, the two League Championship Series and the four Division Series. Contributions shall be made into the pool as follows:

        **(A)** Sixty percent of the total gate receipts from the first four World Series games;

        **(B)** Sixty percent of the total gate receipts from the first four games of each League Championship Series; and

        **(C)** Sixty percent of the total gate receipts from the first three games of each Division Series.

    **(2)** Distribution of Pool. The players' pool shall be apportioned and distributed to the players, by Club, by the Secretary-Treasurer as follows:

        **(A)** Thirty-six percent to the team winning the World Series.

        **(B)** Twenty-four percent to the team losing the World Series.

        **(C)** Twenty-four percent to be divided equally between the losing teams in each of the two League Championship Series.

## MAJOR LEAGUE RULES
## MLR 45(b)

**(D)** Twelve percent to be divided equally among the losing teams in each of the four Division Series.

**(E)** Four percent to be divided equally among the four second-place teams that did not qualify for a Division Series from among the six divisions.

**(3)** How Apportioned. At meetings presided over by the player representatives, the players' pool shall be apportioned according to the vote of all players of each team referred to in Rule 45(b)(2) who

**(A)** are eligible to participate in the World Series for that year under Rule 40 if their team wins its League Championship; and

**(B)** have been with their respective teams on and subsequent to June 1 of the current year.

Attendance at each such meeting shall be limited to players, except that the field manager, prior to being excused from such meeting, shall be given first the opportunity to express the manager's views as to the division of the pool. At the invitation of the player representative, the field manager may be present during the remainder of the meeting, or any part thereof. The vote of the players shall not be subject to alteration, except as may be required to conform to the Major League Rules.

Non-uniformed personnel of a Club shall not be eligible to receive a percentage share of the players' pool, but shall be eligible to receive cash awards of defined dollar value, provided that no cash award may exceed the value of a full share.

All players and managers with their respective teams on and subsequent to June 1 of the current year and eligible to participate in the World Series for the current year under Rule 40 shall receive a full share. Players and managers not with their respective teams on and subsequent to June 1 of the current year, and coaches and all other persons, shall be entitled only to such shares as are voted by the players entitled to receive a full share. In no event shall any person on the Ineligible List at the time the distribution is made or any Club traveling secretary be entitled to receive, or be paid, any money out of the players' pool. The term "a full share" shall be construed to mean one equal part (disregarding fractional differences) of the funds payable to the team, according to the total number of shares, after deducting or allowing for the special allotments as voted by the players.

MAJOR LEAGUE RULES
MLR 45(b) to 45(c)

A player who, during the year, has been a member of more than one Club shall be entitled to receive such shares as may be voted to the player by the players of any participating Clubs of which the player was a member, provided that the total amount voted to a player shall not exceed the larger of the amounts receivable by a player voted a full share by any such Club.

**(4)**    Pooling Shares Penalized.  Any player or person who shall promise or agree to pool his or her interest, apportionment or share in any of said receipts or funds with any other person or persons entitled to participate in the apportionment of such receipts or funds; or who shall give, or promise to give, any part thereof to a player, coach, official or employee of any other Major League Club, or to a Major League umpire; or who shall solicit or attempt to induce a player or other person to make any such promise, agreement or gift; or who, being solicited to make any such promise, agreement, or gift, shall fail to inform the Commissioner immediately of such solicitation, and of all facts and circumstances connected therewith, shall be subject to such penalties (including forfeiture of his or her apportionment or share, fine, suspension, and/or temporary or permanent ineligibility) as, in the judgment of the Commissioner, the facts and circumstances in the particular case may warrant.

**(c)  CLUBS—COMMISSIONER'S OFFICE**.

**(1)**    World Series.   After the fifteen percent payable to the Office of the Commissioner and the sixty percent which forms the players' pool in the first four games of the World Series, as required by Rule 45(b)(1)(A), the balance of the gate receipts shall be equally divided between the two participating Major League Clubs.

**(2)**    League Championship Series.

**(A)**  After the percentage payable to the Commissioner's Office pursuant to Rule 45(a) and the sixty percent which forms the players' pool in the first four League Championship Series games in each League, as required by Rule 45(b)(1)(B), the balance of the gate receipts from said four League Championship Series games of a League shall be equally divided between the two Clubs participating in the League Championship Series of that League.

**(B)** If the League Championship Series games in a League shall exceed four, the gate receipts of such playoff games in excess of four shall be divided as follows:  first, the Commissioner's Office shall be paid the percentage described in Rule 45(a), and then the remaining receipts shall be

equally divided between the two Clubs participating in the League Championship Series of that League.

**(3)**   Division Series.

**(A)**  After the percentage payable to the Commissioner's Office pursuant to Rule 45(a) and the sixty percent which forms the players' pool in the first three Division Series games in each Division Series, as required by Rule 45(b)(1)(B), the balance of the gate receipts from said three Division Series games in each Division Series shall be equally divided between the two Clubs participating in such Division Series.

**(B)**  If the games in a Division Series shall exceed three, the gate receipts of such playoff games in excess of three shall be divided as follows:  first, the Commissioner's Office shall be paid the percentage described in Rule 45(a), and then the remaining receipts shall be equally divided between the two Clubs participating in such Division Series.

**(d)  GUARANTEE OF PLAYERS' POOL**.

**(1)**   To the extent, if any, that the players' pool provides a total of less than $2,416,450 for the World Series winner, the amount to be distributed to such winner shall be increased to $2,416,450.  To the extent, if any, that the players' pool provides a total of less than $1,611,000 for the World Series loser, the amount to be distributed to such loser shall be increased to $1,611,000.

**(2)**   To the extent, if any, that the players' pool provides a total of less than $1,611,000 for both League Championship Series losers ($805,500 each), the amount to be distributed to such losers shall be increased to $1,611,000 ($805,500 each).

**(3)**   To the extent, if any, that the players' pool provides a total of less than $644,400 for the Division Series losers, the total amount to be distributed to such Division Series losers shall be increased to $644,400.

**(4)**   To the extent, if any, that the players' pool provides a total of less than $161,100 for the second-place teams that did not qualify for a Division Series from among the six divisions, the total amount to be distributed to such second-place teams shall be increased to $161,100.

### MAJOR LEAGUE RULES
### MLR 45(d) to 47

**(5)**   If, during the term of any Basic Agreement in effect between the Major Leagues and the Major League Baseball Players Association, the Clubs raise World Series ticket prices, the guarantees set forth subparagraphs (1), (2), (3) and (4) of this Rule 45(d) shall be increased a pro rata amount, such amount established by averaging the percentage increase of a box seat ticket and the percentage increase of a reserved seat ticket and increasing each guarantee by such percentage.

### Rule 46

### BONUS FORBIDDEN

**(a)   PROHIBITION.**   Neither of the contesting Clubs shall give or pay a bonus or prize to any or all of its players before or after the completion of the series, and a player released or transferred by a Club and thereafter signed by another Club in the same League shall not participate in the proceeds of such series as a present or reward from the player's former teammates, the releasing Club or any of its officials.

**(b)   PENALTIES.**   Violations of this Rule 46 are punishable by a fine to be imposed by the Commissioner.   The amount of the fine may equal but shall not exceed the aggregate amount paid to any and all players in violation of this Rule 46, notwithstanding the limitations of penalties set forth in Rule 50.

### Rule 47

### EXHIBITION GAMES

Both teams that contest in the World Series are required to disband immediately after its close and the members thereof are forbidden to participate as individuals or as a team in exhibition games during the year in which that World Championship was decided; provided, however, that the Commissioner may grant permission to individual members of the two teams on their application to participate in such exhibition games, on conditions to be prescribed by the Commissioner, but in no event shall such permission authorize the appearance in any one exhibition game of more than three players out of the joint membership of the two World Series teams, nor shall such permission authorize the playing of any such exhibition games after 30 days following the close of the Major League championship season.

## MAJOR LEAGUE RULES
## MLR 48 to 50(c)

### Rule 48

### OBLIGATIONS OF PARTICIPANTS

Each of the Clubs, players, and umpires, participating or eligible to participate in a World Series, or in any series played or to be played under these Rules and under the Commissioner's auspices, shall faithfully carry out all the provisions of these Rules and regulations, and such others as may hereafter be made to govern such games, and shall not abandon such series, or any game thereof, until it shall have been legally terminated. Any such participant who in connection with any such series or game shall violate any of the Major League or World Series Rules (including particularly but not exclusively Rule 21 (Misconduct)) shall be subject to forfeiture, in whole or in part, of the share of the receipts or other compensation which otherwise would accrue to such participant, and/or to such other penalties, including ineligibility, as the Commissioner, upon consideration of the facts and circumstances connected therewith, shall determine.

### Rule 49

### [Reserved]

### Rule 50

### ENFORCEMENT OF MAJOR LEAGUE RULES

**(a) PENALTIES**. In case the Commissioner shall determine that a League or a Club has violated any of the foregoing Rules, as to which penalty provisions are not otherwise set forth in the Major League Constitution or Major League Rules, the Commissioner may take action consistent with the Commissioner's powers under the Major League Constitution.

**(b) PAYMENT OF FINES**. Upon notification of fine, it shall become the duty of the League or Club to make prompt payment thereof to the Commissioner. In case of non-payment, the Commissioner may suspend the benefit of any or all of these Rules as respects the League or Club in default until such time as payment is made.

**(c) CONTINUITY OF ASSIGNMENTS, AGREEMENTS AND TRANSACTIONS.** All assignments whether optional or otherwise of players' contracts and all agreements and/or other transactions involving players' contracts mentioned in or provided for by the Major League Constitution and the Major League Rules shall be given, and shall have the same force and effect for all and every purpose,

MAJOR LEAGUE RULES
MLR 50(c) to 51(b)

notwithstanding the stock ownership or control either directly or indirectly by any one Club or by a stockholder or stockholders of any one Club in/or of one or more other Clubs.

Provided further that in no event shall ownership and/or control directly or indirectly be permitted by one Club or by a stockholder or the stockholders of one Club in another Club of the same League.

### Rule 51

### CLASSIFICATION OF MINOR LEAGUES

**(a) LEAGUE CLASSIFICATIONS.** Each Minor League shall be classified as a Class AAA, Class AA, Class A, Short-Season A or Rookie League. Leagues in the Class A classification shall be given the further subclassification of Full-Season A or Class A-Advanced. Leagues in the Rookie classification also shall be given the further subclassification of Rookie or Rookie-Advanced. The subclassification in which a Class A or Rookie League is placed shall be determined each year by the Commissioner or the Commissioner's designee, after consultation with the Minor League Association and the President of the affected Minor League.

**(b) COMPOSITION.** The composition of player rosters for Minor League Clubs at the Class AAA and AA levels shall not be limited based on length of prior Minor League service. For Minor League Clubs at the Class A, Short-Season A and Rookie League levels, however, the composition of player rosters shall be based on length of prior Minor League service as described in this Rule 51(b).

**(1)** Length of Service. The following limitations shall apply to the length of prior Major or Minor League service that a player on the Active List of a Minor League Club may have. For purposes of this Rule 51, a player shall be credited with a year of "Minor League Service" for each championship season in which the player was on the Active or Disabled List of a Major League or Minor League Club for at least 30 days, provided, however, that a player who has spent one or more championship seasons on a Disabled List shall have one year of "Minor League Service" subtracted from the player's total. A player's time on the Active or Disabled List of a Minor League Club in a Rookie classification Minor League entirely outside the United States and Canada shall not count toward "Minor League Service" for purposes of Rules 51(b)(1)(A) through (D).

# MAJOR LEAGUE RULES
## MLR 51(b) to 52(a)

**(A)** Class A-Advanced: No more than two players and one player-coach on the Active List may have six or more years of prior Minor League Service.

**(B)** Full-Season A: No more than two players on the Active List may have five or more years of prior Minor League Service.

**(C)** Short-Season A: No more than three players on the Active List may have four or more years of prior Minor League Service.

**(D)** Rookie (in the United States or Canada): No player on the Active List may have three or more years of prior Minor League Service.

**(E)** Rookie (entirely outside the United States and Canada): No player on the Active List may have four or more years of prior Minor League Service.

Notwithstanding anything to the contrary in this Rule 51(b)(1), a player may play during one season in a Short-Season A or Rookie Classification without regard to prior length of service if the player is a pitcher who is changing positions to become a non-pitcher or is a non-pitcher changing positions to become a pitcher. Any player playing at such a classification pursuant to this exception may not pitch if the player was formerly a pitcher and may not play at a position other than pitcher if the player was formerly a non-pitcher.

**(2)** Roster Requirements—Pitchers. In addition to the Active List limits set forth in Rule 2 (Player Limits and Reserve Lists), the Active Rosters of all Minor League Clubs at the Short-Season A and Rookie (both Rookie-Advanced and Rookie) levels shall include at least 10 pitchers as of July 1 of the championship season.

## Rule 52

### MAJOR AND MINOR LEAGUE TERRITORIAL RIGHTS

**(a) HOME TERRITORY.**

**(1)** Each Major and Minor League Club shall be granted protected territorial rights covering a specific geographic area, called a "home territory," unless a Club and League agree to forego a home territory pursuant to an exception obtained in accordance with Rule 52(d).

## MAJOR LEAGUE RULES
### MLR 52(a) to 52(b)

**(2)**   Attachment 52, appended to these Rules, identifies and defines each home territory.  The Major League Club home territories in Attachment 52 shall be the operating territories set forth in the Major League Constitution.  Attachment 52 shall be revised by the Commissioner and the President of the Minor League Association, who shall have obtained all approvals required by the Minor League Association, without a vote of the Major League Clubs as home territories are redefined or as Major and Minor League Clubs are added to, or deleted from, or permitted to relocate by, their respective Leagues.

**(3)**   If the governing document of the Minor League Association so provides, territorial rights protected by this Rule 52 may be granted to a Minor League Club through the League of which the Club is a member.  Any home territory so granted shall be the possession of the League, and any waivers of such League rights must first be approved by the League.

**(4)**   No Major or Minor League Club may play its home games within the home territory or within 15 miles from the boundary of the home territory of any other Minor League Club, and no Minor League Club may play its home games within the home territory or within 15 miles of the home territory of any Major League Club, except pursuant to a grant of protected territory or an exception obtained in accordance with Rule 52(d).  The territorial rights of Major League Clubs with respect to other Major League Clubs are governed by Rule 1 (Circuits) and by the Major League Constitution, and are not governed by this Rule 52.  The territorial rights of Minor League Clubs with respect to other Minor League Clubs are also governed by the governing document of the Minor League Association to the extent that such governing document supplements this Rule 52.

**(b)  NEW TERRITORIES.**

**(1)**   With the exception of the home territories set forth in Attachment 52:

**(A)** the home territory of each Minor League Club must have boundaries that are no closer than 15 miles from the boundaries of all other Major and Minor League Clubs' home territories, unless Rule 52(b)(1)(C) applies;

**(B)** the home territory of each Major League Club must have boundaries that are no closer than 15 miles from the boundaries of all Minor League Clubs' home territories, unless Rule 52(b)(1)(C) applies;

**(C)** a Major or Minor League Club is not in violation of this Rule 52 and may establish a newly created home territory that is adjacent to the existing

**MAJOR LEAGUE RULES**
**MLR 52(b) to 52(d)**

home territory of another Club if the ballpark or proposed ballpark within the newly created home territory is greater than 50 miles from the boundaries of the existing home territory of the other Club; and

**(D)** the home territory of each Major and Minor League Club must be defined by the boundary lines of an entire county or counties (or parish or Canadian division or district), unless a Club agrees to forego a home territory pursuant to an exception granted in accordance with Rule 52(d).

**(2)**   The 15-mile "buffer" is not included as part of a Club's home territory and may coincide (in whole or in part) with the 15-mile "buffer" surrounding another Club's home territory.

**(3)**   If a Club wishes to establish a territory outside the United States or Canada, the Commissioner and President of the Minor League Association may agree to recognize a boundary not defined by county boundaries or the equivalent.

**(c)  OVERLAPPING TERRITORIES.**   An "overlap" exists if the boundary of a home territory overlaps the boundary of another home territory or is within 15 miles of the boundary of another home territory.

**(1)**   Overlap Between a Major League Club and a Minor League Club.  If an overlap exists between a Major League Club and a Minor League Club:

**(A)**  neither Club may play its home games within 15 miles of the boundary of the other Club's home territory; and

**(B)**  the home territory of the Minor League Club may not be shared with, drafted by or otherwise acquired by another Minor League or Minor League Club without the written consent of the Major League Club in accordance with Rule 52(d)(1).  This Rule 52(c)(1)(B) shall not apply if the entering Minor League Club's ballpark or proposed ballpark is greater than 50 miles from the boundaries of the home territory of the Major League Club.

**(2)**   Overlaps Among Minor League Clubs.  Overlaps of Minor League Clubs with respect to other Minor League Clubs are governed by the governing document of the Minor League Association and are not covered by this Rule 52.

**(d)  EXCEPTIONS.**  Exceptions to the requirements of this Rule 52 may be permitted as follows:

## MAJOR LEAGUE RULES
## MLR 52(d)

**(1)**  Consent.  A Major or Minor League Club may establish a home territory or play its home games in a location otherwise prohibited by this Rule 52 only if the Club first obtains the written consent of each Minor League and Major or Minor League Club whose territorial protection would otherwise be violated and of the Commissioner or the Commissioner's designee, in the case of the territorial protection of a Major League Club that would otherwise be violated.  In the case of a Minor League Club seeking to establish a home territory or play its games in a location that otherwise would violate the territorial protection of a Major League Club pursuant to this Rule 52, such written consents shall be obtained before the filing of a request for relocation of the Minor League Club pursuant to Rule 53(b) (Relocation of Minor League Clubs).  A written consent may condition or limit the exception.  Such consent may be revoked only according to the written terms of the consent.  Any Minor League Club, Minor League, prospective Minor League Club, prospective Minor League Club owner or any person acting on behalf of any of the foregoing who wishes to explore the possibility of establishing a home territory or playing its home games in a location otherwise prohibited by this Rule 52 shall obtain, before making any such exploration, inquiries or comments (either public or private), the written permission of each Major League Club whose territorial protection would otherwise be violated by the establishment of such home territory or by the playing of such games.

**(2)**  Draft of Territory.

> **(A)** By Major League Club.  A Major League Club may draft a Minor League Club's home territory pursuant to Article IX of the Professional Baseball Agreement.  A drafting Major League Club shall not be required to include as part of its home territory each county (or its equivalent) that the Club drafts or is required to draft.  A Minor League Club that receives written consent to remain in a drafted territory in accordance with Article IX of the Professional Baseball Agreement shall retain such territorial rights as provided in the written consent.  Notwithstanding Rule 52(a)(4) and Article IX(C) of the Professional Baseball Agreement, a drafting Major League Club may play its home games in the territory of a Minor League Club so long as the Major or Minor League or Major or Minor League Club has notified the Commissioner of its request that a Board of Arbitration determine compensation pursuant to Article IX of the Professional Baseball Agreement.  The drafting Major League Club shall not, however, have any territorial protection under this Rule 52 until it shall have paid the compensation required by Article IX of the Professional Baseball Agreement.  If a Minor League Club's territory is drafted, a Minor League Club may relocate from the drafted territory immediately, subject to the procedures of Rule 53 (Minor League Expansion, Contraction, Relocation,

**MAJOR LEAGUE RULES**
**MLR 52(d) to 52(g)**

and Reclassification), without forfeiting or waiving any right it may have to seek compensation for the draft of territory, notwithstanding the provision in Rule 56(g) (Loss of Territorial Rights) that the territory of a relocated Club shall be considered unprotected and "open territory."  If Article IX of the Professional Baseball Agreement provides that a Major League Club is not required to draft the territory of a Minor League Club, the Major League Club may establish a home territory that is adjacent to the home territory of that Minor League Club.

**(B)**  By Minor League Club.  A Minor League Club may draft the territory of a Minor League Club of lower classification pursuant to applicable rules of the Clubs' Minor League Association.  If the territory of the Minor League Club of lower classification overlaps with the territory of a Major League Club, the drafting Minor League Club must obtain the consent of the Major League Club in accordance with Rule 52(c)(1)(B).

**(e)  RECOGNITION OF FUTURE RIGHTS.**  A Minor League Club that has been granted approval under all applicable rules and agreements to relocate or to operate an expansion Club shall enjoy full protection under this Rule 52 of the home territory granted as part of the expansion or relocation approval, conditioned upon the Club commencing play of its home games on or before the date specified in the approval.  The Commissioner shall have 15 days from the date the Commissioner receives the written approval by the President of the Minor League Association of the proposed expansion or relocation to review the proposed expansion or relocation in accordance with Rule 53 (Minor League Expansion, Contraction, Relocation, and Reclassification).  During that 15-day period, a Major League or Major League Club that applies for the rights to the same territory shall be given preference.

**(f)  APPROVAL OF MINOR LEAGUE TERRITORIAL RIGHTS.**  All grants of protected territory to Minor League Clubs must first be approved by the President of the Minor League Association and by the Commissioner and must otherwise be in accordance with these Rules.

**(g)  LOSS OF TERRITORIAL RIGHTS.**  If a Minor League Club has relocated or has otherwise lost its rights to a home territory pursuant to the rules of its Minor League Association, the Club's original home territory or the home territory to which the Club has lost its rights shall be considered unprotected and "open territory."  No Minor League or Minor League Club may assert any rights with respect to such "open territory" against any Major League Club or the Commissioner's Office, including in any draft of territory pursuant to Rule 52(d)(2)(A) and Article IX of the Professional Baseball Agreement or arbitration in connection with such draft of territory, nor may any Minor League or Minor League Club assert any claim to damage related to or

134                                                                                  **3/08**

arising out of such "open territory" in connection with any such draft of territory or any such arbitration. Nothing in this Rule 52(g) shall be construed as limiting the compensation that a Minor League or Minor League Club may claim in an Article IX proceeding under the Professional Baseball Agreement when the Minor League Club vacates a territory after having been notified of the draft of such Minor League Club's territory by a Major League Club.


## Rule 53

## MINOR LEAGUE EXPANSION, CONTRACTION, RELOCATION, AND RECLASSIFICATION

**(a) EXPANSIONS OR CONTRACTIONS OF MINOR LEAGUES.**

**(1)**   Approval of Expansions or Contractions Proposed by Minor Leagues. If a Minor League intends to expand or reduce the number of its member Clubs, it must notify in writing the Commissioner and the President of its Minor League Association of its intention to expand or contract at least 18 months before opening day of the season in which the proposed expansion or contraction would take effect. In the event that unique or emergency circumstances are presented that justify an expansion or contraction at a time when the required prior notice of intent is not possible, the approval required under this Rule 53 may nevertheless be granted if the other requirements are met.

A League proposing to expand must establish to the satisfaction of the Commissioner and the President of its Minor League Association that a Major League Club is committed to purchase or enter into a PDC with the proposed expansion Club. The Commissioner and/or the President of the League's Minor League Association also may request any additional information that is reasonably necessary to their review of a proposed expansion or contraction of a Minor League. This additional information shall include (but not be limited to) data establishing that the proposed expansion Club will enhance the development of future Major League players and will be capable of sound operations.

A decision by the President of the League's Minor League Association to disapprove an expansion or contraction proposed by a Minor League shall be final. If the President of the League's Minor League Association approves the proposed expansion or contraction, the proposal shall be sent to the Commissioner for the Commissioner's review. The Commissioner shall give due deference to the decision of the President of the Minor League Association, but may disapprove the proposed expansion or contraction if the Commissioner concludes

## MAJOR LEAGUE RULES
## MLR 53(a)

**(A)** that the President of the Minor League Association failed in some material respect to adhere to the review and approval procedures in this Rule 53;

**(B)** that the President of the Minor League Association abused his or her discretion in approving the proposed expansion or contraction; or

**(C)** that the proposed expansion or contraction is not in the best interests of Baseball.

In exercising authority under this Rule 53(a)(1), the Commissioner shall act in good faith.

**(2)** Approval of Expansions Proposed by Major League Clubs or the Commissioner's Designee. If a Major League Club or the Commissioner's designee determines that player development needs cannot be met by a Major League Club entering into a PDC with an existing Minor League Club, the Major League Club or the Commissioner's designee may request a Minor League to expand the number of its member Clubs so long as the Minor League (or combination of Minor Leagues operating under a joint schedule) continues to have an even number of Clubs. Such a request must be accompanied by a commitment to purchase or enter into a PDC with a Club added to the League and must be made in writing to the Minor League President, the President of the Minor League Association, and the Commissioner at least 18 months before opening day of the season in which the proposed expansion would take effect. In the event that unique or emergency circumstances are presented that justify an expansion at a time when the required prior notice is not possible, the approval required under this Rule 53 may nevertheless be granted if the other requirements are met.

If either the Minor League or the President of the Minor League Association refuses to approve a request for expansion made by a Major League Club or the Commissioner's designee, the Major League Club or the Commissioner's designee, as the case may be, may appeal to the Commissioner. In considering such an appeal, the Commissioner shall give due deference to the decision of the Minor League President and the President of the Minor League Association, but may direct that the requested expansion be accomplished if the Commissioner concludes

**(A)** that the President of the Minor League Association failed in some material respect to adhere to the review and approval procedures in this Rule 53;

## MAJOR LEAGUE RULES
### MLR 53(a) to 53(b)

**(B)** that the President of the Minor League Association abused his or her discretion in refusing to approve the request for expansion; or

**(C)** that the disapproval of the requested expansion is not in the best interests of Baseball.

In exercising authority under this Rule 53(a)(2), the Commissioner shall act in good faith.

**(3)** Approval of Contractions or Alternate Arrangements Proposed by Major Leagues. If the Major Leagues contract one or more Major League Clubs, then the Commissioner may request a Minor League to reduce the number of its member Clubs so long as the Minor League (or combination of Minor Leagues operating under a joint schedule) continues to have an even number of Clubs. Such request shall be made through the President of the Minor League Association. The Commissioner or the Commissioner's designee shall discuss with the President of the Minor League Association the terms and conditions of the proposed contraction, which may include, without limitation, changes in classification pursuant to Rule 53(c) (Change in Classification(s) of Minor Leagues or League Affiliations of Minor League Clubs), the establishment of co-op PDCs pursuant to Rule 56(a) (Exclusivity), the establishment of independent Minor League Clubs (see Rule 60(r) (Definitions)) and/or other actions, as the facts and circumstances may warrant. If the President of the Minor League Association approves the request for contraction, then the affected Minor Leagues shall implement the contraction on the terms and conditions agreed to between the Commissioner or the Commissioner's designee and the President of the Minor League Association.

**(b) RELOCATION OF MINOR LEAGUE CLUBS**. If a Minor League Club intends to move to a new location, it must notify in writing the Commissioner and the President of its Minor League Association of its intention to relocate at least 18 months before opening day of the season in which it would begin operations at the new location. In the event that unique or emergency circumstances are presented that justify a relocation at a time when the required prior notice of intent is not possible, the approval required under this Rule 53 may nevertheless be granted if the other requirements are met. The Commissioner and/or the President of the Club's Minor League Association may request any documents or other data that are reasonably necessary to their review of the Club's proposal to relocate.

In reviewing the proposed relocation, the President of the Club's Minor League Association shall require the Minor League Club proposing the relocation to establish that improved business operations (taking into account the quality of playing facility

## MAJOR LEAGUE RULES
### MLR 53(b) to 53(c)

and classification of play involved) and/or improved player development will be achieved at the proposed new location. A disapproval of a proposed relocation by the President of the Club's Minor League Association shall be final. If the President of the Club's Minor League Association approves the proposed relocation, the proposal shall be sent to the Commissioner for review. The Commissioner shall give due deference to the decision of the President of the Club's Minor League Association, but may disapprove the proposed relocation if the Commissioner concludes

**(1)** that the President of the Minor League Association failed in some material respect to adhere to the review and approval procedures in this Rule 53;

**(2)** that the President of the Minor League Association abused his or her discretion in approving the proposed relocation; or

**(3)** that the relocation would not be in the best interests of Baseball.

In exercising authority under this Rule 53(b), the Commissioner shall act in good faith and shall endeavor to preserve the full value of Minor League franchises.

**(c) CHANGE IN CLASSIFICATION(S) OF MINOR LEAGUES OR LEAGUE AFFILIATIONS OF MINOR LEAGUE CLUBS.** If a Minor League Club intends to change its classification or if a Minor League Club intends to change its League affiliation (for the purpose of changing classification or otherwise), it must notify in writing the Commissioner and the President of its Minor League Association of its intention to make such a change at least 18 months before opening day of the season in which the proposed change would take effect. In the event that unique or emergency circumstances are presented that justify a change in a Minor League's classification or a Minor League Club's League affiliation at a time when the required prior notice of intent is not possible, the approval required under this Rule 53 may nevertheless be granted if the other requirements are met.

The Commissioner and/or the President of the Club's Minor League Association may request any documents or other data that are reasonably necessary to their review of a proposed change in a Minor League's classification or the League affiliation of a Minor League Club. A decision by the President of the Minor League Association to disapprove such a proposed change shall be final. If the President of the Minor League Association approves the proposed change, the proposal shall be sent to the Commissioner for review. In reviewing a proposal to change a Minor League classification or a Minor League Club's League affiliation, the Commissioner shall give due deference to the decision of the President of the Minor League Association, but may disapprove the proposed change in classification or affiliation if the Commissioner concludes that

## MAJOR LEAGUE RULES
### MLR 53(c) to 53(d)

**(1)** the President of the Minor League Association failed in some material respect to adhere to the review and approval procedures in this Rule 53;

**(2)** the President of the Minor League Association abused his or her discretion in approving the proposed change in classification or League affiliation; or

**(3)** the proposed change would not be in the best interests of Baseball.

In exercising authority under this Rule 53(c), the Commissioner shall act in good faith and shall endeavor to preserve the full value of Minor League franchises.

**(d) ADMISSION OF NEW LEAGUES TO A MINOR LEAGUE ASSOCIATION.** If a Minor League Association intends to add a Minor League, it must notify the Commissioner or the Commissioner's designee in writing of its intention to do so at least 18 months before opening day of the season in which the additional league would become a member of such Minor League Association. In the event that unique or emergency circumstances are presented that justify adding a league at a time when the required prior notice of intent is not possible, the approval required under this Rule 53 may nevertheless be granted if the other requirements are met.

A league proposing to join a Minor League Association as a Minor League must establish to the satisfaction of the President of the Minor League Association and the Commissioner or the Commissioner's designee that it is capable of and committed to complying fully with the Major League Rules as of October 31 of the year preceding the first championship season such league intends to operate as a Minor League member of the Minor League Association. Prior to approval for admission to a Minor League Association, a league proposing to join the Minor League Association as a Minor League, and all clubs that are members of such league, shall release from all obligations any player who is under reserve to, or on the Negotiation List of, any Major or Minor League Club. The President of the Minor League Association and/or the Commissioner or the Commissioner's designee also may request any additional information that is reasonably necessary to their review of a proposed admission of a Minor League to the Minor League Association. Each club that is a member of a league proposing to join a Minor League Association as a Minor League shall undergo the review and approval process set forth in Rule 54(a) (Approval of Control Interest Transfers). The President of the Minor League Association and the Commissioner or the Commissioner's designee shall have the right to require such league and its member clubs to take such actions as the President of the Minor League Association and the Commissioner or the Commissioner's designee may deem necessary, in the sole and absolute discretion of either, to effect the admission of such league and its member

clubs to the Minor League Association consistent with the Major League Rules and other applicable agreements, regulations, guidelines and policies.

No Minor League shall be admitted to a Minor League Association without the approval of the President of the Minor League Association and the Commissioner or the Commissioner's designee. A decision by the President of the Minor League Association to disapprove the admission of a Minor League shall be final. If the President of the Minor League Association approves the proposed admission of a Minor League, the proposal shall be sent to the Commissioner or the Commissioner's designee for review. The Commissioner or the Commissioner's designee shall give due deference to the decision of the President of the Minor League Association, but may disapprove the proposed admission if the Commissioner or the Commissioner's designee concludes

**(1)** that the President of the Minor League Association failed in some material respect to adhere to the review and approval procedures in this Rule 53 and in Rule 54 (Regulation of Minor League Franchises);

**(2)** that the President of the Minor League Association abused his or her discretion in approving the proposed admission; or

**(3)** that the proposed admission is not in the best interests of Baseball.

In exercising authority under this Rule 53(d), the Commissioner and the Commissioner's designee shall act in good faith.

## Rule 54

### REGULATION OF MINOR LEAGUE FRANCHISES

**(a) APPROVAL OF CONTROL INTEREST TRANSFERS.**

**(1)** No Minor League franchise shall be leased or sublet to any operator other than the actual franchise holder unless approval is granted by its League, the President of its Minor League Association and the Commissioner. No Minor League Club may pledge its franchise (including its protected territorial rights) as security for any indebtedness unless it has first received the prior approval of its League, the President of the Minor League Association and the Commissioner.

**(2)** No sale, transfer, assignment, gift or bequest (including but not limited to the granting of a security interest) of any interest in a Minor League Club shall occur

**MAJOR LEAGUE RULES**
**MLR 54(a)**

without the prior written approval of the President of the Minor League Association. The President of the Minor League Association shall determine whether a proposed transaction constitutes a Control Interest transfer subject to the enhanced review required by this Rule 54, and a determination of such issue by the President of the Minor League Association may not be appealed. The rules of Minor Leagues relating to ownership or Control Interest transfers, whether now existing or hereafter adopted, shall not be affected by this Rule 54 (so long as they are not inconsistent with this Rule 54) and any approval required from the League must be presented in writing to the President of the Minor League Association prior to his or her consideration. The term "Control Interest" is defined as the power or authority directly or indirectly to influence substantially the management policies of a Club. No approval under this Rule 54 is required for sales or transfers of Control Interests occurring pursuant to the terms of any written contract, option or right of first refusal executed on or before October 24, 1990.

**(3)** A Minor League Club must notify the Commissioner or the Commissioner's designee, the President of its Minor League Association and its League President, and provide to all three a detailed written description, of any Regulated Transaction in which the Minor League Club proposes to participate. Any written document memorializing the negotiations concerning the proposed Regulated Transaction (including a non-binding memorandum of understanding or a letter of intent) also must be disclosed as part of the required written description. If the President of the Minor League Association concludes that these documents do not contain adequate data, the President may require the submission of additional information in determining whether the proposed Regulated Transaction amounts to a "Control Interest" transfer. A "Regulated Transaction" is defined to include:

**(A)** sales or transfers of equity interests;

**(B)** loan agreements;

**(C)** stadium leases;

**(D)** television or radio rights sales;

**(E)** concession contracts having a potential duration of more than one year (including any options or renewals);

**(F)** naming rights agreements; and

**(G)** any contract having a potential duration (including any options or renewals) of five years or longer.

# MAJOR LEAGUE RULES
## MLR 54(a)

A material failure to make disclosures or furnish information required under this Rule 54 may, at the discretion of the President of the Minor League Association, result in the transaction being rendered null and void and will subject the Minor League Club or its owner to such fines or other penalties as the President of the Minor League Association may impose. The Commissioner and the Commissioner's designee, the President of the Minor League Association and the League Presidents shall treat the disclosures required by this Rule 54 as confidential information.

**(4)** If the President of the Minor League Association determines that a proposed Regulated Transaction may involve a Control Interest transfer, the President shall so notify the Minor League Club and its League, and the Minor League Club must provide the following information.

**(A)** In the case of a Control Interest transfer involving the transfer of an equity interest:

**(i)** A non-refundable processing fee of $5,000 payable to the Minor League Association which may be waived if the President of the Minor League Association determines that the security investigation required by this Rule 54 has already been performed;

**(ii)** The proposed organizational structure of the entity that will own and operate the Club;

**(iii)** The names of all persons who will have an equity interest in the proposed ownership entity, the names of the individuals who will play active management roles, and the name of the individual who will have ultimate authority to act on all Club matters;

**(iv)** Biographical information on all persons who will have an equity interest in the proposed ownership entity and/or play an active management role on behalf of the Club, together with any release necessary to enable the Commissioner's Office (Security Division) and the President of the Minor League Association to conduct security investigations;

**(v)** A proposed three-year operating budget, and business plans and operating policies for the initial three years of new ownership;

**MAJOR LEAGUE RULES**
**MLR 54(a)**

**(vi)**  As to each individual who will have a direct or indirect ownership interest of five percent or more, or who will have a Control Interest regardless of his or her ownership share, the most recent personal financial statement available or, if that is not available, his or her most recently filed personal federal income tax return and all attachments to the return;

**(vii)** If the acquiring entity is some enterprise other than a natural person, its audited (if available) or unaudited financial statements (including year-end balance sheets and statements of income) for the two most recent fiscal years, and the names of all partners, directors or principals in such entity;

**(viii)** Each potential owner (individual, corporate or otherwise) must identify any other enterprises or businesses in which he, she or it has an ownership interest of greater than five percent; in addition, <u>all</u> such potential owners must identify all professional sports, broadcasting, entertainment, cable or similar enterprises and any gambling-related businesses or enterprises in which such a person has <u>any</u> ownership or management interest, or is a trustee or director;

**(ix)**  A detailed description of the sources of all financing that will be required to effect the proposed transaction, including the names of all lenders and underwriters and copies of commitment letters from the lenders and underwriters; and,

**(x)**  Any additional information that the President of the Minor League Association may reasonably request.

**(B)**  In the case of a Control Interest transfer other than a transfer of an equity interest, such information about the transaction or the parties as the President of the Minor League Association may reasonably request.

**(5)**  After receiving the required information, and obtaining any required League approval, the President of the Minor League Association shall review the information and issue a decision as promptly as permitted by the circumstances.  In determining whether to approve a proposed transfer, the President of the Minor League Association shall be guided by the following principles:

**(A)**  Responsibility and Accountability.  All proposed new owners must adopt business policies consistent with sound fiscal management.  There also must be clearly designated persons within the ownership structure who are

**MAJOR LEAGUE RULES**
**MLR 54(a)**

accountable to the Commissioner and the President of the Minor League Association for the operation of the Club and for compliance with all applicable Baseball rules.  A single person must be identified as being able to exercise control of the franchise and being responsible for and able to make all Club decisions.  That individual must represent that he or she will participate actively in the operation of the Club and will regularly attend Minor League and Minor League Association meetings.

**(B)**  Conflicts of Interest.  The President of the Minor League Association may disapprove any Control Interest transfers that involve actual or potential conflicts of interest.  Among other things, the President of the Minor League Association may consider the following factors in determining whether a proposed transaction presents an actual or potential conflict of interest.

   **(i)**  Forms of Organization.   The President of the Minor League Association may disapprove any form of ownership or business organization that may be subject to statutory or regulatory restrictions inconsistent with sound operation of a baseball franchise.   (For example, some types of government ownership or non-profit ownership might have legal restraints that would prevent or impede sound operations.)

   **(ii)**  Broadcasting Interests.   The President of the Minor League Association may disapprove a transaction involving a broadcasting interest if the President determines that the proposed transaction may threaten the ability of the Minor Leagues and their Clubs or the Major League Clubs to market their broadcasting rights in an orderly manner.

   **(iii)**  Cross-Ownership and Agents.  The President of the Minor League Association may disapprove the transfer of a Control Interest in a Minor League Club to a Major League Club that has a PDC with another Minor League Club in the same League.   Similarly, the President may disapprove the transfer of a Control Interest in a Minor League Club to any entity that has an ownership interest in another Club in the same League.  Further, the President of the Minor League Association may disapprove a transfer of a Control Interest in a Minor League Club to an entity that owns other Minor League Club interests if the President of the Minor League Association concludes that the transfer may create conflicts within the Minor League Association or the Minor League Association Board of Trustees, or if assets of one franchise are pledged to secure indebtedness incurred to purchase an interest in another franchise.   Finally, the President of the Minor

## MAJOR LEAGUE RULES
## MLR 54(a)

League Association may disapprove the transfer of an ownership interest in a Minor League Club to persons having agency relationships with players, owners or other employees of Major or Minor League Clubs.

**(C)** Financial Viability. All proposed new owners of Minor League Clubs must demonstrate to the satisfaction of the President of the Minor League Association that the franchise:

**(i)** Has and can maintain an equity-to-liabilities ratio of at least 55 to 45.

**(ii)** Has a ratio of current assets to current liabilities of at least 1.0 after any injection of capital by the new owner.

**(iii)** Has prepared Cash Budgets, Pro Forma Sources and Uses of Funds Statements, Pro Forma Financial Statements, or a business plan based on reasonable assumptions that shows the franchise will be able to fund the three-year operating budget described in Rule 54(a)(4)(A)(v).

**(iv)** In determining equity-to-liabilities ratio, the following rules apply:

**(aa)** Non-current baseball assets are reflected in the calculations at the greater of the amount reported in the Club's financial statement or $4,000,000 (AAA), $2,500,000 (AA), $1,000,000 (A) and $750,000 (Short A/Rookie).

**(bb)** All deferred revenues are excluded from the ratio calculation. This is accomplished by reducing both assets and liabilities by the amount of deferred revenues reported.

**(cc)** For non-current, non-baseball assets, where appraisals are not available, historical cost is used as the basis of the asset.

**(dd)** Debt incurred for stadium acquisition or improvements (including video displays, scoreboards, etc.) is excluded from liabilities in the calculations.

145                                         3/08

**MAJOR LEAGUE RULES**
**MLR 54(a)**

**(ee)** Loans or advances from stockholders, partners, etc. are considered to be equity and, therefore, are excluded from liabilities in the calculations.

**(ff)** Loans or advances to stockholders, partners, etc. are considered to be equity reductions and, therefore, excluded from assets in the calculations unless it can be demonstrated by the Club that the amounts will be repaid within a reasonable time period. In these instances, the loans or advances will be considered non-current, non-baseball assets for 55-to-45 purposes.

**(D)** Subsidiary or Family Relationships. In determining whether to approve a Control Interest transfer, the President of the Minor League Association may consider whether ownership of a Minor League Club by a corporate subsidiary or relative of another owner might create a conflict of interest or is otherwise not conducive to sound operations. The President of the Minor League Association also may disapprove the transfer of a Control Interest in a Minor League Club to a relative of a person who would be subject to disapproval under this Rule 54.

**(E)** Local Ownership and/or Management. A prospective new owner of a Minor League Club also must establish that the franchise would be owned and/or managed by individuals with strong ties to the local community. This local ownership and/or management is necessary to assure an adequate local playing facility, solid fan support and long-term local government support. Moreover, the local ties of the new owner must be such that he or she has a strong interest in maintaining the stability of the franchise in its existing location. Any intent to relocate the franchise also must be stated.

**(F)** Gambling Interests. The President of the Minor League Association shall disapprove any transfer of any interest in a Minor League Club to a person or entity that has any ownership interest whether direct or indirect, or as sole proprietor, shareholder, member, general or limited partner, trustee, trust beneficiary, or other beneficial owner, management ties to or relationships that create an appearance of ownership or control of (including, without limitation, landlord-tenant relationships) Legalized Gaming Enterprises (as defined in this Rule 54(a)(5)(F)). Notwithstanding the foregoing, such prohibition shall not be applicable to any investment interest in a Legalized Gaming Enterprise or Permitted Lottery (as defined in this Rule 54(a)(5)(F)) that does not represent in excess of 1% of any class of securities (or class of other ownership interests) of such entity. In addition, such prohibition shall not apply to the breeding and ownership of racehorses.

146                                                                          3/08

**MAJOR LEAGUE RULES**
**MLR 54(a)**

The foregoing exceptions set forth in this Rule 54(a)(5)(F) shall not apply to any Legalized Gaming Enterprises that allow, or are seeking to allow, betting on professional or amateur sports or any other game that involves or refers to professional or amateur sports in any manner.  As used in this Rule 54(a)(5)(F) and in Rule 54(a)(6):

> **(i)**  "Legalized Gaming Enterprises" shall include all entities that are engaged, directly or indirectly, in legalized gambling operations, including, without limitation, casinos, jai alai frontons, horse or dog race tracks, off-track betting organizations, gaming enterprises operating on riverboats and Indian reservations, and bingo parlors, as well as all entities or governmental authorities that own, operate, oversee or otherwise exercise any ownership or managerial control over any such entity (but shall not include "Permitted Lotteries," as defined in Rule 54(a)(5)(F)(ii)); and

> **(ii)**  "Permitted Lotteries" shall include any federal, state or provincial lottery that does not offer, promote or have any involvement, whether direct or indirect, in any form of sports betting.

**(6)**    No Minor League Club, nor any owner (whether direct or indirect, or as sole proprietor, shareholder, member, general or limited partner, trustee, trust beneficiary, or other beneficial owner), officers, directors or employees (whether full-time, part-time or seasonal) of a Minor League Club shall acquire or maintain an ownership interest in, management ties to or relationships that create an appearance of ownership or control of (including, without limitation, landlord-tenant relationships) Legalized Gaming Enterprises.    Notwithstanding the foregoing, such prohibition shall not be applicable to any investment interest in a Legalized Gaming Enterprise or Permitted Lottery that does not represent in excess of 1% of any class of securities (or class of other ownership interests) of such entity.  In addition, such prohibition shall not apply to the breeding and ownership of racehorses.  The foregoing exceptions set forth in this Rule 54(a)(6) shall not apply to any Legalized Gaming Enterprises that allow, or are seeking to allow, betting on professional or amateur sports or any other game that involves or refers to professional or amateur sports in any manner.  "Legalized Gaming Enterprise" and "Permitted Lottery" are defined in Rule 54(a)(5)(F) (Gambling Interests).

**(7)**    If the President of the Minor League Association determines that a proposed Regulated Transaction involves the transfer of an equity interest but is not a Control Interest transfer, the President of the Minor League Association shall require the Minor League Club to provide such information about the potential

147                                              **3/08**

## MAJOR LEAGUE RULES
### MLR 54(a)

non-Control Interest owner or owners that the President of the Minor League Association shall reasonably request, which shall include, but not be limited to, the information described in Rules 54(a)(4)(A)(iii), (iv), (vi), (vii), (viii) and (x).

**(8)**    Authority of the Commissioner.  In recognition of the interest of Major League Baseball in the sound operations of Minor League Clubs, the President of the Minor League Association shall furnish the Commissioner or the Commissioner's designee all documents and other information related to a proposed Regulated Transaction requested by the Commissioner or the Commissioner's designee and shall consult with the Commissioner or the Commissioner's designee before making a decision on the question of approving such a transfer.  The Commissioner and the Commissioner's designee shall treat such documents and other information as confidential except that they may be disclosed to the Major League Club party to a PDC with the Minor League Club involved in the proposed transfer.  The Commissioner or the Commissioner's designee may disapprove a Regulated Transaction approved by the President of the Minor League Association if the Commissioner or the Commissioner's designee previously had recommended that the President of the Minor League Association disapprove the Regulated Transaction, or may reverse a decision by the President of the Minor League Association that a Regulated Transaction is not a Control Interest transfer, if in either case the Commissioner or the Commissioner's designee concludes that

> **(A)** the President of the Minor League Association failed in some material respect to adhere to the review and approval procedures in this Rule 54;

> **(B)** the President of the Minor League Association abused his or her discretion in applying the standards in this Rule 54 governing review and approval of Regulated Transactions or in determining that a Regulated Transaction is not a Control Interest transfer; or

> **(C)** a failure to subject a Regulated Transaction to the Control Interest transfer disclosure and review procedures in this Rule 54 is not in the best interests of Baseball or the Regulated Transaction itself is not in the best interests of Baseball.

If the Commissioner or the Commissioner's designee disapproves a Regulated Transaction or reverses a decision that a Regulated Transaction is not a Control Interest transfer under this Rule 54, the Commissioner or the Commissioner's designee shall do so in writing as promptly as permitted by the circumstances and explaining the bases for such disapproval or reversal.  The Commissioner or the Commissioner's designee shall be deemed to have approved the transaction if such

<div align="center">148</div>

## MAJOR LEAGUE RULES
### MLR 54(a) to 54(b)

disapproval or reversal, as the case may be, is not delivered, by facsimile or otherwise, to the Minor League Association within

> **(D)** 30 days, in the case of a Regulated Transaction that is not a Control Interest transaction, or

> **(E)** 60 days, in the case of a Control Interest transaction,

as measured from the time that the Commissioner or the Commissioner's designee receives complete information in regard to the proposed Regulated Transaction (including the approval of the Minor League Association, in the case of a Regulated Transaction that is not a Control Interest transaction, or written notice from the Minor League Association that it is prepared to approve the transaction, in the case of a Control Interest transaction), unless a request for an extension of time is granted. The Minor League Association shall grant requests for reasonable extensions of time when the Commissioner or the Commissioner's designee makes good faith requests (i.e., requests not made for purposes of delay) to the President of the National Association for extensions of time based upon the need for more information, the existence of unusual circumstances (which may or may not relate to the particular transaction being considered) or other good cause. In exercising authority under this Rule 54, the Commissioner and the Commissioner's designee shall act in good faith and shall endeavor to preserve the full value of Minor League franchises.

**(b) MONITORING CONTINUED FINANCIAL VIABILITY OF MINOR LEAGUE CLUBS.**

**(1)** Disclosures of "Control Interest" Transactions. Each Minor League Club must provide the President of the Minor League Association with copies of all loan agreements, stadium leases, television or radio rights contracts, concession contracts having a potential duration of more than one year (including any options or renewals) and all contracts having a potential duration of five years or longer (including any options or renewals). In addition, all Minor League Clubs must provide the President of the Minor League Association with copies of all contracts involving a potential sale of an equity interest.

**(2)** Disclosures of Ownership Interests. Each Minor League Club annually must provide the Commissioner and the President of its Minor League Association with completed forms prescribed by agreement of the Commissioner and the President of the Minor League Association for reporting business ownership interest information on all persons or entities having an ownership interest in the franchise. The information disclosed shall include the extent of ownership interests in all

149    **3/08**

**MAJOR LEAGUE RULES**
**MLR 54(b)**

professional baseball franchises and all business activities outside professional baseball but would not require the disclosure of personal financial information beyond the extent of such ownership interests.

**(3)** Maintenance of Sound Equity-to-Liabilities Ratios. Each Minor League Club annually must provide the Commissioner and the President of its Minor League Association with documentation establishing its equity-to-liabilities ratio. If the disclosed equity-to-liabilities ratio (as defined in Rule 54(a)(5)(C)(iv)) is less than 55 to 45, then the franchise is not in compliance with this Rule 54. The President of the Minor League Association shall calculate the level of the noncompliance and order a pro rata reduction of the level of noncompliance over a period which shall be no longer than three years. A failure at any point during this period to make a scheduled pro rata reduction in the equity-to-liabilities ratio shall subject the franchise to the penalties provided in this Rule 54 if compliance is not achieved within 60 days after notice of such failure.

**(4)** Annual Financial Disclosures. Within 90 days of the close of its fiscal year, each Minor League Club annually must disclose the financial information described in this Rule 54(b)(4) to the persons or entities specified in this Rule 54(b)(4) (except as the Commissioner may waive such disclosures if and to the extent the Commissioner determines that uniform and adequate disclosures may be achieved in some less onerous manner).

> **(A)** Audited Financial Statements. At the Commissioner's request, a Minor League Club shall cooperate in the preparation (by a firm of Certified Public Accountants selected by the Commissioner) of an audited financial statement covering the Club's operations for the fiscal year that includes the most recent championship season. As part of its obligation to cooperate with the firm of Certified Public Accountants selected by the Commissioner, the Minor League Club shall prepare a financial statement and provide the firm with access to all of its financial books, records and other relevant documents, including but not limited to the following:
>
> - general ledger
> - payroll registers
> - cash receipts and disbursements journals
> - tax returns, for past three years
> - leases
> - debt agreements (including lines of credit, letters of credit, etc.)
> - employment contracts
> - payroll tax information
> - television and radio broadcast contracts

**MAJOR LEAGUE RULES**
**MLR 54(b)**

- pension and profit sharing agreements
- advertising agreements
- fixed asset records including leaseholds
- barter arrangements
- all insurance contracts
- concession agreements
- naming rights agreements
- bank statements
- accounts receivable registers
- support for real estate and property tax assessments
- agreements with municipality regarding stadium use
- travel and entertainment detail
- contracts and details regarding arrangements with owners and other related parties
- minutes of board of directors, stockholders and board committee meetings
- letter(s) from outside counsel regarding legal status
- purchase and sales commitments
- stadium suite contracts
- parking contracts
- details of Club ownership
- supporting documentation for expenditures made by Club
- results of year-end physical inventory, with documentation
- ticket manifests
- box office settlement sheets

Upon completion, the audited financial statement shall be submitted to the Commissioner, the President of the Club's Minor League Association and the Minor League Club and shall be kept confidential by the persons or entities to which they are disclosed.  The cost of auditing the financial statement shall be borne entirely by the Office of the Commissioner.  If the Commissioner requests an audit of an individual Minor League Club, the Commissioner also shall request audits of all other Clubs in the League.

**(B)**  Standard Financial Reports.  All Minor League Clubs also shall submit standard financial reports on the form appended to these Rules as Attachment 54 to the Commissioner and the President of its Minor League Association.  The Commissioner may prepare consolidated statements (without names of particular Clubs) from the standard financial reports and may disclose the consolidated statements to Minor Leagues, and to Major and Minor League Clubs, but not to the public.

**MAJOR LEAGUE RULES**
**MLR 54(b) to 55(c)**

**(5)**    Penalties for Noncompliance.  A Minor League Club that fails to make any disclosure or scheduled pro-rata reduction required by this Rule 54 in a timely manner shall be fined and/or subjected to such other penalties as the President of the Minor League Association may determine are appropriate, including but not limited to a fine assessed against such Club or its Owner in an amount not in excess of $50,000.  In cases of failures to comply that are promptly cured, the President of the Minor League Association may waive the imposition of such fines or penalties.  In any case of repeated failures or a single egregious failure, the President of the Minor League Association may, after investigation, order the Owner to divest his or her interest in the franchise.  The Commissioner may act to impose a fine or penalty, that the Commissioner deems appropriate, if the Commissioner concludes in good faith that the President of the Minor League Association abused his or her discretion in enforcing compliance with the requirements of this Rule 54.

**Rule 55**

**MINOR LEAGUE FREE AGENCY**

**(a)  ELIGIBILITY FOR FREE AGENCY.**  At 5 p.m. Eastern Time on October 15 or on the fifth day following the last day of the World Series, whichever is later, of the last year of a player's Minor League Uniform Player Contract, the player's Minor League Uniform Player Contract shall expire and the player shall become a "Minor League free agent" unless the player's Major or Minor League Club has remaining options to renew the contract.  As a "Minor League free agent," the player may negotiate and enter into a contract with any Major or Minor League Club beginning on the first day that year that a Major League free agent is eligible to sign with a different Major League Club upon expiration of the player's Major League contract.

**(b)  SUCCESSOR CONTRACT.**  A player shall not become a "Minor League free agent" if the player has entered into a successor contract with the player's Major or Minor League Club or has been placed on the Major League Reserve List before the expiration of the player's Minor League Uniform Player Contract on the date described in Rule 55(a) (Eligibility for Free Agency).  No negotiations for a successor contract may take place before the completion of the Minor League player's championship season and playoffs or after 5 p.m. Eastern Time on the date the player's Minor League Uniform Player Contract expires, as set forth in Rule 55(a) (Eligibility for Free Agency).

**(c)  LIST OF ELIGIBLE PLAYERS.**  On or before August 1 of each year, the Commissioner or the Commissioner's designee shall prepare and circulate a list of all

## MAJOR LEAGUE RULES
### MLR 55(c) to 56(a)

players (on both Major and Minor League Reserve Lists) whose Minor League Uniform Player Contracts have expired or are scheduled to expire following that season.  This list shall be circulated immediately to all Major League Clubs and independent Minor League Clubs. All players on the list also shall be notified promptly that they may be eligible to become "Minor League free agents" on the following date described in Rule 55(a) (Eligibility for Free Agency).

**(d)  PETITIONS FOR CHANGES TO LIST.**  If a player believes that the player was erroneously omitted from the list circulated by the Commissioner, the player may petition the Commissioner at any time for a determination that the player is eligible to become a "Minor League free agent" as of the date described in Rule 55(a) (Eligibility for Free Agency).  If a Major or Minor League Club believes that a player that it has under contract has been improperly included on the list circulated by the Commissioner, it may petition the Commissioner for a determination that its Minor League Uniform Player's Contract with the player will not terminate on the following date described in Rule 55(a) (Eligibility for Free Agency) and that the player is therefore not eligible to become a "Minor League free agent."  The decision of the Commissioner or the Commissioner's designee regarding such a petition by a player or a Major or Minor League Club shall be final and shall not be challenged in any federal or state court, administrative agency or other tribunal.

**(e)  FINAL LIST.**  As soon as practicable after the date on which the player's Minor League Uniform Player Contract expires, as set forth in Rule 55(a) (Eligibility for Free Agency), the Commissioner or the Commissioner's designee shall issue to all Major League Clubs and independent Minor League Clubs a list of all players who have become "Minor League free agents" on the date described in Rule 55(a) (Eligibility for Free Agency).

**(f)  RESTRICTIONS ON OUTRIGHTING POTENTIAL MINOR LEAGUE FREE AGENT.**  A Club is not permitted to assign outright a player who is a potential Minor League free agent to the roster of a Minor League Club on or after the date described in Rule 55(a) (Eligibility for Free Agency) unless such player has signed a Major League contract for the next season or has signed a letter of agreement with such Club describing the terms of a Major League contract for the next season.

### Rule 56

### STANDARD PLAYER DEVELOPMENT CONTRACT

**(a)  EXCLUSIVITY.**  In order for any Major League Club and any Minor League Club (including a Rookie League Club) to establish or maintain any form of working

**MAJOR LEAGUE RULES**
**MLR 56(a)**

agreement or other contractual relationship, they both must sign a standard form letter (a copy of which is appended to these Rules as Attachment 56) binding them both to the terms and conditions of the standard Player Development Contract ("PDC") set forth in this Rule 56. This standard PDC shall be the one and only form of working agreement or contract permitted between Major and Minor League Clubs. This standard PDC shall apply to all Major and Minor League Clubs (including Rookie League Clubs) regardless of their current contractual status, and the terms of this standard PDC shall automatically be substituted for the provisions of any existing PDC, working agreement or other contract between a Major and Minor League Club that by its terms otherwise would remain in effect after the 1990 season.

Any oral or written additions or amendments to the agreement between a Minor League Club and Major League Club(s) as represented by this standard PDC shall be null and void, and neither party to a PDC shall provide the other with money, equipment, services or any other forms of consideration in excess of the obligations prescribed by this standard PDC. No Major or Minor League Club may, directly or indirectly, provide, offer, request or solicit any economic benefits to or from a Major or Minor League Club different from the terms of this standard PDC in connection with the establishment, extension or maintenance of a PDC, nor may any Major or Minor League Club provide, offer, request or solicit any inducement related to the playing of exhibition games in connection with the establishment, extension or maintenance of a PDC. The Commissioner shall impose a fine of $500,000 on any Major League Club, and the President of the Minor League Association shall impose a fine of not more than $100,000 on any Minor League Club, that attempts to add to or alter this standard PDC in any way and/or to provide, offer, request or solicit any economic benefit (including any money, equipment, services or other forms of consideration) in excess of the obligations in this standard PDC.

If a single Minor League Club desires to establish or maintain a working agreement or other contractual relationship with two or more Major League Clubs, it must enter into a single standard PDC with those two or more Major League Clubs. The rights and obligations of a Minor League Club that is party to a single standard PDC with two or more Major League Clubs shall be the same as if it were party to a standard PDC with only one Major League Club. The aggregate rights and obligations of the two or more Major League Clubs that are party to a single PDC with a Minor League Club shall be the same as those of a single Major League Club that is party to a PDC. The two or more Major League Clubs may allocate their rights and responsibilities under the PDC between or among themselves as they see fit.

A Major League Club may, through ownership or a PDC, affiliate with no more than one Minor League Club per Minor League, or per full-season Class A sub-classification, unless the Commissioner, after having consulted with the President of

**MAJOR LEAGUE RULES**
**MLR 56(a) to 56(d)**

the Minor League Association, provides prior consent to the affiliations proposed by the Major League Club.  The Commissioner may terminate, in the Commissioner's discretion, a PDC of a Major League Club in any Minor League, or in any full-season Class A sub-classification, in which the Major League Club is party to more than one PDC.  Such right of termination, if exercised, would be effective at the conclusion of the championship season designated in the Commissioner's notice. The Major and Minor League Clubs affected by such termination shall be notified as part of Step 2 of the PDC affiliation process, as described in Major League Rule 56(d) (Negotiation of New PDC Affiliations), and termination of a PDC in accordance with this Rule 56(a) shall not affect the parties' rights and obligations under Article VII of the Professional Baseball Agreement.

**(b)   APPLICABLE AUTHORITY AND INCORPORATED AGREEMENTS.** The Major League Rules and Professional Baseball Agreement ("PBA"), including all subsequent amendments to those documents, shall immediately be incorporated (as if set forth verbatim) in all PDCs between Major and Minor League Clubs.  All references in a PDC to a "Rule" or "Rules" are to the applicable Major League Rules.

**(c)   DURATION AND TERMINATION.**  No PDC may have a term extending beyond the expiration of the PBA and the rights and obligations of all parties to a PDC shall terminate (and be of no force and effect) as of the expiration of the PBA.  The term of all PDCs between individual Major League Clubs and individual Minor League Clubs shall be either two years or four years, except that a PDC expiring at the end of the season in a year in which the PBA may be and is reopened for termination at the end of the following season may be followed by a one-year PDC covering the following season.  If neither party to a PDC terminates the PDC in accordance with Rule 56(d) (Negotiation of New PDC Affiliations), the PDC shall automatically be renewed for a two-year term (or a one-year term, if the PBA is to terminate at the end of the following season).

**(d)   NEGOTIATION OF NEW PDC AFFILIATIONS.**  Major League and Minor League Clubs may terminate their PDCs in the final year of the term of such PDCs only in accordance with procedures that follow.

　**(1)**　　Between the conclusion of the Minor League Club's championship season and September 11 of the final year of the term of its PDC, a Major League Club or a Minor League Club shall have the right to give written notice of its intention to terminate its PDC only to the Commissioner (in the case of the Major League Club), or only to the President of the Minor League Association (in the case of the Minor League Club).  The fact that such notices are given shall not be disclosed by the Clubs, the Commissioner or by the President of the Minor League Association except in accordance with this Rule 56.  Failure to give such notice shall make the

155                                    **3/08**

## MAJOR LEAGUE RULES
### MLR 56(d)

Club ineligible to terminate its PDC. After being informed of a Major League Club's intention to terminate a PDC, the Commissioner may direct the Major League Club not to terminate the PDC if the Commissioner determines that such a termination would prejudice the interest of a Major League, another Major League Club, a Minor League Club or a Minor League. In any such case the Major League Club shall be ineligible to terminate its PDC.

**(2)** Between September 12 and September 15 of any year in which they receive notices of intention to terminate PDCs, the Commissioner and the President of the Minor League Association shall notify all Clubs that are the subject of such notices of the identities of other such Clubs whose respective PDC affiliations that are subject to termination involve the same classification or subclassification of play except that there shall be no identification of Major League Clubs that gave such notices but were directed by the Commissioner not to terminate, or of Major or Minor League Clubs that subsequently have withdrawn such notices.

**(3)** Between September 16 and September 30 of the last year of the term of their PDCs, the Clubs receiving notification from the Commissioner and the President of the Minor League Association in accordance with Rule 56(d)(2) may discuss the possibility of a new PDC relationship with other such Clubs (including their current PDC affiliate) for an affiliation at the same classification (or same subclassification) of League play, and may agree to enter into such affiliations. Discussions and agreements in accordance with this Rule 56(d)(3) shall not be considered tampering.

**(4)** On or before October 7, any Clubs that have not agreed to enter into PDCs in accordance with Rule 56(d)(3) must enter into PDCs with one another, or have their PDCs renewed in accordance with Rule 56(c) (Duration and Termination) in the case of Clubs that are parties to the same PDC. If multiple Clubs remain that have not agreed to enter into new PDCs, the Commissioner shall determine, after consultation with the President of the Minor League Association, appropriate affiliations, taking into account the Major League Clubs' player development needs in terms of the ages and experience of its players, the Clubs' respective locations, the Clubs' respective relationships, and equitable considerations, including the effect of a new affiliation on the Minor League Clubs' fan support.

**(5)** PDC affiliations to which Clubs agree in accordance with Rule 56(d)(3), or that are determined in accordance with Rule 56(d)(4), shall result in the termination of those Clubs' existing PDCs effective September 30 of the final year of the term of their PDC, and shall require that those Clubs enter into new PDCs as so agreed or determined by execution of the standard form letter of agreement set forth in Rule 56(a), effective immediately upon such termination.

**MAJOR LEAGUE RULES**
**MLR 56(d)**

**(6)**     No Major League Club may attempt to persuade or induce a Minor League Club whose PDC has terminated to enter into a new PDC by providing or offering to provide, directly or indirectly, economic benefits to the Minor League Club different from the terms provided for in this Rule 56, or by offering any inducement related to the playing of exhibition games, nor may the Minor League Club directly or indirectly request such economic benefits.

**(7)**     Upon complaint by a Major League Club that a Minor League Club has entered into a new PDC with another Major League Club (either the Major League Club with which it had the PDC that was terminated or a Major League Club with which it is newly affiliated) under which the Minor League Club receives economic benefits (including the playing of more exhibition games) that are superior to those provided under the Minor League Club's expired PDC, the Commissioner shall investigate whether the preceding paragraph was violated. The fact that the number of exhibition games played has changed from the prior PDC to the new PDC may be cited by either party as evidence, and the Commissioner may treat such fact as circumstantial evidence.  If a violation of Rule 56(d)(6) is found, both the Minor League Club and Major League Club shall be subject to the penalties in Rule 56(a) (Exclusivity) for providing "money, equipment, services or other forms of consideration in excess of the obligations prescribed by this standard PDC."

| **PDC REAFFILIATION TIMELINE:** | <u>Timetable</u> |
| --- | --- |
| STEP 1:  Clubs notify their respective central office of their intent to seek reaffiliation.  In the case of a Major League Club, notification is made only to the Office of the Commissioner.  In the case of a Minor League Club, notification is made only to the President of the Minor League Association. | End of championship season to 9/11 |
| STEP 2:  The Office of the Commissioner and the President of the Minor League Association give notice to all Clubs seeking reaffiliation, providing a list of Clubs in the same classification or sub-classification that are eligible for a PDC affiliation and that are the subject of a notice of a desire to reaffiliate. | 9/12-9/15 (4 days) |

**MAJOR LEAGUE RULES**
**MLR 56(d) to 56(f)**

|  | Timetable |
|---|---|
| STEP 3:  Clubs receiving notification from the Office of the Commissioner or President of the Minor League Association may discuss the possibility of a new PDC relationship with other such Clubs (including their current PDC affiliates) for an affiliation at the same classification or sub-classification. | 9/16-9/30 (15 days) |
| STEP 4:  Clubs that have not agreed to enter into a PDC arrangement or renew an existing PDC arrangement will be assigned PDC affiliations by the Office of the Commissioner and the President of the Minor League Association. | On or before 10/7 |

**(e)  OTHER AFFILIATION CHANGES.**  If a Major League or Minor League Club desires to change its PDC affiliation during the term of a PDC, the Club shall notify in writing the Commissioner and the President of the Minor League Association of its desire to change affiliations.  A Major League or Minor League Club may not inform or contact any other Major League or Minor League Club concerning its desire to change affiliations.  Upon receiving a notice of desire to change affiliation from a Major League or Minor League Club, the Commissioner and the President of the Minor League Association shall use their best efforts to arrange a new affiliation for the Major League or Minor League Club requesting the change.  Any attempt during the term of a PDC by a Major League or Minor League Club to secure a change in PDC affiliation during the term of a PDC other than through the procedures in this Rule 56(e) shall be considered a violation of the rules against tampering.

**(f)  ASSIGNABILITY.**  A PDC shall be assignable by the Major League Club(s) that originally enters into the PDC, or by any Major League Club(s) to which the PDC is subsequently assigned, only in the following situations:

**(1)**  If a Major League Club desires to reduce the overall number of its Minor League affiliates by assigning a PDC to another Major League Club;

**(2)**  If a Major League Club desires to increase or decrease the number of its Minor League affiliates in a particular classification or subclassification and wishes to assign a PDC to another Major League Club in order to effect such a reconfiguration of its Minor League system; or

**MAJOR LEAGUE RULES**
**MLR 56(f) to 56(g)**

**(3)**    If the Commissioner determines that the player development needs of an existing Major League Club (taking into account geography, the age and experience of the Club's Minor League players, travel burdens, and the configuration of the Club's Minor League system) would be served by an assignment of the Club's PDC to another Major League Club.

A PDC that is supported by the Major League Central Fund also may be freely assigned to a Major League Club or Clubs.  A Major League Club or Clubs may assign a PDC to the Major League Central Fund in emergency circumstances, including, but not limited to, extreme financial difficulties of the Major League Club or Clubs, with the prior approval of the Major League Executive Council.

In the event a PDC is assignable pursuant to this Rule 56(f), the Major League Club (or Clubs) wishing to assign the PDC shall notify the Commissioner (or the Commissioner's designee) and the President of the Minor League Association on or before October 15 of its (or their) desire to assign the PDC for the next championship season and beyond, if applicable.   The Commissioner (or the Commissioner's designee) shall determine if another Major League Club wishes to be assigned the PDC.  A Major League Club may not contact any other Major League Club concerning its desire to assign a PDC without the prior written approval of the Commissioner or the Commissioner's designee.  Any assignment of a PDC permitted by this Rule 56(f) must occur, and notice must be given to the affected Minor League Club, prior to November 1 of the year before the season for which the change in affiliation will be effective.

**(g)  RIGHTS AND OBLIGATIONS.**  The respective rights and obligations of the Minor League Club and the Major League Club(s) under the standard PDC are as follows:

**(1)**    Roster of Minor League Club.  The Major League Club shall provide, and maintain throughout the regular and any post-season play, an active roster of skilled players for the Minor League Club in accordance with the Active List limits in Rule 2.  The players so provided shall be under contract exclusively to the Major League Club and reserved only to the Major League Club.  The Minor League Club shall respect, be bound by, abide by and not interfere with all contracts between the Major League Club and the players that it has provided to the Minor League Club.  In accordance with Rule 2, the Major League Club also shall file and maintain all player lists for the Minor League Club.

**(2)**    Promotional Appearances and Pictures of Players.  As to players assigned, transferred, loaned, leased, or otherwise directed by the Major League Club to perform as a member of the active roster of any Minor League Club, the Major

**MAJOR LEAGUE RULES**
**MLR 56(g)**

League Club grants to the Minor League Club a non-exclusive, royalty-free license to exercise the rights that the Major League Club is authorized to exercise pursuant to paragraphs XIII (Promotion of Baseball) and XIV (Pictures of Player) of the Minor League Uniform Player Contract (<u>see</u> Attachment 3).  The Minor League Club grants to the Major League Club a non-exclusive royalty-free license for non-royalty-bearing promotional purposes to use the marks of the Minor League Club in connection with or with respect to such player's name, picture and likeness and other attributes that the player authorized the Major League Club to exercise pursuant to paragraph XIV of the Minor League Uniform Player Contract, subject to such quality control standards that the Major League Clubs apply to reviewing items bearing their own marks.

**(3)**    Assignments, Transfers and Directions to Perform.  In accordance with these Rules, a Major League Club may assign, direct, designate or otherwise transfer any player to the various players lists that it files and maintains for the Minor League Club.  The Major League Club also may assign, direct, designate or otherwise transfer the contract of any player on the various player lists that it files and maintains for the Minor League Club to any other Major or Minor League Club.  The Minor League Club shall not interfere with, limit or restrict the Major League Club's right to assign, direct, designate or otherwise transfer the contract of any player on the various player lists that it files and maintains for the Minor League Club to any other Major or Minor League Club, except that no more than three players under contract to a Major League Club other than the Major League Club or Clubs that is or are party to a PDC may be assigned, directed, designated or otherwise transferred at any one time to the roster of the Minor League Club.

**(4)**    Managers, Coaches, Instructors and Trainers.  The Major League Club shall have the sole right to select and employ, and the sole obligation to compensate and provide benefits for, the manager, coaches, instructors and trainers for the Minor League Club.  All of these individuals shall be under contract exclusively with the Major League Club.  The Major League Club shall consult with the Minor League Club prior to selecting and employing the manager assigned to the Minor League Club.

**(5)**    Allocation of Team-Related Expenses.

**(A)** Salaries and Other Compensation.   The Major League Club is responsible for the payment of all obligations to or for the benefit of all players assigned, transferred, leased or loaned to, or otherwise directed to play for, or otherwise assigned to any list of, the Minor League Club, including all salary and other compensation, responsibility for all benefits, payroll taxes, worker's compensation coverage, unemployment insurance

160                                                    **3/08**

**MAJOR LEAGUE RULES**
**MLR 56(g)**

coverage, and any other benefits or taxes associated with players' employment.

**(B)** Spring Training. The Major League Club shall pay all spring training expenses for the Minor League Club's team, at a site and for a period to be designated by the Major League Club, including the travel expenses of team personnel reporting to the training camp, the travel expense from the training camp to the city where the team is scheduled to open the season, and the hotel and meal allowances of the team in such city from date of arrival through the day preceding the official opening of the season.

**(C)** Travel. The Major League Club shall pay all travel expenses of any team personnel to his or her home by air coach or other transportation with equivalent fare if the employee's contract with the Major League Club requires such payment. The Major League Club shall pay all travel expenses of their employees arising from assignment of their contracts or the assignment, loan or transfer of such employees to another Major or Minor League Club.

**(D)** Uniforms. The Minor League Club shall furnish a sufficient number of uniforms for all on-field team personnel assigned, transferred, leased or loaned to or otherwise directed to play or perform services for the Minor League Club. The uniforms shall be of at least the same quality as were provided during the 1997 season. The Commissioner's Office and the Minor League Association may establish minimum uniform requirements for Minor League Clubs. Major League Clubs shall receive reasonable notice of changes to a Minor League Club's uniforms. The Minor League Club shall keep its uniforms in good repair and shall have them cleaned when needed. Inventory of uniforms existing in 1997 shall become the property of the respective Minor League Clubs.

**(E)** Bats and Balls. The Major League Club and the Minor League Club that are parties to a PDC shall share in the cost of bats and balls as follows:

**(i)** The Major League Club shall order, ship and pay for all bats and balls necessary for use by the Minor League Club.

**(ii)** The Commissioner or the Commissioner's designee, and the Minor League Association, shall establish bat and ball distribution guidelines for implementation by the Minor League Club.

**MAJOR LEAGUE RULES**
**MLR 56(g)**

**(iii)** Each Minor League Club shall provide, subject to the approval of the Major League Club (which approval shall not be unreasonably withheld), an on-site equipment manager.

**(iv)** All costs (bats and balls actually used and equipment managers) shall be split between the Major League Club and the Minor League Club. The Major League Club shall invoice the Minor League Club for the percentage of total costs due to the Major League Club. The Minor League Club may offset the appropriate percentage of costs it incurred for equipment managers. The cost of shaggers used, if any, shall be the sole responsibility of the Minor League Club. The Minor League Club shall reimburse the Major League Club for its share of total costs on or before October 31 of each year. For costs relating to each Class AAA and Class AA Club, the Major League Club shall pay 66.7% and the Minor League Club shall pay 33.3%. For costs relating to each Club in Class A and in lower classifications, the Major League Club shall pay 75% and the Minor League Club shall pay 25%.

**(v)** Each Major League Club and each Minor League Club shall certify in writing to the Commissioner and the President of the Minor League Association, on or before October 31 of each year, that the reimbursement has, in fact, occurred. Such certification shall include the amounts reimbursed.

**(vi)** Season-end inventory shall remain the property of the Major League Club and shall not be charged to the Minor League Club in that year.

**(F)** Trainer and Medical Supplies. The Major League Club shall provide to the Minor League Club a trainer for the championship season and all reasonable medical supplies for use by such trainer. The Major League Club shall be responsible for the entire cost of the trainer's salary and benefits. The Major League Club shall not be responsible for the purchase of medical supplies by the Minor League Club, unless prior approval is granted.

**(G)** Reimbursements. The Major League Club shall reimburse the Minor League Club within seven days of receipt of a statement for the following expense items:

**(i)** Meal allowances paid by the Minor League Club at the request of the Major League Club, the amount of which allowance shall be determined solely by the Major League Club.

**MAJOR LEAGUE RULES**
**MLR 56(g)**

**(ii)**  Hotel expenses on the road for rooms in excess of 17 rooms per night.  The Minor League Club shall provide up to four single rooms per night for staff personnel and standard double rooms for all players on the Minor League Club's active roster.  A Minor League Club shall not be permitted to lodge with a player any person who is not a member of the Club's traveling party (i.e., manager, two coaches, trainer and players).  A Minor League Club shall not in any event be required to pay the expenses of providing rooms for a Major League Club's roving instructors, field coordinators, scouts, or those persons in like positions with the Major League Club who are not regularly assigned to the Minor League Club.

**(iii)** Reporting and transportation home, including miscellaneous expenses of players, field manager and coach as provided in their Uniform Player Contract; transportation home of trainer; transportation for members of a traveling party fulfilling military reserve or national guard requirements if approved by the Major League Club; as well as any other transportation furnished by the Minor League Club at direction and with approval of the Major League Club.

**(iv)** Commercial fare air transportation charges while traveling in League for members of a traveling party, if any in excess of 30, at all classifications.  The Minor League Club may be reimbursed by the Major League Club for any unused airline ticket purchased for team travel and for which a credit or refund cannot be obtained.  The Minor League Club may be reimbursed by the Major League Club for costs above the discount rate for airline tickets already purchased when changes to the traveling party require the purchase of additional tickets at full price.  The Minor League Club may not prorate ground transportation for players in excess of classification limit, or for manager, coaches or trainers.

**(v)**  All obligations to be paid by the Major League Club to the Minor League Club under this Rule 56 must be submitted by the Minor League Club to the Major League Club no later than November 30, immediately following the conclusion of the season for which the obligations are to be paid in order for the Major League Club to be required to pay those obligations.

**(H)** The Minor League Club shall provide and pay the cost of local basic telephone service for the field manager's office in both home and visiting

**MAJOR LEAGUE RULES**
**MLR 56(g) to 56(j)**

clubhouses.  The Major League Club shall be responsible for all toll (long distance) and special feature charges.

**(I)**  The Minor League Club is required to either install or make readily available, and maintain, a whirlpool, hydroculator (4-pack minimum) and scale in its home clubhouse, and at least a hydroculator (4-pack minimum) in its visiting clubhouse.

**(J)**  If the Minor League Club wins its League championship, it is responsible for providing post-season awards, such as championship rings, for on-field personnel assigned to the Club, and the Major League Club may, but is not required to, participate in the purchase of such awards.

**(6)**  The Minor League Club shall have the right to recommend that disciplinary action be taken by the Major League Club against any player who is under contract to the Major League Club and who is on the Minor League Club's roster or any of its lists maintained pursuant to these Rules, including the right to recommend assignment to another Club's lists or roster, or that any such player be released.  If the Major League Club refuses to take action pursuant to such a recommendation, the Minor League Club may appeal to the Commissioner, who may, acting individually or through a designee, order appropriate disciplinary action, reassignment, transfer or release of the player.  The Minor League Club's League President also may take disciplinary action against any player on the roster or assigned to any of the lists of the Minor League Club, subject to the rights of appeal set forth in the Professional Baseball Agreement.

**(h)  SCHEDULING.**  The Minor League Club shall be bound by and adhere to the official schedule for its League that has been drafted and approved pursuant to the procedures in Rule 32 (Schedules). Except for re-scheduled make-up games approved by its League President, the Minor League Club shall not play any exhibition, regular or post-season games that are not set forth in the official schedule for its League (except pre-season exhibition or post-season playoff games approved to be played in accordance with these Rules).

**(i)  PLAYING FACILITY.**  The Minor League Club must provide a playing facility that complies with Rule 58 or it shall be subject to the sanctions set forth in Rule 58(c) (Failure to Meet Ballpark Standards).

**(j)  RELOCATION OR CHANGE IN LEAGUE AFFILIATION OF MINOR LEAGUE CLUB.**  Any proposal by a Minor League Club to relocate or change League affiliation must first be approved by the Major League Club with which it has a PDC, or the Major League Club may terminate the PDC.  If a Major League Club

**MAJOR LEAGUE RULES**
**MLR 56(j) to 56(n)**

terminates the PDC pursuant to this Rule 56(j), the Commissioner or the Commissioner's designee and the President of the Minor League Association shall use their best efforts to arrange a new affiliation for the Major League Club whenever possible.

**(k) NATIONAL EMERGENCIES.** During any national emergency that causes a suspension of Major League or Minor League play, either party to a PDC may suspend its obligations to the other under this Rule 56.

**(l) EXTENT OF CLUB'S OBLIGATIONS.** Except as specified in the applicable Major League Rules,

**(1)** the Major League Club does not assume and shall not have, by implication or otherwise, any obligation or responsibility to the Minor League Club, its Minor League or Minor League Association or with respect to their operations or employees; and

**(2)** the Minor League Club does not assume and shall not have, by implication or otherwise, any obligation or responsibility to the Major League Club, or the Commissioner's Office, or with respect to their operations or employees.

**(m) NOTICES.** Any notices required to be given by the provisions of a PDC or the Major League Rules shall be made by registered or certified mail or by telegram. The date that the notice actually is sent under this Rule 56(m) shall be deemed to be the date of receipt.

**(n) FILING.** The Major League Club and Minor League Club shall indicate their assent to the terms of the standard PDC, as well as to the incorporated provisions of the Major League Rules and PBA, by signing a standard form letter, a copy of which is appended to these Rules as Attachment 56. This form letter cannot add to, delete from, or otherwise alter the rights and obligations of the Major League Club and Minor League Club as set forth in this Rule 56. Executed copies of the form letter shall be filed with the Commissioner or the Commissioner's designee, with the President of the Minor League Association, and also with the President of the Minor League Club's League.

## MAJOR LEAGUE RULES
## MLR 57(a)

### Rule 57

### TRAVEL STANDARDS FOR MINOR LEAGUE CLUBS

The standards and requirements in this Rule 57 shall govern all travel and lodging that Minor League Clubs provide to active and disabled players, managers, coaches, instructors and trainers.

**(a)  TRANSPORTATION.**  Unless exceptions are granted in writing by the General Manager of the Major League Club whose players are involved, the following standards apply to transportation furnished or arranged by Minor League Clubs:

**(1)**    500-Mile Limit.  Trips by bus in excess of 500 miles shall require the use of an off-day, i.e., a day on which there is no scheduled or make-up game played. Any trips in excess of 500 miles without an off-day shall be by air.

**(2)**    Commuter Trips.   All trips to road games in which the Minor League Club travels to and from the road site in one day shall be limited to no more than 100 miles or two hours in each direction.

**(3)**    Approval of Vehicles.  If a Minor League Club has a PDC, it must obtain the Major League Club's approval of all vehicles used for the purpose of traveling to road games.

**(4)**    Vans.  Minor League Clubs may not use vans for trips that are in excess of 75 miles in each direction.

**(5)**    Flights After Night Games.  If a night game was played on the immediately preceding date, a Minor League Club may not schedule an inter-city flight unless it either

**(A)**  has a departure time later than 9:00 a.m.; or

**(B)**  is the latest departing flight scheduled to arrive at least five hours before the start of the game.

**(6)**    Itineraries.  Subject to the specific rules set forth above, a Minor League Club with a PDC must request the Major League Club's approval of all itineraries (i.e., scheduled route, type of plane if size and quality of equipment is a concern, and departure and arrival times) for bus, hotel and air travel.  Such itineraries must

**MAJOR LEAGUE RULES**
**MLR 57(a) to 58(c)**

be submitted to the Major League Club for approval at least 15 days before the trip to which it applies.

**(b) HOTEL.** The Major League Club must approve all hotels used by a Minor League Club that is party to a PDC, which approval shall not unreasonably be withheld in the case of hotels recommended by the Minor League Club. If a Major League Club approves a hotel(s) for use at the home site of a Minor League Club with which it has a PDC, that approval shall be sufficient for all visiting Minor League Clubs.

**Rule 58**

**STANDARDS FOR MINOR LEAGUE PLAYING FACILITIES**

**(a) STANDARDS.** Each Minor League Club must maintain a playing facility that complies with agreed standards. These standards are set forth in Attachment 58. Any variance or waiver may be granted only by both the President of the Minor League Association and the Commissioner or the Commissioner's designee and shall remain in effect only for the time remaining in the current PDC, unless both the President of the Minor League Association and the Commissioner or the Commissioner's designee agree that the variance or waiver involves a structural issue (a category that includes, but is not limited to, the construction of walls and other permanent features of a facility) for which a variance or waiver of longer duration is appropriate. Any variance or waiver granted under this Rule 58(a) may be renewed beyond its expiration for the term of a successor PDC.

**(b) MONITORING OF COMPLIANCE.** The Commissioner's Office shall employ or otherwise contract for inspectors who will monitor Minor League Clubs' compliance with the agreed playing facility standards, and who will determine the frequency and timing of their inspections.

**(c) FAILURE TO MEET BALLPARK STANDARDS.** The inspectors shall cite any failures to comply with the agreed standards and shall notify the President of the Minor League Association and the Commissioner or the Commissioner's designee of such noncompliance. The President of the Minor League Association shall consult with the Major League Club that has a PDC with the non-complying Minor League Club, with the Commissioner or the Commissioner's designee and with the Minor League Club itself. The President of the Minor League Association shall determine, in consultation with the Commissioner or the Commissioner's designee, the specific measures the Minor League Club must take to achieve compliance and a timetable for achieving such compliance. The President of the Minor League Association shall then promptly notify such Minor League Club of such measures and timetable. Before the

**MAJOR LEAGUE RULES**
**MLR 58(c) to 59(a)**

expiration of the required compliance timetable, the Minor League Club may request an extension of the timetable or a variance from the required compliance measures (see Rule 58(a) (Standards)) upon a showing to the President of the Minor League Association of good cause.

If the Minor League Club fails to achieve such compliance with respect to playing field and other team facilities within the time specified and has not received a variance from such compliance, the President of the Minor League Association shall consult with the Commissioner or the Commissioner's designee about appropriate punitive or remedial action against the Club, its owner(s) and/or its League.  Such punitive or remedial action may include, without limitation, fines not exceeding $250,000 and suspensions of Minor League Club owners and/or personnel.  After consultation with the Commissioner or the Commissioner's designee, the President of the Minor League Association shall then impose such punitive and/or remedial action against the Club, its owner, and/or its League as the President shall determine is appropriate under the circumstances.  In addition to other punitive or remedial action that the President of the Minor League Association may impose, if, after investigation and consultation with the Commissioner or the Commissioner's designee, the President of the Minor League Association determines that the Minor League Club has no good cause for its failure, the President of the Minor League Association shall order the PDC voidable at the option of the Major League Club that is party to the PDC, and shall order the ownership of the Minor League Club to divest its interest in the franchise.  In the event that there is a finding of good cause, the President of the Minor League Association, after consultation with the Commissioner or the Commissioner's designee, shall issue a timetable for compliance within the shortest possible period.

If either the Major League Club that has a PDC with a Minor League Club that has been cited for noncompliance or the Commissioner's designee believes that the failure by the President of the Minor League Association to impose a penalty constitutes an abuse of discretion, or that a timetable or extension for compliance or a variance given by the President of the Minor League Association constitutes an abuse of discretion, the Major League Club or the Commissioner's designee may certify the dispute for appeal to the Commissioner under Article II of the Professional Baseball Agreement.

## Rule 59

## LIEN ON TERRITORY

**(a)  AMOUNT AND PRIORITY OF LIENS.**  The amount of a Major or Minor League Club's indebtedness:

**MAJOR LEAGUE RULES**
**MLR 59(a) to 59(c)**

**(1)**   To its players and for its pro-rata share of its League salary obligations to umpires and to its official scorers or for its pro-rata share of its League indebtedness to official scorers;

**(2)**   To other Major and/or Minor League Clubs for, or in connection with, assignments of player contracts, any of its commitments under a PDC or to any Major or Minor League Club or to any Major or Minor League or Minor League Association for money loaned (if such loans have been recorded with the Commissioner and the President of the Minor League Association within 10 days from the date of the loan);

**(3)**   For obligations due to the Minor League Association of which the Minor League Club's League is a member and for the Minor League Club's pro-rata share of its League obligations to that Minor League Association; and,

**(4)**   For obligations to the Major or Minor League Club's League,

shall become liens against the territory it represents.  The liens shall rank in the order or priority stated in Rules 59(a)(1) through (a)(4).  Except under such conditions as the President of the Minor League Association may impose, in the case of Minor League Clubs, League membership shall not be extended to any Major or Minor League Club in the debtor Club's territory until such debts are discharged.  Liens established under this Rule 59 shall terminate at the expiration of two years from the date they were established.  However, one year shall be added to the lien period for each season that membership is extended to a Major or Minor League Club in the territory of the debtor Club.

**(b) DEDUCTIONS.**  The Commissioner (in the case of a Major League Club) or the President of the Minor League Association (in the case of a Minor League Club) shall deduct the amount of the debts set forth in Rule 59(a) (Amount and Priority of Liens) from any monies received for the account of or to the credit of the debtor Major or Minor League Club.  In the case of a Minor League Club, the President of the Minor League Association shall pay any maintenance charge required by the governing document of the Club's Minor League Association before applying the remainder of the deductions to the payment of the Club's debts.

**(c) EFFECT OF ASSIGNMENTS.**  Except as may be authorized by the Commissioner (in the case of a Major League Club) or the President of the Minor League Association (in the case of a Minor League Club), any assignment by a Club of monies due or to become due shall be subject to the provisions of this Rule 59, and shall not constitute any preference or priority contrary to the preferences and priorities

## MAJOR LEAGUE RULES
### MLR 59(c) to 60(h)

in this Rule 59, or otherwise affect any obligation specified in Rule 59(a) (Amount and Priority of Liens) that is of equal or superior priority.

### Rule 60

### DEFINITIONS

The definitions set forth in this Rule 60 shall apply to the following terms as they are used in the Major League Constitution, the Major League Rules and all documents incorporated into or appended to the Major League Constitution and Major League Rules.

**(a)** The term "Major League" shall refer to the American League and the National League and any other professional baseball league that is recognized as a Major League under the Major League Constitution.

**(b)** The term "Major League Club" shall refer to a professional baseball club that plays in a Major League.

**(c)** The term "Major League Player" shall refer to a professional baseball player who is on the Major League Reserve List of a Major League Club.

**(d)** The term "Minor League Association" shall refer to any association of Minor League Clubs and/or Minor Leagues that is party to an agreement with the Major Leagues and that recognizes the authority of the Commissioner.

**(e)** The term "Minor League" shall refer to any domestic or foreign professional baseball league (other than a Winter League) that is party to an agreement with the Major Leagues that recognizes the authority of the Commissioner and that recognizes that such league shall be a Minor League within the meaning of the Major League Rules.

**(f)** The term "Minor League Club" shall refer to any professional baseball club that is a member in good standing of a Minor League.

**(g)** The term "Club" shall refer to any Major League Club or Minor League Club.

**(h)** The term "Minor League Player" shall refer to any professional baseball player who is on a Minor League Reserve List of a Major League Club or who is on the Reserve List of a Minor League Club.

# MAJOR LEAGUE RULES
## MLR 60(i) to 60(q)

**(i)**　The term "first-year player" shall refer to any player who has never before signed a Major or Minor League contract.

**(j)**　The term "Commissioner" shall refer to the individual who holds the office of Commissioner of Baseball pursuant to Article II of the Major League Constitution, or in the absence of a Commissioner, any entity succeeding to the powers and duties of the Commissioner pursuant to the Major League Constitution.

**(k)**　The term "President of a Minor League Association" shall refer to the individual who holds the authority of a chief executive officer under the governing document of a Minor League Association.

**(l)**　The term "Major League Reserve List" shall refer to the lists filed and maintained by a Major League Club pursuant to Rule 2 of all players, player-managers and player-coaches with whom the Major League Club is party to a Major League Uniform Player's Contract (unless such players have been assigned outright to a Minor League Club) and players whom the Major League Club has promoted to Major League status and also must be tendered Major League Uniform Player's Contracts on or before the following December 20.

**(m)**　The term "Minor League Reserve List" shall refer to the list filed and maintained pursuant to Rule 2 of all players, player-managers and player-coaches with whom a Major or Minor League Club is party to Minor League Uniform Player Contracts, including players under Major League Uniform Player's Contracts who have been assigned outright to Minor League Clubs.

**(n)**　The term "Major League Active List" shall refer to the list filed pursuant to Rule 2 of all players, player-managers and player-coaches who are currently eligible to play in a game for that Major League Club.

**(o)**　The term "Minor League Active List" shall refer to the list filed pursuant to Rule 2 of all players, player-managers and player-coaches who are currently eligible to play in a game for that Minor League Club.

**(p)**　The term "championship season" shall refer to the full schedule of regular-season games that has been approved for a Major or Minor League Club in accordance with the provisions of Rule 32.

**(q)**　The term "Player Development Contract (PDC)" shall refer to the Standard PDC in Rule 56.

**MAJOR LEAGUE RULES**
**MLR 60(r) to Acceptance**

**(r)**   The term "independent Minor League Club" shall refer to a Minor League Club that is not owned by a Major League Club and does not have a PDC with a Major League Club or Clubs.

**(s)**   The term "Inactive Lists" shall refer:

   **(1)**   with respect to Major League Clubs, to the Disabled, Bereavement, Suspended, Voluntarily Retired, Restricted, Disqualified and Ineligible Lists; and

   **(2)**   with respect to Minor League Clubs, to the Disabled, Suspended, Voluntarily Retired, Restricted, Disqualified, Ineligible and Temporarily Inactive Lists.

**(t)**   The term "Winter League" shall refer to a professional baseball league outside the United States and Canada that plays a schedule of games that begins after August 31 and concludes before the start of the next championship season and that the Commissioner or the Commissioner's designee recognizes as a Winter League. Winter Leagues are not Minor Leagues within the meaning of the Major League Rules.  Winter League Clubs are not Minor League Clubs within the meaning of the Major League Rules.

**ACCEPTANCE**

   The foregoing Major League Rules having been proposed by the Major League Executive Council pursuant to the provisions of the Major League Constitution, have been duly accepted by the Major League Clubs and the Leagues of the National Association.  These Rules are recognized as binding upon all their constituent Clubs and can be amended only as provided in said Major League Constitution and the Professional Baseball Agreement, where applicable.

**MAJOR LEAGUE RULES**
**MLR Attachment 3**


**ATTACHMENT 3**


**MINOR LEAGUE UNIFORM**
**PLAYER CONTRACT**

I.        Parties

    The parties to this Minor League Uniform Player Contract are those identified in paragraphs 1 and 2 of Addendum A.

II.       Definitions

    A.    As used in this Minor League Uniform Player Contract, the term "Player" shall refer to the individual identified in paragraph 1 of Addendum A.

    B.    The term "Major League" shall refer to The American League of Professional Baseball Clubs, The National League of Professional Baseball Clubs and any other professional baseball league that is granted Major League status pursuant to the Major League Agreement (MLA).

    C.    The term "Major League Club" shall refer to a professional baseball club that is a member in good standing of a Major League.

    D.    The term "Major League Player" shall refer to a professional baseball player who is on an Active List, Disabled List or other Inactive List of a Major League Club.

    E.    The term "Minor League" shall refer to any domestic or foreign professional baseball league that, either directly or through membership in an association or other entity, is party to an agreement with the Major Leagues and that recognizes the authority of the Commissioner.

    F.    The term "Minor League Club" shall refer to any professional baseball club that is a member in good standing of a Minor League.

    G.    The term "Minor League Player" shall refer to any professional baseball player who is on a Minor League under control list and/or a Minor League Reserve List of a Major League Club and/or any professional baseball player who is on the Active List, Disabled List or other Inactive List of a Minor League Club.

    H.    The term "Commissioner" shall refer to the individual who holds the office of Commissioner of Baseball pursuant to Article I of the MLA (or, in the absence of a

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

Commissioner, any person or entity succeeding to the powers and duties of the Commissioner pursuant to the MLA) or the Commissioner's designee.

I.     The term "Club" shall refer to the professional baseball club identified in paragraph 2 of Addendum A, and any other Major League Club or Minor League Club to which this Minor League Uniform Player Contract may be assigned, loaned, leased or otherwise transferred.  The term "Club" also shall refer to any Major League Club or Minor League Club for which Player is directed to perform.

J.     The terms "Minor League Reserve List" and "Minor League under control list" shall refer to the lists filed pursuant to the Major League Rules of all Minor League Uniform Player Contracts to which that Club holds title.

K.     The terms "Major League Reserve List" and "Major League under control list" shall refer to the lists filed pursuant to the Major League Rules of all Major League Uniform Player Contracts that Club holds title to and that Club has placed on the Major League roster.

L.     The term "championship playing season" shall refer to the full schedule of regular-season games that has been approved for Club.

M.     The term "Minor League Association" shall refer to any association of Minor League Clubs and/or Minor Leagues that is party to an agreement with the Major Leagues and that recognizes the authority of the Commissioner.

III.     Recital

The Major Leagues have jointly subscribed to the Major League Agreement (MLA) and the Major League Rules (MLR).  The parties agree that they and this Minor League Uniform Player Contract are therefore subject to and governed by the MLA and MLR, which are fully incorporated in this Minor League Uniform Player Contract as if set forth herein verbatim.  The Major Leagues are currently party to the Professional Baseball Agreement (PBA) with the National Association of Professional Baseball Leagues (National Association).  To the extent that this Minor League Uniform Player Contract is assigned, loaned, leased or otherwise transferred to a Minor League Club which is a member of a National Association League (or the player is directed by the Club to perform for, or report to, such Minor League Club), the parties acknowledge (A) that they and this Minor League Uniform Player Contract are bound by, subject to and governed by the then-existing PBA and any subsequent amendments to that document, and (B) that the then-existing PBA (and any subsequent amendments to that document) are fully incorporated in this Minor League Uniform Player Contract as if set forth herein verbatim.

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

To the extent that this Minor League Uniform Player Contract is assigned, loaned, leased or otherwise transferred to a Minor League Club which is not a member of a National Association  League (or the Player is directed by the Club to perform for, or report to, such Minor League Club), the parties acknowledge (A) that they and this Minor League Uniform Player Contract are bound by, subject to and governed by any agreement(s) and any subsequent amendments to any present or future agreements then in effect between the Major Leagues and the Minor League or Minor League Association of which the Minor League Club is a member and (B) that any such agreements (and any subsequent amendments to any such agreements) are fully incorporated in this Minor League Uniform Player Contract as if set forth herein verbatim.

IV.       Scope

Subject to the provisions of the Basic Agreement applicable to Major League Players performing for Minor League Clubs and/or in Minor Leagues, this Minor League Uniform Player Contract shall set the terms and conditions of Player's employment during all periods in which Player is employed by Club as a Minor League Player.  The Basic Agreement and the Major League Uniform Player Contract shall exclusively govern the terms and conditions of Player's employment during all periods in which Player is performing services for Club as a Major League Player.  This Minor League Uniform Player Contract therefore shall have no application during any period in which Player is on Club's Major League Active, Disabled or other Inactive List.

V.        Agreement

In consideration of the foregoing Recital and Scope provisions, for the mutual representations, promises, covenants and agreements contained herein (including in Addenda A, B and C) and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties, intending to be legally bound, promise, covenant and agree as follows.

VI.       Duration And Conditions Of Employment

A.       Unless a different term of this Minor League Uniform Player Contract is set forth in Addendum A, Club hereby employs Player to render, and Player agrees to render, skilled services as a Minor League Player in seven (7) separate championship playing seasons, commencing with the beginning of the championship playing season identified in paragraph 3 of Addendum A, or the portion of that regular championship playing season remaining after the execution date of this Minor League Uniform Player Contract, as specified in paragraph 4 of Addendum A, whichever date is later.  Unless

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

this Minor League Uniform Player Contract is terminated pursuant to Paragraph XIX, the term of employment shall extend until Player has performed services for Club as a Minor League Player in the requisite total of separate championship playing seasons. For purposes of determining whether Player has performed in the requisite total of separate championship playing seasons, Player shall not be deemed to have performed services as a Minor League Player during any championship playing season in which Player is on either the Major League Active List, the Major League Disabled List or other Major League Inactive List (or combination of the foregoing) for the entire season. Player also shall not be deemed to have performed services as a Minor League Player in any championship playing season in which Player is on the Restricted List, Disqualified List, Suspended List, Ineligible List, Voluntarily Retired List or Military List (or combinations of the foregoing) for the entire season. Player also shall not be deemed to have performed services as a Minor League Player in any championship season in which Player withholds services for any portion of the championship playing season or playoff games at the conclusion of that championship playing season. For purposes of determining whether Player has performed services in the requisite total of separate championship playing seasons, service in winter league play shall be excluded.

B.  This Minor League Uniform Player Contract obligates Player to perform professional services on a calendar year basis, regardless of the fact that salary payments are to be made only during the actual championship playing season. The salary paid is in part based on considerations in addition to the actual performance of services during the championship playing season. Player therefore understands and agrees that Player's duties and obligations under this Minor League Uniform Player Contract continue in full force and effect throughout the calendar year, including Club's championship playing season, Club's training season, Club's exhibition games, Club's instructional, post-season training or winter league games, any official play-off series, any other official post-season series in which Club shall be required to participate, any other game or games in the receipts of which Player may be entitled to a share, and any remaining portions of the calendar year. Player's duties and obligations shall continue in full force and effect until October 15 of the calendar year of the last championship playing season covered by this Minor League Uniform Player Contract.

C.  Player and Club also agree to comply with all decisions of the Commissioner pursuant to the provisions of the MLA and MLR and, to the extent applicable, the PBA or other agreement in effect between the Major Leagues and one or more Minor Leagues or Minor League Associations.

D.  Player's physical condition is important to the safety and welfare of Player and to the success of Club. Thus, to enable Player to become properly fit for Player's duties under this Minor League Uniform Player Contract, Club may require Player to maintain Player's playing condition and weight during the off-season and to report for

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

practice and conditioning at such times and places as Club may determine and may require Player to participate in such exhibition games prior to the championship playing season as Club may arrange.  Club shall reimburse Player for expenses incurred in traveling from Player's home city to Club's training place and Club shall have the right to select the mode and class of transportation to be used and the route to be taken by Player.  In the event Player fails to report for practice and conditioning as required, or fails to participate in exhibition games, Club may impose a reasonable fine upon Player in accordance with Paragraph XX and also require Player to become fit for Player's duties to the satisfaction of Club at Player's own expense.

    E.    Player represents that Player is aware of the Commissioner's Office Policy (the Policy) prohibiting Minor League Players and other Minor League Personnel from using or possessing tobacco or similar products on ballpark premises or during Club travel.  Player also agrees that all Policy provisions (and any subsequent amendments, revisions or additions) shall be incorporated in this Minor League Uniform Player Contract as if set forth herein verbatim.

    Player further promises that Player will comply fully with all Policy provisions and that Player's obligation to do so is a material term of this Minor League Uniform Player Contract.  Player understands and agrees that any violation of the Policy may subject Player to discipline (including, but not limited to, a monetary fine and/or a suspension) under the terms of this Minor League Uniform Player Contract, the MLA and the MLR.  Moreover, Player stipulates and agrees that all disputes concerning the Policy and/or Player's compliance with the Policy shall be resolved in accordance with this Minor League Uniform Player Contract, the MLA and the MLR.

VII.    Payment

    A.    For the performance of all of the skilled services by Player and for Player's other promises herein contained, Club will pay Player at the monthly rate set out in Addendum C-1 during the first championship playing season covered by this Minor League Uniform Player Contract.  The Player and Club shall attempt annually to negotiate an applicable monthly salary rate for the next subsequent championship playing season covered by this Minor League Uniform Player Contract.  Such negotiations shall be in accordance with the applicable provisions of the MLA and, if applicable, the PBA or other agreement in effect between the Major League and one or more Minor Leagues or Minor League Associations.  If the Player and Club reach agreement, the agreed-upon monthly salary rate shall be set out in a new Addendum C, and Player agrees to execute same. If the Player and Club do not reach agreement, then the Player's monthly salary rate for the next championship playing season shall be set by the Club, but shall not be less than eighty percent (80%) of the monthly salary rate set out in the most recently executed Addendum C.   If the Player's monthly salary rate

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

is set by the Club, that monthly salary rate shall be set out in a new Addendum C, and Player agrees to execute same. Any monthly salary rate set out in any Addendum C shall conform to any applicable minimum salary requirements contained in the MLR. If Player is a foreign national with a nonimmigrant visa, monthly salary rates set out in any Addendum C shall be adjusted upward as necessary to conform with the minimum required salary levels. The various Addenda C for this Minor League Uniform Player Contract shall be numbered consecutively, for example, Addendum C-1, Addendum C-2, et cetera.

B. The monthly payments under this Minor League Uniform Player Contract will be made in two (2) semi-monthly installments on the 15th day and last day of the month after the beginning of Club's championship playing season. The obligation to make such payments to Player shall start with the beginning of Club's championship playing season or such later date as Player reports for championship season play. The obligation to make such payments shall end with the termination of Club's championship playing season and any official play-off series in which Club shall participate, or upon the termination of this Minor League Uniform Player Contract, whichever shall occur first. Player shall not be entitled to any payment under this Minor League Uniform Player Contract for any period that Player is on a Major League Active, Disabled or other Inactive List. If Player is in the service of Club for part of Club's championship playing season only, Player shall receive such proportion of the rate set forth above as the number of days of Player's actual employment in any month compares to the number of days in said month.

VIII.     Disability Of Player

A. If Player is disabled during Club's training season and if this Minor League Uniform Player Contract is terminated during Club's training season as a result of that disability, or if this Minor League Uniform Player Contract is later terminated during the first fourteen days of Club's championship playing season while Player is so disabled, Player shall be paid by Club at the rate of compensation set out in the most recently executed Addendum C for a period of two weeks from the first day of Club's championship playing season. However, if Player is injured during Club's training season and is not released on or before the fourteenth day of Club's championship playing season, Club shall continue to be obligated to pay Player at the rate of compensation set out in the most recently executed Addendum C until the conclusion of Club's championship playing season, or until an earlier date on which Club may give Player an unconditional release.

B. If Player is disabled during Club's championship playing season, that disability shall not impair Player's rights to receive the compensation set forth in subparagraph A of Paragraph VII for a period of fourteen days from the date of such

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

disability if that disability continues for all of such period.  It is specifically provided, however, that said fourteen days' period shall not be considered for purposes of determining whether any additional payments may be due Player under any Special Covenants to this Minor League Uniform Player Contract.  However, if Player is not released during or at the end of the fourteen days' period, Club shall continue to be obligated to Player for compensation under the terms of subparagraph A of Paragraph VII to the conclusion of Club's championship playing season, or to such earlier date on which Club may give Player an unconditional release.

C.    Club also shall pay all of Player's necessary and reasonable hospital and medical expenses incurred during the term of this Minor League Uniform Player Contract by reason of said disability, which expenses are not paid by worker's compensation insurance or other surgical, medical or hospitalization insurance policy, for the number of days in the period of disability or 180 days, whichever is less.  Club, however shall always have the right to select the physician or dentist to perform professional services to be rendered to Player as well as the place of delivery of said services, including hospital, offices or clinic, or to approve the person rendering such services or the place where such services are to be performed if selected by Player.

D.    The following conditions are expressly established as conditions precedent to Club's obligation to pay any of the salary provided for in subparagraphs A and B of this Paragraph VIII, or to pay any of the medical or hospital expenses provided for in subparagraph C of this Paragraph VIII:

1.    Player's disability must have been a direct and proximate result of an injury sustained in the course and within the scope of Player's employment under this Minor League Uniform Player Contract; and

2.    Player must give Club written notice of the place, time, cause and nature of Player's injuries within five (5) days from the date of receiving such injuries or prior to the termination of this Minor League Uniform Player Contract, whichever is earlier.  The failure of Player to give such notice shall not impair the rights of Player, as set forth herein, if Club has actual knowledge of such injury to Player; and

3.    Player, if requested by Club, must provide Club with written medical proof of Player's disability.

E.    Any worker's compensation payments, or any surgical, medical or hospitalization insurance payments received by Player for the period for which Club is paying Player, as specified in this Paragraph VIII, shall be immediately paid by Player

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

to Club.  If Player fails or refuses to pay these monies to Club, Club shall deduct the same from any compensation due Player.

IX.      Allowance

    Club will provide Player during Club's training season and while Club is "abroad" with lodging (if Player is required to remain "abroad" overnight) and the meal allowance required by the MLR.  If while "abroad" Club elects to require Player to remain "home" and Player is on Club's Active or Disabled List, Club shall pay Player the meal allowance required by the MLR.  No such meal allowance shall be due Player, however, if Player's permanent residence is located in the home city of Club or if Player returns to Player's permanent residence while Club is abroad.  The terms "home" and "abroad" mean, respectively, at and away from the city in which Club has its home baseball park.

X.      Transportation

    Club will provide Player with the mode and class of transportation of its choice from "home" to "abroad" games and back.  Player agrees to use the mode of transportation furnished by Club to and from all "abroad" games at all times.  Club will provide Player return transportation to Player's home city at the conclusion of the championship playing season or playoffs, or if unconditionally released prior thereto. Mode and class of transportation shall be at the Club's discretion.

XI.      Uniform

    Club will select and furnish Player with necessary baseball uniforms, excluding shoes, but including all numerals, emblems, logos or devices to be worn on the uniform or affixed thereto.  Additionally, Club may, if it wishes to do so, provide shoes or other personal equipment items or apparel, such as batting gloves or fielding gloves.  Player shall wear uniforms, personal equipment items and apparel as furnished and shall not alter or disfigure them.  At the end of the championship playing season, or at the end of any post-season series games, or upon the assignment or other transfer of this Minor League Uniform Player Contract, or upon the unconditional release of Player from this Minor League Uniform Player Contract, or upon any direction by Club to perform services for a different Club, Player immediately shall return to Club such uniforms, personal equipment items, apparel and any and all other property of Club in the possession of Player.  Player shall not wear or use any personal equipment item, article of apparel or any other item with or upon Player's uniform which is not approved by Club, or which is not in accordance with the MLR.

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

XII.       Loyalty

Player agrees to serve Club diligently and faithfully, to keep in first-class condition, and to observe and comply with all rules and regulations of Club. Further, Player agrees to conform to high standards of personal conduct (before, during and after working hours), fair play and good sportsmanship.

XIII.      Promotion of Baseball

In addition to the furnishings of professional baseball services to Club, Player agrees, beginning with the date that this Minor League Uniform Player Contract is executed, to cooperate with Club and to participate in any and all promotional activities of Club which, in the sole opinion of Club, will promote the welfare of Club or of professional baseball.

XIV.      Pictures Of Player

Player agrees, beginning with the date that this Minor League Uniform Player Contract is executed, that current or future photographs, whether still or action, and motion pictures may be taken and any form of broadcasts or telecasts of Player, individually or with others, may be made at such times or places as Club may designate and agrees that all rights therein and all rights to Player's name, voice, signature, biographical information and likeness shall belong to Club and that they may be used, reproduced, sold, licensed, or otherwise disseminated or published by Club or its licensees, assignees, and/or other designees directly or indirectly in any medium whatsoever for any purpose (including but not limited to in broadcast, in print, on trading cards, posters and other merchandise of any kind, in electronics, in audio, in video or in connection with any media), in any manner and at any time, including after the term of this Minor League Uniform Player Contract, that Club desires. Player acknowledges that the foregoing rights include, without limitation, all related copyright, trademark, trade name, service mark, right of publicity and/or right of privacy rights. Club may exploit each of the rights granted to it by Player pursuant to this Paragraph XIV without additional payment or other compensation to Player. Player further agrees that during the term of this Minor League Uniform Player Contract Player will not make public appearances, participate in radio or television programs, or on-line computer forums or any public conferences of any sort, permit Player's picture to be taken while in Club's uniform or a part thereof, sponsor or permit Player's name, voice, signature, biographical information and/or likeness to be used in conjunction with any commercial purpose, including but not limited to the sale, rental or advertising or promotion of products or services, or write or sponsor newspaper, magazine or any other article for publication, without the express prior written consent of Club.

3/08

## MAJOR LEAGUE RULES
### MLR Attachment 3

XV.        Player's Representations

As a further inducement to Club to enter into this Minor League Uniform Player Contract, Player represents to Club as follows:

A.        Player has no physical or mental defects which would prevent or impair the performance of Player's skilled services as a professional baseball player for Club. Player is capable of and will perform services and such other duties as may be required pursuant to this Minor League Uniform Player Contract with expertness, diligence and fidelity.

B.        Player does not own, directly or indirectly, stock or have any financial interest in the ownership or earnings of any Minor League Club or Major League Club except as hereinafter expressly set forth, and covenants that Player will not hereafter, while under this Minor League Uniform Player Contract, acquire or hold any such stock or interest.

C.        Player has exceptional and unique skill and ability as a baseball player, and Player's services to be rendered to Club are of a special and extraordinary character which gives Player a peculiar value which cannot be reasonably or adequately compensated for in damages at law.  Therefore, Player agrees that Player's breach of this Minor League Uniform Player Contract will cause Club great and irreparable injury and damage.  Accordingly, Player agrees that, in addition to other remedies, Club shall be entitled to injunctive and other equitable relief to prevent a breach of this Minor League Uniform Player Contract by Player, including the right to enjoin Player from playing professional baseball for any other person or organization during the term of this Minor League Uniform Player Contract.

D.        Player is not a party to, and will not enter into, any contract or any contractual obligation to render skilled services as a professional baseball player with any person or organization other than Club.  Additionally, Player is not a party to, and will not enter into, any contract or any contractual obligation that conflicts with any of Player's obligations under this Minor League Uniform Player Contract or limits (as determined by the Club in the sole exercise of its discretion) the rights granted Club under this Minor League Uniform Player Contract or that impairs Club's ability to fully exercise such rights.

E.        Player's name, as set forth in this Minor League Uniform Player Contract, and of which Player's signature to this Minor League Uniform Player Contract consists, is Player's proper and legal name and is not a fictitious or assumed name.

## MAJOR LEAGUE RULES
### MLR Attachment 3

F.    All personal information concerning Player in Addendum A is true and accurate.

G.    Player is eligible, in accordance with the MLR, to execute this Minor League Uniform Player Contract.

H.    Player represents and warrants that:

1.    Player has the full authority to grant the rights contained in this Minor League Uniform Player Contract and to execute, deliver and perform the obligations under this Minor League Uniform Player Contract,

2.    the execution and delivery of this Minor League Uniform Player Contract will not conflict with or result in any breach of any agreement to which Player is a part or by which Player is bound, and

3.    this Minor League Uniform Player Contract is duly executed and delivered by Player.

XVI.    Playing For Others

A.    For the purpose of avoiding physical injuries, Player agrees that during the term of this Minor League Uniform Player Contract, Player will not play baseball other than for Club, without the written consent of the Club.  If Club consents to Player's participation in a winter league, the terms and conditions of Player's employment during winter league play shall be governed by this Minor League Uniform Player Contract, except that Player and Club shall agree on the amount of monetary compensation for Player's participation in winter league play.

B.    Player and Club agree and recognize that Player's participation in any other sport may impair or destroy Player's ability and skill as a professional baseball player. Accordingly, from and after the date of execution of this Minor League Uniform Player Contract, Player agrees that Player shall not engage in automobile or motorcycle racing, hanggliding, fencing, parachuting, skydiving, boxing, wrestling, karate, judo, football, basketball, skiing, hockey, or any other sport or activity involving a substantial risk of personal injury.  Player also agrees that, except with the written consent of Club, Player will not participate in amateur, intramural, intercollegiate or professional athletics in any sport whatsoever.

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

XVII.      Physical Examination

A.    When requested by Club, Player shall submit to a complete physical, psychiatric, psychological and/or dental examination at the expense of Club, and, if necessary, to medical, surgical, psychiatric or dental treatment at Player's own expense, except as otherwise provided in this Minor League Uniform Player Contract.  Upon the failure or refusal of Player to do so, Club may take such action against Player as it deems advisable in the manner agreed to between the parties and set forth at Paragraph XX.

B.    It is specifically provided, however, that if Player signed this Minor League Uniform Player Contract as a free agent (whether or not previously party to a Major League or Minor League Uniform Player Contract), within ninety days subsequent to the execution of this Minor League Uniform Player Contract by Player, Club may require Player to undergo a complete physical, psychiatric, psychological and/or dental examination by a physician and/or dentist of Club's choosing and at Club's expense.  If such examination reveals the presence of any physical and/or dental defect, congenital or otherwise, which in the judgment of the physician or dentist would or might substantially impair Player's ability to play professional baseball and was present at the time of execution of this Minor League Uniform Player Contract by Player, Club may terminate this Minor League Uniform Player Contract without further payment to Player of any bonus, benefits or other compensation provided for in this Minor League Uniform Player Contract or any Special Covenants to this Minor League Uniform Player Contract.  Such a termination, however, must be effected (including notification to the Commissioner's Office) within one hundred and five (105) days subsequent to the execution of this Minor League Uniform Player Contract by Player.  In the event of a termination pursuant to this subparagraph B of Paragraph XVII, this Minor League Uniform Player Contract shall be void and of no force or effect between the Parties and Player shall repay any bonus, benefits or other compensation provided pursuant to any Special Covenants to this Minor League Uniform Player Contract.

XVIII.    Assignments, Transfers And Directions To Perform For Minor Or Major League Clubs

A.    Player specifically agrees and understands that this Minor League Uniform Player Contract may be freely assigned by Club, and re-assigned by any assignee Club, to any other Major League Club or Minor League Club.

B.    Upon assignment of this Minor League Uniform Player Contract, the assignee Club shall be liable to Player only for payments accruing from the date Player reports to the Club for which Player is directed to perform by assignee Club.  Assignor Club shall remain liable to Player for all payments accrued as of the date of the

184                                                            **3/08**

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

assignment. In addition, if Player reports to the Club for which Player is directed to perform by assignee Club as soon as the mode of transportation authorized or furnished to player permits, assignor Club shall be liable to Player for the travel time required to reach the city to which Player is directed to report to join the Club for which Player is directed to perform by assignee Club.

C. In the event this Minor League Uniform Player Contract is assigned, following Player's receipt of written or telegraphic notice of the assignment, Player shall report to the Club for which Player is directed to perform by the assignee Club as soon as the mode of transportation authorized or furnished to Player permits. If Player fails or refuses to report as soon as the mode of transportation authorized or furnished to Player permits, Player shall not be entitled to any payment for the period from the date upon which Player received written or telegraphic notice of the assignment to the date on which Player reports to the Club for which Player is directed to perform by the assignee Club.

D. Player also specifically agrees and understands that this Minor League Uniform Player Contract (and the Club's exclusive rights to Player's services under this Minor League Uniform Player Contract) may be freely loaned, leased or otherwise transferred to any Minor League Club. In the event this Minor League Uniform Player Contract is loaned, leased, or otherwise transferred, following Player's receipt of written or telegraphic notice of the loan, lease or transfer, Player shall report to the Club to which this Minor League Uniform Player Contract is loaned, leased or otherwise transferred as soon as the mode of transportation authorized or furnished to Player permits. If Player fails or refuses to report as soon as the mode of transportation authorized or furnished to Player permits, Player shall not be entitled to any payment for the period from the date upon which Player received written or telegraphic notice of the loan, lease or transfer to the date on which Player reports to the Club to which this Minor League Uniform Player Contract is loaned, leased or otherwise transferred.

E. Player also specifically agrees and understands that Club may freely direct Player to perform services for any Major League or Minor League Club. Further, following Player's receipt of written or telegraphic notice of the direction to perform, Player specifically agrees and understands that Player's obligation under this Minor League Uniform Player Contract to perform services for the directed Club shall be the same as Player's obligation to perform services for Club under this Minor League Uniform Player Contract. If Club directs Player to perform services for a Club, Player agrees to report to the Club as soon as the mode of travel authorized or provided permits, and to perform all services for such Club in a diligent and faithful manner. If Player fails or refuses to report as soon as the mode of transportation authorized or furnished to Player permits, Player shall not be entitled to any payment for the period

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

from the date upon which Player received written or telegraphic notice of the direction to perform to the date on which Player reports to the directed Club.

F.    Player agrees that Player will execute the standard form Major League Uniform Player Contract then in effect in the Major Leagues if Player is placed (following an assignment, direction to perform or otherwise) on a Major League roster, Major League under control list or Major League Reserve List at any point during the term of this Minor League Uniform Player Contract.

G.    If Player agrees, this Minor League Uniform Player Contract may be assigned, loaned, leased or otherwise transferred to (or Player directed to perform for) a Minor League Club or other professional baseball club participating in winter league play.  The terms and conditions of Player's employment during winter league play shall be as stated in Subparagraph A of Paragraph XVI.

XIX.    Termination

A.    If Club is in arrears to Player for any payments due Player under this Minor League Uniform Player Contract for more than fifteen (15) days, or if Club fails for more than fifteen (15) days to perform any other obligations agreed or required to be performed by Club, Player shall be entitled to apply to the Commissioner to terminate this Minor League Uniform Player Contract.  Thereafter, if Club fails to remedy the default as to the payment or other obligation within such time as the Commissioner may fix, the Commissioner shall terminate this Minor League Uniform Player Contract by a declaration of Player's free agency.  It is specifically provided, however, that Club shall remain liable to Player for all payments due him as of the date of the termination of this Minor League Uniform Player Contract and the declaration of Player's free agency.

B.    Club may terminate this Minor League Uniform Player Contract upon the delivery of written or telegraphic notice to Player if Player at any time shall:

     1.    Fail, refuse or neglect to conform Player's personal conduct to high standards of good citizenship and good sportsmanship;

     2.    Fail, refuse or neglect to keep himself in first-class physical condition;

     3.    Fail, refuse or neglect to obey Club's requirements respecting Player's conduct and service;

     4.    Fail in the judgment of Club to exhibit sufficient skill or competitive ability to qualify or to continue as a professional baseball player as a member of Club's team; or

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

5. Fail, refuse or neglect to render Player's services hereunder, or in any other manner to materially breach this Minor League Uniform Player Contract.

C. If Player becomes disabled, Club may also terminate this Minor League Uniform Player Contract in accordance with Paragraph VIII above.

XX. Disputes

A. For the violation by Player of any of the obligations or duties of Player as set forth in this Minor League Uniform Player Contract, or for the violation by Player of any of Club's rules or regulations, Player agrees that Club may impose a reasonable fine upon Player and deduct the amount thereof from Player's compensation, or may suspend Player without compensation, or both. Player also agrees that Club may place him on any disciplinary list or lists prescribed by the MLR or any other applicable Major League or Minor League rules.

B. In the event of any dispute or claim between Player and Club arising under any of the provisions of this Minor League Uniform Player Contract, the sole and exclusive forum available to Player and Club to resolve such dispute shall be arbitration by the Commissioner. Player or Club may exercise such right to arbitration by filing a written, itemized and detailed appeal with the Commissioner within 120 days of the event giving rise to the claim. The decision of the Commissioner shall be final and binding. Player and Club understand that the decision of the Commissioner may not be challenged in any federal or state court or any other tribunal or forum.

C. Player specifically consents that either Club or the Commissioner may make known to the public the findings, decisions or record of any inquiry, investigation or hearing, including all evidence, information or testimony given, received, obtained or elicited as the result of any such inquiry, investigation or hearing.

XXI. Contingent Bonus

A. Any Special Covenants to this Minor League Uniform Player Contract which entitle Player to receive bonus payments if Player is retained by Club on a designated date or for a designated period shall be subject to the following: In the event Player is placed on the Restricted, Voluntarily Retired, Military, Disqualified or Ineligible List prior to the date upon which the bonus payment becomes due and payable to Player, payment of the bonus shall be suspended by Club until Player is reinstated to an Active List and reports to and is retained by Club for the number of

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

days required by this Minor League Uniform Player Contract, including any special covenants.

B.     In the event the official date of placement on any of the lists enumerated in subparagraph A of this Paragraph XXI is later than the date Player ceased to be an active Player, the earlier date shall apply in determining the new date for payment of the Contingent Bonus following Player's reinstatement to an Active List of Club.

XXII.     Special Covenants

If Player is to receive or has received any additional payment whatsoever from Club or from any other source in connection with this Minor League Uniform Player Contract, it must be fully described on Addendum B, giving name of payor, amount and nature of payment, when paid or to be paid, et cetera.

XXIII.     Legislation And Suspension

This Minor League Uniform Player Contract is subject to federal and state legislation, regulations, executive or other official orders and other governmental action, now or hereafter in effect, which may affect directly or indirectly Player or Club.  Additionally, this Minor League Uniform Player Contract is subject to the authority of the Commissioner to suspend the operation of this Minor League Uniform Player Contract, including the payment of compensation to Player, during any national emergency or any cessation or suspension of play in the Major Leagues.  In the event that this Minor League Uniform Player Contract is suspended pursuant to the terms of this paragraph, it is specifically agreed between Player and Club that the compensation provisions of Paragraph VII shall be modified and the compensation paid to Player at the monthly rate set forth in Paragraph VII shall be paid only for the portion of the championship playing season actually played by Player.  Moreover, in the event that this Minor League Uniform Player Contract is suspended pursuant to the terms of this Paragraph XXIII, it is also specifically agreed between Player and Club that the Club's exclusive right to the Player's services shall remain in effect and that this Minor League Uniform Player Contract shall continue in full force and effect for the remainder of its term once the suspension ends.

XXIV.     Entire Agreement

Club and Player covenant that this Minor League Uniform Player Contract fully sets forth all understandings and agreements by and between them and agree that no understandings or agreements, whether heretofore or hereafter made, shall be valid, recognized, or of any effect whatsoever, unless and until they are set forth in a

MAJOR LEAGUE RULES
MLR Attachment 3

subsequent Minor League Uniform Player Contract executed by Player and Club, filed with and approved by the Commissioner of Baseball and complying with the MLR.

XXV.     Governing Law

    This Minor League Uniform Player Contract shall be governed by and interpreted in such a manner as to be effective and valid under New York law. However, if any provisions of this Minor League Uniform Player Contract shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidation only, without invalidating the remainder of such provisions or the remaining provisions of this Minor League Uniform Player Contract.

XXVI.     Approval Required

    This is the only Minor League Uniform Player Contract form prescribed by the MLR. No different form shall be used and no clause shall be added or eliminated without the specific written approval of the Commissioner. Any written or oral agreement between Player and Club not contained in this Minor League Uniform Player Contract shall subject both parties to discipline. No such agreement shall be recognized or enforced by the Commissioner. This Minor League Uniform Player Contract, including any addenda or attachments, shall not be valid, recognized or enforced unless filed with and approved by the Commissioner.

XXVII.     Player Information and Notices

    Player will immediately provide Club and any Club to which this Minor League Uniform Player Contract is assigned, loaned or leased (and any Club for which Player is directed to perform services) with Player's current home address and telephone number, and will keep such information current. Any written notice required to be given by the Club to the Player under this Minor League Uniform Player Contract may be accomplished, at Club's option, by sending the notice via registered mail to the Player's last known address and/or by physically delivering the notice to the Player. The effective date of any written notice shall be the date on which the notice is mailed or physically delivered, whichever is earlier. The effective date of any telegraphic notice by the Club to the Player will be the date on which the telegram is sent.

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

---

This Minor League Uniform Player Contract must be received at the Commissioner's Office within 20 days from the date SIGNED by Player.  Player must sign NAME, including all INITIALS, and must DATE in Player's OWN HANDWRITING on Addendum A.  Player's social security number, date of birth, street address, city, state, country, zip code and telephone number must be included.  If Player has not previously signed a professional contract, Player's position, height, weight, batting hand, throwing hand, high school, high school graduation date, junior college, junior college graduation date, college, college graduation date and place of birth must be included.  A copy of this Minor League Uniform Player Contract, when approved by the Commissioner, must be delivered to Player in person or by registered or certified mail, return receipt requested.

---

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

**ASSIGNMENTS OF THIS MINOR LEAGUE UNIFORM PLAYER**
**CONTRACT**

1.   On_____, this contract was assigned from
                        (Date)

_____ to_____
        (Assignor Club)                                    (Assignee Club)


2.   On_____, this contract was assigned from
                        (Date)

_____ to_____
        (Assignor Club)                                    (Assignee Club)


3.   On_____, this contract was assigned from
                        (Date)

_____ to_____
        (Assignor Club)                                    (Assignee Club)


4.   On_____, this contract was assigned from
                        (Date)

_____ to_____
        (Assignor Club)                                    (Assignee Club)

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

**ADDENDUM A**

1. Player's
   Information_____
          Name    (First)      (Middle)      (Last)

   _____
          Permanent Street Address

   _____
   City    State      Country      Zip

   _____
      Social Security No.  Telephone No.    Date of Birth

2. Club's Name:_____

3. First championship playing season covered by this Minor League Uniform
   Contract: _____ (Year)

4. Execution Date of this Minor League Uniform Player Contract: _____
                                                  Month/Day/Year

5. Pursuant to subparagraph E of Paragraph XVIII, and subject to change at any time,
   Club initially directs Player to perform for the _____ Club of
   the_____League.

---

**STATUS OF PLAYER**

First Minor League Contract

☐ Non-drafted Player
☐ Rule 4 Drafted Player
☐ Not Subject to Rule 4 Draft

Draft    Selection    Overall
Year___   Round____   Sel. No.____

Previous Contract

☐ Assigned from Major League Club
☐ Completed Previous Minor League
   Contract
☐ Released/Nontendered Player
☐ Major League Re-entry Free Agent
☐ Other
   (explain)_____

---

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

---

**PLAYER INFORMATION (MUST BE COMPLETED FOR
FIRST MINOR LEAGUE CONTRACTS)**

POS_____HGT_____WGT_____BATS_____THROWS_____

HIGH SCHOOL_____       _____GRAD DATE_____
                                     (State)                (M/Y)
JUNIOR COLLEGE_____       _____GRAD DATE_____
                                     (State)                (M/Y)
COLLEGE_____       _____GRAD DATE_____
                                     (State)                (M/Y)
DROPPED OUT OF SCHOOL? Y/N (Circle One)
   If Yes, Drop Out Date _____ from (College/JC/HS)
                        (M/Y)            (Circle One)
PLACE OF BIRTH_____
               (City)          (State)          (Country)

---

**CONTRACT TERM (FOR PREVIOUSLY-SIGNED PLAYERS ONLY)**
If Player has previously signed a Minor League or Major League contract, this Minor League Uniform Player Contract shall be, consistent with the MLR, for the following term: 1 2 3 4 5 6 7 (circle one) _____ (write out) championship playing seasons.

---

**EXECUTION OF THIS CONTRACT**
By affixing their signatures below, Player and Club indicate their understanding of, and agreement to, all of the provisions of this Minor League Uniform Player Contract, including pages one through six, Addendum A, Addendum B, Addendum C-1, and any other attachments.

**CLUB DATE AND SIGN HERE**
AS TO CLUB:_____       By:_____
            Date (Write Out Month)     Authorized Club Representative
                                       Signature
                                   Title: _____

**PLAYER DATE AND SIGN HERE**
AS TO PLAYER:_____       _____
              Date (Write Out Month)        Player's Signature

193                                                        3/08

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

---

### PARENTS OR GUARDIAN CONSENT

Irrevocable consent is given to the performance and execution of this Minor League Uniform Player Contract (including all Addenda and attachments) by the minor Player party hereto.  Such consent shall be effective as to all provisions, including (but not limited to) any assignment, loan, lease or direction to perform under Paragraph XVIII hereof, and any compensation and any restrictions thereon that are hereinafter negotiated or set by the Club pursuant to Paragraph VII hereof.  Consent is irrevocably given for the duration of this contract to the payment of all earnings, bonuses and other consideration personally to the minor Player party.  Player's parents or guardian further agree to hold Club harmless for any injury suffered by Player during the term of this Minor League Uniform Player Contract.  These consents and promise to hold harmless are expressly given as an inducement to enter into this contract.

| _____ | _____ |
|---|---|
| Date | Signature of Father-Mother-Guardian |
| | (circle one) |

| _____ | _____ |
|---|---|
| Date | Signature of Father-Mother-Guardian |
| | (circle one) |

---

FOR
COMMISSIONER'S
OFFICE USE ONLY

Approved and recorded:

Date:_____ By:_____

Commissioner of Baseball

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

**ADDENDUM B**

Special Covenants:  In accordance with Paragraph XXII of this Minor League Uniform Player Contract, all additional payments or consideration whatsoever that Player is to receive or has received from Club or from any other source in connection with this Minor League Uniform Player Contract are fully described below:

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

**ADDENDUM C-___**

In accordance with Paragraph VII of the Minor League Uniform Player Contract to which the undersigned Player is a party, Player's monthly salary rate during the _____(Year) championship playing season shall be $_____/month (_____ dollars per month.)

If a Player and Club have agreed on a different monthly salary rate if Player is on the Active or Disabled List of a Club in a particular classification, that monthly salary rate, classification and any restrictions, contingencies, minimum service requirements, and other agreements concerning salary are fully set out below:

_____          _____
Player's Name (print or type)                              Club's Name (print or type)


_____          _____
Player's Signature                                              Club Representative's Name/Position


_____          _____
Street Address                                                  Club Representative Signature


_____          _____
City          State     Country        Zip              Date


_____          _____
Telephone No.                                                Social Security No.


_____
Date


FOR                           Approved and recorded:
COMMISSIONER'S
OFFICE
USE ONLY               Date:_____     By:_____
                                                                      Commissioner of Baseball

196                                                                                        3/08

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

**ADDENDUM C-___**

In accordance with Paragraph VII of the Minor League Uniform Player Contract to which the undersigned Player is a party, Player's monthly salary rate during the _____(Year) championship playing season shall be:

| CLASSIFICATION OR SUBCLASSIFICATION | MONTHLY SALARY | EXAMPLE OF CLUB |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

If Player is on the Active or Disabled Lists of Clubs in more than one subclassification or classification during the same pay period and is entitled to different salary rates for the different subclassifications or classifications, Player's salary shall be prorated in accordance with the number of days of Player's employment in each subclassification or classification compared to the number of days in that pay period.   All other restrictions, contingencies, minimum service requirements, and other agreements concerning salary are fully set out below:

_____          _____
Player's Name (print or type)                         Club's Name (print or type)

_____          _____
Player's Signature                                          Club Representative's Name/Position

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

_____          _____
Street Address                                                        Club Representative's Signature

_____          _____
City    State       Country      Zip                          Date

_____
Telephone No.          Social Security No.

_____
Date

FOR                              Approved and recorded:
COMMISSIONER'S
OFFICE
USE ONLY               Date:_____      By:_____
                                                                      Commissioner of Baseball

**MAJOR LEAGUE RULES**
**MLR Attachment 3**

**ADDENDUM D**

In accordance with subparagraph A of Paragraph XVI and subparagraph G of Paragraph XVIII and all other terms of the Minor League Uniform Player Contract to which the undersigned Player is a party, Player's monthly salary rate during the _____ (Year) championship playing season of the _____ League shall be $_____/month (_____dollars per month).

_____
Team Player has agreed to perform for

_____
Team Representative's Name/Position

_____        _____
Player's Name (print or type)                    Major League Club's Name (print or type)

_____        _____
Player's Signature                                       Major League Club Representative's
                                                                  Name/Position (print or type)

                                                                  _____
                                                                  Major League Club Representative's Signature

_____        _____
Date                                                           Date

FOR                        Approved and recorded:
COMMISSIONER'S
OFFICE
USE ONLY              Date:_____By:_____
                                                                  Commissioner of Baseball

199                                                                      3/08

**MAJOR LEAGUE RULES**
**MLR Attachment 4**

**ATTACHMENT 4**

**(a) PLAYER'S ACKNOWLEDGMENT OF RECEIPT OF CONTRACT TENDER.**

I hereby acknowledge that on _____, I received from _____,
                                    (Date)                                    (Name of Club official)

a representative of the _____, each of the following:
                              (Club Name)

(1)   written notice that I was selected in the First-Year Player Draft;

(2)   a copy of Major League Rules 3(c) (Contract Terms for First-Year Player Contracts), 4(d) (Effect of Selection on Player) and 4(e) (Negotiation Rights); and

(3)   three identical, executed Minor League Uniform Player Contracts, two of which are to be returned to the Major League Club for approval processing after execution by me.  For each copy of the Minor League Uniform Player Contract,

    (A)  Addendum A was completed and signed by a Major League Club official;

    (B)  Addendum B was completed, or the word "NONE" was entered; and

    (C)  Addendum C was completed and signed by a Major League Club official.

DATE:
                                          _____
_____                      Player's Name (print or type)

                                          _____
                                          Player's Signature

                                          _____
                                          Parent or Guardian Signature
                                          (if Player is a minor)

200                                                           3/08

**MAJOR LEAGUE RULES**
**MLR Attachment 4**

**(b)  DECLARATION OF CLUB OFFICIAL**

I hereby declare, under penalty of perjury, that on _____, I, on behalf
<div align="center">(Date)</div>

of the _____, personally delivered to _____
<div align="center">(Club Name)                                      (Name of Player)</div>

("Player") each of the following:

    (1)    written notice that Player was selected in the First-Year Player Draft;

    (2)    a copy of Major League Rules 3(c) (Contract Terms for First-Year Player Contracts), 4(d) (Effect of Selection on Player) and 4(e) (Negotiation Rights); and

    (3)    three identical, executed Minor League Uniform Player Contracts, two of which are to be returned to the Major League Club for approval processing after execution by Player.  For each copy of the Minor League Uniform Player Contract,

        (A)    Addendum A was completed and signed by a Major League Club official;

        (B)    Addendum B was completed, or the word "NONE" was entered; and

        (C)    Addendum C was completed and signed by a Major League Club official.

Player refused to sign a form acknowledging receipt of each of the items described above.

DATE:

_____         _____
                                        Club Official's Name
                                        (print or type)

                                        _____
                                        Club Official's Signature

                                        _____
                                        Club Official's Title

<div align="center">201                                      <strong>3/08</strong></div>

**MAJOR LEAGUE RULES**
**MLR Attachment 12**

**ATTACHMENT 12**

**NOTICE TO PLAYER OF RELEASE OR TRANSFER**

_____, \_\_\_\_\_
(Date)                    (Year)

To Mr. _____

You are hereby notified as follows:

1.    That you are unconditionally released.

2.    That your contract has been assigned to the _____

_____ Club of _____ League.

(a)    Without right of recall.

(b)    With right of recall.

(Cross out parts not applicable.  In case of optional agreement, specify all conditions affecting player.)

_____
Corporate Name of Club

_____
President

A copy must be delivered to the player.  A copy must also be forwarded to the Commissioner.

**THE FOLLOWING INSTRUCTIONS** are given for the guidance of Club officials executing this form:

**(1)**    If the player is unconditionally released, cross out all of paragraph 2, including subparagraphs (a) and (b).

**(2)**    If the player is transferred outright to another Club, insert the name of that Club and of that Club's League in paragraph 2, and cross out the following:

**MAJOR LEAGUE RULES**
**MLR Attachment 12**

**(i)**   paragraph 1; and

**(ii)**   subparagraph (b) of paragraph 2.

**(3)**   If the player is transferred by an optional agreement to another Club, insert the name of that Club and that Club's League in paragraph 2, and cross out the following:

**(i)**   paragraph 1; and

**(ii)**   subparagraph (a) of paragraph 2.

Also specify all conditions affecting the player (date recall option is to be exercised, etc.).

203                                              **3/08**

**MAJOR LEAGUE RULES**
**MLR Attachment 52**

**ATTACHMENT 52**

**MAJOR AND MINOR LEAGUE TERRITORIES**

**(a) NATIONAL LEAGUE CIRCUIT.** The circuit of the National League shall comprise the following cities, as defined below:

| | |
|---|---|
| Arizona: | Maricopa County in Arizona; |
| Atlanta: | City of Atlanta; and Fulton, Cobb, Gwinette and Dekalb Counties in Georgia; |
| Chicago: | Cook, Lake, DuPage, Will, Kendall, McHenry and Grundy Counties in Illinois; and Lake and Porter Counties in Indiana; provided, however, that this territory shall be shared with the Chicago franchise in the American League; |
| Cincinnati: | Butler, Warren, Clermont and Hamilton Counties in Ohio; Boone, Kenton and Campbell Counties in Kentucky; and Dearborn and Franklin Counties in Indiana; |
| Colorado: | City of Denver; and Adams, Arapahoe, Boulder, Broomfield, Douglas, Jefferson and Denver Counties in Colorado; |
| Florida: | Dade and Broward Counties in Florida; provided, however, that with respect to all Major League Clubs, Palm Beach County in Florida shall also be included; |
| Houston: | City of Houston; and Harris, Brazoria, Chambers, Fort Bend, Galveston, Liberty, Montgomery and Waller Counties in Texas; |
| Los Angeles: | Orange, Ventura and Los Angeles Counties in California; provided, however, that this territory shall be shared with the Los Angeles Angels of Anaheim franchise in the American League; |
| Milwaukee: | Milwaukee, Ozaukee and Waukesha Counties in Wisconsin; |

**MAJOR LEAGUE RULES**
**MLR Attachment 52**

New York:        City of New York; Nassau, Suffolk, Rockland and Westchester Counties in New York; Bergen, Hudson, Essex and Union Counties in New Jersey; and that portion of Fairfield County in Connecticut located south of Interstate 84 and west of Route 58; provided, however, that this territory shall be shared with the New York franchise in the American League;

Philadelphia:        Bucks, Montgomery, Chester, Delaware and Philadelphia Counties in Pennsylvania; and Gloucester, Camden and Burlington Counties in New Jersey;

Pittsburgh:        City of Pittsburgh and Allegheny County in Pennsylvania;

St. Louis:        City of St. Louis; and St. Louis, Jefferson, St. Charles and Franklin Counties in Missouri; and St. Clair, Madison, Monroe and Jersey Counties in Illinois;

San Diego:        San Diego County in California;

San Francisco:        City of San Francisco; and San Francisco, San Mateo, Santa Cruz, Monterey and Marin Counties in California; provided, however, that with respect to all Major League Clubs, Santa Clara County in California shall also be included;

Washington:        District of Columbia; and Arlington, Fairfax and Prince William Counties, and all independent cities bordering such counties, in Virginia.

**(b) AMERICAN LEAGUE CIRCUIT.** The circuit of the American League shall comprise the following cities, as defined below:

Baltimore:        City of Baltimore; and Baltimore, Anne Arundel, Howard, Carroll and Harford Counties in Maryland;

Boston:        Suffolk, Middlesex, Essex, Bristol, Worcester and Norfolk Counties in Massachusetts; provided, however, that Bristol and Worcester Counties and the territory south and west of Highway 128 in Norfolk County shall be shared with the Pawtucket franchise in the International League;

# MAJOR LEAGUE RULES
## MLR Attachment 52

| | |
|---|---|
| Chicago: | Cook, Lake, DuPage, Will, Kendall, McHenry and Grundy Counties in Illinois; and Lake and Porter Counties in Indiana; provided, however, this territory shall be shared with the Chicago franchise in the National League; |
| Cleveland: | Cuyahoga, Lorrain, Medina, Geauga, Lake and Summit Counties in Ohio; provided, however, that Summit County shall be shared with the Akron franchise in the Eastern League; |
| Detroit: | Wayne, Monroe, Washtenaw, Oakland, Macomb and St. Clair Counties in Michigan; |
| Kansas City: | Johnson, Wyandotte, Miami and Leavenworth Counties in Kansas; and Clay, Jackson, Cass and Platte Counties in Missouri; |
| Los Angeles Angels of Anaheim: | Los Angeles, Orange and Ventura Counties in California; provided, however, that this territory shall be shared with the Los Angeles franchise in the National League; |
| Minnesota: | Ramsey and Hennepin Counties in Minnesota; |
| New York: | City of New York; Nassau, Suffolk, Rockland and Westchester Counties in New York; Bergen, Hudson, Essex and Union Counties in New Jersey; and that portion of Fairfield County in Connecticut, located south of Interstate 84 and west of Route 58; provided, however, that this territory shall be shared with the New York franchise in the National League; |
| Oakland: | Alameda and Contra Costa Counties in California; |
| Seattle: | King County in Washington; |
| Tampa Bay: | Pinellas and Hillsborough Counties in Florida; |
| Texas: | Cities of Dallas, Ft. Worth and Arlington; and Dallas and Tarrant Counties in Texas; |

## MAJOR LEAGUE RULES
### MLR Attachment 52

Toronto:

Cities of Scarborough, York, East York, North York, Etobicoke and Toronto, commonly referred to as Metropolitan Toronto.

**(c) INTERNATIONAL LEAGUE (AAA) CIRCUIT.** The circuit of the International League shall comprise the following cities, as defined below:

Buffalo:

Erie County in New York;

Charlotte:

Mecklenburg County in North Carolina and York County in South Carolina;

Columbus:

Franklin County in Ohio;

Durham:

Durham, Wake and Orange Counties in North Carolina; provided, however that Wake County shall be shared with the Carolina franchise of the Southern League;

Indianapolis:

Marion County in Indiana;

Lehigh Valley (Allentown):

Lehigh County in Pennsylvania;

Norfolk:

Cities of Norfolk, Portsmouth, Suffolk, Virginia Beach, Hampton, Chesapeake and Newport News; and York and Isle of Wight Counties in Virginia;

Pawtucket:

Providence, Kent and Bristol Counties in Rhode Island; and Bristol and Worcester Counties and the area south and west of Highway 128 in Norfolk County in Massachusetts; provided, however, that the described territory in Massachusetts shall be shared with the Boston franchise in the American League;

Richmond:

City of Richmond, and Henrico, Chesterfield, Goochland and Hanover Counties in Virginia;

Rochester:

Monroe County in New York;

Scranton/ Wilkes-Barre:

Lackawanna and Luzerne Counties in Pennsylvania;

**MAJOR LEAGUE RULES**
**MLR Attachment 52**

Syracuse: Onondaga County in New York;

Toledo: Lucas, Ottawa and Wood Counties in Ohio.

**(d) MEXICAN LEAGUE (AAA) CIRCUIT**. The circuit of the Mexican League shall comprise the following cities, as defined below, provided, however, that for each Club no 15-mile buffer shall extend beyond the described territory:

Campeche: State of Campeche in Mexico;

Chihuahua: Definition pending;

Laguna (Torreon): State of Coahuila in Mexico;

Mexico City: Federal District in Mexico;

Minatitlan: Definition pending;

Monclova: State of Coahuila in Mexico;

Monterrey: State of Nuevo Leon in Mexico;

Nuevo Laredo: Definition pending;

Oaxaca: State of Oaxaca in Mexico;

Puebla: State of Puebla in Mexico;

Quintana Roo
(Cancun): Definition pending;

Saltillo: State of Coahuila in Mexico;

Tabasco
(Villahermosa): State of Tabasco in Mexico;

Tijuana: Definition pending;

Veracruz: State of Veracruz in Mexico;

Yucatan (Merida): State of Yucatan in Mexico.

## MAJOR LEAGUE RULES
### MLR Attachment 52

**(e)  PACIFIC COAST LEAGUE (AAA) CIRCUIT.**  The circuit of the Pacific Coast League shall comprise the following cities, as defined below:

| | |
|---|---|
| Albuquerque: | Bernalillo County in New Mexico; |
| Colorado Springs: | El Paso County in Colorado; |
| Fresno: | Fresno County in California; |
| Iowa (Des Moines): | Polk County in Iowa; |
| Las Vegas: | Clark County in Nevada; |
| Memphis: | Shelby County in Tennessee; |
| Nashville: | Davidson County in Tennessee; |
| New Orleans: | Orleans and Jefferson Parishes in Louisiana; |
| Oklahoma (Oklahoma City): | Oklahoma County in Oklahoma; |
| Omaha: | Douglas County in Nebraska; |
| Portland: | Multnomah County in Oregon; |
| Round Rock: | Travis and Williamson Counties in Texas; |
| Sacramento: | Yolo County in California; |
| Salt Lake: | Salt Lake County in Utah; |
| Tacoma: | Pierce County in Washington; |
| Tucson: | Pima County in Arizona. |

After the 2008 season, the Tucson Club will relocate to Reno and have as its home territory Washoe County in Nevada.

**MAJOR LEAGUE RULES**
**MLR Attachment 52**

**(f) EASTERN LEAGUE (AA) CIRCUIT.** The circuit of the Eastern League shall comprise the following cities, as defined below:

| | |
|---|---|
| Akron: | Stark and Summit Counties in Ohio; provided, however, that Summit County shall be shared with the Cleveland franchise in the American League; |
| Altoona: | Blair County in Pennsylvania; |
| Binghamton: | Broome County in New York; |
| Bowie: | Prince Georges County in Maryland; provided, however, that no 15-mile buffer shall extend into the District of Columbia or the Commonwealth of Virginia; |
| Connecticut (Norwich): | New London County in Connecticut; |
| Erie: | Erie County in Pennsylvania; |
| Harrisburg: | Dauphin County in Pennsylvania; |
| New Britain: | Hartford County in Connecticut; |
| New Hampshire (Manchester): | No home territory; |
| Portland: | Cumberland County in Maine; |
| Reading: | Berks County in Pennsylvania; |
| Trenton: | Mercer County in New Jersey. |

**(g) SOUTHERN LEAGUE (AA) CIRCUIT.** The circuit of the Southern League shall comprise the following cities, as defined below:

| | |
|---|---|
| Birmingham: | Jefferson County in Alabama; |
| Carolina (Zebulon): | Wake, Franklin, Wilson, Nash and Johnston Counties in North Carolina; provided, however, that Wake County shall be shared with the Durham franchise in the International League; |

## MAJOR LEAGUE RULES
### MLR Attachment 52

Chattanooga:              Hamilton County in Tennessee;

Huntsville:               Madison County in Alabama;

Jacksonville:             Duval County in Florida;

Mississippi (Pearl):      Rankin County in Mississippi;

Mobile:                   Mobile and Baldwin Counties in Alabama;

Montgomery:               Montgomery County in Alabama;

Tennessee
(Sevierville):            Sevier and Knox Counties in Tennessee;

West Tennessee
(Jackson):                Madison County in Tennessee.

**(h)  TEXAS LEAGUE (AA) CIRCUIT.**  The circuit of the Texas League shall comprise the following cities, as defined below:

Arkansas
(Little Rock):            Pulaski County in Arkansas;

Corpus Christi:           Nueces County in Texas;

Frisco:                   No home territory;

Midland:                  Midland County in Texas;

Northwest Arkansas
(Springdale):             Washington County in Arkansas;

San Antonio:              Bexar County in Texas;

Springfield:              Greene County in Missouri;

Tulsa:                    Tulsa and Osage Counties in Oklahoma.

**MAJOR LEAGUE RULES**
**MLR Attachment 52**

**(i)   CALIFORNIA LEAGUE (A) CIRCUIT.**   The circuit of the California League shall comprise the following cities, as defined below:

| | |
|---|---|
| Bakersfield: | Kern County in California; |
| High Desert (Adelanto): | San Bernardino County in California; |
| Inland Empire (San Bernardino): | San Bernardino County in California; |
| Lake Elsinore: | Riverside County in California; |
| Lancaster: | No home territory; |
| Modesto: | Stanislaus County in California; |
| Rancho Cucamonga: | San Bernardino County in California; |
| San Jose: | Santa Clara County in California; |
| Stockton: | San Joaquin County in California; |
| Visalia: | Tulare County in California. |

**(j)   CAROLINA LEAGUE (A) CIRCUIT.**   The circuit of the Carolina League shall comprise the following cities, as defined below:

| | |
|---|---|
| Frederick: | Frederick and Montgomery Counties in Maryland; provided, however, that no 15-mile buffer shall extend into the District of Columbia or into Arlington, Fairfax or Prince William Counties, or any independent city bordering such counties, in the Commonwealth of Virginia with respect to any League or Club, and that no 15-mile buffer shall extend into any city or county in the Commonwealth of Virginia with respect to the location or relocation of a Major League Club; |
| Kinston: | Lenoir, Craven and Jones Counties in North Carolina; |
| Lynchburg: | City of Lynchburg, and Amherst, Appomattox, Bedford and Campbell Counties in Virginia; |

**MAJOR LEAGUE RULES**
**MLR Attachment 52**

| | |
|---|---|
| Myrtle Beach: | Horry County in South Carolina; |
| Potomac (Woodbridge): | No home territory; |
| Salem: | City of Salem and Bedford and Roanoke Counties in Virginia; |
| Wilmington: | New Castle County in Delaware; |
| Winston-Salem: | Forsyth County in North Carolina. |

**(k)  FLORIDA STATE LEAGUE (A) CIRCUIT.**  The circuit of the Florida State League shall comprise the following cities, as defined below:

| | |
|---|---|
| Brevard County (Melbourne): | Brevard County in Florida; |
| Clearwater: | No home territory; |
| Daytona: | Volusia County in Florida; |
| Dunedin: | No home territory; |
| Fort Myers: | Lee County in Florida; |
| Jupiter: | Palm Beach County in Florida; |
| Lakeland: | Polk County in Florida; |
| Palm Beach (Jupiter): | Palm Beach County in Florida; |
| St. Lucie: | St. Lucie County in Florida; |
| Sarasota: | No home territory; |
| Tampa: | No home territory; |
| Vero Beach: | Indian River County in Florida. |

MAJOR LEAGUE RULES
MLR Attachment 52

**(*l*)   MIDWEST LEAGUE (A) CIRCUIT.**   The circuit of the Midwest League shall comprise the following cities, as defined below:

| | |
|---|---|
| Beloit: | Rock County in Wisconsin; |
| Burlington: | Des Moines County in Iowa and Henderson County in Illinois; |
| Cedar Rapids: | Linn County in Iowa; |
| Clinton: | Clinton County in Iowa and Whiteside County in Illinois; |
| Dayton: | No home territory; |
| Fort Wayne: | Allen County in Indiana; |
| Great Lakes (Midland): | Midland County in Michigan; |
| Kane County (Geneva): | Kane County in Illinois; |
| Lansing: | Ingham County in Michigan; |
| Peoria: | Peoria, Tazewell and Woodford Counties in Illinois; |
| Quad Cities (Davenport): | Scott County in Iowa and Rock Island County in Illinois; |
| South Bend: | St. Joseph County in Indiana; |
| West Michigan (Comstock Park): | Kent County in Michigan; |
| Wisconsin (Appleton): | Outagamie County in Wisconsin. |

**(m) SOUTH ATLANTIC LEAGUE (A) CIRCUIT.**   The circuit of the South Atlantic League shall comprise the following cities, as defined below:

| | |
|---|---|
| Asheville: | Buncombe County in North Carolina; |

214                                                                                         **3/08**

## MAJOR LEAGUE RULES
### MLR Attachment 52

| | |
|---|---|
| Augusta: | Richmond County in Georgia; |
| Charleston, S.C.: | Charleston County in South Carolina; |
| Columbus: | Dougherty County in Georgia; |
| Delmarva (Salisbury): | Wicomico County in Maryland; |
| Greensboro: | Guilford County in North Carolina; |
| Greenville: | Greenville County in South Carolina; |
| Hagerstown: | Washington County in Maryland; |
| Hickory: | Burke, Catawba and Caldwell Counties in North Carolina; |
| Kannapolis: | Rowan County in North Carolina; |
| Lake County (Eastlake): | No home territory; |
| Lakewood: | No home territory; |
| Lexington: | Fayette County in Kentucky; |
| Rome: | Floyd County in Georgia; |
| Savannah: | Chatham County in Georgia; |
| West Virginia (Charleston): | Kanawha County in West Virginia. |

**(n)  NEW YORK-PENNSYLVANIA LEAGUE (Short-Season A) CIRCUIT.**  The circuit of the New York-Pennsylvania League shall comprise the following cities, as defined below:

| | |
|---|---|
| Aberdeen: | No home territory; |
| Auburn: | Cayuga County in New York; |
| Batavia: | Genesee County in New York; |

## MAJOR LEAGUE RULES
### MLR Attachment 52

| | |
|---|---|
| Brooklyn: | No home territory; |
| Hudson Valley (Fishkill): | Dutchess County in New York; |
| Jamestown: | Chautauqua County in New York; |
| Lowell: | No home territory; |
| Mahoning Valley (Niles): | Trumbull County in Ohio; |
| Oneonta: | Otsego County in New York; |
| State College: | Centre County in Pennsylvania; |
| Staten Island: | No home territory; |
| Tri-City (Troy): | Rensselaer County in New York; |
| Vermont (Burlington): | Chittenden County in Vermont; |
| Williamsport: | Lycoming County in Pennsylvania. |

**(o) NORTHWEST LEAGUE (Short-Season A) CIRCUIT.** The circuit of the Northwest League shall comprise the following cities, as defined below:

| | |
|---|---|
| Boise: | Ada County in Idaho; |
| Eugene: | Lane County in Oregon; |
| Everett: | Snohomish County in Washington; |
| Salem-Keizer: | Marion County in Oregon; |
| Spokane: | Spokane County in Washington; |
| Tri-City (Pasco): | Franklin County in Washington; |

# MAJOR LEAGUE RULES
## MLR Attachment 52

| | |
|---|---|
| Vancouver: | Greater Vancouver District in British Columbia; |
| Yakima: | Yakima County in Washington. |

**(p) APPALACHIAN LEAGUE (Rookie) CIRCUIT.** The circuit of the Appalachian League shall comprise the following cities, as defined below:

| | |
|---|---|
| Bluefield: | Mercer County in West Virginia; |
| Bristol: | City of Bristol and Washington County in Virginia; |
| Burlington: | Alamance County in North Carolina; |
| Danville: | City of Danville and Pittsylvania County in Virginia; |
| Elizabethton: | Carter County in Tennessee; |
| Johnson City: | Washington County in Tennessee; |
| Kingsport: | Sullivan County in Tennessee; |
| Greeneville: | Greene County in Tennessee; |
| Princeton: | Mercer County in West Virginia; |
| Pulaski: | Pulaski County in Virginia. |

**(q) PIONEER LEAGUE (Rookie) CIRCUIT.** The circuit of the Pioneer League shall comprise the following cities, as defined below:

| | |
|---|---|
| Billings: | Yellowstone County in Montana; |
| Casper: | Natrona County in Wyoming; |
| Great Falls: | Cascade County in Montana; |
| Helena: | Lewis and Clark County in Montana; |
| Idaho Falls: | Bonneville County in Idaho; |
| Missoula: | Missoula County in Montana; |

**MAJOR LEAGUE RULES**
**MLR Attachment 52**

Ogden:                    Weber County in Utah;

Orem:                     Utah County in Utah.

**(r)  GULF COAST LEAGUE (Rookie) CIRCUIT.**  The circuit of the Gulf Coast League shall comprise the following cities, as defined below:

Bradenton:                Manatee County in Florida;

Sarasota:                 Sarasota County in Florida.

218                                                        **3/08**

**MAJOR LEAGUE RULES**
**MLR Attachment 54**


**ATTACHMENT 54**


**STANDARD MINOR LEAGUE FINANCIAL DISCLOSURE**


CLUB NAME_____

LEAGUE_____CLASSIFICATION_____

YEAR ENDING_____


    \*Completed By:_____

           Title:_____

           Date:_____


    \*Number of Dates this Season

        _____ Regular Season Dates

        _____ Exhibition/All-Star Date

        _____ Rain Out Dates

        _____ Reported Attendance


    \*Source of Information (check one):

        _____ Audited Financial Statement

        _____ Reviewed Financial Statement

        _____ Compiled by outside firm

        _____ Compiled internally


    \* Form of Ownership:

        _____ Partnership

        _____ Subchapter S Corporation

        _____ C Corporation

        _____ Other (specify)_____


    \*Year Franchise Purchased:_____


    \*Currency:

        _____ U.S. Dollars

        _____ Canadian Dollars

**MAJOR LEAGUE RULES**
**MLR Attachment 54**

**BALANCE SHEET**

**ASSETS**

CURRENT ASSETS                                   $_____            (A1)

NON-CURRENT ASSETS

     PROPERTY & EQUIPMENT     $_____                        (A2)

     STADIUM/LEASEHOLD        $_____                        (A3)

     Accumulated depreciation        ($_____ )                (A4)

       TOTAL (Net of Depreciation)      $_____            (A5)

     BASEBALL ASSETS (FRANCHISE)      $_____            (A6)

NON-BASEBALL ASSETS

     LOANS/ADVANCES TO OWNERS         $_____            (A7)

     NON-OWNER RELATED ASSETS         $_____            (A8)

TOTAL ASSETS                                      $_____            (A9)


NOTE:  Line numbers at right refer to Detailed Instructions.

**MAJOR LEAGUE RULES**
**MLR Attachment 54**

**BALANCE SHEET**

**LIABILITIES AND OWNER EQUITY**

LIABILITIES

      CURRENT LIABILITIES               $_____     (L1)

      DEFERRED REVENUES              $_____     (L2)

      DEBT
          Stadium Related      $_____              (L3)

         Loans/Advances
            from Owners     $_____              (L4)

         Other             $_____              (L5)

              Total Debt    $_____              (L6)

TOTAL LIABILITIES               $_____     (L7)*

OWNER EQUITY                   $_____     (L8)

      TOTAL LIABILITIES AND OWNER EQUITY  $_____     (L9)**

\*    If zero insert $1.00 to allow for equity to liabilities calculation.
\*\*   Line L9 should equal A9

NOTE:  Line numbers at right refer to Detailed Instructions.

**MAJOR LEAGUE RULES**
**MLR Attachment 54**

**INCOME STATEMENT**

REVENUES
    Ticket Revenues:
        Gross Receipts        $_____                (I1)
        Direct Costs        ($_____)            (I2)
        Payment to Major
          Leagues        ($_____)            (I3)
          Net                      $_____     (I4)

    Advertising Revenues:
        Gross Revenues        $_____              (I5)
        Direct Costs        ($_____)            (I6)
          Net                      $_____     (I7)

    Concessions:
        Gross Revenues        $_____              (I8)
        Direct Costs        ($_____)            (I9)
          Net                      $_____     (I10)

    Other:
        Gross Revenues        $_____*            (I11)
        Direct Costs        ($_____)            (I12)
          Net                      $_____     (I13)

    TOTAL REVENUES               $_____     (I14)

OPERATING EXPENSES
    Park and Game Expenses        $_____            (I15)
    Team Expenses           $_____            (I16)
    General & Administrative        $_____            (I17)
    Management Fees          $_____            (I18)
    Other                    $_____            (I19)

    TOTAL OPERATING EXPENSES      $_____     (I20)

**MAJOR LEAGUE RULES**
**MLR Attachment 54**

DEBT SERVICE & OTHER EXPENSES

|  | | |
|---|---|---|
| Interest - 3rd Party Debt | $_____ | (I21) |
| Interest - Owner Debt | $_____ | (I22) |
| Depreciation & Amortization | $_____ | (I23) |
| Income Taxes | $_____ | (I24) |
| Other (Itemize) | $_____ | (I25) |

TOTAL DEBT SERVICE/OTHER          $_____          (I26)

NET INCOME (LOSS)          $_____          (I27)

*Identify the amount of any EXPANSION FEES included as other revenue.

NOTE:  Line numbers at right refer to Detailed Instructions.

**MAJOR LEAGUE RULES**
**MLR Attachment 54**

**EQUITY TO LIABILITIES RATIO TEST WORKSHEET**

ASSET ADJUSTMENTS

    1.   Enter 'TOTAL ASSETS' (Line A9)    $_____    (R1)

    2.   Enter amount, if any, that
        PBA minimum franchise value
        exceeds Line A6    $_____    (R2)

    3.   Enter amount, if any, that
        appraisals for non-current,
        non-baseball assets exceed
        historical cost bases for
        such assets (attached copies
        of appraisals and details)    $_____    (R3)

    4.   Deduct 'Deferred Revenues'
        (Line L2)    ($_____)    (R4)

    5.   Deduct 'Loans/Advances to
        Owners' (Line A7)    ($_____)    (R5)

ADJUSTED ASSETS    $_____    (R6)


LIABILITIES ADJUSTMENTS

    1.   Enter 'TOTAL LIABILITIES'
        (Line L7)    $_____    (R7)

    2.   Deduct 'Deferred Revenues'
        (Line L2)    $_____    (R8)

    3.   Deduct 'Stadium Related
        Debt' (Line L3)    $_____    (R9)

    4.   Deduct 'Owner Related Debt'
        (Line L4)    ($_____)    (R10)

        ADJUSTED LIABILITIES    $_____    (R11)*

**MAJOR LEAGUE RULES**
**MLR Attachment 54**

ADJUSTED EQUITY (Line R6 minus
          Line R11)                       $_____    (R12)

    PBA RATIO TEST:  Line R12 divided
                     by Line R11=          $_____    (R13)
    (Test is passed if result is
    equal to or greater than
    1.222 [55-to-45])

*If zero insert $1.00 to allow for calculation.

## MAJOR LEAGUE RULES
## MLR Attachment 54

### DETAILED INSTRUCTIONS

The following detailed instructions are intended to assist Clubs in uniformly completing this Report. Line numbers in parentheses refer to the corresponding lines in the Standard Financial Report:

### BALANCE SHEET – ASSETS

| | |
|---|---|
| (Line A1) | Current Assets. Enter the total of cash, accounts receivable, prepaid expenses and other comparable assets. Do not include any receivables from owners, affiliates and related parties here (include in Line A7). |
| (Line A2, A3 & A8) | Non-Current Non-Baseball Assets. Historical cost is to be used as the basis of the asset(s). |
| (Line A2) | Property and Equipment. Enter total cost of furniture, fixtures, equipment, and the like. |
| (Line A3) | Stadium/Leasehold. Enter total cost of stadium acquisition and improvements (including video displays, scoreboards, etc.) |
| (Line A4) | Accumulated Depreciation. Enter total accumulated depreciation on assets included in Lines A2 and A3. |
| (Line A5) | Total (Net of Depreciation). Sum of Lines A2 plus A3, less Line A4. |
| (Line A6) | Baseball Assets (Franchise). Enter value of franchise on Club's books. |
| (Line A7) | Loans/Advances to Owners. Enter total outstanding balances of loans/advances from Club to stockholders, partners, etc., whether current or non-current. |
| (Line A8) | Other Non-Owner Related Non-Baseball Assets. Enter total amount of other assets (deposits, etc.). |

3/08

**MAJOR LEAGUE RULES**
**MLR Attachment 54**

## BALANCE SHEET - LIABILITIES AND OWNER EQUITY

(Line L1)    Current Liabilities.  Enter total of accounts payable, accrued expenses and other similar current liabilities.  Do not enter amounts payable to owners, affiliates and related parties here (include in Line L4).

(Line L2)    Deferred Revenues.  Enter total of revenues (net of deferred expenses) on Club's books that are related to a future period, (for example, sale of a billboard sign in November for next season, assuming a fiscal year end of December 31).

(Line L3)    Stadium Related Debt.  Total debt incurred for stadium acquisition or improvements (including video displays, scoreboards, etc.)

(Line L4)    Loans/Advances From Others.  Total loans or advances (current and long term) from stockholders, partners, affiliates and related parties.

(Line L5)    Other Debt.  Total all other debt per books.

(Line L6)    Total Debt.  Sum of Line L3, L4 and L5.

(Line L7)    Total Liabilities.  Sum of Lines L1, L2 and L6.

(Line L8)    Owner Equity.  Total equity of stockholders, partners, etc.; should be equal to Line A9 (Total Assets) less Line L7 (Total Liabilities).

(Line L9)    Total Liabilities and Owner Equity.  Sum of Lines L7 and L8 (must equal Line A9, Total Assets).

## INCOME STATEMENT

(Line I1)    Gross Ticket Receipts.  Enter total revenue from ticket sales (should equal amount from NA Ticket Reporting form).

(Line I2)    Direct Cost, Tickets.  Enter direct cost associated with ticket revenues (sales and admission taxes, payments accrued per leases, printing costs, etc.).

**MAJOR LEAGUE RULES**
**MLR Attachment 54**

(Line I3)          <u>Payment to Major Leagues</u>.  Enter payment to Minor League
                   Association as a result of the "5% tax" on ticket revenues
                   (1992 and subsequent years).

(Line I4)          <u>Net Ticket Revenue</u>.  Line I1, less Line I2, Less Line I3.

(Line I5-I7)       <u>Advertising Revenues</u>.   Enter total gross revenues from
                   advertising (billboards, program ads, radio, etc.) on Line I5;
                   enter direct cost associated with such revenue (printing,
                   painting, radio costs, etc.) on Line I6; and enter net on Line
                   I7.

(Line I8-I10)      <u>Concessions Revenue</u>.  Enter total gross revenues from sale
                   on Line I8; enter direct cost of sales on Line I9; enter net on
                   Line I10.   If concessions are provided by outside
                   concessionaire, amount received by Club would appear on
                   Line I10, but <u>enter concessionaire's gross sales</u> on Line I8,
                   and amount retained by concessionaire on Line I9.

(Line I11-I13)     <u>Other Revenues</u>.   Enter gross sales (souvenirs, concerts,
                   parking, expansion fees, etc.) on Line I11; enter direct cost
                   of such sales on Line I12; enter net on Line I13.

(Line I14)         <u>Total Revenues</u>.  Sum of Lines I4, I7, I10 and I13.

(Line I15)         <u>Park and Game Expenses</u>.  Enter total expenses (rent under
                   ballpark lease, utilities, maintenance, security, labor, etc.)

(Line I16)         <u>Team Expenses</u>.   Enter total expenses, net of
                   reimbursements from Major League Affiliate (team travel,
                   hotel, etc.).

(Line I17)         <u>General and Administrative</u>.   Enter total of all other
                   operating expenses of Club (salaries, league and Minor
                   League Association dues, insurance, office expenses, etc.).

(Line I18)         <u>Management Fees</u>.  Enter amounts paid to owners and
                   related parties under management agreements (other than
                   salaries).

**MAJOR LEAGUE RULES**
**MLR Attachment 54**

(Line I19)          <u>Other</u>.   Enter any miscellaneous expenses not included elsewhere.

(Line I20)          <u>Total Operating Expenses</u>.  Sum of Lines I15 to I19.

(Line I21)          <u>Interest - 3rd Party Debt</u>.  Enter interest incurred on debt to non-owners (those other than stockholders, partners or related parties).

(Line I22)          <u>Interest - Owner Debt</u>.   Enter interest on debts to stockholders, partners, related parties, etc.

(Line I23)          <u>Depreciation and Amortization</u>.  Enter current period (year) total.

(Line I24)          <u>Income Taxes</u>.   Enter income taxes incurred (estimated if necessary) by entity owning franchise and reporting on this Form.  Enter "N/A" if reporting entity is a partnership, sub-S corporation, or other non-taxpaying entity.

(Line I25)          <u>Other</u>.  Enter any expenses not entered elsewhere.

(Line I26)          <u>Total Debt Service/Other</u>.  Sum of Liens I21 and I25.

(Line I27)          <u>Net Income (Loss)</u>.  Line I14 less Line I20 less Line I26.

**MAJOR LEAGUE RULES**
**MLR Attachment 54**

**EQUITY TO LIABILITIES RATIO TEST** (Refer also to Rule 54(b)(3) and Rule 54(a)(5)(C)(iv))

(Line R1)    Total Assets.  Enter amount from Line A9.

(Line R2)    PBA Franchise Value Adjustment.  If franchise value entered on Line A6 is less than $4 million (if AAA), $2.5 million (if AA), $1 million (if A) or $750,000 (if Short-Season A or Rookie), then enter difference on Line R2. Enter -0- if A6 is greater than the corresponding "PBA Allowance" figures listed in previous sentence.

Example #1:  Your AA franchise is $2.0 million per books (Line A6), enter 500,000 on Line R2 ($2.5 million "allowance for AA" less $2.0 million from Line A6).

Example #2:  Your Class A franchise is $1.5 million per books (Line A6), enter -0- on Line R2 (your $1.5 million is greater than PBA "Allowance for Full A" of $1.0 million).

(Line R3)    Non Current, Non-Baseball Asset Adjustment.  Rule 54(a)(5)(C)(iv)(cc) allows "appraised value" to be used in lieu of "historical cost" for purposes of the equity-to-liability ratio test.  If this adjustment is applicable, attach calculation and copies of appraisals(s) and enter adjustment amount in Line R3.

(Line R4)    Deduct "Deferred Revenues".  Enter amount from Line L2.

(Line R5)    Deduct "Loans/Advances to Owners".  Enter -0- if it can be demonstrated that the amounts will be repaid within a reasonable time period (See Rule 54(a)(5)(C)(iv)(ff)); otherwise enter amount from Line A7.

(Line R6)    Adjusted Assets.  Line R1, plus Line R2, plus Line R3, less Line R4, less Line R5.

(Line R7)    Total Liabilities.  Enter amount from Line L7.

(Line R8)    Deduct "Deferred Revenues".  Enter amount from Line L2.

**MAJOR LEAGUE RULES**
**MLR Attachment 54**

(Line R9)    <u>Deduct "Stadium Related Debt"</u>.  Enter amount from Line L3.

(Line R10)   <u>Deduct "Loans/Advances From Owners"</u>.  Enter amount from Line L4.

(Line R11)   <u>Adjusted Liabilities</u>.  Line R7, less Line R8, less Line R9, less Line R10.

(Line R12)   <u>Adjusted Equity</u>.  Line R6 less Line R11.

(Line R13)   <u>PBA Ratio Test</u>.  Divide Line R12 (Adjusted Equity) by Line R11 (Adjusted Liabilities).  If result is <u>equal to or greater than</u> 1.222 (55-to-45) test is passed.

**MAJOR LEAGUE RULES**
**MLR Attachment 56**

**ATTACHMENT 56**

**STANDARD FORM LETTER ESTABLISHING PDC**

The parties to this Player Development Contract, _____,
<span style="font-size:smaller">(Major League Club)</span>
and _____, hereby adopt and agree to all provisions of the
<span style="font-size:smaller">(National Association Club)</span>
standard Player Development Contract (PDC) as set forth in the Major League Rules

(MLR) incorporated by reference into the Professional Baseball Agreement (PBA)

between the Major Leagues and the National Association of Professional Baseball

Leagues, Inc.  As used in the PDC, the term "Major League Club" shall refer to

_____ and the term "Minor League Club" shall refer to
<span style="font-size:smaller">(Major League Club)</span>
_____.  This Agreement shall be in effect from the
<span style="font-size:smaller">(National Association Club)</span>
___ day of _____, _____ through September 30, _____.
<span style="font-size:smaller">(Year)                                     (Year)</span>

_____  By:_____
<span style="font-size:smaller">(Major League Club)</span>

_____  By:_____
<span style="font-size:smaller">(National Association Club)</span>

232                                                                 3/08

**MAJOR LEAGUE RULES**
**MLR Attachment 58**

**ATTACHMENT 58**

**MINOR LEAGUE FACILITY STANDARDS AND**
**COMPLIANCE INSPECTION PROCEDURES**

**Standards**

Unless expressed as recommendations, these facility standards are minimum requirements for all new Minor League facilities.  The standards outlined in Sections 11, 12 and 13 are applicable to both new and existing facilities.

**New Facilities**

Any facility that is scheduled for a construction starting date of January 1, 1991 or later shall be considered a "new facility."  All plans for new facilities, including construction time schedules, must be submitted to field inspection personnel designated by the Commissioner's Office and the President of the Minor League Association, for review and approval by the field inspection personnel prior to the start of construction. Such review must be completed within 30 days after submission or the plans shall be deemed approved.  If such plans meet the standards they shall be approved.  Notwithstanding its facility's designation as a "new facility," a Minor League Club that can demonstrate that its new facility construction planning and approval process was at such a stage as of November 17, 1990 that requiring compliance with a minimum new facilities standard (other than those outlined in Sections 11, 12 and 13) will cause it to suffer a material hardship, may apply to the President of the Minor League Association and to the Commissioner or the Commissioner's designee for a variance from such standard.

**Existing Facilities**

Any facility other than a "new facility" as defined above shall be considered an "existing facility."  All existing facilities must meet the standards outlined in Sections 11, 12 and 13 (playing field and other team facilities) by no later than April 1, 1995. All plans for additions, alterations or renovations of such facilities, including new turf installations, must be submitted to field inspection personnel designated by the Commissioner's Office and to the President of the Minor League Association, for review and approval by the field inspection personnel (including construction time schedules) prior to the start of construction.  Such review must be completed within 30 days after submission or the plans shall be deemed approved.  If such plans meet the standards they shall be approved.

# MAJOR LEAGUE RULES
## MLR Attachment 58

### TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| SECTION | 1.0 | Seating | 236 |
| | 1.1 | Seating Capacity | 236 |
| | 1.2 | Grades Of Seating | 236 |
| | 1.3 | Seating Distribution | 237 |
| | 1.4 | Seat Spacing | 237 |
| | 1.5 | Handicapped Accessibility | 238 |
| SECTION | 2.0 | Public Comfort Stations | 238 |
| | 2.1 | Comfort Station Distribution | 238 |
| | 2.2 | Plumbing Fixtures | 238 |
| | 2.3 | Handicapped Accessibilities | 239 |
| | 2.4 | Drinking Fountains | 239 |
| | 2.5 | Public Telephones | 239 |
| SECTION | 3.0 | Concession And Vending | 239 |
| | 3.1 | Concession Areas | 239 |
| | 3.2 | Concession Vendors | 239 |
| | 3.3 | Concession Compliance/Codes And Regulations | 240 |
| | 3.4 | Concession Storage And Novelty Stands | 240 |
| SECTION | 4.0 | Miscellaneous Public Areas | 240 |
| | 4.1 | Stadium Club/Restaurant/Banquet Facility | 240 |
| | 4.2 | Picnic/Beer Garden Facility | 240 |
| | 4.3 | Family Recreation Area | 240 |
| SECTION | 5.0 | Ticket Windows And Entry Turnstiles | 241 |
| | 5.1 | Ticket Windows | 241 |
| | 5.2 | Turnstiles/Entry Positions | 241 |
| | 5.3 | Handicapped Accessibility | 241 |
| SECTION | 6.0 | Security And First Aid | 241 |
| | 6.1 | Security Command Post | 241 |
| | 6.2 | First Aid Station | 241 |
| SECTION | 7.0 | Parking And Facility Access | 241 |
| | 7.1 | Parking Spaces | 241 |
| | 7.2 | Access And Control | 242 |
| | 7.3 | Handicapped Parking | 242 |

MAJOR LEAGUE RULES
MLR Attachment 58

| SECTION | 8.0 | Sound System And Scoreboard | 242 |
| | 8.1 | Sound System | 242 |
| | 8.2 | Scoreboard | 242 |
| | 8.3 | Scoreboard Location | 242 |
| | 8.4 | Clock | 242 |
| SECTION | 9.0 | Media Facilities | 243 |
| | 9.1 | Press Parking And Access | 243 |
| | 9.2 | Public Address/Scoreboard Personnel | 243 |
| | 9.3 | Radio Broadcast Booths | 243 |
| | 9.4 | Television Broadcast And Camera Booth | 243 |
| | 9.5 | Print Media Area | 243 |
| | 9.6 | Media Toilet Facilities | 243 |
| | 9.7 | Media Workroom/Lounge | 243 |
| | 9.8 | Handicapped Accessibility To Press Box | 244 |
| SECTION | 10.0 | Administration Area | 244 |
| | 10.1 | Facility Administration Area | 244 |
| | 10.2 | Stadium Personnel Dressing/Locker Facilities | 244 |
| | 10.3 | Team Administration Area | 244 |
| SECTION | 11.0 | Team Facilities | 244 |
| | 11.1 | Home Clubhouse/Dressing Area | 244 |
| | 11.2 | Shower And Toilet Facilities | 245 |
| | 11.3 | Training Room | 245 |
| | 11.4 | Team Laundry Facility | 246 |
| | 11.5 | Team Equipment Room | 246 |
| | 11.6 | Coaches' Lockers | 246 |
| | 11.7 | Field Manager's Office | 246 |
| | 11.8 | Visitors Clubhouse/Dressing Area | 246 |
| | 11.9 | Visitors Shower and Toilet Facilities | 246 |
| | 11.10 | Visitors Training Room | 247 |
| | 11.11 | Visiting Field Manager's Office | 247 |
| | 11.12 | Team Storage (Major League Parent Team) | 247 |
| | 11.13 | Umpire Facilities | 247 |
| | 11.14 | Field/Dugout Access | 248 |
| | 11.15 | Player Parking | 248 |
| | 11.16 | Hitting/Pitching Tunnels | 248 |
| | 11.17 | Pre- And Post-Game Waiting Area | 248 |
| SECTION | 12.0 | Playing Field | 248 |
| | 12.1 | Field Dimensions | 248 |

MAJOR LEAGUE RULES
MLR Attachment 58

| | 12.2 | Playing Surface | 248 |
|---|---|---|---|
| | 12.3 | Field Grade | 249 |
| | 12.4 | Field Wall | 249 |
| | 12.5 | Bullpens | 249 |
| | 12.6 | Dugouts | 249 |
| | 12.7 | Field Equipment | 249 |
| | 12.8 | Field Lighting | 251 |
| | 12.9 | Batting Cage Gate | 252 |
| | 12.10 | Backstop | 252 |
| | 12.11 | Playing Field Tarps | 252 |
| SECTION | 13.0 | Maintenance | 252 |
| | 13.1 | Facility Maintenance And Cleanliness | 252 |
| | 13.2 | Field Maintenance | 253 |

**SECTION 1.0        SEATING**

This section establishes standards for the number, type and arrangement of seating in all facilities.

**1.1        SEATING CAPACITY**

Seating capacities shall be established to be appropriate for the size of the Minor League Club's market.  Recommended minimum capacities are as listed below.  All facilities shall conform with the seating grade, seating distribution and spacing requirements described in sections 1.2, 1.3 and 1.4.

| | | | |
|---|---|---|---|
| **1.1.1** | Class AAA Capacity | | 10,000 seats |
| **1.1.2** | Class AA Capacity | | 6,000 seats |
| **1.1.3** | Class A Capacity | | 4,000 seats |
| **1.1.4** | Short-Season Class A/Rookie | | 2,500 seats |

**1.2        GRADES OF SEATING**

In order to enhance the professional atmosphere of the facility, each facility shall provide a minimum of two separate and distinct grades of seating (three separate and distinct grades are recommended).  This provision is intended to designate and define general types of seating and not to define pricing or ticketing structures.

## MAJOR LEAGUE RULES
## MLR Attachment 58

### 1.2.1       TYPES OF SEATING

Seating types shall be defined as in sections 1.2.2, 1.2.3, and 1.2.4.

### 1.2.2       BOX SEATING

Defined as Arm Chair Seats with Backs.  Additional seat width and leg room is recommended, with an additional three inches of tread width to be provided as compared to the tread width in the other seating areas.  Following the traditional definition of box seating, it is recommended that additional access to smaller groupings of box seats be provided.

### 1.2.3       RESERVED SEATING

Defined as a bench with back as a minimum requirement.

### 1.2.4       GENERAL ADMISSION SEATING

Defined as a bench as a minimum requirement.

## 1.3       SEATING DISTRIBUTION

In no event shall more than 90% of the total seating capacity be General Admission seating.  Recommended seating distributions are as follows.

For two grades of seating:

| | |
|---|---|
| Box or Reserved: | 25% of total capacity |
| General Admission: | 75% of total capacity |

For three grades of seating:

| | |
|---|---|
| Box: | 25% of total capacity |
| Reserved: | 25% of total capacity |
| General Admission: | 50% of total capacity |

## 1.4       SEAT SPACING

The spacing and layout of all seating, aisles, vomitories, cross-aisles and concourses comprising the established exiting system shall conform to all applicable local, state and federal codes and regulations.  (NFPA 101 for Assembly Occupancies

**MAJOR LEAGUE RULES**
**MLR Attachment 58**

shall be considered the minimum requirement if the facility does not fall under jurisdiction of other regulations.)

## 1.5      HANDICAPPED ACCESSIBILITY

All facilities shall comply with all applicable local, state and federal codes and regulations regarding access of Handicapped patrons and employees.  (ANSI.A117-1 shall be considered the minimum requirements.)

## SECTION 2.0.      PUBLIC COMFORT STATIONS

This section determines and defines the number of plumbing fixtures and their arrangement at the facilities.

## 2.1      COMFORT STATION DISTRIBUTION

The distribution of the fixtures should be in accordance with the distribution of the seating locations and exiting system to allow minimal walking distances from all parts of the facility to public toilet facilities.

## 2.2      PLUMBING FIXTURES

The minimum plumbing fixture ratios shall be as follows:

|  |  |
|---|---|
| Water closets | 1:125 Women |
|  | 1:450 Men |
| Lavatories (sinks) | 1:150 Women |
|  | 1:150 Men |
| Urinals | 1:125 men |

### 2.2.1      COMFORT STATION ACCESSORIES

All public restroom facilities shall provide mirrors, purse shelves (in women's), hand drying facilities and trash cans.  It is recommended that a table/platform for diaper changing be located in each restroom.

MAJOR LEAGUE RULES
MLR Attachment 58

**2.3      HANDICAPPED ACCESSIBILITIES**

All facilities shall comply with all applicable local, state and federal codes and regulations (ANSI. A117-1).  It is recommended that all facilities provide a minimum of one, unisex h.c. toilet facility per level.  This facility shall be similar to a residential bathroom, and allow a h.c. patron to use the facility with the assistance of his/her companion of the opposite sex.

**2.4      DRINKING FOUNTAINS**

All facilities shall provide drinking fountains per local, state and federal codes and regulations.

**2.5      PUBLIC TELEPHONES**

All facilities shall provide telephones per local, state and federal codes and regulations.

**SECTION 3.0      CONCESSION AND VENDING**

The following standards for Concessions and Vending are recommended for all facilities.  Many of the conditions may be affected by an existing operational agreement between the facility and concessionaire.  It is recommended that these standards be incorporated into any new operational agreement negotiated after the effective date of this PBA.

**3.1      CONCESSION AREAS**

It is recommended all facilities provide 5 lineal feet of counter space (with corresponding support space) per 350 seats in the total facility capacity.  The distribution of the concession areas shall be commensurate with the distribution of the patrons to minimize walking distances.  [Example:  12,000 seats/350 = 34.28 X 5' = 171 lineal feet of counter.  Each stand averages 25' per stand.  Therefore, a minimum of 7 stands, distributed throughout the facility are recommended.]

**3.2      CONCESSION VENDORS**

If concession vendors are provided at the facility, the following ratios are recommended:  one vendor per 350 seats, with 15 sq. ft. of vending commissary space for each vendor separate from the concession areas.

MAJOR LEAGUE RULES
MLR Attachment 58

**3.3      CONCESSION COMPLIANCE/CODES AND REGULATIONS**

Concessionaires are responsible for compliance with all local, state and federal regulations in regard to Health Standards, Fire Department regulations, power, exhaust and ventilation requirements. The agreement between the facility and concessionaire shall define which party is responsible for required modifications.

**3.4      CONCESSION STORAGE AND NOVELTY STANDS**

The following standards shall be minimum requirements.

### 3.4.1      CONCESSION STORAGE

All facilities shall provide adequate storage for concession inventory. It is recommended that the storage area be of such size to store the inventory necessary to stage the number of games in an average home stand. In the Agreement between the facility and the concessionaire, the concessionaire shall provide empirical data to determine the required amount of storage space.

### 3.4.2      NOVELTY STANDS

Any provided novelty stand(s) acting as a sales point for retail sales shall present products in a professional manner commensurate with standard retail sales areas.

**SECTION 4.0      MISCELLANEOUS PUBLIC AREAS**

**4.1      STADIUM CLUB/RESTAURANT/BANQUET FACILITY**

This type of facility shall be optional.

**4.2      PICNIC/BEER GARDEN FACILITY**

This type of facility shall be optional.

**4.3      FAMILY RECREATION AREA**

This type of facility shall be optional.

## MAJOR LEAGUE RULES
## MLR Attachment 58

### SECTION 5.0    TICKET WINDOWS AND ENTRY TURNSTILES

The following Sections 5.1, 5.2, and 5.3 shall be minimum requirements.

### 5.1    TICKET WINDOWS

All facilities shall provide one ticket window for each 1500 seats of total capacity.

### 5.2    TURNSTILES/ENTRY POSITIONS

All facilities shall provide one turnstile or equivalent entry position (minimum of 30" wide) for each 1500 seats of total capacity.

### 5.3    HANDICAPPED ACCESSIBILITY

All facilities shall provide access per all applicable local, state and federal codes and regulations to all public and private areas of the facility.  (ANSI A117.1)

### SECTION 6.0    SECURITY AND FIRST AID

### 6.1    SECURITY COMMAND POST

All facilities shall provide a "command post" for event security forces, centrally located with provisions for removing unruly patrons from the facility.

### 6.2    FIRST AID STATION

All facilities shall provide a first aid station during all events.  It is recommended that certified medical personnel staff the station at all events.

### SECTION 7.0    PARKING AND FACILITY ACCESS

The following Sections 7.1, 7.2 and 7.3 shall be applicable to all facilities.

### 7.1    PARKING SPACES

It is recommended all facilities shall provide public parking spaces at a ratio of 1 space per 3 seats of total capacity.  Such parking spaces shall be on-site or within a 10 minute (1/2 mile) walking distance of the stadium.

**MAJOR LEAGUE RULES**
**MLR Attachment 58**

**7.2      ACCESS AND CONTROL**

All facilities shall coordinate with local law enforcement officials to provide controlled on-site traffic access, so as to promote a safe and trouble-free access environment.

**7.3      HANDICAPPED PARKING**

All facilities shall conform with all applicable local, state and federal regulations.

**SECTION 8.0      SOUND SYSTEM AND SCOREBOARD**

**8.1      SOUND SYSTEM**

All facilities shall provide an acoustically balanced sound system integrated with the capacity to deliver clear audio messages to the press box, concourses and all public areas within the facility.

**8.2      SCOREBOARD**

All facilities shall provide a scoreboard that provides the following as minimum requirements.  All scoreboard characters are to be large enough to be seen throughout the facility.

    Line Score
    Ball-Strike-Out
    Player at Bat

**8.3      SCOREBOARD LOCATION**

No part of any scoreboard and/or associated lighted advertising panels may be located within 50' of the center line of the playing field.

**8.4      CLOCK**

All facilities shall provide a time-of-day clock that is in full view of all field personnel from the beginning of batting practice through the close of each game.

MAJOR LEAGUE RULES
MLR Attachment 58

**SECTION 9.0        MEDIA FACILITIES**

**9.1        PRESS PARKING AND ACCESS**

It is recommended that all facilities provide a parking area for all members of the media with direct access to the facility.  It is also recommended that parking be provided for television vans and broadcast trucks.

**9.2        PUBLIC ADDRESS/SCOREBOARD PERSONNEL**

All facilities shall provide space in the press box for the public address announcer and scoreboard operator(s).  It is recommended that the PA/scoreboard area have a minimum of 50 sq. ft. of floor space in addition to the floor space required for the scoreboard equipment.

**9.3        RADIO BROADCAST BOOTHS**

It is recommended that all facilities provide two radio broadcast booths (home and visitor) that provide a direct view of the entire field and facilitate the broadcast of the game.  Each shall provide counters, chairs, power, lighting and telephone jack.

**9.4        TELEVISION BROADCAST AND CAMERA BOOTH**

It is recommended that all facilities provide a spare broadcast/camera booth available for local television broadcasts and local television media.  The booth should have a direct view of the entire field with operable windows or closures.

**9.5        PRINT MEDIA AREA**

It is recommended that all facilities provide a separate area for 6 to 10 members of the print media with a direct view of the entire field.  Counter, chairs, power, lighting and telephone jack shall be provided.

**9.6        MEDIA TOILET FACILITIES**

It is recommended that all facilities provide media restroom facilities separate from public restrooms, located with direct access to the press box.

**9.7        MEDIA WORKROOM/LOUNGE**

This type of facility shall be optional.

## MAJOR LEAGUE RULES
## MLR Attachment 58

**9.8     HANDICAPPED ACCESSIBILITY TO PRESS BOX**

Facilities shall conform to all applicable local, state and federal codes and regulations for accessibility to the press box.  (ANSI-A117.1)

## SECTION 10.0     ADMINISTRATION AREA

**10.1     FACILITY ADMINISTRATION AREA**

It is recommended that all facilities provide administrative space of 250-300 sq. ft. per person for facility and maintenance operations with separate toilet facilities directly adjacent.

**10.2     STADIUM PERSONNEL DRESSING/LOCKER FACILITIES**

It is recommended that all facilities provide separate dressing/locker facilities (separate for each sex) for all maintenance and event employees (including concession personnel) separate from the public.

### 10.2.1     STADIUM PERSONNEL TOILET FACILITIES

It is recommended that all facilities provide toilet facilities for stadium personnel separate from the public.  Direct access to personnel locker rooms is desirable.

**10.3     TEAM ADMINISTRATION AREA**

If the tenant team has a permanent administration area away from the facility, an on-site game day team administration area must be provided.  If the team's permanent administration area is at the facility, it is recommended that the area provide 250-300 sq. ft. per person for team operations with adjacent toilet facilities.

## SECTION     11.0  TEAM FACILITIES

The following shall be minimum requirements.

**11.1     HOME CLUBHOUSE/DRESSING AREA**

The number of lockers provided shall be at least five more than the Club's active player limit for its classification of play.  The minimum size of each locker shall be 24"

## MAJOR LEAGUE RULES
## MLR Attachment 58

w x 72" h (36" w x 72" h is recommended). A lockable storage compartment is recommended for each locker.

Minimum floorspace requirements for the team dressing area shall be as follows:

New facility:    1,000 sq. ft.
Existing facility:   800 sq. ft. (1,000 sq. ft. is recommended)

## 11.2    SHOWER AND TOILET FACILITIES

All facilities shall provide separate shower, drying and toilet areas with the following minimum fixture counts:

| New facility: | shower heads: | 8 (10 recommended) |
| | water closets: | 2 |
| | urinals: | 2 |
| | lavatories: | 4 (8 recommended) |

| Existing facilities: | shower heads: | 6 (10 recommended) |
| | water closets: | 2 |
| | urinals: | 2 |
| | lavatories: | 2 (8 recommended) |

## 11.3    TRAINING ROOM

All new facilities shall provide a separate training room of not less than 300 sq. ft. divided into three areas: treatment, whirlpool and rehabilitation. The training room shall have space for 1 or 2 treatment tables, a minimum of 2 whirlpools, hydroculator (4-pack minimum), scale, stationary bicycle, ice machine and an area for 2 or 3 pieces of rehabilitation/weight equipment. The training room shall contain a lockable storage area for training supplies. It is recommended that additional space be provided for a separate office/dressing area for the trainer and team physician. It is also recommended that a valuable storage box be installed in the training room.

All existing facilities shall comply with the above paragraph, with the exception that the minimum square footage requirement shall be 175 sq. ft. (300 sq. ft. is recommended).

**MAJOR LEAGUE RULES**
**MLR Attachment 58**

**11.4     TEAM LAUNDRY FACILITY**

All facilities shall provide commercial quality laundry facilities (washer and dryer) for the home team to provide daily washing capability.  This room may be combined with the Team Equipment Room.

**11.5     TEAM EQUIPMENT ROOM**

All facilities shall provide adequate lockable equipment storage space (minimum of 300 sq. ft. in a new facility) contiguous with the clubhouse.

**11.6     COACHES' LOCKERS**

All new facilities shall provide a minimum of 4 coaches lockers (6 are recommended) in addition to the players lockers.  It is recommended these lockers shall be in a separate area from the players lockers.  Locker size and floor space requirements (per capita) shall be the same as in the players dressing area.

Existing facilities shall comply with the above paragraph, with the exception that a minimum of 3 coaches lockers are to be provided.

**11.7     FIELD MANAGER'S OFFICE**

All facilities shall provide a field manager's office with direct access to the home clubhouse.  It shall include a separate toilet, shower and dressing area, along with a desk and adequate meeting space for 6-8 persons.  At existing facilities the separate toilet, shower and dressing area is recommended and not required.

**11.8     VISITORS CLUBHOUSE/DRESSING AREA**

The number of lockers provided shall be at least three more than the Club's active player limit for its classification of play.  Minimum floor space requirements shall be as follows:

New facility:     750 sq. ft.
Existing facility: 500 sq. ft (750 sq. ft. is recommended)

**11.9     VISITORS SHOWER AND TOILET FACILITIES**

All facilities shall provide separate shower, drying and toilet facilities with minimum fixture counts as follows:

## MAJOR LEAGUE RULES
### MLR Attachment 58

New facility:    showers heads:  6 (8 recommended)
water closets:  2
urinals:  2
lavatories:  4

Existing
facility:    shower heads:  4 (8 recommended)
water closets:  2
urinals:  2
lavatories:  2 (4 recommended)

## 11.10   VISITORS TRAINING ROOM

All new facilities shall provide a separate training room (minimum of 150 sq. ft.), with space for one training table, one whirlpool, and a hydroculator (4-pack minimum). In existing facilities, this area may be integrated into the players' dressing area, provided that the dressing area is at least 650 sq. ft.

## 11.11   VISITING FIELD MANAGER'S OFFICE

All facilities shall provide a separate office for the visiting field manager.  It shall include a separate toilet, shower and dressing area, along with a desk and adequate meeting space for 2-4 people.  At existing facilities, the separate toilet, shower and dressing area is recommended and not required.

## 11.12   TEAM STORAGE (MAJOR LEAGUE PARENT TEAM)

It is recommended that all facilities provide a minimum of 300 sq. ft. of lockable team storage, separate from other team storage, with year round access only to the major league team.

## 11.13   UMPIRE FACILITIES

All facilities shall provide a private dressing, shower, and toilet facility for umpires.  This area shall provide enough lockers (each a minimum of 36" w x 72" h) to accommodate the number of umpires typically assigned to work in the applicable classification of play.  In new facilities, this area shall be a minimum of 200 sq. ft.

**MAJOR LEAGUE RULES**
**MLR Attachment 58**

**11.14    FIELD/DUGOUT ACCESS**

It is required that all new facilities and recommended that all existing facilities provide a direct access route to the dugout/playing field.   Similar access is to be provided for the umpires.

**11.15    PLAYER PARKING**

It is recommended that all facilities designate a parking area with clubhouse access for players and other uniformed team personnel.

**11.16    HITTING/PITCHING TUNNELS**

It is recommended that each facility provide two covered tunnels for players to practice hitting and pitching in an enclosed environment.   If provided, these tunnels should be reasonably close to the home clubhouse with minimal public access.

**11.17    PRE- AND POST-GAME WAITING AREA**

It is recommended that all facilities provide a pre-game and post-game waiting area for families of players and other uniformed personnel.

**SECTION 12.0      PLAYING FIELD**

**12.1    FIELD DIMENSIONS**

Layouts of all new fields (and modifications to existing fields) shall be submitted for approval by the parent Major League Club and the Minor League Club.  All field dimensions shall comply with the minimum dimensions specified in Section 1.04 of the Official Baseball Rules.

**12.2    PLAYING SURFACE**

All facilities shall provide a field surface (natural or synthetic) without defects and/or "trip-hazards" that could affect the normal play of the game or jeopardize player safety.   Warning track material shall identify all zones within 15' of all walls and fences. This warning track must be of a material to provide visual and tactile notice of a significant change in surface type.

MAJOR LEAGUE RULES
MLR Attachment 58

**12.3     FIELD GRADE**

The maximum allowable grade from the base of the pitcher's mound to the warning track in foul territory shall be 6".  The maximum allowable grade from second base to the outfield warning track shall be 20".

**12.4     FIELD WALL**

The permanent outfield wall or fence in all new facilities shall be a minimum of 8' high.

**12.5     BULLPENS**

All facilities must provide a bullpen area for each team.  These areas may be located in foul territory down the baselines or just immediately outside the field wall.  Each must be visible to both dugouts and to the press box.  Each shall have two regulation pitching mounds and home plates, adequate distance and clearance for each pitcher and catcher, and a bench for 10 players.  If the bullpens are in foul ball areas, care shall be taken to integrate the slope of the pitcher's mound into the field so as not to create a trip hazard for fielders as they approach the bullpen.  It is recommended that all facilities have phones connecting the bullpens to the dugouts.

**12.6     DUGOUTS**

All facilities must provide two enclosed dugouts (home and visitor).  Each dugout in a new facility must accommodate 25-30 uniformed personnel on a bench with seatback.  Each dugout in an existing facility shall accommodate 20-25 uniformed personnel.  Each dugout must have a helmet rack for a minimum of 15 helmets and a bat rack for a minimum of 30 bats.  It is recommended that a bat swing/storage area be directly accessible to each dugout.  It is recommended that each dugout include a refrigerated water cooler (drinking fountain) and provide direct access to a restroom.  It is recommended that all facilities have telephones connecting the dugouts to the bullpens and to the press box.  All dugouts shall provide as feasible an anti-skid surface as possible on steps and walkways.

**12.7     FIELD EQUIPMENT**

All facilities shall provide the following field equipment.  Examples given shall serve as guidelines for equipment quality, and the equipment provided shall meet or exceed the examples specified.

## MAJOR LEAGUE RULES
### MLR Attachment 58

### 12.7.1     BATTING CAGE

All facilities shall provide a full cover batting cage.  New batting cages shall have minimum dimensions of 18' wide, 14' deep and 9' high.  It is recommended that the cage be portable and made of an aluminum frame to provide maximum maintainability.  Existing batting cages not meeting the above standards may be approved by the parent Major League Club.

### 12.7.2     FIELD SCREENS

All facilities shall provide a pitching screen, first base screen, 2nd base/double play screen, and a shag protector screen.  New screens shall have the following minimum dimensions:

Pitching screen:          7' h x 8' w with 4' x 4' notch in upper corner.

Double play screen:     7' h x 14' w with hinged wings.

First base and
shag protector screens:  7' h x 8' w.

All existing screens not meeting the above standards may be approved by the parent Major League Club.

Periodic checks of the batting cage and all screens shall be performed to verify frame and net integrity.

### 12.7.3     BATTER'S EYE

All facilities shall provide a solid monochromatic batter's eye painted in a flat, dark color with minimum dimensions of 16' high and 40' wide centered in the outfield.  If a centerfield camera is integrated into the batter's eye, the camera must be the same color as the batter's eye.  It is recommended that all new facilities provide a batter's eye with minimum dimensions of 40' high and 80' wide.  Any advertising sign abutting the batter's eye shall not include white lettering, a white background, any neon or other lighting or motion effects.

### 12.7.4     FOUL POLES

All facilities shall provide two foul poles of a bright color that are a minimum of 30' high (45' is recommended) with a screen to the fair side of

MAJOR LEAGUE RULES
MLR Attachment 58

the pole. No white signs shall be allowed on or immediately adjacent to each side of the foul pole.

### 12.7.5     FLAG POLE

All facilities shall provide a flag pole for the United States Flag or Canadian Flag, as applicable, in clear view of the entire seating bowl.

### 12.7.6     SCOREBOARDS, VIDEO MONITORS AND MOTION SIGNS

In addition to other provisions of these Minor League Facility Standards (including, but not limited to, Section 8.3 (Scoreboard Location)), the President of the Minor League Association, in consultation with the Commissioner or the Commissioner's designee, shall develop and distribute guidelines regarding the use and location of scoreboards, video monitors, LED boards and LED/matrix boards so as not to interfere with play.

## 12.8     FIELD LIGHTING

All new lighting systems shall maintain the following minimum brightness requirements after 100 hours of burning:

Class AAA and Class AA:        100 fc average in infield/
                               70 fc average in outfield.

Class A and Rookie:            70 fc average in infield/
                               50 fc average in outfield.

The height and location of poles in all new lighting systems shall follow IES standards.

All existing lighting systems shall maintain the following minimum brightness requirements:

Class AAA and Class AA:        70 fc average in infield/
                               50 fc average in outfield.

Class A and Rookie:            60 fc average in infield/
                               40 fc average in outfield.

MAJOR LEAGUE RULES
MLR Attachment 58

All lighting systems shall operate with a maximum variance ratio of 1.2/1 in the infield and 2/1 in the outfield. The variance ratios shall be computed by comparing the highest and lowest footcandle readings in the infield and the outfield.

## 12.9    BATTING CAGE GATE

All new facilities shall provide a gate large enough to allow the batting cage to be freely taken to and from the playing field.

## 12.10    BACKSTOP

All facilities shall provide a backstop behind home plate. The configuration and dimensions shall vary due to sight-lines for the press box and insurance requirements for the facility. Periodic inspections shall be performed to insure the integrity of the backstop.

## 12.11    PLAYING FIELD TARPS

All Class AAA, Class AA and full season Class A facilities shall provide a full infield tarp and pitcher's mound, home plate, base pit, and bullpen tarps, except that this requirement may be waived by the President of the Minor League Association in the event that the facility is located in an area that does not experience sufficient rainfall to justify the expense of tarps. The tarps shall be oversized to prevent water from running under the edge to a dirt area. The tarps shall be stored in an easily accessible location but in a way not to create a safety hazard on the playing field. Each facility is required to provide adequate manpower to operate the placement and/or removal of the tarps.

## SECTION 13.0    MAINTENANCE

This section outlines requirements and recommendations for overall maintenance of the facility and playing field in a professional manner.

## 13.1    FACILITY MAINTENANCE AND CLEANLINESS

Each facility shall develop a maintenance program (both short-term and long-term) for use by its maintenance personnel. All public areas shall be completely free of trash and rubbish at the opening of each event, and stadium personnel shall be responsible for cleanliness during the event.

Each facility shall follow its maintenance program for interior repairs and touch-ups to maintain the professional atmosphere of the facility. Long-term maintenance

MAJOR LEAGUE RULES
MLR Attachment 58

shall be ongoing in order to deter major facility problems and to minimize potential disruptions to the public.

**13.2     FIELD MAINTENANCE**

The playing field shall be maintained at the highest possible professional level. Every reasonable effort shall be made to insure the safety of the players and the smooth play of the game. The facility shall follow professional grounds- keeping practices and shall utilize proper maintenance equipment. Nail-drags, screens, tampers and rakes are recommended to maintain all dirt areas. Proper turf care equipment (mowers, tractors, etc.) shall be used, and an appropriate maintenance plan shall be developed and followed to care for the playing field.

**13.2.1     PLAYING FIELD RECONDITIONING**

The pitcher's mound and base pit areas shall be reconditioned prior to each game through the use of clay materials and tampers.

**13.2.2     FIELD MAINTENANCE MATERIALS**

All facilities are required to have a sufficient amount of drying material on hand at all times for reconditioning the infield. A chemical drying agent and/or calsonite clay may be used in combination with sand to stabilize areas affected by excessive moisture. Sand may not be the sole drying agent.

**13.2.3     LAYOUT OF PLAYING FIELD**

The entire playing field shall be laid out to coincide with the provisions of Sections 1.04 through 1.08 of the Official Baseball Rules.

**13.2.4     IRRIGATION SYSTEM**

All new facilities shall provide a full field irrigation system as well as water lines 1 1/2" or larger behind both home plate and second base for watering the infield grass and base pit areas. It is recommended that a series of water outlets 1" or larger be distributed around the playing field in order to water the field if the irrigation system should become inoperable. It is recommended that a full-field irrigation system be provided at all existing facilities.

**MAJOR LEAGUE RULES**
**MLR Attachment 58**

### 13.2.5     FIELD DRAINAGE SYSTEM

All new facilities shall provide an underfield drainage system integrated into the subbase of the turf (natural or synthetic) surface.  This system shall be a system of a drain tile fields in a porous collection bed (or similar system) below the turf base.

It is recommended an optimal slope of .5% be maintained from the base of the pitcher's mound to the baselines and from second base to the outfield warning track.

EXHIBIT B

# MAJOR LEAGUE CONSTITUTION

(originally adopted as the Major League Agreement on January 12, 1921)

## Article I

### FORMATION AND DURATION OF CONSTITUTION

This Major League Constitution constitutes an agreement among the Major League Baseball Clubs, each of which shall be entitled to the benefits of and shall be bound by all the terms and provisions hereof, and it shall remain in effect through December 31, 2012, except that the provisions of Article II, Section 3(g) shall expire at such time as the current Commissioner ceases to hold office.

## Article II

### THE COMMISSIONER

Sec. 1.     The Office of the Commissioner of Baseball is an unincorporated association also doing business as Major League Baseball and has as its members the Major League Baseball Clubs.

Sec. 2.     The functions of the Commissioner shall include:

(a)     To serve as Chief Executive Officer of Major League Baseball.   The Commissioner shall also have executive responsibility for labor relations and shall serve as Chairman, or shall designate a Chairman, of such committees as the Commissioner shall name or the Major League Clubs shall from time to time determine by resolution.

(b)     To investigate, either upon complaint or upon the Commissioner's own initiative, any act, transaction or practice charged, alleged or suspected to be not in the best interests of the national game of Baseball, with authority to summon persons and to order the production of documents, and, in case of refusal to appear or produce, to impose such penalties as are hereinafter provided.

(c)     To determine, after investigation, what preventive, remedial or punitive action is appropriate in the premises, and to take such action either against Major League Clubs or individuals, as the case may be.

## MAJOR LEAGUE CONSTITUTION
### MLC Art. II, Sec. 2 to Art. II, Sec. 4

(d)     From time to time, to formulate and to announce the rules of procedure to be observed by the Commissioner and all other parties in connection with the discharge of the Commissioner's duties.  Such rules shall always recognize the right of any party in interest to appear before the Commissioner and to be heard.

(e)     To appoint a President of each League to perform such functions as the Commissioner may direct.

(f)     To make decisions, or to designate an officer of the Commissioner's Office to make decisions, regarding on-field discipline, playing rule interpretations, game protests and any other matter within the responsibility of the League Presidents prior to 2000.

Sec. 3.     In the case of conduct by Major League Clubs, owners, officers, employees or players that is deemed by the Commissioner not to be in the best interests of Baseball, punitive action by the Commissioner for each offense may include any one or more of the following:

(a)     a reprimand; (b) deprivation of a Major League Club of representation in Major League Meetings; (c) suspension or removal of any owner, officer or employee of a Major League Club; (d) temporary or permanent ineligibility of a player; (e) a fine, not to exceed $2,000,000 in the case of a Major League Club, not to exceed $500,000 in the case of an owner, officer or employee, and in an amount consistent with the then-current Basic Agreement with the Major League Baseball Players Association, in the case of a player; (f) loss of the benefit of any or all of the Major League Rules, including but not limited to the denial or transfer of player selection rights provided by Major League Rules 4 and 5; and (g) such other actions as the Commissioner may deem appropriate.

Sec. 4.     Notwithstanding the provisions of Section 2, above, the Commissioner shall take no action in the best interests of Baseball that requires the Clubs to take, or to refrain from taking, action (by vote, agreement or otherwise) on any of the matters requiring a vote of the Clubs at a Major League Meeting that are set forth in Article II, Section 9 or in Article V, Section 2(a) or (b); provided, however, that nothing in this Section 4 shall limit the Commissioner's authority to act on any matter that involves the integrity of, or public confidence in, the national game of Baseball.  Integrity shall include without limitation, as determined by the Commissioner, the ability of, and the public perception that, players and Clubs perform and compete at all times to the best of their abilities.  Public confidence shall include without limitation the public perception, as determined by the Commissioner, that there is an appropriate level of long-term competitive balance among Clubs.

## MAJOR LEAGUE CONSTITUTION
### MLC Art. II, Sec. 5 to Art. II, Sec. 9

Sec. 5.     Notwithstanding the provisions of Sections 2 and 4, above, the powers of the Commissioner to act in the best interests of Baseball shall be inapplicable to any matter relating to the process of collective bargaining between the Clubs and the Major League Baseball Players Association.

Sec. 6.     In the case of conduct by organizations not parties to this Constitution, or by individuals not connected with any of the parties hereto, that is deemed by the Commissioner not to be in the best interests of Baseball, the Commissioner may pursue appropriate legal remedies, advocate remedial legislation and take such other steps as the Commissioner may deem necessary and proper in the interests of the morale of the players and the honor of the game.

Sec. 7.     The Office of the Commissioner shall be financed in such manner as the Major League Clubs shall by rule and/or agreement determine.  Audited financial statements for the preceding fiscal year and a proposed budget for the ensuing year shall be submitted annually by the Commissioner for the approval of the members of the Executive Council.  The Commissioner shall obtain the approval of the Executive Council before incurring any expenses in excess of the annual budget so approved by the Executive Council, except that the Commissioner need not secure such approval in the case of expenses that the Commissioner would be required by law or pre-existing contract to pay in any event.

Sec. 8.
    (a)     The Commissioner shall hold office for a minimum term of three years or for such longer term as shall be established by the Major League Clubs at the time of the Commissioner's election. The Commissioner shall be eligible to succeed himself or herself.

    (b)     Any re-election shall be considered at a Major League Meeting held not less than six months nor more than 15 months prior to the expiration of any term.  The Commissioner's compensation shall be fixed at the time of election.

    (c)     No diminution of the compensation or powers of the present or any succeeding Commissioner shall be made during the Commissioner's term of office.

Sec. 9.     The election of a Commissioner hereunder shall be at a Major League Meeting; the vote shall be by Clubs and by written ballot, and to elect shall require the affirmative vote of not less than three-fourths of all Major League Clubs.  The re-election of a Commissioner to succeed himself or herself shall be by Clubs and by written ballot, and to re-elect shall require the affirmative vote of not less than a majority of all Major League Clubs.  During any period of incapacity of the

MAJOR LEAGUE CONSTITUTION
MLC Art. II, Sec. 9 to Art. III, Sec. 2

Commissioner, as determined by a majority of the Executive Council or by the Commissioner, all the powers and duties of the Commissioner shall be conferred upon and exercised by the Executive Council.  During any vacancy in the Office of the Commissioner, all the powers and duties of the Commissioner shall be conferred upon and thenceforth exercised by the Executive Council, until a Commissioner of Baseball has been elected as herein set forth.  Notwithstanding the two preceding sentences, in the event of such incapacity or vacancy and upon the affirmative vote of not less than three-fourths of all Major League Clubs, a Commissioner Pro Tem may be elected to serve for any period less than three years, with all of the powers and duties that are conferred upon the Commissioner pursuant to this Constitution.

## Article III

## THE EXECUTIVE COUNCIL

Sec. 1.    The Major League Executive Council shall be composed of the Commissioner and eight Club members, four from each League. The Club members shall be appointed by the Commissioner and ratified by the vote of a majority of the Major League Clubs.  Club members shall serve a four-year term, with the term of one member from each League expiring annually.  The Commissioner may designate a substitute or alternate to serve at any meeting of the Council in the absence of any member of the Council.  The Commissioner and five other members shall constitute a quorum at all meetings.  Each member of the Council shall have one vote.  In the case of a division within the Council, the decision of a majority shall be controlling and final.  The Commissioner shall have authority, solely and finally, to determine and decide all jurisdictional questions.

Sec. 2.    The Executive Council shall have jurisdiction in the following matters:

(a)    To cooperate, advise and confer with the Commissioner and other offices, agencies and individuals in an effort to promote and protect the interests of the Clubs and to perpetuate Baseball as the national game of America, and to surround Baseball with such safeguards as may warrant absolute public confidence in its integrity, operations and methods.

(b)    To survey, investigate and submit recommendations for change in, elimination of, addition to or amendments to any rules, regulations, agreements, proposals or other matters in which the Major League Clubs have an interest and particularly in respect to:

3/08

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. III, Sec. 2 to Art. III, Sec. 4**

(1) Rules and regulations determining relationships between players and Clubs and between Clubs, and any and all matters concerning players' contracts or regulations; and

(2) Rules and regulations to govern the playing of World Series games, All-Star Games and any other contests or games in which Major League Clubs participate and/or games that may be played for charitable purposes.

(c) In the interim between Major League Meetings, to exercise full power and authority over all other matters pertaining to the Major League Clubs, not within the jurisdiction granted to the Commissioner under this Constitution, including the adoption, amendment or suspension of Major League Rules, for said interim; provided that all actions of the Executive Council pursuant to this paragraph (c) shall be noticed for action at the next regular or special Major League Meeting for approval or other disposition.

(d) To submit to the Major League Clubs recommendations as to persons to be considered for election as Commissioner whenever a vacancy may exist in that office.

(e) To review and to either approve or disapprove, in whole or in part, the proposed budget submitted annually by the Commissioner for the financing of the Commissioner's Office and requests by the Commissioner for authority to incur expenses in excess thereof.

Nothing contained in this Section 2 shall be deemed to diminish or curtail the jurisdiction granted to the Commissioner under Article II hereof or to empower the Executive Council to amend or suspend in any respect any provisions of this Constitution.

Sec. 3. The Commissioner shall be permanent Chairman of the Executive Council. The members of the Executive Council shall receive no compensation or reimbursement of expenses for their services as members thereof.

Sec. 4. The Executive Council shall hold regularly scheduled meetings at least bi-monthly each calendar year. The Executive Council shall hold such other meetings as may, from time to time, be called at the request of the Commissioner or a majority of the Major League Clubs. The Executive Council shall establish its own rules of procedure for all such meetings and shall keep minutes of its meetings.

MAJOR LEAGUE CONSTITUTION
MLC Art. IV to Art. V, Sec. 1

### Article IV

### RULES, RESOLUTIONS AND REGULATIONS

Any rules, resolutions or regulations adopted as provided in this Constitution shall be binding upon the Major League Clubs and shall not thereafter be amended or repealed except as provided in Article III, Section 2(c), Article V, Section 2 or Article XI, Section 3 hereof. The authority of the Commissioner shall include the authority to determine finally a disagreement over a rule, resolution, regulation or this Constitution.

### Article V

### MAJOR LEAGUE MEETINGS

Sec. 1.

(a)   Four regular Major League Meetings shall be held each year on such dates and at such places as the Commissioner shall designate.  One such regular meeting shall be held each off-season in December or January.   The Commissioner may either cancel a regular meeting so called or may fail to call a regular meeting if in the Commissioner's judgment there is not sufficient business to justify holding the meeting.  The Commissioner may also hold any meeting by teleconference or videoconference or conduct any vote by mail, facsimile, electronic mail or other means.  At all Major League Meetings, the Commissioner shall preside, except that the Commissioner shall not preside at any Major League Meeting for the election of a Commissioner or for consideration of the term of office or duties of a Commissioner.  In the absence of the Commissioner, the presiding officer shall be elected by written ballot of a majority vote of the Major League Clubs represented at the meeting.  Whatever Clubs shall be represented at a Major League Meeting shall constitute a quorum. Each Club at a Major League Meeting shall be represented by a person having full authority to act for the Club and to bind the Club on all matters.  Voting shall be by roll call of the Clubs, in rotating alphabetical order; provided, however, that upon the majority vote of all Clubs, the vote shall be by written ballot.

(b)   The Commissioner or the Executive Council or any Major League Club may, from time to time, propose to the Major League Clubs the adoption, amendment or rescission of any rule, resolution or other matter for action at a Major League Meeting.  Except by unanimous consent, no action shall be taken at any Major League Meeting upon any matter of which at least 20 days, or at any special meeting upon any matter of which at least 10 days, of prior written

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. V, Sec. 1 to Art. V, Sec. 2**

notice shall not have been given all Major League Clubs and the Executive Council. The notice calling any Major League Meeting may specify that the meeting shall act in Executive Session either entirely or as to any particular matter specified therein. Upon the affirmative vote of a majority of the Major League Clubs represented at a Major League Meeting or at the Commissioner's direction, such meeting shall go into Executive Session. At an Executive Session each Club shall be represented by not more than two representatives.

Sec. 2.

    (a)    The vote of a majority of the Major League Clubs shall be required for the approval of any of the following:

        (1)  Any action relating to the process of collective bargaining with the Major League Baseball Players Association or with any representative of the Major League umpires;

        (2)  Any action relating to scheduling for the championship season;

        (3)  Any action relating to the All-Star Game, Division Series, League Championship Series or World Series;

        (4)  Any action to amend Major League Rule 25 relating to the Uniform Playing Rules and Official Scoring Rules; provided, however, that any action to amend the designated hitter rule shall require the vote of three-fourths of all Clubs;

        (5)  Any action relating to radio, television or other audio or video media (including the Internet or any other online technology), including but not limited to any agreement or amendment thereto with any other party, pursuant to which there is the grant, license or other transfer of radio, television or other audio or video media rights for Major League Baseball games; or

        (6)  Any action to extend the term of this Constitution.

    (b)    The vote of three-fourths of the Major League Clubs shall be required for the approval of any of the following:

        (1)  Expansion by the addition of a new Club or Clubs or contraction by the subtraction of a Club or Clubs;

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. V, Sec. 2 to Art. V, Sec. 3**

(2) The sale or transfer of a control interest in any Club; provided, however, that a majority vote of all Major League Clubs shall be sufficient to approve any such sale or transfer occurring upon the death of an owner to a spouse or one or more lineal descendants. For purposes hereof, the term "control" shall mean the possession by the transferee, directly or indirectly, of the power or authority to influence substantially the management policies of the Club. A sale or transfer of a non-control interest in any Club shall require only the approval of the Commissioner;

(3) The relocation of any Major League Club;

(4) Any change from the present form of three-division play in either League (e.g., two-division or four-division play);

(5) The realignment of one or more Clubs into a different division(s) or into the other League; provided, however, that no Club may be moved to a different division or to the other League without its consent;

(6) Any provision affecting the sharing by the Major League Clubs of revenues from any source;

(7) Any provision amending this Constitution, except as specifically provided elsewhere in this Constitution; or

(8) The involuntary termination of the rights, privileges and properties of a Major League Club pursuant to the procedures of Article VIII hereof.

(c) Except as specifically provided in Article II, Section 9 and Article V, Section 2(b) of this Constitution, all actions to be voted upon by the Major League Clubs shall be decided by a majority vote of all Major League Clubs.

(d) Interpretation and applicability of this Section 2 shall be made by the Commissioner and that decision shall be final and non-appealable.

Sec. 3. Special Major League Meetings may be called by the Commissioner and shall be so called whenever the Commissioner is requested in writing by any eight Major League Clubs. If the Commissioner shall, within five days after receipt of such request, fail to call a Major League Meeting, any Major League Club so requesting may call the Major League Meeting.

3/08

## MAJOR LEAGUE CONSTITUTION
### MLC Art. VI, Sec. 1 to Art. VI, Sec. 2

### Article VI

### ARBITRATION

Sec. 1.     All disputes and controversies related in any way to professional baseball between Clubs or between a Club(s) and any Major League Baseball entity(ies) (including in each case, without limitation, their owners, officers, directors, employees and players), other than those whose resolution is expressly provided for by another means in this Constitution, the Major League Rules, the Basic Agreement with the Major League Baseball Players Association, or the collective bargaining agreement with any representative of the Major League umpires, shall be submitted to the Commissioner, as arbitrator, who, after hearing, shall have the sole and exclusive right to decide such disputes and controversies and whose decision shall be final and unappealable.  The procedure set forth in this Section is separate from and shall not alter or affect the procedure set forth in Article V governing the role of the Commissioner at Major League Meetings, or the Commissioner's powers to act in the best interests of Baseball under Article II.

Sec. 2.     The Major League Clubs recognize that it is in the best interests of Baseball that all actions taken by the Commissioner under the authority of this Constitution, including, without limitation, Article II and this Article VI, be accepted and complied with by the Clubs, and that the Clubs not otherwise engage in any form of litigation between or among themselves or with any Major League Baseball entity, but resolve their differences pursuant to the provisions of this Constitution.  In furtherance thereof, the Clubs (on their own behalf and including, without limitation, on behalf of their owners, officers, directors and employees) severally agree to be finally and unappealably bound by actions of the Commissioner and all other actions, decisions or interpretations taken or reached pursuant to the provisions of this Constitution and severally waive such right of recourse to the courts as would otherwise have existed in their favor.  In the event of any legal action other than as prescribed by Section 1 of this Article VI by any Club (including, without limitation, their owners, officers, directors and employees) in connection with any dispute or controversy related in any way to professional baseball, or in the event of noncompliance with any action of the Commissioner, with any action or decision taken or reached pursuant to the provisions of this Constitution, or with the terms or intent of this Article VI, in addition to any other remedy that may be available to the Commissioner, the Commissioner may direct that the costs, including attorneys' fees, to the Office of the Commissioner or any other Baseball entity, whether as plaintiff or defendant, of any court proceeding or other form of litigation resulting therefrom be reimbursed to the Office of the Commissioner or such other Baseball entity by such non-complying Club (on its own behalf and including, without limitation, on behalf of its owners, officers, directors and

## MAJOR LEAGUE CONSTITUTION
### MLC Art. VI, Sec. 2 to Art. VIII, Sec. 1

employees).  Nothing herein shall be construed to limit any rights of indemnity that the Major League Clubs or any Major League Baseball entity may have against any Club.

Sec. 3.     The form of player's contract to be used by the Major League Clubs, and all contracts between Major League Clubs and their officers and employees, shall contain a clause by which the parties agree to submit themselves to the jurisdiction of the Commissioner, and to accept the Commissioner's decisions rendered in accordance with this Constitution.

## Article VII

### SUPERSEDING EFFECT

This Constitution, and all actions taken pursuant to this Constitution, shall supersede any conflicting provisions of any other agreement, as amended, whether now existing or hereinafter entered into, to which any Major League Club is a party and any conflicting actions taken pursuant thereto.

## Article VIII

### CLUBS AND TERRITORIES

Sec. 1.     **Clubs.**  There shall be 30 Major League Clubs, which agree hereby to act at all times in the best interests of Baseball.  The Clubs shall be organized into two Leagues, the American League and the National League, with three divisions in each League, as follows:

| American League | National League |
|---|---|
| East | East |
| Baltimore Orioles | Atlanta Braves |
| Boston Red Sox | Florida Marlins |
| New York Yankees | New York Mets |
| Tampa Bay Rays | Philadelphia Phillies |
| Toronto Blue Jays | Washington Nationals |

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. VIII, Sec. 1 to Art. VIII, Sec. 4**

| Central | Central |
|---------|---------|
| Chicago White Sox | Chicago Cubs |
| Cleveland Indians | Cincinnati Reds |
| Detroit Tigers | Houston Astros |
| Kansas City Royals | Milwaukee Brewers |
| Minnesota Twins | Pittsburgh Pirates |
|  | St. Louis Cardinals |

| West | West |
|------|------|
| Los Angeles Angels of Anaheim | Arizona Diamondbacks |
| Oakland Athletics | Colorado Rockies |
| Seattle Mariners | Los Angeles Dodgers |
| Texas Rangers | San Diego Padres |
|  | San Francisco Giants |

Sec. 2.    **Expansion, Contraction, Realignment, Divisions.**    Any increase or decrease in the number of or any realignment of the Major League Clubs or any change from the present form of three-division play shall be governed by the voting provisions in Article V, Section 2 (b).

Sec. 3.    **Voluntary Termination.**  A Major League Club may withdraw from this Constitution only with the approval of three-fourths of all Major League Clubs, subject to such terms and conditions as the Commissioner may require, by submitting a written request to withdraw to the Commissioner, making full payment of all Baseball indebtedness and offering to assign to the Commissioner or the Commissioner's designee all of the withdrawing Club's rights, privileges and other property rights hereunder and under any other Baseball-related agreement.

Sec. 4.    **Involuntary Termination.**  The rights, privileges and other property rights of a Major League Club hereunder and under any other Baseball-related agreement may be terminated (i) in the event of contraction, pursuant to Article V, Section 2 (b) (1), or (ii) involuntarily, with the approval of three-fourths of all Major League Clubs, if the Club in question shall do or suffer any of the following:

(a)    Disband its team;

(b)    Disband its business organization or cease its business;

(c)    Except pursuant to official policies promulgated by the Commissioner, allow gambling of any kind upon its grounds or any building owned or controlled by it;

<div align="center">11</div>

## MAJOR LEAGUE CONSTITUTION
### MLC Art. VIII, Sec. 4 to Art. VIII, Sec. 6

(d)    Offer, agree, conspire or attempt to lose any game participated in by the Club; or fail to suspend immediately any player, employee or officer who shall be proved guilty of offering, agreeing, conspiring or attempting to lose any such game or of being interested in any pool or wager on any game in which a Club participates;

(e)    Fail to present its team at the time and place it is scheduled to play any championship game, unless such failure is caused by unavoidable accident in travel or conditions beyond the control of the Club or its officers;

(f)    Fail or refuse to comply with any requirement of the Commissioner;

(g)    Willfully violate any provision of this Constitution or any provision of the Professional Baseball Agreement, or any rules duly adopted pursuant to either of those agreements;

(h)    Transfer or assign such number of its player contracts as will prevent it from functioning as a Major League Club;

(i)    Fail to pay any indebtedness owing to Baseball within thirty days after receiving written notice from the Commissioner of default of such payment;

(j)    Fail or refuse to fulfill its contractual obligations;

(k)    Fail to maintain a ballpark suitable for the playing of home Major League Baseball games; or

(l)    Make an assignment for the benefit of its creditors or file a voluntary petition in bankruptcy, or if a receiver or trustee in bankruptcy is appointed for the properties and assets of the Club, or if reorganization proceedings in bankruptcy are instituted by or against the Club.

Sec. 5.    **Termination Procedure.**  The Commissioner shall determine the procedure to be followed with respect to a termination of a Club's rights hereunder, whether voluntary or involuntary.  Such procedures shall include, in the case of a proposed involuntary termination, a written charge identifying the basis for the proposed involuntary termination, and an opportunity for the Club in question to be heard with respect to the charge.

Sec. 6.    **Effect of Termination.**  Upon termination of a Major League Club in accordance with Section 3 or 4 hereof, the Commissioner may, but is not required to,

## MAJOR LEAGUE CONSTITUTION
### MLC Art. VIII, Sec. 6 to Art. VIII, Sec. 8

cancel and/or make such other disposition of the terminated Club's rights, privileges and other property rights hereunder or under any other Baseball-related agreement as the Commissioner deems appropriate. Without limiting the foregoing, the Commissioner is hereby authorized and empowered (but not required) to acquire through a designee and operate or dispose of the baseball park (or leasehold interest therein if such park is leased by such Club) and/or all other baseball properties, including without limitation the Club and the television, radio and other media contracts of such Club, the Player Development Contracts of such Club, the trademark and copyright rights of such Club and any other property, contracts, rights under this Constitution or other rights the Commissioner shall designate. Any terminated Club shall be obligated to assist in carrying out the provisions of any intended sale or other disposition and will execute and deliver any and all documents determined by the Commissioner to be necessary or convenient therefor, including without limitation instruments of conveyance, transfer, lease, bill of sale, assignment or quit claim. In the event of a failure, refusal or inability of any terminated Club to execute any and all such documents, each Club agrees i) that the Commissioner shall have the full and complete authority, to execute any and all such documents on behalf of the terminated Club in order to carry out the intended sale or other disposition, and ii) that any court of competent jurisdiction may enter any orders, judgments or decrees necessary to enforce and carry out the provisions hereof and that such Club will not oppose the entry of any such orders, judgments or decrees. Upon consummation of such purchase or sale, the Commissioner may first apply the proceeds to the payment of Baseball-related debts of the terminated Club, and finally any balance remaining thereafter shall be paid over to the terminated Club. The cancellation, operation, acquisition or disposition of a terminated Club's rights, privileges and properties shall be conducted in such manner, if any, as may be decided by the Commissioner in the Commissioner's sole discretion.

Sec. 7. **Effect of Termination on Active Player Contracts and Reservation Rights.** Upon a termination of a Major League Club in accordance with Section 3 or 4 hereof, title to the contracts of all active players then under contract to the terminated Club and all rights of player reservation of such Club shall, at the option of the Commissioner, thereupon vest in the Commissioner or a designee of the Commissioner, to be disposed of in such manner as the Commissioner may determine. The Commissioner may exercise this option with respect to all or less than all of the active player contracts and reservation rights of the terminated Club.

Sec. 8. **Operating Territories.** The Major League Clubs shall have assigned operating territories within which they have the right and obligation to play baseball games as the home Club.

## MAJOR LEAGUE CONSTITUTION
### MLC Art. VIII, Sec. 8

(a)    National League.  The National League Clubs shall have the following operating territories:

Arizona Diamondbacks:    Maricopa County in Arizona;

Atlanta Braves:    City of Atlanta; and Fulton, Cobb, Gwinette and Dekalb Counties in Georgia;

Chicago Cubs:    Cook, Lake, DuPage, Will, Kendall, McHenry and Grundy Counties in Illinois; and Lake and Porter Counties in Indiana; provided, however, that this territory shall be shared with the Chicago White Sox franchise in the American League;

Cincinnati Reds:    Butler, Warren, Clermont and Hamilton counties in Ohio; Boone, Kenton and Campbell Counties in Kentucky; and Dearborn and Franklin Counties in Indiana;

Colorado Rockies:    City of Denver; and Adams, Arapahoe, Boulder, Broomfield, Douglas, Jefferson and Denver Counties in Colorado;

Florida Marlins:    Dade and Broward Counties in Florida; provided, however, that with respect to all Major League Clubs, Palm Beach County in Florida shall also be included;

Houston Astros:    City of Houston; and Harris, Brazoria, Chambers, Fort Bend, Galveston, Liberty, Montgomery and Waller Counties in Texas;

Los Angeles Dodgers:    Orange, Ventura and Los Angeles Counties in California; provided, however, that this territory shall be shared with the Los Angeles Angels of Anaheim franchise in the American League;

Milwaukee Brewers:    Milwaukee, Ozaukee and Waukesha Counties in Wisconsin;

New York Mets:    City of New York; Nassau, Suffolk, Rockland and Westchester Counties in New York; Bergen, Hudson, Essex and Union Counties in New Jersey; and that

MAJOR LEAGUE CONSTITUTION
MLC Art. VIII, Sec. 8

portion of Fairfield County in Connecticut located south of Interstate 84 and west of Route 58; provided, however, that this territory shall be shared with the New York Yankees franchise in the American League;

Philadelphia Phillies: Bucks, Montgomery, Chester, Delaware and Philadelphia Counties in Pennsylvania; and Gloucester, Camden and Burlington Counties in New Jersey;

Pittsburgh Pirates: City of Pittsburgh and Allegheny County in Pennsylvania;

St. Louis Cardinals: City of St. Louis; and St. Louis, Jefferson, St. Charles and Franklin Counties in Missouri; and St. Clair, Madison, Monroe and Jersey Counties in Illinois;

San Diego Padres: San Diego County in California;

San Francisco Giants: City of San Francisco; and San Francisco, San Mateo, Santa Cruz, Monterey and Marin Counties in California; provided, however, that with respect to all Major League Clubs, Santa Clara County in California shall also be included;

Washington Nationals: District of Columbia; and Arlington, Fairfax and Prince William Counties, and all independent cities bordering such counties, in Virginia.

(b) American League. The American League Clubs shall have the following operating territories:

Baltimore Orioles: City of Baltimore; and Baltimore, Anne Arundel, Howard, Carroll and Harford Counties in Maryland;

Boston Red Sox: Suffolk, Middlesex, Essex, Bristol, Worcester, and Norfolk Counties in Massachusetts; provided, however, that Bristol and Worcester Counties and the territory south and west of Highway 128 in Norfolk County shall be shared with the Pawtucket franchise in the International League;

## MAJOR LEAGUE CONSTITUTION
### MLC Art. VIII, Sec. 8

| | |
|---|---|
| Chicago White Sox: | Cook, Lake, DuPage, Will, Kendall, McHenry and Grundy Counties in Illinois; and Lake and Porter Counties in Indiana; provided, however, that this territory shall be shared with the Chicago Cubs franchise in the National League; |
| Cleveland Indians: | Cuyahoga, Lorrain, Medina, Geauga, Lake and Summit Counties in Ohio; provided, however, that Summit County shall be shared with the Akron franchise in the Eastern League; |
| Detroit Tigers: | Wayne, Monroe, Washtenaw, Oakland, Macomb and St. Clair Counties in Michigan; |
| Kansas City Royals: | Johnson, Wyandotte, Miami and Leavenworth Counties in Kansas; and Clay, Jackson, Cass and Platte Counties in Missouri; |
| Los Angeles Angels of Anaheim: | Los Angeles, Orange and Ventura Counties in California; provided, however, that this territory shall be shared with the Los Angeles Dodgers franchise in the National League; |
| Minnesota Twins: | Ramsey and Hennepin Counties in Minnesota; |
| New York Yankees: | City of New York; Nassau, Suffolk, Rockland and Westchester Counties in New York; Bergen, Hudson, Essex and Union Counties in New Jersey; and that portion of Fairfield County in Connecticut located south of Interstate 84 and west of Route 58; provided, however, that this territory shall be shared with the New York Mets franchise in the National League; |
| Oakland Athletics: | Alameda and Contra Costa Counties in California; |
| Seattle Mariners: | King County in Washington; |
| Tampa Bay Rays: | Hillsborough and Pinellas Counties in Florida; |
| Texas Rangers: | Cities of Dallas, Ft. Worth and Arlington; and Dallas and Tarrant Counties in Texas; |

3/08

Toronto Blue Jays:    Cities of Scarborough, York, East York, North York, Etobicoke and Toronto, commonly referred to as Metropolitan Toronto.

Sec. 9.    **Home Television Territories.**    The definitions of the home television territories of the Major League Clubs shall be maintained in the Commissioner's Office. Amendments to such territories shall be made only with the approval of the Executive Council.


## Article IX

### CONDUCT OF CHAMPIONSHIP SEASON AND POST-SEASON

Sec. 1.    **Schedule.**  The games for each championship season shall be arranged in a written schedule prepared by the Commissioner, acting in accordance with any standing resolutions passed at a Major League Meeting and with the Basic Agreement with the Major League Baseball Players Association.  No Major League Club shall schedule or play any exhibition game during the championship season without the prior approval of the Commissioner.

Sec. 2.    **Playing Rules.**  All championship games shall be played under the Official Baseball Rules.

Sec. 3.    **Parks Not to be Changed During Season.**  No Club shall change the size or dimensions of its playing field during the championship season.

Sec. 4.    **Championship Season and Post-Season.**  The Commissioner shall have responsibility for all matters relating to the administration of the championship season and the post-season, which shall be conducted in accordance with the Major League Rules and the Major League Regulations.

Sec. 5.    **All-Star Game.**  The Clubs shall provide the necessary services of players, and, if selected as a host Club, the park, facilities and equipment needed for the playing of an All-Star Game during each baseball season.  All-Star Games shall be played under the supervision, control and direction of the Commissioner.  The date and the park in which an All-Star Game is to be played shall be determined by the Executive Council.  Each host Club agrees that when it is designated to conduct an All-Star Game, it will provide the park, facilities and equipment for such a game for a total rental of one dollar and will act as agent for the Major League Clubs in the conduct of said game.

# Article X

## MAJOR LEAGUE CENTRAL FUND

Sec. 1.     **Maintenance of Major League Central Fund.**  There shall be maintained for the Major League Clubs in the Office of the Commissioner a separate account to be known as the "Major League Central Fund" and to be administered by the Executive Council.  All sums received for the account of the parties hereto under this Constitution shall be deposited in the Major League Central Fund.   The Commissioner is hereby appointed the fiscal agent of the Major League Central Fund.

Sec. 2.     **All-Star Game Revenues and Expenses.**  The All-Star Game host Club shall be required to submit such revenue and expense budgets for the All-Star Game and reasonably related events as may from time to time be required by the Commissioner.  The host Club shall be entitled to reimbursement of its reasonable and necessary expenses out of such revenues.  With the approval of the Commissioner, reimbursement of expenses included in the budget may be made on application of the host Club periodically in advance of each All-Star Game.  Final settlement pursuant to the approved budget shall be made following submission of a post-game accounting by the host Club.  All-Star Game receipts from the sale of tickets (net of applicable local taxes) shall be transmitted by the host Club to the Major League Central Fund without deduction for expenses, but the host Club may retain revenues received from related activities until the final accounting and settlement.

    The net proceeds of each such game and related activities after the payment of expenses shall be deposited in the Major League Central Fund and shall be credited to the Major League Clubs equally.

Sec. 3.     **Major League Club Broadcasts.**  Major League Club practices with regard to the telecasting and radio broadcasting of games are governed as follows:

    (a)     The Clubs hereby agree that each Club shall have, with respect to each game in which it participates, the right to authorize the telecast of such game only by means of over-the-air, cable and satellite technology, and only within its home television territory.

    (b)     Each Club shall have, with respect to each game in which it participates, the right to authorize the radio broadcast of such game (1) if such Club is a home Club, over any radio broadcast station in the United States, for Clubs in the United States, or in Canada, for Clubs in Canada, except a station whose transmitter is not

<center>18</center>

located within 50 miles of such Club's ballpark and is located within 50 miles of the visiting Club's ballpark, or (2) if such Club is a visiting Club, over any radio broadcast station in the United States, for Clubs in the United States, or in Canada, for Clubs in Canada, whose transmitter is located within 50 miles of such visiting Club's ballpark, except as may be agreed by the home Club and the visiting Club.

(c)     Each Club shall provide in its ballpark to the visiting Club suitable space to be used for the purposes described in subparagraphs (a) and (b), above, together with the ability to install and maintain in such ballpark such wires, cables and other equipment and items as may be necessary for such purposes, at the expense of the visiting Club or the visiting Club's rightsholder.  Each home Club will additionally admit such employees and agents of the visiting Club and the visiting Club's rightsholder to the home Club's ballpark free of charge as may be necessary for the purposes described in subparagraphs (a) and (b), above.

(d)     Each Club hereby agrees, with respect to each game in which it participates, that the other participating Club shall have the right, and hereby authorizes the Commissioner to grant to national rightsholders the right, to make use of the Club's trademarks in connection with all productions made pursuant to subparagraphs (a) and (b), above, and Section 4, below, and all advertising related thereto.  All such use of trademarks shall inure to the benefit of the trademark owner and shall be made pursuant to all established standards of quality.

Sec. 4.     **National Broadcasts, Copyright Royalties.**  Subject to such approving vote of the Major League Clubs as may be required by Article V, Section 2 of this Constitution, the Major League Clubs grant to the Commissioner, acting as their agent, with the prior advice and prior consent of the Major League Executive Council, the exclusive right to sell on their behalf, throughout the United States and other territories as chosen by the Commissioner, exclusive or non-exclusive television and radio or other video or audio media rights (including the Internet and any other online technology) (live or taped) to the World Series, League Championship Series, Division Series, All-Star Games, regular season championship games, spring training games, exhibition games and other Major League Baseball events.  All contracts for the sale of such television, radio and other video and audio media and online rights shall be administered by the Commissioner on behalf of the Clubs, and the contracts shall so provide.

The Clubs further authorize and empower the Commissioner, acting as their agent, to make exclusive demand and present formal claim on their behalf, by appropriate notice, filings and otherwise, and to negotiate and enter into settlement agreements with respect to the collection of royalty fees for broadcasts of Major League Baseball games carried as distant signal programming by cable television systems, satellite providers

and other media providers, pursuant to applicable provisions of the United States, Canada and foreign copyright laws.

The proceeds received from the sales of television and radio or other video or audio media rights to the World Series, League Championship Series, Division Series, All-Star Games, regular season championship games, spring training games and exhibition games and from copyright royalty fees shall be made payable to the Commissioner as agent for the Clubs, and when received by the Commissioner, shall be deposited in the Major League Central Fund and shall be credited to each of them equally.

Sec. 5.  **Payments from Central Fund, Books of Account.**  Each of the Major League Clubs hereto hereby authorizes and directs the Commissioner to make the following payments on its behalf out of the Major League Central Fund.  These payments are to be charged to the Clubs equally.

(a)  There shall be payments of such contributions to the Major League Baseball Players Benefit Plan as the Clubs are or may become obligated to contribute to the Benefit Plan by agreement with the Major League Baseball Players Association or by action of the Clubs.

(b)  In October of each year, there shall be paid to the Commissioner an amount which shall be sufficient for the following purposes:

(1)  to enable the Commissioner, after expenditure of the receipts of the Commissioner's Office from all other sources, to cover (i) the clerical, administrative and operational expenses of the Commissioner's Office and the Executive Council incurred during the fiscal year ending in that month pursuant to the budget for such year as approved by the Executive Council, and (ii) expenditures for contributions and other non-operational purposes made pursuant to the appropriations for such purposes recommended by the Executive Council, and

(2)  to provide, as of the close of each fiscal year, a reserve fund for the Commissioner's Office of at least $10,000,000, or such amount approved by the Executive Council (such reserve fund to be the excess of all assets over all liabilities).

(c)  There shall be paid from time to time such amounts as shall be approved by the Executive Council for the administrative expenses of the Central Fund and for other purposes common to all Clubs, including the compensation and expenses of advisors, attorneys, actuaries and other persons retained or employed by the

## MAJOR LEAGUE CONSTITUTION
### MLC Art. X, Sec. 5 to Art. X, Sec. 6

Commissioner in connection with player relations matters and the Major League Baseball Players Benefit Plan or other matters.

(d) The balance of each Club's share of the Major League Central Fund remaining after said payments (less the reserve) shall be paid to the Clubs on or before October 31 of the year in which received, or as soon thereafter as possible, unless otherwise determined by the Commissioner.

The Commissioner may from time to time invest any balance of the Major League Central Fund on hand in certificates of deposit, obligations of the United States Government, $A_1P_1$ rated commercial paper or such other interest bearing accounts or instruments as have been approved in advance by the Major League Finance & Compensation Committee.

Upon termination of the Major League Central Fund, any remaining funds shall be distributed and paid to the Clubs.

The Commissioner shall provide and keep true and accurate books of account and records of all receipts and disbursements and other transactions involving or pertaining to the Major League Central Fund.

On or before February 15 of each year, the Commissioner shall submit to the Executive Council an accurate statement of account showing all receipts and disbursements and other transactions involving or pertaining to the Major League Central Fund during the preceding fiscal year ending October 31 and, in addition thereto, setting forth a full and complete schedule of all cash obligations of the United States Government and other property then comprising the Major League Central Fund.

Each Major League Club shall be furnished a copy of such annual statement and shall be entitled at all times during business hours to inspect the books of account and records of the Major League Central Fund.

Sec. 6. **Termination of Central Fund.** The Major League Central Fund shall be in existence continuously unless and until three-fourths of the Major League Clubs shall have given to the Commissioner written notice on or before June 30 of any year of their intention to terminate the Major League Central Fund, and upon the giving of any such notice the Major League Central Fund shall terminate on the 31st day of December of the year following the year in which such notice is given.

MAJOR LEAGUE CONSTITUTION
MLC Art. XI, Sec. 1 to Art. XI, Sec. 2

## Article XI

## MISCELLANEOUS

Sec. 1.    **Fiscal Responsibility**.  Each Major League Club shall comply with the Debt Service Rule and any other rules dealing with fiscal responsibility as may be contained in the then-current Basic Agreement with the Major League Baseball Players Association, as may be amended in accordance with Article V, Section 2(a)(1).

Sec. 2.    **Indemnification of Officials.**  The Major League Clubs hereby jointly indemnify each person who is now or hereafter serves as the Commissioner of Baseball, or as an employee, officer or director of the Office of the Commissioner of Baseball, Major League Baseball Properties, Inc., Major League Baseball Enterprises, Inc., Major League Baseball Advanced Media, L.P., the Major League Scouting Bureau, the Arizona Fall League, Inc. or any other similar or affiliated entity currently existing or hereafter created to carry out functions of interest to Major League Baseball or to professional baseball, and each person who is an officer, director, employee or representative of a Major League Club who has been or is hereafter elected, appointed or selected by the Commissioner of Baseball or the Commissioner's designee or the Major League Executive Council to perform, individually or as a member of a committee, a function related to the Office of the Commissioner of Baseball or any other matter of interest to Major League Baseball or to professional baseball, whether or not then acting as such Commissioner of Baseball, employee, officer or director or as such a person so elected, appointed or selected, against expenses (including attorney's fees) judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative to which he or she shall have been made a party by reason of his or her being or having served in such capacity if he or she acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of baseball, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of <u>nolo contendere</u> or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interest of baseball, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

The Commissioner shall hereafter be indemnified in any case, provided that he or she has met the applicable standard of conduct set forth in the preceding portion

**MAJOR LEAGUE CONSTITUTION**
**MLC Art. XI, Sec. 2 to Art. XI, Sec. 3**

of this resolution. In the case of any other person covered by this resolution, indemnification shall be only as authorized in a specific case upon a determination either by the Commissioner or a majority vote of the Major League Clubs that the indemnification of the person is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the preceding portion of this resolution.

Sec. 3.    **Major League Regulations.**   The Commissioner shall adopt a set of Major League Regulations relating to games, ballparks, uniforms and other matters and may otherwise promulgate bulletins and directives binding on the Major League Clubs (including without limitation their owners, officers, directors and employees) in matters relating to the Commissioner's functions and the administration of the game of baseball that are not inconsistent with this Constitution.  Amendments to such Regulations, bulletins and directives may be made in the discretion of the Commissioner.

# EXHIBIT C

## KT

**KOREIN TILLERY**

*Attorneys at Law*

One U.S. Bank Plaza
505 North 7th Street, Suite 3600
St. Louis, MO 63101-1625
www.KoreinTillery.com

Garrett R. Broshuis
GBroshuis@koreintillery.com
*p:* (314) 241-4844
*f:* (314) 241-3525

*Sent Via Certified Mail*

January 30, 2014

Legal Department
Major League Baseball
Major League Baseball Properties, Inc.
Major League Baseball Enterprises, Inc.
245 Park Ave., 31st Floor
New York, NY 10167

> **Re:**   *Statutory Notice: California Private Attorney General Act*

To Whom It May Concern:

Pursuant to California Labor Code § 2699, this letter serves as notice of an intent to bring a civil action under California's Private Attorney General Act on behalf of minor league baseball players ("minor leaguers"). Major League Baseball, its agent entities, the Office of the Commissioner of Baseball, Allan H. "Bud" Selig, and all thirty of its constituent franchises ("the Defendants") are violating Labor Code sections covered by Labor Code § 2699, including, but not limited to, Labor Code §§ 201, 202, 203, 204, 208, 226, 510, 1194, and 1197.

The allegations comprising this claim are more fully set forth in the complaint styled *Aaron Senne, et al. v. Major League Baseball, et al.,* which will soon be filed in the U.S. District Court for the Northern District of California. Please contact us if you are willing to accept service of the complaint in lieu of formal service of process.

To summarize the facts and theories supporting the claims, the Defendants employ hundreds of minor leaguers in the state of California. Work periods include, *inter alia,* minor league championship seasons, offseason periods, and training periods. The



Legal Department
Major League Baseball
Major League Baseball Properties, Inc.
Major League Baseball Enterprises, Inc.
January 30, 2014
Page 2

Defendants direct this work, which is required by contract. Minor leaguers are not represented by a union.

During the championship seasons, the minor leaguers routinely work in excess of forty hours a week yet the Defendants pay salaries below the minimum wage and pay no overtime wages. During other work periods, the Defendants pay no salaries at all. These practices violate, *inter alia*, Labor Code §§ 510, 1194, and 1197.

By failing to pay adequate wages and subsequently withholding these wages, the Defendants also violate California's "payday" requirements (Labor Code § 204). When the employment relationship ceases, the conduct also violates California's rules regarding the immediate payment of wages upon discharge (Labor Code §§ 201–03) and the place of payment of wages (Labor Code § 208). Moreover, the Defendants violate Labor Code § 226 by failing to include adequate information in itemized wage statements.

As a result of these violations, the Defendants are subject to statutory penalties of $100 per pay period per employee for initial violations and $200 per pay period per employee for subsequent violations.

Sincerely,

Garrett R. Broshuis

GRB/lll

# EXHIBIT D

KT

**KOREIN TILLERY**

*Attorneys at Law*

One U.S. Bank Plaza
505 North 7th Street, Suite 3600
St. Louis, MO 63101-1625
www.KoreinTillery.com

Garrett R. Broshuis
GBroshuis@koreintillery.com
*p: (314) 241-4844*
*f: (314) 241-3525*

*Sent Via Certified Mail*

January 30, 2014

Legal Department
Major League Baseball
Major League Baseball Properties, Inc.
Major League Baseball Enterprises, Inc.
245 Park Ave., 31st Floor
New York, NY 10167

      **Re:**    *Statutory Notice: Minor League Wage and Hour Lawsuit*

To Whom It May Concern:

Pursuant to Florida Statute § 448.110, this letter serves as notice that a lawsuit on behalf of a class of minor league baseball players will be brought against Major League Baseball, its agent entities, the Office of the Commissioner of Baseball, Allan H. "Bud" Selig, and all thirty of MLB's constituent franchises for wage and hour violations under Florida law. Please contact us if you are willing to accept service of the complaint in lieu of formal service of process.

The representative plaintiff for the Florida Class is Aaron Senne, a former minor leaguer. The applicable minimum wage rates for the Florida Class are as follows: January 1, 2009 to July 23, 2009: $7.21; July 24, 2009 to May 31, 2011: $7.25; June 1, 2011 to December 31, 2011: $7.31; January 1, 2012 to December 31, 2012: $7.67; January 1, 2013 to December 31, 2013: $7.79; and January 1, 2014 to present: $7.93.

Since Mr. Senne does not have access to your employment records, his exact dates and hours of work remain unknown. Mr. Senne's estimated work dates and hours of work while in Florida are as follows:

KT

Legal Department
Major League Baseball
Major League Baseball Properties, Inc.
Major League Baseball Enterprises, Inc.
January 30, 2014
Page 2

- Mr Senne worked as a minor leaguer from around June 17, 2010 to around June 11, 2013;

- Mr. Senne worked around 2300 hours in Florida during this time period.

Mr. Senne's individual estimated, alleged unpaid wages through the date of the notice (excluding, e.g., liquidated damages, interest, and other statutory damages) are approximately $11,000. Again, the Defendants have control of employment records, so the dates, hours, and unpaid wages are mere estimates and will likely be modified and made more precise once the Defendants' records become available. Also, this estimate is limited to Mr. Senne's individual damages arising under Florida Statute § 448.110 and does not include damages arising under other laws.

As noted above, this lawsuit will be brought on behalf of, among others, the Florida Class, which is defined as:

> all minor league players employed by Defendants under initial uniform player contracts ("UPC") who worked, will work, and/or continue to work as minor leaguers in the state of Florida at any time since five years prior to the filing of this action until the resolution of this action, but who had no service time in the major leagues at the time of performing work as a minor leaguer in Florida. Excluded from the Florida Class are Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper requests for exclusion from the Florida Class.

Thus, this Class will cover all work performed in Florida by minor leaguers during all relevant time periods, including, *inter alia*, training periods, off-season periods, and championship seasons. Even if your spring training site is not located in Florida, this Class includes minor leaguers you employed who performed any work in Florida.



KT

Legal Department
Major League Baseball
Major League Baseball Properties, Inc.
Major League Baseball Enterprises, Inc.
January 30, 2014
Page 3

While the exact names of all class members are unknown at this time, you and the other Defendants should possess the necessary records to identify the class members and estimate damages for these periods of work.

Sincerely,

Garrett R. Broshuis

GRB/lll