STEPHEN M. TILLERY (*pro hac vice*)
  stillery@koreintillery.com
GARRETT R. BROSHUIS (*pro hac vice*)
  gbroshuis@koreintillery.com
GIUSEPPE S. GIARDINA (*pro hac vice*)
  ggiardina@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:  (314) 241-4844
Facsimile: (314) 241-3525

GEORGE A. ZELCS (*pro hac vice*)
  gzelcs@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Telephone: (312) 641-9750

BRUCE L. SIMON (Bar No. 96241)
  bsimon@pswlaw.com
BENJAMIN E. SHIFTAN (Bar No. 265767)
  bshiftan@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile: (415) 433-9008

DANIEL L. WARSHAW (Bar No. 185365)
  dwarshaw@pswlaw.com
BOBBY POUYA (Bar No. 245527)
  bpouya@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone:  (818) 788-8300
Facsimile: (818) 788-8104

Plaintiffs' Interim Co-Lead Class Counsel

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| AARON SENNE, et al., Individually and on Behalf of All Those Similarly Situated; <br><br> Plaintiffs, <br><br> vs. <br><br> OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as MAJOR LEAGUE BASEBALL; et al.; <br><br> Defendants. | CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS) <br><br> **CLASS ACTION** <br><br> **PLAINTIFFS' OPPOSITION TO CERTAIN DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** <br> Hearing date: Feb. 13, 2015 <br> Time: 2:00 p.m. <br> Courtroom: G, 15th Floor <br> Judge: Honorable Joseph C. Spero |

3:14-CV-00608-JCS

OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

# Table of Contents

INTRODUCTION ................................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ........................................................................2

1.     Brief Background Facts. .......................................................................................................2

2.     The PJ Defendants' substantial contacts with California. .................................................4

ARGUMENT................................................................................................................................... 10

1.     General jurisdiction is present because of the PJ Defendants' substantial, longstanding, systematic, and continuous contacts with California. .................................................... 11

2.     Specific jurisdiction is present because the claims closely relate to the PJ Defendants' substantial contacts with California. ................................................................................ 15

       A.     The PJ Defendants purposefully directed activities at California. .................................. 16

       B.     The claims are related to the PJ Defendants' activities in the state.............................. 22

       C.     It is reasonable to litigate this case in this District rather than litigating it in a piecemeal fashion in other forums.................................................................................. 23

CONCLUSION................................................................................................................................. 25

# Table of Authorities

Cases

*Am. Football League v. Nat'l Football League*,
   27 F.R.D. 264 (D. Md. 1961) ............................................................................................... 13

*Ambriz v. Coca Cola*,
   13-CV-03539-JST, 2014 WL 296159 (N.D. Cal. Jan. 27, 2014) ..................................................... 21

*Bancroft & Masters, Inc. v. Augusta Nat. Inc.*,
   223 F.3d 1082, 1087–88 (9th Cir. 2000),
   *holding modified on other grounds by Yahoo!*, 433 F.3d 1199 ........................................................ 19

*Bristol-Myers Squibb Co. v. Superior Court*,
   228 Cal. App. 4th 605, 633–37 (Cal. Ct. App. 2014),
   *review granted and decision superseded*, No. S221038,
   2014 WL 6474924 (Cal. Nov. 19, 2014) ................................................................................. 21

*Burbank Aeronautical Corp. II v. Aeronautical Development Corp., LTD*,
   No. CV 89-6244-WMB, 1990 WL 261395 (C.D. Cal. May 23, 1990) ........................................ 14

*Burger King v. Rudzewicz*,
   471 U.S. 462 (1985) .............................................................................................. 16, 21, 23

*Calder v. Jones*,
   465 U.S. 783 (1984) ............................................................................................................. 17

*Carnival Cruise Lines, Inc. v. Shute*,
   499 U.S. 585 (1991) ............................................................................................................. 22

*Cent. Sports Army Club v. Arena Assocs., Inc.*,
   952 F. Supp. 181 (S.D.N.Y. 1997) ........................................................................................ 13

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014) .......................................................................................................... 12

*Davis v. Billick*, No. 301CV1964D,
   2002 WL 1398560 (N.D. Tex. June 26, 2002) ....................................................................... 15

*Davis v. NIH Fed. Credit Union*,
   12-CV-05502-JCS, 2013 WL 2147468
   (N.D. Cal. May 15, 2013) (Spero, J.) ......................................................................... 19, 23, 25

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*,
   290 F.3d 42 (1st Cir. 2002) ................................................................................................. 13

*Dole Food Co. v. Watts*,
   303 F.3d 1104 (9th Cir. 2002) ........................................................................................ 19, 23

*Dytch v. Yoon*,
   No. C-10-02915-MEJ, 2011 WL 839421 (N.D. Cal. Mar. 7, 2011) ........................................... 17

*Eberle v. City of Anaheim*,
　　901 F.2d 814 (9th Cir. 1990) ........................................................................................ 17

*Enriquez v. Interstate Group., LLC*,
　　11-CV-05155 YGR, 2012 WL 3800801 (N.D. Cal. Aug. 31, 2012) ......................... 18, 22, 23, 24

*Erving v. Virginia Squires Basketball*,
　　349 F. Supp. 709 (E.D.N.Y. 1972) ................................................................................ 13

*Evans v. Boston Red Sox*,
　　No. CIV. 13-00262 SOM, 2013 WL 6147675 (D. Haw. Nov. 22, 2013) ................................... 15

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
　　131 S. Ct. 2846 (2011) ............................................................................................ 11, 12

*GT Sec., Inc. v. Klastech GmbH*,
　　C-13-03090 JCS, 2014 WL 2928013 (N.D. Cal. June 27, 2014) (Spero, J.) ................................ 19

*Hall v. Nat'l Basketball Ass'n*,
　　651 F. Supp. 335 (D. Kan. 1987) ................................................................................... 20

*Hawkins v. Nat'l Basketball Ass'n*,
　　288 F. Supp. 614 (W.D. Pa. 1968) ................................................................................. 13

*Hirsch v. Blue Cross, Blue Shield of Kansas City*,
　　800 F.2d 1474 (9th Cir. 1986) ...................................................................................... 17

*Holliday v. Lifestyle Lift, Inc.*,
　　No. C09-4995, 2010 WL 3910143 (N.D. Cal. Oct. 5, 2010) ............................................... 17, 18

*Hollins v. U.S. Tennis Ass'n*,
　　469 F. Supp. 2d 67 (E.D.N.Y. 2006) .............................................................................. 13

*Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*,
　　326 U.S. 310 (1945) ........................................................................................... passim

*Keeton v. Hustler Magazine, Inc.*,
　　465 U.S. 770 (1984) ........................................................................................ 16, 17, 22

*Kulko v. Superior Ct. of Cal.*,
　　436 U.S. 84 (1978) ................................................................................................. 11

*Manton v. California Sports, Inc.*,
　　493 F. Supp. 496 (N.D. Ga. 1980) ................................................................................ 15

*Martensen v. Koch*,
　　942 F. Supp. 2d 983 (N.D. Cal. 2013)
　　*reconsideration granted on other grounds*,
　　2013 WL 4734000 (N.D. Cal. Sept. 3, 2013) ...................................................................... 17

*Martin v. D-Wave Systems Inc.*,
　　C-09-03602 RMW, 2009 WL 4572742 (N.D. Cal. Dec. 1, 2009) ............................................... 12

3:14-CV-00608-JCS

OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

iii

*McCluskey v. Belford High Sch.*,
    795 F. Supp. 2d 608 (E.D. Mich. 2010) ............................................................................... 21

*McFadden v. Fuyao N. Am. Inc.*,
    10-CV-14457, 2012 WL 1230046 (E.D. Mich. Apr. 12, 2012) ........................................... 15

*Menken v. Emm*,
    503 F.3d 1050 (9th Cir. 2007) ............................................................................................ 16

*Myers v. Bennett Law Offices*,
    238 F.3d 1068 (9th Cir. 2001) ............................................................................................ 14

*Novak v. NanoLogix, Inc.*,
    No. 5:13-CV-01971-EJD, 2014 WL 991119 (N.D. Cal. Mar. 11, 2014) ............................ 20

*Ochoa v. J.B. Martin & Sons Farms, Inc.*,
    287 F.3d 1182 (9th Cir. 2002) ............................................................................. 19, 23, 24

*Orchid Biosciences Inc. v. St. Louis University*,
    198 F.R.D. 670 (S.D. Cal. 2001) ........................................................................................ 11

*Potts v. Cameron Offshore Boats, Inc.*,
    401 F. Supp. 2d 733 (S.D. Tex. 2005) ................................................................................ 19

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) .................................................................................. 10, 16, 17

*Shute v. Carnival Cruise Lines*,
    897 F.2d 377 (9th Cir. 1990) .............................................................................................. 22

*Slepian v. Guerin*,
    172 F.3d 58 (9th Cir. 1999) ................................................................................................ 20

*SRE-Cheaptrips, Inc. v. Media Synergy Grp., LLC*,
    No. CV 09-00622-S-EJL, 2010 WL 1913589 (D. Idaho May 12, 2010) ........................... 20

*Sullivan v. Tagliabue*,
    785 F. Supp. 1076 (D.R.I. 1992) ........................................................................................ 15

*Telles v. Li*,
    5:11-CV-01470-LHK, 2013 WL 5199811 (N.D. Cal. Sept. 16, 2013) ..................... 17, 18, 22

*Tuazon v. R.J. Reynolds Tobacco Co.*,
    433 F.3d 1163 (9th Cir. 2006) ........................................................................... 10, 11, 12, 15

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014) ........................................................................................ 16, 19, 21

*Washington Shoe Co. v. A-Z Sporting Goods Inc.*,
    704 F.3d 668 (9th Cir. 2012) .............................................................................................. 11

*Wood v. Kinetic Sys., Inc.*,
    CV 09-579-S-CWD, 2010 WL 893647 (D. Idaho Mar. 9, 2010) ................................... 18, 20

3:14-CV-00608-JCS

OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

iv

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
    433 F.3d 1199 (9th Cir. 2006)................................................................................................ passim

Statutes

Cal. Civ. Proc. Code § 369.5............................................................................................................ 14

Cal. Corp. Code § 18065................................................................................................................. 14

Rules

Ninth Circuit Rule 36-3,(c))............................................................................................................ 20

OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

**INTRODUCTION**

When it comes to baseball, there is no more fertile ground in America than California. For decades, the moving Defendants ("PJ Defendants") have reaped the benefits of this State, systematically harvesting California's most talented youths. Their scouts live here and their executives routinely travel here, each year actively recruiting a new crop of their chief commodity. They all receive significant revenue in the State from television deals, merchandising, revenue sharing, and other business activities. And they all employ many minor leaguers from and in California, requiring them to perform substantial work during the winter training period without pay.

Despite these deep roots in California (and the enormous benefits reaped from the State), the PJ Defendants now attempt to avoid the jurisdiction of this State's courts, claiming their connection to California is passive and essentially nonexistent. But limited discovery confirmed extensive contacts related to recruitment, hiring, and employment of California minor leaguers, all resulting from systematic, affirmative acts. First, all PJ Defendants consciously chose to base multiple scouts within California to evaluate and recruit the state's amateurs. Next, all PJ Defendants used these contacts to consciously select California minor leaguers and induce them into signing contracts (which are often signed within California). The PJ Defendants then expect these minor leaguers to not only work during the season but also during the winter training months, and they even direct the work by providing training packets. Because most California minor leaguers return to California when the season ends, the PJ Defendants know and expect that these youths will return to their home state to perform this winter work. And lastly, the PJ Defendants consciously decided to not pay these youths for this substantial winter work occurring in California.

The PJ Defendants' other contacts with California also result from express acts. They all obtain significant sums of California revenue from doing business within the state, and they all pay taxes to California. They also obtain substantial California revenue from other streams funneled through Major League Baseball. With far more MLB franchises located in California than any other state (including prominent franchises such as the Dodgers and Giants), PJ Defendants obtain a direct

3:14-CV-00608-JCS

OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

1

financial benefit from business occurring in the state through television revenue, internet revenue, merchandise sales, and other shared revenue.

The personal jurisdiction inquiry focuses on fairness. It is quintessentially fair to call into this Court these MLB franchises—who employ more minor leaguers from California than any other state; who have full-time employees based in California to recruit minor leaguers; who force their California minor leaguers to work without pay while they reside in California during the off-season; and who do significant business in California. Within the close-knit club of MLB, all Defendants made the conscious decision to apply universal policies in California, and the PJ Defendants were no different. The PJ Defendants' motion to dismiss for lack of personal jurisdiction should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Brief Background Facts.

Plaintiffs, thirty-four former minor leaguers, challenge the wage scheme forced upon them by MLB and its 30 member franchises.[1] MLB operates nationally, and although its teams are located throughout the country, far more of its franchises (5) are located within California than any other state.[2] Seven Plaintiffs currently live in California, and six remember signing contracts here.[3] At least 15 performed in-season work in California on Defendants' behalf.[4]

As required by MLB's rules, Plaintiffs and similarly-situated class members all signed uniform player contracts ("UPCs") that were approved by MLB and the Commissioner of Baseball.[5] Under the

---

[1] *See generally* Consolidated Amended Complaint ("CAC"), Dkt. 243.

[2] *See* Broshuis Decl., Ex. G, *Team-by-Team Information*, MLB.com.

[3] *See* CAC, Dkt. 243, at ¶¶ 23, 25, 32, 37, 45, 51, 128. At the time the CAC was filed, Tim Pahuta lived in New Jersey, but he recently moved to California for work and now resides there. *See* Pahuta Decl. ¶ 2. As for contracts signed in California, *see* Watts Decl. ¶ 4; Bennigson Decl. ¶ 4; Lawson Decl. ¶ 5; Kahaulelio Decl. ¶ 4; Opitz Decl. ¶ 4; Woodruff Decl. ¶ 4; Henderson Decl. ¶ 4; McAtee Decl. ¶ 6. Some opt-ins remember signing their UPCs in California. *See* Giarraputo Decl. ¶ 4; Lewis Decl. ¶ 4.

[4] CAC, Dkt. 243, ¶¶ 227 (Odle), 242 (Bennigson), 250 (Lawson), 270 (Kiel), 278 (Nicholson), 300 (Meade), 307 (Murray), 315 (Kahaulelio), 323 (Khoury), 333 (Pease), 350 (Gaston), 382 (Newby), 433 (Hilligoss), 476 (Weeks). Kyle Woodruff also worked in San Jose one season. Woodruff Decl. ¶ 6.

[5] CAC, Dkt. 243, ¶¶ 155–57.

UPC, all first-year players must earn the exact same salary during the first year: currently $1,100 per month, paid only during the "championship season."[6] Yet the UPC requires minor leaguers to perform work throughout the calendar year, including the winter training period when Defendants expect minor leaguers to comply with mandatory training and work programs at their homes. Consistent with the UPC, Defendants do not pay salaries during the winter training period or during other periods, such as spring training, that are outside the championship season.[7] Thus, Plaintiffs allege that Defendants fail to pay any wages at all during certain work periods; fail to pay a minimum wage during other months; and fail to pay overtime despite requiring minor leaguers to often work in excess of fifty hours per week (and sometimes seventy or more).[8]

Plaintiffs allege that these practices violate the Fair Labor Standards Act and several state wage and hour laws, including those in California.[9] Plaintiffs allege that all Defendants (including the PJ Defendants) violated wage and hour laws in California because all Defendants have applied their practices to work being performed in California.[10] No Defendant has challenged the sufficiency of these allegations, even though Plaintiffs have served multiple complaints in this litigation.

On May 23, 2014, MLB, Commissioner Selig, and 19 of the 30 franchise Defendants answered the complaint, but the PJ Defendants filed a motion to dismiss based on lack of personal jurisdiction.[11] Defendants also filed a motion to transfer venue pursuant to 28 U.S.C. § 1404(a).[12] Plaintiffs correctly believed the PJ Defendants grossly understated their California contacts in the

---

[6] *See id.* ¶ 168. The championship season is the period when games are played, but it is far from the only time of the year when work is performed. Minor leaguers perform work throughout the year.

[7] *Id.* ¶¶ 174–79.

[8] *See, e.g.*, *id.* ¶¶ 167–93.

[9] *See id.* ¶¶ 489–661.

[10] *Id.* ¶ 130.

[11] Dkt. 115. The entities for the Atlanta Braves, Boston Red Sox, Cleveland Indians, Chicago White Sox, Detroit Tigers, New York Yankees, Philadelphia Phillies, Pittsburgh Pirates, Tampa Bay Rays, and Washington Nationals claimed a lack of personal jurisdiction. The entities for the Baltimore Orioles later joined this motion. Dkt. 129.

[12] Dkt. 118.

motions, and Plaintiffs were permitted to conduct jurisdictional and venue discovery.[13] A similar case—*Marti, et al. v. Office of the Commissioner of Baseball, et al.*, No. 3:14-cv-03289-RS—was consolidated with this action,[14] and Plaintiffs filed the Consolidated Amended Complaint.[15] The Defendants who previously answered re-filed their answers, and the PJ Defendants re-noticed their motions.[16]

**2.    The PJ Defendants' substantial contacts with California.**

The PJ Defendants have asserted that their contacts are limited to playing major league games in California. Dkt. 281, at 9 of 28. The limited jurisdictional and venue discovery belied that statement, revealing substantial general and specific California contacts. The PJ Defendants' longstanding, systematic contacts make California essentially a second home, and many contacts relate directly to the wrongdoing alleged in this lawsuit.

*Defendants' longstanding and substantial California contacts*. MLB permanently entrenched itself in California in April of 1958 when the Dodgers moved to Los Angeles[17] and the Giants moved to San Francisco.[18] MLB franchises began routinely traveling to the state to play games, and since the San Diego Padres debuted in 1969[19] there have been five franchises located in California.[20] No other state has more than two MLB franchises within it.[21] Because of the high

---

[13] Dkt. 144.

[14] Dkt. 235.

[15] Dkt. 243.

[16] Dkt. 281–86. Defendants re-noticed their motions multiple times. Except for correcting the hearing dates, the second filings appear to duplicate the initial filings. This Opposition responds to all the relevant filings.

[17] *See* Broshuis Decl., Ex. D, *Dodgers Franchise Timeline*, MLB.com. Plaintiffs ask the Court to take judicial notice of the cited facts contained on this website and those cited in notes 18–20, *infra*, the cited facts being both generally known within this Court's jurisdiction and accurately and readily determinable from sources maintained by Defendants themselves. *See* Fed. R. Evid. 201(b).

[18] *See* Broshuis Decl., Ex. E, *Giants Franchise Timeline*, MLB.com.

[19] *See* Broshuis Decl., Ex. F, *Padres Franchise Timeline*, MLB.com.

[20] *See* Broshuis Decl., Ex. G, *Team-by-Team Information*, MLB.com.

[21] *Id.*

number of California franchises, the PJ Defendants openly admit they routinely travel to California to play multiple games every season—up to 16 games in a single season.[22]

The PJ Defendants' contacts, however, go far beyond traveling to California for games. All PJ Defendants receive substantial income derived from California; while PJ Defendants refused to identify most of this revenue, they confirmed that in 2013 each PJ Defendant received at least $113,128.10 in revenue attributable to California from MLB Advanced Media (MLB's internet arm) and $52,199.17 in revenue attributable to California from MLB Network (MLB's own TV network).[23]

Much more California revenue is funneled through the financial conduit that is MLB. MLB did not provide California revenue for television contracts or MLB Properties (its licensing arm that licenses products for all Defendants and distributes revenue), claiming all revenues attribute to New York. But it goes without saying that significant revenues and sales emanate from California—the most populous state—and are eventually funneled to all Defendants.[24] Defendants also would not supply data for California revenue generated through required revenue sharing. Given that five MLB franchises are based in California (including economically successful teams such as the Angels, Dodgers, and Giants), Plaintiffs believe substantial revenue is funneled to all PJ Defendants through revenue sharing. These California revenues were not passively or coincidentally generated but instead result from PJ Defendants' purposeful decision to participate in the nationwide organization MLB.

Because they do business in California, all PJ Defendants also pay taxes in California.[25] And although they state otherwise,[26] records indicate that the Baltimore Orioles are registered to do

---

[22] Dkt. 281, at 12 of 28.

[23] Dkt. 281-1, Bloom Decl., Ex. K, MLB's Objections and Answers to Interrogatory No. 5.

[24] On MLB's merchandise website, for instance, three out of the five top keywords in search engines that lead consumers to mlb.com are California-related ("sf giants," "dodgers," and "giants"), and, from mlb.com, a significant percentage of these consumers shop on MLB's e-commerce site, shop.mlb.com. *See* Broshuis Decl., Ex. H.

[25] Dkt. 281-1, Bloom Decl., Exs. A–J, Objections and Answers to Interrogatory Nos. 11 & 12; Dkt. 285-4, Bruce Decl., Ex. 1, Orioles Objections and Answers to Interrogatory Nos. 11 & 12.

[26] Dkt. 129-2, Smouse Decl., ¶ 5.

3:14-CV-00608-JCS

OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

5

business in California.[27] PJ Defendants participate in numerous workers compensation claims within California, and MLB has even successfully lobbied the California legislature on behalf of its franchises to make it more difficult to bring certain sports-related workers compensation claims in California.[28] Lastly, all Defendants have gathered in California for formal, industry-wide meetings in recent years. In fact, MLB hosted its Winter Meetings in San Diego this year from December 7 to 11; thousands will do business there and plan the future of the industry—including the minor leagues.[29]

*The systematic recruitment of California minor leaguers*. Defendants have systematically harvested California ball fields for decades. California has long produced more major leaguers than any other state,[30] and one recent study found that over 23 percent of American major leaguers came from California—more than twice as many as the next state.[31] Similar to major league rosters, more minor leaguers also come from California than any other state. In discovery, PJ Defendants provided the numbers of Californians they drafted each year in their amateur draft. All PJ Defendants drafted dozens of Californians since 2008, and on average they each selected 7.2 Californians per year.[32]

The recruitment of these minor leaguers is a long, intense process requiring a substantial presence in California. All PJ Defendants have multiple employees based in California (on average 6.3 employees per franchise).[33] Many of these employees are scouts, and their scouting is continuous, systematic, and aimed directly at Californians. They identify youthful prospects early, often in high

[27] Warshaw Decl., Exs. A, B.

[28] *See* Broshuis Decl., Ex. I, *Injury claims by professional athletes*, L.A. Times (Feb. 1, 2014); Broshuis Decl., Ex. J, *California limits workers' comp sports injury claims*, L.A. Times (Oct. 8, 2013) ("The bill...was the subject of nearly 18 months of lobbying by the NFL, Major League Baseball…").

[29] *See* Broshuis Decl., Ex. K, *2014 Baseball Winter Meetings returns to San Diego after three decades*, MiLB.com.

[30] *See* Broshuis Decl., Ex. L, Kevin Nelson, THE GOLDEN GAME xiii (2004).

[31] *See* Broshuis Decl., Ex. M, *California is top producer of major league players*, L.A. Times (July 12, 2010).

[32] Dkt. 281-1, Bloom Decl., Exs. A–J, Objections and Answers to Interrogatory No. 5; Dkt. 285-4, Bruce Decl., Ex. 1, Orioles Objections and Answers to Interrogatory No. 5.

[33] Dkt. 281-1, Bloom Decl., Exs. A–J, Objections and Answers to Interrogatory No. 2; Dkt. 285-4, Bruce Decl., Ex. 1, Orioles Objections and Answers to Interrogatory No. 2 [collectively "PJ Defendants' Objections and Answers to Interrogatory No. 2"].

school, and attempt to evaluate players numerous times, attending practices and games, talking to parents and coaches, grading baseball skills and psychological characteristics, administering tests, and filing central reports.[34] A scout might target the youth for years before he begins a professional career.[35] The scouting of California is so important that Defendants even based the MLB Scouting Bureau in California; its scouts function much like other scouts and provide even more information to Defendants because all Defendants have access to its information.[36]

In addition to California scouts, the PJ Defendants systematically dispatch many other employees to California to target, evaluate, and recruit players, such as higher-level employees like cross checkers, directors of scouting, and even vice presidents and general managers.[37] In 2013, the PJ Defendants sent an average of 9.7 employees per franchise to California to recruit (in addition to scouts based here), many being high-level employees.[38]

The recruitment continues after the team selects a Californian. Upon selection, the team's scout generally begins more formal discussions with the player and his family to convince them to sign the UPC that is integral to this lawsuit.[39] Often the California area scout will handle discussions and espouse the benefits and glories of playing in MLB.[40] Frequently the minor leaguer signs the UPC in California with the scout at his shoulder.[41]

---

[34] *See, e.g.*, Wyckoff Decl.¶¶ 4–8; Lawson Decl. ¶¶ 3,4; McAtee Decl. ¶¶ 3–5.

[35] *Id.*

[36] CAC, Dkt. 243, ¶ 154; Broshuis Decl., Ex. N, *MLB Scouting Bureau Overview Q&A*, MLB.com.

[37] PJ Defendants' Objections and Answers to Interrogatory No. 2; Wyckoff Decl. ¶ 5; McAtee Decl. ¶ 5.

[38] PJ Defendants' Objections and Answers to Interrogatory No. 2.

[39] Wyckoff Decl. ¶ 9.

[40] *See, e.g.*, Wyckoff Decl. ¶ 9; McAtee Decl. ¶ 6; Watts Decl. ¶ 4.

[41] Watts Decl. ¶ 4; Bennigson Decl. ¶ 4; Kahaulelio Decl. ¶ 4; Woodruff Decl. ¶ 4; Henderson Decl. ¶ 4; McAtee Decl. ¶ 6; Giarraputo Decl. ¶ 4; Lewis Decl. ¶ 4.

***The work performed by minor leaguers in California***. Once the season ends, most California minor leaguers return to California.[42] Yet they do not sit idly during the winter but instead work within California at the Defendants' direction.[43] The UPC requires players to maintain "first-class" conditioning during the entire year, and a franchise can "impose a reasonable fine" for not meeting these requirements.[44] All PJ Defendants act out this provision by requiring their minor leaguers to perform extensive training work during the winter training period, and they direct this work by admittedly providing lengthy work packets with detailed assignments.[45] Per the UPC, the PJ Defendants (like all Defendants) pay no wages for this work.[46]

The PJ Defendants elected to have their minor leaguers perform this work at their winter addresses instead of at one of PJ Defendants' own facilities. Of course, much of this work occurs in California. While some PJ Defendants refused to provide the information, discovery revealed that an average of 24.7 minor leaguers *per franchise* reside in California each winter training period.[47] The PJ Defendants know that these minor leaguers reside and work on their behalf in California during this

---

[42] CAC, Dkt. 243, ¶ 130; *see, e.g.*, Khoury Decl. ¶ 7; Bennigson Decl. ¶ 7; Pahuta Decl. ¶ 7; Lawson Decl. ¶¶ 7–8; Watts Decl. ¶¶ 6–11; Kahaulelio Decl. ¶ 5; Smith Decl. ¶ 4; Opitz Decl. ¶ 5; Woodruff Decl. ¶ 5; Henderson Decl. ¶ 5; Giarraputo Decl. ¶¶ 5–6; McAtee Decl. ¶ 7; Lewis Decl. ¶ 5 [collectively hereinafter "Declarations Describing Winter Work"].

[43] CAC, Dkt. 243, ¶¶ 130, 178–79; Declarations Describing Winter Work, *supra* note 42.

[44] CAC, Dkt. 243, ¶ 178 (citing UPC ¶¶ VI.D and XII).

[45] CAC, Dkt. 243, ¶¶ 130, 178–79. Defendants in discovery admit that they provide workout packets. Bloom Decl., Exs. A–J, Objections and Answers to Interrogatory No. 7; Dkt. 285-4, Bruce Decl., Ex. 1, Orioles Objections and Answers to Interrogatory No. 7. Two examples of these lengthy packets have been provided. Hilligoss Decl., Ex. A; Pahuta Decl., Ex. A.

[46] CAC, Dkt. 243, ¶¶ 130, 179 (citing UPC ¶¶ VII.B).

[47] Only five franchises, the Yankees, Orioles, White Sox, Indians, and Tigers, provided the information on a per year basis. *See* Bloom Decl., Exs. C–F, Objections and Answers to Interrogatory No. 6; Bruce Decl., Ex. 1, Orioles Objections and Answers to Interrogatory No. 6. Two other franchises provided the total number of players since 2008 who resided in CA during the winter period but did not do so on a per year basis. The other franchises refused to provide any information.

time period because they request the minor leaguers' off-season addresses; the addresses must be correct both for communication and drug-testing purposes.[48]

The PJ Defendants also send other communications to their California minor leaguers. One customary communication supplies the minor leaguer with rules and information for spring training, and a contract addendum establishing the salary is generally included.[49] Thus, minor leaguers often receive and sign important contract addenda within California.

The limited discovery performed by Plaintiffs substantiates those allegations, and the below chart summarizes many of the specific contacts revealed by the limited jurisdictional and venue discovery.

| | Number of Players Drafted from CA Since 2008 | Number of Minor Leaguers with CA Off-Season Addresses | Employees other than scouts with MiLB Responsibilities Residing in CA | Employees "Based" in CA (usually scouts recruiting) | Other Employees Recruiting Minor Leaguers in CA |
|---|---|---|---|---|---|
| **Tampa Bay Rays** | 61 (8.7 per year) | 75 since '08 (did not provide by year) | Yes | Yes (9 since '08; 5 current) | Yes (18 since '08; 13 current) |
| **Washington Nationals** | 46 (6.6 per year) | 74 since '08 (did not provide by year) | Yes (including the VP of Player Personnel) | Yes (10 since '08; 7 current) | Yes (2, the GM and Asst. GM) |
| **New York Yankees** | 51 (7.3 per year) | Between 17 and 32 per year | Yes | Yes (10 since '08; 6 current) | Yes (24 since '08; 15 since '13) |
| **Philadelphia Phillies** | 55 (7.9 per year) | Refused to Provide | Yes | Yes (12 since '08; 8 current) | Yes (6 since '08; 5 current) Includes Asst. GMs |
| **Pittsburgh Pirates** | 48 (6.9 per year) | Refused to Provide | Yes | Yes (5) | Yes (20 since '08; 14 since '13) Includes GM and Asst. GMs |

[48] Senne Decl., Ex. A; Declarations Describing Winter Work, *supra* note 42.

[49] *See, e.g.*, Broshuis Decl., Exs. A–C; Khoury Decl. ¶ 10; Watts Decl. ¶ 12; Lewis Decl. ¶ 5.

|  | Number of Players Drafted from CA Since 2008 | Number of Minor Leaguers with CA Off-Season Addresses | Employees other than scouts with MiLB Responsibilities Residing in CA | Employees "Based" in CA (usually scouts recruiting) | Other Employees Recruiting Minor Leaguers in CA |
|---|---|---|---|---|---|
| **Baltimore Orioles** | 64 (9.1 per year) | Between 10 and 30 per year | Yes (including VP of Baseball Operations) | Yes (11 since '08; 7 current) | Yes (3–5 per year) |
| **Atlanta Braves** | 39 (5.6 per year) | Refused to Provide | Yes | Yes (9 since '08; 3 current) | Yes (20 since '08; 12 current) |
| **Boston Red Sox** | 28 since 2010 (5.6 per year) | Refused to Provide | Yes (Including Director of Player Personnel) | Yes (9 since '08; 8 current) | Yes (20 since '08; 11 since '13) Includes GM and Asst. GM |
| **Chicago White Sox** | 68 (9.7 per year) | Between 24 and 40 per year | Yes | Yes (13 since '08; 10 current) | Yes (12 since '08; 10 since '13) |
| **Cleveland Indians** | 55 (7.9 per year) | Between 23 and 31 per year | Yes | Yes (6 current) | Yes (18 since '08; 14 current) |
| **Detroit Tigers** | 29 (4.6 per year) | Between 15 and 21 each year | No | Yes (6 since '08; 4 current) | Yes (10 since '08; 7 current) Includes VPs and Asst. GMs |

## ARGUMENT

To assert personal jurisdiction over a nonresident, a defendant need only possess such minimum contacts with a state to not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945). In the absence of an applicable federal statute, district courts apply the law of the forum state. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). California's long-arm jurisdictional statute extends the full length of federal due process requirements. *Id.*

Two categories of personal jurisdiction exist. General jurisdiction allows a court to hear any case against the defendant due to the extent of the defendant's continuous and systematic contacts. *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1173 (9th Cir. 2006). The analysis focuses on economic reality rather than empty formality to determine whether the contacts approximate a

physical presence in the state. *See id.* The other category, specific jurisdiction, is found when the suit arises out of or relates to the defendant's contacts with the forum. *Id.* at 1169.

For personal jurisdiction purposes, the court must resolve all disputed facts in favor of the plaintiff. *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012). Even following jurisdictional discovery, in the absence of an evidentiary hearing a plaintiff need only make a "prima facie showing of jurisdictional facts to withstand a motion to dismiss." *Id.* In all personal jurisdiction analyses, the court "must evaluate all of a defendant's contacts with the forum state"— even if some of the contacts were not wrongful. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006). After all, it is the aggregate contacts that matter when assessing fundamental fairness. *Orchid Biosciences Inc. v. St. Louis University*, 198 F.R.D. 670, 674 (S.D. Cal. 2001).

Here, the court has both general and specific jurisdiction over Defendants.

**1.   General jurisdiction is present because of the PJ Defendants' substantial, longstanding, systematic, and continuous contacts with California.**

*International Shoe*'s minimum contacts test remains the constitutional cornerstone for any jurisdictional analysis. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011). For general jurisdiction, a plaintiff satisfies the bedrock principles of fundamental fairness by showing that a defendant's systematic and continuous contacts essentially render a corporation at home, *id.* at 2851, meaning defendant's contacts "approximate physical presence" in the state, *Tuazon*, 433 F.3d at 1169.

There is no mechanical checklist for general jurisdiction because the overall economic reality is what matters. *Id.* at 1172–73; *see also Int'l Shoe*, 326 U.S. at 319 (saying the personal jurisdiction analysis "cannot be simply mechanical"). Thus, the court should assess the unique facts of each case. *Tuazon*, 433 F.3d at 1172 (citing *Kulko v. Superior Ct. of Cal.*, 436 U.S. 84, 92 (1978)). The nature and extent of the contacts drive the analysis, and some non-exhaustive factors include soliciting or engaging in business in the state, as well as the "[l]ongevity, continuity, volume, economic impact, physical presence, and integration into the state's regulatory or economic markets." *Tuazon*, 433 F.3d at 1172.

General jurisdiction should be found because PJ Defendants' extensive, longstanding contacts with California, both independently and through their joint participation in MLB, make it reasonable for them to answer to lawsuits in California. In *Tuazon*, a Filipino plaintiff brought suit in Washington, alleging a tobacco company (Reynolds) engaged in a worldwide conspiracy to hide smoking's risks. 433 F.3d at 1167. Reynolds was headquartered in North Carolina and had no manufacturing facilities in Washington. *Id.* Yet it had employees there, did substantial business there, targeted consumers there, and engaged in other activities there—and it had done so for decades. *Id.* at 1167–68.

Regarding personal jurisdiction, the Ninth Circuit found that Reynolds' "long and successful operations" in the state were "not accidental." *Id.* at 1174. It had an active and longstanding presence in the state, and it was "significant that the essence of Tuazon's complaint—a worldwide cover-up regarding tobacco risks—cannot be characterized as 'dealings entirely distinct' from Reynolds' business in Washington." *Id.* (quoting *Int'l Shoe*, 326 U.S. at 319). The court noted that "a corporation does not necessarily submit to general jurisdiction in every state in which it merely sells a product,"[50] but "the confluence of Reynolds' physical, economic, and political presence" supported general jurisdiction. *Id.* at 1174–75; *see also Martin v. D-Wave Systems Inc.*, C-09-03602 RMW, 2009 WL 4572742, at *4 (N.D. Cal. Dec. 1, 2009) (finding general jurisdiction in California over a company incorporated in Canada, with principal place of business in Canada, with all records in Canada, and with 58 of 61 employees in Canada because three employees worked in California, a service agent was present there, executives traveled to California, and meetings were held in California).

The PJ Defendants have a similar, longstanding presence in California. For decades they have based scouts in California to recruit, and more of their minor leaguers come from California than any other state. They also have other employees based in California, and they frequently travel to California because it is home to far more franchises than any other state. They all pay California taxes, and, as is described more below, they all receive substantial revenue emanating from California.

---

[50] For this reason, *Tuazon* is consistent with *Goodyear* and *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014).

Aside from these independent contacts, the analysis must also consider the highly interdependent nature of MLB. As *Erving v. Virginia Squires Basketball Club* demonstrates, a professional sports team's travel to away games is by its nature regular and systematic. 349 F. Supp. 709, 712–15 (E.D.N.Y. 1972). The court held that the relationship between the Squires (a member of the now-defunct American Basketball Association), the other teams, and the league was akin to a joint venture. *Id.* at 712. The ABA's bylaws constituted a contractual commitment, and the

> playing of basketball games in New York [was] …essential to the fulfillment of the business purposes and objects of the ABA enterprise of which Squires is an integral part. Squires plays a number of games here with the New York Nets…because it is contractually bound to do so…That the Squires play only 6 to 8 games in New York out of a season schedule of 84 games cannot obscure the vital importance of the New York portion of the schedule to the Squires' continuance.

*Id.* at 713.

Because of the regularity of the schedule, the Squires' presence was "not casual[] or fortuitous[]" but instead regular and "pursuant to a well-organized business plan." *Id.* Also, it did not matter that gate receipts were not purely shared—other revenue was shared and the relationships were symbiotic. *Id.* at 713–14. Thus, personal jurisdiction was present. *Id.* at 715. Other courts analyzing sports teams and sports leagues have come to similar conclusions.[51]

In such interdependent joint ventures, the rules of agency further support finding personal jurisdiction here. When one joint venturer acts on behalf of the other joint venturers, those acts can be imputed. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 55-63 (1st Cir.

---

[51] *See Hollins v. U.S. Tennis Ass'n*, 469 F. Supp. 2d 67, 74 (E.D.N.Y. 2006) (finding personal jurisdiction over a tennis association since "tournaments have been held [in New York] on a regular basis for years"); *Cent. Sports Army Club v. Arena Assocs., Inc.*, 952 F. Supp. 181, 188 (S.D.N.Y. 1997) (finding personal jurisdiction over a non-residents where business in the state led to a presence in the state); *cf. Hawkins v. Nat'l Basketball Ass'n*, 288 F. Supp. 614, 618–19 (W.D. Pa. 1968) ("The only business a corporation-owned professional athletic league team could engage in profitably is to systematically play games with other member teams according to Association schedules…To say that these corporations transacted no business of any substantial character in this district would be to disregard the practical non-technical business standards applicable to professional athletic teams."); *Am. Football League v. Nat'l Football League*, 27 F.R.D. 264, 268–69 (D. Md. 1961) ("The revenues of all the defendants are derived from the playing of football games, road games as well as home games…").

2002).[52] Also, the acts of an agent may be imputed to the principal for jurisdictional purposes. *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1073 (9th Cir. 2001).[53]

The facts of this case are even stronger than in the above authority because this case involves a universal scheme enacted by all Defendants to depress salaries. The common conduct was applied in and directed at California, and it resulted from all Defendants' common decisions, uniform contracts, and common implementation. MLB is a highly interdependent, nationwide association with a substantial foothold in California. By choosing to be part of MLB, the PJ Defendants also chose to systematically travel to California to play games there. Although they do not directly share gate receipts, the collective bargaining agreement requires all MLB franchises to share substantial revenue, with each franchise contributing 34 percent of its local revenue into a common pool split amongst all 30 MLB franchises.[54] And current rules require other revenue sharing in the form of luxury taxes (for teams with high payrolls) and common revenue (from nationally televised games and other centralized events directed by MLB). Given that far more franchises are in California than any other state, much of this shared revenue emanates from California. Although PJ Defendants and MLB did not provide much information regarding common revenue funneled through MLB, discovery did reveal that all PJ Defendants received substantial California revenue: $113,128.10 from MLB's website and $52,199.17 from MLB's TV network in 2013.[55] Other substantial shared revenue also undoubtedly emanates from California, such as from licensing.[56] Lastly, MLB lobbied on behalf of all Defendants to change the

---

[52] Defendants contend that under *Daimler*, the acts of MLB cannot be imputed, but MLB and its franchises are far different than a parent-subsidiary relationship, especially when MLB acts directly on behalf of the PJ Defendants, when they act jointly or conspire together, or when they share revenue.

[53] In California, the normal laws of agency apply to unincorporated agencies, Cal. Corp. Code § 18065, and an unincorporated association's member may be joined as a party in an action against the unincorporated association, Cal. Civ. Proc. Code § 369.5; *see also Burbank Aeronautical Corp. II v. Aeronautical Development Corp., LTD*, No. CV 89-6244-WMB, 1990 WL 261395, at *4 (C.D. Cal. May 23, 1990) (finding jurisdiction based on agency principles).

[54] *See* Broshuis Decl., Ex. O, Article XXIV, 2012-2016 Basic Agreement, at 121.

[55] *See supra* Factual and Procedural Background, "Defendants' longstanding and substantial California contacts."

OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

jurisdictional rules for workers compensation.[57] Such political activity further substantiates general jurisdiction. *See Tuazon*, 433 F.3d at 1174–75 (looking partly at Reynolds' political activity in the state).

PJ Defendants' cases are distinguishable because, unlike in those cases, PJ Defendants have a long, substantial presence in California. Plaintiffs are not attempting to assert personal jurisdiction in a state such as Hawaii, which produces few minor leaguers and has no MLB franchises.[58] Instead, Plaintiffs seek to assert jurisdiction in a state that all PJ Defendants have long made their second home—even if they now self-servingly wish to avoid that home for purposes of this lawsuit. *See McFadden v. Fuyao N. Am. Inc.*, 10-CV-14457, 2012 WL 1230046, at \*5 (E.D. Mich. Apr. 12, 2012) (distinguishing *Goodyear* and finding jurisdiction in Michigan over a foreign auto supplier because of frequent business done with the Michigan auto business). Thus, general jurisdiction exists.

**2. Specific jurisdiction is present because the claims closely relate to the PJ Defendants' substantial contacts with California.**

The specific jurisdiction analysis begins with the basic notion that a company need only possess certain minimum contacts with a state to satisfy due process concerns. *Int'l Shoe*, 326 U.S. at 316. Doing business within a state is a privilege, and obligations accompany that privilege. *Id.* at 319. When "those obligations arise out of or are connected with the activities within the state,… respond[ing] to a suit brought to enforce them can…hardly be said undue." *Int'l Shoe*, 326 U.S. at 319;

---

[56] *Id.*

[57] *Id.*

[58] *Davis v. Billick*, No. 301CV1964D, 2002 WL 1398560 (N.D. Tex. June 26, 2002), for instance, is inapposite because unlike here there were fewer contacts in *Davis*, no common scheme involving all the members of the NFL, and the contacts were not related to the action. The same can be said for the other cases Defendants cite on page 18 of 28. *See Manton v. California Sports, Inc.*, 493 F. Supp. 496, 496–97 (N.D. Ga. 1980) (no employees based in Georgia, far fewer trips, no common scheme, no contacts related to the action); *Sullivan v. Tagliabue*, 785 F. Supp. 1076, 1081 (D.R.I. 1992) (no employees based in Rhode Island and far fewer other contacts, which did not relate to the action); *Evans v. Boston Red Sox*, No. CIV. 13-00262 SOM, 2013 WL 6147675, at \*4 (D. Haw. Nov. 22, 2013) (no employees in Hawaii, no games in Hawaii, no common scheme, no contacts related to the action).

*accord Burger King v. Rudzewicz*, 471 U.S. 462, 474 (1985) (stating that when a defendant engages in economic activity in a state, "it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity").

The Ninth Circuit generally follows a sliding scale for the specific jurisdiction inquiry focusing on "the extent of the defendant's contacts with the forum and the degree to which the plaintiff's suit is related to those contacts. A strong showing on one axis will permit a lesser showing on the other." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1210 (9th Cir. 2006); *accord Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007).

For specific jurisdiction, all the defendant's contacts related to the claim should be examined, whether with named plaintiffs, non-plaintiffs, or otherwise. *Yahoo!*, 433 F.3d at 1207 ("[W]e must evaluate all of a defendant's contacts with the forum state, whether or not those contacts involve wrongful activity by the defendant."). After all, Defendants correctly point out that the jurisdictional analysis focuses on the relationship between the defendant, the forum, and the litigation—not simply the named plaintiff's contacts with the state. *See Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984).

There is a three-part test for specific jurisdiction: (1) the defendant must purposefully direct activities towards the forum or purposefully avail himself of the privileges of the forum; (2) the claim must arise out of or relate to those activities; and (3) the exercise of personal jurisdiction must be reasonable. *Yahoo!*, 433 F.3d at 1205–06. All three prongs of the test are met here, so specific jurisdiction exists over the PJ Defendants.

### A.  The PJ Defendants purposefully directed activities at California.

The first prong of the Ninth Circuit's specific jurisdiction test examines whether the company purposefully directed activities at the state or purposefully availed itself of the benefits of the state. Although related, the concepts of purposeful availment and purposeful direction are somewhat distinct. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). Plaintiffs concur with Defendants that the purposeful direction test is appropriate here. *See Holliday v. Lifestyle Lift, Inc.*,

No. C09-4995, 2010 WL 3910143, at *3 (N.D. Cal. Oct. 5, 2010); *see also Telles v. Li*, 5:11-CV-01470-LHK, 2013 WL 5199811, at *4 (N.D. Cal. Sept. 16, 2013).

Purposeful direction is found when a company takes "actions outside the forum state directed at the forum." *Schwarzenegger*, 374 F.3d at 803. Even if the company's actions did not occur in the forum, the focus is on the forum where the actions were felt. *Yahoo!*, 433 F.3d at 1205. "It is not required that a defendant be physically present within, or have physical contacts with, the forum, provided that his efforts are 'purposefully directed' toward forum residents." *Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1478 (9th Cir. 1986).[59] The purposeful direction test is satisfied when (1) the company commits an intentional act, (2) aimed at the forum state, that (3) causes harm that the company knows will likely be felt in the forum state. *Yahoo!*, 433 F.3d at 1206 (*citing Calder v. Jones*, 465 U.S. 783, 789–90 (1984).

The court should draw a reasonable inference in a plaintiff's favor for this prong instead of making a merits determination. *Martensen v. Koch*, 942 F. Supp. 2d 983, 996 (N.D. Cal. 2013) *reconsideration granted on other grounds*, 2013 WL 4734000 (N.D. Cal. Sept. 3, 2013). It is not necessary for the "brunt" of the harm to occur in a state. *Yahoo!*, 433 F.3d at 1207. Instead, the plaintiff need only show a "jurisdictionally sufficient amount of harm." *Id.* (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984)).

As an initial matter, Defendants fail to analyze the first and third prongs of the purposeful direction test (the intentional act and foreseeable harm prongs), so the Court should find that they conceded them.[60] Nevertheless, Plaintiffs will demonstrate that all three prongs are satisfied.

---

[59] On the contrary, a company purposefully avails itself through economic activities such as contracting with residents for business. *Schwarzenegger*, 374 F.3d at 802. As a quid pro quo, the company must submit to litigation in the forum because it availed itself of the privilege of conducting business in the state (and invoked the benefits of the forum). *Id.*

[60] Defendants cannot raise "new facts or different legal arguments in the reply brief" not in the moving papers. *Dytch v. Yoon*, No. C-10-02915-MEJ, 2011 WL 839421, at *3 (N.D. Cal. Mar. 7, 2011); *see also Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990).

In wage and hour cases, a company commits an intentional act simply by creating the uniform policy at issue. *Holliday*, 2010 WL 3910143, at *4 ("Under the *Calder* effects test, this policy decision operates as the 'intentional act' contemplated in the section."); *Telles v. Li*, 5:11-CV-01470-LHK, 2013 WL 5199811, at *5 (N.D. Cal. Sept. 16, 2013); *Enriquez v. Interstate Group., LLC*, 11-CV-05155 YGR, 2012 WL 3800801, at *4 (N.D. Cal. Aug. 31, 2012). A company expressly aims its conduct in such cases when it applies the allegedly unlawful employment practices in the state. *Holliday*, 2010 WL 3910143, at *4 (requirement "easily satisfied" by applying the policies in state); *Telles*, 2013 WL 5199811, at *5; *Enriquez*, 2012 WL 3800801, at *5. Similarly, a company knows harm will likely occur in a state when it applies a policy to workers in the state. *Holliday*, 2010 WL 3910143, at *4; *Telles*, 2013 WL 5199811, at *5; *Enriquez*, 2012 WL 3800801, at *5. The purposeful direction test is satisfied even if the company applies the employment policies both inside and outside California. *See Enriquez*, 2012 WL 3800801, at *4–5.

Even for work performed at home, specific jurisdiction still lies in wage cases if the company knowingly hires a forum's resident and has reason to know that work will be performed at home. In *Wood v. Kinetic Sys., Inc.*, an FLSA action, the employer argued it had not committed an intentional act because it simply hired Mr. Wood in Idaho, and Mr. Wood worked outside of Idaho. CV 09-579-S-CWD, 2010 WL 893647, at *5 (D. Idaho Mar. 9, 2010). But Mr. Wood also performed work at home in Idaho, and the company communicated with him there. *Id.* The company's actions supported specific jurisdiction because the company "knew it was hiring an Idaho resident as its employee" and had reason to know he would perform activities there. *Id.* at *6.

These wage and hour cases dictate a finding of specific jurisdiction here. PJ Defendants acted intentionally by creating the policy decision to pay no wages at all during the winter training period and to pay no minimum wage or overtime during the season. They expressly aimed their conduct at California by applying the policies to Californians working in California. After all, all PJ Defendants knowingly hired Californians with reason to know most would return to California to perform winter work there. Lastly, they knew harm was likely to occur because they knowingly required Californians to work in California for no pay.

OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Similarly, and as this Court has found, a company purposefully directs activity by recruiting a state's employees. *See Davis v. NIH Fed. Credit Union*, 12-CV-05502-JCS, 2013 WL 2147468, at \*6 (N.D. Cal. May 15, 2013) (Spero, J.) (finding purposeful direction because of communications during recruitment that occurred in California). In *Ochoa v. J.B. Martin & Sons Farms, Inc.*, a Texas contractor recruited Arizona workers for a New York farm. 287 F.3d 1182, 1186–87 (9th Cir. 2002). The workers brought employment claims in Arizona, and the Ninth Circuit found specific jurisdiction over the New York farm because of its recruitment of Arizonans—even though all work was performed in New York. *Id.* at 1189–93. Other cases have reached similar conclusions. *See Davis* , 2013 WL 2147468, at \*6; *Potts v. Cameron Offshore Boats, Inc.*, 401 F. Supp. 2d 733, 737–38 (S.D. Tex. 2005) (recruiting employees in a state sufficient for specific jurisdiction even though work performed in another state).[61] Unlike the Supreme Court's *Walden* decision, these cases involved far more activities directed at the forum state.

Here, in addition to applying the employment policies in the state, PJ Defendants purposefully directed activities at California by systematically recruiting California amateurs. Every PJ Defendant drafted California amateurs every year for the last 6 years, and PJ Defendants averaged 7.2 California draft picks per team per year.[62] Both before and after PJ Defendants select California minor leaguers, their scouts and employees communicate with them and induce them into signing the uniform contracts at issue while they reside in California.[63] This recruitment goes far beyond the acts in *Walden*, 134 S. Ct. at 1124–25, and it alone supports specific jurisdiction, *see, e.g.*, *Ochoa*, 287 F.3d at 1189–93; *Davis*, 2013 WL 2147468, at \*6; *cf. GT Sec., Inc. v. Klastech GmbH*, C-13-03090 JCS, 2014 WL 2928013, at \*13–14 (N.D. Cal. June 27, 2014) (Spero, J.) (discussing *Walden* and finding specific jurisdiction over a German company that formed a continuing relationship with a California company).

---

[61] *See also Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1087–88 (9th Cir. 2000), *holding modified on other grounds by Yahoo!*, 433 F.3d 1199 (express aiming satisfied when a company knowingly targets a state's residents); *Dole Food Co. v. Watts*, 303 F.3d 1104, 1112 (9th Cir. 2002) (same).

[62] *See supra* Factual Background, "Defendants' systematic recruitment of California's minor leaguers."

[63] *See id.*

OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

The PJ Defendants argue that their contacts with minor leaguers in California "are simply a function of where players choose to live during the off-season." (Dkt. 281, at 24 of 28). But the PJ Defendants affirmatively decided to target Californians and contract with them. Due to longstanding practices, PJ Defendants knew most of these Californians would return to California during the off-season, where they would then expect them to perform winter work for no pay. *See Wood*, 2010 WL 893647, at 5–6. Several named Plaintiffs and opt-in plaintiffs suffered injuries in California while performing winter training work in California,[64] and all PJ Defendants employ many California minor leaguers in California who perform winter training work for no pay—an average of 24.7 per team based on supplied data.[65] The PJ Defendants affirmatively decided to require their California minor leaguers to perform winter training and to allow them to do so in California instead of at one of their own sites. By arguing otherwise, Defendants mistakenly (and perhaps unscrupulously) conflate purposeful availment with purposeful direction—they cite to personal availment contract cases involving far fewer contacts with the forum state—and the Court should reject the argument.[66]

---

[64] CAC, Dkt. 243, ¶¶ 446, 427 (stating that Matt Gorgen and Kris Watts performed work in California on behalf of the Rays, Pirates, and Nationals); *see also* Watts Decl. ¶¶ 7–9 (Pirates and Nationals). California opt-ins also performed work in California on behalf of PJ Defendants. Lewis Decl. ¶ 5 (Braves); Giarraputo Decl. ¶¶ 5, 6 (White Sox). Relatedly, Ryan Khoury worked an entire season in the California League for the Red Sox. Khoury Decl. ¶ 6.

[65] CAC, Dkt. 243, ¶ 130; *supra* Factual and Procedural Background, "The work performed by minor leaguers in California."

[66] For instance, Defendants cite to *Slepian v. Guerin*, 172 F.3d 58 (9th Cir. 1999). Not only is *Slepian* a pre-2007 unpublished opinion (that cannot be cited, *see* Ninth Circuit Rule 36-3,(c)), but that case applied the purposeful availment test in a contract case, and it did not involve the type of systematic recruitment engaged in by Defendants here or the pervasive contacts with the forum state. The latter point applies to Defendants' other cases as well. *See Novak v. NanoLogix, Inc.*, No. 5:13-CV-01971-EJD, 2014 WL 991119, at *2 (N.D. Cal. Mar. 11, 2014) (breach of contract case applying purposeful availment in the context of far fewer forum contacts); *SRE-Cheaptrips, Inc. v. Media Synergy Grp.*, LLC, No. CV 09-00622-S-EJL, 2010 WL 1913589, at *3 (D. Idaho May 12, 2010) (contract case applying purposeful availment in the context of far fewer forum contacts); *cf. Hall v. Nat'l Basketball Ass'n*, 651 F. Supp. 335, 339 (D. Kan. 1987) (involving far fewer contacts, failing to apply the *Calder* effects test, and instead applying the availment test).

Lastly, Defendants are wrong in arguing that the court cannot consider "contacts with unnamed putative class members."[67] Dkt. 281, at 23 of 28. It is axiomatic that all of the PJ Defendants' California contacts related to the lawsuit must factor into the jurisdictional analysis— whether with named Plaintiffs, putative class members, or otherwise. *See Yahoo!*, 433 F.3d at 1207 ("[W]e must evaluate all of a defendant's contacts with the forum state, whether or not those contacts involve wrongful activity by the defendant."); *McCluskey v. Belford High Sch.*, 795 F. Supp. 2d 608, 622 (E.D. Mich. 2010) (examining contacts with non-plaintiffs for specific jurisdiction); *see also Bristol-Myers Squibb Co. v. Superior Court*, 228 Cal. App. 4th 605, 633–37 (Cal. Ct. App. 2014), *review granted and decision superseded*, No. S221038, 2014 WL 6474924 (Cal. Nov. 19, 2014) (finding that contacts with non-plaintiffs should be examined, especially since injuries occurred as a result of a common effort). As the Supreme Court first stated in *International Shoe*, and as it has consistently stated since, specific jurisdiction exists when the claims "arise out of *or are connected*" to the defendant's intrastate activities. 326 U.S. at 319 (emphasis added); *accord Burger King Corp.*, 471 U.S. at 472 ("arises out of *or relates*") (emphasis added). The Supreme Court's recent decision in *Walden* further supports this approach, 134 S. Ct. at 1123 (saying the defendant's contacts "may be intertwined" with "the plaintiff *or other parties*," and the defendant's contacts with the state need not even be with the plaintiff (emphasis added)), and *Yahoo!*'s sliding scale of relatedness also supports the approach, 433 F.3d at 1210. To argue the contrary, Defendants cite only to a venue decision, and adopting their view would conflict with binding doctrine because it would ignore relevant contacts with California.[68]

---

[67] Such an argument fails immediately with several PJ Defendants. The Nationals, Rays, and Pirates directly employed named Plaintiffs who were residents of California, and who suffered harm in California at Defendants' direction. Dkt. 243, ¶ 446 (Gorgen); Watts Decl. ¶¶ 6-9. Other PJ Defendants employed opt-in plaintiffs from California. *See* Giarraputo Decl. ¶ 6; Lewis Decl. ¶ 5. Ryan Khoury worked an entire season in California at the Red Sox's direction. Khoury Decl. ¶ 6.

[68] Defendants point only to *Ambriz v. Coca Cola* for the proposition that solely contacts with named plaintiffs matter in a class action. 13-CV-03539-JST, 2014 WL 296159 (N.D. Cal. Jan. 27, 2014). Not only is *Ambriz* a non-controlling decision, but it was also a venue decision instead of a personal jurisdiction decision. Adopting such a narrow view in the personal jurisdiction context would wrongly focus on the plaintiff's contacts with the state instead of the defendant's contacts with the state, which would run afoul of the U.S. Supreme Court, Ninth Circuit, and California state doctrine discussed (footnote continued)

OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

PJ Defendants knowingly targeted Californians and applied the policies to Californians performing work within California. They purposefully directed activities towards California.

### B.  The claims are related to the PJ Defendants' activities in the state.

The "arising out of or related to" requirement is a low bar in the Ninth Circuit. It simply requires some nexus between the claims and the company's activities—a "but for" test. *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 385 (9th Cir. 1990) *overruled on other grounds by Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991). As *Shute* states, "A more restrictive view would represent an unwarranted departure from the core concepts of 'fair play and substantial justice' which are central to due process analysis..." *Id.* at 385–86. In wage and hour cases, this test is "easily satisfied" by simply showing some nexus between the policies and the harm. *Enriquez*, 2012 WL 3800801, at *5 (but for the overtime policies, there would be no overtime claims); *Telles*, 2013 WL 5199811, at *5 (same).

Here, there is a clear nexus between the PJ Defendants' policies (relating to recruitment and employment of California minor leaguers), the harm (relating to their failure to pay minimum wage and overtime to these minor leaguers), and the claims (for violations of wage and hour laws). But for Defendants' uniform policies applied in California, there would be no harm to minor leaguers in California—and no claims. Defendants' collective decision to require unpaid California winter work and to not pay minimum wage or overtime for the long in-season work in California led directly to these claims. Defendants' statement (Dkt. 283, at 26) that the "alleged injuries would have occurred regardless of whether" Defendants had employees in California is simply wrong: Defendants' recruitment of California residents, communications with California residents, and application of policies enabled this harm to occur. The PJ Defendants employed many Californians who performed

---

above. After all, when a company has extensive, longstanding contacts in a state, it is fair and reasonable to expect that company to answer to lawsuits in that forum that relate to the company's contacts. *See Keeton*, 465 U.S. at 781 ("Where… [Hustler] has continuously and deliberately exploited the New Hampshire market, it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine.").

(and continue to perform) substantial winter training work in this state for no pay. But for the recruitment and the uniform policies implemented in this state, the harm would not have occurred.

### C.  It is reasonable to litigate this case in this District rather than litigating it in a piecemeal fashion in other forums.

Once a plaintiff establishes the first two prongs of the test, the burden shifts to the defendant to show the unreasonableness of exercising jurisdiction. *Dole Food*, 303 F.3d at 1111. Reasonableness is presumed unless a defendant makes "a compelling case to the contrary." *Ochoa*, 287 F.3d at 1192 (citing *Burger King*, 471 U.S. at 477). Courts analyze seven factors:

> (1) the extent of the defendants' purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Davis*, 2013 WL 2147468, at *8 (*citing Dole Food*, 303 F.3d at 1114).

These factors strongly favor exercising jurisdiction over PJ Defendants in California, where the case has been pending for almost a year and where PJ Defendants all have substantial contacts.

*Extent of purposeful interjection.* If a plaintiff meets the purposeful direction prong, then this factor weighs in favor of reasonableness. *Enriquez*, 2012 WL 3800801, at *6. All PJ Defendants have employees based in California to recruit California minor leaguers; all routinely sign California minor leaguers to contracts; and all have California minor leaguers performing work in California for no pay. This factor strongly supports a finding of reasonableness.

*The burden of defending here.* In order for the burden to be unreasonable, it must be "'so gravely difficult and inconvenient" that it violates due process." *Enriquez*, 2012 WL 3800801, at *6 (quoting *Burger King*, 471 U.S. at 485). The court must consider both burdens on the defendant and on the plaintiff. *Ochoa*, 287 F.3d at 1192. If re-filing in another jurisdiction would burden the plaintiff, then it would be unreasonable to dismiss the complaint. *Id.*

Here, seven Plaintiffs live in California, including some who were employed by PJ Defendants, and 22 of 34 Plaintiffs live west of the Mississippi. The Plaintiffs have far fewer resources

OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

and means than the PJ Defendants, who regularly travel to California. *See Enriquez*, 2012 WL 3800801, at *6 (finding little burden since defendant regularly traveled to California). All Defendants are currently gathering in California for their largest industry meeting. Except for the Orioles, all are represented by the same counsel, so there will be little additional burden (or cost) for PJ Defendants to defend this case in this District; conversely, filing a new case based on identical facts in multiple districts against the PJ Defendants would be substantially more burdensome and inefficient. Thus, Defendants' burden is low. *Ochoa*, 287 F.3d at 1192. ("Appellants' burden in suing…in New York far outweighs Martin Farms' burden in defending…in Arizona.").

*The extent of sovereignty conflicts.* This factor is neutral because no apparent conflict exists.

*California's interest in adjudicating this dispute.* California "unquestionably has a strong interest in protecting its residents from injury and in furnishing a forum where their injuries may be remedied." *Ochoa*, 287 F.3d at 1193. After all, a state has an interest in protecting its residents "from being exploited by out-of-state employers." *Id.* While residents from states throughout the country are also harmed by Defendants' practices, more California residents are harmed than residents in any other state because many more minor leaguers come from California than any other state. Thus, California has a stronger interest in adjudicating this dispute than any other state.

*The most efficient judicial resolution.* Importantly, it would be most efficient to litigate this dispute within a single district. *See Enriquez*, 2012 WL 3800801, at *7 ("[I]t is more efficient to resolve these claims in one, rather than two forums."). Plaintiffs seek to bring suit against all Defendants for a collusive scheme affecting all similarly-situated minor leaguers. Far more Defendants are based here than any other state, far more Plaintiffs reside here than any other state, and more minor leaguers come from California than any other state. As the epicenter of harm, California is the most appropriate forum. Also, the majority of Defendants have already answered the complaint, so the case will proceed against them regardless of whether the Court grants the motion to dismiss. A dismissal would merely necessitate highly inefficient, piecemeal litigation, which would risk disparate rulings on identical factual and legal issues. This case has already been filed here and made progress here, so this

forum is most efficient for adjudication. *See Davis*, 2013 WL 2147468, at \*8 ("[T]his Court is the most efficient forum for resolution of this controversy, as the case has already been filed here.").

*The importance of the forum to plaintiffs.* Three named Plaintiffs live within this District. Far more Plaintiffs (7) live in California than any state. The forum is certainly important for these Plaintiffs. *See Davis*, 2013 WL 2147468, at \*8. Also, over half of Plaintiffs suffered alleged harm in California either during the season or during winter training, which heightens the forum's importance.

*The existence of an alternative forum.* Given that far more named Plaintiffs are in California than in any other state, more Defendants are headquartered in California than in any other state, and more minor leaguers come from California than any other state, no other forum would be as convenient as California. Also, asking Plaintiffs to litigate in a piecemeal fashion would be highly inefficient, especially since, with the exception of the Orioles, all Defendants share the same counsel.

These factors demonstrate that Defendants cannot demonstrate a compelling burden, and the Court should find that it has specific jurisdiction over all PJ Defendants.

## CONCLUSION

All PJ Defendants have longstanding, systematic contacts with California, and most contacts—such as the recruitment of youths from this state and employment of minor leaguers within the state—relate to this lawsuit. It is fair and just to subject the PJ Defendants to the jurisdiction of this Court, and Plaintiffs respectfully request that the Court deny the motion.

DATED: December 15, 2014                              Respectfully submitted,

        */s/ Garrett R. Broshuis*

PEARSON, SIMON & WARSHAW LLP
Bruce L. Simon
Daniel L. Warshaw
Bobby Pouya
Benjamin E. Shiftan

KOREIN TILLERY, LLC
Stephen M. Tillery
George A. Zelcs
 Giuseppe S. Giardina
Garrett R. Broshuis

*Plaintiffs Interim Co-Lead Class Counsel*