1  STEPHEN M. TILLERY (*pro hac vice*)
      stillery@koreintillery.com
2  GARRETT R. BROSHUIS (*pro hac vice*)
      gbroshuis@koreintillery.com
3  ~~GIUSEPPE S. GIARDINA~~AARON ZIGLER (*pro hac vice pending*)
      ~~ggiardina~~azigler@koreintillery.com
4  **KOREIN TILLERY, LLC**
   505 North 7th Street, Suite 3600
5  St. Louis, MO 63101
   Telephone:  (314) 241-4844
6  Facsimile: (314) 241-3525

7  GEORGE A. ZELCS (*pro hac vice*)
      gzelcs@koreintillery.com
8  **KOREIN TILLERY, LLC**
   205 North Michigan, Suite 1950
9  Chicago, IL  60601
   Telephone: (312) 641-9750
10

11 BRUCE L. SIMON (Bar No. 96241)                  Facsimile: (415) 7433-9008
      bsimon@pswlaw.com                            DANIEL L. WARSHAW (Bar No. 185365)
12 BENJAMIN E. SHIFTAN (Bar No. 265767)               dwarshaw@pswlaw.com
      bshiftan@pswlaw.com                          BOBBY POUYA (Bar No. 245527)
13 CLAY STOCKTON (Bar No. 284213)                     bpouya@pswlaw.com
      cstockton@pswlaw.com                         **PEARSON, SIMON & WARSHAW, LLP**
14 **PEARSON, SIMON & WARSHAW, LLP**                15165 Ventura Boulevard, Suite 400
   44 Montgomery Street, Suite 2450                Sherman Oaks, California 91403
15 San Francisco, CA 94104                         Telephone:  (818) 788-8300
   Telephone:  (415) 433-9000                      Facsimile: (818) 788-8104

16

17 Plaintiffs' Interim Co-Lead Class Counsel

18                   **UNITED STATES DISTRICT COURT**

19      **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

20 AARON SENNE, MICHAEL LIBERTO,           CASE NO. 3:14-cv-00608-~~RS~~JCS (consolidated
   OLIVER ODLE, BRAD MCATEE, CRAIG         with 3:14-cv-03289-~~RS~~JCS)
21 BENNIGSON, MATT LAWSON, KYLE
   WOODRUFF, RYAN KIEL, KYLE               **CLASS ACTION**
22 NICHOLSON, BRAD STONE, MATT
   DALY, AARON MEADE, JUSTIN MURRAY,       **[PROPOSED] SECOND**
23 JAKE KAHAULELIO, RYAN KHOURY,           **CONSOLIDATED AMENDED**
   DUSTIN PEASE, JEFF NADEAU, JON          **COMPLAINT FOR VIOLATIONS OF**
24 GASTON, BRANDON HENDERSON,  TIM         **FEDERAL AND STATE WAGE AND**
   PAHUTA, LES SMITH, JOSEPH NEWBY,        **HOUR LAWS**
25 RYAN HUTSON, MATT FREVERT,
   ROBERTO ORTIZ, WITER JIMENEZ, KRIS      **JURY TRIAL DEMANDED**
26 WATTS, MITCH HILLIGOSS, MATT
   GORGEN, BRETT NEWSOME, JAKE
27 OPITZ, DANIEL BRITT, JOEL WEEKS, ~~and~~
   ~~GASPAR SANTIAGO~~GASPAR SANTIAGO,
28 MATT LEWIS, NICK GIARRAPUTO,

861070.1

| | |
|---|---|
| 1 | LEONARD DAVIS, DAVID QUINOWSKI, MARK WAGNER, BRANDON PINCKNEY, LAUREN GAGNIER, OMAR AGUILAR, AND GRANT DUFF, Individually and on Behalf of All Those Similarly Situated, |
| 2 | |
| 3 | |
| 4 | Plaintiffs, |
| 5 | vs. |
| 6 | OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as MAJOR LEAGUE BASEBALL; ALLAN HUBER "BUD" SELIG; KANSAS CITY ROYALS BASEBALL CORP.; MIAMI MARLINS, L.P.; SAN FRANCISCO BASEBALL ASSOCIATES LLC; BOSTON RED SOX BASEBALL CLUB L.P.; ANGELS BASEBALL LP; CHICAGO WHITE SOX LTD.; ST. LOUIS CARDINALS, LLC; COLORADO ROCKIES BASEBALL CLUB, LTD.; THE BASEBALL CLUB OF SEATTLE, LLLP; THE CINCINNATI REDS, LLC; HOUSTON BASEBALL PARTNERS LLC; ATHLETICS INVESTMENT GROUP, LLC; ROGERS BLUE JAYS BASEBALL PARTNERSHIP; CLEVELAND INDIANS BASEBALL CO., L.P.; CLEVELAND INDIANS BASEBALL CO., INC.; PADRES L.P.; SAN DIEGO PADRES BASEBALL CLUB, L.P.; MINNESOTA TWINS, LLC; WASHINGTON NATIONALS BASEBALL CLUB, LLC; DETROIT TIGERS, INC.; LOS ANGELES DODGERS LLC; LOS ANGELES DODGERS HOLDING COMPANY LLC; STERLING METS L.P.; ATLANTA NATIONAL LEAGUE BASEBALL CLUB, INC.; AZPB L.P.; BALTIMORE ORIOLES, INC.; BALTIMORE ORIOLES, L.P.; THE PHILLIES; PITTSBURGH ASSOCIATES, LP,; NEW YORK YANKEES P'SHIP; TAMPA BAY RAYS BASEBALL LTD.; RANGERS BASEBALL EXPRESS, LLC; RANGERS BASEBALL, LLC; CHICAGO CUBS BASEBALL CLUB, LLC; MILWAUKEE BREWERS BASEBALL CLUB, INC.; MILWAUKEE BREWERS BASEBALL CLUB, L.P.; |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | Defendants. |
| 27 | |
| 28 | |

861070.1

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. NATURE AND BACKGROUND OF SUIT ........................................................................1

II. PARTIES .............................................................................................................................5

III. CLASS ACTION ALLEGATIONS .....................................................................................20

IV. COLLECTIVE ACTION ALLEGATIONS ..........................................................................26

V. JURISDICTION, VENUE, AND COMMERCE .................................................................26

VI. FACTUAL ALLEGATIONS ...............................................................................................28

VII. FEDERAL WAGE AND HOUR VIOLATIONS................................................................82~~82~~

VIII. STATE WAGE AND HOUR VIOLATIONS ......................................................................84~~84~~

IX. PRAYER FOR RELIEF.......................................................................................................109~~108~~

X. DEMAND FOR JURY TRIAL............................................................................................112

# I.  NATURE AND BACKGROUND OF SUIT

1. The collective Defendants[1] are either members of or govern the cartel known as Major League Baseball ("MLB"). The organization traces its roots to the nineteenth century. Unfortunately for many of its employees, its wage and labor practices remain stuck there.

2. MLB's longstanding exemption from the United States' antitrust laws allows it to openly collude on the working conditions for the development of its chief commodity: young baseball players.[2] This antitrust exemption, however, in no way provides an exemption from the federal and state wage and hour laws that the Defendants routinely violate.

3. MLB has a long, infamous history of labor exploitation dating to its inception. To hoard players and depress salaries during its early years, the cartel inserted a provision (known as the reserve clause) into players' contracts that allowed teams to retain the contractual rights to players for their entire careers. Moreover, it quickly quashed any rival leagues, which preserved MLB's system of artificially low salaries and nonexistent contractual mobility.

4. Players at the highest level of the game ("major leaguers") eventually unionized to counteract MLB's collusive power. Since negotiating sports' first collective bargaining agreement in 1968, major leaguers have enjoyed increased contractual mobility and an explosion in salaries. For instance, the most recent collective bargaining agreement negotiated by the union representing major leaguers—the Major League Baseball Players' Association ("MLBPA")—requires Defendants to pay major leaguers a minimum of $500,000 per season.

5. Unlike the major leaguers, players in the minor leagues ("minor leaguers") have no union, even though they comprise the overwhelming majority of baseball players employed by the Defendants. The MLBPA does not represent the interests of minor leaguers.

6. Efforts to unionize minor leaguers have been unsuccessful because minor leaguers fear retaliation by the seemingly omnipotent Defendants. Striving towards a lifelong dream of playing in

---

[1] The term "Defendants" applies to all defendants named in this Complaint.

[2] Plaintiffs' Complaint does not allege violations of antitrust laws.

1  the major leagues, minor leaguers are reluctant to upset the status quo. As one minor leaguer, Dan

2  Peltier, testified before Congress not long ago, "[W]hat minor league player is going to jeopardize his

3  career by challenging the system?"[3]

4        7. Mr. Peltier further testified:

5        [It is] very much like the indentured servitude of the 1700's. When you first sign, you
         are owned by that team for basically 7 seasons. A team can buy you, sell you, send you

6        to another country, or fire you whenever they want. They can cut you if you get hurt.
         A player, on the other hand, cannot try to play for someone else. He can't try out for

7        his home team. You have to play for the team that drafted you even if they are loaded
         at your position….[T]his obsession with making the majors should not be a

8        justification for the current treatment of minor league players, and I certainly hope it
         would not be used as an excuse to give major league and minor league owners a legal

9        blank check.[4]

10       8. The Defendants have preyed upon minor leaguers, who are powerless to combat the

11  collusive power of the MLB cartel. MLB continues to actively and openly collude on many aspects of

12  minor leaguers' working conditions, including, but not limited to, wages, contract terms, drug testing,

13  and discipline. For example, while major leaguers' salaries have increased by more than 2,000 percent

14  since 1976, minor leaguers' salaries have, on average, increased only 75 percent since that time.

15  Meanwhile inflation has risen by more than 400 percent over that same time period.

16       9. Through this collective exercise of power, MLB has suppressed minor leaguers' wages in

17  violation of federal and state law. Most minor leaguers earn between around $3,000 and $7,500 for *the*

18  *entire year* despite routinely working over 50 hours per week (and sometimes 70 hours per week) during

19  the roughly five-month championship season. They receive no overtime pay, and instead routinely

20  receive less than minimum wage during the championship season.

21       10. Worse still, the Defendants have conspired to pay no wages at all for significant periods of

22  minor leaguers' work. Consistent with MLB's rules,[5] the Defendants do not pay minor leaguers their

23  salaries during spring training, even though the Defendants require minor leaguers to often work over

24

25  [3] *Major League Baseball Antitrust Reform, Hearing on S. 53 Before the S. Comm. on the Judiciary*, 105th Cong.
    13–15 (June 17, 1997) (Testimony of Dan Peltier, Former Baseball Player).

26

27  [4] *Id.*

    [5] *See* Exhibit A, Major League Rules ("MLR") Attachment 3, UPC ¶ VII.D.

28

1    fifty hours per week during spring training. Similarly, the Defendants do not pay salaries during other

2    training periods such as instructional leagues[6] and winter training.

3         11. These wage violations force many minor leaguers to live in poverty. The minor leaguers

4    sometimes cram 5 or 6 players—occasionally with wives and children—into a small apartment, often

5    using air mattresses or couches as beds. Other minor leaguers live in the basements of host families

6    during the season, sleeping on futons.

7         12. Recent government investigations illustrate that MLB's illegal wage and labor practices are

8    rampant. In 2013, one of the Defendants settled a U.S. Department of Labor ("DOL") action for

9    illegally compensating clubhouse employees. The DOL is currently conducting other investigations

10   for similar conduct across the industry. In addition to the government investigations, private litigation

11   has been instituted against MLB for wage and hour violations involving the use of unpaid employees.

12        13. According to a recent MLB memo, the DOL has stated that wage and hour violations "are

13   endemic to [the] industry."[7] Recognizing the effect of the Defendants' centralized power on employee

14   wages, the DOL made a presentation to the Defendants at their 2013 Winter Meetings concerning the

15   Franchises' possible violations of federal and state wage and hour laws.

16        14. The Defendants have been on notice that they are not exempt from federal minimum

17   wage and overtime requirements since at least 1995 and 1998, when the Sixth Circuit issued a pair of

18   decisions making clear that the industry is not exempt.[8] Yet wage abuses continue, as the Defendants

19   continue to misclassify workers and willfully violate federal and state laws.

20        15. Congress passed the Fair Labor Standards Act[9] ("FLSA") in 1938 to protect workers from

21   the types of wage and labor abuses experienced by minor leaguers. As President Franklin D.

22

23   [6] At the end of each championship season, each MLB Franchise selects around 30–45 players to participate in an instructional league to further hone the minor leaguers' skills. The Franchises generally host the instructional league at their spring training sites. It usually lasts around one month.

24

25   [7] *See* Memorandum from Robert D. Manfred Jr. to All Presidents and Club Counsel, Sept. 12, 2013, *available at* http://www.fairwarning.org/wp-content/uploads/2013/10/Sept.-12memo.pdf.

26   [8] *See Bridewell v. The Cincinnati Reds*, 68 F.3d 136, 139 (6th Cir. 1995), *cert. denied*, 516 U.S. 1172 (1996); *Bridewell v. The Cincinnati Reds*, 155 F.3d 828, 829 (6th Cir. 1998).

27   [9] 29 U.S.C. §§ 201 *et seq.*

28

1  Roosevelt said prior to its passage, "[The Act must] protect workers unable to protect themselves

2  from excessively low wages and excessively long hours . . . . [and] should reiterate the oft-repeated

3  pledge of political parties that labor is not a mere commodity."[10]

4      16. As is permitted by the FLSA, many states have also passed wage and hour laws to further

5  these protections.[11]

6      17. This suit seeks to recoup the damages sustained by minor leaguers as a result of MLB's

7  illegal wage and labor practices. It seeks to recover damages through a nationwide FLSA collective

8  action. It also seeks to recover complementary class action damages under the state laws of California

9  (where five of the Defendants are located; where an entire minor league, the California League,

10  operates; and where hundreds of minor leaguers work during the winter), as well as Florida, Arizona,[12]

11  North Carolina, New York, Pennsylvania, Maryland, and Oregon.[13]

12      18. Moreover, this suit seeks to enjoin the cartel known as MLB from subjecting future minor

13  leaguers to Defendants' illegal wage and labor practices.

14

15

16

17

18

19

20

21  [10] *See* Message from the President of the United States to the Congress of the United States, Nov. 15,

22  1937, at 3, 6.

23  [11] The Act contains a savings clause that allows states to enact more protective wage and hour laws. 29

24  U.S.C. § 218(a). Consequently, actions may be brought simultaneously under both state and federal
law. *See Busk v. Integrity Staffing Solutions, Inc.*, 713 F.3d 525, 528–30 (9th Cir. 2013) (stating that both a
collective action under the FLSA and a class action under state law may be brought in the same

25  action).

26  [12] All members of the cartel maintain spring training sites in Florida and Arizona and many minor
league teams operate within these two states.

27  [13] Minor league work occurs in these states.

28

4
COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

## II.  PARTIES

1.        **Plaintiffs**

19. Plaintiff and representative plaintiff Aaron Senne is a former minor leaguer who worked in the Florida Marlins' organization from 2010 to 2013. Mr. Senne is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Senne currently resides in Rochester, Minnesota. Mr. Senne is a representative plaintiff for the Minor League Collective, the Florida Class, the North Carolina Class, and the New York Class.

20. Plaintiff and representative plaintiff Michael Liberto is a former minor leaguer who worked in the Kansas City Royals' organization from 2010 to 2013. Mr. Liberto is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Liberto currently resides in The Woodlands, Texas. Mr. Liberto is a representative plaintiff for the Minor League Collective and the Arizona Class.

21. Plaintiff and representative plaintiff Oliver Odle is a former minor leaguer who worked in the San Francisco Giants' organization from 2007 to 2011. Mr. Odle is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Odle currently resides in Pryor, Oklahoma. Mr. Odle is a representative plaintiff for the Minor League Collective, the California Class, and the Arizona Class.

22. Plaintiff and representative plaintiff Brad McAtee is a former minor leaguer who worked in the Colorado Rockies' organization from 2008 to 2011. Mr. McAtee is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. McAtee currently resides in Brooklyn, New York. Mr. McAtee is a representative plaintiff for the Minor League Collective, the California Class, the New York Class, and the Arizona Class.

23. Plaintiff and representative plaintiff Craig Bennigson is a former minor leaguer who worked in the Colorado Rockies' organization from 2008 to 2013. Mr. Bennigson is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Bennigson currently resides in Benicia, California. Mr. Bennigson is a representative plaintiff for the Minor League Collective, the California Class, the North Carolina Class, and the Arizona Class.

24. Plaintiff and representative plaintiff Matt Lawson is a minor leaguer who worked in the

1  Texas Rangers' organization from 2007 to 2010; the Seattle Mariners' organization from 2010 to 2011;

2  and the Cleveland Indians' organization from 2011 to present. Mr. Lawson is a covered employee

3  within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Lawson currently

4  resides in Springfield, Missouri. Mr. Lawson is a representative plaintiff for the Minor League

5  Collective and the Arizona Class.

6      25. Plaintiff and representative plaintiff Kyle Woodruff is a former minor leaguer who worked

7  in the San Francisco Giants' organization from 2008 to 2011. Mr. Woodruff is a covered employee

8  within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Woodruff currently

9  resides in San Jose, California. Mr. Woodruff is a representative plaintiff for the Minor League

10  Collective, the California Class, and the Arizona Class.

11      26. Plaintiff and representative plaintiff Ryan Kiel is a former minor leaguer who worked in

12  the Seattle Mariners' organization from 2010 to 2012 and the Cincinnati Reds' organization in 2012.

13  Mr. Kiel is a covered employee within the meaning of the FLSA and the applicable state wage and

14  hour laws. Mr. Kiel currently resides in Melbourne, Florida. Mr. Kiel is a representative plaintiff for

15  the Minor League Collective, the California Class, the Florida Class, and the Arizona Class.

16      27. Plaintiff and representative plaintiff Kyle Nicholson is a former minor leaguer who

17  worked in the San Francisco Giants' organization from 2007 to 2011. Mr. Nicholson is a covered

18  employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr.

19  Nicholson currently resides in Benton, Louisiana. Mr. Nicholson is a representative plaintiff for the

20  California Class.

21      28. Plaintiff and representative plaintiff Brad Stone is a former minor leaguer who worked in

22  the Miami Marlins' organization from 2006 to 2011. Mr. Stone is a covered employee within the

23  meaning of the FLSA and the applicable state wage and hour laws. Mr. Stone currently resides in St.

24  Louis, Missouri. Mr. Stone is a representative plaintiff for the Minor League Collective and the Florida

25  Class.

26      29. Plaintiff and representative plaintiff Matt Daly is a former minor leaguer who worked in

27  the Toronto Blue Jays' organization from 2008 to 2013. Mr. Daly is a covered employee within the

28  meaning of the FLSA and the applicable state wage and hour laws. Mr. Daly currently resides in

1  Colorado Springs, Colorado. Mr. Daly is a representative plaintiff for the Minor League Collective, the

2  California Class, the New York Class, and the Florida Class.

3      30. Plaintiff and representative plaintiff Aaron Meade is a former minor leaguer who worked

4  in the Los Angeles Angels of Anaheim's organization from 2010 to 2013. Mr. Meade is a covered

5  employee within the meaning of the FLSA and the applicable state wage and hour laws. Mr. Meade

6  currently resides in Springfield, Missouri. Mr. Meade is a representative plaintiff for the Minor League

7  Collective, the California Class, and the Arizona Class.

8      31. Plaintiff and representative plaintiff Justin Murray is a former minor leaguer who worked

9  in the Oakland Athletics' organization from 2008 to 2011. Mr. Murray is a covered employee within

10 the meaning of the FLSA and the applicable state wage and hour laws. Mr. Murray currently resides in

11 Galva, Kansas. Mr. Murray is a representative plaintiff for the Minor League Collective, the California

12 Class, and the Arizona Class.

13     32. Plaintiff and representative plaintiff Jake Kahaulelio is a former minor leaguer who worked

14 in the Cincinnati Reds' organization from 2007 to 2011. Mr. Kahaulelio is a covered employee within

15 the meaning of the FLSA and the applicable state wage and hour laws. Mr. Kahaulelio is a resident of

16 Windsor, California. Mr. Kahaulelio is a representative plaintiff for the Minor League Collective, the

17 California Class, and the Florida Class.

18     33. Plaintiff and representative plaintiff Ryan Khoury is a former minor leaguer who worked

19 in the Boston Red Sox' organization from 2006 to 2011. Mr. Khoury is a covered employee within the

20 meaning of the FLSA and the applicable state wage and hour laws. Mr. Khoury currently resides in

21 Salt Lake City, Utah. Mr. Khoury is a representative plaintiff for the Minor League Collective, the

22 New York Class, and the Florida Class.

23     34. Plaintiff and representative plaintiff Dustin Pease is a former minor leaguer who worked in

24 the San Diego Padres' organization from 2011 to 2013. Mr. Pease is a covered employee within the

25 meaning of the FLSA and the applicable state wage and hour laws. Mr. Pease currently resides in

26 Frederick, Maryland. Mr. Pease is a representative plaintiff for the Minor League Collective, the

27 California Class, and the Arizona Class.

28     35. Plaintiff and representative plaintiff Jeff Nadeau is a former minor leaguer who worked in

1     the St. Louis Cardinals' organization from 2010 to 2012. Mr. Nadeau is a covered employee within the

2     meaning of the FLSA and the applicable state wage and hour laws. Mr. Nadeau currently resides in

3     Westminster, Colorado. Mr. Nadeau is a representative plaintiff for the Minor League Collective and

4     the Florida Class.

5         36. Plaintiff and representative plaintiff Jon Gaston is a former minor leaguer who worked in

6     the Houston Astros' organization from 2008 to 2012 and the Chicago White Sox' organization in

7     2012. Mr. Gaston is a covered employee within the meaning of the FLSA and the applicable state

8     wage and hour laws. Mr. Gaston currently resides in Boise, Idaho. Mr. Gaston is a representative

9     plaintiff for the Minor League Collective, the Florida Class, the New York Class, and the Arizona

10    Class.

11        37. Plaintiff and representative plaintiff Brandon Henderson is a former minor leaguer who

12    worked in the Minnesota Twins' organization from 2010 to 2011. Mr. Henderson is a covered

13    employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently

14    resides in Madera, California. Mr. Henderson is a representative plaintiff for the Minor League

15    Collective, the Florida Class, and the California Class.

16        38. Plaintiff and representative plaintiff Tim Pahuta is a former minor leaguer who worked in

17    the Washington Nationals' organization from 2005 to 2012. Mr. Pahuta is a covered employee within

18    the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in

19    Whitehouse Station, New Jersey. Mr. Pahuta is a representative plaintiff for the Minor League

20    Collective, the Florida Class, and the Pennsylvania Class.

21        39. Plaintiff and representative plaintiff Les Smith is a former minor leaguer who worked in

22    the Detroit Tigers' organization from 2010 to 2012. Mr. Smith is a covered employee within the

23    meaning of the FLSA and the applicable state wage and hour laws. He currently resides in

24    Murfreesboro, Tennessee. Mr. Smith is a representative plaintiff for the Minor League Collective and

25    the Florida Class.

26        40. Plaintiff and representative plaintiff Joseph Newby is a former minor leaguer who worked

27    in the Oakland Athletics' organization from 2004 to 2007; the Seattle Mariners' organization in 2009;

28    and the Los Angeles Dodgers' organization in 2011. Mr. Newby is a covered employee within the

meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Evans, Colorado. Mr. Newby is a representative plaintiff for the Minor League Collective, the California Class, and the Arizona Class.

41. Plaintiff and representative plaintiff Ryan Hutson is a former minor leaguer who worked in the New York Mets' organization from 2011 to 2012. Mr. Hutson is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Leander, Texas. Mr. Hutson is a representative plaintiff for the Minor League Collective and the Florida Class.

42. Plaintiff and representative plaintiff Matt Frevert is a former minor leaguer who worked in the St. Louis Cardinals' organization from 2008 to 2011 and the Atlanta Braves' organization in 2011. Mr. Frevert is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Fayette, Missouri. Mr. Frevert is a representative plaintiff for the Minor League Collective and the Florida Class.

43. Plaintiff and representative plaintiff Roberto Ortiz is a former minor leaguer who worked in the Arizona Diamondbacks' organization from 2008 to 2012 and the Baltimore Orioles' organization in 2012. Mr. Ortiz is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Bayamon, Puerto Rico. Mr. Ortiz is a representative plaintiff for the Minor League Collective, the Arizona Class, the Florida Class, and the Maryland Class.

44. Plaintiff and representative plaintiff Witer Jimenez is a former minor leaguer who worked in the Philadelphia Phillies' organization from 2010 to 2011. Mr. Jimenez is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Monroeton, Pennsylvania. Mr. Jimenez is a representative plaintiff for the Minor League Collective and the Florida Class.

45. Plaintiff and representative plaintiff Kris Watts is a former minor leaguer who worked in the Pittsburgh Pirates' organization from 2006 to 2012 and the Washington Nationals' organization from 2012 to 2013. Mr. Watts is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Fremont, California. Mr. Watts is a representative plaintiff for the Minor League Collective, the California Class, the New York Class, the

1    Arizona Class, the Florida Class, and the Pennsylvania Class.

2    46. Plaintiff and representative plaintiff Mitch Hilligoss is a former minor leaguer who worked

3    in the New York Yankees' organization from 2006 to 2010 and the Texas Rangers' organization from

4    2010 to 2011. Mr. Hilligoss is a covered employee within the meaning of the FLSA and the applicable

5    state wage and hour laws. He currently resides in Windsor, Illinois. Mr. Hilligoss is a representative

6    plaintiff for the Minor League Collective, the California Class, the Arizona Class, and the Florida

7    Class.

8    47. Plaintiff and representative plaintiff Matt Gorgen is a former minor leaguer who worked in

9    the Tampa Bay Rays' organization from 2008 to 2010 and the Arizona Diamondbacks' organization

10   from 2010 to 2013. Mr. Gorgen is a covered employee within the meaning of the FLSA and the

11   applicable state wage and hour laws. He currently resides in Scottsdale, Arizona. Mr. Gorgen is a

12   representative plaintiff for the Minor League Collective, the New York Class, the California Class, the

13   Arizona Class, and the Florida Class.

14   48. Plaintiff and representative plaintiff Brett Newsome is a former minor leaguer who

15   worked in the Washington Nationals' organization from 2008 to 2013. Mr. Newsome is a covered

16   employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently

17   resides in Chicago, Illinois. Mr. Newsome is a representative plaintiff for the Minor League Collective,

18   the Florida Class, and the Maryland Class.

19   49. Plaintiff and representative plaintiff Jake Opitz is a former minor leaguer who worked in

20   the Chicago Cubs' organization from 2008 to 2012 and in the Philadelphia Phillies' organization in

21   2012. Mr. Opitz is a covered employee within the meaning of the FLSA and the applicable state wage

22   and hour laws. He currently resides in Centennial, Colorado. Mr. Opitz is a representative plaintiff for

23   the Minor League Collective, the Arizona Class, and the Florida Class.

24   50. Plaintiff and representative plaintiff Daniel Britt is a former minor leaguer who worked in

25   the Milwaukee Brewers' organization from 2010 to 2011. Mr. Britt is a covered employee within the

26   meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Chadbourn,

27   North Carolina. Mr. Britt is a representative plaintiff for the Minor League Collective and the Arizona

28   Class.

51. Plaintiff and representative plaintiff Joel Weeks is a former minor leaguer who worked in the San Francisco Giants' organization from 2008 to 2012. Mr. Weeks is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Torrance, California. Mr. Weeks is a representative plaintiff for the Minor League Collective, the Arizona Class, the California Class, and the Oregon Class.

52. Plaintiff and representative plaintiff Gaspar Santiago is a former minor leaguer who worked in the San Francisco Giants' organization from 2010 to 2013. Mr. Santiago is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Puerto Rico. Mr. Santiago is a representative plaintiff for the Minor League Collective, the Arizona Class, and the Oregon Class.

53. Plaintiff and representative plaintiff Matt Lewis is a former minor leaguer who worked in the Atlanta Braves' organization from 2010 to 2011. Mr. Lewis is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in San Francisco, California. Mr. Lewis is a representative plaintiff for the Minor League Collective, the Florida Class, and the California Class.

54. Plaintiff and representative plaintiff Nick Giarraputo is a former minor leaguer who worked in the New York Mets' organization from 2006 to 2010, and in the Chicago White Sox' organization in 2013. Mr. Giarraputo is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Simi Valley, California. Mr. Giarraputo is a representative plaintiff for the Minor League Collective, the Arizona Class, the California Class, the Florida Class, and the New York Class.

55. Plaintiff and representative plaintiff Leonard Davis is a former minor leaguer who worked in the Washington Nationals' organization from 2004 to 2010 and in 2011 (including its predecessor the Montreal Expos); he also worked in the Toronto Blue Jays' organization in 2011 and the Colorado Rockies' organization from 2011 to 2012. Mr. Davis is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Hanford, California. Mr. Davis is a representative plaintiff for the Minor League Collective, the Florida Class, the New York Class, the California Class, the Arizona Class, and the Pennsylvania Class.

56. Plaintiff and representative plaintiff David Quinowski is a former minor leaguer who worked in the San Francisco Giants' organization from 2005 to 2012, and in the Baltimore Orioles' organization in 2013. Mr. Quinowski is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Colton, California. Mr. Quinowski is a representative plaintiff for the Minor League Collective, the Arizona Class, the California Class, the Florida Class, and the Oregon Class.

57. Plaintiff and representative plaintiff Mark Wagner is a former minor leaguer who worked in the Boston Red Sox' organization from 2005 to 2011, and in the San Francisco Giants' organization in 2013. Mr. Wagner is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Lakewood, California. Mr. Wagner is a representative plaintiff for the Minor League Collective, the California Class, the Florida Class, and the Arizona Class.

58. Plaintiff and representative plaintiff Brandon Pinckney is a former minor leaguer who worked in the Cleveland Indians' organization from 2003 to 2009; the Baltimore Orioles organization in 2009; the Philadelphia Phillies organization in 2010; and the Oakland Athletics' organization in 2010. Mr. Pinckney is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Elk Grove, California. Mr. Pinckney is a representative plaintiff for the California Class and the Florida Class.

59. Plaintiff and representative plaintiff Lauren Gagnier is a former minor leaguer who worked in the Detroit Tigers' organization from 2006 to 2012. Mr. Gagnier is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Santa Cruz, California. Mr. Gagnier is a representative plaintiff for the Minor League Collective, the Florida Class, the California Class, and the Pennsylvania Class.

60. Plaintiff and representative plaintiff Omar Aguilar is a former minor leaguer who worked in the Milwaukee Brewers' organization from 2005 to 2010 and Cleveland Indians' organization from 2010 to 2011. Mr. Aguilar is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Chico, California. Mr. Aguilar is a representative plaintiff for the Minor League Collective, the Arizona Class, the Florida Class, and California Class.

12

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

61. Plaintiff and representative plaintiff Grant Duff is a former minor leaguer who worked in the New York Yankees' organization from 2005 to 2012. Mr. Duff is a covered employee within the meaning of the FLSA and the applicable state wage and hour laws. He currently resides in Mammoth Lakes, California. Mr. Duff is a representative plaintiff for the Minor League Collective, the Florida Class, and the California Class.

## 2. Defendants

~~53.~~62. **The Office of the Commissioner of Baseball, d/b/a MLB.** The Office of the Commissioner of Baseball, doing business as MLB, is an unincorporated association comprised of the thirty Major League baseball clubs ("the Franchises").[14] MLB has unified operation and common control over the Franchises, as well as agent corporations such as Major League Baseball Properties, Inc. and Major League Baseball Enterprises, Inc.[15] All do business as MLB.

~~54.~~63. Under the broad meaning of "employ" used by the FLSA and the applicable state laws, MLB employed (and/or continues to employ) Plaintiffs, all similarly situated employees, and all employees of the proposed classes. As described more thoroughly below, the Defendants' cartel has developed a unified constitution and unified rules to closely control many fundamental aspects of the minor leaguers' employment, including, *inter alia*, hiring, contracts, wages, periods of wage payment and nonpayment, other working conditions, and control over the minor leaguers before, during, and after the championship season.

~~55.~~64. **Allan Huber "Bud" Selig.** Since 1998, Allan Huber "Bud" Selig has served as the Commissioner of Baseball. Mr. Selig is the former owner of an MLB Franchise.

~~56.~~65. The Commissioner is the "Chief Executive Officer of Major League Baseball."[16]

---

[14] *See* Exhibit B, Major League Constitution ("MLC"), Art. II § 1; *see also* ECF No. 25, *City of San Jose, et al. v. Officer of the Commissioner of Baseball*, et al., No. 13-cv-02787-RMW, at n. 2 (N.D. Cal. August 7, 2013).

[15] These entities are not named as Defendants at this time but Plaintiffs reserve the right to name these entities as Defendants if information obtained during the course of this lawsuit connects these entities to the illegal conduct alleged.

[16] MLC Art. II § 2.

1  Serving in this capacity, Mr. Selig has the power to, among other things, discipline players, announce

2  rules and procedures, and preside over meetings.[17]

3  ~~57.~~ 66. Mr. Selig also has "executive responsibility for labor relations,"[18] meaning that Mr. Selig

4  is the chief bargaining agent for the owners during negotiations with the major league union.

5  ~~58.~~ 67. Since he oversees all labor matters, Mr. Selig is also assumedly the chief agent for the

6  owners when it comes to forming labor practices involving minor leaguers, and he owes a duty to the

7  owners to act in their best interest. Moreover, Mr. Selig implements, enforces, and often directs the

8  development of MLB's rules, guidelines, and policies concerning the employment of minor league

9  players.

10  ~~59.~~ 68. Mr. Selig also serves as MLB's agent in numerous other areas. For instance, Mr. Selig

11  serves as "the fiscal agent of the Major League Central Fund"; has the power to "negotiate and enter

12  into settlement agreements" for nationwide broadcasting rights; can receive funds "made payable to

13  the Commissioner as agent for the Clubs"; and can even invest central funds on behalf of the

14  Defendants.[19]

15  ~~60.~~ 69. The MLB owners elect the Commissioner of Baseball by a vote.[20] They also pay the

16  Commissioner's salary.[21]

17  ~~61.~~ 70. Under the broad meaning of "employ" and "employer" used by the FLSA and the

18  applicable state laws, which allow a chief executive to be held jointly and severally liable, Mr. Selig

19  employed (and/or continues to employ) Plaintiffs, all similarly situated employees, and all employees

20  of the proposed classes. As described later in this complaint, Mr. Selig oversees and closely controls

21  many aspects central to the minor leaguers' employment, including, *inter alia*, hiring, contract terms,

22

23  _____

24  [17] MLC Art. II §§ 2, 3.

     [18] MLC Art. II § 2.

25  [19] MLC Art. X; *see also* MLR 30 (saying that all funds in the hands of the Commissioner are joint funds

26  of the MLB Clubs).

     [20] MLC Art. II §§ 8, 9.

27  [21] MLC Art. II § 8.

28

1    discipline and firing, amount of wages, on-field work rules, and when wages are to be paid.[22]

2    62.71. Upon information and belief, and as described more fully below, Mr. Selig also had

3    direct involvement in the formation of programs affecting working conditions for minor leaguers,

4    such as the unilateral implementation of drug testing in 2001 and HGH testing in 2010, as well as the

5    implementation of a system to suppress signing bonuses for minor leaguers entering MLB's

6    developmental system for the first time. The Commissioner also has implemented and oversees a

7    tobacco policy, and all minor leaguers must abide by the policy.[23]

8    63.72. **Franchise Defendants.** The below named MLB franchises are defendants in this

9    lawsuit and referred to collectively as the "Franchise Defendants":

10   64.73. *Kansas City Royals.* Kansas City Royals Baseball Corp. (d/b/a "Kansas City Royals") is

11   an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the

12   Kansas City Royals employed (and/or continue to employ) Plaintiffs, similarly situated employees,

13   and employees of the Proposed Classes.

14   65.74. *Miami Marlins.* Miami Marlins, L.P. (d/b/a "Miami Marlins") is an MLB Franchise. As a

15   member of Major League Baseball, acting jointly and on its own behalf, the Miami Marlins employed

16   (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed

17   Classes. The Miami Marlins were known and operated as the Florida Marlins until changing its name

18   in 2012. Plaintiffs are informed and believe that the Miami Marlins is the successor in interest to the

19   Florida Marlins franchise.

20   

21   _____

22   [22] *See* MLR Attachment 3, Minor League Uniform Player Contract ("UPC") ¶¶ VI (describing the conditions of employment), VII (payment of salaries), XXIII (granting Commissioner right to suspend the contract), XXVI (requiring approval by the Commissioner for the contract to have effect); *see also, e.g.*, Addendum C to MLR Attachment 3 (salary form requiring approval by the Commissioner); MLR 4 (giving Commissioner power to oversee the amateur draft, one of the chief avenues of hiring players); MLR 13 (giving Commissioner the power to suspend players); MLR 3(e) (requiring all contracts to be approved by the Commissioner); MLR 14 (giving Commissioner the power to accept or deny an application for retirement); MLR 15 (giving Commissioner power to place players on an Ineligible List for misconduct, or to take any other disciplinary action in the best interest of baseball).

23   

24   

25   

26   

27   [23] MLR Attachment 3, UPC ¶ VI.E.

28

66.75. *San Francisco Giants.* San Francisco Baseball Associates LLC (d/b/a "San Francisco Giants") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the San Francisco Giants employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

67.76. *Boston Red Sox.* Boston Red Sox Baseball Club L.P. (d/b/a "Boston Red Sox") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Red Sox employed (and/or continue to employ) Plaintiffs, similarly situated employees, and/or employees of the Proposed Classes.

68.77. *Toronto Blue Jays.* Rogers Blue Jays Baseball Partnership (d/b/a "Toronto Blue Jays") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Toronto Blue Jays employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

69.78. *Chicago White Sox.* Chicago White Sox Ltd. (d/b/a "Chicago White Sox") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Chicago White Sox employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

70.79. *Cleveland Indians.* Cleveland Indians Baseball Co., L.P., and Cleveland Indians Baseball Co, Inc., (d/b/a "Cleveland Indians") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Cleveland Indians employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

71.80. *Houston Astros.* Houston Baseball Partners LLC (d/b/a "Houston Astros") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Houston Astros employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

72.81. *Los Angeles Angels of Anaheim.* Angels Baseball LP (d/b/a "Los Angeles Angels of Anaheim") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Los Angeles Angels of Anaheim employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

73.82.  *Oakland Athletics*. Athletics Investment Group, LLC (d/b/a "Oakland Athletics") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Oakland Athletics employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

74.83.  *Seattle Mariners*. The Baseball Club of Seattle, LLLP (d/b/a "Seattle Mariners") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Seattle Mariners employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

75.84.  *Cincinnati Reds*. The Cincinnati Reds, LLC (d/b/a "Cincinnati Reds") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Cincinnati Reds employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

76.85.  *St. Louis Cardinals*. St. Louis Cardinals, LLC (d/b/a "St. Louis Cardinals") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the St. Louis Cardinals employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

77.86.  *Colorado Rockies*. Colorado Rockies Baseball Club, Ltd. (d/b/a "Colorado Rockies") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Colorado Rockies employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

78.87.  *San Diego Padres*. Padres L.P., and the San Diego Padres Baseball Club, L.P. (d/b/a "San Diego Padres") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the San Diego Padres employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

79.88.  *Minnesota Twins*. Minnesota Twins, LLC (d/b/a "Minnesota Twins") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Minnesota Twins employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

80.89. *Washington Nationals.* Washington Nationals Baseball Club, LLC (d/b/a "Washington Nationals") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Washington Nationals employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

81.90. *Detroit Tigers.* Detroit Tigers, Inc. (d/b/a "Detroit Tigers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Detroit Tigers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

82.91. *Los Angeles Dodgers.* Los Angeles Dodgers LLC and Los Angeles Dodgers Holding Company LLC., (d/b/a "Los Angeles Dodgers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Los Angeles Dodgers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

83.92. *New York Mets.* Sterling Mets L.P. (d/b/a "New York Mets") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the New York Mets employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

84.93. *Atlanta Braves.* Atlanta National League Baseball Club, Inc. (d/b/a "Atlanta Braves") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Atlanta Braves employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

85.94. *Arizona Diamondbacks.* AZPB L.P. (d/b/a "Arizona Diamondbacks") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Arizona Diamondbacks employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

86.95. *Baltimore Orioles.* Baltimore Orioles, Inc., and Baltimore Orioles, L.P., (d/b/a "Baltimore Orioles") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Baltimore Orioles employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

87.96.  *Philadelphia Phillies.* The Phillies L.P. (d/b/a "Philadelphia Phillies") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Philadelphia Phillies employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

88.97.  *Pittsburgh Pirates.* Pittsburgh Associates, LP, (d/b/a "Pittsburgh Pirates") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Pittsburgh Pirates employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

89.98.  *New York Yankees.* New York Yankees Partnership (d/b/a "New York Yankees") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the New York Yankees employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

90.99.  *Tampa Bay Rays.* Tampa Bay Rays Baseball Ltd. (d/b/a "Tampa Bay Rays") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Tampa Bay Rays employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

91.100.  *Chicago Cubs.* Chicago Cubs Baseball Club, LLC(d/b/a "Chicago Cubs") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Chicago Cubs employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

92.101.  *Milwaukee Brewers.* Milwaukee Brewers Baseball Club, Inc., and Milwaukee Brewers Baseball Club, L.P., (d/b/a "Milwaukee Brewers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Milwaukee Brewers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

93.102.  *Texas Rangers.* Rangers Baseball Express, LLC, and Rangers Baseball, LLC, (d/b/a "Texas Rangers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Texas Rangers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

1

### III.  CLASS ACTION ALLEGATIONS

2   ~~94.~~103. Plaintiffs bring the state law claims, Counts 3 through 22 of this action, as class

3   actions under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of

4   themselves and all others similarly situated. The classes (collectively "Proposed Classes") are as

5   follows:

6   ~~95.~~104. **California Class.** For Counts 3 through 5 and 7 through 10 (violations of California

7   wage and labor laws and quantum meruit under California law), the California Class is defined as

8   follows: all minor leaguers employed by Defendants under uniform player contracts ("UPC") who

9   worked, will work, and/or continue to work as minor leaguers in the state of California at any time

10  four years before the filing of this action until its resolution, but who had no service time in the major

11  leagues at the time of performing work as a minor leaguer in California. Excluded from the California

12  Class are Defendants and their officers, directors, assigns, and successors, or any individual who has,

13  or who at any time during the class period has had, a controlling interest in Defendants. Also excluded

14  are the Court and any members of the Court's immediate family, counsel for plaintiffs, as well as

15  persons who submit timely and proper requests for exclusion from the California Class.

16  ~~96.~~105. The California Class Representatives consist of Plaintiffs Aaron Meade, Oliver Odle,

17  Kyle Woodruff, Kyle Nicholson, Brandon Henderson, Brad McAtee, Craig Bennigson, Ryan Kiel,

18  Jake Kahaulelio, Justin Murray, Dustin Pease, Mitch Hilligoss, Joseph Newby, Matt Gorgen, Joel

19  Weeks, Matt Daly ~~and Kris Watts~~, Kris Watts, Matt Lewis, Nick Giarraputo, Leonard Davis, David

20  Quinowski, Mark Wagner, Brandon Pinckney, Lauren Gagnier, Omar Aguilar, and Grant Duff.

21  ~~97.~~106. *California Waiting Time Subclass.* Count 6 of this complaint seeks waiting time penalties

22  under California Labor Code § 203 for the withholding of wages after employment ceases.

23  Consequently, Count 6 requires a subclass within the California Class. The California Waiting Time

24  Subclass will consist of the following: all Plaintiffs and members of the California Class whose

25  employment relationship with the Defendants has already ceased, and/or ceases during the course of

26  this action.

27  ~~98.~~107. **Florida Class.** For Counts 11 and 12 (violations of Florida's Minimum Wage Law

28  and quantum meruit under Florida common law), the Florida Class is defined as follows: all minor

1  leaguers employed by Defendants under UPCs who worked, will work, and/or continue to work as

2  minor leaguers in the state of Florida at any time five years before the filing of this action until its

3  resolution, but who had no service time in the major leagues at the time of performing work as a

4  minor leaguer in Florida. Excluded from the Florida Class are Defendants and their officers, directors,

5  assigns, and successors, or any individual who has, or who at any time during the class period has had,

6  a controlling interest in Defendants. Also excluded are the Court and any members of the Court's

7  immediate family, counsel for plaintiffs, as well as persons who submit timely and proper requests for

8  exclusion from the Florida Class.

9        99.108. The Florida Class Representatives consist of Plaintiffs Ryan Khoury, Brandon

10  Henderson, Jeff Nadeau, Ryan Kiel, Jake Kahaulelio, Jon Gaston, Tim Pahuta, Matt Daly, Aaron

11  Senne, Brad Stone, Mitch Hilligoss, Witer Jimenez, Jake Opitz, Ryan Hutson, Les Smith, Matt Frevert,

12  Roberto Ortiz, Brett Newsome, Kris Watts, and Matt GorgenMatt Gorgen, Matt Lewis, Nick

13  Giarraputo, Leonard Davis, David Quinowski, Mark Wagner, Brandon Pinckney, Lauren Gagnier,

14  Omar Aguilar, and Grant Duff.

15        100.109. **Arizona Class.** For Counts 13 to 15 (violations of Arizona wage laws and quantum

16  meruit under Arizona law), the Arizona Class is defined as follows: all minor leaguers employed by

17  Defendants under UPCs who worked, will work, and/or continue to work as minor leaguers in the

18  state of Arizona at any time three years before the filing of this action until its resolution, but who had

19  no service time in the major leagues at the time of performing work as a minor leaguer in Arizona.

20  Excluded from the Arizona Class are Defendants and their officers, directors, assigns, and successors,

21  or any individual who has, or who at any time during the class period has had, a controlling interest in

22  Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel

23  for plaintiffs, as well as persons who submit timely and proper requests for exclusion from the

24  Arizona Class.

25        101.110. The Arizona Class Representatives consist of Plaintiffs Aaron Meade, Jon Gaston,

26  Oliver Odle, Kyle Woodruff, Brad McAtee, Craig Bennigson, Matt Lawson, Ryan Kiel, Justin Murray,

27  Dustin Pease, Michael Liberto, Jake Opitz, Joseph Newby, Mitch Hilligoss, Kris Watts, Roberto

28  Ortiz, Daniel Britt, Joel Weeks, Gaspar Santiago, and Matt GorgenMatt Gorgen, Nick Giarraputo,

21
COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1  Leonard Davis, David Quinowski, Mark Wagner, and Omar Aguilar.

2  102.111. **North Carolina Class.** For Counts 16 to 18 (violations of North Carolina's wage

3  laws and quantum meruit under North Carolina law), the North Carolina Class is defined as follows:

4  all minor leaguers employed by Defendants under UPCs who worked, will work, and/or continue to

5  work as minor leaguers in the state of North Carolina at any time two years before the filing of this

6  action until its resolution, but who had no service time in the major leagues at the time of performing

7  work as a minor leaguer in North Carolina. Excluded from the North Carolina Class are Defendants

8  and their officers, directors, assigns, and successors, or any individual who has, or who at any time

9  during the class period has had, a controlling interest in Defendants. Also excluded are the Court and

10  any members of the Court's immediate family, counsel for plaintiffs, as well as persons who submit

11  timely and proper requests for exclusion from the North Carolina Class.

12  103.112. The North Carolina Class Representatives consist of Craig Bennigson and Aaron

13  Senne.

14  104.113. **New York Class.** For Counts 19 to 22 (violations of New York's wage laws and

15  quantum meruit under New York law), the New York Class is defined as follows: all minor leaguers

16  employed by Defendants under UPCs who worked, will work, and/or continue to work as minor

17  league players in the state of New York at any time six years before the filing of this action until its

18  resolution, but who had no service time in the major leagues at the time of performing work as a

19  minor leaguer in New York. Excluded from the New York Class are Defendants and their officers,

20  directors, assigns, and successors, or any individual who has, or who at any time during the class

21  period has had, a controlling interest in Defendants. Also excluded are the Court and any members of

22  the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper

23  requests for exclusion from the New York Class.

24  105.114. The New York Class Representatives consist of Ryan Khoury, Brad McAtee, Jon

25  Gaston, Matt Daly, Aaron Senne, Kris Watts, and Matt Gorgen, Nick Giarraputo, and Leonard Davis,

26  .

27  106.115. **Pennsylvania Class.** For Counts 23 to 25 (violations of Pennsylvania's wage and

28  hour laws and quantum meruit under Pennsylvania Law) the Pennsylvania Class is defined as follows:

1  all minor leaguers employed by Defendants under UPCs who worked, will work, and/or continue to

2  work as minor league players in the state of Pennsylvania at any time three years before the filing of

3  this action until its resolution, but who had no service time in the major leagues at the time of

4  performing work as a minor leaguer in Pennsylvania. Excluded from the Pennsylvania Class are

5  Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at

6  any time during the class period has had, a controlling interest in Defendants. Also excluded are the

7  Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons

8  who submit timely and proper requests for exclusion from the Pennsylvania Class.

9  107.116. The Pennsylvania Class Representatives consist of Tim Pahuta and, Kris Watts,

10  Leonard Davis, and Lauren Gagnier.

11  108.117. **Maryland Class.** For Counts 26 to 28 (violations of Maryland's wage and hour laws

12  and quantum meruit under Maryland Law), the Maryland Class is defined as follows: all minor

13  leaguers employed by Defendants under UPCs who worked, will work, and/or continue to work as

14  minor league players in the state of Maryland at any time three years before the filing of this action

15  until its resolution, but who had no service time in the major leagues at the time of performing work

16  as a minor leaguer in Maryland. Excluded from the Maryland Class are Defendants and their officers,

17  directors, assigns, and successors, or any individual who has, or who at any time during the class

18  period has had, a controlling interest in Defendants. Also excluded are the Court and any members of

19  the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper

20  requests for exclusion from the Maryland Class.

21  109.118. The Maryland Class Representatives consist of Roberto Ortiz and Brett Newsome.

22  110.119. **Oregon Class.** For Counts 29 to 31 (violations of Oregon wage and hour laws and

23  quantum meruit under Oregon Law), the Oregon Class is defined as follows: all minor leaguers

24  employed by Defendants under UPCs who worked, will work, and/or continue to work as minor

25  league players in the state of Oregon at any time six years before the filing of this action until its

26  resolution, but who had no service time in the major leagues at the time of performing work as a

27  minor leaguer in Oregon. Excluded from the Oregon Class are Defendants and their officers,

28  directors, assigns, and successors, or any individual who has, or who at any time during the class

1  period has had, a controlling interest in Defendants. Also excluded are the Court and any members of

2  the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper

3  requests for exclusion from the Oregon Class.

4      111.120. The Oregon Class Representatives consist of Joel Weeks and, Gaspar Santiago, and

5  David Quinowski.

6      112.121. *Common characteristics of the Proposed Classes.* All of the Proposed Classes share the

7  following characteristics, making them all optimal for class resolution:

8      113.122. Each of the Proposed Classes is so numerous that joinder of all members is

9  impracticable. While the exact number of Class members in each Class is unknown to Plaintiffs at this

10  time, Plaintiffs are informed and believe that several hundred (and in the case of the Florida and

11  Arizona Classes several thousand) geographically-dispersed Class members worked, will work, and

12  continue to work as minor leaguers in each of the applicable states, either during spring training, at

13  promotional events, during other training and work periods, or during championship seasons occurring

14  within the states.

15      114.123. Plaintiffs' claims are typical of the claims of the other members of each of the

16  Proposed Classes. Plaintiffs and the members of the Proposed Classes were subject to the same or

17  similar compensation practices arising out of Defendants' common course of conduct in violation of

18  the federal and state laws as alleged herein. Plaintiffs and the Proposed Classes have sustained similar

19  types of damages as a result of these common practices.

20      115.124. Plaintiffs will fairly and adequately protect the interests of the members of all

21  members of the Proposed Classes because they possess the same interests and suffered the same

22  general injuries as class members. Plaintiffs have retained counsel competent and experienced in class

23  action litigation, including wage and hour class action litigation.

24      116.125. Common questions of law and fact exist as to all members of the Proposed Classes

25  and predominate over any questions affecting solely individual members of the Class. Among the many

26  questions of law and fact common to the Proposed Classes are:

27      (a)      whether Defendants set wages at a rate below the minimum wages required under the

28              applicable laws;

(b)     whether Defendants paid and continue to pay no wages at all during certain pay periods, contrary to the requirements of applicable laws;

(c)     whether any exemptions apply to the industry or to minor leaguers;

(d)     whether Defendants require all minor leaguers to sign the same UPC, which controls minor leaguers' pay and pay periods and enables the unlawful practices;

(e)     whether all minor leaguers signed substantially the same UPC;

(f)     whether Defendants willfully, or with reckless disregard, carried out their unlawful practices;

(g)     the compensability of certain work periods and the appropriate method of measuring damages for the injuries sustained by Plaintiffs and other members of the Proposed Classes as a result of Defendants' unlawful activities; and

(h)     Whether Defendants have acted or refused to act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive or declaratory relief appropriate with respect to the Plaintiff Class as a whole.

117.126. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members in each of the Proposed Classes is impracticable. The prosecution of separate actions by individual members of the Proposed Classes would impose heavy burdens on the courts and the parties, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

118.127. The interest of members of each of the Proposed Classes in individually controlling the prosecution of separate actions is highly limited and impractical. Each of the Proposed Classes has a high degree of cohesion and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are

often not great individually. As individuals, the class members would lack the resources to vigorously litigate against the ample and powerful resources of the Defendants' cartel. Importantly, many of the Class members are current minor league players and would not bring an individual action out of fear of retaliation. Lastly, Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## IV.  COLLECTIVE ACTION ALLEGATIONS

119.128. Plaintiffs bring Counts I and II, the FLSA claims, on behalf of themselves and all persons similarly situated since three years before the filing of this action until its resolution (the "Minor League Collective").

120.129. The Defendants are liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiffs and the members of the Minor League Collective. The Minor League Collective consists of thousands of similarly situated individuals who have been, will be, and/or continue to be underpaid during certain work periods and not paid at all during other work periods. This Collective would benefit from the issuance of a court-supervised notice of the lawsuit and the opportunity to join the lawsuit.

121.130. The members of the Minor League Collective are known to Defendants, are readily identifiable, and can be located through Defendants' records. Notice should be sent to the members of the Collective pursuant to 29 U.S.C. § 216(b).

## V.  JURISDICTION, VENUE, AND COMMERCE

122.131. This Court has subject matter jurisdiction with respect to Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1337, and jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

123.132. Plaintiffs' state law claims are so closely related to Plaintiffs' claims under the FLSA that they form part of the same case or controversy under Article III of the United States Constitution.

124.133. Additionally and/or alternatively, this Court has jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1332 because the amount in controversy for the Proposed Classes exceeds $5,000,000 and there are members of the Proposed Classes who are citizens of a different state than

1    Defendants, as well as members of the Proposed Classes who are citizens of a foreign state.

2    ~~125.~~137. This Court also has jurisdiction over Plaintiffs' claims under the FLSA pursuant to

3    29 U.S.C. § 216(b).

4    ~~126.~~135. All Defendants are subject to personal jurisdiction in California since all Defendants

5    transact a significant amount of business in California.

6    ~~127.~~136. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on

7    interstate commerce. The Defendants host baseball games, operate baseball leagues, and transact

8    business in multiple states. The Defendants routinely use instruments of interstate commerce, such as

9    interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to carry out their

10   operations.

11   ~~128.~~137. Venue is proper in the Northern District of California pursuant to 28 U.S.C. §

12   1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred

13   in this District. All the Defendants transact business in the Northern District of California; two MLB

14   Franchises are located in the Northern District of California; five of the Plaintiffs were employed by

15   the San Francisco Giants and four worked for a significant period of time at the Giants' minor league

16   affiliate in San Jose, California; and two plaintiffs were employed by the Oakland Athletics.

17   Additionally, it is believed that one of MLB's officers resides within this District.

18   ~~129.~~138. Upon information and belief, each Franchise employs minor leaguers from

19   California, which routinely ranks as the number one provider of minor leaguers in the United States.

20   ~~130.~~139. In the last three years, California averaged 221 draft picks per year (compared to, for

21   instance, an average of 32 per year for New York over the same time span). Since most minor

22   leaguers return home during the offseason, where they continue to work for the Franchises without

23   pay, this complaint alleges that all Defendants employ minor leaguers in the state of California in

24   violation of California law.

25   ~~131.~~140. Moreover, five Franchises are located in California, and an entire minor league is

26   located within the state.

27   ~~132.~~141. All causes of action asserted in this Complaint are closely related to one another and

28   each accrued under the same common set of facts and share a common nucleus of operative facts.

1  Each cause of action emanates from the same uniform contract, from the same policies and practices,

2  as applied to the same group of employees.

3  ## VI. FACTUAL ALLEGATIONS

4  ### 1.      The Booming Business of MLB

5  ~~133.~~142. MLB is the preeminent baseball league in the world. Its games are broadcast in 233

6  countries and territories in 17 different languages.[24] During the 2013 season, over 74 million fans paid

7  to attend MLB games.

8  ~~134.~~143. In 2012, revenue for MLB and its thirty teams surpassed $7.5 billion, an increase of

9  257 percent since 1995. Annual revenue will continue to climb as new television contracts begin to

10 perform and is expected to reach $9 billion dollars in 2014.[25]

11 ~~135.~~144. Franchise values for the thirty MLB teams have grown as well. In 2012 alone,

12 Franchise values increased by 23 percent. The New York Yankees are now the most valuable sports

13 franchise in the United States with an estimated value of $2.3 billion; the average value of the thirty

14 Franchises stands at $744 million each.[26]

15 ~~136.~~145. The baseball players employed by the Defendants sustain this rise in revenue, as they

16 comprise the chief product offered by MLB and its teams. Without baseball players, MLB and its

17 teams would not exist. Yet MLB and its Franchises pay most players—the minor leaguers—wages

18 that fall well below minimum wage. They also fail to pay required overtime pay, and often fail to pay

19 wages at all for work performed, allowing many—if not most—minor leaguers to fall below federal

20 poverty levels.

21

22

---

23 [24] *MLB International*, MLB.com, http://mlb.mlb.com/mlb/international/mlbi_index.jsp (last visited Dec. 16, 2013).

24 [25] *See* Maury Brown, *MLB Revenues $7.5B for 2012, Could Approach $9B by 2014*, Biz of Baseball (Dec. 25 10, 2012), http://www.bizofbaseball.com/?catid=30:mlb-news&id=5769:mlb-revenues-75b-for-2012-could-approach-9b-by-2014&Itemid=42&option=com_content&view=article.

26 [26] Mike Ozanian, *Baseball Team Valuations 2013: Yankees on Top at $2.3 Billion*, Forbes (Mar. 27, 2013), 27 http://www.forbes.com/sites/mikeozanian/2013/03/27/baseball-team-valuations-2013-yankees-on-top-at-2-3-billion/.

28

**2.       Minor Leaguers' Uniform, Adhesive Contracts**

137.146. Since the 1920s, all MLB teams have used an extensive "farm system" to develop players. MLB teams employ a small number of major leaguers that perform in MLB stadiums at the game's highest level. Rules allow Franchises to only maintain 25 major leaguers on an "active roster" and a few additional players reserved on the "40-man" roster. A few more players are inevitably on the major league disabled list, so each Franchise employs a little over 40 major leaguers.

138.147. But each Franchise simultaneously stockpiles around 150 to 250 minor leaguers that perform at the minor league levels of baseball. It is estimated that, at any given time, the Defendants collectively employ around 6,000 minor leaguers total. The Defendants employ this high number of minor leaguers in their farm systems, hoping they eventually develop into major leaguers.

139.148. MLB and its thirty teams enjoy a longstanding antitrust exemption. This exemption allows the Defendants to operate as a single organization when establishing rules for employing minor leaguers. Moreover, the exemption significantly increases the level of bargaining power the Defendants collectively exercise over the minor leaguers.

140.149. While major leaguers have formed a union that successfully combats the Defendants' collusive bargaining power, minor leaguers have no union. Without a union to counteract MLB's power, MLB and its teams have exploited minor leaguers by, among other things, continuing to promulgate and impose oppressive rules on minor leaguers' entry into the industry and on contracts, salaries, and other working conditions.

141.150. The MLB teams acquire minor leaguers in one of two ways: through an amateur draft or through free agency.

142.151. The amateur draft, known as MLB's Rule 4 draft,[27] occurs in June of each year. The genesis of the Rule 4 draft is instructive on the Commissioner's involvement in developing and enforcing MLB's policies on payments to major leaguers. Since at least World War II, the Defendants

---

[27] MLR 4.

have sought to suppress signing bonuses for the most talented amateur players.[28] Various solutions were proposed, but none seemed to work.

143. 152. In 1965, Commissioner Ford Frick oversaw the development and implementation of what is now the Rule 4 draft. By forcing amateur players to participate in the draft, MLB and its Commissioner limited those players seeking to enter MLB's developmental system to only negotiating with a single team. Thus, signing bonuses declined.

144. 153. Upon information and belief, Bud Selig sought to further curb signing bonuses for draftees in the late 1990s. Acting in his capacity as chief labor agent,[29] he directed the development and implementation of an informal "slotting" system with recommended signing bonuses for each high level pick. To enforce the mechanism, Mr. Selig required a Franchise's scouting director to call the Commissioner's office prior to exceeding the recommended slot level. This requirement of approval is an outgrowth of MLB's rules, which require all minor league contracts to be filed with and approved by Mr. Selig.[30]

145. 154. Not satisfied with an informal slotting system, Mr. Selig sought the implementation of a more formal, mandatory slotting system. At his direction, a new, stricter system was instituted in 2012. The current system places limits on the amounts Franchises can spend on signing bonuses.

146. 155. MLB's current Rule 4 draft, as developed and enforced by the Commissioner, requires all amateur players from the United States, Canada, and Puerto Rico to participate in the draft in order to sign with an MLB team.[31] Beginning with the worst MLB team from the previous season, teams select previously amateur players over the course of forty rounds.

147. 156. Players selected in the Rule 4 draft are between the ages of 18 and 22 (with the

---

[28] MLB teams offer large signing bonuses to the most talented amateur players as an incentive to forego college. Only the very top amateurs, however, receive large signing bonuses. The majority of amateurs signed through the draft receive quite small signing bonuses, usually around $2500.

[29] MLC Art. II § 2.

[30] *See* MLR 3(e) (requiring all contracts to be approved by the Commissioner); MLR Attachment 3, UPC ¶ XXVI (requiring approval by the Commissioner for the contract to have effect).

[31] MLR 4(a).

1   exception of a few players who are 23). Once selected by a Franchise, a player cannot bargain with any

2   other Franchise, as MLB's rules grant the drafting Franchise exclusive rights to the player.[32]

3   ~~148.~~157. While some highly talented players retain agents (or advisors) to assist them with

4   negotiations, the National Collegiate Athletic Association—the governing body for college baseball

5   players and prospective college baseball players—prohibits amateur athletes from employing agents or

6   attorneys during contract negotiations.[33] MLB teams have even cooperated with the NCAA to

7   enforce the rule, with suspensions resulting.

8   ~~149.~~158. Moreover, the less talented amateurs, who receive small signing bonuses, offer little

9   incentive for agents to represent them. Also, the Defendants' scouts often discourage the use of

10  attorneys/agents. Thus, many—and likely most—minor leaguers are unrepresented when drafted and

11  initially signing UPCs.

12  ~~150.~~159. In addition to the draft, teams acquire previously amateur Latin American players

13  through free agency. The Dominican Republic, followed by Venezuela, produces the most Latin

14  American players. MLB rules allow the Franchises to sign the players as early as age sixteen, so most

15  Latinos are either sixteen or seventeen when signing with a Franchise.[34]

16  ~~151.~~160. Most Latino minor leaguers come from poor families and have only the equivalent of

17  an eighth grade education. Before signing, many are only represented by similarly-educated

18  "buscones"—usually former players who maintain training facilities for young amateur players. Some

19  of the Franchises' scouts have been reprimanded in recent years for participating in bribes and

20  kickback schemes with the buscones, and the FBI has even investigated the exploitative practices.[35]

---

22  [32] MLR 4(e).

23  [33] *See* 2012–2013 NCAA Division I Manual, Article 12 Amateurism, at 68, *available at*
    http://grfx.cstv.com/photos/schools/bc/genrel/auto_pdf/2012-
24  13/misc_non_event/12_13_NCAA_Manual.pdf ("A lawyer may not be present during discussions of
    a contract offer with a professional organization or have any direct contact…with a professional
25  sports organization on behalf of the individual.").

26  [34] *See* MLR 3(a).

27  [35] *See* Jorge L. Ortiz, *Exploitation, steroids hitting home in Dominican Republic*, USA Today (Mar. 26, 2009),
    http://usatoday30.usatoday.com/sports/baseball/2009-03-26-dominican-republic-cover_N.htm.

28

1    These Latino signees comprise over forty percent of minor leaguers.

2    ~~152.~~161. Similar to the slotting system, Mr. Selig also personally oversaw the development of

3    bonus pools for Latino players in an effort to curtail Latino signing bonuses. Instituted in 2012, Mr.

4    Selig's plan allows each Franchise a certain amount to spend on signing bonuses for Latino players.

5    ~~153.~~162. Teams also sign additional players from the United States, Canada, and Puerto Rico

6    who were not drafted in the Rule 4 draft.[36] MLB rules place limits on when such free agent

7    acquisitions can occur. Since they were not selected in the draft, they are viewed as less skilled amateur

8    players and, even as free agents, have no bargaining power.

9    ~~154.~~163. MLB operates a scouting service known as the Major League Baseball Scouting

10   Bureau that evaluates amateur players on the behalf of all the Defendants. MLB owners created the

11   centralized service in 1974, and it operates under the umbrella of the Office of the Commissioner.

12   The Scouting Bureau routinely hosts tryouts for amateur players seeking to enter the industry, and its

13   scouts attend amateur games throughout the entire country and in Latin America to develop reports

14   on amateur players. The Scouting Bureau additionally requests that amateur players fill out

15   informational cards and, sometimes, psychological tests. All the Franchises have access to these

16   evaluations, and it is believed that they use them when making draft and free agent acquisitions.

17   ~~155.~~164. MLB rules, as implemented and enforced by the Defendants and the Commissioner,

18   require all teams to use the same uniform player contract ("UPC") when signing these previously

19   amateur players. MLR 3(b)(2) states:

20       To preserve morale among Minor League players and to produce the similarity of
    conditions necessary for keen competition, all contracts…shall be in the form of the

21       Minor League Uniform Player Contract that is appended to these Rules as Attachment
    3. All Minor League Uniform Player Contracts between either a Major or a Minor

22       League Club and a player who has not previously signed a contract with a Major or
    Minor League Club shall be for a term of seven Minor League playing seasons….The

23       minimum salary in each season covered by a Minor League Uniform Player Contract
    shall be the minimum amount established from time to time by the Major League

24       Clubs….

25   ~~156.~~165. Moreover, "[a]ll contracts shall be in duplicate," and "[a]ll…must be filed with the

26   

27   [36] MLR 4(i).

28

Commissioner...for approval."[37] No contract can vary any term without the approval of the Commissioner.[38] A minor leaguer cannot work for an MLB team without signing the UPC because a "player's refusal to sign a formal contract shall disqualify the player from playing with the contracting Club or entering the service of any Major or Minor League Club."[39]

~~157.~~166. Thus, the UPC grants the MLB team the exclusive rights to the minor leaguer for seven championship seasons (about seven years).[40] During that time period, the MLB team may assign the minor leaguer's rights to any other team, and the MLB team may terminate the agreement at any time for almost any reason.[41]

~~158.~~167. But the minor leaguer cannot leave voluntarily to play for another baseball team— even outside of MLB, and even outside of the United States.[42] A player doing so "shall be subject to the discipline of the Commissioner."[43] Retirement from baseball during the seven-year term even requires the Commissioner's approval.[44] Thus, minor leaguers possess very little (and one-sided) contractual mobility.

~~159.~~168. The one-sided mobility often traps a player in the minor leagues of a single organization. A minor leaguer selected in the amateur draft can only sign with the MLB team that drafted him. For the next seven years, the MLB team controls the minor leaguer's rights. By the expiration of the contract, much of the value of the minor leaguer as a young prospect has expired because the player has aged.

~~160.~~169. The MLB cartel uses a vertically integrated system of development for these minor leaguers. Players begin at the lowest levels of MLB's developmental system, levels known as Rookie

---

[37] MLR 3(b)(3); *see also* MLR 3(b)(4) (saying that a player cannot play until the UPC is signed).

[38] MLR 3(b)(3).

[39] MLR 3(d).

[40] MLR 3(b)(2); MLR Attachment 3, UPC ¶ VI.A.

[41] MLR 9; MLR Attachment 3, UPC ¶ XVIII.

[42] MLR 18; MLR Attachment 3, UPC ¶ XVI.

[43] MLR 18.

[44] MLR 14.

1  and Short-Season A. Ideally they then advance to higher levels: Class-A, Advanced Class-A, Double-

2  A, and Triple-A (one step from the major leagues). Each level acts as a funnel, though, with many

3  minor leaguers never advancing past Class-A, and the vast majority never reaching the major leagues.

4  ~~161.~~170. Since the signing of a 1962 Player Development Plan, MLB requires MLB Franchises

5  to maintain a certain number of minor league teams. Commissioner Frick oversaw this requirement,

6  even testifying before Congress about the need for maintaining a high number of minor league teams.

7  Currently, all MLB teams have minor league teams at all the levels of the minor leagues, with most

8  having either seven or eight minor league teams.

9  ~~162.~~171. Often the MLB Franchises do not operate the minor league stadium but instead sign

10  agreements with owners of minor league teams. These agreements are known as Player Development

11  Contracts ("PDC"), and the teams are affiliates of the MLB Franchises.

12  ~~163.~~172. MLB rules make clear that MLB and its Franchises remain the employers of minor

13  leaguers at all times when using PDCs. MLR 56(g) states:

> The players so provided shall be under contract exclusively to the Major League Club
> and reserved only to the Major League Club. The Minor League Club shall respect,
> be bound by, abide by and not interfere with all contracts between the Major League
> Club and the players that it has provided to the Minor League Club.

16  ~~164.~~173. Moreover, MLB requires the MLB Franchise to pay the salaries of the minor league

17  players at all times and allows the MLB Franchise the ability to control assignments.[45]

18  ~~165.~~174. MLB's rules also mandate that the Franchises "select and employ" and "compensate

19  and provide benefits for" the minor league "managers, coaches, instructors and trainers" at all times

20  during a PDC agreement.[46] These coaches and instructors, directed by MLB and MLB's Franchises

21  and working under MLB's rules, oversee the daily work of the players. The MLB Franchise

22  consequently "makes all decisions related to player development, including selecting the coaching staff

23  and deciding which players to assign to the team."[47]

---

[45] MLR 56(g).

[46] MLR 56(g).

[47] *MiLB.com Frequently Asked Questions*, MiLB.com, http://www.milb.com/milb/info/faq.jsp?mc
(footnote continued)

1   166.175. The minor league party to the PDC, on the other hand, has little control over players.

2   MLR 56(g) merely requires the minor league party to furnish uniforms, share in the cost of bats and

3   balls, and maintain the minor league stadium.

4        **3.**     **The Illegal Minor League Salaries**

5   167.176. Since minor leaguers do not belong to a union, nothing has prevented the

6   Defendants from artificially and illegally depressing minor league wages. Indeed, MLB's exemption

7   from antitrust laws has only made it easier. Given that MLB carefully controls the entryway into the

8   highest levels of baseball, and given the young minor leaguer's strong desire to enter the industry,

9   MLB and the Defendants have exploited minor leaguers by paying salaries below minimum wage, by

10  not paying overtime wages, and by often paying no wages at all.

11  168.177. Plaintiffs are informed and believe that MLB and the Commissioner issue minor

12  league salary guidelines for players signed to an initial UPC, and teams deviate very little from these

13  guidelines. After all, MLR 3(c) requires that all first-year minor leaguers earn "the amount established

14  by" MLB.[48] It is currently believed that all first-year minor leaguers employed by the Defendants must

15  earn $1,100 per month.

16  169.178. Salaries beyond the first year are very similar across all Franchises. It is believed that

17  discussions regarding minor league salaries (and other working conditions concerning minor leaguers)

18  occur when MLB hosts its quarterly owner meetings that all Defendants attend.

19  170.179. While salary guidelines are not publicly available, the Plaintiffs are informed and

20  believe, based on the salaries paid by the Defendants across the minor leagues, that MLB currently

21  recommends the following salaries, paid only during the championship season:

22      •   $1,100 per month for Rookie and Short-Season A;

23      •   $1,250 per month for Class-A;

24      •   $1,500 per month for Class-AA; and

25  _____

26  =business#3 (last visited Dec. 17, 2013).

27  [48] As the 2013 Miami Marlins Minor League Player Guide states, "all first-year players receive $1,100 per month regardless of playing level per the terms of the [UPC]."

28

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1  • $2,150 for Class-AAA.

2  ~~171.~~180. Beyond the first year, the UPC required by MLB, and enforced by Mr. Selig, purports

3  to allow salary negotiation by the minor leaguer, as the UPC states that salaries will be set out in an

4  addendum to the UPC and subject to negotiation.[49] But the same UPC provision states that if the

5  Franchise and minor leaguer do not agree on salary terms, the Franchise may unilaterally set the salary

6  and the minor leaguer must agree to it.[50]

7  ~~172.~~181. In truth, then, the UPC—and Mr. Selig as enforcer—does not allow for minor league

8  salary negotiations. It is believed that the Franchises simply follow MLB's salary guidelines, and the

9  minor leaguers must accept them. As the 2013 Miami Marlins Minor League Player Guide states,

10  "This salary structure will be strictly adhered to; therefore, once a salary figure has been established

11  and sent to you, there will be NO negotiations."

12  ~~173.~~182. MLB also centrally controls when and how minor leaguers are paid. During the

13  championship season, the Franchises must pay minor leaguers "in two (2) semi-monthly installments

14  on the 15th day and last day of the month."[51]

15  ~~174.~~183. The UPC required by MLB, and enforced by Mr. Selig, further states that salaries are

16  only to be paid during the championship season, which, for most players, lasts about five months out

17  of the year.[52] Due to the funneling that occurs at each level, significantly more minor leaguers perform

18  at the lower levels of the minor leagues than at the upper two levels of the minor leagues (Class-AA

19  and Class-AAA), so Plaintiffs believe that most minor leaguers earn less than $7,500 per calendar year.

20  Some earn $3,000 or less. Despite only being compensated during the championship season, MLB's

21  UPC "obligates Player to perform professional services on a calendar year basis, regardless of the fact

22

23  _____

24  [49] MLR Attachment 3, UPC ¶ VII.A.

25  [50] MLR Attachment 3, UPC ¶ VII.A.

     [51] MLR Attachment 3, UPC ¶ VII.B.

26  [52] MLR Attachment 3, UPC ¶ VII.B. ("Obligation to make such payments to Player shall start with

27  the beginning of Club's championship playing season…[and] end with the termination of Club's
     championship playing season….").

28

1   that salary payments are to be made only during the actual championship playing season."[53]

2   Consistent with that obligation, the UPC states that "Player therefore understands and agrees that

3   Player's duties and obligations under this Minor League Uniform Player Contract continue in full

4   force throughout the calendar year."

5   ~~175.~~184. MLB's UPC, and the Defendants' application of the UPC, requires the minor leaguer

6   to participate in spring training.[54] Again, the UPC does not allow for salaries during this period since

7   spring training falls outside the championship season, so minor leaguers work without earning a

8   paycheck. The spring training season usually lasts around one month, during the month of March, but

9   it sometimes lasts longer.

10   ~~176.~~185. Around 30–50 minor leaguers per MLB Franchise do not earn a roster spot on a

11   minor league team at the end of spring; they instead remain at the Franchise's spring training site in

12   "extended spring training." Since they are not participating in a championship season, MLB's UPC

13   again does not require salaries to be paid.[55] Upon information and belief, many of these players will

14   not earn paychecks until the end of June, when the Rookie and Short-Season A leagues begin. Thus,

15   many minor leaguers are not paid for work performed during March, April, May, and most of June.

16   ~~177.~~186. At the end of the championship season, around 30–45 minor leaguers per MLB

17   Franchise are also selected to participate in an instructional league to further hone their skills. Again,

18   MLB's UPC—as approved and enforced by Mr. Selig—requires minor leaguers to perform this work

19   without pay since it is outside the championship season, so the minor leaguers receive no paychecks

20   during the instructional league.[56] The instructional leagues usually last around one month.

21   ~~178.~~187. MLB's UPC also requires minor leaguers to maintain "first-class" conditioning

22   throughout the calendar year[57] because the player's "physical condition is important to…the success

23   _____

24   [53] MLR Attachment 3, UPC ¶ VI.B.

25   [54] *See* MLR Attachment 3, UPC ¶ VI.B. (saying that the UPC applies to the "Club's training season").

26   [55] MLR Attachment 3, UPC ¶ VII.B.

27   [56] MLR Attachment 3, UPC ¶ VII.B.

     [57] MLR Attachment 3, UPC ¶ XII.

28

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

of the Club."[58] Consequently, a "Club may require Player to maintain Player's playing condition and weight during the off-season and to report for practice and condition at such times and places as Club may determine."[59] If the player fails to meet these requirements, the "Club may impose a reasonable fine upon Player…."[60]

179.188. Carrying out this provision of MLB's UPC, the Defendants therefore require players to perform extensive training and conditioning during the winter off-season. It is believed that all Franchises direct the winter work by issuing training packets to all the players. Many, and perhaps all, Franchises monitor workouts and punish players for not performing off-season workouts. Per MLB's required UPC, as approved by Mr. Selig, minor leaguers receive no wages during this training period because it is outside the championship season.[61]

180.189. In sum, the Defendants, as directed by Mr. Selig, pay illegally low wages during the championship season, no overtime wages, and no wages for work performed outside the championship season. As demonstrated below, the cartel requires players to work very long hours, further demonstrating the illegality of the wage scheme.

### 4.  The Long Hours Worked By Minor Leaguers

181.190. During the roughly five-month championship season, minor league teams play games either six or seven days per week. The minor leaguer enjoys a day off on average only once every 2–3 weeks.

182.191. For Monday through Saturday games, minor leaguers must participate in mandatory pregame activities: stretching, batting practice, fielding practice, throwing, conditioning, etc. With games averaging around three hours in length, minor leaguers usually work around eight mandatory hours at the stadium on these days. For Sunday workdays, players also perform significant amounts of work.

---

[58] MLR Attachment 3, UPC ¶ VI.D.

[59] MLR Attachment 3, UPC ¶ VI.D.

[60] MLR Attachment 3, UPC ¶ VI.D.

[61] *See* MLR Attachment 3, UPC ¶ VII.B.

183.192. In a seven-day workweek—which is typical—the minor leaguer consequently works well in excess of forty hours at the stadium. If the minor leaguer enjoys a rare off day during a week, the minor leaguer still works in excess of forty hours per week at the stadium during the altered six-day workweek.

184.193. As part of the maintenance of first-class conditioning required by MLB's UPC, players must also regularly perform strength and conditioning workouts during the season. These workouts are devised and supervised by strength coaches employed by MLB's Franchises. The required workouts thus add additional compensable time onto the minor leaguers' work schedule.

185.194. Additionally, minor leaguers are required to perform protracted travel, usually by a team bus. Half of the games are played away from home, and the usual road trip often entails a handful of bus rides each lasting several hours.

186.195. The minor leaguer arrives to the home stadium before beginning the trip; packs belongings, bats, uniforms, gloves, and other things; loads the bus with these belongings and other items required by the team on the trip; and then proceeds on the trip. The minor leaguer performs a similar process prior to beginning each trip and reverses the process upon returning to the home stadium from the trip.

187.196. This required team travel adds considerable amounts of work onto the player's workweek when on the road.

188.197. Consequently, when strength and conditioning work and required travel work are added onto the workweek, minor leaguers often work over 60–70 hours per week during the season in Plaintiffs' experience.

189.198. As stated above, minor leaguers also perform extensive work outside the championship season for which they earn no salary.

190.199. Spring training usually lasts four weeks or more. Minor leaguers normally work seven days a week, as minor leaguers do not enjoy a day off during the spring training period unless rain renders the baseball fields unplayable.

191.200. Minor leaguers perform considerable amounts of work during spring training, sometimes—and perhaps usually—exceeding forty hour workweeks. Again, MLB's UPC does not

861070.1
39
COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1   allow players to earn salaries during this time, much less overtime wages.[62]

2   ~~192.~~201. The 30–45 minor leaguers selected for instructional leagues perform a work schedule

3   similar to that performed during spring training. A similar number of players often also attend a pre-

4   spring training minicamp that involves similar work hours. And again, the minor leaguer earns no

5   salary for this work.

6   ~~193.~~202. During the winter months of the off-season, minor leaguers work a few hours per

7   day performing required training. This work is performed 4–6 days per week, depending on the

8   month, and results in considerable unpaid hours. This training is not only required by the Franchises

9   but also required by MLB's UPC.[63]

10      **5.      The Careers of the Class Representatives.**

11         **5.1 Aaron Senne**

12   ~~194.~~203. In June of 2010, Aaron Senne was drafted by the Florida Marlins (now the Miami

13   Marlins) in the tenth round of MLB's 2010 Rule 4 draft.

14   ~~195.~~204. Less than a week later, Mr. Senne agreed to terms without seeing a written contract.

15   On or around June 15, he traveled to Jupiter, Florida, site of the Marlins' training facilities. Once

16   there, he underwent a physical, took a drug test, and signed a contract.

17   ~~196.~~205. The contract was a UPC, as required by MLB, but the Marlins did not point out or

18   explain the provisions of the contract. Mr. Senne was unrepresented throughout the process.

19   ~~197.~~206. Mr. Senne received $25,000 as a one-time bonus for signing his seven-year contract.

20   He also received two semesters in a college scholarship fund as an incentive for signing.

21   ~~198.~~207. The Marlins sent Mr. Senne to Jamestown, New York, site of the Marlins' Short-

22   Season A team (the Jamestown Jammers), where he played for the rest of the 2010 championship

23   season.

24   ~~199.~~208. Mr. Senne worked at the Marlins' spring training site in Jupiter for the entire 2011

25   _____

26   [62] *See* MLR Attachment 3, UPC ¶ VII.B.

27   [63] *See* MLR Attachment 3, UPC ¶¶ VI.D., XXII.

28

season. In 2012, he worked the entire championship season in Greensboro, North Carolina. In 2013, he worked in Jupiter.

200.209. Consistent with MLB's guidelines, the Marlins paid Mr. Senne around $1,100 per month for his work in Jamestown. Thus, for the entire championship season in 2010, Mr. Senne believes he earned about $3,000. Similarly, Mr. Senne believes he earned slightly in excess of $3,000 in 2011; around $7,000 in 2012; and around $3,000 in 2013. Thus, the Marlins failed to meet minimum wage standards.

201.210. Throughout each of these championship seasons, Mr. Senne routinely worked in excess of forty hours per week but received no overtime pay.

202.211. Like all minor leaguers, Mr. Senne remained property of the Franchise (the Marlins) throughout each of these championship seasons and throughout the contract, and, consistent with MLB rules, the Franchise's coaching staff and front office made all work-related decisions no matter where Mr. Senne worked throughout the year.[64]

203.212. A short time after each season ended, he began conditioning in order to maintain the first-class conditioning required by his UPC. The Marlins provided a training packet for each winter off-season period.

204.213. As stipulated in MLB's required UPC, Mr. Senne was not paid at all for this winter work, even though the Marlins required it to be performed.

205.214. Before each championship season, Mr. Senne worked at the Marlins' spring training site. The Marlins directed and required all of the work Mr. Senne performed during spring, and Mr. Senne often exceeded forty hours of work per week.

206.215. Consistent with MLB's required UPC, Mr. Senne received no paycheck during this spring work.

207.216. Mr. Senne retired from the game of baseball around June 11, 2013. Per MLB's UPC,

_____

[64] *See* MLR 56(g).

41

1    it is believed that Mr. Selig approved his retirement.[65] Also per MLB's UPC, he cannot play for

2    another baseball organization, foreign or domestic—or even play another recreational sport—until

3    the expiration of his contract, even though he has retired.[66]

4       208.217. To summarize, Mr. Senne, like all Class Members working under the direction of

5    MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime

6    despite routinely working overtime hours, and often worked for no pay.

7          **5.2 Michael Liberto**

8       209.218. Like Mr. Senne, Mr. Liberto was selected in the June, 2010 Rule 4 draft. The Kansas

9    City Royals selected him in the twenty-first round.

10      210.219. Immediately after being drafted, an employee of the Royals contacted Mr. Liberto.

11   He said he would quickly bring a contract to Mr. Liberto and that Mr. Liberto would receive a one-

12   time $1,000 signing bonus for signing his seven-year UPC.

13      211.220. A short time later, the Royals' employee arrived at Mr. Liberto's house and did not

14   allow any negotiations to occur. He presented a contract, which was a UPC as required by MLB's

15   rules. The employee did not explain any provisions of the contract other than the incentive bonus

16   plan, and instead merely instructed Mr. Liberto where to sign. Mr. Liberto was unrepresented during

17   the process, which took only a few minutes.

18      212.221. Mr. Liberto then traveled to Surprise, Arizona, site of the Royals' training camp. He

19   underwent a physical and drug test, and he participated in a minicamp.

20      213.222. At the conclusion of minicamp, Mr. Liberto remained in Surprise for the beginning

21   of the Rookie ball season. Around July 20 of 2010, the Royals moved Mr. Liberto to Burlington,

22   Iowa, site of their Single-A affiliate; they later moved him to Burlington, North Carolina, site of one

23   of its Short-Season A teams, and Idaho Falls, Idaho, site of another Short-Season A team.

24      214.223. During the 2011 championship season, Mr. Liberto split time between extended

25

26   ───────────────

27   [65] *See* MLR 14.

     [66] *See* MLR Attachment 3, UPC ¶ XVI.

28

1   spring training in Arizona; Kane County (in Illinois, home of the Royals' Class-A affiliate); Idaho
2   Falls; and Wilmington, Delaware (site of the Royals' Advanced Class-A affiliate). For the 2012
3   championship season, Mr. Liberto split time between Wilmington and Northwest Arkansas (site of
4   the Royals' Double-A affiliate). The Royals released Mr. Liberto around the end of the 2013 spring
5   training.

6          215. 224. Similar to Mr. Senne, and consistent with what are believed to be MLB's guidelines,
7   Mr. Liberto received $1,100 per month during his first championship season. He believes he received
8   around $3,000 total in 2010, and believes he earned no more than around $7,500 total during
9   subsequent championship seasons. Thus, he received below the minimum wage.

10          216. 225. Like Mr. Senne and all similarly-situated minor leaguers, Mr. Liberto routinely
11   worked in excess of forty hours per week but received no overtime pay throughout these
12   championship seasons.

13          217. 226. Shortly after each season ended, Mr. Liberto began conditioning in order to maintain
14   the first-class conditioning required by his UPC. The Royals provided a training packet for this winter
15   off-season work.

16          218. 227. As stipulated in MLB's required UPC, Mr. Liberto was not paid at all for this work,
17   even though the Royals required it to be performed.

18          219. 228. Before each championship season, Mr. Liberto worked at the Royals' spring training
19   site. The Royals directed and required all of the work Mr. Liberto performed during spring, and Mr.
20   Liberto often exceeded forty hours of work per week.

21          220. 229. Consistent with MLB's required UPC, Mr. Liberto received no paycheck for this
22   spring work.

23          221. 230. To summarize, Mr. Liberto, like all Class Members working under the direction of
24   MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime pay
25   despite routinely working overtime hours, and often worked for no pay at all.

26      **5.3    Oliver Odle**

27          222. 231. Around June 5, 2007, Oliver Odle was drafted by the San Francisco Giants in the
28   22nd round of the 2007 Rule 4 draft.

223.232. Shortly after selecting Mr. Odle, a Giants employee called Mr. Odle and asked him if he could quickly sign a contract and fly to the Giants' spring training complex the next day.

224.233. The Giants arranged for Mr. Odle to arrive to their spring complex in Scottsdale, Arizona, on or around June 11. Before arriving, Mr. Odle had not seen a contract and the Giants did not permit any negotiations to occur.

225.234. A Giants employee quickly instructed Mr. Odle to sign his contract, which, as required by MLB's rules, was a UPC. The employee did not explain any provisions other than the signing bonus and incentive bonus schedule. Mr. Odle signed the contract and received a one-time signing bonus of $2,500 for signing the seven-year contract. Like Mr. Senne and Mr. Liberto, he was unrepresented throughout the contractual process.

226.235. Mr. Odle worked at the Giants' Rookie-Level Arizona League team for most of the 2007 championship season, though the Giants also required him to work in Salem, Oregon (site of their Short-Season A team) for a brief time.

227.236. The Giants required Mr. Odle to work the entire 2008 season in Augusta, Georgia. He worked most of the 2009 and 2010 seasons in San Jose, California (site of the Giants' Advanced Class-A team), though he spent very brief periods working for the Giants' team in Fresno, California. Mr. Odle was released during the 2011 spring training.

228.237. Consistent with all first-year minor leaguers—including Mr. Senne and Mr. Liberto— Mr. Odle believes he received around $1,100 per month during the first championship season. He believes the Giants paid him between around $3,000 and around $7,500 total per championship season. Thus, the Giants failed to meet minimum wage standards.

229.238. Throughout these championship seasons, Mr. Odle routinely worked in excess of forty hours per week but received no overtime pay.

230.239. Shortly after each season ended, Mr. Odle began conditioning in order to maintain the first-class conditioning required by his UPC. The Giants provided a training packet for this winter off-season period.

231.240. As stipulated in MLB's required UPC, Mr. Odle was not paid at all for this work, even though the Giants required it to be performed.

44
COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

232.241. Before each championship season, Mr. Odle worked at the Giants' spring training site. The Giants directed and required all of the work Mr. Odle performed during spring, and Mr. Odle often exceeded forty hours of work per week.

233.242. Consistent with MLB's required UPC, Mr. Odle did not receive a paycheck for this spring work.

234.243. To summarize, Mr. Odle, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.4    Brad McAtee

235.244. In June of 2008, the Colorado Rockies drafted Brad McAtee in the 45th round of the Rule 4 draft. He quickly signed a UPC a few days later, and the Rockies only pointed out a couple of the UPC's provisions to him—focusing on the salary provisions.

236.245. Mr. McAtee played the 2008, 2009, and 2010 seasons at the Rockies' short-season team in Pasco, Washington. He also spent significant portions of time working at extended spring training at the Rockies' site in Arizona. During the season, Mr. McAtee believes he routinely worked more than 50 hours per week.

237.246. Mr. McAtee went to at least one instructional league and several spring trainings at the Rockies' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

238.247. Mr. McAtee spent much of his off-seasons in California, though he also spent some time in New York. The Rockies provided an off-season training manual, and he performed significant off-season training without being paid.

239.248. Mr. McAtee was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his first year, and believes he never earned more than around $6,000 in salary during any year that he played. He was released in June of 2011.

1    240.249. To summarize, Mr. McAtee, like all Class Members working under the direction of

2    MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime

3    despite routinely working overtime hours, and often worked for no pay.

4    ///

5    ///

6    ///

7        **5.5    Craig Bennigson**

8    241.250. Also in June of 2008, the Colorado Rockies drafted Craig Bennigson in the 9th

9    round of the Rule 4 draft. A few days later he signed a UPC. The Rockies only pointed out the salary

10   provisions of the UPC to him.

11   242.251. Mr. Bennigson worked the 2008 season at the Rockies' short-season team in Casper,

12   Wyoming; the 2009 season at extended spring training and at Pasco, Washington; the 2010 season at

13   extended spring training, Pasco, Washington, and Tulsa, Oklahoma; the 2011 season at Asheville,

14   North Carolina and Pasco, Washington; and the 2012 season at Asheville and Modesto, California.

15   During the season, Mr. Bennigson believes he routinely worked more than 50 hours per week.

16   243.252. Mr. Bennigson worked several spring trainings at the Rockies' site in Arizona. He did

17   not earn a salary for this work, even though he often worked full workdays, 7 days per week.

18   244.253. Mr. Bennigson performed work for the Rockies during the off-seasons, mostly in the

19   Bay Area. The Rockies provided an off-season training manual, and he performed significant off-

20   season work without being paid.

21   245.254. Mr. Bennigson was only paid his salary during the season, and his salary began at

22   around $1,100 per month. He believes he earned around $3,000 in salary during his first year, and

23   believes he never earned more than around $7,500 in salary during any year that he worked.

24   246.255. Because of these salaries, Mr. Bennigson often either stayed with host families or

25   with many players crammed into a small apartment during the season. At times he lived with five

26   players in a two-bedroom apartment, sleeping on an air mattress.

27   247.256. He was released on March 28, 2013.

28

248.257. To summarize, Mr. Bennigson, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.6    Matt Lawson**

249.258. The Texas Rangers drafted Matt Lawson in the 14th round of the 2007 Rule 4 draft. A few days later he signed a UPC without the help of an agent or attorney. The Rangers only pointed out a couple of the UPC's provisions to him.

250.259. Mr. Lawson worked the 2007 season at the Rangers' short-season team in Spokane, Washington; the 2008 season at Clinton, Iowa; the 2009 season at Bakersfield, California; and part of the 2010 season at Frisco, Texas.

251.260. In July of 2010, the Rangers traded Mr. Lawson to the Seattle Mariners. He finished the season working at the Mariners' affiliated in West Tennessee.

252.261. In March of 2011, the Mariners traded Mr. Lawson to the Cleveland Indians. He worked the 2011 and 2012 seasons at the Indians' affiliate in Akron, Ohio. He worked the 2013 season in Akron and Columbus, Ohio.

253.262. Whether working for the Rangers, Mariners, or Indians, Mr. Lawson worked the same hours and believes he routinely worked well in excess of 50 hours per week during the seasons.

254.263. Mr. Lawson worked several spring trainings at the Rangers' site in Arizona. He also worked at the Indians' spring training site in Arizona during the springs of 2011, 2012, and 2013. While working for either team, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

255.264. During the off-seasons, Mr. Lawson performed work for the Franchises, mostly in Springfield, Missouri. He believes each of his employer Franchises provided an off-season training manual, and each off-season he performed significant work without being paid.

256.265. No matter the Franchise, Mr. Lawson was only paid his salary during the season, and his salary began at around $1,100 per month. He believes his pay did not change when he changed teams. He believes he earned around $3,000 in salary during his first year, and believes he never earned more than around $11,000 in salary during any year that he worked.

257.266. Because of these salaries, Mr. Lawson often either stayed with host families or with many guys crammed into a small apartment during the season. At one point he stayed with six guys in a small apartment and slept on an air mattress.

258.267. Mr. Lawson is still under contract with the Indians but is no longer performing work for them.

259.268. To summarize, Mr. Lawson, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.7     Kyle Woodruff

260.269. In June of 2008, the San Francisco Giants drafted Kyle Woodruff in the 27th round of the Rule 4 draft. A few days later he signed a UPC. No agent or attorney represented him, and no negotiations occurred. The Giants only pointed out a couple of the UPC's provisions to him.

261.270. Mr. Woodruff worked the 2008 season at the Giants' complex in Scottsdale, Arizona; the 2009 season at extended spring training in Arizona and at Augusta, Georgia; and the 2010 season at extended spring training and Augusta, Georgia. During the season, Mr. Woodruff believes he routinely worked more than 50 hours per week.

262.271. Mr. Woodruff worked several spring trainings at the Giants' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

263.272. Mr. Woodruff performed work for the Giants during the off-seasons, mostly in San Jose, California, though he performed some work for the Giants in Arizona. The Giants provided an off-season training manual, and he performed significant off-season work without being paid.

264.273. Mr. Woodruff was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his first year, and believes he never earned more than around $5,500 in salary during any year that he worked.

265.274. Because of these salaries, Mr. Woodruff often stayed with many crammed guys into a small apartment, sleeping on air mattresses during the season. At one point seven guys lived with him in a single apartment.

266.275. He was released on March 15, 2011.

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1    267.276. To summarize, Mr. Woodruff, like all Class Members working under the direction of

2    MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime

3    despite routinely working overtime hours, and often worked for no pay.

4    / / /

5    / / /

6         **5.8    Ryan Kiel**

7    268.277. The Seattle Mariners drafted Ryan Kiel in the 37th round of the 2010 Rule 4 draft.

8    He quickly signed a UPC without negotiations. The Mariners only pointed out a couple of the UPC's

9    provisions to him, specifically the salary and bonus provisions.

10   269.278. Mr. Kiel worked the 2010 season at the Mariners' short-season team in Pulaski,

11   Virginia; he worked the 2011 season at the Mariners' extended spring training, the Mariners' Arizona

12   League team, and at Clinton, Iowa. The Mariners released Mr. Kiel in the spring of 2012.

13   270.279. In April of 2012, the Cincinnati Reds signed Mr. Kiel. He played the 2012 season at

14   the Reds' extended spring training in Arizona, and at their affiliates in Dayton, Ohio, and Bakersfield,

15   California.

16   271.280. For both the Reds and Mariners, Mr. Kiel believes he routinely worked more than 50

17   hours per week during the season.

18   272.281. Mr. Kiel worked several spring trainings at the Mariners' site in Arizona. He did not

19   earn a salary for this work, even though he often worked full workdays, 7 days per week.

20   273.282. Mr. Kiel performed work for the Franchises during the off-seasons, mostly in Los

21   Gatos, California. He was provided an off-season training manual, and he performed significant off-

22   season work without being paid.

23   274.283. Mr. Kiel was only paid his salary during the season, and his salary began at around

24   $1,100 per month. He believes he earned around $3,000 in salary during his first year, and believes he

25   never earned more than around $4,500 in salary during any year that he played.

26   275.284. His career ended in late July of 2012.

27

28

49
COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1    ~~276.~~285. To summarize, Mr. Kiel, like all Class Members working under the direction of MLB,

2    the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite

3    routinely working overtime hours, and often worked for no pay.

4    **5.9     Kyle Nicholson**

5    ~~277.~~286. In June of 2007, the San Francisco Giants drafted Kyle Nicholson in the 7th round

6    of the Rule 4 draft. A short time later, he signed a UPC; the Giants did not draw attention to any of

7    the UPC's provisions to him.

8    ~~278.~~287. Mr. Nicholson worked the 2007 season at the Giants' complex in Scottsdale,

9    Arizona; the 2008 season in Scottsdale and briefly at Salem, Oregon; the 2009 season at Augusta,

10   Georgia, and San Jose, California; and the 2010 season in San Jose, California. During the season, Mr.

11   Nicholson believes he routinely worked more than 50 hours per week.

12   ~~279.~~288. Mr. Nicholson worked several spring trainings at the Giants' site in Arizona. He did

13   not earn a salary for this work, even though he often worked full workdays, 7 days per week.

14   ~~280.~~289. Mr. Nicholson performed work for the Giants during the off-seasons, mostly in

15   Texas, though he performed some work for the Giants in Arizona, especially during his first

16   offseason. The Giants provided an off-season training manual, and he performed significant off-

17   season work without being paid.

18   ~~281.~~290. Mr. Nicholson was only paid his salary during the season, and his salary began at

19   around $1,100 per month. He believes he earned between around $3,000 and $7,000 in salary each

20   year that he worked.

21   ~~282.~~291. Mr. Nicholson retired sometime after the 2010 season.

22   ~~283.~~292. To summarize, Mr. Nicholson, like all Class Members working under the direction of

23   MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime

24   despite routinely working overtime hours, and often worked for no pay.

25   **5.10    Brad Stone**

26   ~~284.~~293. The Marlins drafted Brad Stone in the 12th round of the 2006 Rule 4 draft. A few

27   days later he signed a UPC. The Marlins failed to draw attention to any details in the contract other

28   than the signing bonus and salary.

285.294. Mr. Stone worked the 2006 season at Jamestown, New York, and Greensboro, North Carolina; the 2007 season at Greensboro; the 2008 season at Greensboro and Jupiter, Florida; the 2009 season in Jupiter, Jacksonville, and New Orleans; and the 2010 season at the Marlins' spring training site and at Jacksonville. During the season, Mr. Stone believes he routinely worked more than 50 hours per week.

286.295. Mr. Stone worked several spring trainings at the Marlins' site in Florida. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

287.296. Mr. Stone performed work for the Marlins during the off-seasons, mostly in St. Louis. The Marlins provided an off-season training manual, and he performed significant off-season work without being paid.

288.297. Mr. Stone was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his first year, and believes he never earned more than around $12,000 in salary during any year that he played—even while in Triple-A.

289.298. Because of these salaries, Mr. Stone often stayed with many crammed guys into a small apartment, sleeping on air mattresses during the season.

290.299. He was released on March 28, 2011.

291.300. To summarize, Mr. Stone, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.11    Matt Daly

292.301. The Toronto Blue Jays drafted Matt Daly in the 13th round of the 2008 Rule 4 draft. He quickly signed a UPC, and the Blue Jays failed to thoroughly explain all the provisions in the contract.

293.302. Mr. Daly first worked briefly at the Blue Jays' Florida site, and he worked the rest of the 2008 season in Auburn, New York. He worked the 2009 season at affiliates in Lansing, Michigan, and Dunedin, Florida; the 2010 season in Dunedin; the 2011 season in Dunedin and New Hampshire; and the 2012 season in New Hampshire. During the season, Mr. Daly believes he routinely worked more than 50 hours per week.

294.303. He worked several spring trainings at the Blue Jays' site in Florida, and worked at least one instructional league. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

295.304. Mr. Daly performed work for the Blue Jays during the off-seasons, mostly in California but also in Colorado. The Blue Jays provided an off-season training manual and even used online tracking to monitor off-season work. He performed significant off-season work without being paid.

296.305. He was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned less than $3,000 in salary his first season, and he believes he never made more than around $8,500 in any subsequent season that he worked for the Blue Jays.

297.306. He was released on March 19, 2013.

298.307. To summarize, Mr. Daly, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.12    Aaron Meade**

299.308. In June of 2010, the Anaheim Angels drafted Aaron Meade in the 10th round of the Rule 4 draft. He quickly signed a UPC, and the Angels failed to thoroughly explain all the provisions in the contract.

300.309. Mr. Meade first worked at a minicamp at the Angels' Arizona site, and worked the rest of the 2010 season in Orem, Utah. He worked the 2011 season at Arizona and Orem, and he worked at Cedar Rapids, Iowa, and San Bernardino, California, during the 2012 season. During the season, Mr. Meade believes he routinely worked more than 50 hours per week.

301.310. He worked several spring trainings at the Angels' site in Arizona, and worked at least one instructional league. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

302.311. Mr. Meade performed work for the Angels during the off-seasons, mostly in Missouri. The Angels provided an off-season training manual, and he performed significant off-season work without being paid.

303.312. He was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned less than $3,000 in salary his first season, and he believes he never made more than around $7,000 in any subsequent season that he worked for the Angels.

304.313. He was released on March 26, 2013.

305.314. To summarize, Mr. Meade, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.13    Justin Murray**

306.315. In June of 2008, the Oakland Athletics drafted Justin Murray in the 29th round of the Rule 4 draft. Later that summer, he signed a UPC. The Athletics only pointed out a couple of the UPC's provisions to him.

307.316. Mr. Murray worked the 2008 season at the Athletics' complex in Arizona and at Midland, Texas; the 2009 season at Stockton, California and Kane County, Illinois; the 2010 season at Stockton and Midland; and the 2011 season also at Stockton and Midland. During the season, Mr. Murray believes he routinely worked more than 50 hours per week.

308.317. Mr. Murray worked several spring trainings at the Athletics' site in Arizona and worked at least one instructional league. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

309.318. Mr. Murray performed offseason work for the Athletics in Manhattan, Kansas. The Athletics provided an off-season training manual, and he performed significant off-season work without being paid.

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

310.319. Mr. Murray was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned less than $2,000 in salary during his first year, and believes he never earned more than around $7,500 in salary during any year that he worked.

311.320. Because of these salaries, Mr. Murray often stayed with many guys crammed into a small apartment, sleeping on air mattresses during the season. He also stayed with host families.

312.321. He was released on May 16, 2011.

313.322. To summarize, Mr. Murray, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.14    Jake Kahaulelio**

314.323. The Cincinnati Reds drafted Jake Kahaulelio in the 20th round of the 2007 Rule 4 draft. A few days later he signed a UPC. No agent or attorney represented him, and the Reds did not allow negotiations to occur. The Reds only pointed out a couple of the UPCs' provisions to him.

315.324. Mr. Kahaulelio worked the 2007 season mostly at the Reds' complex in Sarasota, Florida; the 2008 season in Dayton, Ohio; the 2009 season in Sarasota and Zebulon, North Carolina; the 2010 season in Zebulon; and the 2011 season in Bakersfield, California and Zebulon. During the season, he believes he routinely worked more than 50 hours per week.

316.325. Mr. Kahaulelio worked several spring trainings at the Reds' site in Florida. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

317.326. He performed work for the Reds during the off-seasons, mostly in California. The Reds provided an off-season training manual, and he performed significant off-season work without being paid.

318.327. Mr. Kahaulelio was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his first year, and believes he never earned more than around $9,000 in salary during any year that he worked.

319.328. Because of these salaries, he often stayed with many guys crammed into a small apartment, sleeping on air mattresses during the season. At one point he and three other guys lived in a single room with a host family.

1  320.329. He was released on October 26, 2011.

2  321.330. To summarize, Mr. Kahaulelio, like all Class Members working under the direction

3  of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime

4  despite routinely working overtime hours, and often worked for no pay.

5  **5.15    Ryan Khoury**

6  322.331. In June of 2006, the Boston Red Sox drafted Ryan Khoury in the 12th round of the

7  Rule 4 draft. A few days later he signed a UPC after very few negotiations. The Red Sox did not draw

8  attention to any of the UPC's provisions.

9  323.332. Mr. Khoury worked the 2006 season at the Red Sox' affiliates in Lowell,

10  Massachusetts; Greenville, South Carolina; and Pawtucket, Rhode Island. He worked the 2007 season

11  at Lancaster, California; the 2008 season at Lowell and Portland, Maine; the 2009 season at Portland;

12  and the 2010 season at Portland and Pawtucket.

13  324.333. The Red Sox released Mr. Khoury on March 31, 2011 but re-signed him on June 21,

14  2011. He worked the rest of the 2011 season at Portland and Pawtucket.

15  325.334. During the season, Mr. Khoury believes he routinely worked far in excess of 50

16  hours per week.

17  326.335. Mr. Khoury worked several spring trainings at the Red Sox' site in Florida. He did

18  not earn a salary for this work, even though he often worked full workdays, 7 days per week.

19  327.336. Mr. Khoury performed work for the Red Sox during the off-seasons, mostly in Utah,

20  though he performed some work for the Red Sox in Florida. The Red Sox provided an off-season

21  training manual, and he performed significant off-season work without being paid.

22  328.337. He was only paid his salary during the season, and his salary began at around $1,100

23  per month. He believes he earned around $3,000 in salary during his first year despite spending

24  significant time at Triple-A, and believes he never earned more than around $10,000 in salary during

25  any year that he played.

26  329.338. Because of these salaries, Mr. Khoury often stayed with many other guys in a small

27  apartment during the season. He also stayed with host families.

28  330.339. He was granted free agency by the Red Sox on November 2, 2011.

55

1   ~~331.~~340. To summarize, Mr. Khoury, like all Class Members working under the direction of

2   MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime

3   despite routinely working overtime hours, and often worked for no pay.

4   **5.16    Dustin Pease**

5   ~~332.~~341. The San Diego Padres signed Dustin Pease as an undrafted free agent out of

6   independent ball in February of 2011. He received no signing bonus and signed a UPC. No agent or

7   attorney represented him, and no negotiations occurred. The Padres only pointed out a couple of the

8   UPC's provisions to him, focusing on the salaries.

9   ~~333.~~342. Mr. Pease worked the 2011 season in Lake Elsinore, California, and he worked the

10  2012 season at San Antonio. During the season, Mr. Pease believes he routinely worked more than 50

11  hours per week.

12  ~~334.~~343. He worked several spring trainings at the Padres' site in Arizona. He did not earn a

13  salary for this work, even though he often worked full workdays, 7 days per week.

14  ~~335.~~344. Mr. Pease performed work for the Padres during the off-seasons, mostly in

15  Maryland. The Padres provided an off-season training manual, and he performed significant off-

16  season work without being paid.

17  ~~336.~~345. While playing independent ball, Mr. Pease worked as a minister during the off-

18  seasons. But given the Padres' extensive work requirements (which mirror all the Franchises'

19  requirements), Mr. Pease could not work at this off-season job after he began working for the Padres.

20  ~~337.~~346. He was only paid his salary during the season, and his salary began at around $1,100

21  per month. He believes he earned between $6,000 and $8,000 in salary each year that he worked for

22  the Padres.

23  ~~338.~~347. Because of these salaries, Mr. Pease struggled to survive. He searched for host

24  families on his own because he could not afford rent.

25  ~~339.~~348. He was released on March 20, 2013.

26  ~~340.~~349. To summarize, Mr. Pease, like all Class Members working under the direction of

27  MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime

28  despite routinely working overtime hours, and often worked for no pay.

1    **5.17    Jeff Nadeau**

2    ~~341.~~350. In the 38th round of the 2010 Rule 4 draft, the St. Louis Cardinals drafted Jeff

3    Nadeau. He quickly signed a UPC, and he believes that the Cardinals only explained the salary

4    provisions of the contract to him.

5    ~~342.~~351. Mr. Nadeau worked the 2010 season at the Cardinals' facility in Jupiter, Florida, and

6    at an affiliate in Johnson City, Tennessee. Due to an injury, he worked the entire 2011 season at

7    Jupiter. During the season, he believes he routinely worked more than 50 hours per week, and even

8    worked overtime hours for the Cardinals while injured.

9    ~~343.~~352. He worked several spring trainings at the Cardinals' site in Florida, and also spent

10   time in extended spring training. He did not earn a salary for this work, even though he often worked

11   full workdays, 7 days per week.

12   ~~344.~~353. Mr. Nadeau performed work for the Cardinals during the off-seasons, either in

13   Arizona, Florida, or Colorado. The Cardinals provided an off-season training manual, and he

14   performed significant off-season work without being paid.

15   ~~345.~~354. He remained in Jupiter for almost the entire 2011–2012 offseason, where the

16   Cardinals directed his rehabilitation and training. He was not paid his salary for this work.

17   ~~346.~~355. He was only paid his salary during the season, and he believes he received less than

18   $3,000 in salary for the entire 2010 and 2011 seasons (each season).

19   ~~347.~~356. He was released in April of 2012.

20   ~~348.~~357. To summarize, Mr. Nadeau, like all Class Members working under the direction of

21   MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime

22   despite routinely working overtime hours, and often worked for no pay.

23   **5.18    Jon Gaston**

24   ~~349.~~358. The Houston Astros drafted Jon Gaston in the 7th round of the 2008 Rule 4 draft.

25   Once his collegiate season ended, he signed a UPC. The Astros only pointed out a couple of the

26   UPC's provisions to him, focusing on the salary and bonus provisions.

27

28

1  350.359. Mr. Gaston worked the 2008 season at the Astros' affiliate in Albany, New York; the

2  2009 season in Lancaster, California; and the 2010 and 2011 seasons in Corpus Christi, Texas. The

3  Astros released Mr. Gaston on March 27, 2012.

4  351.360. On May 25, 2012, the Chicago White Sox signed Mr. Gaston. He worked for the

5  White Sox' affiliate in Birmingham, Alabama, until they released him on June 21, 2012.

6  352.361. For both the Astros and White Sox, Mr. Gaston believes he routinely worked more

7  than 50 hours per week during the season.

8  353.362. Mr. Gaston worked several spring trainings at the Astros' site in Florida. He also

9  worked at least one instructional league and minicamp in Florida. He did not earn a salary for this

10 work, even though he often worked full workdays, 7 days per week.

11 354.363. Mr. Gaston performed work for the Astros during the off-seasons, mostly in Idaho.

12 The Astros provided an off-season training manual, and he performed significant off-season work

13 without being paid.

14 355.364. He was only paid his salary during the season, and his salary began at around $1,100

15 per month. He believes he was paid less than $3,000 in salary his first season, and he believes he never

16 earned more than $8,000 in salary during subsequent seasons.

17 356.365. To summarize, Mr. Gaston, like all Class Members working under the direction of

18 MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime

19 despite routinely working overtime hours, and often worked for no pay.

20 **5.19    Brandon Henderson**

21 357.366. In June of 2010, the Minnesota Twins drafted Brandon Henderson in the 27th round

22 of the 2010 draft. He had no agent or representative, and he quickly signed a UPC. The Twins only

23 pointed out a couple of the UPC's provisions to him, focusing on the salaries.

24 358.367. Mr. Henderson worked most of the 2010 season at the Twins' affiliate in Tennessee,

25 though he spent some time at the Twins' site in Florida. He worked the 2011 season in both Florida

26 and Tennessee. During the season, Mr. Henderson believes he routinely worked more than 50 hours

27 per week.

28

359.368. He worked one spring training at the Twins' site in Florida. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

360.369. Mr. Henderson performed work for the Twins during the off-seasons, mostly in California. The Twins provided an off-season training manual, and he performed significant off-season work without being paid.

361.370. He was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned around $3,000 or less in salary each year that he worked for the Twins.

362.371. He was released on October 21, 2011.

363.372. To summarize, Mr. Henderson, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.20    Tim Pahuta**

364.373. The Washington Nationals drafted Tim Pahuta in the 18th round of the 2005 Rule 4 draft. He did not have an agent, and he quickly signed a UPC. The Nationals focused only on the salary provisions when presenting Mr. Pahuta with the UPC.

365.374. He worked the 2005 season at the Nationals' site in Florida; the 2006 season at the Nationals' affiliate in Savannah, Georgia; the 2007 season at the Florida site; the 2008 season at Hagerstown, Maryland; the 2009 season at Woodbridge, Virginia; the 2010 season at Woodbridge and Harrisburg, Pennsylvania; and the 2011 and 2012 seasons at Harrisburg. During the season, Mr. Pahuta believes he routinely worked more than 50 hours per week.

366.375. He worked several spring trainings at the Nationals' site in Florida. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

367.376. Mr. Pahuta performed work for the Nationals during the off-seasons, mostly in New Jersey but sometimes in Florida. The Nationals provided an off-season training manual, and he performed significant off-season work without being paid.

368.377. He was only paid his salary during the season, and his salary began at around $1,100 or less per month. He believes he earned less than $3,000 in salary during his first season, and he earned less than $10,000 in salary during his last season governed by his initial UPC.

369.378. His initial UPC expired after the 2011 season, and the Nationals re-signed him for a slight salary increase. He believes he made around $20,000 in salary for the 2012 season, but, again, was only paid his salary during the season.

370.379. Because of these salaries, Mr. Pahuta struggled to live. He often lived with host families, or he lived with several other players crammed in a small apartment. He often slept on air mattresses during the season.

371.380. He has not worked for the Nationals since the expiration of his second contract following the 2012 season.

372.381. To summarize, Mr. Pahuta, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.21   Les Smith

373.382. The Detroit Tigers drafted Les Smith in the 27th round of the 2010 Rule 4 draft. He did not have an agent, and he quickly signed a UPC. The Tigers failed to explain all the various provisions of the UPC to Mr. Smith.

374.383. Mr. Smith worked the 2010 season at the Tigers' site in Florida and at the Tigers' short-season affiliate in Connecticut, moving from one level to the next on a moment's notice. During the 2011 season, he again split time between the Tigers' site in Florida (spending significant time in extended spring training) and their affiliate in Connecticut. During the season, Mr. Smith believes he routinely worked more than 50 hours per week.

375.384. He worked multiple spring trainings at the Tigers' site in Florida. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

376.385. Mr. Smith performed work for the Tigers during the off-seasons, mostly in Tennessee. The Tigers provided an off-season training manual, and he performed significant off-season work without being paid.

60

377.386. He was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his first season, and he earned only slightly more during the entire 2011 season.

378.387. Because of these salaries, Mr. Smith struggled to live. He struggled to buy sufficient food, sometimes lived in dorms during the season, and lived with his parents during the off-seasons.

379.388. The Tigers released Mr. Smith on March 27, 2012.

380.389. To summarize, Mr. Smith, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.22    Joseph Newby**

381.390. In June of 2004, Joseph Newby signed with the Oakland Athletics as a non-drafted free agent. He did not have an agent, and he quickly signed a UPC. The Athletics failed to thoroughly explain all the UPC's provisions. After performing about two years of work for the Athletics, they released him in May of 2007.

382.391. In February of 2009, the Seattle Mariners signed Mr. Newby to a UPC. Mr. Newby worked the 2009 season at Mariners' affiliates in High Desert (California), West Tennessee, and Tacoma, Washington, moving between the affiliates at a moment's notice. The Mariners granted Mr. Newby free agency in November of 2009.

383.392. In February of 2011, the Los Angeles Dodgers signed Mr. Newby to a UPC. Mr. Newby split time during the 2011 season between the Dodgers' affiliates in Chattanooga and Albuquerque. The Dodgers granted Mr. Newby free agency in November of 2011.

384.393. While working for all three of these Franchises, Mr. Newby worked similar hours, and believes he routinely worked more than 50 hours per week during the seasons.

385.394. He worked several spring trainings at the Athletics' site in Arizona; worked a spring training at the Mariners' site in Arizona; and worked a spring training at the Dodgers' site in Arizona. While working during spring training for these three Franchises, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

386.395. Mr. Newby performed work for the Franchises during the off-seasons, often in Alaska or Colorado. The Franchises provided off-season training manuals, and he performed significant off-season work without being paid.

387.396. No matter which Franchise employed him, he was only paid his salary during the season, and he believes his salary began at less than $1,100 per month. He believes he earned less than $3,000 in salary during his first season, and his salary remained low during subsequent seasons. As is customary, the Franchises also required him to pay clubhouse dues during the season, sometimes as much as $14 per day, to pay for food and clubhouse services.

388.397. Because of these salaries, Mr. Newby struggled to live. At one point while working for the Athletics, he stayed with a host family that only provided a piece of plywood, two cinder blocks, and an eggshell pad for a bed. While working for the other Franchises, he often slept on an air mattress on the floor of a living room since several teammates crammed into a small apartment to save on rent.

389.398. To summarize, Mr. Newby, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.23   Ryan Hutson

390.399. The New York Mets drafted Ryan Hutson in the 36th round of the 2011 Rule 4 draft. He did not have an agent, no negotiations took place, and he quickly signed a UPC.

391.400. He worked the 2011 season at the Mets' site in Florida, and he also worked the 2012 season at the Mets' site in Florida while in extended spring training. During the season, Mr. Hutson believes he routinely worked more than 50 hours per week.

392.401. Mr. Hutson performed work for the Mets during the off-seasons, mostly in Texas. The Mets provided an off-season training manual, and he performed significant off-season work without being paid.

393.402. He was only paid his salary during the season, and his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his entire first season in 2011, and he believes he earned no more than that in 2012. Because of these salaries, Mr. Hutson struggled to live.

1   ~~394.~~403.  The Mets released Mr. Hutson in June of 2012.

2   ~~395.~~404. To summarize, Mr. Hutson, like all Class Members working under the direction of

3   MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime

4   despite routinely working overtime hours, and often worked for no pay.

5   **5.24    Matt Frevert**

6   ~~396.~~405. In June of 2008, the St. Louis Cardinals drafted Matt Frevert in the 28th round of the

7   Rule 4 draft. He quickly signed a UPC, and the Cardinals did not thoroughly explain all the UPC's

8   provisions.

9   ~~397.~~406. Mr. Frevert worked the 2008 season at the Cardinals' affiliates in Tennessee and

10  Iowa; the 2009 season at the Cardinals' site in Florida (in extended spring training) and at their affiliate

11  in Iowa; the 2010 season at their advanced Class A affiliate in Florida; and the beginning of the 2011

12  season at their Double-A affiliate in Missouri. The Cardinals released Mr. Frevert in May of 2011.

13  ~~398.~~407. Also in May of 2011, the Atlanta Braves signed Mr. Frevert to a UPC shortly after

14  the Cardinals released him. He worked for the Braves at their affiliate in Lynchburg, Virginia, before

15  retiring in July of 2011.

16  ~~399.~~408. While working for either Franchise, Mr. Frevert worked similar hours, and believes

17  he routinely worked more than 50 hours per week during the seasons.

18  ~~400.~~409. He worked several spring trainings at the Cardinals' site in Florida. While working

19  during spring training, he did not earn a salary for this work, even though he often worked full

20  workdays, 7 days per week.

21  ~~401.~~410. Mr. Frevert performed work for the Cardinals during the off-seasons, usually in

22  Missouri. The Cardinals provided an off-season training manual, and he performed significant off-

23  season work without being paid.

24  ~~402.~~411. No matter which Franchise employed him, he was only paid his salary during the

25  season, and he believes his salary began at $1,100 per month. He believes he earned around $3,000 in

26  salary during his first season and his salary remained low during subsequent seasons. As is customary

27  across all teams, the Franchises also required him to pay clubhouse dues during the season to pay for

28  food and clubhouse services.

63

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

403.412. Because of these salaries, Mr. Frevert struggled to live. At one point while working for the Cardinals, he and several teammates were forced to live in the clubhouse—sleeping on couches, the floor, or air mattresses—for a short period of time during a season. At other times, he and several teammates often crammed 4 or 5 players into a 2-bedroom apartment to save on rent.

404.413. To summarize, Mr. Frevert, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.25   Roberto Ortiz**

405.414. The Arizona Diamondbacks signed Roberto Ortiz in 2008 as a non-drafted free agent. He did not have an agent, and he quickly signed a UPC without any negotiations. The Diamondbacks failed to thoroughly explain all the UPC's provisions.

406.415. Mr. Ortiz  worked the 2009 season at the Diamondbacks' site in the Dominican Republic; the 2010 at their site in the Dominican Republic and at their affiliate in Yakima, Washington; and the 2011 season at their site in Arizona (in extended spring training) and at their affiliate in South Bend, Indiana. The Diamondbacks released him on March 23, 2012.

407.416. In May of 2012, the Baltimore Orioles signed Mr. Ortiz to a UPC. Mr. Ortiz worked the 2012 season at the Orioles' site in Florida (in extended spring training) and at their affiliate in Aberdeen, Maryland. The Orioles released Mr. Ortiz around July 16, 2012.

408.417. While working for either Franchise, Mr. Ortiz worked similar hours, and he believes he routinely worked more than 50 hours per week during the seasons.

409.418. He worked multiple spring trainings at the Diamondbacks' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week. He also does not believe he earned his salary during extended spring training.

410.419. Mr. Ortiz performed work for the Diamondbacks during the off-seasons, often in Puerto Rico. The Diamondbacks provided off-season training manuals, and he performed significant off-season work without being paid.

411.420. No matter which Franchise employed him, he was only paid his salary during the season. While working at the Diamondbacks' site in the Dominican Republic, he believes his salary began at around $500 per month. He believes he earned around $1100 per month while working at the Diamondbacks' affiliates within the United States, and believes he earned only slightly more while working for the Orioles in Aberdeen. The most Mr. Ortiz believes he ever made in salary during a season was around $4,000.

412.421. Because of these salaries, Mr. Ortiz struggled to live. He often lived with host families during the season, but when host families were not available, he had to ask his mom for assistance to help pay for an apartment.

413.422. To summarize, Mr. Ortiz, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.26    Witer Jimenez**

414.423. In May of 2010, the Philadelphia Phillies signed Witer Jimenez as an international free agent. He quickly signed a UPC, and the Phillies failed to thoroughly explain all the UPC's provisions.

415.424. Mr. Jimenez worked the 2010 season at the Phillies' site in the Dominican Republic. He worked the 2011 season at their site in Florida (both at extended spring training and during the Rookie season) and at their affiliate in Williamsport, Pennsylvania. The Phillies released Mr. Jimenez in October of 2011.

416.425. While working for the Phillies, Mr. Jimenez believes he routinely worked more than 50 hours per week during the seasons.

417.426. He worked during spring training at the Phillies' site in Florida. While working during spring training, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week. He also does not believe he earned a salary while in extended spring training.

418.427. Mr. Jimenez performed work for the Phillies during the off-seasons, often in the Dominican Republic. The Phillies expected him to perform this work, and he performed significant off-season work without being paid.

419.428. He was only paid his salary during the season. While working at the Phillies' site in the Dominican Republic in 2010, he believes his salary began at around $500 per month. While working at the Phillies' affiliates in the United States during the 2011 championship season, he believes he only made around $1100 per month.

420.429. Because of these salaries, Mr. Jimenez struggled to live. At one point during the season, he and several teammates crammed six players into a 2-bedroom apartment to save on rent.

421.430. To summarize, Mr. Jimenez, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.27    Kris Watts**

422.431. The Pittsburgh Pirates drafted Kris Watts in the 16th round of the 2006 Rule 4 draft. He quickly signed a UPC. He did not have an agent, and the Pirates did not thoroughly explain all the UPC's provisions.

423.432. Mr. Watts worked the 2006 season at the Pirates' affiliate in Williamsport, Pennsylvania; the 2007 season at their affiliate in Hickory, North Carolina; the 2008 season at their affiliates in Altoona, Pennsylvania and Lynchburg, Virginia; the 2009 season in Lynchburg; the 2010 season in Altoona; the 2011 season in Altoona and at their affiliate in Indianapolis; and part of the 2012 season in Indianapolis. The Pirates traded Mr. Watts to the Washington Nationals in June of 2012.

424.433. After being traded, Mr. Watts worked the rest of the 2012 season at the Nationals' affiliate in Harrisburg, Pennsylvania. His contract expired in November of 2012, and the Nationals re-signed him to another UPC. He worked the 2013 season at Harrisburg and at the Nationals' affiliate in Syracuse, New York. The Nationals released Mr. Watts in September of 2013.

425.434. While working for either Franchise, Mr. Watts worked similar hours, and believes he routinely worked more than 50 hours per week during the seasons.

426.435. He worked several spring trainings at the Pirates' site in Florida, and he worked one spring training at the Nationals' site in Florida. While working during spring training for either team, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

427.436. Mr. Watts performed work for the Franchises during the off-seasons, often in California but also in Arizona during the later years of his career. Both Franchises provided off-season training manuals, and he performed significant off-season work without being paid.

428.437. No matter which Franchise employed him, he was only paid his salary during the season, and he believes his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his first season, and his salary remained low in subsequent years.

429.438. Because of these salaries, Mr. Watts struggled to live. He at times lived with host families, and at other times he lived with many guys crammed into a small apartment. He often slept on a cheap air mattress during the season.

430.439. To summarize, Mr. Watts, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.28    Mitch Hilligoss**

431.440. In June of 2006, the New York Yankees drafted Mitch Hilligoss in the 6th round of the Rule 4 draft. He quickly signed a UPC, and the Yankees did not thoroughly explain all the UPC's provisions.

432.441. Mr. Hilligoss worked the 2006 season at the Yankees' affiliate in Staten Island; the 2007 season at their affiliate in Charleston, South Carolina; the 2008 season at their site in Tampa; and the 2009 season in Tampa. He was traded to the Texas Rangers in January of 2010.

433.442. After being traded, Mr. Hilligoss worked the 2010 season at the Rangers' affiliates in Bakersfield, California and Frisco, Texas. He worked the 2011 season at their affiliates in Frisco and Myrtle Beach, South Carolina, though he also worked some at their site in Arizona in extended spring training. The Rangers released him in December of 2011.

434.443. While working for either Franchise, Mr. Hilligoss worked similar hours, and believes he routinely worked more than 50 hours per week during the seasons.

435.444. He worked several spring trainings at the Yankees' site in Florida. He also worked two spring trainings at the Rangers' site in Arizona. While working during spring training for either Franchise, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

436.445. He also worked at two instructional leagues while with the Yankees which took place at the Yankees site in Florida (the same site as spring training, which is customary). He performed a workload similar to that in spring training alongside around 40 or 45 teammates. Like spring training, he did not earn a salary for this work.

437.446. Mr. Hilligoss performed work for the Franchises during the off-seasons, usually in Illinois. The Franchises both provided off-season training manuals, and he performed significant off-season work without being paid.

438.447. No matter which Franchise employed him, he was only paid his salary during the season, and he believes his salary began at around $1,100 per month. He believes he earned around $3,000 in salary during his first season, and his salary remained low throughout his career.

439.448. Because of these salaries, Mr. Hilligoss struggled to live. He states that he almost always slept on a cheap air mattress during the season, and he almost always lived with many other players crammed in a small apartment during the season.

440.449. To summarize, Mr. Hilligoss, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

### 5.29   Matt Gorgen

441.450. The Tampa Bay Rays selected Matt Gorgen in the 16th round of the 2008 Rule 4 draft. He quickly signed a UPC at his home in Northern California, and the Rays focused mainly on the UPC provisions pertaining to salaries and signing bonus.

442.451. Mr. Gorgen worked the 2008 season at the Rays' affiliate in Hudson Valley, New York; the 2009 season at their affiliates in Port Charlotte, Florida and Montgomery, Alabama; and the 2010 season in Montgomery. The Rays traded Mr. Gorgen to the Diamondbacks in September of 2010.

443.452. Mr. Gorgen spent the 2011 season working at the Diamondbacks site in Arizona since he was injured. He worked the 2012 and 2013 seasons while splitting time at the Diamondbacks' affiliates in Reno, Nevada and Mobile, Alabama. The Diamondbacks released Mr. Gorgen in October of 2013.

444.453. While working for either Franchise, Mr. Gorgen worked similar hours, and believes he routinely worked more than 50 hours per week during the seasons.

445.454. He worked several spring trainings at the Rays' site in Florida and at the Diamondbacks' site in Arizona. While working for either Franchise during spring training, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

446.455. Mr. Gorgen performed work for the Franchises during the off-seasons, usually in California. The Franchises provided an off-season training manual, and he performed significant off-season work without being paid.

447.456. No matter which Franchise employed him, he was only paid his salary during the season, and he believes his salary began at $1,100 per month. He believes he earned around $3,000 in salary during his first season, and his salary remained low throughout his career. As is customary, he paid clubhouse dues during the season to pay for food and clubhouse services.

448.457. Because of these salaries, Mr. Gorgen struggled to live. Like many others in the minor leagues, he often slept on cheap air mattresses during the season.

449.458. To summarize, Mr. Gorgen, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.30    Brett Newsome**

450.459. The Washington Nationals signed Brett Newsome as a non-drafted free agent in June of 2008. He quickly signed a UPC at the Nationals' complex in Florida, and the Nationals failed to fully explain all the UPC's various provisions.

451.460. Mr. Newsome worked the 2008 season at the Nationals' site in Florida (at the Rookie level); the 2009 season at their site in Florida (at the Rookie level and in extended spring training) and at their affiliate in Hagerstown, Maryland; and the 2010, 2011, and 2012 seasons in Hagerstown.  The Nationals released Mr. Newsome in January of 2013.

452.461. While working for the Nationals, Mr. Newsome believes he routinely worked more than 50 hours per week during the seasons.

453.462. He worked several spring trainings at the Nationals' site in Florida. While working during spring training, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week. Mr. Newsome also went to the Nationals' instructional league in 2009 (which took place at the Nationals' training site in Florida); worked similar hours to those worked during spring training; and, like spring training, did not earn a salary. He also believes he did not get paid his salary while working during extended spring training.

454.463. Mr. Newsome performed work for the Nationals during the off-seasons, usually in Illinois. The Nationals provided an off-season training manual, and he performed significant off-season work without being paid.

455.464. He was only paid his salary during the season, and he believes his salary began at $1,100 per month. He believes he earned around $3,000 in salary during his first season, and his salary remained low throughout his career.

456.465. Because of these salaries, Mr. Newsome struggled to live. He often lived with many other players crammed in a small apartment—with guys often sleeping on air mattresses in the living room and dining room—in order to save money. He also lived with host families at times.

457.466. To summarize, Mr. Newsome, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.31**     **Jake Opitz**

458.467. In June of 2008, the Chicago Cubs selected Jake Opitz in the 12th round of the Rule 4 draft. He quickly signed a UPC, and the Cubs did not fully explain all the UPC's various provisions to him.

459.468. Mr. Opitz worked the 2008 season at the Cubs' affiliates in Boise, Idaho and Peoria, Illinois; the 2009 season at their affiliate in Daytona, Florida; the 2010 season at their affiliates in Daytona and in Knoxville, Tennessee; and the 2011 season at Daytona and at their site in Arizona (in extended spring training while injured). The Cubs released Mr. Opitz in March of 2012.

460.469. The Philadelphia Phillies signed Mr. Opitz to a UPC in the summer of 2012. Mr. Opitz worked the rest of that season at their affiliates in Reading, Pennsylvania and Allentown, Pennsylvania. They granted him free agency in November of 2012.

461.470. While working for either Franchise, Mr. Opitz worked similar hours, and believes he routinely worked more than 50 hours per week during the seasons.

462.471. He worked several spring trainings at the Cubs' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week. He also went to the Cubs' instructional league one year (at the Cubs' training site in Arizona); worked similar hours as those worked during spring training; and, like spring training, did not earn a salary for the work.

463.472. Mr. Opitz performed work for the Franchises during the off-seasons, usually in Colorado, but sometimes in Nebraska or Arizona. The Franchises provided an off-season training manual, and he performed significant off-season work without being paid. Moreover, he worked considerable time for the Cubs in Arizona during the 2009–2010 off-season while recovering from an injury; as is customary across the industry, he and many other Cubs' minor leaguers (some injured and some not injured) trained at the Cubs' site in Arizona that off-season. As usual, he did not receive a salary for this off-season work.

464.473. No matter which Franchise employed him, he was only paid his salary during the season, and he believes his salary began at $1,100 per month. He believes he earned around $3,000 in salary during his first season, and his salary remained low throughout his career.

465.474. Because of these salaries, Mr. Opitz struggled to live. Like many others in the minor leagues, he lived with many other players crammed into a small apartment and sometimes slept on a cheap air mattress during the season.

71

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1   466.475. To summarize, Mr. Opitz, like all Class Members working under the direction of

2   MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime

3   despite routinely working overtime hours, and often worked for no pay.

4   **5.32   Daniel Britt**

5   467.476. In June of 2010, the Milwaukee Brewers drafted Daniel Britt in the 29th round of the

6   Rule 4 draft. He quickly signed a UPC, and the Brewers did not fully explain all the UPC's various

7   provisions to him.

8   468.477. Mr. Britt worked the 2010 season at the Brewers' site in Arizona, and he worked the

9   2011 season at their affiliate in Wisconsin. The Brewers released Mr. Britt in November of 2011.

10   469.478. While working for the Brewers, Mr. Britt routinely worked more than 50 hours per

11   week during the seasons.

12   470.479. He worked one spring training at the Brewers' site in Arizona. He did not earn a

13   salary for this work, even though he often worked full workdays, 7 days per week.

14   471.480. Mr. Britt performed work for the Brewers during the off-seasons, usually in North

15   Carolina but also in Arizona. The Brewers provided an off-season training manual, and he performed

16   significant off-season work without being paid.

17   472.481. Mr. Britt was only paid his salary during the season, and he believes his salary began

18   at $1,100 per month. He believes he earned around $3,000 in salary during his first season, and his

19   salary remained low throughout his career.

20   473.482. Because of these salaries, Mr. Britt struggled to live. Like many others in the minor

21   leagues, he lived in either a small apartment or with a host family.

22   474.483. To summarize, Mr. Britt, like all Class Members working under the direction of

23   MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime

24   despite routinely working overtime hours, and often worked for no pay.

25   **5.33 Joel Weeks**

26

27

28

475.484. The San Francisco Giants signed Joel Weeks as a non-drafted free agent in June of 2008. He quickly signed a UPC without having the opportunity to negotiate the terms.

476.485. Mr. Weeks worked the 2008 season at the Giants' site in Arizona; the 2009 season at the Giants' affiliates in Salem, Oregon and Augusta, Georgia; the 2010 season at the Giants' affiliate in San Jose; the 2011 season at affiliates in Augusta and Richmond, Virginia; and the 2012 season in Richmond. Mr. Weeks voluntarily retired before the 2013 season.

477.486. While working for the Giants, Mr. Weeks routinely worked more than 50 hours per week during the seasons.

478.487. He worked several spring trainings at the Giants' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

479.488. Mr. Weeks performed work for the Giants during the off-seasons, usually in California. The Giants provided an off-season training manual, and he performed significant off-season work without being paid.

480.489. Mr. Weeks was only paid his salary during the season. He believes he earned around $3,000 in salary during his first season, and his salary remained low throughout his career. Because of these salaries, Mr. Weeks struggled to live.

481.490. To summarize, Mr. Weeks, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.34 Gaspar Santiago**

482.491. In June of 2010, the San Francisco Giants drafted Gaspar Santiago in the 28th round of the Rule 4 draft. He quickly signed a UPC without having the opportunity to negotiate the terms.

483.492. Mr. Santiago worked the 2010 season at the Giants' site in Arizona; the 2011 season at their affiliate in Augusta, Georgia; and the 2012 season at their site in Arizona (in extended spring training) and at their affiliate in Salem, Oregon. The Giants released Mr. Santiago in March of 2013.

484.493. While working for the Giants, Mr. Santiago routinely worked more than 50 hours per week during the seasons.

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

485.494. He worked several spring trainings at the Giants' site in Arizona. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week. Mr. Santiago also went to the Giants' instructional league (which took place at the Giants' training site in Arizona); worked similar hours to those worked during spring training; and, like spring training, did not earn a salary. He also believes he did not get paid his salary while working during extended spring training.

486.495. Mr. Santiago performed work for the Giants during the off-seasons, usually in Puerto Rico. The Giants provided an off-season training manual, and he performed significant off-season work without being paid.

487.496. Mr. Santiago was only paid his salary during the season. He believes he earned around $3,000 in salary during his first season, and his salary remained low throughout his career. Because of these salaries, Mr. Santiago struggled to live.

488.497. To summarize, Mr. Santiago, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.35 Matt Lewis**

498. In June of 2010, the Atlanta Braves drafted Matt Lewis in the 10th round of the Rule 4 draft. He quickly signed a UPC a short time later.

499. Mr. Lewis worked the 2010 season at the Braves' affiliate in Danville, Virginia, and he worked the 2011 season at their site in Florida. The Braves released Mr. Lewis in August of 2011.

500. While working for the Braves, Mr. Lewis routinely worked more than 50 hours per week during the seasons.

501. He worked a spring training at the Braves' site in Florida. He did not earn a salary for this work, even though he often worked full workdays, 7 days per week. He also worked similar hours during the Braves' instructional league (at their spring site), and he was again not paid. He also believes he did not get paid his salary while working during extended spring training.

502. Mr. Lewis performed work for the Braves during the off-seasons in California. The Braves provided an off-season training manual, and he performed significant off-season work without being paid.

74

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

503. Mr. Lewis was only paid his salary during the season. He believes he earned only a few thousand dollars in salary during his first season, and his salary remained low his second season. Because of these salaries, Mr. Lewis struggled to live.

504. To summarize, Mr. Lewis, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.36 Nick Giarraputo**

505. In June of 2006, the New York Mets selected Nick Giarraputo in the 12th round of the Rule 4 draft. He quickly signed a UPC.

506. Mr. Giarraputo worked the 2006 season at the Mets' Rookie affiliate in Florida; the 2007 season at their affiliate in Kingsport, Tennessee; and the 2008 and 2009 seasons at their affiliates in Brooklyn and Savannah. The Mets released Mr. Giarraputo in April of 2010.

507. In January of 2013, the Chicago White Sox signed Mr. Giarraputo to a UPC. They then released him in April of 2013.

508. Mr. Giarraputo believes he routinely worked more than 50 hours per week during the seasons.

509. He worked several spring trainings for the teams. For both teams, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week. He also went to two instructional leagues and spent time in extended spring trainings, and he worked similarly long hours without being paid his salary.

510. Mr. Giarraputo performed work for the Franchises during the off-seasons in California. He received off-season training manuals, and he performed significant off-season work without being paid.

511. No matter which Franchise employed him, he was only paid his salary during the season, and he believes he earned only a few thousand dollars in salary during his first season. His salary remained low throughout his career. Because of these salaries, Mr. Giarraputo struggled to live.

512. To summarize, Mr. Giarraputo, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime

75
COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1    despite routinely working overtime hours, and often worked for no pay.

2    **5.37 Leonard Davis**

3    513. In June of 2004, the Montreal Expos—who became the Washington Nationals in 2005—

4    selected Leonard Davis in the 8th round of the Rule 4 draft. He quickly signed a UPC.

5    514. Mr. Davis worked the 2004 season in Florida; the 2005 season in Florida and Vermont;

6    the 2006 season at the Nationals' affiliate in Savannah; the 2007 season at affiliates in Maryland and

7    Virginia; the 2008 seasons at affiliates in Virginia, Pennsylvania, and Ohio; and the 2009 and 2010

8    seasons at affiliates in Pennsylvania and New York. The Nationals granted Mr. Davis free agency in

9    November of 2010.

10   515. In February of 2011, the Toronto Blue Jays signed Mr. Davis to a UPC. They then

11   released him in April of 2011 towards the end of spring training. The Nationals re-signed Mr. Davis in

12   July of 2011, and he worked at their affiliate in Pennsylvania. He was again granted free agency in

13   November of 2011. The Colorado Rockies next signed Mr. Davis in December of 2011, and they

14   released him in March of 2012 towards the end of spring training.

15   516. Mr. Davis believes he routinely worked more than 50 hours per week during the seasons.

16   517. He worked several spring trainings for the teams. No matter the team, he did not earn a

17   salary for this work, even though he often worked full workdays, 7 days per week.

18   518. Mr. Davis performed work for the Franchises during the off-seasons, usually in

19   California. He received off-season training manuals, and he performed significant off-season work

20   without being paid.

21   519. No matter which Franchise employed him, he was only paid his salary during the season,

22   and he believes he earned only a few thousand dollars in salary during his first season. His salary

23   remained low throughout his career. Because of these salaries, Mr. Davis struggled to live.

24   520. To summarize, Mr. Davis, like all Class Members working under the direction of MLB,

25   the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite

26   routinely working overtime hours, and often worked for no pay.

27   **5.38 David Quinowski**

28

1    521. In June of 2004, the San Francisco Giants selected David Quinowski in the 46th round

2    of the Rule 4 draft. He briefly went to a community college before the Giants signed him to a UPC in

3    May of 2005.

4    522. Mr. Quinowski worked the 2005 season at the Giants' affiliate in Oregon; the 2006

5    season at their affiliate in Georgia; the 2007 season at their affiliate in San Jose; the 2008 season

6    mostly at their site in Arizona; the 2009 season at their affiliate in Oregon; the 2010 season at their

7    affiliates in San Jose and Virginia; and the 2011 season at their affiliate in Virginia. The Giants released

8    Mr. Quinowski in March of 2012.

9    523. In January of 2013, the Baltimore Orioles signed Mr. Quinowski to a UPC. They then

10   released him in May of 2013.

11   524. Mr. Quinowski believes he routinely worked more than 50 hours per week during the

12   seasons.

13   525. He worked several spring trainings for the teams. For both teams, he did not earn a salary

14   for this work, even though he often worked full workdays, 7 days per week. He also went to

15   instructional leagues and spent time in extended spring trainings, and he worked similarly long hours

16   without being paid his salary.

17   526. Mr. Quinowski performed work for the Franchises during the off-seasons, usually in

18   California. He received off-season training manuals, and he performed significant off-season work

19   without being paid.

20   527. No matter which Franchise employed him, he was only paid his salary during the season,

21   and he believes he earned only a few thousand dollars in salary during his first season. His salary

22   remained low throughout his career. Because of these salaries, Mr. Quinowski struggled to live.

23   528. To summarize, Mr. Quinowski, like all Class Members working under the direction of

24   MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime

25   despite routinely working overtime hours, and often worked for no pay.

26   **5.39 Mark Wagner**

27   529. In June of 2005, the Boston Red Sox selected Mark Wagner in the 9th round of the Rule

28   4 draft. He quickly signed a UPC.

77

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

530. Mr. Wagner worked the 2005 season at the Red Sox' short-season affiliate in Massachusetts; the 2006 season at affiliates in South Carolina and North Carolina; the 2007 season at their affiliate in California; the 2008 season at their affiliate in Maine; the 2009 season at their affiliates in Maine and Rhode Island; the 2010 season at their spring site in Florida and their affiliates in Massachusetts and Rhode Island; and the 2011 season at their affiliates in Maine and Virginia. The Red Sox granted Mr. Wagner free agency in November of 2011.

531. In March of 2013, the San Francisco Giants signed Mr. Wagner to a UPC. They then released him in November of 2013.

532. For either team, Mr. Wagner believes he routinely worked more than 50 hours per week during the seasons.

533. He worked several spring trainings for the Franchises. For both teams, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

534. Mr. Wagner performed work for the Franchises during the off-seasons, usually in California. He received off-season training manuals from the Franchises, and he performed significant off-season work without being paid.

535. No matter which Franchise employed him, he was only paid his salary during the season, and he believes he earned only a few thousand dollars in salary during his first season.

536. To summarize, Mr. Wagner, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, often worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.40 Brandon Pinckney**

537. In June of 2003, the Cleveland Indians selected Brandon Pinckney in the 12th round of the Rule 4 draft. He quickly signed a UPC in California.

538. Mr. Pinckney worked several seasons at various affiliates of the Indians, including in North Carolina, Ohio, and New York. The Indians released Mr. Pinckney in April of 2009.

539. In May of 2009, the Baltimore Orioles signed Mr. Pinckney to a UPC. He spent the season working at their affiliates in Maryland and Virginia. The Orioles granted him free agency in November of 2009.

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

540. In January of 2010, the Philadelphia Phillies signed Mr. Pinckney to a UPC. He worked part of that season at their affiliate in Pennsylvania. The Phillies released him in June of 2010.

541. After the Phillies released Mr. Pinckney, the Athletics then signed him to a UPC in late June of 2010. He worked at their affiliate in California. The Athletics granted him free agency in November of 2010.

542. No matter which team he worked for, Mr. Pinckney believes he routinely worked more than 50 hours per week during the seasons.

543. He worked several spring trainings for the Franchises. No matter the team, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

544. Mr. Pinckney performed work for the Franchises during the off-seasons, usually in California. He received off-season training manuals, and he performed significant off-season work without being paid.

545. No matter which Franchise employed him, he was only paid his salary during the season, and he believes he earned only a few thousand dollars in salary during his first season. His salary remained low throughout his career. Because of these salaries, Mr. Pinckney struggled to live.

546. To summarize, Mr. Pinckney, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.41 Lauren Gagnier**

547. The Detroit Tigers selected Lauren Gagnier in the 10th round of the 2006 Rule 4 draft. He quickly signed a UPC.

548. Mr. Gagnier worked the 2006 season at the Tigers' New York affiliate; the 2007 season at their affiliate in Michigan; the 2008 seasons at affiliates in Pennsylvania and Ohio; the 2009 season at affiliates in Florida and Pennsylvania; and the 2010 and 2011 seasons at affiliates in Ohio and Pennsylvania. The Tigers released Mr. Gagnier in March of 2012.

549. Mr. Gagnier believes he routinely worked more than 50 hours per week during the seasons.

79

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

550. He worked several spring trainings for the Tigers, and he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

551. Mr. Gagnier performed work for the Tigers during the off-seasons, usually in California. He received off-season training manuals, and he performed significant off-season work without being paid.

552. Mr. Gagnier was only paid his salary during the season, and he believes he earned only a few thousand dollars in salary during his first season. His salary remained low throughout his career. Because of these salaries, Mr. Gagnier struggled to live.

553. To summarize, Mr. Gagnier, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.42 Omar Aguilar**

554. In June of 2005, the Milwaukee Brewers selected Omar Aguilar in the 30th round of the Rule 4 draft. He signed a UPC a short time later.

555. Mr. Aguilar worked the 2005 to 2009 seasons for the Brewers at their spring site in Arizona and at affiliates in Florida, Arizona, West Virginia, and Alabama. The Brewers traded Mr. Aguilar to the Indians in March of 2010. Mr. Aguilar worked the 2010 season for the Indians at their affiliate in Akron, Ohio. The Indians released him in March of 2011.

556. For either team, Mr. Aguilar believes he routinely worked more than 50 hours per week during the season.

557. He worked several spring trainings for the Brewers and Indians. For either Franchise, he did not earn a salary for this work, even though he often worked full workdays, 7 days per week.

558. Mr. Aguilar performed work for the Brewers and Indians during the off-seasons, generally in California. He received off-season training manuals, and he performed significant off-season work without being paid by either Franchise.

559. The Brewers and Indians only paid his salary during the season, and he believes he earned only a few thousand dollars in salary during his first season.

560. To summarize, Mr. Aguilar, like all Class Members working under the direction of MLB,

the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

**5.43 Grant Duff**

561. The New York Yankees selected Grant Duff in the 31st round of the 2004 Rule 4 draft. He played a while longer at a community college, and then the Yankees signed him to a UPC in May of 2005.

562. Mr. Duff worked the 2005 season at the Yankees' site in Florida; the 2006 season at their spring site and at their short-season affiliate in New York; the 2007 season at their affiliate in South Carolina; the 2008 season at their Advanced-A affiliate in Tampa; the 2009 season at affiliates in New Jersey and Tampa; the 2010 season at their affiliates in New Jersey and Pennsylvania; and the 2011 seasons at their New Jersey affiliate. The Yankees granted Mr. Duff free agency in November of 2011; re-signed Mr. Duff in November of 2011; and then released Mr. Duff in March of 2012.

563. Mr. Duff believes he routinely worked more than 50 hours per week during the seasons.

564. He worked several spring trainings for the Yankees, and he did not earn a salary for this work, even though he often worked full workdays, 7 days per week. He also went to at least one instructional league and again worked similar hours for no salary.

565. Mr. Duff performed work for the Yankees during the off-seasons, usually in California. He received off-season training manuals, and he performed significant off-season work without being paid.

566. Mr. Duff was only paid his salary during the season, and he believes he earned only a few thousand dollars in salary during his first season. His salary remained low throughout his career. Because of these salaries, Mr. Duff struggled to live.

567. To summarize, Mr. Duff, like all Class Members working under the direction of MLB, the Franchises, and Mr. Selig, worked for less than minimum wage, received no overtime despite routinely working overtime hours, and often worked for no pay.

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

# VII.  FEDERAL WAGE AND HOUR VIOLATIONS

## Count 1: FLSA Minimum Wage and Overtime Violations

(Plaintiffs and the Minor League Collective Against All Defendants)

489.568. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

490.569. As detailed above, the Defendants have engaged in a long-standing and widespread violation of the FLSA. The FLSA's minimum wage and overtime requirements, 29 U.S.C. §§ 201 et seq., and the supporting regulations, apply to all Defendants and protect Plaintiffs and the class members.

491.570. At all relevant times, Plaintiffs and all the minor leaguers of the proposed class were (and/or continue to be) employees within the meaning of 29 U.S.C. § 203(e), and were (and/or continue to be) employed by covered enterprises and/or entities engaged in commerce and/or the production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 203(e), (r) and (s). The work also regularly involves interstate commerce.

492.571. At all relevant times, the Defendants jointly employed (and/or continue to employ) Plaintiffs and all similarly-situated minor leaguers within the broad meaning of 29 U.S.C. §§ 203(d) and (g).

493.572. The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay Plaintiffs and all similarly-situated minor leaguers the applicable minimum wage for all hours the minor leaguers worked on behalf of Defendants, and continue to engage in such a policy and practice.

494.573. Further, the Defendants constructed, implemented, and engaged in a policy and practice that failed to pay Plaintiffs and all similarly-situated minor leaguers the applicable overtime wage for all hours minor leaguers worked beyond the normal, forty-hour workweek, and continue to engage in such a policy and practice.

495.574. Defendants also implemented and engaged in the policy and/or practice of failing to pay Plaintiffs and all similarly-situated minor leaguers any wages at all for many hours the minor leaguers worked on behalf of Defendants, and continue to engage in such policies and practices.

496.575. As a result of these minimum wage and overtime violations, Plaintiffs and all similarly-situated minor leaguers have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

497.576. The Defendants' pattern of unlawful conduct was and continues to be willful and intentional, or the Defendants at least acted with reckless disregard. The Defendants were and are aware, or should have been aware, that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with the FLSA with respect to the compensation of Plaintiffs and all similarly-situated minor leaguers. Instead, the Defendants knowingly and/or recklessly disregarded federal wage and hour laws.

498.577. All similarly-situated minor leaguers are entitled to collectively participate in this action by choosing to "opt-in" and submitting written Consents to Join this action. 29 U.S.C. § 216(b).

## Count 2: FLSA Recordkeeping Requirements

(Plaintiffs and the Minor League Collective Against All Defendants)

499.578. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

500.579. The Defendants failed (and continue to fail) to make, keep, and preserve accurate records with respect to Plaintiffs and all similarly-situated minor leaguers, including hours worked each workday and total hours worked each workweek, as required by the FLSA, 29 U.S.C. § 211(c), and supporting federal regulations.

501.580. The lack of recordkeeping has harmed the Plaintiffs and creates a rebuttable presumption that the employees' estimates of hours worked are accurate.[67]

---

[67] *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946).

# VIII.  STATE WAGE AND HOUR VIOLATIONS

~~502.~~581. The state Counts seek to recover for all minor league work performed by the Proposed Classes, including (but not limited to) winter off-season work. Plaintiffs are informed and believe that, during the winter work periods, most minor leaguers return to the state where they were drafted, where they work without pay.

~~503.~~582. The states enumerated in the Proposed Classes routinely produce high numbers of minor leaguers.[68] Thus, Plaintiffs are informed and believe that all Defendants employed and continue to employ minor leaguers in each of the states enumerated in the Proposed Classes during the relevant time periods. Upon information and belief, Plaintiffs further allege that each of the Defendants violated the laws in each of the states enumerated in the Proposed Classes due to uncompensated winter off-season work and/or work performed during other portions of the year.

## Count 3: California Minimum Wage Violations

(The California Class Representatives and the California Class Against All Defendants)

~~504.~~583. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

~~505.~~584. Pursuant to California law, the Defendants are and were required to pay the California Class Representatives and the California Class a minimum wage set by California state law. Cal. Lab. Code §§ 1182 et seq. and 1197. The state's minimum wage requirements apply to the Defendants and protect the California Class Representatives and the California Class.

~~506.~~585. The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay the California Class Representatives and all of the California Class the applicable minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and they continue to engage in such practices.

---

[68] For instance, California averaged 221 draft picks per year during the last Rule 4 drafts; Florida averaged 141 per year; North Carolina averaged 51 per year; Arizona averaged 46 per year; and New York averaged 32 per year. *See All-time Draft Database*, Baseball America, http://www.baseballamerica.com/all-time-draft-db/ (last visited Feb. 6, 2013) (providing a database that allows searches of draft picks by state, which allows for counting draft picks).

507.586. As a result of these minimum wage violations, the California Class Representatives and the California Class have suffered (and continue to suffer) damages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to California Labor Code §§ 1194 and 1194.2.

508.587. The Defendants pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with California's minimum wage requirements with respect to the compensation of the California Class Representatives and the California Class, and instead knowingly and/or recklessly disregarded state law.

**Count 4: California Unpaid Overtime Violations**

(The California Class Representatives and the California Class Against All Defendants)

509.588. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

510.589. The laws of California require the Defendants to pay overtime compensation for work in excess of eight hours in a day or forty hours in a week, at a rate of one and one-half times the regular rate of pay for the employee. Cal. Lab. Code § 510. The laws of California further require employees to be compensated at twice the regular rate of pay for work in excess of twelve hours in one day. The state's overtime requirements apply to the Defendants and protect the California Class Representatives and the California Class members.

511.590. Throughout the California Class period, the California Class Representatives and the California Class routinely worked (and continue to work) in excess of 8 hours per workday, sometimes work(ed) in excess of 12 hours in a workday, routinely work(ed) in excess of 40 hours in a workweek, usually work(ed) 7 days in a workweek and sometimes in excess of 8 hours on the seventh day of the workweek.

512.591. The Defendants failed and continue to fail to pay the California Class Representatives and the California Class overtime wages as required by California Labor Code § 510.

513.592. As a result of these violations, the California Class Representatives and the California

1   Class have suffered and continue to suffer damages in amounts to be determined at trial, and are

2   entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and

3   other compensation pursuant to California Labor Code § 1194.

4       ~~514.~~593. As a result of these violations, and pursuant to California Labor Code § 558, the

5   California Class Representatives and the California Class are also entitled to recover civil penalties in

6   the amount of $50 per employee per violative pay period for initial violations and $100 per employee

7   per violative pay period for subsequent violations.

8       ~~515.~~594. The Defendants pattern of unlawful conduct was and continues to be willful and

9   intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

10  that the practices described in this Complaint are unlawful. The Defendants have not made a good-

11  faith effort to comply with California's overtime requirements with respect to the compensation of

12  the California Class Representatives and the California Class, and instead knowingly and/or recklessly

13  disregarded state law.

**Count 5: Violation of California "Payday" Requirements**

(The California Class Representatives and the California Class Against All Defendants)

16      ~~516.~~595. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

17  paragraphs.

18      ~~517.~~596. California law requires employers to pay employees on designated days at least twice

19  per calendar month. Cal. Lab. Code § 204. Overtime wages must be paid no later than the payday

20  following the payroll period during which overtime wages are earned. These requirements apply to the

21  Defendants and protect the California Class Representatives and the California Class members.

22      ~~518.~~597. The Defendants failed and continue to fail to pay overtime wages in a timely manner

23  as required by California Labor Code § 204.

24      ~~519.~~598. As a result of these violations, the California Class Representatives and the California

25  Class have suffered and continue to suffer damages in amounts to be determined at trial, and are

26  entitled to recover penalties in the amount of $100 per pay period per employee for first-time

27  violations and $200 per pay period per employee for subsequent violations, along with attorneys' fees

28  and any other damages permitted by statute.

1            **Count 6: California Waiting Time Penalties**

2            (The California Class Representatives and the California Waiting Time

3                      Subclass Against All Defendants)

4            ~~520.~~599. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

5    paragraphs.

6            ~~521.~~600. California Labor Code §§ 201 and 202 require Defendants to pay their employees all

7    wages due immediately upon discharge. California Labor Code § 203 states that if an employer fails to

8    pay any wages to an employee who is discharged or quits, wages continue to accrue as a penalty for up

9    to thirty days.

10           ~~522.~~601. The Defendants failed and continue to fail to pay minimum wages and overtime

11   wages for work performed in California. These wages remained unpaid at the time the California Class

12   Representatives and other members of the California Waiting Time Subclass were discharged or quit.

13   Further, the Defendants failed to pay the wages within the time required by California Labor Code §§

14   201 and 202 and continue to remain unpaid today.

15           ~~523.~~602. As a result of the Defendants conduct, the wages continue to accrue as a penalty for

16   up to 30 days, as required by § 203. The California Class Representatives and members of the

17   California Waiting Time Subclass are entitled to recover from Defendant this statutory penalty for

18   each day unpaid up to the thirty-day maximum, together with interest, attorneys' fees, and costs.

19           **Count 7: California Itemized Wage Statement Violations**

20           (The California Class Representatives and the California Class Against All Defendants)

21           ~~524.~~603. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

22   paragraphs.

23           ~~525.~~604. California Labor Code § 226 requires Defendants to provide the California Class

24   Representatives and the California Class with regular, written statements showing, among other

25   things, total hours worked, all applicable hourly rates during the pay period, and the corresponding

26   number of hours worked at each rate by the employee. Defendants knowingly and intentionally failed

27   and continue to fail to provide timely, accurate itemized wage statements including this required

28   information.

1    ~~526.~~605. Under § 226(e), an employee suffering injury as a result of a knowing and intentional

2    violation of § 226(a) is entitled to recover the greater of all actual damages or $50 for the initial

3    violative pay period and $100 for each subsequent violative pay period (up to a maximum of $4,000

4    per employee).

5    ~~527.~~606. As a result of these violations, the California Class Representatives and the California

6    Class have been injured (and continue to be injured) by, among other things, not being paid all wages

7    due, not knowing how many hours were worked, and not knowing the relevant wage rate. Thus, the

8    California Class Representatives and the California Class suffered and continue to suffer damages in

9    amounts to be calculated at trial, and are entitled to recover the penalties, prejudgment interest,

10   attorneys' fees, costs, and other damages pursuant to California Labor Code § 226.

11   ### Count 8: Unfair Business Practices Under California Law

12   (The California Class Representatives and the California Class Against All Defendants)

13   ~~528.~~607. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

14   paragraphs.

15   ~~529.~~608. The California Class Representatives bring this cause of action on behalf of

16   themselves and others similarly situated, seeking restitution of all unpaid wages as described above,

17   including interest, for the four-year period preceding the filing of this complaint until the resolution of

18   this action.

19   ~~530.~~609. The Defendants' conduct constitutes an unfair and unlawful business practice under

20   Business and Professions Code §§ 17200, et seq. Defendants conducted and continue to conduct

21   business activities while failing to comply with California's legal mandates for employment. The

22   California Class Representatives and others similarly situated suffered and continue to suffer injury in

23   fact and lost and continue to lose money as a result of Defendants' unfair competition.

24   ~~531.~~610. The California Class Representatives and others similarly situated are entitled to

25   restitution of the uncompensated pay that has accrued and continues to accrue, as well as costs, fees,

26   and any other relief that the Court determines is proper.

27

28

**Count 9: Recovery under California's Private Attorney General Act**

(Craig Bennigson and All Those Similarly Situated Against All Defendants)

532.611. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

533.612. The Defendants' conduct violated (and continues to violate) many sections of California's Labor Code, including but not limited to §§ 201, 202, 203, 204, 208, 226, 510, 1194, and 1197.

534.613. Mr. Bennigson, as an aggrieved employee, seeks recovery of civil penalties as required by the Labor Code Private Attorney General Act of 2004. Mr. Bennigson seeks these penalties on behalf of himself and other current and former employees of the Defendants against whom one or more of the violations of the Labor Code were committed.

535.614. In accordance with Labor Code § 2699.3, on January 30, 2014, written notice was sent by certified mail detailing the Labor Code violations to the California Labor and Workforce Development Agency ("LWDA"), and the same notice was sent to all Defendants.[69] Plaintiffs have not received written notification by the LWDA of an intention to investigate the allegations set forth in the notice letter, or written notice of cure, by March 3, 2014.

**Count 10: Quantum Meruit Under California Common Law**

(The California Class Representatives and the California Class Against All Defendants)

536.615. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

537.616. Although the parties operated and/or continue to operate under express contracts, many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable. Quantum meruit may be used as a substitute for the unenforceable contract provisions.

538.617. In employing the minor leaguers as baseball players, the Defendants requested that the minor leaguers perform work. Much of this work occurred and continues to occur in California.

---

[69] *See* Exhibit C. The same notice letter was sent to MLB and all thirty Franchises.

539.618. The California Class of minor leaguers performed and continues to perform this work and expects to be compensated for these services. They were not amateurs and expect to be paid for all work performed. By not receiving payment for all services, they were (and continue to be) impoverished.

540.619. The Defendants benefited and continue to benefit from these services because the minor leaguers perform in the Defendants' developmental system for baseball players. The Defendants' developmental system yields the Defendants' chief product of major league players and allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor leaguers at all during some periods of services and conspired to pay below-market salaries during other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

541.620. Under quantum meruit, the Defendants owe the California Class of minor leaguers the salaries that the parties would expect in the open market, in a system in which minor leaguers could freely negotiate with any team.[70]

### Count 11: Florida Minimum Wage Law Violations

(The Florida Class Representatives and the Florida Class Against All Defendants)

542.621. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

543.622. Pursuant to Article X, Section 24 of the Florida Constitution, and pursuant to state statute, Fla. Stat. § 448.01 *et seq.*, the Defendants are and were required to pay the Florida Class Representatives and the Florida Class a minimum wage set by Florida state law. The state's minimum wage requirements apply to the Defendants and protect the Florida Class Representatives and the Florida Class.

544.623. The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay the Florida Class Representatives and all of the Florida Class the applicable minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and they

---

[70] The quantum meruit measurement of damages demonstrates that statutory damages at law would be an inadequate remedy by, among other things, failing to yield complete relief.

1  continue to engage in such policies and practices.

2      545.624. Before instituting this claim, all Defendants were served with the statutory notice

3  required by Section 448.110, which alerted Defendants of the intent to bring this action.[71] Defendants

4  refused to pay the unpaid wages or otherwise satisfactorily settle the claim within fifteen days of

5  receiving the notice.

6      546.625. As a result of these minimum wage violations, the Florida Class Representatives and

7  the Florida Class have suffered and continue to suffer damages in amounts to be determined at trial,

8  and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys'

9  fees, costs, and other compensation pursuant to Article X, Section 24 of the Florida Constitution and

10  Section 448.110 of the Florida Statutes.

11      547.626. Through the Defendants' pattern of unlawful conduct, the Defendants acted and

12  continue to act willfully and intentionally, or at least with reckless disregard. The Defendants were

13  aware or should have been aware that the practices described in this Complaint are unlawful. The

14  Defendants have not made a good-faith effort to comply with Florida's minimum wage requirements

15  with respect to the compensation of the Florida Class Representatives and the Florida Class, and

16  instead knowingly and/or recklessly disregarded state law.

17      548.627. Article X, Section 24 of the Florida Constitution, and Section 448.110 of the Florida

18  Statutes, entitles members of the Florida Class to bring this action as a class action.

19                    **Count 12: Quantum Meruit Under Florida Common Law**

20              (The Florida Class Representatives and the Florida Class Against All Defendants)

21      549.628. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

22  paragraphs.

23      550.629. Although the parties operated and/or continue to operate under express contracts,

24  many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable.

25  Quantum meruit may be used as a substitute for the unenforceable contract provisions.

26  _____

27  [71] *See* Exhibit D. The same notice letter was sent to MLB and all thirty Franchises.

28

551.630. In employing the minor leaguers as baseball players, the Defendants acquiesced to the provision of services by directing, controlling, and allowing the minor leaguers to work. Much of this work occurred and continues to occur in Florida.

552.631. The Florida Class of minor leaguers expected (and continue to expect) to be compensated for these services. They were not amateurs and expected (and continue to expect) to be paid for all work performed.

553.632. The Defendants benefited and continue to benefit from these services because the minor leaguers perform in the Defendants' developmental system for baseball players. The Defendants' developmental system yields the Defendants' chief product of major league players and allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor leaguers at all during some periods of services and conspired to pay below-market salaries during other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

554.633. Under quantum meruit, the Defendants owe the minor leaguers the salaries that the parties would expect in the open market, in a system in which minor leaguers could freely negotiate with any team.[72]

**Count 13: Arizona Minimum Wage and Wage Law Violations**

(The Arizona Class Representatives and the Arizona Class Against All Defendants)

555.634. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

556.635. Pursuant to Arizona law, the Defendants are and were required to pay the Arizona Class Representatives and the Arizona Class a minimum wage set by Arizona state law. Ariz. Rev. Stat. §§ 23-363, 23-364. The state's minimum wage requirements apply to the Defendants and protect the Arizona Class Representatives and the Arizona Class members.

557.636. The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay the Arizona Class Representatives and all of the Arizona Class the applicable

---

[72] The quantum meruit measurement of damages demonstrates that statutory damages at law would be an inadequate remedy by, among other things, failing to yield complete relief.

1  minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and

2  they continue to engage in such practices.

3     558.637. As a result of these minimum wage violations, the Arizona Class Representatives and

4  the Arizona Class have suffered and continue to suffer damages in amounts to be determined at trial,

5  and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees,

6  costs, and other compensation pursuant to Section 23-364.

7     559.638. The Defendants' pattern of unlawful conduct was and continues to be willful and

8  intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

9  that the practices described in this Complaint are unlawful. The Defendants have not made a good-

10  faith effort to comply with Arizona's minimum wage requirements with respect to the compensation

11  of the Arizona Class Representatives and the Arizona Class, and instead knowingly and/or recklessly

12  disregarded state law.

13     560.639. Under Arizona's Wage Law, §§ 23-351 et seq., Defendants have also willfully failed

14  to pay wages to the Arizona Class Representatives and the Arizona Proposed Class for work

15  performed. Thus, the Arizona Class Representatives and the Arizona Proposed Class are also entitled

16  to treble the amount of wages unpaid. § 23-355(A).

17                     **Count 14: Arizona Recordkeeping Requirements**

18           (The Arizona Class Representatives and the Arizona Class Against All Defendants)

19     561.640. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

20  paragraphs.

21     562.641. The Defendants failed (and continue to fail) to make, keep, and preserve accurate

22  records with respect to the Arizona Class Representatives and the Arizona Class, including hours

23  worked each workday and total hours worked each workweek, as required by the Arizona Minimum

24  Wage Law, Ariz. Rev. Stat. § 23-364, and supporting state regulations.

25     563.642. The failure to maintain such records "shall raise a rebuttable presumption that the

26  employer did not pay the required minimum wage rate." § 23-364.

27

28

1

**Count 15: Quantum Meruit Under Arizona Common Law**

2

(The Arizona Class Representatives and the Arizona Class Against All Defendants)

3    ~~564.~~643. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

4    paragraphs.

5    ~~565.~~644. Although the parties operated and/or continue to operate under express contracts,

6    many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable.

7    Quantum meruit may be used as a substitute for the unenforceable contract provisions.

8    ~~566.~~645. In employing the minor leaguers as baseball players, the Defendants acquiesced to

9    the provision of services by directing, controlling, and allowing the minor leaguers to work. Much of

10   this work occurred in Arizona.

11   ~~567.~~646. The Arizona Class of minor leaguers expected (and continues to expect) to be

12   compensated for these services. They are and were not amateurs and expect to be paid for all work

13   performed. By not receiving payment for all services, they were (and continue to be) impoverished.

14   ~~568.~~647. The Defendants benefited (and continue to benefit) from these services because the

15   minor leaguers perform in the Defendants' developmental system for baseball players. The

16   Defendants' developmental system yields the Defendants' chief product of major league players and

17   allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay

18   minor leaguers at all during some periods of services and conspired to pay below-market salaries

19   during other periods of services. Thus, the Defendants were and continue to be unjustly enriched.

20   ~~569.~~648. Under quantum meruit, the Defendants owe the minor leaguers the salaries that the

21   parties would expect in the open market, in a system in which minor leaguers could freely negotiate

22   with any team.[73]

23

**Count 16: North Carolina Minimum Wage Violations**

24

(The North Carolina Class Representatives and the North Carolina Class Against All Defendants)

25   ~~570.~~649. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

26

27   [73] The quantum meruit measurement of damages demonstrates that statutory damages at law would
     be an inadequate remedy by, among other things, failing to yield complete relief.

28

paragraphs.

~~571.~~650. Pursuant to North Carolina law, the Defendants are and were required to pay the North Carolina Class Representatives and the North Carolina Class a minimum wage at least as high as that set by federal law. N.C. Gen. Stat. § 95-25.3. The state's minimum wage requirements apply to the Defendants and protect the North Carolina Class Representatives and the North Carolina Class members.

~~572.~~651. The Defendants were also required to pay all wages accrued on the regular payday, and were not allowed to withhold wages in contravention of the applicable laws. §§ 95-25.6, 95-25.8.

~~573.~~652. The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay the North Carolina Class Representatives and all of the North Carolina Class the applicable minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and they continue to engage in such practices. The Defendants also failed to pay all wages accrued on the regular payday and wrongfully withheld some wages.

~~574.~~653. As a result of these minimum wage violations, the North Carolina Class Representatives and the North Carolina Class have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to section 95-25.22.

~~575.~~654. The Defendants' pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with North Carolina's minimum wage requirements with respect to the compensation of the North Carolina Class Representatives and the North Carolina Class, and instead knowingly and/or recklessly disregarded state law.

### Count 17: North Carolina Overtime Violations

(The North Carolina Class Representatives and the North Carolina Class Against All Defendants)

~~576.~~655. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

~~577.~~656. The laws of North Carolina require the Defendants to pay overtime compensation.

1  N.C. Gen. Stat. § 95-25.4. The state's overtime requirements apply to the Defendants and protect the

2  North Carolina Class Representatives and the North Carolina Class members.

3  578.657. The Defendants were also required to pay all wages accrued on the regular payday,

4  and were not allowed to withhold wages in contravention of the applicable laws. §§ 95-25.6, 95-25.8.

5  579.658. Throughout the North Carolina Class Period, the North Carolina Class

6  Representatives and the North Carolina Class routinely worked (and continue to work) far more than

7  40 hours in a workweek. The Defendants failed and continue to fail to pay the North Carolina Class

8  Representatives and the North Carolina Class overtime wages as required. § 95-25.4. The Defendants

9  also failed to pay all wages accrued on the regular payday and wrongfully withheld some wages.

10  580.659. As a result of these violations, the North Carolina Class Representatives and the

11  North Carolina Class have suffered and continue to suffer damages in amounts to be determined at

12  trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys'

13  fees, costs, and other compensation pursuant to section 95-25.22.

14  581.660. The Defendants pattern of unlawful conduct was and continues to be willful and

15  intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

16  that the practices described in this Complaint are unlawful. The Defendants have not made a good-

17  faith effort to comply with North Carolina's overtime requirements with respect to the compensation

18  of the North Carolina Class Representatives and the North Carolina Class, and instead knowingly

19  and/or recklessly disregarded state law.

20  **Count 18: Quantum Meruit Under North Carolina Common Law**

21  (The North Carolina Class Representatives and the North Carolina Class Against All Defendants)

22  582.661. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

23  paragraphs.

24  583.662. Although the parties operated and/or continue to operate under express contracts,

25  many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable.

26  Quantum meruit may be used as a substitute for the unenforceable contract provisions.

27  584.663. In employing the minor leaguers as baseball players, the Defendants requested that

28  the minor leaguers perform work that occurred and continues to occur in North Carolina.

585.664. The North Carolina Class of minor leaguers performed and continues to perform this work and expects to be compensated for these services. They were not amateurs and expect to be paid for all work performed. By not receiving payment for all services, they were (and continue to be) impoverished.

586.665. The Defendants benefited and continue to benefit from these services because the minor leaguers perform in the Defendants' developmental system for baseball players. The Defendants' developmental system yields the Defendants' chief product of major league players and allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor leaguers at all during some periods of services and conspired to pay below-market salaries during other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

587.666. Under quantum meruit, the Defendants owe the North Carolina Class of minor leaguers the salaries that the parties would expect in the open market, in a system in which minor leaguers could freely negotiate with any team.[74]

## Count 19: New York Minimum Wage Violations

(The New York Class Representatives and the New York Class Against All Defendants)

588.667. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

589.668. Pursuant to New York law, the Defendants are and were required to pay the New York Class Representatives and the New York Class a minimum wage set by New York state law. N.Y. Lab. Law § 652. The state's minimum wage requirements apply to the Defendants and protect the New York Class Representatives and the New York Class members.

590.669. The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay the New York Class Representatives and all of the New York Class the applicable minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and they continue to engage in such practices.

---

[74] The quantum meruit measurement of damages demonstrates that statutory damages at law would be an inadequate remedy by, among other things, failing to yield complete relief.

97

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

591.670. As a result of these minimum wage violations, the New York Class Representatives and the New York Class have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to New York Labor Law § 663.

592.671. The Defendants' pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with New York's minimum wage requirements with respect to the compensation of the New York Class Representatives and the New York Class, and instead knowingly and/or recklessly disregarded state law.

**Count 20: New York Overtime Violations**

(The New York Class Representatives and the New York Class Against All Defendants)

593.672. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

594.673. The laws of New York require the Defendants to pay overtime compensation. 12 N.Y.C.R.R. § 142-2.2. The state's overtime requirements apply to the Defendants and protect the New York Class Representatives and the New York Class members.

595.674. Throughout the New York Class Period, the New York Class Representatives and the New York Class routinely worked (and continue to work) in excess of 40 hours in a workweek. The Defendants failed and continue to fail to pay the New York Class Representatives and the New York Class overtime wages as required by New York law. 12 N.Y.C.R.R. § 142-2.2.

596.675. As a result of these violations, the New York Class Representatives and the New York Class have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to New York Labor Law § 663.

597.676. The Defendants pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1  faith effort to comply with New York's overtime requirements with respect to the compensation of

2  the New York Class Representatives and the New York Class, and instead knowingly and/or

3  recklessly disregarded state law.

**Count 21: New York Wage Statement Violations**

(The New York Class Representatives and the New York Class Against All Defendants)

598.677. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

599.678. New York Labor Law § 195.3 requires Defendants to provide the New York Class Representatives and the New York Class with regular, written statements showing, among other things, deductions, the regular rate of pay, the overtime rate of pay, and the corresponding number of hours worked at each rate by the employee. Defendants knowingly and intentionally failed and continue to fail to provide timely, accurate itemized wage statements including this required information.

600.679. Under New York's Wage Theft and Prevention Act, the New York Class Representatives and the members of the New York Class who suffered injury as a result of a violation of § 195.3 are entitled to recover in a civil suit $100 per pay period, up to a maximum of $2500 per employee.

601.680. As a result of these violations, the New York Class Representatives and the New York Class have been injured (and continue to be injured) by, among other things, not being paid all wages due, not knowing how many hours were worked, and not knowing the relevant wage rate. Thus, the New York Class Representatives and the New York Class suffered and continue to suffer damages in amounts to be calculated at trial.

**Count 22: Quantum Meruit Under New York Common Law**

(The New York Class Representatives and the New York Class Against All Defendants)

602.681. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

603.682. Although the parties operated and/or continue to operate under express contracts, many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable.

1   Quantum meruit may be used as a substitute for the unenforceable contract provisions.

2   604.683. In employing the minor leaguers as baseball players, the Defendants requested that

3   the minor leaguers perform work that occurred and continues to occur in New York.

4   605.684. The New York Class of minor leaguers performed and continues to perform this

5   work and expects to be compensated for these services. They were not amateurs and expect to be

6   paid for all work performed. By not receiving payment for all services, they were (and continue to be)

7   impoverished.

8   606.685. The Defendants benefited and continue to benefit from these services because the

9   minor leaguers perform in the Defendants' developmental system for baseball players. The

10  Defendants' developmental system yields the Defendants' chief product of major league players and

11  allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay

12  minor leaguers at all during some periods of services and conspired to pay below-market salaries

13  during other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

14  607.686. Under quantum meruit, the Defendants owe the New York Class of minor leaguers

15  the salaries that the parties would expect in the open market, in a system in which minor leaguers

16  could freely negotiate with any team.[75]

17  ### Count 23: Pennsylvania Minimum Wage Violations

18  (The Pennsylvania Class Representatives and the Pennsylvania Class Against All Defendants)

19  608.687. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

20  paragraphs.

21  609.688. Pursuant to Pennsylvania law, the Defendants are and were required to pay the

22  Pennsylvania Class Representatives and the Pennsylvania Class a minimum wage in accordance with

23  Pennsylvania State Law. *See* 43 Penn. Stat. § 333.104. The state's minimum wage requirements apply

24  to the Defendants and protect the Pennsylvania Class Representatives and the Pennsylvania Class

25  members.

26  _____

27  [75] The quantum meruit measurement of damages demonstrates that statutory damages at law would
    be an inadequate remedy by, among other things, failing to yield complete relief.

28

610.689. The Defendants were also required to pay all wages accrued on the regular payday, and were not allowed to withhold wages in contravention of the applicable laws. 43 Penn. Stat. § 260.3.

611.690. The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay the Pennsylvania Class Representatives and all of the Pennsylvania Class the applicable minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and they continue to engage in such practices. The Defendants also failed to pay all wages accrued on the regular payday and wrongfully withheld some wages.

612.691. As a result of these minimum wage violations, the Pennsylvania Class Representatives and the Pennsylvania Class have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 43 Penn. Stat. §§ 260.9a, 260.10, 333.112, 333.113, or otherwise permitted by law.

613.692. The Defendants' pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with Pennsylvania's minimum wage requirements with respect to the compensation of the Pennsylvania Class Representatives and the Pennsylvania Class, and instead knowingly and/or recklessly disregarded state law.

### Count 24: Pennsylvania Overtime Violations

(The Pennsylvania Class Representatives and the Pennsylvania Class Against All Defendants)

614.693. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

615.694. The laws of Pennsylvania require the Defendants to pay overtime compensation. The laws of Pennsylvania require the Defendants to pay overtime compensation. *See* 43 P.S. § 333.104. The state's minimum wage requirements apply to the Defendants and protect the Pennsylvania Class Representatives and the Pennsylvania Class members.

616.695. The Defendants were also required to pay all wages accrued on the regular payday,

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

1  and were not allowed to withhold wages in contravention of the applicable laws. 43 Penn. Stat. §

2  260.3.

3  617.696. Throughout the Pennsylvania Class Period, the Pennsylvania Class Representatives

4  and the Pennsylvania Class routinely worked (and continue to work) far more than 40 hours in a

5  workweek. The Defendants failed and continue to fail to pay the Pennsylvania Class Representatives

6  and the Pennsylvania Class overtime wages as required. The Defendants also failed to pay all wages

7  accrued on the regular payday and wrongfully withheld some wages.

8  618.697. As a result of these violations, the Pennsylvania Class Representatives and the

9  Pennsylvania Class have suffered and continue to suffer damages in amounts to be determined at trial,

10  and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees,

11  costs, and other compensation pursuant to 43 P.S. §§ 260.9a, 260.10, 333.112, 333.113, or otherwise

12  permitted by law.

13  619.698. The Defendants pattern of unlawful conduct was and continues to be willful and

14  intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

15  that the practices described in this Complaint are unlawful. The Defendants have not made a good-

16  faith effort to comply with Pennsylvania's overtime requirements with respect to the compensation of

17  the Pennsylvania Class Representatives and the Pennsylvania Class, and instead knowingly and/or

18  recklessly disregarded state law.

19  **Count 25: Quantum Meruit Under Pennsylvania Common Law**

20  (The Pennsylvania Class Representatives and the Pennsylvania Class Against All Defendants)

21  620.699. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

22  paragraphs.

23  621.700. Although the parties operated and/or continue to operate under express contracts,

24  many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable.

25  Quantum meruit may be used as a substitute for the unenforceable contract provisions.

26  622.701. In employing the minor leaguers as baseball players, the Defendants requested that

27  the minor leaguers perform work that occurred and continues to occur in Pennsylvania.

28  623.702. The Pennsylvania Class of minor leaguers performed and continues to perform this

861070.1

102

COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE WAGE AND HOUR LAWS

work and expects to be compensated for these services. They were not amateurs and expect to be paid for all work performed. By not receiving payment for all services, they were (and continue to be) impoverished.

624.703. The Defendants benefited and continue to benefit from these services because the minor leaguers perform in the Defendants' developmental system for baseball players. The Defendants' developmental system yields the Defendants' chief product of major league players and allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor leaguers at all during some periods of services and conspired to pay below-market salaries during other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

625.704. Under quantum meruit, the Defendants owe the Pennsylvania Class of minor leaguers the salaries that the parties would expect in the open market, in a system in which minor leaguers could freely negotiate with any team.[76]

## Count 26: Maryland Minimum Wage Violations

(The Maryland Class Representatives and the Maryland Class Against All Defendants)

626.705. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

627.706. Pursuant to Maryland law, the Defendants are and were required to pay the Maryland Class Representatives and the Maryland Class a minimum wage in accordance with Maryland State Law. *See* Md. Code Lab. & Empl. § 3-413. The state's minimum wage requirements apply to the Defendants and protect the Maryland Class Representatives and the Maryland Class members.

628.707. The Defendants were also required to pay all wages accrued on the regular payday, and were not allowed to withhold wages in contravention of the applicable laws. Md. Code Lab. & Empl. § 3-502.

629.708. The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay the Maryland Class Representatives and all of the Maryland Class the applicable

---

[76] The quantum meruit measurement of damages demonstrates that statutory damages at law would be an inadequate remedy by, among other things, failing to yield complete relief.

1 minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and

2 they continue to engage in such practices. The Defendants also failed to pay all wages accrued on the

3 regular payday and wrongfully withheld some wages.

4 630.709. As a result of these minimum wage violations, the Maryland Class Representatives

5 and the Maryland Class have suffered and continue to suffer damages in amounts to be determined at

6 trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys'

7 fees, costs, and other compensation pursuant to Md. Code Lab. & Empl. §§ 3-427, 3-428, 3-508, or

8 otherwise permitted by law.

9 631.710. The Defendants' pattern of unlawful conduct was and continues to be willful and

10 intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

11 that the practices described in this Complaint are unlawful. The Defendants have not made a good-

12 faith effort to comply with Maryland's minimum wage requirements with respect to the compensation

13 of the Maryland Class Representatives and the Maryland Class, and instead knowingly and/or

14 recklessly disregarded state law.

15 **Count 27: Maryland Overtime Violations**

16 (The Maryland Class Representatives and the Maryland Class Against All Defendants)

17 632.711. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

18 paragraphs.

19 633.712. The laws of Maryland require the Defendants to pay overtime compensation. The

20 laws of Maryland require the Defendants to pay overtime compensation. *See* Md. Code Lab. & Empl.

21 § 3-415. The state's minimum wage requirements apply to the Defendants and protect the Maryland

22 Class Representatives and the Maryland Class members.

23 634.713. The Defendants were also required to pay all wages accrued on the regular payday,

24 and were not allowed to withhold wages in contravention of the applicable laws. Md. Code Lab. &

25 Empl. .§ 3-502.

26 635.714. Throughout the Maryland Class Period, the Maryland Class Representatives and the

27 Maryland Class routinely worked (and continue to work) far more than 40 hours in a workweek. The

28 Defendants failed and continue to fail to pay the Maryland Class Representatives and the Maryland

1  Class overtime wages as required. The Defendants also failed to pay all wages accrued on the regular

2  payday and wrongfully withheld some wages.

3  636.715. As a result of these violations, the Maryland Class Representatives and the Maryland

4  Class have suffered and continue to suffer damages in amounts to be determined at trial, and are

5  entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and

6  other compensation pursuant to Md. Code Lab. & Empl. §§ 3-427, 3-428, 3-508, or otherwise

7  permitted by law.

8  637.716. The Defendants pattern of unlawful conduct was and continues to be willful and

9  intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

10  that the practices described in this Complaint are unlawful. The Defendants have not made a good-

11  faith effort to comply with Maryland's overtime requirements with respect to the compensation of the

12  Maryland Class Representatives and the Maryland Class, and instead knowingly and/or recklessly

13  disregarded state law.

14  **Count 28: Quantum Meruit Under Maryland Common Law**

15  (The Maryland Class Representatives and the Maryland Class Against All Defendants)

16  638.717. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

17  paragraphs.

18  639.718. Although the parties operated and/or continue to operate under express contracts,

19  many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable.

20  Quantum meruit may be used as a substitute for the unenforceable contract provisions.

21  640.719. In employing the minor leaguers as baseball players, the Defendants requested that

22  the minor leaguers perform work that occurred and continues to occur in Maryland.

23  641.720. The Maryland Class of minor leaguers performed and continues to perform this

24  work and expects to be compensated for these services. They were not amateurs and expect to be

25  paid for all work performed. By not receiving payment for all services, they were (and continue to be)

26  impoverished.

27  642.721. The Defendants benefited and continue to benefit from these services because the

28  minor leaguers perform in the Defendants' developmental system for baseball players. The

1    Defendants' developmental system yields the Defendants' chief product of major league players and

2    allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay

3    minor leaguers at all during some periods of services and conspired to pay below-market salaries

4    during other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

5        643.722. Under quantum meruit, the Defendants owe the Maryland Class of minor leaguers

6    the salaries that the parties would expect in the open market, in a system in which minor leaguers

7    could freely negotiate with any team.[77]

8                    **Count 29: Oregon Minimum Wage Violations**

9            (The Oregon Class Representatives and the Oregon Class Against All Defendants)

10       644.723. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

11   paragraphs.

12       645.724. Pursuant to Oregon law, the Defendants are and were required to pay the Oregon

13   Class Representatives and the Oregon Class a minimum wage in accordance with Oregon State Law.

14   *See* O.R.S. § 653.010 *et seq.*  The state's minimum wage requirements apply to the Defendants and

15   protect the Oregon Class Representatives and the Oregon Class members.

16       646.725. The Defendants were also required to pay all wages accrued on the regular payday,

17   and were not allowed to withhold wages in contravention of the applicable laws.  *See* O.R.S. § 652.010

18   *et seq.*

19       647.726. The Defendants constructed, implemented, and engaged in a policy and/or practice

20   of failing to pay the Oregon Class Representatives and all of the Oregon Class the applicable

21   minimum wage for all hours they suffered or permitted the minor leaguers to work in the state, and

22   they continue to engage in such practices. The Defendants also failed to pay all wages accrued on the

23   regular payday and wrongfully withheld some wages.

24       648.727. As a result of these minimum wage violations, the Oregon Class Representatives and

25   the Oregon Class have suffered and continue to suffer damages in amounts to be determined at trial,

26   _____

27   [77] The quantum meruit measurement of damages demonstrates that statutory damages at law would
     be an inadequate remedy by, among other things, failing to yield complete relief.

28

1 and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees,

2 costs, and other compensation pursuant to O.R.S. § 653.991 or otherwise permitted by law.

3 649.728. The Defendants' pattern of unlawful conduct was and continues to be willful and

4 intentional, or at least with reckless disregard. The Defendants were aware or should have been aware

5 that the practices described in this Complaint are unlawful. The Defendants have not made a good-

6 faith effort to comply with Oregon's minimum wage requirements with respect to the compensation

7 of the Oregon Class Representatives and the Oregon Class, and instead knowingly and/or recklessly

8 disregarded state law.

9 **Count 30: Oregon Overtime Violations**

10 (The Oregon Class Representatives and the Oregon Class Against All Defendants)

11 650.729. Plaintiffs re-allege and incorporate by reference all allegations in all preceding

12 paragraphs.

13 651.730. The laws of Oregon require the Defendants to pay overtime compensation. The laws

14 of Oregon require the Defendants to pay overtime compensation. *See* O.R.S. § 653.261 *et seq.* The

15 state's minimum wage requirements apply to the Defendants and protect the Oregon Class

16 Representatives and the Oregon Class members.

17 652.731. The Defendants were also required to pay all wages accrued on the regular payday,

18 and were not allowed to withhold wages in contravention of the applicable laws. *See* O.R.S. § 652.010

19 *et seq.*

20 653.732. Throughout the Oregon Class Period, the Oregon Class Representatives and the

21 Oregon Class routinely worked (and continue to work) far more than 40 hours in a workweek. The

22 Defendants failed and continue to fail to pay the Oregon Class Representatives and the Oregon Class

23 overtime wages as required. The Defendants also failed to pay all wages accrued on the regular payday

24 and wrongfully withheld some wages.

25 654.733. As a result of these violations, the Oregon Class Representatives and the Oregon

26 Class have suffered and continue to suffer damages in amounts to be determined at trial, and are

27 entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and

28 other compensation pursuant to O.R.S. § 653.991 or otherwise permitted by law.

655.734. The Defendants pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with Oregon's overtime requirements with respect to the compensation of the Oregon Class Representatives and the Oregon Class, and instead knowingly and/or recklessly disregarded state law.

### Count 31: Quantum Meruit Under Oregon Common Law

(The Oregon Class Representatives and the Oregon Class Against All Defendants)

656.735. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

657.736. Although the parties operated and/or continue to operate under express contracts, many of the provisions of the contracts, such as the salary provisions, are invalid and unenforceable. Quantum meruit may be used as a substitute for the unenforceable contract provisions.

658.737. In employing the minor leaguers as baseball players, the Defendants requested that the minor leaguers perform work that occurred and continues to occur in Oregon.

659.738. The Oregon Class of minor leaguers performed and continues to perform this work and expects to be compensated for these services. They were not amateurs and expect to be paid for all work performed. By not receiving payment for all services, they were (and continue to be) impoverished.

660.739. The Defendants benefited and continue to benefit from these services because the minor leaguers perform in the Defendants' developmental system for baseball players. The Defendants' developmental system yields the Defendants' chief product of major league players and allows the Defendants to operate their multi-billion-dollar industry. Yet the Defendants do not pay minor leaguers at all during some periods of services and conspired to pay below-market salaries during other periods of services. Thus, the Defendants were (and continue to be) unjustly enriched.

661.740. Under quantum meruit, the Defendants owe the Oregon Class of minor leaguers the

1  salaries that the parties would expect in the open market, in a system in which minor leaguers could

2  freely negotiate with any team.[78]

3                                    **IX.  PRAYER FOR RELIEF**

4         WHEREFORE, Plaintiffs, on their own and on behalf of all other similarly situated persons,

5  seek the following relief:

6     • That at the earliest possible time, Plaintiffs be allowed to give notice of this collective

7        action, or that the Court issue such notice, to members of the Minor League

8        Collective, as defined above. Such notice shall inform them that this civil action has

9        been filed, of the nature of the action, and of their right to join this lawsuit if they

10       believe they were denied (and/or continue to be denied) proper wages;

11    • Unpaid minimum wages and overtime wages, that have accrued and continue to

12       accrue until the resolution of this action, and an additional and an equal amount as

13       liquidated damages pursuant to the FLSA and the supporting regulations;

14    • Unpaid wages and pay pursuant to Arizona, Florida, California, North Carolina, New

15       York, Pennsylvania, Maryland and Oregon state law, that have accrued and continue

16       to accrue until the resolution of this action, and liquidated damages pursuant to state

17       law and supporting regulations;

18    • Statutory damages for Defendants' recordkeeping violations pursuant to federal and

19       state law;

20    • Certification of the Proposed Classes, as set forth above, pursuant to Rule 23 of the

21       Federal Rules of Civil Procedure;

22    • A determination that Defendants violated and continue to violate California Labor

23       Code § 204 payday requirements, and an award of appropriate damages for the

24       violations that have accrued and continue to accrue until the resolution of this action;

25    • A determination that Defendants violated and continue to violate California Labor

26  _____

27  [78] The quantum meruit measurement of damages demonstrates that statutory damages at law would be an inadequate remedy by, among other things, failing to yield complete relief.

28

Code §§ 201, 202, and 203 for withholding compensation at the time of termination of the California Class Representatives and the California Waiting Time Subclass, and an award of appropriate damages for the violations that have accrued and continue to accrue until the resolution of this action;

- A determination that Defendants violated and continue to violate the itemized wage statement requirements of California Labor Code § 226 as to the California Class Representatives and the California Class, and an award of appropriate damages for the violations that have accrued and continue to accrue until the resolution of this action;

- A determination that the relevant claims may be maintained as a representative action under California's Private Attorney General Act, § 2698 *et seq.*, and a determination that Defendants violated and continue to violate many of the Labor Code sections identified in § 2699.5, and an award of appropriate damages for the violations that have accrued and continue to accrue until the resolution of this action;

- A determination that Defendants violated and continue to violate the itemized wage statement requirements of New York Labor Law § 195.3 as to the New York Class Representatives and the New York Class, and an award of appropriate damages for the violations that have accrued and continue to accrue until the resolution of this action;

- An award of quantum meruit under California, Arizona, Florida, North Carolina, New York, Pennsylvania, Maryland, and Oregon common law;

- Designation of Plaintiffs as class representatives of the Classes, designation of counsel of record as Class Counsel, and a reasonable incentive payment to Plaintiffs;

- Pre-judgment and post-judgment interest as permitted by law;

- An injunction requiring Defendants to pay all statutorily required wages pursuant to state and federal law and an order enjoining Defendants from continuing or reinstating their unlawful policies and practices as described within this Complaint;

- Reasonable attorneys' fees and costs of the action; and

- Such other relief as this Court shall deem just and proper.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## X.  DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: ~~October 24, 2014~~March 16, 2015

                                    /s/ Daniel L. Warshaw

**PEARSON, SIMON & WARSHAW, LLP**
Bruce L. Simon
Daniel L. Warshaw
Bobby Pouya
Benjamin E. Shiftan
Clay Stockton

**KOREIN TILLERY, LLC**
Stephen M. Tillery
Garrett R. Broshuis
~~Giuseppe S. Giardina~~
Aaron Zigler
George A. Zelcs

*Plaintiffs' Interim Co-Lead Class Counsel*