1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    AARON SENNE, et al.,                    Case No.  14-cv-00608-JCS

              Plaintiffs,                    Related Case No. 14-cv-03289-JCS
8

9         v.

10   KANSAS CITY ROYALS BASEBALL             **ORDER  RE MOTIONS TO DISMISS**
     CORP., et al.,                          **AND MOTIONS TO TRANSFER**
11
              Defendants.                    Re: Docket Nos. 281,  283, 285, 286
12

13   **I.      INTRODUCTION**

14          Plaintiffs in this putative class action are former Minor League baseball players who assert

15   claims under the federal Fair Labor Standards Act ("FLSA") and California, Florida, Arizona,

16   North Carolina and New York wage and hour laws against the Office of the Commissioner of

17   Baseball doing business as Major League Baseball ("MLB") and its thirty member franchises.

18   Presently before the Court are two sets of motions challenging personal jurisdiction and venue.

19          With respect to personal jurisdiction, two motions to dismiss have been filed in this action

20   (the "Motions to Dismiss").  First, ten of the MLB Clubs named as Defendants in the Complaint –

21   Atlanta National League Baseball Club, Inc., Boston Red Sox Baseball Club L.P., Chicago White

22   Sox, Ltd., Cleveland Indians Baseball Co., Inc., Cleveland Indians Baseball Co., L.P., Detroit

23   Tigers, Inc., New York Yankees Partnership, The Phillies, Pittsburgh Associates, L.P., Tampa Bay

24   Rays Baseball, Ltd., and Washington Nationals Baseball Club, LLC ("Proskauer  PJ Defendants")

25   bring a Motion to Dismiss the Consolidated Amended Complaint as Against Certain Defendants

26   for Lack of Personal Jurisdiction, Docket No. 281 ("Proskauer Motion to Dismiss").  Second,

27   Defendant Baltimore Orioles Limited Partnership and Baltimore Orioles, Inc. (collectively,

28   "Baltimore Orioles") join in the Proskauer Motion to Dismiss and also bring a Motion to Dismiss

United States District Court
Northern District of California

the Consolidated Amended Complaint for Violations of Federal and State Wage and Hour Laws Against the Baltimore Orioles Limited Partnership and Baltimore Orioles, Inc., Docket No. 285 ("Baltimore Orioles Motion to Dismiss").  The Court refers collectively to the Defendants who seek dismissal on the basis of lack of personal jurisdiction as the "Personal Jurisdiction Defendants."

Similarly, two motions seeking transfer under 28 U.S.C. § 1404(a) have been filed ("the Transfer Motions").  First, all of the Defendants except the Baltimore Orioles ("Proskauer Transfer Defendants") bring a Motion to Transfer Action to Middle District of Florida, Docket No. 283 ("Proskauer Transfer Motion").  Second, the Baltimore Orioles join in the Proskauer Transfer Motion and also bring a Motion to Transfer Case to the Middle District of Florida Filed by Defendants Baltimore Orioles, Inc. and Baltimore Orioles Limited Partnership ("Baltimore Orioles Transfer Motion").  In these motions, Defendants ask that the entire case be transferred to the Middle District of Florida.

All of the Motions came on for hearing on Friday, February 13, 2015 at 2:00 p.m. Following the Motion hearing, the Court gave Plaintiffs leave to file a proposed amended complaint that included additional named Plaintiffs to address possible defects with respect to personal jurisdiction over the Personal Jurisdiction Defendants.  The Court further instructed Plaintiffs to file a supplemental brief addressing the "arising out of" requirement for specific jurisdiction on a team-by-team basis.  Plaintiffs have filed a Proposed Second Consolidated Amended Complaint ("SCAC")[1] adding name Plaintiffs, as well as the supplemental brief requested by the Court; the Baltimore Orioles and the Proskauer PJ Defendants have filed a brief in response in which they assert that Plaintiffs still cannot establish the existence of personal jurisdiction as to the teams that challenge jurisdiction.

For the reasons stated below, the Court GRANTS in part and DENIES in part the Proskaur Motion to Dismiss and GRANTS the Baltimore Orioles' Motion to Dismiss.  The Court DENIES the Transfer Motions.[2]

_____

[1] The Court grants leave to file the SCAC pursuant to Fed.R.Civ.P. 15(a)(2).
[2] All of the parties in this action have consented to the jurisdiction of a United States Magistrate

## II.     BACKGROUND

### A.     Overview of Major League Baseball

MLB is an unincorporated association whose members are the thirty MLB Clubs named as defendants in this action.  SCAC, ¶ 62.  Each MLB Club is affiliated with several Minor League teams, organized into "classes" roughly reflecting the skill levels of the players.  *Id*., ¶ 169.  Although some Minor League teams are directly owned by an MLB Club, most Minor League teams are independently owned and operated pursuant to Player Development Contracts ("PDCs"), agreements by which a Minor League club agrees to "affiliate" itself with an MLB Club for a certain time period.  *Id*., ¶ 171.

MLB teams employ a small number of players who play at the highest level, the Major Leaguers.  *Id*., ¶ 146.  They also employ a larger number of Minor Leaguers, who the teams acquire through either an amateur draft or free agency.  *Id*., ¶¶ 147, 150.  The Minor Leaguers begin at the "Rookie" level and then, ideally, advance to higher levels (Class-A, Advanced Class-A, Double-A and Triple-A), potentially leading to the major leagues.  *Id*., ¶ 169.  Many Minor Leaguers do not advance past Class-A.  *Id.*

MLB operates a scouting service known as the Major League Baseball Scouting Bureau ("Scouting Bureau") that evaluates amateur players on behalf of all the Defendants.  *Id*., ¶ 163.  MLB owners created the centralized service in 1974, and it operates under the umbrella of the Office of the Commissioner.  *Id.*  The Scouting Bureau hosts tryouts for amateur players seeking to enter the industry, and its scouts attend amateur games throughout the country and in Latin America to develop reports on amateur players.  *Id.*

MLB rules require that all teams use the same uniform player contract ("UPC") when signing players.  *Id*., ¶ 164.  Under the UPC, players receive a salary during the championship season, which lasts approximately five months.  *Id*., ¶¶ 182-83.  They are not compensated during the remainder of the year.  *Id*., ¶ 183.  The UPC imposes "duties and obligations" that "continue in full force throughout the calendar year," however.  *Id.*  Thus, during the offseason, players are

Judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  required to participate in spring training (lasting approximately one month) and sometimes in

2  extended spring training and instructional leagues as well.  *Id.*, ¶¶ 185-86.  Players are also

3  required to maintain "first-class" conditioning throughout the year.  *Id.*, ¶ 187.

4      **B.    Summary of Plaintiffs' Claims**

5          Plaintiffs are former and current Minor League baseball players who allege that they were

6  paid "illegally low wages during the championship season, no overtime wages, and no wages for

7  work performed outside the championship season."  *Id.*, ¶¶ 19-61, 189.  Defendants are the Office

8  of the Commissioner of Baseball and MLB's thirty member franchises.  *Id.*, ¶¶ 62-102.  Plaintiffs

9  assert twenty state law wage and hour claims on behalf of a number of putative classes (including

10  a California class)[3] under Rule 23 of the Federal Rules of Civil Procedure.  *Id.*, ¶¶ 103-27.  In

11  particular, Plaintiffs assert eight claims under California law, two claims under Florida law, three

12  claims under Arizona law, three claims under North Carolina law, four claims under New York

13  law, three claims under Pennsylvania law, three claims under Maryland law and three claims

14  under Oregon law.  They also assert two claims under the FLSA on behalf of themselves and all

15  persons similarly situated since three years before filing of the action.  *Id.*, ¶ 128.

16  **III.   MOTIONS TO DISMISS**

17      **A.    Motions**

18          **1.   Proskauer PJ Defendants**

19          The Proskauer PJ Defendants are ten MLB Clubs that contend they are not subject to

20  personal jurisdiction in California.  Proskauer Motion to Dismiss at 1.  According to these

21  defendants, they "do not have any Minor League affiliates based in California or that play games

22  in California, and do not have any operations whatsoever in California."  *Id.* at 4 (citing Dkt. No.

23  115-1 ("Heller Decl.") at ¶ 8; Dkt No. 115-2 ("Steward Decl.") at ¶ 8; Dkt No. 115-3 ("Znidarsic

24  Decl.") at ¶ 8; Dkt. No. 115-4 ("Corvino Decl.") at ¶ 8; Dkt. No. 115-5 ("Westhoff Decl.") at ¶ 8;

25

26  ─────────────
    [3] The California class representatives are: Aaron Meade, Oliver Odle, Kyle Woodruff, Kyle

27  Nicholson, Brandon Henderson, Brad McAtee, Craig Bennigson, Ryan Kiel, Jake Kahaulelio,
    Justin Murray, Dustin Pease, Mitch Hilligoss, Joseph Newby, Matt Gorgen, Joel Weeks, Matt

28  Daly, Kris Watts, Matt Lewis, Nick Giarraputo, Leonard Davis, David Quinowski, Mark Wagner,
    Brandon Pinckney, Lauren Gagnier, Omar Aguilar, and Grant Duff.  *Id.*, ¶ 105.

Dkt. No. 115-6 ("Trost Decl.") at ¶ 8; Dkt No. 115-7 ("Strouse Decl.") at ¶ 8; Dkt No. 115-8 ("Stroh Decl.") at ¶ 8; Dkt. No. 115-9 ("Higgins Decl.") at ¶ 8; Dkt. No. 115-10 ("Jones Decl.") at ¶ 8)). They assert that their primary connection with California is that "their Major League Baseball Clubs occasionally play baseball games against other California-based Major League Clubs in California." *Id.* (citing Heller Decl. at ¶ 7; Steward Decl. at ¶ 7; Znidarsic Decl. at ¶ 7; Corvino Decl. at ¶ 7; Westhoff Decl. at ¶ 7; Trost Decl. at ¶ 7; Strouse Decl. at ¶ 7; Stroh Decl. at ¶ 7; Higgins Decl. at ¶7; Jones Decl. at ¶ 7). In particular, the Proskauer PJ Defendants represent that aside from "sporadic travel to California by individual employees and a small number of California-based employees," they travel to California to play Major League baseball games only one and three times per year and those trips are relatively short, ranging in duration from two to ten days per trip. *Id.* (citing Declaration Of Elise M. Bloom In Support Of Motion To Dismiss The Consolidated Amended Complaint As To Certain Defendants For Lack Of Personal Jurisdiction ("Bloom Jurisdiction Decl."), Ex. A-J (Moving Defendants' Supplemental Objection and Answer to Interrogatory No. 2)).

The Proskauer PJ Defendants further state that they "are not licensed to do business in California; are incorporated in or organized under the laws of states *other* than California; maintain their principal places of business *outside* of California; and do not own or rent property, maintain bank accounts, or have a designated agent in the State of California." *Id.* at 5 (citing Heller Decl. at ¶¶ 2-6; Steward Decl. at ¶¶ 2-6; Znidarsic Decl. at ¶¶ 2-6; Corvino Decl. at ¶¶ 2-6; Westhoff Decl. at ¶¶ 2-6; Trost Decl. at ¶¶ 2-6; Strouse Decl. at ¶¶ 2-6; Stroh Decl. at ¶¶ 2-6; Higgins Decl. at ¶¶ 2-6; Jones Decl. at ¶¶ 2-6) (emphasis in original). Nor do they "receive any income from tickets, concessions, parking or similar items for regular season games played as a visiting Club in California," the Proskauer PJ Defendants contend. *Id.* (citing Bloom Jurisdiction Decl., Ex. K (Defendant MLB's Supplemental Objection and Answer to Interrogatory No. 5); *id.*, Exs. A-J (Moving Defendants' Supplemental Objection and Answer to Interrogatory No. 10)).

The Proskauer PJ Defendants assert that exercise of personal jurisdiction in California is not consistent with due process and California's long-arm statute, Cal. Code Civ. Proc. § 410.10, because they do not have sufficient minimum contacts with California to comport with "traditional

5

1   notions of fair play and substantial justice." *Id*. at 6-7 (citing *Walden v. Fiore*, 134 S. Ct. 1115,

2   1121 (2014); *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011); *Int'l*

3   *Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In particular, the Proskauer PJ Defendants

4   argue that they are not subject to personal jurisdiction under the doctrines of either general or

5   specific jurisdiction. *Id*.

6           The Proskauer PJ Defendants argue that the theory of general jurisdiction applies only if

7   their "affiliations with the State are so continuous and systematic as to render them essentially at

8   home in the forum State." *Id*. (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.

9   Ct. 2846, 2851 (2011) (quotations and citations omitted)). This is a high standard, they assert,

10  requiring that the contacts of a defendant corporation "approximate physical presence" in the state.

11  *Id*. at 7-8 (citing *Brand v. Menlove Dodge*, 796 F.2d 1070, 1073 (9th Cir. 1986); *Bancroft &*

12  *Masters, Inc. v. Augusta Nat'l, Inc*., 223 F.3d 1082, 1086 (9th Cir. 2000)). They argue that

13  merely "engaging in commerce with residents of the forum state is not in and of itself the kind of

14  activity that approximates physical presence within the state's borders." *Id*. at 8 (quoting *Bancroft*

15  *& Masters, Inc*., 223 F.3d at 1086 (internal quotations omitted)). They also point to the Supreme

16  Court's recent statement that "it would be the 'exceptional case' where 'a corporation's operations

17  in a forum other than its formal place of incorporation or principal place of business may be so

18  substantial and of such a nature as to render the corporation at home in that State.'" *Id*. (quoting

19  *Daimler AG v. Bauman*, 134 S. Ct. 746, 761, n. 19 (2014)).

20          In light of these stringent requirements, the Proskauer PJ Defendants argue, their limited

21  contacts with California related to the occasional major league games that are played here are

22  insufficient to show that they are "at home" in California or to support general jurisdiction. *Id*. at

23  8. Further, the Proskauer PJ Defendants assert, the fact that MLB does not challenge personal

24  jurisdiction in California has no bearing on the analysis because the exercise of personal

25  jurisdiction over an unincorporated association is not a basis for exercising personal jurisdiction

26  over its non-resident members. *Id*. at 9 (citing *Daynard v. Ness, Motley, Loadholt, Richardson &*

27  *Poole, P.A*., 284 F. Supp. 2d 204 (D. Mass. 2003)). Nor can the contacts of other (non-moving)

28  member Clubs be imputed to the Proskauer PJ Defendants, they assert. *Id*. They point to the

United States District Court
Northern District of California

6

Supreme Court's holding in *Daimler* that a foreign corporation may not be subjected to a court's general jurisdiction based on the contacts of its in-state subsidiary, which the Proskauer PJ Defendants assert amounts to a rejection of the Ninth Circuit's "expansive view of agency principles" in the context of personal jurisdiction. *Id.* (citing 134 S. Ct. at 759-60).  According to the Proskauer PJ Defendants, the reasoning of *Daimler* compels the conclusion that "simply because [the Proskauer PJ] Defendants are members of an unincorporated association some of whose members are California residents, does not mean that the foreign Clubs are 'at home' in California for all purposes." *Id.* at 10.

The Proskauer PJ Defendants further assert that case law specifically addressing personal jurisdiction in the context of sports teams supports the same conclusion. *Id.* at 10-11 (citing *Davis v. Billick*, Case No. 301CV1964D, 2002 WL 1398560, at *6 (N.D. Tex. June 26, 2002); *Manton v. Cal. Sports, Inc.*, 493 F. Supp. 496, 496-98 (N.D. Ga. 1980);  *Sullivan v. Tagliabue*, 785 F. Supp. 1076, 1081 (D. R.I. 1992); *Evans v. Boston Red Sox*, Case No. 13-00262 SOM BMK, 2013 U.S. Dist. LEXIS 166307, at *10-12 (D. Haw. Nov. 22, 2013); *Donatelli v. Nat'l Hockey League*, 893 F.2d 459 (1st Cir. 1990)).

Nor do communications with California residents support a finding of general jurisdiction, the Proskauer PJ Defendants contend. *Id.* at 11 (citing *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1331 (9th Cir. 1984); *SRE-Cheaptrips, Inc. v. Media Synergy Grp., LLC*, Case No. 09-cv-00622-S-EJL, 2010 WL 1913589, at *2 (D. Id. May 12, 2010); *MMCA Grp., Ltd. v. Hewlett-Packard, Co.*, Case No. 06-cv-7067 MMC (EMC), 2007 WL 1342586, at *5 (N.D. Cal. May 8, 2007)).  Even to the extent such communications might be evidence that players who reside in California performed work during the offseason, they argue, this evidence would not support a finding of general jurisdiction because it is well-established that such unilateral activities, based on those players' choice to live in California, cannot give rise to general jurisdiction. *Id.* at 11-12 (citing *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 816-17 (9th Cir. 1988); *Hall v. Nat'l Basketball Ass'n*, 651 F. Supp. 335, 339 (D. Kan. 1987)).  Finally, the Proskauer PJ Defendants argue that intermittent travel to California by their employees is not sufficient to support general jurisdiction. *Id.* at 12-14 (citing *A.C.K. Sports, Inc. v. Doug Wilson Enters., Inc.*, 661 F. Supp. 386

7

1  (S.D.N.Y. 1987); *Collyard v. Washington Capitals*, 477 F. Supp. 1247, 1250, n.3 (D. Minn. 1979);

2  *Munchak Corp. v. Riko Enterprises, Inc.*, 368 F. Supp. 1366, 1374 (M.D. N.C. 1973); *Core-Vent*

3  *Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1490 (9th Cir. 1993); *Autogenomics, Inc. v. Oxford Gene*

4  *Tech., Ltd.*, 566 F.3d 1012, 1018 (Fed. Cir. 2009); *Bancroft & Masters, Inc. v. Augusta Nat'l.,*

5  *Inc.*, 45 F. Supp. 2d 777, 781 (N.D. Cal. 1998), *reversed on other grounds*, 223 F.3d 1082 (9th

6  Cir. 2000); *Vice v. Woodline USA, Inc.*, Case No. C 10-04103 CW, 2011 U.S. Dist. LEXIS 8014,

7  at *6-7 (N.D. Cal. Jan. 21, 2011);  *Reiffin v. Microsoft Corp.*, Case No. 11-cv-03505 CRB, 2012

8  WL 1309179, at *11 (N.D. Cal. Apr. 16, 2012)).

9        The Proskauer PJ Defendants also argue that the Court lacks specific jurisdiction over

10  them.  *Id.* at 14.  According to the Proskauer PJ Defendants, to establish specific jurisdiction

11  Plaintiffs must satisfy the Ninth Circuit's three-part test, which requires that they demonstrate the

12  following:

13         (i) the nonresident defendant must purposefully direct his activities
          or consummate some transaction with the forum or residents thereof;
14         or perform some act by which he purposefully avails himself of the
          privilege of conducting activities in the forum, thereby invoking the
15         benefits and protections of its laws; (ii) the Named Plaintiffs' claims
          must arise out of or relate to the defendant's forum-related activities;
16         and (iii) the exercise of jurisdiction must comport with fair play and
          substantial justice, i.e., it must be reasonable.
17

18  *Id.* (citing *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008)).  In the class action context,

19  they assert, "courts may not consider a defendant's contacts with unnamed putative class members

20  residing in the forum state when considering specific jurisdiction."  *Id.* (citing *Ambriz v. Coca*

21  *Cola*, Case No. 13-cv-03539-JST, 2014 WL 296159 (N.D. Cal. Jan. 27, 2014)). The Proskauer PJ

22  Defendants contend Plaintiffs fail to meet any of the three requirements for specific jurisdiction.

23  *Id.*

24        With respect to the first part of the test, which requires either "purposeful availment" or

25  "purposeful direction," the Proskauer PJ Defendants argue that there is no evidence of "purposeful

26  availment" because they have not "performed some type of affirmative conduct which allows or

27  promotes the transaction of business within the forum state."  *Id.* at 14-15 (quoting *Sinatra v. Nat'l*

28  *Enquirer, Inc.*, 854 F.2d 1191, 1195 (9th Cir. 1988)). The "purposeful direction" requirement,

United States District Court
Northern District of California

which is the one that applies to cases like this one, involving wage-and-hour claims, also is not met, the Proskauer PJ Defendants assert. *Id*. at 15 (citing *Enriquez v. Interstate Group, LLC*, Case No. 11-cv-05155 YGR, 2012 WL 3800801, at *3 (N.D. Cal. Aug. 31, 2012); *Holliday v. Lifestyle Lift, Inc.*, Case No. 09-cv-4995 RS, 2010 WL 3910143, at *3 (N.D. Cal. Oct. 5, 2010)).

Purposeful direction, according to the Proskauer PJ Defendants, requires that "Defendants must have: (1) committed an intentional act that was; (2) expressly aimed at the forum state and which; (3) caused harm that Defendants knew was likely to be suffered in the forum state." *Id*. (*quoting Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 803 (9th Cir. 2004)). Even assuming the first and third requirements are met, the express aiming requirement is not, the Proskauer PJ Defendants assert. *Id*. at 15-17. In particular, any contacts the Proskauer PJ Defendants may have with Minor League players in California are "simply a function of where the players chose to live in the offseason" and are not the result of any intentional conduct on the part of the Proskauer PJ Defendants. *Id*. at 16-17 (citing *Walden*, 134 S. Ct. at 1123; *Slepian v. Guerin*, 172 F.3d 58, 1999 WL 109676 (9th Cir. 1999) (unpublished disposition); *Novak v. NanoLogix, Inc*., Case No. 13-cv-01971 EJD, 2014 WL 991119, at *2 (N.D. Cal. Mar. 11, 2014); *SRE-Cheaptrips, Inc*., 2010 WL 1913589 at *4; *Hall*, 651 F. Supp. at 339).

The Proskauer PJ Defendants argue that the second part of the specific jurisdiction test is not satisfied because Plaintiffs' claims do not arise out of or relate to the Proskauer PJ Defendants' forum-related activities. *Id*. at 17-18. This requirement, they contend, is satisfied only if the plaintiffs' claims "would have arisen but for the defendants' contacts with California." *Id*. (citing *Doe v. Unocal Corp*., 248 F.3d 915, 924-25 (9th Cir. 2001)). That requirement is not satisfied here, they argue, because none of the Plaintiff Minor League players "worked for the [Proskauer PJ Defendants] or their Minor League affiliates in California . . . [and], even though the Defendants' Major League players worked in California while playing Major League Baseball games, neither these players – nor the time they spent playing Major League games – are the subject of this action." *Id*. at 17 (citing *Thos P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica*, 614 F.2d 1247 (9th Cir. 1980)). Nor do Plaintiffs' claims arise out of the Proskauer PJ Defendants' "other  insubstantial contacts with California," as they have not

United States District Court
Northern District of California

9

1   "'directed' their activities to California any more than any other state, and they do not – and

2   cannot – claim that 'but for' the [Proskauer PJ Defendants'] contacts with California, their alleged

3   injuries would not have occurred." *Id.* at 18 (citing *SRE-Cheaptrips, Inc.*, 2010 WL 1913589 at

4   *7).

5           Finally, the third requirement for specific jurisdiction, that exercise of jurisdiction must be

6   reasonable, also is not met, the Proskauer PJ Defendants assert. *Id.* at 18-20.  In determining

7   whether this requirement is met, they contend, courts consider the following seven factors:

8               (1) the extent of the defendant's purposeful interjection into the
                forum state's affairs; (2) the burden on the defendant of defending in
9               the forum; (3) the extent of conflict with the sovereignty of the
                defendant's state; (4) the forum state's interest in adjudicating the
10              dispute; (5) the most efficient judicial resolution of the controversy;
                (6) the importance of the forum to the plaintiffs' interest in
11              convenient and effective relief; and (7) the existence of an
                alternative forum.
12

13   *Id.* (citing *CE Distrib., LLC. v. New Sensor Corp.*, 380 F.3d 1107, 1112 (9th Cir. 2004)).

14   According to the Proskauer PJ Defendants, these factors weigh in favor of finding that exercise of

15   personal jurisdiction over them is not reasonable.  *Id.*

16           The Proskauer PJ Defendants contend the first factor favors their position because, for the

17   reasons discussed above, their contacts with California do not amount to "purposeful interjection"

18   and they have not sought the protection of California's laws.  *Id.* at 19.  They argue that the second

19   factor, the burden of defending in California, is substantial "because it would require each Club's

20   representatives and employees to travel out-of-state to litigate claims that did not arise here."  *Id.*

21   The Proskauer PJ Defendants concede the third factor is neutral, but assert the fourth factor favors

22   their position because "California does not have a compelling interest in adjudicating the dispute

23   where the conduct at issue did not take place within its borders."  *Id.* (citing *Fed. Deposit Ins.*

24   *Corp. v. British-Am. Ins. Co.*, 828 F.2d 1439, 1444 (9th Cir. 1987)). The fifth factor, efficiency of

25   the forum, turns primarily on where witnesses and evidence are likely to be located and weighs

26   "heavily in favor of dismissal," the Proskauer PJ Defendants assert, because "the evidence related

27   to the Moving Defendants' Minor League operations exists exclusively outside of California."  *Id.*

28   (citing *Core-Vent Corp.*, 11 F.3d at 1489).  Further, they argue, "[l]itigating Plaintiffs' claims

United States District Court
Northern District of California

10

against the Moving Defendants in California would be demonstrably inconvenient because out-of-state witnesses would be required to travel here to testify about events which occurred outside of California." *Id*. The Proskauer PJ Defendants note that the sixth factor, which looks to the convenience and effectiveness of relief in the forum, is "not of paramount importance." *Id*. at 20 (citing *Dole Food Co. v. Watts*, 303 F.3d 1104, 1116 (9th Cir. 2002)). They suggest, however, that it favors their position because "only six out of the 34 Named Plaintiffs reside in this State." *Id*. The seventh factor also favors the Proskauer PJ Defendants, they assert, because the plaintiff has the burden of proving the unavailability of an alternative forum and Plaintiffs cannot do so here. *Id*. In particular, according to the Proskauer PJ Defendants, each of them is subject to general jurisdiction in the state where it has its principal place of business and all of them are also subject to specific jurisdiction in Florida, where the claims arose. *Id*. Considered together, the Proskauer PJ Defendants assert, the seven factors discussed above demonstrate that the exercise of personal jurisdiction over them by this Court is not reasonable. *Id*.

### 2. Baltimore Orioles

The Baltimore Orioles join in and adopt the arguments and authorities set forth in the Proskauer Motion to Dismiss. In their motion, they do not offer any new arguments but rather, highlight the evidence they contend demonstrates a lack of personal jurisdiction (either general or specific) as to the Baltimore Orioles specifically. In particular, the Baltimore Orioles point to the following evidence:

- The Baltimore Orioles do not have Minor League affiliates based in California, and none of their Minor League affiliates play Minor League baseball games in California. Baltimore Orioles Motion to Dismiss at 2 (citing Declaration of Daniel F. Duquette in Support Motion to Dismiss Consolidated Amended Complaint for Violation of Federal and State Wage and Hour Laws Against the Baltimore Orioles Limited Partnership and Baltimore Orioles, Inc. ("Duquette Decl.") at ¶3; Declaration of Kent Qualls in Support Motion to Dismiss Consolidated Amended Complaint for Violation of Federal and State Wage and Hour Laws Against the Baltimore Orioles Limited Partnership and Baltimore Orioles, Inc. ("Qualls Decl.") at ¶¶2-3).

- The Baltimore Orioles do not hold tryouts in California and pre-draft workouts normally are held in Baltimore, Maryland. *Id*. at 3 (citing Declaration of M. Celeste Bruce in Support Motion to Dismiss Consolidated Amended Complaint for Violation of Federal and State Wage and Hour Laws Against the Baltimore Orioles Limited Partnership and Baltimore Orioles, Inc., ("Bruce Decl."), Ex. 1 (Baltimore Orioles' Supplemental Answers

United States District Court
Northern District of California

11

to Plaintiffs' First Set of Interrogatories regarding Jurisdiction and Venue, Objection and Answer to Interrogatory No. 9)).

- Players who are drafted by the Baltimore Orioles are subjected to physical examinations before being offered a contract;  these physicals and execution of the contracts are "generally conducted" in either Maryland or at the Baltimore Orioles' spring training facility in Florida.  *Id.*

- Beginning with the 2012 baseball season, Minor League players with offseason addresses in California "have signed their Addendum Cs in Florida during spring training camp."  *Id.* (citing Bruce Decl., Ex. 1 (Objection and Answer to Interrogatory No. 7)).

- "Minor League players are provided off-season workout packages during in-person meetings held at the location of the Minor League Club, normally during the last week of the Minor League season."  *Id.* (citing Bruce Decl., Ex. 1 (Objection and Answer to Interrogatory No. 8)).

- With respect to Major League games played by the Baltimore Orioles in California, "[i]n each year since 2009, the Baltimore Orioles have not made more than three separate trips to California, nor played more than thirteen (13) Major League Championship Season Baseball games" in California.  *Id.* (citing Duquette Decl. at ¶2).  Further, the schedule for these games is set by the Commissioner of Baseball and not the Baltimore Orioles.  *Id.*

- "The Baltimore Orioles only employ a small number of California-based scouts (in 2014, 6) and had a handful of scouts who travelled to California for short periods of time." *Id.* (citing Bruce Decl., Ex. 1).

- "The Baltimore Orioles do not have corporate officers or directors located in California. Nor do the Baltimore Orioles have operations, offices, a place of business or postal address in California."  *Id.* (citing Declaration of H. Russell Smouse in Support Motion to Dismiss Consolidated Amended Complaint for Violation of Federal and State Wage and Hour Laws Against the Baltimore Orioles Limited Partnership and Baltimore Orioles, Inc., ("Smouse Decl.") at ¶¶4-5).

- "The Baltimore Orioles, Inc. is a Maryland corporation with its principal place of business in Maryland. The Baltimore Orioles Limited Partnership was formed in Maryland and also has its principal place of business in Maryland."  *Id.* (citing Smouse Decl. at ¶¶2 -3; Bruce Decl., Ex. 1 (Objection and Answer to Interrogatory No. 14)).

- "The Baltimore Orioles do not own or lease property in California."  *Id.* (citing Smouse Decl. at ¶4; Bruce Decl., Ex. 1 (Objection and Answer to Interrogatory No. 1)).

- "The Baltimore Orioles do not receive income from tickets, concessions, parking or similar items for regular season games that it plays in California as a visiting Club."  *Id.* (citing Bloom Jurisdiction Decl., Ex. K (Objection and Answer to Interrogatory No. 5)). "And the Baltimore Orioles have not been sued in California (other than the instant lawsuit, consolidated with *Marti v. MLB*) nor initiated any lawsuits, filed cross-claims or

United States District Court
Northern District of California

12

counterclaims [in California] since 2008." *Id.* (citing Bruce Decl., Ex. 1 (Objection and Answer to Interrogatory No. 13)).

**B.      Opposition**

Plaintiffs respond that the Personal Jurisdiction Defendants have "deep roots in California," with "extensive contacts related to recruitment, hiring, and employment of California Minor Leaguers, all resulting from systematic, affirmative acts."  Plaintiffs' Opposition to Certain Defendants' Motion to Dismiss for Lack of Personal Jurisdiction ("Personal Jurisdiction Opposition") at 1.  In particular, Plaintiffs assert, "all [Personal Jurisdiction] Defendants consciously chose to base multiple scouts within California to evaluate and recruit the state's amateurs . . . [then] used these contacts to consciously select California Minor Leaguers and induce them into signing contracts (which are often signed within California)."  Further, Plaintiffs assert, the Personal Jurisdiction Defendants "then expect these Minor Leaguers to not only work during the season but also during the winter training months, and they even direct the work by providing training packets . . . know[ing] and expect[ing] that these youths will return to their home state to perform this winter work."  *Id.*

Plaintiffs contend Personal Jurisdiction Defendants' "other contacts with California also result from express acts."  *Id.*  According to Plaintiffs, "[t]hey all obtain significant sums of California revenue from doing business within the state, and they all pay taxes to California. They also obtain substantial California revenue from other streams funneled through Major League Baseball."  *Id.*  Plaintiffs assert that "[w]ith far more MLB franchises located in California than any other state (including prominent franchises such as the Dodgers and Giants), [the Personal Jurisdiction] Defendants obtain a direct financial benefit from business occurring in the state through television revenue, internet revenue, merchandise sales, and other shared revenue." *Id.* at 1-2.  In light of these contacts, Plaintiffs assert, it is "quintessentially fair" to exercise personal jurisdiction over these MLB franchises.  *Id.* at 2.

According to Plaintiffs, MLB "entrenched itself in California" in 1958, when the Dodgers and the Giants came to California, followed in 1969 by the San Diego Padres.  *Id.* at 4 (citing Declaration Of Garrett R. Broshuis In Support Of Plaintiffs' Opposition To Certain Defendants' Motion To Dismiss For Lack of Personal Jurisdiction ("Broshuis Decl."), Ex. D (Dodgers

1    Franchise Timeline, MLB.com); *id.*, Ex. E (Giants Franchise Timeline, MLB.com); *id.*, Ex. F

2    (Padres Franchise Timeline, MLB.com); *id.*, Ex. G (Team-by-Team Information, MLB.com)).

3    There are now five franchises in California, they assert, which is more than in any other state. *Id.*

4    This high number of franchises in California means that the Personal Jurisdiction Defendants

5    "routinely travel to California to play multiple games every season – up to 16 games in a season."

6    *Id.* at 5 (citing Proskauer Motion to Dismiss at 4).

7         Plaintiffs assert that MLB's contacts with California go beyond travel and that the Personal

8    Jurisdiction Defendants each derive substantial income from California, including "$113,128.10 in

9    revenue attributable to California from MLB Advanced Media (MLB's internet arm) and

10   $52,199.17 in revenue attributable to California from MLB Network (MLB's own TV network)."

11   *Id.* at 5 (citing Bloom Jurisdiction Decl., Ex. K (MLB's Objection and Answer to Interrogatory

12   No. 5)). Plaintiffs also assert that although MLB "did not provide California revenue for television

13   contracts or MLB Properties (its licensing arm that licenses products for all Defendants and

14   distributes revenue) . . . it goes without saying that significant revenues and sales emanate from

15   California – the most populous state – and are eventually funneled to all Defendants." *Id.* (citing

16   Broshuis Decl., Ex. H (search engine metrics showing that "three out of the five top keywords in

17   search engines that lead consumers to mlb.com are California-related ('sf giants,' 'dodgers,' and

18   'giants'), and, from mlb.com, a significant percentage of these consumers shop on MLB's e-

19   commerce site, shop.mlb.com"). Plaintiffs also point to the admissions of the Personal

20   Jurisdiction Defendants that they pay taxes in California. *Id.* (citing Bloom Jurisdiction Decl.,

21   Exs. A-J (Objection and Answer to Interrogatory Nos. 11 & 12); Bruce Decl., Ex. 1 (Orioles

22   Objection and Answer to Interrogatory Nos. 11 & 12)). In addition, according to Plaintiffs, the

23   Personal Jurisdiction Defendants have participated in workers compensation claims within

24   California and MLB has lobbied the California legislature on behalf of its franchises "to make it

25   more difficult to bring certain sports-related workers compensation claims in California." *Id.* at 6

26   (citing Broshuis Decl., Ex. I (Injury claims by professional athletes, L.A. Times (Feb. 1, 2014));

27   *id.*, Ex. J (California limits workers' comp sports injury claims, L.A. Times (Oct. 8, 2013)).

28   Plaintiffs also point to evidence that MLB has hosted industry-wide meetings in California in

United States District Court
Northern District of California

1    recent years.  *Id*. (citing Broshuis Decl., Ex. K (2014 Baseball Winter Meetings returns to San

2    Diego after three decades, MiLB.com)).

3           In addition to the contacts discussed above, Plaintiffs point to what they contend is

4    "systematic recruitment" of California Minor Leaguers.  *Id*. at 6.  According to Plaintiffs,

5    "California has long produced more major leaguers than any other state, and one recent study

6    found that over 23 percent of American major leaguers came from California - more than twice as

7    many as the next state."  *Id*. (citing Broshuis Decl., Ex. L (Kevin Nelson, THE GOLDEN GAME

8    xiii (2004)); *id.*, Ex. M (California is top producer of major league players, L.A. Times (July 12,

9    2010)); Bloom Jurisdiction Decl., Exs. A-J (Objection and Answer to Interrogatory No. 5);  Bruce

10   Decl., Ex. 1 (Orioles Objection and Answer to Interrogatory No. 5)). Plaintiffs further contend that

11   more Minor Leaguers come from California than any other state, citing the discovery responses of

12   the Personal Jurisdiction Defendants reflecting that "[a]ll PJ Defendants drafted dozens of

13   Californians since 2008, and on average they each selected 7.2 Californians per year."  *Id*. (citing

14   Bloom Jurisdiction Decl., Exs. A-J (Objection and Answer to Interrogatory No. 5);  Bruce Decl.,

15   Ex. 1, (Orioles Objection and Answer to Interrogatory No. 5)).

16          According to Plaintiffs, the recruitment of Minor Leaguers from California involves a

17   "long, intense process requiring a substantial presence in California."  *Id*.  In particular, they

18   contend, all of the Personal Jurisdiction Defendants have multiple employees in California (an

19   average of 6.3 employees per franchise), many of whom are scouts.  *Id.* (citing Bloom Jurisdiction

20   Decl., Exs. A-J (Objection and Answer to Interrogatory No. 2); Bruce Decl., Ex. 1 (Orioles

21   Objection and Answer to Interrogatory No. 2)).  The fact that the MLB Scouting Bureau is based

22   in California is a reflection of the importance of scouting here, Plaintiffs contend.  *Id*. at 7.

23   Plaintiffs also cite to evidence that the Personal Jurisdiction Defendants "systematically dispatch

24   many other employees to California to target, evaluate, and recruit players, such as higher-level

25   employees like cross checkers, directors of scouting, and even vice presidents and general

26   managers."  *Id*. (citing Bloom Jurisdiction Decl., Ex. A-J (Personal Jurisdiction Defendants'

27   Objection and Answer to Interrogatory No. 2);  Wyckoff Decl. at ¶ 5; McAtee Decl. at ¶5).

28   Plaintiffs assert that in 2013, the Personal Jurisdiction Defendants sent an average of 9.7 such

15

1  employees per franchise to California.  *Id*.  And further, when a player is selected, according to

2  Plaintiffs, the scouts will continue to be involved in the formal discussions with the player and

3  may also be present when the player signs the UPC.  *Id*. (citing Wyckoff Decl. at ¶ 9; McAtee

4  Decl. at ¶ 6; Watts Decl. at ¶ 4;  Bennigson Decl. at ¶ 4; Kahaulelio Decl. at ¶ 4; Woodruff Decl.at

5  ¶ 4; Henderson Decl. at ¶ 4; Giarraputo Decl. at ¶ 4; Lewis Decl. at ¶ 4).

6        Plaintiffs also present evidence relating to the work performed by Minor Leaguers in

7  California.  Plaintiffs note that the UPC requires that the Minor Leaguers "maintain 'first class'

8  conditioning during the entire year, and a franchise can 'impose a reasonable fine' for not

9  meeting these requirements."  *Id*. at 8 (citing CAC, ¶ 178 (citing UPC ¶¶ VI.D and XII)).  They

10  also point to the admissions of the Personal Jurisdiction Defendants that they direct this

11  conditioning by handing out "work-out packets" to the players.  *Id*. (citing Bloom Jurisdiction

12  Decl., Exs. A-J (Objection and Answer to Interrogatory No. 7);  Bruce Decl., Ex. 1 (Orioles

13  Objection and Answer to Interrogatory No. 7); Hilligoss Decl., Ex. A;  Pahuta Decl., Ex. A).

14  Further, although only five franchises provided information about how many of their players

15  reside in California during the offseason,  as to those that did, the discovery responses showed that

16  an average of 24.7 Minor Leaguers per franchise reside in California each winter training period,

17  Plaintiffs contend.  *Id*. (citing Bloom Jurisdiction Decl., Exs. C-F (Objection and Answer to

18  Interrogatory No. 6); Bruce Decl., Ex. 1 (Orioles Objection and Answer to Interrogatory No. 6)).

19  According to Plaintiffs, the Personal Jurisdiction Defendants are aware that these players are

20  living in California during the offseason because they communicate with the players and must

21  maintain correct addresses, sending them rules and information about spring training and also a

22  contract addendum with their salaries.  *Id*. at 9 (citing Senne Decl., Ex. A; Khoury Decl. at ¶ 7;

23  Bennigson Decl. at ¶ 7; Pahuta Decl. at ¶ 7; Lawson Decl. at ¶¶ 7–8; Watts Decl. at ¶¶ 6–11;

24  Kahaulelio Decl. at ¶ 5; Smith Decl. at ¶ 4; Opitz Decl. at ¶ 5; Woodruff Decl. at ¶ 5; Henderson

25  Decl. at ¶ 5; Giarraputo Decl. at ¶¶ 5–6; McAtee Decl. at ¶ 7; Lewis Decl. at ¶ 5 [collectively

26  "Declarations Describing Winter Work"]).

27        Plaintiffs argue that there is both general and specific jurisdiction over the Personal

28  Jurisdiction Defendants in California.  *Id*. at 11.  They assert that for general jurisdiction, the

United States District Court
Northern District of California

minimum contacts test of *International Shoe* and the "bedrock principal" of fundamental fairness are satisfied when "a defendant's systematic and continuous contacts essentially render a corporation at home . . . meaning defendant's contacts 'approximate physical presence' in the state." *Id.* (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011), *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1169 (9th Cir. 2006)).  Under *Tuazon*, Plaintiffs assert, "some non-exhaustive factors include soliciting or engaging in business in the state, as well as the '[l]ongevity, continuity, volume, economic impact, physical presence, and integration into the state's regulatory or economic markets.'" *Id.* (citing *Tuazon*, 433 F.3d at 1172).  Those factors support a finding of general jurisdiction here, Plaintiffs assert, based on the "longstanding presence in California" of the Personal Jurisdiction Defendants, discussed above. *Id.* at 12.  Plaintiffs further assert that here, as in *Tuazon*, the "'long and successful operation' in the state were 'not accidental.'"  *Id.* (citing 433 F.3d at 1174).

Plaintiffs also argue that "the highly interdependent nature of MLB" supports a finding of general jurisdiction.  *Id.* at 13 (citing *Erving v. Virginia Squires Basketball Club*, 349 F. Supp. 709, 712-15 (E.D.N.Y. 1972)).  Thus, Plaintiffs assert, in *Erving*, the court found that the Squires basketball team, which was a member of the American Basketball Association ("ABA"), was subject to personal jurisdiction in New York, even though it played only six to eight games in New York out of a season schedule of 84 games, because the games that were played in New York were "essential to the fulfillment of the business purposes and objects of the ABA enterprise of which Squires is an integral part."  *Id.* (citing 349 F. Supp. at 713).  According to Plaintiffs, the court in *Erving* concluded that it "did not matter that gate receipts were not purely shared – other revenue was shared and the relationships were symbiotic."  *Id.* (citing 349 F. Supp. at 713-14).  Plaintiffs contend other courts analyzing sports teams and sports leagues have reached the same conclusion.  *Id.* (citing *Hollins v. U.S. Tennis Ass'n*, 469 F. Supp. 2d 67, 74 (E.D.N.Y. 2006); *Cent. Sports Army Club v. Arena Assocs., Inc.*, 952 F. Supp. 181, 188 (S.D.N.Y. 1997); *Hawkins v. Nat'l Basketball Ass'n*, 288 F. Supp. 614, 618-19 (W.D. Pa. 1968); *Am. Football League v. Nat'l Football League*, 27 F.R.D. 264, 268-69 (D. Md. 1961)). This conclusion is consistent with the law of agency, Plaintiffs assert, where the acts of one joint venturer can be imputed to another

17

1    joint venturer.  *Id.* (*citing Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d

2    42, 55-63 (1st Cir. 2002)).

3              Plaintiffs argue that the facts here support a finding of general jurisdiction even more

4    strongly than the cases cited above because this case involves "a universal scheme enacted by all

5    Defendants to depress salaries." *Id.* at 14.  Further, as discussed above, Plaintiffs point to

6    "common conduct [that] was applied in and directed at California, and [which] resulted from all

7    Defendants' common decisions, uniform contracts, and common implementation." *Id.*  Although

8    the Personal Jurisdiction Defendants "do not directly share gate receipts, the collective bargaining

9    agreement requires all MLB franchises to share substantial revenue, with each franchise

10   contributing 34 percent of its local revenue into a common pool split amongst all 30 MLB

11   franchises." *Id.* at 14 (citing Broshuis Decl., Ex. O (Article XXIV, 2012-2016 Basic Agreement)

12   at 121).  The rules also require other revenue sharing, Plaintiffs contend, and as there are more

13   franchises in California than in any other state, "much of this shared revenue emanates from

14   California." *Id.*  Further, Plaintiffs point to substantial revenue from California, including from

15   the website and TV network, possible licensing revenues from California, and MLB's lobbying in

16   California, all of which show that the Personal Jurisdiction Defendants have made California their

17   second home, Plaintiffs assert, thus giving rise to general jurisdiction.  *Id.* at 15.

18             Plaintiffs also contend that there is specific jurisdiction over their claims in California.  *Id.*

19   at 15.  According to Plaintiffs, the theory of specific jurisdiction is based on the premise that

20   "[d]oing business within a state is a privilege, and obligations accompany that privilege." *Id.*

21   (citing *Int'l Shoe*, 326 U.S. at 316).  Thus, it is not unfair to subject a defendant to litigation in a

22   forum where the claims are related to the defendant's activities in the forum.  *Id.*  at 15-16.  The

23   Ninth Circuit uses a "sliding scale" for determining whether there is specific jurisdiction, Plaintiffs

24   assert, considering both "the extent of the defendant's contacts with the forum and the degree to

25   which the plaintiff's suit is related to those contacts. A strong showing on one axis will permit a

26   lesser showing on the other." *Id.* at 16 (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et*

27   *L'Antisemitisme*, 433 F.3d 1199, 1210 (9th Cir. 2006)).  The contacts that the Court should

28   consider, according to Plaintiffs, are not limited to the plaintiffs' contacts but also include contacts

United States District Court
Northern District of California

18

with non-plaintiffs.  *Id.* (citing *Yahoo!*, 433 F.3d at 1207).

Plaintiffs agree with the Personal Jurisdiction Defendants that specific jurisdiction is evaluated under a three-part test that asks whether: (1) the defendant purposefully directed its activities towards the forum or purposefully availed itself of the privileges of the forum; (2) the claim arises out of or relates to those activities; and (3) the exercise of personal jurisdiction is reasonable.  *Id.* (citing *Yahoo!*, 433 F.3d at 1205-06).  Plaintiffs also agree that the proper inquiry in this case as to the first part of the test is whether the Personal Jurisdiction Defendants "purposefully directed" their activities at the forum rather than the purposeful availment test.  *Id.* at 16-17.  According to Plaintiffs, purposeful direction is satisfied when: "(1) the company commits an intentional act, (2) aimed at the forum state, that (3) causes harm that the company knows will likely be felt in the forum state."  *Yahoo!*, 433 F.3d at 1206 (citing *Calder v. Jones*, 465 U.S. 783, 789-90 (1984)).  Plaintiffs reject the Personal Jurisdiction Defendants' argument that this test is not met, however.  *Id.*

Plaintiffs argue that because the Personal Jurisdiction Defendants did not address the first and third prongs of the purposeful direction test, the Court should find that those requirements are met.  *Id.*  In any event, they contend, the evidence shows that all three requirements are, in fact, met.  *Id.*  In particular, they argue that in wage and hour cases, the intentional act requirement is met where, as here, there is a uniform employment policy that is applied within the state, even if it is also applied to employees in other states.  *Id.* at 18 (*Holliday v. Lifestyle Lift, Inc.*, Case No. 09-cv-4995 RS, 2010 WL 3910143, at *3 (N.D. Cal. Oct. 5, 2010); *Telles v. Li*,  Case No. 11-cv-1470 LHK, 2013 WL 5199811, at *5 (N.D. Cal. Sept. 16, 2013); *Enriquez v. Interstate Group.*, LLC, Case No. 11-cv-5155 YGR, 2012 WL 3800801, at *4 (N.D. Cal. Aug. 31, 2012)).  According to Plaintiffs, "[a] company expressly aims its conduct in such cases when it applies the allegedly unlawful employment practices in the state" and "knows harm will likely occur in a state when it applies a policy to workers in the state."  *Id.* (citing *Holliday*, 2010 WL 3910143, at *4; *Telles*, 2013 WL 5199811, at *5; *Enriquez*, 2012 WL 3800801, at *5).  Further, Plaintiffs assert, specific jurisdiction is found "[e]ven for work performed at home . . . if the company knowingly hires a forum's resident and has reason to know that work will be performed at home."  *Id.* (citing *Wood*

19

1    *v. Kinetic Sys., Inc*., Case No. Case No. 09-cv--579 SCWD, 2010 WL 893647, at *5 (D. Idaho

2    Mar. 9, 2010)).  Here, Plaintiffs assert, the Personal Jurisdiction Defendants "acted intentionally

3    by creating the policy decision to pay no wages at all during the winter training period and to pay

4    no minimum wage or overtime during the season," "expressly aimed their conduct at

5    California by applying the policies to Californians working in California," and "knew harm was

6    likely to occur because they knowingly required Californians to work in California for no pay."

7    *Id*.

8         Plaintiffs further assert that the purposeful direction requirement is satisfied on the basis of

9    the recruiting activities conducted by the Personal Jurisdiction Defendants in California.  *Id*. at 19.

10   According to Plaintiffs, numerous courts have reached this conclusion.  *Id*. (citing *Davis v. NIH*

11   *Fed. Credit Union*, Case No. 12-cv-5502 JCS, 2013 WL 2147468, at *6 (N.D. Cal. May 15,

12   2013); *Ochoa v. J.B. Martin & Sons Farms, Inc*., 287 F.3d 1182, 1186-87 (9th Cir. 2002); *Potts v.*

13   *Cameron Offshore Boats, Inc*., 401 F. Supp. 2d 733, 737-38 (S.D. Tex. 2005)).  These cases are

14   distinguishable from the Supreme Court's decision in *Walden*, they contend, because they

15   "involved far more activities directed at the forum state."  *Id*. (citing *Ochoa*, 287 F.3d at 1189-93;

16   *Davis*, 2013 WL 2147468, at *6; *GT Sec., Inc. v. Klastech GmbH*, Case No. 13-cv-3090 JCS,

17   2014 WL 2928013, at *13-14 (N.D. Cal. June 27, 2014)).  According to Plaintiffs, the Personal

18   Jurisdiction Defendants have "systematically recruited" in California, as is apparent from evidence

19   showing that each one of them "drafted California amateurs every year for the last 6 years," and

20   that they "averaged 7.2 California draft picks per team per year."  *Id*.  Further, they assert, "[b]oth

21   before and after [the Personal Jurisdiction Defendants] select California Minor Leaguers,

22   their scouts and employees communicate with them and induce them into signing the uniform

23   contracts at issue while they reside in California."  *Id*.

24        Plaintiffs reject the argument of the Personal Jurisdiction Defendants that there is no

25   purposeful direction because their contacts with California "are simply a function of where players

26   choose to live during the off-season."  *Id*. at 20 (citing Proskauer Motion to Dismiss at 16). In fact,

27   Plaintiffs assert, the Personal Jurisdiction Defendants "affirmatively decided to target Californians

28   and contract with them," knowing that "most of these Californians would return to California

United States District Court
Northern District of California

during the offseason, where they would then expect them to perform winter work for no pay." *Id*. (citing *Wood*, 2010 WL 893647, at 5-6). Further, they argue, "[s]everal named Plaintiffs and opt-in plaintiffs suffered injuries in California while performing winter training work in California, and all [Personal Jurisdiction Defendants] employ many California Minor Leaguers in California who perform winter training work for no pay – an average of 24.7 per team based on supplied data." *Id*.  These activities are sufficient to show purposeful direction, Plaintiffs argue, and the Court should reject the reliance of the Personal Jurisdiction Defendants on contract cases involving purposeful *availment* and "far fewer contacts with the forum state" in support of a contrary result.  *Id*. (citing *Slepian v. Guerin*, 172 F.3d 58 (9th Cir. 1999) (unpublished); *Novak v. NanoLogix, Inc.*, Case No. C-13-01971 EJD, 2014 WL 991119, at *2 (N.D. Cal. Mar. 11, 2014); *SRE-Cheaptrips, Inc. v. Media Synergy Grp., LLC,* Case No. C- 09-00622-S-EJL, 2010 WL 1913589, at *3 (D. Idaho May 12, 2010);  *Hall v. Nat'l Basketball Ass'n*, 651 F. Supp. 335, 339 (D. Kan. 1987)).

Further, Plaintiffs contend, the Personal Jurisdiction Defendants are incorrect in their assertion that in determining whether there is purposeful direction, the court should consider named plaintiffs only and not putative class members. *Id*. at 21.  Defendants cite only a single case in support of their position, *Ambriz v. Coca Cola*, and that case, according to Plaintiffs, is not on point because it involved venue rather than personal jurisdiction.  *Id*.  Moreover, Plaintiffs assert, *Yahoo*, *International Shoe*, and *Walden* all make clear that the purposeful direction inquiry requires an evaluation of *all* of the defendant's contacts with the forum state that are connected with the litigation; thus even contacts with non-parties (such as putative class members) are considered in cases where the contacts of the plaintiffs are intertwined with those the non-parties. *Id*.

The second requirement for specific jurisdiction – that the claims must "arise out of" or be "related to" the plaintiff's activities in the forum is also met here, Plaintiffs assert.  *Id*. at 22. Plaintiffs argue that this requirement is a "low bar" in the Ninth Circuit and merely requires "some nexus between the claims and the company's activities – a 'but for' test." *Id*. (citing *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 385 (9th Cir. 1990),  *rev'd on other grounds by Carnival*

*Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991)).  Here, Plaintiffs assert, "there is a clear nexus between the [Personal Jurisdiction Defendants'] policies (relating to recruitment and employment of California Minor Leaguers), the harm (relating to their failure to pay minimum wage and overtime to these Minor Leaguers), and the claims (for violations of wage and hour laws)." *Id*.  According to Plaintiffs, "[b]ut for Defendants' uniform policies applied in California, there would be no harm to Minor Leaguers in California – and no claims." *Id*.

Finally, Plaintiffs assert, it is reasonable to exercise jurisdiction in this District rather than "litigating it in a piecemeal fashion in other forums." *Id*. at 23.  The burden as to this third requirement is on the Personal Jurisdiction Defendants because Plaintiffs have met the first two prongs of the specific jurisdiction test, they contend.  *Id*. (citing *Dole Food*, 303 F.3d at 1111).  Plaintiffs argue that the seven factors that are considered to determine reasonableness (discussed above) "strongly favor exercising personal jurisdiction over [the Personal Jurisdiction Defendants] in California." *Id*.

First, for the same reasons there is purposeful direction, Plaintiffs assert, the "purposeful interjection" factor weighs in favor of reasonableness. *Id*. (citing *Enriquez*, 2012 WL 3800801, at *6).

Second, Plaintiffs argue, the burden on a defendant is only unreasonable where defending in the forum is "so gravely difficult and inconvenient that it violates due process." *Id*. (citing *Enriquez*, 2012 WL 3800801, at *6 (internal citation omitted)).  Moreover, they assert, when determining whether the "burden of defending" in the forum is unreasonable, the Court must consider the burdens on *both* the defendants and the plaintiffs. *Id*. (citing *Ochoa*, 287 F.3d at 1192).  The facts here favor Plaintiffs, they argue, because seven Plaintiffs (some of whom were employed by the Personal Jurisdiction Defendants) live in California and 22 of 34 Plaintiffs live west of the Mississippi. *Id*.  In addition, the burden of travel is greater for Plaintiffs, who have limited resources, than it is on the Personal Jurisdiction Defendants, who regularly travel to California, Plaintiffs contend. *Id*. at 24.  Moreover, Plaintiffs argue, because all but one of the Personal Jurisdiction Defendants are represented by the same counsel, there will be little additional burden of litigating in California. *Id*.  In contrast, they assert, "filing a new case based

22

on identical facts in multiple districts against the [Personal Jurisdiction Defendants] would be substantially more burdensome and inefficient." *Id*. Thus, this factor favors the conclusion that exercise of jurisdiction is reasonable, they contend. *Id*.

Plaintiffs agree with the Personal Jurisdiction Defendants that the "sovereignty" factor is neutral. *Id*.

Plaintiffs argue that the next factor, the forum's interest in adjudicating the dispute, strongly favors California. *Id*. In particular, they argue that "[w]hile residents from states throughout the country are also harmed by Defendants' practices, more California residents are harmed than residents in any other state because many more Minor Leaguers come from California than any other state." *Id*.

Plaintiffs argue that the exercise of jurisdiction in California will also support the fifth factor, which asks the court to consider "the most efficient judicial resolution." *Id*. Plaintiffs contend it would be most efficient to litigate this dispute within a single district and further, that as the "epicenter of harm," California is the most appropriate forum. Plaintiffs also assert that dismissal of the Personal Jurisdiction Defendants would result in "highly inefficient, piecemeal litigation, which would risk disparate rulings on identical factual and legal issues." *Id*.

The importance of the forum to Plaintiffs also favors a finding that jurisdiction is reasonable, Plaintiffs argue, because three named Plaintiffs live in this district, far more Plaintiffs reside in California than any other state and over half of Plaintiffs suffered alleged harm in California. *Id*. at 25.

Finally, the last factor – the existence of an alternative forum – favors Plaintiffs' position, they argue, because "far more named Plaintiffs are in California than in any other state, more Defendants are headquartered in California than in any other state, and more Minor Leaguers come from California than any other state, [and therefore] no other forum would be as convenient as California." *Id*.

Consequently, Plaintiffs assert, the seven factors that go to reasonableness "demonstrate that Defendants cannot demonstrate a compelling burden, and the Court should find that it has specific jurisdiction over all [Personal Jurisdiction Defendants]." *Id*.

23

C.   **Reply Briefs**

   1.   **Proskauer PJ Defendants**

   In their Reply brief, the Proskaur PJ Defendants reject Plaintiffs' assertion that there is general jurisdiction over them, asserting that Plaintiffs have relied on outdated precedent while failing to address the Supreme Court's more recent guidance in *Daimler AG v. Bauman*, 134 S. Ct. 736 (2014) and *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846 (2011).  Reply in Support Of Motion To Dismiss The Consolidated Amended Complaint As Against Certain Defendants For Lack Of Personal Jurisdiction ("Proskauer Jurisdiction Reply") at 1.  Moreover, they assert, the contention that California is their "second home" is "unsupportable."  *Id.*  They also challenge Plaintiffs' assertion that there is specific jurisdiction over them.  *Id.*  As they argued in the underlying motion, the Proskauer PJ Defendants assert that Plaintiffs' position is based almost entirely on the fact that "certain Plaintiffs and unnamed members of the putative class voluntarily choose to live in California during the offseason."  *Id.*  The Proskauer PJ Defendants argue that this is not a sufficient basis to find specific jurisdiction given that it is "undisputed that (i) not one Minor League player played a single inning for a Moving Defendant in California, and (ii) not one Minor League player was required to perform any training activities for a Moving Defendant in California."  *Id.*  The Proskauer PJ Defendants also point to Plaintiffs' assertion in response to Defendants' transfer motions that there is no personal jurisdiction over some of the MLB clubs in Florida, asserting that Plaintiffs' argument is based on the same absence of contacts with Florida that the Proskauer PJ Defendants assert in their Motion to Dismiss deprives this Court of personal jurisdiction over them.  *Id.*

   On the question of general jurisdiction, the Proskauer PJ Defendants argue that Plaintiffs have relied heavily on a Ninth Circuit case, *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163 (9th Cir. 2006), that predates *Daimler* and *Goodyear* and is inconsistent with those more recent Supreme Court cases.  *Id.* at 3.  In particular, the Proskauer PJ Defendants assert, in *Tuazon*, the Ninth Circuit found that there was general jurisdiction over a defendant that had a "serious presence" and generated "enormous revenues" in the forum even though the forum was not the defendant's "home away from home."  *Id.*  That conclusion is at odds with *Daimler*, the Proskauer

United States District Court
Northern District of California

PJ Defendants argue, in which the Supreme Court "warned that 'the exercise of general jurisdiction in every State in which a corporation engages in a substantial, continuous, and systematic course of business… is unacceptably grasping.'"  *Id*. (citing 134 S. Ct. at 761 (internal quotations omitted)).  Even if the "more lenient standard set forth in *Tuazon*" applies, the Proskauer PJ Defendants argue, the contacts in that case were more extensive than the contacts here.  *Id*.  Moreover, they assert, "[c]ourts have uniformly held that contacts of the sort on which Plaintiffs rely do not support personal jurisdiction over an out-of-state sports team."  *Id*. at 4 (citing *Davis v. Billick*, Case No. CIV.A. 301CV1964D,  2002 WL 1398560 (N.D. Tex. June 26, 2002); *Manton v. Cal. Sports, Inc.*, 493 F. Supp. 496 (N.D. Ga. 1980); *Sullivan v. Tagliabue*, 785 F. Supp. 1076, 1081 (D. R.I. 1992)).  The Proskauer PJ Defendants reject Plaintiffs' claim that these cases are distinguishable because they did not involve a "common scheme" or "contacts related to the action," arguing that these distinctions have no bearing on whether the forum was the defendants' "second home."  *Id*.

Nor does the evidence establish that the Proskauer PJ Defendants are "at home" in California, they contend.  They argue that "[t]o the extent that the Moving Defendants have established a second home in any jurisdiction, it could only be Florida, where they conduct spring training, extended spring training, and instructional leagues for extended periods each year at facilities that they maintain in that state, and where one or more of their Minor League teams are based."  *Id*.  In contrast, they argue, the Proskauer PJ Defendants "are 'visitors' when they travel to California to play 'away' games" and "do not receive income from tickets, concessions, parking, or other similar items for regular season games played in California."  *Id*.

The Court should also reject Plaintiffs' attempt to impute the contacts of MLB and other non-moving clubs to the Proskauer PJ Defendants for the purposes of general jurisdiction, they argue.  *Id*. at 5-6.  According to the Proskauer PJ Defendants, Plaintiffs' reliance on *Erving v. Virginia Squires Basketball Club*, 349 F. Supp. 709 (E.D.N.Y. 1972) in support of this approach is misplaced, both because the decision does not apply the post-*Daimler* analysis and because the facts in that case were distinguishable.  *Id*. at 5-6.  In particular, they argue, the court in that case found jurisdiction in New York over a Virginia team because the American Basketball

United States District Court
Northern District of California

1    Association's principal office was located in New York City, was listed in the telephone directory

2    there and acted as designated agent for the basketball clubs. *Id.* at 6. Here, in contrast, "MLB is

3    based in New York and MiLB is based in Florida – not California." *Id.* Further, the Proskauer PJ

4    Defendants contend, the facts here do not support a finding of agency. *Id.*

5         Plaintiffs' reliance on revenues that are allegedly funneled through MLB also is misplaced,

6    the Proskauer PJ Defendants assert, as Plaintiffs have evidence of revenue from only two sources,

7    amounting to approximately $165,000 per club in 2013, and they merely offer speculation that the

8    actual revenues are significantly greater. *Id.* Even if true, the Proskauer PJ Defendants argue,

9    revenues from California are not sufficient to support general jurisdiction under *Daimler,* in which

10   the Supreme Court "rejected the Ninth Circuit's finding that the defendant was subject to general

11   jurisdiction because its in-state subsidiary performed services that were important to the defendant

12   company, holding that such an agency theory would 'subject foreign corporations to general

13   jurisdiction whenever they have an in-state subsidiary or affiliate, an outcome that would sweep

14   beyond even the sprawling view of general jurisdiction we rejected in *Goodyear.*'" *Id.* (quoting

15   *Daimler*, 134 S. Ct. at 760 (internal quotations omitted)). Finally, the Proskauer PJ Defendants

16   argue that the other cases Plaintiffs cite in support of their agency theory of jurisdiction –

17   *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42 (1st Cir. 2002) and

18   *Myers v. Bennett Law Offices*, 238 F.3d 1068 (9th Cir. 2001) – also do not support a finding of

19   general jurisdiction. *Id.* at 7-8.

20        The Proskaur PJ Defendants also reject Plaintiffs' assertion that there is specific

21   jurisdiction over them in California. As in their motion, they argue that the players' unilateral

22   decision to live in California in the offseason is not sufficient to establish that the Personal

23   Jurisdiction Defendants have  intentionally directed their actions at California. *Id.* at 8. They

24   argue that evidence that the players were recruited, received communications in California and

25   signed contracts here, cited by Plaintiffs in support of specific jurisdiction, does not show

26   purposeful direction because "the 'minimum contacts' analysis 'looks to the defendant's contacts

27   with the forum State itself, not the defendant's contacts with persons who reside there.'" *Id.*

28   (quoting *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014)). The Proskauer PJ Defendants further

United States District Court
Northern District of California

26

United States District Court
Northern District of California

1   assert that "Plaintiffs vastly overstate the purported contacts between the Moving Defendants and

2   California-based Minor League *players*." *Id*. at 9.  In particular, the Proskauer PJ Defendants

3   argue that of the fifteen player declarations submitted by Plaintiffs, only nine reflect that those

4   players even played for the Proskauer PJ Defendants, with the remaining six playing for

5   defendants who do not contest jurisdiction.  *Id*.  Further, according to the Proskauer PJ

6   Defendants, of the nine who played for them during the relevant time period, "five allege no

7   personal connections with California during the relevant timeframe while playing for the moving

8   Clubs, but instead offer that they had 'teammates' – none of whom they identify by name – who

9   reportedly returned to California for the winter." *Id*. at 10.

10          Nor do the allegations in the remaining declarations (of players Smith, Watts, Lewis and

11  Giarraputo) provide evidence of sufficient contacts to support jurisdiction against each of the

12  Clubs that challenges jurisdiction, the Proskauer PJ Defendants assert.  *Id*.  It is also significant,

13  they contend, that neither Lewis nor Giarraputo are named Plaintiffs in this action, as "a

14  defendant's contacts with the named plaintiff[s] in a class action, without reference to the

15  defendant's contacts with unnamed members of the proposed class, must be sufficient for the

16  Court to exercise specific jurisdiction over the defendant." *Id*. (citing *Ambriz*, 2014 WL 296159,

17  at *6 (N.D. Cal. Jan. 27, 2014)).

18          The Proskauer PJ Defendants also argue that Plaintiffs' claims do not arise out of their

19  forum activities.  *Id*. at 12.  The "but for" test cannot be met, they contend, on the basis of the

20  players' decision to live in California because the test requires that the contacts *enabled* the harm

21  to occur, not merely that the contacts are *related* to the claims.  *Id*. (citing *Norris v. Okla. City

22  Univ.*, Case No. 93-cv-1626 VRW, 1993 WL 313122, at *3 (N.D. Cal. Aug. 3, 1993) (quoting

23  *Alexander v. Circus Circus Enters., Inc.*, 939 F2d 847, 853 (9th Cir. 1991)).  Further, the

24  Proskauer PJ Defendants assert, Plaintiffs' other forum activities, "including their recruitment,

25  signing contracts, or receipt of various communications . . . are too attenuated from their wage-

26  and-hour claims to establish 'but for' causation." *Id*.

27          Finally, the Proskauer PJ Defendants reiterate their position that exercise of specific

28  jurisdiction in California is unreasonable based on the factors that courts must consider to make

27

such a determination.  *Id*. at 14-15.  Purposeful interjection, the first factor, favors the Proskauer

PJ Defendants for the same reasons there is no purposeful direction, they assert.  *Id*. at 14.  As to

the second factor, the burden of defending in the forum, they argue that Plaintiffs "grossly

misrepresent the authority cited for their specious proposition that '[i]f re-filing in another

jurisdiction would burden the plaintiff, then it would be unreasonable to dismiss the complaint.'"

*Id*. at 14.  Rather, they assert, the proper focus should be on the fact that "the number of likely

witnesses who live in or reasonably close to Florida overwhelms the number who live in or

reasonably close to California."  *Id*.  With respect to the interest of the forum state in adjudicating

the claims, the Proskauer PJ Defendants contend Plaintiffs "cannot dispute that this forum's

interest in enforcing California law is mitigated because the events at issue with respect to the

Moving Defendants did not occur in California."  *Id*. (citing *Fed. Deposit Ins. Corp. v. British-Am.

Ins. Co., Ltd*., 828 F.2d 1439, 1444 (9th Cir. 1987)).  The Proskauer PJ Defendants also reject

Plaintiffs' argument that litigation in California is more efficient because it will avoid piecemeal

litigation, arguing that Plaintiffs undercut their opposition to the transfer motions, as the entire

case could have been brought in Florida.  *Id*.  Similarly, they argue that the availability of an

alternative forum factor favors the Proskauer PJ Defendants because the case could have been

brought against all of the Clubs in Florida.  *Id*. at 15.

### 2.   Baltimore Orioles

In their reply brief, the Baltimore Orioles join in the arguments made by the Proskauer PJ

Defendants and also highlight specific facts relating to the Baltimore Orioles that they contend

support those arguments.  Defendants', The Baltimore Orioles, Inc. And The Baltimore Orioles

Limited Partnership, Reply In Support Of Motion To Dismiss The Consolidated Amended

Complaint For Lack Of Personal Jurisdiction ("Baltimore Orioles Personal Jurisdiction Reply").

In support of their assertion that there is no specific jurisdiction, the Baltimore Orioles

point to the contacts (or absence of contacts) with California of named Plaintiff Roberto Ortiz,

who is alleged to be a "representative plaintiff for the ML Collective Class, the Arizona Class, the

Florida Class and the Maryland Class."  *Id*. at 1-2 (quoting CAC, ¶ 43).  Ortiz is alleged to reside

in Bayamon, Puerto Rico and, according to the Baltimore Orioles, "[t]here is no allegation that

United States District Court
Northern District of California

28

United States District Court
Northern District of California

1   Mr. Ortiz is a representative of the California Class, ever lived in California[,] received any

2   documentation from the Baltimore Orioles while residing in California[,] that he played for any

3   affiliate associated with the Baltimore Orioles in California[,] or that he was harmed by any action

4   of the Baltimore Orioles in California." *Id*. at 2.  Consequently, they assert, the claims against the

5   Baltimore Orioles asserted by Mr. Ortiz do not arise out of the Baltimore Orioles' contacts with

6   California and there is no specific jurisdiction against the Baltimore Orioles.  *Id*.

7         With respect to general jurisdiction, the Baltimore Orioles acknowledge that they are

8   registered to do business in California and pay taxes here as well, but argue that these contacts are

9   not sufficient to make California a second home for them, and therefore, these contacts do not give

10   rise to general jurisdiction under *Daimler* and *Goodyear*. *Id.* at 3-4. Nor, the Baltimore Orioles

11   contend, can Plaintiffs establish general jurisdiction over the Baltimore Orioles based on their

12   other "limited contacts" with California, which include "a handful of employees in California, a

13   small amount of income derived from California, scouting trips, travel to California for occasional

14   meetings, recruitment and a limited number of MLB games played in any given Championship

15   Season." *Id.* at 5-6.  In a footnote, the Baltimore Orioles concede that their Vice President of

16   Baseball Operations lives in California during the off-season but they assert that this connection

17   "has no bearing on whether Plaintiffs can establish general jurisdiction over the Baltimore

18   Orioles." *Id*. at 5 n. 7.

19       **D.    The Second Consolidated Amended Complaint**

20         In the Second Consolidated Amended Complaint, Plaintiffs add nine new named Plaintiffs:

21   Matt Lewis (representative for Minor League Collective, Florida Class and California Class), Nick

22   Giarraputo (representative for Minor League Collective, Arizona Class, California Class, Florida

23   Class and New York Class), Leonard Davis (representative for the Minor League Collective,

24   Florida Class, New York Class, California Class, Arizona Class and Pennsylvania Class), David

25   Quinowski (representative for Minor League Collective, Arizona Class, California Class, Florida

26   Class and Oregon Class), Mark Wagner representative for Minor League Collective, California

27   Class, Florida Class, and Arizona Class), Brandon Pinckney (representative for California Class

28   and Florida Class), Lauren Gagnier (representative for Minor League Collective, Florida Class,

California Class and Pennsylvania Class), Omar Aguilar  (representative for Minor League Collective, Arizona Class, Florida Class and California Class) and Grant Duff (representative for Minor League Collective, Florida Class and California Class).  SCAC, ¶¶ 53-61;  *see also id.*, ¶¶ 498-567 (specific allegations regarding careers of new named Plaintiffs).

### E.    Supplemental Briefs

#### 1.    Plaintiffs' Supplemental Brief

In their Memorandum of Points and Authorities Regarding Personal Jurisdiction Over Certain Defendants Named in the Second Consolidated Amended Complaint ("Plaintiffs' Supp. Brief"), Plaintiffs contend that there is personal jurisdiction as to all of the Personal Jurisdiction Defendants because "[a]s alleged in the proposed [SCAC] and supported by accompanying declarations, each [Personal Jurisdiction] Defendant recruited, scouted, and ultimately hired one or more of these named Plaintiffs from California."  Plaintiffs' Supp. Brief at 1.  Plaintiffs further assert, "[t]hese named Plaintiffs then performed work in California on behalf of the [Personal Jurisdiction] Defendants.  The [Personal Jurisdiction] Defendants knew these Plaintiffs would perform that work in California, and permitted and encouraged them to do so.  But the [Personal Jurisdiction] Defendants did not pay them for that work."  *Id.*  Consequently, Plaintiffs argue, this Court may exercise personal jurisdiction over all of the Personal Jurisdiction Defendants.  *Id.*

As directed by the Court, Plaintiffs' supplemental brief focuses on the "arising out of" prong of the test for specific jurisdiction.  Plaintiffs argue that this requirement is satisfied by meeting a "but for" test, which "simply requires 'that there be some nexus between the cause of action and the defendants' activities in the forum.'"  *Id.* at 2 (citing *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1075 (9th Cir. 2001); *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 385 (9th Cir. 1990), *rev'd on other grounds by Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991)).  Plaintiffs further assert, as they did in their Opposition brief, that in wage and hour cases, the "arising out of" requirement is satisfied "by alleging that a company applies a wage policy in a state that leads to claims." *Id.* at 3 (citing *Enriquez v. Interstate GRP., LLC*, 11-cv-5155 YGR, 2012 WL 3800801, at *5 (N.D. Cal. Aug. 31, 2012); *Telles v. Li*, Case No. 11-cv-1470 LHK, 2013 WL 5199811, at *5 (N.D. Cal. Sept. 16, 2013)).  According to Plaintiffs, these cases "demonstrate

1  that knowledge is not a requirement of the but-for test when a company applies a wage policy to

2  work performed in the state." *Id.* But when "the company knowingly hires a forum's resident and

3  has reason to know work will be performed there," Plaintiffs assert, "specific jurisdiction is

4  assuredly present." *Id.* (citing *Wood v. Kinetic Sys., Inc.*, Case No. CV 09-579-S-CWD, 2010 WL

5  893647, at *5-6 (D. Idaho, Mar. 9, 2010); *Sheets v. Integrated Info. Sys., Inc.*, Case No. 98-cv-

6  1328-KI, 1999 WL 417274, at *1 (D. Or. Jun. 17, 1999); *Mendelsohn, Drucker & Assocs. v. Titan

7  Atlas Mfg., Inc.*, 885 F. Supp. 2d 767, 779 (E.D. Pa. 2012)).

8        Applying these standards, Plaintiffs address each of the Minor League teams that

9  challenges personal jurisdiction, asserting that "the claims of at least one named Plaintiff can be

10  mapped directly to purposeful conduct undertaken by each one of the [Personal Jurisdiction]

11  Defendants." *Id.* at 6.

12            **2.    Defendants' Supplemental Brief**

13        In their responsive brief, Defendants contend the addition of the new named Plaintiffs in

14  the SCAC does not cure the deficiencies in the previous consolidated complaint with respect to the

15  existence of personal jurisdiction over them.  Opposition to Plaintiffs' Memorandum of Points and

16  Authorities Regarding Personal Jurisdiction Over Certain Defendants Named in the Second

17  Consolidated Amended Complaint ("Personal Jurisdiction Defendants' Supp. Brief") at 1.  In

18  particular, according to Defendants, Plaintiffs have not demonstrated that the Personal Jurisdiction

19  Defendants "purposefully directed their activities toward California *and* that their claims arise out

20  of those activities." *Id.* (emphasis in original).

21        The Personal Jurisdiction Defendants agree with Plaintiffs that the "arising out of"

22  requirement is satisfied if there is "but for" causation but contend Plaintiffs are incorrect in

23  asserting this test is met by "simply [showing] . . . 'some nexus between the cause of action and

24  the defendant's activities in the forum." *Id.* at 2 (quoting Plaintiffs' Supp. Brief at 2-3).  Instead,

25  the Personal Jurisdiction Defendants contend, "the key question is 'whether the entire course of

26  events  . . . was an uninterrupted whole which began with, and was *uniquely* made possible by, the

27  [defendant's] contacts in [the forum state].'" *Id.* (quoting *Norris v. Okla. City Univ.*, Case No. C-

28  93-1626 VRW, 1993 WL 313122, at *3 (N.D. Cal. Aug. 3, 1993) (emphasis added in Defendants'

brief)).  Thus, they assert, "[i]f a plaintiff 'would have the same claims against [the defendant]' even in the absence of the alleged forum contacts, jurisdiction is lacking."  *Id*. (citing *Young v. Actions Semiconductor Co*., 386 F. App'x 623, 627 (9th Cir. 2010)).  According to the Personal Jurisdiction Defendants, Plaintiffs have not met this standard.

First, the Personal Jurisdiction Defendants argue that Plaintiffs mischaracterize the declarations of the new named Plaintiffs, overstating their contacts with the forum.  *Id*.  They contend, for example, the declarations do not support Plaintiffs' assertion that "'*each* [Moving] Defendant' recruited and scouted one or more of the named Plaintiffs from California."  *Id*. at 2-3 (quoting Plaintiffs' Supp. Brief at 1) (emphasis added in Defendants' brief).  In fact, they argue, the declarations reflect that seven out of eleven of the new Plaintiffs were "scouted in California *not* by any of the Moving Defendants, but by unidentified 'MLB teams.'"  *Id*. at 3 (citing Lewis Decl. at ¶ 3, Giarraputo Decl. at ¶ 3, Gorgen Decl. at ¶ 3, Davis Decl. at ¶ 3, Pinckney Decl. at ¶ 3, Wagner Decl. at ¶ 3 and Quinowski Decl. at ¶ 3).  Further, these contacts occurred "a decade ago, well beyond any applicable limitations period, and cannot possibly be the 'but for' cause of the alleged work for which Plaintiffs seek to be compensated."  *Id*. (citing Watts Decl. at ¶¶ 3-4, Gagnier Decl. at ¶ 3, Aguilar Decl. at ¶ 4 and Duff Decl. at ¶ 4).

The Personal Jurisdiction Defendants also challenge Plaintiffs' contention that they "'facilitated . . . California work by providing extensive winter training packets and by directing communications to Plaintiffs in California.'"  *Id*. (quoting Plaintiffs' Supp. Brief at 5).  According to the Personal Jurisdiction Defendants, only five of them – the Atlanta Braves, Washington Nationals, Pittsburgh Pirates, Chicago White Sox and Tampa Bay Rays – are alleged to have sent any communications to California, while six of the declarants (Quinowski, Wagner, Aguilar, Gagnier, Duff and Pinckney) who played for the remaining Personal Jurisdiction Defendants "did not state that they, in fact, received communications in California."  *Id*.[4]  Further, Defendants

---

[4] The Personal Jurisdiction Defendants note that a number of the named Plaintiffs state only that they "believe" that they received communications at their California addresses.  *Id*. at 6 n. 10.  According to the Personal Jurisdiction Defendants, such equivocal statements should be disregarded because they do not satisfy Civil Local Rule 7-5(B), which requires that "any statement made upon information or belief must specify the basis therefore."  *Id*. (citing Declarations of Davis, Gagnier, Pinckney, Wagner, Quinowski, Aguilar and Duff).

United States District Court
Northern District of California

assert, none of the declarants alleges that any communication mailed to him in California related to offseason training *in California*; to the contrary, many of the communications received by Plaintiffs in California "refer to activities to be performed in *Florida*." *Id.* at 3-4 (citing Broshuis Supp. Decl., Exs. A, B). Therefore, the Personal Jurisdiction Defendants argue, Plaintiffs have not shown that "for each Moving Defendant, there is a Named Plaintiff who had 'claims that arise out of or relate to the conduct of that individual Defendant in California.'" *Id.* at 4.

Next, the Personal Jurisdiction Defendants contend the "abbreviated and attenuated contacts" that *can* be attributed to them – scouting and recruiting, mailings, and situs of contract signing – do not establish personal jurisdiction because they are unrelated to Plaintiffs' wage and hour claims. *Id.* at 4-5. With respect to scouting and recruiting, the Personal Jurisdiction Defendants assert that only Watts (Pittsburgh Pirates), Gagnier (Detroit Tigers), Aguilar (Cleveland Indians / Baltimore Orioles) and Duff (New York Yankees) claim that they were recruited or scouted by one of the Personal Jurisdiction Defendants. *Id.* at 5. None of the remaining Personal Jurisdiction Defendants is even alleged to have recruited a named Plaintiff in California, they contend. *Id.* at 5-6. Further, even as to the teams who allegedly recruited named Plaintiffs in California, such recruiting activities are not sufficient to establish specific jurisdiction, the Personal Jurisdiction Defendants argue. *Id.* at 6 (citing *Selhorst v. Alward Fisheries, LLC*, Case No. C-11-3266 EMC, Case No. C-11-3266 EMC, 2011 WL 4974568, at * 6 (N.D. Cal. Oct. 19, 2011); *Norris v. Okla. City Univ.*, Case No. C-93-1626 VRW, 1993 WL 313122, at *3 (N.D. Cal. Aug. 3, 1993)). Thus, they conclude, Plaintiffs have failed to establish personal jurisdiction over any of the Personal Jurisdiction Defendants based on recruiting in the forum. *Id.*

Nor do the communications cited by Plaintiffs establish personal jurisdiction over any of the Personal Jurisdiction Defendants, they argue, because none of the declarants claims that he received any communications relating to the work allegedly performed in California. *Id.* at 6-7. Consequently, the Personal Jurisdiction Defendants assert, Plaintiffs are unable to satisfy the "but for" test because they have not shown that their wage and hour claims "emanated from these communications." *Id.* at 6. According to the Personal Jurisdiction Defendants, it is well-established that "limited informational communications sent into the forum" such as the ones cited

1    here do not give rise to specific jurisdiction. *Id.* at 7 (citing *Norris*, 1993 U.S. Dist. LEXIS 11349,

2    at *9-10; *Martin v. Clemson Univ.*, Case No. 07-536, 2007 U.S. Dist. LEXIS 93703, at *21-25

3    (E.D. Pa. Dec. 21, 2007); *Hardnett v. Duquesne Univ.*, 897 F. Supp. 920, 922, 924 (D. Md. 1995);

4    *Sunbelt Corp. v. Noble, Denton & Assocs., Inc.*, 5 F.3d 28, 32 (3d Cir. 1993)).  In short, the

5    Personal Jurisdiction Defendants contend, Plaintiffs "have not proffered any facts supporting the

6    proposition that, 'absent Defendants' [mailings to] California, [their] claims would not have

7    arisen,'" and thus, these communications do not establish specific jurisdiction over the Personal

8    Jurisdiction Defendants who are alleged to have sent them. *Id.* (quoting *Levi Strauss & Co. v.*

9    *Toyo Enter. Co.*, 665 F. Supp. 2d 1084, 1094 (N.D. Cal. 2009)).

10           With respect to the named Plaintiffs who claim that they signed their initial contracts in

11   California – Lewis, Wagner, Giarraputo, Gorgen, Davis, Pinckney and Duff – the Personal

12   Jurisdiction Defendants assert that these contacts also are not sufficient to establish specific

13   jurisdiction. *Id.* at 8.  According to the Personal Jurisdiction Defendants, signing a contract with

14   an out-of state defendant does not "automatically establish sufficient minimum contacts to support

15   jurisdiction;" rather, whether such a contract is evidence that the defendant "purposefully

16   established minimum contacts with the forum" depends on the "prior negotiations and

17   contemplated future consequences, along with the terms of the contract and the parties' actual

18   course of dealing." *Id.* (quoting *Selhorst*, Case No. C-11-3266 EMC, 2011 WL 4974568, at * 4

19   (N.D. Cal. Oct. 19, 2011)).  Those factors do not support a finding of specific jurisdiction here

20   because the named Plaintiffs who signed their contracts in California are not alleging breach of

21   contract and the contracts "do not require or even contemplate the performance of any work in

22   California." *Id.*  (distinguishing *Wood v.Kinetic Sys., Inc.*, Case No. CV 09-579-S-CWD, 2010

23   WL 893647 (D. Idaho Mar. 9, 2010) on the basis that contract specified that forum was report-to-

24   work location).  Further, according to the Personal Jurisdiction Defendants, Plaintiffs claim that

25   "*no* contract negotiations took place at all," citing allegations in the SCAC that some of the

26   players signed the Uniform Player Contract "quickly." *Id.* (citing SCAC, ¶¶ 431, 450, 498,[5] 505,

27   

28   ---

     [5] In the brief, the Personal Jurisdiction Defendants cite SCAC, ¶ 489. The Court concludes that
     this is a typographical error as that paragraph does not address any players' signing of a contract

     34

1    513, 529, 537 and 547).

2         The Personal Jurisdiction Defendants contend courts in the Ninth Circuit have "declined to

3    exercise specific jurisdiction in circumstances where plaintiffs have alleged far more significant

4    contract dealings occurring in California." *Id*. at 8.  As a case that is "particularly instructive,"

5    they point to *Sarkis v. Lajcak*, Case No. C-08-0911 RMW, 2009 U.S. Dist. LEXIS 95971 (N.D.

6    Cal. Oct. 15, 2009), *aff'd* 425 Fed. App'x 557 (9th Cir. 2011).  In that case, Personal Jurisdiction

7    Defendants assert, the court found that there was no specific jurisdiction over a claim for

8    fraudulent inducement, even though it was based on representations contained in the contract,

9    because the plaintiff's termination did not arise out of the pre-employment discussions and

10   negotiations. *Id*. at 9.

11        The Personal Jurisdiction Defendants also challenge the existence of specific jurisdiction

12   over the Boston Red Sox and the Baltimore Orioles on the basis that "Plaintiffs Wagner and

13   Quinowski do not allege that [these teams] scouted or recruited them in California, or mailed

14   communications to them in California[,] or entered into contracts with them in California." *Id*.

15        Finally, the Personal Jurisdiction Defendants argue that Plaintiffs' voluntary choice to

16   perform offseason training in California does not establish contacts with California that can be

17   imputed to them under the effects test, citing the Supreme Court's decision in *Walden*.  *Id*. at 10.

18   They reject Plaintiffs' assertion that under *Walden* it is enough to establish specific jurisdiction

19   that a defendant knowingly hires a forum's resident and has reason to know that work will be

20   performed there.  *Id.* They further assert that two "home office" cases cited by Plaintiffs – *Woods*

21   and *Sheets v. Integrated Info. Util. Sys., Inc.* – are not on point because in both cases the contacts

22   with the forum were more extensive than they are here.  *Id*. at 11-12. On the other hand, courts

23   have "overwhelmingly found personal jurisdiction to be lacking in a multitude of 'home office'

24   cases where, like here, the plaintiffs made unilateral decisions to perform work in a particular

25   location," according to the Personal Jurisdiction Defendants.  *Id*. at 13 (citing *Adams v. Riverview*

26   *Healthcare Ass'n*, Case No. A3-02-135, 2003 U.S. Dist. LEXIS 4253, at *7 (D.N.D. Mar. 17,

27

28   whereas ¶ 498 does.

United States District Court
Northern District of California

2013); *McDowell v. Tankinetics, Inc.*, Case No. C-11-3306-CV-S-RED, 2012 U.S. Dist. LEXIS 31429, at *11 (W.D. Mo. Mar. 8, 2012); *Elliott v. Armor Holdings, Inc.*, Case No. 99-337-B, 2000 U.S. Dist. LEXIS 1071 (D.N.H. 2000); *Walburn v. Rovema Packaging Machs., LLP*, 2008 U.S. Dist. LEXIS 25369 (D.N.J. Mar. 28, 2008)).

Plaintiffs also fail to establish personal jurisdiction against the Tampa Bay Rays and the Philadelphia Phillies, the Personal Jurisdiction Defendants contend, because Plaintiffs' claims (based on the allegations of Gorgen and Pinckney) are time-barred. *Id.* at 14. Finally, the Personal Jurisdiction Defendants assert that all the claims for unpaid offseason work asserted against them are so vaguely alleged in the SCAC that Plaintiffs do not state a claim under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 669 (2009). *Id.* at 14-15. Therefore, they argue, these claims cannot give rise to personal jurisdiction. *Id.*

## F. Legal Standard under Rule 12(b)(2)

A party may move for dismissal under Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction. The plaintiff bears the burden of establishing personal jurisdiction over the defendant. *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). "Where, as here, the motion is based on written materials rather than an evidentiary hearing, 'the plaintiff need only make a prima facie showing of jurisdictional facts.'" *Id.* (quoting *Sher v. Johnson*, 911 F.3d 1357, 1361 (9th Cir. 1990)). "Although the plaintiff cannot simply rest on the bare allegations of its complaint, . . . uncontroverted allegations in the complaint must be taken as true." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (internal quotations omitted). "Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Id.* "Where . . . there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits." *Dole Food Company, Inc. v. Watts*, 303 F.3d 1104, 1110 (9th Cir. 2002). The FLSA is silent with respect to personal jurisdiction and thus, the Court applies the law of California to determine whether personal jurisdiction exists. *See Kouba v. Renzenberger, Inc.*, Case No. C10-159 TUC FRZ (GEE), 2010 U.S. Dist. LEXIS 135743 (D. Ariz. May 14, 2010).

"Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Dole Food*, 303 F.3d at 1110 (citing Cal. Code Civ. Proc. § 410.10).

### G. Whether the Court May Exercise Jurisdiction over the Personal Jurisdiction Defendants

#### 1. Overview of Personal Jurisdiction

"For a court to exercise personal jurisdiction over a non-resident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Dole Food*, 303 F.3d at 1110-11 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Calder v. Jones*, 465 U.S. 781, 788 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).

Personal jurisdiction may be either general or specific. *See Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). In *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011), the Supreme Court explained that "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id*. (citing *International Shoe*, 326 U.S., at 317). On the other hand, the Court continued, "[s]pecific jurisdiction . . . depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id*. (citation omitted). Thus, the Court stated, "[i]n contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id*. (citation and internal quotation marks omitted).

United States District Court
Northern District of California

### 2. General Jurisdiction

#### a. Legal Standard

In *International Shoe,* the Court observed that there are "instances in which . . . continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." 326 U.S. at 318. The standard for establishing general jurisdiction is "fairly high." *Brand v. Menlove Dodge*, 796 F.2d 1070, 1073 (9th Cir. 1986). A corporate defendant may be subject to general jurisdiction when its contacts with the forum "approximate physical presence." *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). Whether this standard is met turns on the "economic reality of the defendants' activities rather than a mechanical checklist." *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1173 (9th Cir. 2006). "Factors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Bancroft & Masters*, 223 F.3d at 1086.

"[E]ngaging in commerce with residents of the forum state is not in and of itself the kind of activity that approximates physical presence within the state's borders." *Id*. On the other hand, where there is a "confluence of  . . . physical, economic, and political presence," in the forum, there may be sufficient minimum contacts to give rise to general jurisdiction. *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d at 1173-75. Thus, for example, in *Tuazon*, the Ninth Circuit held that there was general jurisdiction over defendant R.J. Reynolds Tobacco ("Reynolds") in Washington State, even though Reynolds had its headquarters in North Carolina, based on, *inter alia*, Reynolds' extensive business in Washington, generating "enormous" yearly sales in the hundreds of millions of dollars, its activities targeting consumers in Washington (including focused market research and various promotions) and its involvement in organizing opposition to state and local legislation aimed at limiting or banning smoking or cigarette advertising. *Id*. at 1174. The court also found significant the fact that "the essence of Tuazon's complaint – a worldwide coverup regarding tobacco risks – cannot be characterized as 'dealings entirely distinct' from Reynolds' business in Washington." *Id*. (quoting *International Shoe*, 326 U.S. at 319).

38

In recent years, in *Goodyear* and *Daimler*, the Supreme Court has cautioned against an overly expansive view of general jurisdiction in the context of the parent-subsidiary relationship. In *Goodyear*, the Court held that there was no general jurisdiction over a foreign subsidiary, even though there was general jurisdiction over the United States parent corporation, because the subsidiary's contacts with the forum were "attenuated" and it was "at no sense at home" there. 131 S. Ct. at 2857.  The Supreme Court also noted that for a corporate defendant, the "paradigm forum for the exercise of general jurisdiction" as to the corporation is "an equivalent place" to an individual's domicile, such as the place of incorporation or principal place of business.  131 S. Ct. at 2853-54.

In *DaimlerAG v. Bauman*, 134 S. Ct. 746 (2014), the Supreme Court held that a foreign parent could not be subject to general jurisdiction based on the contacts with the forum of the subsidiary.  The Court explained that the principal place of business and the place of incorporation "have the virtue of being unique – that is, each ordinarily indicates only one place – as well as easily ascertainable." *Id*. at 760-61.  The *Daimler* Court noted that "*Goodyear* did not hold that a corporation may be subject to general jurisdiction only in a forum where it is incorporated or has its principal place of business," though it "typed those places paradigm all-purpose forums." *Id*. at 760-761.  Nor did it "foreclose the possibility that in an exceptional case . . . a corporation's operations in a forum other than its formal place of operation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Id*. at 761 n. 19.  It rejected, however, the plaintiff's argument that there is general jurisdiction in "every State in which a corporation engages in a substantial, continuous, and systematic course of business," opining that such a formulation would be "unacceptably grasping." *Id*. at 761 (internal citations omitted).

The Court in *Daimler* further advised that "the general jurisdiction inquiry does not focu[s] solely on the magnitude of the defendant's in-state contacts." *Id*. at 762 n. 20 (internal quotation and citation omitted) (alteration in original).  The Court explained:

> General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all

1    of them. Otherwise, "at home" would be synonymous with "doing business" tests framed before specific jurisdiction evolved in the United States.

2

3    *Id.*

4            **b.   Discussion**

5        The Personal Jurisdiction Defendants assert that although this case does not involve a

6    parent-subsidiary relationship, the stringent requirements for general jurisdiction that are set forth

7    in *Goodyear* and *Daimler* apply here and that under that standard, their contacts with California

8    are insufficient to establish general jurisdiction over them in California.  The Court agrees.

9        A number of courts have held that there is no general jurisdiction over sports teams with

10    forum contacts that are comparable to those of the Personal Jurisdiction Defendants in this case.

11    For example, in *Davis v. Billick*, the court found no jurisdiction over the Baltimore Ravens in

12    Texas under similar facts.  Case No. 301CV1964D, 2002 WL 1398560 at *6 (N.D. Tex. June 26,

13    2002).  There, the court held that the team's contacts were not sufficiently continuous and

14    systematic to give rise to general jurisdiction where: 1) employees regularly traveled to Texas for

15    National Football League ("NFL") owners meetings and the annual management council meeting;

16    2) the Ravens had contracted with a Texas resident to conduct scouting for the team; and 3) the

17    team derived "substantial income" from NFL merchandise sales in Texas. *Id.* at *5-6.

18        Similarly, in *Manton v. Cal. Sports, Inc*., the court held that there was no personal

19    jurisdiction over the Los Angeles Lakers in Georgia despite the fact that the Lakers: 1)

20    "occasionally play games in Georgia"; 2)  received "some revenue from Georgia by way of

21    defendant's broadcast of games played in Georgia back to the Los Angeles area";  3)  received

22    $800,000 from the National Basketball Association ("NBA") as its share of the amount paid by

23    TV networks to broadcast NBA games, some of which were played in Georgia; and 4) received

24    100% of the gate receipts when Georgia NBA member the Atlanta Hawks played them in

25    California.  493 F. Supp. 496, 496-98 (N.D. Ga. 1980).

26        In S*ullivan v. Tagliabue*, the Court considered whether there was general jurisdiction in

27    Rhode Island over the NFL and 21 of the 28 NFL member clubs.  785 F. Supp. 1076 (D. R.I.

28    1992).  The court considered the contacts of the NFL with Rhode Island and concluded that they

United States District Court<br>Northern District of California

were insufficient to establish general jurisdiction. *Id*. at 1079-81. It went on to address whether the contacts of the member clubs were sufficient to establish jurisdiction. *Id*. at 1081. The contacts of the member clubs with Rhode Island included: 1) "occasional trips" to Rhode Island, 2) broadcasts of NFL games into Rhode Island over network and cable stations and 3) receipt of money from ticket sales in the state and transaction of business with Rhode Island banks. *Id*. at 1081. The court concluded that these contacts were insufficient to support jurisdiction, at least where the claims (which were based on antitrust law) were not related to the contacts. *Id*.

In *Evans v. Boston Red Sox*, the court found that there was no general jurisdiction over an MLB Club, the Boston Red Sox, in Hawaii. Case No. 13-00262 SOM BMK, 2013 U.S. Dist. LEXIS 166307, at *10-12 (D. Haw. Nov. 22, 2013). In reaching this conclusion, the court cited the facts (which were undisputed) that: 1) the Red Sox team "does not have any offices, employees, agents or bank accounts in Hawaii and does not own, rent or lease any property in Hawaii." *Id*. at * 10. The team also "does not have any regular season or exhibition Major League Baseball games in Hawaii." *Id*. Therefore, the court concluded, the Boston Red Sox did not have contacts with Hawaii that were "continuous, systematic and substantial." *Id*.

In all of these cases, the courts evaluated general jurisdiction with reference only to the contacts of the teams themselves to the forum state; they did not aggregate the contacts of the teams with those of the sports associations of which they were members. As discussed further below, the Court concludes that that approach is correct. It is true that the contacts of the Personal Jurisdiction Defendants with California are, arguably, more extensive than the contacts with the forum in the cases cited above. In *Davis v. Billick*, there was only a single scout in Texas and there was no indication that any employees of the Baltimore Ravens were based in Texas. Nor was there any evidence that Baltimore Ravens players traveled to Texas for games. In *Manton*, although the Lakers played occasional games in Georgia, there was no suggestion that they had any employees or were engaged in any scouting there. And in *Sullivan* and *Evans*, there appears to have been no travel to the forum state by the defendant teams for games, no employees based in the forum and no scouting activities. Nonetheless, the Court concludes that the result reached in those cases also applies here.

41

1    The Supreme Court's recent guidance on the theory of general jurisdiction has made clear

2    that the concept of "home" in the context of general jurisdiction should be understood narrowly,

3    with the "paradigm forum" for an individual being his or her domicile and for a corporation being

4    its principal place of business or place of incorporation.  *Goodyear*, 131 S. Ct. at 2853-54.

5    *Daimler* did not foreclose the possibility that under some circumstances a forum may be "home"

6    even if it does not fall into one of the paradigmatic categories.  *Id*. at 760-61.  The Court

7    emphasized, however, that merely engaging in a "substantial, continuous and systematic course of

8    business" is not sufficient to establish general jurisdiction and described as "exceptional" the case

9    in which a defendant would be "at home" in a state other than one that falls within the paradigm.

10   134 S. Ct. at 761 n. 19.  It also explained that in determining whether a defendant is at home, the

11   court must appraise the defendant's "activities in their entirety, nationwide and worldwide."  *Id*. at

12   762 n. 20.

13   Applying these principals to the Personal Jurisdiction Defendants here, the Court

14   concludes that California cannot be considered home to any of these Clubs.  Even though they

15   have all engaged in regular travel to California, conducted some business with California, engage

16   in scouting activities in the State and even have employees who are based here, there is no

17   indication that these ties represent such a significant portion of their activities that their presence

18   in California would be analogous to being domiciled in California or having their principal place

19   of business in California.  Nor have Plaintiffs offered any evidence showing that the revenues the

20   Personal Jurisdiction Defendants receive from MLB's internet sales and TV broadcasts constitute

21   a significant portion of their overall revenues.[6]

22   Plaintiffs' reliance on *Tuazon* is unavailing.  There, the contacts of the defendant tobacco

23   company were vastly more significant than the contacts of the Personal Jurisdiction Defendants in

24   this case.  In particular, the court found that Reynolds had had a "serious" presence in the forum

25   and generated "enormous" revenues from the state.  433 F.3d at 1173.  Reynolds had also held a

26

27   ───────────────
     [6] Plaintiffs suggest that the revenue funneled through MLB to the Personal Jurisdiction Defendants
28   is much higher than the amounts they have been able to document as a result of discovery.  While
     Plaintiffs may well be correct, the Court declines to rely on this speculation.

United States District Court
Northern District of California

1   license to do business in the state for decades, "advertised in purely local publications since at

2   least the 1950s," and engaged in local political activity to protect its market, and maintained a

3   permanent office and workforce in the state.  *Id*.  Plaintiffs have not been able to document

4   revenues comparable to those in *Tuazon* or show that for any team challenging jurisdiction the

5   revenues derived from activities in California constitute a significant share of their overall

6   revenue.  Further, Plaintiffs cite only a passing reference to lobbying by MLB to support their

7   assertion that Personal Jurisdiction Defendants have a presence in California sufficient to establish

8   general jurisdiction.  *See* Personal Jurisdiction Opposition at 6 (citing Broshuis Decl., Exs. I-J).

9   There is no evidence that any of the Personal Jurisdiction Defendants were engaged in this

10   lobbying.

11       The Court also rejects Plaintiffs' assertion that it should reach a different result based on

12   the "interdependent nature of MLB."  Personal Jurisdiction Opposition at 13.  Plaintiffs' position

13   draws on cases that have highlighted the unique characteristics of sports associations, described in

14   one case as follows:

> The highly special character of the business of operating a football team as a member of a league was discussed in *United States v. National Football League*, E.D.Pa., 116 F.Supp. 319. The revenues of all the defendants are derived from the playing of football games, road games as well as home games. As was said in *United States v. Scophony Corp.*, 333 U.S. at page 817, 68 S.Ct. at page 866: 'Such a continuing and far-reaching enterprise is not to be governed in this respect by rules evolved with reference to the very different businesses and activities of manufacturing and selling. Nor, what comes to the same thing, is the determination to be made for such an enterprise by atomizing it into minute parts or events, in disregard of the actual unity and continuity of the whole course of conduct, by the process sometimes applied in borderline cases involving manufacturing and selling activities.'

23   *Am. Football League v. Nat'l Football League*, 27 F.R.D. 264, 268 (D. Md. 1961) (finding that

24   venue was proper as to two NFL team members based on activities of the NFL as a whole).

25   Plaintiffs rely heavily on *Erving v. Virginia Squires Basketball Club*, 349 F. Supp. 709 (E.D.N.Y.

26   1972), which follows a similar line of reasoning to find personal jurisdiction over a basketball

27   team based, in part, on the contacts with the forum of the unaffiliated association (the ABA) of

28   which it was a member.  For the reasons stated below, the Court concludes that this case does not

United States District Court
Northern District of California

43

provide strong support for Plaintiffs' assertion that the contacts of MLB with California should be attributed to the Personal Jurisdiction Defendants.

In *Erving*, a professional basketball player sought to rescind his contract with a basketball club ("Squires"). 349 F. Supp. at 711. Although the Squires were based in Virginia, the plaintiff brought the action in New York. *Id.* The Squires argued that there was no personal jurisdiction, but the court disagreed, finding that under New York's long-arm statute, N.Y. CPLR § 313, the Squires were "doing business" in New York and therefore were subject to jurisdiction. *Id.* at 712. The court reasoned that the contacts of the Squires had to be appraised with reference to their affiliation with the ABA, which it likened to a "joint venture" through which the member clubs "carry on an integrated business operation for mutual profit." *Id.* at 712-13. Thus, although the Squires played only six to eight games in New York (out of a total of 84 in a season), these games were not "casual[] or fortuitous[]" but rather, were played "on a regular and continuing basis pursuant to a well-organized business plan." *Id.* at 713. Further, the court pointed out, although the Squires did not receive game receipts for their games in New York, the contract among the ABA members provided that they *would* receive all gate receipts from games in their home state of Virginia. *Id.* The court also pointed out that under the agreement, all of the member teams received a portion of the revenue generated by television and radio broadcasts. *Id.* The court further found that Squires officials and employees regularly visited New York, where the ABA was headquartered, to conduct business. *Id.* at 714-15. The court found that considered together, these contacts were sufficient to show that the team had "continuous and substantial business operations" that satisfied N.Y. CPLR § 301 and therefore, that there was personal jurisdiction. *Id.* at 715.

Many of the contacts listed in *Erving* mirror the ones that the Personal Jurisdiction Defendants have with California in this case. These include games in the forum that are planned and scheduled by MLB as part of a "well-organized business plan," regular travel to the forum by employees and officials of the Personal Jurisdiction Defendants, and receipt of a share of certain revenues generated by MLB. The *Erving* court did not, however, address the question of whether its conclusion comported with the requirements of due process as set forth in *International Shoe*

and its progeny.  Nor did the court consider whether the Squires could be considered to be "at home" in New York.  In addition, to the extent that its conclusion was based on the Squires' "continuous and substantial business operations" in New York, the court's reasoning may run afoul of the Supreme Court's recent decisions relating to general jurisdiction, which suggest that the approach in *Erving* may be "overly grasping."  Therefore, the Court does not find Plaintiffs' reliance on *Erving* persuasive.

The Court also rejects Plaintiffs' arguments based on the law of agency and joint ventures. Plaintiffs argue that acts of an agent may imputed to the principal for the purposes of personal jurisdiction, citing *Myers v. Bennett Law Offices*, 238 F.3d 1068 (9th Cir. 2001).  *Myers* held that the acts of a defendant's employee could be imputed to the employer for the purposes of determining whether there was specific jurisdiction where the plaintiff had made a prima facie case that the employee had apparent authority as to the conduct at issue *and* the employer subsequently ratified the act.  238 F.3d at 1073.  The court in that case court did not address general jurisdiction, however.  Nor does the case shed any light on how agency principles might apply to members of an unaffiliated association for the purposes of assessing general jurisdiction.

Similarly, Plaintiffs' reliance on *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42 (1st Cir. 2002) is misplaced.  In that case, the First Circuit addressed whether there was jurisdiction in Massachusetts over claims against a Mississippi law firm on the basis of the contacts of a second law firm that had acted as an agent of the Mississippi firm.  290 F.3d at 44.  The First Circuit reversed the district court's decision, finding that because the second firm held itself out as an agent of the first, there was a prima facie showing of jurisdiction.  *Id*. at 45. The reasoning of that case is not applicable here, however, as the court expressly rejected the district court's reliance on a "substantial influence" test that was articulated in a case involving an unaffiliated association, *Donatelli v. Nat'l Hockey League*, 893 F.2d 459 (1st Cir. 1990)).  The court explained that:

> *Donatelli's* substantial influence test does not control the entire universe of cases in which one party's contacts might be attributed to another. By its terms, *Donatelli* applies "in the world of unincorporated associations." *Id.* at 468. Indeed, as *Donatelli* itself observed, the substantial influence test does not control where one

United States District Court
Northern District of California

> seeks to attribute contacts from partner to partnership or from subsidiary to corporate parent. *Id.* at 465-67. In the partnership context, "the activities of the partner are generally attributed to the partnership and jurisdiction over the partnership follows from the partner's contacts, if sufficient, regardless of the absence of independent contacts between the partnership qua entity and the forum." *Id.* at 466. *Donatelli*'s substantial influence test does not apply here, where the question is whether an actual or implied agency relationship, sufficient to attribute contacts, existed between the parties. We conclude that, similar to some cases involving actual partnerships, the relationship between the defendants here invokes certain principles of the law of agency, partnership, and joint venture and that these principles permit imputing contacts without the need to show substantial influence.

*Id.* at 54. If anything, the reasoning in *Daynard* points to the conclusion that members of unaffiliated associations are *not* treated like actual agents or joint venturers for the purposes of general jurisdiction.

Accordingly, the Court finds that there is no general jurisdiction over the Personal Jurisdiction Defendants in California.

### 3. Specific Jurisdiction

#### a. Legal Standard

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the "relationship among the defendant, the forum, and the litigation."'" *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977))). The exercise of specific jurisdiction "is consistent with due process" only where "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum state." *Id.*; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) ("the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum state").

A court may exercise specific jurisdiction over a non-resident defendant where the following requirements are met:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).

The plaintiff bears the burden of satisfying the first two prongs of the test for specific jurisdiction. *Id*. (citing *Sher v. Johnson*, 911 F.3d 1357, 1361 (9th Cir. 1990)). "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id*. (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)). In a purported class action, specific jurisdiction must be demonstrated by the named Plaintiffs. *See, e.g., AM Trust v. UBS AG*, Case No. C-14-4125 PJH, 2015 WL 395465, at *8 (N.D. Cal., Jan. 29, 2015) ("claims of unnamed class members are irrelevant to the question of specific jurisdiction").

### b.   Purposeful Availment

Although the first prong of the test for specific jurisdiction is often referred to as "purposeful availment," the Ninth Circuit has explained that this is "shorthand" that refers to both "purposeful availment" and "purposeful direction." *Schwarzenegger v. Fred Martin Motor Co,*. 374 F.3d 797, 802 (9th Cir. 2004). These are "two distinct concepts." *Id*. In *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, the Ninth Circuit explained that "[i]n tort cases, we typically inquire whether a defendant 'purposefully direct[s] his activities' at the forum state, applying an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum," whereas "in contract cases, we typically inquire whether a defendant 'purposefully avails itself of the privilege of conducting activities' or 'consummate[s] [a] transaction' in the forum, focusing on activities such as delivering goods or executing a contract." 433 F.3d at 1206 (citing *Schwarzenegger*, 374 F.3d at 802-03) (citing *Calder v. Jones*, 465 U.S. 783, 789-90 (1984)).

Wage and hour claims asserted under the FLSA and state law are neither tort nor contract claims. Some courts in this District have "likened FLSA claims to tort claims and have applied the purposeful direction standard." *Telles v. Li*, Case No. 11-cv-1470 LHK, 2013 WL 5199811, at

1  *4 (N.D. Cal., Sept. 16, 2013) (citing *Enriquez v. Interstate Group, LLC*, Case No. 11-cv-05155

2  YGR, 2012 WL 3800801, at *3 (N.D. Cal. Aug. 31, 2012) (applying purposeful direction to FLSA

3  claim); *Holliday v. Lifestyle Lift, Inc.*, Case No. 09-cv-4995 RS, 2010 WL 3910143, *3 (N.D. Cal.

4  Oct. 5, 2010) (same)).  In *Holliday*, for example, the court concluded that the allegations in that

5  case - that two of the defendants "masterminded the employment policy that denied overtime

6  compensation to non-exempt employees" - "[lent] itself to the intentional tort analysis" and

7  therefore analyzed the first prong of the specific jurisdiction test under the purposeful direction

8  standard.  2010 WL 3910143, at * 3.  The court acknowledged, however, that FLSA claims are

9  "not easily categorized as either a contract or a tort dispute" and that because an FLSA claim

10  "assumes the existence of an employment contract . . . courts have analogized violations under the

11  contract to common law contract breach."  *Id.* (citing *Pavlo v. Stiefel Laboratories, Inc.*, Case No.

12  78, 1979 WL 105, at *6 (S.D.N.Y. Nov. 27, 1979)).

13         While the parties here have characterized the first prong of the specific jurisdiction test as a

14  question of purposeful direction, both sides have relied upon purposeful availment decisions in

15  support of their positions as well.  *See, e.g., Sheets v. Integrated Information Utility Systems, Inc.*,

16  Case No. 98-cv-1328-KI, 1999 WL 417274 (D.Or. Jun. 17, 1999) (applying purposeful availment

17  analysis in case involving both breach of contract and statutory wage and hour claims) (cited by

18  Plaintiffs);  *Novak v. NanoLogix, Inc.*, Case No. 13-cv-01971 EJD, 2014 WL 991119, at *2 (N.D.

19  Cal. Mar. 11, 2014) (applying purposeful availment analysis in case involving only claims for

20  breach of employment agreement) (cited by Personal Jurisdiction Defendants);  *SRE-Cheaptrips,*

21  *Inc. v. Media Synergy Group, LLC*, Case No. 09-cv-00622-S-EJL, 2010 WL 1913589 (D. Idaho,

22  May 12, 2010) (applying purposeful availment analysis in case involving both breach of contract

23  claims and tort claims and noting that purposeful availment approach was appropriate because

24  "[a]lthough one of [plaintiff's] claims sound[s] in tort, all of its claims arise out of [plaintiff's]

25  contractual relationship with the Defendants") (cited by Personal Jurisdiction Defendants).  In

26  addition, Plaintiffs have pointed to many alleged contacts with California that are considered in

27  the purposeful availment context, including recruiting and scouting in the forum, where the

28  players signed their contracts with the Personal Jurisdiction Defendants, and where the parties

United States District Court
Northern District of California

48

1    envisioned performance of the contract would occur.

2          The Court has found no case law that suggests that wage and hour claims may not be

3    addressed under the purposeful availment approach and further finds that many of the facts here

4    lend themselves to the contract analysis.  Therefore, the Court addresses the first prong of the

5    specific jurisdiction test under both the contractual purposeful availment approach and the

6    purposeful direction approach.  Before the Court conducts a team-by-team analysis of the

7    Purposeful Availment prong, it sets forth certain guidelines under each approach based on the case

8    law that it finds to be relevant to the facts of this case.

9                              i.    **Purposeful Availment**

10         As the Personal Jurisdiction Defendants correctly note in their supplemental brief,

11   "[s]igning a contract with an out-of-state defendant does not 'automatically establish sufficient

12   minimum contacts to support jurisdiction.'"  Personal Jurisdiction Defendants' Supp. Brief at 8

13   (quoting *Selhorst v. Alward Fisheries, LLC*, Case No. 11-cv-3266 EMC, 2011 WL 4974568, at * 4

14   (N.D. Cal. Oct. 19, 2011) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478 (1985))).

15   Instead, "[b]ecause the contract is 'ordinarily but an intermediate step serving to tie up prior

16   business negotiations with future consequences which themselves are the real object of the

17   business transaction[,] [i]t is these factors – prior negotiations and contemplated future

18   consequences, along with the terms of the contract and the parties' actual course of dealing – that

19   must be evaluated in determining whether the defendant purposefully established minimum

20   contacts within the forum.'"  *Id.* (quoting *Burger King*, 471 U.S. at 479).

21         With respect to prior negotiations, courts do not focus narrowly on the negotiation of

22   specific contract terms; rather, they consider which party initiated the negotiations and whether the

23   defendant reached out to the plaintiff in the forum (a factor that may support a finding of

24   contractual purposeful availment).  *See Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir.

25   1991) (question of purposeful availment depends, in part, on which party initiated contact); *Van

26   Steenwyk v. Interamerican Mgmt. Consulting Corp.*, 834 F. Supp. 336, 342 (E.D. Wash.  1993)

27   (finding there was purposeful availment based, in part, on evidence that defendant negotiated

28   contract with plaintiff in the forum); *cf. Slepian v. Guerin*, 172 F.3d 58 (9th Cir. 1999)

United States District Court
Northern District of California

49

1  (unpublished) (finding that California employer did not direct its activities toward Oregon based,

2  in part, on the fact that Oregon plaintiff had initiated contact with employer by sending her resume

3  to the employer in California and going there for an interview); *Novak v. NanoLogix, Inc.*, 2014

4  WL 991119, at *4 (N.D. Cal. Mar. 11, 2014) (finding no purposeful availment of right to conduct

5  business in California where plaintiff first made contact with Ohio-based employer in California

6  but there was no evidence the employer was attempting to recruit California employees; rather, the

7  plaintiff had, on his own initiative "pitched himself" to a representative of the employer who

8  happened to be visiting California on other business).

9  　　While courts also consider the "actual course of dealing," communication with the plaintiff

10  in the forum by mail, telephone, or other forms of communications generally is not sufficient to

11  show purposeful availment. *Roth*, 942 F.2d at 622 (citing *Peterson v. Kennedy*, 771 F.2d 1244,

12  1262 (9th Cir. 1985)). Similarly, courts have found that even where the contract was negotiated

13  and signed in the forum, there is no purposeful availment if this was but a "one shot" contact with

14  no future performance envisioned in the forum. *See Selhorst v. Alward Fisheries, LLC*, Case No.

15  2011 WL 4974568, at *4 (noting that courts find purposeful availment of the privilege of doing

16  business in the forum where "the contract was not 'a one-shot deal that was merely negotiated and

17  signed by one party in the forum,' but dependent upon further activities in the forum state"

18  (quoting *Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991)); *see also Sarkis v. Lajcak*,

19  Case No. 08-cv-01911 RMW, 2009 WL 3367069, at *3 (N.D. Cal., Oct. 15, 2009) (holding that

20  job advertisement placed in magazine that was circulated worldwide, including in California, was

21  not sufficient to establish purposeful availment in California where performance of contract was

22  entirely in Bosnia, even though the defendant communicated with the plaintiff in California during

23  the negotiations that led to the signing of the contract).

24  　　In *Selhorst*, the defendants recruited and hired the plaintiff in California to work as a

25  skiffman on their vessel. 2011 WL 4974568, at *1. The plaintiff was injured while working on the

26  vessel in Alaska and brought claims under the Jones Act in California. *Id.* In addressing specific

27  jurisdiction, the court found that there was no purposeful availment of the privilege of conducting

28  business in California because "the contract concerned fishing activities in Alaska only." *Id.* at *6.

United States District Court
Northern District of California

50

The court in *Selhorst* did not cite to any specific terms of the contract specifying the location of performance  and it is not clear if the contract in that case contained any such terms.  Rather, the court cited the fact that "[n]o part of the contract was performed in California, and any payments sent to California would be dependent on Plaintiff's work in Alaska." *Id*. This is consistent with the Ninth Circuit's instruction that in evaluating the future consequences of a contract, it is the "economic reality" that matters.  *See Roth*, 942 F.2d at 622 (citing *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd*., 784 F.2d 1392, 1398 (9th Cir. 1986)).  "This 'qualitative analysis' must determine whether the [defendant] could have reasonably anticipated being haled into court in [the forum]."  *Sarkis*, 2009 WL 3367069, at *3 (citing *Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd*., 328 F.3d 1122, 1130 (9th Cir. 2003)).

An instructive example of the application of the purposeful availment approach in the wage and hour context is *Wood v. Kinetic Systems, Inc*., Case No. 09-cv-579 SCWD, 2010 WL 893647 (D. Idaho Mar. 9, 2010).  Although that case purports to be a purposeful direction case (and was cited as such by the parties), the undersigned finds that it is better understood as a purposeful availment case. In particular, in *Wood*, the court relied almost entirely upon a contract case in which specific jurisdiction was analyzed with reference to purposeful availment.  *Id*. at * 5 (citing *Albertson's LLC v. Kleen-Sweep Janitorial Co., Inc*., Case No. 09-cv-263-S-BLW, 2009 WL 3786290 (D. Idaho Nov. 9, 2009)).  Analogizing the facts of *Wood* to those of *Albertson's*, the court found that the defendant purposefully availed itself of the privilege of conducting activities in Idaho because the "contract and performance epitomized the type of case involving a continuing business obligation."  *Id*. at *6 (internal quotation and citation omitted).  Although the court set forth the factors of the *Calder* effects test (discussed below), it did not address them in its analysis.  Further, the court in *Wood* appears to have analogized the plaintiff's claims - asserted under the FLSA and Idaho's wage claim statute - to breach of contract claims.  *See id*. (finding that the plaintiffs' claims arose out of the defendant's contacts with Idaho because they were based on "breach of [the defendant's] employment agreement with [the plaintiff]").

In *Wood*, the plaintiff  ("Wood") was employed as a Regional Labor Manager in Idaho by a company, Kinetic Systems, Inc. ("Kinetic"), that was incorporated in California and had its

principal place of business in Fremont, California until 2006 and then in North Carolina. *Id*. at *1. Kinetic did not maintain any offices in Idaho. *Id*. Kinetic hired Wood by sending him a letter agreement in Idaho. *Id*. When Wood was not travelling to other job assignments, he worked out of his home. *Id*. Kinetic considered Plaintiff's home to be his "report-to-work" location, although Wood travelled extensively to other locations while employed by Kinetic and Kinetic had no ongoing projects in Idaho during Wood's employment. *Id*. at *1-2. Kinetic provided office equipment for Wood's home office and paid for his land-line telephone expenses, union dues to a local Idaho union and unemployment insurance premiums to the state of Idaho. *Id*. Wood sued Kinetic in Idaho and Kinetic sought dismissal on the basis that there was no personal jurisdiction there, arguing that it had committed no intentional act aimed at Idaho other than hiring Wood and considering Idaho to be his "report-to-work" location. *Id*. at *5. The court, however, rejected Kinetic's position, citing the fact that Kinetic knew it was hiring an Idaho resident, sent the letter agreement to Idaho, considered Idaho to be Wood's "report-to-work" location (as reflected in the letter agreement between the parties), had a longstanding business relationship with Wood, paid local union dues and maintained its registration with the State of Idaho so that it could perform contracting work if the need arose. *Id*. at *6. On the basis of these contacts, the court concluded that the purposeful availment requirement was met. *Id*.

### ii.  Purposeful Direction

Purposeful direction is analyzed under the "effects test" announced in the Supreme Court's decision in *Calder v. Jones,* 465 U.S. 7831984). *Dole Food*, 303 F.3d at 1111. "*Calder* stands for the proposition that purposeful availment is satisfied even by a defendant 'whose only "contact" with the forum state is the "purposeful direction" of a foreign act having effect in the forum state.'" *Id*. at 1111 (quoting *Haisten v. Grass Valley Med. Reimbursement Fund*, 784 F.2d 1392, 1397 (9th Cir. 1986) (emphasis omitted)). The three-part "effects test" requires that "the defendant allegedly have 1) committed an intentional act, 2) expressly aimed at the forum state, 3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Foods,* 303 F.3d at 1111.

Typically, the adoption of a uniform policy regarding the payment (or nonpayment) of

wages satisfies the first prong of the effects test, the intentional act requirement. *See Holliday v. Lifestyle Lift, Inc*., Case No. 09-cv-4995 RS, 2010 WL 3910143, at *4 (N.D. Cal. Oct. 5, 2010); *Enriquez v. Interstate Group, L.L.C.,* Case No. 11-cv-5155 YGR, 2012 WL 3800801, at *4 (Aug. 31, 2012). Further, where an employer knows that its employee is performing work in the forum, the third requirement is also satisfied because it is reasonably foreseeable that the harm that results from the alleged violations of wage and hour laws will be felt in California. *See Holliday*, 2010 WL 3910143, at *4. The Personal Jurisdiction Defendants do not appear to dispute that there is sufficient evidence to meet these requirements. Rather, the focus of the parties' dispute is the second requirement, that the defendant's conduct must be expressly aimed at the forum state.

The Court looks first to *Calder* and *Walden* for guidance in applying the express aiming test. In *Calder*, the Supreme Court addressed whether a reporter ("South") and editor ("Calder") located in Florida could be subject to jurisdiction on a defamation claim in California based on publication of an article about the plaintiff ("Jones") – who lived and worked in California – that was published by their employer, the National Enquirer. 465 U.S. 783 (1984). The National Enquirer had a nationwide circulation and did not challenge jurisdiction, but South and Calder asserted that they were not subject to jurisdiction in California because all of their alleged conduct occurred in Florida, where they resided. *Id*. at 785-86. South had few contacts with California. *Id*. He "wrote the first draft of the challenged article . . .[and] did most of his research in Florida, relying on phone calls to sources in California for the information contained in the article. " *Id*. at 785. In addition, "[s]hortly before publication, South called [Jones's] home and read to her husband a draft of the article so as to elicit his comments upon it" *Id*. at 786. Similarly, Calder "reviewed and approved the initial evaluation of the subject of the article and edited it in its final form." *Id*. at 786. "He also declined to print a retraction requested by respondent." *Id*. Calder did not travel to California in connection with the publication of the article. *Id*.

The Court found that the contacts of South and Calder were sufficient to establish personal jurisdiction. *Id*. at 788-89. It acknowledged that neither the reporter nor the editor was responsible for the actual circulation of the article in California by the National Enquirer and recognized that "their contacts with California [were] not to be judged according to their

53

1   employer's activities there." *Id*. at 790.  Nonetheless, the Court concluded that "their intentional,

2   and allegedly tortious, actions were expressly aimed at California," citing its decision in *World-*

3   *Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980) and the Restatement (Second)

4   of Conflict of Laws § 37.[7] *Id*. at 789.  The Court reasoned as follows:

> The allegedly libelous story concerned the California activities of a
> California resident.  It impugned the professionalism of an
> entertainer whose television career was centered in California. The
> article was drawn from California sources, and the brunt of the
> harm, in terms both of respondent's emotional distress and the injury
> to her professional reputation, was suffered in California. In sum,
> California is the focal point both of the story and of the harm
> suffered.  Jurisdiction over petitioners is therefore proper in
> California based on the "effects" of their Florida conduct in
> California.

11  *Id*. at 788.

12          The Supreme Court revisited the effects test in *Walden v. Fiore*, 134 S. Ct. 1115 (2014).

13  In that case, Drug Enforcement Agency ("DEA") agents in Atlanta received information that two

14  professional gamblers (Gina Fiore and Keith Gipson) who were carrying a substantial amount of

15  cash, had boarded a plane from San Juan, Puerto Rico headed for Atlanta, and that they planned to

16  catch a connecting flight to Las Vegas.  134 S. Ct. at 1119.  When Fiore and Gipson arrived in

17  Atlanta, the DEA agents questioned them and, after using a drug-sniffing dog to perform a sniff

18  test (which was "at best, inconclusive"), seized the cash, telling Fiore and Gipson that the money

19  would be returned if they later proved they had obtained the cash from a legitimate source.  *Id*. At

20  some point after the seizure, one of the DEA agents ("Walden") – a Georgia police officer who

21  had been deputized by the DEA – drafted a probable cause affidavit in connection with the

22  forfeiture that Fiore and Gipson asserted was false and misleading, and forwarded the affidavit to

---

[7] Section 37 is entitled, "Causing Effect in State by Act Done Elsewhere" and provides as follows:

> A state has power to exercise judicial jurisdiction over an individual
> who causes effects in the state by an act done elsewhere with respect
> to any cause of action arising from these effects unless the nature of
> the effects and of the individual's relationship to the state make the
> exercise of such jurisdiction unreasonable.

Restatement (Second) of Conflict of Laws § 37.

54

United States District Court
Northern District of California

the United States Attorney's office in Georgia. *Id*. at 1119-20. Fiore and Gipson alleged that the affidavit omitted exculpatory information related to the encounter at the Atlanta airport, namely, that there was no drug evidence and the funds were from a legitimate source (gambling winnings). *Id*. at 1120. Ultimately, no forfeiture complaint was filed and the money was returned to Fiore and Gipson. Fiore and Gipson then asserted a claim against Walden in Nevada under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971) based on alleged violation of their Fourth Amendment rights. *Id*. Walden, in turn, argued that there was no jurisdiction in Nevada. *Id*. The Ninth Circuit, applying the *Calder* "effects test," concluded that Walden's original search and seizure was not directly aimed at Nevada but that the false affidavit was because by that time, Walden knew that Fiore and Gipson had a significant connection to Nevada. *Fiore v. Walden*, 688 F.3d 558, 577-578 (9th Cir. 2012). The Supreme Court, however, disagreed.

The *Walden* Court began its analysis by reviewing the principles that apply to the assertion of specific jurisdiction over a non-resident, beginning with the general proposition that "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." 134 S. Ct. at 1121. It then went on to highlight two "related aspects of this necessary relationship." *Id*. First, the Court emphasized, "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Id*. at 1122 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (emphasis in original). Thus, the Court explained, "[w]e have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Id*. (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("[The] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction")).

Second, the Court in *Walden* cautioned that "our 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id*. The Court acknowledged that "a defendant's contacts with the forum state may be intertwined with his transactions or interactions with the plaintiff or other parties" but

55

emphasized that "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id*. at 1123. Rather, "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id*. (quoting *Burger King*, 471 U.S. at 575).

Applying these principles, the Court found that Walden's contacts with Nevada were not sufficient to exercise specific jurisdiction in connection with the allegedly false affidavit. *Id*. at 1124. The Court reasoned:

> It is undisputed that no part of petitioner's course of conduct occurred in Nevada. Petitioner approached, questioned, and searched respondents, and seized the cash at issue, in the Atlanta airport. It is alleged that petitioner later helped draft a "false probable cause affidavit" in Georgia and forwarded that affidavit to a United States Attorney's Office in Georgia to support a potential action for forfeiture of the seized funds. 688 F.3d, at 563. Petitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada. In short, when viewed through the proper lens - whether the *defendant's* actions connect him to the forum - petitioner formed no jurisdictionally relevant contacts with Nevada.

*Id*. (emphasis in original). The Court found that the Ninth Circuit had erred by "shifting the analytical focus from petitioner's contacts with the forum to his contacts with respondents" and relying on Walden's "knowledge of respondents' 'strong forum connections.'" *Id*. (quoting 688 F.3d at 577-579). This approach, the Court concluded, "obscure[d] the reality that none of [Walden's] challenged conduct had anything to do with Nevada itself." *Id*. The Court distinguished *Calder* on the basis that the "'effects' of the alleged libel connected the defendants to California, not just to the plaintiff" because of the "nature of the libel tort." *Id*. at 1123-24. In particular, the Court reasoned, libel is considered to occur where the statement is published because that is where the harm to reputation occurs. *Id*. Because the article in *Calder* was published in California and was read by a large number of California citizens, the tort in that case was "connected to *California*, not just to a plaintiff who lived there." *Id*. (emphasis in original).

The undersigned understands *Walden* to stand for the proposition that where a defendant's *only* contact with the forum is its knowledge of the plaintiff's connection with the forum resulting

56

from the plaintiff's unilateral actions (e.g., the plaintiff's choice to reside in the forum), there are not sufficient contacts with the forum to support specific jurisdiction consistent with the requirements of due process. *Walden* does not, however, preclude a finding of specific jurisdiction where the defendant's *own* intentional conduct "creates the necessary contacts with the forum." *Walden*, 134 S.Ct. at 1123. Thus, in the wage and hour context, the express aiming requirement is met where an out-of-state defendant targets the forum by operating businesses there and applying the challenged policy to individuals hired to work at those businesses. *See Enriquez v. Interstate Group, LLC*, Case No. 11-cv-05155 YGR, 2012 WL 3800801 (N.D. Cal. Aug. 31, 2012) (finding express aiming because "[b]y operating eight retail stores in California and applying allegedly unlawful overtime policies to stores in California, [the defendant] targeted California"); *Holliday v. Lifestyle Lift, Inc.*, Case No. 09-cv-4995 RS, 2010 WL 3910143 (N.D. Cal. Oct. 5, 2010) (finding express aiming because "[b]y operating medical centers in California and applying the allegedly unlawful employment practices here, defendants both targeted California and, as a consequence could reasonably have suspected that California employees would be harmed by such conduct").

The Court further concludes that where a defendant conducts extensive and ongoing scouting and recruiting in the forum and hires residents of the forum on a regular and continuous basis, the application of a wage policy that is alleged to be in violation of the FLSA and state wage and hour laws to work that is required under the contract and is performed in California is a contact that is not "random" or "fortuitous," even if the defendant does not expressly require employees to perform the work in California. Therefore, such conduct may satisfy the express aiming requirement of purposeful direction. *See Ochoa v. J.B. Martin and Sons Farms, Inc.*, 287 F.3d 1182 (9th Cir. 2001) (finding specific jurisdiction where it was undisputed that labor contractor that hired workers in Arizona and brought them back to New York to work on the defendant's farm had "directed its recruiting activities toward Arizona");[8] *Davis v. NIH Fed.*

_____

[8] The Proskauer PJ Defendants assert in their Reply brief that *Ochoa* is a purposeful availment case. Proskauer PJ Defendants' Reply Brief at 11 n. 14. Although the court in *Ochoa* states in its discussion of the reasonableness prong of the specific jurisdiction test that the defendant "purposefully availed itself of Arizona," 287 F.3d at 1192, earlier in the decision the court found

United States District Court
Northern District of California

*Credit Union*, Case No. 12-cv-5502 JCS, 2013 WL 2147468 (N.D. Cal. May 15, 2013) (holding that the plaintiff satisfied the "express aiming" requirement of the *Calder* "effects test" based on allegation that the defendants recruited her while she lived in California for the purpose of inducing her to move to Maryland); *Potts v. Cameron Offshore Boats, Inc.*, 401 F. Supp. 2d 733, 737-38 (S.D. Tex. 2005) (holding that recruiting in the forum was sufficient to show purposeful direction in employment action against out-of-state employer).

### iii.  Club-by-Club Analysis

#### A.     Atlanta Braves

**Purposeful direction:** Since January 2008, the Atlanta National League Baseball Club, dba Atlanta Braves, have employed nine scouts whose principal work location is or was in California.  *See* Bloom Jurisdiction Decl., Ex. A (Atlanta Braves Interrogatory Responses, Objection and Answer to Interrogatory No. 2).  At the time of their interrogatory responses, the Atlanta Braves employed three scouts who were based in California.  *Id*.  In addition, since January 2008, twenty of their employees have travelled to California between three and ten times a year to scout and recruit California players.  *Id*. Between 2008 and 2014, the Atlanta Braves have drafted California players every year, ranging from a low of three California players in 2012 to a high of nine California players in 2010.  *Id*.  (Objection and Answer to Interrogatory No. 5).  During these years, California players constituted, on average, 12% of the total number of players drafted by the Atlanta Braves.  *Id*.  The Court finds that these contacts are sufficient to show purposeful direction.

**Purposeful availment:** In addition to the evidence of ongoing recruiting and scouting that the Atlanta Braves conduct in California, summarized above, Plaintiffs offer evidence regarding the relationship between the Atlanta Braves and named Plaintiff Matt Lewis in support of specific jurisdiction.  According to his declaration, Matt Lewis is a California resident and was employed

---

that "purposeful availment" was satisfied based, in part, on the fact that it was undisputed that the labor contractor "directed its recruiting activities toward Arizona."  287 F.3d at 1189.  The court did not rely on any contract negotiations;  nor did it cite the place of future performance under the contract (which clearly was *not* the forum state of Arizona).   Therefore, the Court understands *Ochoa* to be a purposeful direction rather than a purposeful availment decision.

by the Atlanta Braves as a Minor League player from June 2010 to August 2011.  Lewis Decl. at ¶ 2.  Lewis was scouted and recruited by MLB teams while he attended college in California at the University of California, Davis.  *Id*. at ¶ 3.  He does not state, however, that the Atlanta Braves scouted or recruited him.  When the Atlanta Braves drafted Lewis, their area scout called Lewis and arranged to meet at a brewery in Chico, California, where Lewis signed his uniform contract.  *Id*. at ¶ 4.  The Atlanta Braves provided Lewis with winter work packets for the offseason and he was expected to perform this work.  *Id*. at ¶ 5.  Lewis returned to California when the season ended, where he performed unpaid winter training work.  *Id.*  The Atlanta Braves knew that Lewis was returning to California during the offseason because Lewis provided the Atlanta Braves with his winter address, which had to be accurate for communication and drug-testing purposes.  *Id.* at ¶ 6.  In addition, before spring training, the Atlanta Braves mailed employment forms to Lewis in California, including a form setting his salary for the upcoming season, which he signed in California and returned to the Atlanta Braves.  *Id.*

In sum, although there is evidence that the Atlanta Braves conducted recruiting and scouting in California, there is no evidence that they reached out to Lewis in the forum to recruit him.  Thus, this factor does not support a finding of purposeful availment.  Nor did the contract affirmatively require that Lewis perform his offseason work in California;  indeed, it is undisputed that much of the performance envisioned under the contract would occur outside of California.  On the other hand, the Atlanta Braves presented the contract to Lewis in the forum, sent communications related to Lewis's employment to Lewis in the forum, and knew that the required offseason conditioning would likely be performed (and was actually performed) in California given that Lewis was a California resident.  Though a close call, the Court concludes that in the absence of any evidence that the Atlanta Braves affirmatively reached out to the forum to recruit Lewis, the evidence offered by Plaintiffs is not sufficient to show that the Atlanta Braves purposefully availed themselves of the privilege of doing business in California.

59

B.    Pittsburgh Pirates

**Purposeful direction:** Since January 2008, the Pittsburgh Pirates have employed five individuals who are based in California - three scouts, a Scout Supervisor and an Area Supervisor. Bloom Jurisdiction Decl., Ex. H (Pittsburgh Pirates Interrogatory Responses, Objection and Answer to Interrogatory No. 2).  In addition, since January 2008, twenty Pittsburgh Pirates employees  have travelled to California to scout and recruit California players between one and eight times a year.  *Id.*  Between 2008 and 2013, the Pittsburgh Pirates drafted seven California players every year.  In 2014, the Pittsburgh Pirates drafted six California players.  *Id.* (Objection and Answer to Interrogatory  No. 5).  During these years, California players constituted, on average, 15% of the total number of players drafted by the Pittsburg Pirates.  *Id.* The Court finds that these contacts are sufficient to show purposeful direction.

**Purposeful availment:** In addition to the evidence of ongoing recruiting and scouting that the Pittsburgh Pirates conduct in California, summarized above, Plaintiffs offer evidence regarding the relationship between the Pittsburgh Pirates and named Plaintiff Kris Watts in support of specific jurisdiction.  According to his declaration, Kris Watts is a California resident and was employed as a Minor League player by the Pittsburgh Pirates from June of 2006 to June of 2012. Watts Decl. ¶ 2.  Watts was scouted and recruited by MLB teams, including the Pittsburgh Pirates, while he attended a California high school and a California college.  Watts Decl. at ¶ 3.  The Pittsburgh Pirates selected Watts in June of 2006 while he attended that California college and the area scout presented the contract to Watts in Santa Clara, California, where he signed it.  *Id.* at ¶ 4. Throughout the years that he played for the Pittsburgh Pirates, Watts returned to California during the winter training periods where he performed substantial unpaid offseason work.  *Id.* at ¶ 8.  The Pittsburgh Pirates provided Watts with winter work packets and knew that Watts would perform that work in California because he supplied them with a California winter address.  *Id.*  at ¶¶ 7-8. Further, the Pittsburgh Pirates communicated with Watts in California during the offseason by telephone or text message to ensure that Watts was performing the offseason work, and sent other work-related communications, including salary addenda, to California.  *Id.* at ¶¶ 11-12.

In sum, Plaintiffs have presented evidence that the Pittsburgh Pirates reached out to

California to recruit Watts, presented the contract to Watts in California, had an ongoing relationship with Watts in California for a significant portion of every year over a six-year period, and required Watts to perform offseason work that they knew was being performed in California. Under these circumstances, the Court finds that the Pittsburgh Pirates have purposefully availed themselves of the privilege of doing business in California.

### C.  Chicago White Sox

**Purposeful direction:** Since January 2008, the Chicago White Sox have employed thirteen individuals who are based in California, eleven of which have job titles reflecting that they are or were engaged in scouting. *See* Bloom Jurisdiction Decl., Ex. C (Chicago White Sox Interrogatory Responses, Objection and Answer to Interrogatory No. 2). In addition, since January 2008, twelve Chicago White Sox employees have travelled to California to scout and recruit California players. *Id.* While some of these employees came to California only once a year, most came more than once a year and some came much more frequently - up to 25 trips in a single year. *Id.* Between 2008 and 2014, the Chicago White Sox have drafted California players every year, ranging from a low of six California players in 2012 and 2014 to a high of thirteen California players in 2011. *Id.* (Objection and Answer to Interrogatory No. 5). During these years, California players constituted, on average, 21% of the total number of players drafted by the Chicago White Sox. *Id.* The Court finds that these contacts are sufficient to show purposeful direction.

**Purposeful availment:** In addition to the evidence of ongoing recruiting and scouting that the Chicago White Sox conduct in California, summarized above, Plaintiffs offer evidence regarding the relationship between the Chicago White Sox and named Plaintiff Nick Giarraputo in support of specific jurisdiction. According to his declaration, Giarraputo is a California resident who was employed by the Chicago White Sox as a Minor League baseball player from January to April of 2013. Giarraputo Decl. at ¶ 2. Before that he was employed as a Minor League player by the New York Mets, from June 2006 to April 2010. *Id.* Giarraputo was scouted and recruited heavily by MLB teams while he attended a California high school, but he does not state that he was scouted and recruited by the Chicago White Sox. *Id.* at ¶ 3. In January 2013, the White Sox

61

mailed Giarraputo's contract to him in California, where he signed it. *Id.* at ¶ 6.  Between January

2013 and the commencement of spring training, Giarraputo was expected to do pre-season training

work and the Chicago White Sox knew he would perform that work in California, where he

resided. *Id*. at  ¶ 6.

The Court finds that Plaintiffs have offered insufficient evidence to establish that the

Chicago White Sox purposefully availed themselves of the privilege of doing business in

California.  While they sent Giarraputo's contract to California and required him to perform pre-

season conditioning that they knew would likely be performed in California, their relationship

with Giarraputo in California lasted only a short period and they did not affirmatively reach out to

California to recruit Giarraputo.  Nor has Giarraputo pointed to any ongoing communications sent

to him in California while he was employed by the Chicago White Sox.  Therefore, the Court

concludes that Plaintiffs have not shown purposeful availment in California by the Chicago White

Sox.

### D.    Tampa Bay Rays

**Purposeful direction:**  Since January 2008, the Tampa Bay Rays have employed nine

individuals who are based in California - eight scouts and a Director of Baseball Research and

Development.  Bloom Jurisdiction Decl., Ex. I (Tampa Bay Rays Interrogatory Responses,

Objection and Answer to Interrogatory No. 2).  In addition, since January 2008, eighteen

employees of the Tampa Bay Rays have travelled to California between one and eight times a year

to scout and recruit California players.  *Id*.  Between 2008 and 2014, the Tampa Bay Rays have

drafted California players every year, ranging from a low of two players in 2014 to a high of

thirteen players in 2008.  *Id*. (Objection and Answer to Interrogatory No. 5).  During these years,

California players constituted, on average, 18% of the total number of players drafted by the

Tampa Bay Rays.  *Id*. The Court finds that these contacts are sufficient to show purposeful

direction.

**Purposeful availment:** In addition to the evidence of ongoing recruiting and scouting that

the Tampa Bay Rays conduct in California, summarized above, Plaintiffs offer evidence regarding

the relationship between the Tampa Bay Rays and named Plaintiff Matt Gorgen in support of

62

specific jurisdiction.  According to his declaration, Matt Gorgen is currently a resident of Arizona and was a Minor League player for the Arizona Diamondbacks from September 2010 to October 2013.  Gorgen Decl. at ¶ 2.  Before that, he was employed by the Tampa Bay Rays from June of 2008 to September of 2010.  *Id.*  Gorgen states that he was scouted and recruited by MLB teams while he attended a California high school and when he continued on to the University of California, Berkeley.  *Id.* at ¶ 3.  He does not state, however, that he was recruited by the Tampa Bay Rays.  After the Tampa Bay Rays selected Gorgen in June of 2008, the area scout came to his parents' house in California, where he signed the contract.  *Id.* at ¶ 4.  Gorgen returned to California during the offseason, where he performed unpaid winter work for the Tampa Bay Rays.  *Id.* at ¶ 5.  The Tampa Bay Rays provided Gorgen with a winter work packet that described the work Gorgen was expected to perform.  *Id.* at ¶ 5.  In addition, the Tampa Bay Rays required Gorgen to provide his address during the offseason so that they could communicate with him or have drug testing done.  *Id.* at ¶ 6.  Gorgen states that "the teams" sent him communications in California, including salary addenda establishing his salary for the upcoming season.  *Id.* Plaintiffs also provide copies of communications from the Tampa Bay Rays that were mailed to Gorgen in California, including the addenda for the 2009 and 2010 seasons listing Gorgen's monthly salary.  *See* Declaration of Garrett R. Broshuis in Support of Plaintiffs' Memorandum Regarding Personal Jurisdiction Over Certain Defendants in the Second Consolidated Amended Complaint ("Broshuis Supp. Decl."), Ex. B.

In sum, Plaintiffs have offered evidence that the Tampa Bay Rays presented Gorgen with the contract in California, mailed at least two communications to California relating to the contract over the course of two years, and knew that Gorgen was returning to California during the offseason, where he was performing his offseason conditioning.  On the other hand, there is no evidence that the Tampa Bay Rays reached out to California to recruit Gorgen and Gorgen's description the communications he received while in California (other than the contract and the addenda) is vague, suggesting these contacts were limited.  These facts, like those relating to the Atlanta Braves, present a close call.  The Court concludes, however, that the evidence regarding the negotiation of the contract, ongoing course of conduct of the parties and the envisioned future

United States District Court
Northern District of California

performance under the contract points away from a finding of purposeful availment.

### E.   Washington Nationals

**Purposeful direction:**  Since January 2008, the Washington Nationals have employed ten individuals who are based in California - six scouts, two Special Assistants to the General Manager, a Minor League coach and a Vice President of Player Personnel.  Bloom Jurisdiction Decl., Ex. J (Washington Nationals Interrogatory Responses, Objection and Answer to Interrogatory No. 2).  In addition, since January 2008, two individuals who are not based in California have made an unspecified number of trips to California in connection with scouting and recruiting of California players.  *Id*.  Between 2008 and 2014, the Washington Nationals have drafted California players every year, ranging from a low of five players in 2010, 2013 and 2014 to a high of ten players in 2012.  *Id*. (Objection and Answer to Interrogatory No. 5).  During these years, California players constituted, on average, 15% of the total number of players drafted by the Washington Nationals.  *Id*. The Court finds that these contacts are sufficient to show purposeful direction.

**Purposeful availment**: In addition to the evidence of ongoing recruiting and scouting that the Washington Nationals conduct in California, summarized above, Plaintiffs offer evidence regarding the relationship between the Washington Nationals and named Plaintiff Leonard Davis in support of specific jurisdiction.  According to his declaration, Leonard Davis resides in California and was employed by the Washington Nationals and their predecessor, the Montreal Expos, from June of 2004 to November of 2010, and from July of 2011 to November of 2011. Davis Decl. at ¶ 2.  He was also employed at some point by the Toronto Blue Jays and the Colorado Rockies.  *Id*.  Davis states that he was scouted and recruited by MLB teams him while he attended a California high school and later when he attended Fresno Community College, in California.  *Id.*  at ¶ 3.  He does not, however, state that the Washington Nationals (or the Montreal Expos) scouted or recruited him.  Davis states that when the Expos drafted him in 2004, the area scout came to his mother's house, in Dos Palos California, where he signed the contract.  *Id.*  at ¶ 4.  Davis states that he remained a California resident and thus returned to California during the offseason months, where he performed substantial unpaid training work for the Washington

1   Nationals, and that the Washington Nationals provided him with a "winter training program" that

2   Davis was expected to follow. *Id.* at ¶ 5. In addition, he was required to provide the Washington

3   Nationals his offseason address so that communications could be sent to him and for drug testing

4   purposes. *Id.* He states that he "believe[s] the teams also mailed materials to [his] winter

5   address." *Id.*

6   In sum, Plaintiffs have offered evidence that the Washington Nationals presented Davis

7   with the contract in California and knew that Davis was returning to California, where he was

8   performing his offseason conditioning. On the other hand, there is no evidence that the

9   Washington Nationals reached out to California to recruit Davis and Davis's statement that he

10   "believes" he received materials in California from "the teams" is too vague to support an

11   inference that he received regular (or any) communications from the Washington Nationals in

12   California related to the contract on an ongoing basis. The Court concludes, balancing these

13   factors, that Plaintiffs have not offered sufficient evidence to establish purposeful availment of the

14   privilege of doing business in California by the Washington Nationals.

15                          F.      Detroit Tigers

16   **Purposeful direction:** Since January 2008, the Detroit Tigers have employed six

17   individuals who are based in California - five scouts and a Regional Crosschecker. Bloom

18   Jurisdiction Decl., Ex. E (Detroit Tigers Interrogatory Responses, Objection and Answer to

19   Interrogatory No. 2). At the time of the interrogatory responses, four of these individuals were

20   employed by the Detroit Tigers. *Id.* In addition, since January 2008, ten employees of the Detroit

21   Tigers travelled to California between one and ten times a year to scout and recruit California

22   players. *Id.* Between 2008 and 2014, the Detroit Tigers have drafted California players every

23   year, ranging from a low of two California players in 2013 to a high of eight California players in

24   2009. *Id.* (Objection and Answer to Interrogatory No. 5). During these years, California players

25   constituted, on average, 9% of the total number of players drafted by the Detroit Tigers. *Id.* The

26   Court finds that these contacts are sufficient to show purposeful direction.

27   **Purposeful availment:** In addition to the evidence of ongoing recruiting and scouting that

28   the Detroit Tigers conduct in California, summarized above, Plaintiffs offer evidence regarding the

United States District Court
Northern District of California

65

relationship between the Detroit Tigers and named Plaintiff Lauren Gagnier in support of specific jurisdiction. In his declaration, Gagnier states that he resides in California and was employed by the Detroit Tigers from July of 2006 to March of 2012. Gagnier Decl. at ¶ 2. Gagnier was scouted and recruited by MLB teams, including the area scout for the Detroit Tigers, while he attended a California high school and later when he attended California State University - Fullerton. *Id.* at ¶ 3. When the Detroit Tigers drafted Gagnier in 2006, the area scout contacted Gagnier while he was still a resident of California to work out the terms of the agreement. *Id.* at ¶ 4. It is not clear where Gagnier signed the contract. Gagnier remained a California resident throughout his Minor League career and thus returned to California during the offseason months, where he claims he performed "much winter work" for the Detroit Tigers. *Id.* at ¶ 5. The Detroit Tigers provided Gagnier with a "winter work packet" that Gagnier was expected to follow. *Id.* He also was required to provide the Detroit Tigers his offseason address so that communications could be sent to him and for drug testing purposes. Gagnier states that he "believe[s]" the Detroit Tigers sent "materials" to him at that address. *Id.*

In sum, even though there is no evidence that Gagnier actually signed the contract with the Detroit Tigers in California, the evidence shows that the Detroit Tigers reached out to the forum to hire Gagnier, not only by recruiting and scouting him in California but also by having their area scout contact Gagnier to work out the terms of the agreement. Though it is not clear what communications were sent to Gagnier in California (again, the description of what he believes may have been sent to him in California is vague), the evidence shows that the Detroit Tigers had an ongoing relationship with Gagnier in California for a significant portion of every year over a six-year period, and required Gagnier to perform offseason work that they knew was being performed in California. The Court finds that this evidence is sufficient to show that the Detroit Tigers purposefully availed themselves of the privilege of doing business in California.

G.   Philadelphia Phillies

**Purposeful direction:** Since January 2008, the Philadelphia Phillies have employed twelve individuals who are or were based in California, ten of whom have titles indicating that they are or were involved in scouting activities.  Bloom Jurisdiction Decl., Ex. G (Philadelphia Phillies Interrogatory Responses, Objection and Answer to Interrogatory No. 2).  At the time of the interrogatory responses, eight of these individuals were employed by the Philadelphia Phillies.  *Id*.  In addition, since January 2008, six employees of the Philadelphia Phillies travelled to California between one and ten times a year to scout and recruit California players.  *Id*.  Between 2008 and 2014, the Philadelphia Phillies drafted California players every year, ranging from a low of five California players in 2013 to a high of nine California players in 2009, 2010 and 2012.  *Id*. (Objection and Answer to Interrogatory No. 5).  During these years, California players constituted, on average, 17% of the total number of players drafted by the Philadelphia Phillies.  *Id*. The Court finds that these contacts are sufficient to show purposeful direction.

**Purposeful availment:** In addition to the evidence of ongoing recruiting and scouting that the Philadelphia Phillies conduct in California, summarized above, Plaintiffs offer evidence regarding the relationship between the Philadelphia Phillies and named Plaintiff Brandon Pinckney.  In his declaration, Pinckney states that he resides in California and was employed by the Cleveland Indians from June of 2003 to April of 2009, the Baltimore Orioles from May of 2009 to November of 2009, the Philadelphia Phillies from January of 2010 to June of 2010 and the Oakland Athletics from June of 2010 to November of 2010.  Pinckney Decl. at ¶ 2.  Pinckney states that he was scouted and recruited by MLB teams while he attended Sacramento City College, in California.  *Id.*  at ¶ 3.  He does not state, however, that he was scouted or recruited by the Philadelphia Phillies.  Pinckney signed his contract with the Phillies in January 2010 in California.  *Id.* at ¶ 4.  After he signed his contract with the Philadelphia Phillies, Pinckney performed unpaid work at home, in California, until spring training began, in March of that year.  *Id*. at ¶ 6. He states that he remained a California resident throughout his Minor League career and thus "generally" returned to California during the offseason months, where he performed substantial unpaid training work for the teams that employed him, including the Philadelphia

67

1   Phillies.  *Id.* at ¶ 5. According to Pinckney, the teams expected him to perform offseason training

2   and he was required to provide the teams his offseason address so that communications could be

3   sent to him and for drug testing purposes.  *Id.*  Pinckney further states that he "believe[s]" the

4   teams sent "materials" to him at that address.  Pinckney Decl. at ¶7.

5       In sum, Pinckney signed his contract with the Philadelphia Phillies in California and, in

6   early 2010, performed between two and three months of required preseason work for the Phillies

7   in California.  It is not clear what materials may have been sent to him in California.  Nor was

8   Pinckney scouted or recruited by the Philadelphia Phillies in California.  The Court finds that

9   these contacts are insufficient to establish purposeful availment of the privilege of doing business

10  in California by the Philadelphia Phillies.

11                          H.    Boston Red Sox

12      **Purposeful direction:** Since January 2010, the Boston Red Sox have employed seven

13  scouts, two staff members, and a Director of Player Personnel who are or were based in California.

14  Bloom Jurisdiction Decl., Ex. B (Boston Red Sox Interrogatory Responses, Objection and Answer

15  to Interrogatory No. 2).  At the time of the interrogatory responses, the Boston Red Sox employed

16  five scouts who were based in California.  *Id.*  In addition, since January 2008, twenty employees

17  of the Boston Red Sox travelled to California at least once a year to scout and recruit California

18  players.  *Id.*  Between 2010 and 2014, the Boston Red Sox have drafted California players every

19  year, ranging from a low of four California players in 2012 and 2013 to a high of eight California

20  players in 2010.  *Id.* (Objection and Answer to Interrogatory No. 5).  During these years,

21  California players constituted, on average, 12% of the total number of players drafted by the

22  Boston Red Sox.  *Id.* The Court finds that these contacts are sufficient to show purposeful

23  direction.

24      **Purposeful availment:** In addition to the evidence of ongoing recruiting and scouting that

25  the Boston Red Sox conduct in California, summarized above, Plaintiffs offer evidence regarding

26  the relationship between the Boston Red Sox and named Plaintiff Mark Wagner.  In his

27  declaration, Wagner states that he resides in California and was employed by the Boston Red Sox

28  from June of 2005 to November of 2011 and by the San Francisco Giants in 2013.  Wagner Decl.

United States District Court
Northern District of California

68

at ¶ 2.  Wagner was scouted and recruited by MLB teams while he attended a California high school and then when he attended University of California, Irvine.  *Id*. at ¶ 3.  He does not state, however, that he was scouted or recruited by the Boston Red Sox.  Nor does he state where he signed the contract.  While he was employed by the Boston Red Sox, Wagner remained a California resident and thus "generally" returned to California during the offseason months, where he performed unpaid training work for the Boston Red Sox, including in 2010 and 2011.  *Id*. at ¶ 5.  The Boston Red Sox provided Wagner with a winter training program that they expected him to follow.  *Id*. at ¶ 5.  He was also required to provide the teams his offseason address so that communications could be sent to him and for drug testing purposes.  *Id*. at ¶ 6.  Wagner states that he "believe[s]" the team sent "materials" to him at that address.  *Id*.

These facts present a close call.  Wagner was employed by the Boston Red Sox for a period of six years, during which time he continued to reside in California.  Thus, the Boston Red Sox knew that work that was required under the contract likely was being performed by Wagner in California during this period.  On the other hand, there is no evidence that the Boston Red Sox reached out to California to scout or recruit Wagner.  Nor is there evidence that the contract was signed in California.  And even though Wagner played for the Boston Red Sox for six years, it is not clear that how much of the offseason training occurred in California given that Wagner states only that he "generally" returned to California to perform offseason training.  It also is unclear what "materials" may have been mailed to him in California; nor is there evidence of any other communications with Wagner in California.  Balancing these factors, the Court concludes that Plaintiffs have failed to establish that the Boston Red Sox purposefully availed themselves of the privilege of doing business in California.

I.     Baltimore Orioles

**Purposeful direction:**  In the years between 2008 and 2014, the Baltimore Orioles have employed between six and seven individuals who reside in California and between three and five individuals who have worked in California for part of the year - ranging from two to thirty-six days out of the year.  Bruce Decl., Ex. 1 (Baltimore Orioles Interrogatory Responses, Objection and Answer to Interrogatory No. 2).  The job titles of these employees indicate that almost all of

69

1    these individuals worked as scouts. *Id.* Between 2008 and 2014, the Baltimore Orioles have

2    drafted California players every year, ranging from a low of six California players in 2011 and

3    2014 to a high of fourteen California players in 2010. *Id.* (Objection and Answer to Interrogatory

4    No. 5). During these years, California players constituted, on average, 20% of the total number of

5    players drafted by the Baltimore Orioles. *Id.* The Court finds that these contacts are sufficient to

6    show purposeful direction.

7         **Purposeful availment:**  In addition to the evidence of ongoing recruiting and scouting that

8    the Baltimore Orioles conduct in California, summarized above, Plaintiffs offer evidence

9    regarding the relationship between the Baltimore Orioles and named Plaintiff David Quinowski.

10   In his declaration, Quinowski states that he resides in California and was employed by the

11   Baltimore Orioles from January to May of 2013. Quinowski Decl. at ¶ 2.  Before that, he was

12   employed by the San Francisco Giants from May of 2005 to March of 2012. *Id.*  Quinowski was

13   scouted and recruited by MLB teams while he attended a California high school. *Id.* at ¶ 3.  He

14   does not state, however, that he was scouted or recruited by the Baltimore Orioles.  Nor does he

15   state that he signed his contract with the Baltimore Orioles in California.  Quinowski states that

16   throughout his Minor League career, he remained a California resident and thus "generally"

17   returned to California during the offseason months, where he performed unpaid training work for

18   the teams. *Id.* at ¶ 5.  He states that he "believe[s] that [he] performed work in California for about

19   a month without pay" after signing with the Baltimore Orioles. *Id.*  He states that he  performed

20   additional unpaid work for the Baltimore Orioles later that spring, when he was sent home from

21   spring training due to an injury. *Id.*  Quinowski was required to provide the teams his offseason

22   address so that communications could be sent to him and for drug testing purposes and he

23   "believe[s]" the teams sent "materials" to him at that address. *Id.* at ¶ 6.

24        The evidence relating to Quinowski's relationship with the Baltimore Orioles is

25   insufficient to show purposeful availment.  Quinowski was not scouted or recruited in California

26   by the Baltimore Orioles, did not sign his contract in California and only worked a short time for

27   the Baltimore Orioles (between four and six months).  Further, from his declaration it is not clear

28   how long he was in California while he was employed for the Baltimore Orioles, given that he

United States District Court
Northern District of California

70

states only that he "believes" he performed about a month of unpaid work and he offers no details

about the work he claims to have performed when he returned to California with an injury.

Quinowski's description of the "materials" he "believes" he received in California are similarly

vague and it is not even clear if any of them were sent by the Baltimore Orioles.  Thus, the

relationship between the Baltimore Orioles and Quinowski does not show that the Baltimore

Orioles purposefully availed themselves of the privilege of doing business in California.

### J.    Cleveland Indians

**Purposeful direction:**  Since January 2008, the Cleveland Indians have employed five

scouts who are based in California, as well as a Regional Supervisor who is also based in

California.  Bloom Jurisdiction Decl., Ex. D (Cleveland Indians Interrogatory Responses,

Objection and Answer to Interrogatory No. 2).  In addition, since January 2008, eighteen

employees of the Cleveland Indians have travelled to California at least once a year - and up to

eight times a year - to scout and recruit California players.  *Id.*  Between 2008 and 2014, the

Cleveland Indians have drafted California players every year, ranging from a low of five

California players in 2009 to a high of ten California players in 2010 and 2013.  *Id.* (Objection and

Answer to Interrogatory No. 5).  During these years, California players constituted, on average,

18% of the total number of players drafted by the Cleveland Indians.  *Id.* The Court finds that

these contacts are sufficient to show purposeful direction.

**Purposeful availment:**  In addition to the evidence of ongoing recruiting and scouting that

the Cleveland Indians conduct in California, summarized above, Plaintiffs offer evidence

regarding the relationship between the Cleveland Indians and named Plaintiff Omar Aguilar.  In

his declaration, Aguilar states that he resides in California and was employed by the Milwaukee

Brewers from 2005 to 2010 and then traded to the Cleveland Indians, who employed Aguilar from

2010 to 2011.  Aguilar Decl. at ¶ 2.  Aguilar states that he was scouted and recruited by MLB

teams, including the Cleveland Indians, while he attended Merced Junior College, in California.

*Id.* at ¶ 4.  While employed by the Milwaukee Brewers and the Cleveland Indians, Aguilar

remained a California resident and thus "generally" returned to California during the offseason

months, where he performed unpaid training work for the teams, including in 2010-2011.  *Id.* at ¶

United States District Court
Northern District of California

6. Both teams provided Aguilar with a winter training program that he was expected to follow. *Id*. at ¶ 6. Aguilar also was required to provide the teams his California address so that communications could be sent to him and for drug testing purposes. *Id*. at ¶ 7. He "believe[s]" the teams sent "materials" to him at that address. *Id*.

The evidence relating to Aguilar is insufficient to establish purposeful availment as to the Cleveland Indians. Although the Cleveland Indians scouted and recruited Aguilar when he was a student in California, in 2004-2005, it was not until many years later that Aguilar was employed by the Cleveland Indians, when he was traded to the Indians. There is no indication his employment with the Cleveland Indians was in any way related to their scouting of Aguilar in California many years prior to the trade. Aguilar also does not state that he signed his contract with the Cleveland Indians in California and it is not clear what communications, if any, the Cleveland Indians mailed to him in California during the year that he was employed by them. In short, the contacts with Aguilar do not show that the Cleveland Indians purposefully availed themselves of the privilege of doing business in California.

### K.    New York Yankees

**Purposeful direction:** Since January 2008, the New York Yankees have employed ten scouts who are or were based in California. Bloom Jurisdiction Decl., Ex. F (New York Yankees Interrogatory Responses, Objection and Answer to Interrogatory No. 2). At the time of the interrogatory responses, the New York Yankees employed six scouts who were based in California. *Id*. In addition, since 2008, twenty-four individuals have travelled to California between one and eleven times a year to scout and recruit California players. *Id*. Between 2008 and 2014, the New York Yankees have drafted California players every year, ranging from a low of five players in 2011-2012 and 2014 to a high of twelve players in 2008. *Id*. (Objection and Answer to Interrogatory No. 5). During these years, California players constituted, on average, 16% of the total number of players drafted by the New York Yankees. *Id*. The Court finds that these contacts are sufficient to show purposeful direction.

**Purposeful availment:** In addition to the evidence of ongoing recruiting and scouting that the New York Yankees conduct in California, summarized above, Plaintiffs offer evidence

United States District Court
Northern District of California

regarding the relationship between the New York Yankees and named Plaintiff Grant Duff.  In his declaration, Duff states that he resides in California and was employed by the New York Yankees from May of 2005 to March of 2012.  Duff Decl. at ¶ 2.  Duff was scouted and recruited by MLB teams while he attended a California community college.  *Id*. at ¶ 3.  He states that in 2003 and 2004, the New York Yankees selected him in the draft while he played at College of the Sequoias, in California, and continued to scout and evaluate him in California after they selected him in 2004.  *Id*. at ¶ 4. When the New York Yankees offered Duff a contract, in May 2005, the area scout met with him at a hotel in Fresno, California where he signed the contract.  *Id*.  While employed by the New York Yankees, Duff remained a California resident and thus returned to California during the offseason months, where he performed unpaid training work for the team.  *Id*. at ¶ 5.  The New York Yankees provided Duff with a winter training program that he was expected to follow.  *Id*.  In addition, he was required to provide the New York Yankees his California address so that communications could be sent to him and for drug testing purposes.  *Id*. at ¶ 6.  Duff states that he "believe[s]" the New York Yankees sent materials, including contract addenda containing salary information, to him at that address.  *Id*.

In sum, the New York Yankees recruited Duff in California over a two-year period, had their area scout present the contract to Duff in California and had an ongoing relationship with Duff in California for a seven-year period, requiring Duff to perform offseason work that they knew was being performed in California during a significant portion of every year.  The Court finds that this evidence is sufficient to show that the New York Yankees purposefully availed themselves of the privilege of doing business in California.

### iv.  Conclusion

For the reasons stated above, the Court finds that Plaintiffs have established purposeful direction as to all of the Personal Jurisdiction Defendants on the basis that they have applied their wage and hour policies to work performed in California, resulting in foreseeable harm in California, and that this conduct was expressly aimed at the forum in light of their extensive scouting and recruiting of California residents.  In addition, the Court finds that the Pittsburgh Pirates, the Detroit Tigers and the New York Yankees purposefully availed themselves of the

privilege of doing business in California based on the contractual relationships between those teams and the named Plaintiffs discussed above. Therefore, the Court proceeds to the next prong of the specific jurisdiction test, the "arising out of" requirement.

### c. Arising Out Of

The second prong of the specific jurisdiction test, which asks whether a claim "arises out of or relates to" the defendant's contacts with the forum, is governed by a "but for" test, that is, would the claims have arisen but for the contacts with the forum. *Doe v. Unocal Corp.*, 248 F.3d 915, 924-25 (9th Cir. 2001) (citing *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995)); *see also Alexander v. Circus Circus Enterprises, Inc.*, 939 F.2d 847, 853 (9th Cir. 1991), *withdrawn and superseded on rehearing,* 972 F.2d 261 (9th Cir. 1992) ("[t]his circuit has already decided that the critical focus in the 'arising out of' prong is whether, 'but for' the defendant's forum-related activities, the injury would have occurred; that is, whether the 'entire course of events . . . was an uninterrupted whole which began with, and was uniquely made possible by, the [defendant's] contacts in [the forum state]'") (quoting *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 383-84 (9th Cir. 1990), *rev'd on other grounds by Carnival Cruise Lines v. Shute*, 499 U.S. 585 (1991)).

In *Shute*, the Ninth Circuit rejected a strict approach to the "arising out of" prong that would have required proximate causation be demonstrated, adopting instead a looser approach that requires only "some nexus between the cause of action and the defendant's activities in the forum." 897 F.2d 377, 385 (9th Cir. 1990). There, the plaintiffs were residents of Southern California who had traveled to Nevada, where they were injured when a pontoon boat operated by the defendant capsized. 939 F.2d at 849. The plaintiffs sued in California, asserting that they would not have gone to Nevada and subsequently been injured but for the defendant's advertising in the travel section of the Los Angeles Times. *Id.* at 853. In addressing the "arising out of" prong, the court rejected the defendant's assertion that the plaintiffs were required to show that "but for the advertising, the pontoon boat would not have capsized," finding this reading of the causation requirement was overly narrow and was not necessary to "protect potential defendants from unreasonable assertions of jurisdiction." *Id*.

In wage and hour cases where the defendant has ongoing operations in the forum, such as

74

1   stores (*see Enriquez*, 2012 WL 3800801, at *5), a restaurant (*see Telles*, 2013 WL 5199811, at *5)

2   or medical facilities (*see Holliday*, 2010 WL 3910143, at *4), the "arising out of" requirement is

3   usually easy to satisfy.  Under these circumstances, but for the application of the challenged wage

4   and hour policy to employees who were hired to work at these businesses, the harm would not

5   have occurred and the claim would not have arisen.  Nor is the location of the harm dependent

6   upon the unilateral actions of the plaintiffs in such cases, as they were hired to work at specific

7   locations in the forum.  Thus, this conclusion is consistent with the admonition of *Walden* that

8   jurisdiction cannot be based on the "unilateral activity" of a plaintiff but rather "must be based on

9   intentional conduct by the defendant that creates the necessary contacts with the forum."  134

10   S.Ct. at 1123.

11       Here, however, Plaintiffs were not hired to work in a specific location (at least during the

12   offseason, when the unpaid work was performed) but rather, were permitted to perform that work

13   wherever they chose.  Thus, to satisfy *Walden* and the requirements of due process, there can be

14   specific jurisdiction only if Plaintiffs' claims arise out of the purposeful conduct of the Personal

15   Jurisdiction Defendants.  As discussed above, Plaintiffs have demonstrated that the Personal

16   Jurisdiction Defendants have purposefully directed their conduct toward California by scouting

17   and recruiting here and, as to at least some of the Personal Jurisdiction Defendants, have also

18   availed themselves of the privilege of doing business in California by entering into contracts with

19   California residents that envision that the plaintiffs will perform unpaid work during the offseason.

20   Below, the Court addresses whether Plaintiffs' claims arise out of either or both of these types of

21   conduct.

22               **i.   Recruiting and Scouting in California**

23       The difficult issue before the Court in determining whether Plaintiffs' claims arise out of

24   the Personal Jurisdiction Defendants' recruiting and scouting in California is how tight the

25   connection must be between the Personal Jurisdiction Defendants' contacts and Plaintiffs' claims.

26   In *Yahoo! Inc. v. La Ligue Contre le Racisme et L'Antisemitisme*, the court explained that courts

27   "consider the extent of the defendant's contacts with the forum and the degree to which the suit is

28   related to those contacts," using a sliding scale whereby "[a] strong showing on one axis will

United States District Court
Northern District of California

75

1    permit a lesser showing on the other."  433 F.3d 1199, 1210 (9th Cir. 2006) (citations omitted).

2    According to the *Yahoo!* court, the "classic polar case for specific jurisdiction described in

3    *International Shoe*" is the one "in which there are very few contacts but in which those few

4    contacts are *directly related* to the suit."  *Id*. (emphasis added). By implication, specific

5    jurisdiction might also exist as to a defendant with more extensive contacts with the forum even

6    though those contacts are not as closely related to the claims being asserted.

7         The tightness of the connection between the forum-related contacts and Plaintiffs' claims

8    depends on the level of generality at which the inquiry is framed.  *See* Rhodes, Charles W. &

9    Robertson, Cassandra Burke, *Towards a New Equilibrium in Personal Jurisdiction*, 48 U.C. Davis

10   L. Review 207, 242 (2014) (recognizing that "higher levels of generality will expand the state's

11   jurisdictional reach").  Thus, for example, if the inquiry is framed at a rather general level, one

12   might find that Plaintiffs' claims for wage and hour violations would not have arisen but for the

13   *collective* scouting and recruiting activities of MLB teams in California; that is, as a result of the

14   California scouting and recruiting activities of the MLB teams, including the Personal Jurisdiction

15   Defendants, all of the named Plaintiffs were recruited to work as Minor League players, ultimately

16   resulting in their performing unpaid work for one of the Personal Jurisdiction Defendants in

17   California.  This is how Plaintiffs have framed the issue.  *See* Plaintiffs' Supp. Brief at 4 ("The

18   [Personal Jurisdiction] Defendants' conscious selection of Californians . . . led to named Plaintiffs

19   performing work in California for no pay").  Alternatively, a narrower way of framing the issue

20   would require that a plaintiff who is asserting a wage and hour claim must actually have been

21   recruited and drafted by the team against whom the claim is asserted. Without conceding that their

22   scouting and recruiting in California can give rise to specific jurisdiction, the Personal Jurisdiction

23   Defendants have taken this narrower approach, arguing, *inter alia*, that Plaintiffs have not satisfied

24   the "arising out of" requirement because many of the named Plaintiffs do not claim to have been

25   recruited by the specific Personal Jurisdiction Defendant against whom that Plaintiff asserts a

26   claim.  Defendants' Supp. Brief at 3.

27         The Court concludes that the narrower framing of the issue is more consistent with the

28   Supreme Court's recent guidance on specific jurisdiction than the more general framing proposed

United States District Court
Northern District of California

by Plaintiffs.  In *Walden*, the Court emphasized that minimum contacts cannot be based on contacts between the forum and third parties.  *See Walden*, 134 S. Ct. at 1122.  Finding that claims against one defendant arise from the recruiting and scouting activities of another defendant flies in the face of that rule.  As discussed above, members of unaffiliated associations are not agents or joint venturers and therefore, it is not appropriate to impute the conduct of one member of the association to another member. Therefore, the Court finds that in order to meet the "arising out of" requirement based on the scouting and recruiting activities of the Personal Jurisdiction Defendants, Plaintiffs must show that for each Personal Jurisdiction Defendant, there is at least one named Plaintiff who was scouted or recruited by that particular Defendant in California and later suffered harm because that *same* defendant did not pay for work that was performed by the named Plaintiff in California.

As the Personal Jurisdiction Defendants acknowledge, four of the named Plaintiffs claim to have been scouted or recruited while they were attending high schools or colleges in California by one or more of the Personal Jurisdiction Defendants:  Kris Watts (Pittsburgh Pirates), Lauren Gagnier (Detroit Tigers), Omar Aguilar (Cleveland Indians/ Baltimore Orioles) and Grant Duff (New York Yankees).  *See* Defendants' Supp. Brief at 5;  *see also*  Watts Decl. at ¶ 3; Gagnier Decl. at ¶ 3, Aguilar Decl. at ¶ 4;  Duff Decl. at ¶ 4.  Watts, Gagnier and Duff were recruited directly out of high school or college by the Personal Jurisdiction Defendants against whom they assert their wage and hour claims (the Pittsburgh Pirates, the Detroit Tigers and the New York Yankees, respectively) and went on to perform unpaid offseason work in California for those defendants. Therefore, as to the Pittsburgh Pirates, the Detroit Tigers and the New York Yankees the Court has no difficulty concluding that the claims of Watts, Gagnier and Duff arise out of the purposeful conduct of those Clubs.

On the other hand, the Court concludes that the claim by Aguilar that he was scouted by the Cleveland Indians is not sufficient to satisfy the "arising out of" requirement as to his claim against the Cleveland Indians because there is no indication that Aguilar entered into an employment relationship with the Cleveland Indians as a result of their scouting and recruiting of Aguilar.  Rather, as discussed above, Aguilar was traded to the Cleveland Indians many years after

77

1   that conduct occurred.

2        The Court rejects the Personal Jurisdiction Defendants' reliance on *Norris v. Oklahoma*

3   *City University*, Case No. 93-cv-1626 VRW, 1993 WL 313122, at *3 (N.D. Cal. Aug. 3, 1993) for

4   the broad proposition that recruiting in the forum cannot give rise to specific jurisdiction and

5   therefore Plaintiffs cannot establish but for causation based upon such contacts.  *See* Personal

6   Jurisdiction Defendants' Supp. Brief at 6.  In *Norris*, the court found that there was no specific

7   jurisdiction in California over an Oklahoma law school as to the plaintiff's claims that she had

8   received an inadequate legal education there.  1993 WL 313122, at * 3-4.  The court held that the

9   plaintiff's claims did not "arise out of" the law school's forum related activities, which included

10  "typical out-of-state school activities such as student recruitment."  *Id*. at * 3.  Rather, "[t]he

11  majority of plaintiff's claims in fact arose from defendant's alleged activity in Oklahoma."  *Id*.

12  Notably, however, there was no suggestion that the plaintiff herself had been recruited in

13  California.  To the contrary, the court in *Norris* made clear that at the time she applied to be

14  admitted to the law school in Oklahoma, she did *not* reside in California.  *Id*. at *3.  Consequently,

15  *Norris* does not stand for the proposition that Plaintiffs' claims in this case cannot arise out of the

16  recruiting and scouting of the Personal Jurisdiction Defendants in California.

17       The Court also rejects the assertion that it may not consider scouting and recruiting

18  activities that occurred outside of the applicable limitations periods.  *See* Personal Jurisdiction

19  Defendants' Supp. Brief at 3.  No authority was offered in support of this assertion and the Court

20  finds none.

21                   **ii.  Contractual Relationships with Named Plaintiffs**

22       In addition to the scouting and recruiting activities of the Personal Jurisdiction Defendants,

23  the Court has also found that certain of these defendants availed themselves of the privilege of

24  doing business in California, namely, the Pittsburgh Pirates, the Detroit Tigers and the New York

25  Yankees. As to these Club, the Court finds that the "arising out of" requirement is satisfied

26  because their claims that the Personal Jurisdiction Defendants failed to pay them for offseason

27  work in California is directly related to the requirement under the players' contracts that they

28  perform such work during the offseason.  But for this contractual requirement, these named

United States District Court
Northern District of California

78

Plaintiffs' claims would not have arisen.

### iii. Whether Plaintiffs Fail to Satisfy Arising Out of Requirement Because their Claims are Insufficiently Pled

The court rejects the Personal Jurisdiction Defendants' assertion that Plaintiffs' claims cannot arise out of any contacts they may have with the forum because their claims are too vague to satisfy the requirements of *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 669 (2009). The case cited in support of this argument, *Landers v. Quality Communications, Inc*., 771 F.3d 638, 646 (9th Cir. 2014), is not on point. There, the Ninth Circuit held that the allegations in support of the plaintiffs' claim for failure to pay overtime wages were so vague that a reasonable inference could not be drawn that there was *any* week in which they worked more than forty hours and were not paid overtime. *Id*. at 646. In contrast, the allegations of the named Plaintiffs against the Personal Jurisdiction Defendants easily support an inference that they performed unpaid work during specific time periods, in violation of the FLSA and state wage and hour laws.

### iv. Conclusion

For the reasons stated above, the Court concludes that the "arising out of" requirement is satisfied as to the Pittsburgh Pirates, the Detroit Tigers and the New York Yankees.

### d.   Reasonableness of Jurisdiction

"Once it has been decided that a defendant purposefully established minimum contacts with a forum, 'he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable' in order to defeat personal jurisdiction." *Dole Foods Co*., 303 F.3d at 1114 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). To determine whether the exercise of jurisdiction is reasonable, and therefore, "comports with fair play and substantial justice," courts consider seven factors:

> (1) the extent of the defendants' purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to

United States District Court
Northern District of California

1          the plaintiff's interest in convenient and effective relief; and (7)
           the existence of an alternative forum.
2

3    *Dole Food*, 303 F.3d at 1114.  Here, the Court has found that the Pittsburgh Pirates, the Detroit

4    Tigers and the New York Yankees have purposefully established minimum contacts with the

5    forum and therefore, these Clubs must make a compelling case that jurisdiction in California

6    would be unreasonable.  They have not met that burden here.

7          First, the analysis of purposeful interjection into the forum state's affairs "parallels the

8    question of minimum contacts" in determining the reasonableness of an exercise of specific

9    jurisdiction. *Amoco Egypt Oil Co. v. Leonis Nav. Co., Inc.*, 1 F.3d 848, 852 (9th Cir. 1993).

10   Where courts find purposeful direction, the purposeful interjection factor usually weighs in favor

11   of a finding of reasonableness.  *Enriquez*, 2012 WL 3800801, at *6.  The Court finds that this

12   factor weighs in favor of Plaintiffs for the same reasons it found purposeful direction and

13   purposeful availment as to the Pittsburgh Pirates, the Detroit Tigers and the New York Yankees.

14         Second, the burden on these defendants of litigating in California is not "so gravely

15   difficult and inconvenient" that it violates due process.  *See Burger King*, 471 U.S. at 485.  As will

16   be discussed further in connection with Defendants' transfer motion, the burden on Defendants

17   (including the Personal Jurisdiction Defendants) of litigating in California does not rise to this

18   level, especially when compared with the burden that would be imposed on Plaintiffs if the Court

19   were to dismiss Plaintiffs' claims against these same defendants, requiring Plaintiffs to refile their

20   claims in another jurisdiction.  *See Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir.

21   1988) (court considers both the burden on the defendant of litigating in the forum and the burden

22   on the plaintiff that would result from transferring or dismissing the action).  The Court notes that

23   the assertions by the Personal Jurisdiction Defendants that they will be burdened by litigating in

24   California is undermined by the evidence showing that all of them send their employees to

25   California on a regular basis for the purposes of recruiting and scouting of California residents, as

26   discussed above.  Therefore, this factor also favors a finding of reasonableness.

27         The third factor, the extent of conflict with the sovereignty of the defendant's state, is

28   neutral because there appear to be no conflicts with any "defendant's state."

United States District Court
Northern District of California

80

The fourth factor, the forum state's interest in adjudicating the dispute, weighs slightly in favor of Plaintiffs.  Where plaintiffs reside in California and the injury occurs here, California has a strong interest in adjudicating the dispute.  *Enriquez*, 2012 WL 3800801, at *7.  Although it is impossible to determine at this stage of the litigation the exact magnitude of the alleged injury that occurred in California as compared to any other state, the evidence provided by the Personal Jurisdiction Defendants regarding the number of players they employ who reside in California during the offseason and who have performed work here over the past several years is sufficient to demonstrate that California has an interest in adjudicating this dispute.

Fifth, the Court must assess reasonableness in light of the efficient judicial resolution of the case.  Although the case is at a relatively early stage, it is now in a posture where the parties will soon be able to proceed to the merits.  Although the Court has concluded that it may not exercise jurisdiction over all of the Personal Jurisdiction Defendants, it nonetheless finds that it is in the interest of judicial efficiency to allow Plaintiffs' claims against the Pittsburgh Pirates, the Detroit Tigers and the New York to move forward in this Court rather than requiring Plaintiffs to refile their claims against those Clubs in new forums, causing further delay. This factor favors Plaintiffs' position.

Sixth, the Court considers the importance of the forum to Plaintiffs' interest in convenient and effective relief.  Given that named Plaintiffs  asserting claims against the Pittsburgh Pirates, the Detroit Tigers and the New York Yankees all reside in California, this factor supports Plaintiffs' positions.

Seventh, the Court must consider whether an alternative forum is available if the Court were to dismiss these Personal Jurisdiction Defendants.  As any of the Personal Jurisdiction Defendants could be sued in the states where they are based, this factor favors the Personal Jurisdiction Defendants.

Considered together, the Court finds that these factors support the conclusion that the exercise of specific jurisdiction over the Pittsburgh Pirates, the Detroit Tigers and the New York Yankees in California is reasonable.

United States District Court
Northern District of California

e.    **Conclusion**

For the reasons stated above, the Proskauer Motion to Dismiss is GRANTED in part and DENIED in part.  The Baltimore Orioles Motion to Dismiss is GRANTED.  The following Clubs are dismissed from this action without prejudice because the Court finds that there is no personal jurisdiction:  the Atlanta Braves, the Chicago White Sox, the Tampa Bay Rays, the Washington Nationals,  the Philadelphia Phillies, the Boston Red Sox, the Baltimore Orioles and the Cleveland Indians.  The Court finds that there is personal jurisdiction as to the Pittsburgh Pirates, the Detroit Tigers and the New York Yankees and therefore, that Plaintiffs' claims may proceed in this Court as to those defendants.

## IV.    MOTION TO TRANSFER[9]

### A.    Contentions of Proskauer Transfer Defendants in the Motion to Transfer

In the Proskauer Transfer Motion, the Office of the Commissioner of Baseball (MLB) and all of the MLB Clubs named as defendants except the Baltimore Orioles (who join in the Proskauer Transfer Motion but have filed a separate transfer motion) ask the Court to transfer this action to the Middle District of Florida under 28 U.S.C. § 1404(a) on the ground that transfer will be in the interest of justice and will serve the convenience of the parties and witnesses.  Proskauer Transfer Motion at 1.  According to the Proskauer Transfer Defendants, the Middle District of Florida is a more appropriate venue than the Northern District of California because "that is the situs of the events giving rise to Plaintiffs' claims and where the largest concentration of parties and witnesses can be found." *Id*.  Plaintiffs cite the facts that: 1)  fifteen Clubs maintain spring training sites in Florida, including twelve in the Middle District of Florida;  2) the headquarters for

---

[9] Having found that the Court lacks jurisdiction over the Baltimore Orioles, the Baltimore Orioles Transfer Motion is DENIED as moot.  *See* Baltimore Orioles Transfer Motion at 2 n. 1 ("If the Baltimore Orioles Motion to Dismiss is denied, the club has moved in the alternative to transfer venue to the Middle District of Florida").  Similarly, the Proskauer Transfer Motion  is DENIED as moot as to the Atlanta Braves, the Chicago White Sox, the Tampa Bay Rays, the Washington Nationals,  the Philadelphia Phillies, the Boston Red Sox, the Baltimore Orioles and the Cleveland Indians.  *See* Proskauer Transfer Motion at 2 n. 2 ("In the event that the [Proskaur PJ Defendants'] motion to dismiss is denied, these Defendants move in the alternative to transfer and respectfully join in the instant motion").   The Court's ruling on the substantive issues raised in the Proskauer Transfer Motion applies to those Defendants the Court has not dismissed for lack of personal jurisdiction.

Minor League Baseball ("MiLB")[10] is located in St. Petersburg, Florida; 3) there is no spring

training facility in California or in this District; and 4) there are twenty-three Minor League clubs

located in the Middle District of Florida whereas there is only one Minor League club located in

this District.  *Id*.  They also assert that the Middle District of Florida is more convenient than

California for Baseball Commissioner Allen H. "Bud" Selig, who is a resident of Wisconsin.  *Id*.

at 2.  According to the Proskauer Transfer Defendants, "[i]n these circumstances, the Middle

District of Florida provides greater access to the key sources of proof, has greater ability to compel

the attendance of relevant non-party witnesses, would greatly reduce the costs of litigation, and

has appreciably greater contacts relating to Plaintiffs' allegations and Defendants' defenses."  *Id*.

In support of their transfer motion, the Proskauer Transfer Defendants cite the

concentration of Minor League teams in and around Florida, the number of employees whose

duties and responsibilities include Minor League baseball operations located on the East Coast and

in Florida, the fact that spring training occurs in Florida and Arizona, and evidence that most

Minor Leaguers sign their contracts in Florida and Arizona.  *Id*. at 3-7.

With respect to the location of the Minor League teams, the Proskauer Transfer Defendants

contend, approximately 188 Minor League teams operate throughout the United States, of which

30 are based in Florida, including 23 in the Middle District of Florida.  *Id*. at 3-4 (citing Woodfork

Decl., ¶ 4, Ex. A).  In contrast, they assert, only twelve Minor League teams are based in

California, with only one in this District.  *Id*. at 4.  In addition, the Proskauer Transfer Defendants

assert, nearly two-thirds of all Minor League teams are located east of the Mississippi River, and

approximately 75 percent of all Minor League teams are located within a 1000 mile radius of the

Middle District of Florida.  *Id*.  In contrast, "only 47 teams (or 25 percent) are located within a

1000 mile radius of this District," according to the Proskauer Transfer Defendants.  *Id*. They also

---

[10] MiLB is not a party to this action.  According to the Proskauer Transfer Defendants, MiLB's headquarters are located in St. Petersburg, Florida, in Pinellas County, in the Middle District of Florida. Declaration of Peter Woodfork In Support of Defendants' Motion To Transfer Action to the Middle District of Florida ("Woodfork Decl.") at ¶ 5. They contend "[t]he Major League Rules, including but not limited to the Minor League Uniform Player Contracts and rules concerning the number and scheduling of Minor League games, are binding on MiLB. Proskauer Transfer Motion at 3 (citing CAC, Ex. A at 105).

United States District Court
Northern District of California

point to a map on the MiLB's website graphically illustrating the distribution of Minor League teams across the United States. *Id.* (citing www.milb.com/milb/info/geographical.jsp). Although the map omits affiliates in Arizona and in the Gulf Coast league (at least thirteen of which they contend are based in the Middle District of Florida), the Proskauer Transfer Defendants contend it provides a "powerful illustration of teams on the East Coast and in Florida in particular." *Id.*

The Proskauer Transfer Defendants also argue that of the more than 1800 employees "identified by the various Defendants whose duties and responsibilities include Minor League baseball operations, approximately two thirds of them have a principal work location in states located in the eastern half of the country (*i.e.*, east of the Mississippi River)," [11] and nearly one fifth of them have a principal work location in Florida (as compared to only one tenth of these employees whose work location is in California). *Id.* at 4-5 (citing Declaration of Elise M. Bloom In Support Of Motion To Transfer Action To The Middle District Of Florida ("Bloom Transfer Decl."), Exs. K-DD (Objection and Answer to Interrogatories No. 1) and Exs. A-J (Objection and Answer to Interrogatory No. 2) (collectively, "Defendants' Interrogatory Objection and Answer Identifying Employees Involved in Minor League Operations")). Even more reside in Florida, they assert, pointing to evidence that 382 employees (or *over* one fifth of the 1800 employees cited above) reside in Florida. *Id.*

The Proskauer Transfer Defendants contend the concentration of employees in Florida is even higher if "only employees with job titles indicating that they supervise Plaintiffs (i.e., managers, field managers, coaches, trainers, and coordinators)" are considered. *Id.* at 6. In particular, "more than 50 percent of Minor League managers, field managers, coaches, trainers and coordinators reside in Florida, and nearly three times as many of these employees live or work in Florida than live or work in California." *Id.* at 6 (citing Defendants' Interrogatory Objection

---

[11] This number does not include scouts, who were identified in Defendants' interrogatory responses only if their employment was based in California. According to the Proskauer Transfer Defendants, "[s]couts are irrelevant to venue because they are not likely witnesses in the matter. In general, scouts' primary contact with Minor League players occurs prior to the players being drafted and signed to a Minor League team. Scouts are not likely to have knowledge of the allegations of the Complaint or whether Plaintiffs were compensated in accordance with federal and state wage and hour laws." *Id.* at 4 n. 9.

1   and Answer Identifying Employees Involved in Minor League Operations). With respect to

2   Defendant MLB, the Proskauer Transfer Defendants assert that "all of the employees identified by

3   Defendant MLB as being involved in Minor League operations have a principal work location in

4   New York, and 90 percent of those same employees reside in New York or in a neighboring

5   state." *Id*. at 5 (citing Bloom Transfer Decl.,  Ex. K (Defendant MLB's Objection and Answer to

6   Interrogatory No. 1).

7        The Proskauer Transfer Defendants also assert the Middle District of Florida will be more

8   convenient because 15 of the 30 MLB Clubs have spring training sites in Florida, 12 of which are

9   located in the Middle District of Florida.  *Id*. at 6 (citing CAC ¶ 17, n.12; Woodfork Decl. at ¶ 2).

10  They point to the fact that the remaining 15 Clubs have spring training sites in Arizona, while

11  none has a spring training facility in California.  *Id*. This is significant, they assert, because Minor

12  League players spend between one to four months per year at the spring training facility.  *Id*.

13  (citing CAC ¶¶  10 n. 6, 175-77).

14       Finally, the Proskauer Transfer Defendants cite players' declarations and interrogatory

15  responses that they contend show that "[f]or the most part, Minor League players sign their

16  employment contracts at the Club's spring training facility either in Florida or in Arizona."  *Id*.

17  (citing Dkt. No. 118-3 ("Graves Decl.") at ¶ 2; Dkt. No. 118-5 ("Lunetta Decl.") at ¶¶ 2-3; Dkt.

18  No. 118-7 ("Papaneri Decl.") at ¶¶ 2-3; Dkt No. 118-8 ("Wilson Decl.") at ¶¶ 2-3; Dkt. No. 118-9

19  ("Vuch Decl.") at ¶¶ 2-3; Dkt. No. 118-10 ("Steil Decl.") at ¶¶2-3; Dkt. No. 118- 6 ("Ferreira

20  Decl.") at ¶ 2-3; Dkt. No. 118-11 ("Ricco Decl.") at ¶¶2-3; Dkt No. 118-2 ("Minniti Decl.") at

21  ¶¶2-3; Dkt. No 118-4 ("Leonard Decl.") at ¶ 2 and Bloom Transfer Decl., Exs. E, G and H

22  (Objection and Answer to Interrogatory No. 8)).  According to the Proskauer Transfer Defendants,

23  eleven Clubs identified Florida as a primary location where contracts are signed.  *Id*. (citing

24  Bloom Transfer Decl., Ex. E, G and H).  On the other hand, they assert, "only one Club

25  specifically identified California as a possible place of contracting" and "at least five Clubs

26  maintain a policy of not signing contracts in California."  *Id*. (citing Bloom Transfer Decl., Ex. D).

27       The Proskauer Transfer Defendants argue that they have satisfied the requirements for

28  transfer under 28 U.S.C. § 1404(a), namely, that the action "might have been brought" in the

United States District Court
Northern District of California

Middle District of Florida and that the convenience of the witnesses and interests of justice favor

transfer. *Id.* at 10. In support of their contention that the action "might have been brought" in the

Middle District of Florida, the Proskauer Transfer Defendants cite Florida's long-arm statute,

which provides, in relevant part:

> (1) Any person, whether or not a citizen or resident of this state, who
> personally or through an agent does any of the acts enumerated in this subsection
> thereby submits himself or herself and, if he or she is a natural person, his or her
> personal representative to the jurisdiction of the courts of this state for any cause
> of action arising from the doing of any of the following acts:
>
>> (a) Operating, conducting, engaging in, or carrying on a business or
>> business venture in this state or having an office or agency in this state.
>> . . .
>> (c) Owning, using, possessing, or holding a mortgage or other lien on
>> any real property within this state.
>> . . .
>> (g) Breaching a contract in this state by failing to perform acts required
>> by the contract to be performed in this state.
>> . . .
>
> (2) A defendant who is engaged in substantial and not isolated activity
> within this state, whether such activity is wholly interstate, intrastate, or
> otherwise, is subject to the jurisdiction of the courts of this state, whether or not
> the claim arises from that activity.

Fla. Stat. § 48.193.

According to the Proskauer Transfer Defendants, the requirements of the Florida long-arm

statute are clearly satisfied as to the MLB Clubs that "(i) conduct spring training in Florida; and

(ii) have Minor League affiliates based in Florida or that play games in Florida." Proskauer

Transfer Motion at 9 (citing *Burris v. Bangert Computer Sys., Inc.*, Case No. 209 CV 201-FTM-29

DNF, 2009 WL 3256477 (M.D. Fla. Oct. 7, 2009), at *2-3; *In re W. States Wholesale Natural Gas

Antitrust Litig.*, 715 F. 3d 716, 741 (9th Cir. 2013)). As to the remaining MLB clubs, the

Proskauer Transfer Defendants argue that "it is certainly reasonable for all MLB Clubs to be

called into court in Florida – the State where MiLB is headquartered and maintains its principal

place of business – for this case that involves the compensation of Minor League players." *Id.*

The Proskauer Transfer Defendants go on to address the factors that are considered in

determining whether transfer is appropriate, namely, "(1) convenience of the parties and

86

witnesses; (2) the ease of access to sources of proof; (3) the availability of compulsory process to compel attendance of witnesses; (4) the differences in the costs of litigation in the two forums; (5) the contacts relating to the plaintiffs' claims in the chosen forum; (6) the respective parties' contacts with the forum; (7) the location where the relevant agreements were negotiated and executed and; (8) the relative congestion of the courts." *Id*. at 10. These favors weigh in favor of transfer, they assert. *Id*. (citing *Machado v. CVS Pharmacy, Inc*., Case No. 13-cv-04501-JCS, 2014 WL 631038, at *4 (N.D. Cal. Feb. 18, 2014); *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001); *Vu v. Ortho-McNeil Pharm., Inc.*, 602 F. Supp. 2d 1151 (N.D. Cal. 2009); *Animal Legal Def. Fund v. U.S. Dep't of Agric*., No. 12-cv-4407-SC, 2013 WL 120185, at *5 (N.D. Cal. Jan. 8, 2013); *Jones v. GNC Franchising, Inc*., 211 F.3d 495, 498-99 (9th Cir. 2000)).[12]

First, the convenience of the parties and witnesses and the ease of access to proof factors favor transfer, the Proskauer Transfer Defendants contend, because "important sources of proof will be the trial testimony of the witnesses – including but not limited to the opt-in plaintiffs, Minor League players who elect not to opt-in, their managers and coaches, as well as Club employees with knowledge of Minor League operations." *Id*. at 11. They further assert that "substantially more witnesses with knowledge and information pertaining to Plaintiffs' claims – e.g., Minor League players, coaches, managers and trainers – work or play in the Middle District of Florida, or within a much more reasonable travelling distance to the Middle District of Florida, than is the case with respect to this District." *Id*. The Proskauer Transfer Defendants cite the evidence summarized above regarding the location of their employees. They conclude, "[m]ost of the witnesses with knowledge relating to the players' employment and hours reside, play and/or work in Florida or within a much more reasonable traveling distance from Florida [and] [a]s such, the lives of these witnesses, as well as Defendants' business operations, will be significantly disrupted if they are required to travel across the country to San Francisco to participate in the litigation of this case." *Id*. at 14.

---

[12] According to the Proskauer Transfer Defendants, other factors that are sometimes considered – "the court's familiarity with the governing law, the plaintiff's choice of forum and the interest of the transferee district in the controversy – are neutral or inapplicable." *Id*.

1    Second, the Proskauer Transfer Defendants contend the availability of compulsory process

2    factor favors transfer because more witnesses can be compelled to testify in person in Florida

3    under Rule 45(c)(1) of the Federal Rules of Civil Procedure.[13]  *Id.* at 14-15.

4        Third, the contacts with Plaintiffs' claims are greater in the Middle District of Florida than

5    in the Northern District of California, according to the Proskauer Transfer Defendants.  *Id.* at 15-

6    16.  In particular, they cite the evidence discussed above, including the fact that "only one Minor

7    League team is located in the Northern District of California, while 23 Minor League teams are

8    located within the Middle District of Florida" and "significantly more of the putative plaintiffs

9    regularly play in the Middle District of Florida for months at a time during spring training,

10   extended spring training, instructional league, and/or the Championship season."  *Id.*  In addition,

11   they point to  evidence that "(i) half of the Club Defendants maintain spring training sites in that

12   State (including 12 spring training sites in the Middle District of Florida); and (ii) they depend on

13   MiLB, which is headquartered in the Middle District of Florida, to administer Minor League

14   operations."  *Id.* at 16.

15       Fourth, consideration of the location where the relevant agreements were negotiated and

16   executed also favors transfer, the Proskauer Transfer Defendants contend.  *Id.* at 16.  They cite the

17   evidence discussed above, showing that most players sign the UPC at the location where spring

18   training is conducted, with eleven teams saying the primary place of signing the UPC is Florida

19   and five saying they have a policy of *not* having players sign the UPC in California.  *Id.*

20

21   [13] Rule 45(c)(1) provides, in relevant part, as follows:

22   (1) . . . . A subpoena may command a person to attend a trial, hearing, or deposition only as
     follows:
23

24   (A) within 100 miles of where the person resides, is employed, or regularly transacts business in
     person; or
25
     (B) within the state where the person resides, is employed, or regularly transacts business in
26   person, if the person

27   (i) is a party or a party's officer; . . . .

28   Fed. R. Civ. P. 45(c)(1).

88

United States District Court
Northern District of California

United States District Court
Northern District of California

Fifth, the Proskauer Transfer Defendants argue that litigation in the Northern District of California will likely be more expensive than litigation in the Middle District of Florida because "approximately two-thirds of the likely witnesses identified by Defendants in jurisdictional and venue discovery work in states in the eastern half of the United States, including the majority of managers, field managers, coaches, trainers and coordinators residing in the State of Florida, (2) more than 75 percent of the putative collective/class members are regularly located within 1000 miles of the Middle District of Florida and (3) at least half of the players will, at some point, actually be in the Middle District of Florida for spring training and during the season, it logically follows that it would be significantly less expensive to litigate this case in a venue located closer to the evidence and these witnesses." *Id.* at 16-17.

Sixth, the Proskauer Transfer Defendants argue that the statistics regarding the relative congestion of this District as compared to the Middle District of Florida favor transfer because these statistics show that the median time to trial in this District is longer than it is in the Middle District of Florida. *Id.* at 17 (citing statistics retrieved on Sept. 30, 2013 from http://www.uscourts.gov/ Statistics/FederalCourtManagementStatistics.aspx).

Seventh, while acknowledging that courts may also consider whether the transferee court is more familiar with the law governing the case, the Proskauer Transfer Defendants argue that this factor does not point away from transfer; in particular, although Plaintiffs have asserted numerous claims under California law, they have also brought ancillary state law claims under the laws of Florida, Arizona, North Carolina, California, New York, Maryland, Pennsylvania and Oregon. *Id.* at 18. Furthermore, they assert, "[t]his Court's greater familiarity with California law is balanced out by the Florida court's greater familiarity with Florida law." *Id.* (citing *Roberts v. C.R. England, Inc.*, 827 F. Supp. 2d 1078, 1087 (N.D. Cal. 2011)). In any event, a Florida court is fully capable of adjudicating California claims, just as it can adjudicate Plaintiffs' claims under the laws of other states, the Proskauer Transfer Defendants argue. *Id.* (citing *Skyriver Tech. Solutions, LLC v. OCLC Online Computer Library Ctr., Inc.*, Case No. 10-cv-03305 JSW, 2010 WL 4366127, at *5 (N.D. Cal. Oct. 28, 2010); *Holliday v. Lifestyle Lift, Inc.*, Case No. 09-cv-4995 RS, 2010 WL 3910143, at *8 (N.D. Cal. Oct. 5, 2010)).

1    Eighth, the Proskauer Transfer Defendants argue that in the context of a class or collective

2    action, the named plaintiff's choice of forum is entitled to little deference on a transfer motion.  *Id*.

3    at 18 (citing *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987);  *McKenzie v. Wells Fargo Home*

4    *Mortg., Inc.*, Case No. 11-cv-04965 JCS, 2012 WL 5372120, at *24 (N.D. Cal. Oct. 30, 2012);

5    *Williams v. WinCo Foods, LLC*, Case No. 12-cv-02690-KJM, 2013 WL 211246, at *3 (E.D. Cal.

6    Jan. 10, 2013)).

7    Finally, the Proskauer Transfer Defendants note that some courts consider whether the case

8    presents a "localized controversy."  *Id*. at 19 (citing *Animal Legal Def. Fund v. U.S. Dep't of*

9    *Agric.*, Case No. 12-cv-4407-SC, 2013 WL 120185, at *5 (N.D. Cal. Jan. 8, 2013)). They argue

10   that to the extent this case presents nationwide issues, this factor is neutral, but that there are also

11   localized issues that favor transfer to the Middle District of Florida, "e.g., the facts that the alleged

12   claims predominantly arose in Florida and that a substantial number of players sign their

13   employment contracts there at spring training."  *Id*. at 20.

14       **B.    Plaintiffs' Opposition**

15       Plaintiffs argue that the Transfer Motions should be denied because:  1) Defendants fail to

16   meet their threshold burden of demonstrating that this action "could have been brought" in the

17   Middle District of Florida; 2) even though this is a class action, Plaintiffs' choice of forum is

18   entitled to deference and Defendants have not shown that convenience or interest-of-justice factors

19   warrant disturbing that choice; and 3) Defendants seeks "merely to shift the inconvenience of

20   litigation from the well-resourced corporate entities that comprise MLB to the named Plaintiffs, a

21   group of underpaid former Minor Leaguers."  Plaintiffs' Opposition to Defendants' Motion to

22   Transfer Venue ("Transfer Opposition") at 1.

23       With respect to their assertion that the convenience of the parties and witnesses does not

24   support transfer, Plaintiffs argue that the named Plaintiffs are likely to be the key witnesses in the

25   case and point to allegations and evidence that seven of the thirty-four named Plaintiffs currently

26   reside in California, with three living in this District and a fourth living nearby, in Solano County.

27   *Id*. at 2 (citing CAC,  ¶ 23 (alleging Craig Bennigson currently resides in Benicia, CA), ¶ 25

28   (alleging Kyle Woodruff currently resides in San Jose, CA), ¶ 32 (alleging Jake Kahaulelio resides

United States District Court
Northern District of California

in Windsor, CA), ¶ 37 (alleging Brandon Henderson resides in Madera CA), ¶ 45 (alleging Kris Watts resides Fremont, CA), ¶ 51 (alleging Joel Weeks resides in Torrance, CA), ¶ 128 (alleging venue is proper in the Northern District of California);  Pahuta Decl. at ¶ 2 (stating that he recently moved to California and currently resides here)).  According to Plaintiffs, this is the heaviest concentration of named Plaintiffs in any state.  *Id.*  Further, they assert, using the Defendants' dividing line (the Mississippi River), "far more Plaintiffs live west of the Mississippi River than east of it: 22 out of the 34 (65 percent)." *Id.* (citing CAC, ¶¶ 19-52).  And, they contend, over 40% of the named Plaintiffs "live in or around California" – seven in California, as noted above, four in Colorado, and one each in Utah, Idaho, and Arizona.  *Id.* (citing CAC, ¶¶  29, 33, 35, 36, 40, 47, 49).  In contrast, they assert, "only a single named Plaintiff resides in Florida . . . [and] [n]o Plaintiffs live in a state bordering Florida." *Id.* (citing CAC, ¶ 26).

Plaintiffs also point to the locations of the defendants and witnesses in support of their opposition to Defendants' transfer request.  *Id.* at 3-4.  First, as noted above, five out of the thirty franchise defendants are located in California, with two located in this District.  *Id.* at 4 (citing Broshuis Decl., Ex. D (Team-by-Team Information, MLB.com)).  According to Plaintiffs, there are no more than two franchises in any other state and only one franchise resides in the Middle District of Florida.  *Id.*  Second, Plaintiffs point out that the MLB Scouting Bureau, "a central scouting service for the recruitment of future Minor Leaguers that serves all MLB franchises," is headquartered in California.  *Id.* (citing CAC, ¶ 154; Broshuis Decl., Ex. E (Major League Baseball Scouting Bureau Q&A, MLB.com).  Third, Plaintiffs argue that the location of the Officer of the Commissioner of Baseball (New York) and the Commissioner's principal residence (Wisconsin) do not support transfer because a plane ride will be required for these parties whether the case proceeds in California or Florida.  *Id.*

Plaintiffs also argue that the location of Defendants' employees does not support transfer to the Middle District of Florida.  *Id.* at 4.  According to Plaintiffs, Defendants have over 250 employees principally working in California whose "responsibilities related to Minor Leaguers," 200 of whom also reside in California.  *Id.* (citing Bloom Transfer Decl., Exs. A-DD (Objection and Answer to Interrogatory No. 2); Bruce Decl., Ex. 1 (Objection and Answer to Interrogatory

91

No. 2)). They contend that "[e]ven if scouts are removed from the calculation, Defendants still have over 250 employees involved in their Minor League operations who either reside or principally work in California." *Id.* Plaintiffs also assert that 27 of the 30 MLB franchises employ officials with Minor League responsibilities who either live or principally work in California" and "have many more employees – often high-level officials such as Vice Presidents, General Managers, and Assistant General Managers – frequently traveling to California on behalf of Defendants." *Id.* at 4-5 (citing Bloom Transfer Decl., Exs. A-J (Objection and Answer to Interrogatory No. 2); Bruce Decl., Ex. 1 (Orioles Objection and Answer to Interrogatory No. 2)). They also point to evidence that "[e]ven eastern franchises have many employees either residing or principally working in California." *Id.* at 5.

Plaintiffs argue that the figures presented by Defendants in their briefs regarding the location of their employees are "inaccurate and misleading." *Id.* at 5. They challenge the Defendants' claim that "one-fifth of employees with Minor League operations principally work in Florida," arguing instead that "even if the Baltimore Orioles are included (they apparently were not included in Defendants' original calculations), the number is actually below 15 percent (and not substantially higher than California, which is around 12 percent)." *Id.* at 5 (citing Defendants' Objection and Answer to Interrogatory No. 2). Plaintiffs also reject as "grossly inaccurate" Defendants' "claim that 'more than 50 percent of Minor League managers, field managers, coaches, trainers and coordinators reside in Florida.'" *Id.* Rather, Plaintiffs assert, "the number is actually less than 20 percent (at 269 out of 1358 – again not substantially higher than California)." *Id.* Further, they contend, "[t]he franchises' employees overseeing the Minor Leagues and chiefly responsible for making decisions and implementing policies – employees such as general managers, along with those assistant general managers and vice presidents with the primary Minor League responsibilities – are concentrated more in California," with over 20 percent of the 98 such employees either residing or principally working in California and less than 10 percent either residing or principally working in Florida. *Id.*

Plaintiffs also argue that Defendants' briefs are misleading as to MLB because they did not "identify a single employee with Minor League responsibilities either residing or principally

United States District Court
Northern District of California

92

working in Florida." *Id*.  Plaintiffs present evidence that MLB's Executive Vice President of

Baseball Development, Frank Robinson, resides in California and within this District.  *Id*. at 5-6

(citing Bloom Transfer Decl., Ex. K (MLB's Objection and Answer to Interrogatory No. 2)).

Finally, they assert that one franchise (the Angels) has no employees with minor  league

responsibilities that reside or principally work in Florida, three other franchises (the Giants,

Athletics and Padres) have only a single such employee in Florida, and several other franchises

have only two such employees in Florida.  *Id*. at 6.

   Plaintiffs also argue that "a substantial amount of the relevant work was performed in or

around this District."  *Id*. at 6. In particular, they contend, Defendants require Minor Leaguers to

perform substantial unpaid work during the offseason and are aware that much of this work takes

place in California because more Minor Leaguers reside in and are drafted from California than

from any other state.  *Id*. (citing CAC, ¶¶ 174–80; Khoury Decl. at ¶ 7; Bennigson Decl. at ¶ 7;

Pahuta Decl. at ¶ 7; Lawson Decl. at ¶¶ 7–8; Watts Decl. at ¶¶ 6–11; Kahaulelio Decl. at ¶ 5;

Smith Decl. at ¶ 4; Opitz Decl. at ¶ 5; Woodruff Decl. at ¶ 5; Henderson Decl. at ¶ 5; Giarraputo

Decl. at ¶¶ 5-6; McAtee Decl. at ¶ 7). Based on evidence obtained in discovery, Plaintiffs estimate

that an average of 24.7 Minor Leaguers per franchise maintain California addresses each winter,

suggesting that "around 750 Minor Leaguers work and reside in this state every single winter

training period."  *Id*. at 7 (citing Bloom Transfer Decl., Exs. C-F (Objection and Answer to

Interrogatory No. 6); Bruce Decl., Ex. 1 (Orioles Objection and Answer to Interrogatory No. 6).

Plaintiffs concede, however, that "[o]nly five franchises, the Yankees, Orioles, White Sox,

Indians, and Tigers, provided the information on a per year basis."  *Id*. n. 36.  "Two other

franchises provided the total number of players since 2008 who resided in CA during the winter

period but did not do so on a per year basis. The other franchises refused to provide any

information."  *Id*.

   In addition to training that occurs in California during the offseason, Plaintiffs cite to

evidence that many Minor Leaguers play for teams that are based in California.  *Id*.  According to

Plaintiffs, there are 12 Minor League teams located in California and of the 34 named Plaintiffs, at

least 15 worked at Minor League teams based in California.  *Id*.  (citing CAC, ¶ 227 (Odle), ¶ 242

United States District Court
Northern District of California

(Bennigson), ¶ 250 (Lawson), ¶ 270 (Kiel), ¶ 278 (Nicholson), ¶ 300 (Meade), ¶ 307 (Murray), ¶ 315 (Kahaulelio), ¶ 323 (Khoury), ¶ 333 (Pease), ¶ 350 (Gaston), ¶ 382 (Newby), ¶ 433 (Hilligoss), ¶ 476 (Weeks); Woodruff Decl. at ¶ 6).  Plaintiffs also point to the fact that while 15 teams hold spring training in Florida, the other 15 hold spring training in the western half of the United States, in Arizona.  *Id*.  Finally, Plaintiffs cite to the extensive recruitment of Minor Leaguers in California, pointing specifically to the fact that the MLB Scouting Bureau is based in California and evidence that all of the teams have a "heavy scouting presence" in California.  *Id*. Plaintiffs also reject Defendants' reliance on evidence that many teams have a stated policy of having players sign the UPC in Florida during spring training, citing evidence that in the past, players frequently were asked to sign the UPC in California.  *Id*. at 8 (citing  Wyckoff Decl. at ¶ 9; Watts Decl. at ¶ 4; Bennigson Decl. at ¶ 4; Lawson Decl. at ¶ 5; Kahaulelio Decl. at ¶ 4; Opitz Decl. at ¶ 4; Woodruff Decl. at ¶ 4; Henderson Decl. at ¶ 4; Giarraputo Decl. at ¶ 4; McAtee Decl. ¶ 6). Plaintiffs also offer evidence that the teams regularly ask players to sign during the offseason addenda to their contracts establishing their salaries for the upcoming season.  *Id*. (citing Broshuis Decl., Exs. A-C; Khoury Decl. at ¶ 10; Watts Decl. at ¶ 12).

Based on the foregoing evidence, Plaintiffs contend Defendants fail to meet either the threshold requirement for transfer under § 1404(a) – that the action could have been brought in the transferee district – or to establish that transfer is in the interest of the convenience or fairness.  *Id*. at 9.  With respect to the first requirement, Plaintiffs argue that Defendants bear the burden of showing that the action could have been brought in the Middle District of Florida and that the fact that Defendants could have consented to jurisdiction and venue in that District is irrelevant.  *Id*. (citing *Commercial Lighting Prods., Inc. v. U.S. Dist. Court*, 537 F.2d 1078, 1079 (9th Cir. 1976); *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960)).  If a defendant fails to meet this burden, Plaintiffs contend, the transfer motion must be denied.  *Id*. (citing *Goor v. Vignoles*, Case 12-cv-01794 DMR, 2012 WL 5499841, at *4 (N.D. Cal. Nov. 13, 2012)).  Plaintiffs do not challenge Defendants' assertion that there is personal jurisdiction in Florida as to the MLB Clubs that have affiliates and/or spring training in Florida.  As to at least twelve MLB Clubs with no franchises in Florida, however, Plaintiffs assert that Defendants have failed to show that there is any basis for

94

exercising personal jurisdiction over these Defendants. *Id.* at 10-11.

Plaintiffs assert that the only basis for exercising personal jurisdiction over these teams offered by Defendants is that Minor League Baseball is headquartered in Florida. *Id.* at 10. This argument is a "red herring," they contend, because Minor League Baseball is not a party to this action and is a "separate entity." *Id.* (citing Broshuis Decl., Ex. G, General History, MiLB.com). Further, Plaintiffs assert, Defendants are not members of Minor League Baseball and Plaintiffs (and similarly situated players) are not employed by Minor League Baseball. *Id.* In fact, under the MLB Rules, the responsibility of Minor League Baseball is limited to stadium maintenance and ticket sales. *Id.* (citing CAC, ¶¶ 161-66). Thus, there is no basis for imputing the contacts of Minor League Baseball to the twelve teams that have no affiliates in Florida and also do not conduct their spring training there, Plaintiffs argue. *Id.* For this reason alone, they contend, the Transfer Motions should be denied. *Id.* at 11.

Even assuming Defendants were able to demonstrate that the action could have been brought in the Middle District of Florida, Plaintiffs argue that the factors courts consider in assessing whether transfer is warranted do not support Defendants' position. *Id.* at 11.

First, Plaintiffs argue that their choice of forum is entitled to some deference because it is not the result of forum shopping and a number of the named Plaintiffs (and some Defendants) have ties to this District. *Id.* at 12-13 (citing *Hendricks v. StarKist Co.*, 13-cv-729 YGR, 2014 WL 1245880, at *2-3 (N.D. Cal. Mar. 25, 2014); *Roling v. E*Trade Sec.*, LLC, 756 F. Supp. 2d 1179, 1185-86 (N.D. Cal. 2010) (citing *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir.1987)); *Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353, 1363 (N.D. Cal. 2007)). Plaintiffs further assert that Courts afford more deference to a plaintiff's forum choice in an FLSA collective action than in a standard class action. *Id.* at 12 (citing *Johnson v. VCG Holding Corp.*, 767 F. Supp. 2d 208, 216 (D. Me. 2011)). According to Plaintiffs, this is because "by arming the FLSA with the opt-in mechanism instead of the Rule 23 mechanism, 'Congress intended to give plaintiffs considerable control over the bringing of a FLSA action.'" *Id.* (citing *Koslofsky v. Santaturs, Inc.*, 10 CIV. 9160 BSJ, 2011 WL 10894856, at *2 (S.D.N.Y. Aug. 18, 2011)).

Second, Plaintiffs argue that the Northern District of California is more convenient to the

United States District Court
Northern District of California

parties and witnesses than the Middle District of Florida and at best, a transfer will only shift the burden from some parties and witnesses to others. *Id.* at 14 (citing *Decker Coal Co.*, 805 F.2d at 843; *Hendricks*, 2014 WL1245880, at *4; *Cal. Writer's Club v. Sonders*, 11-cv-02566 JCS, 2011 WL 4595020, at *13 (N.D. Cal. Oct. 3, 2011); *Kabushiki Kaisha Stone Corp. v. Affliction, Inc.*, 09-cv-2742 RS, 2009 WL 3429560, at *3 (N.D. Cal. Oct. 22, 2009)). Plaintiffs argue that the primary witnesses in the case will be the named Plaintiffs, and for the reasons discussed above, this District will be more convenient to them than the Middle District of Florida. *Id.* Further, they assert, this District will be more convenient for Defendants because more MLB Clubs are located in California than in any other state and half of the Clubs train in Arizona rather than Florida. *Id.* As to the other party witnesses, Plaintiffs contend, it is only the trial that matters "because depositions will be taken at a location convenient for the deponent rather than the District where the action is pending." *Id.* (citing Fed. R. Civ. Proc. 45(c)(1)(A); *Roling*, 756 F. Supp. 2d at 1186); *Van Slyke*, 503 F. Supp. 2d at 1363). Because the Court has agreed to hold the trial during the offseason, Plaintiffs argue, the locations of the Minor League teams are irrelevant. *Id.* at 15-16. Further, they assert, more players are found in California during the offseason than in any other state, making this District a more convenient forum for these witnesses. *Id.*

Plaintiffs also argue the request for transfer should be denied because Defendants have not identified any specific witnesses – party or non-party – who will be inconvenienced by litigating in California. *Id.* at 17 (citing *Cal. Writer's Club*, 2011 WL 4595020, at *14). This is significant, Plaintiffs assert, because "[t]he convenience of non-party witnesses is paramount." *Id.* (citing *Hendricks*, 2014 WL 1245880, at *3). In contrast, Plaintiffs argue, they have offered specific facts showing that Plaintiffs will be inconvenienced by a transfer, pointing to the fact that "7 named Plaintiffs reside in California, an additional 7 reside in nearby states, and 65 percent reside west of the Mississippi." *Id.* at 18.

Next, Plaintiffs argue that transfer should be denied because they bring far more claims under California law than under any other state's law. *Id.* at 19-20. While district courts are equally capable of adjudicating federal claims, this District is likely to be more familiar with issues of California state law than the Middle District of Florida, Plaintiffs assert. *Id.* (citing

96

1    *Hendricks*, 2014 WL1245880, at *5; *In re Ferrero Litig.*, 768 F. Supp. 2d at 1081; *Van Slyke*, 503

2    F. Supp. 2d at 1366).

3            The factor that considers feasibility of consolidation also does not support transfer,

4    Plaintiffs contend, because this case has already been consolidated with a related case and no other

5    cases have been filed in the Middle District of Florida or in any other district.  *Id.* at 20.

6            Plaintiffs also argue that California has a greater interest in the controversy than the Middle

7    District of Florida because more of the putative class likely resides in California than any other

8    state and many of Plaintiffs' claims are asserted under California law.  *Id.* at 20 (citing *Van Slyke*,

9    503 F. Supp. 2d at 1365).

10           Plaintiffs reject Defendants' assertion that access to evidence and availability of

11   compulsory process favors transfer.  *Id.* at 20-21.  According to Plaintiffs, "[u]nder revised Rule

12   45(c)(1), a Court can compel to trial a witness residing, working, or regularly doing business in a

13   state."  *Id.* at 20.  Because more parties reside in California than in any other state, and a plethora

14   of potential witnesses either reside or principally work in California, Plaintiffs assert, this factor

15   does not support transfer.  *Id.*

16           Plaintiffs also challenge Defendants' assertion that there is less congestion in the Middle

17   District of Florida, arguing that "courts examine not only time to trial but also other factors,

18   such as filings per judgeship." *Id.* at 21 (citing *In re Ferrero Litig.*, 768 F. Supp. 2d at 1082).

19   When the various metrics for the two districts are compared, Plaintiffs assert, it is apparent that the

20   statistics as a whole disfavor transfer.  *Id.* at 22 (citing Broshuis Decl., Ex. H (Fed. Court Mgmt.

21   Statistics Archive, USCourts.gov).

22           Plaintiffs argue that the relative cost of litigation in the two districts also disfavors transfer

23   because more Plaintiffs and Defendants are located in this District than in the Middle District of

24   Florida.  *Id.* at 22-23.  Plaintiffs further contend transfer should be denied because many events

25   occurred in this District, the parties have substantial contacts with this District, and many of the

26   players' contracts were signed here.  *Id.* at 23.

27

28

United States District Court
Northern District of California

97

C.    **Contentions of Proskauer Transfer Defendants in Reply Brief**

In their Reply brief, the Proskauer Transfer Defendants reject Plaintiffs' assertion that this action could not have been brought in the Middle District of Florida, again highlighting the relationship between the MLB Clubs and Minor League Baseball to establish that there is personal jurisdiction in Florida against all of the Defendants. Reply in Support of Motion to Transfer Action to the Middle District of Florida ("Proskaur Transfer Reply") at 1-5. According to the Proskauer Transfer Defendants, "the fact that MiLB – an entity to which all Minor League teams affiliated with and/or owned by MLB Clubs belong – is located in Florida makes it patently reasonable for MLB Clubs to be sued in a Florida court for claims arising out of their Minor League operations"  because those Defendants "'[u]ndoubtedly. . . expected to gain some benefit from [their] venture' with MiLB" and "should 'reasonably expect[] to be haled into the State of Florida' in connection with that venture." *Id*. at 2 (quoting *Kim v. Keenan*, 71 F. Supp. 2d 1228, 1236 (M. D. Fla. 1999)).

The Proskauer Transfer Defendants reject Plaintiffs' reliance on the fact that Minor League Baseball is not a party to this action, arguing that its non-party status is irrelevant to personal jurisdiction. *Id*. They point in particular to the agreement between Minor League Baseball and Major League Baseball (on behalf of its members), the Professional Baseball Agreement ("PBA"), which is incorporated into the UPC and is cited in the exhibits to Plaintiffs' complaint. *Id*. (citing CAC, Exs. A & B; Supplemental Declaration Of Elise M. Bloom In Support Of Motion To Transfer Action To The Middle District Of Florida ("Supp. Bloom Transfer Decl."), Ex. EE (relevant portions of the PBA) and Ex. FF (Plaintiffs' Request to Franchise Defendants for Production of Documents Nos. 3 and 8)). The Proskauer Transfer Defendants reason as follows:

> The PBA governs the business relationship between each MLB Club and MiLB. The PBA's express purpose is to "establish a high quality relationship" between the MLB Clubs and MiLB in order to, among other things, "[p]rovide an environment for athletes to develop their potential as Major League players . . . while participating in Minor League Baseball." Thus, the PBA requires that MLB Clubs field at least 160 Minor League teams in each season, and that each MLB Club support at least one AAA and one AA Club. It further provides that there be an "appropriate" number of Minor League clubs at lower levels. Thus, each MLB Club's participation in the Minor League system demonstrates the existence

98

1   of specific jurisdiction, as Plaintiffs' claims unquestionably relate to
    the compensation of Minor League players.

2   *Id.* (citing *Louis Vuitton Malletier, S. A. v. Mosseri*, 736 F.3d 1339, 1358 (11th Cir. 2013);

3   *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.* , 593 F.3d 1249, 1267 (11th Cir. 2010);

4   *Fireman's Fund Ins. Co. v. Nat'l Bank of Coops*., 103 F.3d 888, 894 (9th Cir. 1996)).

5          The Proskauer Transfer Defendants also cite to the Florida long-arm statute, Fla. Stat. §

6   48.193(1)(a), in support of personal jurisdiction arguing that under it, there is personal jurisdiction

7   wherever "two non-resident defendants 'anticipated some type of benefit' from their venture with

8   Florida residents (including non-party residents)." *Id.* (quoting *Kim*, 71 F. Supp. 2d at 1234).

9   Moreover, they contend, Plaintiffs' assertion that there is no specific jurisdiction over the Clubs

10  that do not have affiliates or hold spring training in Florida is undercut by their contrary arguments

11  in support of personal jurisdiction in California over the Proskauer PJ Defendants.  *Id.* at 5.

12         The Proskauer Transfer Defendants also argue, for the first time, that the Court need not be

13  able to find personal jurisdiction over each of the MLB Club Defendants in the Middle District of

14  Florida in order to find that the action could have been brought in that district for the purposes of

15  28 U.S.C. § 1404(a).  *Id.* at 5.  Rather, they contend, "where claims are brought against multiple

16  defendants 'scattered all over the United States,' an exception is warranted." *Id.* (quoting *Wild v.*

17  *Subscription Plus, Inc.*, 292 F.3d 526, 531 (7th Cir. 2002), cert. denied, 537 U.S. 1045 (2002)).

18  According to the Proskauer Transfer Defendants, in *Wild*, "Judge Posner affirmed transfer of a

19  complex multidefendant suit, concluding that 'there is no absolute bar on the transfer of a

20  multidefendant suit to a district in which one of the defendants cannot be served.'" *Id.*  They note

21  that other courts, including one in the Eastern District of California, have followed *Wild*.  *Id.*

22  (citing *Leskinen v. Halsey*, Case No. 10-cv-03363 MCE KJN PS, 2011 WL 4056121 at *8, n. 12

23  (E.D. Cal. Sept. 12, 201)).  Because it is undisputed that this case could have been brought in the

24  Middle District of Florida against at least eighteen of the MLB Clubs named as defendants, and

25  because the Middle District of Florida is a more convenient forum, the Proskauer Transfer

26  Defendants assert, the Court should transfer the action to the Middle District of Florida.  *Id.* at 6.

27         The Proskauer Defendants also challenge Plaintiffs' assertions that transfer will not further

28  the interests of convenience and justice.  *Id.* at 7-15.

United States District Court
Northern District of California

**D.     Legal Standard under 28 U.S.C. § 1404(a)**

Pursuant to 28 U.S.C. § 1404(a), a case may be transferred to any district where the action could have been brought "[f]or the convenience of parties and witnesses, in the interest of justice[.]"  The district court has discretion to transfer cases based on the individualized facts of each case and considerations of convenience and fairness.  *Jones v. GNC Franchising, In*c., 211 F.3d 495, 498 (9th Cir. 2000). In determining whether to transfer an action under § 1404(a), courts may consider the following non-exclusive factors:

> (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof.

*Id*. at 498-99. The party that seeks a transfer of venue under § 1404(a) bears the burden of showing that the transfer is appropriate.  *Fabus Corp. v. Asiana Exp. Corp.*, Case No. C-003172, 2001 WL 253185, at * 1 (N.D. Cal. Mar. 5, 2001) (citing *Sec. Investor Protection Corp. v. Vigman*, 764 F.2d 1309, 1316-17 (9th Cir. 1985), rev'd in part on other grounds by *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258 (1992)).

**E.     Whether the Action Could Have Been Brought in the Middle District of Florida**

Plaintiffs contend Defendants have not met their burden of showing that this action could have been brought in the Middle District of Florida and therefore, their request to transfer the action under § 1404(a) fails on that basis alone.  The Court declines to decide this question because, as discussed below, it finds that transfer of this action to the Middle District of Florida is not in the interest of justice.

United States District Court
Northern District of California

100

### F.   Whether Transfer will Serve the Convenience of the Parties and Witnesses and Will Promote the Interests of Justice[14]

#### 1.   Plaintiffs' Choice of Forum

As a preliminary matter, the Court finds that Plaintiffs' choice of forum in this case is entitled to at least some deference, even though this class action involves named plaintiffs from numerous states throughout the country.

Typically, a party seeking transfer must make "a strong showing . . . to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). In the context of a class or collective action, however, the named plaintiff's choice of forum is given less weight. *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987). "The rationale for a diminished degree of deference is that 'where there are hundreds of potential plaintiffs . . . all of whom could with equal show of right go into their many home courts, the claim of any one plaintiff that a forum is appropriate merely because it is his home forum is considerably weakened.'" *Hendricks v. StarKist Co.*, Case No. 13-cv-0729 YGR, 2014 WL 1245880, at *2 (N.D. Cal. Mar. 25, 2014) (quoting *Koster v. (Am.) Lumbermens Mut. Cas., Co.*, 330 U.S. 518, 524 (1947)). In *Hendricks*, the court summarized the considerations that determine the degree of deference to which the plaintiff's choice of forum is entitled in the class action context as follows:

> [C]ourts must consider the extent of the parties' contacts with the chosen forum, including contacts relating to the plaintiff's cause of action. *Belzberg*, 834 F.2d at 739 (citing *Pac. Car & Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968)). Plaintiff's choice of forum would receive only minimal deference if the operative facts had not occurred within the forum and the forum had no interest in the parties or subject matter. *Id*. In contrast, when "there is no

---

[14] In their briefs, the parties have addressed the relative convenience of adjudicating this action in Florida as compared to California with reference to the allegations in the Consolidated Amended Complaint. After the Transfer Motions were briefed, however, the Court permitted Plaintiffs to amend the complaint to add new named Plaintiffs with ties to California. As a consequence, the relative convenience for the remaining parties of adjudicating in this District as compared to the Middle District of Florida has likely tipped somewhat in Plaintiffs' favor. Even before the Court allowed Plaintiffs to add named Plaintiffs with ties to California, however, Defendants failed to establish that a transfer to the Middle District of Florida would serve the convenience of the parties and the interest of justice, as discussed below. Thus, in its discussion of the convenience factors, the Court uses the figures provided by the parties in their briefs even though some of these numbers have likely changed slightly due to the addition of named Plaintiffs with contacts in California.

United States District Court
Northern District of California

> evidence that plaintiffs engaged in forum shopping and both plaintiffs and defendant have significant contacts with the Northern District of California, plaintiffs' choice of forum carries significant weight." *Roling v. E\*Trade Sec., LLC*, 756 F. Supp. 2d 1179, 1186 (N.D. Cal. 2010).

*Id.*, at \*3.  Here, there is no evidence that Plaintiffs have engaged in forum shopping.  Further, a significant portion of the named plaintiffs reside in California[15] and Plaintiffs assert numerous claims under California law on behalf of a California subclass. Under these circumstances, it is appropriate to afford some deference to Plaintiffs' choice of forum.[16]

Turning to the factors that courts consider to determine whether transfer is appropriate under § 1404(a), the Court finds that they weigh in favor of Plaintiffs.

### 2.  Location of Parties and Witnesses and Costs of Litigation

The parties go to great lengths to persuade the Court that more parties and witnesses are located in or near their preferred forum.  Plaintiffs focus on the concentration of named Plaintiffs in or near California (20%, they contend, as opposed to 3% of plaintiffs who live in or near the State of Florida), while Defendants assert that more employees of Defendants who have job responsibilities relating to Minor League Baseball  – and thus, who may be likely to offer testimony relevant to Plaintiffs' claims – reside or work in Florida than in California (more than 20%, according to Defendants, though Plaintiffs contend this number is inaccurate and is below 15%, as compared to 12% of employees involved with Minor League Baseball who are based in California).  Plaintiffs also highlight the fact that five of the thirty Defendant franchises are located in California, while only two are located in Florida.  On the other hand, Defendants point out that half of the franchises conduct spring training in Florida, lasting at least one month a year for those teams, whereas no Club conducts spring training in this District.

Having considered the many different measures of convenience offered by the parties, the Court concludes that, on the whole, neither of the two fora is significantly more convenient to the

---

[15] In the CAC, seven out of thirty-four named Plaintiffs resided in California.
[16] This conclusion is also consistent with cases that have held that in enacting the FLSA, Congress intended to give plaintiffs "considerable control" over the action and therefore, that the plaintiffs' choice of forum in an FLSA action is entitled to greater deference than in the case of Rule 23 class actions.  *See, e.g., Johnson v. VCG Holding Corp.*, 767 F. Supp. 2d 208, 215-16 (D. Me. 2011).

1  parties and witnesses than the other; nor will the costs of litigation likely be significantly higher in

2  either forum.  Given that many players and other relevant witnesses will likely be deposed at a

3  location that is most convenient to them (and not in California *or* Florida), that the Court has

4  scheduled trial to occur during the offseason, and that the majority of witnesses who testify at trial

5  will likely be required to travel a significant distance to do so regardless of where the trial is

6  conducted, the Court concludes that transferring the action to the Middle District of Florida will

7  simply shift the inconvenience from some parties and witnesses to others.  Therefore, this factor

8  does not favor transfer.  *See Decker Coal Co. v. Commonwealth Edison Co*., 805 F.2d 834, 843

9  (9th Cir. 1986) (denying request for transfer where "the transfer would merely shift rather than

10  eliminate the inconvenience").

### 3.  Access to Evidence

12  Defendants argue that the "access to evidence" factor favors transfer because there are

13  more parties and witnesses who can be compelled under Rule 45(c)(1) of the Federal Rules of

14  Civil Procedure to testify in Florida than there are in California.  The Court does not find this

15  argument persuasive.  First, because Plaintiffs assert violations of wage and hour laws, much of

16  the evidence on which the parties will rely is likely to be documentary evidence such as contracts,

17  policy documents and paystubs.  Second, a substantial number of parties and witnesses reside in

18  California – possibly more than are based in Florida – and therefore will be subject to compulsory

19  process under Rule 45(c)(1). Therefore, this factor does not favor transfer.

### 4.  California's Interest in the Litigation

21  Plaintiffs assert claims under both Florida law and California law, and named Plaintiffs

22  include residents of both states.  Therefore, both California and Florida have an interest in this

23  litigation.  *See Davis v. Social Service Coordinators, Inc*., Case No. 10-cv-2372 LJO, 2013 WL

24  4483067, at *10 (E.D. Cal. Aug. 19, 2013).  Plaintiffs contend the interest of California is greater

25  than Florida because there are more named Plaintiffs who reside here than in Florida, but it is not

26  clear how many opt-in plaintiffs from these states have joined – or are likely to join– in the FLSA

27  collective action.  Thus, it is difficult to determine whether the interest of California or Florida is

28  greater.  The Court concludes that this factor is neutral.

### 5.  Familiarity with Governing Law

Plaintiffs assert claims under the laws of many states, including Florida and California, but the number of claims asserted under California law vastly exceeds those of the other states (including Florida).  Further, while all federal courts are equally competent in applying federal law, the courts of this District have adjudicated numerous wage and hour claims under California law and are, thus, more familiar with the law governing such claims.  Therefore, this factor slightly favors Plaintiffs' position that the action should remain in this District.  *See Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353, 1366 (N.D. Cal. 2007).

### 6.  Relative Congestion of Courts

"The relative congestion of each proposed forum is relevant – though not as weighty as the other factors – to the Court's decision on whether to transfer, because a congested court would probably be slower to adjudicate the matter than a less busy court."  *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, Case No. 12-cv-4407 SC, 2013 WL 120185, at * 6 (N.D. Cal., Jan. 8, 2013). The statistics presented by the parties reflect that this District has a slightly shorter time to disposition in civil cases, while the Middle District of Florida has a somewhat shorter time to trial. *See* Broshius Decl., Ex. H (Fed. Court Mgmt. Statistics Archive, USCourts.gov).  Thus, as a general matter, the speed with which matters are resolved is about the same in both districts.  The Court notes, however, that if it were to transfer this action to Florida, that transfer would result in further delay in reaching the merits of Plaintiffs' claims. Therefore, this factor favors Plaintiffs.

### 7.  Balancing of Factors and Conclusion

Based on consideration of the factors discussed above, and in light of the Court's conclusion that Plaintiffs' choice of forum is entitled to some deference, the Court finds that transfer to the Middle District of Florida is not in the interest of justice and the convenience of the parties.  On that basis, the Court DENIES the Proskauer Transfer Motion as to those defendants that have not been dismissed for lack of personal jurisdiction.  As stated above, in footnote 9, as to the Proskauer PJ Defendants that were dismissed for lack of personal jurisdiction, the Proskauer Transfer Motion is DENIED as moot.  Similarly, the Baltimore Orioles Transfer Motion is DENIED as moot.

1    **V.  CONCLUSION**

2           For reasons stated above, the Proskauer Motion to Dismiss is GRANTED in part and

3    DENIED in part.  The Baltimore Orioles Motion to Dismiss is GRANTED.  The Court dismisses

4    the following Defendants without prejudice based on lack of personal jurisdiction in California:

5    the Atlanta Braves, the Chicago White Sox, the Tampa Bay Rays, the Washington Nationals, the

6    Philadelphia Phillies, the Boston Red Sox, the Baltimore Orioles and the Cleveland Indians. The

7    Transfer Motions are DENIED.

8           **IT IS SO ORDERED.**

9

10   Dated:  May 20, 2015

11

12

13

14   _____

15   JOSEPH C. SPERO
     Chief Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28