1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    AARON SENNE, et al.,                    Case No.  14-cv-00608-JCS

              Plaintiffs,
8
                                             **ORDER GRANTING MOTION FOR**
9        v.                                  **CONDITIONAL CERTIFICATION**
                                             **PURSUANT TO THE FAIR LABOR**
10   KANSAS CITY ROYALS BASEBALL             **STANDARDS ACT**
     CORP., et al.,
11                                           Re: Dkt. No. 414
              Defendants.

12

## I.    INTRODUCTION

13

14          Plaintiffs in this wage and hour case are former minor league baseball players who assert

15   claims under state law and the federal Fair Labor Standards Act ("FLSA") against the Office of

16   the Commissioner of Baseball, doing business as Major League Baseball ("MLB"), its member

17   franchises,[1] and former Commissioner Allan H. "Bud" Selig.  Presently before the Court is

18   Plaintiffs' Motion for Notice to the Class and Conditional Certification Pursuant to the Fair Labor

19   Standards Act ("the Motion").  A hearing on the Motion was held on Friday, October 2, 2015 at

20   9:30 a.m.  For the reasons stated below, the Motion is GRANTED.[2]

## II.   BACKGROUND

21

### A.    Procedural Background

22

23          This action was filed on February 7, 2014.  Docket No. 1. After Defendants filed motions

24   to dismiss for lack of personal jurisdiction and to transfer the action to Florida ("the Jurisdiction

25

26   _____

27   [1] Although Plaintiffs sued all thirty member franchises, the Court dismissed eight of the franchises
     without prejudice for lack of personal jurisdiction.  *See* Docket No. 379.  Hereinafter, the Court
     refers to the franchises that remain in this action as "the Franchise Defendants."
     [2] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge
28   pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

and Venue Motions"), the Court granted Plaintiffs' request for leave to conduct jurisdictional and venue discovery. Docket No. 144. Subsequently, the parties entered into a stipulation ("the Stipulation") agreeing to toll the statute of limitations under the FLSA applicable to all current or former similarly-situated minor leaguers from July 11, 2014 until 45 days after the Court's resolution of the Jurisdiction and Venue Motions. Docket No. 230. In return for Defendants' agreement to toll the FLSA limitations period, Plaintiffs agreed that they would not bring a motion for conditional certification under the FLSA or request the contact information for similarly-situated minor leaguers before the Court's resolution of the Jurisdiction and Venue Motions. *Id*. The Stipulation was signed and entered as an Order of the Court on October 1, 2014. Docket No. 231.

On May 20, 2015, the undersigned ruled on the Jurisdiction and Venue Motions. On June 26, 2015, Plaintiffs filed the instant motion.

### B.   The Major League Rules and the Uniform Players Contract

The Major League Rules ("MLR" or "MLB Rules") give MLB and the Major League franchises extensive control over minor league baseball, establishing rules for, *inter alia,* the "farm system" under which minor league players are selected and advance, the minor league playing schedule, and travel. *See* MLR 4 (first-year player draft), 32(b) (minor league playing schedule), 57 (travel standards). Under the MLB Rules, the Major League franchises "have the sole right to select and employ, and the sole obligation to compensate and provide benefits for, the managers, coaches, instructors and trainers" for the minor league clubs. MLR 56(g)(4). The Major League franchises also are obligated to pay the salaries and benefits of the minor league players. MLR 56(g)(5)(A).

In addition, the MLB Rules provide that "[t]o preserve morale among Minor League players and to produce the similarity of conditions necessary for keen competition," all minor league players must sign the Minor League Uniform Player Contract ("UPC"). MLR 3(b)(2); *see also* MLR 3(d) ("The player's refusal to sign a formal contract shall disqualify the player from playing with the contracting Club or entering the service of any Major or Minor League Club unless the player is released or assigned"). Under MLR 56(g)(1), the minor league players "shall

2

United States District Court
Northern District of California

be under contract exclusively to the Major League Club" and the Minor League Club "shall respect, be bound by, abide by and not interfere with all contracts between the Major League Club and the players that it has provided to the Minor League Club." [3]  MLR 56(g)(1).  No Club may enter into a contract with a minor league player that differs from the UPC without the written approval of the Commissioner.  MLR 3(b)(2).

The term of the UPC for a minor league player who has not previously entered into a contract with an MLB club is seven years.  MLR 3(b)(2).  Where the minor league player has previously entered into a contract with an MLB club, the UPC may be for a shorter period.  *Id*. Under the MLR, all first-year minor league players earn the same wages. [4]  MLR 3(c)(2).  The UPC with a first-year minor league player may include no special covenants except the ones specifically permitted under MLR 3(c)(4), which include certain bonus payments and payments under MLB's College Scholarship Plan.  MLR 3(c)(4).   After the first year, "[t]he [minor league player] and Club shall attempt annually to negotiate an applicable monthly salary rate for the next subsequent championship playing season" covered by the UPC.  MLR Attachment 3, UPC ¶ VII.A.  If they "do not reach agreement, then the Player's monthly salary rate for the next championship playing season shall be set by the Club, but shall not be less than eighty percent (80%) of the monthly salary rate" paid in the previous season.[5] *Id*.

Under the UPC, minor league players are paid only during the championship season.  In particular, the UPC states, in part, as follows:

> The monthly payments under this Minor League Uniform Player Contract will be made in two (2) semi-monthly installments on the 15th day and last day of the month after the beginning of Club's championship playing season. The obligation to make such payments to Player shall start with the beginning of Club's championship playing season or such later date as Player reports for

---

[3] The Franchise Defendants are Major League Clubs.

[4] Plaintiffs present evidence that all first-year minor leaguers earn approximately $1,100/month during the championship season.  *Id*. at 7 (citing Declaration of Bobby Pouya in Support of Plaintiffs' Motion for Notice to the Class and Conditional Certification Pursuant to the Fair Labor Standards Act ("Pouya Motion Decl."), Ex. B (2013 Miami Marlins Minor League Player Guide); Player Declarations at 3-4).

[5] Plaintiffs allege that in reality, no negotiations occur and that instead, "Defendants unilaterally determine non-first-year wages in annual, non-negotiable addenda to the UPC."  *Id*. at 7 (citing SCAC ¶ 179).

1

2

3

> championship season play. The obligation to make such payments shall end with the termination of Club's championship playing season and any official play-off series in which Club shall participate, or upon the termination of this Minor League Uniform Player Contract, whichever shall occur first.

4

MLR Attachment 3, UPC ¶ VII.B.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

Despite the fact that "salary payments are to be made only during the actual championship playing season," the UPC obligates minor league players to "perform professional services on a calendar year basis." *Id*. Specifically, minor league players agree that their "duties and obligations . . . continue in full force and effect throughout the calendar year, including Club's championship playing season, Club's training season, Club's exhibition games, Club's instructional, post-season training or winter league games, any official play-off series, any other official post-season series in which Club shall be required to participate, any other game or games in the receipts of which Player may be entitled to a share, and any remaining portions of the calendar year." *Id*., UPC ¶ VI.B. The UPC also provides that minor league players may be required to participate in exhibition games and "maintain [their] playing condition and weight during the off-season and to report for practice and conditioning at such times and places as the Club may determine." *Id*., ¶ VI.D. Conversely, the UPC prohibits minor league players from playing baseball "other than for the Club, without the written consent of the Club." *Id*., UPC ¶ XVI.A.

19

### C.   The Motion

20

21

In the Motion, Plaintiffs ask the Court to certify the following proposed Minor League Collective under the FLSA:

22

23

24

> All minor leaguer baseball players employed by MLB or any MLB franchise under the Minor League Uniform Player Contract who worked or works [sic] as minor league players at any time since February 7, 2011, but who had no service time in the major leagues at the time of performing work as a minor leaguer.

25

26

27

28

Motion at 4. Plaintiffs offer forty declarations by minor league players ("Player Declarations") which they contend show that the members of the proposed Minor League Collective have the following shared duties, responsibilities and obligations, regardless of the Major League franchise or minor league affiliate to which they are assigned:

- **Schedule during championship season:** According to Plaintiffs, the Player Declarations reflect that during the championship season, the minor league teams play games either six or seven days per week and that "[a]s a result of Defendants' unilateral control over scheduling decisions, minor leaguers enjoy a day off on average only once every 2-3 weeks." *Id.* at 8 (citing Player Declarations at 2-3).

- **Game day obligations:** Plaintiffs contend that "[o]n a typical game day, all minor leaguers share the same general responsibilities: they have to arrive at the stadium hours prior to the game, they warm up and stretch; they participate in batting practice and other pre-game work; they meet with their team and coaches before the game; they play a game that typically lasts three hours; and they shower, change, and go home - often as late as 11:00 p.m." *Id.* (citing Player Declarations at 2-3). As a result of this routine, they assert, minor league players are "systematically" required to work eight or more hours per day and more than forty hour per week. *Id.*

- **Travel:** Plaintiff asserts that all minor leaguers are "required to perform protracted travel, usually by a team bus in order to attend road games." *Id.* (citing Player Declarations at 2-3). In particular, Plaintiffs assert that about half of the "road games" that involve multiple bus rides over the course of several hours. *Id.* (citing Player Declarations at 2-3). They note that under MLR 57(a), travel itineraries must be reviewed and approved by the MLB franchises and conform to MLB's standards and procedures. *Id.*

- **Off-Season Work:** According to Plaintiffs, Defendants require the Minor League Collective to perform extensive work outside the championship season without pay during spring training, fall instructional leagues, and the winter training period. *Id.* at 9 (citing Player Declarations at 3-4; MLR Attachment 3, UPC ¶ VII.B).

Plaintiffs contend that the members of the Minor League Collective do not exercise independent judgment or discretion and that the shared duties and obligations arise from the extensive control of MLB and the MLB franchises over the Minor League Collective "through the MLR, UPC, and other collusive means." Motion at 10. They further contend that Defendants' uniform wage-and-hour policies violate the FLSA's requirements as to payment of minimum

5

wages and overtime and the maintenance of accurate time records.  *Id.* at 10-11 (citing 29 U.S.C. §§ 206, 207 & 211(c)).

Plaintiffs argue that the Player Declarations, along with the MLR and UPC, are sufficient to meet the lenient requirements for conditional certification under the FLSA, which allows employees to bring a collective action "[on] behalf . . . of themselves and other employees similarly situated."  *Id.* at 11 (quoting 29 U.S.C. § 216(b) and citing *Does v. Advanced Textile Corp.*, 214 F.3d 1058, 1064 (9th Cir. 2000); *Leuthold v. Destination America, Inc.*, 224 F.R.D. 462, 466 (N.D. Cal. 2004)).  They claim that the "similarly situated" standard is not as stringent as Rule 23(b)(3)'s requirement that common questions of law and fact predominate.  *Id.* (citing *Santiago v. Amdocs, Inc.*, No. C 10-4317 SI, 2013 WL 5444324, at *3 (N.D. Cal. Sept. 30, 2013)).  In the Ninth Circuit, Plaintiffs contend, the "similarly situated" inquiry is conducted in two stages: first, courts consider pleadings and affidavits addressing whether class members are similarly situated and should receive notice (the conditional certification stage); second, after substantial discovery has occurred, the Court can revisit the issue to decide if the case should proceed to trial as a collective action, that is, if the collective should be decertified.  *Id.* (citing *Lewis v. Wells Fargo & Co.*, 669 F. Supp. 2d 1124,1127 (N.D. Cal. 2009); *Misra v. Decision One Morg. Co*, LLC, 673 F. Supp. 2d 987, 992-93 (C.D. Cal. 2008); *Wren v. RGIS Inventory Specialists*, 2007 WL 4532218, *4-5 (N.D. Cal. Dec. 19, 2007)).

Plaintiffs assert that to establish that conditional certification is warranted, they need only point to "'substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'"  *Id.* at 12 (quoting *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001) (internal quotation and citation omitted)).  Typically, this showing is made based on pleadings and affidavits and can be met in an FLSA case by making a threshold showing that the class members' job duties are "similar in pertinent regards."  *Id.* (citing *Leuthold*, 224 F.R.D. at 468-69; *Helton v. Factor 5, Inc.*, 2012 WL 2428219, at *4 (N.D. Cal. June 26, 2012); *Kress v. PricewaterhouseCoopers, LLP*, 263 F.R.D. 623, 630 (E.D. Cal. 2009)).

According to Plaintiffs, the conditional certification inquiry does not "'include an examination of the merits of the alleged FLSA claims.'"  *Id.* (citing *Helton*, 2012 WL 2428219, at

United States District Court
Northern District of California

United States District Court
Northern District of California

*5). The determination of whether Plaintiffs are similarly situated is, however, evaluated, in light of the issues raised by the particular FLSA claim. *Id.* at 13 (citing *Kress*, 263 F.R.D. at 630). Here, they contend, the members of the proposed collective are subject to "the identical, compulsory terms of the UPC and the MLRs," leading to "FLSA allegations applicable to all members of the Collective, including:  failure to pay minimum wage for hours worked during the championship season;  failure to pay overtime wages for performing more than forty hours in a workweek; and failure to pay any wages for work performed throughout the calendar year outside of the championship season." *Id.*  According to Plaintiffs, they have shown through affidavits and documentary evidence that the Minor League Collective Members are similarly situated and subject to a "single scheme orchestrated by Defendants." *Id.*

Plaintiffs concede that the issue of damages may require individualized inquiries but contend that "the possible presence of individual inquiries related to the number of hours worked and damages allotted to class members cannot undermine the appropriateness of collective adjudication under the FLSA." *Id.* at 14 (citing *Wren*, 2007 WL 4532218, at *5).

Because Plaintiffs have demonstrated that the Minor League Collective should be conditionally certified, they assert, the Court should also order that notice be distributed to the class members and that Defendants be required to produce contact information for the class members.  *Id.* at 15 (citing *Wren*, 2007 WL 4532218, at *9; *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 172 (1989);  *Gerlach v. Wells Fargo & Co.*, No. C 05-0585 CW, 2006 WL 824652 (N.D. Cal. Apr. 11, 2007); *Benedict v. Hewlett-Packard Co.*, No. 13-CV-00119 LHK, 2014 WL 587135, at *14 (N.D. Cal. Feb. 13, 2014)).  Plaintiffs have provided a proposed notice, which they contend "has been drafted utilizing neutral language and adequately informs members of the Minor League Collective of their rights." *Id.* at 16;  Pouya Motion Decl., Ex. A.  They propose that the "notice be distributed to putative members of the Minor League Collective through individualized notice via U.S. mail, e-mail, each Defendant's official website, a case website, and at each location or facility where minor league players work."  Motion at 16.

Plaintiffs argue that for the purposes of notice, the Court should apply a three-year statute of limitations on Plaintiffs' claims, applicable in cases involving willful violations of the FLSA,

rather than the two-year of statute of limitations that applies when a violation is not willful.  *Id.* According to Plaintiffs, the two-year statute of limitations should be applied at the conditional certifications stage of the case only when it is clear, as a matter of law, that the violation was not willful.  *Id.* (citing *Wren*, 2007 WL 4532218 * 10; *Adams*, 242 F.R.D. at 542).   That is not the case here, Plaintiffs contend, where "Defendants have willfully and purposely imposed wages, hours and conditions on minor leaguers that disregard the fundamental minimum wage and overtime requirements of the FLSA."  *Id.*

Plaintiffs request that the Court approve a proposed ninety-day opt-in period, which they contend is appropriate in light of the long hours of the minor league players and the fact that they are often on the road.  *Id.* at 17.  Similarly, they propose that members receive a reminder notice thirty days before the expiration of the ninety-day period in view of the "nomadic nature of the work and the relative youth of many of the potential claimants."  *Id.*

Finally, Plaintiffs ask the Court to toll the statute of limitations on Plaintiffs' claims from the date the Motion was filed through the close of the applicable opt-in period.  *Id.* at 18. Plaintiffs contend this further tolling of the limitations period is consistent with the intent of the parties, as reflected in the previous tolling agreement between the parties (discussed above) and is also necessary to protect the rights of the members of the Minor League Collective.  *Id.* (citing *Owens v. Bethlehem Mines Corp.*, 630 F. Supp. 309, 312-13 (S.D. W. Va. 1986); *Adams*, 242 F.R.D. at 543-44).  Specifically, Plaintiffs argue that "[b]ased on the parties' tolling agreement, the statute of limitations should  . . . run from at least July 11, 2011 until the end of the 90-day notice period for those opting into the action after July 11, 2014" and that "[f]or those persons who opted in before July 11, 2014, the limitations period should at least extend to three years from the date the opt-in form was signed."  *Id.*  Plaintiffs further request that the Court "apply principles of equitable tolling to extend the tolling period to the date that the initial complaint was filed on February 7, 2014" on the basis of their belief that Defendants failed to post the required minimum wage and overtime posters in minor leaguers' workplaces.  *Id.* at 18-19 (citing *Yu G. Ke. v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 258–59 (S.D.N.Y. 2008)).  Plaintiffs concede that discovery is necessary to substantiate this belief but argue that for the purposes of notice, the limitations period

United States District Court
Northern District of California

should be extended based on the possibility that equitable tolling may be justified.  *Id*. at 19 (citing *Ayala v. Tito Contractors, Inc*., 2015 WL 968113, at *6-9 (D.D.C. Mar. 4, 2015)).

In their Opposition brief, Defendants argue that the Minor League Collective proposed by Plaintiffs should not be certified because there is nothing in the MLB Rules or the UPC that renders Plaintiffs similarly situated.  Opposition at 1.  More importantly, they argue, the MLB Rules and UPC are only "overarching guidelines";  the actual determinations as to how much work Plaintiffs do and where and how they are compensated are made by the individual Clubs and by the various supervisors for those clubs.  Opposition at 2-3.  According to Defendants, this means that the collective proposed by Plaintiffs "would include minor league players who have played for various combinations of 180 minor league teams, each of which is affiliated with one of 30 different Major League Clubs . . . during the 2011, 2012, 2013, 2014 and/or 2015 seasons."  *Id*. at 2.  In order to "put that number into perspective," Defendants offer evidence that "each year there are approximately 200 individuals on an active minor league baseball roster for each of the 30 Clubs," that "each of the 30 Clubs is its own distinct, separately owned corporate entity," that "each Club is affiliated with between six and seven U.S.-based minor league affiliates," that the compensation, skill-level and location of these affiliates varies, and that  players  in the collective "will have each been supervised by a combination of the numerous managers, coaches, instructors and trainers."   *Id*. at 3 (citing Declaration of Peter Woodfork in Support of Defendants' Opposition to Plaintiffs' Motion for Notice to the Class and Conditional Certification Pursuant to the Fair Labor Standards Act ("MLB Decl.") at ¶ 4; Declaration of Elise Bloom in Support of Defendants' Opposition to Plaintiffs' Motion for Notice to the Class and Conditional Certification Pursuant to the Fair Labor Standards Act ("Bloom Decl.") at ¶ 5; Declarations of Scott Sharp ("Royals Decl."), Ian Levin ("Mets Decl."), Brian Chattin ("Marlins Decl."), Tom Flanagan ("Brewers Decl."), Zach Wilson ("Rockies Decl.") (collectively, "Club Decl.") at ¶ 2; MLB Decl., Ex. A).

Defendants also offer evidence that the practices of the Clubs and affiliates vary in numerous respects with respect to the hours and compensation of minor league players:

- **Determination of non-first year player salaries:** While Defendants do not dispute that

9

MLB Rules and the UPC set the salary for first-year players, they point out that under MLR 3(c)(2)(B) and UPC ¶ VII, only baselines are created for players' compensation. *Id.* at 3. Defendants contend it is the individual Clubs that determine the salaries of non-first year players and that the Clubs have discretion to determine salaries "based on the factors *they chose.*" *Id.* (emphasis in original) (citing MLB Decl. ¶ 8). Defendants also offer declarations to show that the practices of the Clubs in setting salary levels for non-first year players do, in fact, vary. *Id.* (citing Club Decl. ¶ 7). For example, "[s]ome clubs, such as the Marlins, provide their players with an additional $100 per month in salary if they are awarded an organizational pitcher or player of the month award during the prior season; the Royals have a similar practice, although they may provide the bonus in the form of a cash or gift card; the Mets award salary increases to minor league players for those who won an MVP award and/or led their leagues in certain statistical categories the prior season; other Clubs have no such practice." *Id.* (citing MLR 3(b)(2); Club Decl. at ¶ 7).

- **Determination of free agent salaries:** Defendants contend "the first-year salary or subsequent salary scales established by each Club are inapplicable to free agent players signed to non-first year minor league UPCs." *Id.* According to Defendants, "[t]hose negotiations are completely individualized between the Club and the free agent player based on that player's skill level." *Id.* (citing Club Decl. ¶ 8). Defendants present evidence that from 2011 to the present, 30 MLB Clubs executed a total of 5,820 UPCs with 2,960 different minor league free agents. *Id.* at 3-4 (citing MLB Decl. ¶ 5).

- **Practices relating to player bonuses:** Defendants contend the Clubs "individually negotiate bonuses and/or incentive payments (e.g., signing bonuses, incentive bonuses, College Scholarship Plan payments, etc.) with players, and thus, the additional bonuses/payments can vary widely." *Id.* at 4 (citing MLR 3(c)(4)(B)-(D); MLB Decl. ¶ 9; Club Decl. ¶ 9). Defendants point to evidence that one name Plaintiff, Joseph Newby, received a signing bonus of $500 while another, Jonathan Gaston, received a signing bonus of $150,000. *Id.* (citing Bloom Decl. ¶¶ 6-8). Defendants also offer evidence that

10

members of the putative class have received even higher signing bonuses, receiving bonuses as high as $6,500,000 in the 2015 Rule 4 Draft. *Id.* (citing Bloom Decl., Ex. E). Defendants further cite evidence that other bonuses and incentives received by the name Plaintiffs were individually negotiated, including evidence that "at least 24 out of 42 Plaintiffs negotiated for the receipt of incentive bonus plan payments in their UPCs" and "at least 20 out of 42 Plaintiffs had provisions in their UPCs where the Clubs agreed to reimburse them for tuition, room, board, books and fees in connection with their attendance in pursuit of an undergraduate degree at an accredited university as part of the College Scholarship Plan." *Id.* (citing Bloom Decl. ¶¶ 9-10).

- **Players' schedules and travel itineraries:** Defendants assert that MLB does not dictate the daily schedules or travel itineraries of the minor league players. *Id.* (citing MLB Decl. ¶ 7). Defendants argue that schedules and travel policies for the minor league players depend on the "various policies or practices that were implemented either by each Club, or by the managers and coaches at each affiliate." *Id.* (citing Club Decl. ¶¶ 5-6). Defendants reject Plaintiffs' reliance on MLR 32 for the assertion that "MLB Rules dictate the minor league playing schedule," *id.* (citing Motion at 5), arguing that MLR 32 "only sets forth parameters (such as the total number of games per season, as well as opening and closing dates) so that the Minor Leagues may establish the actual game schedules governing players." *Id.* Defendants assert that the player declarations offered by Plaintiffs also support Defendants' position that there is a great deal of variation as to when players must report; these variations are not due to the MLB Rules or policies, they contend, but rather, to factors such as whether a game is at home or on the road, day or night, or during spring training or the championship season. *Id.* at 5. According to Defendants, reporting time also varies "on a player-by-player basis, depending on the player's position (i.e., pitchers, non-pitchers, etc.), injury (i.e., whether the individual player is rehabilitating an injury or needs additional treatment prior to the game), or placement in the game (whether the team is planning to start the player on the particular day)." *Id.* (citing Royals Decl. ¶ 5; Mets Decl. ¶ 5). Defendants further assert that "MLR 57 only provides travel guidelines,

11

United States District Court
Northern District of California

including general policies regarding limits on distances that players travel each year." *Id*.

- **Training activities outside championship season:** Defendants argue that the minor league players' training activities during the off-season also vary widely depending on "player-specific variables." *Id*.   According to Defendants, these variables include "a player's skill level, experience and/or health status (as well as the Club's individual practices)." *Id*. (citing Player Decl. generally; Royals Decl. ¶¶ 12-13; Rockies Decl. ¶ 14). Defendants cite evidence that some players are not required to attend spring training, and that for those who do attend, the schedule varies from Club to Club and player-by-player. *Id.* at 5-6 (citing Hutson Decl. ¶ 19; Mets Decl. ¶ 12;  Royals Decl. ¶ 12).  They also assert that "players choose to perform offseason conditioning at the location of their choice, and for any number of hours (ranging drastically based on the discretion of each player)." *Id.* at 6 (citing Player Decl.;  Club Decl. ¶ 10;  Royals Decl. ¶ 10; and comparing Lawson Decl. ¶ 20 with Aguilar Decl. ¶ 18).  Defendants contend putative collective members also had "widely varying experiences regarding the contact they received from Clubs during the offseason," citing evidence that "some players completed progress reports via websites, some submitted 'workout' cards, and others did not report their progress at all." *Id*. (citing Nicholson Decl. ¶ 19, Pease Decl. ¶ 18; Ortiz Decl. ¶¶ 17-18; Club Decl. ¶ 10).  According to Defendants, "the degree to which the Clubs (through their coaches) even 'checked-in' with players - if at all - during the offseason regarding their conditioning varied dramatically by player, depending on, among other things, the player's injury status and skill level." *Id*. (citing Brewers Decl. ¶ 10; Royals Decl. ¶ 10).

In light of the facts discussed above, Defendants argue that Plaintiffs have not demonstrated that they are "similarly situated" to the collective.  *Id*.  According to Defendants, to meet their burden Plaintiffs must show that they and the putative class were "subject to a *single decision, policy or plan that violated the law*" and - to the extent they seek to certify a nationwide collective - that the policy was nationwide. *Id*. at 6-7 (quoting *Banks v. Robinson*, No. 2:11-CV-00441-RLH-PAL, 2011 WL 3274049, at *5 (D. Nev. July 28, 2011) (emphasis added in Defendants' brief); citing *Castle v. Wells Fargo Fin., Inc*., No. C 06-4347 SI, 2008 WL 495705, at

*2 (N.D. Cal. Feb. 20, 2008); *Sheffield v. Orius Corp*., 211 F.R.D. 411, 413 (D. Or. 2002)). Defendants argue that Plaintiffs have not met this burden because that have not identified any uniform common policy that was *facially* unlawful and they also have not demonstrated that any policies were unlawfully *applied* in a uniform manner.  *Id*. at 7.

Defendants argue that the only common policy identified by Plaintiffs is the requirement under MLB Rules that all minor league players sign a UPC.  *Id.*  But the determination of the salary is by the Club and the player, Defendants assert, and there is "nothing unlawful, *per se*, about a contract paying players for time spent playing baseball," given that "[t]he UPCs apply to individuals who are not necessarily FLSA 'employees'; who participated in varying activities, not all (or any) of which are compensable under the FLSA; who were not necessarily deprived minimum wage or overtime; and who may be exempt from the FLSA."  *Id.*  In contrast, Defendants contend, in the *Wren* and *Helton* cases cited by Plaintiffs, motions for conditional certification were granted where the "defendants had maintained *facially unlawful* practices and policies."  *Id.* at 7 n. 26 (emphasis in original).  Defendants argue that the MLB Rules do not establish sufficient similarity for conditional certification because they are merely "overarching parameters" that "enable *each Club to create its own policies* governing training, reporting times, schedules, and players' responsibilities, etc., (and, at times, each Club can, and does, establish different policies for different players)."  *Id.* at 8 (emphasis in original).  Because there is no common or national policy applicable to Plaintiffs' claims, Defendants assert, collective treatment is inappropriate.  *Id.* (citing *Velasquez v. HSBC Fin. Corp.*, 266 F.R.D. 424, 426 (N.D. Cal. 2010); *Sheffield*, 211 F.R.D. at 413).

Defendants argue that in the absence of any facially unlawful uniform policy, Plaintiffs must show that Defendants applied policies unlawfully "in a way that is 'sufficiently uniform and pervasive to warrant [collective] treatment.'"  *Id.* at 9 (quoting *In re Wells Fargo Loan Processor Overtime Pay Litig.*, No. C 07-01841 MHP, 2008 WL 2397424, at *8 (N.D. Cal. June 10, 2008)).  Defendants point to cases in which conditional certification was denied because, they assert, the application of the defendants' policies required "too many diverse analyses."  *Id.* (citing *Till v. Saks Inc.*, No. C 11-00504 SBA, 2013 WL 5755671, at *9 (N.D. Cal. Sept. 30, 2013); *Sheffield*,

211 F.R.D. at 416-17; *West v. Border Foods, Inc.*, No. 05-2525 (DWF/RLE), 2006 WL 1892527, at *8 (D. Minn. July 10, 2006); *Brooks v. BellSouth Telecomms., Inc.*, 164 F.R.D. 561, 569 (N.D. Ala. 1995)).  Defendants argue that in this case the facts are even more compelling, where the putative collective worked for 180 affiliates of 30 different clubs in 44 different states with more than 700 different supervisors.  *Id*. at 9-10.  Defendants point to a series of questions that they contend would require individualized inquiries.

First, Defendants argue, Plaintiffs' claims will require individualized inquiries as to the threshold question of whether the putative collective members are "employees" under the FLSA. *Id*. at 10-11.  According to Defendants, this inquiry is governed by the "primary beneficiary" test, which in turn requires the court to weigh and balance eight factors to determine which party benefits from the relationship.  *Id.* (citing *Walling v. Portland Terminal Co*., 330 U.S. 148 (1947); *Tenn. Coal Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944)).  In applying this test, courts must consider the "individual aspects of the [individual's] experience," Defendants argue, which makes class treatment inappropriate.  *Id.* at 11 (citing *Glatt v. Fox Searchlight Pictures, Inc*., 791 F.3d 376 (2d Cir. 2015)).  Defendants further assert that there would be individualized inquiries as to whether the players' non-championship season training activities were "'integral,' 'indispensable,' and  . . . 'controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer.'"  *Id*. at 11-12 (citing *Bamonte v. City of Mesa*, 598 F.3d 1217, 1220 (9th Cir.  2010)).

Second, Defendants argue that Plaintiffs' "claims regarding alleged offseason training are quintessential 'off the clock' claims, which are especially unsuitable for collective treatment" because they require too many individualized determinations as to hours actually worked and awareness of supervisors.  *Id*. at 12 (citing *Castle*, 2008 WL 495705, at *5).  This problem is particularly acute here, Defendants contend, "because Plaintiffs' offseason conditioning occurred on the players' terms, and the activities varied extensively by position and by player."  *Id*. (citing Nicholson Decl. ¶ 19; Ortiz Decl. ¶¶ 17-18).  Further, it was the players themselves who determined how much work they performed during the offseason, Defendants contend, and therefore, the Court "cannot possibly assess the viability of these claims on a collective basis."  *Id*.

United States District Court
Northern District of California

at 13 (citing *Williams v. Securitas Sec. Servs. USA, Inc*., No. CIV.A. 10-7181, 2011 WL 3629023, at *6 (E.D. Pa. Aug. 17, 2011)).  Defendants note that while Plaintiffs "have not produced a single document reflecting their other activities during the offseason," publicly available information indicates that some plaintiffs, such as Lauren Gagnier, were payed for playing baseball during the offseason.  *Id*. at 13 (citing Bloom Decl., Ex. F).

Third, Defendants argue that players' other activities outside the championship season, including participation in minicamps, instructional leagues, extended spring training, and/or rehabilitation training, were also "individualized and player-specific" because these activities varied by affiliate and the types of training activities in which players were invited to participate depended on individualized factors such as the player's position and skill level.  *Id*. at 14. Defendants point to the Player Declarations offered by Plaintiffs, which they contend show that:

- 3 out of 42 (7%) Plaintiffs took the opportunity to receive extra training during "minicamps" in the offseason.

- 23 out of 42 (55%) Plaintiffs attended "instructional leagues" at least once.

- 16 out of 42 (38%) Plaintiffs were never required to attend extended spring training.

- Of those 26 out of 42 (62%) Plaintiffs who did attend extended spring training, some were paid for that time, while others were not (despite Plaintiffs' claims that they were not paid outside of the Championship Season). . . Because at least two Clubs compensated players for time spent at extended spring training, at an absolute minimum, 500 members of the putative collective (approximately 100 per year, over the course of five years) may have, in fact, received compensation during this period.

- 5 out of 42 (12%) Plaintiffs alleged to have "rehabbed" during at least one training season (e.g., extended spring training), by receiving treatment for an injury or injuries.

*Id*.  Defendants further point out that "[m]any players attended varying combinations of trainings each year," while "[s]ome attended none."  *Id*. (citing Kiel Decl.; Nadeau Decl.; Britt Decl.; Gagnier Decl.).

Fourth, Defendants argue that the question of liability on the minimum wage and overtime claims also involves individualized inquiries because "liability depends on a computation of dollars earned per hours worked, both of which vary by player [and] by year."  *Id*. at 14 (citing

United States District Court
Northern District of California

1    *Brewer v. Gen. Nutrition Corp.*, No. 11-CV-3587 YGR, 2014 WL 5877695, at *15 (N.D. Cal.

2    Nov. 12, 2014); *Hinojos v. Home Depot, Inc.*, No. 2:06-CV-00108, 2006 WL 3712944, at *2 (D.

3    Nev. Dec. 1, 2006)). Here, certification is not appropriate, Defendants argue, because Plaintiffs'

4    allegations as to hours worked and compensation received vary dramatically, both as between

5    players and from year to year. *Id.* at 15-17. Similarly, Plaintiffs' allegations as to how much time

6    they devoted to travel varies widely, also making conditional certification inappropriate, according

7    to Defendants. *Id.* at 16- 17 (citing *Hilley v. Tacala, L.L.C.*, No. 2:12-CV-2691-SLB, 2014 WL

8    1246364, at *18 (N.D. Ala. Mar. 24, 2014); *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 688 (D.

9    Md. 2010)).

10         Finally, Defendants argue that there are likely to be individualized inquiries required to

11   determine whether the FLSA's seasonal amusement or recreational establishment exemption

12   applies to the "'distinct physical place[s] of business' where minor league players play baseball."

13   *Id.* (citing 29 C.F.R. § 779.23; *Chen v. Major League Baseball Props.*, No. 14-1315-CV, 2015

14   U.S. App. LEXIS 14275, at *15 (2d Cir. Aug. 14, 2015)).

15         Defendants reject Plaintiffs' assertion that the statute of limitations should be tolled for

16   putative class members for the purposes of giving notice to putative class members. *Id.* at 18-21.

17   In the first place, tolling is not warranted because the class should not be conditionally certified,

18   Defendants contend, and therefore no notice is required. *Id.* at 18. Even if the Court orders

19   notice, Defendants assert, tolling is not appropriate because Congress "made a conscious decision

20   not to permit tolling when it required that the statute of limitations continue to run on an

21   individual's claim until a written consent form is filed." *Id.* at 18-19 (citing 29 U.S.C. § 216(b);

22   *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1106 (11th Cir. 1996)). Further, Plaintiffs bear a heavy

23   burden to establish that equitable tolling is warranted and they have not met that burden,

24   Defendants contend. *Id.* at 18. According to Defendants, Plaintiffs "fail to identify any

25   wrongful conduct on the part of Defendants (or Defendants' counsel) and do not even allege that

26   any extraordinary circumstances justify equitable tolling." *Id.* Plaintiffs' reliance on *Adams v.*

27   *Inter-Con Security Systems., Inc.*, 242 F.R.D. 530, 543 (N.D. Cal. 2007) in support of equitable

28   tolling is misplaced, Defendants assert, because in that case the court tolled the statute of

1  limitations on the basis of the defendants' refusal to comply with the plaintiffs' request for contact

2  information for the putative collective. *Id.*  Because there has been no such request here,

3  Defendants assert, "Defendants' failure to provide that information could not have delayed

4  Plaintiffs' pursuit of their legal rights." *Id.*

5        To the extent that Plaintiffs rely on the parties' previous tolling agreement, Defendants

6  contend courts in this district have routinely denied similar requests where the parties had

7  previously entered into a tolling agreement.  *Id.* at 20 (citing *Woods v. Vector Mktg. Corp.*, No. C-

8  14-0264 EMC, 2015 U.S. Dist. LEXIS 32370, at *20-21 (N.D. Cal. Mar. 16, 2015); *Shaia v.*

9  *Harvest Mgmt. Sub LLC*, No. C 14-4495 PJH, 2015 U.S. Dist. LEXIS 49808, at *12-15 (N.D. Cal.

10  Apr. 15, 2015)).  Defendants also argue that "Plaintiffs' speculative belief that some or all

11  Defendants did not post wage and hour posters is insufficient to justify [equitable tolling]." *Id.*

12  (citing *Campanelli v. Hershey Co.*, No. C 08-1862 BZ, 2010 U.S. Dist. LEXIS 92364, at *18

13  (N.D. Cal. Aug. 13, 2010)).[6]

14        Defendants also ask the Court to reject Plaintiffs' proposed notice on the basis that "it: (i)

15  sets an unreasonably long opt-in period (90 days); (ii) includes the Court's name, creating the

16  impression of judicial sponsorship of this litigation; and (iii) misleads potential class members by

17  failing to notify them that they may seek further information about the case from Defendants." *Id.*

18  at 21. In addition, Defendants contend the proposed notice is overbroad.  *Id.*  In particular,

19  "Plaintiffs' proposed notice cannot include players who played exclusively for dismissed Clubs,

20  because each of those players' claims depends entirely on each of their alleged joint employment

21  relationships with MLB, which must be conducted on a player-by-player basis, and accordingly

22  cannot be treated collectively." *Id.*  Further, "because FLSA opt-in forms do not relate back to a

23  complaint and tolling is inappropriate, [Defendants contend that] the Court should restrict any

24  collective time period in any FLSA Class Notice to commence no more than two years back from

25  the Court's Order on this Motion, and to end thirty days after notice is mailed." *Id.*  Defendants

26

27  _____

28  [6] While Defendants argue that they have not engaged in any conduct that warrants equitable tolling, they recognize that in light of "this Court's decision in *Wren*, . . . notice will likely be distributed based on a three-year limitations period."

United States District Court
Northern District of California

1  have submitted a proposed revised notice that addresses these issues.  *See* Bloom Decl., Exs. C-D.

2          Next, Defendants argue that the six methods of giving notice proposed by Plaintiffs are

3  overbroad and unnecessary.  Opposition at 22. According to Defendants, notice by first-class mail

4  is adequate and therefore Defendants should not be required to post the notice: (i) at each location

5  or facility where minor league players work; (ii) on their websites; or (iii) on a case website.  *Id*. at

6  22-23.  Nor should Plaintiffs be permitted to give notice via email, Defendants assert "due to the

7  high risk that the notification will be distorted through modification of the notice itself or the

8  addition of commentary to the e-mail."  *Id*. at 23 (citing *Reab v. Elec. Arts, Inc*., 214 F.R.D. 623,

9  630-31 (D. Colo. 2002)); *McKeen-Chaplin v. Provident Sav. Bank, FSB*, No. 2:12-CV-03035-

10  GEB-JFM, 2013 WL 4056285, at *8 (E.D. Cal. Aug. 12, 2013)).  Plaintiffs' proposal that

11  reminder notices be sent thirty days before the end of the class period also should be rejected,

12  Defendants assert, both because Plaintiffs have not provided a draft notice and because reminder

13  notices will be unnecessary if the Court adopts a shorter opt-in period, as Defendants argue it

14  should.  *Id*. at 22 (citing *Villarreal v. Caremark LLC*, 66 F. Supp. 3d 1184, 1196 (D. Ariz. 2014);

15  *Cardoza v. Bloomin' Brands Inc*., No. 13-cv-1820-JAD-NJK, 2014 WL 5454178, at *5 (D. Nev.

16  Oct. 24, 2014)).

17          Regardless of the manner of notice, Defendants argue that they should not be required to

18  provide Plaintiffs' counsel with the contact information for putative class members.  *Id*. at 23.

19  First, they assert, Plaintiffs have not established that they are similarly situated.  *Id*. (citing

20  *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).  Second, to prevent "unwarranted

21  intrusions" into the privacy of the putative class members, Defendants argue that "a claims

22  administrator should be used to facilitate notice and any list of address[es] should be provided

23  only to the claims administrator."  *Id*. at 24 (citing *Wren*, 2007 WL 4532218, at *9).  Defendants

24  further assert that Plaintiffs' counsel should bear all of the costs associated with the notice process.

25  *Id*.

26          In their Reply brief, Plaintiffs contend Defendants have incorrectly applied a heightened

27  standard to conditional certification, taking the position that Plaintiffs are required to prove the

28  merits of their claims, that is, that all putative collective members were subject to a single

18

decision, policy or plan that violated the law, and to weigh competing evidence.  Reply at 1.
According to Plaintiffs, they need not demonstrate that the policy at issue violated the law, and the
cases cited by Defendants in support of that assertion - *Banks*, *Castle*, and *Sheffield* - do not
support their position.  *Id*. at 2-3.  Plaintiffs also are not required to *prove* their claims at the
conditional certification stage, they assert, or to demonstrate that the policy at issue was *per se* or
facially unlawful.  *Id*. at 3.

Plaintiffs argue that the "six carefully crafted and hand-picked declarations" offered by
Defendants should not be considered as they are "untested" at this early stage of the case, when
little discovery has occurred.  *Id*. at 3-4.  According to Plaintiffs, courts generally do not consider
declarations offered to defeat conditional certification where, as here, Plaintiffs' allegations and
declarations meet the lenient requirements for conditional certification.  *Id*. at 4 (citing *Lewis v.
Wells Fargo & Co*., 669 F.Supp.2d 1124, 1127 (N.D. Cal. 2009);  *Escobar v. Whiteside Const.
Corp*., No. C 08-01120 WHA, 2008 WL 3915715 *4 (N.D. Cal. Aug. 21, 2008*); *Leuthold v.
Destination America, Inc*., 224 F.R.D. 462, 468 (N.D. Cal. 2004)).  Here, the policies identified in
the MLR and UPC, along with the Player Declarations, are sufficient to show that Plaintiffs are
"similarly situated," Plaintiffs assert, and Defendants' assertion that these policies are merely
"guidelines" is contradicted by "the express language of these compulsory agreements hold[ing]
otherwise."  *Id*. at 4-5.

Plaintiffs also argue that even if Defendants' assertions regarding differences in hours,
wages and work by putative collective members are accepted as true, these do not defeat
Plaintiffs' request for conditional certification because they need only demonstrate that they are
"similarly situated" and not that all class members' claims are identical.  *Id*. at 6 (citing *Wren*,
2007 WL 4532218, at *5; *Benedict*, 2014 WL 587135, at *10). Further, Plaintiffs reject
Defendants' argument that some of the differences go to liability rather than damages, arguing that
they have presented evidence and allegations that: 1)  all class members worked overtime without
receiving overtime pay; and 2) all class members worked outside the championship season without
receiving pay.  *Id*. at 8.  Plaintiffs also reject Defendants' reliance on evidence that signing and
other types of bonuses received by minor league players vary widely in support of their position

that the collective should not be certified. *Id*. at 8-9. According to Plaintiffs, some of these bonuses likely are not considered wages under the FLSA and therefore have no bearing on the question of conditional certification; other bonuses that might be considered wages would simply mean that damages for lost overtime pay would be higher and not that the class should not be conditionally certified. *Id*. at 9.

Plaintiffs argue that Defendants' assertion that minor league players are not "employees" and do not perform "work" under the FLSA has no merit under the test used to determine whether an employment relationship exists, which is evaluated in the Ninth Circuit under the factors identified in *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983). *Id*. at 10 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979); *Hale v. State of Ariz.*, 967 F.2d 1356, 1364 (9th Cir. 1992)). Under *Bonnette*, courts "focus on whether the proposed employer: '(1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Id*. (quoting *Hale*, 967 F.2d at 1364). According to Plaintiffs, "[t]here can be no dispute that these factors are satisfied in this case." *Id*. Further, they assert, Defendants' reliance on the "primary beneficiary test" applied in *Glatt v. Fox Searchlight Pictures, Inc.*, 791 F.3d 376 (2d Cir. 2015) is misplaced because that case involved the "narrow question of whether 'an unpaid intern [is] entitled to compensation as an employee under the FLSA.'" *Id*. at 10-11 (quoting *Glatt*, 791 F.3d at 382)).

Plaintiffs also reject Defendants' assertion that conditional certification should be denied because the possibility that the amusement exception may apply will require individualized inquiries. *Id*. at 11. First, Plaintiffs argue, whether this exception applies is a question that is more appropriately addressed at a later stage of the case, when the record has been fully developed. *Id*. (citing *Shaia*, 306 F.R.D. at 272; *Alvarez Perez v. Sanford–Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1156 (11th Cir. 2008)). Second, even when the Court reaches this question, it will not do so on a particularized level, player-by-player, but rather, will resolve the issue for large classes of workers. *Id*. at 11-12.

1    On the question of tolling, Plaintiffs reiterate their arguments that it is equitable to toll the

2    limitations period and also consistent with the parties' intent in the previous tolling agreement.

3    *Id*. at 12-13.  Plaintiffs argue that it is disingenuous of Defendants to argue against tolling on the

4    basis that Plaintiffs have not yet requested contact information given that Plaintiffs expressly

5    agreed in the previous tolling agreement that they would not request such information until after

6    the Court decided the Jurisdiction and Venue motions.  *Id*. at 13.  Plaintiffs further assert that

7    Defendants' failure to offer any evidence in response to the Motion showing that they have, in

8    fact, posted mandatory minimum wage and overtime posters "speaks volumes and supports tolling

9    the statute of limitations until [] February 7, 2011, three years prior to the filing of Plaintiffs'

10   lawsuit."  *Id*.

11   With respect to the proposed notice plan, Plaintiffs argue that it is appropriate to use

12   multiple methods to give notice and that "this Court and others have ordered FLSA notice utilizing

13   multiple means including direct mail, e-mail, postings on the defendant's website, and posting in a

14   conspicuous place in defendant's offices."  *Id*. (citing *Otey v. CrowdFlower, Inc*., No. 12-cv-

15   05524 JST, 2013 WL 4552493, at *3 (N.D. Cal. Aug. 27, 2013); *Butler v. DirectSAT USA, LLC*,

16   876 F.Supp.2d 560, 575 (D. Mar. 2012); *Wren*, 2007 WL 4532218 at *9)).  Plaintiffs further assert

17   that both the 90-day opt-in period and the 30-day reminder notice are appropriate.  *Id*. at 14-15.

18   Finally, Plaintiffs argued that the language of their original proposed notice was not

19   overbroad but noted the parties were in the process of meeting and conferring in an effort to

20   resolve some of their disputes.

21   Plaintiffs filed an alternative proposed notice on October 1, 2015.  *See* Docket No. 433.

22   **III.    ANALYSIS**

23   **A.    Legal Standard**

24   Under the FLSA, employers are required to pay covered employees overtime

25   compensation of one and one-half times the regular rate of pay for all hours worked in excess of

26   forty hours per week, unless an exemption applies. 29 U.S.C. § 207(a)(1).  The FLSA authorizes

27   an employee to bring an individual action for violations or a collective action on behalf of the

28   employee and other "similarly situated" employees.  29 U.S.C. § 216(b).  Where employees bring

United States District Court
Northern District of California

21

a collective action under the FLSA, potential members of a collective action must "opt-in" to the suit by filing a written consent with the Court in order to benefit from and be bound by a judgment. *Id.*

The determination of whether a collective action under the FLSA is appropriate is within the Court's discretion. *Benedict v. Hewlett-Packard Co.*, No. 13-CV-00119-LHK, 2014 WL 587135, at *4-6 (N.D. Cal. Feb. 13, 2014) (citing *Adams v. Inter–Con Security Sys., Inc.*, 242 F.R.D. 530, 535 (N.D.Cal. Apr. 11, 2007)). It is the plaintiff's burden to show that he and the proposed class members are "similarly situated." *Id.*; 29 U.S.C. § 216(b). The FLSA does not define "similarly situated" and neither the Supreme Court nor the Ninth Circuit has interpreted the term. *Kress v. Pricewaterhouse Coopers, LLP*, 263 F.R.D. 623, 627-628 (E.D. Cal. 2009). In this Circuit, district courts generally apply a two-step inquiry. *Benedict*, 2014 WL 587135, at *5 (citing *Leuthold*, 224 F.R.D. at 466-67; *Adams*, 242 F.R.D. at 536). Under the first step of the inquiry, "the court makes an initial 'notice-stage' determination of whether potential opt-in plaintiffs are similarly situated to the representative plaintiffs, determining whether a collective action should be certified for the sole purpose of sending notice of the action to potential class members." *Id.* The second step occurs later, after discovery is complete, when the party opposing certification may move to decertify the class. *Id.* at *6.

At the first stage, when courts decide whether to conditionally certify the class, the burden is "not heavy" and requires only that plaintiffs show a "reasonable basis for their claim of class-wide" conduct. *Morton v. Valley Farm Transport, Inc.*, No. C-06-2933 SI, 2007 WL 1113999, at *2 (N.D.Cal. Apr. 13, 2007). To meet this burden, "courts require little more than substantial allegations, supported by declarations or discovery, that 'the putative class members were together the victims of a single decision, policy, or plan.'" *Benedict*, 2014 WL 587135, at *5. "All that need be shown is that 'some identifiable factual or legal nexus binds together the various claims of the class members in a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA.'" *Id.* (quoting *Russell v. Wells Fargo & Co.*, No. 07-CV-3993CW, 2008 WL 4104212, at *3 (N.D. Cal. Sept. 3, 2008)). The standard is lenient at this stage of the inquiry and typically results in certification. *Kress v.*

United States District Court
Northern District of California

*Pricewaterhouse Coopers, LLP*, 263 F.R.D. at 627-28 (citation omitted).   Courts have explained that this lenient standard is appropriate because there is not a great deal of evidence available to the court at this stage of the proceedings and moreover, the defendant will have the opportunity to revisit the question of whether collective resolution is proper at the close of discovery.  *Benedict*, 2014 WL 587135, at *5-6 (citing *Kress*, 263 F.R.D. at 630; *Vasquez v. Coast Valley Roofing, Inc*., 670 F. Supp. 2d 1114, 1123 (E.D. Cal. 2009);  *Labrie v. UPS Supply Chain Solutions, Inc*., No. C 08-3182 PJH, 2009 WL 723599, at *4 (N.D. Cal. Mar. 18, 2009)).

In light of the fact that conditional certification occurs before significant discovery has occurred, courts "bear in mind the following:  (1) A plaintiff need not submit a large number of declarations or affidavits to make the requisite factual showing that class members exist who are similarly situated to him . . . [and] (2) The 'fact that a defendant submits competing declarations will not as a general rule preclude conditional certification.'" *Benedict*, 2014 WL 587135, at *6 (*Gilbert v. Citigroup, Inc*., No. 08–0385 SC, 2009 WL 424320, at *2 (N.D. Cal. Feb. 18, 2009); *Escobar*, 2008 WL 3915715, at *3-4; *Leuthold*, 224 F.R.D. at 468–69; *Harris v. Vector Mktg. Corp*., 716 F. Supp. 2d 835, 838 (N.D. Cal. 2010)).

At the second step of the two-step inquiry, when discovery is complete, "the Court makes a factual determination about whether the plaintiffs are actually similarly situated by weighing such factors as: '(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations.'" *Id*. (quoting *Leuthold*, 224 F.R.D. at 467).  While this standard is more stringent than at the conditional certification stage, it "is different, and easier to satisfy, than the requirements for a class action certified under Federal Rule of Civil Procedure 23(b)(3)." *Id*. (citing *Lewis v. Wells Fargo & Co*., 669 F.Supp.2d 1124, 1127 (N.D. Cal. 2009)).

**B.**     **Whether the Minor League Collective Should be Conditionally Certified**

Plaintiffs contend they are "similarly situated" under the FLSA because, under MLB Rules and the UPC, all of them are required to work without compensation during the off-season, play six to seven games a week and engage in protracted travel during the championship season

1   without receiving overtime, and adhere to the same grueling daily schedule on game days without

2   receiving minimum wages.  They further assert that putative collective members are subject to a

3   uniform policy as to their salary levels, not only during the first year, but also in subsequent years.

4   Plaintiffs offer Player Declarations to show that they are similarly situated, along with the MLB

5   Rules and UPC.  The Court finds that under the lenient standard that applies to conditional

6   certification, Plaintiffs have met their burden.

### 1.   Failure to Pay Wages for Off-Season Work

8          The strongest evidence that Plaintiffs are similarly situated is found in the uniform policy

9   under MLR 3 and the UPC that the obligations of minor league players continue throughout the

10   calendar year even though they receive a salary only during the championship season.  *See* MLR

11   Attachment 3, UPC ¶ VII.B. All of the Player Declarations submitted by Plaintiffs state that the

12   players performed work during the off-season that was required but was not compensated, which

13   included performing required winter conditioning and spring training.  *See* Players Declarations at

14   2-3.   Based on the Player Declarations and the UPC, the Court finds that Plaintiffs have

15   demonstrated a sufficient nexus binding the claims of the class members that Defendants failed to

16   pay them for work during the off-season to warrant conditional certification.

17          The Court rejects Defendants' assertion that conditional certification should not be granted

18   because the nature and quantity of the work performed by Plaintiffs during the off-season varies

19   depending on numerous factors, including skill level and team, as well as their reliance on various

20   defenses that may apply to this claim, including the defense that the activities performed by

21   Plaintiffs may not constitute "work" under the FLSA because Plaintiffs are not employees.  These

22   arguments go to questions that are more appropriately addressed at the second stage of the

23   certification process, when courts consider the "disparate factual and employment settings of the

24   individual plaintiffs" and "the various defenses available to the defendants with respect to the

25   individual plaintiffs."  *Leuthold*, 224 F.R.D. at 467.  The Court rejects Defendants' invitation to

26   address the merits of this claim at this stage of the proceedings.  *See Otey*, 2013 WL 4552493, at

27   *3.

28          The Court also finds that the cases cited by Defendants in support of their assertion that

24

Plaintiffs are not similarly situated are distinguishable.  *See* Opposition at 9 (citing *Till v. Saks Inc.*, No. C 11-00504 SBA, 2013 WL 5755671 (N.D. Cal. Sept. 30, 2013), *Sheffield*; 211 F.R.D. at 416-17; *West v. Border Foods, Inc.*, No. 05-2525 (DWF/RLE), 2006 WL 1892527, at *8 (D. Minn. July 10, 2006);  *Brooks v. BellSouth Telecomms., Inc.*, 164 F.R.D. 561, 569 (N.D. Ala. 1995)).   In *Till* and *Brooks*, the courts applied the more stringent standard that applies at the second step of the conditional certification inquiry because substantial discovery had already occurred.  *See Till v. Saks, Inc.,* 2013 WL 5755671, at *9;  *Brooks v. BellSouth Telecomms., Inc.*, 164 F.R.D. at 568.  In *Sheffield*, plaintiffs sought conditional certification of a collective of employees who worked for different subsidiaries and affiliates of the defendant.  211 F.R.D. at 413.  The court found, based on the affidavits supplied by the plaintiffs, that "the dissimilarities among the putative class members extend[ed] to geography, work sites, and payment systems" and therefore denied conditional certification, noting that "[p]utative class members must share more than a common allegation that they were denied overtime or paid below the minimum wage." *Id*. In contrast to the facts here, the plaintiffs in *Sheffield* pointed to no uniform policy or practice that linked the claims of the putative class members.  Similarly, in *West v. Border Foods, Inc.*, conditional certification was denied where no uniform policy linked the claims of the putative class members that they were denied overtime pay because they were required to work "off the clock" without pay; indeed, the only express written policy in the record was offered by the defendant and reflected that the defendant had a policy requiring all employees to clock in at the beginning of their shifts and clock out at the end.  *See* 2006 WL 1892527, at *7 (D. Minn. July 10, 2006).

### 2.   Failure to Pay Overtime for Workweeks in Excess of Forty Hours During Championship Season

Plaintiffs claim that during the championship season they are required to work more than forty hours a week and are not paid overtime.  Rather, as discussed above, they are compensated only as specified under UPC ¶ VII, which does not provide for overtime compensation.  They further assert that they are similarly situated as to their claim for failure to pay overtime because the salary received by first year players is the same under MLR 3(c)(2)(B) and because salaries are not actually negotiated for non-first year players (as permitted under the MLB Rules) but dictated

United States District Court
Northern District of California

1   by the Clubs.  Finally, they point to MLR Rules that establish guidelines as to scheduling and

2   travel to show that the players are similarly situated as to the long hours they are required to work.

3   The Court concludes that Plaintiffs have demonstrated that there is a nexus between Plaintiffs'

4   claims based on the fact that all are subject to a uniform policy whereby they are paid a set salary

5   without regard to whether they have worked more forty hours a week.  Further, the Player

6   Declarations support Plaintiffs' allegations that they are routinely required to work more the forty

7   hours a week during the championship season.[7]

8         The Court rejects Defendants' assertion that conditional certification should be denied

9   because Plaintiffs' hours may vary, raising the possibility that some did not work more than forty

10   hours a week during the championship season and therefore, that there may not be liability as to

11   those class members.  Defendants rely on *Brewer v. General Nutrition Corp*. in support of this

12   argument, but in that case, Judge Gonzales-Rogers *granted* conditional certification of the FLSA

13   collective; it was not until the second stage of the certification process, when she was considering

14   whether to decertify the class on the basis of the fully developed record that she concluded that

15   this variation supported decertification of the FLSA class.  *See* 2014 WL 5877695, at *15.

16   Similarly, Defendants' arguments relating to variations in the players' compensation should be

17   addressed at a later stage of the case, on a fully developed record.

18         Nor is the Court persuaded that it should deny conditional certification on the basis of

19   possible individualized inquiries relating to the FLSA's amusement exemption.   Like the defense

20   that Plaintiffs are not employees, discussed above, the amusement exception is a defense that goes

21   to the merits of Plaintiffs' claim and therefore, is not relevant to the conditional certification

22   inquiry.  *See Shaia v. Harvest Mgmt. Sub LLC*, 306 F.R.D. 268, 272 (N.D. Cal. 2015) (noting that

23

24   _____

[7] Plaintiffs cite MLR 32 and 57 in support of their assertion that they are similarly situated.  These
25   rules, unlike Rule 3 (discussed above) do not expressly address the substance of Plaintiffs' claim.
     While Rule 3 expressly states that players must perform work during the off-season without
26   compensation, Rule 32 only states that minor league teams must submit their game schedules to
     the major league clubs for the purposes of soliciting "input."  MLR 32(b).  Similarly, Rule 57
27   requires that all travel itineraries must be approved by the Major League Club but does not impose
     any specific requirements that would obviously result in a work week that exceeds 40 hours.
28   Therefore, the Court finds that these rules do not have any particular significance as to the
     conditional certification inquiry.

because "the initial 'notice stage' is not the appropriate time for a court to evaluate the merits of plaintiffs' FLSA claims . . . courts routinely hold that the potential applicability of an FLSA exemption does not preclude conditional certification") (internal quotations and citation omitted)).

### 3.   Failure to Pay Minimum Wages During the Championship Season

Plaintiffs assert that they are similarly situated as to their claim that they are not paid minimum wage during the championship season for similar reasons they contend they are similarly situated as to the overtime claims.  In particular, all of them are bound by the UPC, which requires players to worker for a fixed salary regardless of the number of hours worked, resulting in compensation that falls below the minimum wage because of the long hours they are required to work during the championship season.  The Court finds that Plaintiffs' allegations that they are subject to a uniform policy that results in failure to meet the minimum wage requirements of the FLSA are substantial for the same reasons the allegations as to Plaintiffs' overtime claims are substantial.  Therefore, conditional certification is warranted as to this claim.

### C.   Limitations Period

#### 1.   Legal Standard

The statute of limitations for filing a claim under the FLSA is two years, or three years if the violation is "willful."  29 U.S.C. § 255(a).   Under the FLSA, the filing of the complaint does not toll the limitations period for putative class members who are not named as plaintiffs;  rather, those individuals' claims are tolled only when they file an opt-in form consenting to joinder in the action.  29 U.S.C. § 256.  The FLSA limitations period is subject to the doctrine of equitable tolling, but typically "[e]quitable tolling is extended sparingly and only where claimants exercise diligence in preserving their legal rights." *Adams v. Inter-Con Sec. Sys., Inc*., 242 F.R.D. 530, 543 (N.D. Cal. 2007) (citing *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990)).  "There are two general categories of situations warranting equitable tolling: (1) where the plaintiffs actively pursued their legal remedies by filing defective pleadings within the statutory period, and (2) where the defendants' misconduct induces failure to meet the deadline." *Adams v. Inter-Con Sec. Sys., Inc*., 242 F.R.D. 530, 543 (N.D. Cal. 2007) (citing *Irwin*, 498 U.S. at 96).  The equitable tolling inquiry focuses on fairness to both parties. *Id.* (citing *Partlow v. Jewish Orphans' Home of*

*S. Cal., Inc.*, 645 F.2d 757, 760 (9th Cir. 1981), *overruled on other grounds by Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165 (1989)).

### 2.   Whether Two-Year or Three-Year Limitations Period Should Apply

Plaintiffs assert that for the purposes of notice, the Court should apply the three-year limitation period that applies to willful violations of the FLSA.  The Court agrees.

At this early stage of the case, it would be appropriate to limit the class period to two years only if it is apparent, as a matter of law, that Defendants' conduct was not willful.   Given that Plaintiffs' FLSA claims are based, in part, on policies that are expressly set forth in the MLB Rules and the UPC, the Court cannot make such a finding.  Therefore, it is appropriate to give notice based on the three-year limitations period that applies to willful violations of the FLSA. *See Wren*, 2007 WL 4532218, at *10.  The Court does not, however, decide which limitations period will ultimately apply to Plaintiffs' claims; that is a question more appropriately decided after the development of a complete factual record.

### 3.   Whether Court Should Toll FLSA Claims

Plaintiffs ask the Court to toll the limitations period: 1) during the pendency of the instant motion and through the opt-in period; and 2) from the date of Plaintiff's originally filed complaint, February 7, 2014.  The Court finds that equitable tolling is not warranted during the pendency of the Motion through the end of the opt-in period.  The Court does not decide whether the limitations period should be tolled between February 7, 2014 and July 11, 2014 but permits Plaintiffs to extend the limitations period for this period for the purposes of notice only.

With respect to Plaintiffs' request that the tolling period be extended beyond the date to which the parties stipulated to the end of the opt-in period, the Court does not find that Defendants have engaged in any misconduct or misrepresentations that would justify tolling the statute of limitations for this period.   Defendants were not required to agree to extend the parties' tolling agreement to cover the period during which the instant motion was being briefed and decided and it would certainly have been obvious to counsel at the time the parties entered into the original agreement that Plaintiffs' conditional certification motion would not be decided by the time the tolling agreement expired, 45 days after the Court's order on the Jurisdiction and Transfer

1    Motions.  Moreover, as Judge Chen explained under almost identical circumstances, the time that

2    elapses during the pendency of a motion for conditional certification is "the kind that Congress

3    anticipated would pass when Congress enacted Section 256" of the FLSA. *Woods v. Vector Mktg.*

4    *Corp.*, No. C-14-0264 EMC, 2015 WL 1198593, at *7 (N.D. Cal. Mar. 16, 2015) (citing

5    *Adedapoidle–Tyehimba v. Crunch, LLC*, No. 13-CV-00225 WHO, 2013 WL 4082137, at *7 (N.D.

6    Cal. Aug. 9, 2013)).  Even assuming that significant delay on the part of the court in resolving a

7    motion for conditional certification may be sufficient to toll the limitations period, there has been

8    no such delay in this case and therefore, the Court rejects Plaintiffs' request to toll the limitations

9    period through the end of the opt-in period.

10          Plaintiffs also ask the Court to toll the limitations period for the approximately 5-month

11   period between the date the Complaint was filed to the date the parties entered into the tolling

12   agreement on the basis that Defendants may not have posted required minimum wage and

13   overtime posters in the players' workplaces notifying them of the applicable laws.   In support of

14   their position they cite *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 259 (S.D.N.Y. 2008).

15   In that case, the court found following a trial that the statute of limitations was equitably tolled on

16   the basis that the defendants failed to post required notices informing employees of their rights

17   under the FLSA, and that the defendants' failure to provide notice was intentional.  595 F. Supp.

18   2d 259.  Therefore, the court rejected the defendants' statute of limitations defense altogether,

19   finding that "equitable tolling should apply up to the point that [the plaintiffs] learned of the

20   requirements of the minimum-wage and overtime laws, shortly before they filed [their] lawsuit."

21   *Id*.  In reaching this conclusion, the court noted that "tolling may be used to suspend the statute of

22   limitations against a plaintiff who is unaware of his cause of action" and that an employer's

23   "failure to provide required notice of the governing legal requirements may be a sufficient basis

24   for tolling." *Id*. (internal quotations and citations omitted).

25          On the other hand, in *Campanelli v. Hershey Co.*, Judge Zimmerman rejected the

26   plaintiffs' assertion, in a motion for conditional certification of an FLSA class, that the statute of

27   limitations should be tolled because the defendants failed to post required notices under the FLSA.

28   2010 WL 3219501, at *6.  He acknowledged that there is a split of authority on the question of

United States District Court
Northern District of California

whether failure to post FLSA notices may give rise to equitable tolling.  He concluded, however, that the cases in which courts have found that failure to post such notices did not give rise to equitable tolling took the "more reasonable approach."  *Id*.  In particular, he noted that "plaintiffs' proposed rule could lead to indefinite tolling."  *Id*.  He also declined to apply the doctrine of equitable tolling because the plaintiffs had failed to establish that the defendants had not posted the required notices, failed to show that they were not aware of their right to overtime, and failed to cite factually similar authority where notices were "required and feasible" involving sales representatives  who worked remotely, as did the plaintiffs in that case.  *Id*.

The undersigned tends to agree with Judge Zimmerman that a per se rule that failure to post required notices results in equitable tolling would be inconsistent with the Supreme Court's admonition that the doctrine is to be applied "sparingly."  On the other hand, in the absence of discovery, the Court concludes that it is premature to make any factual findings as to whether the required notices were posted, or more generally, whether and when Plaintiffs in this case had actual notice of their legal rights under the FLSA.  Moreover, neither side has meaningfully addressed the split of authority as to the implications of a failure to post required notices under the FLSA as to tolling.   Therefore, the Court defers deciding this question until the parties have conducted discovery and provided more extensive briefing on this issue.  Plaintiffs will be permitted to give notice based on the assumption that equitable tolling applies for this period however.

### D.   Notice

#### 1.  Production of Contact Information

To the extent the Court has found that the collective should be conditionally certified, Defendants shall be required to produce the contact information for putative collective members. To protect the privacy of collective members, however, contact information shall be produced only to a claims administrator retained by Plaintiffs and not to Plaintiffs or to Plaintiffs' counsel. *See Wren*, 2007 WL 4532218, at *9.

#### 2.  Form of Notice

"The overarching policies of the FLSA's collective suit provisions require that the

1    proposed notice provide 'accurate and timely notice concerning the pendency of the collective

2    action, so that [potential plaintiffs] can make informed decisions about whether to participate.'"

3    *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 450 (S.D.N.Y. 2011) (quoting

4    *Fasanelli v. Heartland Brewery, Inc.*, 516 F.Supp.2d 317, 323 (S.D.N.Y. 2007) (quoting

5    *Hoffmann–La Roche*, 493 U.S. at 17)).  The form and content of the notice are left to the "broad

6    discretion" of the trial court.  *Id*.

7        In the Motion, Defendants challenge Plaintiffs' original proposed notice on the grounds

8    that it includes the Court's name.  In the revised notice that was filed just before the motion

9    hearing, Docket No. 433, Plaintiffs' proposed notice is no longer on pleading paper with the name

10    of this Court.  Therefore, the Court need not address this dispute, which has been resolved.

11    Similarly, Defendants' objection that the original notice did not provide putative class members

12    with the contact information of Defendants' counsel also has been resolved, with both sides'

13    counsel being listed in the section entitled, "How do I get more information?"  The Court

14    overrules Defendants' objection to the Plaintiffs' proposed notice on the basis that it may include

15    players who played exclusively for dismissed Clubs and/or whose claims accrued outside of the

16    two-year limitations period.  To the extent that the notice may encompass claims which are

17    ultimately found to be barred or unsuitable for class treatment, these issues are more appropriately

18    addressed at the second stage of the FLSA certification process, that is, at the decertification stage.

19        With respect to the parties' specific disputes regarding wording, the Court rules as follows:

20    • **Section 1 ("Why did I get this notice"):** the Court finds that Plaintiffs' version (which

21        does not list out the specific teams who are defendants in this action) is acceptable and

22        that Defendants' version listing the teams is potentially confusing to putative class

23        members without further language making clear that players for the dismissed Clubs may

24        be members of the collective.  With that guidance, Defendants withdrew their objection

25        to Plaintiff's version of Section 1 at the Motion hearing.

26    • **Section 3 ("Who can participate in the lawsuit?"):** the Court finds that Plaintiff's

27        version provides a more accurate description of the class and rejects Defendants'

28        proposed version of that section.

United States District Court
Northern District of California

31

United States District Court
Northern District of California

- **Section 5 ("What happens if I join the lawsuit"):**  the Court rejects the additions proposed by Defendants to Plaintiffs' version.  The statement "You will be bound by and share in any ruling, settlement or judgment, whether favorable or unfavorable," is duplicative of other language in that section and the reference to payment of attorneys' fees and costs is confusing and unnecessary.

- **Section 6 ("What happens if I do nothing?"):**  The Court overrules Defendants' objection to the third and fifth sentences proposed by Plaintiffs, which may be included in Plaintiffs' notice.

- **Section 9 ("Who will represent me if I join the lawsuit"):**  The first sentence of this section shall read: "If you choose to join this suit, you may retain your own counsel (at your own expense) or choose to be represented by the attorneys who represent the Named Plaintiffs and any players who consent to join this suit."

- **Section 10 ("How do I get more information"):**  The Court approves Plaintiffs' version of this section.

### 3.  Method of Delivering Notice

The Court concludes that notice by First-Class mail, email and posting of the notice on a case website will provide sufficient notice to potential class members.  Although Defendants suggest that notice by email should not be permitted because of the "high risk that the notification will be distorted through modification of the notice itself or the addition of commentary to the email," Opposition at 23 (citing *Reab v. Elec. Arts, Inc.*, 214 F.R.D. 623, 630-31 (D. Colo. 2002)), courts routinely permit email notice.  *See, e.g., Otey*, 2013 WL 4552493, at *5 (approving notice by email and online postings); *Butler v. DirectSAT USA, LLC*, 876 F. Supp. 2d 560, 575 (D. Md. 2012) ("[w]ith regard to the use of email to notify potential plaintiffs of this litigation, 'communication through email is [now] the norm.'") (quoting *In re Deloitte & Touche, LLP Overtime Litig.*, 2012 WL 340114, at *2 (S.D.N.Y. Jan. 17, 2012)).  Courts (including the undersigned) also routinely approve the posting of notices on a case website maintained by Plaintiffs' counsel.  *See Wren*, 2007 WL 4532218, at *9.  Any possibility of prejudice that might arise from giving notice via email or by posting a notification on a case website can be addressed

32

United States District Court
Northern District of California

by an agreement between the parties as to the specific format of the email or website posting.

The Court rejects Plaintiffs' request that notices also be posted on each Defendant's website and in work places as Plaintiffs have not demonstrated that the three forms of notice discussed above will not adequately provide notice to putative class members.  The court also notes that because the minor league players perform much of their off-season work at a variety of locations and often do not perform their work in traditional work places, the identification of the locations where notices would have to be posted would unnecessarily complicate the notice process.

### 4.  Opt-In Period and Proposed Reminder

Plaintiffs ask the Court to approve a 90-day opt-in period and the issuance of a reminder notice after 30 days before the end of the opt-in period.  As Judge Armstrong noted in *Sanchez v. Sephora USA, Inc*., "[t]hough opt-in periods vary, timeframes of sixty to ninety days appear to have become the presumptive standard in this District."  No. 11-03396 SBA, 2012 WL 2945753, at *6 (N.D. Cal. July 18, 2012).   Plaintiffs have requested an opt-in period on the longer end of that scale because minor league players work long hours and are often on the road. The Court finds a 90-day opt-in period to be reasonable.   Further, as noted by Judge Koh in *Benedict*, "courts commonly approve . . . reminders."  2014 WL 587135, at *14 (approving 90-day opt-in period with reminder notice 30 days before the end of the opt-in period in FLSA collective action) (citing *Helton v. Factor 5, Inc*., No. C-10-04927 SBA, 2012 WL 2428219 (N.D. Cal. Jun. 25, 2012) (authorizing reminder notice 30 days before the end of the opt-in period)).   Therefore, the Court also approves Plaintiffs' request to send a reminder notice to putative class members thirty days before the end of the opt-in period.

**IV.     CONCLUSION**

For the reasons stated above, the Motion is GRANTED. Plaintiffs shall submit to the Court for approval a copy of their proposed notice and reminder, consistent with this Order, before initiating the notice process.

**IT IS SO ORDERED.**

Dated:  October 20, 2015

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California