PROSKAUER ROSE LLP
Elise M. Bloom (*pro hac vice*)
Howard L. Ganz
Neil H. Abramson (*pro hac vice*)
Adam M. Lupion (*pro hac vice*)
Rachel S. Philion (*pro hac vice*)
Noa Michelle Baddish (*pro hac vice*)
11 Times Square
New York, NY 10036
Telephone:    (212) 969-3000
Facsimile:    (212) 969-2900

PROSKAUER ROSE LLP
Enzo Der Boghossian
ederboghossian@proskauer.com
2049 Century Park East, 32nd Floor
Los Angeles, CA  90067-3206
Telephone:    (310) 557-2900
Facsimile:    (310) 557-2193

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SENNE, *et al.*<br><br>                         Plaintiffs,<br><br><br>                vs.<br><br><br><br>OFFICE OF THE COMMISSIONER OF BASEBALL, *et al.*<br><br>                         Defendants. | Case No. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)<br><br>Hon. Joseph C. Spero<br><br>**CLASS ACTION**<br><br>**NOTICE OF MOTION AND MOTION TO DECERTIFY THE FAIR LABOR STANDARDS ACT COLLECTIVE ACTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: May 20, 2016<br>Time: 9:30 a.m.<br>Courtroom: G-15th Floor |

i

1
2

## NOTICE OF MOTION AND MOTION TO DECERTIFY THE FAIR LABOR STANDARDS ACT COLLECTIVE ACTION

3      PLEASE TAKE NOTICE that on May 20, 2016 at 9:30 a.m. or as soon thereafter as

4  counsel may be heard Defendants Office of the Commissioner of Baseball, an unincorporated

5  association doing business as Major League Baseball ("MLB"); Allan Huber "Bud" Selig; Angels

6  Baseball LP; Athletics Investment Group, LLC; AZPB L.P.; Chicago Cubs Baseball Club, LLC;

7  The Cincinnati Reds LLC; Colorado Rockies Baseball Club, Ltd.; Detroit Tigers, Inc.; Houston

8  Baseball Partners LLC; Kansas City Royals Baseball Corp.; Los Angeles Dodgers LLC; Los

9  Angeles Dodgers Holding Company LLC; Miami Marlins, L.P.; Milwaukee Brewers Baseball

10  Club, Inc.; Milwaukee Brewers Baseball Club, L.P.; Minnesota Twins, LLC; Sterling Mets, L.P.;

11  New York Yankees P'ship; Padres L.P.; San Diego Padres Baseball Club, L.P.; Pittsburgh

12  Associates, L.P.; San Francisco Baseball Associates LLC; The Baseball Club Of Seattle, LLLP;

13  St. Louis Cardinals, LLC; Rangers Baseball Express, LLC; Rangers Baseball, LLC; and Rogers

14  Blue Jays Baseball Partnership (collectively, "Defendants") will and hereby do move this Court

15  for an order decertifying the Fair Labor Standards Act ("FLSA") collective action that the Court

16  conditionally certified for notice purposes on October 20, 2015 (Dkt. 446).

17      This motion is made pursuant to Section 216(b) of the FLSA and is based on this Notice;

18  the Memorandum of Points and Authorities; the Declaration of Elise M. Bloom and exhibits

19  thereto; the pleadings and records on file with this Court; all matters of which the Court must or

20  may take judicial notice; such information as was provided by the Defendants during jurisdictional

21  and venue discovery; and such evidence and argument as may be presented at or before the

22  hearing on this matter.

23  Dated:  March 4, 2016          PROSKAUER ROSE LLP
                                  ELISE M. BLOOM (*pro hac vice*)
                                  HOWARD L. GANZ
24                                NEIL H. ABRAMSON (*pro hac vice*)
                                  ADAM M. LUPION (*pro hac vice*)
25                                ENZO DER BOGHOSSIAN
                                  RACHEL S. PHILION (*pro hac vice*)
26                                NOA MICHELLE BADDISH (*pro hac vice*)

27                                By:   */s/ Elise M. Bloom*
                                  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
28                                Elise M. Bloom
                                  Attorneys for Defendants

ii

DEFENDANTS' MOTION TO DECERTIFY THE FAIR LABOR STANDARDS ACT COLLECTIVE ACTION –
CASE No. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

1

**TABLE OF CONTENTS**

2

**Page**

3

I.      PRELIMINARY STATEMENT ................................................................................1

4

II.     STATEMENT OF RELEVANT FACTS ..................................................................2

5

        A.      A SHARED GOAL AND VARIED EXPERIENCES ...................................2

6

        B.      THE EVIDENCE DEMONSTRATES THAT PLAINTIFFS ARE NOT
                SIMILARLY SITUATED ..............................................................................4

7

                1.      Plaintiffs Are Not Similarly Situated As To The Question Of

8                       Whether They Are Employees.............................................................4

9               2.      Plaintiffs Are Not Similarly Situated As To Their Wages Earned Or
                        The Hours They Allegedly Worked Throughout The Year......................7

10

                        a)      The Compensation Plaintiffs Received During The Championship

11                              Season – And The Activities They Performed During That
                                Timeframe – Varied Greatly ...........................................................7

12

                                (1)     Plaintiffs' Compensation Differed In Their First

13                                      Championship Season And Throughout Their Careers .......7

14                              (2)     Plaintiffs' Schedules Fluctuated From Day To Day Based On
                                        Numerous Factors .............................................................10

15

                        b)      Outside Of The Championship Season, Plaintiffs Participated In

16                              Different Combinations Of Training Activities Offered By The
                                Clubs ...............................................................................................13

17

                        c)      The Activities That Plaintiffs Allegedly Performed In The Off-

18                              Season Were Widely Divergent And Subject To Their Discretion16

19

III.    LEGAL ARGUMENT................................................................................................19

20

        A.      PLAINTIFFS CANNOT SATISFY THEIR HEIGHTENED, SECOND-

21              STAGE BURDEN ......................................................................................19

22      B.      PLAINTIFFS ARE NOT SIMILARLY SITUATED AS TO THE
                THRESHOLD LEGAL ISSUE OF WHETHER THEY ARE EMPLOYEES

23              WITHIN THE MEANING OF THE FLSA.......................................................21

24              1.      Plaintiffs' Employment Status With Respect To The Defendant
                        Clubs Will Require Individualized Inquiries .............................................21

25              2.      Plaintiffs' Theory That MLB Was Their Joint Employer Requires
                        Individualized Inquiries .........................................................................24

26

27      C.      PLAINTIFFS ARE NOT SIMILARLY SITUATED ON ACCOUNT OF
                THEIR DISPARATE FACTUAL AND EMPLOYMENT SETTINGS ..............27

28              1.      Plaintiffs Cannot Identify A Common Policy, Plan, Or Scheme That
                        Violates The FLSA ...............................................................................27

iii

2.       Plaintiffs' Compensation And Schedules Varied Widely Based On A Host Of Factors ...................................................................................28

D.       VARIOUS DEFENSES ARE AVAILABLE TO EACH SEPARATE DEFENDANT, AND ARE FURTHER INDIVIDUAL TO EACH PLAINTIFF ............................................................................................35

1.       Whether Defendants Acted In Good Faith, And Other Affirmative Defenses, Require Individualized Inquiries ................................35

2.       The Seasonal Amusement Or Recreational Establishment Exemption Requires Individualized Proof From Each Defendant In Each Year .................................................................................36

3.       The Creative Professional Exemption Requires Individualized Proof As To Each Plaintiff ...........................................................36

E.       FAIRNESS AND PROCEDURAL CONSIDERATIONS MILITATE AGAINST A COLLECTIVE ACTION .................................................37

1.       Plaintiffs Have No Viable Plan To Determine Liability On A Collective Basis ...............................................................................38

2.       A Representative Trial Would Unduly Prejudice All Of The Defendants As Well As The Plaintiffs ............................................39

IV.   CONCLUSION...........................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Alaniz v. City of L.A.*,
No. CV 04-8592 GAF (AJNx), 2014 U.S. Dist. LEXIS 116110 (C.D. Cal. May
21, 2014) ...................................................................................................................passim

*Bamonte v. City of Mesa*,
598 F.3d 1217 (9th Cir. 2010) ....................................................................................31

*Beauperthuy v. 24 Hour Fitness USA, Inc.*,
772 F. Supp. 2d 1111 (N.D. Cal. 2011) ...................................................................passim

*Benjamin v. B & H Educ., Inc.*,
No. 13-cv-04993-VC, 2015 U.S. Dist. LEXIS 144351 (N.D. Cal. Oct. 16, 2015) ..................21

*Berger v. Nat'l Collegiate Athletic Ass'n*,
No. 1:14-cv-1710-WTL-MJD (S.D. Ind. Feb. 16, 2016)....................................................21, 22

*Blair v. Wills*,
420 F.3d 823 (8th Cir. 2005) ......................................................................................21

*Brewer v. Gen. Nutrition Corp.*,
No. 11-CV-3587 YGR, 2014 U.S. Dist. LEXIS 159380 (N.D. Cal. Nov. 12,
2014) ........................................................................................................................28

*Castle v. Wells Fargo Fin., Inc.*,
No. C 06-4347 SI, 2008 U.S. Dist. LEXIS 106703 (N.D. Cal. Feb. 20, 2008) ......................31

*Chen v. Major League Baseball Props.*,
No. 14-1315-CV, 2015 U.S. App. LEXIS 14275 (2d Cir. Aug. 14, 2015) .............................36

*Deane v. Fastenal Co.*,
No. 11-CV-0042 YGR, 2013 U.S. Dist. LEXIS 25631 (N.D. Cal. Feb. 25,
2013) ......................................................................................................................37, 38

*Donovan v. Am. Airlines, Inc.*,
686 F.2d 267 (5th Cir. 1982) ......................................................................................21

*Espinoza v. County of Fresno*,
290 F.R.D. 494 (E.D. Cal. 2013) .............................................................................33, 34, 39

*Glatt v. Fox Searchlight Pictures, Inc.*,
811 F.3d 528 (2016)....................................................................................................21, 22

*McLaughlin v. Ensley*,
877 F.2d 1207 (4th Cir. 1989) ....................................................................................21

*Petroski v. H&R Block Enters., LLC*,
750 F.3d 976 (8th Cir. 2014) ......................................................................................21

v

DEFENDANTS' MOTION TO DECERTIFY THE FAIR LABOR STANDARDS ACT COLLECTIVE ACTION –
CASE No. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

*Pfohl v. Farmers Ins. Grp.*,
   No. CV 03-3080 DT, 2004 U.S. Dist. LEXIS 6447 (C.D. Cal. Mar. 1, 2004)...................24, 25

*Reed v. Cty. of Orange*,
   266 F.R.D. 446 (C.D. Cal. 2010) ...................................................................................passim

*Schumann v. Collier Anesthesia, P.A.*,
   803 F.3d 1199 (11th Cir. 2015) .....................................................................................21

*Sheffield v. Orius Corp.*,
   211 F.R.D. 411 (D. Or. 2002) .......................................................................................27

*Solis v. Laurelbrook Sanitarium & Sch., Inc.*,
   642 F.3d 518 (6th Cir. 2011) .........................................................................................21

*Stiller v. Costco Wholesale Corp.*,
   298 F.R.D. 611 (S.D. Cal. 2014) ..............................................................................29, 34, 35

*Walling v. Portland Terminal Co.*,
   330 U.S. 148 (1947)....................................................................................................21, 22

*Zavala v. Wal-Mart Stores, Inc.*,
   No. 03-5309, 2010 WL 2652510 (D.N.J. June 25, 2010)........................................................27

**FEDERAL STATUTES**

29 U.S.C. §§ 206-07 .........................................................................................................21

29 U.S.C. § 213(a)(1) ........................................................................................................37

29 U.S.C. § 213(a)(3)........................................................................................................36

**REGULATIONS**

29 C.F.R. § 779.23 ............................................................................................................36

29 C.F.R. § 779.305 ..........................................................................................................36

29 C.F.R. § 785.39 ............................................................................................................33

1    I.    PRELIMINARY STATEMENT

2           After more than a year of extensive discovery, the evidence shows that that the disparities

3    among the members of the collective (as well as among Defendants) precludes maintaining this

4    diverse collection of claims asserted by minor league players as a "collective action" under the

5    Fair Labor Standards Act ("FLSA").  Indeed, the conditionally certified collective includes players

6    who individually negotiated their signing bonuses, ranging from $7,500,000 to a few hundred

7    dollars; players who drove around in luxury cars such as a Mercedes Benz and BMW while others

8    allegedly "struggled to live"; players who lived in mansions on the beach and players who were

9    allegedly forced to sleep on futons; players who played at the most advanced levels of the minor

10   leagues for salaries in the tens of thousands of dollars per month – and even some players who

11   eventually realized their dream of playing for a Major League Club ("Club") – and players who

12   never advanced past rookie ball.  Significantly, the collective includes players who, despite having

13   *no* service time in the Major Leagues, were on a Major League 40-man roster and were therefore

14   members of the Major League Baseball Players Association, the exclusive collective bargaining

15   representative of Major League players.  These minor league players earned thousands of dollars

16   per month – amounts that were determined in collective bargaining and not by any Club or by

17   MLB.  The collective also includes players who seek compensation for training and conditioning

18   (as well as other baseball and non-baseball activities) in which they engaged voluntarily, on their

19   own time, at their own discretion (both during the season and during the off-season), in varying

20   amounts based on their own needs and goals.  Remarkably, the collective also includes players

21   who testified that they are seeking to recover for time spent *sleeping* and *shopping for groceries*,

22   because their Clubs recommended that they sleep well and eat healthily.

23          To be sure, the experience of each player varied widely based not only on which one (or

24   more) of the 30 Major League Clubs for which he aspired to play, but even further based on

25   playing for one (or more) of the Clubs' 180 minor league affiliates, whose hundreds of different

26   managers, coaches, and trainers not only determine, but also oversee, players' daily activities.

27          Although the collective was conditionally certified, that was based in large part on

28   "cookie-cutter" form declarations from Named Plaintiffs that have, in many instances, proven to

1

be misleading at best and false at worst.  That is precisely why Named Plaintiffs bear a significantly more rigorous burden of proof now, at this second stage of analysis, than they did at the initial, conditional certification stage.

Based on the voluminous evidence adduced, it is clear that Plaintiffs cannot prove that they are similarly situated, either to each other or to all opt-in plaintiffs (collectively, "plaintiffs").  The diversity of plaintiffs' experiences as minor league baseball players is fundamentally at odds with the purposes of collective treatment, as a fact-finder will have to conduct individualized inquiries to resolve layers of legal and factual questions to adjudicate plaintiffs' claims.  At the very outset, the threshold legal question of whether plaintiffs are "employees" within the meaning of the FLSA – whether they are employees of the Defendant Clubs individually, or employed "jointly" by their respective Clubs and the Office of the Commissioner of Baseball ("MLB") – requires highly individualized inquiries that cannot be answered by common proof.  However, even if the Court sees fit to determine that threshold question on a collective basis, fundamental issues of liability in this case – calculation of hours worked and compensation paid – cannot be determined collectively.  Whether the various activities players performed constitute "work" within the meaning of the FLSA, the number of hours they worked, and what, if any, compensation they are owed, are greatly individualized and player-specific.  Accordingly, it would be impossible to resolve the factual and legal issues in this case on a representative basis by looking at any "sample" of minor league players and extrapolating that the same result must obtain for *all* players, simply because they happen to play the same game.

## II.   STATEMENT OF RELEVANT FACTS

### A.   A SHARED GOAL AND VARIED EXPERIENCES

While plaintiffs' experiences as minor league baseball players diverge from inception, there is, perhaps, one similarity uniting this diverse collection of individuals – the fact that they share a common dream of eventually playing in the Major Leagues, the undisputed apex of their

profession.[1]  For plaintiffs in pursuit of this dream, the opportunity to play for a minor league affiliate of a Major League Club was simply a step in a chain of baseball-related activities that began even before they were old enough to play little league baseball, and which continued through their youths, in middle school, high school, junior college, and college.  In pursuit of this "dream" opportunity, plaintiffs spent the time between school baseball seasons participating in summer leagues up to six days per week, and training independently in the off-seasons, for as many as six to eight additional hours per week – and almost always at their own expense.[2]

As their testimony bore out, however, the similarities among plaintiffs began and ended with their shared pursuit of playing in the Major Leagues.  Upon being drafted or otherwise selected by one of the 30 Major League Clubs, plaintiffs signed contracts with their particular Clubs that contained widely divergent signing bonuses and other provisions that were negotiated on an individual basis.  If a player was fortunate enough to make a team, he then reported to one of approximately 180 affiliates in one of more than a dozen domestic leagues and any one of forty-four states across the country.  Once at their affiliates, plaintiffs received first-rate instruction, geared specifically to the appropriate level of skill.  This instruction was provided at the expense of the Clubs and for the purpose of developing players' skills, despite the fact that the overwhelming majority of minor league players will never play in the Major Leagues.

Some plaintiffs ascended the ranks of the minor leagues quickly, moving from the lowest level affiliates (Rookie and Short-Season League) to the most advanced (Triple-A) in a matter of a few seasons, either with the same Club or among affiliates of multiple Clubs.  Other players did

---

[1] *See, e.g.*, Senne Tr. 24:24-25:4; Wagner Tr. 47:20-22; Nadeau Tr. 18:8-15; Kiel Tr. 41:22-42:3; Giarraputo Tr. 298:16-19.  All deposition transcripts are referenced herein as _____ Tr., and relevant portions of each are annexed in alphabetical order as exhibits to the Declaration of Elise M. Bloom in Support of Defendants' Motion to Decertify the Fair Labor Standards Acts Collective Action ("Bloom Decl.").

[2] *See, e.g.*, Quinowski Tr. 58:10-61:13 (practiced 5 hours a week during high school off-season with his team, plus 8 hours independently); Woodruff Tr. 75:16-77:19 (practiced up to 6 days a week during high school off-season); Frevert Tr. 51:7-52:23 (participated in summer leagues during high school and college); Newby Tr. 25:24-26:14, 34:6-10 (went above and beyond off-season program provided by college coaches).

3

1  not progress, and spent the duration of their careers at the lower levels.  Even for the most gifted

2  minor league players, the odds of playing in the Major Leagues are slim:  Of the approximately

3  6,000 individuals on an active minor league roster in any given year, approximately 450 will play

4  in the Major Leagues.[3]  Those players who never play in the Major Leagues still go on to use the

5  skills they developed as minor league players in their post-playing careers, whether or not they

6  relate to baseball.  *See* Sec. III(B)(1), *infra*.

7   **B.**      **THE EVIDENCE DEMONSTRATES THAT PLAINTIFFS ARE NOT**

8              **SIMILARLY SITUATED**

9       Whether Plaintiffs were employees under the FLSA, and if so, whether they performed

10  compensable work, and then whether they were paid the minimum wage or overtime for the hours

11  they allegedly worked, all are issues that are not susceptible to collective treatment because the

12  facts differ widely among the proposed collective as to each of these areas in which plaintiffs must

13  prove their case.

14       **1.      Plaintiffs Are Not Similarly Situated As To The Question Of Whether**

15              **They Are Employees**

16       In order to be employees subject to the FLSA, plaintiffs must show that Defendants, not

17  they, were the "primary beneficiaries" of their respective relationships.  This involves an

18  assessment of, *inter alia*, whether Defendants received an immediate advantage from the activities

19  performed by plaintiffs, whether plaintiffs expected to receive compensation, whether they

20  expected to be hired by Major League Clubs, and whether their participation in the training

21  activities offered to them resulted in the displacement of any Major League players who would

22  have otherwise been afforded those training opportunities.  *See* Sec. III(B)(1), *infra*.  The minor

23  leagues exist for the purpose of enhancing the skills and opportunities of minor league players

24  with the ultimate goal of helping them develop into Major League players, although only a small

25  fraction of minor league players actually reach their goal of playing in the Major Leagues.  As set

26  forth in the Professional Baseball Agreement ("PBA"), which is incorporated into the Minor

27
---
[3] Bloom Decl. ¶ 63.

28

DEFENDANTS' MOTION TO DECERTIFY THE FAIR LABOR STANDARDS ACT COLLECTIVE ACTION –
CASE No. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

League Uniform Player Contract ("UPC"), the purpose of the minor leagues is to "[p]rovide an environment for athletes to develop their potential as Major League players and to become role models for our society by encouraging opportunities while participating in Minor League Baseball."[4]  In furtherance of this purpose, Clubs offer players the opportunity to learn from and train with the highest caliber of professional managers, coaches and trainers in order to improve, and to showcase their skills during games and practices.  Unlike professionals in other fields, minor league players are not charged for the advanced training they receive.  But as is the case in other professions, there is no guarantee that a minor league player will emerge from this training with the job he so covets – a spot on a Major League roster.

Clubs offer a variety of training activities outside of the Championship Season (commonly referred to as the regular season), including during spring training, which takes place prior to the Championship Season; extended spring training, which takes place after spring training and prior to the start of the "short-season" leagues in mid-June; and instructional leagues, an invitation-only training opportunity that certain Clubs offer following the conclusion of the Championship Season.  These activities are designed and operated specifically for minor league players, such that no Major League players were displaced by minor league players' participation.

Plaintiffs' testimony as to whether they and/or their Clubs benefitted from the training they received was highly varied.  Some (but not all) plaintiffs participated in instructional leagues and testified to its benefits, stating that they saw "definite improvements," that it was "an important part of" a player's career advancement, and that it was "more hands on" due to a lower instructor-to-player ratio.[5]  Others described instructional leagues as "babysitting" or "baseball 101," and

---

[4] Bloom Decl. ¶ 66 (relevant portions of the PBA).  This principle was aptly stated by Gabe Kapler, the Dodgers' Director of Player Development, who testified that his "role is to build our players to be the best men that they can be," and the job of his staff "is to make our players better human beings, stronger human beings." Kapler Tr. 197:24-198:20.

[5] Daly Tr. 137:13-25; Newsome Tr. 121:15-17; Hilligoss Tr. 203:22-204:3.

stated that they "didn't get any better" as a result of their participation.[6]  Plaintiffs testified

divergently as to nearly every one of the training activities offered to them as follows:

- **Minicamps**:  Kiel Tr. 292:14-21 ("…you want to be seen [at minicamp] so that a lot of these coordinators who may… have not seen when you got drafted or through your first season would at least see you working hard and trying to… get better."); Daly Tr. 139:20-140:6 (considered it "an honor to be selected" to attend and thought it would "improve [his] skills").  *Cf.* Meade Tr. 142:6-13 ("Well, did I feel like I was any better when I left mini camp—or when I left Instructs than I was when I was in college? No.").

- **Extended spring training**: Opitz Tr. 265:7-11 ("improved as a player as a result of participating in extended spring training"); Hilligoss Tr. 186:8-13 (purpose was "to keep getting me healthier [following injury] The more you play, the more… it becomes normal"); Duff Tr. 203:8-21 (attended because he "[w]asn't good enough to make it to the team above… It was essentially a way to… continue preparing for your opportunity.").  *Cf.* Frevert 218:7-16 ("There was a lot of basic instruction going on that I felt like I had previous learned in college that for some of us down there in extended spring training program didn't need to be going over.  It was somewhat remedial.").

- **Instruction from coaches and trainers**:  Santiago Tr. 208:14-209:9 (throwing ability and control improved based on training received from minor league coaches and trainers); Pahuta Tr. 231:11-21 (coaches helped him improve in fielding and hitting for power); McAtee Tr. 272:3-273:1 (regained control in pitching with help of a new pitching coach).  *Cf.* Smith Tr. 106:16-107:4, 107:18-24 (did not improve as a result of coaching; "one of them told me one thing, the other one told me the other"); Newby Tr. 98:7-14 (no college or minor league coaches stood out as especially helpful).

- **Off-season training**:  Bennigson Tr. 298:18-23 (was healthier and stronger due to off-season weights program); Gagnier Tr. 105:7-12 (exercises in the off-season pitcher's manual were "beneficial to staying in shape"); Santiago Tr. 195:1-13 (engaging in off-season conditioning would "probably get a better chance of playing in the next level").  *Cf.* Henderson Tr. 181:3-19 (Twins benefitted from his off-season training because they "received a better baseball player that could produce on the field"); L. Davis Tr. 235:21-236:3 (Nationals gave him training manual so he could get "how they pretty much want me to be when I come back"); Aguilar Tr. 197:18-198:3, 210:7-211:1 (training helped him with "maintaining [his] weight, keeping [his] body fat down," but he would not be "in tiptop shape" if he adhered to training manual).

Some plaintiffs acknowledged that they did not expect to be compensated for these

various baseball activities, but that the payoff was being afforded "the opportunity of continuing to

play" in order to attempt to show that they could compete in the Major Leagues[7] – even though

they understood that the odds were not in their favor.[8]

---

[6] Kiel Tr. 309:13-25; McAtee Tr. 184:19-24.

[7] *See, e.g.*, Woodruff Tr. 168:6-25 (testifying that he did not expect to be paid for running, lifting or pitching during the off-season, although thought he should be); Ortiz Tr. 195:23-196:14, 196:20-197:9 (did not expect to be compensated during the off-season; "believed that they would

2.       **Plaintiffs Are Not Similarly Situated As To Their Wages Earned Or The Hours They Allegedly Worked Throughout The Year**

a)       *The Compensation Plaintiffs Received During The Championship Season – And The Activities They Performed During That Timeframe – Varied Greatly*

(1)       **Plaintiffs' Compensation Differed In Their First Championship Season And Throughout Their Careers**

As to their compensation, plaintiffs contend that collective treatment is appropriate based entirely on the fact that their UPCs contain "overarching policies" relating to when their wages are paid and their first-year base salaries.[9]  Their claim is both misleading and legally insufficient to support collective treatment, even if it was true.  While it is true that all players receive the same *base* salary only for their first Championship Season, that base salary is a small fraction of players' total possible compensation – and all other aspects of their compensation are determined *between players and their individual Clubs*.  Despite what plaintiffs claimed in their sworn declarations – namely, that that they were all made to "promptly" sign and return their contracts and were "not permitted to negotiate" over their wages[10] – the reality is that many players negotiated with their respective Clubs concerning, *inter alia*, signing bonuses, benefits under the College Scholarship Plan, and participation in the Incentive Bonus Plan.[11]

---

be compensating me by affording me the opportunity of continuing to play and allowing me to show them that I could playing the big leagues").

[8] *See*, *e.g.*, Pease Tr. 307:6-9.

[9] *See* Plaintiff's Motion for Notice to the Class and Conditional Certification Pursuant to the Fair Labor Standards Act ("Pls.' Mot. for Conditional Cert."), Dkt. 414 at 6.

[10] *See* Aguilar Decl. ¶ 26 (Dkt. 414-2), Bennisson Decl. ¶ 27 (Dkt. 414-3), Britt Decl. ¶ 27 (Dkt. 414-4), Daly Decl. ¶ 27 (Dkt. 414-5), Davis Decl. ¶ 29 (Dkt. 414-6), Duff Decl. ¶ 27 (Dkt. 414-7), Frevert Decl. ¶ 28 (Dkt. 414-8), Gagnier Decl. ¶ 25 (Dkt. 414-9), Gaston Decl. ¶ 28 (Dkt. 414-10), Giarraputo Decl. ¶ 28 (Dkt. 414-11), Henderson Decl. ¶ 26 (Dkt. 414-12), Hilligoss Decl. ¶ 28 (Dkt. 414-13), Hutson Decl. ¶24 (Dkt. 414-14).

[11] Indeed, co-lead counsel for plaintiffs is well aware that players negotiate their UPCs, as Plaintiff Les Smith testified that Garrett Broshuis sought to serve as Smith's agent and in connection with the negotiation of Smith's UPC. Smith Tr. 31:16-33:5.

7

1    In particular, and contrary to the contents of their sworn declarations, Named Plaintiffs

2    testified that their negotiations resulted in UPCs that were more favorable than those which were

3    first presented to them, and which differed substantially among members of the collective based

4    on factors such as injury status, remaining years of college eligibility, or when they were selected

5    in the draft.  For example:

6    - Plaintiff David Quinowski was offered $5,000 to sign with the Giants as a free agent, but
         successfully negotiated for a $35,000 signing bonus and the inclusion of three semesters of
7        payments under the College Scholarship Plan.  (Quinowski Tr. 98:12-106:13.)

8    - Plaintiff Nicholas Giarraputo was offered $50,000 to sign with the Mets, but negotiated for
         a $62,500 signing bonus and college scholarship payments worth $24,000.  (Giarraputo Tr.
9        149:20-21, 152:19-25.)

10   - Plaintiff Bradley McAtee negotiated with the Rockies for a UPC that contained: (i) a
         signing bonus of $62,500; (ii) payments of $7,000 per quarter under the College
11       Scholarship Plan; and (iii) the ability to participate in the Incentive Bonus Plan, after
         initially being offered a UPC that contained *none* of these payments or provisions.
12       (McAtee Tr. 305:17-307:23; McAtee Dep. Exs. 1, 2.)

13   - Plaintiff Aaron Meade negotiated his signing bonus with the Angels from $75,000 to
         $100,000.  (Meade Tr. 60:2-11, 82:14-2.)
14

15   Numerous opt-in plaintiffs received far larger bonuses, including Stetson Allie, Brandon

16   Finnegan, Jarrod Parker, and Joseph Torres, **_all of whom received at least $2,000,000 when they_**

17   **_signed their initial UPCs_**.[12]  On the other hand, certain plaintiffs had less success negotiating with

18   their respective Clubs, such as Omar Aguilar, Joseph Newby, Ryan Hutson and Ryan Khoury,

19   none of whom were able to obtain the lucrative signing bonuses and other benefits that other

20   Named Plaintiffs and members of the collective were able to negotiate.[13]

21       After a player's first Championship Season, the Clubs individually – not MLB – determine

22   all aspects of player compensation, based on factors of their choosing, which may include years of

23   service with the Club, or the affiliate level at which the player plays.[14]  In other words, outside of a

24   _____

25   [12] Bloom Decl. ¶¶ 67-70.

26   [13] *See* Aguilar Tr. 78:20-80:1; Newby Tr. 50:3-51:11; Hutson Tr. 112:22-113:6, 116:18-120:8;
     Khoury Tr. 177:16-23.
27

28   [14] *See, e.g.*, Vuch Tr. 198:21-199:6 (salaries of Cardinals' minor league players "depend[] on the
     classification of service time… what level the player was at and number of years at that level");

1   player's first Championship Season – *i.e.*, other than for approximately ***eleven weeks of a player's***

2   ***entire minor league career*** for players who sign contracts within the first month after the draft in

3   June – his monthly salary is subject to the policies of the Club(s) for which he plays.[15]

4          Plaintiffs are not similarly situated for the additional reason that the collective includes

5   players who were on a Major League 40-man roster and therefore represented by a union, the

6   Major League Baseball Players Association.  Accordingly, the compensation these players

7   received while they were members of the union was determined in collective bargaining.  The

8   salary scales that each Club sets for drafted players also do not apply to minor league free agents,

9   each of whose base salaries and bonuses are established through individual negotiations – often

10  with the assistance and guidance of player agents.  As of the time that plaintiffs filed their motion

11  for notice to the class, the Clubs had negotiated a total of 5,820 contracts with 2,960 different

12  minor league free agents since 2011.[16]  It is not surprising, therefore, that the base salaries of

13  members of the collective varied widely.  For example:

- Plaintiff Quinowski negotiated a salary of $10,000 per month as a minor league free agent. Previously, the most he could have earned was $2,150 per month.  (Quinowski Tr. 145:22-146:8.)

- Plaintiff Leonard Davis' salary jumped to the collectively-bargained amount of $5,327.87 per month, due to the fact that he was placed on the Nationals' 40-man roster.  Davis believed this was a "huge increase" compared to players on the traditional salary scale, but not compared to free agents, who received $10,000 per month contracts.  (L. Davis Tr. 163:22-167:25.)

- Plaintiff Aguilar's salary likewise rose from roughly $1,500 per month to the collectively-bargained amount of $5,327.88 per month, when he was placed on the Brewers' 40-man

_____

Chattin Tr. 222:21-223:6 (Marlins' salaries are determined by "a salary scale that we utilize for all players" and that that does not contain "any recommendations from MLB that go into that scale"); Broadway Tr. 307:18-25 ("Our Pirates salary scale is typically how we would decide who makes what money for a given year.").

[15] In addition to setting their own pay scales, certain Clubs, such as the Marlins, provide an additional $100 per month in salary to minor league players who are awarded an organizational pitcher or player of the month award during the prior season.  The Mets award salary increases to players who won an MVP award and/or led their leagues in certain statistical categories in the prior season.  The Blue Jays awarded a $3,500 bonus for community service.  *See* Mets Decl. at ¶ 7 (Dkt. 430-12); Marlins Decl. at ¶ 7 (Dkt. 430-10); Daly Tr. 183:1-7.

[16] MLB Decl. at ¶ 5 (Dkt. 430-15).

9

1    roster.  In 2010, his agents negotiated over the terms of his contract and his salary again
rose to $10,655.73 per month.  (Aguilar Tr. 86:9-20, 91:18-93:13.)

3    Based on all of these factors and variations, the analysis of minimum wage compliance becomes

4    even more unsustainable on a class-wide basis.

**(2)    Plaintiffs' Schedules Fluctuated From Day To Day Based On Numerous Factors**

Player schedules and training activities during the Championship Season – which go to the issues of compensable time and hours "worked" – are just as divergent as compensation, as they are established by managers and coaches at each of the Clubs' affiliates, as well as by the plaintiffs themselves.[17]  Each manager, along with his coaching staff, exercises discretion as to whether to require "early work" (*i.e.*, extra infield practice, outfield practice, pitcher fielding practice) of some or all players, whether to hold batting practice or take infield/outfield before a game, which activities to schedule as part of pregame warmups, and what time players take the field.[18]

Plaintiffs testified that their activities and "hours" also varied based on their affiliate level, which affected how much and how far they traveled, as well as the duration of their season.[19]

---

[17] *See*, *e.g.*, Woodruff Tr. 133:21-135:19 (manager is the "one running the practice or… the game or… what we were doing"); Newsome Tr. 127:17-132:20 (Championship Season schedule dependent on coaches' and instructors' schedule and availability); Kiel Tr. 70:18-71:2 ("[m]y coaches told me… what to do"); Gaston Tr. 186:10-14 (managers told players when to arrive for games); Weeks Tr. 157:12-16 (managers decided when players had to arrive on game days).

[18] Gwynn Tr. 204:15-16 (whether affiliate does "early work" is left to manager's discretion); Broadway Tr. 231:16-232:2; 237:9-18 (whether to take batting practice is left to manager's discretion; some managers did not set a formal time for players to take the field before a game, left it to the player's preference); Turner Tr. 169:19-25 (pregame activities would "depend on… discussions with the managers and what he wanted to have done.  The hitting coach, what he wanted to have done.  The pitching coach, what he wanted to have done."); D. Davis Tr. 176:20-177:6 (whether players take infield and outfield, and whether they do it before or after batting practice "has changed from year to year," depends on the manager's preference); Harper Tr. 110:13-111:24 (managers set schedules and choose activities based on "personal preference").

[19] *See*, *e.g.*, Nicholson Tr. 239:18-240:9 (bus travel with Giants' Rookie affiliate was a maximum of 1.25 hours); Murray Tr. 295:5-16 (bus travel with Athletics' AA affiliate was up to 12 hours); Henderson Tr. 156:3-9 (bus travel with Twins' Rookie affiliate ranged from 30 minutes to 3 hours); Gagnier Tr. 219:20-220:12 (players for Tigers' AAA affiliate could travel to games in personal cars, were not required to ride the team bus); Weeks Tr. 220:11-13 (longest bus trip with Giants' AA affiliate was 16 hours).

1    Their activities and "hours" were also largely dependent on the position they played,[20] whether

2    they were home or on the road,[21] how well they and their team had performed in a given week,[22]

3    whether they were injured and undergoing treatment,[23] whether the previous day's game went into

4    extra innings or otherwise ended late, and even the weather.  Their proposed collective includes

5    players who did not travel more than one hour and fifteen minutes for a road game, and players

6    who traveled overnight and on "off days" for up to sixteen hours at a time, which disparities raise

7    questions as to whether various time spent traveling is compensable at all.  The collective includes

8    position players who were asked to report to the stadium up to six hours before a home game, and

9    pitchers who were allowed to arrive whenever they chose.  It includes injured players who sat on

10   the bench during games or stayed after games for treatment, and healthy players who left

11   immediately after games or stayed late to work out.  (*See* footnotes 19 through 23.)  To underscore

12   the magnitude of the differences between members of the collective, opt-in plaintiff Camden

13   Maron played for a total of eleven different affiliates of four different Major League Clubs; opt-in

---

[20] *See, e.g.*, Meade Tr. 117:6-119:4 (Angels starting pitchers could to arrive much closer to game times and had different pre-game routines than other players); Pahuta Tr. 185:15-187:3 (Nationals position players and pitchers had different report times prior to home games); Aguilar Tr. 141:4-12 (Brewers starting pitchers are "on they're [sic] own schedule. They come in, whatever they need to do to get ready for the game."); Odle Tr. 164:13-165:4; 173:19-174:10 (with Giants, had 1:00 to 2:00 p.m. arrival time for an evening home game when not pitching, but 5:00 p.m. arrival when pitching); McAtee Tr. 159:13-23 (Rockies players reported at 2:30 p.m. prior to game time, except starting pitchers, who arrived at 4:00 p.m.).

[21] *See, e.g.*, Newsome Tr. 127:22-142:5 (arrived 6 hours prior to home games and 2 hours prior to road games); Jimenez Tr. 229:2-11 (arrived 7 hours prior to home games and 5 hours prior to road games); Aguilar Tr. 144:21-146:7; 148:2-24 (arrived 2 to 4 hours early for daytime home games and 1 to 2 hours early for daytime away games).

[22] *See, e.g.*, Aguilar Tr. 134:1-22 (if he performed poorly, "[u]sually the next day our pitching coach would make it mandatory for all the pitchers to be there extra early to work on those specific drills just because of one guy's screw up").

[23] *See, e.g.*, Aguilar Tr. 97:14-20 (did not play in any games in 2005 due to injury); Duff Tr. 280:6-18 (did not play any games in 2011 season after June, due to injury); Gaston Tr. 199:6-14 (only Astros' injured players were required to report to trainers after games).

---

11

1  plaintiff Michael Burgess played for fifteen different affiliates of four different Clubs.[24]  By sharp

2  contrast, opt-in plaintiff Colter Moore played for a portion of one season, for one affiliate.[25]

3          Players' numbers of "hours," and the ways that they actually spent these hours, varied

4  further based on activities that they voluntarily chose to do "off the clock" and according to their

5  *personal preferences*, rendering their schedules wholly unique from one player to the next and one

6  day to the next.  Plaintiff Justin Murray, for example, preferred to arrive at the stadium up to two

7  hours before he was asked to report in order to complete a personal, pregame routine; Plaintiff

8  Michael Liberto arrived early because he "wanted to get there first," and would "work out or… get

9  dressed, relax in the locker room… maybe watch some baseball if it was on TV at the time."[26]

10  Plaintiff Matt Lawson arrived at least two hours early so he could "eat in plenty of time to digest

11  [his] meal," and Plaintiff Leonard Davis arrived early so he could make a good impression.[27]

12  Players also testified to staying after practices or games and seek compensation for time that they

13  elected to eat dinner or work out at their clubhouses, even when they had to ask if a staff member

14  was willing to stay late to supervise them.[28]

15          These differences create circumstances that preclude arriving at a common answer to the

16  ultimate questions of whether plaintiffs were employees, whether they were performing

17  compensable work, and whether they were paid the minimum wage.

18

19

20  _____

21  [24] Bloom Decl. ¶¶ 71-72.

22  [25] Bloom Decl. ¶ 73.  While it is reasonable to assume that deposition testimony of the opt-in
    plaintiffs would accentuate these differences, plaintiffs have refused to produce 8 opt-in plaintiffs
23  whose depositions were noticed for the weeks preceding Defendants' filing deadline.

24  [26] *See, e.g.*, Murray Tr. 180:24-181:21; Liberto Tr. 136:23-137:4.  *See also* Nicholson Tr. 239:9-
    17 (arrived 1 hour prior to report time to do personal exercises and mentally prepare for games).

25  [27] Lawson Tr. 150:13-25, 151:6-152:9; L. Davis Tr. 220:11-221:11.

26
    [28] *See, e.g.*, L. Davis Tr. 189:6-10 (dinner at clubhouse was not mandatory, could be taken "to-
27  go"); Gagnier Tr. 224:13-20 (chose to work out after games); Khoury Tr. 269-271 (if a player
    wanted to stay late to work out, would have to find a staff member willing to stay with him).

28

DEFENDANTS' MOTION TO DECERTIFY THE FAIR LABOR STANDARDS ACT COLLECTIVE ACTION –
CASE No. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

**b)** *Outside Of The Championship Season, Plaintiffs Participated In Different Combinations Of Training Activities Offered By The Clubs*

Outside of the Championship Season, the differences in plaintiffs' compensation and schedules diverged further, based, among other things, on their varied participation in (and compensation for) activities offered by one or more Clubs for the benefit of minor league players, including spring training, extended spring training, minicamps, and instructional leagues.

Plaintiffs' own allegations evince the dissimilarities in their experiences, both from person to person and from year to year. By their own estimates, each year, approximately thirty to forty-five players per Club attend pre-spring training minicamp, which takes place prior to spring training.[29] At the end of spring training, plaintiffs allege, approximately thirty to fifty players per Club do not earn a roster spot with any affiliate and remain in extended spring training until June.[30] At the end of the Championship Season, Plaintiffs claim, "around 30–45 minor leaguers per [Club] are also selected to participate in an instructional league to further hone their skills," which they do at the Clubs' spring training complexes for approximately one month.[31] Participation is voluntary, and players have declined invitations to instructional leagues (as well as other training opportunities) for any number of reasons.[32]

In itself, the different numbers and combinations of players who participate in these various training activities each year warrant decertification, as they create an impossible mixture

---

[29] Compl. ¶¶ 184, 201.

[30] Compl. ¶¶ 10 n.6, 185. *See also* Newsome Tr. 171:20-172:12 (players not released at the end of spring training who have not "made an affiliated championship season team" participate in extended spring training); McAtee Tr. 264:2-7 (same).

[31] Compl. ¶ 186.

[32] Lieppman Tr. 211:4-12 (identifying Athletics player who declined invitation to instructional league and describing various reasons that players have declined in the past); Quinowski Tr. 160:4-14 (declined Giants' Arizona Fall League invitation in order to play in the Dominican Republic); Britt Tr. 109:22-110:9 (declined Brewers' minicamp invitation in order to go home); Diggs Tr. 78:14-79:2 (identifying Brewers player who declined invitation to winter training program in order to train with personal trainer).

13

of potential answers to the threshold questions of plaintiffs' employment status, hours worked, and whether they were compensated properly for these hours.  Even more compelling, however, is the underlying diversity of each player's experience *within* these activities (as described by plaintiffs and Club personnel alike), which further influences and personalizes the answers to these same threshold questions.  For instance, different Clubs organize different numbers of minicamps in a given year, and do so for their own, discrete purposes.  Plaintiff Aaron Meade testified to a June minicamp that all new Angels players were required to attend, where they practiced, conditioned, and learned "all the Angels systems" such as Club-specific strategies for bunt defense and holding runners on base.  Plaintiff Daniel Britt, by contrast, testified to attending a January invitational minicamp for the Brewers that was "strengthening and conditioning every day."[33]  Tony Diggs, the Brewers' Assistant to the Director of Staff and Player Development, described another Brewers' invitational minicamp that takes place in February and is offered to players who are expected to make Championship Season rosters – *not* players who need additional conditioning.[34]

Extended spring training is similarly varied from Club to Club, and even for players *within* each respective organization.  When asked about the purpose of extended spring training for the Athletics, Director of Player Development Keith Lieppman testified as follows:

> Extended Spring Training is… a[n] introductory program to teach [younger players and Latin players] the fundamentals and give them opportunities to play.  It also – there's a group of players that didn't go out and make a team during Spring Training that will go and play at our Rookie League team in Burlington, Vermont… So those are the first two groups.  The third group would be rehab players that have been injured that need this time to prepare themselves to get ready to go play at a higher level.[35]

Witnesses have ascribed different purposes to their experiences in extended spring training, such as additional conditioning for players who are out of shape, "just something for players do to"

---

[33] Meade Tr. 90:22-92:10; Britt Tr. 110:10-13.

[34] Diggs Tr. 31:15-21, 76:14-77:4.

[35] Lieppman Tr. 257:12-258:2.

1  before the short seasons starts, "remedial" skills training, and rehabilitation from injury.[36]

2  Moreover, several Clubs paid monthly salaries to players who attended extended spring training.[37]

3          Instructional leagues, which not all Clubs offer, are intended to provide players with more

4  individualized attention for the purpose of honing their skills and, depending on the Club, may be

5  offered to all players, players who need to address a specific deficiency, or as an honor for players

6  who have been performing particularly well.[38]  Here, too, Clubs design programs that are unique

7  to their respective organizations and to the players who are invited to participate.[39]

8          Finally, even in spring training, the activities that players perform vary based on factors

9  such as Club, position, manager/coach discretion, and player choice.[40]  Even the duration of spring

10 training differed for the 1,423 pitchers and 261 catchers who opted in to the lawsuit, and for the

11 1464 infielders and outfielders,[41] who reported to spring training one to two weeks later than

12 pitchers and catchers.[42]

13 _____

14 [36] See, e.g., Meade Tr. 195:2-196:14 (arriving out of shape to spring training could result in being
    sent to extended spring training); Pahuta Tr. 175:23 -176:3 (purpose of extended spring training is
15 "just something for players to do before the short season starts"); Frevert Tr. 218:7-16 ("It was
    somewhat remedial."); Aguilar Tr. 166:21-167:3 (spent 2005 and 2006 in extended spring training
16 to rehabilitate from an injury).

17 [37] Royals Decl. at ¶ 13 (Dkt. 430-14); Rockies Decl. at ¶ 14 (Dkt. 430-14).  See also Broadway Tr.
    219:21-220:6.
18
   [38] See Diggs Tr. 222:3-7; Harper Tr. 139:10-13; Sharp Tr. 235:17-236:3.  See also Owen Tr.
19 66:15-23 (Tigers do not offer instructional leagues).

20 [39] See, e.g., Murray Tr. 238:5-20 (Athletics' instructional league offered individualized, one-on-
    one experience for players to improve); McAtee Tr. 183:5-11, 184:15-18 (invitation to Rockies'
21 instructional league "could be considered a privilege" but "could also mean that you really need to
    work on something," provides more individualized instruction); Kahaulelio Tr. 263:18-24 ("all
22 young or first time players have to go" to Reds' instructional league).

23 [40] See, e.g., Pahuta Tr. 153:12-156:15 (report times, meetings, and baseball activities depended on
    a player's position); Hilligoss Tr. 171:1-13 (players separated into groups for "positional work");
24 Kiel Tr. 297:1-11 (fitness testing at the beginning of spring training varied by position); Owen Tr.
    148:3-17 (players are told if they have been selected for early practice, but "[i]t's their choice and
25 they want to do it... you can't say that [they're] required to be there."); Broadway Tr. 218:20-24
    (differences in pregame activities based on "manager's discretion... on a daily basis").

26 [41] Bloom Decl. ¶ 64.
27
   [42] See Aguilar Tr. 156:20-157:2; McAtee Tr. 250:1-22.
28

15

1

2

          **c)**      ***The Activities That Plaintiffs Allegedly Performed In The Off-Season Were Widely Divergent And Subject To Their Discretion***

3          Plaintiffs also seek to be compensated for the time that they allegedly spent training and

4  conditioning during the winter off-season.  Off-season training activities were performed at

5  locations of their choice, at any time of day they wished, and for any number of hours, based on

6  each player's individual, independent judgment.

7          Plaintiffs testified to a variety of reasons and methods for performing strength and

8  conditioning activities during the off-season.  First, plaintiffs differed as to whether off-season

9  training was mandatory or simply advisable, so they would avoid injury and be in shape when they

10  reported to spring training and had to compete for a roster spot.[43]  While plaintiffs also testified to

11  having received off-season training programs from their respective Clubs, they testified to varying

12  expectations regarding whether they were to conduct the specific training activities set forth in the

13  programs, or whether they should simply stay in shape by whatever means they saw fit.  To wit,

14  certain plaintiffs described their Clubs' programs as "encouraged," "recommended," or "outlines"

15  that they personally altered, whereas others attested to their Clubs' "unique" or "mandatory"

16  training programs that, "if you didn't do it [the Club] would know."[44]  Similarly, plaintiffs

17  testified that some Clubs did not check in on them at all during the off-season, some made

18

---

19  [43] *See, e.g.*, Nadeau Tr. 248:12-249:8 (Cardinals' off-season strength and conditioning program

20  only mandatory for players not on the 40-man roster); Murray Tr. 266:21-267:22 (Athletics' off-season program not mandatory, but important to continue to improve and maintain a roster spot);

21  Gaston Tr. 264:3-13 (Astros "…told us to follow [the off-season manual] so that we could come in, in shape for spring training. And when we got to spring training, there was physical fitness

22  tests…. if we followed the program, we'll pass the fitness test."); Khoury Tr. 162:21-163:3 (off-season training prevented injury upon return to spring training).

23  [44] *See, e.g.*, Murray Tr. 266:21-267:22 (Athletics "encouraged," did not require players to follow

24  off-season program); Meade Tr. 173:6-16 (Angels' off-season program "was recommended . . . . [but] I don't know if you were necessarily required to do exactly this"); Henderson Tr. 167:25-

25  168:8 (followed "rough outline" suggested by the Twins, but "altered it" and "added in my own little things here and there that I found [worked] better… for my skill set"); Weeks Tr. 228:17-

26  229:2 (Giants had a "specific plan for the strength and conditioning that was mandatory," but players could perform whatever baseball-related activities they needed to prepare for the season);

27  Kiel Tr. 231:22-232:14 (Mariners had a "unique training program… if you didn't do it they would know").  *See also* Diggs Tr. 244:12-15 ("…our expectations are for the players to come in shape

28  in spring training  How they accomplish that during the off season is in their control.").

---

16

1    occasional contact simply to ensure that the player was healthy and maintaining his goal weight,

2    some requested the submission of written workout logs showing progress with respect to the

3    Club's training program, and some made in-person visits to the players in their hometowns.[45]

4         The number of hours that plaintiffs testified to training – and the types of activities for

5    which they seek compensation – also varies widely.  Some plaintiffs claimed to have spent as

6    many as fifteen hours per week performing the activities outlined in their Clubs' training manuals,

7    while others spent as few as six or seven.[46]  Others acknowledged having no estimate of how

8    many hours of training were contemplated by the Club-issued programs.[47]  Some plaintiffs seek

9    compensation for time spent grocery shopping, sleeping, or ***doing nothing***, in cases where their

10   Clubs suggested eating healthy food, getting enough sleep, and taking time off to recover.[48]

11        As to how many hours they *actually* trained during the off-season, certain plaintiffs

12   testified to voluntarily going "above and beyond" what their Clubs suggested, in some cases for an

13   additional three to five hours per week.[49]  They differ, however, as to whether they believe they

14   should be compensated for time they voluntarily trained in excess of what was recommended.[50]

15   _____

16   [45] *See, e.g.*, Murray Tr. 273:8-15 (received monthly calls from Athletics to check on progress);
     Duff Tr. 250:1-14 (received "a few calls" from the Yankees following injury and to check on
17   workouts); Kahaulelio Tr. 110:3-15 (Reds players submitted off-season workout cards,); Weeks
     Tr. 170:13-20 (Giants players had to turn in a "workout book" every couple of weeks); Kiel Tr.
18   231:22-232:14 (Mariners sent email and visited plaintiff in his hometown).

19   [46] *See, e.g.*, Meade Tr. 169:4-11 (Angels' off-season workouts lasted 1 to 1.25 hours per day);
     Daly Tr. 151:3-21 (Blue Jays' off-season manual contemplated 12 to 15 hours per week); Lawson
20   Tr. 183:12-24 (trained for 1.5 to 2 hours per day, 4 or 5 days per week during off-seasons with the
     Indians); Weeks Tr. 228:3-12 (trained for 3 to 3.5 hours per day, 4 or 5 days per week during off-
21   seasons with the Giants); Kahaulelio Tr. 113:2-5 (amount of time needed to complete the Reds'
     program varied from person to person).

22   [47] *See, e.g.*, Quinowski Tr. 221:3-15 (training time "fluctuated" throughout the off-season; did not
23   have "any kind of recollection" of amount of time spent); Gaston Tr. 270:3-8 (followed Astros'
     off-season program but could not recall amount of time spent doing so); Aguilar Tr. 195:18-23
24   (could not estimate hours per week recommended by Brewers' manual).

25   [48] Khoury Tr. 80:10-86; Quinowski Tr. 273:7-18; Bennigson Tr. 265:11-267:10; Kiel Tr. 249:3-
     21.
26
     [49] *See, e.g.*, Odle Tr. 207:1-215:8; Daly Tr. 151:22-152:2.
27
     [50] *Compare* Aguilar Tr. 178:17-20, 197:3-198:3 (seeking payment for training beyond what
28   teammates did and beyond what manual suggested); Britt Tr. 218:1-11 (same) *with* Hutson Tr.

---

17

1    Further, some plaintiffs performed the specific training activities that their Clubs recommended,

2    while others opted for unique regimens of their choosing, which they followed with private

3    coaches or trainers, with friends, or on their own.[51]  Plaintiffs also seek compensation for

4    voluntary recreational activities that they claim conferred some physical benefit during the off-

5    season, including cycling classes, mountain-climbing while on vacation, paddle boarding, surfing,

6    jiu jitsu, and throwing batting practice to local high school players.[52]  Notably, many of plaintiffs'

7    training activities were consistent with the types of activities they performed even before they

8    became minor league players, but which were enhanced by the instruction they received from their

9    coaches and trainers, which worked to players' benefit and came at no cost to them.

10          Those who engaged in physical therapy or rehabilitation during the winter off-season also

11   seek compensation for those hours.  Indeed, players who were paid thousands of dollars per month

12   playing winter league baseball also seek compensation from Defendants in this case for the time

13   that they spent working out while they were getting paid to play for another team.[53]  Even more

14   remarkably, certain plaintiffs seek compensation for training during off-seasons when they were

15   _____

16   224:7-225:19 (not seeking payment for training beyond what manual suggested); Opitz Tr. 323:1-
     9 (same).

17
18   [51] *See*, *e.g.*, Pahuta Tr. 116:22-117:13 (would "tweak" Nationals' off-season program to add
     activities that he determined would be beneficial); Liberto Tr. 201:21-202:14, 206:5-208:18,
19   216:10-22 (met with "baseball strength guru" who designed custom program that incorporated
     some of the Royals' throwing program); Lawson Tr. 185:9-186:11 (used services of "Health
20   Tracks" and CrossFit during off-seasons); McAtee Tr. 277:13-22 (retained private mental coach
     during off-season with the Rockies).

21   [52] *See*, *e.g.*, Aguilar Tr. 176:17-177:15, 202:19-25 (seeking compensation for paddle boarding in
     Hawaii); McAtee Tr. 236:14-237:4 (seeking compensation for hiking a mountain with his wife
22   while on vacation); Gaston Tr. 287:10-17 (seeking compensation for participating in jiu jitsu and
     CrossFit); Odle Tr. 213:13-20 (seeking compensation for "throwing batting practice to high school
23   kids"); Watts Tr. 309:24-311:24 (seeking compensation for hiking, golfing, spinning classes and
     swimming).

24
25   [53] *See*, *e.g.*, Nicholson Tr. 297:20-301:1 (seeking compensation for time spent rehabbing during
     multiple seasons with the Giants); Pahuta Tr. 87:8-88:9 (seeking compensation for time spent
26   rehabbing, but has no recollection of number of hours); Gagnier Tr. 112:3-114:1 (seeking
     compensation from Tigers for time spent playing in winter league); Santiago Tr. 188:10-24;
27   182:20-183:13 (seeking compensation from Giants for time spent training and conditioning for
     winter league in Puerto Rico, including time spent preparing in September even though the Giants
28   manual called for September to be a time of rest).

DEFENDANTS' MOTION TO DECERTIFY THE FAIR LABOR STANDARDS ACT COLLECTIVE ACTION –
CASE No. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

1    free agents and not under contract with *any Club*; they were training not out of any so-called

2    obligation but because they wanted to enhance their chances of being acquired by another Club to

3    continue playing minor league baseball.[54]

4    **III.    LEGAL ARGUMENT**

5         **A.    PLAINTIFFS CANNOT SATISFY THEIR HEIGHTENED, SECOND-**

6              **STAGE BURDEN**

7         Before plaintiffs in a conditionally certified FLSA collective action can proceed to a

8    collective trial, they must satisfy a significantly higher burden of proof than at the conditional

9    notice stage.  In order to meet this more exacting burden, plaintiffs must show that the similarities

10   among them extend "beyond the mere facts of job duties and pay provisions."  *See Reed v. Cty. of*

11   *Orange*, 266 F.R.D. 446, 463 (C.D. Cal. 2010) (holding that "…while '[P]laintiffs' claim that they

12   were illegally denied overtime pay is ostensibly a common legal nexus giving rise to a common

13   injury, that commonality is illusory because the underlying claims are disparate.'").  To determine

14   if plaintiffs have met this burden, courts consider: "(1) the disparate factual and employment

15   settings of the individual plaintiffs; (2) the various defenses available to defendants with respect to

16   the individual plaintiffs; and (3) fairness and procedural considerations."  *Beauperthuy v. 24 Hour*

17   *Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1118 (N.D. Cal. 2011).  Alleged injury stemming from

18   an "'overarching' policy is generally insufficient" to support certification.  *Reed*, 266 F.R.D. at

19   458.  Further, "[i]t is not sufficient for the plaintiffs' evidence to merely 'successfully engage' the

20   competing evidence offered by the defendant, rather, it is plaintiffs' burden to provide *substantial*

21   *evidence* to demonstrate that they are similarly situated."  *Id*. at 449 (emphasis added).

22        The "facts" and allegations that plaintiffs relied upon at the lenient conditional certification

23   stage – many of which have proven to be false – are plainly inadequate to carry their burden at this

24   stage.  Specifically, plaintiffs' self-serving declarations – all of which were virtually identical in

25   most material respects – stating that they worked more than forty hours per week, or that they

26   were subject to a uniform policy regarding compensation – would not support certification in the

27   _____

28   [54] *See*, *e.g.*, L. Davis Tr. 232:24-233:24; 254:13-256:1; 264:14-25; Pinckney Tr. 234:8-16.

19

DEFENDANTS' MOTION TO DECERTIFY THE FAIR LABOR STANDARDS ACT COLLECTIVE ACTION –
CASE No. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

1   absence of additional evidence, even if they went unchecked.  However, as their declarations have

2   proven to be riddled with overstatements and inaccuracies, they are wholly incapable of showing

3   that plaintiffs were similarly situated and of supporting certification of the collective.  *See* Sec.

4   III(C)(2), *infra*.  To punctuate that point, one plaintiff filed an incomplete declaration with this

5   Court that contained a blank space stating that he "received communications from ____ during the

6   offseason, and they would check up on me."  That same plaintiff also admitted that his statement

7   that he "was not paid… wages" for his time in extended spring training was false.[55]

8        Courts in this Circuit have decertified collective actions based on differences between

9   plaintiffs that are far less pronounced than they are in this case.  In *Beauperthuy*, 772 F. Supp. 2d

10  1111, for example, the court decertified a collective of employees who claimed they were

11  misclassified as exempt, noting, among other things, that they worked in hundreds of locations,

12  under different supervisors, performing some (but not all) of the same job duties, under different

13  compensation plans, and worked "off the clock" under different circumstances.  *Id.* at 1121.

14  Based on these sundry differences, the court found that the jury would have to make

15  individualized determinations as to too many dispositive issues, and that "proceeding collectively

16  would be 'unmanageable, chaotic, and counterproductive.'"  *Id.* at 1128.  More recently, in *Alaniz*

17  *v. City of L.A.*, No. CV 04-8592 GAF (AJWx), 2014 U.S. Dist. LEXIS 116110 (C.D. Cal. May 21,

18  2014), the court decertified a collective of police officers who claimed that they worked off-the-

19  clock and were not provided full meal breaks.  The court likewise noted that the officers worked in

20  disparate locations, for several hundred supervisors, and in different divisions and bureaus with

21  assignments of varying natures.  *Id.* at *9-10.  It rejected the plaintiffs' "boilerplate declarations"

22  with their "verbatim factual statements" describing their pre- and post-shift tasks, finding that the

23  "sprinkling of… personalized remarks" did not repair the credibility issues that their declarations

24  posed.  *Id.* at 11-12, 20.  Additionally, decertification was necessary because the city was entitled

25  to raise individualized defenses as to whether the activities alleged constituted "work" or were *de*

26  *minimis*, and because the disparities among plaintiffs would prejudice defendants and make a

27

28
[55] Liberto Decl. ¶¶ 18, 22 (Dkt. 414-21); Liberto Tr. 309:15-21.

DEFENDANTS' MOTION TO DECERTIFY THE FAIR LABOR STANDARDS ACT COLLECTIVE ACTION –
CASE No. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

1   collective trial unworkable.  The same obstacles to collective treatment inhere in the present case

2   and warrant decertification.

3   **B.      PLAINTIFFS ARE NOT SIMILARLY SITUATED AS TO THE**

4   **THRESHOLD LEGAL ISSUE OF WHETHER THEY ARE EMPLOYEES**

5   **WITHIN THE MEANING OF THE FLSA**

6   The FLSA covers only *employees*. 29 U.S.C. §§ 206-07.  Thus, before reaching the

7   question of whether an individual has performed compensable work and was paid the minimum

8   wage and overtime, a court must first decide whether plaintiffs have proven that they were, in fact,

9   employees covered by the statute during the timeframe for which they seek compensation.

10   **1.      Plaintiffs' Employment Status With Respect To The Defendant Clubs**

11   **Will Require Individualized Inquiries**

12   The United States Supreme Court has long recognized that the FLSA's mandate

13   concerning the payment of employees was not intended to apply to individuals who might "work

14   for their own advantage on the premises of another." *Walling v. Portland Terminal Co.*, 330 U.S.

15   148, 152 (1947).  Such individuals, the Court held, are better characterized as "trainees" than

16   employees, and are not subject to coverage under the FLSA.  *Id*. at 152-53.  Since *Walling*, the

17   majority of circuit courts – as well as courts in this District – have held that the test for such an

18   analysis is the "primary beneficiary" test, which considers which party primarily benefitted from

19   the relationship.  *See Benjamin v. B & H Educ., Inc.*, No. 13-cv-04993-VC, 2015 U.S. Dist.

20   LEXIS 144351 (N.D. Cal. Oct. 16, 2015) (granting summary judgment to defendant school on

21   issue of whether student cosmetologists were employees); *Glatt v. Fox Searchlight Pictures, Inc.*,

22   811 F.3d 528, 538 (2d Cir. 2016); *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1209-12

23   (11th Cir. 2015).[56]  Most recently, the District Court for the Southern District of Indiana adopted

24   the "primary beneficiary" test in dismissing a lawsuit brought by student athletes who alleged that

25   

26   [56] *See also Petroski v. H&R Block Enters., LLC*, 750 F.3d 976, 980 (8th Cir. 2014); *Solis v.*

27   *Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 528-29 (6th Cir. 2011); *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005); *McLaughlin v. Ensley*, 877 F.2d 1207, 1209 (4th Cir. 1989); *Donovan v. Am. Airlines, Inc.*, 686 F.2d 267, 272 (5th Cir. 1982).

28

1   they were covered employees under the FLSA.  *See Berger v. Nat'l Collegiate Athletic Ass'n*, No.

2   1:14-cv-1710-WTL-MJD (S.D. Ind. Feb. 16, 2016).  Citing the spate of circuit court decisions that

3   have applied the primary beneficiary test in various contexts, the court noted that "generations

4   of… students have vied for the opportunity to be part of [the tradition of collegiate athletics] with

5   no thought of any compensation," and observed that the U.S. Department of Labor's silence

6   further supported its finding that student athletes were not employees under the FLSA.  *Id.*

7        As described by the Supreme Court in *Walling*, the factors relevant to the "primary

8   beneficiary" analysis include, *inter alia*, whether the employer received an immediate advantage

9   from the activities performed by the trainees, whether the trainees expected to receive

10  compensation, whether they expected to be hired upon completion of their training, and whether

11  they displaced any current employees.  330 U.S. at 149-53.  The Court also emphasized that the

12  fact that the trainees would "constitute a labor pool from which the [employer] would later draw

13  its employees" did *not* mean that the trainees were covered employees, as the FLSA "was not

14  intended to penalize [employers] for providing, free of charge, the same kind of instruction at a

15  place and in a manner which would most greatly benefit the trainees."  *Id.* at 153.

16       For plaintiffs to establish that they are all employees will require individualized

17  assessments of each player, because the "primary beneficiary" question is inherently a highly

18  individualized inquiry.  *Glatt*, 811 F.3d at 538-40.  Plaintiffs participated in countless

19  permutations of discrete training activities to enhance their skills and allow them "to develop their

20  potential as Major League players and to become role models for our society."  In pursuing their

21  shared goal of playing in the Major Leagues, plaintiffs collected an array of experiences and

22  attested to obtaining different benefits therefrom.  Thus, the collective consists of players who

23  testified that the coaching and instruction they received in the minor leagues resulted in their

24  improvement, and players who testified that they did not improve at all; players whose time in the

25  minor leagues enhanced their post-playing career opportunities, and others whose time did not;

26  players who testified that they benefitted greatly from the physical training and conditioning they

27  received, and others who testified that the Club benefitted from having players in better shape;

28  players who expected to be paid for training, and those who did not.  As plaintiffs also testified,

22

DEFENDANTS' MOTION TO DECERTIFY THE FAIR LABOR STANDARDS ACT COLLECTIVE ACTION –
CASE No. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

1   the training opportunities that their respective Clubs afforded them depended on individualized

2   factors such as the round in which they were drafted and the negotiated bonuses that players

3   received, factors that plaintiffs believed were a proxy for the Clubs' level of interest in their

4   success.[57]

5          Moreover, based on their presence on a minor league roster, many plaintiffs received the

6   added benefit of being invited to participate in various fall and winter leagues such as the Arizona

7   Fall League, the Hawaii Winter League, the Puerto Rican Winter League, and the Dominican

8   Winter League, for which they received salaries as high as $9,000 per month during the offseason,

9   as well as the opportunity to showcase their skills and develop their talents against other

10  professionals.[58]  Other players did not receive the opportunity to play in off-season leagues.

11         In addition to plaintiffs' conflicting testimony concerning the immediate benefits that they

12  received from their training, the evidence points to great variations in the benefits that continued to

13  accrue to plaintiffs in their post-playing careers (both inside and outside of baseball), with some

14  attesting to ongoing advantages owing to the skills they learned and the prestige of the position on

15  their resumes (as contemplated by the PBA), and others attesting to no enduring benefits to their

16  professional careers.[59]  But despite the disparities in plaintiffs' perceptions of the lasting impact of

17  _____

18  [57] See, e.g., Kiel Tr. 286:6-287-16 (came to spring training "ready to go" because "lower round

19  guys" with low bonuses were cut sooner than "someone they had invested more into"); Giarraputo
    Tr. 178:24-180:1 (passed over for roster spot by someone with a higher bonus, because "the

20  money wasn't invested in me like they were with the other guys"); Newby Tr. 68:12-20 (released
    because Mariners "had nothing invested in me, and they had four or five first-round draft picks in

21  the bullpen… it makes them look bad if someone who they have nothing invested in outperforms
    their million- and two-million-dollar guys…"); Liberto Tr. 79:10-20 (got fewer opportunities than

22  players with higher bonuses because "the team had a lot invested in them. So they would play.").

23  [58] See, e.g., Wagner Tr. 217:6-218:8 (paid $9,000/month to play in the Dominican Winter
    League); Aguilar Tr. 105:1-12, 106:16-107:7, 112:15-114:2 (paid $2,250/month to play in the

24  Arizona Fall League and $2,000/month to play in the Hawaii Winter League; was an "honor" to be
    selected); Daly Tr. 141:8-14, 143:10-144:3 (paid $2,250/month to play in the Arizona Fall

25  League; was an "honor" to be selected); Santiago Tr. 172:17-25 (paid $1,200/month to play in the
    Puerto Rican Winter League; faced "better competition"); Gagnier Tr. 110:12-111:2, 120:16-22

26  (paid $9,000/month to play in the Dominican League; thought it was a "good idea" to do so).

27  [59] See, e.g., Gagnier Tr. 24:24-25:6, 235:22-236:9 (experience as minor league player, and listing
    it on resume, is helpful in post-playing career); Wagner Tr. 231:4-234:3 (learned skills in minor

28  leagues that could be valuable to employers outside of baseball); Odle Tr. 239:25-240:13, 246:18-
    247:11 (in applying for "recreation daytime building supervisor" job at a university, identified

1    their minor league experiences, the evidence is clear that Defendants intended to equip their

2    players with skills that they could use in their post-minor-league careers.[60]

3                    **2.    Plaintiffs' Theory That MLB Was Their Joint Employer Requires**

4                            **Individualized Inquiries**

5             More than four hundred members of the collective played exclusively for affiliates of one

6    or more of the eight Major League Clubs that were dismissed from this action for lack of personal

7    jurisdiction (the "Dismissed Clubs"),[61] (Dkt. 379), and never played for any of the Clubs that are

8    currently Defendants.[62]  Each of these four-hundred-plus plaintiffs is part of the "collective" based

9    on the theory that each is jointly employed by both their Dismissed Clubs and by MLB.  This

10   issue, however, cannot possibly be resolved on a collective basis.

11            Courts recognize that the joint employer test is generally inappropriate for class-wide

12   treatment and, like the trainee test, requires individualized inquiries.  *Pfohl v. Farmers Ins. Grp.*,

13   No. CV 03-3080 DT (RCx), 2004 U.S. Dist. LEXIS 6447 (C.D. Cal. Mar. 1, 2004), in which the

14   court denied certification on account of "diverse individualized factors… necessary to conclude

15   that Farmers is a 'joint employer'," is instructive.  *Id.* at *33.  The plaintiff in that unpaid overtime

16   action was hired through a staffing agency as a contractor for the defendant insurance company,

17   which he sought to hold liable as a joint employer.  In finding that he was not similarly situated to

18   _____

19   experience with the Giants in section requesting "any special training, achievements, skills… that
     you possess which relate to the job for which you are applying"); Weeks Tr. 217:11-24 (minor
20   league experience has been helpful to career coaching baseball); Pinckney Tr. 304:22-305:7,
     311:8-10 (resume is "impressive" for pursuing a career in a baseball-related field). *Cf.* Pahuta Tr.
21   224:14-228:2 (did not consider time spent/skills learned in the minor leagues useful to future
     employers).

22   [60] *See*, *e.g.*, Sharp Tr. 159:7-18; 166:24-167:9 (winter program "may be focused on a development
23   of the individual, whether it's character training, team building… something that is going to
     benefit them long term.  A leadership academy, a variety of different programs…"); Bennett Tr.
24   98:17-20, 228:20-22 (players "learn life experiences playing in the minor leagues, even if they
     don't get to the major leagues"; "My job as farm director also includes developing boys into
25   young men, to be responsible citizens, in addition to major league baseball players").

26   [61] The Dismissed Clubs are the Atlanta Braves, Baltimore Orioles, Chicago White Sox, Tampa
     Bay Rays, Washington Nationals, Philadelphia Phillies, Boston Red Sox, and Cleveland Indians.
27
     [62] Bloom Decl. ¶ 65.

28

                                              24

1   other insurance adjusters who were also hired as independent contractors through various staffing

2   agencies, the court discounted the plaintiff's generic "state[ment] that he was supervised by

3   Farmers' supervisors at certain assignments," and held that even if Farmers had the requisite

4   supervision and control over the plaintiff, there was "no evidence that [it] had the same requisite

5   supervision and control of adjusters from other agencies." *Id*. at *16-17. The court also observed

6   that Farmers' agreements with the staffing agencies did "not specify how the contracting entity is

7   to pay these independent contractor adjusters, as that [was] a matter between the adjusting

8   company and its workers." *Id*. at *17-18. Rather, Farmers had shown that it did "not control the

9   rate of pay or method of payment from the contracting entity to the worker. It [did] not prepare

10   the payroll or pay wages to the adjusters." *Id*. at *18. Accordingly, the court found that the

11   plaintiff failed to show that Farmers was his joint employer. More importantly, even if the

12   plaintiff had made such a showing, he had not shown that he was similarly situated to the other

13   members of the proposed collective in regard to the joint employer theory, because whether other

14   members of the collective were also jointly employed by Farmers depended on the relationship

15   between each member of the collective and his alleged joint employer, such that the issue was not

16   susceptible to common answers applicable to all members of the putative class. *Id*. at *20. The

17   court held, therefore, that "[o]n this basis alone… denial of certification of this action as a

18   collective action is warranted." *Id*.

19         The facts in the present case are less amenable to collective treatment than those which

20   resulted in decertification in *Pfohl*. Here, too, plaintiffs make the conclusory claim that "[Former

21   MLB Commissioner] Selig oversees and closely controls many aspects central to the minor

22   leaguers' employment," and that "MLB also centrally controls when and how minor leaguers are

23   paid."[63] The evidence is to the contrary. Not a single plaintiff testified that Selig or any employee

24   of MLB had any relevant involvement in their employment. Revealingly, in response to

25   Defendants' interrogatory seeking the identification of "each individual who Plaintiff contends

26   supervised, directed or assigned his duties, tasks, and responsibilities," none of the plaintiffs listed

---

[63] Dkt. 382, ¶¶ 70, 182.

1   a single employee of MLB, instead providing names of employees of the Clubs for which they

2   played, and referring generally to "the MLB executives" identified in response to Defendants'

3   Interrogatories to Plaintiffs Collectively.  When asked if they even *recognized* the names of these

4   "MLB executives," none of the plaintiffs did (including those who played only for Dismissed

5   Clubs).[64]  In fact, many plaintiffs could not point to a single interaction with an employee of MLB,

6   and those who did cited only those contacts that related to MLB's policies concerning drugs and

7   tobacco, which are completely unrelated to their claims in this lawsuit.[65]  Plaintiffs' complete lack

8   of evidence that MLB exercised *any* control over their activities necessarily precludes an argument

9   that a joint employer claim can be assessed on a class-wide basis.

10          It also bears noting that if the Court *were* to find that plaintiffs, collectively, were not

11  jointly employed by MLB, this would mean that the plaintiffs who played only for Dismissed

12  Clubs were not employed by any Defendant and could not be similarly situated to plaintiffs who

13  played for Defendant Clubs.  Although Defendants are not asking the Court to rule on the merits

14  of this question with regard to all members of the collective at this time, allowing plaintiffs to

15  proceed collectively would necessarily entail the possibility of a certified action that included

16  plaintiffs who have no viable legal claims.

17          As a plaintiff's employment status is a threshold question in a case alleging violations of

18  the FLSA, these individualized inquiries concerning that status render maintenance of any

19  collective completely unfeasible.

20

21

22

23  _____

24  [64] *See, e.g.*, Pahuta Tr. 288:13-18; Khoury Tr. 308:20-309:4.  *See also* Daly Tr. 187:12-19;
    Lawson Tr. 194:3-10; Aguilar Tr. 220:1-6; Pinckney Tr. 303:19-304:1.

25  [65] *See, e.g.*, Pahuta Tr. 166:21-167:21 (training was supervised by Nationals employees; only
26  interaction with MLB employee was in regard to tobacco policy); Kiel Tr. 75:19-79:24
    (interactions with MLB executives limited to "check[ing] in" for drug testing; no MLB employees
27  dictated practices or training); Giarraputo Tr. 205:15-206:7 (no MLB executives directed or
    assigned his duties or tasks as a minor league player).

28

26

DEFENDANTS' MOTION TO DECERTIFY THE FAIR LABOR STANDARDS ACT COLLECTIVE ACTION –
CASE No. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

1

2

C.     **PLAINTIFFS ARE NOT SIMILARLY SITUATED ON ACCOUNT OF THEIR DISPARATE FACTUAL AND EMPLOYMENT SETTINGS**

3       Assuming, *arguendo*, that plaintiffs could show that they were *all* employees within the

4  meaning of the FLSA, the collective should still be decertified based on the first factor that courts

5  consider in the second-stage analysis, namely, the disparate factual and employment settings of the

6  individual plaintiffs.  Courts have denied certification in multi-defendant lawsuits brought by

7  employees of multiple subsidiaries of the same company, and even in cases of single, multi-

8  location employers.  *See, e.g.*, *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 416-17 (D. Or. 2002)

9  (denying motion for notice where plaintiffs were located in ten states and employed by five

10 subsidiaries of the same company).  *See also Beauperthuy*, 772 F. Supp. 2d at 1121-28

11 (decertifying class where 772 employees worked across 24 locations outside of California);

12 *Zavala v. Wal-Mart Stores, Inc.*, No. 03-5309, 2010 WL 2652510, at *3 (D.N.J. June 25, 2010)

13 ("significant differences in the factual and employment settings" warranted decertification where

14 class members worked in 180 stores in 33 states and for 70 different contractors and

15 subcontractors).  Here, plaintiffs' factual and employment settings are exponentially more diverse.

16

17

1.     **Plaintiffs Cannot Identify A Common Policy, Plan, Or Scheme That Violates The FLSA**

18      When analyzing plaintiffs' factual and employment settings, courts evaluate "whether

19 plaintiffs have provided substantial evidence that their claims arise out of a single policy, custom

20 or practice that leads to FLSA violations."  *Reed*, 266 F.R.D. at 450.  Plaintiffs have failed to do

21 so.  Tellingly, plaintiffs' Motion for Conditional Certification refers only to the UPCs and the

22 Major League Rules ("MLR"), which they describe as "overarching policies [that] control when,

23 how, and what the collective is paid."[66]

24      Plaintiffs' characterization of the UPC and MLR as controlling payment to the collective is

25 factually inaccurate: Other than with respect to the first-year ***base*** salary in player contracts, which

26 constitutes a small fraction of their overall compensation, players' compensation is determined by

27

[66] Pls.' Mot. for Conditional Cert. at 6, 13.

28

negotiations between the player and his Club, based on factors such as the player's potential, health, level of advancement, number of years of experience, and accomplishments during the season.  With respect to the signing bonus and college scholarship benefits specifically, players negotiate individually (again, with each Club, not MLB) and receive amounts that vary based on a variety of factors, including their potential, health, injury history, and college eligibility.  Thus, even for their first Championship Season, where Clubs have no discretion as to base salary, they do have significant discretion to determine a player's total compensation.  Moreover, plaintiffs' express admission that the UPC and MLR are merely "overarching policies" undermines their argument that the collective should remain certified, as courts recognize that "[a]n allegation of an 'overarching' policy is generally insufficient; plaintiffs must produce 'substantial evidence' of a 'single decision, policy or plan.'"  *Reed*, 266 F.R.D. at 458.  *See also Beauperthuy*, 772 F. Supp. 2d at 1123 (same); *Alaniz*, 2014 U.S. Dist. LEXIS 116110, at *14-15 (same).

Aside from a player's base salary (but not bonus and other remuneration) for the first few weeks of his career, a player's compensation is determined by his Club.  The number of hours allegedly worked, as well as when, where, and how players perform baseball-related activities, are determinations not made collectively or pursuant to any uniform policy or plan, but rather by each individual Club, the managers, coaches, and trainers at each of the 180 affiliates, and in many cases, the players themselves.  Therefore, their effort to proceed collectively should fail based on the very first consideration in the "similarly situated" analysis.

### 2. Plaintiffs' Compensation And Schedules Varied Widely Based On A Host Of Factors

A plaintiff's compensation, and the number of compensable hours that he worked, go directly to the issue of liability in a wage-and-hour case such as this.  *See Brewer v. Gen. Nutrition Corp.*, No. 11-CV-3587 YGR, 2014 U.S. Dist. LEXIS 159380, at *54 (N.D. Cal. Nov. 12, 2014). In the absence of single decision, policy or plan, the disparities among plaintiffs' factual and employment settings with respect to these two key components of liability precludes collective treatment.  The fact that "individualized inquiries [are necessary] to establish liability… weigh[s]

1    against a finding that the opt-in claimants are 'similarly situated,'" and in favor of decertification.

2    *Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 631-32 (S.D. Cal. 2014).

3         As to their compensation, the discretion that Clubs exercise resulted in at least one plaintiff

4    earning $7,500,000 more than the baseline salary for first-year players.[67]  A side-by-side

5    comparison of non-first-year players shows a predictably similar gap in wages.  For example,

6    Plaintiff Omar Aguilar earned a salary of $10,655.73 per month in 2010, which was his fifth

7    season with the Brewers' organization.  That same year, Plaintiff Lauren Gagnier was in his fifth

8    season with the Tigers and earned $2,200 per month, and Plaintiff Tim Pahuta was in his fifth

9    season with the Nationals and earned approximately $1,500 per month.[68]  Moreover, the collective

10   includes players who were members of the Major League Baseball Players Association and whose

11   minor league baseball salaries – thousands of dollars per month – were, accordingly, determined in

12   collective bargaining.

13        The fact that all players engage in baseball-related activities is also insufficient to maintain

14   a collective.  Decertification is appropriate where, as here, plaintiffs are subject to varying

15   conditions in different locations or under different supervisors.  The case of *Reed v. County of*

16   *Orange*, 266 F.R.D. 446 (C.D. Cal. 2010), is on point.  There, the plaintiffs worked in over 100

17   "pay locations" (representing different assignments) and under different supervisors, but sought to

18   maintain a collective because the defendant sheriff's department maintained an unofficial policy of

19   discouraging deputies from reporting off-the-clock work and failed to compensate them for a

20   myriad of pre- and post-shift activities.  In granting defendant's motion to decertify, the court

21   rejected plaintiffs' assertion that they were similarly situated because they were "all employed by

22   the [sheriff's department] and engage[d] in similar law enforcement activities."  *Id.* at 450.  The

23   Court held that "[t]hese generalized commonalities do not make Plaintiffs similarly situated," and

24   that "the disparity between Plaintiffs' factual and employment settings as to their pre-shift and

25   post-shift activities" resulted in "highly individualized questions of fact that make proceeding as a

---

26   [67] Bloom Decl. ¶ 74.

27   [68] Gagnier Tr. 38:1-2; Gagnier Dep. Ex. 12; Pahuta Tr. 88:16-89:12; Pahuta Dep. Ex. 8.

28

1   collective action impractical and prejudicial." *Id*.  The court noted that plaintiffs had identified

2   numerous pre- and post-shift activities in which some, but not all, had engaged, and that they spent

3   varying amounts of time on such activities and engaged in the activities for different reasons,

4   including preparing for work and feeling different degrees of pressure from peers and supervisors.

5   *Id*. at 453-54, 459.  The court concluded that on account of these variations, "finding a

6   'representative' sample of claimants would be nearly impossible" and would result in substantial

7   underpayment or overpayment of certain claimants' claims.  *Id*. at 454.

8          The impossibilities present in *Reed* are much greater here.  In any given year, plaintiffs

9   played for at least one of 180 possible minor league teams affiliated with one of 30 separately-

10  owned Major League Baseball Clubs, based in one of 44 states across the country.  Their answers

11  to Defendants' interrogatories identify scores of Club employees (and no MLB employees) who

12  supervised, directed or assigned their duties, tasks, and responsibilities.  They seek compensation

13  for activities that some, but not all, participated in, such as extended spring training, instructional

14  leagues, fall and winter leagues, minicamps, rehabilitation, as well as voluntarily arriving at the

15  stadium hours before anyone asked them to be there, and then staying hours later, in order to

16  engage in activities of their choosing, for their own personal benefit.

17         In addition, plaintiffs' generalized descriptions of the "baseball activities" they performed

18  gloss over the great variations among them.  For example, while nearly all plaintiffs submitted

19  boilerplate declarations attesting to arriving at their stadiums long before games began, the amount

20  of time varied from two-and-a-half to seven hours.[69]  Plaintiff Leonard Davis would "take[] [his]

21  time" getting dressed for up to a half-hour, whereas Plaintiff Ryan Khoury would get dressed in

22  five to ten minutes.[70]  Plaintiffs' reasons for arriving before their report times and staying after

23

24  [69] *See, e.g*., Gagnier Decl. ¶ 9, 10, 13 (Dkt. 414-9) arrived 4.5 hours before an away game, 6 or 7
    hours before a home night game, and 4 hours before a home day game); McAtee Decl. ¶ 9, 10, 13
25  (Dkt. 414-22) (arrived 5 hours before an away game, 6 hours before a home night game, and a
    "couple of hours" before a home day game); Smith Decl. ¶ 9, 10, 13 (Dkt. 414-36) (arrived 4
26  hours before an away game, 5.5 hours before a home night game, and 2.5 before a home day
    game).

27  [70] L. Davis Tr. 180:17-24; Khoury Tr. 261:21-262:2.

28

their practices or games included the desire to complete personal pre- and post-game routines, eat lunch or dinner, conduct additional training, receive personal instruction from coaches, receive medical attention, or simply avoid crowds.[71]  The activities they allegedly performed were equally varied, and included yoga, ice baths, extra time in the batting cages, and watching television.[72] These elective activities, like their off-season activities, are quintessential off-the-clock claims that are exceptionally individualized and ill-suited for collective treatment.  *See, e.g., Castle v. Wells Fargo Fin., Inc.*, No. C 06-4347 SI, 2008 U.S. Dist. LEXIS 106703, at *3-4, 6, 14-16 (N.D. Cal. Feb. 20, 2008) (denying motion for notice in off-the-clock claim brought by plaintiffs in multiple locations, where overtime was worked under a "variety of different circumstances," and collecting cases in which "individual issues predominate" in off-the-clock claims).

The threshold question of which of these activities, if any, are compensable "work," also defies collective resolution.  The Ninth Circuit defines "work" as activities that are "*controlled or required by the employer* and pursued necessarily and primarily for the benefit of the employer." *Bamonte v. City of Mesa*, 598 F.3d 1217, 1220 (9th Cir. 2010) (emphasis in original).  To illustrate the unfeasibility of assessing this question collectively – and using off-season training as an example, would plaintiffs be compensated for every off-season activity that contributed to their physical fitness (be it cycling class, mountain-climbing on vacation, or paddle boarding at the beach (*see* footnote 52, *supra*)), or only for those activities "recommended" in their Clubs' off-season training manuals?  If the latter, would the same analysis apply to Mitch Hilligoss, who moved between Clubs and received a different manual each year, and to Leonard Davis, who spent his entire career with affiliates of the Nationals and received *a single training program over the*

---

[71] *See, e.g.*, Murray Tr. 180:24-181:21 (wanted to complete personal pre-game routine); Hilligoss Tr. 211:24-212:9 (enjoyed arriving early because stadium was less crowded); Opitz Tr. 273:20-274:9, 285:15-24 (injured players would get treatment, and Cubs affiliate "wanted us to mold as a team.  They wanted us to eat lunch together at the field…"); Gagnier Tr. 158:7-159:4 (arrived early to do extra conditioning because it would give him a "competitive edge").

[72] *See, e.g.*, Newsome Tr. 127:22-128:22 (ate lunch and got dressed); Aguilar Tr. 129:25-132:4 (ran on treadmill, yoga, ice bath, stretched); Gaston Tr. 188:19-190:12 (training, rehab, batting cage); Liberto Tr. 136:20-137:4 (got dressed, "relax[ed] in the locker room… maybe watch some baseball if it was on TV…"); McAtee Tr. 162:1-20 ("sit and wait" until practice).

1    *course of his six years* with that organization?[73]  And would the same treatment apply both to

2    plaintiffs who testified that following the manuals was mandatory, and to those who testified that

3    it was merely recommended and therefore crafted their own training routines?  And as plaintiffs

4    went "above and beyond" what their Clubs purportedly expected, would these discretionary hours,

5    which varied from person to person, be compensable as well?

6           A single determination regarding hours "worked" rehabilitating or otherwise recovering

7    from injury is equally unfathomable.  For example, certain plaintiffs missed entire Championship

8    Seasons (as well as other training opportunities) due to baseball-related injuries, but were paid for

9    time spent attempting to rehabilitate.[74]  Others returned home, such as Grant Duff, who was paid

10   for the time he "sat up" with a foot injury, and Kyle Nicholson, who finished his college degree

11   while rehabilitating from an elbow injury.[75]  (Following another injury, Nicholson remained at the

12   Giants' complex and testified that he seeks compensation for reporting to the facility simply to

13   have his gauze changed – after which he left.[76])  Other plaintiffs required time off and/or

14   rehabilitation – some of which was paid – for injuries sustained in activities unrelated to baseball,

15   including moving a couch, cleaning a gun, and falling down after a night spent drinking.[77]  By

16   allowing this action to proceed collectively, the Court would have to determine, *inter alia*, which

17   injuries resulted in compensable time off, which rest or rehabilitation-related activities were

18   compensable, and how these determinations would apply to players who were *already paid* for

19   time recuperating or rehabilitating based on when during the calendar year they were injured.

20          These questions abound for every segment of the calendar year, as plaintiffs seek

21   compensation for time spent at their stadiums or training complexes engaged in activities that

22

23   ───────────────────

     [73] *See* Hilligoss Tr. 106:13-108:25; L. Davis Tr. 238:19-239:15.

24
     [74] Nadeau Tr. 304:20-305:25;

25
     [75] Duff Tr. 273:5-24; Nicholson Tr. 190:14-191:10.

26
     [76] Nicholson Tr. 260:1-261:1.

27
     [77] Duff Tr. 275:19-277:1; Frevert Tr. 238:18-239:23; Stone Tr. 293:18-294:23.

28

                                              32

1    ranged from medical treatment to discretionary exercise to listening to music, and for numbers of

2    hours that bear no consistency from player to player, or from day to day for any given player.

3         The same holds for the time players spent traveling.  Whether travel time is compensable at

4    all is based on factors such as whether players remained away overnight, whether they traveled to

5    and from their opponents' stadium in a single day, and whether the travel was outside of normal

6    "working" hours.  29 C.F.R. § 785.39.  Plaintiffs' travel varied based on which affiliates they

7    played for, and the minor league to which that affiliate belonged.  There are commuter leagues

8    with no overnight trips and only short bus trips, and leagues that require travel across the country

9    by plane.  Depending on the affiliate and the league, travel could occur after games, in the

10   mornings, overnight, and on scheduled off-days, and ranged from short day trips to neighboring

11   towns, to overnight and off-day bus rides between states, to plane trips across large swaths of the

12   country.  Accordingly, whether travel time is compensable cannot be determined collectively.

13        The case of *Espinoza v. County of Fresno*, 290 F.R.D. 494 (E.D. Cal. 2013) illustrates why

14   both the claims and defenses are such that the collective should be decertified.  There, the plaintiff

15   deputy sheriffs sought overtime compensation for alleged off-the-clock work that included

16   qualifying their weapons for service, as well as cleaning and maintaining their weapons, uniforms,

17   and safety gear.  Defendant's defenses included, as they do here, that certain of these activities

18   were *de minimis* or were not "work" within the meaning of the FLSA.  Despite finding that the

19   plaintiffs *had* identified a policy of failing to compensate overtime, and that certain plaintiffs *had*

20   in fact worked overtime, the court decertified the collective, holding that proceeding collectively

21   would prejudice defendant's ability to investigate and defend against the same individualized

22   issues that plaintiffs likewise purport to raise here.  Specifically, plaintiffs' personal preferences

23   and diverse factual and employment settings (*e.g.*, different supervisors and work locations) led to

24   great variations in their regimens, including the time of day they performed various activities, the

25   frequency with which they undertook them, the specific activities that comprised their routines,

26   and the amount of time they spent so engaged.  *Id.* at 498-501.  These disparities were "more than

27   an issue of damages; [they were] symptomatic of other differences" that rendered decertification

28   necessary because plaintiffs were not similarly situated.  *Id.* at 506.

---

33

1   Here, too, the difficulties of collectively determining which activities are compensable

2   work, not to mention the amount of alleged work performed, are insurmountable.  Defendants'

3   defenses – which are defenses to liability, and not just damages – are necessarily as individualized

4   as plaintiffs' circumstances and weigh in favor of decertification.  *See also Alaniz*, 2014 U.S. Dist.

5   LEXIS 116110, at *24-25 (holding that defendant was entitled to raise the "inherently

6   individualized" defense that off-the-clock activities did not constitute compensable work and that

7   plaintiffs' request to bifurcate the trial into liability and damages "ignore[s] the fact that these

8   defenses directly impact whether or not the City can be held liable for certain alleged violations").

9   This is particularly true as plaintiffs' carbon-copy declarations are rife with inaccuracies

10  concerning the amount of time that they allegedly spent engaging in activities for which they seek

11  compensation.[78]  *See Stiller*, 298 F.R.D. at 632 (holding that whether plaintiffs performed

12  uncompensated work "depends on several individualized facts, including whether any

13  uncompensated work was de minimis," and that defendant "should have the opportunity to

14  determine whether individual opt-in claimants are being truthful" about alleged unpaid time).

15  Simply put, these facts do not permit a conclusion that plaintiffs are similarly situated.  *See*

16  *Alaniz*, 2014 U.S. Dist. LEXIS 116110, at *8-9 (granting decertification where plaintiffs worked

17  in 31 locations and reported to several hundred supervisors).  Indeed, courts in this Circuit have

18  decertified collective actions where the dissimilarities among plaintiffs were far less pronounced

19  than they are here.  *See*, *e.g.*, *id.* at *22 (holding that "the very declarations submitted to show that

20  Plaintiffs are similarly situated instead establish significant variations in the claims that Plaintiffs

21

---

22  [78] *See*, *e.g.*, Opitz Tr. 159:3-15, 161:7-9/Decl. ¶ 9 (Dkt. 414-29) (testifying that he was in Phillies'
    lineup approximately 3 days per week, while declaration asserts that he "played games almost

23  every day" during Championship Season); Kahaulelio Tr. 343:21-344:12/Decl. ¶ 9 (Dkt. 414-16)
    (testifying to arriving at stadium 3.5 to 4 hours before games, while declaration asserts that he

24  arrived 4.5 to 5 hours early); Newby Tr. 38:10-24/Decl. ¶ 11 (Dkt. 414-25) (testifying to arriving
    at stadium 2.5-3 hours before games if he was the starting pitcher and 4.5 to 5 hours if he was not

25  starting, while declaration asserts that he arrived 6 hours early); McAtee Tr. 308:2-25/Decl. ¶ 9
    (Dkt. 414-22) (testifying to arriving at stadium 4.5 hours before games and 3.5 hours prior if he

26  was the starting pitcher, while declaration asserts that he arrived 6 hours early); Weeks Tr. 155:18-
    156:24/Decl. ¶ 10 (Dkt. 414-40) (testifying to arriving at stadium for away games 20 to 30

27  minutes before games with Giants' Rookie affiliate, while declaration asserts that he arrived 6
    hours before away games).

28

34

1   seek to present," based on the facts that not all plaintiffs claimed pre- and post-shift overtime, and

2   that of those who did, the amount alleged varied from five minutes to an hour); *Stiller*, 298 F.R.D.

3   at 621, 631-32 (finding that plaintiffs' individual managers implemented common policy in

4   different ways, such that plaintiffs were not similarly situated in regard to off-the-clock work

5   performed for different reasons, in different locations, and for different amounts of time).

6   Accordingly, this factor of the "similarly situated" analysis essentially compels decertification.

7       D.    **VARIOUS DEFENSES ARE AVAILABLE TO EACH SEPARATE**

8                   **DEFENDANT, AND ARE FURTHER INDIVIDUAL TO EACH PLAINTIFF**

9               1.    **Whether Defendants Acted In Good Faith, And Other Affirmative**

10                    **Defenses, Require Individualized Inquiries**

11      The second factor that courts consider on decertification is "whether the defendant asserts

12  defenses that would require individualized proof."  *Beauperthuy*, 772 F. Supp. 2d at 1125-26.

13  Defendants have put forth several such affirmative defenses that foreclose resolution on a

14  collective basis, including that MLB does not jointly employ plaintiffs, that certain plaintiffs'

15  claims are barred by the applicable statute of limitations (including the longer three-year limitation

16  period, if applicable), and that some or all of the activities claimed to have been performed by

17  plaintiffs are *de minimis* and/or are otherwise not compensable "work."

18      As set forth above, the threshold issue of whether plaintiffs performed compensable work

19  (which also relates to what, if any, "work" was *de minimis*), is utterly individualized.  Regarding

20  Defendants' defense concerning the applicable limitation period, the Court would again have to

21  make individualized inquiries into whether each individual Club Defendant acted willfully, and

22  the implications of each of those findings would affect the composition of the collective.  For

23  instance, Plaintiff Kyle Woodruff was released by the Giants on March 15, 2011 – *two weeks*

24  within the three-year limitation period, should the Court find that the Giants willfully violated the

25  FLSA.[79]  Under a two-year limitation period, he would be unable to assert any claims.

26

27  [79] Woodruff Tr. 228:18-20; Dep. Ex. 7.

28

2.     **The Seasonal Amusement Or Recreational Establishment Exemption Requires Individualized Proof From Each Defendant In Each Year**

Defendants have also asserted the seasonal amusement or recreational establishment exemption as an affirmative defense.[80]  As used in the FLSA, the term "establishment" refers to the "distinct physical place[s] of business" where minor league players play baseball.  *See* 29 C.F.R. § 779.23; *Chen v. Major League Baseball Props.*, No. 14-1315-CV, 2015 U.S. App. LEXIS 14275, at *79 (2d Cir. Aug. 14, 2015) ("the term 'establishment' for purposes of the exemption at Section 13(a)(3)… mean[s] a distinct, physical place of business as opposed to an integrated multiunit business or enterprise").  Plaintiffs played baseball in dozens, if not hundreds, of different establishments each year.  *See* 29 C.F.R. § 779.305.

In determining whether an establishment qualified for the seasonal exemption, the Court will be required to assess whether *each establishment*: (a) operated for seven months or less during the calendar year; and/or (b) during the preceding calendar year, had average receipts during any six months of the calendar year that were 33 1/3 percent or less than the average receipts for the other six months of the year.  *See* 29 U.S.C. § 213(a)(3).  And that analysis must be conducted not only for each establishment, but for *each year* during the statutory period.  Simply put, there is no means by which this defense can be established by common proof – *i.e.*, it is simply not the case that if one establishment is not exempt, then they are all not exempt.

3.     **The Creative Professional Exemption Requires Individualized Proof As To Each Plaintiff**

Defendants have asserted that plaintiffs are exempt from the FLSA's wage-and-hour provisions as creative professionals: (i) whose primary duties consist of the performance of work requiring "invention, imagination, originality or talent in a recognized field of artistic or creative endeavor…" and/or that requires the exercise of discretion and independent judgment; and (ii) who are compensated on a salary or fee basis at a rate of not less than $455 per week for time

---

[80] *See* Defendants' Answer to the Second Amended Consolidated Complaint ("Defs. Ans.") (Dkt. Nos. 386-402, 404-09)

36

1    which is compensable and/or subject to federal and/or wage or overtime requirements. *See* 29

2    U.S.C. § 213(a)(1).

3            Should plaintiffs contest the applicability of this defense, the inquiry would entail

4    examination of whether each plaintiff satisfied the "salary or fee basis" prong of the analysis (by

5    considering their monthly salaries, bonuses, housing allowances, per diems, and other forms of

6    compensation), as well as their individual "primary duties," both of which are inherently

7    individualized inquiries that make proceeding as a collective action impracticable. *See*, *e.g.*,

8    *Beauperthuy*, 772 F. Supp. 2d at 1133; *Deane v. Fastenal Co.*, No. 11-CV-0042 YGR, 2013 U.S.

9    Dist. LEXIS 25631, at *6-7 (N.D. Cal. Feb. 25, 2013) (granting motion to decertify, and finding

10   that "the facts concerning the exemption or exemptions applicable to each individual who has

11   opted into the collective action vary so greatly that a collective action is unwieldy and

12   unwarranted… the discrepancies between the tasks performed, as well as the proportion of time

13   each of them spent on those tasks, makes collective treatment here impracticable.").[81]

14   **E.      FAIRNESS AND PROCEDURAL CONSIDERATIONS MILITATE**

15   **AGAINST A COLLECTIVE ACTION**

16           In evaluating fairness and procedural considerations, "the Court must consider the primary

17   objectives of a collective action: (1) to lower costs to the plaintiffs through the pooling of

18   resources; and (2) to limit the controversy to one proceeding which efficiently resolves common

19   issues of law and fact that arose from the same alleged activity." *Reed*, 266 F.R.D. at 462. The

20   Court must also determine "whether it can coherently manage the class in a manner that will not

21   prejudice any party.'" *Reed*, 266 F.R.D. at 462. Significantly, "[t]he specter of these costs [of

22   separate trials], does not change the ultimate analysis… It is the disparities between the class

23   members that would ultimately break the action down into hundreds of mini-trials, not

24   decertification itself." *Deane*, 2013 U.S. Dist. LEXIS 25631, at *7-8. In this case, fairness and

25

26   _____

     [81] It bears noting that "at this stage in the litigation, Defendants do not have the burden of proving
27   that the exemptions apply to the class members….On the instant motion, it is Plaintiffs who have
     the burden of proving that they are similarly situated." *Beauperthuy*, 772 F. Supp. 2d at 1134.
28

1    procedural considerations weigh strongly in favor of decertification, as plaintiffs have offered no

2    means of resolving the factual and legal issues that they purport to raise, and as any attempt to

3    impose a common mechanism would work prejudice upon plaintiffs and Defendants alike.

4        **1.      Plaintiffs Have No Viable Plan To Determine Liability On A Collective**

5                 **Basis**

6        In order to achieve the objectives of a collective action, plaintiffs must provide some

7    rational explanation of how the case would be tried on a collective or representative basis,

8    including how to determine liability on an aggregate basis.  They cannot do so.

9        As set forth above, liability toward each individual plaintiff will hinge on factors that

10   include, but are not limited to, the threshold question of whether he is an employee of a Defendant,

11   the amount of compensation he received, whether he is exempt from coverage of the FLSA under

12   the creative professional or seasonal exemption, and whether any other individualized defenses

13   apply.  These determinative questions cannot be answered by common proof, and the

14   individualized inquiries they necessitate would render collective treatment unmanageable.  *See*

15   *Beauperthuy*, 772 F. Supp. 2d at 1127-28 ("the jury will have to make individualized

16   determinations as to factors such as what duties each trainer performed, what compensation plan

17   each trainer worked under, the method of calculating overtime…, and whether each particular

18   trainer qualified as exempt… The need for such individualized inquiries would make proceeding

19   by representative testimony impracticable."); *Alaniz*, 2014 U.S. Dist. LEXIS 116110, at *26-27

20   ("the jury hearing these cases will have to make individualized determinations as to whether each

21   Plaintiff worked the time claimed and whether Plaintiffs' supervisors knew they were working off-

22   the-clock… [E]ach Plaintiff will have several supervisors and co-workers that will be required to

23   testify at trial.  Thus, permitting these cases to proceed as collective actions 'would, in short, be

24   unmanageable, chaotic and counterproductive.'").

25       Because plaintiffs cannot satisfy their burden at this stage to prove that they can establish

26   liability on a class-wide basis, and that they can do so in a manner conducive to a single trial, the

27   Court should decertify the collective.

28

1

2

### 2.     A Representative Trial Would Unduly Prejudice All Of The Defendants As Well As The Plaintiffs

3

Certifying this case for collective trial would force a jury into the untenable position of

4

making liability findings on a class-wide, all-or-nothing basis, based on testimonial evidence that

5

does not represent all members of the putative collective.  This is unfair and prejudicial, as the use

6

of flawed "representative" testimony is nothing short of *mis*representative, and carries the inherent

7

risk of "some Plaintiffs being prejudiced by underpayment on their claims as well as [Defendants

8

overpaying] some Plaintiffs on their claims."  *Reed*, 266 F.R.D. at 462-63.  *See also Espinoza*, 290

9

F.R.D. at 505 ("representative testimony is not appropriate where defendants are not similarly

10

situated.  Here, there is no reasonable time or frequency for the task in question.  Each deputy's

11

weapon will accumulate dirt at a materially different rate and in a materially different way, and

12

each deputy will clean it according to his subjective preference.  In this situation, paying each

13

Plaintiff a 'reasonable' amount has its unfair side as well, rewarding individuals who did less work

14

and punishing those who did more.").

15

By way of just one example, opt-in plaintiffs Derek (Bubba) Starling and Tyler Mack

16

signed minor league UPCs with the Kansas City Royals in the summer of 2012 and began their

17

professional careers with the Club's Rookie affiliate, the Burlington Royals.[82]  Starling, an

18

infielder, was a first-round draft pick who received a signing bonus of $7,500,000; Mack, a

19

pitcher, received a $1,000 bonus.  After spending one season with the Royals' Rookie affiliate,

20

Starling was promoted to the Club's low-A affiliate in 2013, their high-A affiliate in 2014, and

21

their AA affiliate in 2015, when he was also placed on the 40-man roster of the Club's Major

22

League team.  In each of 2014 and 2015, he was given the honor of being invited to represent the

23

Royals in the Arizona Fall League, for which he received additional compensation.  Mack, by

24

contrast, spent two years with the Royals' Rookie affiliates, and his playing career ended when he

25

was unconditionally released before the start of the 2014 season.

26

27

[82] Bloom Decl. ¶¶ 74-77.

28

1    It defies logic and contravenes any notion of fairness to argue that these two individuals –

2  whose compensation differed by millions of dollars, who played for the same affiliate for less than

3  three months, and whose different positions meant that they received the benefit of instruction

4  from different coaches and trainers, and that they performed substantively different activities – can

5  both have their claims fairly adjudicated by the same representative evidence in the same case.

6  This is to say nothing of the plaintiffs who played for *any of the other twenty-one separate Clubs*

7  that are Defendants in this lawsuit, not to mention those who never played for *any* Defendant

8  Clubs, and whose claims hinge on their ability to show that they are each jointly employed by

9  MLB.  However, this unjust outcome is exactly what would ensue were this case to proceed on a

10  collective basis.  Because the Court would be forced to undertake an analysis of individualized

11  evidence and make individualized liability and damages determinations, directly at variance with

12  the purpose of a collective action, the conditionally certified collective should now be decertified.

**IV.    CONCLUSION**

14    For the foregoing reasons, Defendants respectfully request that the Court decertify this

15  collective action and dismiss the claims of the opt-in plaintiffs.

17  Dated:  March 4, 2016                   PROSKAUER ROSE LLP
                                            ELISE M. BLOOM (*pro hac vice*)
18                                          HOWARD L. GANZ
                                            NEIL H. ABRAMSON (*pro hac vice*)
19                                          ADAM M. LUPION (*pro hac vice*)
                                            ENZO DER BOGHOSSIAN
20                                          RACHEL S. PHILION (*pro hac vice*)
                                            NOA MICHELLE BADDISH (*pro hac vice*)

                                            By:   */s/ Elise M. Bloom*
22                                          Elise M. Bloom
                                            Attorneys for Defendants