STEPHEN M. TILLERY (*pro hac vice*)
  stillery@koreintillery.com
GARRETT R. BROSHUIS (*pro hac vice*)
  gbroshuis@koreintillery.com
AARON M. ZIGLER (*pro hac vice*)
  azigler@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:  (314) 241-4844
Facsimile: (314) 241-3525

GEORGE A. ZELCS (*pro hac vice*)
  gzelcs@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Telephone: (312) 641-9750

BRUCE L. SIMON (Bar No. 96241)
  bsimon@pswlaw.com
BENJAMIN E. SHIFTAN (Bar No. 265767)
  bshiftan@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile: (415) 433-9008

DANIEL L. WARSHAW (Bar No. 185365)
  dwarshaw@pswlaw.com
BOBBY POUYA (Bar No. 245527)
  bpouya@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone:  (818) 788-8300
Facsimile: (818) 788-8104

Plaintiffs' Interim Co-Lead Class Counsel

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| AARON SENNE, et al., Individually and on Behalf of All Those Similarly Situated;<br><br>Plaintiffs,<br><br>vs.<br><br>OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as MAJOR LEAGUE BASEBALL; et al.;<br><br>Defendants. | CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)<br><br>**CLASS ACTION**<br><br>**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT**<br><br>Hearing date: May 20, 2016<br>Hearing Time: 9:30 a.m.<br>Courtroom: G, 15th Floor<br>Judge: Honorable Joseph C. Spero |

**NOTICE OF MOTION AND MOTION**

Please take notice that on May 20, 2016, at 9:30 a.m., or as soon thereafter as the matter may be heard by the Honorable Joseph C. Spero of the U.S. District Court of the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California, Courtroom G, 15th Floor, Plaintiffs will and hereby do move the Court for an order granting Plaintiffs' Motion for Class Certification.

Plaintiffs' seek to certify their state law wage-and-hour claims under Federal Rule of Civil Procedure 23 since the case fulfills all of Rule 23's requirements. Plaintiffs seek to certify classes under the laws of Arizona, California, Florida, North Carolina, New York, Pennsylvania, Maryland, and Oregon as follows:[1] All persons who under a Minor League Uniform Player Contract, work or worked for MLB or any MLB franchise as a minor league baseball player within the relevant state at any time during the statutory period for each state. Excluded from the class are those players who had service time on a major league player contract at the time of performing work as a minor leaguer.[2]

Plaintiffs' interim co-lead class counsel also seeks to be named as co-lead class counsel.

This motion is based on this Notice of Motion and Motion for Class Certification, the following memorandum of points and authorities, the supportive declarations and evidence, the pleadings and papers on file in this action, and such other matters as the Court may consider.

---

[1] The California Class will include a waiting time subclass for penalties under California Labor Code § 203 for the withholding of wages after employment ceases. It will consist of the class representatives and members of the California Class whose employment relationship with a Defendant has ceased or will cease since February 7, 2010.

[2] This means that once a player is placed on a major league roster—whether the active 25-man roster or the larger 40-man roster—any subsequent work in the minor leagues would not fall within the class definition. Of course, the previous work in the minor leagues performed *before* being placed on the major league roster would still fall within the class definition. Also excluded are Defendants and their officers, directors, and successors, or any individual who has, or during the class period has had, a controlling interest in Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel for Plaintiffs, and persons who submit timely and proper requests for exclusion from the class.

# <u>Table of Contents</u>

NOTICE OF MOTION AND MOTION ...................................................................................i

INTRODUCTION ...........................................................................................................1

PROCEDURAL AND FACTUAL BACKGROUND ...............................................................2

    I.     Relevant Procedural History. ...............................................................................2

    II.    Relevant Facts. ...................................................................................................2

           A.    MLB and Its Franchises Have Implemented Uniform Contracts, Policies, and the Major League Rules to ensure similar conditions of employment. .........................................................................................2

           C.    The similar work and duties performed by all class members. ...................5

TRIAL PLAN .............................................................................................................11

LEGAL STANDARD ...................................................................................................14

ARGUMENT .............................................................................................................15

    I.     The Proposed Classes Satisfy Rule 23(a), (b)(2), and (b)(3). ...............................15

           A.    The class members are sufficiently numerous and ascertainable. ...............15

           B.    The claims are typical. ........................................................................16

           C.    The class members are adequately represented. ........................................17

           D.    The classes satisfy commonality and predominance. ................................18

           E.  A class action is superior to other methods. ........................................37

           F.    Rule 23(b)(2)'s Requirements Are Satisfied. ............................................38

    II.    Class Notices Should be Distributed in the Same Manner as the FLSA Collective ...........................................................................................................39

CONCLUSION ...........................................................................................................39

# Table of Authorities

**Page(s)**

**Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
   731 F.3d 952 (9th Cir. 2013) ................................................................................. *passim*

*Adoma v. Univ. of Phoenix, Inc.*,
   270 F.R.D. 543 (E.D. Cal. 2010) ........................................................................... 25

*Alcantar v. Hobart Serv.*,
   800 F.3d 1047 (9th Cir. 2015) ............................................................................... 15

*Alvarez v. IBP, Inc.*,
   339 F.3d 894 (9th Cir. 2003) *aff'd*, 546 U.S. 21, 126 S. Ct. 514, 163 L. Ed. 2d
   288 (2005) .............................................................................................................. 28

*Ambrosia v. Cogent Commc'ns, Inc.*,
   No. 14-CV-02182-RS, 2016 WL 31356 (N.D. Cal. Jan. 4, 2016) .......................... 35

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997) .............................................................................................. 38

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*,
   133 S. Ct. 1184 (2013) ............................................................................... 15, 20, 21, 24

*Anderson v. Mt. Clemens Pottery Co.*,
   328 U.S. 680 (1946) .............................................................................................. 27

*Arias v. Superior Court*,
   46 Cal. 4th 969 (2009) .......................................................................................... 32

*Armour & Co. v. Wantock*,
   323 U.S. 126 (1944) .............................................................................................. 26

*Bateman v. Am. Multi-Cinema, Inc.*,
   623 F.3d 708 (9th Cir. 2010) ................................................................................. 14

*Baum v. AstraZeneca LP*,
   605 F. Supp. 2d 669 (W.D. Pa. 2009) *aff'd on other grounds*, 372 F. App'x 246
   (3d Cir. 2010) ........................................................................................................ 26

*Bonnette v. California Health & Welfare Agency*,
   704 F.2d 1465 (9th Cir. 1983) ............................................................................ 22, 24

*Bouaphakeo v. Tyson Foods, Inc.*,
   765 F.3d 791 (8th Cir. 2014) *cert. granted*, 135 S. Ct. 2806 (2015) .................... 14, 27

*Boyd v. Bank of Am. Corp.*,
    300 F.R.D. 431 (C.D. Cal. 2014) ................................................................27, 30, 32, 38

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013)...............................................................................20

*Cejas Commercial Interiors, Inc. v. Torres-Lizama*,
    316 P.3d 389 (2013) ...............................................................................................24

*Centeno v. I&C Earthmovers Corp.*,
    970 F. Supp. 2d 1280 (S.D. Fla. Sept. 6, 2013) ..................................................29

*Chu Chung v. New Silver Palace Restaurants, Inc.*,
    272 F. Supp. 2d 314 (S.D.N.Y. 2003)..................................................................23

*Collinge v. IntelliQuick Delivery, Inc.*,
    No. 2:12-CV-00824 JWS, 2015 WL 1292444 (D. Ariz. Mar. 23, 2015)...................34

*Evon v. Law Offices of Sidney Mickell*,
    688 F.3d 1015 (9th Cir. 2012)........................................................................17, 19

*Garcia v. San Antonio Metro. Transit Auth.*,
    469 U.S. 528 (1985) ...............................................................................................22

*Giles v. St. Charles Health Sys., Inc.*,
    294 F.R.D. 585 (D. Or. 2013) ...............................................................................33

*Goldberg v. Whitaker House Cooperative, Inc.*,
    366 U.S. 28 (1961) .................................................................................................23

*Guifu Li v. A Perfect Day Franchise, Inc.*,
    5:10-CV-01189-LHK, 2012 WL 2236752 (N.D. Cal. June 15, 2012) (Koh, J.) ......28

*Gunnells v. Healthplan Servs., Inc.*,
    348 F.3d 417 (4th Cir. 2003)................................................................................20

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998)........................................................................17, 21

*Harris v. Palm Springs Alpine Estates, Inc.*,
    329 F.2d 909, 913–14 (9th Cir.1964)....................................................................15

*Jimenez v. Allstate Ins. Co.*,
    765 F.3d 1161 (9th Cir. 2014)..................................................................... *passim*

*Juvera v. Salcido*,
    294 F.R.D. 516 (D. Ariz. 2013) ............................................................................34

*Kristensen v. Credit Payment Servs.*,
   12 F. Supp. 3d 1292, 1306 (D. Nev. 2014) ...............................................................19

*Laborers' Int'l Union of N. Am., AFL-CIO v. Case Farms, Inc.*,
   488 S.E.2d 632 (1997)..............................................................................................23

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013)............................................................................ *passim*

*Martinez v. Combs*,
   49 Cal. 4th 35, 231 P.3d 259 (2010), *as modified* (June 9, 2010).........................22, 24

*Martinez v. Ehrenberg Fire Dist.*,
   No. CV-14-00299-PHX-DGC, 2015 WL 3604191 (D. Ariz. June 8, 2015) ......................22, 23

*Martino v. Ecolab, Inc.*,
   No. 14-CV-04358-PSG, 2016 WL 614477 (N.D. Cal. Feb. 16, 2016)....................................35

*McLaughlin v. Ho Fat Seto*,
   850 F.2d 586 (9th Cir. 1988)..............................................................................27, 36

*Medepalli v. Maximus, Inc.*,
   No. CIV S-06-2774 FCD EF, 2008 WL 958045 (E.D. Cal. Apr. 8, 2008)..............................30

*Minns v. Advanced Clinical Employment Staffing LLC*,
   No. 13-CV-03249-SI, 2015 WL 3491505 (N.D. Cal. June 2, 2015) ..............................25, 29

*Moon v. Kwon*,
   248 F. Supp. 2d 201 (S.D.N.Y. 2002) ......................................................................26

*Morgan v. Family Dollar Stores, Inc.*,
   551 F.3d 1233 (11th Cir. 2008) ..............................................................................28

*Morillion v. Royal Packing Co.*,
   22 Cal. 4th 575 (2000)........................................................................................26, 29

*Mudgett v. Univ. of Pittsburg Med. Ctr.*,
   No. CIV.A.09-254, 2010 WL 1838413 (W.D. Pa. May 6, 2010) .......................................30

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. July 28, 2015) ......................................................................16

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
   No. C 09-1967 CW, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) .........................................38

*Newell v. Runnels*,
   967 A.2d 729 (Md. 2009).........................................................................................24

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ................................................................14, 16, 38

*Peterson v. Snodgrass*,
    683 F. Supp. 2d 1107 (D. Or. 2010) ......................................................................30

*Rai v. Santa Clara Valley Transp. Auth.*,
    308 F.R.D. 245 (N.D. Cal. 2015) .................................................................. *passim*

*Reich v. S. New England Telecommunications Corp.*,
    121 F.3d 58 (2d Cir. 1997) ...................................................................................28

*Ries v. Arizona Beverages USA LLC*,
    287 F.R.D. 523 (N.D. Cal. 2012) ..........................................................................16

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) ..............................................................................38

*Rosales v. El Rancho Farms*, No. 1:09-CV-00707-AWI, 2014 WL 321159, at *7
    (E.D. Cal. Jan. 29, 2014) *report and recommendation adopted*, No. 1:09-CV-
    00707-AWI, 2014 WL 631586 (E.D. Cal. Feb. 18, 2014)....................................28

*Rutherford Food Corp. v. McComb*,
    331 U.S. 722 (1947) ..............................................................................................23

*Sethi v. Narod*,
    974 F. Supp. 2d 162 (E.D.N.Y. 2013)...................................................................30

*Skrzecz v. Gibson Island Corp.*,
    No. CIV.A. RDB-13-1796, 2014 WL 3400614 (D. Md. July 11, 2014) ...............26

*Stockwell v. City & Cty. of San Francisco*,
    749 F.3d 1107 (9th Cir. 2014) .........................................................................14, 15

*Thompson v. U.S. Airways, Inc.*,
    717 F. Supp. 2d 468 (E.D. Pa. 2010) ....................................................................24

*Tokoshima v. Pep Boys Manny Moe & Jack of California*,
    No. C-12-4810-CRB, 2014 WL 1677979 (N.D. Cal. Apr. 28, 2014)................26, 33

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
    471 U.S. 290 (1985) ..............................................................................................23

*Torres v. Air to Ground Servs., Inc.*,
    300 F.R.D. 386 (C.D. Cal. 2014) ..........................................................................19

*Torres-Lopez v. May*,
    111 F.3d 633 (9th Cir. 1997) ...........................................................................24, 25

*Villalpando v. Exel Direct Inc.*,
  303 F.R.D. 588 (N.D. Cal. 2014) (Spero, J.)..................................................25, 37

*Villalpando v. Exel Direct Inc.*,
  No. 12-CV-04137 JCS, 2014 WL 1338297
  (N.D. Cal. Mar. 28, 2014) (Spero, J.) ...............................................................32

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541, 2550 (2011) ............................................................................19

*Walling v. Portland*,
  330 U.S. 148 (1947). .........................................................................................23

*Wang v. Chinese Daily News, Inc.*,
  737 F.3d 538 (9th Cir. 2013).............................................................................19

*Welling v. Alexy*,
  155 F.R.D. 654 (N.D.Cal.1994) ........................................................................15

*In re Wells Fargo Home Mortgage Overtime Pay Litig.*,
  571 F.3d 953 (9th Cir. 2009).............................................................................35

*Wren v. RGIS Inventory Specialists*,
2009 U.S. Dist. LEXIS 74789, at *22 (N.D. Cal. Aug. 24, 2009) ....................29

*Wren v. RGIS Inventory Specialists*,
  256 F.R.D. 180 (N.D. Cal. 2009) ............................................................. *passim*

**Statutes**

29 U.S.C. § 213(a)(3) ...............................................................................................32

12 N.Y. Lab. Law § 651.....................................................................................22, 30

12 N.Y. Lab. Law § 652.....................................................................................22, 25

43 Penn. Stat. § 333.105............................................................................................31

Ariz. Rev. Stat. § 23-362...........................................................................................22

Ariz. Rev. Stat. §§ 23-363–64.............................................................................22, 25

Cal. Code Regs. tit. 8, § 11100.2E...........................................................................22

Cal. Lab. Code § 510.................................................................................................22, 27

Cal. Lab. Code § 1182.12....................................................................................22, 25

Code of Ma. Reg. 09.12.41.10 .................................................................................29

Fla. Stat. § 448.110 ................................................................................. *passim*

Md. Code Lab. & Empl. § 3-101 .......................................................................22

Md. Code. Lab. & Empl. § 3-413 ...............................................................22, 25, 31

Md. Code Lab. & Empl. § 3-415 ................................................................22, 27

Md. Code Regs. 09.12.41.17 ..........................................................................30

N.C. Gen. Stat. § 95-25.2 ..................................................22, 25, 26, 29, 31

N.C. Gen. Stat. § 95-25.4 ......................................................22, 27, 31

N.C. Gen. Stat. § 95-25.3 ......................................................22, 25, 31

N.C. Gen. Stat. § 95-25.4 ........................................................20, 25

N.C. Gen. Stat. § 95-25.14 .............................................................30

Or. Rev. Stat. § 653.010 ...............................................................22

Or. Rev. Stat. § 653.025 ...............................................................25

Pa. Code § 231.1 .................................................................26, 27, 29

Pa. Code § 231.21 ..................................................................22, 25

Pa. Code § 231.41 ........................................................................22

Pa. Cons. Stat. § 333.105 ........................................................30, 31

Pa. Stat. Ann. § 333.103 ..............................................................22

**Other Authorities**

29 C.F.R. 785.11 ..........................................................................26

29 C.F.R. § 541.300 ......................................................................30

29 C.F.R. § 541.602 ......................................................................31

29 C.F.R. § 785.12 ........................................................................26

29 C.F.R. § 785.38 ........................................................................29

29 CFR § 541.300 . .......................................................................30

12 N.Y.C.R.R § 142-2.1 ...................................................................9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12 N.Y.C.R.R. § 142-2.2 .................................................................................22, 27, 31

12 N.Y.C.R.R. § 142-2.14 ...............................................................................30

34 Pa. Code § 231.84 ......................................................................................30

13 N.C. Admin. C. 12 .0103 ...........................................................................26

Ariz. Admin. Code R20-5-1202 ......................................................................26

IWC Wage Order 4-2001, as amended and effective July 1, 2014 ................30

N.Y. Dep't of Labor Opinion Letter, August 10, 2010, RO-09-0190 ............29

Newberg on Class Actions § 4:50 (5th ed.) ..............................................19, 20

Or. Admin. R. 839-020-0004 ..........................................................................26

Or. Admin. R. 839-020-0005 ..........................................................................30

Or. Admin. R. 839-020-0045 ..........................................................................29

Or. Admin. R. 839-020-0030 .......................................................................22, 7

Rule 23 ........................................................................................................15, 38

Substantive Policy Statement Interpreting "Hours Worked"
     For Purposes of the Arizona Minimum Wage Act, Aug. 16, 2007 ...........29

## INTRODUCTION

Major League Baseball ("MLB") and its 30 member franchises collectively operate the multi-billion dollar business of professional baseball. They attain their massive profits on the backs of professional baseball players. The vast majority of these baseball players will never sign a million-dollar contract or even play in a major league stadium. Instead, they will toil in the minor league "farm system," under a standard form Minor League Uniform Player Contract ("UPC") and be subjected to facially unlawful and oppressive pay practices.

Under the standard terms of the UPC, MLB and its franchises do *not* pay minor leaguers wages during spring training, do *not* pay minor leaguers wages for winter conditioning, do *not* pay minor leaguers wages for instructional leagues, and do *not* pay minor leaguers any overtime regardless of the number of hours worked. During the few months when minor leaguers are actually paid, their wages are often so low that they do not satisfy basic minimum wage requirements, with monthly salaries beginning at $1,100 per month.

Thousands of minor leaguers for all 30 MLB franchises are currently reporting to spring training. While there, they will toil for long hours, seven days per week. No matter the MLB franchise, they will not receive wages for this work. Once the season begins, the abuses will continue, as minor leaguers will continue to work long hours, often seven days per week, at wages that often fall below the minimum, and they will not be paid overtime. Minor leaguers will then perform even more required work once the season ends, and they will not be paid.

Through this lawsuit, Plaintiffs seek to ensure that MLB and its franchises to comply with the same laws that apply to all other businesses (large and small). Plaintiffs seek to do so for all minor leaguers. After all, extensive evidence in the form of depositions, documents, declarations, and expert materials has confirmed what Plaintiffs have alleged from the beginning: a minor leaguer working in California is treated the same as a minor leaguer working in Pennsylvania.

In one fell swoop, the Court can therefore determine for all minor leaguers whether they should be paid for all work performed, whether they are entitled to overtime pay, and whether the

minimum wage laws apply to MLB and its franchises. The Court should consequently grant Plaintiffs' motion for class certification.

**PROCEDURAL AND FACTUAL BACKGROUND**

**I.       Relevant Procedural History.**

Plaintiffs filed their initial complaint against MLB, Selig, and three MLB franchises on February 7, 2014. (Dkt. 1). In subsequent months, Plaintiffs twice amended, adding more Plaintiffs and naming all 30 MLB franchises as Defendants.[3] (Dkt. Nos. 19, 57). On October 10, 2014, the Court consolidated a related case with this action and appointed Korein Tillery, LLC and Pearson, Simon & Warshaw, LLP as Interim Co-Lead Counsel over the actions. (Dkt. 236). Plaintiffs later filed the operative Second Consolidated Amended Complaint. (Dkt. 382).

On October 20, 2015, the Court conditionally certified Plaintiffs' proposed collective under the Fair Labor Standards Act ("FLSA"), which authorized notice to be sent to minor leaguers within the proposed collective. (Dkt. 446). The Court found that Plaintiffs had demonstrated a sufficient nexus between the claims to warrant conditional certification. *Id.* Over 2,200 minor leaguers opted into the FLSA collective before the deadline of February 11, 2016. *See* Simon Decl., ¶ 12.

**II.      Relevant Facts.**

       **A. MLB and Its Franchises Have Implemented Uniform Contracts, Policies, and the Major League Rules to ensure similar conditions of employment.**

MLB is an unincorporated association consisting of the 30 MLB franchises.[4] MLB and its franchises operate under the Major League Rules ("MLR"), which govern the recruitment, drafting, hiring, pay, and employment of minor leaguers and the structure of the entire minor league system.[5]

---

[3] The Atlanta Braves, Chicago White Sox, Tampa Bay Rays, Washington Nationals, Philadelphia Phillies, Boston Red Sox, Baltimore Orioles, and Cleveland Indians were later dismissed for lack of personal jurisdiction. (Dkt. 379). Players for these organizations still have claims against MLB and are members of the relevant classes.
[4] *See* Broshuis Decl., Ex. A (Major League Constitution, at Art. II, § 1).
[5] *See* Broshuis Decl., Ex. B (attaching the MLRs produced by MLB). All references to the MLRs will refer to this attachment to the Broshuis Declaration.

MLR 4, for instance, governs the process that MLB franchises must follow when hiring amateur players as minor leaguers. For players from the United States, Canada, and Puerto Rico, a draft is held in June of each year, which allows the MLB teams to select the amateur players they desire to employ and attain the exclusive right to sign the player to a UPC. (MLR 4(a)). For players from most other countries, an international signing period takes place each year.[6]

MLR 3(b)(2) mandates that all minor league players must sign the same minor league UPC "[t]o preserve morale among Minor League players and to produce the *similarity of conditions* necessary for keen competition." (Emphasis added.) The form UPC is attached to the MLRs as Attachment 3.[7] MLR 3 mandates that the MLB franchises cannot deviate from the form UPC, and players must sign it before performing work. Also, all UPCs must be approved by MLB. (MLR 3(b)(3)). Evidence confirms that all MLB franchises use this form UPC when employing their minor leaguers.[8]

The initial UPC signed by all minor leaguers must be for seven championship seasons. (MLR 3(b)(2)). If a player's initial UPC expires, or if the player is released, then the player may sign a subsequent UPC with another MLB franchise for a shorter duration. But until the player is released, traded, or the UPC expires, the player cannot work for another MLB franchise as a minor leaguer.[9]

The MLRs also dictate that the MLB franchises—not the minor league affiliates—determine where to assign the players to work and select the coaches and managers that oversee the players. (MLR 56(g)). The MLRs also establish rules governing the minor league playing schedule and for minor league travel during the championship season. (MLR 57)).

**B.  MLB and its franchises have implemented uniform pay practices for all class members.**

---

[6] Broshuis Decl., Ex. C, 2012–2016 Basic Agreement, at 268.
[7] The references to the UPC will refer to the form UPC found at Attachment 3 of the MLRs. For more examples of UPCs, see Exhibit D to the Broshuis Declaration.
[8] *See* Broshuis Decl., Ex. D (attaching exemplar UPCs for all the MLB franchises).
[9] *See id.*

The UPC and MLRs also control when, how, and what minor leaguers are paid. The UPC mandates that wages will only be paid during the championship season.[10] UPC ¶ VII.B. But the same contract provision requires minor leaguers to perform work throughout the year, stating:

> This [UPC] obligates Player to perform professional services on a calendar year basis, regardless of the fact that salary payments are to be made only during the actual championship playing season…Player therefore understands and agrees that Player's duties and obligations under this [UPC] continue in full force and effect throughout the calendar year.

When wages are actually paid during the season, the UPC dictates that all minor leaguers must be paid in the same manner, twice per month "on the 15th day and last day of the month after the beginning of Club's championship playing season." UPC ¶ VII.B. All first-year minor leaguers must also earn the same wages. MLR 3(c)(2).

Discovery to date confirms the uniform implementation of these policies. No matter the MLB franchise, minor leaguers only receive their paychecks during the championship season.[11] They are not paid during spring training, instructional leagues, for winter workouts, or when performing other mandatory work that falls outside the championship season.[12] MLB sets the initial, uniform salary for first-year players at $1,100 per month.[13] The MLB franchises use non-negotiable salary scales that

---

[10] As defined in the UPC, the championship season is the "full schedule of regular-season games," which is roughly April to September.

[11] *See* Broshuis Decl., Ex. F (collecting documentary evidence and deposition testimony discussing pay practices); Bennigson Decl., Ex. A; Britt Decl., Ex. A; Daly Decl., Ex. A; Duff Decl., Ex. A; Frevert Decl., Ex. A; Gagnier Decl., Ex. A; Gaston Decl., Ex. A; Giarraputo Decl., Ex. A; Henderson Decl., Ex. A; Hilligoss Decl., Ex. A; Hutson Decl., Ex. A; Kahaulelio Decl., Ex. A; Khoury Decl., Ex. A; Kiel Decl., Ex. A; Lawson Decl., Ex. A; Liberto Decl., Ex. A; Meade Decl., Ex. A; Murray Decl., Ex. A; Nadeau Decl., Ex. A; Newby Decl., Ex. A; Newsome Decl., Ex. A; Nicholson Decl., Ex. A; Odle Decl., Ex. A; Opitz Decl., Ex. A; Ortiz Decl., Ex. A; Pahuta Decl., Ex. A; Pease Decl., Ex. A; Pinckney Decl., Ex. A; Quinowski Decl, Ex. A; Santiago Decl., Ex. A; Senne Decl., Ex. A; Smith Decl., Ex. A; Stone Decl., Ex. A; Watts Decl., Ex. A; Weeks Decl., Ex. A; Woodruff Decl., Ex. A [hereinafter "Plaintiff Declarations"];

[12] *Id.*

[13] *See* Broshuis Decl., Ex. F (collecting documents and testimony showing the initial salaries beginning at $1,100 per month and the MLB franchises' salary scales).

1   establish the monthly wages for subsequent years under the initial UPC.[14] Before spring training,

2   players sign "Addendum Cs" to their UPCs that set forth these wages.[15]

3        These uniform salaries fail to comply with state and federal minimum wage and overtime laws.

4   The UPC does not allow for the payment of overtime wages to minor league players, resulting in a

5   uniform failure to pay overtime. *See* UPC. Despite schedules that frequently result in more than 40

6   hours of work per week, MLB and its franchises admit that they never pay minor leaguers an overtime

7   rate.[16]

8        If a minor leaguer's initial UPC expires, or if he is released, he may then sign a subsequent

9   UPC. Yet while the basic championship season salary may increase for some such players, the same

10  UPC rules governing compensation for *all* minor leaguers remain the same. No matter how long a

11  minor leaguer has played, the minor leaguer is not paid for work performed outside the championship

12  season and is not paid overtime.[17] This is no accident: the goal of MLR 3(b)(2) has been realized, as

13  the UPC has indeed produced a "similarity of conditions" for all minor leaguers.

14       **C.  The similar work and duties performed by all class members.**

15       The business of player development in professional baseball follows the same, well-established

16  annual calendar across all MLB franchises and their affiliates. Minor leaguers attend spring training

17  from early March to early April.[18] The championship season then takes place from early April to

18  September.[19] Many minor leaguers then attend instructional leagues from mid-September to mid-

19  October.[20] And minor leaguers must perform more training and workouts during the remaining

20  months while they complete off-season conditioning programs.[21]

21  _____

22  [14] *Id.* MLB even issues a memo establishing the baseline for these salary structures. *See id.,* Ex. F-1.

23  [15] *See* Broshuis Decl., Ex. G (collecting exemplar Addendum Cs for the MLB franchises).
    [16] Broshuis Decl., Ex. H (Defendants' answers to requests for admissions, in which they admit to

24  never providing overtime pay).
    [17] *See* Broshuis Decl., Ex. D (providing exemplars of UPCs, including some non-first-year UPCs such

25  as Ryan Khoury's second UPC with the Red Sox).
    [18] *See* Broshuis Decl., Ex. I (collecting examples of spring training schedules).

26  [19] *See* Broshuis Decl., Ex. J (collecting testimony regarding in-season schedules and routines).
    [20] *See* Broshuis Decl., Ex. K (collecting examples of instructional league schedules).

27  [21] *See* Broshuis Decl., Ex.U (collecting exemplars of off-season training programs).

28

1    The similarities extend both vertically and horizontally. If an MLB franchise transfers a player

2  from the Advanced A level to the Double A level, for instance, the work routine will remain similar.[22]

3  After all, the MLB franchises' player development hierarchies—which include farm directors, field

4  coordinators, and other various coordinators roving from level to level—ensure consistency within

5  the organizations.[23] Additionally, the confines of common game schedules for the various work

6  periods—alongside standard industry practices—lead to remarkable similarities both within and

7  across MLB franchises. Unsurprisingly, many Plaintiffs and fact witnesses who have been employed

8  by multiple teams have confirmed that schedules and policies are consistent between teams.[24] As one

9  Plaintiff who worked for three different organizations testified, "The only differences between all

10  three organizations was the color of the paint on the walls and the names of the coaches."[25]

11    *1. The similar work performed during spring training.*

12    All MLB franchises have minor league spring training at their Florida and Arizona

13  complexes.[26] It generally begins in early March and concludes just before the championship season

14  begins in early April.[27]

15    Minor league players usually work seven days per week during spring training,[28] and the

16  workload is extensive. During the early days of spring training, minor leaguers arrive to the complexes

17  daily and perform required work routines, which include baseball-related activities such as stretching,

18

19

20

21  _____

22  [22] *See* Plaintiff Declarations; Broshuis Decl., Ex. J (collecting testimony discussing in-season routines).

23  [23] *See* Broshuis Decl., Ex. M (collecting evidence showing similarities in organizational structure).

   [24] *See* Broshuis Decl., Ex. N-1 (Scales Dep. Tr. at 118–19) ████████████████████████

24  ████████████████████████████████████████████████████████████████████████
   Ex. N-2 (Harper Dep. Tr. 169, 174–79); Broshuis Decl., Ex. N-3 (Newby Dep. Tr. at 79).

25  [25] Broshuis Decl., Ex. N-3 (Newby Dep. Tr. 79).

   [26] *See* Broshuis Decl., Ex. I (collecting examples of spring training schedules).

26  [27] *Id.*

   [28] *See* Plaintiff Declarations; *see also* Broshuis Decl., Ex. I (spring training schedules); Broshuis Decl.

27  Ex. O (collecting deposition excerpts from Defendants witnesses discussing spring training routines).

28

1   throwing, running, hitting, and fielding.[29] Although specific practice drills may change from day to

2   day, the work routines are standardized and remain similar from team to team.[30]

3          Around the middle of March, spring training games begin and workdays become longer.

4   Spring training games usually start at 1:00 and take place nearly every day once they commence.[31]

5   Minor leaguers arrive early in the morning on these game days and perform similar morning routines

6   as performed earlier in spring. They then ready themselves for the day's 1:00 game. The spring games

7   last around three hours, meaning they do not conclude until late afternoon.[32]

8          Required strength and conditioning workouts take place throughout spring training. A

9   strength and conditioning coordinator—with the assistance of strength coaches—develops the

10  workouts, schedules the workouts, and supervises them.[33]

11         The MLB franchises' daily schedules, their employees' testimony, and other evidence has

12  substantiated what Plaintiffs have now alleged for two years: minor leaguers work long hours during

13  spring training for no pay.[34] Indeed, Plaintiffs' survey expert, J. Michael Dennis, Ph.D., conducted a

14  pilot study to assess minor leaguers' work patterns; out of the 195 minor leaguers surveyed, nearly

15  85% stated that they were expected to work more than 40 hours per week during spring training, and

16  over 30% stated that they were expected to work more than 55 hours per week.[35] Thus, thousands of

17  minor leaguers have worked—and are currently working this spring—without receiving any wages.

18         *2. The similar work performed during extended spring training.*

19         Once spring training concludes, MLB and its franchises require many minor leaguers to

20  continue working at the Florida and Arizona complexes in what is called extended spring training. As

21  explained by one of Defendants' employees, ███████████████████████

---

22

23  [29] *Id.*
    [30] *Id.*

24  [31] *See* Broshuis Decl., Ex. I (spring training schedules); Broshuis Decl. Ex. O (collecting deposition excerpts from Defendants witnesses discussing spring training routines).

25  [32] *Id.*
    [33] *Id.*

26  [34] *See* Plaintiff Declarations; *see also* Broshuis Decl., Ex. I (spring training schedules); Broshuis Decl. Ex. O (collecting deposition excerpts from Defendants witnesses discussing spring training routines).

27  [35] Dennis Decl., Ex. E.

28

1    ██████████████████████████████████████████████████[36] It generally

2    lasts from early April until June (around the time of MLB's amateur draft).[37] The work performed is

3    similar to that performed during spring training. Meetings, stretching, drills, batting practice, and other

4    work activities take place before games are played.[38]

5         *3. The similar work performed during the championship season.*

6         The championship season also begins once spring training ends. Each MLB franchise has at

7    least six minor league affiliates.[39] Games are mostly night games, with 7:00 being a frequent start

8    time.[40] Games are usually played seven days per week, with only a couple off days scheduled each

9    month.[41]

10        The sample daily schedules, daily travel itineraries, survey data, declarations, and deposition

11   testimony reveal an extensive daily work routine for minor leaguers that begins long before the game's

12   start time.[42] For a 7:00 night game at home, almost 90% of minor leaguers surveyed in Dr. Dennis's

13   pilot study stated they arrived at the stadium before 2:00.[43] They do so to perform activities such as

14   early hitting in batting cages, stretching, warm-up routines, throwing, other drill work, and any

15   scheduled early work.[44]

16        Batting practice is taken before almost every night game.[45] The home team takes batting

17   practice first at around 4:00 or 4:30 for a 7:00 game.[46] While the home team takes batting practice, the

---

19   [36] Broshuis Decl., Ex. P (Scales Dep. Tr. at 34).
20   [37] *See* Broshuis Decl., Ex. Q (compiling evidence discussing extended spring training in the form of schedules and testimony).
21   [38] *Id.*
     [39] *See* Woodfork Declaration, Ex. A (Dkt. 118-1).
22   [40] *See* Kriegler Decl., ¶ 17; Broshuis Decl., Ex. R (collecting in-season schedules and travel itineraries).
     [41] *Id.* Game schedules of course show the actual scheduled start times. *See* Kriegler Decl., ¶ 22.
23   [42] Broshuis Decl., Ex. J (collecting testimony regarding in-season schedules and routines); Broshuis
24   Decl., Ex. R (collecting in-season schedules and travel itineraries); Dennis Decl., Ex. E; Plaintiff Declarations.
25   [43] Dennis Decl., Ex. E; *see also* Plaintiff Declarations.
     [44] Plaintiff Declarations, *supra* note X; Broshuis Decl., Ex. R (collecting sample daily in-season
26   schedules and travel itineraries); Broshuis Decl., Ex. J (collecting excerpts of deposition testimony describing in-season routines).
27   [45] Bill Bavasi, the former general manager for two MLB franchises, testified that ████████████
28   (footnote continued)

visiting team prepares for their own batting practice (e.g., stretching, warming up, throwing). The visiting team then begins batting practice around 5:00 or 5:30.[47] After batting practice concludes, the players return to the clubhouse. They remain at the stadium during the period between batting practice and the game, and they attend meetings and otherwise ready themselves for the game.[48]

Typical games last between two-and-a-half and three hours, and official game lengths are available and calculable.[49] After the games end, postgame meetings and training room activities are common, and post-game weightlifting sometimes occurs.[50] For a home game, approximately 95% of minor leaguers surveyed by Dr. Dennis stated that they do not leave the stadium until at least 30 minutes after the game.[51]

For day games, the work day is sometimes shorter, yet players still must arrive to the stadium several hours before the scheduled game time to perform pregame work activities. Dr. Dennis's preliminary survey showed that around 80% of minor leaguers arrive before 10:00 for a 1:00 game.[52] The same routine takes place after the games as for night games.[53]

Strength and conditioning also takes place during the season. The MLB teams employ strength and conditioning coaches and coordinators to develop, schedule, and supervise the workouts.[54] The workouts must be performed both at home and while on the road.

Minor league players must travel with the team for road trips during the season.[55] At all levels below Triple A, this travel almost always takes place on a team bus.[56] Players take their gear on the

---

██████████████████████████████████████████████████████████████████████████. Broshuis Decl., Ex. J-1 (Bavasi Dep. Tr. at 254). *See also* Broshuis Decl., Ex. R (in-season schedules and itineraries).
[46] Broshuis Decl., Ex. R (collecting sample daily in-season schedules and travel itineraries).
[47] *Id.*; *see also* Broshuis Decl., Ex. J (excerpts of deposition testimony describing in-season routines).
[48] *Id.*
[49] Kriegler Decl., ¶ 18; Broshuis Decl., Ex. J (collecting deposition excerpts describing in-season routines).
[50] *Id.*
[51] Dennis Decl., Ex. E; *see also* Plaintiff Declarations.
[52] *Id.*
[53] Plaintiff Declarations; Broshuis Decl., Ex. J (collecting excerpts describing in-season routines).
[54] *Id.*; Broshuis Decl., Ex. M (collecting evidence showing similarities in organizational structure).
[55] Broshuis Decl., Ex. S (collecting evidence discussing travel requirements); Plaintiff Declarations.

1  bus, which departs from the stadium to the site of another minor league team. This travel time is

2  extensive, and Plaintiffs' damages expert, Dr. Brian Kriegler, has developed a methodology for

3  calculating the travel time for each minor league road trip. *See* Kriegler Decl. ¶¶ 19–20.

4       The substantial evidence collected to date has thus again confirmed what Plaintiffs have

5  alleged for two years: minor leaguers work exhaustive workweeks during the season without receiving

6  overtime pay. Frank Viola, a coach for the New York Mets, ████████████████████

7  ███████████████████████████████████.[57] Other employees of Defendants have

8  likewise confirmed the long hours, as has Dr. Kriegler's work to date.[58]

9       *4. The similar work performed during instructional leagues.*

10       Each fall, many minor leaguers work during instructional leagues held at the MLB franchises'

11  Arizona and Florida complexes.[59] The leagues take place from around mid-September to mid-

12  October.[60] Evidence demonstrates that the work performed is similar to that performed during spring

13  training.[61] Meetings, stretching, drills, batting practice, and other work activities take place in the

14  morning, and games usually take place in the early afternoon. Travel to away games is similar to spring

15  training. Work is usually performed six days per week.[62]

16       Like spring training, minor leaguers do not receive any wages for this work.[63]

17       *5. The similar work performed during the winter training period.*

18       Even after the championship season and instructional leagues conclude, the work continues.

19  The MLB franchises' strength and conditioning coordinators develop baseball-related strength and

20

21  ───────────────────

22  [56] *Id.*; *see also* Broshuis Decl., Ex. J (collecting deposition excerpts describing in-season routines).
   [57] Broshuis Decl., Ex. T-1 (Viola Dep. Tr. at 202–04).

23  [58] *See* Broshuis Decl., Ex. T-2 (Scales Dep. Tr. 129–33, 251–52), Ex. T-3, (Candaele Dep. Tr. 241–43);

24  Kriegler Decl. ¶ 13 and Ex. 8.
   [59] *See* Broshuis Decl., Ex. K (collecting evidence discussing instructional leagues in the form of game

25  schedules, daily schedules, and testimony).
   [60] *Id.*

26  [61] *Id.*
   [62] *Id.*

27  [63] *Id.*; *see also* Broshuis Decl., Ex. F (collecting salary structures and pay practices).

28

1  conditioning manuals for the winter training period that are provided to their minor leaguers.[64] MLB

2  franchises follow up with minor leaguers to track the progress of the work and expect them to

3  perform it, with many even requiring players to maintain logs or otherwise verify their work.[65] When

4  asked if minor leaguers need to stay in shape during the winter, one of Defendants' minor league

5  coordinators, Jody Reed, gave a straightforward response: ███████████████████

6  ███████[66]

7        The minor leaguers in fact perform baseball-related strength and conditioning during this time

8  period.[67] Minor leaguers also perform other baseball-related work during the winter training period to

9  prepare for the next season, such as throwing, hitting, and fielding.[68] So prevalent is hitting that Bill

10  Bavasi (former GM for two MLB franchises) ████████████████████████████

11  ████████████[69]

12        Minor leaguers do not receive any wages for this work.[70]

13                              **TRIAL PLAN**

14        Given these uniform policies and practices, Plaintiffs can establish both liability and damages

15  on a classwide basis in a single trial.

16        The legal issues can be distilled to a few common issues: whether minor leaguers must be paid

17  for work performed outside the championship season; whether minor leaguers must be paid overtime

18  pay; and whether minor leaguers must be paid the requisite minimum when they actually receive

19  wages during the season. For each of these issues, an overarching, preliminary element will be whether

20  MLB and its franchises "employ" their minor leaguers.

---

22  [64] *See* Broshuis Decl., Ex. U (compiling examples of strength and conditioning manuals); Broshuis Decl., Ex. V (compiling testimony describing strength and conditioning);

23  [65] *See* Plaintiff Declarations; Broshuis Decl., Ex. V (compiling testimony describing strength and conditioning); Broshuis Decl., Ex. U (compiling examples of strength and conditioning manuals).

24  [66] Broshuis Decl., Ex. V-1 (Reed Dep. Tr. at 167-68).

25  [67] *See* Dennis Decl., Ex. E; Plaintiff Declarations; Broshuis Decl., Ex. V (compiling testimony describing strength and conditioning).

26  [68] *Id.*

27  [69] Broshuis Decl., Ex. V-2 (Bavasi Dep. Tr. at 270).

[70] Plaintiff Declarations; Broshuis Decl., Ex. F (collecting salary structures and pay practices).

Several sources of evidence will demonstrate classwide liability for these key issues, including: (1) testimony from the 43 named Plaintiffs discussing duties and activities performed and estimating hours worked; (2) testimony from current and former employees of MLB and its franchises; (3) documentary evidence from MLB, its franchises, and Plaintiffs, including policies, payroll information, and schedules; and (4) expert testimony, including compilations of game times and travel times, an extensive survey, and possible industry experts. The classwide proof for these key issues is discussed more thoroughly below in the commonality and predominance section, but the current work of Plaintiffs' experts will first be discussed here.

To supplement the representative testimony, schedules, and other documentary evidence, Plaintiffs' expert statistician, Dr. Kriegler, will provide a comprehensive estimate of hours worked for each minor leaguer for each workweek. Dr. Kriegler has already constructed a database that provides reasonable estimates of travel times for *every in-season minor league trip since 2008*. Kriegler Decl. ¶¶ 17–19. Using data available from MiLB.com, he has also computed the duration of each game during the championship season. *Id.* In Dr. Kriegler's damages model, these two measures—travel times and game times—are supplemented with representative evidence of hours worked.

Although this evidence has not been finalized, Dr. Dennis has already performed a pilot of the survey, which demonstrates its validity and feasibility. Dennis Decl. ¶ 44. The pilot study collected responses from 195 minor leaguers who spanned all MLB franchises. Kriegler Decl. ¶ 27. The survey targeted the minor leaguers' work routines during spring training, the championship season, and the off-season work period. *Id.* ¶ 28. For the off-season, it accounted for possible increases or decreases in the magnitude of work during early months of the off-season work period versus later months. *Id.* ¶ 29; *see also* Dennis Decl. ¶ 25. For spring training, it accounted for possible increases or decreases in work across the spring training weeks. Kriegler Decl. ¶ 29; *see also* Dennis Decl. ¶ 23. And for the championship season, it accounted for possible differences in magnitude of work performed at home versus away games and night versus day games. Kriegler Decl. ¶ 29; *see also* Dennis Decl. ¶ 24. As Dr. Dennis concluded, "The pilot survey proves that a reliable statistical survey addressing the issues in this litigation is feasible." Dennis Decl. ¶ 44. Dr. Kriegler also opined that the preliminary survey

provides "concrete preliminary information about Potential Class Members and their hours worked," and that future information "can be readily incorporated into my damage model." Kriegler Decl. ¶ 32.

By combining the travel data, the average game lengths, and the pilot survey data, Dr. Kriegler has made preliminary computations for the 2015 San Francisco Giants minor leaguers working at different minor league levels and found persistent overtime violations. *See* Kriegler Decl., Ex. 8. For instance, a conservative measure demonstrated that 2015 Giants' minor leaguers working in Augusta, Georgia (a Giants' affiliate) worked more than 40 hours per week in all but three weeks of the 2015 season (the three weeks were partial workweeks—the first week, last week, and All-Star week). *Id.* At trial, Dr. Kriegler will be able to present similar computations for each minor leaguer. Kriegler Decl. ¶ 55–57. He will also be able to make similar computations for each workweek during the other work periods, such as spring training. *Id.* Documents such as schedules and daily itineraries, combined with the representative testimony, will validate the measurements.[71]

Once a minor leaguer's number of hours in a workweek are known, Dr. Kriegler can then determine whether a minimum wage or overtime violation occurred under the applicable state law. Kriegler Decl. ¶ 55–57. Using the payroll data produced by Defendants, he will determine each player's hourly rate and compare it to the required minimum rate. *Id.* If it falls below the minimum, then a minimum wage violation occurred for that time period. And if overtime hours accrued, then an overtime violation occurred. Again, Dr. Kriegler has already performed such preliminary calculations for some 2015 Giants minor leaguers, showing that he can assess which players suffered from minimum wage and overtime violations for which pay periods. Kriegler Decl. ¶ 13 and Exs. 8, 11.

Dr. Kriegler can also make accurate damages calculations on a classwide basis and for each class member using the payroll data, roster moves, and schedules. This data will indicate (1) where a minor leaguer worked during a given week, (2) how many days per week he worked, and (3) what his rate of pay was (if paid at all). Kriegler Decl. ¶¶ 18–34. Once the location and rate of pay are known, Dr. Kriegler can then use the hours worked to calculate both minimum wage and overtime damages

---

[71] Broshuis Decl., Ex. I (spring training schedules); Broshuis Decl. Ex. O (collecting deposition excerpts from Defendants' witnesses discussing spring training routines).

1   for each class member for each work period. *Id.* ¶¶ 13, 55. Dr. Kriegler's sample damages calculations

2   demonstrate this methodology. Kriegler Decl., Ex. 11.

3     The other claims, such as those for itemized wage statement violations and payday

4   requirements, will be derivative of the main claims. Damages can easily be calculated in a seamless

5   fashion, as Dr. Kriegler has already established. *Id.*

6     Plaintiffs' damages methodology is therefore tethered to Defendants' "actions that created the

7   legal liability." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Similar statistical methods

8   are commonly approved of in wage-and-hour cases since they ensure sufficient due process while

9   simultaneously allowing claims to be prosecuted in an efficient, representative manner. *See Bouaphakeo*

10   *v. Tyson Foods, Inc.*, 765 F.3d 791, 798 (8th Cir. 2014) *cert. granted*, 135 S. Ct. 2806 (2015) ("Plaintiffs do

11   rely on inference from average donning, doffing, and walking times, but they apply this analysis to

12   each class member individually. Using this representative evidence is comparable to a jury applying

13   testimony from named plaintiffs to find classwide liability."); *Rai v. Santa Clara Valley Transp. Auth.*,

14   308 F.R.D. 245, 264 (N.D. Cal. 2015) (approving damages plan involving employee data records and

15   possible use of extrapolation based on sampling). Such is the entire goal of Rule 23.

16     Plaintiffs consequently do not believe that any bifurcation will be needed at trial because both

17   liability and damages can be established simultaneously using common evidence and sound methods.

18   Yet, if it deems it necessary, the Court of course has discretion to bifurcate the matter. *Jimenez v.*

19   *Allstate Ins. Co.*, 765 F.3d 1161, 1168 (9th Cir. 2014). After all, any purported variations will relate to

20   the amount of a minor leaguer's damages once liability is established, and individualized damages do

21   not defeat class certification. *See id.* (citing authority from the Sixth, Seventh, and Fifth Circuits).

22               **LEGAL STANDARD**

23     To carry the burden, Plaintiffs must satisfy all of Rule 23(a)'s and one of Rule 23(b)'s

24   subsections' requirements. *See Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir.

25   2014); *Parsons v. Ryan*, 754 F.3d 657, 673 (9th Cir. 2014). Here, Plaintiffs seek certification under both

26   Rule 23(b)(2) and (b)(3).

27

28

The trial court has great discretion when deciding whether or not to certify a class, *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010), but a grant of class certification is accorded more deference than a denial, *Parsons*, 754 F.3d at 673. The trial court abuses its discretion when it relies on improper factors, omits substantial factors, or clearly misweighs the correct factors. *Bateman*, 623 F.3d at 712 (overturning denial of class certification). For instance, individualized damages are not a bar to class certification, so a court abuses its discretion by not certifying a class because of possible individualized damages inquiries. *Leyva*, 716 F.3d at 513.

Plaintiffs need not show that they will prevail on the merits of the claims to certify the class. *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1053 (9th Cir. 2015) (reversing denial of class certification in a wage and hour commute-time claim because district court improperly addressed the merits); *see also Stockwell*, 749 F.3d at 1112, 1117 (reversing denial of certification in an age discrimination case for same reason). Instead, the merits should be examined only to the extent needed to examine Rule 23's requirements. *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1195 (2013).

## ARGUMENT

### I.     The Proposed Classes Satisfy Rule 23(a), (b)(2), and (b)(3).

Rule 23(a) has four requirements: numerosity, commonality, typicality, and adequacy. Plaintiffs satisfy each of them. Plaintiffs also satisfy Rule 23(b)(3)'s predominance, which will be analyzed in the same section as commonality due to the overlap between the two inquiries, and meet Rule 23(b)(3)'s superiority requirement. Finally, Plaintiffs meet Rule 23(b)(2)'s requirements.

### A.   The class members are sufficiently numerous and ascertainable.

The proposed class should be so numerous that joinder of all members is impracticable. Rule 23(a)(1). Joinder is impracticable when joinder of all class members would be difficult or inconvenient. *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir.1964). While "there is no set number cut-off," courts have certified classes as small as 14 and often certify classes containing 50–60 members. *Wren v. RGIS Inventory Specialists*, 256 F.R.D. 180, 203 (N.D. Cal. 2009) (citing *Welling v. Alexy*, 155 F.R.D. 654, 656 (N.D.Cal.1994)). All of the proposed classes exceed these benchmarks.

MLB's active roster limits permit between 25 minor leaguers and 35 minor leaguers to be working on each minor league team.[72] California has ten minor league teams based within it; Florida has 30; Arizona has 13; North Carolina has nine; New York has 11; Pennsylvania has eight; Maryland has five; and Oregon has two.[73] Thus, the number of players working in each state during the championship season alone satisfies the numerosity requirement. Additional minor leaguers perform winter training work within the states after each season concludes, and thousands of minor leaguers perform spring training work each year in Arizona and Florida.[74]

A class is ascertainable if the class definition is clear and objective. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015); *see Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 535 (N.D. Cal. 2012). Nothing more is required. *Mullins*, 795 F.3d at 672. Plaintiffs' class definition is objectively tied to work performed under a minor league UPC within a state. The class members can be identified from Defendants' records such as roster moves and payroll data that show when and where the minor leaguers worked.

The classes are therefore sufficiently numerous and can be ascertained.

### B.   The claims are typical.

The claims brought here are also typical as required under Rule 23(a)(3). The typicality standard is a permissive one. *Parsons*, 754 F.3d at 685. "Representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Id.* The test is whether class members suffered similar types of injuries; whether the action results from similar conduct not unique to named plaintiffs; and whether other class members suffered injuries from this conduct. *Id.*

When a uniform policy is alleged, typicality is satisfied if class members and plaintiffs suffered similar (though not necessarily identical) types of injuries from the policy. *Id.*; *see also Rai*, 308 F.R.D. at 260 (typicality met in wage-and-hour case despite some variances in claims where common policies

---

[72] MLR 2 permits 35 players per roster for short-season teams.
[73] *See* Woodfork Decl., Ex. A (Dkt. 118-1).
[74] *See id.* ¶¶ 2–3 (stating that 15 MLB franchises have spring sites in Arizona and 15 in Florida).

1    were alleged). Like all members of the classes, the class representatives were employed as minor

2    league baseball players by MLB and its franchises. Like the class members, they were subjected to

3    MLB's uniform policies that dictated how they entered the minor league system, the conditions of

4    their employment, and the payment of their salaries. The same MLB uniform policies dictated that

5    they (like all class members) were not paid for work outside the championship season, and (like all

6    class members) were not paid overtime pay, even though they routinely worked more than 40 hours

7    per week.

8           Plaintiffs therefore suffered the same type of injuries as the class members and their claims are

9    substantially identical. Additionally, the broad composition of the 36 class representatives,[75] who

10   represent every MLB franchise and every level of minor league baseball, vitiates any potential

11   concerns regarding purported differences amongst class members. *Hanlon v. Chrysler Corp.*, 150 F.3d

12   1011, 1020 (9th Cir. 1998) ("[T]he broad composition of the representative parties vitiates any

13   challenge founded on atypicality.")

14          Typicality is consequently satisfied.

15          **C.  The class members are adequately represented.**

16          Rule 23(a) further requires that class members be adequately represented. This inquiry focuses

17   on two questions: (1) Do any conflicts of interest exists between named plaintiffs and class members?;

18   and (2) Will the action be vigorously prosecuted? *Hanlon*, 150 F.3d 1011. It is not necessary for the

19   named plaintiff to be the best possible representative; instead, the named plaintiff need only be

20   adequate. *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012). Class counsel must

21   also be qualified and capable, and must vigorously prosecute the class's interests. *Rai*, 308 F.R.D. at

22   261.

23   ────────────────────────

24   [75] Although there are 43 named Plaintiffs, only 36 of them will be class representatives. Plaintiffs will
     also soon file a motion to withdraw two of the named Plaintiffs, Matt Gorgen and Matt Lewis, as

25   class representatives and will seek leave to amend their complaint to add Aaron Dott as a class
     representative for the Florida and New York classes. Mr. Dott worked as a minor leaguer for both the

26   Tampa Bay Rays and the New York Yankees. *See* Dott Decl. Because he was picked by Defendants as
     one of the opt-ins required to respond to discovery requests, he will already be answering

27   interrogatories and producing documents.

28

The class representatives for each class[76] have all suffered wage-and-hour injuries while working as minor leaguers in the respective state. They do not have any conflicts of interests with class members, and all have worked diligently to prosecute this action. They have responded to discovery requests and attended depositions. They are willing to place the interests of absent class members ahead of their own[77] and are adequate class representatives.

Plaintiffs are represented in this case by counsel from Korein Tillery, LLC, and Pearson, Simon, & Warshaw, LLP, who this Court has already found satisfy the standards of Rule 23(g). (*See* Dkt. 236.) While acting as Interim Co-Lead Class Counsel, they have vigorously prosecuted the action by defending against multiple motions to dismiss and diligently conducting extensive discovery.[78] The parties and their counsel are consequently adequate.

**D.  The classes satisfy commonality and predominance.**

Rule 23(a)(2) requires that class members' claims depend on a common contention such that a central issue can be resolved in one stroke. *Jimenez*, 765 F.3d at 1165. "[T]he key inquiry is not whether the plaintiffs have raised common questions, 'even in droves,' but rather, whether class treatment will

---

[76] **California Class representatives**: Aaron Meade, Oliver Odle, Kyle Woodruff, Kyle Nicholson, Brandon Henderson, Craig Bennigson, Ryan Kiel, Jake Kahaulelio, Justin Murray, Dustin Pease, Mitch Hilligoss, Joseph Newby, Joel Weeks, Matt Daly, Kris Watts, Nick Giarraputo, David Quinowski, Brandon Pinckney, Lauren Gagnier, and Grant Duff.
**Florida Class representatives**: Ryan Khoury, Brandon Henderson, Ryan Kiel, Jake Kahauleelio, Jon Gaston, Tim Pahuta, Matt Daly, Aaron Senne, Brad Stone, Mitch Hilligoss, Jake Opitz, Ryan Hutson, Les Smith, Matt Frevert, Roberto Ortiz, Brett Newsome, Kris Watts, Nick Giarraputo, David Quinowski, Brandon Pinckney, Lauren Gagnier, Jeff Nadeau, Grand Duff, and Aaron Dott.
**Arizona Class representatives**: Aaron Meade, Jon Gaston, Oliver Odle, Kyle Woodruff, Craig Bennigson, Matt Lawson, Ryan Kiel, Justin Murray, Dustin Pease, Michael Liberto, Jake Opitz, Joseph Newby, Mitch Hilligoss, Kris Watts, Roberto Ortiz, Daniel Britt, Joel Weeks, Gaspar Santiago, David Quinowski, and Nick Giarraputo.
**North Carolina Class representatives**: Craig Bennigson and Aaron Senne.
**New York Class representatives**: Ryan Khoury, Jon Gaston, Matt Daly, Aaron Senne, Kris Watts, Nick Giarraputo, and Aaron Dott.
**Pennsylvania Class representatives:** Tim Pahuta, Kris Watts, and Lauren Gagnier.
**Maryland Class representatives**: Roberto Ortiz and Brett Newsome.
**Oregon Class representative**s: Joel Weeks, Gaspar Santiago, and David Quinowski.
[77] *See* Plaintiff Declarations.
[78] *See* Declarations of Bruce L. Simon and Steve Tillery.

'generate common *answers* apt to drive the resolution of the litigation.'" *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011)). Not *every* question must be common, however, for only a single common question is needed if it is apt to drive the resolution of the litigation. *Id.*; *Jimenez*, 765 F.3d at 1165. Commonality exists even "[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class." *Evon*, 688 F.3d at 1029.

Whether an issue is common depends on whether "(1) it is susceptible to generalized, class-wide proof; or (2) if the same evidence will suffice for each member to make a prima facie showing of that issue." *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1306 (D. Nev. 2014) (citing *Newberg on Class Actions* § 4:50 (5th ed.)). Conversely, "[a]n issue is individual if members of a proposed class will need to present evidence that varies from member to member." *Kristensen*, 12 F. Supp. 3d at 1306. Commonality is satisfied when class members suffer the same type of injury—they need not suffer the same *magnitude* of injury since the magnitude of injury relates to damages. *See Jimenez*, 765 F.3d at 1167. The commonality requirement has received more attention since the Supreme Court's *Dukes* decision. 131 S. Ct. at 2551. But unlike the Title VII claims asserted in *Dukes*, which depend on individualized reasons for employment decisions, wage-and-hour claims often do not depend on individualized decisions by employers. *See Jimenez*, 765 F.3d at 1167 (distinguishing *Dukes* in a wage-and-hour case because Title VII claims contain affirmative defenses related to "motive and alternative explanations"); *Torres v. Air to Ground Servs., Inc.*, 300 F.R.D. 386, 399 (C.D. Cal. 2014) (same). "When the claim is that an employer's policy and practices violated labor law, the key question for class certification is whether there is a consistent employer practice that could be a basis for consistent liability." *Wren*, 256 F.R.D. at 204.

Common questions, however, are only one part of a related showing. Rule 23(b)(3), in turn, requires that the common questions "predominate" over individualized issues. "'[T]he predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the common and individual issues' in the case, and tests whether the proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *Abdullah*, 731 F.3d at 964 (quoting *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545

1  (9th Cir. 2013)) (some internal quotation marks omitted). Whether a proposed class is "cohesive"

2  turns on whether its claims "will prevail or fail in unison." *Amgen*, 133 S. Ct. at 1191.

3  Ultimately, the focus is on efficiency. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir.

4  2013); *see also Abdullah*, 731 F.3d at 963-64 ("A principal  purpose behind Rule 23 class actions is to

5  promote efficiency and economy of litigation."). Predominance therefore requires a qualitative

6  analysis of the common versus individualized issues rather than mere "bean counting." *Butler*, 727

7  F.3d at 801; *see also Newberg on Class Actions* § 4:50 (stating that courts loosely compare the issues,

8  which "is more of a qualitative than quantitative analysis"). After all, "[q]uantitatively, almost by

9  definition there will always be more individual damages issues than common liability issues....

10  Qualitatively, however, ... liability issues may far exceed in complexity the more mundane individual

11  damages issues." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003) (internal

12  quotations omitted).

13  As *Gunnells* suggests, the issues that matter for commonality and predominance are issues of

14  liability, not issues of damages. Even though "'damages determinations are individual in nearly all

15  wage-and-hour class actions,' … '[i]n this circuit ... damage calculations alone cannot defeat class

16  certification.'" *Jimenez*, 765 F.3d at 1167 (quoting *Leyva*, 716 F.3d at 513). Indeed, the refusal to certify

17  a class action on the ground that the case presents individualized issues of damages is "a per se abuse

18  of discretion." *Jimenez*, 765 F.3d at 1167 (citing *Leyva*, 716 F.3d at 514).

19  The Ninth Circuit's decision in *Abdullah*, being a wage-and-hour case, is particularly

20  instructive. A group of security guards sought to represent a class of guards who worked at over 700

21  locations. 731 F.3d at 954. Many worked alone, with no other guards on duty at the same time. *Id.* at

22  955. The employer forced them to sign waivers that purportedly waive the right to off-duty meal

23  breaks. *Id.* The guards thus alleged violations of California's meal break requirements. *Id.* Under

24  California law, employees may agree to take an on-the-job paid meal period "when the nature of the

25  work prevents an employee from being relieved of all duty," and the defendant asserted this defense.

26  *Id.* at 958. On appeal from the district court's certification of a meal-break class, the employer argued

27  that its nature-of-the-work defense precluded class certification because its resolution would require

28

1    "'an individualized, fact-specific analysis' of each employee's work history, including 'a day-by-day

2    examination of an employee's job duties.'" *Id.* at 957. In support, the employer cited a long list of

3    duties performed by the guards that allegedly varied from one location to the next. *Id.* at 963.

4            The Ninth Circuit rejected the defendants' arguments, concluding that it was not the nature of

5    the security work that prevented guards from taking off-duty meals, but rather the employer's decision

6    "to adopt a single-guard staffing model"—in other words, assigning only a single guard to a post. *Id.*

7    at 963. Whether the employer could "invoke a 'nature of the work' defense on a class-wide basis,

8    where the need for on-duty meal periods results from its own staffing decisions," presented a

9    "'significant question of law' that is 'apt to drive the resolution of the litigation,'" and thus satisfied

10   the (a)(2) commonality requirement. *Id.* at 963. That same significant, common question drove the

11   predominance inquiry. *Id.* at 964. Because there were "'no relevant distinctions between the

12   worksites,' 'the "nature of the work" inquiry would be a common one,' focused on the legality of a

13   single-guard staffing model, 'rather than a site-by-site' inquiry." *Id.* at 964. Moreover, in addition to the

14   employer's "uniform on-duty meal period policy," the plaintiffs presented evidence about how the

15   employer's "policies and practices are implemented on the ground," including employee declarations,

16   which supported the district court's finding "that, 'in the vast majority of cases, this policy was

17   implemented to require [that] on-duty meal breaks be taken.'" *Id.* at 965-66. The common question

18   thus satisfied (b)(3)'s predominance requirement, despite the multitude of variations in the guards'

19   work duties and locations. *Id.* at 966; *see also Jimenez*, 765 F.3d at 1165 ("common questions may center

20   on 'shared legal issues with divergent factual predicates [or] a common core of salient facts coupled

21   with disparate legal remedies.'")(quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir. 1998).

22           Like in *Abdullah*, the key questions at issue here will be resolved by examining common

23   policies, meaning that the claims "will prevail or fail in unison." *Amgen Inc.*, 133 S. Ct. 1184 at 1191.

24   Plaintiffs make three overarching claims against Defendants: (1) the failure to pay wages for work

25   performed outside the championship season; (2) the failure to pay overtime wages; and (3) the failure

26   to pay the minimum wage when wages are actually paid. Like the FLSA, all the state laws at issue

27

28

require employers to pay a minimum wage for all hours worked.[79] California, North Carolina, New York, Pennsylvania, Maryland, and Oregon also have laws that require overtime pay for work exceeding forty hours in a workweek.[80] These three claims will be resolved on a classwide basis, as will the overarching element of liability: whether an employment relationship exists.

     1.   *The "employment" of minor leaguers presents a common, predominating question.*

Two types of employment relationships are at issue in this case. First, the MLB franchises dispute that they employ their own minor leaguers. Second, MLB disputes whether it employs the minor leaguers jointly with the MLB franchises. Because of Defendants' uniform policies and practices, both lines of inquiry present classwide, predominating questions.

Although the concept of employment is somewhat broader under California law (discussed further below), the analysis of the employment relationship is similar under all state laws at issue and relies on the FLSA's concepts.[81] Under the FLSA, to employ a person means to "suffer or permit to work." 29 U.S.C. § 203(g). The concept is not meant to be limited by common law notions of employment but is instead to be interpreted more broadly. *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983) *disapproved of on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985). Whether an employer-employment relationship exists depends on

---

[79] *See* Cal. Lab. Code § 1182.12; Fla. Stat. § 448.110; Ariz. Rev. Stat. §§ 23-363–64; N.C. Gen. Stat. § 95-25.3; 12 N.Y. Lab. Law § 652; Pa. Code § 231.21; Md. Code. Lab. & Empl. § 3-413; Or. Rev. Stat. § 653.025.

[80] Cal. Lab. Code § 510; N.C. Gen. Stat. § 95-25.4; 12 N.Y.C.R.R. § 142-2.2; Pa. Code § 231.41; Md. Code Lab. & Empl. § 3-415; Or. Admin. R. 839-020-0030.

[81] Fla. Stat. § 448.110(3) (adopting federal law); Ariz. Rev. Stat. § 23-362 ("'Employ' includes to suffer or permit to work."); Cal. Lab. Code § 510; N.C. Gen. Stat. § 95-25.2(3) (to "suffer or permit to work"); 12 N.Y. Lab. Law § 651 (employee is anyone "employed or permitted to work"); Pa. Stat. Ann. § 333.103(f) (to "suffer or permit to work"); Md. Code Lab. & Empl. § 3-101 ("employ means to engage an individual to work" and includes "allowing an individual to work"); Or. Rev. Stat. § 653.010 (to "suffer or permit to work"); *see also Martinez v. Ehrenberg Fire Dist.*, No. CV-14-00299-PHX-DGC, 2015 WL 3604191, at *2 (D. Ariz. June 8, 2015) (Arizona law "looks to looks to the standards of the FLSA to determine whether an individual is an employee"). California's wage orders contain a similar definition of "employ." *See, e.g.*, Cal. Code Regs. tit. 8, § 11100.2E ("'Employ' means to engage, suffer, or permit to work."). Yet the scope of coverage extends more broadly than under the FLSA because of California's broader definition of "employer." *Martinez v. Combs*, 49 Cal. 4th 35, 59, 231 P.3d 259, 274 (2010), *as modified* (June 9, 2010). This broader coverage is discussed in the section on joint employment.

1   "the circumstances of the whole activity," *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947),

2   and focuses on the economic reality of the situation, *Goldberg v. Whitaker House Cooperative, Inc.*, 366

3   U.S. 28, 33 (1961).

4          Although it seems self-evident that minor leaguers signed to employment contracts requiring

5   them to work throughout the year are employees, the only question at this juncture is whether that

6   question is capable of classwide resolution. Per the MLRs, all MLB franchises use the same, *Uniform*

7   Player Contracts, with all initial contracts lasting seven years. The UPC dictates when and how much

8   wages are to be paid in the same manner for all minor leaguers. Minor leaguers are subject to

9   extensive rules and policies regarding nearly every aspect of their lives, including hotel policies, travel

10  policies, drug policies, tobacco policies, social media policies, and policies on playing recreational

11  sports.[82] Minor leaguers receive Forms W2, and they are eligible for health insurance throughout the

12  year, for 401(k) plans, and for pension plans.[83] Thus, the issue of minor leaguers' employment by the

13  franchises is a common issue that will not vary from minor leaguer to minor leaguer because the

14  evidence will be common, classwide evidence.[84]

15         Similarly, the question of joint employment is also common to all class members.[85] The

16  "fundamental principle behind the joint employment doctrine… [is] that a worker may be employed

17

18  [82] *See* Broshuis Decl., Ex. F (which includes player guides that not only discuss salary structures but
19  also employment policies).
    [83] *Id.*
20  [84] Defendants will likely attempt to rely on a test enunciated in *Walling v. Portland Terminal* to argue that
    the MLB franchises do not employ their minor leaguers. 330 U.S. 148 (1947). In *Portland Terminal*, the
21  Court found that unpaid trainees with no employment contract and who did not expect to be paid
    were not employees. *Id.* at 152–53. But that test does not apply when, like here, there is a traditional
22  employment relationship with an employment agreement calling for compensation. *See Tony & Susan
    Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985); *Martinez v. Ehrenberg Fire Dist.*, No. CV-14-
23  00299-PHX-DGC, 2015 WL 3604191, at *2 (D. Ariz. June 8, 2015) (Arizona law). Also, picking the
    right test will be a decision that affects all class members, which provides yet another common
24  question that will drive the resolution of the case.
    [85] Fla. Stat. § 448.110(3) (adopting federal law); *Martinez*, 2015 WL 3604191, at *2 (Arizona law "looks
25  to the standards of the FLSA to determine whether an individual is an employee"); *Laborers' Int'l Union
    of N. Am., AFL-CIO v. Case Farms, Inc.*, 488 S.E.2d 632, 634 (1997) (looking to federal law for
26  guidance on who is an "employer" under North Carolina law); *Chu Chung v. New Silver Palace
    Restaurants, Inc.*, 272 F. Supp. 2d 314, 319 n.6 (S.D.N.Y. 2003) ("Most courts agree that the test for
27  (footnote continued)

28

by more than one entity at the same time," and it is a concept that "should be defined expansively." *Torres-Lopez v. May*, 111 F.3d 633, 639, 641 (9th Cir. 1997). A multi-factor framework applies to claims of joint employment, with four factors being commonly used: the power to hire and fire the workers; supervision and control of work schedules and conditions of employment; control over the rate and method of payment; and the maintenance of employment records. *See Bonnette*, 704 F.2d at 1470.[86] The California test for joint employment involves similar factors, except the test is disjunctive: if the plaintiffs satisfy one of the factors, then a joint employment relationship exists. *See Martinez v. Combs*, 49 Cal. 4th 35, 59 (2010), *as modified* (June 9, 2010); *see also Torres*, 300 F.R.D. at 395.

The analysis of these factors will center on the same evidence for all minor leaguers. MLB controls the hiring for all minor leaguers by controlling the amateur draft, free agent signing periods, the type of contract used, and by requiring approval of all contracts.[87] It controls conditions of employment for all minor leaguers by issuing drug policies, tobacco policies, social media policies, and other employment policies.[88] It controls both the rate and method of pay by setting the salary for all first-year minor leaguers, setting salary guidelines for non-first-year minor leaguers, and dictating when wages are to be paid.[89] Lastly, it maintains extensive employment records for minor leaguers, including contracts and roster moves. Being uniform practices, these factors apply to all minor leaguers.

Whether minor leaguers are employed by their respective franchises and by MLB are therefore not only common questions, they are also predominating questions. After all, common questions do not predominate only if "individual questions ... overwhelm questions common to the class." *Amgen,*

---

determining whether an entity or person is an 'employer' under New York Labor Law is the same as the test set forth in *Herman* for analyzing employer status under the Fair Labor Standards Act."); *Thompson v. U.S. Airways, Inc.*, 717 F. Supp. 2d 468, 479 (E.D. Pa. 2010) (stating that Pennsylvania law did not enunciate a test for joint employment, but looking to factors such as influence on compensation and performance of services); *Newell v. Runnels*, 967 A.2d 729, 771-72 (Md. 2009) (merging the analysis under Maryland law with that of federal law); *Cejas Commercial Interiors, Inc. v. Torres-Lizama*, 316 P.3d 389, 399-400 (2013) (same factors under Oregon law).

[86] In other cases, the Ninth Circuit has expanded the list of factors, with the focus remaining on the economic realities. *See Torres-Lopez*, 111 F.3d at 639.

[87] *See supra* pp. 2–5 (discussing the MLRs, UPC, and other uniform practices).

[88] *See* Broshuis Decl., Ex. F (which includes player guides that not only discuss salary structures but also employment policies).

[89] *See* Broshuis Decl., Ex. F-1 (MLB memo on minor league salaries).

133 S. Ct. at 1196. Any individual questions of employment status—assuming there are any—will not overwhelm the common questions that are based on common evidence like the UPC, the MLRs, and other policies that apply to all minor leaguers. *See Minns v. Advanced Clinical Employment Staffing LLC*, No. 13-CV-03249-SI, 2015 WL 3491505, at *8 (N.D. Cal. June 2, 2015) (finding the question of "employ" to be suitable to class resolution under California law); *Torres*, 300 F.R.D. at 400 ("FedEx's conduct is a common question of fact, and whether it demonstrates control over working conditions is a question of law."); *cf. Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 606 (N.D. Cal. 2014) (Spero, J.) (finding employment status in an independent contractor case to be a threshold issue capable of classwide resolution).

> 2.   *The unpaid work performed outside the championship season presents a common, predominating question.*

Again, all the states at issue require employers to pay a minimum wage for all hours worked.[90] Per the UPC and Defendants' policies, minor leaguers are not paid for work performed outside the championship season, including during spring training, the instructional league, and the off-season training period. The challenge to this uniform policy naturally requires the resolution of questions common to all class members.

The failure to pay wages for work performed outside the season is comparable to an "off-the-clock" claim, which generally has three elements: "(1) [the employee] performed work for which he did not receive compensation; (2) that defendants knew or should have known that plaintiff did so; but that (3) the defendants stood idly by." *Jimenez*, 765 F.3d at 1165 (quoting *Adoma v. Univ. of Phoenix, Inc.,* 270 F.R.D. 543, 548 (E.D. Cal. 2010)). The core facts governing the analysis will be the same for all class members.

The work performed during spring training, extended spring training,  and instructional leagues—as well as other camps such as pre-spring minicamps and certain conditioning camps—occurs in just two states: Arizona and Florida. Under Arizona and Florida law, the workweek includes

---

[90] *See* Cal. Lab. Code § 1182.12; Fla. Stat. § 448.110; Ariz. Rev. Stat. §§ 23-363–64; N.C. Gen. Stat. § 95-25.3; 12 N.Y. Lab. Law § 652; Pa. Code § 231.21; Md. Code. Lab. & Empl. § 3-413; Or. Rev. Stat. § 653.025.

1   all time an employee suffers or is permitted to work.[91] Accordingly, the key, common question will be

2   whether this known, uncompensated work is compensable under Arizona and Florida law, and the

3   analysis will be the same for all minor leaguers participating in these activities.

4          Defendants also expect minor leaguers to continue baseball-related activities during the winter

5   months without pay. That this work is performed remotely does not complicate the analysis. The

6   relevant laws at issue hold that work performed remotely is generally compensable if the employer

7   "knows or has reason to believe that the work is being performed."[92] The evidence collected to date

8   reveals that Defendants not only knew but expected minor leaguers to continue to work throughout

9   the winter months. Thus, under all the state laws, the analysis can be performed on a classwide basis.

10         The unpaid work therefore presents not only common questions, but also predominating

11  questions. Resolution of this issue will require answering a simple binary question for all class

12  members: Are minor leaguers' activities during such periods as spring training, the instructional

---

14  [91] *See* 29 C.F.R. 785.11; *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944). Under Arizona law, hours

15  worked "means all hours for which an employee covered under the Act is employed and required to

16  give to the employer, including all time during which an employee is on duty or at a prescribed work place and all time the employee is suffered or permitted to work." Ariz. Admin. Code § R20-5-

17  1202(9). Florida law adopts the interpretations of federal law. Fla. Stat. § 448.110(3) ("Only those individuals entitled to receive the federal minimum wage under the federal Fair Labor Standards Act and its implementing regulations shall be eligible to receive the state minimum wage.").

18  [92] 29 C.F.R. § 785.12. An analysis of the state laws at issue revealed few differences between the states,

19  as the laws do not distinguish between work performed at the job site versus work performed away from the job site. *See Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 585 (2000) (analyzing "hours

20  worked" under California law and citing to federal regulations interpreting "suffered or permitted"); Ariz. Admin. Code R20-5-1202 (defining "hours worked" as "all hours for which an employee…is

21  employed and required to give to the employer, including all time during which an employee is on duty or at a prescribed work place *and* all time the employee is suffered or permitted to work"); Fla.

22  Stat. § 448.110(3) (adopting federal law); N.C. Gen. Stat. § 95-25.2(8) (defining "hours worked" as "all time an employee is employed"); 13 N.C. Admin. C. 12 .0103 (stating that federal law guides North

23  Carolina law); *Moon v. Kwon*, 248 F. Supp. 2d 201 (S.D.N.Y. 2002) (merging analysis of New York law with the FLSA); Pa. Code § 231.1 (defining "hours worked" as including all hours employee is

24  "permitted to work"); *Baum v. AstraZeneca LP*, 605 F. Supp. 2d 669, 673-74 (W.D. Pa. 2009) *aff'd on other grounds*, 372 F. App'x 246 (3d Cir. 2010) (stating that it is proper to look to federal law to

25  interpret Pennsylvania wage law); *Skrzecz v. Gibson Island Corp.*, No. CIV.A. RDB-13-1796, 2014 WL

26  3400614, at *10 (D. Md. July 11, 2014) (looking to interpretations of FLSA under Maryland law); Or. Admin. R. 839-020-0004(19) (defining "hours worked" as including "all time the employee is suffered

27  or permitted to work").

28

1    league, and the winter off-season compensable "work"? If so, then MLB and its franchises must

2    remedy the harm caused to all minor leaguers by not paying for this work. Thus, a common question

3    exists, and individual issues do not predominate.

4        *3.   The failure to pay overtime wages presents a common, predominating question.*

5        California, North Carolina, New York, Pennsylvania, Maryland, and Oregon have laws that

6    require overtime pay for work exceeding forty hours in a workweek.[93] MLB and its franchises admit

7    that they have a common policy of never paying overtime to minor leaguers no matter how many

8    hours they work.[94] But extensive evidence—in the form of documents, declarations, depositions, and

9    expert analyses—demonstrates that minor leaguers routinely work more than 40 hours per week,

10   especially during the season. The common policy of refusing to provide overtime pay therefore

11   provides a strong basis for commonality. *See Boyd v. Bank of Am. Corp.*, 300 F.R.D. 431, 437 (C.D. Cal.

12   2014) (certifying California overtime class of appraisers since there was a policy of not paying

13   overtime and appraisers frequently worked more than 40 hours per week).

14       MLB and its franchises' failure to keep time records for work performed cannot defeat

15   commonality or predominance. Due to the lack of time records, the minor leaguers may rely on

16   estimates and representative evidence to establish their hours worked. *Anderson v. Mt. Clemens Pottery*

17   *Co.*, 328 U.S. 680, 687 (1946). These estimates may be provided by representative plaintiffs,

18   documentary evidence, expert evidence utilizing sampling, or a combination of various methods.

19   *McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988) ("We hold that the *Mt. Clemens Pottery*

20   standard allows district courts to award back wages under the FLSA to non-testifying employees

21   based upon the fairly representative testimony of other employees."); *Jimenez*, 765 F.3d at 1167

22   (sampling and representative testimony acceptable ways to determine liability); *Bouaphakeo*, 765 F.3d at

23   798 (following *Mt. Clemens* and approving of using averages from a sample to prove liability and

24

25   _____

     [93] Cal. Lab. Code § 510; N.C. Gen. Stat. § 95-25.4; 12 N.Y.C.R.R. § 142-2.2; Pa. Code § 231.41; Md.
26   Code Lab. & Empl. § 3-415; Or. Admin. R. 839-020-0030. Arizona and Florida do not have state
     overtime laws.
27   [94] *See* Broshuis Decl., Ex. H (collecting responses to requests for admission).

28

1    damages); *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1279 (11th Cir. 2008) (approving of

2    representative testimony to supplement corporate records and policies and finding that the executive

3    exemption was not individualized); *Alvarez v. IBP, Inc.*, 339 F.3d 894, 915 (9th Cir. 2003) *aff'd*, 546 U.S.

4    21, 126 S. Ct. 514, 163 L. Ed. 2d 288 (2005) (approving of "approximated" awards from reasonable

5    inferences when sufficient records do not exist because "[i]n such cases, the only uncertainty is the

6    *amount* of damage, not the fact that damages are due").[95]

7            For this inquiry, Dr. Kriegler has devised a reliable, common method for estimating each class

8    member's hours worked for each pay period. As explained above, Dr. Kriegler has already developed

9    a database built on actual game times during the championship season and a database for estimating

10   the duration of each road trip. This time will be combined with survey data, schedules, and roster

11   moves to estimate a minor leaguer's hours worked. Thus, using data common to all class members

12   and a methodology common to all class members, Dr. Kriegler can determine whether an overtime

13   violation occurred for each class member for each class period. Indeed, his preliminary calculations

14   based on the pilot survey data already demonstrate rampant overtime violations during the season—

15   even when conservative estimates are used. Kriegler Decl. ¶ 13.

16           4.   *Other issues present additional common questions.*

17           The above issues represent core questions in this case. The questions will be analyzed using

18   common evidence, and the answers will drive the resolution of the case. These common questions

19   already satisfy commonality and demonstrate that common questions predominate over individualized

20

21   _____

22   [95] *See also, e.g., Reich v. S. New England Telecommunications Corp.*, 121 F.3d 58, 67 (2d Cir. 1997) (sample of
     2.5% adequate for proving damages for members of collective); *Tokoshima*, 2014 WL 1677979, at *8

23   ("Plaintiffs describe that approximate damages can be based on individual testimony about hours
     worked, representative testimony, and/or Pep Boys' computerized time records of labor hours.");

24   *Rosales v. El Rancho Farms*, No. 1:09-CV-00707-AWI, 2014 WL 321159, at *7 (E.D. Cal. Jan. 29, 2014)

25   *report and recommendation adopted*, No. 1:09-CV-00707-AWI, 2014 WL 631586 (E.D. Cal. Feb. 18, 2014)
     ("The fact that neither El Rancho nor Garza maintained the required records cannot be used to

26   preclude the class claims here."); *Guifu Li v. A Perfect Day Franchise, Inc.*, 5:10-CV-01189-LHK, 2012
     WL 2236752, at *13 (N.D. Cal. June 15, 2012) (Koh, J.) (following *Mt. Clemens* and approving of use

27   of survey of sample of class to establish damages).

28

1    issues. *See Jimenez*, 765 F.3d at 1165. Yet additional common questions also exist, and they will be

2    briefly discussed.

3             *Compensability of travel time.* Minor leaguers must also perform extensive travel on road trips,

4    mostly by team bus. As this Court has recognized, "Where an employee is required to report at a

5    meeting place to receive instructions or to perform other work there, or to pick up and to carry tools,

6    the travel from the designated place to the work place is part of the day's work, and must be counted

7    as hours worked regardless of contract, custom, or practice." *Wren v. RGIS Inventory Specialists*, 2009

8    U.S. Dist. LEXIS 74789, at *22 (N.D. Cal. Aug. 24, 2009) (citing 29 C.F.R. § 785.38).[96]

9             Here, the circumstances and requirement for work-related travel are uniform across the MLB

10   franchises and their minor leaguers.[97] Thus, whether or not the travel time is compensable will affect

11   all minor leaguers in the classes—making it suitable for class treatment. *Wren v. RGIS Inventory*

12   *Specialists*, 256 F.R.D. 180, 207 (N.D. Cal. 2009) (certifying travel time class); *see also Minns v. Advanced*

13   _____

14   [96] Although some state laws have more relaxed standards, the analysis for compensability of this time
     is similar for each state. *See Morillion*, 22 Cal.4th 575 (under California law, if an employee is required to
15   report to the employer's business premises before proceeding to an off-site work location, all of the
     time from the moment of reporting until the employee is released to proceed home (or to the hotel) is
16   subject to the control of the employer, and constitutes hours worked); *Centeno v. I&C Earthmovers
     Corp.*, 970 F. Supp. 2d 1280, 1290-1291 (S.D. Fla. Sept. 6, 2013) (under Florida law, using same
17   analysis for travel time as federal law); 12 N.Y.C.R.R. § 142-2.1(b) ("The minimum wage shall be paid
     for the time an employee is permitted to work, or is required to be available for work at a place
18   prescribed by the employer, and shall include time spent in traveling to the extent that such traveling
     is part of the duties of the employee."); N.Y. Dep't of Labor Opinion Letter, August 10, 2010, RO-
19   09-0190 (opining that travel time between work sites is time worked since employees must travel from
     one site to the other, and are not free to leave or engage in personal pursuits or activities); N.C. Gen.
20   Stat. § 95-25.2 (3) & (8) (adopting same definitions as FLSA for hours worked); Code of Ma. Reg.
     09.12.41.10 (travel time is compensable if it occurs during regular work hours or if the worker is
21   traveling from one worksite to another); Pa. Code § 231.1 (defining "hours worked" and discussing
     compensability of travel time); O.A.R. 839-020-0045 (travel time is compensable under Oregon law if,
22   among other things, it occurs during regular work hours or if the worker is traveling from one
     worksite to another); Ind'l Comm's of Ariz., *Substantive Policy Statement Interpreting "Hours Worked" For
23   Purposes of the Arizona Minimum Wage Act*, Aug. 16, 2007, *available at*
     http://www.ica.state.az.us/Legal/SubstantivePolicyStatements/Other/Minimum%20Wage%20-
24   %20Hours%20Worked.pdf (indicating that when interpreting "hours worked," Arizona law looks to
     federal regulations interpreting compensability of activities when no state law or regulation is on
25   point).
     [97] *See* Broshuis Decl., Ex. S (collecting documents and testimony discussing travel requirements).
26

27

28

*Clinical Employment Staffing LLC*, No. 13-CV-03249-SI, 2015 WL 3491505, at *8 (N.D. Cal. June 2, 2015) (certifying class with issue regarding compensability of travel times).

      *Creative professionals exemption.* Defendants have asserted the "creative professionals" exemption under California, Florida, Maryland, New York, North Carolina, Oregon, and Pennsylvania law. Although some slight differences in state laws exist, these states all have similar salary and duties components, and the analysis will be similar to that performed under the FLSA.[98]

      To establish the exemption, Defendants must satisfy both a duties component and a salaries component.[99] The duties analysis will focus on the type of work performed and whether it falls within the scope. All minor leaguers perform the same, standard baseball-related activities no matter the MLB franchise: throwing, running, hitting, fielding, lifting weights.[100] Thus, the duties test can be decided in one fell swoop for all minor leaguers working within each state at issue. *Boyd*, 300 F.R.D. at 437 (certifying California class of appraisers where California's professional exemption was at issue; job descriptions were standardized; they could not "pick and choose" assignments; and standardized compensation and conduct policies were present).

---

[98] Florida, North Carolina and Maryland have adopted the definitions used in the FLSA's Section 213 defenses. *See* Fla. Stat. § 448.110(3) ("The provisions of ss. 213 and 214 of the [FLSA], as interpreted by applicable federal regulations and implemented by the Secretary of Labor, are incorporated herein."); N.C. Gen. Stat. § 95-25.14(b)(4) (Exempting any "person employed in a bona fide…professional…capacity, as defined under the [FLSA]."); Md. Code Regs. 09.12.41.17 ("'Professional capacity' has the meaning stated in 29 CFR § 541.300 et seq."). New York's, Pennsylvania's, and Oregon's professional exemptions contain a substantially similar salaries and duties tests, but they are slightly more difficult to satisfy than the FLSA. *See* N.Y. Lab. Law § 651; 12 N.Y. Comp. Codes R. & Regs. 142-2.14; Pa. Cons. Stat. § 333.105; 34 Pa. Code § 231.84; Or. Admin. R. 839-020-0005; *see also Sethi v. Narod*, 974 F. Supp. 2d 162, 184 (E.D.N.Y. 2013) (finding employees not professionals under both the FLSA and New York law and finding the analysis very similar; *Mudgett v. Univ. of Pittsburg Med. Ctr.*, No. CIV.A.09-254, 2010 WL 1838413, at *3 (W.D. Pa. May 6, 2010) (merging the analysis under the FLSA and Pennsylvania law); *Peterson v. Snodgrass*, 683 F. Supp. 2d 1107, 1122 (D. Or. 2010) (finding that if the federal exemption is not met, then the employee cannot be exempt under Oregon law either because the most favorable law to employee controls). The professional exemption under California law is also substantially similar. *See* IWC Wage Order 4-2001, as amended and effective July 1, 2014; *see also Medepalli v. Maximus, Inc.*, No. CIV S-06-2774 FCD EF, 2008 WL 958045, at *7 (E.D. Cal. Apr. 8, 2008) (noting that California's IWC wage orders incorporated parts of the DOL's regulations for the professional exemption).
[99] *See* 29 C.F.R. § 541.300.
[100] Plaintiff Declarations; Broshuis Decl., Ex. J (testimony on in-season schedules and routines).

1    Similarly, the salary-basis analysis is also capable of classwide resolution. A person is paid on a

2  salary basis by receiving the same amount weekly or less frequently, and the employee "must receive

3  the full salary for any week in which the employee performs any work without regard to the number

4  of days or hours worked." 29 C.F.R. § 541.602. No matter the MLB franchise, minor leaguers are only

5  paid during the championship season, yet they perform work outside the championship season during

6  spring training, winter training, instructional leagues, minicamps, and other training periods. If the

7  Court deems any of these activities to be compensable work, then no minor leaguer is paid on a

8  "salary" basis because the laws dictate that the same amount of salary must be paid in any month

9  when any work is performed. 29 C.F.R. § 541.602. Furthermore, salaries during the championship

10  season are readily identifiable through Defendants' payroll records.

11    Both components of the exemption are thus capable of class resolution.

12    *The amusement exemption.* Defendants have asserted a seasonal and amusement exemption under

13  California, Florida, Maryland, New York, North Carolina, and Pennsylvania law. With the exception

14  of California (which actually does not recognize the exemption),[101] these states either adopt the

15  FLSA's seasonal and amusement exemption or rely on functionally similar tests, with most still

16  requiring some of the states' minimum wage and overtime requirements to be met even if the

17  exemption applies.[102]

18

19

---

20  [101] Although Defendants have asserted this defense under California law, it is not recognized in that

21  state. California Wage Order No. 10-2001 is a wage order that governs the various California state labor law requirements for amusement and recreation workers, but it does not contain the exemption.

22  In fact, the Order substantively states that workers in such industries are entitled to minimum wage for all hours worked and overtime pay.

23  [102] *See* Fla. Stat. § 448.110(3) (adopting the FLSA's defenses); N.C. Gen. Stat. §§ 95-25.2(13), 95-

24  25.3(e), 95-25.4(a) (adopting similar test, but still requiring wages of at least 85% of minimum in the state and still requiring overtime pay for hours beyond 45 in a week); Md. Code Lab. & Empl. §§ 3-

25  413(d)(2)(i), (ii); 3-415(b)(3) (adopting similar test but still requiring wages of at least 85% of minimum in the state while exempting from overtime requirements; 12 N.Y.C.R.R. § 142-2.2 (adopting the

26  FLSA's overtime exemptions with exceptions, but still requiring wages of "one and one-half times the basic minimum hourly rate" even if the seasonal/amusement test is met); 43 Penn. Stat. §

27  333.105(a)(9) (adopting a similar test).

28

Two stages of analyses will be needed.[103] The Court will first determine the relevant establishments. The Court will then determine whether the establishments are exempt or not. The inquiry will thus focus on establishments—not individual employees—and each analysis will affect large numbers of minor leaguers, making it suitable for class treatment.

*Wage statement penalties.* The New York and California Classes have claims for itemized wage statement penalties. These claims will rise and fall with the other common questions delineated above. The wage statements will uniformly either violate or not violate the laws' requirements depending on whether the laws apply to minor leaguers, making the question capable of class resolution. *See Boyd*, 300 F.R.D. at 437 (certifying California wage statement claims and analyzing 2013 amendment minimizing injury requirement); *Wren*, 256 F.R.D. at 209 (certifying itemized wage statement claims).

*California waiting time violations.* Finally, the waiting time claims for California workers who were not paid all their wages when employment ceased will again depend on the common resolution of the questions discussed above. Thus, the Court can answer these questions on a classwide basis. *Boyd*, 300 F.R.D. at 437 (certifying California class and finding these claims derivative of the other claims).[104]

   5.   *An analysis of each state's laws confirms that commonality and predominance are satisfied for all classes.*

   **Arizona Class.** Arizona is the site of work performed by minor leaguers throughout the calendar year, as spring training, extended spring training, regular season, instructional leagues, and

---

[103] Under the FLSA, the exemption applies to those

> employed by an establishment which is an amusement or recreational establishment, organized camp, or religious or non-profit educational conference center, if (A) it does not operate for more than seven months in any calendar year, or (B) during the preceding calendar year, its average receipts for any six months of such year were not more than 33 ⅓ per centum of its average receipts for the other six months of such year.

29 U.S.C. § 213(a)(3).

[104] Plaintiffs have also asserted claims under California's Private Attorney General Act of 2004 ("PAGA"). Cal. Labor Code § 2698 et seq. Being a representative action that substitutes for governmental proceedings, class action requirements need not be met. *Arias v. Superior Court*, 46 Cal. 4th 969, 987 (2009); *see also Villalpando v. Exel Direct Inc.*, No. 12-CV-04137 JCS, 2014 WL 1338297, at *20 (N.D. Cal. Mar. 28, 2014) (Spero, J.).

1   offseason training all occur there. In Arizona, Defendants have raised *no affirmative defenses*. There also

2   is no overtime law in Arizona. Thus, the analysis comes down to the core classwide issues discussed

3   above: (1) Must minor leaguers be paid for spring training work, instructional leagues work, winter

4   training work, and other work that falls outside the championship season, when no wages are paid?;

5   (2) Is the time spent traveling from one job site to another to play games compensable time?; and (3)

6   During the season, when minor leaguers actually receive wages, do the wages fall below Arizona's

7   required minimum for the minor leaguers working on the 13 teams based in Arizona?

8        The first question—whether minor leaguers should be paid for work performed outside the

9   championship season—is again a prototypical binary question. Either the time is compensable under

10   the laws at issue, or it's not. As with any compensability question, the Court will first determine

11   whether Defendants employ the minor leaguers, and the same uniform contracts, uniform policies,

12   and uniform duties will inform the analysis regardless of the MLB franchise. Next, the Court will

13   determine whether spring training, instructional leagues, and other periods of activity constitute

14   "work." Given that all minor leaguers perform similar activities during these work periods, this

15   question is therefore capable of classwide resolution. *See Tokoshima v. Pep BoysManny Moe & Jack of*

16   *California*, No. C-12-4810-CRB, 2014 WL 1677979, at *6–7 (N.D. Cal. Apr. 28, 2014) (collecting cases

17   and certifying class of various types of auto technicians doing various jobs because the minimum wage

18   claims depended on "a common, company-wide policy").[105]

19        Similarly, the second question—regarding travel time—is also a binary question: either minor

20   leaguers should be paid for the time spent traveling from one job site to another, or they shouldn't.

21   The evidence establishes that all MLB franchises implemented policies requiring minor leaguers to

---

[105] *See also Rai*, 308 F.R.D. at 257 (certifying class of drivers seeking compensation for various activities because of uniform policy of not compensating for the activities); *Giles v. St. Charles Health Sys., Inc.*, 294 F.R.D. 585, 590 (D. Or. 2013) (certifying class of nurses seeking compensation for training time since they were subjected "to the same policies regarding test-taking and study time"); *Wren*, 256 F.R.D. at 206 (certifying class where company policy implied that workers would not be compensated for donning and doffing, even though some managers compensated workers for such time).

travel with their teammates on road trips.[106] Thus, determining the compensability of this travel time will not vary from team to team or player by player. Moreover, Dr. Kriegler has devised a method of calculating duration of travel using verified schedules and reliable, computer-generated travel times.[107]

The third question—whether the minor leaguers working in Arizona earned below minimum wage during the season—is also capable of classwide resolution. As noted above, all minor leaguers working in Arizona during periods *outside* the championship season will have suffered minimum wage violations. For the season, Dr. Kriegler has developed a reliable methodology for determining which minor leaguers' wages fall below the minimum. Hours worked during the championship season will be estimated from sources such as the schedules, game time data, travel time data, and survey results from Dr. Dennis.[108] The reasonableness of the estimate will be substantiated by the documentary evidence, testimony, and the declarations. Dr. Kriegler can then use a class member's estimated hours worked within a workweek combined with the pay the class member received during a workweek to determine whether the class member received below the minimum wage for that workweek. Such analyses are not uncommon in wage-and-hour actions since some members often have claims during certain work periods but not during others. *Cf. Abdullah*, 731 F.3d at 967 (finding that records could be used to determine which guards suffered damages).

Consequently, common questions predominate for the Arizona class. *See Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12-CV-00824 JWS, 2015 WL 1292444, at *16 (D. Ariz. Mar. 23, 2015) (predominance met when key question, under Arizona law, was whether assigning additional work led to wage falling below the minimum required); *Rai*, 308 F.R.D. at 259 ("Plaintiffs have shown that VTA has uniform policies and procedures relating to compensation that did not leave the relevant compensation decisions to the discretion of local supervisors." (internal citations omitted)); *Juvera v. Salcido*, 294 F.R.D. 516, 522 (D. Ariz. 2013) (certifying a class under Arizona's minimum wage law).

---

[106] Broshuis Decl., Ex. S (collecting travel requirements).
[107] Kriegler Decl., ¶¶ 19–20.
[108] Kriegler Decl., ¶¶ 37–38.

***California and Oregon.*** Like Arizona, the states of California and Oregon also do not recognize the amusement exemption. For the California and Oregon Classes, the same common questions as those identified for the Arizona will be present: compensability of work performed outside the season, compensability of travel time, and whether wages fall below the minimum.

Additional common questions will flow from the determination of whether the creative professionals exemption applies. As noted above, the exemption has two components: a duties test and a salary test.

In this case, the Court need not inquire into whether a person is devoting a certain percentage of activities to one type of activity as opposed to another because all minor leaguers perform the same type of duties. Rather, the question here will be whether the type of activities performed by all minor leaguers—throwing, running, fielding, and other physical activities—qualify as the type of work envisioned in the exemption. Thus, this case does not require individualized inquiries and therefore differs from some misclassification cases, such as certain cases involving the outside sales exemption, where a court needs to determine whether a worker's activities meet a 50% threshold. *See In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009). *But see Martino v. Ecolab, Inc.*, No. 14-CV-04358-PSG, 2016 WL 614477, at *5 (N.D. Cal. Feb. 16, 2016) (certifying case involving outside sales exemption because of common policies); *Ambrosia v. Cogent Commc'ns, Inc.*, No. 14-CV-02182-RS, 2016 WL 31356, at *9 (N.D. Cal. Jan. 4, 2016) (same).

For the salaries component, the Court will need to determine whether Defendants in fact pay minor leaguers on a salary basis. As already noted, to qualify for this exemption, the employer must pay the same salary during every month when an employee performs *any* work. Yet minor leaguers only receive their salaries during the season despite working throughout the year, so, as a class, they cannot qualify for the exemption. This common, classwide piece of evidence will result in a common answer to this question for all minor leaguers.

Unlike Arizona, these states also have overtime laws, which present a significant common issue that furthers the predominance of common issues over individual ones. Again, evidence, including Dr. Kriegler's preliminary, conservative analysis, Kriegler Decl. ¶ 13, shows that minor

1  leaguers routinely work more than 40 hours per week, but Defendants maintain a uniform policy of

2  not paying overtime no matter how many hours minor leaguers work. As a threshold inquiry, the

3  analysis again leads to a binary question: Should minor leaguers receive overtime compensation when

4  working overtime hours within these states?

5  Thus, the question will be whether minor leaguers should be compensated at an overtime rate

6  for the hours beyond 40, and any further questions will relate to the amount of damages. Again,

7  Plaintiffs need only provide a reasonable estimate of hours worked since Defendants failed to keep

8  time records. *McLaughlin*, 850 F.2d at 589. The schedules, travel times, game times, survey results, and

9  other data allow Dr. Kriegler to reliably estimate each class member's hours worked during a

10  workweek.[109] If the class member qualifies for overtime pay, Dr. Kriegler will then use payroll data to

11  calculate the class member's overtime rate and to calculate the overtime damages. Plaintiffs will

12  further establish liability through a variety of methods, including documentary evidence,

13  representative testimony, and expert analyses.[110]

14  Consequently, common questions predominate over any individualized inquiries in the

15  California and Oregon Classes.

16  ***Other states.*** New York, North Carolina, Florida, Maryland, and Pennsylvania recognize

17  similar forms of the creative professionals exemption, and they additionally recognize the amusement

18  exemption. These states will therefore have the same common issues as those identified for the

19  Arizona class. With the exception of Florida's lack of an overtime law, these states will also have the

20  same common issues identified for California and Oregon.

21  These states will have an additional common issue stemming from the amusement exemption.

22  First, the Court must identify the appropriate establishments, an analysis that will affect all class

23  members. The Court will then determine whether the establishments are exempt, and the analysis for

24  each establishment will affect large numbers of minor leaguers.

25

26

27  [109] Kriegler Decl., ¶¶ 47, 56–57.
   [110] *See supra*, "Trial Plan" section.

28

1    Thus, the key questions in all state classes remain susceptible to common proof, and they

2  predominate over any individualized issues.

3    **E.  A class action is superior to other methods.**

4    Under Rule 23(b)(3), plaintiffs must also show that a class action is superior to other methods.

5  The non-exhaustive list of factors includes:

6    (A) the class members' interests in individually controlling the prosecution or defense
     of separate actions;
7    (B) the extent and nature of any litigation concerning the controversy already begun by
     or against class members;
8    (C) the desirability or undesirability of concentrating the litigation of claims in the
9    particular forum; and
     (D) the likely difficulties in managing a class action.
10

11    First, no evidence exists of class members having an interest in individually prosecuting

12  claims. A large number of minor leaguers opted into the FLSA action to proceed collectively, and the

13  fear of reprisal if proceeding individually is quite real. *See Villalpando*, 303 F.R.D. at 610. Also, there is

14  a relatively small amount of damages per individual litigant when juxtaposed against the large

15  resources necessary to litigate against an entity such as MLB—absent a class device, most of the

16  claims would not be brought because an individual, underpaid minor leaguer would likely lack the

17  resources to pursue claims against an entity such as MLB. *Rai*, 308 F.R.D at 265; *Wren*, 256 F.R.D. at

18  210 ("Not only might they never be brought given the limited amount at stake for each individual, but

19  the enormity of the resources required to adjudicate such claims, and the risk of inconsistent

20  outcomes, counsels in favor of class treatment.").

21    Second, no other overlapping suits are pending other than the case already consolidated with

22  this action.

23    Third, the court is familiar with the facts and legal issues, so concentrating claims in this

24  forum is desirable. *Villalpando*, 303 F.R.D. at 610. It would be redundant and inefficient to force the

25  same claims to be filed individually. *Rai*, 308 F.R.D. at 265.

26    Fourth, the suit is manageable. Counsel for both Plaintiffs and Defendants have extensive

27  experience in class actions. *Villalpando*, 303 F.R.D. at 610. Also, the class sizes are not so large as to be

28

1  unmanageable. *Leyva*, 716 F.3d at 515 (citing approvingly to certification of wage-and-hour classes of

2  6,000 and 15,000 employees). And as discussed, Plaintiffs can use various mechanisms, such as their

3  survey, documentary evidence, and representative testimony, to resolve the action efficiently for all

4  class members while preserving procedural fairness. *See Boyd*, 300 F.R.D. at 444  (despite need for

5  individualized inquiries, class action was superior and manageable because court could employ various

6  tools to "achieve economies of time, effort, and expences…without sacrificing procedural fairness…"

7  (quoting *Amchem Prods. v. Windsor,* 521 U.S. 591, 615 (1997)).

8     Consequently, the class action is superior to thousands of individual actions.

9     **F.  Rule 23(b)(2)'s Requirements Are Satisfied.**

10     Plaintiffs also satisfy Rule 23(b)(2)'s requirements due to the universal application of MLB's

11  rules to all minor league baseball players.[111] Rule 23(b)(2) applies where a defendant has "acted or

12  refused to act on grounds that apply generally to the class, so that final injunctive relief or

13  corresponding declaratory relief is appropriate respecting the class as a whole." "[The Rule 23(b)(2)]

14  inquiry does not require an examination of the viability or bases of the class members' claims for

15  relief, does not require that the issues common to the class satisfy a Rule 23(b)(3)-like predominance

16  test, and does not require a finding that all members of the class have suffered identical injuries."

17  *Parsons*, 754 F.3d at 688 (footnote omitted). "Rather, as the text of the rule makes clear, this inquiry

18  asks only whether 'the party opposing the class has acted or refused to act on grounds that apply

19  generally to the class.'" *Id.* (*citing* Rule 23(b)(2)).

20     A class should be certified under Rule 23(b)(2) where "an injunction would offer all class

21  members 'uniform relief' from [the] harm." *In re NCAA Student-Athlete Name & Likeness Licensing*

22  *Litig.*, No. C 09-1967 CW, 2013 WL 5979327, at *7 (N.D. Cal. Nov. 8, 2013) (*quoting Rodriguez v. Hayes*,

23  591 F.3d 1105, 1125 (9th Cir. 2010)). This case presents just that situation. Plaintiffs seek to enjoin

24  MLB from continuing to perpetuate the ongoing wage-and-hour violations affecting all minor

25

26  [111] Plaintiffs are entitled to seek certification of classes under *both* Rule 23(b)(2) *and* Rule 23(b)(3). *In re*

27  *NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW, 2013 WL 5979327, at *7
(N.D. Cal. Nov. 8, 2013).

28

1  leaguers, including the failure to pay wages for work performed outside the season, the failure to

2  provide overtime pay, and the failure to pay the minimum wage. An injunction would uniformly offer

3  minor leaguers relief from these harms, so the classes should be certified under Rule 23(b)(2).

4  **II.      Class Notices Should be Distributed in the Same Manner as the FLSA Collective**

5      At the FLSA conditional certification stage, the Court approved a comprehensive notice plan,

6  which provided direct notice to members of the FLSA collective based on information obtained from

7  Defendants' records. The notice plan provided members with 90 days to exercise their rights and

8  included a 30-day reminder notice. After being distributed to nearly 15,000 minor leaguers, it resulted

9  in over 2,200 opt-ins, which demonstrates its legal sufficiency. *See* Simon Decl., ¶ 12. Plaintiffs

10  respectfully submit that the notice plan also satisfies the requirements of Rule 23, and request that the

11  Court employ the same methodology with respect to the state classes.

12                                        **CONCLUSION**

13      Because all the elements of Rule 23 are satisfied, Plaintiffs respectfully requests that the

14  Court: (1) certify Plaintiffs' proposed classes, (2) appoint the named plaintiffs as class representatives

15  and counsel as Class Counsel; and (3) order notice to be given consistent with the notice previously

16  given to the FLSA collective.

17

18  DATED: March 4, 2016                          Respectfully submitted,

19                                                    */s/ Garrett R. Broshuis*

20                                               PEARSON, SIMON & WARSHAW LLP
                                                 Bruce L. Simon
21                                               Daniel L. Warshaw
                                                 Bobby Pouya
22                                               Benjamin E. Shiftan
                                                 Michael H. Pearson
23                                               Alexander L. Simon

24                                               KOREIN TILLERY, LLC
                                                 Stephen M. Tillery
25                                               George A. Zelcs
                                                 Aaron M. Zigler
26                                               Garrett R. Broshuis

27                                               *Plaintiffs Interim Co-Lead Class Counsel*

28