UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AARON SENNE, et al.,

        Plaintiffs,

    v.

KANSAS CITY ROYALS BASEBALL CORP., et al.,

        Defendants.

Case No.  14-cv-00608-JCS
Consolidated with C-14-3289 JCS

**ORDER RE: 1) MOTION FOR CLASS CERTIFICATION; 2) MOTION TO DECERTIFY THE FAIR LABOR STANDARDS ACT COLLECTIVE ACTION; AND 3) MOTION TO EXCLUDE PLAINTIFFS' EXPERT DECLARATION AND TESTIMONY**

Re: Docket Nos. 495, 496, 632

## I.    INTRODUCTION

      In this putative class action, Plaintiffs are minor league baseball players who assert claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and the wage and hour laws of various states, against Major League Baseball ("MLB"), Commissioner of Baseball Bud Selig, and many of the franchises that are MLB members.  Presently before the Court are the following motions: 1) Plaintiffs' Motion for Class Certification ("Rule 23 Motion"); 2) Defendants' Motion to Decertify the Fair Labor Standards Act Collective ("Motion to Decertify"); and 3) Motion to Exclude Plaintiffs' Expert Declarations and Testimony of J. Michael Dennis, Ph.D and Brian Kriegler, Ph.D Filed in Support of Plaintiffs' Motion for Class Certification ("Motion to Exclude"). The Court held a hearing on the Motions on July 8, 2016 at 9:30 a.m.  For the reasons stated below, the Court DENIES the Rule 23 Motion, GRANTS the FLSA Decertification Motion, and GRANTS in part and DENIES in part the Motion to Exclude.[1]

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

## II.    PROCEDURAL BACKGROUND

On February 7, 2014, Aaron Senne, Michael Liberto, and Oliver Odle filed the initial complaint in this action against MLB, Commissioner Selig and three MLB franchises.[2]  *See* Docket No. 1.  Subsequently, they amended their complaint to name all 30 MLB franchises as Defendants.  Docket Nos. 19, 57.  Additional Plaintiffs also joined the action.  *Id*.  On October 10, 2014, the Court consolidated Case No. C-14-3289 with this action and appointed Korein Tillery, LLC and Pearson, Simon & Warshaw, LLP as Interim Co-Lead Counsel over the actions.  Docket No. 236.

On May 20, 2015, Plaintiffs filed the Second Consolidated Amended Complaint for Violations of Federal and State Wage and Hours Laws ("SCAC"), which is the operative complaint in this action.  *See* Docket No. 382.  On the same date, the undersigned ruled on challenges to personal jurisdiction by eleven MLB Clubs ("the Personal Jurisdiction Defendants"). *See* Order re Motions to Dismiss and Motions to Transfer, Docket No. 379 ("Personal Jurisdiction Order").  The Court found that the activities of three of the Clubs – the New York Yankees, the Pittsburgh Pirates and the Detroit Tigers – were sufficient to establish the existence of personal jurisdiction over them in California and dismissed the remaining eight Personal Jurisdiction Defendants for lack of personal jurisdiction.  In particular, the Court dismissed the following Clubs for lack of jurisdiction:  1) the Atlanta Braves; 2) the Chicago White Sox; 3) the Tampa Bay Rays; 4) the Washington Nationals; 5) the Philadelphia Phillies; 6) the Boston Red Sox; 7) the Baltimore Orioles; and 8) the Cleveland Indians.[3]

The Court conditionally certified Plaintiffs' proposed collective under the FLSA on October 20, 2015, defining the collective as follows:

> All minor league baseball players employed by MLB or any MLB franchise under the Minor League Uniform Player Contract who worked or work as minor league players at any time since February 7, 2011, but who had no service time in the major leagues at the

---

[2] Throughout this Order the Court, like the parties, uses the terms "franchise" and "Club" interchangeably.
[3] Even though these Clubs were dismissed for lack of personal jurisdiction, individuals who played for them are still asserting their wage and hour claims against Defendant MLB.

United States District Court
Northern District of California

time of performing work as a minor leaguer.

Docket No. 446.  Subsequently, notice was sent to the minor league players allowing them to opt

in to the collective by February 11, 2016.  According to Plaintiffs, over 2,200 minor leaguers

opted into the FLSA collective by the deadline.  *See* Docket No. 500 (Simon Decl.) ¶ 12.

Plaintiffs now ask the Court to certify their state law wage and hour claims under Rule 23

of the Federal Rules of Civil Procedure.  In particular, they seek to certify classes under the laws

of Arizona, California, Florida, North Carolina, New York, Pennsylvania, Maryland and Oregon

of all persons who under a Minor League Uniform Player Contract, work or worked for MLB or

any MLB franchise as a minor league baseball player within the relevant state at any time during

the statutory period for each state.  Rule 23 Class Certification Motion at i.

Defendants, in turn, ask the Court to decertify the FLSA collective on the grounds that the

Plaintiffs are not similarly situated and the defenses Defendants plan to assert will require too

many individualized inquiries to allow for class treatment of Plaintiffs' claims.  Defendants also

ask the Court to exclude the expert declarations and testimony of Drs. J. Michael Dennis and

Brian Kriegler under *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*, 509 U.S. 579 (1993) and

Rule 702 of the Federal Rules of Evidence.

## III.   THE MOTIONS

### A.   The Rule 23 Motion

#### 1.   Plaintiffs' Motion

##### a.   Proposed Class Definitions and Representatives

Plaintiffs ask the Court to certify eight classes (collectively, "the State Classes") to pursue

claims under the laws of California, Florida, Arizona, North Carolina, New York, Pennsylvania,

Maryland and Oregon.  Notice of Motion and Motion at i.  Plaintiffs propose that each class

consist of:

> All persons who under a Minor League Uniform Player Contract,
> work or worked for MLB or any MLB franchise as a minor league
> baseball player within the relevant state at any time [during the
> statutory period for each state]. Excluded from the class are those
> players who had service time on a major league player contract at
> the time of performing work as a minor leaguer.

*Id.*[4]  Plaintiffs also propose a waiting time subclass for the California class defined as follows:

> The California Class shall include a waiting time subclass for alleged penalties under California Labor Code § 203 for the withholding of wages after employment ceases. It will consist of the class representatives and members of the California Class whose employment relationship with a Defendant has ceased or will cease since February 7, 2010.

Proposed Order at 1.

Plaintiffs propose that the following named Plaintiffs be appointed as class representatives:

- <u>California Class</u>:  Aaron Meade, Oliver Odle, Kyle Woodruff, Kyle Nicholson, Brandon Henderson, Craig Bennigson, Ryan Kiel, Jake Kahaulelio, Justin Murray, Dustin Pease, Mitch Hilligoss, Joseph Newby, Joel Weeks, Matt Daly, Kris Watts, Nick Giarraputo, David Quinowski, Brandon Pinckney, Lauren Gagnier, and Grant Duff.

- <u>Florida Class</u>:  Ryan Khoury, Brandon Henderson, Ryan Kiel, Jake Kahaulelio, Jon Gaston, Tim Pahuta, Matt Daly, Aaron Senne, Brad Stone, Mitch Hilligoss, Jake Opitz, Ryan Hutson, Les Smith, Matt Frevert, Roberto Ortiz, Brett Newsome, Kris Watts, Nick Giarraputo, David Quinowski, Brandon Pinckney, Lauren Gagnier, Jeff Nadeau, Grant Duff, and Aaron Dott.

- <u>Arizona Class</u>:  Aaron Meade, Jon Gaston, Oliver Odle, Kyle Woodruff, Craig Bennigson, Matt Lawson, Ryan Kiel, Justin Murray, Dustin Pease, Michael Liberto, Jake Opitz, Joseph Newby, Mitch Hilligoss, Kris Watts, Roberto Ortiz, Daniel Britt, Joel Weeks, Gaspar Santiago, David Quinowski, and Nick Giarraputo.

- <u>North Carolina Class</u>:  Craig Bennigson and Aaron Senne.

---

[4] The definitions of the eight State Classes are identical except for the start date of the class period. Thus, for each class, the bracketed language in the block quote above is replaced by the words "since [start date for that state] until judgment."  *See* Proposed Order (Docket No. 536) at 1.  The start dates of the specific classes proposed by Plaintiffs are as follows:  February 7, 2010 (California, North Carolina); February 7, 2009 (Florida); February 7, 2011 (Arizona, Pennsylvania, Maryland); and February 7, 2008 (New York, Oregon).  Although Defendants refer to these classes as subclasses, there appears to be no dispute between the parties that each of the proposed State Classes, whether referred to as a class or a subclass, must independently satisfy the requirements of Rule 23.  *See* Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.").

United States District Court
Northern District of California

- <u>New York Class</u>:  Ryan Khoury, Jon Gaston, Matt Daly, Aaron Senne, Kris Watts, Nick Giarraputo, and Aaron Dott.

- <u>Pennsylvania Class</u>:  Tim Pahuta, Kris Watts, and Lauren Gagnier.

- <u>Maryland Class</u>:  Roberto Ortiz and Brett Newsome.

- <u>Oregon Class</u>:  Joel Weeks, Gaspar Santiago, and David Quinowski.

Proposed Order at 2-3.

###### b.  Factual Background

According to Plaintiffs, they will be able to prove both liability and damages on a classwide basis because MLB and its franchises have implemented uniform contracts, policies and Major League rules "to ensure similar conditions of employment" and the legal issues in the case can be "distilled to a few common issues."  Rule 23 Motion at 2, 11.  In support of Plaintiffs' contention that they are subject to uniform contracts, policies and rules, they point to the following evidence:

- **Recruiting, Drafting and Hiring Under the Major League Rules ("MLRs")**: According to Plaintiffs, the MLRs "govern the recruitment, drafting, hiring, pay, and employment of minor leaguers and the structure of the entire minor league system."  Motion at 2.  Plaintiffs cite to MLR 4, entitled "First Year Player Draft," which "governs the process that MLB franchises must follow when hiring amateur players as minor leaguers."  *Id*. at 3 (citing Declaration of Garrett R. Broshuis in Support of Plaintiffs' Motion for Class Certification ("Broshuis Rule 23 Motion Decl."), Ex. B (MLRs)).  They also point to MLR 3(b)(2), which requires that all minor leaguers sign a Uniform Player Contract ("UPC") in order to "preserve morale among Minor League Players and produce the similarity of conditions necessary for keen competition."  *Id*.  The form UPC is attached to the MLRs as Attachment 3; Plaintiffs note that under MLR 3 the "MLB franchises cannot deviate from the form UPC" and contend that the evidence shows that the franchises do, in fact, use this form UPC when employing minor leaguers.  *Id*. at 3 (citing Broshuis Rule 23 Motion Decl., Ex. B (MLRs) and D (sample UPCs for all of the MLB franchises)).  Plaintiffs note that under MLR 3(b)(2), the initial term of the UPC for all minor leaguers is seven championship seasons and that a minor leaguer cannot work for another franchise until that term expires or he is released or traded.  *Id*. (citing Broshuis Rule 23 Motion Decl., Ex. B (MLRs)).  Plaintiffs also point to MLR 56(g), providing that the "MLB franchises – not the minor league affiliates – determine where to assign the players to work and select the coaches and managers that oversee the players."  *Id*.  Finally, Plaintiffs cite to MLR 57, which "establishes rules governing the minor league playing schedule and for minor league travel during the championship season."  *Id*.

- **Pay Practices under the MLRs and UPC:** Plaintiffs contend MLB and the franchises follow uniform pay practices as to all minor leaguers pursuant to the MLRs and UPC. Rule 23 Motion at 3-5. In particular, under a provision of the UPC (MLR Attachment 3) entitled "Payment," minor leaguers receive salary payments only during the "actual championship playing season" but their "duties and obligations under [the UPC] continue in full force and effect throughout the calendar year." Broshuis Rule 23 Motion Decl., Ex. B (MLRs), Attachment 3 ¶ VIIB. Paragraph VIIB of the UPC also provides that minor leaguers are to be paid in "two (2) semi-monthly installments on the 15th day and last day of the month after the beginning of the Club's championship playing season or such later date as Player reports for championship season play." *Id*. Plaintiffs also point to MLR 3(c)(2), providing that all first year minor leaguers earn the same wage rate. Broshuis Rule 23 Motion Decl., Ex. B (MLRs), MLR 3(c)(2)(B) ("The salary in each Minor League Uniform Player Contract between an independent Minor League Club and a first-year player shall be the amount established by the Minor League Association for each Minor League Classification or League.").

Plaintiffs also contend the evidence in this case shows that the policies set forth in the MLRs and UPC are uniformly implemented. Rule 23 Motion at 4. In particular, they offer documents and deposition testimony indicating that the initial salary rate for all minor league players is $1,100 per month and that MLB franchises use "non-negotiable salary scales that establish the monthly wages for subsequent years under the initial UPC." *Id*. at 4-5 (citing Broshuis Rule 23 Motion Decl., Ex. F). Further, all minor leaguers sign an Addendum C to the UPC setting out their pay rate prior to spring training, Plaintiffs contend. *Id*. at 5 (citing Broshuis Rule 23 Motion Decl., Ex. G (sample Addendum Cs for the MLB franchises). Plaintiffs also submit declarations by the named Plaintiffs stating that they were paid only during the championship season and were not paid during spring training, instructional leagues, winter workouts or for other mandatory work performed outside of the championship season. *Id*. (citing Plaintiff Declarations[5]).

---

[5] The "Plaintiff Declarations" consist of the following declarations: Declaration of Craig Bennigson in Support of Motion to Certify Class [Docket No. 501] ("Bennigson Decl."); Declaration of Daniel Britt in Support of Motion to Certify Class [Docket No. 502] ("Britt Decl."); Declaration of Matt Daly in Support of Motion to Certify Class [Docket No. 503] ("Daly Decl."); Declaration of Grant Duff in Support of Motion to Certify Class [Docket No. 504] ("Duff Decl."); Declaration of Matt Frevert in Support of Motion to Certify Class [Docket No. 505] ("Frevert Decl."); Declaration of Lauren Gagnier in Support of Motion to Certify Class [Docket No. 577] ("Gagnier Decl."); Declaration of Jon Gaston in Support of Motion to Certify Class [Docket No. 506] ("Gaston Decl."); Declaration of Nick Giarraputo in Support of Motion to Certify Class [Docket No. 507] ("Giarraputo Decl."); Declaration of Brandon Henderson in Support of Motion to Certify Class [Docket No. 508] ("Henderson Decl."); Declaration of Mitch Hilligoss in Support of Motion to Certify Class [Docket No. 509] ("Hilligoss Decl."); Declaration of Ryan Hutson in Support of Motion to Certify Class [Docket No. 510] ("Hutson Decl."); Declaration of Jake Kahaulelio in Support of Motion to Certify Class [Docket No. 511] ("Kahaulelio Decl."); Declaration of Ryan Khoury in Support of Motion to Certify Class [Docket No. 512] ("Khoury Decl."); Declaration of Ryan Kiel in Support of Motion to Certify Class [Docket No. 513] ("Keil Decl."); Declaration of Matt Lawson in Support of Motion to Certify Class [Docket No. 514] ("Lawson Decl."); Declaration of Michael Liberto in Support of Motion to Certify Class [Docket

They note that the UPC does not permit overtime pay and also offer interrogatory responses by MLB and its franchises that minor leaguers are never paid overtime. *Id*. at 5 (citing Broshuis Rule 23 Motion Decl., Ex. H (Defendants' answers to requests for admissions admitting that they do not provide overtime pay)).

- **Conditions of Work**: Plaintiffs contend minor leaguers follow a "well-established" annual calendar with respect to player development, attending spring training from early March to early April, playing in the championship season from April until September, participating in instructional leagues from mid-September to mid-October and performing training and work-outs during the off-season. Rule 23 Motion at 5 (citing Broshuis Rule 23 Motion Decl., Exs. I (sample spring training schedules), J (testimony regarding in-season schedules and routines), K (sample instructional league schedules) and U (sample off-season training programs)). According to Plaintiffs, the similarities in work conditions extend "both vertically and horizontally," that is, the work routine is similar at all levels of the minor league organizational structure and across all franchises. *Id*. at 6. They offer the following evidence of similar work conditions as to spring training, extended spring training, the championship season, instructional leagues and winter training:

*Spring Training*: Plaintiffs offer sample schedules to show that all MLB franchises have spring training in either Florida or Arizona, typically beginning in early March and ending in early April, just before the championship season. *Id*. at 6 (citing Broshuis Rule 23 Motion Decl., Ex. I (sample spring training schedules)). They also cite player declarations and deposition testimony of Defendants' witnesses addressing spring training routines in support of the assertion that "[m]inor league players usually work seven days per week during spring training." *Id*. (citing Plaintiff Declarations; Broshuis Rule 23 Motion Decl., Exs. I (sample

No. 515] ("Liberto Decl."); Declaration of Aaron Meade in Support of Motion to Certify Class [Docket No. 516] ("Meade Decl."); Declaration of Justin Murray in Support of Motion to Certify Class [Docket No. 517] ("Murray Decl."); Declaration of Joseph Newby in Support of Motion to Certify Class [Docket No. 519] ("Newby Decl."); Declaration of Brett Newsome in Support of Motion to Certify Class [Docket No. 520] ("Newsome Decl."); Declaration of Kyle Nicholson in Support of Motion to Certify Class [Docket No. 521] ("Nicholson Decl."); Declaration of Oliver Odle in Support of Motion to Certify Class [Docket No. 522] ("Odle Decl."); Declaration of Jake Opitz in Support of Motion to Certify Class [Docket No. 523] ("Opitz Decl."); Declaration of Roberto Ortiz in Support of Motion to Certify Class [Docket No. 524] ("Ortiz Decl."); Declaration of Tim Pahuta in Support of Motion to Certify Class [Docket No. 525] ("Pahuta Decl."); Declaration of Dustin Pease in Support of Motion to Certify Class [Docket No. 526] ("Pease Decl."); Declaration of Brandon Pinckney in Support of Motion to Certify Class [Docket No. 527] ("Pinckney Decl."); Declaration of David Quinowski in Support of Motion to Certify Class [Docket No.528] ("Quinowski Decl."); Declaration of Gaspar Santiago in Support of Motion to Certify Class [Docket No. 529] ("Santiago Decl."); Declaration of Aaron Senne in Support of Motion to Certify Class [Docket No. 530] ("Senne Decl."); Declaration of Les Smith in Support of Motion to Certify Class [Docket No. 531] ("Smith Decl."); Declaration of Brad Stone in Support of Motion to Certify Class [Docket No. 532] ("Stone Decl."); Declaration of Kris Watts in Support of Motion to Certify Class [Docket No. 533] ("Watts Decl."); Declaration of Joel Weeks in Support of Motion to Certify Class [Docket No. 534] ("Weeks Decl."); Declaration of Kyle Woodruff in Support of Motion to Certify Class [Docket No. 535] ("Woodruff Decl.").

spring training schedules) & O (deposition testimony of Defendants' witnesses)). Plaintiffs further point to this evidence in support of the contention that during spring training, all minor leaguers go to the sports complexes to perform required baseball-related work routines that includes stretching, throwing, running, hitting and fielding. *Id*. at 6-7. Plaintiffs contend that while the "practice drills may change from day to day, the work routines are standardized and remain similar from team to team. *Id*. (citing Plaintiff Declarations; Broshuis Rule 23 Motion Decl., Exs. I (sample spring training schedules) & O (deposition testimony of Defendants' witnesses)). Plaintiffs assert the evidence shows that work days become longer for all minor leaguers once spring training games commence, with minor leaguers arriving earlier in the morning to complete their work-out routine before the 1 pm game, which typically lasts three hours. *Id*. According to Plaintiffs, throughout spring training all minor leaguers also participate in strength and conditioning workouts that are scheduled by a strength and conditioning coordinator. *Id*. All of this evidence shows that minor leaguers work long hours for no pay during spring training, Plaintiffs assert. *Id*.

This conclusion finds further support, according to Plaintiffs, in a pilot survey conducted by their expert, J. Michael Dennis, to assess minor leaguers' work patterns. *Id*. (citing Declaration of J. Michael Dennis, Ph.D in Support of Plaintiffs' Motion for Class Certification ("Dennis Decl."), Ex. E (pilot survey results). Dr. Dennis found that "out of the 195 minor leaguers surveyed, nearly 85% stated that they were expected to work more than 40 hours per week during spring training, and over 30% stated that they were expected to work more than 55 hours per week." *Id*. (citing Dennis Decl., Ex. E).

*Extended spring training*: Plaintiffs point to deposition testimony of a minor league player for the Los Angeles Angels, Bobby Scales, who testified that extended spring training is simply "an extension of spring training for those players who do not make full-season affiliates." *Id*. at 7-8 (citing Broshuis Rule 23 Motion Decl., Ex. P (Scales Dep.) at 34). According to Plaintiffs, the evidence shows that extended spring training lasts from early April until June and that the work performed during extended spring training is similar to the work performed during spring training. *Id*. (citing Broshuis Rule 23 Motion Decl., Ex. Q (compilation of schedules and testimony relating to extended spring training)).

*The championship season*: Plaintiffs also present evidence they contend shows that minor leaguers perform similar work during the championship season and that they work "exhaustive workweeks" without overtime pay. *Id*. at 8-10. They contend the work includes games seven days per week with only "a couple off days scheduled each month." *Id*. at 8 (citing Declaration of Brian Kriegler, Ph.D. in Support of Plaintiffs' Motion for Class Certification ("Kriegler Rule 23 Decl.") ¶ 17). Plaintiffs' expert, Brian Kriegler, notes that there are organizational schedules available that show the actual game locations and times for each championship game for all levels from Rookie level to the major league club. Kriegler Rule 23 Decl. ¶ 22.

Plaintiffs point to evidence that most games start at 7 pm and last two and a half to three hours (again, the actual times of all games are available, Plaintiffs contend).

United States District Court
Northern District of California

Rule 23 Motion at 9 (citing Kriegler Rule 23 Decl. ¶ 18; Broshuis Rule 23 Decl., Ex. J (deposition excerpts describing in-season routines)). They assert the players arrive at the stadium hours before the game, citing Dr. Dennis's survey (discussed above) reflecting that 90% of minor leaguers arrive at the stadium by 2 pm for an evening game. *Id.* (citing Plaintiff Declarations; Dennis Decl., Ex. E). They describe a regular routine that includes pre-game warm-ups, stretches, drills and batting practice, pre-and post-game meetings, weight lifting and training room activities, and travel on a team bus for away games. *Id.* at 8-10 (citing Broshuis Rule 23 Motion Decl., Exs. J (deposition excerpts describing in-season routines), R (sample in-season schedules and itineraries), & S (evidence addressing travel requirements)). Plaintiffs also contend the travel time for minor leaguers to away games is "extensive," citing their expert, Dr. Kriegler. *Id.* at 10. Plaintiffs state that Dr. Kriegler has "developed a methodology for calculating the travel time for each minor league road trip." *Id.* (citing Kriegler Rule 23 Decl. ¶¶ 19-20).

*Instructional Leagues*: Plaintiffs offer evidence that many players also participate in instructional leagues in the fall, from mid-September to mid-October, held at the MLB complexes in Florida and Arizona. *Id.* at 10 (citing Broshuis Rule 23 Motion Decl., Ex. K (compilation of game schedules, daily schedules and testimony relating to instructional leagues)). According to Plaintiffs, the evidence shows that the work performed at the instructional leagues is similar to spring training, with players engaging in meetings, stretching, drills, batting practice and games (including travel to away games), and that players usually perform work six days a week during instructional leagues. *Id.* Plaintiffs note that like spring training, minor leaguers are not paid any wages for their participation in the instructional leagues. *Id.*

*Winter Training*: Finally, Plaintiffs contend the evidence shows that players perform similar off-season conditioning work in the winter, using strength and conditioning manuals developed by the MLB franchises' strength and conditioning coordinators. *Id.* at 10-11 (citing Broshuis Rule 23 Motion Decl., Exs. U (examples of strength and conditioning manuals) &V (testimony describing strength and conditioning)). Plaintiffs cite evidence that the franchises follow up with the players, requiring them to maintain logs reflecting their strength and conditioning work and keeping track of their progress. *Id.* at 11 (citing Plaintiff Declarations; Broshuis Rule 23 Motion Decl., Exs. U & V)). Plaintiffs also assert that the players perform other "baseball-related work" during the winter training period, including throwing, hitting and fielding. *Id.*

    c.   Plaintiffs' Proposed Trial Plan

Plaintiffs assert that in light of Defendants' uniform policies and practices and the common conditions of work for minor league players, their claims can be tried in a single trial. *Id.* at 11. First, they contend their claims can be "distilled" to three main issues: 1) whether they should be paid for work performed outside of the championship season; 2) whether they are entitled to overtime pay; and 3) whether they are entitled to requisite minimum wages during the

9

championship season. *Id*. A preliminary inquiry as to all of these issues is whether MLB and the franchises "employ" the minor league players, Plaintiffs assert. *Id*. Plaintiffs contend they will be able to address this question on a classwide basis using the testimony of the named Plaintiffs and employees of MLB and the franchises, documentary evidence from MLB and the franchises such as policies, payroll information and schedules, and expert testimony. *Id*. at 12.

Plaintiffs explain that they intend to rely on two experts at trial, Dr. Kriegler and Dr. Dennis. Dr. Kriegler, a statistician, will offer a damages model that includes "a comprehensive estimate of hours worked for each minor leaguer for each work week." *Id*. (citing Kriegler Rule 23 Decl. ¶¶ 17-19). According to Plaintiffs, Dr. Kriegler's estimate is based on reasonable estimates of travel time for "every in-season minor league trip since 2008," and calculations relating to the duration of each game, supplemented by representative evidence obtained by Dr. Dennis of hours worked in spring training, the championship season and the off-season. *Id*. Dr. Dennis has already performed a pilot survey based on the responses of 195 minor leaguers who "spanned all MLB franchises." *Id*. Dr. Dennis opines that "[t]he pilot survey proves that a reliable statistical survey addressing the issues in this litigation is feasible." *Id*. (quoting Dennis Decl. ¶ 44). Dr. Kriegler opines that the pilot survey shows that the future information obtained by Dr. Dennis can be "readily incorporated" into his damages model. *Id*. at 13 (citing Kriegler Rule 23 Decl. ¶ 32). Plaintiffs contend the methodology of their experts is consistent with the statistical methods that have been approved in other wage and hour class actions and will "ensure sufficient due process while simultaneously allowing claims to be prosecuted in an efficient and representative manner." *Id*. at 14. They believe that bifurcation of the trial will not be necessary because liability and damages can be proved simultaneously through common evidence. *Id*.

### d.  Application of Rule 23 Requirements

Turning to the Rule 23 inquiry, Plaintiffs contend the proposed classes should be certified because they satisfy the four requirements of Rule 23(a) (numerosity, commonality, typicality and adequacy of representation), as well as the requirements of both Rule 23(b)(2) (where the party opposing the class has acted or refused to act on grounds that apply generally to the class) and 23(b)(3) (where common issues predominate and the class mechanism is superior to individual

actions).  *Id*. at 15.

The numerosity requirement is satisfied, Plaintiffs contend, because for each of the State Classes there are multiple minor league teams (ten in California, thirty in Florida, thirteen in Arizona, nine in North Carolina, eleven in New York, eight in Pennsylvania, five in Maryland and two in Oregon), each of which has an active roster that is permitted to have between twenty-five and thirty-five minor league players on it.  *Id*. at 16 (citing Declaration of Peter Woodfork in Support of Defendants' Motion to Transfer Action to the Middle District of Florida [Docket No. 118-1] ("Woodfork Decl."), Ex. A).  The number of class members is therefore large enough that "joinder of all members is impracticable."  *Id*. (citing Fed. R. Civ. P. 23(a)).  Plaintiffs further contend the classes are ascertainable because the class definition is clear and objective.  *Id*. (citing *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015); *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 535 (N.D. Cal. 2012)).

Plaintiffs contend their claims meet the typicality requirement as well, noting the permissive nature of this requirement, which requires only that the claims of the named plaintiffs be "reasonably coextensive" with the claims of the absent class members rather than "substantially identical." *Id*. (quoting *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014)).  According to Plaintiffs, the typicality requirement is met here because the named Plaintiffs, like the absent class members, were subject to the same MLB policies governing how they entered the minor league system, the conditions of their employment  and the payment of their salaries.  *Id*. at 17. Consequently, Plaintiffs assert, the representative plaintiffs and class members suffered similar injuries arising out of Defendants' failure to pay them for work outside of the championship season and failure to pay overtime, giving rise to substantially identical claims.  *Id*.  Plaintiffs seek appointment of thirty-six of the named Plaintiffs as class representatives; they do not seek appointment of Plaintiffs Matt Gorgen and Matt Lewis, who were dismissed from the action in a separate Order.  *See* Docket No. 682.  Plaintiffs state that they intend to ask the Court for leave to amend their complaint to add Aaron Dott as a class representative for the Florida and New York classes.  Rule 23 Motion at 17 n. 75.  Plaintiffs contend the "broad composition of the 36 class representatives, who represent every MLB franchise and every level of minor league baseball,

United States District Court
Northern District of California

11

1  vitiates any potential concerns regarding purported differences among class members." *Id*. (citing

2  *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1020 (9th Cir. 1998)).

3      Plaintiffs contend the adequacy requirement is met because there are no conflicts of

4  interest between the class representatives and the absent class members and because class counsel

5  is qualified and capable and will vigorously prosecute the class's interests. *Id*. at 17-18 (citing

6  *Hanlon*, 150 F.3d at 1020; *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir.

7  2012)).

8      Plaintiffs also argue that the class members' claims satisfy the commonality requirement of

9  Rule 23(a)(2) and the more stringent predominance requirement of Rule 23(b)(3). *Id*. at 18-37.

10  Commonality, according to Plaintiffs, is satisfied when an issue "is susceptible to generalized,

11  classwide proof" or "if the same evidence will suffice for each member to make a prima facie

12  showing of that issue." *Id*. at 19 (quoting *Kristensen v. Credit Payment Servs.,* 12 F. Supp. 3d

13  1292, 1306 (D. Nev. 2014) (citing *Newberg on Class Actions* § 4:50 (5th ed.)). On the other hand,

14  an individualized issue is one where "members of a proposed class will need to present evidence

15  that varies from member to member." *Id*. (quoting *Kristensen*, 12 F. Supp. 3d at 1306). Plaintiffs

16  assert that so long as class members suffer the same *type* of injury, commonality is satisfied even

17  if the magnitude of the injury varies. *Id*. (citing *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167

18  (9th Cir. 2014)). To demonstrate predominance, they contend, a further showing is necessary

19  demonstrating that the "proposed class is 'sufficiently cohesive to warrant adjudication by

20  representation.'" *Id*. (quoting *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 964 (9th Cir.

21  2013) (quoting *Wang v. China Daily News, Inc*., 737 F.3d 538, 545 (9th Cir. 2013)). This analysis

22  focuses on the relationship between the common issues and the individual issues, according to

23  Plaintiffs, and is a "qualitative" analysis based on efficiency and economy of litigation. *Id*. at 20

24  (citing *Butler v. Sears, Roebuck & Co*., 727 F.3d 796, 800 (7th Cir. 2013); *Abdullah*, 731 F.3d at

25  963-64; *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003)). Further, the focus

26  of the inquiry is on liability, not damages, Plaintiffs contend. *Id*. (citing *Gunnells*, 348 F.3d at

27  429; *Jimenez*, 765 F.3d at 1167).

28      In the wage and hour context, an employer's policies will often drive the resolution of the

United States District Court
Northern District of California

plaintiffs' claims such that the commonality and predominance requirements are met, Plaintiffs assert, even where the employer seeks to assert a defense based on the (varying) job duties of the class members. *Id*. at 20-21 (citing *Abdullah*, 731 F.3d at 963). That is true here, they argue, because "the key questions at issue . . . will be resolved by examining common policies, meaning that the claims 'will prevail or fall in unison.'" *Id* at 21 (quoting *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1191 (2013)). In particular, Plaintiffs contend they assert "three overarching claims against Defendants:  1) the failure to pay wages for work performed outside the championship season; 2) the failure to pay overtime wages; and 3) the failure to pay the minimum wage when wages are actually paid." *Id*. These three claims will be resolved on a classwide basis, they contend, "as will the overarching element of liability:  whether an employment relationship exists." *Id*. at 22. They point to the following issues they contend present common, predominating questions:

- Underline: The employment relationship:  Plaintiffs assert there are two common questions relating to the employment relationship that are implicated by their claims: 1) whether the minor leaguers are employed by the MLB franchises; and 2) whether MLB and the franchises *jointly* employ the minor leaguers. *Id*. With respect to the first question, Plaintiffs argue that the standards used by all of the relevant states are similar and draw upon the FLSA, requiring the court to look at the "circumstances of the whole activity," focusing on the economic reality of the situation. *Id*. at 23 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). Given that the circumstances of employment of the class members are largely dictated by the UPC and the MLRs, as well as other rules and policies promulgated by MLB relating to the minor leaguers, this issue can be addressed on a classwide basis, according to Plaintiffs. Plaintiffs note that Defendants are likely to assert that this issue involves individualized inquiries because it is governed by the "primary beneficiary test" articulated in *Walling v. Portland Terminal,* 330 U.S. 148 (1947) but that that test does not apply here because in this case "there is a traditional employment relationship with an employment agreement calling for compensation." *Id*. at 23 n. 84 (citing *Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985)). Plaintiffs also assert that the joint employment inquiry will turn on common issues as all of the states apply a multifactor test which looks to similar factors, such as the power to hire and fire workers, supervision and control of work schedules and conditions of employment, control over the rate and method of employment and maintenance of employment records. *Id*. at 24 (citing *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983); *Martinez v. Combs*, 49 Cal. 4th 35, 59 (2010), *as modified* (June 9, 2010); *Torres v. Air to Ground Servs., Inc.*, 300 F.R.D. 386, 395  (C.D. Cal. 2014)). Again, these factors will center on the same evidence for all minor leaguers, Plaintiffs contend, because

13

of MLB's uniform practices, discussed above.

- Unpaid work performed outside the championship season: Plaintiffs contend their claim for unpaid work outside the championship season turns on common issues because all of the states at issue require employers to pay a minimum wage for all hours worked, whereas under the Defendants' uniform policy the minor league players are required to perform extensive work outside of the championship season, including spring training, instructional leagues and off-season training, without compensation. *Id*. at 25. The claim is comparable to an off-the-clock claim, Plaintiffs contend, and therefore they will need to prove three elements: 1) the employee performed work for which he did not receive compensation; 2) the defendants knew or should have known plaintiff performed the work; and 3) the defendant "stood idly by." *Id*. (citing *Jimenez*, 765 F.3d at 1165). According to Plaintiffs, "the core facts governing this analysis will be the same for all class members." *Id*. As to spring training, Plaintiffs note that this work occurred only in Florida and Arizona and therefore the common question for all minor leaguers will be whether the work is compensable under Florida and Arizona law. *Id*. at 26. As to off-season training, Plaintiffs contend that this analysis also can be performed on a classwide basis because all of the relevant states' laws provide that work performed remotely is compensable if the employer "knows or has reason to believe that the work is being performed." *Id*. (quoting 29 C.F.R. § 785.11). Plaintiffs note that the laws of the states at issue do "not distinguish between work performed at the job site versus work performed away from the job site." *Id*. n. 92. The common and predominating question, then, will be whether the minor leaguers' activities outside of the championship season are compensable work, according to Plaintiffs.

- Failure to pay overtime wages: Plaintiffs assert that they are entitled to overtime wages under the laws of all of the relevant states except Arizona and Florida and that this claim will be based on Defendants' uniform policy of never paying overtime, combined with the "extensive evidence – in the form of documents, declarations, depositions and expert analyses – demonstrat[ing] that minor leaguers routinely work more than 40 hours per week, especially during the [championship] season." *Id*. at 27. Plaintiffs also contend MLB's "failure to keep time records for work performed cannot defeat commonality and predominance" in light of the rule of *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680, 687 (1946), that estimates and representative evidence may be used where an employer has not kept adequate records of hours worked. Plaintiffs assert that they will be able to provide such evidence, citing the methodology developed by their expert, Dr. Kriegler, who they say has "devised a reliable, common method for estimating each class member's hours worked for each pay period." *Id*. at 28. In particular, using the databases he has developed of actual game times during the championship season and travel time for each road trip taken, in combination with estimates of hours worked for each minor leaguer developed on the basis of surveys, schedules and roster moves, Dr. Kriegler will be able to "determine whether an overtime violation occurred for each class member for each class period," Plaintiffs assert. *Id*.

- Other issues that present common questions: In addition to the "core questions"

14

discussed above, Plaintiffs contend their claims raise other common issues including whether travel time on the team bus is compensable, whether the "creative professionals" and "amusement exemptions" that exist in most of the relevant states apply, whether certain states' itemized wage statement rules have been violated and whether those who have performed work in California are entitled to waiting time penalties. *Id.* at 28-32.

Plaintiffs also address each of the relevant states' laws to show that common issues predominate for all of the proposed classes. *Id.* at 32-37. With respect to the Arizona Class, Plaintiffs contend Arizona is the site of work by minor leaguers throughout the year and that Defendants do not assert any affirmative defenses. *Id.* at 33. Arizona also does not have an overtime law, according to Plaintiffs. *Id.* Consequently, Plaintiffs assert, the analysis will come down to the "core classwide issues discussed above," namely, must minor leaguers be paid for work performed outside the championship season, is travel time compensable, and must minor leaguers be paid minimum wages during the championship season. *Id.* According to Plaintiffs, the first question is "binary" and will turn on whether the Defendants "employ" the minor leaguers (a question that will be resolved on the basis of MLB's uniform policies and contracts) and whether the activities of the minor leaguers outside of the championship season constitutes "work" (which will be based on the similar activities of the minor leaguers). Thus, this issue can be resolved on a classwide basis, Plaintiffs contend. *Id.* Plaintiffs assert that the second question is also binary; that is, travel time is either compensable or it is not. *Id.* As to this question too, the common MLB policies requiring minor leaguers to travel with their teammates will be the focus of the analysis, according to Plaintiffs. *Id.* at 33-34. Finally, Plaintiffs assert that the third question – whether the wage rate of the minor leaguers working in Arizona fell below the minimum wage – is capable of classwide resolution. *Id.* at 34. In particular, Plaintiffs point to the methodology developed by Dr. Kriegler, using the estimates of Dr. Dennis, for determining which minor leaguers' wages fell below the minimum during the championship season. *Id.*

Plaintiffs also assert that common issues predominate as to the California and Oregon classes. *Id.* at 35. As to these states, they contend, there will be the same common issues as for the Arizona Class, namely, compensability of work performed outside of the championship season, compensability of travel time, and whether wages fall below the minimum. *Id.* In

15

United States District Court
Northern District of California

addition, Plaintiffs argue, there will be common issues that flow from the creative professionals exemption, which, in contrast to Arizona, applies in California and Oregon (though the amusement exemption does not). *Id*. The creative professionals exemption has a "duties" component and a salary component, Plaintiffs contend. *Id*. The duties component will turn on whether the similar activities of minor leaguers – "throwing, running, fielding, and other physical activities – qualify as the type of work envisioned in the exemption." *Id*. Plaintiffs contend the duties component will *not* require an individualized inquiry as to the specific duties of each class member. *Id*. The salaries component will also turn on a common issue according to Plaintiffs, namely, whether the payments made to the minor leaguers can be considered a salary (which is characterized by payments of the same amount for all months in which any work was performed). *Id*. The common evidence cited by Plaintiffs to show that the minor leaguers are not paid a "salary" is the evidence that they are paid only during the championship season and not during other months, even though they are required to perform work throughout the year. *Id*.

California and Oregon also have overtime laws and the claims the California and Oregon Classes assert under these laws also turn on a "significant common issue that furthers the predominance of common issues over individual ones," according to Plaintiffs. *Id*. In particular, all of the class members will rely on Defendants' policy of never paying overtime, no matter how many hours the minor leaguers work. *Id*. at 36. They will also rely on the survey data and the reasonable estimates of their experts showing that they routinely work more than 40 hours in a week. *Id*. Finally, Dr. Kriegler will use payroll data to calculate each class member's overtime rate and overtime damages. *Id*. Thus, Plaintiffs' contend, common questions predominate over any individualized inquiries as to the California and Oregon Classes.

Finally, Plaintiffs argue that common issues predominate as to the claims of the classes proposed for the remaining states (New York, North Carolina, Florida, Maryland and Pennsylvania). These states recognize both the creative professionals and the amusement exemptions. In addition, all of these states except Florida have overtime laws. Thus, the same common issues that predominate as to the California and Oregon Classes also will predominate here, Plaintiffs contend. *Id*. at 36. In addition, the applicability of the amusement exemption will

turn on common issues, Plaintiffs assert. *Id*. First, the Court will have to identify the appropriate "establishment," which will affect all class members, Plaintiffs assert. *Id*. Next, the Court will have to determine whether each such establish is an "amusement" establishment for the purposes of the exemption. *Id*. This latter determination will "affect large numbers of minor leaguers" and therefore also involves common issues, Plaintiffs assert. *Id*.

Plaintiffs argue that the superiority requirement of Rule 23(b)(3) is also satisfied, citing the following factors that they contend make class treatment appropriate: 1) the absence of evidence that class members have an interest in individually prosecuting their claims and the disincentives to bringing such actions, including the fear of reprisals, the relatively low amount of individual damages awards, and the high cost of prosecuting claims individually; 2) the fact that there are no overlapping suits pending in any court (other than the one that was consolidated with this action); 3) the familiarity of this Court with the facts and legal issues, making it desirable to concentrate the litigation in this forum; 4) the fact that class treatment is manageable because counsel for both sides have extensive experience in litigating class actions, the class size is not too large to handle, and Plaintiffs' experts have developed mechanisms such as survey, documentary evidence and representative testimony to "resolve the action efficiently for all class members while preserving procedural fairness." *Id*. at 37-38.

As an alternative basis for certifying the class, Plaintiffs rely on Rule 23(b)(2) (instead of Rule 23(b)(3)), which applies where a defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Id*. at 38 (quoting Fed. R. Civ. P. 23(b)(2)). According to Plaintiffs, under Rule 23(b)(2), a class may be certified regardless of whether common issues predominate and this section does not require that all members must have suffered identical injuries. *Id*. (citing *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014)). Instead, a class may be certified under Rule 23(b)(2) where "an injunction would offer all class members 'uniform relief' from the harm." *Id*. (quoting *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C-09-1967 CW, 2013 WL 5979327, at *7 (N.D. Cal. Nov. 8, 2013) (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010))). That is the situation here, Plaintiffs contend, as

they seek "to enjoin MLB from continuing to perpetuate the ongoing wage-and-hour violations affecting all minor leaguers, including the failure to pay wages for work performed outside the season, the failure to provide overtime pay, and the failure to pay the minimum wage." *Id*. at 38-39.   Therefore, they assert, the proposed classes should be certified under Rule 23(b)(2) as well as 23(b)(3).

e.   Class Notice

Plaintiffs ask the Court to authorize notice to the Rule 23 classes using the same approach to notice that was used for the FLSA collective. *Id*. at 39.   In particular, Plaintiffs ask that class members be given direct notice based on information obtained from Defendants' records, that they be given 90 days to "exercise their rights," and that a 30-day reminder notice be sent to class members. *Id*.

**2.  Defendants' Opposition**

In their Opposition brief, Defendants contend Plaintiffs have failed satisfy all of the requirements of Rule 23(a) and that they also have not demonstrated that either Rule 23(b)(2) or (b)(3) applies.  Rule 23 Opposition at 1-3.  Defendants further assert that all of the proposed classes lack Article III standing. *Id*. at 3.  According to Defendants, in order for Article III standing to exist, "for each claim and defendant in a class action, there must be at least one class representative who was injured by that defendant in that state." *Id*. at 3.  Because all of the proposed classes assert claims against the 22 Club Defendants, Defendants contend,  there must be at least one class representative for each proposed class who played baseball for each Club Defendant in that state – a requirement that Plaintiffs have not met. *Id*.

a.  Factual Background[6]

According to Defendants, named Plaintiffs are former minor league players who played with one or more of the 30 MLB Clubs (22 of which remain as Defendants in this action, hereinafter the "22 Club Defendants" or "Club Defendants"). *Id*. at 3.  All of the players

---

[6] Defendants offer a more detailed factual background in their Motion to Decertify, discussed below, which they incorporate by reference in their Rule 23 Opposition.  Defendants provide a summary of those facts in their Rule 23 Opposition. *See* Rule 23 Opposition at 3.

United States District Court
Northern District of California

United States District Court
Northern District of California

"negotiat[ed] and agree[d] to contract terms with the Club that drafted them," "signed a [UPC] with that Club and subsequently reported to one of 180 affiliates located in 44 states to play baseball during the championship season." *Id*. at 4. Defendants contend the players "often played for multiple teams based in multiple states during the statutory period, and engaged in diverse activities (games, training, and so on) in literally dozens of locations over the course of their careers." *Id*. at 1. Some of this information is reflected in the "transaction history" that is maintained for each minor leaguer, which lists the dates he signed contracts, dates of transfers from various affiliates and dates he was put on the "disabled list," among other things. *Id*. at 4 (citing Declaration of Elise Bloom in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification Under Federal Rule of Civil Procedure 23 ("Bloom Rule 23 Opposition Decl."), Ex. 80 (sample transaction history, entitled "Player History," for named Plaintiff Kristopher Watts)). Defendants contend the activities of the players varied widely because each Club and its affiliates "administered its own policies and schedules, typically at the discretion of the Clubs' many minor league managers, coaches and trainers, and each player often had discretion to decide whether or not (and for how long) to engage in particular activities." *Id*. (citing Motion to Decertify at 4-6).

Defendants contend that "because the baseball year is broken into so many different activities and seasons, each of which takes place at different locations (which differ for each minor leaguer), each putative class member participated in different baseball activities in a different constellation of states, and therefore under the aegis of many different state laws." *Id*. at 4-5. In this context, they assert, the members of each of the State Classes will include any player who performed any activity in the state during the statutory period, "no matter how fleeting or minimal," and players could qualify as members of multiple State Classes to the extent they conducted their activities in more than one of the relevant states. *Id*. at 5 (citing Bloom Rule 23 Opposition Decl., Ex. 4 (chart created by Defendants for each State Class reflecting Class representatives' contacts with the states they purport to represent ("State Contacts Chart"))). Defendants note that although Plaintiffs have asked the Court to approve the appointment of 36 of the 43 named Plaintiffs as class representatives, none of the state classes proposed by Plaintiffs

1   has a class representative for *each* of the 22 Club Defendants.  *Id*.

2                    b.   Rule 23(a) Requirements

3        Defendants assert that Plaintiffs' proposed classes do not satisfy the requirements of Rule

4   23(a) because the classes are not ascertainable, the claims of the proposed class representative are

5   not typical of those of the absent class members, the issues in the case do not meet the

6   commonality requirement, and the class representatives and their counsel will not adequately

7   represent the interests of the class.  *Id*. at 6-22.

8                    i.   Ascertainability

9        Defendants contend a class may only be certified if its "precise membership can *currently*

10  be ascertained by reference to 'objective criteria.'"  *Id*. at 6 (citing *In re Clorox Consumer Litig.*,

11  301 F.R.D. 436, 440 (N.D. Cal. 2014); *Xavier v. Philip Morris USA Inc*., 787 F. Supp. 2d 1075,

12  1088-90 (N.D. Cal. 2011)) (emphasis in original).  According to Defendants, a class is

13  ascertainable only if the method of determining its members is "administratively feasible and

14  [does] not involve individualized analyses of class members."  *Id*. (citing *Martin v. Pac. Parking

15  Sys. Inc*., 583 F. App'x 803, 804 (9th Cir. 2014), *cert denied*, 135 S. Ct. 962 (2015)).  That

16  standard is not satisfied by the State Classes proposed by Plaintiffs, Defendants assert.  *Id*. at 6-7.

17  Defendants reject Plaintiffs' assertion that class membership can be ascertained using "records

18  'such as roster moves and payroll data.'"  *Id*. at 7 (quoting Rule 23 Motion at 16).  This is because

19  analysis of these records will require "an enormously fact-intensive analysis for *each class

20  member*, which does not satisfy Rule 23."  *Id*. (emphasis in original) (citing *Spencer v. Beavex,

21  Inc.*, No. 05-cv-1501 WQH (WMC), 2006 WL 6500597, at *9 (S.D. Cal. Dec. 15, 2006); *Martin*,

22  583 Fed. App'x at 804; *Daniel F. v. Blue Shield of Cal*., 305 F.R.D. 115, 125 (N.D. Cal. 2014)).

23       Defendants argue that the roster moves are reflected in the players' transaction histories

24  and these would have to be reviewed, line-by-line, for each of thousands of players for each year

25  during the statutory period in order to determine the State Classes for which the player is qualified.

26  *Id*. at 8.  "The payroll data is no better," Defendants assert, because each Club's payroll data

27  "comes in different forms [and therefore] . . . to sort through each Club's unique payroll data as to

28  each class member will similarly mandate an unfeasibly individualized and complex review."  *Id*.

United States District Court
Northern District of California

                                    20

1    Defendants argue further that these records are not sufficient to ascertain class membership

2    because they reflect only the locations where the players played during the championship season,

3    not where they engaged in other activities during the off-season. *Id.* In fact, Defendants contend,

4    as to off-season training, "the Court will *never* have a way to assess where class members engaged

5    in off-season training." *Id.*

6        Defendants further challenge the ascertainability of class membership on the basis that the

7    class definitions are unclear and overbroad. *Id.* at 9-12. First, they point to the fact that the

8    classes are defined with reference to the "work" the members allegedly performed in each state,

9    yet Plaintiffs are unable to offer a clear definition of what constitutes "work," according to

10    Defendants. *Id.* at 9. Defendants assert that Plaintiffs' recent decision not to seek compensation

11    for time spent in mini-camps and at the Arizona Fall League, even though such activities were

12    alleged in Plaintiffs' complaint, illustrates that "Plaintiffs themselves cannot decide what actually

13    constitutes 'work' in the first place." *Id.* at 9-10.

14        Second, Defendants argue that the classes are overbroad because they "include class

15    members who have no cognizable wage-and-hour claims against their Club under that state's law."

16    *Id.* at 10 (citing *Tietsworth v. Sears, Roebuck & Co.*, No. 5:09-cv-00288-JF (HRL), 2012 WL

17    1595112, at *14 (N.D. Cal. May 4, 2012); *Astiana v. Ben & Jerry's Homemade, Inc.,* No. C 10-

18    4387 PJH, 2014 WL 60097, at *3 (N.D. Cal. Jan. 7, 2014); *Diacakis v. Comcast Corp.*, No. C 11-

19    3002 SBA, 2013 WL 1878921, at *4 (N.D. Cal. May 3, 2013)). In particular, according to

20    Defendants, the State Classes proposed by Plaintiffs "include individuals who technically

21    performed some kind of activity in that state, even though the nature and scope of that activity

22    may be insufficient [for the individual] to be deemed to have been 'employed' under that state's

23    laws." *Id.* at 11. Consequently, Defendants contend, the Court would have to conduct an

24    assessment of "the wide range of different potentially *de minimis* contacts" of the class members

25    with the state to ensure that each one has standing.[7] *Id.* Moreover, they argue, the analysis will be

26

27    [7] According to Defendants, examples of such determinations include the following: "Does a week of conditioning on vacation in a state constitute 'employment' in that state? Do two weeks at

28    spring training in a state constitute 'employment' in that state? Does a single day at an affiliate in

*United States District Court*
*Northern District of California*

1   further complicated by the fact that "the states have different tests to assess whether their laws

2   apply to out-of-state employees." *Id.* at 11 n. 15.  And even as to class members who can state a

3   cognizable claim under the state law of their class, Defendants assert, there may be another state

4   that has an overriding interest in the application of its laws to the class members' claims.  *Id.*

5   Because a class cannot include members who lack standing, Defendants assert, the Court will be

6   required to make findings on these issues for each class member.  *Id.*  However, the need to

7   conduct such individualized inquiries does not comport with Rule 23, they argue.  *Id.*

8                           ii.   Typicality

9           According to Defendants, the typicality requirement cannot be met if the class

10   representative had no dealings with the Defendants against whom the class asserts claims.  *Id.*

11   (citing *Mazur v. eBay, Inc*., 257 F.R.D. 563, 569 (N.D. Cal. 2009); *La Mar v. H & B Novelty &*

12   *Loan Co*., 489 F.2d 461, 462 (9th Cir. 1973)).  That is the case here, Defendants assert, because

13   each class is asserting claims against all 22 Club Defendants but there is not a class representative

14   who played for each of these Clubs for each of the State Classes.  *Id.*  Therefore, Defendants

15   argue, all of the State Classes fail to satisfy the typicality requirement of Rule 23.  *Id.* at 13.

16   Defendants argue that the typicality requirement isn't met for the additional reason that many of

17   the class representatives purport to represent State Classes in which they themselves have no

18   claims – a problem that also goes to adequacy of representation.  *Id.*  (citing *Major v. Ocean Spray*

19   *Cranberries, Inc.*, No. 5:12-CV-03067 EJD, 2013 WL 2558125, at \*4 (N.D. Cal. June 10, 2013);

20   *Williams v. Oberon Media, Inc*., No. CV 09-8764-JFW AGRX, 2010 WL 8453723, at \*6 (C.D.

21   Cal. Apr. 19, 2010), *aff'd*, 468 F. App'x 768 (9th Cir. 2012)).  They point to Ryan Kiel as "[o]ne

22   of the most glaring examples" of this problem.  *Id.*  According to Defendants, Kiel purports to

23   represent the Florida class, even though he is not alleged to have performed *any* baseball-related

24   activities in Florida, in the off-season or otherwise.  *Id.*  They also note that Ryan Khoury, who is

25   proposed as a class representative for the New York Class, appears to have had no contacts with

26

27   _____
     a state during the championship season constitute 'employment' in that state?  Does playing an
28   occasional 'away game' in a state constitute "employment" in that state?"

New York other than playing an occasional away game there and thus likely has no claims under New York law. *Id*. at 12 n. 19 & 13 n. 22. Defendants also assert that the claims of Kris Watts, Joseph Newby and Jon Gaston are atypical of the classes they seek to represent because they performed no baseball-related activities in the relevant state within the limitations period. *Id*. Other class representatives also may be atypical of the classes they purport to represent, Defendants argue, depending on other decisions the Court may make in this case, such as how much contact with a state is sufficient to justify a cause of action under that state's laws. *Id*. at 13 n. 22.

Defendants also argue that the claims of the classes may not be typical of the class representatives because many of the proposed class representatives played for Clubs that have been dismissed as defendants; as a consequence, these class representatives' claims will fail if Plaintiffs do not establish that the Clubs and MLB had a joint employment relationship. *Id*. at 14. The class representatives who fall in this category are: Arizona Class Representative Nick Giarraputo (played "exclusively for a Dismissed Club while in Arizona"); Florida Class representatives Ryan Khoury, Brett Newsome, Roberto Ortiz, Tim Pahuta, Brandon Pinckney, and David Quinowski (played "exclusively for Dismissed Clubs while in Florida"); New York Class representatives Ryan Khoury and Kris Watts (played "exclusively for Dismissed Clubs while in New York"); Maryland Class representatives Brett Newsome and Roberto Ortiz (played "exclusively for Dismissed Clubs"); and Pennsylvania Class Representative Tim Pahuta (played "exclusively got a Dismissed Club while in Pennsylvania").

Finally, Defendants argue that the claims of the classes don't satisfy the typicality requirement because the claims of the class representatives are based on "activities they allegedly performed in that particular state that are not typical of the activities performed by the class members whom they seek to represent." *Id*. at 15.

### iii. Commonality

Defendants argue that the commonality requirement is not met because Plaintiffs have not offered "'significant proof' that a resolution of the legal issues in the case shall be performed 'in one stroke.'" *Id*. at 15 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).

According to Defendants, "[t]he key inquiry under the commonality requirement is whether class treatment 'will generate common *answers* apt to drive the resolution of the litigation.'"  *Id*. at 16 (quoting *Wal-Mart*, 564 U.S. at 350 (emphasis added)).  Instead, Defendants contend, Plaintiffs identify common *questions* (whether Defendants failed to pay wages for work performed outside the championship season, whether Defendants failed to pay overtime wages, and whether Defendants failed to pay minimum wage when wages were paid).  *Id*.  These questions cannot be answered on a classwide basis, Defendants contend.  *Id*.  Defendants argue that there is a threshold question as to each of the three questions posed by Plaintiffs, namely, whether that player was an "employee" in the first instance when he performed the relevant activities.  *Id*.  According to Defendants, that question will turn on application of the "primary beneficiary test" as well as an analysis of whether the Clubs and MLB were joint employers and both of these analyses requires individualized inquiries for each class member.  *Id*.

With respect to the primary beneficiary test, Defendants argue that the Court will be required to "analyze the job duties and work performed by class members" to determine if they were apprentices or trainees and that this analysis cannot be conducted on a classwide basis under the facts here.  *Id*. at 17 (quoting *Brady v. Deloitte & Touche LLP*, No. C 08-177 SI, 2012 WL 1059694, at *6 (N.D. Cal. Mar. 27, 2012), *aff'd sub nom. Brady v. Deloitte & Touche*, 587 F. App'x 363 (9th Cir. 2014)).  According to Defendants, the testimony of named Plaintiffs shows that "players experienced different benefits (or lack thereof) from different activities in ways that impact the 'primary beneficiary' determination."  *Id*. (citing Bloom Rule 23 Opposition Decl., Ex. 4 (State Contacts Chart)).  Defendants dispute Plaintiffs' assertion that *Walling* and the primary beneficiary test do not apply because there is a traditional employment relationship between the players and the Clubs and/or MLB, arguing Plaintiffs' approach is "backwards."  *Id*. at 18.  They also contend Plaintiffs' reliance on *Alamo Found. v. Secretary of Labor* is misplaced because in that case, the plaintiffs were "entirely dependent" on the defendant for their food and shelter and performed uncompensated work for the defendant from which it derived the majority of its income.  *Id*. (citing 471 U.S. at 301).  In contrast, Defendants assert, the plaintiffs here *chose* to participate in the minor league and saw their participation as an opportunity for receiving "the

24

1    highest quality training in baseball as well as general life skills." *Id.*

2          Similarly, as to the question of whether MLB is a joint employer, Defendants argue, the

3    Court will be required to conduct a "highly individualized, fact-specific" analysis that will render

4    class treatment inappropriate. *Id.* at 19 (citing *Maddock v. KB Homes, Inc.*, 248 F.R.D. 229, 246

5    (C.D. Cal. 2007); *Ouedraogo v. A-1 Int'l Courier Serv., Inc.*, No. 12-CV-5651 AJN, 2014 WL

6    4652549, at *7 (S.D.N.Y. Sept. 18, 2014)).  This question is particularly important as to the class

7    representatives who played for the Dismissed Clubs, Defendants note, as their claims will stand or

8    fall on whether MLB is found to have been their employer.  *Id.*  Defendants further challenge

9    Plaintiffs' joint employer theory on the merits, asserting that "despite Plaintiffs' boilerplate claims

10   [in the Complaint] to having been controlled and supervised by MLB . . . Plaintiffs' depositions

11   revealed that not a single Plaintiff had ever been supervised by an executive of MLB, nor could

12   some Plaintiffs even recognize the name of a single MLB executive whom their lawyers listed in

13   their responses to interrogatories." *Id.* (citing Compl. ¶¶ 70, 182; Bloom Rule 23 Opposition

14   Decl., Ex. 2 (comparing testimony of named Plaintiffs in declarations with deposition testimony

15   on question of MLB supervision)).

16         Defendants also dispute Plaintiffs' assertion that there are "common resolutions to the key

17   issues in this case simply because minor leaguers all signed UPCs."  *Id.* at 20 (citing Rule 23

18   Motion at 23).  The UPC only sets the players' "*base* salary, that is, *only* for their first

19   championship season," Defendants assert.  *Id.* (emphasis in original). It does not dictate the bonus

20   each player receives, college scholarship benefits or participation in an incentive bonus plan.  *Id.*

21   Rather, Defendants assert, "[t]hese and all aspects of player compensation (aside from first-year

22   championship base salary) are determined *between players and their individual Clubs.*"  *Id.* (citing

23   Motion to Decertify at 7-10; SCAC at 307 (UPC)).  According to Defendants, "the disparate

24   policies and practices of each Club further preclude a finding of commonality."  *Id.* at 21.

25                             iv.  Adequacy

26         Defendants argue that the adequacy requirement is not met because the class

27   representatives have engaged in misconduct in connection with their declarations, with some

28   signing false and misleading declarations and others signing declarations they did not prepare or

United States District Court
Northern District of California

1   review.  *Id.* at 21-22 (citing Bloom Rule 23 Opposition Decl., Ex. 2).  Class counsel has also

2   engaged in conduct that undermines their adequacy, Defendants contend.  *Id.*  In particular,

3   Defendants assert that Mr. Broshuis "engaged in what appears to be solicitation of Named

4   Plaintiffs."  *Id.*  Defendants also contend counsel filed and refiled declarations they knew or

5   should have known were false and relied on stock, boilerplate declarations.  *Id.* This conduct does

6   not satisfy the adequacy requirement, Defendants assert.  *Id.* (citing *Bodner v. Oreck Direct, LLC*,

7   No. C 06-4756 MHP, 2007 U.S. Dist. LEXIS 30408, at *5-6 (N.D. Cal. 2007); *Evans v.*

8   *IAC/Interactive Corp.*, 244 F.R.D. 568, 578-79 (C.D. Cal. 2007)).

9                                      c.  Rule 23(b)(3)

10          Defendants argue that the predominance requirement of Rule 23(b)(3), which is more

11   stringent than the commonality requirement of Rule 23(a), also is not satisfied because

12   individualized inquiries will overwhelm any common issues.  *Id.* at 23-38.  First, as discussed

13   above, Defendants assert that in order to determine liability, the Court will have to conduct an

14   individualized analysis of the types of activities the class members engaged in to determine if they

15   constituted compensable work, and the compensation each class member received.  *Id.* (citing

16   *Levias v. Pac. Mar. Ass'n*, No. 08-cv-1610-JPD, 2010 WL 358499 (W.D. Wash. Jan. 25, 2010)).

17   With respect to the question of whether certain types of activities constitute work, Defendants

18   challenge what they contend is Plaintiffs' "binary" description of the issue; according to

19   Defendants, whether or not a certain activity is "compensable work" is not subject to a simple

20   "yes" or "no" answer but instead, may differ from class member to class member.  *Id.* at 24-25.

21   As an example, Defendants compare a player who performed off-season training according to their

22   Club's manual (which might be found to be compensable work) with one who did not follow the

23   manual (in which case, the off-season training would not be compensable work, Defendants

24   assert).  *Id.*  Other examples Defendants cite are players whose off-season conditioning work was

25   monitored by his Club versus those whose conditioning was not monitored and those who

26   submitted work-out logs versus those who did not.  *Id.* at 23.  These variations will be "amplified"

27   because the State Classes contain players who played for different Clubs, Defendants assert.  *Id.* at

28   25.  Further, Defendants argue, courts "find that individualized issues predominate over common

26

United States District Court
Northern District of California

1  ones in cases where, as here, managers have discretion to administer policies," where "employees

2  have discretion to choose if or how they comply with those policies," and where the policies differ

3  from location to location.  *Id.* (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011);

4  *Villa v. United Site Servs. of Cal., Inc.*, No. 5:12-CV-00318-LHK, 2012 WL 5503550, at *8 (N.D.

5  Cal. Nov. 13, 2012); *Amey v. Cinemark USA Inc*., No. 13-CV-05669-WHO, 2015 WL 2251504, at

6  *12 (N.D. Cal. May 13, 2015); *Bryant v. Serv. Corp. Int'l*., No. C 08-01190 SI, 2011 WL 855815,

7  at *9 (N.D. Cal. Mar. 9, 2011)).

8          Another question that will require individualized inquiries, according to Defendants, is

9  how much time players engaged in each activity.  *Id.*  This question will go to liability on the

10  overtime claims and will differ for each player depending on "a number of factors, including the

11  activities in which they participated and the Club or affiliate for whom they played."  *Id.*

12  Defendants argue that in characterizing their claims as "off-the-clock," Plaintiffs overlook the fact

13  that courts have held that such claims cannot be addressed on a classwide basis.  *Id.* at 26 (citing

14  *Lou v. Ma Labs., Inc*., No. C 12-05409 WHA, 2014 WL 68605, at *4 (N.D. Cal. Jan. 8, 2014);

15  *Villa*, 2012 WL 5503550, at *12).  Defendants also challenge Plaintiffs' assertion that because

16  they did not keep records of the time spent engaging in these activities Plaintiffs are entitled to

17  rely on representative evidence such as survey evidence.  *Id.*  According to Defendants, this

18  argument fails "[b]ecause Plaintiffs chose to perform activities on their own time at their own

19  discretion, [and therefore] there can never be time records for their off-the-clock claims."  *Id.*

20  Even Plaintiffs themselves do not remember how much time they spent on these activities,

21  Defendants contend.  *Id.*  They cite as an example an alleged discrepancy between the declaration

22  and deposition testimony of Joel Weeks, who stated in his declaration that he typically arrived six

23  hours before games but testified in his deposition that when he played with one affiliate he showed

24  up 20 to 30 minutes before away games.  *Id.* (comparing Weeks Dep. at 155-56 with Weeks Decl.,

25  Docket No. 414-40).  Consequently, Defendants argue, "there is simply no classwide resolution to

26  the question of which players, if any, are owed minimum wage or overtime, which is yet another

27  individualized issue that will predominate in this litigation."  *Id.*

28          Defendants also assert that individualized inquiries will have to be conducted to determine

which players were payed minimum wages under the relevant states' laws and which were not. *Id.* at 26-28. They point to large variations among the players as to the size of their signing bonuses, citing as examples the bonuses paid to (now dismissed) named Plaintiff Matt Lewis ($100,000) and putative class member Yoan Moncada ($31,500,000). *Id.* at 27 (citing Bloom Rule 23 Opposition Decl., Ex. 40 & ¶ 88). They also point to the monthly salary negotiated by named Plaintiff David Quinowski as a free agent ($10,000/month). *Id.* (citing Motion to Decertify at 9 (citing Quinowski Dep. at 145-46)). In addition, they assert, some class members received various forms of additional compensation outside of the championship season, "including but not limited to signing bonuses, incentive bonuses, college scholarship money, salaries negotiated in non-first year contracts, salaries from playing in the AFL, stipends and contractual awards for those who attended Major League spring training, salaries from extended spring training depending on the Club, per diems, room and board, and performance-related bonuses. *Id.* (citing Smith Dep. at 182 (compensated for participating in extended spring training); Duff Dep. at 273 (compensated during 2009 AFL); Quinowski Dep. at 159-162; 166 (testifying that during the 2012 Major League spring training he was paid $1,100 a week for seven weeks); Liberto Dep. at 256 (paid during extended spring training); Daly Dep. at 183 ($3,500 bonus for community service award)). All of this compensation will have to be considered individually, according to Defendants, in order for the Court to determine whether the players are entitled to minimum wage or overtime. *Id.* at 28.

Defendants also argue that the defenses they assert against Plaintiffs' claims will require individualized inquiries that will overwhelm any common issues. *Id.* at 28-29. These defenses include the various creative professional and seasonal amusement exemptions recognized (in varying forms) under many of the relevant states' laws. *Id.* 28. As to the creative professional exemption, Defendants argue, the Court will have to conduct individualized inquiries as to the players' "primary duties" and "salary threshold." *Id.* at 29. Similarly, they contend, the seasonal amusement exemption would require the Court to address the operating time and receipts of each "establishment" where players performed compensable work, applying a variety of state law standards, for each year in the class period, in order to determine whether the exemption applied. *Id.*

The difficulty of addressing the individualized issues discussed above would be multiplied by the choice-of-law analyses that the Court would have to conduct, Defendants argue. *Id*. at 29-31. In particular, they contend, the Court would have to "grapple with choice-of-law across a multitude of states to determine which state's law applies to the alleged work at issue." *Id*. at 29. Further, they assert, "in the event that a state law other than the state law of the subclass applies to certain alleged work, administration of the class becomes impracticable." *Id*. at 30. Defendants argue that Plaintiffs have entirely ignored the fact that each player performed work in a number of different states, thus requiring an individual choice-of-law analysis for each player. *Id*. According to Defendants, the necessity to conduct such an analysis makes it impossible for Plaintiffs to satisfy the predominance requirement. *Id*. (*citing Williams v. Oberon Media, Inc*., No. CV 09-8764-JFW AGRX, 2010 WL 8453723, at *7 (C.D. Cal. Apr. 19, 2010), *aff'd*, 468 F. App'x 768 (9th Cir. 2012); *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 591-93 (9th Cir. 2012); *Church v. Consol. Freightways, Inc*., No. C-90-2290 DLJ, 1991 WL 284083, at *12-13 (N.D. Cal. June 14, 1991)).

To illustrate the magnitude of the choice-of-law problem, Defendants point to California's three-part test for determining whose laws should apply (which focuses on how the laws of the competing jurisdictions differ, whether both states have an interest in applying their respective laws, and which states' interest would be more impaired if its laws were not applied), arguing that the application of this standard would have to be conducted for each non-forum state with an interest in the application of its laws and for each claim. *Id*. (citing *Williams*, 2010 WL 8453723, at *9). They offer as an example Ryan Khoury, who is named as a class representative for the New York Class on the basis that he played away games there. *Id*. at 31. According to Defendants, Khoury played for Red Sox affiliates located in Maine, Rhode Island, Massachusetts and South Carolina and therefore, the Court would have to determine which of these states had the greater interest in having its laws applied to Khoury's claims. *Id*. Defendants contend "[t]he permutations and combinations of these choice-of-law evaluations are mind-bending." *Id*.

Moreover, Defendants assert, even if the court can "hypothetically discern which laws apply to which claims, Plaintiffs have also failed to establish how a jury in a 'single trial' can

possibly conceptualize the variations amongst the laws of the eight states governed by the subclasses, and how they would disparately affect class members." *Id*. at 32 (citing Rule 23 Motion at 11; *Bryant v. Serv. Corp. Int'l*, No. C 08-01190 SI, 2011 WL 855815, at *6 (N.D. Cal. Mar. 9, 2011)). Nor have Plaintiffs adequately addressed the variations in the various states' laws, Defendants argue. *Id*.

Defendants argue that manageability problems alone preclude certification and characterize Plaintiffs' proposed trial plan as merely an attempt to "paper over" these problems. *Id*. at 33. Plaintiffs' proposal is insufficient, Defendants assert, because it makes no attempt to account for the resolution of the many individualized issues discussed above. *Id*. Defendants argue that extrapolating from the testimony of the 43 named Plaintiffs is not a viable option to resolve these issues because these players have "wildly variable testimony as to crucial legal questions in this case . . . , in light of the various activities in which they partook, the benefits they and the Defendants reaped from those activities, and the time they spent engaging in those activities." *Id*. at 33-34 (citing Bloom Rule 23 Opposition Decl., Ex. 3 (chart prepared by Defendants listing alleged "Variations Exemplified by Deposition Testimony"); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1128 (N.D. Cal. 2011); *Vinole v. Countrywide Home Loans, Inc*., 571 F.3d 935, 947 (9th Cir. 2009)). Defendants also argue that the representative evidence Plaintiffs plan to use, including survey responses, is fatally flawed, as set forth in Defendants' Motion to Exclude, discussed below. *Id*. at 34-38.

### d.  Rule 23(b)(2)

Defendants argue that Plaintiffs' alternative ground for certification, under Rule 23(b)(2), also has no merit. *Id*. at 38. That section allows a class to be certified where class members seek common injunctive relief and money damages are only "incidental" to their claim, Defendants assert. *Id*. Further, only a current employee has standing to pursue injunctive relief, according to Defendants. *Id*. Here, however, the class does not include any current players and the requested injunctive relief (a declaration requiring that Defendants pay all statutorily required wages) "amounts to a request for monetary damages." Under these circumstances, the request for money damages is not "incidental" to the claim for injunctive relief, Defendants contend. *Id*.

30

Furthermore, none of the classes has standing to pursue injunctive relief. *Id.* Therefore, Defendants assert, Rule 23(b)(2) does not provide a basis for certification. *Id.*

### e.   Article III Standing

Finally, Defendants contend the Court must address the threshold issue of Article III standing before it decides the question of certification.[8] *Id.* at 38 (citing *Bruce v. United States*, 759 F.2d 755, 757 (9th Cir. 1985); *Burton v. Nationstar Mortg.*, LLC, No. 1:13-cv-00307-LJO-JLT, 2014 WL 5035163, at *6 (E.D. Cal. Oct. 8, 2014)).  According to Defendants, that requirement is only met in a multi-defendant case where there is at least one named plaintiff who can assert a claim directly against each defendant. *Id.* at 39 (citing *Henry v. Circus Circus Casinos, Inc.*, 223 F.R.D. 541, 544 (D. Nev. 2004); *Perez v. Wells Fargo & Co.*, No. C 14-0989 PJH, 2015 WL 1887354, at *5 (N.D. Cal. Apr. 24, 2015)).  Further, they assert, each State Class is treated as a separate lawsuit and therefore Plaintiffs must establish that each of the State Classes satisfies Article III standing requirements. *Id.* (citing *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981); *Nguyen v. Medora Holdings, LLC*, No. 5:14-CV-00618-PSG, 2015 WL 4932836, at *4 (N.D. Cal. Aug. 18, 2015)).  It is not sufficient, according to Defendants, that "amongst all of the class representatives for all of the subclasses, at least one played for each Club Defendant." *Id.*  Rather, Defendants contend, "Plaintiffs must have standing to bring each state law claim against each Defendant." *Id.* (citing *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1218 (N.D. Cal. 2014); *Perez*, 2015 WL 1887354, at *5). Because each State Class does not have a named Plaintiff for each Club named as a defendant, Defendants assert, the standing requirement is not satisfied as to any of the classes. *Id.* at 40.

### 3.  Plaintiffs' Reply

Plaintiffs reject Defendants' assertions that "minor league baseball is wholly different from one minor league affiliate to another," pointing out that the purpose of the farm system, as stated

---

[8] Defendants raised the standing issue at the motion to dismiss stage of the case.  The Court declined to decide the issue at that point, however, finding that the standing question was more appropriately addressed "after class certification or, where applicable, in the context of the class certification determination."  Docket No. 420.

United States District Court
Northern District of California

in MLR 3(b), was to imbue "a similarity of conditions" for all minor leaguers.  Reply at 1.  In fact, Plaintiffs contend, the evidence shows that "Plaintiffs and class members suffered the same types of injuries, as a result of common employment policies, while performing similar work during similar work periods."  *Id.*  Thus, they contend, "[i]n one fell swoop, the Court can finally determine the legality of the practices for all minor leaguers, making class resolution of this matter the best means of resolution for all parties."  *Id.*

First, Plaintiffs reiterate their assertion that Rule 23's commonality and predominance requirements are met, arguing that their claims raise not only common questions but also common answers.  *Id*. at 2.  Plaintiffs reject Defendants' assertion that their trial plan is deficient, arguing that their approach finds support in the Supreme Court's recent decision, *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036 (2016), in which the Supreme Court upheld the use of statistical evidence in a wage and hour class action where the employer had failed to keep adequate time records.  Plaintiffs argue that Defendants' reliance on the *Wal-Mart* case in support of their assertion that the classes should not be certified is misplaced because that case is distinguishable from the facts here.  *Id*. at 4.  According to Plaintiffs, in *Wal-Mart* the plaintiffs asserted Title VII claims where "there was no corporate policy and no common mode of exercising local control."  *Id*.  In contrast, they assert, in this case (as in *Tyson Foods*), the workers performed similar work under the same compensation policy, which is set forth in the UPC and the MLB Rules.  *Id*.

Plaintiffs argue that Defendants mischaracterize their claims when they assert that the claims involve "no uniform policy."  *Id*. at 5.  In fact, they contend, their core claims "arise from uniform, classwide policies" that are susceptible to classwide proof.  *Id*.  In particular, they contend that their claims are based on:  1) a "core commonality" that "unpaid work [is] paid outside the championship season"; 2) Defendants' admitted, uniform policy of not paying overtime to minor leaguers; and 3) their failure to pay minimum wage in many instances, which can be evaluated based on the analysis of Dr. Kriegler, Plaintiffs' expert.  *Id.* at 5-6.

Plaintiffs argue that the existence of an employment relationship with both the Clubs and MLB will also turn on common evidence relating to the economic realities of the players' relationship with Defendants.  *Id.* at 6.  Plaintiffs reject Defendants' assertion that the "primary

United States District Court
Northern District of California

benefit doctrine" of *Walling* applies here, arguing that that case expressly "limited its holding to persons '*without any express or implied compensation agreement*'" in contrast to the facts here. *Id*. (quoting 330 U.S. at 152) (emphasis added in Plaintiffs' brief).

Plaintiffs also reject Defendants' argument that the variations as to signing bonuses, college scholarship plans, and incentive bonus plans raise individual issues. *Id*. at 7.  Rather, Plaintiffs assert, these payments "yield another classwide question," namely, whether they constitute wages. *Id*.  Plaintiffs also note that these payments are subject to "stock language" contained in Addendum B of the UPC and therefore, that their terms and conditions are uniform. *Id*.  The nature of the work performed by minor leaguers also does not require individual inquiries, Plaintiffs assert, because "vast evidence" indicates that the core activities in which they engage are "quite similar." *Id*. at 8.  Moreover, the defenses Defendants assert also raise common issues, Plaintiffs contend. *Id*. at 9.  For example, the creative professionals exemption "will be assessed by looking at the core duties of all minor leaguers and Defendants' pay practices." *Id*.  Thus, no individual inquiries will be necessary, Plaintiffs contend. *Id*.  Similarly, the amusement exemption will not require interrogation of each class member. *Id*. at 10.  Instead, the Court will be able to evaluate this defense by "consider[ing] the legal question of the 'establishment' to be examined, and then assessing the year-round activities that take place there." *Id*. at 9-10.

Plaintiffs reject Defendants' contention that choice-of-law issues preclude certification. *Id*. at 10.  They assert that the states' laws are "quite similar" and that in the few areas where there are variations, these differences are manageable. *Id*.  As to choosing which of the eight states' laws will apply, the "mechanics will be simple," they say. *Id*.  In particular, they contend the following approach will work:

> For spring training, extended spring training, and instructional leagues, either Arizona or Florida law will apply (depending on where the MLB franchise has its facility). The in-season work will be tied to the affiliate at which a minor leaguer is assigned; if a player is assigned to the San Jose Giants, for example, then California law will apply. *See Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1059, 1063 (N.D. Cal. 2014) (law of state where work primarily performed applies). During the off-season training period, the law of the state in which the minor leaguer resides will apply.

*Id*.  Plaintiffs explain further, "[i]f a minor leaguer resides in California during that time, then

33

United States District Court
Northern District of California

1    California law will apply.  If he lives in a state such as Idaho, however, then no Rule 23 class in

2    this action would cover that off-season training work because Plaintiffs have not asserted Idaho

3    claims." *Id.* n. 23.

4         Plaintiffs argue that Defendants are incorrect in asserting that the classes do not satisfy the

5    typicality requirement of Rule 23(a).  *Id.* at 11.  According to Plaintiffs, the class members

6    suffered similar injuries as a result of similar conduct that constituted a common, concerted

7    scheme, and this is sufficient to satisfy the typicality requirement.  *Id.*  Plaintiffs reject the

8    argument that some class representatives' claims are atypical because they worked for Dismissed

9    Clubs and therefore only have claims against MLB.  *Id.* at 12.  Because *all* class members are

10   asserting claims against MLB, Plaintiffs contend, these class representatives satisfy the typicality

11   requirement.  Plaintiffs also reject Defendants' related assertion that Plaintiffs lack standing

12   because each State Class does not have a class representative for each Club.  *Id.*  Plaintiffs argue

13   that the Court has already held that the standing question will not be resolved until after the class

14   certification stage of the case.  *Id.*  If the classes are certified, Plaintiffs assert, the standing inquiry

15   will take into account not only class representatives but also class members. *Id.* (citing *In re I.Q.*

16   *Carrier, Inc*, 78 F. Supp. 3d 1051, 1072 (N.D. Cal. 2015)).

17        According to Plaintiffs, the adequacy requirement is also satisfied.  With respect to

18   Defendants' allegations that many of the proposed class representatives are ignorant of the basic

19   facts of the case, Plaintiffs argue that the class representative does not need to "know every detail

20   of the case but instead must simply be 'familiar with the basic elements of her claim, and will be

21   deemed inadequate only if she is startlingly unfamiliar with the case.'"  *Id.* (quoting *Californians*

22   *for Disability Rights, Inc. v . Cal. Dep't of Transp.*, 249 F.R.D. 334, 349 (N.D. Cal. 2008)).

23   Plaintiffs also ask the Court to strike the Exhibits 1-4 to the Bloom Declaration, arguing that they

24   are "impermissibly argumentative (violating L.R. 7-4) and thwart the page limits for briefing

25   (violating L.R. 7-5)."  *Id.* at 12 n. 26 (citing *Think Vill.-Kiwi, LLC v. Adobe Sys., Inc.*, C-08-04166

26   SI, 2009 WL 3837270, at *7 (N.D. Cal. Nov. 16, 2009)).  Plaintiffs also assert that Defendants

27   "grossly exaggerate" the inconsistencies between the declarations and deposition testimony.  *Id.* at

28   13.  They also argue that the attacks on class counsel are unfounded and that they are qualified and

34

1    capable counsel.  *Id.*

2         Plaintiffs also reject Defendants' assertion that the classes are not ascertainable.  Plaintiffs

3    argue that the class need not be "so ascertainable that every potential member can be identified at

4    the commencement of the action."  *Id*. at 14 (quoting *O'Connor v. Boeing N. Am., Inc*., 184 F.R.D.

5    311, 319 (C.D. Cal. 1998)).  Rather, Plaintiffs contend, so long as class membership is defined

6    with reference to objective criteria and it can be determined by reviewing records whether these

7    criteria are satisfied, the ascertainability requirement is met.  *Id*. (citing *Kamakahi v. Am. Soc'y for*

8    *Reprod. Med*., 305 F.R.D. 164, 186 (N.D. Cal. 2015), leave to appeal denied (May 12, 2015)).

9    Here, they argue, their class definition is tied to objective criteria, namely work performed under a

10   UPC within a state; moreover, it excludes people after they sign a major league player contract.

11   *Id*.  These criteria can be applied by reviewing the players' transaction histories, schedules

12   showing where games were played, rosters, invitation letters, and other documents showing who

13   attended spring training, according to Plaintiffs.  *Id*.  The situation here is not comparable to a

14   consumer class action, Plaintiffs assert, where the victims are not known.  *Id*. at 15.

15        Finally, Plaintiffs contend Rule 23(b)(2) is satisfied because one of the primary objectives

16   of this action is to obtain injunctive relief forcing Defendants to change their compensation

17   practices.  *Id*.  To the extent the Court may find that the injunctive relief claim requires named

18   Plaintiffs who are current players, Plaintiffs request leave to amend to add such players, citing this

19   Court's decision allowing a similar amendment in *Villalpando v. Exel Direct Inc*., No. 12-cv-

20   04137 JCS, 2015 WL 5179486, at *38 (N.D. Cal. Sept. 3, 2015).  *Id*.  They note that many of the

21   players who have opted into the FLSA collective are current players.  *Id*. (citing Declaration of

22   Aaron M. Zigler in Support of Plaintiffs' Reply in Support of Motion for Class Certification

23   ("Zigler Decl.") ¶ 19).

24   **B.     The Motion to Decertify**

25        **1.  Defendants' Motion**

26        Defendants' motion to decertify the FLSA collective mirrors their Opposition to Plaintiffs'

27   Rule 23 Motion in many respects.  Broadly speaking, Defendants argue that the FLSA collective

28   should be decertified for the same reason Plaintiffs' Rule 23 Motion should be denied, namely,

United States District Court
Northern District of California

that the "experience of each player varied widely based not only on which one (or more) of the 30 Major League Clubs for which he aspired to play, but even further based on playing for one (or more) of the Clubs' 180 minor league affiliates, whose hundreds of different managers, coaches, and trainers not only determine, but also oversee, players' daily activities."  Motion to Decertify at 1.  Defendants contend that while the "cookie-cutter" declarations supplied earlier in the case may have been sufficient to warrant preliminary certification, these declarations have proven to be "misleading at best and false at worst." *Id*. at 1-2.  Defendants argue that given the more stringent standard that applies at the second stage of the FLSA certification process, and in light of the "voluminous evidence adduced," "it is clear that Plaintiffs cannot prove that they are similarly situated, either to each other or to all opt-in plaintiffs." *Id*. at 2.

In their overview of the relevant evidence, Defendants contend Plaintiffs have a "shared dream of eventually playing in the Major Leagues" but otherwise have "varied experiences." *Id*. at 2.  In particular, Defendants contend Plaintiffs are not similarly situated as to the question of whether they are employees, their wages earned, or the hours they allegedly worked throughout the year. *Id*. at 4-19.  As to the question of whether Plaintiffs are employees, Defendants contend the "primary beneficiary" test applies, which involves consideration of "whether Defendants received an immediate advantage from the activities performed by plaintiffs, whether plaintiffs expected to receive compensation, whether they expected to be hired by Major League Clubs, and whether their participation in the training activities offered to them resulted in the displacement of any Major League Players who would have otherwise been afforded those training opportunities." *Id.* at 4.

According to Defendants, "the minor leagues exist for the purpose of enhancing the skills and opportunities of minor league players with the ultimate goal of helping them develop into Major League Players, although only a small fraction of minor league players actually reach their goal of playing in the Major Leagues." *Id*.  Thus, the Professional Baseball Agreement ("PBA"), which is incorporated into the UPC, states that the "purpose of the minor leagues is to '[p]rovide an environment for athletes to develop their potential as Major League players and to become role models for our society by encouraging opportunities while participating in Minor League

Baseball.'"  *Id.* at 5 (citing Declaration of Elise M. Bloom In Support of Defendants' Motion To

Decertify the Fair Labor Standards Act Collective Action ("Bloom Decertification Decl.") ¶ 66 &

Ex. AI (PBA)).  The testimony, however, as to whether the players received any benefit from the

training they received was "highly varied," according to Defendants.  *Id.* at 5-6 (contrasting

deposition testimony of  Matt Daley at 137, Brett Newsome  at 121 and Mitch Hilligoss at 202-

204 – who found the training to be helpful – with the deposition testimony of Ryan Kiel at 309

and Bradley McAtee at 184, who testified that the training was not helpful to them).

Defendants also quote the following testimony they contend demonstrates that the

experiences of the players varied as to the training activities offered to them:

- **Minicamps:**  Kiel Dep. at 292 ("[Y]ou want to be seen [at minicamp] so that a lot of these coordinators who may . . . have not seen when you got drafted or through your first season would at least see you working hard and trying to . . . get better."); Daly Dep. at 139-140 (considered it "an honor to be selected" to attend and thought it would "improve [his] skills").  *Cf.* Meade Dep. at 142 ("Well, did I feel like I was any better when I left mini camp—or when I left Instructs than I was when I was in college? No.").

- **Extended Spring Training:**  Opitz Dep. at 265 ("improved as a player as a result of participating in extended spring training"); Hilligoss Dep. at 186 (purpose was "to keep getting me healthier [following injury] and to see live pitching. . . . The more you play, the more . . . it becomes normal"); Duff Dep. at 203 (attended because he "[w]asn't good enough to make it to the team above . . . .  It was essentially a way to . . . continue preparing for your opportunity.").  *Cf.* Frevert Dep. at 218 ("There was a lot of basic instruction going on that I felt like I had previously learned in college that for some of us down there in extended spring training program didn't need to be going over. It was somewhat remedial.").

- **Instruction from Coaches and Trainers:** Santiago Dep. at 208-209 (throwing ability and control improved based on training received from minor league coaches and trainers); Pahuta Dep. at 231 (coaches helped him improve in fielding and hitting for power); McAtee Dep. at 272-273 (regained control in pitching with help of a new pitching coach).  *Cf.* Smith Dep. at 106-107, 107 (did not improve as a result of coaching; "one of them told me one thing, the other one told me the other"); Newby Dep. at 98 (no college or minor league coaches stood out as especially helpful).

- **Off-Season Training:** Bennigson Dep. at 298 (was healthier and stronger due to offseason weights program); Gagnier Dep. at 105 (exercises in the off-season pitcher's manual were "beneficial to staying in shape"); Santiago Dep. at 195 (engaging in offseason conditioning would "probably get a better chance of playing in the next level").  *Cf.* Henderson Dep. at 181 (Twins benefitted from his off-season training because they "received a better baseball player that could produce on the field"); L. Davis Dep. at 235-236 (Nationals gave him training manual so he could get "how they pretty much want me

to be when I come back"); Aguilar Dep. at 197-198, 210-211 (training helped him with "maintaining [his] weight, keeping [his] body fat down," but he would not be "in tiptop shape" if he adhered to training manual).

*Id*. at 6.

With respect to variations in compensation and hours worked, Defendants acknowledge that the UPC sets a uniform base salary, but assert that this is "a small fraction of players' total possible compensation." *Id*. at 7. Other than the base salary, Defendants contend, all other aspects of players' compensation "are determined between players and their individual Clubs." *Id*. Defendants assert that the players' testimony confirms that many of them negotiated with the Clubs as to signing bonuses, benefits under the College Scholarship Plan, and participation in the Incentive Bonus Plan – even though the players stated in their declarations that they were made to sign their contracts without negotiation. *Id*. at 7-8 (citing Aguilar Decl. ¶ 26 (Docket No. 414-2), Bennigson Decl. ¶ 27 (Docket No. 414-3), Britt Decl. ¶ 27 (Docket No. 414-4), Daly Decl. ¶ 27 (Docket No. 414-5), Davis Decl. ¶ 29 (Docket No. 414-6), Duff Decl. ¶ 27 (Docket No. 414-7), Frevert Decl. ¶ 28 (Docket No. 414-8), Gagnier Decl. ¶ 25 (Docket No. 414-9), Gaston Decl. ¶ 28 (Docket No. 414-10), Giarraputo Decl. ¶ 28 (Docket No. 414-11), Henderson Decl. ¶ 26 (Docket No. 414-12), Hilligoss Decl. ¶ 28 (Docket No. 414-13), Hutson Decl. ¶24 (Docket No. 414-14). In particular, Defendants point to testimony by named Plaintiffs David Quinowski, Nicholas Giarraputo, Bradley McAtee and Aaron Meade that they negotiated various aspects of their contracts, including signing bonuses ranging from $35,000 and $75,000. *Id*. at 8 (citing Quinowski Dep. at 98-106 ("offered $5,000 to sign with the Giants as a free agent, but successfully negotiated for a $35,000 signing bonus and the inclusion of three semesters of payments under the College Scholarship Plan"); Giarraputo Dep. at 149, 152 ("offered $50,000 to sign with the Mets, but negotiated for a $62,500 signing bonus and college scholarship payments worth $24,000"); McAtee Dep. at 305-307; McAtee Dep. Exs. 1, 2 ("negotiated with the Rockies for a UPC that contained: (i) a signing bonus of $62,500; (ii) payments of $7,000 per quarter under the College Scholarship Plan; and (iii) the ability to participate in the Incentive Bonus Plan, after initially being offered a UPC that contained none of these payments or provisions"); Meade Dep. at 60, 82 ("negotiated his signing bonus with the Angels from $75,000 to $100,000")).

1    Defendants cite evidence that some opt-in Plaintiffs (Stetson Allie, Brandon Finnegan, Jarrod

2    Parker and Joseph Torres) received much higher signing bonuses of at least $2 million when they

3    signed the UPC.  *Id*. (citing Bloom Decertification Decl. ¶¶ 67-70).

4        Defendants also assert that "Plaintiffs are not similarly situated for the additional reason

5    that the collective includes players who were on a Major League 40-man roster and therefore

6    represented by a union, the Major League Baseball Players Association.  Accordingly, the

7    compensation these players received while they were members of the union was determined in

8    collective bargaining."  *Id.*  In addition, Defendants contend that after their first year, players'

9    salaries are determined by the individual Clubs rather than MLB, "based on factors of their

10   choosing."  *Id*. (citing Vuch Dep. at 198-199 (testifying about what factors the Cardinals consider

11   when setting salaries); Chattin Dep. at 222-223 (testifying that Marlins use their own salary scale

12   that is not based on MLB recommendations); Broadway Dep. at 307 (testifying that Pirates use

13   their own salary scale)).  Furthermore, some players are "free agents" who negotiate their base

14   salaries and bonuses individually, with the assistance of player agents.  *Id*. at 9.  According to

15   Defendants, "[a]s of the time that plaintiffs filed their motion for notice to the class, the Clubs had

16   negotiated a total of 5,820 contracts with 2,960 different minor league free agents since 2011."  *Id*.

17   (citing Declaration of Peter Woodfork in Support of Defendants' Opposition to Plaintiffs' Motion

18   for Notice to the Class and Conditional Certification Pursuant to the Fair Labor Standards Act,

19   Docket No. 430-15("Woodfork Conditional Certification Decl.") ¶ 5).

20       As a consequence of these variations, Defendants argue, players' base salaries "varied

21   widely."  *Id*. at 9 (citing Quinowski Dep. at 145-146 (negotiated a salary of $10,000/month); L.

22   Davis Dep. (salary increased to collectively-bargained amount of $5,327.87/month when he was

23   placed on Nationals 40-man roster); Aguilar Dep. at 86, 91 (salary rose from $1,500/month to

24   collectively-bargained amount of $5,327.87/month when placed on Brewers 40-man roster)).

25       Defendants assert that the schedules and training activities of the class members, like their

26   compensation, also varied widely depending on numerous factors.  *Id*. at 10.  They cite evidence

27   that players' managers have discretion as to whether the players are required to perform "early

28   work," "whether to hold batting practice or take infield/outfield before a game, which activities to

United States District Court
Northern District of California

1   schedule as part of pregame warmups, and what time players take the field." *Id*. (citing Gwynn

2   Dep. at 204; Broadway Dep. at 231, 237; Turner Dep. at 169; D. Davis Dep. at 176-177; Harper

3   Dep. at 110-111)).  According to Defendants, hours varied depending on their affiliate level

4   (which affected the amount of travel and length of the season), position played, "whether

5   they were home or on the road, how well they and their team had performed in a given week,

6   whether they were injured and undergoing treatment, whether the previous day's game went into

7   extra innings or otherwise ended late, and even the weather." *Id*. at 10-11 (citing Meade Dep. at

8   117-119; Pahuta Dep. at 185-187; Aguilar Dep. at 97, 134,141, 144-146, 148; Odle Dep. at 164-

9   165, 173-174; McAtee Dep. at 159; Newsome Dep. at 127-142; Jimenez Dep. at 229; Duff Dep. at

10  280; Gaston Dep. at 199).

11         Defendants also argue that there were variations in the Plaintiffs' hours depending on the

12  activities they "voluntarily chose to do 'off the clock' and according to their personal preferences,

13  rendering their schedules wholly unique from one player to the next and one day to the next." *Id*.

14  at 12 (citing deposition testimony of Justin Murray at 180-181, Michael Liberto at 136-137, Matt

15  Lawson at 150-152,  and Leonard Davis at 220-221, addressing their reasons for arriving at the

16  stadium early or staying after practices or games).  According to Defendants, the differences in

17  Plaintiffs' hours "preclude arriving at a common answer to the ultimate questions of whether

18  plaintiffs were employees, whether they were performing compensable work, and whether they

19  were paid the minimum wage." *Id*.

20         During the off-season as well, the activities of the players varied significantly, "both from

21  person to person and from year to year," Defendants contend. *Id*. at 13.  According to Defendants,

22  some players attended mini-camps before spring training, others did not; some attended extended

23  spring training, others did not; some participated in instructional leagues, others did not. *Id*.

24  These variations "create an impossible mixture of potential answers to the threshold questions of

25  plaintiffs' employment status, hours worked, and whether they were compensated properly for

26  these hours." *Id*. at 13-14.  Further, they contend, this problem is amplified by "the underlying

27  diversity of each player's experience within these activities (as described by plaintiffs

28  and Club personnel alike), which further influences and personalizes the answers to these same

United States District Court
Northern District of California

1   threshold questions." *Id*. at 14.  For example, "different Clubs organize different numbers of

2   minicamps in a given year, and do so for their own, discrete purposes," Defendants contend.  *Id*.

3   (citing Meade Dep. at 90-92; Britt Dep. at 110; Diggs Dep. at 3, 76).  Extended spring training is

4   similarly varied.  *Id*. at 14-15 (citing Lieppman Dep. at 257-258, testifying that several different

5   types of players participate in extended spring training for different purposes).  The same is true for

6   instructional leagues, Defendants assert.  *Id*. at 15 (citing Royals Decl. ¶ 13 (Docket No. 430-14);

7   Rockies Decl. ¶ 14 (Docket No. 430-14); Broadway Dep. at 219-220; Diggs Dep. at 222; Harper

8   Dep. at 139; Sharp Dep. at 235-236; Owen Dep. at 66).  Finally, Defendants argue that the

9   activities conducted at spring training also vary widely "based on factors such as Club, position,

10  manager/coach discretion, and player choice."  *Id*. (citing Pahuta Dep. at 153-156; Hilligoss Dep.

11  at 171; Kiel Dep. at 297; Owen Dep. at 148; Broadway Dep. at 218).

12          Off-season training and conditioning activities performed by the players are also widely

13  divergent, according to Defendants.  *Id*. at 16.  Defendants assert that "[o]ff-season training

14  activities were performed at locations of their choice, at any time of day they wished, and for any

15  number of hours, based on each player's individual, independent judgment."  *Id*.  Defendants

16  contend that the players' testimony differed as to whether this training was mandatory or merely

17  advisable, whether they were required to perform specific training activities or merely had to be

18  sure they stayed in shape, and whether the Clubs kept track of their activities through contacts

19  with the Club, submission of written logs or in-person visits.  *Id*. at 16-17 (citing Nadeau Dep. at

20  248-249; Murray Dep. at 266-267; Gaston Dep. at 264; Khoury Dep. at 162-163; Murray Dep. at

21  266-267, 273; Meade Dep. at 173; Henderson Dep. at 167-168; Weeks Dep. at 228-229; Kiel Dep.

22  at 231-232; Diggs Dep. at 244:12-15; Duff Dep. at 250; Kahaulelio Dep. at 110:3-15; Weeks Dep.

23  at 170; Kiel Dep. at 231-232).  The types of activities the players performed and the numbers of

24  hours spent on them also varied widely, Defendants assert.  *Id.* at 17-18 (citing Meade Dep. at

25  169; Daly Dep. at 151-152; Lawson Dep. at 183; Weeks Dep. at 228; Kahaulelio Dep. at 113;

26  Quinowski Dep. at  221, 273; Gaston Dep. at 270; Aguilar Dep. at 195; Khoury Dep. at 80-86;

27  Bennigson Dep. at  265-267:10; Kiel Dep. at 249).

28          The players' testimony also differs, according to Defendants, as to whether they went

United States District Court
Northern District of California

41

"above and beyond" the training that was recommended by their Club and whether they believe they should be compensated for this extra training. *Id*. at 17 (citing Odle Dep. at 207; Aguilar Dep. at 178, 197-198; Britt Dep. at 218; Hutson Dep. at 224-225; Opitz Dep. at 323). Defendants also assert that some players seek compensation for voluntary recreational activities on the basis that they "conferred some physical benefit." *Id*. at 18 (citing Aguilar Dep. at 176-177, 202 (paddle boarding in Hawaii); McAtee Dep. at 236-237 (hiking a mountain with his wife while on vacation); Gaston Dep. at 287 (participating in jiu jitsu and CrossFit); Odle Dep. at 213 ("throwing batting practice to high school kids"); Watts Dep. at 309-311 (hiking, golfing, spinning classes and swimming)). Other players seek compensation for physical therapy or rehabilitation during the off-season, Defendants assert. *Id*. (citing Nicholson Dep. at 297-301; Pahuta Dep. at 87-88; Gagnier Dep. at 112-114; Santiago Dep. at 188). And Defendants point to two plaintiffs who allegedly seek compensation for off-season training they performed while free agents, when they were not under contract with any Club. *Id.* at 18-19 (citing L. Davis Dep. at 232-233, 254-256, 264; Pinckney Dep. at 234).

Based on the evidence discussed above, Defendants assert that Plaintiffs cannot meet their burden for proceeding on a collective basis under the FLSA even if the declarations supplied by Plaintiffs might have been sufficient to warrant conditional certification under the more lenient standard that governs that inquiry. *Id*. at 19-20. First, they argue that Plaintiffs are not similarly situated with respect to the threshold legal issue of whether they are "employees" within the meaning of the FLSA. *Id*. at 21-26. As in their opposition to the Rule 23 Motion, Defendants assert that this inquiry will be governed by *Walling* and the "primary beneficiary" test, and that application of this test will require individualized inquiries. *Id*. at 21-24. Similarly, Defendants argue that the question of whether MLB was their joint employer will require highly individualized inquiries and therefore is inappropriate for classwide treatment. *Id*. at 24-26 (citing *Pfohl v. Farmers Ins. Grp*., No. CV 03-3080 DT (RCx), 2004 U.S. Dist. LEXIS 6447 (C.D. Cal. Mar. 1, 2004)).

Defendants further assert that Plaintiffs cannot proceed on a collective basis on their FLSA claims because of the "disparate factual and employment settings of the individual plaintiffs." *Id*.

United States District Court
Northern District of California

at 27.  Defendants reject Plaintiffs' contention that the UPC and MLB Rules constitute a common policy or scheme that violates the FLSA.  *Id.*  Instead, Defendants contend, players' compensation is a result of negotiations with the Clubs based on a variety of factors, including a "player's potential, health, level of advancement, number of years of experience, and accomplishments during the season."  *Id.* at 28.  Moreover, they contend, Plaintiffs' characterization of the UPC and MLB Rules as "overarching policies" also "undermines their argument that the collective should remain certified, as courts recognize that "[a]n allegation of an 'overarching' policy is generally insufficient; plaintiffs must produce 'substantial evidence' of a 'single decision, policy or plan.'"  *Id.* (citing *Reed v. Cty. of Orange*, 266 F.R.D. 446, 458 (C.D. Cal. 2010); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1123 (N.D. Cal. 2011); *Alaniz v. City of L.A.*, No. CV 04-8592 GAF (AJWx), 2014 U.S. Dist. LEXIS 116110, at *14-15 (C.D. Cal. May 21, 2014)).  Defendants also assert that the amount of compensation, number of hours and types of activities Plaintiffs performed varied significantly and therefore make their FLSA claims unsuitable for classwide treatment.  *Id.* at 28-31.  Because of these variations, Defendants contend, the "threshold question of which of these activities, if any, are compensable 'work' . . . defies collective resolution."  *Id.* at 31.

Defendants cite off-season training, hours spent "rehabilitating" or recovering from injury, and travel time as examples of activities that would require extensive individualized inquiries to determine what constituted "work."  *Id.* at 31-33.  They also assert that their defenses to Plaintiffs' claims (e.g., that the amount of time spent performing a certain activity was *de minimis*) cannot be addressed on a classwide basis.  *Id.* at 33.  Rather, Defendants assert, Plaintiffs are not similarly situated and therefore the FLSA collective should be decertified.  *Id.* at 34.

Defendants argue that another factor that is considered in determining whether class treatment is appropriate under the FLSA – whether the defendants assert defenses that would require individualized proof – also favors decertification.  *Id.* at 35.  In particular, Defendants argue that the seasonal amusement or recreational establishment exemption and the creative professional exemption will require individualized inquiries, just as they argued in their Opposition to the Rule 23 Motion.  *Id.* at 36-37.  They also argue that their statute of limitations

43

1   defenses will require the Court to examine each individual Club to determine whether it acted in

2   good faith.  *Id*. at 35.

3          Finally, Defendants contend fairness and procedural considerations require that the

4   collective be decertified.  *Id*. at 37-40.  First, Defendants argue that Plaintiffs have not offered a

5   viable plan for trying the issues raised in this case on a collective basis and therefore, the interests

6   of Plaintiffs and Defendants will be prejudiced if the Court does not decertify the collective.  *Id*. at

7   38.  Further, Defendants contend, it would be unfair to permit Plaintiffs to attempt to prove their

8   claims on the basis of representative testimony and evidence given the dramatic differences in

9   circumstances as to activities and compensation between class members.  *Id*. at 40.

10         **2.  Plaintiffs' Opposition**

11         In their Opposition to the Motion to Decertify ("Decertification Opposition"), Plaintiffs

12  reject Defendants' "attempt to disavow" what Plaintiffs contend is a "common scheme [ ] whereby

13  they do not pay minor leaguers for work performed outside the championship season, do not pay

14  minor leaguers any overtime wages for work in excess of forty hours per week, and do not pay

15  minor leaguers minimum wages for all hours worked during the championship season."

16  Decertification Opposition at 1-2.  As in their Rule 23 Motion, Plaintiffs point to the UPC and the

17  MLRs as evidence of this common scheme, and argue that because Plaintiffs challenge the legality

18  of the policies set forth in them, this case is "suitable for collective treatment" under the FLSA.

19  *Id*. at 1.[9]

20         Plaintiffs contend that all of the factors courts consider at the second stage of the FLSA

21  certification project – "the disparate factual and employment settings of the individual plaintiffs,"

22  ───────────────────────

23  [9] In Section III of their Decertification Opposition, Plaintiffs summarize the evidence they contend
    shows that: 1) the UPC and MLRs establish common policies governing recruitment, drafting,

24  hiring, pay and employment and the structure of the minor league farm system; and 2) minor
    leaguers perform substantially similar work throughout the year, including spring training,

25  extended spring training, the championship season, instruction leagues and winter training.  *Id*. at
    3-11.  As this evidence is summarized above, in connection with Plaintiffs' Rule 23 Motion, the

26  Court does not repeat it here.  In the same background section of their brief, Plaintiffs reject what
    they characterize as "ad hominem attacks" on the named Plaintiffs in this action, arguing that

27  Defendants' allegations of inconsistencies and falsehoods in the players' declarations are not
    supported by the deposition testimony Defendants cite in support of their accusations.  *Id*. at 11-

28  13.

United States District Court
Northern District of California

"the various defenses available to the defendants with respect to the individual plaintiffs," and "fairness and procedural considerations" – point in favor of allowing them to proceed with their claims on a classwide basis. *Id*. at 13-40. First, Plaintiffs contend the evidence shows Defendants have common policies as to three core issues in the case: failure to pay wages outside the championship season, failure to pay overtime wages, and failure to pay minimum wages for all hours worked during the championship season. *Id*. at 16-21. Plaintiffs reject Defendants' reliance on alleged differences in the amount paid to players in wages and bonuses during the championship season as a basis for decertification. *Id*. at 21-25. Plaintiffs contend the variations in wages have no bearing at all on their claim for failure to pay wages except during the championship season because all of the players are receiving the same wages outside of the championship season, that is $0. *Id*. at 22.

With respect to their claim for overtime wages, Plaintiffs argue that the variations in wage rates will simply mean that the overtime rate (which is calculated at a rate of one and one half times the employee's regular rate of pay for all hours worked over 40 hours per week) will vary for the purposes of determining damages. *Id*. Variations in damages, however, do not warrant decertification, Plaintiffs contend. *Id*. (citing *Gilmer v. Alameda-Contra Costa Transit Dist.*, 2011 WL 5242977, at *5 (N.D. Cal. Nov. 2, 2011)). Similarly, Plaintiffs contend, their experts will be able to take into account variations in wages in determining the damages to which class members are entitled for their claim that Defendants failed to pay minimum wages during the championship season. *Id*. at 22-23.

To the extent Defendants contend the wage variations require decertification because they implicate issues of liability, Plaintiffs argue that Defendants' position is "factually flawed because all minor leaguers suffered . . . damages for unpaid work outside the championship season regardless of their wages during the championship season." *Id*. at 23. They also argue that Defendants' position is "legally flawed because there is no requirement that all class members suffered an injury to maintain a class action." *Id*. (citing *Parko v. Shell Oil Co*., 739 F.3d 1083, 1085 (7th Cir. 2014) ("To require the district judge to determine whether each of the 150 members of the class has sustained an injury . . . would make the class certification process

45

unworkable.")).  Rather, they assert, it is sufficient that they offer a damages model that will allow the jury to determine which players suffered injury as a result of Defendants' failure to pay minimum wage.  *Id*. (citing Kriegler Rule 23 Decl. ¶¶ 52-55; Declaration of Brian Kriegler, Ph.D. in Support Of Plaintiffs' Opposition to Defendants' Motion to Decertify the Fair Labor Standards Act Collective Action ("Kriegler FLSA Decl.") ¶¶ 12-16 & Ex. A).

Plaintiffs argue that variations in incentives and signing bonuses – like variations in wage rates – also do not justify decertification.  *Id*. at 23.  First, Plaintiffs assert, while the FLSA requires that some bonuses must be counted as part of an employee's regular rate of pay for the purposes of determining whether they are entitled to minimum wage and overtime, this rule does not apply to "payments to an employee which are not made as compensation for his hours of employment."  *Id*. (quoting 29 U.S.C. § 207(e)(2); *Minizza v. Stone Container Corp. Corrugated Container Div. East Plant*, 842 F.2d 1456, 1462 (3d Cir. 1988)).  Thus, they assert, the bonus payments received by the players in this case are not factored in when determining whether they are entitled to minimum wages and overtime.  *Id*. at 24.  Similarly, they contend, incentive bonuses are governed by 29 U.S.C. section 207(e)(3), which exempts "[s]ums paid in recognition of hours performed" if they meet certain criteria.  *Id*. (citing 29 C.F.R. § 778.211).

Whether the bonus and incentive payments are or are not a part of the class members' salaries, however, Plaintiffs argue that they "can be adjudicated on a classwide basis."[10]  *Id*.  This is because these bonuses are governed by UPC Addendum B for all players and therefore, "while the *amount* of the signing and incentive bonuses may differ, the *terms and conditions* applicable to such bonuses (and the reason for providing them) are common to the Minor League Collective." *Id*. (emphasis in original) (citing 29 C.F.R. § 778.209; *Leyva v. Medline Indus. Inc*., 716 F.3d 510, 514 (9th Cir. 2013)).  According to Plaintiffs, "[u]tilizing Defendants' payroll records and other applicable tools, Plaintiffs and their experts can easily include (or exclude) such bonus payments in their damages calculations for the members of the Minor League Collective."  *Id*. at 24-25.

---

[10]Plaintiffs note as an aside that while Defendants also point to variations relating to the college scholarship plans, they make no attempt to explain how these plans could be considered wages. *Id*. n. 106.

United States District Court
Northern District of California

1    Next, Plaintiffs address Defendants' arguments that the collective should be decertified

2  because:  1) the employment status of the members of the collective is governed by the "primary

3  benefit" doctrine, which will require the Court to conduct highly individualized inquiries; 2) the

4  lack of adequate records to establish the number of hours worked precludes collective treatment;

5  3) the players were assigned to affiliates in numerous different states; and 4) Defendants assert

6  affirmative defenses that will require individualized inquiries.  *Id*. at 25-35.

7    With respect to employment status, Plaintiffs contend the relevant test is the "economic

8  realities" test rather than the "primary benefit" test, as Defendants assert.  *Id*. at 25-26 (citing

9  *Boucher v. Shaw*, 572 F.3d 1087, 1090 (9th Cir. 2009) (citing *Lambert v. Ackerley*, 180 F.3d 997,

10  1011-12 (9th Cir. 1999); *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir.

11  1983))).  The economic realities test, according to Plaintiffs, requires the Court to apply a totality

12  of the circumstances approach and to consider the following factors:  "(1) the power to hire and

13  fire employees; (2) supervision and control of employee work schedules or conditions of

14  employment; (3) determining the rate and method of payment; and (4) maintaining employment

15  records."  *Id*. at 26 (citing *Hale v. Arizona*, 993 F.2d 1387, 1394 (9th Cir. 1993)).  Plaintiffs

16  contend that these factors may be evaluated using common evidence because the employment

17  relationship between Defendants (both the Clubs and MLB) and the collective is governed by

18  common evidence, namely, "the UPC, MLRs, and other generally applicable policies and

19  procedures."  *Id*. at 26-28.  Plaintiffs argue that the primary benefit doctrine set forth in *Walling v.*

20  *Portland Terminal* does not apply because the FLSA exemption announced in that case is limited

21  to "persons '*without any express or implied compensation agreement,* who might work for their

22  own advantage on the premises of another.'"  *Id*. at 28 (quoting 330 U.S. at 152) (emphasis in

23  Plaintiffs' brief).  Here, Plaintiffs contend, the players entered into "traditional employment

24  agreements" with Defendants and therefore, the exemption does not apply.  *Id*. at 29.  Moreover,

25  they assert, even if the primary benefit test applied to this case, the analysis could be conducted on

26  a classwide basis using common evidence, including the UPC, MLRs and other common

27  evidence.  *Id*. at 30 (citing *Harris v. Vector Mktg. Corp.* ("*Harris II*"), 753 F. Supp. 2d 996, 1005,

28  1101 (N.D. Cal. 2010); *Woods v. Vector Mktg. Corp.*, No. C-14-0264 EMC, 2015 WL 5188682, at

1    *7-8 (N.D. Cal. Sept. 4, 2015)).

2          Plaintiffs also argue that Defendants' challenge to their reliance on survey and

3    representative evidence in support of decertification runs counter to the FLSA's requirement that

4    "[e]very employer . . . shall make, keep, and preserve such records of the persons employed by

5    him and of the wages, hours, and other conditions and practices of employment." *Id*. at 31 (citing

6    29 U.S.C. § 211(c)).  Citing the Supreme Court's decision in *TysonFoods, Inc. v. Bouaphakeo*,

7    Plaintiffs assert that where, as here, an employer fails to keep records of work performed,

8    employees are entitled to prove their hours worked using representative estimates and expert

9    evidence.  *Id*. at 31-32 (citing 136 S. Ct. 1036 (2016)).  Plaintiffs assert that the pilot survey

10   conducted by Dr. Dennis and the damages model created by Dr. Kriegler demonstrate that they

11   will be able to use such methods to prove the damages of the FLSA collective.  *Id*. at 32.

12   Plaintiffs contend, "[a]lthough Defendants can attempt to challenge Plaintiffs' expert analysis,

13   they do not have the right to challenge the use of representative evidence of hours worked in this

14   case." *Id*.

15         Plaintiffs reject Defendants' assertion that the collective should be decertified because the

16   members played for affiliates that are located in many different states.  *Id*. at 33.  According to

17   Plaintiffs, so long as all of the members of the collective were subject to common employment

18   policies, it makes no difference that they played in different states or are under the supervision of

19   different managers.  *Id*. at 33-35.  Thus, they contend, nationwide collectives are commonly

20   certified under the FLSA.  *Id*. (citing *Falcon v. Starbucks Corp*., 580 F. Supp. 2d 528, 536 (S.D.

21   Tex. 2008); *Indergit v. Rite Aid Corp*., 293 F.R.D. 632, 636 (S.D.N.Y. 2013); *Lillehagen v.

22   Alorica, Inc*., No. SACV 13-0092-DOC (JPRx), 2014 WL 6989230, at *1 (C.D. Cal. Dec. 10,

23   2014); *Wren v. RGIS Inventory Specialists*, 256 F.R.D. 180, 212-13 (N.D. Cal. 2009)).  As in the

24   cited cases, Plaintiffs here contend that they are similarly situated, even though they play for

25   different affiliates in different states, and therefore should be permitted to proceed as a collective.

26   *Id*. at 34. Plaintiffs further assert that the cases cited by Defendants, in which collectives were

27   decertified, did not involve a common policy, in contrast to the facts of this case.  *Id*. at 34-35

28   (distinguishing *Beauperthuy v. 24 Hour Fitness USA, Inc*., 772 F. Supp. 2d 1111, 1122-23 (N.D.

United States District Court
Northern District of California

48

United States District Court
Northern District of California

Cal. 2011)).

Plaintiffs argue that the affirmative defenses asserted by Defendants also do not warrant decertification of the collective. *Id.* at 35-38. The FLSA statute of limitations defense, requiring a determination of whether Defendants acted in good faith, does not require individualized inquiries, Plaintiffs assert, because it turns on the conduct of Defendants, not the individual Plaintiffs. *Id.* at 36. The relevant conduct is common to all of the collective, according to Plaintiffs. *Id.* The amusement and recreational establishment exemption under the FLSA also does not require individual inquiries, Plaintiffs argue; rather, the Court will be able to determine whether the various establishments qualify for the exemption based on common evidence. *Id.* Plaintiffs further contend that the relevant "establishment" for the purposes of this exemption is the corporate headquarters rather than the various stadiums where games were played. *Id.* (citing 29 C.F.R. § 779.309).

The creative professionals exemption also lends itself to classwide treatment, according to Plaintiffs, because the duties component of the analysis will depend on the standard activities of the minor leaguers. *Id.* The salary component of the analysis is also capable of classwide resolution, Plaintiffs assert. *Id.* First, to the extent a salary involves payment of the same amount weekly or less frequently regardless of the hours worked, Plaintiffs contend none of the players satisfy this requirement because they are not paid anything at all outside of the championship season. *Id.* (citing 29 C.F.R. § 541.602). Second, they assert, even if the payments made during the championship season are deemed to be a salary, the question of whether the payments meet the threshold amount of $445/week can be determined on the basis of Defendants' payroll records and therefore this inquiry does not point in favor of decertification. *Id.* (citing 29 C.F.R. § 541.600).

Finally, Plaintiffs reject Defendants' contention that the question of whether they performed compensable work will involve highly individualized inquiries, citing the broad interpretation of the term "work" under the FLSA. *Id.* at 37-38 (citing 29 C.F.R. §§ 785.7, 785.12, 785.38; *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005); *Lindow v. United States*, 738 F.2d 1057, 1062-63 (9th Cir. 1984)). Plaintiffs argue that "[t]his is a classic classwide issue because members of the Minor League Collective engaged in similar baseball-related activities throughout the

49

calendar year." *Id*. at 38. According to Plaintiffs, "[u]nder the permissive definition of 'work,' the relevant inquiry does not necessitate an individualized inquiry into the activities that are performed by minor leaguers on a given day" but instead "will focus on whether certain activities performed by all minor leaguers (e.g. road trips, off-season training, batting practice) constitute compensable 'work' within the definition of the FLSA." *Id*. The amount of time spent performing the activities that the Court finds are compensable will then be the focus of the damages experts, Plaintiffs assert. *Id*.

Finally, Plaintiffs reject Defendants' assertion that the collective should be decertified on the basis of fairness and procedural concerns. *Id*. at 38-40. This case involves common issues related to Defendants' compensation policies and can be proved using classwide evidence, Plaintiffs contend. *Id*. at 38. The "only 'individualized' issue in this case centers on the total damages incurred by members of the Minor League Collective," Plaintiffs assert, but individualized issues relating to damages are not a proper basis for decertification. *Id*. (citing *Gilmer v. Alameda-Contra Costa Transit Dist*., 2011 WL 5242977, at *5 (N.D. Cal. Nov. 2, 2011); *Parko v. Shell Oil Co*., 739 F.3d 1083, 1085 (7th Cir. 2014)). Plaintiffs further contend that the Supreme Court has expressly approved the use of representative evidence where an employer has not met its obligation to maintain records of employee work. *Id*. at 38-39 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036; *Rai v. Santa Clara Valley Transp. Auth*., 308 F.R.D. 245, 264 (N.D. Cal. 2015)). As discussed above, Plaintiffs contend their experts have developed a sound methodology for proving damages that will allow the Court to address damages in a single trial. Therefore, Plaintiffs assert, "Defendants' claim that the Minor League Collective should be decertified because a representative trial is not 'viable' and 'unduly prejudicial' is without merit." *Id.* at 50.

### 3. Defendants' Reply

In their Reply brief, Defendants argue that Plaintiffs "fail to adequately address the diverse composition of the collective and the highly individualized inquiries required to resolve the questions they raise." Decertification Reply at 1. They assert that Plaintiffs have failed to demonstrate that they are similarly situated, rejecting Plaintiffs' assertion that the economic

1    realities test applies to the question of whether they performed compensable work and arguing

2    further that Plaintiffs have not identified a common policy or scheme that violates the FLSA.  *Id.*

3    at 2-8.  Plaintiffs also have not offered substantial evidence that they performed similar work,

4    Defendants assert.  *Id.* at 8-10.  In addition, Defendants challenge the representative evidence

5    Plaintiffs intend to present as "deeply flawed," an argument that is also the subject of their

6    separate Motion to Exclude.  *Id.* at 11-13.  Because Plaintiffs have not demonstrated that there are

7    common answers to the issues they raise, a collective trial on Plaintiffs' claims would be

8    unmanageable and prejudicial, Defendants assert.  *Id.* at 13-14.  Further, for the reasons stated in

9    the Motion to Decertify, Defendants argue that their defenses require individualized inquiries that

10   make this case unsuitable for class treatment.  *Id.* at 14-15.

### C.    The Motion to Exclude

#### 1.    Defendants' Motion

13       In the Motion to Exclude, Defendants ask the Court to exclude the expert opinions offered

14   in the declarations of Plaintiffs' experts, Michael Dennis, Ph.D. and Brian Kriegler, Ph.D., filed in

15   support of class certification, on the basis that they are inherently unreliable and use flawed

16   methodologies and therefore do not satisfy the requirements of Rule 702 of the Federal Rules of

17   Evidence or *Daubert*.  Motion to Exclude at 1.  Defendants' challenges focus primarily upon

18   alleged inadequacies relating to the pilot survey conducted by Dr. Dennis ("Pilot Survey" or

19   "Survey"); Defendants contend Dr. Kriegler's opinions should be excluded because he relied on

20   the Pilot Survey in his damages model.  *Id.*

21       Defendants, citing the opinions of their own expert, Eugene P. Ericksen, Ph.D., identify the

22   following alleged shortcomings in the Pilot Survey:  1) the Survey suffers from coverage error;

23   2) the Survey suffers from non-response bias; 3) the Survey suffers from self-interest bias; 4) the

24   Survey suffers from recall bias and assumes accurate recall by respondents of the Survey; 5) the

25   Survey asks respondents to perform burdensome cognitive tasks, resulting in "satisficing"; and

26   6) the Survey questions' response categories influenced respondents' answers.  *Id.* at 1-2, 8-17;

27   *see also* Expert Declaration of Eugene P. Ericksen in Support of Defendants' Opposition to

28   Plaintiffs' Motion for Class Certification Under Federal Rule of Civil Procedure 23 [Docket No.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    630] ("Ericksen Decl.").  They also assert that the Pilot Survey should be excluded as unreliable

2    because even Dr. Dennis does not opine that is reliable, stating only that it "'provides the

3    foundation' for a future reliable study."  *Id*. at 7, 20 (citing Dennis Decl. ¶ 44).

4         Defendants argue further that Dr. Dennis's Survey is based on assumptions that are

5    contradicted by direct evidence.  *Id*. at 19-20.  In particular, they assert that Dr. Dennis assumed

6    that the minor league players are similarly situated when in fact, the players' testimony shows that

7    they did not spend similar amounts of time on the activities for which they seek compensation.  *Id*.

8    at 20.  Defendants further contend the player testimony contradicts Dr. Dennis's assumption that

9    the players accurately recalled the amount of time they spent on these activities.  *Id.*  Because

10   individualized issues predominate, Defendants assert, Dr. Dennis's reliance on representative

11   evidence presents "'too great an analytical gap between the data and the opinion proffered.'"  *Id*.

12   (quoting *GE v. Joiner*, 522 U.S. 136, 146 (1997); and citing *Domingo ex rel. Domingo v. T.K.,*

13   *M.D*., 289 F.3d 600, 607 (9th Cir. 2002)).  Similarly, Defendants argue, Dr. Kriegler's opinions do

14   not satisfy the requirements of *Daubert* to the extent that he used "key data" from the Pilot Survey

15   to "plug the gaps in his own declaration."  *Id*. at 20-21.

16        For these reasons, Defendants ask the Court to exclude the declarations of both Dr. Dennis

17   and Dr. Kriegler (as well as the underlying Survey results) and preclude them from testifying.

18                    **2.   Plaintiffs' Opposition**

19        In their Opposition brief, Plaintiffs reject Defendants' assertion that the opinions of Drs.

20   Dennis and Kriegler should be excluded, arguing that at this stage of the case *Daubert* requires

21   only that Plaintiffs' experts demonstrate a sound *methodology* for conducting a representative

22   survey of hours worked by minor leaguers.  Opposition at 1.  Plaintiffs contend Defendants apply

23   the wrong standard, treating this *pilot* study as if it were the final study to be presented at trial.  *Id*.

24   With the proper standard in mind, Plaintiffs contend, Dr. Dennis's methodology is sound, as was

25   Dr. Kriegler's reliance on the Pilot Survey in is declaration supporting class certification.  *Id*. at 2-

26   6.  They argue further that under *Tyson Foods* and *Mt. Clemens* it is reasonable to rely on

27   representative data because Defendants did not maintain adequate records of time worked.  *Id*. at

28   8-10.  Plaintiffs also reject the specific criticisms of Defendants' expert relating to coverage error,

1   non-response bias, self-interest bias, recall bias, and burdensome questions that result in

2   "satisficing." *Id*. at 10-18.  Finally, Plaintiffs reject Defendants' reliance on alleged

3   inconsistencies between the record evidence and the Survey results. *Id*. at 18-21.  According to

4   Plaintiffs, their expert's Survey, like the study in *Tyson Foods*, offers a "reliable and admissible

5   methodology for providing estimates of hours worked by class members." *Id*. at 19.  Similarly,

6   they contend, Dr. Kriegler uses a statistical methodology that is reasonable and conforms with

7   accepted practices in the field. *Id*. at 21.

### 3. Defendants' Reply

9       Defendants reject Plaintiffs' assertions that their experts' declarations satisfy *Daubert*,

10  arguing that even if a "tailored" *Daubert* standard is applied, Plaintiffs have failed to demonstrate

11  that Dr. Dennis's methodology is sound or that any future study based on a similar survey will be

12  reliable.  Reply at 1.  To the contrary, they assert, Dr. Dennis's survey suffers from fundamental

13  flaws that cannot be remedied, namely, the inability of those surveyed to accurately recall the

14  amount of time they spent on the various activities for which they seek compensation and the self-

15  interest that will motivate any minor league player surveyed.  *Id.*  Defendants also reject Plaintiffs'

16  reliance on *Tyson Foods*, arguing that it "does not provide license to use any sort of representative

17  evidence in all cases" and that it does not permit Plaintiffs to rely on the Dennis survey evidence

18  where both the results and the methodology are "ridden with flaws." *Id*.

## IV.   ANALYSIS

### A.   The Rule 23 Motion

#### 1.   General Legal Standards Governing Class Certification Under Rule 23

22      A class action may be maintained under Rule 23 of the Federal Rules of Civil Procedure if

23  all of the requirements of Rule 23(a) are satisfied and the plaintiff demonstrates that one of the

24  requirements of Rule 23(b) is met as well.  Rule 23(a) requires that a plaintiff seeking to assert

25  claims on behalf of a class demonstrate:  1) numerosity; 2) commonality; (3) typicality; and (4)

26  fair and adequate representation of the interests of the class.  Fed. R. Civ. P. 23(a).  In addition to

27  the explicit requirements of Rule 23(a), courts have found that "the party seeking class

28  certification must demonstrate that an identifiable and ascertainable class exists." *Mazur v. eBay*

United States District Court
Northern District of California

1    *Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009) (citing *Whiteway v. FedEx Kinko's Office & Print*

2    *Servs., Inc.*, No. C 05-2320 SBA, 2006 WL 2642528, at *3 (N.D. Cal. 2006) ("An implied

3    prerequisite to certification is that the class must be sufficiently definite."); *see also O'Connor v.*

4    *Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) ("A class definition should be precise,

5    objective, and presently ascertainable," though "the class need not be so ascertainable that every

6    potential member can be identified at the commencement of the action." (internal quotation marks

7    omitted)).

8           Rule 23(b)(2) allows a class action to be maintained where "the party opposing the class

9    has acted or refused to act on grounds that apply generally to the class, so that final injunctive

10   relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R.

11   Civ. P. 23(b)(2).

12          Rule 23(b)(3) allows a class action to be maintained where "the court finds that the

13   questions of law or fact common to class members predominate over any questions affecting only

14   individual members, and that a class action is superior to other available methods for fairly and

15   efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "An individual question is one

16   where 'members of a proposed class will need to present evidence that varies from member to

17   member,' while a common question is one where 'the same evidence will suffice for each member

18   to make a prima facie showing [or] the issue is susceptible to generalized, classwide proof.'"

19   *Tyson Foods, Inc. v. Bouaphakeo*, — U.S. —, 136 S. Ct. 1036, 1045 (2016) (quoting 2 W.

20   Rubenstein, Newberg on Class Actions § 4:50, pp. 196-197 (5th ed. 2012) (internal quotation

21   marks omitted)).

22          "At class certification, a court does not accept at face value a plaintiff's theory of the case;

23   the court must engage in a 'rigorous analysis . . . [into whether] . . . the prerequisites of Rule 23(a)

24   have been satisfied,' and 'frequently that "rigorous analysis" will entail some overlap with the

25   merits of the plaintiff's underlying claim.'"  *Rodman v. Safeway, Inc.*, No. 11-CV-03003-JST,

26   2014 WL 988992, at *6 (N.D. Cal. Mar. 10, 2014) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564

27   U.S. 338, 351 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982))).  "While

28   the trial court has broad discretion to certify a class, its discretion must be exercised within the

United States District Court
Northern District of California

54

framework of Rule 23." *Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180, 1186 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) (citing *Doninger v. Pac. Nw. Bell, Inc*., 564 F.2d 1304, 1309 (9th Cir. 1977)).

### 2. Application of Legal Standards

The parties have engaged in extensive discovery in this case and have submitted a great deal of evidence in support of their respective positions. The Court has reviewed all of this evidence in detail. The Court concludes that while Plaintiffs have satisfied many of the requirements of Rule 23 – and might be able to remedy certain problems by narrowing or modifying their class definition – the individualized issues that would need to be addressed if Plaintiffs' claims went forward on a class basis are insurmountable for the purposes of Rule 23(b)(3). Nor is the Court persuaded that it is appropriate to certify the proposed classes under Rule 23(b)(2) for the reasons set forth below.

#### a. Numerosity

Rule 23(a)(1) requires that the size of the proposed class be "so numerous that joinder of all the class members is impracticable." While there is no set number cut-off, the number of individuals who will satisfy the requirements for membership in the proposed classes in this case easily satisfies the numerosity requirement. *See Welling v. Alexy*, 155 F.R.D. 654, 656 (N.D. Cal. 1994) (noting that courts have certified classes as small as 14 and have often certified classes with 50 to 60 members). Plaintiffs cite evidence that the number of minor league teams in the relevant states ranges from two in Oregon to thirty in Florida and MLB's active roster limits allow between 25 and 35 players per team. *See* Woodfork Conditional Certification Decl., Ex. A. Thus, based on baseball-related activities performed in the championship season alone, there appear to be a sufficient number of class members to make joinder impracticable. Moreover, Defendants do not dispute that the numerosity requirement is satisfied. The Court concludes the numerosity requirement is satisfied.

#### b. Ascertainability

"A threshold inquiry in determining whether a proposed class is appropriately certified is

whether the class is sufficiently definite so as to render it 'administratively feasible to determine if a given individual is a member of the class.'" *Joyce v. City & County of San Francisco*, No. C-93-4149 DLJ, 1994 WL 443464, at *3 (N.D. Cal. Aug. 4, 1994) (quoting *Aiken v. Obledo*, 442 F. Supp. 628, 658 (E.D. Cal. 1977) (citing 7 Wright & Miller, Federal Practice and Procedure, § 1760 at 582)).  The question of whether a class is ascertainable turns on a variety of considerations.  *See, e.g.*, *Dudum v. Carter's Retail, Inc*., No. 14-CV-00988-HSG, 2016 WL 946008, at *5 (N.D. Cal. Mar. 14, 2016) ("Courts have considered at least three types of 'ascertainability' concerns when determining whether class certification is appropriate: (1) whether the class can be ascertained by reference to objective criteria; (2) whether the class includes members who are not entitled to recovery; and (3) whether the putative named plaintiff can show that he will be able to locate absent class members once a class is certified.")

First, courts look to whether the class definition establishes "objective, rather than subjective, criteria" for determining membership.  *Xavier v. Philip Morris USA Inc*., 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011).  Thus, for example, "[i]f a class definition includes a requirement that cannot be proven directly, and that depends instead upon each putative class member's feelings and beliefs, then there is no reliable way to ascertain class membership."  *Id*.  In *Xavier*, the court found that the objective criteria requirement was not met where "the central condition [for class membership was] that class members smoked Marlboro cigarettes for at least twenty pack-years."  *Id*.  The court concluded that there was "no good way to identify such individuals," reasoning that "[a] smoker's rate of cigarette consumption and cigarette brand of choice are liable to change over time, and we cannot expect smokers to recall the cumulative total of Marlboro packs they have smoked."  *Id*.  Therefore, the court concluded, "while the arithmetic total of an individual's Marlboro-smoking history is an 'objective' question, it remains a question, and its answer depends on each individual's subjective estimate of his or her long-term smoking habit."  *Id*.  Because there were no records available to identify class members, the court held that class membership "would come down to the state of mind of the putative class member."  Under these circumstances, the class definition did not meet the ascertainability requirement, the court held.  *Id*.

56

United States District Court
Northern District of California

1    A class definition may also fail because membership in the class depends upon a

2    determination of the merits of the plaintiff's claim.  For example, in *Daniel F. v. Blue Shield of*

3    *California*, one of the reasons the court found that the proposed class definition fell short was that

4    it defined membership in the class with reference to whether an individual had been wrongfully

5    denied insurance coverage for residential treatment in violation of the Mental Health Parity Act.

6    305 F.R.D. 115, 125 (N.D. Cal. 2014).  The court found that "[d]etermining class membership

7    under such a definition [would] essentially require resolving the merits of each individual's claim

8    that he or she received residential treatment for a mental health condition, and that Blue Shield

9    unlawfully denied coverage."  *Id*.  It concluded, "[t]his by itself renders the class action

10   unmanageable virtually by definition . . .  and makes plaintiffs' class definition unworkable."  *Id*.

11   (citations omitted).

12   In other cases, courts have found that a class was not ascertainable even though

13   membership did not turn on any subjective criteria on the basis that determination of who was a

14   member of the class would be "excessively complex," requiring a highly fact-specific and

15   individualized inquiry.  *Spencer v. Beavex, Inc*., No. 05-CV-1501WQH (WMC), 2006 WL

16   6500597, at *9 (S.D. Cal. Dec. 15, 2006) (citing *Mike v. Safeco Ins*. Co., 223 F.R.D. 50, 54 (D.

17   Conn. 2004)).  In *Spencer*, a wage and hour case, the court addressed whether a proposed class of

18   delivery drivers who alleged they were misclassified as independent contractors was ascertainable.

19   *Id*.  The proposed class definition excluded from the class drivers who "[p]rovided more than 51%

20   of their services to Beavex, Inc. by using their own employees or subcontractors." *Id*.  The

21   defendant, however, asserted that its records did not reflect whether any given route was driven by

22   the contractor or the contractor's employees and therefore, it would be impossible to determine

23   which contractors were covered by the exclusion.  *Id*.  The court noted that it *might* be possible to

24   determine who actually drove each route by looking at the route manifests submitted by the

25   drivers each day, but found that such a laborious individualized inquiry was "a potentially

26   impossible task" that did not satisfy the ascertainability requirement of Rule 23.  *Id*.

27   Yet other courts "appear to accept the argument . . . that the ascertainability analysis

28   requires district courts to deny certification if the class includes any members who will not be able

57

1    to recover." *Lilly v. Jamba Juice Co.,* 308 F.R.D. 231, 237 (N.D. Cal. 2014) (Tigar, J.) (citing

2    Wright & Miller, 7A Fed. Prac. & Proc. Civ. § 1760 (3d ed.) ("Some courts also have considered

3    whether the class definition must exclude anyone who does not have a viable claim.")); *see* Rule

4    23 Opposition at 10.  In a recent decision, Judge Tigar rejected this requirement, reasoning as

5    follows:

> This Court is aware that, in addition to considering the standard "ascertainability" requirements described *infra.*, "some courts also have considered whether the class definition must exclude anyone who does not have a viable claim." Wright & Miller, 7A Fed. Prac. & Proc. Civ. § 1760 (3d ed.). "In effect, this interpretation means that plaintiffs must plead what effectively is a 'fail-safe' class." *Id.* But this concept does not appear in the text of Rule 23, and Defendant cites no precedential authority suggesting that this Court is bound to apply it. As noted in Wright & Miller, an *en banc* panel of the Third Circuit recently addressed "whether . . . [a] class could be properly certified if it contained class members who did not possess a viable claim," and concluded "that it was not necessary to limit the class to those in states where a viable claim could be brought." *Id.* (citing *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 304–07 (3d Cir. 2011)); see also *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010) ("[t]hat a class possibly or even likely includes persons unharmed by a defendant's conduct should not preclude certification"). Ninth Circuit authority seems to be in accord. *See Wolin*, 617 F.3d at 1173 (quoting *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975) ("proof of the manifestation of a defect is not a prerequisite to class certification . . . '[n]either the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule.'")

20   *Rodman v. Safeway, Inc.*, No. 11-CV-03003-JST, 2014 WL 988992, at *15 (N.D. Cal. Mar. 10,

21   2014).

22           Judge Tigar went on to recognize that "[t]here is a place in the Rule 23 analysis for

23   considering whether a class definition is sufficiently 'overbroad' as to preclude certification."  *Id*.

24   "The fact that a Proposed Class 'will often include persons who have not been injured by the

25   defendant's conduct . . . does not preclude class certification,' but it is also the case that 'a class

26   should not be certified if it is apparent that it contains a great many persons who have suffered no

27   injury at the hands of the defendant.'"  *Id*. (quoting *Kohen v. Pac. Inv. Mgmt. Co*. LLC, 571 F.3d

28   672, 677 (7th Cir. 2009) (collecting cases)).  The Court finds Judge Tigar's reasoning to be

United States District Court
Northern District of California

1    persuasive and therefore concludes that while a class may be ascertainable even if it include

2    persons who have suffered no injury, where it appears there are "a great many" such individuals,

3    the class may not be ascertainable.

4        With these standards in mind, the Court considers whether the State Classes proposed by

5    Plaintiffs are ascertainable.  The Court concludes that as currently defined, the classes are not

6    ascertainable because of the problems associated with determining membership in the State

7    Classes based on winter training.[11]

8        First, because the class is defined on the basis of whether an individual performed "work"

9    in a particular state, membership in the State Classes will turn on a threshold determination of

10   whether particular activities constituted "work."  As recognized in *Daniel F. v. Blue Shield of*

11   *California*, defining a class in a manner that requires that legal determinations be made to

12   ascertain membership can be problematic under Rule 23.  305 F.R.D. at 125.

13       Winter training activities present difficulties comparable to those in *Spencer* and *Xavier*.  It

14   is undisputed that there are no official records available that document these activities and that the

15   home addresses provided by the players do not necessarily reflect where they conducted their off-

16   season training.  As a consequence, determining where the players conducted their off-season

17   training for each of the years within the limitations periods would require highly individualized

18   inquiries and might, ultimately, be impossible as players themselves are unlikely to remember the

19   details of where they engaged in conditioning work, just as the court found in *Xavier*.  This

20   problem is compounded by the fact that the class definitions include the term "work," which

21   requires a threshold merits inquiry as to the meaning of that term.  Defendants offer evidence that

22   the minor league players engaged a wide variety of activities during the off-season to stay in top

23   condition and the degree to which these activities were dictated by the Clubs and/or monitored by

24   them appears to have varied a great deal from Club to Club and from player to player.  It would be

25

26   [11] The Court uses the term "winter training" to refer only to the strength and conditioning
     activities performed by the players in the off-season to meet their obligation under the UPC to
27   "keep in first-class condition" throughout the year.  It does not use the term to refer to the more
     formal activities conducted outside of the championship season that are organized by the Clubs,
28   such as instructional leagues, spring training and extended spring training.

United States District Court
Northern District of California

1     extremely difficult to draw clear lines regarding the types of activities that would qualify a player

2     for membership in a particular State Class – especially as even the same activity might not always

3     constitute "work," depending upon whether or not the Club required that activity to be performed.

4          While Plaintiffs have cited two cases in which the class definitions used the term "work,"

5     both of those cases involved work performed at the employer's place of business, and there appear

6     to have been no disputes as to the types of activities that constituted "work."  *See* Rule 23 Reply at

7     14 n. 32 (citing *Dudum v. Carter's Retail, Inc*., No. 14-CV-00988-HSG, 2016 WL 946008 (N.D.

8     Cal. Mar. 14, 2016) (granting preliminary approval of class action settlement in wage-and-hour

9     case where plaintiffs were employees of retail store); *Cervantez v. Celestica Corp*., 253 F.R.D.

10    562, 567 (C.D. Cal. 2008) (certifying class under Rule 23 in wage-and-hour case where plaintiffs

11    were employees who worked at a shipping facility)).  That is not the case here, where the question

12    of what constitutes "work" is highly contested.

13         As to the activities performed during the championship season, spring training and

14    instructional leagues, the Court does not find that the inclusion of the term "work" in the class

15    definition presents a serious problem with respect to ascertainability.  While it is true that class

16    membership would depend upon certain determinations by the Court as to the types of activities

17    that constitute work, the evidence offered by Plaintiffs suggests that the types of activities that

18    minor league players engage in during spring training, the championship season, and instructional

19    leagues are quite similar.  Consequently, it is unlikely that individualized inquiries would be

20    required to determine class membership based on these types of activities.

21         On the other hand, there appear to be wide variations in the types of activities in which

22    minor league players engaged to meet their winter training obligations, the degree of discretion

23    players had as to how they conducted their winter training and the degree of supervision over the

24    players by the Clubs.  As a consequence, to evaluate which of the players' winter training

25    activities constituted "work" would be much more likely to involve highly individualized inquiries

26    that make the class definition "unworkable."  *See Daniel F.*, 305 F.R.D. at 125.

27         The difficulties associated with determining what activities constitute "work" in the

28    context of winter training are compounded by the fact that there appear to be no official records

United States District Court
Northern District of California

United States District Court
Northern District of California

1    documenting these activities.  Because it may be impossible to determine from official records the

2    types of conditioning activities in which the players engaged, membership in the State Classes

3    based on winter training would depend largely upon the players' ability to remember, with a

4    reasonable amount of detail, what they did during the off-season (often for multiple years and for

5    many, several years in the past) to stay fit.  As discussed below, in connection with the Motion to

6    Exclude, the Court has grave doubts as to ability of the players to remember in the necessary

7    detail, for many years, these activities.

8         The Court finds that the question of *where* minor league players conducted their various

9    winter training activities will involve laborious and highly individualized inquiries.  As class

10   membership is based, in part, on the location of the work that each minor league player performed,

11   this is an issue of ascertainability.  Although Plaintiffs contend the addresses that the minor league

12   players provided to the Clubs for the purposes of receiving communications during the off-season

13   can be used to determine where winter training occurred, Defendants have introduced deposition

14   testimony suggesting that the players did not necessarily reside at these addresses (which were

15   often the addresses of their parents) during the off-season.  *See, e.g.*, Bloom Rule 23 Opposition

16   Decl., Ex. 79 (Watts Dep.) at 272 (testifying that he used parents' address because it was only

17   stable address he had while he was a minor league player but that he did not actually reside at that

18   address during the off-season).  Thus, with respect to class membership based on winter training,

19   there will be no simple way to determine who is a member of each of the State Classes.  Indeed,

20   such a determination may be next to impossible, making the State Classes, as currently defined,

21   unascertainable. [12]

22

23   ───────────────────

[12] At oral argument, Plaintiffs' counsel suggested that the problem of ascertaining class
24   membership based on winter training could be avoided by "defining around it," though no specific
     modification of the class definition was proposed.  Counsel may be correct that it would be
25   possible to remedy the ascertainability problem discussed above by modifying the class definition
     to exclude winter training work.  The Court notes in particular that it is *not* persuaded by
26   Defendants' assertion that the State Classes are overbroad because they may include members
     who have no cognizable wage and hour claim against their Club under that state's law.  As
27   discussed above, the undersigned agrees with Judge Tigar that Rule 23 does not preclude
     certification of a class that may contain individuals whose claims ultimately may fail, though a
28

1

### c.   Commonality

2        The commonality requirement of Rule 23(a)(2) is met where "the class members' claims

3   'depend upon a common contention' such that 'determination of its truth or falsity will resolve an

4   issue that is central to the validity of each [claim] with one stroke.'"  *Mazza v. Am. Honda Motor*

5   *Co*., 666 F.3d 581, 588 (9th Cir. 2012) (internal citation omitted) (quoting *Wal-Mart*, 131 S.Ct. at

6   2551).  Thus, plaintiffs seeking to certify a class must "demonstrate 'the capacity of classwide

7   proceedings to generate common answers' to common questions of law or fact that are 'apt to

8   drive the resolution of the litigation.'"  *Id*. (quoting *Wal-Mart*, 131 S.Ct. at 2551).

9   "[C]ommonality only requires a single significant question of law or fact."  *Id*. at 589 (citing *Wal-*

10  *Mart*, 131 S.Ct. at 2556).  "The commonality preconditions of Rule 23(a)(2) are less rigorous than

11  the companion requirements of Rule 23(b)(3)."  *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019

12  (9th Cir. 1998).  "The existence of shared legal issues with divergent factual predicates is

13  sufficient, as is a common core of salient facts coupled with disparate legal remedies within the

14  class."  *Id*.

15        The Court finds that Plaintiffs have satisfied the commonality requirement.  In particular,

16  they have asserted three core claims that arise from the compensation policies set forth in the UPC

17

18  class that contains a "great many" such people is likely overbroad.  *Rodman v. Safeway, Inc*., No.
    11-CV-03003-JST, 2014 WL 988992, at *15 (N.D. Cal. Mar. 10, 2014).  As Defendants have not

19  shown that there are a "great many" such people in the proposed State Classes, the Court
    concludes that the possibility that some class members may not have a claim does not render those

20  classes unascertainable.  Nor is the Court persuaded that the need to conduct a "line-by-line
    analysis" of the players' transaction histories and "sort through each Club's unique payroll data"

21  to determine where players conducted various baseball-related activities makes determination of
    class membership so individualized and complex as to be unfeasible.  *See* Rule 23 Opposition at 8.

22  For many of the activities that would give rise to membership in the State Classes, such as playing
    in championship games or attending spring training or instructional leagues, there appear to be

23  sufficient records to determine for each minor league player when and where these occurred.
    While review of such records may be burdensome, courts routinely find that classes in wage and

24  hour cases are ascertainable where determination of class membership requires review of
    employment records such as these.  *See Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164,

25  186 (N.D. Cal. 2015), leave to appeal denied (May 12, 2015).  Nonetheless, the Court declines to
    exercise its discretion to modify the proposed class definition to "define around" the winter

26  training issue because it finds that there are other problems relating to predominance that cannot
    be fixed, even if the winter training activities are excluded.

27

28

1   and MLRs, namely, failure to pay players a salary outside the championship season, failure to pay

2   overtime, and failure to pay minimum wage during the championship season.  Plaintiffs present

3   common evidence to show that all minor league players are subject to these policies and therefore,

4   their legality will raise common questions of law that are likely drive the resolution of the

5   litigation.  As discussed below, all of these claims (and many of the defenses Defendants assert

6   against them) also raise individualized issues that present substantial – if not insurmountable –

7   challenges to classwide adjudication.  Nonetheless, the Court finds that these claims satisfy the

8   low threshold of Rule 23(a)(2).

9               **d.  Typicality**

10          Rule 23(a)(3) requires that "the [legal] claims or defenses of the representative parties [be]

11  typical of the claims or defenses of the class."  Fed. R. Civ. P.  23(a)(3).  "Typicality refers to the

12  nature of the claim or defense of the class representative and not on facts surrounding the claim or

13  defense."  *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 510 (N.D. Cal. 2007) (citing *Hanon

14  v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir.1992)).  "The test of typicality is whether other

15  members have the same or similar injury, whether the action is based on conduct which is not

16  unique to the named plaintiffs, and whether other class members have been injured by the same

17  course of conduct."  *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012)

18  (internal quotation marks and citation omitted).  "Under the rule's permissive standards,

19  representative claims are 'typical' if they are reasonably co-extensive with those of absent class

20  members."  *Hanlon*, 150 F.3d at 1020.  "The typicality requirement ensures that 'the named

21  plaintiff's claim and the class claims are so interrelated that the interests of the class members will

22  be fairly and adequately protected in their absence.'"  *Lee v. Pep Boys-Manny Moe & Jack of Cal.*,

23  No. 12-CV-05064-JSC, 2015 WL 9480475, at *8 (N.D. Cal. Dec. 23, 2015) (quoting *Gen. Tel.

24  Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n. 13 (1982)).

25          As a general rule, "a plaintiff who has no cause of action against the defendant cannot

26  'fairly and adequately protect the interests' of those who do have such causes of action . . . even

27  though the plaintiff may have suffered an identical injury at the hands of a party other than the

28  defendant and even though his attorney is excellent in every material respect."  *La Mar v. H & B*

United States District Court
Northern District of California

63

United States District Court
Northern District of California

*Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973).  In *LaMar*, however, the Ninth Circuit recognized that this rule does not apply in "situations in which all injuries are the result of a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury" or "in instances in which all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious."  *Id.*; *see also* Newberg on Class Actions § 3:49 (5th ed.) (noting that in *LaMar*, the Ninth Circuit recognized two exceptions to this rule:  "First, typicality may exist if the class complaint alleges a conspiracy, a joint tort, or some other relationship among the defendants that constitutes more than simple commonality of the challenged conduct.  Second, a court may find typicality if it determines that the actions of the various defendants are 'juridically related' in a way that would make class resolution of the issue expeditious").  Although the contours of the "juridically related" exception are not always clear, a number of courts (including in this district) have found that it applies where the defendants "entered into . . . an agreement and were thereby bound to a common course of conduct" that gave rise to the plaintiff's alleged injuries.  *In re Computer Memories Sec. Litig.*, 111 F.R.D. 675, 681 (N.D. Cal. 1986); *see also In re Activision Sec. Litig.*, 621 F. Supp. 415, 432 (N.D. Cal. 1985) (finding that "juridical link" exception applied because there was an agreement between the defendants binding them to a common course of conduct); *In re Eaton Vance Corp. Sec. Litig.*, 220 F.R.D. 162, 171 (D. Mass. 2004) ("The juridical link doctrine is most commonly applied when there is a contractual obligation among the defendants, a conspiracy among the defendants or a state or local statute which requires common action by the defendants."); *Dash v. FirstPlus Home Loan Owner Trust 1996–2*, 248 F. Supp. 2d 489, 505 (M.D.N.C. 2003) (recognizing that juridical link doctrine is commonly applied where a contract between defendants binds them to common action).

Here, the Court finds that MLB and the franchise Defendants are "juridically related," because they have come together to form MLB by enacting the MLB constitution and have jointly issued the MLB rules and UPC pursuant to that constitution.  Because of these rules and agreements, all of the Defendants in this action are bound to a common course of conduct with respect to the compensation of minor league players.  Under these circumstances, the general rule

United States District Court
Northern District of California

1    articulated in *La Mar* does not apply and a class representative's claims may be typical of the

2    absent class members' claims even if their claims are asserted against different defendants.

3    Consequently, the Court rejects Defendants' assertion that in order to satisfy the typicality

4    requirement there must be a class representative for each of the Clubs for each of the state classes.

5        The Court also is not persuaded by Defendants' reliance on the fact that some of the class

6    representatives played for dismissed Clubs and therefore, their claims stand or fall on whether

7    MLB is found to be a joint employer (whereas some class members assert claims against both

8    MLB and Clubs that remain as defendants in the action).  It is sufficient that all class members

9    assert a claim against MLB based on similar injuries for these class representatives' claims to

10   satisfy the typicality requirement.  *See Akaosugi v. Benihana Nat'l Corp.*, 282 F.R.D. 241, 257

11   (N.D. Cal. 2012) (certifying a class under Rule 23 with respect to wage and hour claims asserted

12   against overarching employer and multiple franchise subsidiaries on joint employer theory and

13   permitting individual who worked for one of the franchise defendants to represent class members

14   who worked for other franchise defendants who suffered similar injury as a result of common

15   policy of parent company).

16       Finally, the Court addresses Defendants' assertion that the class representatives do not

17   satisfy the typicality requirement because many of them are "proffered as Class representatives

18   based on activities they allegedly performed in that particular state that are not typical of the

19   activities performed by the class members whom they seek to represent."  Rule 23 Opposition at

20   15.  Under this theory, a class representative who performed only off-season training in a

21   particular state, for example, will have claims that are not typical of class members who are

22   members of the class based on their activities in that state during the championship season.  This

23   criticism carries some weight with the Court.

24       Although the parties do not appear to have addressed the question, the Court finds that in

25   cases such as this, where the claims can be broken down into various subcategories involving a

26   variety of activities which are likely to raise discrete issues (e.g., the compensability of travel time

27   during the championship season or the types of activities and degree of supervision required to

28   recover for winter training), it is not necessarily reasonable (or even possible) to require that each

65

and every class representative must have engaged in all of the relevant activities that give rise to the claims asserted by the class to satisfy the typicality requirement (though certainly each class representative must have engaged in at least *some* of the categories of activities that are the subject of class claims). Nonetheless, the Court concludes that at a minimum, the class representatives *as a group* must fairly and adequately represent the interests of the class for each State Class. This requirement cannot be met unless the class representatives (collectively) can assert claims that are reasonably co-extensive with those of absent class. Under the circumstances here, this means that Plaintiffs must demonstrate that for each class, the representatives, as a group, assert timely claims based on all of the various types of activities that are the subject of the class claims asserted under that state's laws.

The Court concludes that Plaintiffs have not demonstrated that this requirement is met. As a preliminary matter, Plaintiffs failed to respond to Defendants' specific challenges as to a number of the class representatives who may or may not have timely claims under the laws of the states for which they seek to represent a class. For example, they have not explained how Ryan Kiel can be an appropriate class representative for the Florida class when he is not alleged to have engaged in any baseball-related activities in Florida and there appears to be no evidence in the record of any such contacts. Nor have they addressed the fact that Ryan Khoury seeks to represent the New York class but apparently has only engaged in baseball-related activities in New York when he traveled to away games; given that Plaintiffs say that in-season activities will be "tied to the affiliate at which the minor-leaguer is assigned," Rule 23 Reply at 10, and Mr. Khoury was never assigned to an affiliate based in New York, any claims based on his time in New York would presumably be asserted under the law(s) of other states. Similarly, Plaintiffs do not address challenges based on the allegation that some of the proposed class representatives' claims (those of Kris Watts, Joseph Newby and Jon Gaston) would be untimely under the relevant states' laws because their activities in those states fell outside of the applicable limitations periods. It is well-established that "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (quoting *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977))

1   (internal quotation marks and citation omitted).  To the extent that there are questions as to

2   whether this basic requirement has been met, Plaintiffs have failed to meet their burden as to the

3   typicality requirement.

4   More broadly, the Court is unable to determine whether the proposed class representatives

5   for each state class *collectively* present claims that are typical of the class.  This would require a

6   showing that for each state class, there are class representatives who engaged in all of the various

7   types of activities that will be the subject of that class's claims and have timely claims under that

8   state's laws.  Based on the current record, Plaintiffs have not demonstrated that the typicality

9   requirement is met.[13]

10   **e.  Adequacy**

11   Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the

12   interests of the class."  "Determining whether the representative parties adequately represent a

13   class involves two inquiries:  (1) whether the named plaintiff and his or her counsel have any

14   conflicts of interest with other class members and (2) whether the named plaintiff and his or her

15   counsel will act vigorously on behalf of the class." *Calvert v. Red Robin Int'l, Inc*., No. C 11-

16   03026 WHA, 2012 WL 1668980, at *2 (N.D. Cal. May 11, 2012) (citing *Lerwill v. Inflight Motion*

17   *Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)).  These inquiries are guided by the principle that

18   "a class representative sues, not for himself alone, but as representative of a class comprising all

19   who are similarly situated.  The interests of all in the redress of the wrongs are taken into his

20   hands, dependent upon his diligence, wisdom and integrity."  *Calvert*, 2012 WL 1668980, at *2

21   (quoting *Cohen v. Beneficial Indus. Loan Corp*., 337 U.S. 541, 549 (1949)).  Thus, "[t]he honesty

22   and credibility of a class representative is a relevant consideration when performing the adequacy

23   _____

24   [13]At oral argument, Plaintiffs' counsel suggested that the listing of Ryan Khoury as a class
     representative – despite the fact that he has no apparent claim under New York law – might be a

25   "scrivener's error" that could be remedied.  Had Plaintiffs made a detailed showing that the
     remaining individuals who have been listed as class representatives satisfy the typicality

26   requirement for each of the State Classes, it might be appropriate to give Plaintiffs an opportunity
     to fix this problem.  As discussed above, however, the Court finds that Plaintiffs have failed to

27   demonstrate typicality as to any of the State Classes and therefore, Plaintiffs would be required to
     address not just a simple "scrivener's error."  Under these circumstances, the Court declines to

28   afford Plaintiffs another opportunity to make the required showing.

United States District Court
Northern District of California

1    inquiry because an untrustworthy plaintiff could reduce the likelihood of prevailing on the class

2    claims." *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) (internal

3    quotations and citations omitted).  Courts have found, however, that issues relating to credibility

4    do not automatically result in inadequacy of a class representative; rather, lack of credibility

5    renders a class representative inadequate "only where the representative's credibility is questioned

6    on issues directly relevant to the litigation or there are confirmed examples of dishonesty, such as

7    a criminal conviction for fraud."  *Id.* (citations omitted).

8          As discussed above, Plaintiffs have not established that all of the proposed class

9    representatives can assert claims under the relevant states' laws.  To the extent these individuals

10   may not be members of the classes they seek to represent, they cannot adequately represent those

11   classes.  *See Diacakis v. Comcast Corp.*, No. C 11-3002 SBA, 2013 WL 1878921, at *7 (N.D. Cal.

12   May 3, 2013) (holding that where putative class representatives were not members of the class the

13   plaintiffs also failed to demonstrate that the adequacy requirement was met) (citing *Gen. Tel. Co.*

14   *of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).  On the other hand, the Court rejects Defendants'

15   assertion that the putative class representatives and their counsel have failed to act with "diligence,

16   wisdom, and integrity."

17         With respect to the class representatives, Defendants allege that they have offered

18   testimony that contradicts their declarations, filed declarations that contain stock language,

19   demonstrated a lack of fundamental knowledge of the claims in the case and, as to a handful of

20   individuals, engaged in affirmative misconduct.  *See* Bloom Rule 23 Opposition Decl., Ex. 2.  As

21   a preliminary matter, the Court addresses Plaintiffs' request that the Court to strike Exhibit 2,

22   along with three other similar exhibits attached to the Bloom declaration on the basis that the

23   charts that they contain are impermissibly argumentative and violate the page limits set forth in the

24   Civil Local Rules.  *See* Rule 23 Reply Brief at 12 n. 26.  They cite *Think Village-Kiwi, LLC v.*

25   *Adobe Systems, Inc.*, in which the court struck an exhibit that consisted of a chart listing all the

26   disputed facts that were alleged to preclude summary judgment, along with an explanation by

27   counsel why each of these facts was not material and therefore did not preclude summary

28   judgment.  No. C 08-04166 SI, 2009 WL 3837270, at *7 (N.D. Cal. Nov. 16, 2009).  The court in

United States District Court
Northern District of California

68

1   that case found that the chart was improper because the party offering it was required to include all

2   of its arguments in its briefs.

3      Here, Defendants' charts arguably fail to comply with the page limitations of the Local

4   Rules to the extent that their arguments are set forth in much greater detail in the exhibits than is

5   contained in their briefs.  Nonetheless, the Court declines to strike these exhibits.  Defendants'

6   charts are primarily a means of identifying the specific evidence that Defendants contend supports

7   the general arguments set forth in their briefs.  Given the challenges of addressing the extensive

8   evidence and multitude of issues that must be resolved at this stage of the case, the Court

9   concludes that it was not unreasonable, at least in principle, to summarize the supporting evidence

10  in this manner.  Therefore, the Court declines to strike these exhibits.

11     While Defendants' exhibits do not violate the Local Rules, the Court nonetheless finds that

12  the lengthy and detailed allegations attacking the adequacy of the class representatives are largely

13  unfounded and frequently exaggerated.  The Court's conclusions are based on a detailed review of

14  the evidence cited in Exhibit 2 for each and every class representative, although the Court only

15  addresses Defendants' allegations on a general level here.

16     First, the Court has reviewed the alleged inconsistencies between the declarations of the

17  named Plaintiffs and their deposition testimony and finds that the Defendants have on numerous

18  occasions mischaracterized deposition testimony and exaggerated the alleged discrepancies

19  between the declarations and the deposition testimony.  Often, the deposition testimony cited by

20  Defendants can be easily reconciled with the statements in the players' declarations.  For example,

21  Defendants contend many of the named Plaintiffs' declarations were inconsistent with their

22  deposition testimony because they stated in their declarations that they were not permitted to

23  negotiate over their "wages" whereas they testified in their depositions that they negotiated their

24  bonuses or college scholarship benefits.  *See* Bloom Rule 23 Opposition Decl., Ex. 2 (identifying

25  the following players as having offered such "inconsistent" testimony:  Bennigson, Duff, Gagnier,

26  Gaston, Giarraputo, Lawson, Meade, Murray, Nicholson, Pahuta, Quinowski, Santiago, Senne,

27  Smith, and Stone).  The deposition testimony is not inconsistent with the players' declarations,

28  however, if the players used the term "wages" to refer only to the monthly payments they received

United States District Court
Northern District of California

1    in the championship season and not to other types of compensation such as bonuses and college

2    scholarship benefits.

3           The Court is similarly unpersuaded by Defendants' suggestion that the statements of some

4    of the players in their declarations that MLB "supervised and dictated their duties and

5    responsibilities" were false or unreliable in light of deposition testimony by those same players

6    that they couldn't remember the names of any MLB executives.  *See* Bloom Decl., Ex. 2

7    (identifying the following players as having offered such "inconsistent" testimony:  Bennigson,

8    Britt, Daly, Duff, Gagnier, Giarraputo, Henderson, Hilligoss, Kahaulelio, Khoury, Kiel, Lawson,

9    Liberto, Nadeau, Pinckney, Stone, and Weeks).  Plaintiffs have consistently asserted that MLB set

10   the rules and conditions of their employment through the MLRs and the UPC; they have never

11   argued that MLB executives or personnel directly supervised their day-to-day activities.

12   Plaintiffs' testimony that they could not name any specific  MLB personnel is therefore neither

13   surprising nor  inconsistent with their declarations.

14          It is true that Defendants have identified some actual inconsistencies.  David Quinowski,

15   for example, stated in his declaration that he "believe[d] [his] salary during the championship

16   [season] began [at] less than $1,000/month," *see* Docket No. 414-33 ¶ 28, but at his deposition he

17   conceded that his base pay was $1,100/month after he was asked to review the UPC he had signed.

18   *See* Docket No. 631-38.  This sort of inconsistency is not of the magnitude that renders class

19   representatives inadequate, however.  Rather, such inconsistencies are appropriate issues for the

20   jury to consider in determining whether Plaintiffs can prove their claims.  The Court concludes

21   that the alleged inconsistencies between the players' declarations and their testimony does not rise

22   to a level that would cast doubt on the adequacy of Plaintiffs or counsel to represent the class.

23          The Court also rejects Defendants' reliance on the fact that the proposed class

24   representatives submitted declarations containing stock language.  It is no secret that in the class

25   action context declarations, in the first instance, are often drafted by counsel based on

26   conversations with class representatives and often contain stock language.  While boilerplate

27   declarations can cast doubt on the adequacy of the class representatives, the declarations here are

28   not so similar as to suggest that the class representatives did not review them or that counsel was

United States District Court
Northern District of California

70

1    remiss in including such stock language.  Moreover, the evidence in the record indicates that the

2    class representatives have a basic understanding of the case and have engaged in reasonable efforts

3    in connection with discovery.  *See* Zigler Rule 23 Reply Decl., Ex. C [Docket No. 643].

4            Finally, the Court rejects Defendants' reliance on the alleged affirmative misconduct of the

5    class representatives.  This alleged misconduct takes a variety of forms, with one of the more

6    extreme allegations being that a class representative showed up at his deposition under the

7    influence of drugs and/or repeatedly left the room to take drugs.  While such conduct on the part

8    of a class representative would surely be disqualifying, the deposition testimony cited in Exhibit 2

9    shows only that defense counsel repeatedly asked the plaintiff if he was on drugs or leaving the

10   room to take drugs, pointing to the plaintiff's red eyes and what counsel characterized as the

11   plaintiff's inability to remember basic facts.  The deponent answered that he was not on drugs but

12   that he was tired as he had traveled several hours to get to the deposition, which had been going on

13   for many hours at that point.  Defendants' failure to cite to any specific testimony that reflects that

14   the deponent was impaired indicates that Defendants' attacks are unfounded.  Moreover, the Court

15   has reviewed all of the other instances of alleged misconduct contained in Exhibit 2 and finds

16   them to be similarly exaggerated or unfounded.  The Court does not repeat these allegations here.

17           The Court also rejects Defendants' assertions that Plaintiffs' counsel cannot adequately

18   represent the class.  Plaintiffs' counsel has already demonstrated that they are experienced in the

19   area of wage and hour class actions and the Court has observed at first-hand that counsel has

20   vigorously represented Plaintiffs' interests.  Nor is the Court impressed by Defendants' citation of

21   testimony by some named Plaintiffs that they joined the case after receiving telephone calls or

22   emails from Mr. Broshuis.  *See* Rule 23 Opposition at 22 n. 32.  Defendants rely on *Bodner v.*

23   *Oreck Direct, LLC,* but that case is clearly distinguishable.  In *Bodner*, Judge Patel refused to

24   certify the class based in part on the plaintiff's "overwhelming and undeniable ignorance about the

25   nature" of the case, making it clear that "plaintiff's counsel, and not plaintiff, [was] the driving

26   force" in the action.  *Bodner v. Oreck Direct, LLC*, No. C 06-4756 MHP, 2007 WL 1223777, at *3

27   (N.D. Cal. Apr. 25, 2007).  The court concluded that "plaintiff's counsel constructed this lawsuit

28   before it had a plaintiff," citing the plaintiff's own admissions and "counsel's previous abortive

United States District Court
Northern District of California

71

United States District Court
Northern District of California

attempt to bring a seemingly identical lawsuit in another district." *Id.* Finally, the court in *Bodner* noted that the firm that represented the plaintiff in that case had "had trouble regarding its choice of plaintiffs in the past" and had been disqualified in another consumer class action for similar conduct. *Id.* (citation omitted). In contrast to the facts in *Bodner*, the evidence in the record reflects that the class representatives here have been involved in the case and have an adequate understanding of the facts and legal theories of the case, as noted above. *See* Zigler Rule 23 Reply Decl., Ex. C [Docket No. 643]. Nor is there any "air of impropriety surrounding [counsel's] conduct" such that the holding of *Bodner* would apply here. *Trosper v. Styker Corp.*, No. 13-CV-0607-LHK, 2014 WL 4145448, at *13 (N.D. Cal. Aug. 21, 2014) (quoting *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 111 (N.D. Cal. 2008), in which the court also found that *Bodner* was distinguishable). Therefore, the Court finds that the adequacy requirement is satisfied except to the extent that the adequacy inquiry overlaps with the typicality requirement.

### f. Predominance under Rule 23(b)(3)

The predominance test of Rule 23(b)(3) is "far more demanding" than the commonality test under Rule 23(a)(2). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022 (quoting *Windsor*, 521 U.S. 591, 117 S. Ct. 2231, 2249). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." *Id.*; *see also Mazza*, 666 F.3d at 589. Further, "uniform corporate policies will often bear heavily on questions of predominance and superiority." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009) ("[C]ourts have long found that comprehensive uniform policies detailing the job duties and responsibilities of employees carry great weight for certification purposes." (citing *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 160 (S.D.N.Y.2008))). Whether the predominance requirement is satisfied in a particular case, however, "turns on close scrutiny of 'the relationship between the common and individual issues.'" *Id.* (quoting *Hanlon*, 150 F.3d at 1022).

1    Defendants point to a series of issues that they contend are not amenable to classwide

2  treatment and will require individualized inquiries.  The Court addresses them below.

3              i.    Threshold Question of Whether Plaintiffs are "Employees"

4    The primary dispute as to whether or not Plaintiffs are employees relates to the applicable

5  test.  Defendants contend the primary beneficiary test set forth in *Walling v. Portland Terminal*

6  *Co.* applies and that the fact-intensive inquiry that must be conducted in applying this test will

7  require highly individualized inquiries. Plaintiffs argue that *Walling* does not apply, that the

8  applicable test is the economic realities test that was applied in *Tony and Susan Alamo Foundation*

9  *v. Secretary of Labor*, 471 U.S. 290 (1985), and that this test can be applied on the basis of

10  common evidence.  In the alternative, Plaintiffs contend the primary beneficiary test can also be

11  applied on the basis of classwide proof.[14]  Likewise, Defendants contend the economic realities

12  test requires individualized inquiries.  Because the question of whether Plaintiffs have met the

13  predominance requirement depends, in part, on which test is applied, it is appropriate for the Court

14  to reach the merits as to this issue. The Court concludes that the primary beneficiary test

15  announced in *Walling* does not apply under the circumstances here.  It further finds that common

16  proof can be used to address the question of whether there was an employment relationship under

17  the economic reality test.

18    In *Walling*, the Supreme Court addressed whether a seven-day training program offered by

19  a railroad company violated the FLSA where trainees received no compensation during the

20  training.  330 U.S. at 150.  Those who successfully completed the program and were listed as

21  accepted and available for work were given a retroactive allowance, but those who were not

22  accepted never received any compensation for their participation in the program.  *Id*.  The Court

23  started its analysis by noting that "[w]ithout a doubt the [FLSA] covers trainees, beginners,

24  _____

25  [14] The Court notes that the tests in both *Walling* and *Alamo* apply to claims asserted under the
   FLSA rather than state law claims.  Plaintiffs contend the laws of all of the relevant states,

26  however, are similar to the standards under the FLSA.  Rule 23 Motion at 22.  Defendants have
   not challenged Plaintiffs' assertion.  Therefore, the Court assumes that all of the states for which a

27  class is proposed apply the same or similar standards as are applied under the FLSA to determine
   whether an individual is "employed" by the defendant.

28

United States District Court
Northern District of California

apprentices, or learners if they are employed to work for an employer for compensation." *Id*. at 151. It explained that this is because the FLSA's "purpose as to wages was to ensure that every person whose employment contemplated compensation should not be compelled to sell his services for less than the prescribed minimum wage." *Id*. at 152. Nonetheless, the Court reasoned, the definition of "employ" under the FLSA – "to suffer or permit to work" – "was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Id*. Further, the Court found, the definitions of "employee" and "employ," "broad as they are, . . . cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction." *Id*. Thus, a training program that is comparable to a class that could have been taken at a vocational school is not "employment" under the FLSA, the Court held. *Id*. at 153. The Court stated, "[t]he Fair Labor Standards Act was not intended to penalize railroads for providing, free of charge, the same kind of instruction at a place and in a manner which would most greatly benefit the trainees." *Id*. The Court therefore held that the railroad had not violated the FLSA by failing to compensate the plaintiffs for their time spent in the training program.

In contrast, in *Alamo*, the Court found that the FLSA applied to unpaid work by individuals who had been rehabilitated by the defendant, a nonprofit religious foundation, concluding that the holding of *Walling* did not apply. 471 U.S. at 299-303. In that case, the Department of Labor brought an action against the foundation even though the individuals who worked for the foundation "vehemently protested" coverage under the FLSA and disavowed any expectation that they would be paid for their work. *Id*. at 302. While the Court recognized that this situation was "unusual," it rejected the argument that an exception to the FLSA should be carved out for individuals who "voluntarily" work for an employer as such an exception could invite employers to use their "superior bargaining power" to coerce employees into making such assertions. *Id*. Whatever the individuals might say, the Court reasoned, the applicable test was the "economic reality" of the situation. *Id*. at 301 (citing *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). It also noted that the individuals did, in fact, receive "food, clothing, shelter, and other

benefits," even though they were not paid for their work.  *Id*. at 292.  Moreover, the Court

reasoned, these individuals "must have expected to receive in-kind benefits – and expected them

in exchange for their services" because many of them were "entirely dependent on the Foundation

for long periods, in some case several years."  *Id*. at 301.  Under these circumstances, the Court

concluded, the situation was a "far cry" from *Walling* because the expectation of in-kind benefits

amounted to an "implied compensation agreement."  *Id*. at 302.

      In *Glatt v. Fox Searchlight Pictures*, the Second Circuit addressed the question of when an

unpaid intern is entitled to compensation under the FLSA.  811 F.3d 528 (2d Cir. 2016).  The

court addressed the factors that should be considered in applying the "primary beneficiary" test of

*Walling* and in particular, whether it should apply a set of factors set forth in the Department of

Labor's Field Operation Handbook intended to provide guidance as to when an individual is an

"employee" for the purposes of the FLSA.  *Id*. at 534-535.  The court concluded that the

Department of Labor's factors were not entitled to deference and that in developing them, the

Department of Labor had adhered too rigidly to *Walling*, "attempting to fit [*Walling's*] particular

facts to all workplaces."  *Id*. at 536.  It went on to fashion a set of factors consistent with *Walling*

that would be appropriate for application to the "modern internship."  *Id*. at 537.

      The court in *Glatt* started from the premise that the primary beneficiary test has "three

salient features":

> First, it focuses on what the intern receives in exchange for his
> work. *See Portland Terminal*, 330 U.S. at 152, 67 S.Ct. 639
> (focusing on the trainee's interests). Second, it also accords courts
> the flexibility to examine the economic reality as it exists between
> the intern and the employer. *See Barfield v. N.Y.C. Health & Hosps.
> Corp*., 537 F.3d 132, 141–42 (2d Cir. 2008) (employment for FLSA
> purposes is "a flexible concept to be determined on a case-by-case
> basis by review of the totality of the circumstances"). Third, it
> acknowledges that the intern-employer relationship should not be
> analyzed in the same manner as the standard employer-employee
> relationship because the intern enters into the relationship with the
> expectation of receiving educational or vocational benefits that are
> not necessarily expected with all forms of employment (though such
> benefits may be a product of experience on the job).

*Id*. at 536.  With these principles in mind, the court went on to articulate a series of considerations

that should be weighed and balanced.  The factors are as follows:

1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation. Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.

2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.

3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship.

*Id.* at 536-537. The court described the test as "flexible" and noted that "because the touchstone of this analysis is the 'economic reality' of the relationship . . . a court may elect in certain cases, including cases that can proceed as collective actions, to consider evidence about an internship program as a whole rather than the experience of a specific intern." *Id.* at 537 (citing *Barfield*, 537 F.3d at 141)). Finally, the court emphasized that the test was "confined to internships and does not apply to training programs in other contexts." *Id.*

Courts have applied *Walling* and the so-called "*Glatt* factors" to unpaid student interns in a variety of contexts. For example, the Eleventh Circuit in *Schumann v. Collier Anesthesia, P.A.*, applied the *Glatt* test to students of a for-profit anesthesiology school that required students to perform "clinical work" associated with state licensing requirements to receive their degree. 803 F.3d 1199, 1203-04 (11th Cir. 2015). The Eleventh Circuit agreed with the Second Circuit that the *Walling* test was a flexible one and that it was appropriate to "tweak" the Supreme Court's treatment of training programs to fit it to the modern-day economy. *Id.* at 1211. Similarly, in

76

United States District Court
Northern District of California

1    *Benjamin v. B&H Education, Inc.*, the court applied *Walling* and the *Glatt* factors where students

2    were required to perform unpaid "clinical work" at salons run by a cosmetology school to receive

3    their certificate.  As in *Schumann*, the clinical work was associated with state licensing

4    requirements for cosmetologists.  No. 13-cv-04993 VC, 2015 WL 6164891 (N.D. Cal. Oct. 16,

5    2015).

6           *Berger v. National Collegiate Athletic Association* applied *Walling* in a different context,

7    in which the plaintiffs were members of the track and field team at the University of Pennsylvania

8    who asserted claims under the FLSA and sought to represent a class of student athletes.  Case No.

9    14-cv-1710 WTL, Docket No. 238 (S.D. Ind. Feb. 16, 2016).  In that case, the court found that the

10   flexible approach taken in *Glatt* was consistent with *Walling* but that the specific factors

11   considered in that case did not fit because the economic reality of the nature of the working

12   relationship for "trainee and private sector intern[s]" differed from the economic reality for student

13   athletes.  *Id.* at 15-16.  Instead, the court found that an "essential part of the 'economic reality' of

14   the relationship between the Plaintiffs and Penn" was the "'revered tradition of amateurism in

15   college sports.'"  *Id.* at 15 (quoting *Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ. of

16   Okla.*, 468 U.S. 85, 120 (1984)).  The court further found that an essential part of the economic

17   reality was the fact that "generations of Penn students have vied for the opportunity to be part of

18   that revered tradition with no thought of any compensation."  *Id.* at 16.  Ultimately, the court

19   concluded that the students' participation in an NCAA athletics team at Penn did not make them

20   employees under the FLSA.  *Id.* at 18.

21          From the cases discussed above, the Court draws several conclusions.  First, to the extent

22   that minor league players have always entered into contracts with MLB to receive a salary and

23   other forms of compensation (including bonuses and college scholarship benefits), and that they

24   often negotiate with the Clubs over the terms of their compensation (as Defendants have

25   emphasized), it cannot be denied that minor league players expect to receive – and do in fact

26   receive – compensation in return for playing baseball for the Clubs.  This basic fact distinguishes

27   this case from all of the cases discussed above that applied *Walling*.  These are not unpaid interns,

28   students who were receiving clinical training in connection with licensing requirements, or

1    amateur student athletes participating in a long tradition in which no compensation had ever been

2    paid or expected.  Rather, like the workers in *Alamo*, these Plaintiffs expected to receive

3    compensation, both in the form of money payments and other benefits.  *See Martinez v. Ehrenberg*

4    *Fire Dist*., No. CV-14-00299-PHX-DGC, 2015 WL 3604191, at *3 (D. Ariz. June 8, 2015)

5    (finding that "volunteer" firefighters were employees under the FLSA on the basis that they

6    expected to receive compensation for their work).

7            The Court rejects Defendants' attempt to distinguish *Alamo* on the basis that the workers in

8    that case were "entirely dependent" on the defendant whereas the players here are not dependent

9    on MLB and the Clubs.  Defendants miss the point.  The dependency of the workers in *Alamo* was

10   cited only to show that they did, in fact, expect some form of compensation in return for their

11   work, notwithstanding their assertions to the contrary.  Here, there is little doubt that the players

12   expected to be compensated, as discussed above.  Nor is the Court persuaded by Defendants'

13   assertion that the players did not expect to be compensated because they understood they would

14   not be paid during the off-season.  The case law (including *Walling*) does not suggest that such a

15   narrow focus is permissible.

16           While the Court concludes that *Walling* and its progeny are distinguishable, however, it

17   also finds that the distinction the parties have drawn between the "economic reality" test and the

18   "primary beneficiary" test is overdrawn for the purposes of determining whether the Court will be

19   required to conduct individualized inquiries in this case.  In fact, the rule announced in *Walling* is

20   based on what the Court saw to be a *particular* economic reality, as are the later cases that have

21   applied *Walling* in a variety of settings.  Further, as the court in *Glatt* acknowledged, even in

22   applying the primary beneficiary test, "a court may elect in certain cases, including cases that can

23   proceed as collective actions, to consider evidence about [the] program as a whole rather than the

24   experience of a specific [plaintiff]."  811 F.3d at 537.  Here, the Court concludes that the

25   economic reality of the minor league players' relationship with Defendants depends in large part

26   on the common features of the draft system instituted by MLB and the Clubs, as well as the

27   uniform contract signed by all players and the MLB rules to which they are subject.  The Court is

28   not persuaded by Defendants' reliance on player testimony that some felt they benefited more than

United States District Court
Northern District of California

78

1   others from the various types of activities in which they engaged while they played for the MLB

2   Clubs.  While this is to be expected in virtually any setting, the case law does not suggest that

3   these subjective feelings of the players have much (if any) bearing on the economic realities of the

4   relationship.  Indeed, the very term (focusing on "reality") suggests that the focus of the test is

5   primarily objective.

6         For these reasons, the Court rejects Defendants' assertion that the question of whether

7   Plaintiffs were "employees" precludes certification under Rule 23(b)(3) because of the

8   individualized inquiries that would be required to determine whether minor league players are

9   "employees" of MLB and/or the Clubs.

10                  ii.   Whether MLB is a "joint employer"

11         The question of whether a defendant is a "joint employer" under the FLSA is also

12   governed by the "economic reality" of the relationship.[15] *Maddock v. KB Homes, Inc.*, 248 F.R.D.

13   229, 246 (C.D. Cal. 2007).  Where a joint employment relationship is alleged, courts consider

14   whether the alleged employer "(1) had the power to hire and fire the employees, (2) supervised

15   and controlled employee work schedules or conditions of employment, (3) determined the rate and

16   method of payment, and (4) maintained employment records." *Bonnette v. Cal. Health & Welfare*

17   *Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), *disapproved of on other grounds by Garcia v. San*

18   *Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985).  Much of the evidence that will be used to

19   address these factors is common evidence.  Plaintiffs will look to the UPC and MLRs to show that

20   MLB controls the amateur draft system and other aspects of hiring and firing, that MLB

21   establishes policies that affect the conditions of employment, including drug and tobacco policies

22   and social media policies, that MLB sets the rate of pay for first year minor leaguers and sets

23   salary guidelines for non-first-year players, as well as dictating when salaries are paid, and that it

24   maintains extensive employee records including roster moves and contracts.

25

26         [15] Again, Plaintiffs contend the standard under the FLSA is similar to those applied under the

27   relevant states' laws, though they acknowledge that California courts apply a slightly different
standard.  *See* Rule 23 Motion at 23-24 & n. 85.  Defendants do not appear to challenge Plaintiffs'

28   assertion.

United States District Court
Northern District of California

1    Defendants suggest that the Court will be required to evaluate the existence of a joint

2  employment relationship for each individual player, asserting that there are "*thousands* of unique

3  joint-employment relationships." Rule 23 Opposition at 19. Their argument appears to be based

4  on the idea that the degree of supervision exercised by MLB executives over the minor league

5  players may have varied from player to player. In fact, however, Plaintiffs' joint employer theory

6  is not based on day-to-day supervision of the players by MLB executives and the factors listed

7  above do not require such supervision as a prerequisite for finding a joint employment

8  relationship. Therefore, the Court is not persuaded by this argument.

9    The Court also rejects Defendants' reliance on *Pfohl v. Farmers Insurance Group*, No. C-

10  03-3080 DT, 2004 U.S. Dist. LEXIS 6447 (C.D. Cal. Mar. 1 2004). In that case, the court

11  declined to certify a class under the FLSA in which the plaintiff sought to represent a class of

12  insurance adjusters who worked for temporary agencies that contracted with the defendant

13  (Farmers Insurance Group) to provide independent contractor adjusters. The court concluded that

14  the plaintiff himself could not demonstrate that Farmers was a joint employer and that even if he

15  could meet that burden, he had not established that the class he sought to represent was similarly

16  situated because he had offered "no evidence in regard to the other contracting companies." *Id.* at

17  *14. Here, in contrast to *Pfohl*, Plaintiffs have offered class-wide evidence relating the joint

18  employment question.

19    Consequently, the Court concludes that under Plaintiffs' theory of the case, the

20  determination of whether MLB was a joint employer will not require extensive individualized

21  inquiries that preclude certification of the Rule 23 classes.

22                  iii. Whether Plaintiffs Are Owed Compensation

23    Defendants contend the individualized inquiries that will be required to determine which

24  class members are owed compensation, for both unpaid minimum wages and overtime, would

25  overwhelm the litigation because of the wide variations among class members regarding: (1) the

26  types of activities in which they engaged (which would only be compensable if they were found

27  to constitute "work"; (2) the time they spent engaged in these activities; and (3) how much each

28  class members has been compensated, which would also require the Court to make determinations

United States District Court
Northern District of California

80

1 about which forms of additional compensation should be considered in determining the class

2 members' regular wage rate and overtime rate.  The Court agrees.

3 　　　　With respect to the question of what activities constitute compensable work and the

4 amount of time spent on them, Defendants have cited evidence that the minor league players

5 engaged in a wide variety of activities for which they seek compensation and that the time they

6 devoted to different activities varied as well.  These variations are particularly striking as to winter

7 training:  while all minor league players were required to engage in some sort of conditioning

8 outside the championship season, the policies of the Clubs varied as to how players were expected

9 to meet this obligation, and the players themselves had significant discretion on this question.  The

10 players' testimony reflects wide variations in the types of activities they performed to meet their

11 winter training obligations, the degree to which the Clubs monitored these activities, and the time

12 the players spent on them.  Also, some players testified that they engaged in physical therapy and

13 rehabilitation during the off-season because they were recovering from injuries, thus raising

14 another set of questions as to what constitutes compensable work.

15 　　　　In addition to the variations as to winter training, players' activities outside the

16 championship season varied with respect to whether they participated in such training

17 opportunities as extended spring training, mini-camps and instructional leagues.  Defendants also

18 offer evidence that these training activities themselves varied depending on many factors,

19 including the goals and priorities of the individual Clubs and their managers and coaches, the

20 players' own preferences, and the affiliate level and position of the player, among other things.

21 　　　　During the championship season as well, players' activities varied depending on a

22 multitude of factors, including the particular priorities of the Club managers and coaches.  The

23 players also testified that they sometimes had discretion as to their work schedule, including

24 deciding when they arrived at the stadium before games and when they left after games.  Under

25 these circumstances, the Court would have to conduct a multitude of individualized inquiries

26 relating to the types of activities that might have constituted "work" and the circumstances

27 necessary to make these activities compensable under the relevant states' law.  Another set of

28 individualized inquiries arises in connection travel time (for which Plaintiffs seek compensation);

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the players' testimony varied significantly on such questions as how much time they spent

2    traveling in any given season, whether they rode on the team bus or were permitted to travel in

3    their own vehicles, and whether travel was more often completed in the course of a single day or

4    required an overnight stay.

5          Further, the evidence reflects that while the base salary of players was the same during the

6    first championship season, salaries varied significantly in subsequent seasons, when players and

7    teams negotiated their salaries based on factors that varied from team-to-team.  The evidence

8    offered by Defendants also shows that other forms of compensation such as bonuses and college

9    scholarship benefits varied significantly from player to player.  And while Plaintiffs have

10   emphasized that under the UPC players are not entitled to receive salary payments outside of the

11   championship season, Defendants have presented evidence that players sometimes received

12   stipends and contractual awards for participation in Major League spring training and extended

13   spring training, performance-related bonuses, and salaries from playing in the AFL.  While there

14   may be common questions relating to whether these forms of compensation should be considered

15   "wages" under the various states' laws, if the answer to that question is "yes," these variations will

16   give rise to the need to conduct additional individualized inquiries relating to Plaintiffs' claims.

17         Further, these variations present individualized issues that go not only to damages but also

18   to liability.  Class members can demonstrate minimum wage and overtime violations only by

19   demonstrating that their rate of pay fell below the minimum wage rate and that they worked the

20   requisite hours to be entitled to overtime pay, both of which will turn on the number of hours of

21   compensable work they performed and the amount of compensation they received for that work.

22   The Court concludes that the individualized issues that will arise in connection with adjudicating

23   these questions will be extensive and will make classwide treatment of Plaintiffs' claims virtually

24   impossible.  On this basis alone, the Court concludes that the predominance requirement is not

25   met.

26         The Court rejects Plaintiffs' reliance on *Abdullah v. U.S. Security Associates, Inc.*, 731

27   F.3d 952 (9th Cir. 2013) in support of their contention that variations among the minor league

28   players' circumstances do not defeat certification under Rule 23(b)(3).  In that case, the plaintiffs

United States District Court
Northern District of California

were security guards employed by a private security guard company who worked at over 700 locations in the state of California.  731 F.3d at 954.  The plaintiffs alleged that the employer had a "policy of requiring employees to work through their legally mandated meal periods" and the district court certified a subclass under Rule 23 to assert that claim.  *Id*. at 955-56.  The Ninth Circuit addressed whether the district court had erred in certifying the subclass in light of the fact that the members worked at different locations where circumstances might have varied and concluded that it did not.  Reviewing the applicable California law governing meal breaks, the court explained that in general, an employer violates California law where it has a uniform policy of requiring on-duty meal breaks, but that in limited situations, such on-duty breaks may be permissible if justified by the "nature of the work."  *Id*. at 960-62.  The employer in that case argued that individualized inquiries would be necessary to determine whether this exception applied to each separate workplace where the class members were employed and therefore, that the predominance requirement was not met.  *Id*. at 954, 962-63.  In order to win this argument, the court said, the employer "had to demonstrate not just that its employees' duties varied, but that they varied to an extent that some posts would qualify for the 'nature of the work' exceptions, while others would not" and that the employer "failed to do so."  *Id*. at 962.  In particular, the employer "did not argue that any particular posts would qualify for the 'nature of the work' exception *absent* the single-guard staffing model."  *Id*. at 963.  Because the only evidence in the record was that the missed meal breaks were the product of a common policy, that is, the staffing model itself, the court found that the "nature of the work" defense could be addressed on a classwide basis under Rule 23(b)(3).  *Id*. at 964.

The facts here are distinguishable from *Abdullah* because Defendants have offered concrete examples supported by specific evidence to show that the types of activities Plaintiffs contend are compensable work, and the circumstances under which they were performed, vary across players, levels and Clubs in ways that are likely to be material to whether they are compensable.  These potential variations are summarized in the Bloom Rule 23 Opposition Declaration, Exhibit 3. Among the specific examples Defendants point to are variations as to when players arrived for practice or games and how long they stayed after games, variations in the types

83

1  of activities in which the players engaged while at the clubhouse (including activities such as

2  showering or icing an injury that may or may not have been required), variations as to

3  participation in "player appearances" to sign autographs, and variations regarding how players

4  traveled to and from away games, whether they were required to ride the team bus and what types

5  of activities they engaged in while on the bus. *See id.*  Consequently, while the court in *Abdullah*

6  found that the defense at issue at that case was subject to classwide treatment because the

7  employer had not pointed to any variations that were specific and material to the analysis, that is

8  not the case here.

9                    iv.  Seasonal Amusement and Recreational Establishment Defenses

10         Defendants assert defenses based on seasonal amusement and recreational establishment

11  exemptions under the laws of California, Florida, Maryland, New York, North Carolina and

12  Pennsylvania.  According to Plaintiffs, California law does not recognize such an exemption.

13  With that exception, however, the parties appear to agree that in all of the states for which the

14  defense is asserted, the exemption is similar to the FLSA amusement exemption and therefore, the

15  question of whether this defense requires individualized inquiries can be assessed with reference

16  to the FLSA exemption. The amusement exemption of the FLSA is set forth in 29 U.S.C. §

17  213(a)(3), which provides that 29 U.S.C. §§ 206 (minimum wage requirement) and 207 (overtime

18  pay) do not apply with respect to:

19             any employee employed by an establishment which is an amusement

20             or recreational establishment . . . if (A) it does not operate for more
           than seven months in any calendar year, or (B) during the preceding

21             calendar year, its average receipts for any six months of such year
           were not more than 33 1/3 per centum of its average receipts for the

22             other six months of such year . . . .

23  29 U.S.C. § 213(a)(3).  This exemption requires a determination of the relevant establishment(s)

24  and then an examination of whether the period of operation and receipts of the "establishment" for

25  any given year fall within the requirements of the exemption for any portion of the relevant

26  statutory period.

27         The need to conduct individualized inquiries on this defense will depend, in part, on the

28  Court's preliminary determination of whether the relevant establishments are the specific venues

United States District Court
Northern District of California

1    where games and training occurred (as Defendants contend) or MLB headquarters (as Plaintiffs

2    contend).  If it is the former, adjudication of this defense could be burdensome, given that there are

3    presumably scores of locations (if not hundreds) where class members performed baseball-related

4    activities.  If the Court were to find that the relevant establishment for all of the class members

5    was MLB corporate headquarters, on the other hand, addressing this defense on a classwide basis

6    would likely be more manageable.  It is premature to make a determination on this question.  The

7    Court concludes, however, that while this defense on its own would not warrant denial of class

8    certification, it increases the likelihood that class treatment of Plaintiffs' claims will be swamped

9    by the individual inquiries related to determining whether each establishment satisfies the

10   requirements of the exemption.

v.   Creative Professionals Exemption

12          Defendants assert a defense on the basis of the "creative professionals exemption" under

13   the laws of California, Florida, Maryland, New York, Pennsylvania and Oregon.  While neither

14   Defendants nor Plaintiffs have briefed the standards that apply in these states as to this exemption,

15   the parties again look to the FLSA as a point of reference.  The FLSA exempts from minimum

16   wage and overtime requirements "creative professionals," that is, employees whose "primary duty

17   [is] the performance of work requiring invention, imagination, originality or talent in a recognized

18   field of artistic or creative endeavor as opposed to routine mental, manual, mechanical or physical

19   work."  29 C.F.R. § 541.302.  To qualify for the exemption, the individual must be [c]ompensated

20   on a salary or fee basis at a rate of not less than $455 per week."  29  C.F.R. § 541.300.

21          In general, the determination of an employee's primary job duties is highly factual and

22   therefore, when there are variations in the job duties of a proposed class, assertion of this sort of

23   exemption will require individualized inquiries that make class treatment inappropriate.  *See*

24   *Beauperthuy v. 24 Hour Fitness USA*, 772 F. Supp. 2d 1111, 1133 (N.D. Cal. 2011) (decertifying

25   FLSA class on the basis that defendant asserted various exemptions under the FLSA that turned on

26   the employees' primary duties and there was evidence that the job duties of the putative class

27   members varied).  Here, however, Defendants have not pointed to any variations in the duties of

28   the class members that appear to relate to the degree of creativity or originality that characterizes

United States District Court
Northern District of California

their primary duties.  Therefore, the Court is not persuaded that this part of the test will require significant individualized inquiries.  It is true, however, that determination of whether the exemption applies will require that the compensation paid to each class member is taken into account so that it can be determined whether the player meets the minimum salary requirement for the exemption.  Because there was significant variation in the players' compensation (especially after the first season), this part of the test will require individualized inquiries.  Therefore, the Court concludes that this exemption, like the seasonal amusement/recreational exemption, increases the likelihood that class treatment of Plaintiffs' claims will be overwhelmed by the individual inquiries, even if this particular defense would not, by itself, warrant denying class certification.

### vi.  Choice of Law Questions

Plaintiffs assert claims under the laws of eight states on behalf of minor league players who conducted baseball-related activities in a multitude of states. They contend the "mechanics" of determining which state's law applies "will be simple."  Rule 23 Reply at 10.  The Court disagrees.

The Court applies California choice of law principles in determining which law to apply to Plaintiffs' state law claims.  *See Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487 (1941); *SEC v. Elmas Trading Corp*., 683 F. Supp. 743 (D. Nev. 1987), *aff'd without opinion*, 865 F.2d 265 (9th Cir.1988) ("[V]arious cases indicate that state choice of law rules should apply to state claims pendent to federal question claims, in order to give full effect to the *Erie* doctrine.").  California's choice-of-law rules require the Court to determine:  "(1) whether the laws of various jurisdictions differ, and (2) whether both states have an interest in applying their respective law.  If the laws conflict, this Court is to apply the law of the state whose interest would be more impaired if its law were not applied."  *Church v. Consol. Freightways, Inc*., No. C-90-2290 DLJ, 1991 WL 284083, at *12 (N.D. Cal. June 14, 1991) (citing *Ledesma v. Jack Stewart Produce, Inc*., 816 F.2d 482, 484 (9th Cir. 1987)). Given the number of claims, the fact that so many of the players engaged in baseball related activities in numerous jurisdictions, and the presumed interest of each forum in regulating the employment relationships within its jurisdiction, the Court finds that Plaintiffs

United States District Court
Northern District of California

86

1    underestimate the choice-of-law determinations it will be required to make and the manageability

2    problems that will arise as a result.  *See id.*

3            The problems that may arise in connection with choice of law issues are myriad.  For

4    instance, players who travel to other states with more favorable wage and hour laws during the

5    championship season may have an interest in having their time compensated under the laws of the

6    "away" state (especially if they play for an affiliate based in a state other than the eight states in

7    this case and the "away" state is one of the eight).  Depending on the circumstances, there may be

8    a reasonable basis for applying the law of that state, in which case Plaintiffs' proposed approach of

9    applying the law of the state where the affiliate is based would not be in the best interests of those

10   particular class members or consistent with California choice of law rules – even if it would make

11   the choice of law determination more manageable.

12           The analysis for off-season work (and particularly, winter training) would become even

13   more complicated.  Instead of deciding between the laws of the "home" state or the "away" state,

14   the Court might be faced with a player who spent time in multiple states with no clear residence.

15   Again, in addition to the possibility that the laws of some states are likely to be more favorable

16   than those of other states, the players may have interests in seeking application of a certain state's

17   law because of the fact that they will only be able to recover in this action under the laws of eight

18   states; to the extent they engaged in baseball-related activities in other states, they will be forced to

19   bring a separate action if the laws of those states are found to apply rather than the laws of one of

20   these eight states.  Nor is the Court persuaded that it will be able to adopt simple guidelines to deal

21   with these situations without risking the impairment of the rights of both Defendants and the class

22   members themselves.  Therefore, the Court concludes that the choice of law problems that would

23   have to be navigated in order to adjudicate the claims of the proposed State Classes present very

24   significant individualized issues that cannot be handled on a classwide basis.

25                   vii. Applicability of *Tyson Foods v. Bouaphakeo*

26           Plaintiffs contend they will be able to prove their claims with common proof by using

27   representative data, namely, a survey that will be conducted by their expert, which will then be

28   used in a damages model constructed by another expert.  They rely on the Supreme Court's recent

87

1    decision in *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016), in support of their position

2    that such evidence is permissible to prove liability and damages where, as here, an employer has

3    failed to keep adequate records.  *Tyson Foods* does not remedy the problems discussed above

4    relating to the individualized inquiries necessary to adjudicate Plaintiffs' claims.

5         In *Tyson Foods,* the Supreme Court addresses the use of statistical evidence in the class

6    action context, and in particular, the so-called *Mt. Clemens* rule, from the Court's seminal decision

7    in *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680 (1946).  In *Mt. Clemens*, the plaintiffs

8    asserted donning and doffing claims under the Fair Labor Standards Act.  The Court held that

9    where "the employer's records are inaccurate or inadequate and the employee cannot offer

10   convincing substitutes . . . an employee has carried out his burden if he proves that he has in fact

11   performed work for which he was improperly compensated and if he produces sufficient evidence

12   to show the amount and extent of that work as a matter of just and reasonable inference."  328

13   U.S. at 687-88.  The Court reasoned that under these circumstances, the employee should not be

14   penalized "by denying him any recovery on the ground that he is unable to prove the precise

15   extent of uncompensated work" as this would "place a premium on an employer's failure to keep

16   proper records in conformity with his statutory duty" and "would allow the employer to keep the

17   benefits of an employee's labors without paying due compensation as contemplated by the Fair

18   Labor Standards Act."  *Id*.  Under *Mt. Clemens*, once the employee's work is demonstrated by

19   "just and reasonable inference," "[t]he burden then shifts to the employer to come forward with

20   evidence of the precise amount of work performed or with evidence to negative the reasonableness

21   of the inference to be drawn from the employee's evidence."  *Id*.  "If the employer fails to produce

22   such evidence, the court may then award damages to the employee, even though the result be only

23   approximate."  *Id*.

24        The *Mt. Clemens* rule is not limited to FLSA cases.  It has also been invoked in cases

25   involving state law wage and hour claims based on the same reasoning that was applied to FLSA

26   claims in *Mt. Clemens*, namely, that it would unfairly penalize employees to deny recovery

27   because of the employer's failure to keep proper records.  *See, e.g*., *Melgar v. CSk Auto, Inc*., No.

28   13-CV-03769-EMC, 2015 WL 9303977, at *9 (N.D. Cal. Dec. 22, 2015) (holding that Rule 23

United States District Court
Northern District of California

class asserting claim under California Labor Code section 2802, requiring that employees must be reimbursed for business expenses, met predominance requirements under *Mt. Clemens*); *Garcia v. Bana*, No. C 11-02047 LB, 2013 WL 621793, at *9 (N.D. Cal. Feb. 19, 2013), *aff'd*, 597 F. App'x 415 (9th Cir. 2015) (applying *Mt. Clemens* rule in wage and hour case asserting overtime claims under both FLSA and California state law); *Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 403 (C.D. Cal. 2008), *aff'd sub nom. Kamar v. RadioShack Corp.*, 375 F. App'x 734 (9th Cir. 2010) (holding that Rule 23 predominance requirement was met in case asserting wage and hour claims under state law based, in part, on *Mt. Clemens* rule); *Hernandez v. Mendoza*, 199 Cal. App. 3d 721, 725 (1988) (holding that where employer "failed to keep records required by statute" a plaintiff seeking overtime pay under California state law could rely on "imprecise evidence" and citing *Mt. Clemens*).

In *Tyson Foods, Inc. v. Bouaphakeo*, the Supreme Court reiterated the principle of *Mt. Clemens* that "when employers violate their statutory duty to keep proper records, and employees thereby have no way to establish the time spent doing uncompensated work, the 'remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making' the burden of proving uncompensated work 'an impossible hurdle for the employee.'" 136 S. Ct. at 1047 (quoting *Mt. Clemens*, 382 U.S. at 687). In that case, the Court held that it was permissible for the plaintiffs to "introduce a representative sample to fill an evidentiary gap created by the employer's failure to keep adequate records" in order to prove their overtime claim. *Id.* In particular, the plaintiffs in that case relied on the opinions of an industrial relations expert who conducted 744 videotaped observations to determine the average time class members had spent donning and doffing required protective equipment in different departments. *Id.* at 1043. The employer had not kept records of its employees' donning and doffing time but had records of the class members' time at their work stations, which another expert used, in combination with the estimated donning and doffing times, to determine how many class members had worked overtime without receiving overtime compensation and how much overtime compensation was owed to the class. *Id.*

The Court in *Tyson Foods* began its analysis by recognizing that "[i]n many cases, a

United States District Court
Northern District of California

1   representative sample is the 'only practicable means to collect and present relevant data'

2   establishing a defendant's liability." *Id*. at 1046 (quoting Manual of Complex Litigation § 11.493,

3   p. 102 (4th ed. 2004)).  It further reasoned that the use of sampling was permissible under the facts

4   of that case because "the study here could have been sufficient to sustain a jury finding as to hours

5   worked if it were introduced in each employee's individual action." *Id*. at 1048.  The Court

6   explained, "[i]n a case where representative evidence is relevant in proving a plaintiff's individual

7   claim, that evidence cannot be deemed improper merely because the claim is brought on behalf of

8   a class." *Id*. at 1046.  The Court acknowledged that "[r]easonable minds may differ as to whether

9   the average time [the plaintiffs' expert] calculated is probative as to the time actually worked by

10   each employee" but found that resolving this question "is the near-exclusive province of the jury."

11   *Id*. at 1049.  The Court also made clear that not "all inferences drawn from representative evidence

12   in an FLSA case are 'just and reasonable,'" explaining:

> Representative evidence that is statistically inadequate or based on
> implausible assumptions could not lead to a fair or accurate estimate
> of the uncompensated hours an employee has worked. Petitioner,
> however, did not raise a challenge to respondents' experts'
> methodology under *Daubert*; and, as a result, there is no basis in the
> record to conclude it was legal error to admit that evidence.

17   *Id*. at 1048.

18        In *Tyson Foods*, the Court distinguished its earlier decision in *Wal-Mart Stores, Inc. v.*

19   *Dukes*, 564 U.S. 338 (2011), in which it held that a class of more than a million and a half female

20   employees asserting discrimination claims under Title VII was not properly certified because the

21   plaintiffs failed to establish even that there were common questions of fact or law under Rule

22   23(a).  *Id*. at 1048.  In *Wal-Mart*, the Court explained, "'[t]he only corporate policy that the

23   plaintiffs' evidence convincingly establishe[d was] Wal-Mart's 'policy' of allowing discretion by

24   local supervisors over employment matters'; and even then, the plaintiffs could not identify 'a

25   common mode of exercising discretion that pervade[d] the entire company.'" *Id*. (quoting 564

26   U.S. at 355-56).  Thus, the plaintiffs proposed the use of representative evidence to "overcom[e]

27   this absence of common policy."  *Id*.  This "Trial by Formula" was impermissible, the *Tyson*

28   *Foods* Court explained, because it enlarged the substantive rights of the class members and

90

United States District Court
Northern District of California

1    deprived the defendant of its right to litigate individual statutory defenses.  *Id*.  Notably, the *Tyson*

2    *Foods* Court found, in *Wal-Mart*, the sample at issue could not have been used "to establish

3    liability in an individual action" because the Court held that the employees were not similarly

4    situated.  *Id*.

5          Applying these principles to the situation here, the Court concludes that the variations

6    among class members as to the types of activities in which they engaged and the time spent

7    performing those activities make this case distinguishable from *Tyson Foods*.  Rather than merely

8    filling in "evidentiary gaps" in a situation where all of the employees were similarly affected by a

9    uniform policy, Plaintiffs here are attempting to paper over significant material variations that

10   make application of the survey results to the class as a whole improper.  Allowing Plaintiffs to rely

11   on the survey evidence obtained by Dr. Dennis (whether the Pilot Survey or the future survey he

12   plans to conduct using the same methodology) would be inappropriate under the circumstances

13   here because doing so would enlarge the rights of Plaintiffs and deprive Defendants of the right to

14   litigate the individual issues discussed above.  Further, as discussed below, the Court finds that in

15   this case, in contrast to *Tyson Foods*, the experts' methodology does not satisfy the requirements

16   of Rule 702 and *Daubert* and that the shortcomings in the Pilot Survey cannot be remedied.

17                    viii.      Superiority of Class Action

18          To satisfy Rule 23(b)(3), Plaintiffs also must demonstrate that "a class action is superior to

19   other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23

20   (b)(3).  Rule 23 sets out lists the following factors that Courts should consider in making this

21   determination:

23          A)  the class members' interests in individually controlling the
               prosecution or defense of separate actions;

24          B)  the extent and nature of any litigation concerning the
               controversy already begun by or against class members;

25

26          C)  the desirability or undesirability of concentrating the litigation
               of the claims in the particular forum; and

27          D)  the likely difficulties in managing a class action.

28

                                            91

United States District Court
Northern District of California

1   Fed. R. Civ. P. 23(b)(3)(A)-(D).  Most of these factors favor class treatment.  It does not appear

2   that class members have any strong interest in individually prosecuting their claims, there is no

3   other pending litigation and concentration of Plaintiffs' claims makes sense in some respects

4   because the Court is familiar with the facts and legal issues of the case.

5       The difficulties in managing this putative class action, however, outweigh these factors.

6   As discussed above, too many individualized issues will have to be adjudicated because of the

7   variations among the players, the choice of law issues that will have to be addressed and certain

8   defenses asserted by Defendants to handle Plaintiffs' claims in a single action.

9                               ix.  Conclusion

10      The Court finds that the individualized inquiries associated with Plaintiffs' claims will

11  overwhelm the common questions as to all of the State Classes and that the class mechanism is not

12  superior because adjudicating Plaintiffs' claims on a classwide basis will not be manageable.

13  Therefore, the Court concludes that the requirements of Rule 23(b)(3) are not met.

14                            g.   Rule 23(b)(2)

15      Under Rule 23(b)(2), class certification is appropriate "'only where the primary relief

16  sought is declaratory or injunctive.'"  *Friend v. Hertz Corp*., No. C-07-5222 MMC, 2011 WL

17  750741, at *4 (N.D. Cal. Feb. 24, 2011), *aff'd*, 564 F. App'x 309 (9th Cir. 2014) (quoting *Zinser v.*

18  *Accufix Research Inst., Inc*., 253 F.3d 1180, 1195 (9th Cir. 2001), *opinion amended on denial of*

19  *reh'g*, 273 F.3d 1266 (9th Cir. 2001)).  On the other hand, a class that seeks both monetary and

20  injunctive relief "may be certified pursuant to Rule 23(b)(2) where [the monetary] relief is 'merely

21  incidental to [the] primary claim for injunctive relief.'"  *Zinser*, 253 F.3d at 1195 (quoting *Probe*

22  *v. State Teachers' Ret. Sys*., 780 F.2d 776, 780 (9th Cir. 1986)).  "Where a plaintiff seeks to certify

23  a class under Rule 23(b)(2), such plaintiff must have standing to seek the declaratory and/or

24  injunctive relief sought on behalf of the class."  *Friend v. Hertz Corp*., No. C-07-5222 MMC,

25  2011 WL 750741, at *4 (citing *Bates v. United Parcel Serv*., 511 F.3d 974, 983-85 (9th Cir. 2007)

26  ("In a class action, standing is satisfied if at least one named plaintiff meets the [standing]

27  requirements.")).

28      As all of the named Plaintiffs here are former minor leaguers, they do not have standing to

seek injunctive relief because they have not shown that they suffer any likelihood of future harm from Defendants. In addition, the absence of any current minor league players among named Plaintiffs reflects that any interest they may have in obtaining injunctive relief for future players is incidental to their request for money damages.[16] *See Jimenez v. Domino's Pizza, Inc.,* 238 F.R.D. 241, 250 (C.D. Cal. 2006) (finding that where the plaintiffs were former employees, an injunction as to the employer's "behavior to current employees" could not be the plaintiffs "primary concern" and that "a damages award [was] their main interest"). Accordingly, Plaintiffs have not met the requirements to proceed as a class under Rule 23(b)(2).[17]

### h.   Standing

Defendants contend the Court must address Article III standing as a "threshold issue before ruling on class certification." Rule 23 Opposition at 38. They make the same arguments they raised in their prior motion to dismiss, Docket No. 410, with the added gloss that Defendants contend the problem is "even more glaring" now because Plaintiffs are seeking to certify eight

---

[16] Plaintiffs cite generally to a collection of deposition excerpts by named Plaintiffs that purportedly shows that "a primary objective is to change MLB's practices for future players." *See* Reply at 15 n. 37 (citing Zigler Rule 23 Reply Decl., Ex. C). Even aside from Plaintiffs' lack of standing to seek injunctive relief on behalf of future players, this representation is not supported by the record as a factual matter. Exhibit C contains deposition excerpts for 36 named Plaintiffs. Plaintiffs do not identify any specific testimony that supports the assertion in footnote 37. The Court has reviewed these excerpts and finds no testimony that would support the conclusion that the injunctive relief sought in this case was any named Plaintiff's primary objective or that the monetary relief requested in the case is merely incidental to the injunctive relief. At best, some of the named Plaintiffs testified that changing Defendants' practices was important to them. *See, e.g.,* Exhibits C-3 (Kiel) at 33, C-4 (Kahaulelio) at 292. Even these Plaintiffs did not address the relative importance to them of the two types of relief and as to Kahaulelio, the deposition excerpt is cut off just before he answers Defense counsel's question asking him if he was "looking for money" himself. Many of the deposition excerpts do not address the question at all. And some actually *support* the conclusion that their primary objective was money damages rather than injunctive relief. *See, e.g.,* Ex. C-10 (Hilligoss) at 307 (testifying that objective of lawsuit was to obtain lost wages), Ex. C-15 (Ortiz) (testifying that the lawsuit was about unpaid wages).
[17] Plaintiffs do not offer any authority that suggests that they have standing to seek injunctive relief but instead ask the Court to allow them to amend the complaint to add current players as named plaintiffs, citing this Court's recent decision in *Villalpando v. Exel* permitting the plaintiffs in that case to amend the Complaint to add current employees as named plaintiffs so that claims asserted on behalf of an injunctive relief class could go forward. *See* No. 12-cv-4137 JCS, 2015 WL 5179486, at *38 (N.D. Cal. Sept. 3, 2015). The circumstances in that case differed from the situation here, however, because the plaintiffs in that case had already demonstrated that they satisfied the requirements of Rule 23(a) and a class had been certified. Because Plaintiffs in this case have not met that burden, the Court declines to permit Plaintiffs to amend their Complaint to add current minor league players.

United States District Court
Northern District of California

state classes, each of which must have standing.  The Court has already decided that in this case, the question of Article III standing is more appropriately decided after class certification.  *See* Docket No. 420.  Accordingly, the Court rejects Defendants' Article III standing challenge on the basis that it is premature.

### B.    The Motion to Decertify

#### 1.   Legal Standard

Under Section 16 of the FLSA, workers may sue their employers for unpaid wages on their own behalf and on behalf of "other employees similarly situated."  29 U.S.C. § 216(b).  In contrast to classes certified under Rule 23, an employee who wishes to participate in an FLSA collective action must affirmatively opt in by filing a written consent in the court in which the action is brought.  *Id.*  While plaintiffs seeking to proceed as a collective under the FLSA need not be "identically" situated, they must be similarly situated enough that collective treatment is "the superior way of resolving the controversy."  *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1118 (N.D. Cal. 2011) (citing *Falcon v. Starbucks*, 580 F. Supp. 2d 528, 534 (S.D. Tex. 2008)).  In deciding this question, the Court must balance "'[t]he benefits to the parties of a collective proceeding . . . against any prejudice to [the defendant] and any problems of judicial administration that may surface.'"  *Id.* (quoting *Campanelli v. The Hershey Co.*, No. C 08-1862 BZ, 2010 WL 3219501 at *5 (N.D. Cal. Aug. 13, 2010) (citation omitted)).

District courts in the Ninth Circuit apply an "ad hoc, two-tiered approach" in determining whether the plaintiffs are similarly situated.  *Gerlach v. Wells Fargo & Co.*, No. 08-0585 CW, 2006 WL 824652, at *2 (N.D. Cal. Mar. 28, 2006) (citing *Wynn v. Nat'l Broad. Co., Inc.*, 234 F. Supp. 2d 1067, 1082 (C.D. Cal. 2002) (noting that majority of courts prefer this approach)).  Under this approach, the district court makes two determinations.  *Id.*  First, the court determines whether a collective action should be certified for the purpose of sending notice to potential class members ("the notice stage").  *Id.*  At this stage, the standard is lenient, requiring "little more than substantial allegations, supported by declarations or discovery, that 'the putative class members were together victims of a single decision, policy, or plan.'"  *Id.* (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001)).  Second, after discovery has concluded, the

United States District Court
Northern District of California

94

court revisits the question of whether the class meets the "similarly situated" requirement, this time applying a stricter standard. *Id*. This second determination involves a review of several factors, including "the disparate factual and employment settings of the individual plaintiffs; the various defenses available to the defendant which appear to be individual to each plaintiff; [and] fairness and procedural considerations." *Id*. If the court finds that the standard is not met, the class will be decertified. *Id*.

### 2. Discussion

The analysis of whether Plaintiffs in the FLSA collective are similarly situated largely mirrors the analysis under Rule 23(b)(3), except that the variations in state law and potential choice-of-law questions that may arise as to those classes are not an issue for the FLSA collective. Even without the difficulties that are likely to arise in connection with applying the laws of numerous states to class members who are asserting claims based on work performed in multiple states, the Court finds that the requirement that class members be similarly situated is not met. While the Court finds that many of the issues raised in this case (including issues relating to defenses) may be addressed on a class-wide basis, the collective members are not similarly situated. Rather, as discussed above, the disparate factual and employment settings of the class members make collective adjudication of Plaintiffs' FLSA claims unmanageable and potentially unfair to Defendants. Most significantly, the Court finds that there are wide variations among the players as to the types of activities in which they engaged and the circumstances under which they engaged in them, which will give rise to a plethora of individualized inquiries relating to the determination of the amount of compensable work Plaintiffs performed. Adjudication of Plaintiffs' FLSA claims will also involve numerous individualized inquiries regarding the amount of compensation received by class members and the applicability of various defenses, including the amusement exemption and the creative professionals exemption.

Because the Court finds that the collective members are not similarly situated and that adjudicating the FLSA on a collective basis will be unmanageable, the Court DECERTIFIES the FLSA collective.

United States District Court
Northern District of California

## C.   The Motion to Exclude

### 1.   Legal Standard Under Rule 702 and *Daubert*

Rule 702 of the Federal Rules of Evidence permits a party to offer the testimony of a "witness who is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  This Rule embodies a "relaxation of the usual requirement of firsthand knowledge," *Daubert*, 509 U.S. at 592, and requires that certain criteria be met before expert testimony is admissible.  The Rule sets forth four elements, allowing such testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  These criteria can be distilled to two overarching considerations:  "reliability and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  The inquiry does not, however, "require a court to admit or exclude evidence based on its persuasiveness." *Id.*

When a party seeks to exclude expert testimony or reports at the class certification stage, courts apply the *Daubert* standard to evaluate the challenged evidence.  *Id.*  The reliability prong requires the court to "act as a 'gatekeeper' to exclude junk science," and grants the court "broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 147–49, 152 (1999)).  Evidence should be excluded as unreliable if it "suffer[s] from serious methodological flaws." *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005).

The relevance prong looks to whether the evidence "fits" the issues to be decided: "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes," and "[e]xpert testimony which does not relate to any issue in the case is not relevant." *Daubert*, 509 U.S. at 591.  Here, the issue to be decided is whether Plaintiffs have demonstrated that they have a reliable method for proving liability and damages on a classwide basis such that

96

United States District Court
Northern District of California

the predominance requirement of Rule 23 is met and that they meet the requirements of

proceeding as a collective under the FLSA.  *See Kamakahi v. Am. Soc'y for Reprod. Med.*, 305

F.R.D. 164, 180 (N.D. Cal. 2015); *Rai v. Santa Clara Valley Transp. Auth.*, 308 F.R.D. 245, 264

(N.D. Cal. 2015) (finding that under *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011), at

the class certification stage the court conducts a "'tailored *Daubert* analysis which "scrutinize[s]

the reliability of the expert testimony in light of the criteria for class certification and the current

state of the evidence"'" (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 495 (C.D.

Cal. 2012) (concluding that "tailored" *Daubert* standard is consistent with Ninth Circuit authority

and the Supreme Court's decisions in the *Wal-Mart* case))).  Therefore, in determining whether the

expert testimony at issue satisfies *Daubert*, the Court considers the soundness of the methodology,

not the ultimate findings, of Plaintiffs' expert, with particular focus on the question of whether any

shortcomings in the Pilot Survey conducted by Dr. Dennis are likely to be remediable.

### 2.  Alleged Shortcomings of Dr. Dennis's Methodology

Defendants' expert identifies numerous problems with Dr. Dennis's Survey methodology

and results.  As discussed below, some of these problems are exaggerated or remediable but others

are more fundamental and cannot be fixed.

#### a.  Coverage error

In his declaration, Dr. Ericksen criticizes the Pilot Survey on the basis that all of the

individuals who responded had opted in to the FLSA class.  *See* Ericksen Decl.  ¶¶ 16-18.  He

contends this makes the results of the Pilot Survey unreliable because minor league players who

opted in to the collective may differ from those who did not opt in in significant ways.  *Id*.  Dr.

Dennis explains that he only limited the individuals he included in the survey to opt-in Plaintiffs

because a complete list of class members was not available to him at the time of the Pilot Survey.

Supplemental Declaration of J. Michael Dennis in Support of Plaintiffs' Motion for Class

Certification ("Dennis Supp. Decl.") ¶ 11.  Indeed, Dr. Ericksen acknowledges that "in the main

survey, Dr. Dennis will add players who have not opted-in to the collective action to his universe."

Ericksen Decl.  ¶ 17.  Thus, this problem is merely a reflection of the limitations associated with

conducting a survey at this stage of the case.  There is no reason to believe that a survey conducted

97

1   at a later stage of the case would suffer from this defect.  Therefore, under the tailored *Daubert*

2   standard discussed above, the Court concludes that the coverage error that Defendants' expert

3   points to does not warrant excluding the testimony of Dr. Dennis.

4               b.   Non-response bias

5       Dr. Ericksen criticizes the Pilot Survey on the basis that the response rate was 32.4%, a

6   rate that he contends is low enough to raise the possibility of non-response bias, that is, bias that

7   arises when those who responded to a survey differ from those who did not respond.  Ericksen

8   Decl. ¶¶ 10, 20.  He speculates that in the case of the Pilot Survey, those who responded may have

9   worked longer hours than those who did not and therefore those individuals were more motivated

10  to participate in the survey.  *Id.* ¶ 20.  Dr. Ericksen does not offer any evidence of such bias,

11  focusing instead on the fact that Dr. Dennis did not address the possibility of non-response bias in

12  his declaration.  *Id.* ¶ 21.  Dr. Dennis, in turn, contends the response rate is relatively high, citing

13  experts in the survey research literature who have opined that surveys with much lower response

14  rates can produce accurate results that do not suffer from non-response bias.  Dennis Supp. Decl.

15  ¶¶ 17-20.  He also outlines a number of measures he plans to take when he conducts the main

16  survey to ensure that the respondents are representative of the class, including sending a pre-

17  notification letter through the U.S. mail, using Spanish-language interviewing, offering the option

18  to complete the survey by telephone and including a longer data collection field period.  *Id.* ¶ 18.

19  Finally, he notes that when the main survey is conducted he will have access to a list of class

20  members for whom administrative information is available, which will allow him to conduct an

21  impartial non-response bias analysis.  *Id.* ¶ 21.

22      The Court concludes that Defendants have, at most, raised the *possibility* that the main

23  survey in the case could suffer from non-response bias.  They have not demonstrated any actual

24  non-response bias as to the Pilot Survey and they have not pointed to any specific features relating

25  to the administration of the Pilot Survey that  suggest that Dr. Dennis's methodology is flawed in

26  such a way that a  more comprehensive survey conducted at a later stage of the case would suffer

27  from non-response bias.  Therefore, the Court rejects Defendants' *Daubert* challenge to the extent

28  it is based on Dr. Dennis's failure to address the possibility of non-response bias in connection

United States District Court<br>Northern District of California

98

1   with the Pilot Survey.

2                    c.   Respondents' burden and "satisficing"

3          Dr. Ericksen contends the questions on the Pilot Survey required respondents to go through

4   too many mental steps to answer them, pointing to research that has found that participants in

5   surveys tend to give their "best guess" or "satisfice" when survey questions require them to go

6   through a difficult series of questions to come up with an answer.  Ericksen Decl. ¶ 34.  According

7   to Dr. Ericksen, one of the questions on the Pilot Survey, which asked respondents to provide the

8   total amount of time they spent on a variety of activities for each of the four weeks of spring

9   training, is similar to a question that was found to produce just this result in a British study.  *See*

10  *id*. ¶¶ 36-38.  Dr. Dennis responds that he did not receive any complaints from respondents that

11  the survey was too difficult and that in any event, he plans to conduct cognitive interviews to be

12  sure that the questions on the main survey will be easy to understand and answer.  Dennis Supp.

13  Decl. ¶¶ 42-45.

14         The Court is troubled by the format of the question flagged by Dr. Ericksen and is not

15  persuaded that the players' failure to complain about the questions on the Pilot Survey is an

16  indication that they did not take "shortcuts" in answering the question or that respondents in the

17  main study would not do the same if asked questions set forth in a similar format.  Presumably,

18  that problem can be minimized by reframing the survey questions and breaking them down into

19  more bite-size questions.  The fact that Dr. Dennis was not able to do that on the Pilot survey is

20  not encouraging, however.  Further, while this problem on its own probably is not sufficient to

21  render the Pilot Survey or its methodology unreliable, when considered in light of the assumptions

22  about what players will be able to remember (discussed below), the reliability of any survey used

23  to determine the amounts of time the players spent engaging in particular activities is questionable,

24  even assuming the questions can be made simpler to avoid "respondent burden."

25                    d.   Response category bias

26         Dr. Ericksen points to two related problems with the questions on the Pilot survey:

27  ambiguity in the questions (e.g., how should respondents interpret the question asking them to

28  estimate the total number of hours they were "**expected** to be at the MLB franchise's training

United States District Court
Northern District of California

United States District Court
Northern District of California

1    complex and stadium for practices") and response categories providing various ranges of time for

2    respondents to select.  Ericksen Decl. ¶¶ 51-55.  According to Dr. Ericksen, the survey research

3    literature has shown that where a question is ambiguous, the ranges that are offered as answers can

4    influence the respondent's response, depending on which end of the range is emphasized in the

5    answer categories.  *Id*. at 52-53.  Dr. Ericksen contends that may have happened here, pointing to

6    the fact that over 30 percent of the respondents chose the top category (55 or more hours) as the

7    amount of time they spent each week on spring training activities.  *Id*. ¶ 55.

8           Dr. Dennis responds that the use of questions with categories from which the respondent

9    can select (rather than open-ended questions where a respondent must write in a number) is an

10   accepted survey technique and that experts in the field have discounted the likelihood of bias

11   associated with using close-ended questions.  *Id*. at 46-48.

12          As it appears that the use of closed-ended questions is an accepted practice in conducting

13   surveys of this nature, the Court concludes that the use of such questions in the Pilot Survey is not

14   inconsistent with the requirements of *Daubert*.  Nor does it reflect inadequacies as to Dr. Dennis's

15   methodology.

16                    e.   Self-interest bias and assumptions about players' ability to recall time spent
                           engaging in baseball-related activities
17

18          Dr. Ericksen contends the Pilot Survey suffers from self-interest bias and that the Survey

19   and the methodology used in it are defective to the extent it is assumed that players will be able

20   recall details about the time they spent on various activities.  Dr. Ericksen's criticisms are well

21   taken.  As discussed below, the Court finds that the methodology used in conducting the Pilot

22   Survey is fundamentally flawed in these respects and that Plaintiffs have not demonstrated that

23   they can overcome these problems when they conduct the more comprehensive survey that they

24   plan to conduct in preparation for trial.

25          With respect to self-interest bias, the problem is particularly striking as it relates to the

26   Pilot Survey.  Although the Pilot Survey was created by an independent expert, all of the

27   recipients had a vested interest in the results of the survey as they had opted in to the FLSA

28   collective and were told when they were asked to complete the survey that that was the reason

                                                    100

they were being asked to participate.  *See* Dennis Decl. ¶ 20; Ericksen Decl. 57.  This fact alone raises questions about the reliability of the results.  *See Gibson v. Cty. of Riverside*, 181 F. Supp. 2d 1057, 1068 (C.D. Cal. 2002) (finding that survey was unreliable because it was drafted by counsel and "[m]ore importantly," because "the recipients of the survey were informed of the purpose of the survey and reminded that they were the beneficiaries of the survey"); *Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978) (explaining that "the circumstantial guarantees of trustworthiness are for the most part satisfied if the poll is conducted in accordance with generally accepted survey principles" and that to meet this standard "[t]he interviewers or sample designers should . . . ideally should be unaware of the purposes of the survey or the litigation" and "the Respondents should be similarly unaware").

While Plaintiffs contend this problem can be minimized when they conduct the main survey, they have not offered a convincing explanation of how this will be achieved.  First, while Dr. Dennis contends he will be able to address potential self-interest bias in the main study by comparing the responses of FLSA opt-in plaintiffs with the responses of those who did not opt-in, *see* Dennis Supp. Decl. ¶ 25, that comparison will not be sufficient to evaluate the impact of self-interest bias because *all* minor league players who played within the applicable limitations periods will likely have a vested interest in the outcome of this action regardless of whether or not they opted in to the FLSA collective.[18]  *See* Ericksen Supp. Decl. ¶ 13.  This is because the proposed Rule 23 classes include any minor league player who participated (within the relevant limitations period) in spring training in Arizona or Florida, which are the only two locations where spring training is held.  Similarly, Dr. Dennis's suggestion that the players who did not opt in to the FLSA class "may not be aware" of this litigation gives the Court little comfort.  *See* Dennis Supp. Decl. ¶ 25.  Given that virtually all minor league players have a vested interest in the outcome of this litigation, the likelihood that there will be enough minor league players who are both unaware

---

[18] It has not been suggested that seeking the participation of minor league players who do not have timely claims would solve this problem and it is unlikely that it would; these players would not have a vested interest in the outcome of this litigation but it is unlikely they would be able to reliably recall the amount of time they spent on various baseball-related activities years before participating in the survey.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    of this litigation and who participate in a future survey to draw any reliable conclusions about the

2    impact of self-interest bias appears speculative, at best.

3           Second, although Dr. Dennis states that he plans to validate the survey responses using

4    "available administrative records," he has not pointed to any specific types of records that may be

5    available to show how he will be able to validate the results of the survey.  As Defendants did not

6    maintain time records for many of the activities at issue, it is unlikely Dr. Dennis will be able to

7    ensure the reliability of the survey results using this approach.  *See* Ericksen Supp. Decl. ¶ 19.

8           The Court's concerns regarding possible self-interest bias are compounded by the

9    problems identified by Defendants' expert arising from the heavy reliance in the Pilot Survey –

10   and in any future survey – on the ability of the minor league players to remember the type of

11   mundane events necessary to come up with reliable answers to questions about the amount of time

12   they spent on various types of activities.  *See* Ericksen Decl. ¶¶ 31-32.  These include, for

13   example, remembering for each week when they arrived and left the stadium each day, how much

14   time they spent eating, and various irregular events, such as days when it rained or they had to

15   miss practice due to injury or illness.  *Id*.  Dr. Ericksen cites memory research indicating that

16   retrospective reporting of events that occurred more than a year ago tends to be unreliable,

17   especially when respondents are asked to recall "non-salient or irregular events."  *Id*. ¶ 31.  The

18   participants in the Pilot Survey were asked to recall events that occurred, for many, years before

19   they completed the survey.  *Id*. ¶ 30.  According to Dr. Ericksen, "the median respondent had most

20   likely participated in spring training in 2014 – 2 years before taking the survey," "the last regular

21   season the average respondent participated in was 2014, and almost one third of those who played

22   in the regular season last played four or more years ago."  *Id*.

23          Dr. Dennis counters that surveys that rely on the respondents' ability to recall past events

24   are widely used and have been found to be reliable.  Dennis Supp. Decl. ¶¶ 28-29.  However, these

25   surveys appear to use detailed and burdensome "memory aids" that are not practical here, such as

26   asking the participants to recall more recent events or focusing on more salient events than must

27   be remembered by the minor leaguers here.  *See* Ericksen Supp. Decl. ¶ 7 & Ex. B.  And while Dr.

28   Dennis contends the likely timing of the main survey – after spring training – will facilitate recall

1   because "many respondents will have only to reflect on their experiences in the previous 12

2   months to report on all three reference periods (off-season work-outs, spring training, and

3   championship season)," *see* Dennis Supp. Decl. ¶ 40, this assurance does not address the fact that

4   many other players who are likely to respond are no longer playing for a minor league affiliate and

5   therefore will have to recall events that occurred more than a year ago, as was the case with

6   respect to the Pilot Survey.  To the extent their memories may be unreliable due to the passage of

7   time, the responses of these players are likely to taint the results of the survey as a whole.

8          Further, the Court finds unpersuasive Dr. Dennis's assertion that because baseball is

9   extremely important to the minor league players, they will be able to recall the time they spent on

10  various activities reliably even though months or years have passed since the relevant events.  *See*

11  Dennis Supp. Decl. ¶ 34.  As Dr. Ericksen explains, while "[p]articipating in spring training,

12  generally speaking, may be a salient event for some respondents . . . it is highly unlikely that

13  during the course of that spring training, the individual portions of time spent at the stadium and

14  traveling to and from individual games are salient enough to be remembered specifically or even

15  on average."  Ericksen Supp. Decl. ¶ 10.  Similarly, the players' participation *generally* in various

16  baseball-related activities during the championship season and off-season may be of great

17  importance to them, but the specific amounts of time they devoted to them are less likely to be

18  particularly salient. And although Dr. Dennis represents that he intends to use various tools to

19  assist in recall, he has not demonstrated how he will do so as a practical matter.  *See* Dennis Supp.

20  Decl. ¶¶ 37-39.

21         In sum, the Court concludes that both the methodology and the results of the Pilot Survey

22  are unreliable and that any future survey that applies a similar methodology is likely to yield

23  unreliable results as well, especially in light of the problems discussed above as to its failure to

24  adequately ensure objectivity and its reliance on the players' ability to recall details of activities

25  and events that occurred many months (and often years) ago.  Accordingly, the Motion to Exclude

26  is GRANTED as to the Dr. Dennis's declaration and testimony and as to Dr. Kriegler's declaration

27  and testimony to the extent that it relies on Dr. Dennis's testimony and the Pilot Survey.

28

United States District Court
Northern District of California

## V.       CONCLUSION

For the reasons stated above, the Rule 23 Motion is DENIED.  The Motion to Decertify is GRANTED.  The Motion to Exclude is GRANTED.  The parties are instructed to meet and confer and submit a joint case management statement no later than August 5, 2016.  A Case Management Conference will be held on August 19, 2016 at 2:00 p.m.

**IT IS SO ORDERED.**

Dated:  July 21, 2016

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California