1

2

3

4                       UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7    AARON SENNE, et al.,                    Case No.  14-cv-00608-JCS

            Plaintiffs,
8                                            **ORDER RE: 1) MOTION FOR**
                                             **RECONSIDERATION REGARDING**
9        v.                                  **CLASS AND COLLECTIVE**
                                             **CERTIFICATION; 2) MOTION TO**
10   KANSAS CITY ROYALS BASEBALL             **EXCLUDE;  3) MOTION TO**
     CORP., et al.,                          **INTERVENE; AND 4) MOTION FOR**
11                                           **LEAVE TO FILE SUR-REPLY**
            Defendants.
12                                           Re: Dkt. Nos. 719, 720, 724, 768

13   **I.   INTRODUCTION**

14          On July 21, 2016, the Court denied Plaintiffs' request for class certification under Rule 23

15   of the Federal Rules of Civil Procedure and decertified the FLSA collective it had preliminarily

16   certified.  *See* Docket No. 687 ("Class Certification Order" or "July 21 Order").  In the same

17   Order, it granted Defendants' request to exclude the testimony of Plaintiffs' expert, Dr. J. Michael

18   Dennis, under Rule 702 of the Federal Rules of Evidence and *Daubert*.  Plaintiffs brought a

19   Motion for Leave to File a Motion for Reconsideration ("Motion for Leave") on August 4, 2016.

20   The Court granted in part and denied in part the Motion for Leave on August 19, 2016, allowing

21   Plaintiffs to "file a renewed motion . . . for class certification under Rule 23 in which Plaintiffs

22   will propose narrower classes and address the concerns articulated by the Court in its July 21

23   Order, including those related to the survey conducted by their expert and the expert opinions that

24   were based on the survey." Docket No. 710 ("August 19 Order") at 1.   Under the August 19

25   Order, Plaintiffs were also permitted to "seek (re)certification of narrower FLSA classes than the

26   ones the Court decertified in its July 21 Order."  *Id*.

27          Presently before the Court are the following motions ("Motions"): 1) Plaintiffs' Motion

28   for Reconsideration Regarding Class and Collective Certification ("Motion for Reconsideration");

United States District Court
Northern District of California

2) Motion to Intervene by Shane Opitz, Corey Jones, Brian Hunter, Kyle Johnson, and Aaron Dott; 3) Defendants' Motion to Exclude the Declaration and Testimony of J. Michael Dennis, Ph.D. ("Motion to Exclude"); and 4) Defendants' Motion for Leave to File Sur-Reply.  A hearing on the Motions was held on December 2, 2016 at 9:30 a.m.  The Court's rulings are set forth below.[1]

## II.      BACKGROUND

### A.    The Class Certification Order

In their original class certification motion, Plaintiffs asked the Court to certify under Rule 23(b)(3), or in the alternative, Rule 23(b)(2), classes consisting of "[a]ll persons who under a Minor League Uniform Player contract, work or worked for MLB or any MLB franchise as a minor league baseball player within the relevant state at any time" during the applicable statutory period.  *See* Motion to Certify Class, Docket No. 496.  These classes asserted wage and hour claims under the laws of eight different states based on a variety of activities the putative class members perform throughout the year, including spring training, extended spring training, the championship season, instructional leagues, and winter conditioning.  Class Certification Order at 3-4, 7-9.  To show that their claims were amenable to class treatment, Plaintiffs offered a declaration by their expert, Dr. J. Michael Dennis, describing a survey questionnaire ("Pilot Survey") he conducted to show that it would be possible to conduct a "main survey" ("Main Survey") that would produce reliable results and would address the issues in this case through common proof.  *See* Declaration of J. Michael Dennis, Ph.D. in Support of Plaintiffs' Motion for Class Certification, Docket No. 498 ("March 3, 2016 Dennis Decl.").

Defendants argued, *inter alia*, that the classes should not be certified under Rule 23 because the experiences of the putative class members varied widely.  *See generally*, Defendants' Opposition to Plaintiffs' Motion for Class Certification Under Federal Rule of Civil Procedure 23, Docket No. 628.  Similarly, they argued that the FLSA collective should be decertified because the

---

[1] The parties to this action have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).  The individuals who seek to intervene also have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).  *See* Docket No. 728.

United States District Court
Northern District of California

1    named Plaintiffs were not similarly situated, either to each other or the opt-in plaintiffs.  *See*

2    *generally,* Motion to Decertify the Fair Labor Standards Act Collective, Docket No. 495. Finally,

3    Defendants sought to exclude the testimony of Plaintiffs' expert, Dr. Dennis, on the grounds that it

4    was unreliable, and to exclude the testimony of Plaintiffs' damages expert, Dr. Kriegler, to the

5    extent he relied on Dr. Dennis's survey results.  *See* Motion to Exclude Plaintiffs' Expert

6    Declarations and Testimony of J. Michael Dennis, Ph.D and Brian Kriegler, Ph.D filed In Support

7    of Plaintiffs' Motion for Class Certification, Docket No. 632.

8           The Court agreed with Defendants that the classes, as proposed, could not be certified

9    under Rule 23.  First, it found that one of the requirements of Rule 23(a), ascertainability, was not

10   satisfied because of the "problems associated with determining membership in the State Classes

11   based on winter training."  Class Certification Order at 59.  These problems arose from the wide

12   variations as to the types of activities in which the players engaged to meet their winter

13   conditioning obligations, the fact that many players performed these activities in more than one

14   state, the absence of official records documenting these activities, and the difficulty players would

15   likely have remembering the details relating to their winter conditioning activities, including, in

16   some cases, the state or states where they performed them. *Id*.

17          The Court went on to hold that Plaintiffs' proposed classes did not meet the requirements

18   of Rule 23(b)(3) because of the highly individualized inquiries that would have been required to

19   evaluate the claims of the class members.  *Id*. at 81. The Court pointed to variation in the types of

20   activities in which the minor leaguers engage, finding that these variations were "particularly

21   striking as to winter training."  *Id*.  The Court also pointed to variations as to the hours and

22   activities of minor league players during the championship season and variations with respect to

23   salaries, bonuses and other forms of compensation.  *Id*. at 81-82.  The Court found that these

24   variations went not only to damages but also liability, reasoning that "[c]lass members can

25   demonstrate minimum wage and overtime violations only by demonstrating that their rate of pay

26   fell below the minimum wage rate and that they worked the requisite number of hours to be

27   entitled to overtime pay, both of which will turn on the number of hours of compensable work

28   they performed and the amount of compensation they received for that work."  *Id*. at 82.

United States District Court
Northern District of California

3

The individualized choice-of-law determinations that would be required to address the claims of the putative class members were also a source of significant concern to the Court. *Id*. at 86-87.  Again, the Court found that winter training was particularly problematic as players are permitted to perform their conditioning wherever they choose and the evidence shows that many players perform their conditioning in more than one state. *Id*.  The Court also found that individualized inquiries related to the seasonal amusement and recreational establishment defenses and the creative professionals exemption would "increase the likelihood that class treatment of Plaintiffs' claims will be overwhelmed by the individual inquiries." *Id*. at 84-86.  The Court noted as to both of these defenses, however, that they would not be sufficient, on their own, to warrant denial of class certification. *Id*.

In the end, the Court concluded that the variations were too significant to meet the predominance requirements of Rule 23(b)(3) and that the survey results on which Plaintiffs intended to rely constituted an impermissible attempt to "paper over significant material variations that make application of the survey results to the class as a whole improper." *Id*. at 91.  In reaching this conclusion, the Court rejected Plaintiffs' reliance on *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016), in which the Supreme Court found, applying the rule of its seminal *Mt. Clemens* decision, that the plaintiffs could demonstrate their work based on representative evidence sufficient to support a "just and reasonable inference" where the employer had not kept adequate records of their work. *Id*. at 88.  The undersigned found that "[a]llowing Plaintiffs to rely on the survey evidence obtained by Dr. Dennis (whether the Pilot Survey or the future survey he planned to conduct using the same methodology) would be inappropriate under the circumstances here because doing so would enlarge the rights of Plaintiffs and deprive Defendants of the right to litigate the individual issues discussed above." *Id*. at 91.

With respect to Plaintiffs' request that the Court certify the same proposed classes under Rule 23(b)(2), the Court found that Plaintiffs did not have standing to pursue injunctive relief claims under Rule 23(b)(2) because none of the named Plaintiffs was a current minor leaguers and therefore, Plaintiffs could not demonstrate a likelihood of future harm.  Class Certification Order at 92-93.  The Court further found that "the absence of any current minor league players among

1    named Plaintiffs reflects that any interest they may have in obtaining injunctive relief for future

2    players is incidental to their request for money damages." *Id*. at 93.

3          The Court also decertified the FLSA collective that it had previously certified, finding that

4    the collective members were not "similarly situated" because of the many individualized inquiries

5    that would be required to resolve those claims. *Id*. at 95.

6          Finally, on Defendants' motion to exclude, the Court found that some of the problems

7    identified by Defendants with respect to Dr. Dennis's Pilot Survey, including alleged coverage

8    error and non-response bias, were "exaggerated or remediable." *Id*. at 97-99.  On the other hand,

9    the Court was "troubled by the format of [a] question flagged by" Defendants' expert, Dr.

10   Ericksen, that asked respondents to "go through a difficult series of questions to come up with an

11   answer," possibly leading them to "satisfice" or give "best guesses." *Id*. at 99.  Specifically, Dr.

12   Ericksen pointed to a question that asked respondents to provide the total amount of time they

13   spent on a variety of activities for each of the four weeks of spring training. *Id*. (citing Ericksen

14   Decl. ¶¶ 36-38).   The Court found that the "satisficing" problem was compounded by: 1) the fact

15   that all of the respondents of the Pilot Survey had opted in to the FLSA class, giving them a vested

16   interest in the results of the survey; and 2) the likelihood of recall bias, given that respondents

17   were asked to remember mundane events that occurred more than a year earlier and often several

18   years earlier, such as when they arrived at and left the stadium each day. *Id*. at 100-101.

19         As a consequence, the Court held that Dr. Dennis's Pilot Survey (as well as Dr. Kriegler's

20   expert report to the extent he relied on Dr. Dennis's opinions) was not sufficiently reliable to meet

21   the requirements of *Daubert* and Rule 702 of the Federal Rules of Evidence. *Id*. at 103.  In

22   particular, the Court concluded that "both the methodology and the results of the Pilot Survey

23   [conducted by Dr. Dennis and offered in support of Plaintiffs' request for class certification] are

24   unreliable and . . . any future survey that applies a similar methodology is likely to yield unreliable

25   results as well, especially in light of the problems . . . as to its failure to adequately ensure

26   objectivity and its reliance on the players' ability to recall details of activities and events that

27   occurred many months (and often years) ago." *Id*.

28

United States District Court
Northern District of California

1

      **B.**   **The August 4, 2016 Dennis Declaration**

2

      In support of their Motion for Reconsideration, Plaintiffs filed a new declaration by Dr.

3

Dennis in which he responded to the concerns expressed by the Court in its July 21, 2016 Order

4

and described the "findings, methodology and results" of the Main Survey.  Declaration of J.

5

Michael Dennis Ph.D., Docket No. 696 ("August 4, 2016 Dennis Decl.").  According to Plaintiffs,

6

the Main Survey and Dr. Dennis's opinions in the August 4, 2016 Declaration "lay to rest" the

7

Court's concerns regarding the Pilot Survey.  Motion for Leave at 2.

8

      In the Main Survey, Dr. Dennis collected responses from 720 Minor Leaguers between

9

July 9, 2016 and July 27, 2016.  August 4, 2016 Dennis Decl. ¶ 3.  According to Dr. Dennis, he

10

took numerous measures to improve the methodology of the Main Survey, using lessons he had

11

learned from the Pilot Survey, "including conducting cognitive interviews with actual English-

12

and Spanish-speaking minor league players, sampling Non Opt-in class members for the main

13

survey, creating a study website for respondents to use to access the survey, translating the survey

14

into Spanish language, and setting up an outbound telephone campaign to support survey

15

participation."  *Id.*   These measures were, among other things, intended to avoid self-interest

16

bias, recall bias or non-response bias in the Main Survey results and/or allow Dr. Dennis to

17

determine whether the survey results were affected by any of these forms of bias.  *See generally*

18

*id*. ¶¶ 3-12.  Dr. Dennis concluded that the results of the Main Survey are a reliable measure of the

19

hours worked by minor league players and that they are not infected by any of these forms of bias.

20

*Id.* ¶¶ 7, 9, 47.

21

      On the question of self-interest bias, Dr. Dennis points to the fact that non opt-in minor

22

leaguers made up 87.2% of the 7,762 randomly sampled class members selected to receive the

23

survey and that the majority of those who responded (66%) were non opt-ins.  *See id*. ¶¶ 4, 41.  In

24

addition, to the extent that the percentage of opt-ins who responded relative to non opt-ins resulted

25

in over-representation of the opt-ins, Dr. Dennis performed a statistical adjustment so that the opt-

26

ins in the survey would represent the same share of the survey results as they do the total class,

27

that is, 15%.  *Id*. ¶¶ 18, 46.  The high proportion of non opt-in survey respondents reduces the

28

likelihood of self-interest bias, according to Dr. Dennis, because "[n]on Opt-ins have the lowest

United States District Court
Northern District of California

1    potential for self-interest bias as evidenced by their not having joined the lawsuit.  Although they

2    may be aware of the lawsuit, they have not expressed interest in joining or participating in the

3    litigation." *Id*. ¶¶ 4, 13.   At the same time, Dr. Dennis opines that "reliable surveys can be done

4    with respondents who are also plaintiffs in a lawsuit."  *Id*. ¶ 12.   He cites <u>The Reference Manual</u>

5    <u>on Scientific Evidence</u> (3d Edition) ("the Reference Guide") as the "authoritative guide to the

6    acceptable use of scientific evidence in litigation," noting that the Reference Guide "cites

7    employee surveys as an example of litigation surveys conducted with the 'appropriate universe'

8    and again in the context of survey questionnaire design (p. 389)."

9        Dr. Dennis also took measures to avoid recall bias in the Main Survey.  *Id*. ¶ 4.  First, he

10    added "aided prompt" survey questions to "improve the accuracy of respondents' recall of time

11    spent on baseball related activities."  *Id*. ¶¶ 4, 33-38.  He explains that these questions are designed

12    to "cue" the respondent to trigger recall of past events, a technique that has been found to be

13    effective in the literature on survey research methods in helping a respondent to recall events more

14    accurately.  *Id*.  The aided recall questions used in the Main Survey related to housing, roommate

15    status and transportation were asked in connection with each year in which the respondent

16    participated in baseball-related activities. *Id*. ¶ 35.  According to Dr. Dennis, the eight cognitive

17    interviews he conducted led him to conclude that these aided prompt questions "were effective in

18    stimulating the respondents to think about the reference period (i.e., the year that the baseball

19    activity took place)."  *Id*. ¶ 44.

20        Dr. Dennis further states that he reduced the potential for recall bias by adjusting the spring

21    training questions in the Main Survey.  *Id*. ¶ 37.  These questions had been flagged by Dr.

22    Ericksen (and the Court) as being overly burdensome to the extent they asked players to recall the

23    number of hours they worked for each week in which they participated in spring training.  *See*

24    Class Certification Order at 99 (citing Ericksen Decl. ¶¶ 36-38).  In the Main Survey, Dr. Dennis

25    instead asked players to answer questions about the times they arrived at and left the ballpark on

26    game days and non-game days.  August 4, 2016 Dennis Decl. ¶ 37.  Dr. Dennis states, "[b]ecause

27    the main survey questions asked the respondent to recall routines and daily schedules instead of an

28    abstract number of hours worked in a week, the spring training questions then mirrored the

United States District Court
Northern District of California

1   structure of the other non-off-season questions that also place less recall burden on the

2   respondents." *Id*.  In support of this conclusion, he cites survey research literature that has found

3   that "[w]ith respect to routine tasks, . . . recall is likely to be more accurate for situations that occur

4   more regularly." *Id*. ¶ 31.  He also points to deposition testimony and schedules produced by

5   Defendants that he contends establish that the work of minor league players "tends to be

6   predictable and based on routines, particularly for spring training, extended spring training, the

7   regular season, and fall instructionals." *Id*. ¶ 32.

8           Dr. Dennis also notes that because the Main Survey was conducted in July 2016, the most

9   recent "survey modules included the 2016 reference year for both spring training and extended

10   spring training, placing a lower recall burden on the respondents for those that participated in

11   2016." *Id*. ¶ 38.  According to Dr. Dennis, "[s]ince 36% of respondents indicated they had

12   participated in spring training earlier in 2016 and another 15% participated in 2015, a majority of

13   the main survey respondents were recalling events that occurred as little as three to 16 months

14   ago." *Id*.

15           Dr. Dennis analyzed the results of the Main Survey to determine whether they were

16   affected by self-interest bias or recall bias by identifying a "Control Group" of respondents for

17   whom there was the lowest potential for these types of bias. *Id*. ¶¶ 5, 13-21.  The Control Group

18   consisted of respondents who met two criteria: 1) they had not opted in to the FLSA collective;

19   and 2) they participated recently in baseball activity – either in 2015 or 2016. *Id*.  He compared

20   the survey results for the Control Group to the results based on all of the interviews and found that

21   they were very similar, leading him to conclude that self-interest bias and recall error had little

22   impact on the results. *Id*. ¶ 6.  In particular, he found that the average hours worked for the

23   Control Group was 17 minutes less than the hours worked estimate for the total sample. *Id*.

24   According to Dr. Dennis, the difference was only 6 minutes for regular season hours at the

25   ballpark for non-playing day away games and 9 minutes for home game days. *Id*.  Even if this

26   discrepancy were considered unacceptably high, the damages expert could use the data from the

27   Control Group to avoid any self-interest or recall bias, Dr. Dennis opines. *Id*. at 21.

28           Dr. Dennis also conducted a non-response analysis to ensure that there was no error in the

8

Main Survey caused by low response rate. *Id.*  ¶¶ 9, 22-25.  He cites the Reference Guide in support of the opinion that "while 'surveys may achieve reasonable estimates even with relatively low response rates,' even surveys with high response rates still need to [be] examined since they 'may seriously underrepresent' some portions of the population." *Id.* ¶ 8 (citation omitted).  Dr. Dennis conducted his non-response analysis by using administrative data he obtained from Baseball-Reference.com to compare respondents and non-respondents with respect to age, the year they last played in the minor leagues for a major league team, and fielding position. *Id.*  He also reviewed the Baseball-Reference.com database to ensure that there were at least ten completed interviews for each MLB franchise.  *Id.* ¶ 9.  Based on his analysis, Dr. Dennis concluded that "error was not introduced via nonresponse." *Id.*

Dr. Dennis conducted two tests to validate the Main Survey data. *Id.* ¶ 26.  First, he looked at a set of 85 documents, many of which are daily itineraries produced by Defendants, that contained information about start and end times, with about half referring to game days and half to non-game days. *Id.*  From these documents Dr. Dennis "ascertained when the first and last activities of the particular workday were scheduled to occur, both for 'anyone' and 'everyone.'" *Id.*  Based on his analysis of these documents, Dr. Dennis concluded that the "documents align with the survey results." *Id.* ¶ 27.  He explains his conclusion as follows:

> Looking at game days, the data obtained from the validating documents do not include game durations or travel times to away games. Without including this time for game durations or travel, the average time spent performing activities on a spring training game day amounts to between 4.13 and 5.76 hours. . . . Given that deposition testimony indicates that the duration of a spring game is close to three hours, the documents therefore show that the average workday for a spring game day would be between roughly 7 and 8.5 hours, not including travel. The survey data indicated that respondents spent between 7.91 and 8.76 hours at the workplace on spring game days (depending on whether it was a home game or away game). This data therefore validates the survey results.

*Id.*

Dr. Dennis acknowledges that "[o]n some measures, the survey data is somewhat higher than the data extracted from the validating documents." *Id.*  In particular, the documents "yield a lower average number of hours than the survey data" for non-game-days during spring training

United States District Court
Northern District of California

and extended spring training." *Id.*   He opines that this may be because the documents "do not

include time spent changing into uniforms, time spent performing extra work, and often do not

include time spent performing strength workouts." *Id.*   He further suggests that "it is possible that

minor leaguers perform more of this extra work and strength conditioning on non-game-days

during these periods, which would explain the differences in the data." *Id.*

Because fewer daily itineraries were produced for the championship season, Dr. Dennis

conducted another validation test for that period.  *Id.* ¶ 29.   In particular, he "looked at the

deposition testimony from Defendants' own witnesses to validate the survey data for the

championship season." *Id.*   According to Dr. Dennis, "[t]hese witnesses testified that players

generally arrived to work between 3 and 4.5 hours before a night game, depending on whether the

game was home or away." *Id.*   While these estimates would "yield a smaller number of hours

than the survey data yields," Dr. Dennis opined, the difference would not be substantial.  *Id.*  Dr.

Dennis suggests that "[a] conservative measure of the survey data, such as the tenth percentile,

could be used if needed to more than account for any differences." *Id.*

In sum, Dr. Dennis concludes that the Main Survey was conducted using a methodology

that is consistent with generally accepted methods for survey research and that its results are

reliable.  *Id.* ¶ 47.

### C.   The Motion for Reconsideration

In their Motion for Reconsideration, Plaintiffs ask the Court to certify a set of classes that

they contend will address the concerns expressed by the Court in the Class Certification Order.

The proposed classes are defined as follows:

> *Florida Class*: Any person who, while signed to a Minor League
> Uniform   Player   Contract,   participated   in   spring   training,
> instructional leagues, or extended spring training in Florida on or
> after February 7, 2009, and had not signed a Major
> League Uniform Player Contract before then.

> *Arizona Class*: Any person who, while signed to a Minor League
> Uniform   Player   Contract,   participated   in   spring   training,
> instructional leagues, or extended spring training in Arizona on or
> after February 7, 2011, and had not signed a Major League Uniform
> Player Contract before then.

> *California Class*: Any person who, while signed to a Minor League

United States District Court
Northern District of California

1    Uniform Player Contract, participated in the California League on or
     after February 7, 2010, and had not signed a Major League Uniform
2    Player Contract before then.

3    *California Waiting Time Subclass*: Any California Class Member
     who played in the California League since February 7, 2010, but
     who is no longer employed by MLB or its franchises as a minor
4    league player.

5    Motion for Reconsideration at i-ii.  Plaintiffs also propose a separate Rule 23(b)(2) injunctive

6    relief class, defined as follows:

7    Any person who is a) signed to a Minor League Uniform Player
     Contract, b) has never signed a Major League Player Contract, and
8    c) participates in spring training, instructional leagues, or extended
     spring training in Florida or Arizona.

9

10   *Id.* at ii.  The proposed class representatives for each of these classes is listed in the Declaration of

11   Garrett Broshuis in Support of Motion to Reconsider Regarding Class Certification ("Broshuis

12   Decl."), Ex. E.  Their participation in Arizona and Florida spring training, extended spring training

13   and instructional leagues and in the California League, is set forth in Exhibit F to the Broshuis

14   Declaration.

15       Finally, Plaintiffs seek (re)certification of an FLSA collective and propose the following

16   definition:

17   Any person who, while signed to a Minor League Uniform Player
     Contract, participated in the California League, or in spring training,
     instructional leagues, or extended spring training, on or after
18   February 7, 2011, and who had not signed a Major League Uniform
     Player Contract before then.

19

20   *Id.*

21       According to Plaintiffs, the "streamlined class structure" that they now propose will

22   eliminate the problems associated with winter conditioning work because they no longer seek

23   certification as to those claims.  *Id.* at 1. Further, with respect to the California Class, Plaintiffs

24   seek certification only as to the California League championship season, which they contend

25   involves no interstate travel.  *Id.*  Moreover, Plaintiffs argue, for all the proposed classes the work

26   at issue was performed only in a single state and therefore, the choice-of-law determination will be

27   simplified; in particular, Arizona law will be applied to the training season work performed in

28   Arizona, Florida law will be applied to the training season work performed in Florida, and

United States District Court
Northern District of California

11

California law will be applied to work performed in the California League. *Id*. at 1, 3-5.

Plaintiffs also argue that their new Rule 23(b)(3) classes "eliminate concerns about the variations in the work class members performed." *Id*. at 1. This is because the "three proposed classes are focused exclusively on work class members performed as teams at team complexes, under the direct control and supervision of Defendants." *Id*. This means that an activity-by-activity inquiry will not be necessary and instead, the common question will be, when did the team's workday begin and end. *Id*. at 1, 6-10. This approach is consistent with the "whistle to whistle" measure of the workday that is applied under the "continuous workday" doctrine, Plaintiffs argue. *Id*. According to Plaintiffs, under this doctrine, all activities that occur during the workday are compensable. *Id*. They further assert that it is permissible to rely on the Main Survey to establish the average length of the workday and that that survey is sufficiently reliable to meet the requirements of Rule 702 and *Daubert*. *Id*. at 11-13. In light of *Mt. Clemens* and *Tyson Foods*, they assert, this evidence will allow a jury to draw "just and reasonable" inferences about when the work day began and ended for class members. *Id*. at 14-17.

Plaintiffs also argue that differences in compensation among minor league players do not give rise to individualized issues that defeat certification because these variations go to damages rather than liability. *Id*. at 17-18. Plaintiffs acknowledge that the Court treated these variations as relating to liability in its Class Certification Order but contend that under the Ninth Circuit's decision in *Torres v. Mercer Canyons, Inc*., 835 F.3d 1125 (9th Cir. 2016), which this Court cited elsewhere in its opinion, this issue is more appropriately treated as one going to damages. *Id*.

Plaintiffs further contend that the two main affirmative defenses that Defendants assert as to the class claims – the seasonal amusement or recreational establishment defense and the creative professional defense – do not raise sufficient individualized issues or manageability problems to preclude certification of their proposed classes. *Id*. at 19-21. As to the former, which applies only under Florida law and the FLSA,[2] Plaintiffs address the Court's suggestion that it

---

[2] Plaintiffs correctly note that the Court erred in its Class Certification Order when it stated that California law provides for a seasonal amusement or recreational establishment exemption. Motion for Reconsideration at 19 n. 16. In fact, it does not.

might be "swamped" by the individual inquiries necessary to determine whether a multitude of "establishments" qualified for the exemption. *Id*. at 19 (citing Class Certification Order at 85). They point out that these inquiries rely on common evidence and therefore are not individualized in the sense that the issue must be addressed on a class-member-by-class-member basis. *Id*. at 20. In any event, they argue, the number of "establishments" at issue under the narrower class definitions they now propose is significantly reduced because there are "at most 15 facilities in Florida, 15 facilities in Arizona, and 10 facilities in California." *Id*.

With respect to the creative professionals exemption, Plaintiffs argue that neither of the two prongs of the applicable test – the first relating to an individual's primary duties and the second setting a minimum compensation requirement of $455/week – requires individualized inquiries. *Id*. at 20-21. Plaintiffs note that the Court already concluded that there are no individualized inquiries as to the "primary duties" prong of the test but found that the "compensation" prong of the test would require individualized inquiries. *Id*. Plaintiffs argue that in fact, the second prong of the test also will not require individualized inquiries because there are employment and payroll records that can be used to determine whether any particular class member meets this requirement. *Id*. at 21 (citing *Minns v. Advanced Clinical Employment Staffing LLC*, No. 13-CV-03249-SI, 2015 WL 3491505, at *8 (N.D. Cal. June 2, 2015)). Plaintiffs also point out that the Court already found that any individualized inquiries associated with this defense would not, on their own, be sufficient to defeat class certification. *Id*. (citing Class Certification Order at 86).

Plaintiffs contend their more narrowly crafted classes also satisfy all of the requirements of Rule 23(a) and solve the ascertainability problem identified by the Court in its Class Certification Order. *Id*. at 21-22. In particular, Plaintiffs argue that because they are no longer asking to certify any classes to pursue the winter conditioning claims, the problems associated with determining who is a member of the State Classes based on that work is eliminated. *Id*.

Plaintiffs also argue that the Court should certify its proposed Rule 23(b)(2) class to pursue injunctive relief. *Id*. at 22-23. They contend the problem with standing identified by the Court has been remedied by the (requested) intervention of four current minor league players. *Id*. at 22.

13

United States District Court
Northern District of California

They further assert that in order for a Rule 23(b)(2) to be certified, Plaintiffs need only establish that Defendants have "acted or refused to act on grounds that apply generally to the class" and need not demonstrate that they have suffered the same injury. *Id.* (citing *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010)).  Plaintiffs assert this requirement is met, citing Defendants' compensation policies, including failure to pay wages outside of the championship season and failure to pay overtime during the championship season. *Id.* at 23.  According to Plaintiffs, "[t]he adjudication of the legality of these practices will not only resolve a central issue 'in one stroke' . . . , it will conclusively determine whether the (b)(2) plaintiffs and class members are entitled to the injunctive and declaratory relief they seek, namely, an order compelling Defendants to pay current minor leaguers in compliance with applicable state wage laws." *Id.* (citation omitted).

With respect to the requirement that any monetary relief sought by a Rule 23(b)(2) class must be incidental to the injunctive relief sought by that class, Plaintiffs contend this issue is not a concern because the (b)(2) class they propose is requesting *only* injunctive relief. *Id.* at 23 (citing *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW, 2013 WL 5979327, at *7 (N.D. Cal. Nov. 8, 2013)).  According to Plaintiffs, courts have found that "[i]t is permissible to seek both a damages class under Rule 23(b)(3) and a separate injunctive relief class under Rule 23(b)(2)" and when such an approach is taken it is not necessary to address whether damages are "incidental" to injunctive relief. *Id.* (citing *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW, 2013 WL 5979327, at *7 (N.D. Cal. Nov. 8, 2013); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 503, 536–37 (N.D. Cal. 2012); *Aho v. AmeriCredit Fin. Servs., Inc.*, 277 F.R.D. 609, 619, 623 (S.D. Cal. 2011)).

Even if the Court declines to certify Plaintiffs' proposed 23(b)(2) and (b)(3) classes, Plaintiffs request that the Court certify a Rule 23(c)(4) class to address common issues, including the following:

- Whether minor leaguers are employees under the wage-and-hour laws, and, relatedly, whether MLB jointly employs them;

- Whether minor leaguers are performing "work" during the training seasons and the championship season;

- Whether the creative artist exemption applies to minor leaguers under Florida and California law;

- Whether the seasonal and amusement exemption applies under Florida law.

*Id*. at 24-25.

Finally, Plaintiffs argue that the FLSA collective should be recertified "with the exception that Plaintiffs propose limiting the Collective in the same manner as their proposed narrowing of the Rule 23 class[es] (*ie.,* eliminating the winter offseason claims and limiting the Collective to minor leaguers who participated in spring training, extended spring training or instructional leagues in Arizona or Florida or who worked in the California League.)." *Id*. at 25.

In their Opposition brief, Defendants argue that Plaintiffs' proposal does not remedy any of the deficiencies identified by the Court in its Class Certification Order and that Plaintiffs have even introduced new problems relating to certification of their proposed classes. Opposition to Motion for Reconsideration at 1. First, Defendants contend that even the more limited classes proposed by Plaintiffs will require the Court to conduct individualized choice of law inquiries to compare the relative interests of the states that might potentially have an interest in applying their laws, which will depend on the circumstances of each individual player. *Id*. at 1, 3-9. They reject Plaintiffs' assertion that the law of the situs where the relevant work was performed can be applied to each of the three proposed Rule 23(b)(3) classes. *Id*. at 5.

With respect to the Arizona and Florida Classes, Defendants assert that the players who participate in spring training and instructional leagues typically do not reside in these states and spend only about four weeks there during spring training. *Id*. at 6. Under these circumstances, they contend, there will be other states that have an interest in applying their law and therefore, a balancing test will have to be applied for each player in the class. *Id*. at 6-7. Similarly, they assert, there will be choice of law questions requiring individualized inquiries as to the California Class. *Id*. at 7-9. Defendants contend the application of California law to these class members should not be assumed, given that the majority of MLB Clubs with affiliates in the California League are not based in California and the putative members of this class spend varying amounts of time in the California League – some as little as a single day. *Id*. at 8. Defendants support their

United States District Court
Northern District of California

1    argument with an expert declaration by Mr. Paul K. Meyer, who reviewed and analyzed player

2    transaction records for the 11 MLB Clubs that had a minor league baseball affiliate in the

3    California League between the 2010 and 2015 Championship Seasons.  Declaration of Paul K.

4    Meyer in Support of Defendants' Opposition to Plaintiffs' Renewed Motion for Class and

5    Collective Certification Under Federal Rule of Civil Procedure 23 and the FLSA ("Meyer Decl.")

6    ¶ 11.

7       According to Mr. Meyer, he analyzed over 469,000 data rows of player transaction history

8    information.  *Id.*  The "detailed transaction records contain information on the affiliates and/or

9    MLB Clubs to which a player was assigned, including when the player was transferred from one

10    affiliate and/or MLB Club to another." *Id.* ¶ 12. They also contain information about when a

11    player: 1) signed a Major or Minor League contract; 2) was placed on the disabled list; 3) was

12    placed on rehabilitation assignment; 4) was placed on an inactive list; or 5) was released by a

13    Club.  Mr. Meyer found that a total of 2,113 players were assigned to affiliates in the California

14    League between the 2010 and 2015 championship seasons. *Id.* ¶ 15.  He further found that

15    between 68% and 75% of those players played for affiliates outside of California during the *same*

16    championship season in which they played for the California League.  *Id.* ¶¶ 16-17.  These players

17    spent varying amounts of time playing in California.  *Id.*  For example, for the 2010 championship

18    season, Mr. Meyer found a range of between one day and 151 days, with approximately 11% of

19    the 364 players who were assigned to the California League that season spending one week or less

20    playing in California.  *Id.* ¶ 19.

21       Mr. Meyer also found that of the players who were assigned to play in the California

22    League and other affiliates outside of California in the same season, over 50% spent more time

23    assigned to affiliates outside of California than they spent assigned to play for the California

24    League.  *Id.* ¶¶ 20-21.  He also performed an analysis to determine how many different states

25    putative class members were assigned to during the championship season in addition to the

26    California League, both individually and collectively.  *Id.* ¶¶ 22-24.  He found that "many players

27    played in multiple states during the same season" and that between 2010 and 2015 putative class

28    members played for between 27 and 33 different states during the same seasons in which they

were assigned to the California League.  *Id.*

Finally, Mr. Meyer analyzed the transaction histories to determine what percentage of the California League were first-year players.  *Id.* ¶¶ 25-26.  He concluded that less than five percent of the California League players were first year players during the period of 2010 and 2015.  *Id.* Based on Mr. Meyer's findings Defendants contend "it is clear that there is no basis for the global application of California law" because "[t]he players' ephemeral contacts with the state of California must always be balanced against the interests of the other states where they, for example, reside, play, train, and where their MLB Club is located."  Opposition at 8-9.

Next, Defendants argue that Plaintiffs have not addressed the problem that there is a "plethora of individualized issues requiring resolution in order to determine the amount of compensable time."  *Id.*  Defendants reject Plaintiffs' assertion that they have eliminated this problem by "focus[ing] only on team work periods" and that their Main Survey "provides reliable representative evidence that eliminates the need for player-by-player review."  *Id.*  Instead, they argue that individualized liability issues still predominate, despite Plaintiffs' reliance on the "continuous workday" doctrine and "representative evidence" that allegedly demonstrates "average" time players spent working based on responses to the Main Survey.  *Id.* at 1-2, 9-16.

With respect to Plaintiffs' reliance on the "continuous workday" doctrine, Defendants contend this theory does not help Plaintiffs because there "is no common continuous workday;" instead, they assert, "[d]etermining what constitutes a 'continuous workday' for a single player depends not only on when the day begins and ends [but] also requires an individualized analysis of what activities are 'principal' and 'integral and indispensable'" in order to determine whether they are "compensable at all or part of a continuous workday."  *Id.* at 10 (citing *Bryant v. Service Corp. Int'l*, No. C 08-01190 SI, 2011 WL 855815 (N.D. Cal. Mar. 9, 2011)).

Defendants also reject Plaintiffs' assertion that they can use the Main Survey results to provide representative evidence of a "common workday for all minor league players."  *Id.* at 11. According to Defendants, even if the Main Survey survived scrutiny under *Daubert*, it cannot properly be used for this purpose because it does not take into account variations in player circumstances.  *Id.*  Defendants argue that the Main Survey does not address "team related

United States District Court
Northern District of California

1    activities," contrary to Plaintiffs' assertions, pointing out that it does not ask minor league players

2    about the specific activities in which they engaged while at the ballpark and only asked them to

3    recall their "most often" arrival and departure times. *Id.* Consequently, they contend, the Main

4    Survey does not provide evidence of "hours worked" at all. *Id.* at 12. *Id.* In addition, they argue,

5    relying on "averaging" will result in significantly understating or overstating the players' hours

6    because of the variations among players. *Id.*

7         Defendants offer two expert declarations that address the variations in responses to the

8    Main Survey, one by Dr. Jonathon Guryan and another by Dr. Denise M. Martin. *See* Declaration

9    of Jonathon Guryan, Ph.D. in Support of Defendants' Opposition to Plaintiffs' Renewed Motion

10   for Class and Collective Certification under Rule 23 and the FLDA, Docket No. 749 ("Guryan

11   Decl."); Declaration of Denise N. Martin, Ph.D. in Support of Defendants' Opposition to

12   Plaintiffs' Renewed Motion for Class and Collective Certification under Rule 23 and the FLSA,

13   Docket No. 750 ("Martin Decl."). Dr. Guryan opines that there is substantial variation among

14   respondents to the Main Survey as to arrival and departure times for each of the types of day at

15   issue (e.g., non-game days, home game days, away game days) and between the hours reported at

16   the 10th percentile and the 90th percentile. Guryan Decl., ¶ 8. He finds that as a result of these

17   variations, reliance on the "average" hours worked could result in significantly overstating or

18   understating the hours worked for a substantial portion of respondents. *Id.* Dr. Guryan also finds

19   significant differences for hours reported across Clubs and from year to year. *Id.* Finally, he finds

20   significant variations even among players who played for the same Club in the same year, which

21   he contends renders the Main Survey unreliable for proving classwide damages. *Id.* ¶¶ 11-16.

22        Dr. Martin updates her earlier opinions with regard to whether the results of Dr. Dennis's

23   survey (previously, the Pilot Survey, now the Main Survey) can be used in the "formulaic model

24   proposed by Dr. Kriegler to generate a reliable classwide estimate of the number of 'hours

25   worked' . . . and, therefore, allow determination of the extent to which each player was not paid at

26   least the applicable minimum wage and/or worked uncompensated overtime." Martin Decl. ¶ 6.

27   Dr. Martin concludes that they cannot. *Id.* ¶ 8. First, she agrees with Dr. Ericksen that recall and

28   self-interest bias, combined with respondent burden, will cause the estimate of hours worked

derived from the Main Survey to be inflated. *Id.* ¶ 9. She further opines that variability among responses as to arrival and departure times is a reflection of the discretionary activities in which players engage before and after team-related activities; to the extent the Main Survey results include these activities, "the inclusion of such hours in any formulaic model would inflate the estimate of any 'hours worked' to an unknowable degree." *Id.* ¶¶ 11, 19-30.

Dr. Martin also rejects the validation tests conducted by Dr. Dennis as having "no value." *Id.* ¶ 12. This is because the schedules upon which Dr. Dennis relied were merely "aspirational and do not reflect what happened on a given day," according to Dr. Martin. *Id.* In any event, she contends, any test to validate the results of the Main Survey that used the schedules should have compared the survey responses of players on individual teams to see if the players of teams with longer scheduled hours actually reported longer hours. *Id.* Dr. Martin states that she conducted such an analysis and found no such correlation. *Id.* ¶¶ 12, 31-39.

Dr. Martin opines that the unreliability of Dr. Dennis's survey would also render any "formulaic damages model" that used these results unreliable and that no such model "could repair the infirmities embodied in the survey responses." *Id.* ¶ 14, 40-41. She bases this opinion on the fact that the Main Survey "is Plaintiffs' proposed source of 100% of the hours for spring training, extended spring training and instructional league, as well as all of the pre- and post-game hours for the Championship season." *Id.* ¶ 40.

Next, Dr. Martin challenges Plaintiffs' assertion that "standardized 'working hours' during spring training, extended spring training, instructional league and standardized pre- and post-game hours during the championship season were required by the Clubs." *Id.* ¶ 42. She opines that the Main Survey results do not support this conclusion but instead show "pronounced variability exists in the survey responses regarding hours reportedly spent at the ballpark, even for players on the same team." *Id.* This variability is indicative of the discretion players have as to their hours, she opines, giving rise to the need to conduct individualized inquiries as to whether the activities they performed at the ballpark were voluntary or required by the Clubs. *Id.* According to Dr. Martin, reliance on an average or use of 10th percentile data as a measure of hours worked would "mis-estimate liability and damages for many, if not most, individual players." *Id.* ¶ 43.

Finally, Dr. Martin opines that the data Dr. Dennis obtained from the Main Survey is distinguishable statistically from the data that was found by the Supreme Court to be acceptable in *Tyson Foods v. Bouaphakeo*. *Id.* ¶¶ 45-50. She concedes that she is "not an expert in the *Tyson* matter" but states that she has "reviewed the reports in that matter, as well as the decision rendered." *Id.* ¶ 45. She distinguishes the study at issue in *Tyson* on two main grounds.

First, Dr. Dennis notes that *Tyson Foods* involved a time and motion study in which the expert "actually watched employees engaged in discrete donning and doffing tasks, providing measurements with virtually no error." *Id.* ¶ 46. In contrast, she opines, the data from the Main Survey consists of player recollections and do not address specific tasks, resulting in a likelihood that the estimates will be inflated and infected with various forms of bias. *Id.*

Second, Dr. Dennis states that the expert in *Tyson Foods* calculated an "*average* or *mean* time spent donning and doffing, adding up all the time spent and dividing by the number of observations, while Dr. Dennis asked about the *mode* time, or the time that 'most often' occurred." *Id.* ¶ 47 (emphasis in original). She opines that "[u]se of an overall mean to estimate liability and aggregate damages is not subject to [the] same skewness/overestimation problem that can affect mode." *Id.* She further states that "the mode is systematically likely to differ from the mean for players, to the extent that shorter-than-typical days due to factors such as injuries, rain-outs, manager discretion or other unforeseen events are more likely to occur than longer-than-typical days." *Id.* ¶ 50. Therefore, she concludes, "in addition to getting the estimate of any hours worked wrong for virtually every player, use of the 'mode' results from Dr. Dennis'[s] survey (vs. the average gathered in *Tyson*) may not even offer the prospect of getting the estimate of liability or *aggregate* damages correct." *Id.*

In opposing Plaintiffs' new proposed classes, Defendants further point to the Court's reliance in its Class Certification Order on the variations in the types of activities in which the players engaged as a basis for declining to certify the proposed classes under Rule 23(b)(3). Opposition at 14 (citing Class Certification Order at 83). In espousing a "broad definition" of work based only on departure and arrival times, Defendants contend, Plaintiffs "all but ignore this aspect of the Court's decision." *Id.* Similarly, Defendants contend, Plaintiffs have not addressed

20

1   the significant variations as to compensation that the Court cited, except to argue that this

2   variation goes to damages rather than liability. *Id*. at 14-15. According to Defendants, the Court

3   already rejected this argument and moreover, Plaintiffs' reliance on *Torres v. Mercer Canyons,*

4   *Inc*. is misplaced because that case involved informational injury that was classwide and therefore

5   liability could be established without regard to the pecuniary loss to the plaintiffs. *Id*. at 15 (citing

6   No. 15-35615, 2016 WL 4537378 (9th Cir. Aug. 31, 2016)).

7         Defendants further contend Plaintiffs' proposed classes will give rise to new defects under

8   Rule 23. *Id*. at 16. First, they argue that because Plaintiffs have "abandoned classwide pursuit of

9   the vast majority of the claims they are still pursuing individually," the class device is no longer

10  the "superior means of adjudication under Rule 23." *Id*. at 16. Second, they argue that there are

11  now "adequacy" problems relating to Plaintiffs' representation of the putative classes because

12  Plaintiffs seek to apply the laws of Arizona, Florida and California to the proposed classes even

13  though some class members may have an interest in having the law of some other state applied.

14  *Id*. at 17. Defendants also argue that by limiting two of the classes to spring training and

15  instructional leagues, when players are not compensated at all, they have revived the question of

16  whether they are trainees or employees, which will turn on individualized inquiries relating to

17  their expectation of compensation. *Id*. at 18. There also remain "numerous individualized

18  inquiries that must be resolved in connection with other defenses asserted in this case,"

19  Defendants contend. *Id*.

20        Defendants also contend the Court should reject Plaintiffs' request to certify a separate

21  Rule 23(b)(2) class. *Id*. at 19. First, they argue, certification of the Rule 23 (b)(2) class should be

22  denied because the "relief the proposed intervenors seek – the future payment of money – is a

23  claim for damages disguised as equitable relief." *Id*. According to Defendants, courts reject such

24  attempts to transform a claim for money into one for injunctive relief. *Id*. (citing *Herskowitz v.*

25  *Apple, Inc*., 301 F.R.D. 460, 482 (N.D. Cal. 2014); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281

26  F.R.D. 534, 560 (C.D. Cal. 2012)). Second, they argue, the intervenors' request for injunctive

27  relief is not "incidental" to the money damages they seek. *Id*. Finally, Defendants argue that

28  adjudication of the claims of the Rule 23(b)(2) class would require "endlessly individualized

United States District Court
Northern District of California

21

adjudication." *Id*.  In particular, they assert that "the Court would be faced with the very same fact-intensive determinations that have rendered all of the other classes unsuitable for certification, including: what state law applies to each class member, what activities constitute compensable time (if any), which players (if any) are owed additional compensation, and the applications of the various defenses." *Id*.  According to Defendants, "these individualized inquiries would necessitate a separate injunction tailored to each player" and therefore, the requirements of Rule 23(b)(2) are not met. *Id*. (citing *McKinnon v. Dollar Thrifty Auto. Grp., Inc*., No. CV 12-cv-04457-SC, 2015 WL 4537957, at *12 (N.D. Cal. July 27, 2015); *Cholakyan*, 281 F.R.D. at 560).

With respect to Plaintiffs' request that the Court certify an issues class under Rule 23(c)(4), Defendants argue that the request is an attempt to "circumvent this Court's prior denial of class certification" and that Plaintiffs have not provided sufficient details to show that the issues are amenable to classwide treatment.  *Id*. at 21-23.  They further contend that Plaintiffs' request does not address one of the Court's primary findings in the Class Certification Order, namely, that "key issues going to liability require individualized proof." *Id*. at 21-22.  Defendants also assert that Plaintiffs have not demonstrated that the commonality requirement of Rule 23(a) would be met as to the issues classes Plaintiffs propose, which requires that Plaintiffs demonstrate not only that their claims turn on common issues of law but also that these questions are susceptible to a common *answer*. *Id*. at 22 n. 28.   Moreover, Defendants argue, the issues classes Plaintiffs propose will not "significantly advance the resolution of the underlying case." *Id*. at 23 (quoting *Valentino v. Carter-Wallace, Inc*., 97 F.3d 1227, 1229 (9th Cir. 1996)).

Defendants again raise the issue of Article III standing, arguing that this is a threshold issue that should be decided before deciding whether the proposed classes should be certified. *Id*. at 23.  They contend that the problem of standing is particularly significant as to the California Class and the proposed (b)(2) class. *Id*.  In particular, they point to the fact that the California Class contains class representatives who played in the California League for only seven of the eleven Club Defendants. *Id*. at 24 (citing Bloom Decl., Ex. A).  Similarly, they assert, the (b)(2) class contains class representatives who played for only four of the Club Defendants. *Id*.

Finally, Defendants argue that the proposed FLSA collective does not meet the heightened

United States District Court
Northern District of California

"second-stage" standard for certification with respect to demonstrating that the putative opt-ins are similarly situated. *Id*. Even with the modifications proposed by Plaintiffs, Defendants contend, Plaintiffs have not solved the problems related to the "disparate factual and employment settings of the class members" and the "plethora of individualized inquiries" necessary to adjudicate their claims. Therefore, they assert, the Court should deny Plaintiffs' request to re-certify the FLSA collective just as it should deny their request to certify modified classes under Rule 23. *Id*. at 25.

In their Reply brief, Plaintiffs reject Defendants' assertion that the new proposed classes will require a multitude of choice of law analyses that defeat class certification, arguing that it is Defendants' burden to show that another state's law applies to class members' claims. Reply at 1-2. According to Plaintiffs, Defendants have not met that burden. *Id*. at 3-5.

Plaintiffs also challenge Defendants' argument that there is no common continuous work day because players do not arrive and depart at the same time each day. *Id*. at 5-6. Plaintiffs contend they have "never argued that all players arrive and depart at the same time each day" and in any event, it is not their burden to prove that they do; rather, they need only show that they performed work for which they were improperly compensated and present evidence from which a "just and reasonable inference" can be drawn as to the amount of work they performed. *Id*. at 6 (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)). Plaintiffs also argue that Defendants are incorrect in reading *Tyson Foods* as requiring that a representative sample must be based on an observational study, or that it must measure every discrete activity, in order to be considered in the class action context. *Id*. Moreover, they contend, *Tyson Foods* itself allowed the use of representative evidence where there were material variations between employees as to the time spent donning and doffing of equipment. *Id*.

Plaintiffs contend they can provide a reasonable estimate of hours worked based on the model offered by Dr. Kriegler. *Id*. at 7-8.[3] Dr. Kriegler offered a declaration in support of

---

[3]Defendants object to Plaintiffs' introduction of Dr. Kriegler's Rebuttal Declaration (Docket No. 755) and ask the Court to strike that declaration, as well as all of the arguments in Plaintiffs' Reply brief that rely on Dr. Kriegler's declaration. *See* Docket No. 767 ("Objection"). They further request leave to file a sur-reply in the event the Court decides to consider this material. *See* Docket No. 768 ("Motion for Leave to File Sur-Reply"). In support of their request that the Court strike the Kriegler Rebuttal Declaration, Defendants contend Dr. Kriegler's declaration violates

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiffs' original class certification motion and has now updated that declaration to address the

2    expert declarations of Defendants' experts and explain how he would use the results of the Main

3    Survey, in combination with other available information, to come up with a classwide estimate of

4    damages.  *See* Kriegler Rebuttal Decl. ¶¶ 1-12.

5          In his rebuttal declaration, Dr. Kriegler explains that MLB's eBis data, which contains the

6    transactional history for each player, will allow him to determine for each day during the class

7    period each class member's status and the team for which he was playing.  *Id*. ¶ 14.  This

8    information is the starting point for his damages model and "combined with the technical

9    capabilities of computational software programs" such as the one used by Defendants' expert, Mr.

10   Meyer, will enable him to "perform very precise calculations for every player for any time

11   period."  *Id.* ¶¶ 14, 18. Dr. Kriegler states that he intends to cross-reference the transactional data

12   with other information, including: 1) for game days, the game duration times, which are available

13   on MiLB.com; 2) for away games, the travel commute times, which can be obtained using Google

14   maps; 3) the type of workday, which can be determined from information on MiLB.com and

15   organizational schedules; 4) estimated hours worked given the type of workday.  *Id*. ¶ 14.  Dr.

16   Kriegler states that organizational schedules will allow him to categorize workdays during the

17

18   the Court's instructions at the August 19, 2016 hearing, when it addressed the question of whether
     Plaintiffs would be permitted to offer any additional expert declarations beyond the declaration of
19   Dr. Dennis addressing the main survey.  *See* Objection, Ex. B (August 19, 2016 hearing transcript)
     at 42-46.  At that hearing, the Court opined that it was unlikely that any additional expert opinions
20   would be helpful if it found that the Main Survey was deficient because of the problems related to
     individual players' recall of relevant events.  *See id*. at 42.  As discussed below, however, the
21   Court now finds that the Main Survey meets *Daubert*'s threshold reliability requirement and
     therefore the Court must resolve the critical question of whether the claims of the new classes
22   proposed by Plaintiffs can be proven on a classwide basis through common evidence.  The answer
     to that question turns, in part, on how the data obtained from the Main Survey will be used, in
23   conjunction with other evidence, to establish the amount of work performed by the proposed
     classes.  Defendants have offered two expert declarations offering opinions on this question,
24   including one that is based on an entirely new and very extensive study of the player transaction
     records.  Under these circumstances, it is appropriate that Plaintiffs be permitted to introduce a
25   rebuttal declaration by Dr. Kriegler explaining why the opinions of Defendants' experts are
     incorrect. The Court also finds that Defendants' assertions the Dr. Kriegler has offered a "new"
26   damages model are exaggerated and that many of the approaches he explains in his rebuttal
     declaration, such as his use of a percentile method, were also described in his earlier declaration.
27   Therefore, the Court declines to strike Dr. Kriegler's declaration.  To alleviate any possible
     prejudice to Defendants, however, the Court will consider Defendants' Sur-Reply.  Therefore, the
28   Motion for Leave to File a Sur-Reply is GRANTED.

1   championship season depending on whether games were home or away and whether they were

2   night games or day games. *Id*. ¶ 14.  Similarly, with respect to spring training, he will be able to

3   use Club training schedules to distinguish between camp days and game days. *Id*. ¶¶ 9-10.

4          Plaintiffs further contend that Defendants' criticisms of the Main Survey are not

5   sufficient to warrant denial of class certification. *Id*. at 8-10.  First, Plaintiffs reject Defendants'

6   assertion that the Main Survey cannot be relied upon to determine the amount of work conducted

7   by class members because it does not attempt to evaluate the specific tasks the players were

8   performing throughout the day and does not take into account the fact that some players arrived at

9   the ballpark early (ie., before they were required to be at the ballpark). *Id*. at 8.  According to

10  Plaintiffs, under the continuous workday doctrine, it is neither necessary nor appropriate to assess

11  the compensability of each discrete activity. *Id*.  To the extent that there are variations as to

12  arrival time, Plaintiffs contend, these should not defeat class certification. *Id*.  In particular,

13  Plaintiffs assert, both California and Arizona law treat all hours at the ballpark as being

14  compensable, with Arizona law defining "hours worked" as "all time . . . *at a prescribed*

15  *workplace*," *id*. (quoting Ariz. Admin. Code § R20-5-1202(9)) (emphasis added in Plaintiffs'

16  brief) and California law defining hours worked as all time an employee is "permitted to work,

17  *whether or not required to do* so" and further providing that an employee "subject to an

18  employer's control does not have to be working during that time." *Id.* (quoting *Morillon v. Royal*

19  *Parking Co*., 995 P.2d 139, 143 (Cal. 2000)).

20         As to Florida and federal law, Plaintiffs contend, variations in arrival times also do not

21  preclude certification because they lie "at the fringe of the workday." *Id*.  Citing the testimony of

22  Defendants' witnesses, Plaintiffs contend "[t]here is a core work routine across minor league

23  baseball that consists of some form of early work or team fundamentals, a stretch, throwing,

24  batting practice, and then a game." *Id*.  Much of this workday can be established through common

25  evidence other than the Main Survey, Plaintiffs contend, such as schedules. *Id*.  The Main Survey,

26  however, captures time at the beginning and end of the workday that is spent performing required

27  activities that is not reflected on the schedules. *Id*. at 9.  As to this time, Plaintiffs argue that much

28  of the variation can be taken care of using averages, which will eliminate outliers. *Id*.  If the Court

United States District Court
Northern District of California

25

1    is concerned about the players whose arrival and departure times were significantly above the

2    average, Plaintiffs suggest, the class notice can alert class members that the class claims will be

3    based on averages and that class members may be able to recover more in an individual action if

4    they opt out of the class.  *Id.*

5            Plaintiffs argue further that conservative estimates can be used to measure this time, such

6    as the 10th percentile. *Id.* at 9.  Plaintiffs contend that Defendants "do not genuinely dispute that

7    there was a time by which all team members *had* to arrive to begin work activities, so the

8    continuous workday must begin no later than that time."  *Id.* at 9.  According to Plaintiffs, "[t]he

9    10th percentile can be used to reveal when the *required* team work began because it represents the

10   time by which 90% of respondents had already arrived at work.  *Id.* at 10 (citing Kriegler Rebuttal

11   Decl. ¶¶ 7, 34-35).[4]  Plaintiffs argue that while Defendants are "free to try to rebut this evidence . .

12   . the persuasive value of the evidence is a jury question, not a question of class certification."  *Id.*

13   (citing *Tyson Foods*, 136 S. Ct. at 1049; *Villalpando v. Exel Direct Inc*., 12-CV-04137-JCS, 2016

14   WL 1598663, at *21 (N.D. Cal. April 21, 2016)).

15           Next, Plaintiffs reject Defendants' reliance on variations in pay as a reason for denying

16   class certification.  *Id.* at 10.   Plaintiffs note that Defendants make this argument only as to the

17   California Class.  *Id.*   This is because the Arizona and Florida Classes focus on periods when

18   players receive no compensation.  *Id.* n. 6.  As to the California Class, Plaintiffs do not dispute that

19

20   [4] Dr. Kriegler states in his declaration that "the 10th percentile for hours worked closely tracks (and
     in some instances is lower than) the required work hours according to daily schedules and

21   depositions." Kriegler Rebuttal Decl. ¶ 13.  To illustrate this point, he provides bar charts for each
     of the seven types of workdays in which games are played (spring training, extended spring

22   training, instructional league and the four types of championship season game days – home, away,
     day and night games).  *Id.* ¶ 35 & Exhibit A-G.  According to Dr. Kriegler, these bar charts reveal

23   that the Main Survey results at  the 10th percentile are generally at or below the hours reported in
     the schedules.  *Id.*  He acknowledges that the 10th percentile is higher than the hours reflected on

24   some of the daily schedules for home night games (depicted in Exhibit 4G to his declaration) but
     opines that this is not a cause for concern because the schedules for these days include pre-game

25   stretching, throwing, batting practice and fielding practice but do not include conditioning, weight
     lifting, team meetings, video review, training room treatment, or putting on uniforms, even though

26   deposition testimony reflects these activities were required.  *Id.* ¶ 36.  Dr. Kriegler opines that the
     close correlation between the times reflected on the schedules and the results of the Main Survey

27   at the 10th percentile "supports the notion that, while some Minor Leaguers may have performed
     more early activities than others, survey data can be relied upon to estimate hours worked, and

28   there is a minimum expectation for the number of work hours that is common to all class
     members."  *Id.* ¶ 13.

the vast majority of class members are beyond their first year – which means that their salaries will not be uniform – but point out that this also means that fewer class members will be subject to the variations in signing bonuses that characterize first year players. *Id*. In any event, they argue, variations in compensation do not defeat predominance because there are common payroll records that can be used to assess a player's rate of pay and damages for each week. *Id*. (citing Kriegler Rebuttal Decl. ¶ 40). In fact, they contend, the existence of computerized payroll records has been found to *support* class certification because it allows class claims to be evaluated on the basis of generalized proof. *Id*. (citing *Minns v. Advanced Clinical Employment Staffing LLC*, No. 13-CV-03249-SI, 2015 WL 3491505, at *8 (N.D. Cal. June 2, 2015); *Leyva v. Medline Indus.*, 716 F.3d 510, 514 (9th Cir. 2013); Newberg § 450 (5th ed)).

Plaintiffs further contend that under their new proposal there are no defenses that require individualized analyses. *Id*. at 11. The only defense under Arizona law is that the players are not employees, Plaintiffs contend, and the Court has already held that this issue can be decided based on common evidence. *Id*. Plaintiffs also argue that the creative artist exemption under California law will depend on common proof of the players' duties and that the seasonal and amusement exemptions will not require any individualized analysis. *Id*.

Plaintiffs also argue that to the extent individualized inquiries exist, they relate to damages and therefore do not defeat class certification. *Id*. at 11. First, as to the Arizona and Florida Classes, the players are not compensated, so liability will be established once the defenses are resolved and the players show that they performed *any* work, Plaintiffs contend. *Id*. at 11-12. If these classes establish liability, calculation of their damages will simply require that the minimum wage is multiplied by the hours worked. *Id*. at 12. Similarly, they contend, for the California Class, the game schedules show that players were commonly scheduled to work seven days a week in violation of California law; consequently, they contend, liability will be easily established as to the overtime claim simply by looking to game schedules. *Id*. (citing Kriegler Rebuttal Decl. ¶¶ 24-26). Thus, the calculation of hours worked and pay will relate only to damages, they contend. *Id*. Plaintiffs assert that it is well settled under Ninth Circuit law that the need to make individualized findings as to the amount of damages does not defeat class certification. *Id*. (citing

27

1  *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016)).

2      Plaintiffs argue that Defendants' assertions of "new defects" are also incorrect.  *Id*. at 12-

3  13.  As to their argument that the class claims are too limited relative to the many individual

4  claims that would remain to be litigated, Plaintiffs argue that there is no requirement that all of the

5  claims asserted in a class action be litigated on a classwide basis.  *Id*.  Moreover, they argue, the

6  claims they seek to certify relate to a core part of their case, challenging Defendants' failure to pay

7  any compensation at all for spring training, extended spring training and instructional leagues and

8  providing an opportunity for the over 2,000 members of the California League to seek a remedy

9  for Defendants' alleged violations of class members' rights under California wage and hour law.

10  *Id*. at 13.  Plaintiffs also reject the argument that the proposed class representatives are inadequate

11  to the extent they seek to apply a single state's law to the entire class when there might be

12  individual class members who could assert their claims under the laws of other states with laws

13  more favorable to them.  *Id*.  This argument is simply a "recycling of their failed choice of law

14  arguments," Plaintiffs contend.  *Id*.

15      As to standing, Plaintiffs repeat their argument that this issue is more appropriately

16  addressed after class certification.  *Id*. at 14.

17      Plaintiffs also reiterate their argument that the Rule 23(b)(2) class should be certified.  *Id.*

18  They argue that the relief this class seeks is not monetary and that it is well established that class

19  claims for back pay and injunctive relief can be pursued in the same action where two separate

20  classes are established to do so.  *Id*. (citing *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544

21  (9th Cir. 2013)).  Further, when such an approach is taken, it is not necessary to ask whether

22  monetary relief is incidental to the injunctive relief because there *is* no monetary relief being

23  sought by the injunctive relief class.  *Id*.  Finally, Plaintiffs reiterate their argument that the Court

24  should certify one or more issue classes under Rule 23(c) even if it declines to certify the new

25  proposed Rule 23(b) classes and that the Court should recertify the FLSA collective consistent

26  with the limitations in the new proposed classes.  *Id*. at 15.

27      In their Sur-Reply, Defendants contend Dr. Kriegler's model, as described in his rebuttal

28  declaration, does not "come close to fixing all of the core impediments to collective or class

certification previously identified by the Court."  Sur-Reply at 1.  First, they challenge Dr. Kriegler's model on the basis that it relies on a survey that does not attempt to assess "team-related" activities and therefore does not provide a reliable measure of "work" for the proposed classes.  *Id.* at 2.  They reject Dr. Kriegler's reliance on a percentile approach to correct for the variations in the survey results, arguing that this approach will "shortchange" 90% of minor league players.  *Id.* at 3.  They also argue that Dr. Kriegler has failed to "explain how an approach that dismisses the majority of survey responses in an attempt to make the survey responses 'fit' with schedules is reliable." *Id.* n. 6.  Defendants contend this approach also raises questions as to superiority and adequacy to the extent Plaintiffs are essentially seeking less than the amount to which they claim they are entitled.  *Id.* at 3-4.

Defendants reject Dr. Kriegler's use of schedules as evidence of the "minimum amount of pregame work" in combination with survey results as evidence of pre- and post-game work, arguing that comparison of the schedules and the survey results does not address the "substantial variability" reflected in both.  *Id.* at 4.  First, Defendants contend the use of the schedules to demonstrate any time worked on a representative basis is improper because "each Club and its affiliates had their own schedules in varying formats, at the discretion of the Club's various minor league managers, coaches, and trainers and written schedule were not necessarily reflective of the activities planned or actually performed on a given day."  *Id.* at 5. Next, Defendants challenge Dr. Kriegler's comparative approach on the basis that he made these comparisons "without controlling for team." *Id.* at 5.  Moreover, Defendants assert, comparison of the survey results with the team schedules shows that the survey results "are *not* correlated with the schedules by team and there are substantial differences in the hours individual respondents reported while playing for the same Club in the same year."  *Id.* (citing Guryan Decl. ¶¶ 11-12; Martin Decl. ¶¶ 36-37).  Defendants also reject Dr. Kriegler's conclusion that "the majority of work performed by all Minor Leaguers was required team activities." *Id.* (quoting Kriegler Rebuttal Decl. ¶ 13).  Defendants contend the Main Survey does not provide any basis for this conclusion as it does not ask about team-related activities; to the extent Dr. Kriegler relies on his belief that all players were required to perform the activities listed on the schedules, Defendants argue that the deposition testimony does not

1    support this conclusion.  *Id.* (citing Kriegler Rebuttal Decl. ¶¶ 32-33; Bloom Opposition Decl.

2    (Docket No. 744-2), Ex. B).

3          Defendants also challenge Dr. Kriegler's reliance on the eBis data as the "starting point"

4    for his damages estimate.  *Id.* at 6.  According to Defendants, the transaction histories only record

5    a player's assignment to an affiliate roster; they do not "reveal the activities a player may or may

6    not have engaged in during that assignment, whether any of those activities constitute

7    compensable 'work,' or how much time a player may have spent engaged in any particular

8    activity."  *Id.*  Furthermore, Defendants assert, the eBis data "cannot be utilized in any way for

9    Plaintiffs' Arizona and Florida classes, not even to track player assignments, because eBis does

10   not contain any information regarding a player's attendance at spring training, extended spring

11   training, or instructional leagues, let alone information regarding the nature of activities or

12   participation therein."  *Id.*  The *only* thing this data can be used for, according to Defendants, is "to

13   identify the number of players who were assigned to the roster of a particular minor league

14   affiliate and the dates they were assigned to the roster."  *Id.*

15         Next, Defendants contend the game schedules and rosters do not provide a sufficient basis

16   for Dr. Kriegler to draw distinctions between different types of game days.  *Id.* In particular, the

17   game schedules do not indicate which players participated in or attended games, and the rosters

18   reveal "only the names of active players assigned to an affiliate on a particular game day during

19   the championship season" and "do not include information regarding the activities a player

20   participated in, if any, or time spent on those activities."  *Id.* at 7.  Game schedules during spring

21   training and instructional leagues are even less useful, Defendants contend, because "during these

22   periods, games are modified based on the training needs of the players, and may be cut short or not

23   played at all."  *Id.*

24         Finally, Defendants contend Dr. Kriegler's reliance on other sources of information to

25   "reconstruct" a workday are to no avail because they do not allow him to determine how long any

26   particular player engaged in compensable "work." *Id.* at 7.   Given the variations in the players'

27   individual activities, Defendants argue, these sources of information could be used to measure

28   hours worked only if Dr. Kriegler conducted an individualized inquiry as to each player.  *Id.* at 8-

1    9.  Even if this could be done, Defendants argue, the variations in forms and amounts of

2    compensation paid to players would mean that individualized liability inquiries would still be

3    required.  *Id.* at 9.

4    **D.    The Motion to Exclude**

5    Defendants contend in their Motion to Exclude that the Main Survey, like the Pilot Survey, is

6    based on flawed methodology and that its results are similarly unreliable.  Motion to Exclude at 1.

7    Defendants challenge the reliability of the Main Survey on the following grounds:

8    •   The Main Survey asks players only about arrival times, departure times and meal times and

9        assumes that all time spent at the ballpark except meal times constituted "hours worked"

10       instead of  attempting to measure players' "baseball-related" or "team-related activities."

11       Motion to Exclude at 7-9;  Declaration of Eugene P. Ericksen in Support of Defendants'

12       Motion to Exclude the Declaration and Testimony of J. Michael Dennis, Ph.D., Docket No.

13       726 ("Ericksen Decl.") ¶¶ 5-6.  Because the Main Survey does not measure time that is

14       spent performing compensable work, Defendants contend, the results of the Main Survey

15       are irrelevant and unreliable.

16   •   The questioning strategy of the Main Survey does not remedy the problem of recall bias

17       that the Court found rendered the Pilot Survey unreliable.  Motion to Exclude at 2, 10-15;

18       Ericksen Decl. ¶¶ 4-5, 7, 13, 19-37, 54.  Dr. Ericksen opines that the Main Survey results

19       are unreliable because players were asked to recall details about mundane events (arrival

20       and departure times and mealtimes) that occurred months or years ago.  Dr. Ericksen

21       further opines that Dr. Dennis's reliance on a "control group" of non opt-in players and use

22       of "aided recall questions" do not solve these problems.  *Id.*  He opines that the recall

23       problems are worsened by the substantial "respondent burden" arising from the fact that

24       respondents were required to answer up to 65 questions, many of which were complex in

25       structure and sought information about events that occurred between four months and five

26       years before the survey interviews.  Motion to Exclude at 14;  Ericksen Decl. ¶¶ 20-22.

27   •   The Main Survey does not remedy the problem of self-interest bias and Dr. Dennis's

28       reliance on the responses of the "control group" of non opt-in players to validate his results

United States District Court
Northern District of California

31

1    is not persuasive because these players have an interest in the outcome of this case even if
2    they did not opt in to the FLSA collective as putative members of the Rule 23 classes.
3    Motion to Exclude at 3, 16-17;  Ericksen Decl. ¶¶ 4, 8 14, 38-48.

4    • The Main Survey is unreliable because it may suffer from non-response bias.  Motion to
5      Exclude at 17-19.  Dr. Dennis began with a random sample of 994 opt-in class members
6      and 6,769 non opt-in players;  24.6 percent of the opt-ins and 7.0 percent of the non opt-ins
7      responded.  Ericksen Decl. ¶ 47.  Dr. Ericksen opines that Dr. Dennis's efforts to assess
8      whether any large biases were created due to variations in response rates by looking at four
9      variables (age, fielding position, most recent year played and number of games played) are
10     not sufficient because Dr. Dennis does not explain how he selected these factors and does
11     not acknowledge that there may be other factors that affected the response rate and that
12     could result in bias.  *Id*. ¶¶ 44, 48.

13    • Dr. Dennis's attempt to "validate" the Main Survey results by comparing averages of the
14      survey responses with the daily schedules is misguided because the Main Survey and the
15      schedules "reflect different things: the [Main] Survey asks about arrival and departure
16      times from the ballpark while the daily schedules list activities that were planned for future
17      days."  Motion to Exclude at 3, 19-21;  Ericksen Decl. ¶¶ 16, 49-50.  According to
18      Defendants, the averages of the arrival and departure times reported in the Main Survey
19      vary significantly from the hours reflected on the schedules, especially for nongame days,
20      and these discrepancies have not been addressed by Dr. Dennis.  Motion to Exclude at 20.
21      Furthermore, they contend, Dr. Dennis's use of averages to validate his results is
22      "particularly insufficient" in light of the "extreme variability in responses."  *Id*.

23    In addition to these alleged flaws, Defendants contend the Main Survey and associated
24    Dennis Declaration should be stricken because Plaintiffs "failed to produce critical information
25    associated with the Main Survey" including "data or back-up information regarding the cognitive
26    interviews [Dr.] Dennis claims to have conducted to 'test' the Survey, as well as the dates and
27    durations of the Main Survey interviews."  Motion to Exclude at 3-4, 21-24.  Defendants further
28    contend that "based on the extremely limited information that [Dr.] Dennis provided in his

United States District Court
Northern District of California

1   declaration, it is clear that [he] has grossly deviated from standard best practices regarding

2   cognitive interviews." *Id*. at 21.

3        In their Opposition brief, Plaintiffs reject Defendants' assertion that the results of the Main

4   Survey are irrelevant because the Main Survey measures only arrival and departure times and

5   mealtimes and does not attempt to measure time spent on particular activities while at the ballpark.

6   Opposition at 3-8.  According to Plaintiffs, under Rule 702 of the Federal Rules of Evidence

7   expert testimony need only "help the trier of fact to understand the evidence;"  it need not provide

8   conclusive proof of an ultimate fact in the case  to be relevant.  *Id*. at 4.  Dr. Dennis's Main Survey

9   meets this "'low bar' of relevancy," Plaintiffs contend, because the Main Survey is "probative of

10  whether minor leaguers performed any work" and it "is also probative of how much they worked."

11  *Id*. at 4-5.  In particular, under the whistle-to-whistle rule, the time minor league players spent at

12  the ballpark offers at least a rough estimate of how much work they performed, Plaintiffs contend.

13  *Id*. at 5 (citing *IBP, Inc. v Alvarez*, 546 U.S. 21, 36 (2005)).   To the extent the estimate may not be

14  exact, Plaintiffs assert, this is not a basis for exclusion given the fact that Defendants do not keep

15  records of the time minor league players work and in light of the Supreme Court's admonition in

16  *Mt. Clemens* that "[t]he employer cannot be heard to complain that the damages lack the exactness

17  and precision of measurement that would be possible had he kept [time] records."  *Id*. (quoting

18  328 U.S. at 688).

19       Plaintiffs further contend that Dr. Dennis adhered to sound survey principals and that this

20  is all that is required for a study to be reliable under *Daubert*, and thus admissible.  *Id*. at 9 (citing

21  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1036 (9th

22  Cir. 2010) (recognizing that "survey evidence should be admitted as long as it is conducted

23  according to accepted principles and is relevant" and that "technical inadequacies" in a survey,

24  "including the format of the questions or the manner in which it was taken, bear on the weight of

25  the evidence, not its admissibility"); Declaration of J. Michael Dennis in Support of Plaintiffs'

26  Opposition to Motion to Exclude ("Dennis Opp. Decl.") ¶ 36; Declaration of Stanley Presser,

27  Ph.D., in Support of Plaintiffs' Opposition to Motion to Exclude the Testimony of J. Michael

28  Dennis, Ph.D. ("Presser Decl.") ¶¶ 4, 15.  The alleged flaws cited by Defendants relating to non-

1    response bias, recall bias and self-interest bias are, at most, technical deficiencies that go to the

2    weight of the evidence rather than admissibility, Plaintiffs contend.  Opposition at 12-22.

3           In any event, the challenges Defendants bring on these grounds are exaggerated, according

4    to Plaintiffs.  *Id.*  Plaintiffs cite to the expert report of Dr. Presser, who disagrees with the

5    opinions of Dr. Ericksen as to many of the alleged deficiencies of the Main Survey, as well as to

6    Dr. Dennis's own Opposition declaration.

7           Plaintiffs also assert that they have complied with their discovery obligations by turning

8    over all of the expert data required under the rules. *Id.* at 22-23.  Plaintiffs reject Defendants'

9    assertion that Dr. Dennis did not follow best practices relating to use of cognitive interviews,

10   citing the opinions of both Dr. Dennis and Dr. Presser.  *Id.* at 23-24. Finally, Plaintiffs assert that

11   Dr. Dennis's reliance on the schedules as a means of validating the results of the Main Survey is

12   reasonable and supports the reliability of the survey results.  *Id.* at 24-25.  Plaintiffs contend

13   "Defendants' own witnesses testified that the daily schedules are the best documents available to

14   show what happened on a given day" and that "[i]f anything, the schedules *underestimate* the

15   length of the workday for many class members because (as many defense witnesses have

16   confirmed) a considerable amount of work took place in addition to that indicated on team

17   schedules, including weightlifting, and especially on non-game days." *Id.* at 25 (emphasis in

18   original).

19          In their Reply brief, Defendants reiterate their argument that the Main Survey is flawed

20   and irrelevant because it does not attempt to measure team-related activities, even though

21   Plaintiffs claim they are seeking to establish the amount of time worked by class members by

22   looking at such activities.  Reply at 1-4.  In addition, Defendants contend, the responses to the

23   Main Survey cannot be used to establish the *average* time worked by putative class members

24   because the players were not asked to provide information about the average hours worked;

25   instead, they were asked to provide the times of their arrivals and departures and mealtimes that

26   they experienced "most often."  *Id.* at 1, 5 (citing Ericksen Decl. ¶¶ 14-17, 42).  According to

27   Defendants, by requesting times based on the "mode" the Main Survey does not allow for a

28   calculation of average hours worked.  *Id.* at 5 (citing *Wallace v. Countrywide Home Loans Inc.*,

United States District Court
Northern District of California

34

1    No. SACV 08-1463-JST, 2012 WL 11896333, at *5 (C.D. Cal. Aug. 31, 2012) (holding that

2    survey that asked respondents to report how many hours they worked in a "typical" week could

3    not be used to show *average* hours worked)).

4            Defendants also argue that the Main Survey, like the Pilot Survey, suffers from flawed

5    methodology because it asks "respondents who have an interest in the outcome of the litigation to

6    recall detailed and trivial information from months, if not years, prior to the survey concerning the

7    very same 'mundane events' that concerned the Court previously . . . ." *Id*. at 6.  Defendants

8    reject Plaintiffs' assertion that the flaws go to the weight of the Main Survey results rather than

9    their admissibility, arguing that Plaintiffs "ignore that it is their burden to prove that the survey

10   satisfies *Daubert* and is reliable representative evidence for class certification *now*." *Id*. at 7

11   (emphasis in original).   According to Defendants, use of reliable survey methods alone does not

12   guarantee that the *results* of a survey will be reliable or that they will not be infected by self-

13   interest, non-response or recall bias. *Id*. (citing Ericksen Decl. ¶ 6).

14           Defendants contend the unreliability of the results of the Main Survey can be seen in the

15   variability of the responses from players who played for different Clubs. *Id*. at 8-9 (citing

16   Ericksen Decl.).  These variations show that the survey responses do not provide reliable evidence

17   of "team activities," Defendants contend. *Id*. at 9.  Defendants further assert that the Main Survey

18   does not address the problems of recall bias, self-interest bias or non-response bias. *Id*. at 10-13.

19   Nor do Plaintiffs adequately respond to the problem of respondent burden, Defendants argue. *Id*.

20   To the extent Dr. Presser rejected Dr. Ericksen's opinion on this issue, Defendants assert, his

21   opinion is not persuasive because he looked at only one question in the Main Survey and did not

22   address the fact that the questions were asked up to 21 times for each respondent. *Id*.  In any

23   event, Defendants argue, Dr. Presser's declaration should be excluded because it is based only on

24   Dr. Presser's review of the scientific literature and not a review of the Main Survey or its results.

25   *Id*. at 13, 14-15.

26           Finally, Defendants reject Dr. Dennis's attempt to "validate" his survey results by

27   comparing the "average" responses of the Control Group to "average" times reflected on

28   schedules. *Id*. at 14-15.  The Control Group responses are subject to the biases discussed above,

United States District Court
Northern District of California

1    Defendants contend, and moreover, the Main Survey does not ask for averages and therefore

2    cannot be used for that purpose. *Id*. Averaging the schedules is also meaningless, Defendants

3    assert, because Plaintiffs' expert fails to account for the fact that there is variation in schedules

4    from Club to Club and there has been no effort to link the survey respondents to particular Clubs.

5    *Id*.

6        **E.    The Motion to Intervene**

7            In the Motion to Intervene, four current minor leaguers ("Injunctive Intervenors") and a

8    fifth intervenor who seeks to take the place of recently dismissed named Plaintiff Matt Gorgen,

9    seek to intervene under Rule 24(a) of the Federal Rules of Civil Procedure (governing intervention

10   as of right) or in the alternative, under Rule 24(b) (governing permissive intervention).[5]   Plaintiffs

11   contend the Motion to Intervene is timely because it is in response to the Court's Class

12   Certification Order, which was when the Injunctive Intervenors became aware that their interests

13   might no longer be protected by having opted in to the FLSA collective.   Motion to Intervene at 5.

14   They further contend there will be no prejudice to Defendants as minimal additional discovery will

15   be needed and the trial dates in this case have been vacated.   Plaintiffs argue that intervention as of

16   right is warranted because the Injunctive Intervenors have a significantly protectable interest in the

17   action that may be impaired if they are not permitted to intervene and the current named Plaintiffs,

18   all of whom are former minor leaguers, will not adequately represent their interests.

19           Even if the Court were to find that intervention under Rule 24(a) is not warranted,

20   Plaintiffs assert, the Court should allow permissive intervention under Rule 24(b) because

21   Plaintiffs have established timeliness, commonality and a basis for jurisdiction.

22           Defendants oppose the Motion to Intervene, arguing that the motion is untimely and

23   would result in severe prejudice to Defendants because of the additional discovery that would have

24   to be conducted (including discovery related to individual claims they plan to pursue) and the

25

26   _____

     [5] The Injunctive Intervenors are Shane Opitz, Corey Jones, Brian Hunter, and Kyle Johnson.
27   Motion to Intervene at 1.  The fifth intervenor is Aaron Dott, a former minor leaguer who played
     for the Tampa Bay Rays' organization from 2009 to 2011 and the New York Yankees'
28   organization from 2011 to 2015. *Id.; see also* Docket No. 719-6 (Proposed Complaint in
     Intervention) ¶ 3.

United States District Court
Northern District of California

delay that could result as to resolving the Motion for Reconsideration. They contend leave to intervene under both Rule 24(a) and 24(b) should be denied.

## III.   MOTION TO INTERVENE

### A.   Legal Standards Under Rule 24

Pursuant to Rule 24(b), "[a]n applicant who seeks permissive intervention must prove that it meets three threshold requirements: (1) it shares a common question of law or fact with the main action; (2) its motion is timely; and (3) the court has an independent basis for jurisdiction over the applicant's claims." *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998) (citing *Nw. Forest Resource Council*, 82 F.3d at 839).  If the party seeking to intervene meets those elements, the district court has broad discretion to grant or deny the motion, but "must consider whether intervention will unduly delay the main action or will unfairly prejudice the existing parties." *Id.*; *see also* Fed. R. Civ. P. 24(b)(3).

### B.   Discussion

The Court finds that the requirements of Rule 24(b) of the Federal Rules of Civil Procedure have been satisfied and therefore exercises its discretion to permit the Proposed Intervenors to intervene in this action.  The Court does not reach the question of whether the requirements of Rule 24(a) have been satisfied.  Defendants do not dispute that the claims of the proposed intervenors satisfy the commonality requirement or that there is a basis for jurisdiction over their claims.  Rather, they contend the request to intervene is untimely and will cause undue delay or prejudice.  The Court disagrees.

First, with respect to proposed intervenor Aaron Dott, the Court has already addressed a very similar issue in its July 6, 2016 Order Granting Motion to Withdraw and Dismissing Claims Without Prejudice [Docket No. 682].  There, the Court addressed whether the withdrawal of named Plaintiff Matt Gorgen would result in prejudice to Defendants such that his claims should be dismissed with prejudice. The Court found that it would not, finding that Plaintiffs timely notified Defendants of their intent to seek leave to substitute Aaron Dott for Matt Gorgen as a named Plaintiff and that Defendants had suffered no prejudice from Gorgon's withdrawal from the case. For the same reasons as are stated in that Order, and because Mr. Dott filed a motion to

United States District Court
Northern District of California

United States District Court
Northern District of California

1   intervene promptly after the Court issued its order permitting Matt Gorgen to withdraw, the Court

2   finds that Plaintiffs have timely requested that Aaron Dott be permitted to intervene and that they

3   will suffer no prejudice from that intervention.  Therefore, the Court exercises its discretion to

4   permit Mr. Dott to intervene as a named Plaintiff.

5   The Court also finds that intervention of the Injunctive Intervenors is timely and will not

6   result in undue prejudice to Defendants.  "Courts weigh three factors in determining whether a

7   motion to intervene is timely: '(1) the stage of the proceeding at which an applicant seeks to

8   intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay.'"

9   *United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004) (quoting *Cal. Dep't of*

10  *Toxic Substances Control v. Commercial Realty Projects, Inc.*, 309 F.3d 1113, 1119 (9th Cir.

11  2002)).  "[P]rejudice is evaluated based on the difference between timely and untimely

12  intervention—not based on the work the defendants would need to do regardless of when [the

13  proposed intervenors] sought to intervene."  *Kamakahi v. Am. Soc'y for Reprod. Med.*, No. 11-

14  CV-01781-JCS, 2015 WL 1926312, at *4 (N.D. Cal. Apr. 27, 2015) (citing *Day v. Apoliona*, 505

15  F.3d 963, 965 (9th Cir. 2007) (paranthetical omitted)).

16  Here, the Injunctive Intervenors requested leave to intervene promptly after the Court

17  issued its order decertifying the FLSA collective (of which the Injunctive Intervenors were

18  members) and denying Plaintiffs' request for certification of the State Law Classes under Rule 23.

19  The Supreme Court has made clear that absent class members may rely on the representation of

20  class members and their counsel during the pendency of a putative class action until class

21  certification is denied and that permitting them to do so is in the interests of "efficiency and

22  economy" of litigation.  *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353–54 (1983) ("'the

23  commencement of a class action suspends the applicable statute of limitations as to all asserted

24  members of the class who would have been parties had the suit been permitted to continue as a

25  class action.' . . . Once the statute of limitations has been tolled, it remains tolled for all members

26  of the putative class until class certification is denied.  At that point, class members may choose to

27  file their own suits or to intervene as plaintiffs in the pending action.").  Therefore, the Court

28  concludes that the Injunctive Intervenors did not unduly delay in seeking to intervene.

1        Nor is the Court persuaded by Defendants' assertions that they will be severely prejudiced

2 if the Injunctive Intervenors are permitted to intervene.  First, the Court rejects Defendants'

3 complaint that the Injunctive Intervenors' request amounts to an "effort for a 'second bite' at Rule

4 23(b)(2) class certification."  Opposition to Motion to Intervene at 1.  As it is undisputed that the

5 Injunctive Intervenors could assert these same claims in a separate action, the prejudice that would

6 result from permitting them to intervene in *this* action is minimal.  Indeed, combining the claims

7 of the Injunctive Intervenors with those of the existing Named Plaintiffs is likely in the interest of

8 judicial efficiency as the Injunctive Intervenors' claims are based on essentially the same theories

9 and evidence as those of the existing Named Plaintiffs.

10        Second, the Court rejects Defendants' assertion that permitting the Injunctive Intervenors

11 to intervene in this action will severely prejudice Defendants by delaying the resolution of the

12 Motion for Reconsideration and the entire action because of the need to conduct additional

13 discovery.  The Court concludes that Defendants' concerns on this score are exaggerated.  They

14 have not pointed to anything about these four individuals that requires additional discovery to be

15 conducted *before* the Court decides the Motion for Reconsideration.  Moreover, there are no

16 imminent deadlines relating to trial because the Court vacated the trial dates following its Class

17 Certification ruling.  And to the extent Defendants may be required to conduct discovery as to

18 claims that these individuals do not seek to assert on behalf of the class, the same discovery would

19 be necessary if the Court were to require them to file separate actions rather than permitting them

20 to intervene in this one.

21        Accordingly, the Motion to Intervene is GRANTED.

22 **IV.   MOTION TO EXCLUDE**

23    **A.   Legal Standards**

24        Rule 702 of the Federal Rules of Evidence provides that "[i]f scientific, technical, or other

25 specialized knowledge will assist the trier of fact to understand the evidence . . . a witness

26 qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto

27 in the form of an opinion."  Fed. R. Evid. 702. The Ninth Circuit has held that in applying this

28 standard to survey evidence, such evidence "should be admitted 'as long as [it is] conducted

United States District Court
Northern District of California

39

according to accepted principles and [is] relevant.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1036 (9th Cir. 2010) (quoting *Wendt v. Host Int'l, Inc*., 125 F.3d 806, 814 (9th Cir.1997)).   Thus, a district court's treatment of a survey involves two steps.  *See In re: Autozone, Inc.*, No. 3:10-MD-02159-CRB, 2016 WL 4208200, at *16 (N.D. Cal. Aug. 10, 2016) (citing *Clicks Billiards, Inc. v. Sixshooters, Inc*., 251 F.3d 1252, 1263 (9th Cir. 2001)).  "First, the court is to determine admissibility: 'is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles?'" *Id.* (quoting *Click's Billiards*, 251 F.3d at 1263).  "Second, once the survey is admitted, 'follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility.'" *Id.* (quoting *Click's Billiards*, 251 F.3d at 1263);  *see also Fortune Dynamic*, 618 F.3d at 1036)("'we have made clear that 'technical inadequacies' in a survey, 'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.'")(quoting *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988)).

## B.   Discussion

Defendants' challenges to Dr. Dennis's Main Survey are based on alleged shortcomings in the methodology he used to conduct the survey and on the alleged unreliability of its results.  The Court has carefully reviewed the opinions of both parties' experts and concludes that the Main Survey and the opinions of Dr. Dennis that are based upon it are sufficient to meet the standards set forth above.  Therefore, the Court DENIES the Motion to Exclude.

### 1.   Evidentiary Issues

As a preliminary matter, the Court rejects Defendants' requests to strike Dr. Dennis's report and survey under Rule 37 (c)(1) of the Federal Rules of Civil Procedure on the basis that Plaintiffs failed to comply with their discovery obligations under Rule 26(a)(2)(ii) with respect to disclosure of information on which Dr. Dennis's opinions are based.  "Rule 26(a)(2) only deals with disclosure of expert witnesses that parties intend to use at trial." *Ewert v. eBay, Inc*., No. C-07-02198 RMW, 2010 WL 4269259, at *13 (N.D. Cal. Oct. 25, 2010).  "Rule 26(a)(2) does not require advance disclosure of expert witness reports for use in class certification briefing." *Id*.  In

United States District Court
Northern District of California

1    any event, the single case cited by Defendants, *Rembrandt Vision Techs., L.P. v. Johnson &*

2    *Johnson Vision Care, Inc.*, 282 F.R.D. 655, 667 (M.D. Fla. 2012), aff'd, 725 F.3d 1377 (Fed. Cir.

3    2013), does not support their position.  First, that case (unlike the situation here) clearly implicated

4    Rule 26(a)(2) because it addressed whether an expert's testimony was improperly admitted at trial.

5    282 F.R.D. 655, 658.  Second, the alleged violation of Rule 26(a)(2) was obvious and egregious –

6    the  expert acknowledged on cross-examination that his opinions were not based on the test he

7    described in his expert report but instead, on a "completely different" test.  *Id*. at 663.  Under these

8    circumstances, the court found that the disclosures in the expert report were "woefully deficient."

9    *Id*.  There is no such violation alleged here.

10           Similarly, the Court declines to exclude the opinions of Dr. Presser.  Defendants contend it

11   was improper for Plaintiffs to introduce this declaration in support of their opposition to

12   Defendants' *Daubert* motion because they were already aware of Defendants' challenges to Dr.

13   Dennis's methodology.  This argument makes no sense.  In the Ericksen Declaration, Defendants

14   introduced new and specific challenges to Dr. Dennis's updated expert report based on the Main

15   Survey.  Dr. Presser's opinions were offered specifically to address the validity of Dr. Ericksen's

16   new opinions, which Plaintiffs could not have anticipated.  Therefore, the Court concludes that

17   there was nothing improper about Plaintiffs' submission of the Presser Declaration.  Furthermore,

18   there was no prejudice to Defendants because they had an opportunity to respond to Dr. Presser's

19   opinions in their reply papers and indeed, they did so by filing a responsive declaration by Dr.

20   Ericksen that directly addressed Dr. Presser's criticisms of Dr. Ericksen's earlier opinions.  *See*

21   Docket No. 761.

22                     **2.  Whether the Main Survey is Relevant**

23           Defendants contend Dr. Dennis's opinions based on the Main Survey results are irrelevant

24   for the purposes of Rule 702 and *Daubert* because respondents were asked only to recall their

25   arrival and departure times and meal times and were not asked about their actual activities while

26   they were at the ballpark to determine the amount of time they spent on team-related activities.

27   The Court disagrees.

28           Dr. Dennis's questions in the Main Survey are premised on the "whistle-to-whistle" or

United States District Court
Northern District of California

41

continuous workday doctrine, under which a workday is considered to be "continuous, not the sum of discrete periods," *Alvarez v. IBP, Inc.,* 339 F.3d 894, 907 (9th Cir. 2003), *aff'd,* 546 U.S. 21 (2005), and consists "in general,  [of] the period between the commencement and completion on the same workday of an employee's principal activity or activities."  *IBP, Inc. v. Alvarez*, 546 U.S. 21, 36 (2005);  *see also* Ariz. Admin. Code R20-5-1202 (defining "hours worked" under Arizona minimum wage law as "all hours for which an employee . . . is employed and required to give to the employer, including all time during which an employee is on duty or at a prescribed work place and all time the employee is suffered or permitted to work.");  *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 582 (2000), as modified (May 10, 2000) ("Wage Order No. 14–80 defines 'hours worked' as 'the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so.'" ).  Consistent with this doctrine, Dr. Dennis used arrival and departure times as an indicator of when ball players' principal activities began and ended.

While the data Dr. Dennis obtained may or not be sufficient to establish the ultimate issue of how much actual work was performed by the putative classes, it will allow the jury to ascertain *whether* the class members performed work  and will provide estimates of  the amounts of time they worked.  This evidence may be helpful to the jury, especially when considered in combination with other evidence such as the daily schedules and witness testimony, and that is all that is required to meet the relatively low relevance requirement under Rule 702.  *See In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 1351040, at *2 (N.D. Cal. Apr. 4, 2014) ("Rule 702 'mandates a liberal standard for the admissibility of expert testimony.'") (*quoting  Cook v. Rockwell Int'l Corp.*, 580 F.Supp.2d 1071, 1082 (D.Colo. Dec. 7, 2006); and citing *Daubert*, 509 U.S. at 588; *Dorn v. Burlington N. Sante Fe R.R. Co.*, 397 F.3d 1183, 1196 (9th Cir.2005) ("The Supreme Court in *Daubert* [ ] was not overly concerned about the prospect that some dubious scientific theories may pass the gatekeeper and reach the jury under the liberal standard of admissibility set forth in that opinion[.]").

As Judge Illston explained in *Ridgeway v. Wal-Mart Stores, Inc.*, "[t]he 'fit test' [under *Daubert*] does not require an expert to provide all of the components of a party's case."  No. 08-

1    CV-05221-SI, 2016 WL 4728668, at *4 (N.D. Cal. Sept. 12, 2016).  Therefore, in that case the

2    court declined to exclude an expert report that measured the amounts of time class members spent

3    on various tasks, where the expert used these times in support of a damages estimate, even though

4    the expert did not address "whether the tasks for which he gives time estimates were performed

5    during paid or unpaid time."  *Id*. (internal quotations and citation omitted).  The court concluded

6    that this was an issue that was more appropriately addressed through "'[v]igorous cross-

7    examination, presentation of contrary evidence, and careful instruction on the burden of proof'"

8    rather than outright exclusion.  *Id*. (quoting *Daubert*, 509 U.S. at 596).  The Court reaches the

9    same conclusion here.[6]

### 3.   Whether Dr. Dennis Followed Accepted Principals

11          Defendants point to three types of bias in support of their contention that Dr. Dennis's

12   methodology is fatally flawed:  1) recall bias; 2) self-interest bias; and 3) non-response bias.  In

13   addition, they challenge the Survey's methodology to the extent it asks player to describe their

14   "most often" arrival and departure times for particular periods rather than their average arrival and

15   departure time.  As discussed above, the Court cited both recall bias and self-interest bias in its

16   Class Certification Order as reasons for concluding that the Pilot Survey was inadmissible, and

17   went so far as to find that "any future survey that applies a similar methodology is likely to yield

18   unreliable results as well."  Class Certification Order at 103.  The Court is now persuaded that the

19   alleged flaws in Dr. Dennis's methodology have either been addressed in the Main Survey or are

20   the type of issues that are more appropriately addressed through cross-examination, but that they

21   do not warrant exclusion of Dr. Dennis's opinions under Rule 702 and *Daubert*.

                a.   Recall Bias

23          In its Class Certification Order, the Court was particularly concerned about the possibility

24   of recall bias because the Pilot Survey asked players to remember mundane events that occurred,

25   for many respondents, over a year before they participated in the survey.  The problem was

---

[6] In finding that Dr. Dennis's opinions are relevant for the purposes of admissibility, however, the Court does *not* hold that use of the Main Survey results is a proper use of representative  evidence under *Tyson Foods* and *Wal-Mart*.  That issue is addressed below.

United States District Court
Northern District of California

particularly pronounced, the Court found, as to a question about spring training that asked respondents to provide the total amount of time they spent on a variety of activities for each week of the four weeks of Spring training.  The Court was skeptical of Dr. Dennis's assertion that he could use "memory aids" to improve recall and also rejected his assertion that the times reported by the players could be validated using other records, concluding that Dr. Dennis had not pointed to any specific types of records that might be available to validate the results of the survey.   The Court concluded these problems were so severe as to warrant outright exclusion.  The Court now finds that problems associated with respondents' ability to recall details in connection with the Main Survey can be addressed through cross-examination and/or the introduction of admissible evidence and that these problems are better left to a jury to evaluate.

As the Court revisits this question, it notes that there is no authority suggesting that there is a bright-line rule or cut-off with respect to how far in the past survey respondents can be asked to recall past events in order for a survey to be admissible.  To the contrary, courts have found admissible surveys – including in the wage and hour context – that asked respondents to recall events that occurred many years in the past.  *See, e.g., Medlock v. Taco Bell Corp*., No. 1:07-CV-01314-SAB, 2015 WL 8479320, at *5 (E.D. Cal. Dec. 9, 2015) (finding that survey that asked respondents to report on their rest and meal breaks for an eleven year period was admissible and concluding that any issues as to memory were better addressed through cross-examination); *Oracle Am., Inc. v. Google Inc*., No. C 10-03561 WHA, 2016 WL 1743116, at *8 (N.D. Cal. May 2, 2016) (holding that survey that asked respondents to recall details about their decision-making process many years before the survey was conducted did not warrant outright exclusion as the issue of imperfect recall was not "a fatal flaw of the survey methodology" and could be addressed through cross-examination or the introduction of other admissible evidence).  Moreover, surveys that rely on the respondents' ability to recall detailed information are widely used by the United States Census Bureau and other "official statistical agencies, government health agencies, and academic research centers."  Dennis Opp. Decl. ¶ 20 n. 2.

The Court also finds that notwithstanding the criticisms Defendants' experts have made of Dr. Dennis's approach, Dr. Dennis's efforts to improve recall accuracy and test for recall bias are

United States District Court
Northern District of California

based on accepted principles in the survey research literature.  For example, Dr. Dennis used memory aid questions for each year a respondent played.  *See* August 4, 2016 Dennis Decl. ¶¶ 35-36.  There is a body of literature that shows that aided recall questions are an accepted technique for assisting in recall.  *See* Presser Decl. ¶ 7 & n. 3.  He has also removed the question about spring training that the Court found was particularly burdensome and might give rise to recall bias. August 4, 2017 Dennis Decl. ¶ 37.   In addition, Dr. Dennis has cited to literature indicating that even if mundane events may be more difficult for respondents to recall, routine events are more easily remembered than non-routine events.  Dennis Opp. Decl. ¶ 21 & n. 3;  *see also* August 4, 2016 Dennis Decl. ¶¶ 30-31.  Plaintiffs have also introduced evidence that the activities of minor league players are, in fact, routinized.  *See* Declaration of Garrett E. Broshuis in Support of Opposition to Motion to Exclude ("Broshuis Opposition Decl."), Ex. A (chart summarizing testimony of minor league players regarding routine nature of activities).

Dr. Dennis has also conducted various types of "checks" on his responses to determine whether the results of the Main Survey are characterized by any recall bias.   First, he analyzed daily schedules produced by Defendants for both game days and non-game days and concluded that the results of these schedules are in line with the results of the Main Survey.  August 4, 2016 Dennis Decl. ¶¶ 26-28.  Second, he looked at the deposition testimony of Defendants' witnesses as to arrival and departure times before night games during the championship season to see how it compared with the Main Survey Results.  *Id*. ¶ 29.  He found that the amount of time reflected in the testimony of Defendants' witnesses was lower but not "substantially lower" and that a "conservative measure of the survey data, such as the tenth percentile, could be used if needed to account for any differences."  *Id*.  Finally, Dr. Dennis compared the responses of the Control Group (who played in the 2015 or 2016 season and who did not opt in to the FLSA collective) to the responses of all of the respondents and did not find that they were significantly different, leading him to conclude that recall bias was not a problem.  *Id*. ¶ 6.

In light of the measures Dr. Dennis has taken to avoid recall bias and also because Defendants' experts have not been able to identify in any convincing way that the responses to the Main Survey are characterized by any *actual* recall bias, the Court concludes that the criticisms

1    leveled by Defendants and their experts relating to recall bias do not warrant exclusion of the Main

2    Survey in its entirety.

3                    b.   Self-Interest Bias

4           In its Class Certification Order, the Court expressed concern that respondents to the Pilot

5    Survey might have inflated their responses as to time worked because they might have believed

6    they had a vested interest in the outcome of the survey.  The Court noted that all of the

7    respondents to the Pilot Survey had opted in to the FLSA collective and that the respondents were

8    told that they were being asked to complete the survey *because* they had opted in.  Class

9    Certification Order at 100.   The measures taken to avoid self-interest bias and test for its existence

10   alleviate the Court's concerns and therefore, the Court concludes that the potential self-interest

11   bias cited by Defendants does not justify exclusion of Dr. Dennis's opinions and the Main Survey.

12          First, in the Main Survey (in contrast to the Pilot Survey) Dr. Dennis did not tell

13   respondents why they were being asked to complete the survey and he used a logo that suggested

14   the survey was being conducted as independent research.  *See* Dennis Opp. Decl., ¶ 12.  He also

15   attempted to reduce the possibility that respondents would connect the survey to this lawsuit by

16   describing the survey to respondents as one about their "experiences" as minor league players and

17   not asking directly about their hours.  *Id.*   Second, he sought and obtained responses from a

18   significant number of non opt-in players; he also corrected the results statistically to ensure that

19   the weight of opt-in and non opt in responses would correspond to the relative proportions of these

20   groups as part of the class.   August 4, 2016 Dennis Decl. ¶¶ 4, 46.

21          While the Court previously expressed the concern that reliance on the responses of non

22   opt-ins to address the possibility of self-interest bias would not be effective because even these

23   players were likely to have an interest in the outcome of this action, *see* Class Certification Order

24   at 101-102, the Court now concludes that this is an issue that goes to the weight of the evidence

25   and not its admissibility.  *See Medlock v. Taco Bell Corp*., No. 1:07-CV-01314-SAB, 2015 WL

26   8479320, at *5 (E.D. Cal. Dec. 9, 2015) (rejecting *Daubert* challenge to survey based on alleged

27   self-interest bias arising from the fact that respondents were told throughout the survey that they

28   were members of the class and holding that any self-interest bias that might have result went to the

United States District Court
Northern District of California

46

weight of the evidence rather than its admissibility); *Johnson v. Big Lots Stores, Inc.*, No. CIV.A.
04-3201, 2008 WL 1930681, at *7 (E.D. La. Apr. 29, 2008) ("statistical experts frequently employ
surveys in which respondents have a potential interest in the outcome of the survey. . . . Potential
bias by the survey respondents may affect the ultimate weight that should be accorded to
Rausser's opinion, but it does not render his study unreliable.").

Finally, Dr. Dennis has also conducted tests for self-interest bias that apply accepted
principles of survey research;  conversely, Defendants have not established the existence of any
actual self-interest bias.

The Court concludes that Plaintiffs have taken meaningful measures in the Main Survey to
reduce the likelihood of self-interest bias and that while Defendants will have an opportunity to
challenge Dr. Dennis on this question through cross-examination and the introduction of
admissible evidence, this problem does not warrant exclusion of the Main Survey.

c.   Non-response Bias

Defendants make much of the low response rate to the Main Survey.  Dr. Dennis, however,
has cited research survey literature (including a paper by Defendants' expert, Dr. Ericksen) that
suggests that a low response rate is not likely to skew the results of a survey where, as here, the
respondents were randomly selected.  Dennis Opp. Decl. ¶ 31.  Dr. Dennis also conducted
analyses of various factors that could have led to bias as a result of the low response rate and did
not find any significant bias.  *See id*. ¶ 27.  Although Defendants' expert suggests there might be
other criteria that Dr. Dennis should have considered, *see* Ericksen Decl. ¶¶ 44, 48, he has not
established that any such bias exists.   Accordingly, the Court concludes this is not a shortcoming
of the Main Survey that requires exclusion.

d.   "Most often" arrival and departure times

Defendants have offered the expert opinion of Dr. Martin that by asking respondents to
describe their "most often" arrival and departure times, rather than their average arrival and
departure time, Dr. Dennis may have skewed the results of the survey.  As discussed above, Dr.
Martin offers a hypothetical example to illustrate how this approach might have led to an inflated
result with respect to the measurement of work performed by class members.  Dr. Kriegler, on the

other hand, rejects Dr. Martin's opinion that Dr. Dennis's use of the "mode" rather than the average arrival and departure times of the players leads to an unreliable result. *See* Kriegler Rebuttal Decl. at 6, 21. In particular, he contends Dr. Martin's example is misleading because she used "fictitious data and extremely small sample sizes, neither of which is based on actual data in the instant matter." *Id*. at 6. He goes on to address, in detail, why use of the mode may, in fact, give rise to a more conservative estimate of hours worked than would be obtained based on use of averages. *See id*. at 21-23. The Court concludes that this is a dispute between the experts about survey methodology and that Defendants have failed to show that the methodology used by Dr. Dennis is not within the range of accepted principals of survey design. Accordingly, Defendants' challenge goes to the weight of the Survey and not its admissibility.

Accordingly, the Motion to Exclude is DENIED.

## V.   MOTION FOR RECONSIDERATION

### A.   Legal Standard

"A district court . . . retains jurisdiction over an interlocutory order—and thus may reconsider, rescind, or modify such an order—until a court of appeals grants a party permission to appeal." *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 886 (9th Cir. 2001). Further, Rule 23(c)(1)(C) of the Federal Rules of Civil Procedure provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." "Accordingly, it is not uncommon for district courts to permit renewed certification motions that set out a narrower class definition or that rely upon different evidence or legal theories." *Hartman v. United Bank Card, Inc*., 291 F.R.D. 591, 597 (W.D. Wash. 2013) (citing *Bushbeck v. Chicago Title Ins. Co.*, No. C08–0755JLR, 2012 WL 405173, at *2 (W.D.Wash. Feb. 8, 2012); *In re Apple iPod iTunes Antitrust Litig*., No. 05–0037, 2011 WL 5864036, at *1–2, *4 (N.D.Cal. Nov. 22, 2011)). [7]

---

[7] Defendants contend, in a footnote, that Plaintiffs' Motion for Reconsideration should be denied on the ground that Plaintiffs have "completely ignored the standard governing" motions for reconsideration and that they do not satisfy that standard. Opposition at 3 n. 2. This argument fails because the Court made clear in its August 19 Order that it was granting Plaintiffs leave to file a motion that not only addressed whether the Court should reconsider aspects of its Class Certification Order but also addressed whether the Court should certify narrower classes.

United States District Court
Northern District of California

**B.    Certification of Rule 23 Classes**

       **1.    Rule 23(a)**

Rule 23(a) requires that a plaintiff seeking to assert claims on behalf of a class demonstrate:  1) numerosity; 2) commonality; 3) typicality; and 4) fair and adequate representation of the interests of the class.  Fed. R. Civ. P. 23(a).  While the Court treated ascertainability as a separate Rule 23 requirement in its Class Certification Order, the Ninth Circuit's recent decision in *Briseno v. ConAgra Foods, Inc.* suggests that the concerns that have led courts to conclude that classes are not ascertainable should be addressed with reference to the requirements of Rule 23 that are expressly enumerated in that rule.  *See* 844 F.3d 1121, 1126 (9th Cir. 2017) (holding that "Rule 23 does not impose a freestanding administrative feasibility prerequisite to class certification" and finding that "Supreme Court precedent  . . . counsels in favor of hewing closely to the text of Rule 23.").

      There is no dispute that the numerosity requirement is satisfied for all of the new Rule 23 Classes proposed by Plaintiffs. The Court also finds that the commonality requirement is satisfied because the claims asserted by the proposed classes turn on a number of common and central questions that are likely to give rise to common answers, including:  1) whether the Clubs and MLB are joint employers; 2) whether the activities Minor League players perform at the ballpark and/or or in connection with games constitute "work" for the purposes of the applicable wage and hour laws; and 3) whether the common compensation policies applied to Minor Leaguers by Defendants under the Minor League Rules and Uniform Player Contracts – including  failure to pay players a salary outside the championship season and failure to pay minimum wage and overtime during the championship season – violate the applicable wage and hour laws. *See Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 588 (9th Cir. 2012).

      The Court also finds that the claims of the proposed class representatives meet the typicality requirement because they are "reasonably coextensive with those of the absent class members."  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998);  Broshuis Decl., Exs. E & F.   To the extent that the Court expressed concern regarding the typicality of Named Plaintiffs' claims in connection with off-season training performed in different states, *see* Class

1    Certification Order at 65, that concern has been addressed by Plaintiffs' new Rule 23 Classes,

2    which do not seek to assert claims based on off-season training on a classwide basis.  For the same

3    reason, the Court's concerns relating to the ascertainability of the proposed classes have been

4    adequately addressed.[8]

5            Finally, the Court addresses whether the adequacy requirement is met by the new Rule 23

6    classes.  The Court rejects Defendants' assertion that Plaintiffs' plan to use a conservative

7    "percentile" approach to determine the amount of work performed by class members will result in

8    inadequate representation of the proposed Rule 23 absent class members because the vast majority

9    of those who responded to the Main Survey reported longer hours than the named Plaintiffs will

10   seek to recover for the proposed classes.  *See* Sur-Reply at 3-4. As in any class action, Plaintiffs

11   must make judgment calls about what claims can be addressed on a classwide basis and what relief

12   should be pursued for the class.  So long as class members are adequately informed of their right

13   to opt out of the class and the potential for a larger recovery if they proceed individually, the Court

14   does not find that Plaintiffs' approach will impair their ability to adequately represent the

15   proposed classes.

16           On the other hand, the Court agrees, at least in part, with Defendants' primary challenge to

17   the adequacy of representation for the new Rule 23(b) classes, which is based on the fact that

18   Plaintiffs now ask the Court to apply the law of a single state to all members of each class.

19   Defendants contend this creates a conflict between the named Plaintiffs and absent class members

20   because some absent class members will forfeit their right to recover significant additional

21   damages under the laws of other states that may potentially apply to their claims.  The Court

22

23   ───────────────

24   [8] As noted above, in light of the Ninth Circuit's discussion in *Briseno*, it appears that
     ascertainability is not an independent requirement under Rule 23.  Nonetheless, the main concerns
     that were the basis of the Court's conclusion in its Class Certification Order with respect to

25   ascertainability, namely, the wide range of activities and circumstances under which minor
     leaguers perform their winter training  and the difficulty of determining class membership based

26   on winter training activities, are relevant to both typicality (as the Court found in its Class
     Certification Order) and the superiority requirement of  Rule 23(b)(3), which allows courts to take

27   into account the administrative difficulties associated with identifying class members. *See*
     *Briseno*, 844 F.3d 1121, 1127–28 (finding that a separate "administrative feasibility" requirement

28   is unnecessary because Rule 23(b)(3) "already contains a specific, enumerated mechanism to
     achieve that goal: the manageability criterion of the superiority requirement").

1    addresses the choice of law question below, in the context of the predominance inquiry of Rule

2    23(b)(3).  There, the Court finds that Plaintiffs have not met their burden of showing that the

3    claims of all of the Florida and Arizona Class members are governed by the laws of those two

4    states.  Consequently, the Court agrees with Defendants that the adequacy requirement has not

5    been met for the Florida and Arizona Classes.  On the other hand, the Court finds that Plaintiffs

6    have established that all of the claims of the California Class members can be decided under

7    California law.  Therefore, the Court concludes that the adequacy requirement is met as to that

8    class.

9          Therefore, the Court concludes that the requirements of Rule 23(a) are met as to all three

10   of the proposed Rule 23(b)(3) classes, except that the adequacy requirement is not met as to the

11   Arizona and Florida classes.

12                    **2.  Rule 23(b)(3)**

13         Rule 23(b)(3) allows for certification of a class where a court finds that: 1) "questions of

14   law or fact common to class members predominate over any questions affecting only individual

15   members;" and  2)  "a class action is superior to other available methods for fairly and efficiently

16   adjudicating the controversy."   Defendants' challenges to Plaintiffs' new Rule 23(b)(3) classes

17   implicate both the "predominance" requirement and the "superiority" requirement.

18

19                    a.   Whether the Claims of the New Rule 23(b) Classes Can be Proved Using
                          Representative Evidence Obtained from the Main Survey

20         One of Defendants' primary challenges to Plaintiffs' new Rule 23(b) classes is that the

21   claims these classes assert cannot be proven through the use of common evidence, especially in

22   light of the variations in players' arrival and departure times, work routines and compensation.

23   This challenge requires that the Court revisit the question of what the Supreme Court's *Tyson*

24   *Foods v. Bouaphakeo* decision means at the class certification stage.

25         As discussed in the Court's Class Certification Order, in *Tyson Foods, Inc. v. Bouaphakeo*,

26   the Supreme Court reiterated the principle first articulated in *Anderson v. Mt. Clemens Pottery*

27   *Co*., 328 U.S. 680 (1946) that "when employers violate their statutory duty to keep proper records,

28   and employees thereby have no way to establish the time spent doing uncompensated work, the

'remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making' the burden of proving uncompensated work 'an impossible hurdle for the employee.'" 136 S. Ct. at 1047 (quoting *Mt. Clemens*, 382 U.S. at 687). Thus, "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." 328 U.S. at 687-88. The *Mt. Clemens* rule is not limited to FLSA cases and has also been invoked in cases involving state law wage and hour claims based on the same reasoning that was applied to FLSA claims in *Mt. Clemens*, namely, that it would unfairly penalize employees to deny recovery because of the employer's failure to keep proper records. Class Certification Order at 88.

There is no dispute that Defendants have not kept the records of the activities that Plaintiffs contend are "work" under any potentially applicable wage and hour laws, state or federal. Thus, Plaintiffs are entitled to prove the amount of work they performed by "just and reasonable inference" so long as they can show that they did, in fact, perform work for which they were improperly compensated. The Court previously found, though, that the experiences of the players varied so widely with respect to the activities upon which their claims were based, that reliance on Dr. Dennis's Pilot Survey to draw conclusions on a classwide basis would be improper. *See* Class Certification Order at 90. The Court now reaches a different conclusion and finds that the classes have been narrowed sufficiently that any individualized issues that arise in connection with the representative evidence offered by Plaintiffs will not predominate over common issues.

As a preliminary matter, the Court notes that the "continuous workday" doctrine did not figure prominently (if at all) in the first round of briefs, addressing Plaintiffs' original class certification request. In its Motion for Reconsideration, however, Plaintiffs rely heavily on the doctrine, arguing that "[a]pplication of the continuous workday doctrine means that it does not matter *what* specific activities class members performed during the workday or whether they took short breaks." Motion for Reconsideration at 8 (emphasis in original). In other words, Plaintiffs contend, because their proposed Rule 23(b)(3) classes are "focused exclusively on work class

1    members performed as teams at team complexes, under the direct supervision and control of

2    Defendants," "individualized inquiries into the activity-by-activity course of a class member's

3    workday are unnecessary." *Id*. at 1.

4            "[T]he continuous workday rule . . . means that the 'workday' is generally defined as 'the

5    period between the commencement and completion on the same workday of an employee's

6    principal activity or activities." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 28 (2005) (citing 29 C.F.R. §

7    790.6(b)).  It dates back to the enactment of the Fair Labor Standards Act of 1938, as amended by

8    the Portal-to-Portal Act of 1947, and is set forth in long-standing Department of Labor regulations.

9    *See* 29 C.F.R. §§ 778.223 (providing that an employer must compensate an employee for "(a) All

10   time during which an employee is required to be on duty or to be on the employer's premises or at

11   a prescribed workplace and (b) all time during which an employee is suffered or permitted to work

12   whether or not he is required to do so"), 785.18 (providing that "[r]est periods of short duration,

13   running from 5 minutes to about 20 minutes, are common in the industry" and "must be counted

14   as hours worked") & 790.6 (defining "workday" as "the period between the commencement and

15   completion on the same workday of an employee's principal activity or activities" "includ[ing] all

16   time within that period whether or not the employee engages in work throughout all of that

17   period").

18           Under this rule, "work" is defined relatively broadly to include "physical or mental

19   exertion (whether burdensome or not) controlled or required by the employer and pursued

20   necessarily and primarily for the benefit of the employer." *Alvarez v. IBP, Inc*., 339 F.3d 894, 902

21   (9th Cir. 2003), aff'd, 546 U.S. 21 (2005) (citing *Tenn. Coal, Iron & R. Co. v. Muscoda Local No.

22   123*, 321 U.S. 590, 598 (1944)).  Florida law follows federal law, Fla. Stat. Ann. § 448.110

23   (Florida minimum wage law, incorporating terms of FLSA), while Arizona and California define

24   work even more broadly.  *See* Ariz. Admin. Code § R20-5-1202(9) (defining "hours worked" as

25   "all hours for which an employee covered under the Act is employed and required to give to

26   the employer, including all time during which an employee is on duty or at a prescribed work

27   place and all time the employee is suffered or permitted to work").

28           Plaintiffs' original classes asserted claims that were based not only on activities in which

53

United States District Court
Northern District of California

they engaged at the ballpark but also winter conditioning activities performed individually.  The evidence in the record indicated that players had wide latitude as to what types of winter conditioning they engaged in and where and when they performed this work. Players were not required to perform their conditioning at a particular workplace and were not under the control of their employer when they performed their conditioning activities.  Under these circumstances, the continuous workday doctrine was of little assistance for measuring the amount of work they performed, at least for the winter conditioning work, and therefore classwide determination of the amount of work performed by class members would have been difficult, if not impossible. Moreover, the wide variations as to players' winter conditioning activities and the broad discretion each player had as to how he would meet these requirements (including the amount of conditioning, the type of activities and the place where they were performed) were significant factors in the Court's conclusion that it would be improper to rely on the results of Dr. Dennis's survey to establish the amount of work on classwide basis.  In particular, as to these activities the Court found that Plaintiffs' proposed classes – and the survey evidence they intended to use prove their claims based on these activities – amounted to the sort of "trial by formula" approach against which the Supreme Court cautioned in *Wal-Mart Stores, Inc. v. Dukes*.  *See* 564 U.S. 338, 367 (2011).

Under their new proposal, Plaintiffs no longer seek to assert claims on behalf of the proposed classes based on winter conditioning work.  In dropping these claims, they have significantly reduced the variations that led the Court to conclude that Plaintiffs were attempting to stretch the holding of *Tyson Foods* too far.  To be sure, Defendants' experts have identified variations in the survey responses relating to arrival and departure times, hours worked by players affiliated with different clubs and even hours worked reported by players affiliated with the same clubs.  *See generally* Guryan Decl. In addition, as noted by the Court in its previous order, there is evidence of other variations, including variations with respect to: 1) whether players participated in extended training, mini-camps or instructional leagues; 2) the types of activities in which players engaged when they participated in these various training opportunities; 3)  practices related to travel time; 4) and salaries, bonuses and other forms of compensation received by

54

1    players.  The Court concludes, however, that the remaining variations are not so significant as to

2    preclude a jury from addressing Plaintiffs' claims on a classwide basis.

3           As discussed above, Plaintiffs have narrowed the range of activities on which they base

4    their class claims by eliminating winter conditioning, instead focusing on activities that are

5    conducted primarily on a team basis.  In addition, Plaintiffs' theory of liability as to the new

6    classes reduces the need to focus on the players' specific activities in order to quantify the amount

7    of work performed to the extent they rely on the continuous workday doctrine.  While it is likely

8    that some individualized issues will remain as to whether certain types of activities should be

9    included under the continuous work-day rule or are properly considered "work" under the

10   applicable law, the Court is not persuaded that they will overwhelm the common issues raised by

11   Plaintiffs' claims.

12          The Court also revises its conclusion as to the significance of variations in salary and other

13   forms of compensation; these variations do not present an obstacle to class treatment because

14   sufficient payroll records have been maintained by Defendants to account for them in Plaintiffs'

15   damages model.  *See* Kriegler Rebuttal Decl. ¶¶ 38-44;  *Minns v. Advanced Clinical Employment

16   Staffing LLC*, No. 13-CV-03249-SI, 2015 WL 3491505, at *8 (N.D. Cal. June 2, 2015) ("the

17   necessity of making individualized factual determinations does not defeat class certification if

18   those determinations are susceptible to generalized proof like employment and payroll records")

19   (citing Newberg on Class Actions § 4:50 (5th ed.)).

20          Finally, the Court finds that many of the individualized inquiries cited by Defendants go to

21   damages and not liability, and therefore do not present an impediment to class certification.  *See*

22   *Vaquero v. Ashley Furniture Indus., Inc*., 824 F.3d 1150, 1155 (9th Cir. 2016) ("Under *Tyson*

23   *Foods* and our precedent, therefore, the rule is clear: the need for individual damages calculations

24   does not, alone, defeat class certification.").  First, with respect to the Florida and Arizona Classes,

25   Plaintiffs have presented evidence that virtually all players were unpaid for their participation in

26   spring training, extended spring training and instructional leagues.  *See* Kriegler Rebuttal Decl. ¶

27   41 & Ex. 5.  Consequently, for these classes, liability can be established simply by showing that

28   class performed *any* work. In addition, with respect to the California Class, Plaintiffs may be able

United States District Court
Northern District of California

55

to establish liability as to some of their overtime claims by using schedules reflecting weeks in which teams were scheduled to play games on seven consecutive days in violation of California overtime law. *See* Kriegler Rebuttal Decl. ¶¶ 24-26. According to Dr. Kriegler, approximately 65-85% of Minor Leaguers had at least one workweek in which they were scheduled for seven days. *Id.* ¶ 26.

Of particular significance to the Court's conclusion that the variations among players do not preclude certification of the new Rule 23(b)(3) classes is the fact that Plaintiffs will be able to use the survey data in combination with other evidence that may be sufficient to allow a jury to draw conclusions based on reasonable inference as to when players were required to be at the ballpark and how long after games they were required to remain at the ballpark. This evidence includes the transactional histories of the players, the daily schedules, and records of games that were played, including where the games were played and how long they lasted. Thus, as in *Tyson Foods,* it appears that representative evidence can be combined with actual records of time spent engaged in the various activities to derive a reasonable estimate of the amount of time worked by class members. The Court also notes that in *Tyson Foods* itself, there were variations among class members with respect to the time it took them to perform the donning and doffing activities that were at issue in that case – even when class members performed the *same* activities, but these were not found to preclude reliance on representative evidence. *See* 136 S. Ct. at 1055 (Thomas, J. dissenting). Moreover, the Court rejects Defendants' suggestion that under *Tyson Foods*, only observational studies are permitted to fill in evidentiary gaps. There is simply nothing in the reasoning of that decision that supports such a narrow reading of the opinion.

Furthermore, certification of the proposed classes will not preclude Defendants from challenging the sufficiency of the Main Survey and Plaintiffs' damages model on summary judgment and/or at trial. *See Tyson Foods*, 136 S. Ct. at 1047 ("When, as here, the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity – an alleged failure of proof as to an element of the plaintiffs' cause of action – courts should engage that question as a matter of summary judgment, not class certification.")(internal quotations, brackets and citations omitted). At that point, it is likely that the Court also will be in a better

1    position to evaluate the overarching theory of Plaintiffs' claims and whether they will be able to

2    prove their claims on a classwide basis.

3           Therefore, the Court finds that individualized issues that will arise in connection with

4    proving the claims of the new Rule 23(b)(3) classes  are not sufficient to defeat the predominance

5    requirement as to those classes.

6           b.   Whether individualized issues related to defenses preclude certification of the
                 Rule 23(b)(3) classes
7

8           In its previous Order, the Court found that the individualized inquiries that would be

9    associated with Defendants' main defenses – the seasonal amusement and recreational

10   establishment defenses and the creative professionals exemption – would not be sufficient, on

11   their own, to warrant denial of class certification for lack of predominance.  Class Certification

12   Order at 84-86.  The Court expressed some concern, however, regarding the need to conduct a

13   multitude of inquiries to determine whether the various venues where Minor Leaguers play

14   baseball fell within the ambit of the seasonal amusement and recreational establishment

15   exemptions.  *Id*. at 85.  That concern is now significantly diminished.  Under Plaintiffs' new

16   proposal, it appears that there are only about 40 facilities that would need to be evaluated.  See

17   Motion for Reconsideration at 20.  The Court concludes that any individualized inquiries required

18   to evaluate whether facilities qualify for the exemptions are likely to be manageable and will not

19   overwhelm the common questions raised by the new classes proposed by Plaintiffs.

20          With respect to the creative professionals exemption, the Court finds (as it did in its

21   previous order) that Defendants have failed to point to any material variations in the duties of the

22   class members with respect to the degree of creativity that characterizes their primary duties and

23   therefore rejects Defendants' assertion that evaluation of that question would require a multitude

24   in individualized inquiries.  Further, with respect to the minimum compensation requirement that

25   must be satisfied for this exemption to apply, the Court concludes that there are sufficient

26   employment and payroll records to address this question on a classwide basis for the reasons

27   discussed above.  To the extent the Court previously held that the salary part of the test for the

28   creative professional exemption will require individualized inquiries because of "significant

1 variation in the players' compensation," *see* Class Certification Order at 86, the Court now

2 concludes that it was incorrect.

3        Finally, the Court rejects Defendants' assertion that the new Rule 23(b)(3) classes revive

4 the problem of addressing the joint employer question on a classwide basis for the Arizona and

5 Florida Classes because players did not expect compensation for their participation in spring

6 training, extended spring training and instructional leagues.  Apart from the fact that the Court

7 already rejected a very similar argument, *see* Class Certification Order at 78, Defendants'

8 argument only highlights the common nature of the inquiry as all of the members of the Florida

9 and Arizona classes were treated the same in this respect.

10        Accordingly, the Court finds that Defendants' defenses do not require the Court to engage

11 in so many individualized inquiries that they will overwhelm the common issues and defeat the

12 predominance requirement.

13              c.   Individualized Issues Related to Choice of Law

14        A class action that requires the court to apply multiple state laws implicates the

15 predominance requirement of Rule 23(b)(3).  *Zinser v. Accufix Research Inst., Inc*., 253 F.3d

16 1180, 1189 (9th Cir.), opinion amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001)

17 ("Understanding which law will apply before making a predominance determination is important

18 when there are variations in applicable state law.").  Consequently, where plaintiffs seek

19 certification of classes for which the laws of multiple states potentially apply, it is the plaintiffs'

20 burden to offer a realistic plan tor trying the class claims.  *Id*.  Here, Plaintiffs contend their new

21 Rule 23(b)(3) classes do not defeat predominance because for each of the proposed classes the

22 Court need apply only the law of the state where the class performed the activities Plaintiffs

23 contend is work.  Thus, according to Plaintiffs, California law will apply to the claims of the

24 California Class, Arizona law will apply to the claims of the Arizona class and Florida law will

25 apply to the Florida class.  The Court concludes that Plaintiffs have met their burden on this

26 question with respect to the California Class.  On the other hand, the Court finds that as to the

27 Arizona and Florida classes, there is a danger that choice of law questions will overwhelm the

28 common issues raised by these classes.

United States District Court
Northern District of California

1    California choice of law principles govern the determination of which state's law should be

2    applied to Plaintiffs' state law claims. S*ee Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487

3    (1941); *SEC v. Elmas Trading Corp*., 683 F. Supp. 743 (D. Nev. 1987), *aff'd without opinion*, 865

4    F.2d 265 (9th Cir.1988).  Under those principals, the Court asks:  "(1) whether the laws of various

5    jurisdictions differ, and (2) whether both states have an interest in applying their respective law.  If

6    the laws conflict, this Court is to apply the law of the state whose interest would be more impaired

7    if its law were not applied."  *Church v. Consol. Freightways, Inc*., No. C-90-2290 DLJ, 1991 WL

8    284083, at *12 (N.D. Cal. June 14, 1991) (citing *Ledesma v. Jack Stewart Produce, Inc*., 816 F.2d

9    482, 484 (9th Cir. 1987)).

10    While these basic rules are the same regardless of whether a plaintiff seeks to apply

11    California law (as is the case for the California Class) or the law of some foreign jurisdiction (as is

12    the case for the Arizona and Florida classes), the choice of law analysis differs somewhat in these

13    two scenarios because "[i]n California (as in every other American jurisdiction) a court begins

14    with the presumption that the applicable substantive rule is drawn from its own forum law."

15    *Sullivan v. Oracle Corp*., 547 F.3d 1177, 1181–82 (9th Cir. 2008), opinion withdrawn, reh'g

16    dismissed, 557 F.3d 979 (9th Cir. 2009), certified question answered, 51 Cal. 4th 1191 (2011).

17    Where a party brings a constitutional challenge to the application of California law, the class

18    action proponent bears the initial burden to show that California has "significant contact or

19    significant aggregation of contacts" to the claims of each class member. *Mazza v. Am. Honda

20    Motor Co*., 666 F.3d 581, 589 (9th Cir. 2012) (citation omitted) (citing *Wash. Mut. Bank v.

21    Superior Court*, 24 Cal. 4th 906, 921, (Cal.2001)).  "Once the class action proponent makes this

22    showing, the burden shifts to the other side to demonstrate 'that foreign law, rather than California

23    law, should apply to class claims.'" *Id.* (quoting *Wash. Mut. Bank,* 24 Cal.4th at 921).

24    Applying these principles to the proposed California Class, the Court finds that Plaintiffs

25    have met the threshold requirement of showing that application of California law to their claims is

26    constitutional.  In particular, all of the class members have had significant contact with California

27    because they have been assigned to the California League and played baseball in California with

28    the California League.  Further, Plaintiffs have proposed the addition of a temporal component to

United States District Court
Northern District of California

59

the class definition to exclude any individuals who were assigned to the California League for less

than a specified period in order to ensure that the class does not include any class members whose

contacts with California were so minimal as to raise questions about the constitutionality of

applying California law to their claims.  The Court concludes that a seven-day minimum is

sufficient to meet this objective.  With this limitation, the Court finds that Plaintiffs have met their

burden as to the constitutionality of applying California law to the claims of the California Class.

Because Plaintiffs have met their burden as to the constitutionality of applying California

law, the burden shifts to Defendants to demonstrate that foreign law should be applied to the

claims of the California Class members.   In the class certification context, the Court concludes

that this means that in order to defeat class certification on choice of law grounds, Defendants

must make a specific and meaningful showing that the application of California law will not be

appropriate under California choice of law principals to absent class members.  *See Opperman v.*

*Path, Inc*., No. 13-CV-00453-JST, 2016 WL 3844326, at *10 (N.D. Cal. July 15, 2016), leave to

appeal denied (Oct. 20, 2016) (rejecting defendants' assertion that classes should not be certified

because of the complex and individualized choice of law questions that would have to be

addressed, citing the fact that defendants did not "identify or discuss the interests of other

jurisdictions except at the greatest level of generality.").  Defendants have not met that burden.

The California Supreme Court has found that California has a strong interest in applying

its wage and hour laws to work performed in California even if it is performed by non-residents.

*See Sullivan v. Oracle Corp*., 51 Cal. 4th 1191, 1196 (2011).  In *Sullivan*, the California Supreme

Court agreed to answer several certified questions from the Ninth Circuit, including whether the

California Labor Code applied to overtime work performed in California for a California-based

employer by non-residents.  *Id*.  The court held, as a matter of statutory construction, that

California overtime laws did apply where, as in that case, the employees asserted overtime claims

based on "entire days and weeks worked in California."  *Id*. at 1200.  In reaching that conclusion,

the court rejected the employer's reliance on language in an earlier decision by the California

Supreme Court, *Tidewater Marine W., Inc. v. Bradshaw*, 14 Cal. 4th 557 (1996), in which the

court suggested that California law "might follow California resident employees of California

1  employers who leave the state 'temporarily . . . during the course of the normal workday' . . . , and

2  California law might not apply to nonresident employees of out-of-state businesses who 'enter

3  California temporarily during the course of the workday.'" *Sullivan*, 51 Cal. 4th at 1199 (quoting

4  *Tidewater*, 14 Cal. 4th at 578).  The court in *Sullivan* found that "[n]othing in *Tidewater* suggests

5  a nonresident employee, especially a nonresident employee of a California employer such as

6  Oracle, can enter the state for entire days or weeks without the protection of California law."  *Id.*

7  at 1200.

8        The Court in *Sullivan* went on to address whether the laws of the states where the

9  employees resided – Arizona and Colorado – conflicted with California law and if they did,

10  whether California's interest in having its own law applied outweighed the interests of the other

11  two states.  *Id.* at 1202-1206.  The court concluded that there was no true conflict because neither

12  Arizona nor Colorado had expressed an interest in regulating overtime work performed in another

13  state.  *Id.* at 1204. The court also rejected the employer's argument that Arizona and Colorado law

14  should be applied based on those states' interest in providing a business-friendly environment for

15  their own businesses, reasoning that "every state enjoys the same power in this respect" and that

16  "[i]t follows from this basic characteristic of our federal system that, at least as a general matter, a

17  company that conducts business in numerous states ordinarily is required to make itself aware of

18  and comply with the law of a state in which it chooses to do business."  *Id.* at 1205 (citations

19  omitted).  Therefore, the court concluded, neither Colorado nor Arizona had a "legitimate interest

20  in shielding [the employer] from the requirements of California overtime law as to work

21  performed here."  *Id.*

22        Finally, the *Sullivan* court addressed which state's interest would be more impaired by

23  application of another state's law and concluded that California's interest would be more impaired.

24  The court reasoned:

> Assuming for the sake of argument a genuine conflict does exist . . .,
> to subordinate California's interests to those of Colorado and
> Arizona unquestionably would bring about the greater impairment.
> To permit nonresidents to work in California without the protection
> of our overtime law would completely sacrifice, as to those
> employees, the state's important public policy goals of protecting
> health and safety and preventing the evils associated with overwork.
> . . . Not to apply California law would also encourage employers to

61

1    substitute lower paid temporary employees from other states for
     California employees, thus threatening California's legitimate
2    interest in expanding the job market. . . . By way of comparison, not
     to apply the overtime laws of Colorado and Arizona would impact
3    those states' interests negligibly, or not at all. Colorado overtime
     law expressly does not apply outside the state's boundaries, and
4    Arizona has no overtime law. . . . Alternatively, viewing Colorado's
     and Arizona's overtime regimens as expressions of a general interest
5    in providing hospitable regulatory environments to businesses
     within their own boundaries, that interest is not perceptibly impaired
6    by requiring a California employer to comply with California
     overtime law for work performed here.

7    *Id*. at 1205-1206.

8          Defendants reject Plaintiffs' reliance on *Sullivan*, asserting that case is distinguishable

9    because it involved a California employer whereas many of the members of the putative California

10   Class are employed by non-California affiliates.  While it is true that the holding of *Sullivan* was

11   limited to the facts of that case, the Court does not find that the reasoning of that case supports the

12   conclusion that non-residents who perform work in California are entitled to the protections of

13   California wage and hour laws only if they work for a California employer.  To the contrary, the

14   emphasis of the *Sullivan* court on the "state's important public policy goals of protecting health

15   and safety and preventing the evils associated with overwork" applies equally to California

16   employers and non-California employers.  *Sullivan* also suggests that to the extent other states

17   may have adopted labor laws that are friendlier to employers, employers from other states may not

18   "shield" themselves from the requirements of California labor law when their employees perform

19   work in California.  *See* 51 Cal. 4th at 1205.

20         In the face of California's strong interest in applying its own law to work performed within

21   the state, as recognized by the California Supreme Court, Defendants can only defeat the

22   predominance requirement based on choice of law if they can make a meaningful and detailed

23   showing that other states' laws are likely to apply to the class members' claims.  Instead,

24   Defendants have not gone beyond speculating in a general manner that the claims of some

25   members of the putative California Class *might* be subject to the law of another state and that the

26   interests of another state *might* be more impaired by application of California law.

27         The only specific example offered by Defendants in support of their contention that the

28   Court will need to conduct choice of law inquiries as to every member of the California Class is

United States District Court
Northern District of California

62

United States District Court
Northern District of California

1   based on the experience of Named Plaintiff Mitch Hilligoss and it is not persuasive.  According to

2   Defendants, Hilligoss, a putative representative of the California Class, "spent a total of two

3   months (out of a 6 year long career) in the state of California playing in the California League,"

4   has "never played for a California-based MLB Club, has spent many months each year allegedly

5   performing off-season training in Illinois, and has resided in Illinois since his release."  *See*

6   Opposition at 9 n. 13.  Given the California Supreme Court's guidance in *Sullivan*, in which it

7   distinguished between work performed in the state "temporarily . . . during the course of the

8   normal workday" (to which California wage and hour laws might not apply) and work performed

9   "over entire days and weeks" (to which California overtime laws were found to apply), it is not at

10  all obvious the work performed by Hilligoss in California would not be subject to California's

11  wage and hour laws.  Furthermore, to the extent Defendants are suggesting that Illinois law should

12  apply to Hilligoss's claims, they have not cited any case law indicating that Illinois wage and hour

13  laws would apply extraterritorially to that work; nor have they pointed to any interest on the part

14  of the state of Illinois that might outweigh California's interest in having its own law applied.  The

15  Court therefore finds Defendants' general assertions related to the choice of law questions raised

16  by the California Class to be unpersuasive.

17       On the other hand, the choice of law problem associated with the Florida and Arizona

18  classes is significant.  In support of their assertion that it is appropriate to apply Florida law to all

19  Florida class members and Arizona law to all Arizona class members, Plaintiffs point to the fact

20  that in many jurisdiction, "the place where the work takes place is the critical issue." *Jimenez v.*

21  *Servicios Agricolas Mex, Inc.*, 742 F. Supp. 2d 1078, 1099 (D. Ariz. 2010) (citing cases); *see also*

22  *O'Neill v. Mermaid Touring Inc.*, 968 F. Supp. 2d 572, 578–79 (S.D.N.Y. 2013) (granting

23  summary judgment in favor of employer on wage and hour claim asserted under New York law

24  for work performed outside of New York and holding that New York law does not apply to work

25  performed outside New York because "[t]he crucial issue is where the employee is 'laboring,' not

26  where he or she is domiciled.");  *Killian v. McCulloch*, 873 F. Supp. 938, 942 (E.D. Pa. 1995),

27  aff'd sub nom. *Stadler v. McCulloch*, 82 F.3d 406 (3d Cir. 1996) ("The legislature has a strong

28  interest in enacting legislation to protect those who work in the Commonwealth, but has almost no

1   interest in extending that protection to those who work outside Pennsylvania."); *Mulford v.*

2   *Computer Leasing, Inc.*, 759 A.2d 887, 891 (N.J. Law. Div. 1999) (holding that New Jersey's

3   interest in enforcing wage and hour laws against New York employer who employed workers in

4   New Jersey gave New Jersey "the paramount interest in enforcing its law"); *Bigham v. McCall*

5   *Serv. Stations, Inc.*, 637 S.W.2d 227, 231–32 (Mo. Ct. App. 1982) (holding that Missouri wage

6   and hour law rather than Kansas law  applied based, in part, on the fact that the work was

7   performed in Missouri);  *Risinger v. SOC LLC*, 936 F. Supp. 2d 1235, 1249–50 (D. Nev. 2013)

8   (holding that Nevada wage and hour law did not apply to work performed outside Nevada);

9   *Abdulina v. Eberl's Temp. Servs., Inc.*, 79 F. Supp. 3d 1201, 1205–06 (D. Colo. 2015) (holding

10  that plaintiff did not have standing to assert claim under Colorado's Wage Claim Act where she

11  did not reside or work in Colorado);  *Mitchell v. Abercrombie & Fitch*, No. C2-04-306, 2005 WL

12  1159412, at *4 (S.D. Ohio May 17, 2005) (holding that Ohio Minimum Fair Wage Standards Act

13  could not be applied to work performed outside Ohio).

14         Plaintiffs have not, however, addressed in any detail the interests of either Florida or

15  Arizona in applying their law to the claims of the class members.  Nor have they cited authority

16  comparable to *O'Sullivan* addressing the comparative interests of these states to the interests of

17  other states whose residents come to Florida or Arizona to perform work.  Further, Defendants

18  point to numerous states in which courts have recognized an interest in applying the law of that

19  state to residents who work outside of the state, raising the possibility that the laws of states other

20  than Arizona and Florida should be applied to the claims of some absent class members.  *See*

21  Docket No. 740 at 3 n. 3.  For example, among the states that have found that their wage and hour

22  laws may be applied to work performed outside the state are Washington and Massachusetts.  *See*

23  *Bostain v. Food Exp., Inc.*, 159 Wash. 2d 700, 711 (2007);  *Gonyou v. Tri-Wire Engineering*

24  *Solutions., Inc.*, 717 F. Supp. 2d 152, 154 (D. Mass. 2010).  It is thus possible that class members

25  from those states, e.g., minor leaguers who play for clubs affiliated with the Boston Red Sox or the

26  Seattle Mariners, might be entitled to assert their claims under the laws of those states.

27         And in contrast to the California Class, there is no presumption that the law of either

28  Arizona or Florida must be applied by this Court.  Rather, as to these classes the burden is on

United States District Court
Northern District of California

64

1    Plaintiffs to show that the interests of Arizona and Florida will outweigh the interests of any of the

2    potential states that the claims of absent class members may implicate.   Plaintiffs have not met

3    that burden.  Therefore, the Court concludes that the choice of law questions that are likely arise in

4    connection with the Florida and Arizona classes defeat the predominance requirement as to those

5    classes.

6                      d.   Superiority of Class Mechanism

7           In its previous Order, the Court found that most of the factors courts consider in

8    determining whether class treatment is superior to individual actions favor class treatment in this

9    case.  *See* Class Certification Order at 91-92.  The only factor that pointed away from that

10   conclusion was the Court's finding that adjudication of Plaintiffs' claims under their previous

11   proposal would have been unmanageable because "too many individualized issues [would] have to

12   be adjudicated because of the variations among the players, the choice of law issues that will have

13   to be addressed and certain defenses asserted by Defendants to handle Plaintiffs' claims."  *Id*. at

14   92.  For the reasons discussed above, the Court concludes that Plaintiffs' proposed California

15   Class, which is the only Rule 23(b)(3) class that meets the predominance requirement, will not

16   require so many individualized inquiry as to make it unmanageable and that class treatment of the

17   claims asserted by that class meets the superiority requirement of Rule 23(b)(3).

18          **3.   Rule 23(b)(2)**

19          Rule 23(b)(2) allows a class action to be maintained where "the party opposing the class

20   has acted or refused to act on grounds that apply generally to the class, so that final injunctive

21   relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R.

22   Civ. P. 23(b)(2).  While 23(b)(2) class actions have no predominance or superiority requirements,

23   the class claims must be cohesive. *See Barefield v. Chevron, U.S.A., Inc*., No. C 86-2427 TEH,

24   1988 WL 188433, at *3 (N.D. Cal. Dec. 6, 1988) (noting that "[t]he trademark of the (b)(2) action

25   is homogeneity" and explaining that "[i]t is this characteristic that allows the court to dispense

26   with notice to the class and bind all members to any judgment on the merits without an

27   opportunity to opt out");  *see also Barnes v. Am. Tobacco Co*., 161 F.3d 127, 142–43 (3d Cir.

28   1998) (noting that "a (b)(2) class may require more cohesiveness than a (b)(3) class . . . because in

United States District Court
Northern District of California

65

a (b)(2) action, unnamed members are bound by the action without the opportunity to opt out");
*In re Prempro*, 230 F.R.D. 555, 569 (E.D. Ark. 2005) (noting that "[w]hile 23(b)(2) class actions do not have the predominance or superiority requirements of 23(b)(3), courts have held that the class claims under 23(b)(2) must be cohesive" and holding that this requirement was not met where claims of proposed b(2) class implicated laws of 24 to 29 states); *In re Rezulin Prod. Liab. Litig.*, 210 F.R.D. 61, 75 (S.D.N.Y. 2002) (holding that "the individual issues that defeat the predominance requirement of Rule 23(b)(3) also pose an obstacle to class certification in the Rule 23(b)(2) context" and noting that "[a]t base, the (b)(2) class is distinguished from the (b)(3) class by class cohesiveness"); *Santiago v. City of Philadelphia*, 72 F.R.D. 619, 628 (E.D. Pa. 1976) ("In a (b)(2) class action the court must be especially vigilant in protecting unnamed members of the class who are bound by the action without the opportunity to withdraw. As a result, the court should be more hesitant in accepting a (b)(2) suit which contains significant individual issues than it would under subsection 23(b)(3).").

Here, Plaintiffs' proposed Rule 23(b)(2) class is aimed at alleged wage and hour violations arising from spring training activities in Florida and Arizona. The problem with this class is that it seeks injunctive and declaratory relief for a class whose members come to Florida and Arizona from many different states. As discussed above, it is not apparent that is appropriate to apply the law of the states where spring training is conducted to the claims of all class members. As a consequence, the Court could not necessarily adjudicate the claims of the Rule 23(b)(2) classes or fashion a remedy (assuming Plaintiffs' claims are meritorious) based on the law of only one or two states. Instead, it could potentially be required to apply the law of numerous states to Plaintiffs' claims, which undermines the cohesiveness of the class and makes certification of Plaintiffs' proposed (b)(2) class inappropriate.

Accordingly, the Court declines to certify Plaintiffs' proposed Rule 23(b)(2) class.

### C.    Recertification of the FLSA Collective

Under Section 16 of the FLSA, workers may sue their employers for unpaid wages on their own behalf and on behalf of "other employees similarly situated." 29 U.S.C. § 216(b). District courts in the Ninth Circuit apply an "ad hoc, two-tiered approach" in determining whether the

1   plaintiffs are similarly situated, applying a more lenient standard to determine whether a collective

2   should be  certified for the purposes of giving notice to potential opt-ins and a stricter standard

3   once discovery has been completed.  Class Certification Order at 94-95 (citations omitted).  The

4   Court applies the stricter standard to the question of whether the narrower FLSA collective that

5   Plaintiffs now propose should be certified.  Under that standard, the Court concludes that the new

6   FLSA class meets the "similarly situated" requirement of Section 216(b).

7          Courts consider three factors in deciding whether plaintiffs have met their burden at the

8   second step of the FLSA certification inquiry:  "(1) the disparate factual and employment settings

9   of the individual plaintiffs; (2) the various defenses available to defendants with respect to the

10  individual plaintiffs; and (3) fairness and procedural considerations." *Beauperthuy v. 24 Hour*

11  *Fitness USA, Inc*., 772 F. Supp. 2d 1111, 1118 (N.D. Cal. 2011).  While this standard is more

12  stringent than at the conditional certification stage, it "is different, and easier to satisfy, than the

13  requirements for a class action certified under Federal Rule of Civil Procedure 23(b)(3)." *Id*.

14  (citing *Lewis v. Wells Fargo & Co*., 669 F.Supp.2d 1124, 1127 (N.D. Cal. 2009)).

15         The Court found in the Class Certification Order that "[t]he analysis of whether Plaintiffs

16  in the FLSA collective are similarly situated largely mirrors the analysis under Rule 23(b)(3),

17  except that the variations in state law and potential choice-of-law questions that may arise as to

18  those classes are not an issue for the FLSA collective." *Id*. at  95.   The Court concluded that the

19  class members were not similarly situated because there were "wide variations among the players

20  as to the types of activities in which they engaged and the circumstances under which they

21  engaged in them, which will give rise to a plethora of individualized inquiries relating to the

22  determination of the amount of compensable work Plaintiffs performed." *Id*.  It further pointed to

23  the need to conduct "numerous individualized inquiries regarding the amount of compensation

24  received by class members and the applicability of various defenses, including the amusement

25  exemption and the creative professionals exemption." *Id*.  The Court now revises those

26  conclusions consistent with its conclusions relating to the new Rule 23(b)(3) classes.

27         First, by eliminating the winter conditioning claims and pursuing on a classwide basis only

28  claims that are based on the continuous workday doctrine, Plaintiffs have significantly reduced the

United States District Court
Northern District of California

67

need to engage in individualized inquiries relating to the type of work performed.  Second, the Court is now persuaded that the payroll records maintained by Defendants will allow any variations in compensation to be analyzed without burdensome individualized inquiries.  This is especially true as to the spring training, extended spring training and instructional league claims because players generally were not compensated for their participation in these activities and the small fraction of players who *did*  receive compensation for these activities can be identified using payroll records maintained by Defendants.[9] Third, as discussed above, the Court finds that the defenses asserted by Defendants to the FLSA present common questions that are not likely to be overwhelmed by the need to conduct individualized inquiries.  Finally, the possibility that the Court will be required to apply the laws of numerous states (or at a minimum, conduct numerous choice of law inquiries) is not present as to the FLSA class, which will require the Court to apply only federal wage and hour law.

Accordingly, the Court grants Plaintiffs' request to recertify the narrower FLSA collective proposed in its Motion for Reconsideration.

**VI.    CONCLUSION**

For the reasons stated above, the Motion for Leave to File Sur-Reply and the Motion to Intervene are GRANTED.   The Motion for Reconsideration is GRANTED in part and DENIED in part. The Motion to Exclude is DENIED.

The Court certifies the following FLSA Collective:

> Any person who, while signed to a Minor League Uniform Player Contract, participated in the California League, or in spring training,

---

[9] In addition, the Court is persuaded that the problems that were addressed at length at oral argument concerning the difficulty of identifying which minor leaguers participated in spring training, extended spring training and instructional leagues do not pose such serious problems that they render class treatment unmanageable.  In particular, Plaintiffs' counsel has represented to the Court that numerous witnesses testified in depositions that the Clubs and affiliates maintained rosters listing players who participated in these activities, and that many such rosters have been produced already, albeit in redacted form.  In addition, the eBis transaction records, used in combination with disabled lists and payroll records, are likely to provide relevant information that will allow the parties to determine who may have participated in spring training, extended spring training and instructional leagues.

1  instructional leagues, or extended spring training, on or after
2  February 7, 2011, and who had not signed a Major League Uniform
   Player Contract before then.

3  The parties shall meet and confer to address the specific wording of the Rule 23(b)(3) California

4  class definition that the Court has approved, incorporating the temporal limitation discussed

5  above.  If the parties can agree, a stipulation shall be filed with the Court by **April 28, 2017**

6  containing the revised class definition.  If the parties are unable to agree, they should jointly file

7  by the same date a statement, not to exceed five pages, setting forth the competing proposed class

8  definitions and explaining the basis for any disagreements.  In addition, the parties shall meet and

9  confer and jointly submit a proposed schedule for the case, also to be filed by **April 28, 2017**.  A

10 Case Management Conference is set for **May 12, 2017 at 2:00 p.m.**

11         **IT IS SO ORDERED.**

12

13 Dated:  March 7, 2017

14  _____

15 JOSEPH C. SPERO
   Chief Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California