1

**PROSKAUER ROSE LLP**
ELISE M. BLOOM (admitted *pro hac vice*)

2

ebloom@proskauer.com
NEIL H. ABRAMSON (admitted *pro hac vice*)

3

nabramson@proskauer.com
ADAM M. LUPION (admitted *pro hac vice*)

4

alupion@proskauer.com
RACHEL S. PHILION (admitted *pro hac vice*)

5

rphilion@proskauer.com
NOA M. BADDISH (admitted *pro hac vice*)

6

nbaddish@proskauer.com
JOSHUA S. FOX (admitted *pro hac vice*)

7

jfox@proskauer.com
Eleven Times Square

8

New York, NY 10036
Telephone:  (212) 969-3000

9

Facsimile:  (212) 969-2900

10

**PROSKAUER ROSE LLP**                           **PROSKAUER ROSE LLP**
PHILIPPE A. LEBEL (SBN 274032)        MARK W. BATTEN (admitted *pro hac vice*)

11

plebel@proskauer.com                             mbatten@proskauer.com
2029 Century Park East, 24th Floor         SAMANTHA R. MANELIN (admitted *pro hac vice*)

12

Los Angeles, CA  90067-3010                  smanelin@proskauer.com
Telephone:  (310) 557-2900                     One International Place

13

Facsimile:  (310) 557-2193                      Boston, MA 02110-2600
                                                               Telephone:  (617) 526-9600

14

                                                               Facsimile:  (617) 526-9899

15

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

16

17

AARON SENNE, *et al.*,

Case No. CV 14-00608 JCS (consolidated with 3:14-cv-03289-JCS)

18

                                    Plaintiffs,

Hon. Joseph C. Spero

19

vs.

20

OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as MAJOR LEAGUE

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

21

BASEBALL, *et al.*

22

                                    Defendants.

Date:  February 11, 2022
Time:  9:30 am
Place:  Courtroom G, 15th Floor

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

**PLEASE TAKE NOTICE** that on February 11, 2022 at 9:30 a.m. or as soon thereafter as counsel may be heard, Defendants[1] will and hereby do move this Court for an entry of partial summary judgment.

Pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(a), Defendants hereby move for summary judgment or partial summary judgment as follows:  (i) Defendants are entitled to summary judgment on all Plaintiffs' claims[2] for minimum wage and overtime because they have not offered admissible testimony to calculate "hours worked" and corresponding damages; (ii) Defendants are entitled to summary judgment as to Plaintiffs' claims for minimum wage and overtime under the Fair Labor Standards Act ("FLSA") and for minimum wage under Florida law (Counts 1, 2, and 11 of the Second Consolidated Amended Complaint ("Complaint"), Dkt. 382 at ¶¶ 568-80, 621-27) since March 23, 2018, pursuant to 29 U.S.C. § 213(a)(19), Article X, Section 24 of the Florida Constitution and Fla. Stat. Ann. § 448.110(3); (iii) Defendants are entitled to summary judgment as to Plaintiffs' claims for minimum wage and overtime under the FLSA (Counts 1-2 of the Complaint, Dkt. 382 at ¶¶ 568-80); for minimum wage under Florida law (Count 11 of the Complaint, *id.* at ¶¶ 621-27); for minimum wage and overtime under Pennsylvania law (Counts 22 and 23 of the Complaint, *id.* at ¶¶ 687-98); and for overtime under Maryland law (Count 27 of the Complaint, *id.* at ¶¶ 711-16) because Defendants are exempt pursuant to the seasonal amusement or recreational establishment exemption under the FLSA and respective state laws (*see* 29 U.S.C. § 213(a)(3); Fla. Stat. § 448.110(3); 43 Penn. Stat. § 333.105(a)(9); Md. Code Lab. & Empl. § 3-415(b)(3)); (iv) Defendants are entitled to partial summary judgment as to Plaintiffs' claims for minimum wage and/or overtime under the FLSA and all state laws pled in the Complaint for periods of time outside of the Championship Season because Plaintiffs are not "employees" as a matter of law during that time; (v) Defendant Allan H. Selig is entitled to summary judgment because he is not Plaintiffs' "employer" as a matter of law under the FLSA and all state laws pled in the Complaint;

---

[1] "Defendants" refers to all Defendants named in the Second Consolidated Amended Complaint, with the exception of the MLB Clubs that have been dismissed for lack of personal jurisdiction.

[2] "Plaintiffs' claims" refers to the claims of the Named Plaintiffs, the members of the FLSA Collective, and the members of the classes certified under Fed. R. Civ. P. 23, as defined in Defendants' Motion for Partial Summary Judgment, as applicable.

1

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT – CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

1   (vi) Defendants are entitled to summary judgment as to Count 5 of the Complaint (*see* Dkt. 382 at

2   ¶¶ 595-98) because California Labor Code Section 204 does not provide a private right of action;

3   and (vi) Defendants are entitled to partial summary judgment as to Count 9 of the Complaint (Dkt.

4   382 at ¶¶ 611-14) because Plaintiffs have failed to properly exhaust their administrative remedies

5   under California's Private Attorney General Act ("PAGA") (*see* Cal. Lab. Code § 2699).

6       This Motion is based on this Notice, the Memorandum of Points and Authorities, the

7   Declaration of Elise M. Bloom ("Bloom Decl."), accompanying Exhibits, accompanying

8   Declarations, the pleadings and records on file with this Court, all matters of which the Court must

9   or may take judicial notice, and such evidence and argument as may be presented at or before the

10  hearing on this matter.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT OF ISSUES TO BE DECIDED ......................................................................2

RELEVANT BACKGROUND ...............................................................................................3

STATEMENT OF UNDISPUTED MATERIAL FACTS .......................................................5

    A.    Undisputed Material Facts Relevant To Application Of The Save America's Pastime Act ("SAPA")...............................................................................5

    B.    Undisputed Material Facts Relevant To The Seasonal Amusement Or Recreational Establishment Exemption. .............................................................5

    C.    Undisputed Material Facts Relevant To Players' Status As Primary Beneficiaries Of Training Outside The Championship Season. .......................7

    D.    Undisputed Material Facts Relevant To Commissioner Emeritus Selig. ...................10

    E.    Undisputed Material Facts Relevant To Plaintiffs' Letter To The California Labor And Workplace Development Agency ("LWDA"). ..........................12

    F.    Plaintiffs Rely Exclusively On Their Experts To Establish "Hours Worked" And Corresponding Damages For All Claims. .............................................13

LEGAL ARGUMENT..........................................................................................................14

I.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLASS, COLLECTIVE, AND INDIVIDUAL CLAIMS BECAUSE THEY DO NOT HAVE ANY ADMISSIBLE EVIDENCE OF "HOURS WORKED" OR DAMAGES.........14

II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS BASED ON ALLEGED VIOLATIONS OF THE FLSA AND FLORIDA LAW AS OF MARCH 23, 2018, THE EFFECTIVE DATE OF THE SAVE AMERICA'S PASTIME ACT ("SAPA"). .................................................................................................16

    A.    SAPA Exempts Players From Coverage Under The FLSA.......................................16

    B.    SAPA Exempts Players From Coverage Under Florida Law.....................................16

III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS UNDER THE FLSA AND CERTAIN STATE LAWS BY VIRTUE OF THE "AMUSEMENT OR RECREATIONAL ESTABLISHMENT" EXEMPTION. ..................20

    A.    Each Spring Training Facility And Minor League Stadium Is An Independent "Establishment" Because Each Is A "Distinct, Physical Place Of Business." ............21

    B.    The Presentation Of Baseball At The Clubs' "Establishments" Is Unquestionably "Amusement or Recreational" In Nature...........................................26

    C.    Players Are Or Were "Employed By" The Individual "Establishments" For Purposes Of The Amusement Exemption.....................................................................27

i

D.   Each "Establishment" Satisfies Either The Seasonal Or Receipts Prong Of The Amusement Exemption..................................................................................28

1.   Each "Establishment" At The Clubs' Minor League Affiliate Stadiums Is A "Seasonal Establishment" That Indisputably Operates For Less Than Seven Months Of The Year. ..................................................29

2.   The Clubs' Spring Training Facility "Establishments" Indisputably Satisfy The "Receipts" Prong. ..........................................................31

E.   The Court Should Grant Summary Judgment Or Partial Summary Judgment As To The Named Plaintiffs' Claims Under The Laws Of Pennsylvania and Maryland. ..............................................................................................32

IV.   DEFENDANTS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT DISMISSING ALL CLAIMS BASED ON ALLEGED WORK OUTSIDE OF THE CHAMPIONSHIP SEASON BECAUSE THE PLAYERS ARE NOT EMPLOYEES DURING THOSE OTHER TIMES OF THE YEAR. ..............................................33

A.   Individuals Are Not Entitled To Minimum Wage And Overtime Year-Round Merely Because They Perform Services..................................................33

B.   The Totality Of The Circumstances Demonstrates That Players Are The Primary Beneficiaries Of Training Outside Of The Championship Season. ...............36

1.   Players Do Not Expect To Receive Salaries Outside Of The Championship Season. ................................................................37

2.   Minor League Training Provides Opportunities For Improving Players' Baseball Skills..................................................................37

3.   Players Are Equipped With Skills To Obtain Other Jobs Outside Of Professional Baseball. ..............................................................39

4.   The Undisputed Record Evidence Confirms Defendants Receive No Immediate Benefit From Players' Minor League Training. ...........................41

V.   DEFENDANT COMMISSIONER EMERITUS SELIG IS ENTITLED TO SUMMARY JUDGMENT BECAUSE HE WAS NOT AN "EMPLOYER" UNDER THE FLSA OR STATE WAGE LAWS..................................................................42

A.   There Is No Evidence Selig Was An Employer Within The Meaning Of The FLSA..........................................................................................42

B.   Nor Was Selig An "Employer" Under Florida, Arizona, North Carolina, New York, Pennsylvania, Maryland, or Oregon Wage Laws. ...............................47

C.   Likewise, Selig Is Entitled To Summary Judgment On Plaintiffs' California State Law Claims. ..............................................................................47

1.   Plaintiffs Have Failed To Adduce Evidence That Selig Was An "Employer" Under California Law..............................................................48

2.   There Is No Evidence To Permit Plaintiffs To Hold Selig Liable In His Individual Capacity..............................................................50

ii

VI.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' COUNT 5 OF THE COMPLAINT BECAUSE THERE IS NO PRIVATE RIGHT OF ACTION UNDER CALIFORNIA LABOR CODE SECTION 204. ...................................52

VII.   DEFENDANTS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' COUNT 9 BECAUSE PLAINTIFFS FAILED TO SATISFY THE JURISDICTIONAL PREREQUISITES TO PURSUE CERTAIN PAGA PENALTIES. ...................................53

CONCLUSION...................................55

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*A.H. Phillips, Inc. v. Walling,*
   324 U.S. 490 (1945) ..................................................................................................23

*Adams v. Detroit Tigers, Inc.,*
   961 F. Supp. 176 (E.D. Mich. 1997) .................................................................24, 26

*Alcantar v. Hobart Serv.,*
   800 F.3d 1047 (9th Cir. 2015) ...............................................................................54

*Anagnos v. Nelson Residence, Inc.,*
   721 F. App'x 901 (11th Cir. 2018) .........................................................................20

*Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc.,*
   856 F. App'x 445 (4th Cir. 2021) .................................................................35, 36, 37

*Baird v. Kessler,*
   172 F. Supp. 2d 1305 (E.D. Cal. 2001), *aff'd*, 81 F. App'x 249 (9th Cir. 2003)..............43, 44, 45

*Baum v. AstraZeneca LP,*
   372 F. App'x 246 (3d Cir. 2010) ............................................................................32

*Benjamin v. B & H Educ., Inc.,*
   877 F.3d 1139 (9th Cir. 2017) ........................................................................ passim

*Bonnette v. Cal. Health & Welfare Agency,*
   704 F.2d 1465 (9th Cir. 1983) ..........................................................................43, 45

*Brennan v. Tx. City Dike & Marina, Inc.,*
   492 F.2d 1115 (5th Cir. 1974) ...............................................................................26

*Bridewell v. Cincinnati Reds,*
   155 F.3d 828 (6th Cir. 1998) .................................................................................31

*Bridewell v. Cincinnati Reds,*
   68 F.3d 136 (6th Cir. 1995) ........................................................................24, 26, 30

*Caldwell v. OS Rest. Servs., LLC,*
   No. ED CV 19-00754-DMG, 2021 WL 3264306 (C.D. Cal. May 13, 2021) ..............53

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ..........................................................................................14, 42

*Chen v. Major League Baseball,*
   6 F. Supp. 3d 449 (S.D.N.Y. 2014), *aff'd*, 798 F.3d 72 (2d Cir. 2015) ................ passim

*Chen v. Major League Baseball Props.,*
   798 F.3d 72 (2d Cir. 2015)................................................................22, 23, 24, 25, 26

iv

*Chen v. St. Beat Sportswear, Inc.*,
    364 F. Supp. 2d 269 (E.D.N.Y. 2005) ............................................................47

*Chessin v. Keystone Resort Mgmt., Inc.*,
    184 F.3d 1188 (10th Cir. 1999) ......................................................................23

*Clarke v. AMN Servs., LLC*,
    987 F. 3d 848 (9th Cir. 2021) .........................................................................21

*Coleman v. Quaker Oats Co.*,
    232 F.3d 1271 (9th Cir. 2000) ........................................................................53

*Cramton v. Grabbagreen Franchising LLC*,
    No. CV-17-04663-PHX-DWL, 2019 WL 7048773 (D. Ariz. Dec. 23, 2019) ............................47

*De Guzman v. Parc Temple LLC*,
    537 F. Supp. 2d 1087 (C.D. Cal. 2008) ...........................................................44

*Doe v. Butler Amusements, Inc.*,
    71 F. Supp. 3d 1125 (N.D. Cal. 2014) ...............................................25, 27, 31

*Donovan v. Am. Airlines, Inc.*,
    686 F.2d 267 (5th Cir. 1982) ........................................................35, 37, 38, 41

*Eberline v. Douglas J. Holdings, Inc.*,
    982 F.3d 1006 (6th Cir. Dec. 2020), *cert. denied*, 141 S. Ct. 2747 (2021) ...................35

*Edgecombe v. Lowes Home Ctrs., L.L.C.*,
    391 F. Supp. 3d 1142 (S.D. Fl. 2019) ..............................................................20

*Edwards v. Leaders in Cmty. Alt., Inc.*,
    850 F. App'x 503 (9th Cir. 2021) ....................................................................14

*Feagley v. Tampa Bay Downs, Inc.*,
    No. 8:11-CV-564 2012 U.S. Dist. LEXIS 81757 (M.D. Fl. June 13, 2012) .......................21

*Ford v. Yasuda*,
    No. EDCV131961PSGDTBx, 2017 WL 4676575 (C.D. Cal. June 20, 2017) ........................38

*Free v. Littlefield Corp.*,
    No. 3:20CV4326-TKW-HTC, 2020 WL 7421751 (N.D. Fla. Dec 11, 2020) ....................20, 47

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
    771 F.3d 1119 (9th Cir. 2014) ........................................................................14

*Garcia-Celestino v. Ruiz Harvesting, Inc.*,
    No. 2:10-cv-542-FtM-38DNF, 2013 WL 3816730 (M.D. Fla. July 22, 2013) ......................19

*Gibbs v. Montgomery Cnty. Agric. Soc'y*,
    140 F. Supp. 2d 835 (S.D. Ohio 2001) .............................................................23

*Glatt v. Fox Searchlight Pictures, Inc.*,
    811 F.3d 528 (2d Cir. 2016).............................................................................35

*Guifu Li v. A Perfect Day Franchise, Inc.*,
    281 F.R.D. 373 (N.D. Cal. 2012)......................................................................44

*Guzman v. Lincoln Tech. Inst*,
 339 F. Supp. 3d 1048 (D. Nev 2018) ........................................................................38

*Hayward v. IBI Armored Servs.*,
 954 F.3d 573 (2d Cir. 2020) ....................................................................................32

*Hill v. Del. N. Cos. Sportservice*,
 838 F.3d 281 (2d Cir. 2016) ..............................................................24, 26, 27, 28

*Hill v. Del. N. Cos. Sportservice, Inc.*,
 Nos. 11-CV-00753(S)(M), 14-CV-00138(S)(M), 2014 U.S. Dist. LEXIS 185057,
 at *6 (W.D.N.Y. July 28, 2014), *report recommendation adopted by,* 2015 U.S.
 Dist. LEXIS 73131 (W.D.N.Y. June 4, 2015), *aff'd*, 838 F.3d 281 (2d Cir. 2016).....................24

*Hurst v. First Student, Inc.*,
 181 F. Supp. 3d 827 (D. Or. 2016) ..........................................................................41

*Ison v. Happy Chef Diner, LLC*,
 17-cv-14279, 2018 WL 2688802 (S.D. Fl. Apr. 23, 2018)..........................................20

*Jeffery v. Sarasota White Sox, Inc.*,
 64 F.3d 590 (11th Cir. 1995) ....................................................................... passim

*Johnson v. Hewlett-Packard Co.*,
 809 F. Supp. 2d 1114 (N.D. Cal. 2011), *aff'd*, 546 F. App'x 613 (9th Cir. 2013) .......................53

*Jones v. Am. Airlines, Inc.*,
 No. 5:08-CV-236-BR, 2008 WL 9411160 (E.D.N.C. Oct. 16, 2008) ..........................47

*Lee v. Askin Trucking, Inc.*,
 No. 05-14335-CIV, 2006 WL 8430906 (S.D. Fla. Feb. 8, 2006)..................................20

*Llorca v. Sheriff, Collier Cnty., Fla.*,
 893 F.3d 1319 (11th Cir. 2018) ................................................................................20

*Lopez v. G.A.T. Airline Ground Support, Inc.*,
 No. 09-CV-2268-IEG-BGS, 2010 WL 2839417 (S.D. Cal. July 19, 2010) ...............43, 44, 45, 46

*Luna-Reyes v. RFI Const., LLC*,
 109 F. Supp. 3d 744 (M.D.N.C. 2015) ....................................................................47

*Maciel v. City of L.A.*,
 569 F. Supp. 2d 1038 (C.D. Cal. 2008) ....................................................................14

*Mackereth v. Kooma, Inc.*,
 N. 14-04824, 2015 WL 2337273 (E.D. Pa. May 14, 2015)..........................................47

*Maravilla v. Rosas Bros. Constr., Inc.*,
 401 F. Supp. 3d 886 (N.D. Cal. 2019) ....................................................................44

*Marshall v. New Hampshire Jockey Club, Inc.*,
 562 F.2d 1323 (1st Cir. 1977).................................................................................30

*Martinez v. PM&M Elec. Inc.*,
 No. CV-18-01181-PHX-JG2, 2019 U.S. Dist. LEXIS 18393 (D. Ariz. Feb. 4,
 2019) .....................................................................................................................15

vi

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT –
CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

*Mata v. Manpower Inc.*,
  No. 14-CV-03787-LHK, 2016 WL 948997 (N.D. Cal. Mar. 14, 2016) ................................42, 48

*Mays v. Wal-Mart Stores, Inc.*,
  354 F. Supp. 3d 1136 (C.D. Cal. 2019) ...................................................................................54

*McDonald v. Ricardo's on Beach, Inc.*,
  No. CV 11-9366 PSG MRWX, 2013 WL 153860 (C.D. Cal. Jan. 15, 2013) ..........................52

*McGlinchy v. Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988) ..................................................................................................15

*McLaughlin v. Lunde Truck Sales, Inc.*,
  714 F. Supp. 920 (N.D. Ill. 1989) ...........................................................................................22

*Mitchell v. Bekins Van & Storage Co.*,
  231 F.2d 25 (9th Cir. 1956) ....................................................................................................23

*Mitchell v. Bekins Van & Storage Co.*,
  352 U.S. 1027 (1957) ..............................................................................................................24

*Mitchell v. Corelogic, Inc.*,
  No. SA CV 17-2274-DOC, 2019 WL 7172978 (C.D. Cal. Nov. 20, 2019) ............................54

*Montoya v. 3PD, Inc.*,
  No. CV-13-8068-PCT-SMM, 2014 WL 3385116 (D. Ariz. July 10, 2014) .............................47

*Morataya v. Nancy's Kitchen of Silver Spring, Inc.*,
  No. GJH-13-01888, 2015 WL 165305 (D. Md. Jan. 12, 2015) .............................................47

*Moua v. Int'l Bus. Mach. Corp.*,
  No. 5:10-CV-01070-EJD, 2019 WL 1170488 (N.D. Cal. Mar. 13, 2019) .........................48, 50

*Orquiza v. Walldesign, Inc.*,
  No. 2:11-CV-1374 JCM CWH, 2013 WL 3027765 (D. Nev. June 14, 2013), *aff'd
  sub nom. Orquiza v. Bello*, 634 F. App'x 605 (9th Cir. 2016) ..................................................46

*Otico v. Hawaiian Airlines, Inc.*,
  229 F. Supp. 3d 1047 (N.D. Cal. 2017) ..............................................................................37, 39

*Petroski v. H & R Block Enters., LLC*,
  750 F.3d 976 (8th Cir. 2014) ..................................................................................................35

*Philips v. Ford Motor Co.*,
  No. 14-cv-02989-LHK, 2017 U.S. Dist. LEXIS 23241 (N.D. Cal. Feb. 16, 2017).....................15

*Plaksin v. Newsight Reality, Inc.*,
  No. 2:19-cv-00458-RGK-SS, 2019 U.S. Dist. LEXIS 168063 (C.D. Cal. Apr. 30,
  2019) .......................................................................................................................................51

*Quinteros v. Sparkle Cleaning, Inc.*,
  532 F. Supp. 2d 762 (D. Md. 2008) ........................................................................................33

*Rios v. Airborne Express, Inc.*,
  No. C-05-2092 VRW, 2006 WL 2067847 (N.D. Cal. July 24, 2006) .........................................42

*Rios v. Linn Star Transfer, Inc.*,
 No. 19-CV-07009-JSC, 2020 WL 1677338 (N.D. Cal. Apr. 6, 2020) ........................................51

*Rogers v. Schenkel*,
 162 F.2d 596 (2d Cir. 1947)........................................................................................................35

*Salinas v. Com. Interiors, Inc.*,
 848 F.3d 125 (4th Cir. 2017) ......................................................................................................47

*Schumann v. Collier Anesthesia, P.A.*,
 803 F.3d 1199 (11th Cir. 2015) ..................................................................................................35

*Skidmore v. Swift & Co.*,
 323 U.S. 134 (1944).....................................................................................................................22

*Solar v. Buchanan Ingersoll & Rooney, P.C.*,
 2017 WL 6270478 (S.D. Cal. Dec. 8, 2017)...............................................................................48

*Solis v. Laurelbrook Sanitarium & Sch., Inc.*,
 642 F.3d 518 (6th Cir. 2011) ...........................................................................................35, 36, 40

*Solis v. Velocity Exp., Inc.*,
 No. CV 09-864-MO, 2010 WL 2990293 (D. Or. July 26, 2010) ...............................................43

*Thomas v. Home Depot USA Inc.*,
 527 F. Supp. 2d 1003 (N.D. Cal. 2007) ......................................................................................53

*Thomas v. River Greene Constr. Grp. LLC*,
 No. 17 CIV. 6954 (PAE), 2018 WL 6528493 (S.D.N.Y. Dec. 11, 2018) ...................................47

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
 471 U.S. 290 (1985)...............................................................................................................33, 34

*Ulrich v. Alaska Airlines, Inc.*,
 No. C07-1215RSM, 2009 WL 364056 (W.D. Wash. Feb. 9, 2009)..........................38, 39, 41, 42

*Valladares v. Insomniac, Inc.*,
 No. EDCV 14-00706-VAP, 2015 WL 12656267 (C.D. Cal. Jan. 29, 2015).........................22, 23

*Volterra v. Semiconductor Corp., v. Primarion, Inc.*,
 No. 08-cv-05129-JCS, 2013 U.S. Dist. LEXIS 163970 (N.D. Cal. Sept. 24, 2013)
 (Spero, J.) ....................................................................................................................................15

*Walling v. Portland Terminal Co.*,
 330 U.S. 148 (1947)................................................................................................................ passim

*West v. City of Ft. Pierce, Fla.*,
 No. 07-14335-CV, 2008 WL 3270849 (S.D. Fl. Aug. 8, 2008) ..................................................23

*Wood v. N. Am. Van Lines, Inc.*,
 No. 8:20-CV-02092-JLS-ADS, 2021 WL 3134203 (C.D. Cal. July 23, 2021)...........................53

*Wright v. Adventures Rolling Cross Country, Inc.*,
 No. 12 Civ. 982, 2013 WL 1758815 (N.D. Cal. Apr. 24, 2013) .................................................22

## STATE CASES

*Brown v. Ralphs Grocery Co.*,
   28 Cal. App. 5th 824 (2018) ................................................................54

*Coastal Fla. Police Benev. Ass'n, Inc. v. Williams*,
   838 So. 2d 543 (Fla. 2003)................................................................17

*Curry v. Equilon Enters., LLC*,
   23 Cal. App. 5th 289 (2018) ..............................................................50

*Dinicola v. State, Dep't of Or. of Revenue*,
   246 Or. App. 526 (2011)....................................................................47

*Futrell v. Payday Cal., Inc.*,
   190 Cal. App. 4th 1419 (2010) ..........................................................50

*Haight v. Minchak*,
   58 N.E.3d 1135 (Ohio 2016) .............................................................18

*Hardee Cnty. v. FINR II, Inc.*,
   221 So. 3d 1162 (Fla. 2017)..............................................................18

*In re Advisory Op. to the Atty. Gen. re Fla. Minimum Wage Amendment*,
   880 So. 2d 636 (Fla. 2004)................................................................18

*Leadership Hous., Inc. v. Dep't of Revenue*,
   336 So. 2d 1239 (Fla. Dist. Ct. App. 1976) ......................................18

*Martinez v. Combs*,
   49 Cal. 4th 35 (2010) ...................................................................48, 49

*Reynolds v. Bement*,
   36 Cal. 4th 1075, 1087, *as modified by*, No. S115823, 2005 Cal. LEXIS 9852, &
   *modified by*, 2005 Cal. LEXIS 10110 (Cal. Sept. 7, 2005).........................48, 49

*Shepard v. State*,
   259 So. 3d 701 (Fla. 2018)................................................................19

*Usher v. White*,
   64 Cal. App. 5th 883 (2021) ..............................................................52

*Villanueva v. State*,
   200 So.3d 47 (Fla. 2016)...................................................................19

*White v. Mederi Caretenders Visiting Serv. of Se. Fla., LLC*,
   226 So. 3d 774 (Fla. 2017)................................................................19

## FEDERAL STATUTES

29 U.S.C.
   § 203(d) ............................................................................................43

§ 203 (e)(1) ...................................................................................................................33
§ 203 (g) .......................................................................................................................33
§ 206 .............................................................................................................................16
§ 213(a)(3) ...............................................................................................................passim
§ 213(a)(3)(A) ..............................................................................................................29
§ 213(a)(3)(B) ..............................................................................................................31
§ 213(a)(19) ............................................................................................................1, 16

Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348 ....................16

**STATE STATUTES**

43 P.S. Labor § 333.105(a)(9) .........................................................................................32

Cal. Lab. Code
§ 201(a) .........................................................................................................................48
§ 203 .............................................................................................................................48
§ 210(c) .........................................................................................................................53
§ 226(a) .........................................................................................................................48
§ 510(a) .........................................................................................................................14
§ 558(a) .........................................................................................................................51
§ 558.1(a) ......................................................................................................................51
§ 1194 ...........................................................................................................................14
§ 1197.1(a) ....................................................................................................................51
§ 2699.3(a)(1)(A) .....................................................................................................53, 54

48A Fla. Jur 2d Stat.
§ 116 .............................................................................................................................17
§ 120 .............................................................................................................................19
§ 170 .............................................................................................................................17

Fla. Stat. Ann.
§ 448.110 ...............................................................................................................18, 19
§ 448.110(2) ..................................................................................................................19
§ 448.110(3) ..................................................................................................................19

Md. Code Lab. & Empl., § 3-415(b)(3) .............................................................................33

N.C. Gen. Stat. § 95-25.4(a) ............................................................................................32

**RULES**

Fed. R. Civ. P. 56(a) ......................................................................................................14

Fed. R. Civ. P. 56(c) ......................................................................................................14

Fed. R. Evid. 702 ...........................................................................................................15

**REGULATIONS**

29 C.F.R. § 779.23 .........................................................................................................22

29 C.F.R. § 779.203 .......................................................................................................22

29 C.F.R. § 779.308 .......................................................................................................27

x

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT –
CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

85 Fed. Reg. 2820 (Feb. 26, 2020) ...................................................................................20

86 Fed. Reg. 40939 (July 30, 2021)..................................................................................20

12 N.Y.C.R.R. § 142-2.2 ...................................................................................................32

**CONSTITUTIONAL PROVISIONS**

Fla. Stat. Ann. Const. Art. 10 § 24 (b)........................................................................16, 17

Fla. Stat. Ann. Const. Article 10, § 24(f)....................................................................17, 20

Ohio Const. Article II, § 34a..............................................................................................18

**OTHER AUTHORITIES**

95 Cong. Rec. 12,579 (1949) .............................................................................................22

Fla. Att'y Gen. Op. 2005-64, 2005 WL 3132090 (Fla. A.G. Nov. 23, 2005) ...................18

H.R. Rep. No. 871, 89th Cong., 1st Sess. 35 (1965) ........................................................26

U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., 2021 WL 240824 (Jan. 15, 2021).....31

U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., 1967 DOLWH LEXIS 164 (June
    22, 1967) ......................................................................................................................24

U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., 1978 DOLWH LEXIS 30 (Oct. 11,
    1978) ............................................................................................................................24

U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., 1986 DOLWH LEXIS 69 (May
    12, 1986) ......................................................................................................................31

U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., 1999 WL 1002367 (Feb. 18, 1999)...24

xi

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT –
CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

Based on the undisputed record evidence in this action, Defendants respectfully request that the Court grant summary judgment or partial summary judgment on the following grounds.

*First*, Defendants are entitled to summary judgment on all Plaintiffs' claims for minimum wage and overtime (whether asserted in their individual capacity or on behalf of class or collective members) because they rely exclusively on inadmissible expert testimony to calculate "hours worked" and corresponding damages. Without this inadmissible evidence, Plaintiffs cannot prove essential elements of their claims in this case and they should all be dismissed.

*Second*, Plaintiffs and the class and collective members they seek to represent are not entitled to damages under the FLSA (for minimum wage and overtime) and Florida law (for minimum wage) as of March 23, 2018, the effective date of the Save America's Pastime Act ("SAPA"). 29 U.S.C. § 213(a)(19). SAPA provides that the FLSA's minimum wage and overtime requirements do not apply to minor league players who are "compensated pursuant to a contract that provides for a weekly salary for services performed during the league's Championship Season (but not spring training or the off season) at a rate that is not less than a weekly salary equal to the minimum wage under section 6(a)…for a workweek of 40 hours, irrespective of the number of hours the employee devotes to baseball related activities." *Id.* It is undisputed that the Clubs paid their minor league players at least this statutory minimum. The same result obtains under Florida law, because Florida follows the FLSA in all respects.

*Third*, the Clubs are exempt from minimum wage and overtime under the FLSA pursuant to the seasonal amusement or recreational establishment exemption, as well as under the state laws of Florida, Pennsylvania and Maryland that incorporate this exemption. *See* 29 U.S.C. § 213(a)(3). As set forth in Section III, *infra,* the "establishments" at issue in this case—the spring training facilities where games and training take place, as well as the minor league affiliate stadiums where Championship Season games are played—easily satisfy the requirements for the exemption as a matter of law.

*Fourth*, Plaintiffs and the class and collective members they seek to represent are not entitled to minimum wage and/or overtime under the FLSA and the state wage-and-hour laws pled in the Complaint outside of the Championship Season.  The undisputed record evidence compels the conclusion that they are not "employees" within the meaning of the applicable laws during those times.

*Fifth*, Plaintiffs' federal and state wage-and-hour claims against Defendant Commissioner Emeritus Selig (whether asserted in their individual capacity or on behalf of class or collective members) indisputably fail as a matter of law and should be dismissed.  The undisputed record establishes that during his tenure as Commissioner, Selig did not personally play any role in hiring or firing minor league players; supervising and controlling work schedules or conditions of employment; determining their rate and method of payment; and/or maintaining employment records.  Selig is also entitled to summary judgment as to Plaintiffs' California state-law claims, because he cannot be held personally liable in his individual capacity under the PAGA or California Labor Code, given that he was not directly involved in the alleged violations.

*Finally*, all of Plaintiffs' claims under California Labor Code Section 204 (Count 5 of the Complaint) fail as a matter of law because the statute does not provide a private right of action. Further, Defendants are entitled to partial summary judgment on Plaintiffs' claims for certain PAGA penalties, because Plaintiffs failed to satisfy the jurisdictional prerequisites attendant to such claims.

For these reasons, and those explained in greater detail below, summary judgment and partial summary judgment are appropriate.

## STATEMENT OF ISSUES TO BE DECIDED

1)      Whether Defendants are entitled to summary judgment on all of Plaintiffs' claims for minimum wage and overtime because Plaintiffs have not offered admissible testimony to calculate "hours worked" and corresponding damages;

2)      Whether Defendants are entitled to summary judgment as to Plaintiffs' claims for minimum wage and overtime under the FLSA and for minimum wage under Florida law as of March 23, 2018, the effective date of the SAPA;

2

3)       Whether Defendants are entitled to summary judgment on the issue of whether the Clubs are exempt from minimum wage and overtime under the FLSA pursuant to the seasonal amusement or recreational establishment exemption, as well as under the state laws of Florida, Pennsylvania and Maryland that incorporate this exemption;

4)       Whether Defendants are entitled to partial summary judgment on Plaintiffs' claims for minimum wage and overtime under the FLSA and state wage-and-hour laws for all periods of time outside the Championship Season because minor league players are not "employees" as a matter of law during those periods;

5)       Whether Defendant Commissioner Emeritus Selig is entitled to summary judgment because he is not Plaintiffs' "employer" as a matter of law under the FLSA and all state laws pled in the Complaint; and

6)       Whether Plaintiffs' claims under California Labor Code Section 204 (Count 5 of the Complaint) fail as a matter of law because the statute does not provide a private right of action, and with respect to certain PAGA penalties, because Plaintiffs failed to properly exhaust their administrative remedies.

## RELEVANT BACKGROUND

Forty-five (45) Plaintiffs (the "Named Plaintiffs" or "Plaintiffs") are pursuing individual claims against Defendants The Office of the Commissioner of Baseball ("MLB"), Commissioner Emeritus Allan H. "Bud" Selig ("Selig"), and twenty-two (22) MLB Clubs[3] ("Defendant Clubs" and collectively with MLB and Selig, "Defendants").  The Named Plaintiffs purport to bring individual claims under the FLSA, and the laws of California, Florida, Arizona, North Carolina, New York, Pennsylvania, Maryland, and Oregon, alleging that they were not paid minimum wage and/or overtime for services performed during spring training, extended spring training, the Championship Season, fall instructional league, and for off-season training activities.  (*See* Dkt. 382 ¶¶ 568-740.)

---

[3] The following eight (8) MLB Clubs were dismissed for lack of personal jurisdiction (the "Dismissed MLB Clubs"): Atlanta Braves, Baltimore Orioles, Boston Red Sox, Chicago White Sox, Cleveland Indians, Philadelphia Phillies, Tampa Bay Rays, and Washington Nationals.  (*See* Dkt. 379.)

After briefing on collective and class-certification, including cross-appeals before the Ninth Circuit, there currently are three Rule 23(b)(3) classes, one Rule 23(b)(2) class and one FLSA collective.  The classes and collective are as follows:

- **"The California Class"** includes minor league players[4] who did not opt-out and participated in the California League for at least seven consecutive days since February 7, 2010 (the "California Class Members").  The California Class Members seek minimum wage, overtime and waiting time penalties under California law.  (Dkt. 799 at 1.)

- **"The Arizona Class"** includes minor league players who did not opt-out and participated in spring training, extended spring training and/or fall instructional league (collectively, the "Training Seasons") in Arizona since February 7, 2011 (the "Arizona Class Members").  The Arizona Class Members seek minimum wage under Arizona law.  (Dkt. 782 at 10-11.)

- **"The Florida Class"** includes minor league players who did not opt-out and participated in one or more of the Training Seasons in Florida since February 7, 2009 (the "Florida Class Members" and with the California Class Members and Arizona Class Members, the "Class Members").  The Florida Class Members seek minimum wage under Florida law. (*Id.*)

- **"The Rule 23(b)(2) Class"** includes minor league players who participate in one or more of the Training Seasons, or the Championship Season in Florida or Arizona.  (Dkt. 950 at 1.)

- **"The FLSA Collective"** is comprised of minor league players who opted in and participated in one or more of the Training Seasons or the California League since February 7, 2011 (the "FLSA Collective Members" and collectively with the Named Plaintiffs and Class Members, the "Players").  The FLSA Collective Members seek minimum wage and overtime under the FLSA.  (Dkt. 782 at 11.)

---

[4] Minor league players meet the criteria for inclusion in the FLSA Collective or Rule 23(b)(3) Classes if they participated in the California League and/or the Training Seasons during the applicable limitations period while signed to a Minor League Uniform Player Contract and had not signed a Major League Uniform Player Contract before then.  (*See* Dkt. 782 at 10-11, 799 at 1.)

4

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.    Undisputed Material Facts Relevant To Application Of The Save America's Pastime Act ("SAPA").**

Players were compensated pursuant to the terms of their Minor League Uniform Player Contracts ("UPCs").[5]  Since March 23, 2018, all Clubs compensated Players at least $290 per week for a 40-hour workweek during the Championship Season.[6]

**B.    Undisputed Material Facts Relevant To The Seasonal Amusement Or Recreational Establishment Exemption.**

Each year, MLB Clubs present minor league baseball games and training activities to the public at different stadiums or facilities located throughout the country.[7]  The Clubs host games and training activities involving Players at the facilities they maintain in Florida or Arizona (referred to as the "spring training facilities"), including but not limited to during the Training Seasons.[8]  The games and training activities are generally open to the public to attend and fans have attended.[9]  The Clubs derive revenue from the baseball-related activities they present at their spring training facilities (including but not limited to, Major League Spring Training and for some Clubs, Championship Season affiliates that play there), from ticket sales, concessions, merchandise sales, and sponsorships.[10]  All of the Clubs' Florida and Arizona spring training facility "establishments" in all relevant years had average gross receipts (on a cash accounting basis) during the lowest six

---

[5] *See* Declarations of Sheila Yammer, Kelly Young, Michael Hoppes, Cathy Fahy, Amanda Park, John Storiz, Leanna Priest, Mary Forkapa, Juli Daedelow, Mark Cebelak, Jennifer Springs, Jodi Parsons, Lorelei Schlitz, Angelica Romero, Carolina Calderon, James Norton, Lori Beasley, Steve Canna, Christian Ruiz, Adam Tyhurst, Bryan Humphreys, Laura Kallop, Jessica Anderon, Eric Flemming, Tim Kornegay, Kurt Hoevel, Rob Gagliardi, Starr Gulledge, Janet Chant, and Ted Towne (collectively, the "Club SAPA Decls."), at ¶ 3.

[6] *See* Club SAPA Decls. at ¶¶ 4-6.

[7] *See* Bloom Decl. Exs. 1-2 (summary charts identifying the locations of all minor league affiliate stadiums and spring training facilities); 3-32 (collecting Club media guides); 62-97 (collecting maps of spring training facilities).

[8] *See* Bloom Decl. Exs. 120-149 at ¶ 2 (collecting Club declarations noting that "[m]inor league spring training, extended spring training and instructional league take place at the facility the Club[s] maintain[]" in Arizona or Florida).  *See also* Bloom Decl. Exs. 204 (D. Davis Tr. 21:13-20); 214 (Tigers 30(b)(6) Tr. 27:18-20, 39:16-22, 65:22-25); 215 (Astros 30(b)(6) Tr. 184:19-185:5); 216 (Royals 30(b)(6) Tr. 122:20-123:3); 217 (Angels 30(b)(6) Tr. 227:11-13); 225 (Padres 30(b)(6) Tr. 341:6-16, 361:6-9); 227 (Mariners 30(b)(6) Tr. 370:6-10).

[9] *See* Bloom Decl. Exs. 120-149 at ¶ 2 (collecting Club declarations).

[10] *See id.* at ¶¶ 3-5 (collecting Club declarations identifying the gross receipts derived from the presentation of baseball-related activities at the Arizona and Florida spring training facilities, the underlying documents reflecting those receipts, and the types of receipts).

5

months of each calendar year that were less than one-third of their gross receipts during the other six months of each year.[11]

Players who are assigned to the Clubs' minor league affiliate teams play games against other affiliate teams during what is referred to as the "Championship Season." These games take place at stadiums located throughout the country.[12] Players play in Championship Season games and postseason games at the affiliate stadiums from early April through early to mid-September (for full-season minor league affiliates) and from mid- or late-June through late-August (for short-season minor league affiliates).[13] The Clubs' minor league affiliates do not present any baseball games to the public outside of that period, and the Clubs for the most part[14] do not employ staff at the minor league affiliate stadiums on a year-round basis—*i.e.,* outside of the Championship Season each year, from January through March, and October through December.[15]

---

[11] *See id. See also* Bloom Decl. Ex. 2 (summary chart demonstrating that the average gross receipts on a cash accounting basis derived by the Clubs during the lowest six months of each calendar year were less than one-third of their average receipts during the other six months during each relevant year).

[12] *See* Bloom Decl. Exs. 1 (summary chart reflecting Championship Season stadium "establishments"); 3-32 (collecting Club media guides); 33-61 (collecting Club game schedules); 98-119 (collecting Club Interrogatory Answers and Objections). *See also* Declarations of Greg Heller and Daniel Fumai at ¶¶ 2, 3; and Declarations of Kent Qualls, David Friedman, John Corvino, Maxwell Kosman, Leslie Safran, John Higgins, Ted Towne, Harold Roth, Alan Chang, and Amy Tovar at ¶ 2 (collectively, the "Club Seasonal Employee Decls.").

[13] *See* Bloom Decl. Exs. 213 (Rockies 30(b)(6) Tr. 177:4-21); 214 (Tigers 30(b)(6) Tr. 40:24-41:10); 215 (Astros 30(b)(6) Tr. 158:3-9); 219 (Marlins 30(b)(6) Tr. 111:8-11); 220 (Brewers 30(b)(6) Tr. 83:17-18, 201:9-25); 221 (Twins 30(b)(6) Tr. 89:11-90:6, 136:18-23); 222 (Mets 30(b)(6) Tr. 255:6-15, 255:23-25); 226 (Giants 30(b)(6) Tr. 152:5-12); 228 (Cardinals 30(b)(6) Tr. 108:21-109:7); 230 (Rangers 30(b)(6) Tr. 313:10-13); 231 (Blue Jays 30(b)(6) Tr. 166:21-167:8); 174 (Liberto Tr. 142:19-143:1, 170:11-19); 199 (Watts Tr. 183:24-184:3). *See also* Bloom Decl. Exs. 3-32 (Club media guides); 33-61 (Club game schedules for Championship Season minor league affiliates).

[14] Among the 30 Clubs, the only Clubs that have employed any year-round staff at the minor league affiliate Championship Season "establishments" listed in Bloom Decl. Ex. 1 are as follows: the Houston Astros employed up to 9 year-round employees (generally, between 4 and 5) at Pioneer Park for the Greeneville Astros between 2011 and 2017; since 2011, the Atlanta Braves have employed between 21 and 26 year-round employees at Coolray Field for the Gwinnett Braves; between 15 and 22 year-round employees at Trustmark Park for the Mississippi Braves; between 14 and 23 year-round employees at State Mutual Stadium for the Rome Braves; and between 5 and 7 year-round employees at American Legion Post 325 Field for the Danville Braves; and since October 2017, the Milwaukee Brewers employed between 13 and 24 year-round employees at Five County Stadium in Zebulon, North Carolina for the Carolina Mudcats. *See* Bloom Decl. Exs. 1 (summary chart of Championship Season "establishments"); 103 (Houston Astros Interrogatory Answers and Objections); Declaration of Greg Heller at ¶¶ 2-4; and Declaration of Daniel Fumai at ¶¶ 2-4.

[15] *See* Bloom Decl. Exs. 98-119 (Club Interrogatory Answers and Objections). *See also* Club Seasonal Employee Decls. at ¶¶ 2-4 (sworn declarations from the Clubs indicating the number of Club employees employed at the minor league affiliate stadiums on a year-round basis).

## C.  Undisputed Material Facts Relevant To Players' Status As Primary Beneficiaries Of Training Outside The Championship Season.

Players are not paid a salary under their UPCs outside of the Championship Season, with few exceptions.[16]  *See* Dkt. 382 at ¶¶ 184-88 (alleging that Players earn no compensation during the Training Seasons, or the off-season); Dkt. 720 at 7, 23 (alleging that no wages are paid during the Training Seasons).[17]  Players receive some benefits during the Training Seasons, such as meal stipends and housing, but not all of them chose to accept those benefits.[18]

Plaintiffs testified that they participated in the minor leagues in order to help them achieve their goal of reaching the Major Leagues, which many characterized as their "dream."[19]  Clubs offered training and development opportunities to Players, and provided trainers and coaches,[20]

---

[16] Certain Clubs paid salaries during extended spring training during certain years. *See* Bloom Decl. Exs. 209 (Cubs 30(b)(6) Tr. 181:11-15); 212 (Indians 30(b)(6) Tr. 17:7-14); 213 (Rockies 30(b)(6) Tr. 241:24-242:1); 214 (Tigers 30(b)(6) Tr. 195:21-196:23); 216 (Royals 30(b)(6) Tr. 311:23-312:1); 223 (Phillies 30(b)(6) Tr. 142:18-143:19); 224 (Pirates 30(b)(6) Tr. 120:22-121:10). In the midst of the COVID-19 pandemic, Players who participated in the fall instructional league continued to receive the same weekly stipend they received during the cancelled season.  *See, e.g.,* Bloom Decl. Exs. 208 (Braves 30(b)(6) Tr. 214:7-11); 210 (White Sox 30(b)(6) Tr. 12:23-13:6); 212 (Indians 30(b)(6) Tr. 172:16-173:5); 223 (Phillies 30(b)(6) Tr. 190:18-191:8); 232 (Nationals 30(b)(6) Tr. 53:21-54:1).

[17] *See also* Bloom Decl. Exs. 238 (excerpt from Advocates for Minor Leaguers 2021 Handbook, p. 6 (instructing minor leaguers "not [to] expect a paycheck for any of the work you perform during those periods [outside the Championship Season]")); 239 (MLB0028879, UPC at VI. "Duration and Conditions of Employment" (confirming that salary payments are made only during Championship Season)).

[18] *See, e.g.,* Bloom Decl. Exs. 151 (Anderson Tr. 87:22-88:8 (stating that it was "his choice" to live in an apartment outside the team hotel)); 169 (Khoury Tr. 276:24-279:16 (stating that he chose not to stay in team hotel because it was not a "great hotel")); 172 (Lawson Tr. 146:9-18 (testifying that he chose not to live in team hotel during spring training)); 176 (Loux Tr. 101:18-21 (stating that he lived outside the team hotel every year)); 189 (Pease Tr. 290:17-292:1 (Plaintiff chose to live in an apartment near spring training complex instead of team hotel)).

[19] *See, e.g.,* Bloom Decl. Exs. 153 (Bennigson Tr. 75:5-12 (agreeing that he pursued a career as a professional baseball player in order to achieve his dream of becoming a Major League Baseball player)); 155 (Cody Tr. 150:2-15 (played baseball from 2006 to 2013 with goal of reaching Major Leagues)); 157 (Dott Tr. 105:23-106:5 (testifying that his "dream was to play in the big leagues because [he] knew that's where the money was and that's what [he] wanted to do as a career" and agreeing that playing in the minor leagues was "a step in reaching [his] dream of playing for the big leagues")); 157 (Dott Tr. 233:7-15 ("I played Minor League Baseball for seven years and tried to chase a dream at getting to the big leagues")); 158 (Duff Tr. 195:25-196:15 (agreeing that he was aspiring to play for the major leagues while playing minor league baseball)); 168 (Kahauelio Tr. 157:4-9 (agreed to sign a UPC because he wanted to become a Major League Baseball player)); 191 (Quinowski Tr. 187:3-25 (testifying that he signed with a major league organization, rather than playing in an independent league, because that gave him an opportunity to play in the big leagues)).  Although only a small percentage of Players ultimately reach the Major Leagues, by training in the minor leagues, the Players all reaped the benefit of having the **chance** of reaching the Major Leagues, which generates a substantial increase in expected lifetime earnings.  *See* Bloom Decl. Ex. 235 (Martin Report, dated 8/16/2016) at Figure 5, ¶ 45.

[20] *See, e.g.,* Bloom Decl. Exs. 208 (Braves 30(b)(6) Tr. 150:15-151:5); 221 (Twins 30(b)(6) Tr. 40:14-20).

7

during the Training Seasons to help them improve as baseball players.[21]  For instance, activities

during spring training included Players practicing their baseball skills or learning new skills from the

Club's coaches and trainers in order to better their chances of success during the Championship

Season.[22]  Extended spring training and instructional league also included activities to provide

Players with additional training to optimize their success (or for injured Players, to facilitate their

recovery).[23]

      Players obtained jobs during and following their time in the minor leagues, such as coaching

baseball, providing baseball instruction at camps or privately, providing fitness instruction, owning

athletic camps, managing baseball teams, and directing athletic departments.[24]  Moreover, many

---

[21] Some athletes are willing to **pay** significant sums of money in order to attain extra training in baseball and conditioning in camps offered at cost on the open market.  *See, e.g.*, Bloom Decl. Ex. 235 (Martin Report, dated 8/16/2016) at ¶ 29-32, Figures 1-3.  In fact, some Players even sought out and paid for additional training during their time in the minor leagues.  *See, e.g.*, Bloom Decl. Exs. 151 (Anderson Tr. 113:1-19 (hired a personal trainer)); 157 (Dott Tr. 244:5-245:8 (hired a personal trainer who created fitness programs for him)); 167 (Johnson Tr. 121:24-124:21 (testifying that his grandmother paid for his training at IMG Academy, where he would train in the morning for two to three hours in the weeks leading up to spring training, and is seeking compensation for that time)); 193 (Schmeltzer Tr. 89:7-92:5 (spent four hours a day in the off-season working with a pitching coach and trainer whom he hired)).

[22] *See, e.g.*, Bloom Decl. Exs. 207 (Diamondbacks 30(b)(6) Tr. 127:13-24 (spring training is intended so a player may "prepare to perform and to make sure that their…body is ready to stay healthy…to give them the best chance to succeed and develop)); 208 (Braves 30(b)(6) Tr. 113:9-24 (testifying that spring training provides players with programming and developmental opportunities designed to "help them develop" and "make them better baseball players")); 204 (Bavasi Tr. 306:14-307:4 (describing spring training as a "training period to prepare for the…apprenticeship you're going to go through during the year")).

[23] *See, e.g.*, Bloom Decl. Exs. 207 (Diamondbacks 30(b)(6) Tr. 46:24-47:10 (explaining that players were selected for extended spring training based on whether they would benefit from extra training time, or "just for their overall health")); 208 (Braves 30(b)(6) Tr. 166:20-167:13 ("we…invite our…best minor league players [to instructional league]…who we believe have, you know, the greatest potential to develop into big leaguers…to participate in …training with our…best instructors, best staff…in an effort to accelerate their development, provide them with the most and best resources we can, whether that's from a staff standpoint or otherwise.")); 216 (Royals 30(b)(6) Tr.  122:1-19 (extended spring training provides an opportunity to "continue to work on their skills in an effort to hopefully one day be able to make [a full-season club]")); 217 (Angels 30(b)(6) Tr. 183:7-23 (duration of instructional league for each player depended on "what the player's personal need is, what would benefit him most…it's created to give players the best opportunity to develop in the areas that they needed most."), 236:21-237:13 (describing these "life skills and mental development activities" for players in instructional league, including "programs talking about what it means to be a good teammate and how that could help you in other areas of your life outside of baseball")); 232 (Nationals 30(b)(6) Tr. 48:4-15 (instructional leagues are designed to "provide players with more one-on-one coaching combined with team building, off the field baseball education…to really begin their development and build a foundation.")).

[24] *See* Bloom Decl. Ex. 235 (Martin Report, dated 8/16/2016 at Figure 4 (detailing the sports-related positions held by 31 of the 41 Named Plaintiffs who were part of the case at the time she conducted her research in 2016), ¶¶ 28, 47 (explaining how Plaintiffs were investing in "human capital" by obtaining education and training, which not only increased their chances of achieving their dreams of becoming Major League Baseball Players, but also enhanced their ability to pursue other careers and thus cumulatively increasing their expected future income)).  In the intervening years since Dr. Martin performed her research, four more individuals joined the litigation as Named Plaintiffs, all of whom also held sports-related positions during or after their minor league experiences.  *See* Bloom Decl. Exs. 176 (Loux Tr. 113:4-114:15, 117:6-14 (testimony regarding baseball lessons given by Barrett Loux)); 241-242 (Henry Dep. Ex. 6 and

---

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT –
CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

Players testified that their experiences playing baseball, including in the minor leagues, enhanced

skills, such as language,[25] communication, leadership, discipline and time management, and certain

Players featured their time in the minor leagues on their resumes and LinkedIn pages.[26]

Defendants benefit from the minor leagues to the extent they develop a skilled pool of

players who may eventually be called up to the Major Leagues, or traded in exchange for Major

---

MLBHENRB0000267 (evidence of Bryan Henry's sports-related endeavors, including lessons in the off-season, baseball coaching, and his current business, a sports performance training academy)); 243-246 (MLBJOHNK0000003, MLBJOHNK0000351, MLBJOHNK0000395, MLBJOHNK0000351, and MLBJOHNK0000354 (evidence of Kyle Johnson's sports-related endeavors, including hitting lessons, baseball camps, and a self-started company that sells baseball equipment)); 247-249 (MLBSEDL0004432, MLBSEDL0004320, and MLBSEDL0002528 (evidence of coaching and lessons given by Cody Sedlock)). Evidence shows that 90% of college baseball athletes do not pursue a career in professional sports, instead pursuing variety of other careers. *See* Bloom Decl. Ex. 237 (Martin Declaration, dated 10/29/2021) at ¶ 15. Evidence also shows that former student athletes are particularly successful in the business, healthcare, and education sectors, earning a wage premium relative to those without a sports background. *Id.*

[25] Many minor leaguers had the benefit of attending free English or Spanish language classes provided by the Clubs during the Training Seasons. *See, e.g.*, Bloom Decl. Exs. 253-257 (PHI0003627, PHI0001672, PHI0001725, PHI0001753, and PHI0001772 (exemplars of ESL class schedules offered by the Philadelphia Phillies)); 259 (SEA0039774 (exemplar schedule from the Seattle Mariners offering "English and Culture Classes")); 251 (KAN0014816 (exemplar schedule from the Kansas City Royals)); 250, 252, 258, 260-261 (BOS0000838, MIA0053759, PIT0014788, SFG0000058, TOR0051827 (collecting examples of Spanish classes offered by various Clubs)).

[26] *See* Bloom Decl. Ex. 235 (Martin Report, dated 8/16/2016 at ¶ 37). *See also* Bloom Decl. Exs. 150 (Alvino Tr. 88:3-20 (testifying that he included baseball experience on his resume used to apply for teaching positions, and that the skills he attained as a professional ball player would help him be successful as a teacher)); 152 (Arnesen Tr. 78:6-79:10 (explaining that he included a discussion of his minor league experience on his cover letters to other jobs because he believed his experiences and successes would make him a valuable employee)); 163 (Henderson Tr. 189:23-191:1 (describing how he learned patience in professional baseball, and has incorporated those lessons into his non-baseball jobs)); 169 (Khoury Tr. 297:21-298:14 (baseball helped him with his communication skills and people skills)); 173 (Lashmet Tr. 141:6-19, 150:18-24 (believed that professional baseball made him a distinctive candidate for non-baseball jobs)); 183 (Negus Tr. 126:15-128:12 (explaining why he thought his time in the minor leagues would develop life skills, such as "perseverance, hard work, teamwork, leadership, time management, competitiveness, and dedication", that would correlate to a job in business)); 186 (Opitz Tr. 313:6-315:5 (describing how baseball helped him develop leadership skills, time management, and drive, which can apply outside of baseball)); 200 (Zapata Tr. 185:15 -186:7, 188:6-21 (testifying that he included minor league baseball on his resume even for non-baseball jobs because it's "very professional…it describes me as a professional")); 201 (Bavasi Tr. 307:5-22 (testifying that while professional baseball experience may make a resume attractive, "this doesn't even take into account yet the – what they've learned as they've gone through the minor league experience of team – teamwork, leadership, figuring things out, passage into adulthood. There's a lot of things that, that go on at the minor league level")); 205 (Kapler Tr. 25:15-26:14 ("[W]e understand that most of our minor league players will not reach the major league level. So our responsibility is to help them become more equipped to navigate the world…")); 206 (Scales Tr. 144:23-145:13 (describing program and explaining that "it was a holistic approach to developing the man and thereby developing the player")); 217 (Angels 30(b)(6) Tr. 202:5-203:6 ("…there are other activities that we conduct with players that is to assist them in their life development. There are other things that occur that will help a player many years down the road, whether they're still playing baseball or not, that are off the field … bringing somebody in to discuss financial planning with them is an example of something that we do to – to help players expand their – their life development")); 218 (Dodgers 30(b)(6) Tr. 132:18-133:4 ("The purpose [of the Dodgers' Player Development Department] is to develop our – our men first, to develop our – the human beings in the Player Development System … to try to make them the strongest individuals and subsequently athletes … they can be")).

9

1  League Players or other minor league players.[27]  Defendants do not sell tickets to games played

2  between Clubs during the Training Seasons.[28]

3       **D.      Undisputed Material Facts Relevant To Commissioner Emeritus Selig.**

4       Allan Huber "Bud" Selig was elected the Commissioner of Baseball on July 9, 1998 and

5  served in that role until January 25, 2015.[29]  During his tenure as Commissioner, Selig was

6  employed by the Office of the Commissioner of Baseball—not by any of the Clubs.[30]  Selig did not

7  hold an ownership interest in the Commissioner's Office or any Club since 2008.[31]  As

8  Commissioner, Selig had no role in setting the specific hours or scheduling for any Player.[32]  Selig

9

10

11  [27] *See, e.g.*, Bloom Decl. Exs. 202 (Broadway Tr. 306:16-307:1 ("The purpose of maintaining a relationship with a player would be to continue their development and try to get them to the major leagues to help us win championships in Pittsburgh.")); 203 (Chattin Tr. 19:18-21 (agreeing that "the Marlins benefit from having minor league players because they might become major league players…")); 211 (Reds 30(b)(6) Tr. 331:21-332:24 ("The Minor League player does not generate one single cent of revenue for the Cincinnati Reds.  They don't provide any service that I benefit directly from today.  A Major League player comes in a finished product.  He is supposed to be fully developed.  He generates revenue by filling up Great American Ballpark for the Cincinnati Reds.")); 216 (Royals 30(b)(6) Tr. 178:16-179:14 (goal of minor leagues is to "help…players reach their ceiling…to help them maximize their potential while in the process developing championship caliber players that can compete at the highest level…")); 230 (Rangers 30(b)(6) Tr. 130:13-131:6 ("That's where we get the benefit, is when they turn into Major League players and we reward them pretty handsomely when they do.")).  *See also* Bloom Decl. Ex. 229 (Rays 30(b)(6) Tr. 82:5-16 ("[The minor league system] is important to – to any baseball club in order to continue to provide talent for our major league club…we rely on minor league players ascending to the big leagues after our training is completed with them in the minor leagues.")).

18  [28] *See, e.g.*, Bloom Decl. Exs. 218 (Dodgers 30(b)(6) Tr. 179:6-17 (Dodgers do not sell tickets to early camp, minor league spring training, extended spring training, or instructional leagues)); 214 (Tigers 30(b)(6) Tr. 30:19-22 (Tigers do not sell tickets to minor league spring training games)); 222 (Mets 30(b)(6) Tr. 245:18-21 (Mets do not sell tickets to minor league spring training games)); 226 (Giants 30(b)(6) Tr. 154:14-17 (Giants do not sell tickets "for any of the activities that occur at the minor league complex at Scottsdale")); 227 (Mariners 30(b)(6) Tr. 301:23-303:2 (tickets are not sold to minor league spring training games, nor for any minor league game that occurs at the spring training facility throughout the year, including extended spring training, and instructional league)).  *See also* Bloom Decl. Exs. 208 (Braves 30(b)(6) Tr. 143:22-144:18, 191:2-8 (Braves do not sell tickets to minor league spring training games, extended spring training games or instructional league games)); 210 (White Sox 30(b)(6) Tr. 94:12-14 (White Sox do not sell tickets to minor league spring training games)); 232 (Nationals 30(b)(6) Tr. 29:16-18 (Nationals do not sell tickets for minor league spring training games)); 229 (Rays 30(b)(6) Tr. 104:24-105:10 (Rays do not sell tickets to minor league spring training games, instructional league games, or extended spring training games)).

24  [29] *See* Bloom Decl. ¶ 243; Bloom Decl. Ex. 240 (Declaration of Allan H. Selig, dated July 5, 2016 ("2016 Selig Decl."), which was produced to Plaintiffs on July 7, 2016.).

25  [30] *See* Supplemental Declaration of Allan H. Selig, dated October 28, 2021 ("Supplemental Selig Decl.") ¶ 2.

26  [31] *See* Supplemental Selig Decl. ¶ 2.

27  [32] *See* Supplemental Selig Decl. ¶ 3; *see also* Bloom Decl. Exs. 159 (Gagnier Tr. 257:15-22 ("Q: Has Mr. Selig ever given you any kind of direction or instruction relating to your performance as a pitcher?  A: No")); 191 (Quinowski Tr. 133:7-16 (nobody from the Commissioner's Office determined what Plaintiff's responsibilities were during practices, games, travel, or team meetings)); 200 (Zapata Tr. 211:8-12 ("Q: Are you aware of Mr. Selig ever having any directed involvement in directed your activities [*sic*] as a player for the Mets and their minor league organizations?  A: No.")).

10

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT –
CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

did not interact with Players on a day-to-day (or even less frequent) basis.[33]  As one Player put it: "Selig did not come down and tell me what to do."[34]

As Commissioner, Selig never contributed monetarily to the wages or compensation of any Player.[35]  As Commissioner, Selig had no role whatsoever in recording Players' hours, payroll processing, or issuing them their wages.[36]  Selig did not personally maintain any employment records for any Player.[37]  As Commissioner, Selig was not involved in processing Players' paychecks.[38]  Selig also had no authority or involvement in negotiating individual Players' compensation, or deciding whether to pay Players a salary or hourly rate of pay.[39]  Furthermore, during his tenure as Commissioner, Selig did not provide Players with any tools, equipment, or uniforms, and since 2008, Selig had no ownership interest in any of the facilities where Players played or practiced.[40]

As Commissioner, Selig did not exercise any direct authority with respect to decisions as to which Players Clubs selected in the amateur draft, signed to a contract, and/or were released from their contracts by the Clubs.[41]  Although the Major League Rules require Players' UPCs to be

---

[33] *See* Supplemental Selig Decl. ¶ 3; *see also, e.g.*, Bloom Decl. Exs. 156 (L. Davis Tr. 315:16-19 (never interacted with Selig)); 158 (Duff Tr. 235:21-23 (never met Selig)); 163 (Henderson Tr. 107:3-8 (never met Selig; Selig never gave him instructions)); 165 (Hutson Tr. 327:23-328:1 (did not interact with Selig)); 168 (Kahaulelio Tr. 282:12-19 (no contact with Selig and not aware of any involvement by Selig in directing his activities as a Player)); 169 (Khoury Tr. 309:19-23 (no communications with Selig)); 179 (McAtee Tr. 333:24-25 (never interacted with Selig)); 180 (Meade Tr. 299:15-18 (same)); 185 (Odle Tr. 278:22-25 (same)); 188 (Pahuta Tr. 294:22-25 (same)).

[34] *See* Bloom Decl. Ex. 196 (Stone Tr. 281:3-4).

[35] Supplemental Selig Decl. ¶ 4.

[36] *See* Supplemental Selig Decl. ¶ 4; *see also* 2016 Selig Decl. ¶ 12 (Selig "do[es] not have any knowledge of the activities that take place during minor league spring training, the instructional league or during the championship season (other than players training to play and playing the game of baseball), or the amount of time spent on these activities").

[37] *See* Supplemental Selig Decl. ¶ 4.

[38] *See* Supplemental Selig Decl. ¶ 5.

[39] 2016 Selig Decl. ¶ 8; Supplemental Selig Decl. ¶ 5.  Players confirmed that they were signed by their respective teams, in some cases, without any communication with MLB.  *See, e.g.*, Bloom Decl. Exs. 156 (L. Davis Tr. 114:18-117:2); 160 (Gaston Tr. 311:18-312:10); 161 (Giarraputo Tr. 117:1-17, 145:15-19, 149:20-152:21); 168 (Kahaulelio Tr. 282:2-4); 174 (Liberto Tr. 100:18-22); 182 (Nadeau Tr. 330:1-18); 187 (Ortiz Tr. 114:17-116:12, 119:11-25); 189 (Pease Tr. 121:6-124:20); 191 (Quinowski Tr. 98:12-104:8).  Likewise, numerous former Players confirmed that they were released by their respective teams.  *See, e.g.*, Bloom Decl. Exs. 154 (Caseres Tr. 115:18-116:9); 170 (Kiel Tr. 291:13-15); 178 (Mathis Tr. 45:7-46:6); 187 (Ortiz Tr. 194:2-15); 192 (Santiago Tr. 277:5-6).

[40] *See* Supplemental Selig Decl. ¶ 6.

[41] *See* Supplemental Selig Decl. ¶ 7.

11

1   approved by the Commissioner's Office, to the best of Selig's recollection, that task was performed

2   by other employees in the Commissioner's Office; Selig does not recall personally approving or

3   disapproving the terms of any Player's UPC, and Plaintiffs failed to adduce any evidence to the

4   contrary.[42]  As Commissioner, Selig was not involved in any decision regarding the termination of

5   any Player.[43]

6       **E.    Undisputed Material Facts Relevant To Plaintiffs' Letter To The California
             Labor And Workplace Development Agency ("LWDA").**

7

8       On January 30, 2014, Plaintiffs sent a letter by certified mail to the California Labor and

9   Workforce Development Agency ("LWDA"), purporting to provide notice of certain violations of

10  the California Labor Code, pursuant to the Labor Code Private Attorneys' General Act ("PAGA").

11  *See* Complaint, Ex. C (Dkt. 382 at 414-15).  In their letter to the LWDA (the "LWDA Letter"),

12  Plaintiffs summarized the factual allegations purportedly giving rise to the alleged violations of

13  Labor Code sections 510, 1194, and 1197 as follows:

14          During the championship seasons, the minor leaguers routinely work in excess of
            forty hours a week yet the Defendants pay salaries below the minimum wage and pay
15          no overtime wages.  During other work periods, the Defendants pay no salaries at all.

16  *Id.* at 2.  However, with respect to alleged violations of Labor Code section 201-204, 208, and 226,

17  Plaintiffs provided no additional facts, alleging, in relevant part:

18          By failing to pay adequate wages and subsequently withholding these wages, the
            Defendants also violate California's "payday" requirements. (Labor Code § 204).
19          When the employment relationship ceases, the conduct also violates California's rules
            regarding the immediate payment of wages upon discharge (Labor Code§§ 201-03)
20          and the place of payment of wages (Labor Code § 208). Moreover, the Defendants
            violate Labor Code § 226 by failing to include adequate information in itemized wage
21          statements.

22  *Id.*  Instead of providing additional details, Plaintiffs directed the LWDA and Defendants to

23  Plaintiffs' as-of-yet unfiled District Court complaint.  *Id.* at 1 ("The allegations comprising this

24  claim are more fully set forth in the complaint … which will soon be filed….").

25

26

27  _____

28  [42] *See* 2016 Selig Decl. ¶ 5.

    [43] *See* Supplemental Selig Decl. ¶ 8.

12

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT –
CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

**F.      Plaintiffs Rely Exclusively On Their Experts To Establish "Hours Worked" And Corresponding Damages For All Claims.**

Plaintiffs seek to recover minimum wage and/or overtime for "hours worked" under the FLSA and Arizona, California, Florida, Maryland, New York, North Carolina, Oregon and Pennsylvania wage-and-hour laws.[44]  Plaintiffs rely exclusively on the Supplemental Expert Report of Brian Kriegler, Ph.D., dated August 13, 2021 ("Kriegler Report"), as their evidence of (i) total "hours worked" per pay period; and (ii) damages for their class, collective and individual claims.[45] Kriegler relies exclusively on the Main Survey attached to Dennis' August 4, 2016 declaration to estimate the number of "hours worked" and corresponding damages for the Arizona and Florida Classes, Collective Members who performed training activities during spring training, extended spring training and the instructional league in Arizona and Florida, as well as the Named Plaintiffs' individual claims during the Training Seasons and the Championship Season.[46]  Kriegler also relies exclusively on the Main Survey to estimate the number of "hours worked" before and after games and corresponding damages for the California Class and Collective Members who participated in the California League.[47]  Plaintiffs' experts do not use daily itineraries or schedules to estimate purported "hours worked" for any Named Plaintiff, Class Member, or FLSA Collective Member.[48] The only evidence other than the Main Survey that Plaintiffs' experts use to estimate "hours worked" is limited to: (i) the box scores for the length of games and Google maps data for travel time for the California League and Named Plaintiffs' individual championship season claims; and (ii) testimony from the Named Plaintiffs for their individual off-season claims.[49]

Defendants filed *Daubert* motions to exclude the reports and corresponding testimony of Kriegler and Dennis (including the Main Survey) on various grounds, including that the Main

---

[44] *See* Complaint (Dkt. 382).

[45] *See* Bloom Decl. Ex. 234 (Kriegler Report, dated August 13, 2021).

[46] *See* Bloom Decl. Ex. 236 (Martin Report, dated 9/27/2021) at ¶¶ 9-11, 20-24.

[47] *See id.* at ¶¶ 9-11, 20-24.  While Kriegler also relies on box scores (for length of games) and Google Maps (to calculate travel time), his model does not break out damages using either or both of those components, but instead relies on all hours between arrival and departure times reported in the survey to calculate total hours worked.  *See id.* at ¶ 11(b); ¶ 24.

[48] *See id.* at ¶¶ 9-11, 20-24. *See also* Bloom Decl. Ex 233 (Kriegler Tr. 61:21-62:23, 72:16-73:20).

[49] *See* Bloom Decl. Ex. 236 (Martin Report, dated 9/27/2021) at ¶¶ 9-11, 20-24.

Survey and the subset of survey responses on which Kriegler relies in conducting his damages

analysis do not reliably estimate "hours worked" and damages for the Named Plaintiffs or the

Arizona, Florida, or California Class or the Collective Members based on Plaintiffs' theory of

liability (*i.e.,* damages for team-related activities).[50]

## LEGAL ARGUMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P.

56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine'

only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors,*

*LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Indeed, "the existence of 'some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment.'"

*Edwards v. Leaders in Cmty. Alt., Inc.*, 850 F. App'x 503, 506 (9th Cir. 2021) (citing *Anderson*, 477

U.S. at 247-48).

## I.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLASS, COLLECTIVE, AND INDIVIDUAL CLAIMS BECAUSE THEY DO NOT HAVE ANY ADMISSIBLE EVIDENCE OF "HOURS WORKED" OR DAMAGES.

Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The number of "hours worked" is an essential element of all Players' claims.  *See, e.g.*,

*Maciel v. City of L.A.*, 569 F. Supp. 2d 1038, 1055 (C.D. Cal. 2008) (explaining that to prove

minimum-wage violation, plaintiff must show that his hours worked multiplied by the statutory rate

is less than what he was paid); Cal. Lab. Code § 510(a) (stating that entitlement to overtime depends

on number of hours worked); Cal. Lab. Code § 1194 (stating that any employee receiving less than

---

[50] Defendants' motion for partial summary judgment is without waiver or prejudice to any argument under Federal Rule of Civil Procedure 23 based on the fact that Plaintiffs' damages model does not correspond with their theory of liability.

14

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT –
CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

the legal minimum wage is entitled to recover the unpaid balance of the full amount of this minimum wage); *Martinez v. PM&M Elec. Inc.*, No. CV-18-01181-PHX-JG2, 2019 U.S. Dist. LEXIS 18393 (D. Ariz. Feb. 4, 2019) (to bring a claim under the FLSA, a plaintiff must prove, among other things, that the defendant failed to pay plaintiff minimum wage and/or overtime pay).  *See also* Bloom Decl. Ex. 233 (Kriegler Tr. at 42:14-43:2).  Plaintiffs rely solely on the Kriegler Report and the Main Survey to calculate "hours worked" and damages for all of their class and individual claims.[51]

For the reasons explained in detail in Defendants' *Daubert* motions, the Kriegler Report and the Main Survey are inadmissible under Federal Rule of Evidence 702.  Because Plaintiffs' inadmissible expert evidence is their sole evidence of total "hours worked" and damages, Plaintiffs have not proffered any admissible evidence to prove these essential elements of their claims.  The Court should therefore grant summary judgment in favor of Defendants on all of Plaintiffs' claims.[52] *McGlinchy v. Shell Chem. Co*., 845 F.2d 802, 808 (9th Cir. 1988) (affirming district court's decision granting summary judgment on plaintiffs' claims where expert report on damages was inadmissible and plaintiffs offered no other evidence of damages); *Philips v. Ford Motor Co.*, No. 14-cv-02989-LHK, 2017 U.S. Dist. LEXIS 23241 (N.D. Cal. Feb. 16, 2017) (granting summary judgment in favor of defendants where the court excluded plaintiffs' expert's damages report and plaintiffs did not have any admissible evidence to prove damages).

---

[51] Kriegler does not use the Main Survey to calculate "hours worked" and damages for the Named Plaintiffs' off-season claims.  *See* Bloom Decl. Ex. 234 (Kriegler Report, dated August 13, 2021 at 45-49).

[52] To the extent the Court excludes portions of either of the Kriegler Report and/or the Main Survey, Defendants ask that the Court grant partial summary judgment to Defendants on all corresponding claims.  *See Volterra v. Semiconductor Corp.*, *v. Primarion, Inc.*, No. 08-cv-05129-JCS, 2013 U.S. Dist. LEXIS 163970, at *93-97 (N.D. Cal. Sept. 24, 2013) (Spero, J.) (granting defendants' motion for summary judgment as to certain damages because the opinions expressed by the plaintiffs' expert were based on a theory of damages that was barred under applicable case law and because the expert's opinion did not satisfy the requirements of Federal Rule of Evidence 702).

1

2

## II.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS BASED ON ALLEGED VIOLATIONS OF THE FLSA AND FLORIDA LAW AS OF MARCH 23, 2018, THE EFFECTIVE DATE OF THE SAVE AMERICA'S PASTIME ACT ("SAPA").

3

### A.     SAPA Exempts Players From Coverage Under The FLSA.

4

5

In March 2018, Congress passed the Save America's Pastime Act ("SAPA"), which amended

6

the FLSA to exempt baseball players from the statute's minimum wage and overtime requirements.

7

The amendment states as follows:

8

9

10

The provisions of sections 206…and 207 of [Title 29] shall not apply with respect to: (19) any employee employed to play baseball who is compensated pursuant to a contract that provides for a weekly salary for services performed during the league's championship season (but not spring training or the off season) at a rate that is not less than a weekly salary equal to the minimum wage under section 6(a) for a workweek of 40 hours, irrespective of the number of hours the employee devotes to baseball related activities.

11

29 U.S.C. § 213(a)(19).

12

13

The amendment became effective on March 23, 2018.  *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348, at *1127 (2018).

14

15

As the current federal minimum wage is $7.25 per hour, SAPA requires compensation of at

16

least $290 per week for a 40-hour workweek to satisfy the criteria for the exemption.  29 U.S.C.

17

§ 206.  There is no dispute that Clubs have paid Players at least $290 per week since March 23,

18

2018.[53]  Accordingly, Defendants are entitled to judgment as a matter of law on all claims based on

19

alleged violations of the FLSA as of March 23, 2018.

20

### B.     SAPA Exempts Players From Coverage Under Florida Law.

21

Because Florida law follows the FLSA, there can be no liability under Florida law as of

22

March 23, 2018.

23

On November 2, 2004, the citizens of Florida voted to pass an amendment to the Florida

24

Constitution through a public ballot initiative entitled "Florida Minimum Wage Amendment 03-29."

25

The ballot initiative, which became Article X, Section 24 of the Florida Constitution (hereinafter,

26

"Section 24"), defines "Employer," "Employee," and "Wage" to "have the meanings established

27

under the federal Fair Labor Standards Act (FLSA) and its implementing regulations." Fla. Stat.

28

---

[53] *See* Club SAPA Decls. at ¶¶ 4-6.

1   Ann. Const. Art. 10 § 24 (b).  Section 24 also provides that "[i]t is intended that case law,

2   administrative interpretations, and other guiding standards developed under the federal FLSA shall

3   guide the construction of this amendment and any implementing statutes or regulations."  Art. 10

4   § 24(f).

5          Florida's incorporation of the FLSA in its entirety encompasses amendments to the FLSA

6   after the enactment of Section 24.  First, the plain language of Section 24 supports that Florida

7   incorporates the FLSA's amendments passed after the enactment of Section 24.  Section 24 states

8   that the terms "Employer," Employee," and "Wage" shall "have the meanings established under the

9   federal Fair Labor Standards Act (FLSA) and its implementing regulations." Art. 10 § 24 (b).  The

10  amendment then goes on to say that it shall be guided by the federal FLSA, including any other

11  "guiding standards developed under the federal FLSA…"  Art. 10 § 24 (f) (emphasis added).[54]  By

12  referencing standards "developed" under the federal FLSA, Section 24 clearly suggests that there is

13  no temporal limitation on Florida's incorporation.  To hold otherwise would render the referenced

14  sentence in Section (f) entirely superfluous and therefore meaningless, because Section 24 already

15  provided that Florida law shall have the same meaning as established under the FLSA in subsection

16  (b).  Such a construction should be avoided.  48A Fla. Jur 2d Stat. § 170 ("Words in a statute should

17  not be construed as mere surplusage. . . A construction that would leave without effect any part of

18  the language used should be rejected if possible . . .").  Moreover, the drafters could have—but did

19  not—include a temporal limitation on incorporation, such as stating that only those provisions of the

20  FLSA in effect at the time of the constitutional amendment would be incorporated.  The absence of

21  any such limitation is evidence that they did not intend for one to apply.  48A Fla. Jur 2d Stat. § 116

22  ("The court, in construing a statute, cannot and will not attribute to the legislature an intent beyond

23  that expressed.").  In Florida, constitutional provisions "receive a broader and more liberal

24  construction than statutes."  *Coastal Fla. Police Benev. Ass'n, Inc. v. Williams*, 838 So. 2d 543, 548–

25

26

27

28  [54] The Ninth Circuit pointed out this same Constitutional language in its reference to SAPA in its prior decision in this litigation.  *See* Case No. 17-16245, Dkt. 91-1, n.22.

49 (Fla. 2003) (citation omitted).  Imposing a temporal limitation in Section 24 where none exists runs counter to that objective.[55]

The Florida Supreme Court recognized the broad scope of Section 24's incorporation of the FLSA, noting that it "incorporates a reference to the entire body of law under the FLSA," including "the definition of employee, found in section 203 of the FLSA, the exemptions found in section 213 of the FLSA, and any other relevant provision within the FLSA or its implementing regulations."  *In re Advisory Op. to the Atty. Gen. re Fla. Minimum Wage Amendment*, 880 So. 2d 636, 641–42 (Fla. 2004).  The Court held that the consequence of Section 24 is that "employees covered under federal minimum wage will be the same [as] employees covered under the state minimum wage."  *Id.* at 642.[56]

While Section 24 states that no legislation was required in order to enforce the amendment, *id.* (f), it empowered the state legislature to "by statute . . . adopt any measures appropriate for the implementation of th[e] amendment."  *Id.* at 638.  Consequently, in December 2005, the Florida Legislature passed the Florida Minimum Wage Act, Fla. Stat. Ann. § 448.110 ("FMWA"), which states that its purpose is "to provide measures appropriate for the implementation of s. 24, Art. X of

---

[55] Similarly, by referencing the plural "meanings" of the terms "Employer," "Employee" and "Wage" in section (b), without providing for any limitation, the drafters of Section 24 expressed their intent to incorporate the entire FLSA.  In *Haight v. Minchak*, 58 N.E.3d 1135 (Ohio 2016), the Ohio Supreme Court interpreted similar language in Ohio's minimum wage law, which was also enacted as a constitutional amendment by popular initiative.  Like Section 24, Ohio's minimum wage amendment states that its terms shall "have the same meanings as under the Federal Labor Standards Act."  Ohio Const. art. II, § 34a.  The Ohio Supreme Court concluded that Ohio's minimum wage law incorporates the FLSA "without any limitation" and that by having drafted the definition to include the word "meanings" in plural, the "entirety of the FLSA is to be considered when determining who is covered under [the Ohio law's] protections."  *Haight*, 58 N.E.3d at 1139.  Like Ohio's minimum wage law, Section 24's use of the term "meanings" supports that Florida incorporates the FLSA without any limitation.

[56] In a similar vein, after the passage of Section 24, Florida's Attorney General was asked for an advisory legal opinion regarding whether Section 24 "include[s] the exemptions found in 29 United States Code section 214 of the Fair Labor Standards Act and any other relevant provisions with the Act or its implementing regulations."  Fla. Att'y Gen. Op. 2005-64, 2005 WL 3132090, at *1 (Fla. A.G. Nov. 23, 2005).  The Attorney General explained that the amendment looks "to the entire federal law, the code of federal regulations, case law and other standards for guidance regarding the interpretation and application of the Florida minimum wage," and thus Section 24 was intended to incorporate the FLSA in its entirety, "unless Article X, section 24, Florida Constitution, specifically provides otherwise."  *Id.*  Florida courts hold that "opinions of the Attorney General are entitled to great weight in construing the law of [Florida]."  *Leadership Hous., Inc. v. Dep't of Revenue*, 336 So. 2d 1239, 1241 (Fla. Dist. Ct. App. 1976); *see also Hardee Cnty. v. FINR II, Inc.*, 221 So. 3d 1162, 1166 (Fla. 2017) ("Attorney General opinions are also persuasive in statutory construction.").  Since SAPA is now part of the "entire" federal minimum wage law, the Attorney General's interpretation therefore further corroborates that Florida minimum wage law should incorporate SAPA because Section 24 does not specifically provide for any temporal limitation.

the State Constitution, in accordance with authority granted to the Legislature pursuant to s. 24(f), Art. X of the State Constitution." § 448.110.  The FMWA further provides:

> Only those individuals entitled to receive the federal minimum wage under the federal Fair Labor Standards Act and its implementing regulations shall be eligible to receive the state minimum wage pursuant to s. 24, Art. X of the State Constitution and this section. The provisions of ss. 213 and 214 of the federal Fair Labor Standards Act, as interpreted by applicable federal regulations and implemented by the Secretary of Labor, are incorporated herein.

§ 448.110(3).

Like Section 24, the FMWA is broad in scope and its plain text and purpose also supports the conclusion that future amendments to the FLSA are incorporated.  "[W]here the Court is tasked with construing a statute, [its] first (and often only) step is to ask what the Legislature actually said in the statute, based upon the common meaning of the words used."  *Shepard v. State*, 259 So. 3d 701, 705 (Fla. 2018) (internal citation and alterations omitted).  Accordingly, "[t]o determine the legislative intent, [Florida courts] look to the plain language of the statute."  *White v. Mederi Caretenders Visiting Serv. of Se. Fla., LLC*, 226 So. 3d 774, 779-80 (Fla. 2017) (citation omitted).  The FMWA was passed to "provide measures appropriate for the implementation of s. 24, Art. X of the State Constitution."  § 448.110(2).  Because the FMWA was enacted to facilitate the peoples' enactment of Section 24, it is considered part and parcel of Section 24.  *See Garcia-Celestino v. Ruiz Harvesting, Inc.*, No. 2:10-cv-542-FtM-38DNF, 2013 WL 3816730, at *17 (M.D. Fla. July 22, 2013) (interpreting Section 24 and the FMWA as single cause of action).  The FMWA further states that Sections 213 and 214 of the FLSA are incorporated "as interpreted by applicable federal regulations and implemented by the Secretary of Labor."  Fla. Stat. Ann. § 448.110(3).  Like Section 24, no temporal limitation is included on the face of the FMWA.  Imposing such a limitation would essentially insert a new provision into the statute that does not currently exist.  48A Fla. Jur 2d Statutes § 120 ("Courts are not at liberty to add words to statutes that were not placed there by the legislature . . . [A] court may not import words or meaning into a statute that do not appear on the face of the statute."); *Villanueva v. State*, 200 So.3d 47, 52 (Fla. 2016) (noting the "well-established rule that [the court is] not at liberty to add to a statute words that the Legislature itself has not used in drafting that statute.").

1    Indeed, a federal district court in Florida recently construed the FMWA consistently with

2    these principles.  *See Free v. Littlefield Corp.*, No. 3:20CV4326-TKW-HTC, 2020 WL 7421751, at

3    *4 (N.D. Fla. Dec 11, 2020).  At issue in that case was the Department of Labor's updated joint

4    employer test under the FLSA, which became effective on March 16, 2020.[57]  85 Fed. Reg. 2820

5    (Feb. 26, 2020).  The court confirmed that this updated test governed the analysis of joint

6    employment under the FMWA despite the fact that it post-dates the passage of the FMWA, without

7    expressing any concern regarding the recent date of the new regulation.  *Free*, 2020 WL 7421751, at

8    *4; *see also Anagnos v. Nelson Residence, Inc.*, 721 F. App'x 901, 903 (11th Cir. 2018) ("The Wage

9    Amendment makes plain that employees receive the same protection under state law that they enjoy

10   under the Fair Labor Standards Act. . . [T]he Wage Amendment should operate like the federal

11   minimum wage law."); *Lee v. Askin Trucking, Inc.*, No. 05-14335-CIV, 2006 WL 8430906, at *3

12   (S.D. Fla. Feb. 8, 2006) ("A plain reading of section 24(f) of the Minimum Wage Amendment

13   indicates that it was the state legislature's intent to apply the teachings of cases decided under the

14   FLSA with equal force to actions brought under the Minimum Wage Amendment. Fla. Const. art.

15   10, § 24(f)."); *Llorca v. Sheriff, Collier Cnty., Fla.*, 893 F.3d 1319, 1328 (11th Cir. 2018) ("The

16   FMWA is to be interpreted as consistent with the FLSA"); *Edgecombe v. Lowes Home Ctrs., L.L.C.*,

17   391 F. Supp. 3d 1142, 1149 n.2 (S.D. Fl. 2019) ("[Florida law] adopt[s] the meanings promulgated

18   by [the FLSA]"); *Ison v. Happy Chef Diner, LLC*, 17-cv-14279, 2018 WL 2688802, at *3 (S.D. Fl.

19   Apr. 23, 2018) ("Florida has adopted the eligibility criteria from the federal Fair Labor Standards

20   Act to determine which employees qualify for coverage.").

21       Because there is no dispute that Players have been paid in accordance with the SAPA

22   exemption, Defendants are entitled to partial summary judgment on all claims under Florida law as

23   of March 23, 2018.

24   **III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS**
         **UNDER THE FLSA AND CERTAIN STATE LAWS BY VIRTUE OF THE**
25       **"AMUSEMENT OR RECREATIONAL ESTABLISHMENT" EXEMPTION.**

26       The FLSA exempts from the minimum wage and/or overtime requirements "amusement or

27   recreational establishments" that: (a) operated for seven months or less during the year (hereafter,

28

---

[57] This rule was since rescinded, effective as of October 5, 2021. 86 Fed. Reg. 40939 (July 30, 2021).

the "seasonal" prong); **or** (b) during the preceding calendar year, had average receipts during any six months of the calendar year that were 33 1/3 % or less than the average receipts for the other six months of the year (hereafter, the "receipts" prong). *See* 29 U.S.C. § 213(a)(3) (hereafter, the "amusement exemption"). In interpreting the FLSA's statutory exemptions, courts must construe them under a "fair (rather than a 'narrow') interpretation." *See Clarke v. AMN Servs., LLC*, 987 F. 3d 848, 853 (9th Cir. 2021) (quoting *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)).

The "establishments" at issue in this case are: (i) the Clubs' presentation of baseball-related activities at their spring training facilities in Florida and Arizona; and (ii) the Clubs' presentation of minor league baseball Championship Season games at the minor league stadiums where games are played.[58] As explained in greater detail below, the undisputed record evidence confirms that each "establishment" satisfies the criteria for the amusement exemption. Accordingly, Defendants are entitled to summary judgment on all individual and collective claims under the FLSA. In addition, and as discussed above (*see supra* Section II), because Florida law incorporates the FLSA's exemptions, including the amusement exemption, Defendants also are entitled to summary judgment on all claims asserted under Florida law, including all claims asserted on behalf of the Florida Class.[59]

### A. Each Spring Training Facility And Minor League Stadium Is An Independent "Establishment" Because Each Is A "Distinct, Physical Place Of Business."

As this Court previously noted, it must make a "preliminary determination of whether the relevant establishments are the specific venues where games and training occurred (as Defendants contend) or MLB headquarters (as Plaintiffs contend)."[60] As discussed in greater detail below, as a matter of law, the relevant "establishments" are the "distinct, physical places of business" where games and training occurred—*i.e.*, the spring training facilitates and the minor league affiliate stadiums.

---

[58] *See* Bloom Decl. Exs. 1-2 (attaching charts summarizing the Clubs' "establishments" that satisfy the "seasonal" prong and the "receipts" prong of the amusement exemption, respectively, and referring to source documents).

[59] The FLSA's amusement exemption applies to parallel claims brought under the FMWA. *See, e.g.*, *Feagley v. Tampa Bay Downs, Inc.*, No. 8:11-CV-564 2012 U.S. Dist. LEXIS 81757, at *11-13 (M.D. Fl. June 13, 2012).

[60] *See* Dkt. 687 at 84-85.

21

Although the FLSA does not define "establishment,"[61] the DOL regulations provide that an "establishment" is a "distinct, physical place of business"—not a broader "enterprise."  *See* 29 C.F.R. § 779.23 (defining "establishment" as a "distinct physical place of business," as opposed to "'an entire business or enterprise' which may include several separate places of business"); 29 C.F.R. § 779.203 (noting that an "enterprise" is distinct from an "establishment," in that an enterprise "may be composed of a number of establishments which may be operated by one or more employers").  "Arguably, the only reason for defining 'establishment' as a distinct physical place of business [in 29 C.F.R. § 779.23] was so that it could be distinguished from an integrated business enterprise."  *Wright v. Adventures Rolling Cross Country, Inc.*, No. 12 Civ. 982, 2013 WL 1758815, at *5 (N.D. Cal. Apr. 24, 2013); *see McLaughlin v. Lunde Truck Sales, Inc.*, 714 F. Supp. 920, 925 (N.D. Ill. 1989) (noting that the definition of "establishment" set forth in the DOL regulations "mirror[s] earlier court opinions" and "[a]ll that is required to create an establishment is a distinct physical place of business.").

The regulations go on to note that the distinction between "establishment" and "enterprise" is "consistent with the normal use of the term in business and in government," is "judicially settled," and was "recognized in the Congress in the course of enactment of amendatory legislation."  *See* 29 C.F.R. § 779.23.  As the Second Circuit observed, these regulations are "particularly instructive" in defining an "establishment" for purposes of the amusement exemption because they are "'well-reasoned, internally consistent, and generally consistent with judicial interpretations of the exemption,' and, as such, supply a persuasive interpretation of the statute."  *Chen v. Major League Baseball Props.*, 798 F.3d 72, 78-79 (2d Cir. 2015) (citation omitted).  Accordingly, the regulations, which are "interpretative rules" by the DOL, should be afforded *Skidmore* deference.  *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944); *see also Valladares v. Insomniac, Inc.*, No. EDCV 14-00706-VAP (DTBx), 2015 WL 12656267, at *18, n.11 (C.D. Cal. Jan. 29, 2015) (affording DOL regulations *Skidmore* deference for purposes of defining "establishment" under the amusement exemption).

---

[61] Legislative history related to the retail or service establishment exemption under the FLSA supports the interpretation that "establishment" was intended to mean a "distinct, physical place of business."  The amendment's sponsor, Senator George, stated, "I wish to say that the word 'establishment' has been very well defined in the Wage and Hour Act.  It means now a single physically separate place of business…and it does not mean an entire business enterprise."  95 Cong. Rec. 12,579 (1949).

1      Consistent with the regulations, courts have interpreted "establishment" for purposes of

2  FLSA exemptions as a "distinct physical place of business."  In the context of the FLSA's retail

3  exemption, the Supreme Court found that "Congress used the word 'establishment' as it is normally

4  used in business and in government – as meaning a distinct physical place of business."  *A.H.*

5  *Phillips, Inc. v. Walling*, 324 U.S. 490, 496 (1945) (rejecting the argument that the numerous stores,

6  the warehouse and the office building were a single establishment so as to bring the entire enterprise

7  within the retail exemption, and finding that each unit was a separate establishment).  Other courts

8  have similarly held that "Congress used the term 'establishment' for purposes of the [amusement]

9  exemption at Section 13(a)(3), 29 U.S.C. § 213(a)(3), to mean a distinct, physical place of business,

10  as opposed to an integrated multiunit business or enterprise."  *Chen*, 798 F.3d at 79 (citations

11  omitted) (finding at the motion to dismiss stage that MLB's 2013 All-Star FanFest at the Jacob K.

12  Javits Center was an "establishment," rather than MLB as a whole); *see also West v. City of Ft.*

13  *Pierce, Fla.*, No. 07-14335-CV, 2008 WL 3270849, at *3 (S.D. Fl. Aug. 8, 2008) (finding on a

14  motion for summary judgment that the Sunrise Theater was its own "establishment," rather than the

15  "entire City" because the Theater is a "distinct, physical place of business"); *Gibbs v. Montgomery*

16  *Cnty. Agric. Soc'y*, 140 F. Supp. 2d 835, 843 (S.D. Ohio 2001) (finding on a motion for summary

17  judgment that the fairgrounds was an exempt amusement "establishment" under the FLSA, and

18  citing the definition of "establishment" in the regulations as a "distinct, physical place of business");

19  *Chessin v. Keystone Resort Mgmt., Inc.*, 184 F.3d 1188, 1192-93 (10th Cir. 1999) (finding on a

20  motion for summary judgment that two ski areas were separate "establishments" due to the "six-mile

21  separation" between them, even though the two ski areas "marketed their operations as one

22  enterprise, exchanged some employees, and lacked separate accounting and management" because

23  "issues of business integration are not dispositive in determining whether establishments are

24  separate").  A district court in the Ninth Circuit has also recently recognized that, in the context of

25  the amusement exemption, "courts…routinely rely on the 'distinct physical place of business' test

26  alone to determine the relevant 'establishment.'"[62]  *Valladares*, 2015 WL 12656267, at *8, n.11-12

27

28

---

[62] The Ninth Circuit has addressed the definition of "establishment" in the context of the retail exemption, but not the amusement exemption.  In *Mitchell v. Bekins Van & Storage Co.*, 231 F.2d 25, 27 (9th Cir. 1956), the Ninth Circuit affirmed the district court's conclusion that the defendant's five warehouses constituted a single "establishment," even though they were neither "contiguous nor widely scattered" from each other.  Significantly, however, the Supreme Court,

1   (citing cases for this proposition, and holding that a producer of music festivals was an "enterprise,"

2   while the individual music festival that was produced at a "distinct, physical place of business" for

3   12 days in a given year constituted its own separate "establishment" that satisfied the amusement

4   exemption and granting partial summary judgment).

5        In the context of MLB Clubs' operations, Courts have universally defined the

6   "establishments" as the Clubs' operations **at** distinct locations—not their business operations as a

7   whole.  *See Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590 (11th Cir. 1995) (holding that the White

8   Sox's spring training facility constituted the exempt "establishment" and not the White Sox's

9   broader operations generally); *Hill v. Del. N. Cos. Sportservice, Inc.*, Nos. 11-CV-00753(S)(M), 14-

10  CV-00138(S)(M), 2014 U.S. Dist. LEXIS 185057, at *6 (W.D.N.Y. July 28, 2014) (holding that "the

11  relevant establishment (that is, the 'distinct physical place of business') is Oriole Park at Camden

12  Yards, not the Orioles team"), *report recommendation adopted by*, 2015 U.S. Dist. LEXIS 73131

13  (W.D.N.Y. June 4, 2015), *aff'd*, 838 F.3d 281 (2d Cir. 2016);[63] *Adams v. Detroit Tigers, Inc.*, 961 F.

14  Supp. 176, 179 (E.D. Mich. 1997) (concluding that the establishment for purposes of the amusement

15  exemption was the "Tigers' establishment at Tiger Stadium, and not the Tigers' organization as a

16  whole").  In addition, in *Bridewell v. Cincinnati Reds*, 68 F.3d 136, 138 (6th Cir. 1995), the Court

17  did "not broadly define the establishment there as encompassing all team-related activities

18  anywhere; instead, the Sixth Circuit found the Reds' operations at their stadium [was] the relevant

19  establishment."  *Chen*, 798 F.2d at 80 (discussing *Bridewell*).  Moreover, the DOL has recognized as

20  far back as 1967 that a "baseball park" can qualify as its own "establishment" for purposes of the

21  exemption.  *See* U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., 1967 DOLWH LEXIS 164 (June

22  22, 1967).[64]  Thus, the precedent uniformly supports defining a MLB Club's "establishment" for

23

24  in a *per curiam* opinion, reversed the Ninth Circuit, concluding that "Respondent's five physically separate warehouses

25  do **not** constitute a single 'retail establishment' within the meaning of the exemption."  *See Mitchell v. Bekins Van & Storage Co.*, 352 U.S. 1027 (1957) (emphasis added).

26  [63] In affirming the district court's decision, the Second Circuit held that Maryland Sportservice, a concessionaire, was
    itself an exempt "establishment" within Oriole Park, and qualified for the exemption as a concessionaire.  *Hill v. Del. N.*
27  *Cos. Sportservice*, 838 F.3d 281 at 292-93 (2d Cir. 2016).

28  [64] *See also* U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., 1999 WL 1002367, *1 (Feb. 18, 1999) ("stadiums…can
    qualify as amusement or recreational establishments"); U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., 1978 DOLWH
    LEXIS 30 (Oct. 11, 1978) ("It is evident that [the]…Arena i[s] the amusement and recreational establishment" and

1   purposes of the amusement exemption as the distinct, physical place of business of each stadium or

2   complex where the alleged work at issue is performed.

3       The Second Circuit's decision in *Chen*, finding that MLB's 2013 All-Star FanFest at the

4   Jacob K. Javits Center satisfied the amusement exemption, is particularly instructive.  There,

5   FanFest was not only found to be an independent "establishment" from MLB's operations as a

6   whole, but also a separate "establishment" from MLB's other 2013 All-Star Week events held at

7   different physical locations in New York City.  *Chen*, 798 F.2d at 79.  The Court held that "physical

8   separation [was] determinative in deciding whether [MLB's] business units constitute a single

9   establishment or multiple ones," and "[w]here such business units are not located at the same

10  premises, overlap in operations and personnel is immaterial to determining whether they are separate

11  establishments."  *Id* at 81.

12      This Court has also rejected the notion that an "establishment" should be defined broadly so

13  as to include the entirety of an employer's business operations across different locations.  In *Doe v.*

14  *Butler Amusements, Inc.*, 71 F. Supp. 3d 1125, 1141, n.6 (N.D. Cal. 2014), this Court held that

15  where a carnival company that "conducts a variety of activities at its permanent locations and that its

16  carnivals and offices are spread over a wide geographical area[,]…[that] to consider the entire

17  business a single establishment would be inconsistent with the case law and regulations, which

18  distinguish between an 'enterprise' and an 'establishment' and place heavy emphasis on the physical

19  location of business operations."

20      Here, it is undisputed that each MLB Club presents minor league baseball games and training

21  activities to the public at distinct, physical places of business:  (i) minor league stadiums located

22  throughout the country; and (ii) at each Club's spring training facility.[65]  Thus, as a matter of law,

23

24  _____

    finding that the administrative offices constituted a **separate** establishment; "[t]he fact that the [club] put on a basketball

25  game 41 nights in the year does not make [the club] synonymous with the arena") (emphasis added);

26  [65] *See* Bloom Decl. Exs. 1-2 (attaching summary charts reflecting the Clubs' "establishments"); 3-32 (collecting excerpts
    from the Clubs' media guides reflecting the locations of the Clubs' "establishments"); 62-97 (collecting maps of the

27  Clubs' spring training facilities); 98-119 (collecting Defendant Clubs' Interrogatory Answers and Objections describing
    the Clubs' "establishments"); *see also* Club Seasonal Employee Decls. at ¶¶ 2-4.  One exception is the Baltimore

28  Orioles, which has two separate "establishments" in different cities in Florida, which are separated by 10 miles and
    constitute distinct, physical places of business for purposes of the amusement exemption.  *See* Bloom Decl. Ex. 122
    (Declaration of Michael Hoppes at ¶¶ 2, 3).

1    each location is a separate "establishment" for purposes of the amusement exemption.  *See Jeffery*,

2    64 F.3d at 590; *Adams*, 961 F. Supp. at 179; *Bridewell*, 68 F.3d at 138; *Chen*, 798 F.2d at 80.

3        **B.       The Presentation Of Baseball At The Clubs' "Establishments" Is
                    Unquestionably "Amusement or Recreational" In Nature.**

4            There is no dispute as to the activities in which Players participate at the "establishments"—

5    playing baseball games (and with respect to the spring training facilities, also training to play

6    games).[66]  These activities are open to the public and are precisely the type of "amusement or

7    recreational" pursuits that fall within the scope of the amusement exemption.  Indeed, these activities

8    indisputably are "sports events" that are among the core categories of recreational or amusement

9    establishments specifically enumerated in the legislative history.  *See* H.R. Rep. No. 871, 89th

10   Cong., 1st Sess. 35 (1965) (Congress expanded the FLSA overtime exemptions to cover other types

11   of employers, drawing on a 1965 proposed amendment that had included such enterprises as

12   "amusement parks, carnivals, circuses, sports events, pari-mutuel racing, sport boating or fishing

13   . . . .").

14           Courts have consistently applied the amusement exemption to baseball-related

15   "establishments" that included the presentation of games and training activities to the public,

16   including minor league baseball specifically.  *See Jeffery*, 64 F.3d at 594-95 (finding that the White

17   Sox's spring training complex in Sarasota, Florida, where the White Sox staged minor league

18   baseball games and training activities was "an amusement and recreational establishment" because

19   "[s]ports events are among those types of recreational activities specifically considered by Congress

20   to be covered by the exemption"); *see also Hill*, 838 F.3d at 292 (noting that "Oriole Park, the host

21   facility, clearly has an amusement or recreational character because of the baseball games it hosts");

22   *Adams*, 961 F. Supp. at 179 (noting that "Major [L]eague [B]aseball teams may properly be

23   considered 'recreational' establishments, or establishments designed for 'amusement'"); *Brennan v.*

24   *Tx. City Dike & Marina, Inc.*, 492 F.2d 1115, 1118 (5th Cir. 1974) (noting that the amusement

25   exemption has historically covered "amusement or recreational" events, such as "baseball parks").

26

27

28

---

[66] *See supra* n.8.

26

1   Thus, there can be no dispute that the Clubs' presentation of baseball games and training activities

2   that are open to the public satisfy the "amusement or recreational" requirement of the exemption.

3       **C.     Players Are Or Were "Employed By" The Individual "Establishments" For**
        **Purposes Of The Amusement Exemption.**

4

5       The amusement exemption applies only to "employee[s] employed by an establishment" that

6   satisfies either the seasonal or receipts prong.  29 U.S.C. § 213(a)(3).  In the context of the retail

7   exemption, which has also been applied to the amusement exemption,[67] "[i]n order to meet the

8   requirement of actual employment 'by' the establishment, an employee, whether performing his

9   duties inside or outside the establishment, must be employed by his employer in the work of the

10  exempt establishment itself in activities within the scope of its exempt business."  29 C.F.R.

11  § 779.308.  "[F]or the purposes of Section 13(a)(3) [the amusement exemption], an individual is

12  employed by the establishment at which he works, regardless of any enterprise that may operate or

13  control the establishment."  *See Chen v. Major League Baseball*, 6 F. Supp. 3d 449, 458 (S.D.N.Y.

14  2014), *aff'd*, 798 F.3d 72 (2d Cir. 2015).  As this Court has held, the "type" of work performed is the

15  "key consideration" in determining whether an individual is "employed by" the "establishment" or

16  whether someone is merely "employed in" an "establishment.  *See Butler Amusements, Inc.*, 71 F.

17  Supp. 3d at 1135-38.

18      Here, if the Players are deemed "employees,"[68] then they should be considered "employed

19  by" the "establishments" for purposes of the amusement exemption as a matter of law.  Indeed, there

20  is no dispute that Players perform services that lie at the core of the exempt nature of the Clubs'

21  amusement or recreational business at each distinct location—*i.e.*, the presentation of baseball games

22  and training activities to the public—and Players are claiming entitlement to minimum wage and

23  overtime for their participation in such activities.  The same conclusion was reached by the Second

24  Circuit in the context of stadium employees that provide services even less connected to the

25  amusement character of the "establishment."  *Hill*, 838 F.3d at 288.  In that case, the Court held that

26  concessionaires at Oriole Park (the Baltimore Orioles' Major League Stadium) fell within the scope

---

27  [67] *See, e.g.*, *Butler Amusements, Inc.*, 71 F. Supp. 3d at 1135 (applying 29 C.F.R. § 779.308 to its analysis under the amusement exemption).

28  [68] As set forth in Section IV, *infra*, Plaintiffs are not "employees" under the federal and applicable state wage-and-hour laws outside of the Championship Season.

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT –
CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

of the amusement exemption, as the services they provided "enhance[d] the amusement or recreational value of watching the game" at the stadium.  *Id.*

It is not relevant for purposes of the amusement exemption that Players may be employed by the Clubs, not the minor league affiliates or the owner(s)/operator(s) of the "establishment."  Indeed, in the context of an "establishment" at a Club's spring training facility, the Eleventh Circuit, in *Jeffery v. Sarasota White Sox*, held that grounds crew employees at the White Sox spring training facility in Sarasota, Florida were "employed by the establishment" (the stadium), even though they were employed by the Sarasota White Sox, rather than the owner of the stadium itself.  64 F.3d at 595 ("Defendant's status as an amusement and recreational establishment is not rendered inapplicable by the fact that Defendant does not own the sports complex in which it operates").  Similarly, in *Hill*, the concessionaires were deemed "employed by" the "establishment," even though they were on the payroll of a third-party vendor, and not employed by the Club.  838 F.3d at 285-86.  *See also Chen*, 6. F. Supp. 3d at 458 (holding that for a volunteer at MLB's All Star FanFest at the Javits Center in New York City, it was "of no consequence that the plaintiff was employed by MLB rather than by FanFest").

Thus, because Players indisputably performed the alleged work that lies at the core of the exempt nature of the "establishments," the Players are or were "employed by" the "establishments" for purposes of the amusement exemption as a matter of law.

### D.  Each "Establishment" Satisfies Either The Seasonal Or Receipts Prong Of The Amusement Exemption.

As the statute makes plain, an amusement or recreational establishment is exempt from the FLSA's minimum wage and overtime requirements if it satisfies:  (i) the seasonal prong—*i.e.*, "does not operate for more than seven months in any calendar year", "**or**" (ii) the receipts prong—*i.e.*, "during the preceding calendar year, its average receipts for any six months of such year were not more than 33 1/3 per centum of its average receipts for the other six months of such year" for each year in question.  29 U.S.C. § 213(a)(3) (emphasis added).  Thus, an "establishment" may be exempt if it satisfies the "receipts" prong, even if it is "open for more than seven months a year." *Jeffery*, 64 F.3d at 595 (citing *Brock v. Louvers & Dampers, Inc.*, 817 F.2d 1255, 1259 (6th Cir. 1987)).  The undisputed record demonstrates that: (i) the Clubs' "establishments" at the minor league affiliate

28

1   stadiums satisfy the "seasonal" prong; and (ii) the Clubs' spring training facility "establishments"

2   easily meet the "receipts" test.

3           1.       Each "Establishment" At The Clubs' Minor League Affiliate Stadiums Is
                     A "Seasonal Establishment" That Indisputably Operates For Less Than
4                    Seven Months Of The Year.

5           The amusement exemption requires evidence that the amusement or recreational

6   "establishments" (not the enterprise as a whole) "do[] not operate for more than seven months in any

7   calendar year."  29 U.S.C. § 213(a)(3)(A).  The Clubs' "establishments" at their minor league

8   affiliate stadiums indisputably last for less than seven (7) months each year—*i.e.*, during the term of

9   the Championship Season, from April through, at most, early to mid-September for full-season

10  affiliates and from June through late August or early September for short-season affiliates.[69]

11          When evaluating the "seasonal" prong, courts have held that what matters is the duration of

12  the operation of the "establishment," and not the operation of the "employer" as a whole.  *See Chen*,

13  6 F. Supp. 3d at 459, n.8 ("what matters. . . is the duration of MLB's operations at the Javits

14  Center. . . not MLB's operations as a whole").  Similarly, in *Jeffery*, the only other case involving

15  the exempt status of a MLB Club's minor league stadium, "the relevant duration of operations. . .

16  was the time that the Sarasota White Sox and the parent Chicago White Sox operated at the baseball

17  complex in Florida – not the duration of the Chicago White Sox's operations as a whole."  *See id.*

18  (discussing *Jeffery*).  In so holding, for purposes of the seasonal prong, the Court focused on the

19  operation of the Club's presentation of Championship Season games and training activities: "The

20  evidence shows that spring training in the sports complex in Sarasota begins and ends in March of

21  each year.  Defendant begins play in April and continues to play up to the end of August of each

22  year.  Accordingly, Defendant's operation at the baseball complex in Sarasota lasts approximately

23  five months each year which is two months less than the seven month period afforded under 29

24  U.S.C. § 213(a)(3)."  *Jeffery*, 64 F.3d at 596.  Similarly, here, the duration of each Club's operations

25

26

27

28  ─────────────
    [69] *See supra* n.13.  Plaintiffs' own damages expert acknowledged that the length of the championship season is from
    April through the end of September.  *See* Bloom Decl. Ex. 234 (Kriegler Report dated August 13, 2021 at 32).

1  at their minor league affiliate stadiums (as summarized in Bloom Decl. Ex. 1) is limited to the

2  Championship Season—which indisputably lasts less than seven (7) months each year.[70]

3           Moreover, as the Eleventh Circuit in *Jeffery* noted, the amusement exemption "does not

4  require Defendant to completely shut down or to terminate every employee at the end of each

5  baseball season."  64 F.3d at 596.  In evaluating whether an operation is truly seasonal, some courts

6  have considered the number of year-round employees (if any) employed at the "establishments" by

7  the companies against whom the wage-and-hour violations are asserted.  *See Marshall v. New*

8  *Hampshire Jockey Club, Inc.*, 562 F.2d 1323, 1328 (1st Cir. 1977) (finding that two separate

9  establishments at the same location were both "seasonal," even though "[f]ourteen clerical or support

10  workers were employed throughout the year" and one establishment "maintained one painter on its

11  payroll continuously through 1973 and 1974").  *Cf. Bridewell*, 68 F.3d at 139 ("While a truly

12  seasonal business that employs an insignificant number of workers year-round could conceivably

13  qualify for the exemption, the fact that the Reds employ 120 year-round workers [at Riverfront

14  Stadium] compels the conclusion that they 'operate' year-round.").

15           Like in *Jeffery*, the undisputed record evidence is that nearly all of the Clubs have not

16  employed **anyone** at the affiliate stadium "establishments" on a year-round basis—*i.e.*, during the

17  months outside of the Championship Season,[71] and that only a handful of Clubs employed even a

18  minimal number of year-round staff at their affiliate stadium "establishments."[72]  There is no

19  evidence whatsoever that any of the Clubs employ year-round staff at their affiliates at a level that

20  remotely approaches the number of year-round personnel at the Reds' Major League stadium at issue

21  in *Bridewell*.

22           Based on these undisputed facts, the Clubs' minor league affiliate stadium "establishments"

23  satisfy the "seasonal" prong of the exemption.

24

---

25  [70] *See, supra* n.13.  In addition, given that the Orioles' Minor League Spring Training Complex operates only during
   February and March each year, that "establishment" satisfies the "seasonal" prong of the exemption.  *See* Bloom Decl.
26  Ex. 122 (Declaration of Michael Hoppes) at ¶¶ 2.a through 2.e.

27  [71] *See* Bloom Decl. Exs. 98-119 (collecting Club Interrogatory Answers and Objections).  *See also* Club Seasonal
   Employee Decls. at ¶¶ 2-4 (sworn declarations from the Clubs indicating the number of Club employees employed at the
28  minor league affiliate stadiums on a year-round basis).

[72] *See supra* n.14.

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT –
CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

2.      **The Clubs' Spring Training Facility "Establishments" Indisputably Satisfy The "Receipts" Prong.**

The "receipts" prong is a straightforward arithmetic calculation, requiring that "during the preceding calendar year, [the establishment's] average receipts for any six months of such year were not more than 33 1/3 per centum of its average receipts for the other six months of such year."  29 U.S.C. § 213(a)(3)(B).  The statute clearly states that the calculation can be satisfied based on "any" six months, so the highest and lowest six months need not be consecutive.  *Id.*  Receipts are calculated on a cash accounting method as opposed to the accrual method.  *See, e.g.*, *Butler Amusements, Inc.*, 71 F. Supp. 3d at 1135; *Bridewell v. Cincinnati Reds*, 155 F.3d 828, 830 (6th Cir. 1998); U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., 2021 WL 240824 (Jan. 15, 2021).  Receipts include fees from admissions, parking, concessions, promotional sponsorships, publications sales, and advertising.  *See Jeffery*, 64 F.3d at 595; U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., 1986 DOLWH LEXIS 69 (May 12, 1986).

Here, the undisputed record evidence is that the Clubs' Florida and Arizona spring training facility "establishments" had average gross receipts (on a cash accounting basis) during the lowest six months of each calendar year that were demonstrably lower than one-third of their gross receipts during the other six months of each year.[73]  Specifically, as set forth in the accompanying declarations from each of the Clubs, each spring training facility "establishment" in all relevant years easily satisfies the receipts prong of the exemption based on revenue from admissions, concessions, merchandise sales, sponsorships and other income derived by the Clubs from use of the spring training facility for its baseball-related activities.[74]  Since the Clubs' spring training facility "establishments" in Florida and Arizona include all of their baseball-related activities at the "distinct, physical places of business" (including the main stadiums, back-fields and facilities at the

---

[73] *See* Bloom Decl. Ex. 2 (summary chart demonstrating that the average gross receipts on a cash accounting basis derived by the Clubs during the lowest six months of each calendar year were less than one-third of their average receipts during the other six months during each relevant year).  *See also* Bloom Decl. Exs. 120-149 at ¶¶ 3-5 (collecting Club declarations identifying the gross receipts derived from the presentation of baseball-related activities at the Arizona and Florida training complexes, the underlying documents reflecting those receipts, and the types of receipts).

[74] *See id.* Since the receipts prong considers gross receipts for the "preceding calendar year" for purposes of complying with the amusement exemption, each Club has provided gross receipts from 2008 to 2020 for its Florida spring training facilities (Florida's 5-year limitations period extends to 2009), or from 2010 to 2020 for its Arizona complexes (the FLSA's 3-year limitations period extends in this case to 2011 for the Plaintiffs who opted in in 2014, assuming willfulness is shown).

1   complex),[75] the receipts include revenue derived from ticket sales and other sources from Major

2   League activities at the spring training facility, such as Major League Spring Training, as well as any

3   other baseball-related activities by the Club at the facilities.[76]

4          Accordingly, the Court should find as a matter of law that the Clubs' Florida and Arizona

5   spring training facility "establishments" are exempt from the FLSA's minimum wage and overtime

6   requirements because they easily satisfy the receipts prong of the amusement exemption for each

7   year at issue in this case.

8          **E.     The Court Should Grant Summary Judgment Or Partial Summary Judgment
                As To The Named Plaintiffs' Claims Under The Laws Of Pennsylvania and**
9               **Maryland.**

10         In addition to Florida law, which recognizes the amusement exemption for the reasons

11  discussed above, Defendants are also entitled to summary judgment or partial summary judgment as

12  to the Named Plaintiffs' individual claims under the laws of Pennsylvania and Maryland.[77]

13         The Pennsylvania Minimum Wage Act exempts from minimum wage and overtime "public

14  amusement or recreational establishments" if the "establishment" satisfies the "seasonal" or

15  "receipts" prong under the FLSA.  *See* 43 P.S. Labor § 333.105(a)(9).  "According to the

16  Pennsylvania courts, 'it is proper to give deference to federal interpretation of a federal statute when

17  the state statute substantially parallels it.'"  *Baum v. AstraZeneca LP*, 372 F. App'x 246, 248 n.4 (3d

18  Cir. 2010) (citations omitted).  Therefore, for the reasons discussed above, summary judgment is

19  appropriate as to the Named Plaintiffs' individual claims for minimum wage and overtime under

20  Pennsylvania law (Dkt. 382 ¶¶ 682-98) for work allegedly performed by the Named Plaintiffs at the

21  Clubs' minor league affiliate stadium "establishments" located in Pennsylvania.

22

23  [75] *See* Bloom Decl. Ex. 62-97 (collecting maps of spring training facility "establishments").

24  [76] *See* Bloom Decl. Exs. 2 (chart summarizing spring training facility "establishments"); 120-149 (collecting Club declarations related to gross receipt calculations at spring training facility "establishments").

25  [77] To the extent Defendants satisfy the amusement exemption, damages, if any, as to certain of the Named Plaintiffs' individual claims under New York and North Carolina law, respectively, should be reduced accordingly.  *See* N.C. Gen.

26  Stat. § 95-25.4(a) (until the statute was repealed on January 1, 2018, seasonal amusement or recreational establishments were required to pay their employees overtime for hours worked in excess of 45 hours per week, not 40 hours); 12

27  N.Y.C.R.R. § 142-2.2 (employers subject to FLSA exemptions, but not exempt under New York law, must pay their employees "overtime at a wage rate of one and one-half times the basic minimum hourly rate," rather than employees'

28  regular rates of pay); *see also Hayward v. IBI Armored Servs.*, 954 F.3d 573, 576 (2d Cir. 2020) (applying 12 N.Y.C.R.R. § 142-2.2).

1    Likewise, Maryland's overtime provisions contain an amusement exemption that mirrors the

2   FLSA.  *See* Md. Code Lab. & Empl., § 3-415(b)(3).  Under Maryland law, employees of amusement

3   establishments are not entitled to overtime.  *Id.*  Maryland courts have considered parallel FLSA and

4   Maryland state-law exemptions under the same analysis.  *See Quinteros v. Sparkle Cleaning, Inc.*,

5   532 F. Supp. 2d 762, 777-78 (D. Md. 2008) (analyzing FLSA and Maryland state law's "movie

6   theater" exemption under the same analysis).  Thus, the Court should also grant partial summary

7   judgment as to the Named Plaintiffs' individual claims for unpaid overtime under Maryland law

8   (Dkt. 382 at ¶¶ 711-16), for activities performed at the Clubs' minor league affiliate stadium

9   "establishments" in Maryland.

10  **IV.    DEFENDANTS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT
          DISMISSING ALL CLAIMS BASED ON ALLEGED WORK OUTSIDE OF THE
11         CHAMPIONSHIP SEASON BECAUSE THE PLAYERS ARE NOT EMPLOYEES
          DURING THOSE OTHER TIMES OF THE YEAR.**

12   The Players' minimum wage and overtime claims for baseball-related activities that take

13  place outside the Championship Season—times of the year during which Players engage in training

14  activities with no expectation of receiving salaries—should be dismissed because the Players are not

15  employees for purposes of wage-and-hour laws during those periods of time.

16       **A.    Individuals Are Not Entitled To Minimum Wage And Overtime Year-Round
                Merely Because They Perform Services.**

17

18   In order to be entitled to minimum wage or overtime under the FLSA or state law, plaintiffs

19  must be "employees" under the applicable statutes.  The FLSA defines "employ" as "to suffer or

20  permit to work," and defines "employee" as any individual "employed by the employer."  29 U.S.C.

21  §§ 203 (g), (e)(1).[78]  In *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152-153 (1947)

22  ("*Walling*"), the Supreme Court recognized that the definition of "suffer or permit to work" does not

23  extend to all persons who perform services for another.  *See also Tony & Susan Alamo Found. v.*

24  *Sec'y of Labor*, 471 U.S. 290, 299 (1985) ("*Alamo*") (holding that an "individual may work for a

25

26

27  ───────────────
    [78] This Court previously assumed for the purposes of the case that the standards for determining whether an individual is
    "employed" by a defendant under the FLSA apply under the laws of all relevant states at issue in this litigation.  *See* Dkt.
28  No. 687 at n.14.  Accordingly, the proceeding analysis is performed under federal law but applies in full to Plaintiffs'
    claims brought under state law.

1   covered enterprise and nevertheless not be an 'employee.'").[79]  To the contrary, the Court held that

2   the FLSA was obviously **not** intended to "stamp all persons as employees who, without any express

3   or implied compensation agreement, might work for their own advantage on the premises of

4   another." *Walling* at 152.  The plaintiffs in *Walling* were individuals who sought eventual

5   employment with the railroad as brakemen.  In order to become eligible for employment, they were

6   required to attend a training course provided by the railroad.  *Id.* at 149.  The railroad did not

7   guarantee the plaintiffs a job after completing the program, and plaintiffs entered the training

8   understanding they would not receive minimum wage or overtime for their time spent in the training

9   program.  *Id.* at 149-50.  The Court concluded that these individuals were not employees of the

10  railroad, notwithstanding the fact that they were required to take the training course in order to be

11  considered for employment.  *Id.* at 153.  In so holding, the Court underscored that the FLSA "cannot

12  be interpreted so as to make a person whose work only serves his own interest an employee of

13  another person who gives him aid and instruction."  *Id.* at 152.  The Court further observed that

14  employers should not be penalized for providing for free the types of services that might be offered

15  in a public or private vocational school, and that the plaintiffs were not to be considered employees

16  just because the railroad benefited from having created an eligible labor pool from which it "could

17  later draw its employees."  *Id.* at 152-53.

18      The Ninth Circuit has followed the Supreme Court's ruling in *Walling*, most recently in

19  concluding that cosmetology students who performed unpaid services for their salon were not

20  employees entitled to minimum wage and overtime under federal or state law, because they received

21  "hands-on training" without an expectation of compensation.  *Benjamin v. B & H Educ., Inc.*, 877

22  F.3d 1139, 1146 (9th Cir. 2017).  Indeed, the Ninth Circuit's decision in *Benjamin* comports with the

---

[79] In this case, the Court previously considered whether minor league players were comparable to the plaintiffs in *Alamo*, since minor league players receive compensation "both in the form of money payments and other benefits." Dkt. 687 at 78.  Outside of the Championship Season, however, minor league players are more analogous to the plaintiffs in *Walling* than they are to the plaintiffs in *Alamo*.  Players do not receive a salary under their UPC outside of the Championship Season.  *See infra* IV.B.1.  The fact that Players receive certain benefits during the Training Seasons, including meal stipends and housing, does not render them analogous to the plaintiffs in *Alamo*—former drug addicts and criminals who were "entirely dependent" upon the Foundation for food and shelter.  *Alamo* at 24.  By contrast, Players chose to invest in their human capital by joining the minor leagues, and at all times, Players could choose to pursue other careers instead of minor league baseball.  *See infra* Section IV.B.3.; *see also* Bloom Decl. Ex. 235 (Martin Report, dated 8/16/2016) at ¶¶ 28, 47.  Moreover, Plaintiffs' testimony confirms that they were not wholly dependent upon these offered benefits. *See supra* n.18.

1   decisions of several sister circuits, all of whom have held that individuals are not employees merely

2   because they perform helpful services for a purported employer.  *See, e.g.*, *Armento v. Asheville*

3   *Buncombe Cmty. Christian Ministry, Inc.*, 856 F. App'x 445 (4th Cir. 2021); *Eberline v. Douglas J.*

4   *Holdings, Inc.*, 982 F.3d 1006, 1014 (6th Cir. Dec. 2020), *cert. denied*, 141 S. Ct. 2747 (2021); *Glatt*

5   *v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2016); *Schumann v. Collier Anesthesia, P.A.*,

6   803 F.3d 1199 (11th Cir. 2015); *Petroski v. H & R Block Enters., LLC*, 750 F.3d 976 (8th Cir. 2014);

7   *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 531 (6th Cir. 2011) ("*Laurelbrook*");

8   *Donovan v. Am. Airlines, Inc.*, 686 F.2d 267, 272 (5th Cir. 1982); *Rogers v. Schenkel*, 162 F.2d 596

9   (2d Cir. 1947).

10          Furthermore, just because an individual provides compensable services as an employee

11   during certain parts of the year does not mean that individual is a covered employee entitled to

12   minimum wage and overtime laws throughout the entire year.  For instance, in *Eberline*, the Sixth

13   Circuit concluded that "relationships can be segmented for purposes of an FLSA analysis such that a

14   person is an employee in one part of the relationship but not another." 982 F.3d at 1014-15

15   (reversing the district court's grant of summary judgment to plaintiffs on the issue of whether they

16   were "employees" at all times, and holding that the analysis of an individual's status as "employee"

17   may focus on only "part of the relationship").  In so holding, the Sixth Circuit concluded that its

18   approach was in line with the Ninth Circuit's analysis in *Benjamin*, 377 F.3d at 1146, because the

19   holding in *Benjamin* was "specific to the record of challenged activities before the court." *Eberline*,

20   932 F.3d at 1015-16; *see also Petroski*, 750 F.3d at 982 (affirming that tax preparation service

21   providers were not "employees" under *Walling* during their annual off-season training, even though

22   they may subsequently become employees during the subsequent tax season); *Schumann*, 803 F.3d

23   at 1214-15 (noting that a portion of the experience can constitute a training period while another

24   portion can constitute employment).

25          In assessing whether an individual is considered an employee for purposes of the relevant

26   statutes, courts apply what has become known as the "primary beneficiary" test.  *Walling*, at 153.

27   An integral part of this analysis is the extent to which the plaintiffs, as opposed to the defendant,

28   derived immediate benefits or advantages from the activities at issue.  *Id.*  The Ninth Circuit has

35

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT –
CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

1   confirmed that the evaluation of whether an individual is an employee under the FLSA turns on the

2   "primary beneficiary" analysis as established in *Walling*, the goal of which is to assess the economic

3   realities of the relationship.  *Benjamin*, 877 F.3d at 1146-48.  The Ninth Circuit further underscored

4   that the primary beneficiary analysis should evaluate the "totality of the circumstances of each case."

5   *Id.* at 1146-48.  Notably, in joining a number of other appellate courts in adopting the primary

6   beneficiary test, the Ninth Circuit expressly agreed with the Sixth Circuit's decision in *Laurelbrook*,

7   where the court focused "principally on the relative benefits of the work performed by the purported

8   employees" in assessing the totality of the circumstances in each case.[80] *Id.* at 1146-47; *Laurelbrook*

9   at 526.  Most recently, the Fourth Circuit joined in this approach when it concluded that the

10  determination of whether someone is an "employee" under the FLSA and under parallel state law is

11  based on the totality of the circumstances, including the facts surrounding the principal purpose of

12  the relationship and "for whose benefit that arrangement was designed," without strict adherence to

13  certain factors or technical tests.  *See Armento*, 856 F. App'x at 452.  Accordingly, the "primary

14  beneficiary" analysis governs the economic reality of the parties' relationship.  And the totality of

15  the circumstances—based on the undisputed record evidence—compels the conclusion that Players

16  are not employees outside of the Championship Season.

17        **B.    The Totality Of The Circumstances Demonstrates That Players Are The
             Primary Beneficiaries Of Training Outside Of The Championship Season.**

18

19        In evaluating the totality of the circumstances of the relationship between the Players and

20  Defendants, it is undisputed that: (i) Players do not expect to receive salaries outside of the

21  Championship Season; (ii) training affords them the opportunity to improve their baseball skills and

22  potentially reach the Major Leagues; and (iii) Players are provided with skills to obtain jobs inside

23  and outside of professional baseball.  *See Laurelbrook*, 642 F.3d at 531; *Armento*, 856 F. App'x at

24  451-52.  In addition, the undisputed record evidence confirms that Defendants do not immediately

25  benefit from the training provided to Players.  Accordingly, there is no triable issue of fact on the

26  _____

27  [80] In *Benjamin*, the Ninth Circuit noted that it chose to apply the non-exhaustive seven-factor test set out by the Second
    Circuit in *Glatt* as it applied specifically "in the…context of student workers." *Id.* at 1147.  However, the Ninth Circuit
    also implied that courts are ultimately tasked with evaluating the totality of the circumstances of each case in order to

28  assess the economic realities of a relationship, regardless of which specific test or factors are applied.  *Id.* at 1146-47; *see
    also Laurelbrook*, 642 F.3d at 531; *Armento*, 856 F. App'x at 451-52.

36

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT –
CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

1    issue of whether Players are the primary beneficiaries of the training they receive outside of the

2    Championship Season.

3                **1.       Players Do Not Expect To Receive Salaries Outside Of The**
                 **Championship Season.**
4
             It is undisputed that Players do not expect to receive salaries under their UPC outside of the

5    Championship Season, except in limited and exceptional circumstances.[81]  *See* Dkt. 382 at ¶¶ 184-

6    188 (alleging that minor leaguers earn no compensation during spring training, extended spring

7    training, instructional league, or the off-season); Dkt. 720 at 7, 23 (alleging that no wages are paid

8    during the Training Seasons).[82]  *See, e.g.*, *Walling*, 330 U.S. at 152 (holding that the FLSA is not

9    meant to cover individuals who perform activities for their own pleasure or profit, without promise

10   or expectation of compensation); *Benjamin*, 3877 F.3d at 1147 (relying on the fact that plaintiffs did

11   not expect to receive compensation in affirming district court's holding that they were not employees

12   owed minimum wage and overtime).

13               **2.       Minor League Training Provides Opportunities For Improving Players'**
                 **Baseball Skills.**
14
             Courts have concluded that individuals are the primary beneficiaries of training programs,

15   and thus not considered employees, when the activities allow "trainees [to] receive the benefit of

16   learning how to do a job they hope to get."  *See, e.g.*, *Otico v. Hawaiian Airlines, Inc.*, 229 F. Supp.

17   3d 1047, 1051 (N.D. Cal. 2017).  By training in the minor leagues, the Players are training for the

18   job they hope to get: a spot in the Major Leagues.[83]  *Id.*; *see also Walling*, 330 U.S. at 152 (holding

19   that the definition of "employ" and "employee" does not cover situations in which a person performs

20   services for his own interest and for someone who provides him "aid and instruction"); *Donovan*,

21   686 F.2d at 272 (concluding that plaintiffs were not employees despite having made "a sacrifice" to

22

23

24   [81] Certain Clubs paid salaries during extended spring training, and in the midst of the COVID-19 pandemic, Players who
     participated in the fall instructional league continued to receive the same weekly stipend they received during the

25   cancelled season.  *See supra* n.16.  This does not change the conclusion that Players are not owed minimum wage and
     overtime.  *See Armento*, 856 F. App'x at 455 (concluding that the extent to which an individual is compensated for their

26   services is not a dispositive factor under the primary beneficiary analysis, and that holding otherwise would run contrary
     to the Supreme Court's instruction to focus on the totality of the circumstances).

27   [82] *See supra* n.17.

28   [83] Numerous Players testified that one of their reasons for participating in the minor leagues was in hopes of reaching the
     Major Leagues. *See supra* n.19.

1    attend the training, since "they attended "for their own benefit, to qualify for employment they could

2    not otherwise obtain.").

3         Here, it is undisputed that the purpose of spring training is to provide Players with an

4    opportunity to develop their skills, including access to coaches and trainers that the Clubs provide,[84]

5    in order to optimize their success during the Championship Season.[85]  Relatedly, extended spring

6    training provides Players with additional opportunities to improve their skills (or rehabilitate their

7    injuries) and to better situate them for a successful Championship Season at a short-season

8    affiliate.[86]  Similarly, the fall instructional league is intended to provide Players with opportunities to

9    obtain extra, individualized attention to optimize their success in the following season.[87]  *See Ford v.*

10   *Yasuda*, No. EDCV131961PSGDTBx, 2017 WL 4676575, at *6 (C.D. Cal. June 20, 2017) (granting

11   summary judgment to employer and thus concluding that plaintiffs were primary beneficiaries of

12   training program and therefore not employees, in part because "it is hard to quarrel with the notion

13   that practice makes perfect or, at least, practice makes one better").

14        As noted by the Supreme Court in *Walling*, the FLSA "was not intended to penalize

15   [companies] for providing, free of charge, the same kind of instruction at a place and in a manner

16   which would most greatly benefit the trainees," drawing a comparison to the training offered at the

17   railroad to the type of training they might have sought out at a public or private vocational school.[88]

18   *Walling*, at 153.  Here, too, baseball training camps and academies are offered at cost on the open

19   market.  *See, e.g.*, Bloom Decl. Ex. 235 (Martin Report, dated 8/16/2016) at ¶¶ 29-32, Figures 1-3.

20

21

22   _____

23   [84] *See supra* n.20.

     [85] *See supra* n.22.

24   [86] *See supra* n.23.

25   [87] *Id.*

26   [88] To this end, the length of the training is neither relevant nor dispositive to the primary beneficiary analysis.  *See, e.g.*
     *Ford*, 2017 WL 4676575 at *6 (holding that plaintiffs who participated in a 1600 hour training program were not
     employees); *Ulrich v. Alaska Airlines, Inc.,* No. C07-1215RSM, 2009 WL 364056, at *7 (W.D. Wash. Feb. 9, 2009)

27   (holding that plaintiffs who participated in a five-week training program were not employees); *Guzman v. Lincoln Tech.*
     *Inst*, 339 F. Supp. 3d 1048 (D. Nev 2018) (holding that plaintiffs who participated in 900 training hours were not

28   employees); *see also Donovan*, 686 F.2d at 272 (concluding that plaintiffs were not employees, despite the fact the
     defendant required "full time attendance" for 40 hours a week for four or five weeks).

Indeed, several Players testified that they paid for additional training during their time in the minor leagues.[89]

Although only a small percentage of Players ultimately reach the Major Leagues, by training in the minor leagues, Players are provided with the chance to reach the Major Leagues, which generates a substantial increase in their expected lifetime earnings.  *See* Bloom Decl. Ex. 235 (Martin Report, dated 8/16/2016) at Figure 5, ¶ 45.  Moreover, the undisputed fact that not all Players are guaranteed to make a Championship Season affiliate or ultimately reach Major League Baseball further supports the conclusion that they are not employees.  *See, e.g.*, *Benjamin*, 877 F.3d at 1148 (finding it relevant that plaintiffs were not "entitled to a job" at the end of their training experience); *Otico*, 229 F. Supp. at 1050 (same); *Ulrich v. Alaska Airlines, Inc.*, 2009 WL 364056, at *6 (same).

### 3.   Players Are Equipped With Skills To Obtain Other Jobs Outside Of Professional Baseball.

During their time in the minor leagues, Players are also equipped with skills to obtain jobs outside of professional baseball.  If a training program allows an individual to build skills that can be taken to a subsequent job with the company, or to another job in the general industry, "or even employment in a different field"—in other words, if the skills are "valuable and transferable to other settings"—the training is beneficial and thus indicates that individuals are not employees under the FLSA.  *Ulrich*, 2009 WL 364056, at *4.

Although Players may pursue a spot on a Major League roster as their ultimate goal or dream career, *see supra* n.19,  Players have numerous options as to how to use their athletic training in other careers inside and outside of professional baseball.[90]  After all, almost all of the Named Plaintiffs have obtained jobs in athletics, such as coaching, providing baseball instruction at camps, providing fitness instruction, owning athletic camps, managing baseball teams, and directing athletic departments.  *See* Bloom Decl. Ex. 235 (Martin Report, dated 8/16/2016) at Figure 4 (detailing the

---

[89] *See supra* n.21.

[90] Evidence shows that 90% of college baseball athletes do not pursue a career in professional sports, instead pursuing variety of other careers. *See* Bloom Decl. Ex. 237 (Martin Declaration, dated 10/29/2021) at ¶ 15. Evidence also shows that former student athletes are particularly successful in the business, healthcare, and education sectors, earning a wage premium relative to those without a sports background. *Id.*

1    sports-related positions held by 31 of the 41 Named Plaintiffs who were part of the case at the time

2    she conducted her research in 2016)[91]; ¶¶ 28, 47 (explaining how Players were investing in "human

3    capital" by obtaining education and training which not only increased their chances of achieving

4    their dreams of becoming Major League Baseball players, but also enhanced their ability to pursue

5    other careers and thus cumulatively increasing their expected future income).

6            Moreover, Players gained generally beneficial life skills from their time in the minor leagues.

7    In particular, Players had the opportunity to develop their language skills,[92] and Named Plaintiffs

8    testified that minor league training allowed them to develop their communication skills, leadership

9    ability, discipline and time management skills.[93]  *See Laurelbrook*, at 531 (in concluding that

10   plaintiffs were not employees, noting that they received benefits, such as understanding "the

11   importance of working hard and seeing a task through to completion," becoming "more

12   responsible," taking on "leadership" roles, and developing "strong work ethic").  The former

13   Director of Player Development for the Los Angeles Dodgers testified to this effect: "[W]e

14   understand that most of our minor league players will not reach the major league level.  So our

15   responsibility is to help them become more equipped to navigate the world…" *See* Bloom Decl. Ex.

16   205 (Kapler Tr. 25:15-26:14).  *See also* Bloom Decl. Ex. 218 (Dodgers 30(b)(6) Tr. 132:18-133:4

17   ("The purpose [of the Dodgers' Player Development Department] is to develop our – our men first,

18   to develop our – the human beings in the Player Development System … to try to make them the

19   strongest individuals and subsequently athletes … they can be")).  Other Clubs also testified that the

20   minor leagues help promote the development of life skills, in addition to baseball skills.  *See, e.g.*,

21   Bloom Decl. Exs. 217 (Angels 30(b)(6) Tr. 202:5-203:6 ("…there are other activities that we

22   conduct with players that is to assist them in their life development.  There are other things that

23   occur that will help a player many years down the road, whether they're still playing baseball or not,

24   that are off the field … bringing somebody in to discuss financial planning with them is an example

25   of something that we do to – to help players expand their – their life development")); 206 (Scales Tr.

---

[91] In the intervening year since Dr. Martin performed her research, four more individuals joined the litigation as Named Plaintiffs, all of whom also held sports-related positions during or after their minor league experiences.  *See supra* n.24.

[92] *See supra* n.25.

[93] *See supra* n.26.

144:23-145:13 (describing program and explaining that "it was a holistic approach to developing the man and thereby developing the player.")); 201 (Bavasi Tr. 307:5-22 (while professional baseball experience may make a resume attractive, "this doesn't even take into account yet the – what they've learned as they've gone through the minor league experience of team – teamwork, leadership, figuring things out, passage into adulthood.  There's a lot of things that, that go on at the minor league level")).

### 4.    The Undisputed Record Evidence Confirms Defendants Receive No Immediate Benefit From Players' Minor League Training.

In weighing the relative benefits under the primary beneficiary test, the essential question is not whether the defendant "derives any benefit at all from its training program"—it is whether that benefit is "immediate."  *Hurst v. First Student, Inc*., 181 F. Supp. 3d 827, 840-41 (D. Or. 2016); *see also Ulrich*, 2009 WL 364056, at *6; *Donovan*, 686 F.2d at 271-72.  Training is not considered beneficial to the employer if the trainees do not become "productive…until after their training ends."  *Donovan*, 686 F.2d 267 (5th Cir. 1982); *see also Ulrich*, 2009 WL 364056, at *5.

The undisputed record evidence confirms that Players' participation in training activities does not result in any "immediate" benefit to the Defendants.  For example, although training activities are open to the public, it is undisputed that Defendants do not sell tickets to games during the Training Seasons.[94]  Moreover, it is undisputed that most Players never make the Major League Club.  At most then, the Clubs are developing a qualified labor pool of minor league players on which to draw for the Major League roster,[95] but that is insufficient as a matter of law to constitute the type of benefit that tips the primary beneficiary test in favor of the employer.  *See, e.g.*, *Walling*, 330 U.S. at 153 ("Nor could they…have been considered as employees of the railroad merely because the school's graduates would constitute a labor pool from which the railroad could later draw its employees"); *Hurst*, 181 F. Supp. 3d at 841 (granting summary judgment to employer and concluding that the Supreme Court has rejected the theory that training primarily benefits an organization where "its training led to a pool of qualified [individuals]" who may later be staffed by that organization); *Ulrich*, 2009 WL 364056, at *6 (explaining that the Supreme Court and other

---

[94] *See supra* n.28.

[95] *See supra* n.27.

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT –
CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

1  courts reject the "qualified labor pool" argument in affirming the district court's grant of summary

2  judgment to the employer on the basis that plaintiffs were not employees).  Based on all of these

3  undisputed facts, the Court should conclude that Players are the primary beneficiaries of the parties'

4  relationship outside of the Championship Season and dismiss all claims for alleged work performed

5  because the Players are not employees as a matter of law during those periods.

6  **V.   DEFENDANT COMMISSIONER EMERITUS SELIG IS ENTITLED TO SUMMARY
7       JUDGMENT BECAUSE HE WAS NOT AN "EMPLOYER" UNDER THE FLSA OR
        STATE WAGE LAWS.**

8       In addition to the Clubs and MLB, Plaintiffs have alleged their federal and state wage-and-

9  hour claims against Commissioner Emeritus Selig, claiming that he was their "employer" and

10  seeking to hold him liable **in his individual capacity**.  (Dkt. 382 at ¶¶ 568-740, alleging violations

11  of federal and state law against "all Defendants").[96]  Yet, the record is devoid of evidence that Selig

12  employed any Players.[97]  To the contrary, under both the FLSA, and the wage laws of Arizona,

13  Florida, Oregon, Pennsylvania, Maryland, North Carolina, and New York (all of which define an

14  "employer" similarly to or the same as the FLSA (*see* Section V.B, *infra*)) the undisputed facts

15  demonstrate Selig was not an employer as a matter of law.  The result is the same under California

16  law.

17       **A.   There Is No Evidence Selig Was An Employer Within The Meaning Of The
18            FLSA.**

       Plaintiffs have the burden of demonstrating that Selig was their "employer."  *See, e.g.*, *Rios*

19  *v. Airborne Express, Inc.*, No. C-05-2092 VRW, 2006 WL 2067847, at *2 (N.D. Cal. July 24, 2006).

20  Accordingly, Selig is entitled to summary judgement merely by demonstrating that Plaintiffs have

21  failed to adduce sufficient evidence to carry their burden at trial.  *See Celotex Corp. v. Catrett*, 477

22  U.S. 317, 325 (1986); *Mata v. Manpower Inc.*, No. 14-CV-03787-LHK, 2016 WL 948997, at *9

23

24

---

25  [96] Plaintiffs do not allege that Selig is an "employer" with respect to their claims on behalf of the FLSA Collective and
    on behalf of the Class Members under Arizona, California and Florida law, respectively, in their motions for
26  class/collective certification and reconsideration/recertification in 2016.  (*See* Dkt. 496, 720.)  Nonetheless, for the same
    reason Plaintiffs' claims against Selig as a putative "employer" fail as a matter of law under the FLSA and relevant state
27  laws, the same rationale compels dismissal of such claims asserted by the Collective Members and Class Members under
    Arizona, California and Florida law, respectively.

28  [97] Despite naming Commissioner Selig as an individual defendant in the complaint, Plaintiffs abandoned their pursuit of
    his deposition during discovery.  Bloom Decl. ¶ 243.

1    (N.D. Cal. Mar. 14, 2016) (citing *Celotex*).  Here, the undisputed evidence more than satisfies

2    Selig's minimal burden.

3        The FLSA defines an employer as "any person acting directly or indirectly in the interest of

4    an employer in relation to an employee." 29 USC § 203(d).  To determine whether an individual

5    constitutes an employer for purposes of FLSA liability, the Ninth Circuit applies a version of the

6    "economic reality" test which considers whether the individual: (1) had the power to hire and fire the

7    employees, (2) supervised and controlled employee work schedules or conditions of employment,

8    (3) determined the rate and method of payment, and (4) maintained employment records.  *Bonnette*

9    *v. Cal. Health & Welfare Agency*, 704 F. 2d 1465, 1470 (9th Cir. 1983).  No one factor is

10   dispositive, and courts consider the totality of the circumstances.  *Lopez v. G.A.T. Airline Ground*

11   *Support, Inc.*, No. 09-CV-2268-IEG-BGS, 2010 WL 2839417, at *9 (S.D. Cal. July 19, 2010).

12   When applying the test, "courts pay particular attention to whether the corporate officer's duties

13   made him or her 'principally in charge of directing employment practice' such that the employer was

14   'instrumental' in causing the corporation to violate the FLSA."  *Solis v. Velocity Exp., Inc.*, No. CV

15   09-864-MO, 2010 WL 2990293, at *5 (D. Or. July 26, 2010) (quoting *Chao v. Hotel Oasis, Inc.*, 493

16   F.3d 26, 33 (1st Cir. 2007)).

17       While an individual may, **under certain limited circumstances**, be deemed an "employer"

18   under the FLSA, courts have cautioned against an overly-broad application of the factors above.  As

19   one court explained:

20           [T]oo much weight cannot be put on the … [FLSA's] broadly inclusive definition of
             "employer." Taken literally and applied in this context it would make any supervisory
21           employee, even those without any control over the corporation's payroll, personally
             liable for the unpaid or deficient wages or other employees. It makes more sense … to
22           interpret the language as intended to prevent employers from shielding themselves
             from responsibility for the acts of their agents.
23

24   *Baird v. Kessler*, 172 F. Supp. 2d 1305, 1311 (E.D. Cal. 2001), *aff'd*, 81 F. App'x 249 (9th Cir.

25   2003) (quoting *Donovan v. Agnew*, 712 F. 2d 1509, 1513 (1st Cir. 1983)).  Accordingly, courts have

26   held that individuals who, like Selig, are not directly involved in employment decisions relating to

27   the alleged unlawful conduct and/or who do not have economic control over employees are not

28   "employers" as a matter of law.  *See, e.g.*, *Baird*, at 1311-12 (even though individual manager

43

1   defendants set employees' schedules, assisted in drafting employee handbooks, recommended

2   termination and maintained employment records, they did not "control the purse strings" that

3   supported the plaintiffs' jobs and, thus, could not be considered employers under the FLSA); and

4   ("This court does not believe that Congress intended to make each individual manager and officer …

5   personally liable for violations of the FLSA, when a manager or officer cannot control the very

6   things which may lead to violations."); *Lopez*, 2010 WL 2839417, at *9 (holding that co-owners and

7   board members were not employers under the FLSA because they had no involvement in supervising

8   employees in California, or in controlling their work schedules or conditions of employment;

9   "[W]here courts have found corporate officers and board members liable as employers, the

10  individuals had at least some degree of involvement in supervising employees, controlling work

11  schedules, and setting wages.") (citing cases).

12          In those rare cases where courts have held individual officers liable as "employers," it often

13  has been based on evidence of a significant financial investment or ownership interest in the

14  employing entity and/or a direct role in making decisions germane to the underlying alleged causes

15  of action.  *See, e.g.*, *Maravilla v. Rosas Bros. Constr., Inc.*, 401 F. Supp. 3d 886, 902 (N.D. Cal.

16  2019) (holding individual defendants who "own[ed] and operate[ed] ... [a] business as a family

17  concern" liable as employers under the FLSA; evidence established that the owners had instructed

18  the plaintiff to "to record his hours inaccurately," had conversations about "hours banking" with

19  him, and "took turns supervising … [the plaintiff] at various job sites"); *Guifu Li v. A Perfect Day*

20  *Franchise, Inc.*, 281 F.R.D. 373, 398-400 (N.D. Cal. 2012) (denying summary judgment for sole

21  owner of massage parlor who regularly supervised the plaintiffs; "[a]s the sole owner of Minjian and

22  individual solely responsible for its finances, a reasonable jury could infer that Tailiang Li

23  determined the amount to be deducted from the massage therapists' pay checks"); *De Guzman v.*

24  *Parc Temple LLC*, 537 F. Supp. 2d 1087, 1094 (C.D. Cal. 2008) (denying summary judgement for

25  President of employer who owned 70% of the company, hired and set the plaintiff's work schedule,

26  and determined the rate of pay and method of payment of the plaintiff's wages).  Those factors

27  indisputably are not present here.

28

44

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT –
CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

It is undisputed that Selig had no ownership interest during the relevant time period of the litigation (*i.e.,* since 2008) or day-to-day control over the Players' activities,[98] and there is no evidence that Selig was "instrumental" in causing any of the alleged FLSA violations.  To the contrary, consideration of the four relevant *Bonnette* factors based on the undisputed record evidence confirms that, as a matter of law, Selig was not Plaintiffs' employer.

*First*, there is no evidence that Selig was personally involved in hiring or firing minor league Players.[99]  At most, the record consists of Selig's signature appearing on UPCs approving the terms of a contract between a Player and his Club, or on a letter regarding discipline for policy violations.  That is insufficient as a matter of law to render Selig personally an "employer."  *See Lopez*, 2010 WL 2839417, at *10 (individual defendants signing financial documents and lease agreements not sufficient to be held liable as employers).  There is no evidence that Selig had any personal involvement with respect to these actions.[100]  To the contrary, the undisputed record is that Selig delegated these tasks to others at MLB.[101]  Indeed, not a single Plaintiff testified that Selig had personal involvement in his Club's drafting him (*i.e.*, hiring), negotiating the terms of his contract, or release (*i.e.*, firing).  In any event, regardless of where his name or signature appeared, there is no evidence whatsoever that Selig "control[led] the purse strings" in a manner that would be sufficient to be deemed an "employer" under the FLSA.  *Baird*, 172 F. Supp. 2d at 1311 (holding that individual defendants were not "employers" even though it was undisputed they "could make civil appointments, appoint employees to work in … [specific units], and participate in the collective bargaining process").

*Second*, there is no evidence that Selig had any involvement, much less exercised supervision or control, over Players' day-to-day performance or their schedules of activities.[102]  None of the Plaintiffs who testified about Selig claimed he had ever directed their work; virtually all of them

---

[98] *See* Supplemental Selig Decl. ¶¶ 2-4.

[99] *See* Supplemental Selig Decl. ¶¶ 7, 8.

[100] *See* 2016 Selig Decl. ¶ 5.

[101] Supplemental Selig Decl. ¶¶ 7, 8; 2016 Selig Decl. ¶¶ 5, 13.

[102] Supplemental Selig Decl. ¶¶ 3-4; *see also* 2016 Selig Decl. ¶ 12.

1   confirmed that they had no contact with him whatsoever.[103]  Moreover, since 2008, Selig had no

2   ownership interest in MLB, any MLB Club, or any minor league affiliate, and he did not provide

3   Players with any tools or equipment.[104]

4        *Third*, and perhaps most importantly given the claims at-issue, there is no evidence that Selig

5   had a role in negotiating or setting pay for Players, nor any authority to determine whether any

6   particular Player earned a salary or hourly rate or what periods of time were or were not

7   compensable.[105]  Given the nature of Plaintiffs' claims—*i.e.*, that they were not properly

8   compensated for all time worked—the absence of evidence of Selig's role in these compensation-

9   related decisions is compelling evidence that he was not Plaintiffs' employer.  *See Lopez*, 2010 WL

10  2839417, at *9 (granting summary judgment for individual defendants; "[a]lthough Raines and

11  Baggett signed employees' paychecks, it is undisputed they had no involvement in determining rates

12  and method of payment, or in any compensation decisions."); *Orquiza v. Walldesign, Inc.*, No. 2:11-

13  CV-1374 JCM CWH, 2013 WL 3027765, at *4 (D. Nev. June 14, 2013) (holding that founder and

14  vice president of the company were not "employers" as a matter of law because, *inter alia*, they did

15  not set the individual rate or methods of payment, and the fact that defendants made "big picture

16  decisions" at the company was not relevant to this analysis), *aff'd sub nom. Orquiza v. Bello*, 634 F.

17  App'x 605 (9th Cir. 2016).

18       *Fourth*, as Commissioner, Selig did not maintain records concerning the alleged hours

19  worked by or pay provided to Players.[106]  Nor was Selig involved in processing Players'

20  paychecks.[107]  Thus, the **only** undisputed evidence in the record demonstrates that Selig was not an

21  employer under any prong of the FLSA test and, therefore, cannot be held liable for alleged federal

22  wage and hour violations.

23

24

25
    ---
26  [103] *See supra* n.33.

    [104] Supplemental Selig Decl. ¶¶ 2, 6.

27  [105] Supplemental Selig Decl. ¶ 5; 2016 Selig Decl. ¶¶ 7, 8.

    [106] Supplemental Selig Decl. ¶ 4.

28  [107] Supplemental Selig Decl. ¶ 5.

**B.    Nor Was Selig An "Employer" Under Florida, Arizona, North Carolina, New York, Pennsylvania, Maryland, or Oregon Wage Laws.**

Plaintiffs have asserted state-law claims against Selig under the laws of Arizona, Florida, Oregon, Pennsylvania, Maryland, North Carolina, and New York, on the basis that Selig was their "employer."  *See* Dkt. 382, Counts 11, 13-14, 16-17, 19-21, 23-24, 26-27, 29-30.  However, the definition of "employer" under these states' laws aligns with the FLSA.[108]  Accordingly, because Plaintiffs have failed to prove that Selig is an "employer" for purposes of the FLSA, he likewise cannot be held liable as an employer under the laws of any of these states and is entitled to summary judgment on Counts 11, 13-14, 16-17, 19-21, 23-24, 26-27, 29-30 of the Complaint as well.

**C.    Likewise, Selig Is Entitled To Summary Judgment On Plaintiffs' California State Law Claims.**

Plaintiffs assert Counts 3-7 and 9 of the Complaint against Selig pursuant to various provisions of the California Labor Code, based on the allegation that Selig personally employed Plaintiffs.  *See* Dkt. 382 ¶¶ 64-71, 583-606, 611-614 (emphasis added).  However, as in the case of their FLSA claims, the record is devoid of evidence that would permit Plaintiffs to pursue their

---

[108] The determination of "employer" or "joint employer" status applied by courts under the laws of Arizona, Florida, Oregon, Pennsylvania, Maryland, North Carolina, and New York, respectively, generally mirrors the tests those courts have applied under the FLSA.  *See, e.g., Montoya v. 3PD, Inc.*, No. CV-13-8068-PCT-SMM, 2014 WL 3385116, at *1 n.2 (D. Ariz. July 10, 2014) (noting that the definition of "employ" is the same under the FLSA and Arizona law and finding that an entity is not a joint employer under Arizona law for the same reasons it is not a joint employer under the FLSA); *Cramton v. Grabbagreen Franchising LLC*, No. CV-17-04663-PHX-DWL, 2019 WL 7048773, at *24 (D. Ariz. Dec. 23, 2019) (interpreting Arizona minimum wage statute; "[T]he Court will look to case law interpreting the meaning of 'employer' under the FLSA because the two statutes define the term in similar ways); *Free v. Littlefield Corp.*, No. 3:20CV4326-TKW-HTC, 2020 WL 7421751, at *3 (N.D. Fla. Dec. 11, 2020) (applying the FLSA joint employer test to a claim for minimum wage under Florida law);  *Dinicola v. State, Dep't of Or. of Revenue*, 246 Or. App. 526, 545 (2011) (applying "the FLSA test to resolve [plaintiff's] state claims [under Oregon law] and reach the same conclusion that we reached under the FLSA"); *Mackereth v. Kooma, Inc.*, No. 14-04824, 2015 WL 2337273, at *8 (E.D. Pa. May 14, 2015) ("Pennsylvania courts look to federal case law and the tests employed by the federal courts to determine if a defendant is an employer under the PMWA"); *Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 131 (4th Cir. 2017) ("Our resolution of the FLSA joint employment question also resolves Plaintiffs' claims under the Maryland Wage and Hour Law, which defines 'employer' consistently with the FLSA."); *Morataya v. Nancy's Kitchen of Silver Spring, Inc.*, No. GJH-13-01888, 2015 WL 165305, at *3 (D. Md. Jan. 12, 2015) ("Because the [Maryland minimum wage law] is the state equivalent of the FLSA[,] it provides a similar definition of 'employer.'"); *Luna-Reyes v. RFI Const., LLC*, 109 F. Supp. 3d 744, 752 (M.D.N.C. 2015) (holding since "[t]he North Carolina Wage and Hour Act is modeled after the Fair Labor Standards Act (FLSA)" so the NCWHA claim should be treated the same as the FLSA claim) (internal quotations and citations omitted); *Jones v. Am. Airlines, Inc.*, No. 5:08-CV-236-BR, 2008 WL 9411160, at *3 (E.D.N.C. Oct. 16, 2008) (holding that North Carolina courts have "relied upon federal case law that interpreted the term 'employee' as used in the FLSA" when analyzing North Carolina law) (citations omitted); *Chen v. St. Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 278 (E.D.N.Y. 2005) ("Courts hold that the New York Labor Law embodies the same standards for joint employment as the FLSA.") (collecting authority); *Thomas v. River Greene Constr. Grp. LLC*, No. 17 CIV. 6954 (PAE), 2018 WL 6528493, at *5 (S.D.N.Y. Dec. 11, 2018) ("[D]istrict courts in this Circuit 'have interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA.'") (citations omitted).

---

47

California law claims against Selig under any legal theory.  Accordingly, Selig is entitled to summary judgment on these Counts as well.

### 1. Plaintiffs Have Failed To Adduce Evidence That Selig Was An "Employer" Under California Law.

Obligations to pay minimum and overtime wages, issue wage statements, and timely issue wages—*i.e.*, the alleged unlawful conduct in the Complaint—belong to employers only.  *See, e.g.*, Cal. Lab. Code § 201(a) ("If an employer discharges an employee…"), § 203 ("If an employer willfully fails to pay, without abatement, … any wages of an employee…"), § 226(a) ("An employer … shall furnish to his or her employee… an accurate itemized statement…"); *see also, e.g., Martinez v. Combs*, 49 Cal. 4th 35, 49 (2010) ("That only an employer can be liable . . . seems logically inevitable as no generally applicable rule of law imposes on anyone other than an employer a duty to pay wages").  Thus, to prevail on their fifth, sixth, seventh, and ninth Counts of the Complaint against Selig, Plaintiffs are required, first, to establish he was their employer.  *See Mata*, 2016 WL 948997, at *9 (Plaintiffs have the burden of proving joint employment under California law on summary judgment; "To the extent that [P]laintiffs are suggesting that Defendants have the burden of disproving the allegations in Plaintiffs' complaint, this suggestion is incorrect."); *Solar v. Buchanan Ingersoll & Rooney, P.C.*, 2017 WL 6270478, at *3 (S.D. Cal. Dec. 8, 2017) (same).  To do so, Plaintiffs must demonstrate that Selig either:  (a) exercised control over their wages, hours or working conditions, (b) suffered or permitted them to work, or (c) personally engaged them, thereby creating a common law employment relationship.  *See Martinez*, 49 Cal. 4th at 64.  Based on the undisputed facts in the record, however, Plaintiffs cannot meet any of these requirements as a matter of law.

As a threshold matter, it is well-settled under California law that "corporate agents acting within the scope of their agency are not personally liable for the corporate employer's failure to pay its employees' wages."  *Reynolds v. Bement*, 36 Cal. 4th 1075, 1087, *as modified by*, No. S115823, 2005 Cal. LEXIS 9852, & *modified by*, 2005 Cal. LEXIS 10110 (Cal. Sept. 7, 2005), *abrogated on other grounds by Martinez v. Combs*, 49 Cal. 4th 35 (2010); *Moua v. Int'l Bus. Mach. Corp.*, No. 5:10-CV-01070-EJD, 2019 WL 1170488, at *3 (N.D. Cal. Mar. 13, 2019) (granting summary judgment for individual defendant; "Koenig did not exercise control over wages by implementing

48

1    the on-call and comp time policies. … Koenig acted within the 'scope of his agency' in creating and

2    implementing these policies.").  Were it otherwise, virtually every manager involved in hiring or

3    termination decisions would be personally liable for unpaid wages of their corporate employer—an

4    extraordinary result the law never envisioned.

5           Here, there is not even an allegation—much less record evidence—that Selig was acting

6    outside the scope of his authority as Commissioner in any respect whatsoever.  Selig is entitled to

7    summary judgment for this reason alone.  *See Reynolds*, 36 Cal. 4th at 1087.

8           Even if Plaintiffs could raise a triable issue with respect to Selig's acting within the scope of

9    his duties as Commissioner—and they plainly cannot—he would still be entitled to summary

10   judgment because there is no indicia that he was their employer under California law.  There is zero

11   evidence—none—that Selig personally exercised any control over any Player's wages, hours, or

12   working conditions.  As Commissioner, Selig did not exercise any authority with respect to, or

13   decide, which Players Clubs selected in the amateur draft, signed to a contract, and/or released from

14   their contracts by the Clubs.[109]  He likewise had no authority to direct individual Players' activities,

15   assign them work, or set their work schedules.[110]  And, critically, Selig had no involvement in

16   negotiating rates of pay or deciding whether to pay Players a salary or on an hourly basis.[111]

17          Nor did Selig "suffer or permit" Players to work.  To do so, an employer must have the

18   power to prevent the alleged violation from occurring.  *See Martinez*, 49 Cal. 4th at 70 (holding third

19   parties did not suffer or permit the plaintiffs' work "because neither had the power to prevent [the]

20   plaintiffs from working").  Here, Selig had no authority to tell Plaintiffs or any other Player to work

21   or stop working, nor was he involved in setting or paying Players' wages.[112]  Every Plaintiff to have

22   testified on this issue confirmed as much.[113]

23   _____

     [109] Supplemental Selig Decl. ¶ 7.

24   [110] *See* Supplemental Selig Decl. ¶¶ 3-4; *supra* n.32.

25   [111] 2016 Selig Decl. ¶¶ 4, 8; Supplemental Selig Decl. ¶ 5.

     [112] *Id.*

26   [113] *See, e.g.*, Bloom Decl. Exs. 153 (Bennigson Tr. 259:18-25 (Selig "never came to me personally in my face and said,
     hey you need to go pitch more")); 159 (Gagnier Tr. 257:15-22 (no instructions or direction received from Selig regarding
27   performance as a pitcher)); 168 (Kahaulelio Tr. 282:12-19 (no knowledge of whether Selig directed activities)); 189
     (Pease Tr. 348:9-22 (received no communications from Selig regarding training sessions)); 195 (L. Smith Tr. 185:22-
28   186:9 (paid by Club, not MLB)); 196 (Stone Tr. 280:25-281:4 ("Bud Selig did not come down and tell me what to do"));
     198 (Veres Tr. 175:23-176:9 (only knowledge of Selig's involvement in activities of minor league players is "he signs

     _____

                                                    49

1       Finally, there is no evidence whatsoever that Selig established a common law employment

2  relationship with Plaintiffs or any other Players.  "The essence of the common law employment test

3  'is the control of details—that is, whether the principal has the right to control the manner and means

4  by which the worker accomplishes the work."  *Curry v. Equilon Enters., LLC*, 23 Cal. App. 5th 289,

5  304 (2018) (citation omitted; emphasis added).[114]  For all of the reasons set forth above, those indicia

6  of control indisputably are absent here.

7       Accordingly, Selig cannot be deemed to have established any common law employment

8  relationship with Plaintiffs or any other Player, and he is entitled to summary judgment on Plaintiffs'

9  California wage-and-hour counts to the extent they are based on an alleged employment relationship.

10  *See, e.g., Moua*, 2019 WL 1170488, at *3 (granting summary judgment for individual defendants;

11  "IBM and not [the individually named Defendants] classified Plaintiff's job as exempt from

12  overtime pay. Therefore, IBM exercised control over Plaintiff's wages.").

### 2.    There Is No Evidence To Permit Plaintiffs To Hold Selig Liable In His Individual Capacity.

14       As set forth above (*see supra* Section V.C.1.), Plaintiffs have failed to adduce any evidence

15  sufficient to create a triable issue as to whether Selig was their employer for purposes of alleged

16  Labor Code violations.  In the absence of an employment relationship, only two sections of the

17  California Labor Code could theoretically permit an individual to be held liable for unpaid wages,

---

off on the contracts")); 200 (Zapata Tr. 211:6-12 (Selig did not direct activities as a Player)).  Numerous Players also testified that they did not so much as meet, communicate or interact with Selig.  *See, e.g.*, Bloom Decl Exs. 150 (Alvino Tr. 139:17-20); 151 (Anderson Tr. 197:25-198:4); 152 (Arnesen Tr. 165:10-15); 154 (Caseres Tr. 139:24-140:3); 156 (L. Davis Tr. 315:16-19); 157 (Dott Tr. 295:12-15); 162 (Hart Tr. 182:4-9); 164 (Hilligoss Tr. 245:19-22); 165 (Hutson Tr. 327:23-328:1); 166 (D. Jimenez Tr. 132:22-25); 167 (Johnson Tr. 298:11-21); 169 (Khoury Tr. 309:19-23); 171 (Kramer Tr. 213:19-22); 173 (Lashmet Tr. 161:19-22); 172  (Lawson Tr. 173:1-5); 175 (Lis Tr. 213:10-16); 177 (Mahoney Tr. 182:7-11); 179 (McAtee Tr. 333:13-25); 180 (Meade Tr. 299:15-18); 181 (Murray Tr. 331:16-20); 183 (Negus Tr. 138:24-139:4); 184 (Newsome Tr. 282:4-7); 185 (Odle Tr. 278:22-25); 188 (Pahuta Tr. 294:22-25); 190 (Proscia Tr. 167:23-168:13); 192 (Santiago Tr. 292:15-293:9); 193 (Schmeltzer Tr. 133:3-10); 194 (Senne Tr. 162:10-13, 163:7-10); 197 (Swift Tr. 123:12-16).

[114] Depending on the circumstances, factors generally considered in determining whether the putative employer had the right to control an employee's work include, but are not limited to: (1) whether the worker is engaged in a distinct occupation or business; (2) whether, considering the kind of occupation and locality, the work is usually done under the alleged employer's direction or without supervision; (3) the skill required; (4) whether the alleged employer or worker supplies the instrumentalities, tools, and place of work; (5) the length of time the services are to be performed; (6) the method of payment, whether by time or by job; (7) whether the work is part of the alleged employer's regular business; and (8) whether the parties believe they are creating an employer-employee relationship.  *Futrell v. Payday Cal., Inc.*, 190 Cal. App. 4th 1419, 1434 (2010).

1   minimum wage violations, untimely wage payments, wage statement violations, and/or waiting time

2   penalties:  (1) under the PAGA (derivative of alleged violations of Labor Code sections 558 and

3   1197); and/or (2) pursuant to Labor Code section 558.1 ("Section 558.1").  Plaintiffs did not assert a

4   claim under Section 558.1 in the Complaint.  (*See generally* Dkt. 382.)  Even if they did, Selig

5   would be entitled to summary judgment under Section 558.1 and Labor Code Sections 558 and

6   1197.1 because all such sections require that the managers in question have been directly involved in

7   the alleged violations, which Selig indisputably was not.  *See* Cal. Lab. Code at § 558(a) ("[a]ny

8   employer or other person acting on behalf of an employer who violates, or causes to be violated, a

9   section of this chapter or any provision regulating hours and days of work in any order of the

10   Industrial Welfare Commission shall be subject to a civil penalty"); § 1197.1(a) ("[a]ny employer or

11   other person acting either individually or as an officer, agent, or employee of another person, who

12   pays or causes to be paid to any employee a wage less than the minimum fixed by an applicable state

13   or local law…, shall be subject to a civil penalty, restitution of wages, liquidated damages payable to

14   the employee, and any applicable penalties imposed pursuant to Section 203"); § 558.1(a) ("[a]ny

15   employer or other person acting on behalf of an employer, who violates, or causes to be violated, any

16   provision regulating minimum wages or hours and days of work in any order of the Industrial

17   Welfare Commission, or violates, or causes to be violated, Sections 203, 226, 226.7, 1193.6, 1194,

18   or 2802, may be held liable as the employer for such violation.").

19         Consistent with the statutory language, courts have declined to impose personal liability on

20   individual officers and/or managers absent evidence that they were actually involved in the conduct

21   that underlies the alleged Labor Code violations.  *Compare Plaksin v. Newsight Reality, Inc*., No.

22   2:19-cv-00458-RGK-SS, 2019 U.S. Dist. LEXIS 168063, at *12-13 (C.D. Cal. Apr. 30, 2019)

23   (finding that "the plain language of Section 558.1 suggests substitutive liability for a person acting

24   on behalf of an employer," and dismissing Labor Code claims against individual defendant because

25   "allegations pertain[ed] only to [his] role as a corporate officer," and included no "allegation of

26   individual wrongdoing"), *and Rios v. Linn Star Transfer, Inc.*, No. 19-CV-07009-JSC, 2020 WL

27   1677338, at *6 (N.D. Cal. Apr. 6, 2020) (emphasis added) (internal citations and quotations omitted)

28   (collecting authority of district courts dismissing claims premised on liability under Section 558.1

1   where plaintiffs failed to show "specific facts to establish that [the individual defendant] was

2   **personally involved** in the alleged violations."), *with McDonald v. Ricardo's on Beach, Inc.*, No.

3   CV 11-9366 PSG MRWX, 2013 WL 153860, at *4 (C.D. Cal. Jan. 15, 2013) (finding triable issues

4   of material fact existed regarding whether an individual defendant (the co-owner of a company),

5   who made the decision to pay employees who worked overtime "through multiple paychecks and

6   subsequently ended that policy[,]" was liable for civil penalties under Section 558 (via the PAGA)

7   based on overtime violations).

8          Here, there is zero evidence (or even an allegation) that Selig was personally involved in any

9   of the purported Labor Code violations; the undisputed evidence demonstrates he was not.[115]

10  Accordingly, any claim against Selig in his individual (non-employer) capacity also fails as a matter

11  of law because he "lacked sufficient participation in the operation and management of [minor league

12  Players] to create a triable issue of material fact that []he 'cause[d]' the wage and hour violations."

13  *Usher v. White*, 64 Cal. App. 5th 883, 886 (2021); *id* at 897 (granting summary judgment for

14  individual defendant; "Shirley did not participate in the decision of White Communications to

15  classify plaintiffs as independent contractors, which classification is the basis of plaintiff's … 10

16  causes of action.  Indeed, it is undisputed that Shirley was never consulted about, or provided any

17  guidance regarding, the classification of service technicians; played no role in the hiring of

18  technicians; did not create, draft or contribute to the content of any of the independent contractor

19  agreements…; and did not sign any such agreements on behalf of the company.").

20         Accordingly, because Selig also was not Plaintiffs' or other Players' employer as a matter of

21  law, he is entitled to summary judgment on all of their California counts.

22  **VI.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
23        COUNT 5 OF THE COMPLAINT BECAUSE THERE IS NO PRIVATE RIGHT OF
           ACTION UNDER CALIFORNIA LABOR CODE SECTION 204.**

24         In the Complaint (Dkt. 382 at ¶¶ 595-98, at Count 5), Plaintiffs allege untimely wages during

25  employment pursuant to California Labor Code section 204 ("Section 204").  However, courts

26  repeatedly have held that there is no private right of action under Section 204.  *See, e.g., Wood v. N.*

27

28  ---
[115] Specifically, Selig was not involved in preparing or processing checks and wage statements, deciding whether to pay players a salary, as opposed to paying them hourly, nor personally approving the terms of the UPC.  See 2016 Selig Decl. ¶¶ 4, 5, 8; Supplemental Selig Decl. ¶¶ 3-5.

1   *Am. Van Lines, Inc.*, No. 8:20-CV-02092-JLS-ADS, 2021 WL 3134203, at *6 (C.D. Cal. July 23,

2   2021); *Caldwell v. OS Rest. Servs., LLC*, No. ED CV 19-00754-DMG (MRWx), 2021 WL 3264306,

3   at *11 (C.D. Cal. May 13, 2021); *Johnson v. Hewlett-Packard Co.*, 809 F. Supp. 2d 1114, 1136

4   (N.D. Cal. 2011), *aff'd*, 546 F. App'x 613 (9th Cir. 2013).

5         While the Legislature amended California Labor Code Section 210 ("Section 210") in 2020

6   to potentially permit employees to recover civil penalties for violations of Section 204, Plaintiffs'

7   Count 5 still fails as a matter of law.  As an initial matter, Plaintiffs have not alleged Count 5

8   pursuant to Section 210—only Section 204.[116]  Yet, even if Plaintiffs had pled a violation of Section

9   210, Count 5 nonetheless fails as a matter of law because Plaintiffs cannot seek statutory penalties

10   under Section 210 when, as here, they are also seeking duplicative civil penalties under the PAGA

11   for the same alleged violations of the wage payment timing requirements.  *See* Cal. Lab. Code

12   § 210(c) ("An employee is only entitled to either recover the statutory penalty provided for in this

13   section **or** to enforce a civil penalty as set forth in subdivision (a) of Section 2699, but not both, for

14   the same violation.") (emphasis added).

15         Accordingly, Defendants are entitled to summary judgment as to Count 5 of the Complaint.

16   **VII.**    **DEFENDANTS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' COUNT 9 BECAUSE PLAINTIFFS FAILED TO SATISFY THE**

17         **JURISDICTIONAL PREREQUISITES TO PURSUE CERTAIN PAGA PENALTIES.**

18         In Count 9 of the Complaint, Plaintiffs seek to recover PAGA penalties based on purported

19   violations of California Labor Code Sections 201, 202, 203, 204, 208, 226, 510, 1194, and 1197.

20   *See* Dkt. 382 at ¶ 612.  However, as a prerequisite to pursuing PAGA penalties in court, purportedly

21   "aggrieved employees" (*i.e.*, Plaintiffs) must first send a letter to the LWDA detailing the alleged

22   Labor Code violations.  *See* Cal. Lab. Code § 2699.3(a)(1)(A).  Administrative exhaustion of a

23   PAGA claim is jurisdictional, and, accordingly, courts have rejected PAGA claims based on

24   allegations that were not timely and sufficiently set forth in written notice to the LWDA.  *See, e.g.*,

25   *Thomas v. Home Depot USA Inc.*, 527 F. Supp. 2d 1003, 1007 (N.D. Cal. 2007).

26

27

28

---

[116] The moving party's burden is governed by what Plaintiffs actually, not could have, alleged in the pleadings.  *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) ("A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations.").

53

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT –
CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

1    To satisfy the above notice requirement, Plaintiffs' LWDA Letter was required to set forth

2  the specific factual allegations and legal theories that related to the alleged Labor Code violations.

3  *See* Cal. Lab. Code § 2699.3(a)(1)(A).  Notice that merely cites a string of statutes alleged to have

4  been violated is insufficient as a matter of law.  *See Brown v. Ralphs Grocery Co.*, 28 Cal. App. 5th

5  824, 837-38 (2018) ("[T]he 2009 Notice … did not state facts and theories supporting the alleged

6  violations not implied by reference to the Labor Code.  The notice did not give sufficient

7  information … for defendants to determine what policies or practices were being complained of,

8  have an opportunity to cure the violations, and prepare a meaningful response."); *Mitchell v.*

9  *Corelogic, Inc.*, No. SA CV 17-2274-DOC (DFMx), 2019 WL 7172978, at *7 (C.D. Cal. Nov. 20,

10  2019) ("[Notice] letter simply stat[ing] that Defendant has a 'consistent policy' of violating

11  California laws regarding overtime, wage statement, and waiting time penalty claims … is a simple

12  parroting of the statutes and does not contain even minimal factual allegations."); *see also Alcantar*

13  *v. Hobart Serv.*, 800 F.3d 1047, 1057 (9th Cir. 2015) ("a string of legal conclusions with no factual

14  allegations or theories of liability to support them" is insufficient notice).

15    Here, Plaintiffs' January 30, 2014 LWDA Letter provided no factual allegations regarding

16  purported violations of Labor Code section 201-204, 208, and 226.  It provides only, in relevant part:

17    By failing to pay adequate wages and subsequently withholding these wages, the
18    Defendants also violate California's "payday" requirements. (Labor Code § 204).
     When the employment relationship ceases, the conduct also violates California's rules
19    regarding the immediate payment of wages upon discharge (Labor Code §§ 201-03)
     and the place of payment of wages (Labor Code § 208). Moreover, the Defendants
20    violate Labor Code § 226 by failing to include adequate information in itemized wage
     statements.

21  LWDA Letter at page 2.  This language, which amounts to a string of legal conclusions unsupported

22  by facts, is insufficient as a matter of law to administratively exhaust claims for PAGA penalties

23  under any of the enumerated Labor Code sections.  *See Brown*, 28 Cal. App. 5th at 837; *Mitchell*,

24  2019 WL 7172978, at *7.  Rather than specify what Defendants allegedly did wrong—*i.e.*, how they

25  allegedly violated the rules regarding payment of final wages, the place of paying wages, and what

26  was missing from the wage statements—the LWDA Letter summarily contends that certain Labor

27  Code sections were violated, which is insufficient as a matter of law.  *Compare Mitchell*, 2019 WL

28  7172978, at *7 *with Mays v. Wal-Mart Stores, Inc.*, 354 F. Supp. 3d 1136, 1148 (C.D. Cal. 2019)

1   ("Plaintiff's PAGA letter informs the LWDA that Walmart's wage statements were inadequate

2   because Walmart failed to provide all information required by Labor Code section 226(a), '**such as**

3   **the inclusive dates of the period for which the employee is paid**.'") (emphasis in original).

4           Accordingly, Defendants are entitled to partial summary judgment on Plaintiffs' Count 9

5   pursuant to the PAGA to the extent it is premised on Labor Code sections 201-204, 208, and/or 226.

6                                        **<u>CONCLUSION</u>**

7           For the foregoing reasons, Defendants respectfully request that the Court grant Defendants'

8   motion for partial summary judgment on the grounds set forth herein and in the proposed order.

9

10   Dated:  October 29, 2021          PROSKAUER ROSE LLP
                                        ELISE M. BLOOM (*pro hac vice*)
11                                      NEIL H. ABRAMSON (*pro hac vice*)
                                        ADAM M. LUPION (*pro hac vice*)
12                                      MARK W. BATTEN (*pro hac vice*)
                                        RACHEL PHILION (*pro hac vice*)
13                                      JOSHUA S. FOX (*pro hac vice*)
                                        NOA M. BADDISH (*pro hac vice*)
14                                      PHILIPPE A. LEBEL
                                        SAMANTHA R. MANELIN (*pro hac vice*)

15

16                                      By:   */s/ Elise M. Bloom*
                                              Elise M. Bloom
17                                            Attorneys for Defendants

18

19

20

21

22

23

24

25

26

27

28