STEPHEN M. TILLERY (*pro hac vice*)
  stillery@koreintillery.com
GARRETT R. BROSHUIS (Bar No. 329924)
  gbroshuis@koreintillery.com
MARC A. WALLENSTEIN (*pro hac vice*)
  mwallenstein@koreintillery.com
DIANE MOORE (Bar No. 214903)
  dmoore@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:  (314) 241-4844
Facsimile: (314) 241-3525


CLIFFORD H. PEARSON (Bar No. 108523)
  cpearson@pswlaw.com
DANIEL L. WARSHAW (Bar No. 185365)
  dwarshaw@pswlaw.com
BOBBY POUYA (Bar No. 245527)
  bpouya@pswlaw.com
THOMAS J. NOLAN (Bar No. 66992)          BENJAMIN E. SHIFTAN (Bar No. 265767)
  tnolan@pswlaw.com                        bshiftan@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**        **PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400       350 Sansome Street, Suite 680
Sherman Oaks, CA 91403                   San Francisco, CA 94104
Telephone: (818) 788-8300                Telephone: (415) 433-9000
Facsimile: (818) 788-8104                Facsimile: (415) 433-9008


Plaintiffs' Co-Lead Class Counsel

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| AARON SENNE, et al., Individually and on Behalf of All Those Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as MAJOR LEAGUE BASEBALL, et al.,<br><br>Defendants. | CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)<br><br>**CLASS ACTION**<br><br>**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT**<br><br>Hearing Date and Time: Feb. 11, 2022<br>Time: 9:30 a.m. PST<br>Courtroom: G, 15th Floor<br>Judge: Honorable Joseph C. Spero |

**NOTICE OF MOTION AND MOTION**

Please take notice that Plaintiffs and the certified classes and collective will and hereby do move for partial summary judgment. We ask that this Motion be heard on February 11, 2022 at 9:30 a.m., in Courtroom G, 15th Floor of the U.S. District Court for the Northern District of California, San Francisco Division, before the Honorable Joseph C. Spero.

This Motion is made pursuant to Federal Rule of Civil Procedure 56 because, for the core liability issues in the case, there is no genuine dispute as to any material fact and Plaintiffs are entitled to judgment as a matter of law. The Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the accompanying supportive declarations and exhibits, the records on file in this action, and upon additional evidence and argument as may be presented at or before the hearing on this Motion.

**STATEMENT OF THE ISSUES TO BE DECIDED**

Plaintiffs move for partial summary judgment as to the following issues:

- Plaintiffs and members of the certified classes and collective are "employees" under all laws at issue (Counts 1-31, ECF 382).

- Plaintiffs and members of the certified classes and collective are "jointly employed" by the Defendant MLB Clubs and Defendant MLB under all laws at issue (Counts 1-31).

- Plaintiffs and members of the certified classes and collective perform at least some "work" during the Arizona and Florida training seasons (Counts 1-2, 11-15).

- The time spent travelling to and from away games during the Arizona and Florida training seasons and during the California League is compensable for the Arizona, Florida, and California Classes and the FLSA Collective (Counts 1-15).

- Plaintiffs and members of the certified classes and collective are entitled to summary judgment that they are not "creative professionals" subject to the exemption raised by Defendants under the FLSA and under Florida, California, New York, North Carolina, Pennsylvania, Maryland, and Oregon law. (Defendants did not raise this defense under Arizona law because it is not available.) (Fifth Affirmative Defense, ECF 886 at 81.)

- Plaintiffs and members of the certified classes and collective are entitled to summary judgment that they do not fall within the "seasonal and amusement" exemption that Defendants raised under the FLSA and under Florida, California, New York, North Carolina, Pennsylvania, and Maryland law. (Defendants did not raise this defense under Arizona or Oregon law because it is not available. Defendants attempted to raise the defense under California law, but it is not available, as discussed below.) (Fourth Affirmative Defense, ECF 886 at 81.)

- Plaintiffs and members of the Arizona Class are entitled to treble damages, along with fees and costs. (Count 13, ECF 382.)

- Defendants never had any defense available to them under Arizona law, so the violations under Arizona law are willful and members of the Arizona Class are entitled to a three-year statutory limitations period (which includes all violations occurring as part of a continuing course of conduct regardless of date). (Count 13.)

- Plaintiffs and members of the Arizona and California Classes are entitled to summary judgment that Defendants are liable for wage statement and recordkeeping violations under Arizona and California law. (Counts 7 & 14, ECF 382.)

- Plaintiffs and members of the certified classes and collective are entitled to summary judgment that Defendants have failed to establish an affirmative defense that "offsets" should be permitted under the FLSA and under Arizona, Florida, and California law. Neither Arizona nor California law permit wage credits, and Defendants have not met their burden of establishing entitlement to any credits for the Florida Class or the FLSA Collective. (Eighth Affirmative Defense, ECF 886 at 82.)

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ............................................................................... i

STATEMENT OF THE ISSUES TO BE DECIDED ........................................................... i

TABLE OF AUTHORITIES ............................................................................................... v

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

STATEMENT OF FACTS .................................................................................................. 3

    I.     The Major League Rules and Uniform Player Contract Govern the
           Employment of Minor League Players. ...................................................... 3

    II.    The Work that Minor League Players Perform Throughout the Year. ...................7

    III.   MLB Recently Took Complete Control of the Minor Leagues. ..................................... 10

ARGUMENT ..................................................................................................................... 11

    I.     Minor League Baseball Players Are Employees. ........................................... 12

        A.    Defendants Admitted in Pleadings that Minor League Players Are
               "Employees." ............................................................................... 12

        B.    Defendants Are Estopped from Arguing Otherwise Because They
               Successfully Argued to the Ninth Circuit that Minor League Players
               Are Their Employees ................................................................... 13

        C.    In Any Event, Minor League Baseball Players Are "Employees" Under
               Wage Laws. .................................................................................. 14

    II.    MLB and Its Clubs Jointly Employ Minor League Players. ............................. 18

        A.    Professional Sports Leagues Are Generally Joint Employers of Players
               Under Employment Laws, and the *Bonnette* Factors Confirm that MLB
               Is an Employer. ........................................................................... 20

    III.   Minor Leaguers Are "Employees" and Are Jointly "Employed" by MLB and
           the MLB Clubs Under California's Wage Laws. ....................................... 34

        A.    Defendants Jointly Control Wages, Hours, or Working Conditions. .............. 35

        B.    Defendants Jointly Suffer or Permit Minor Leaguers to Work. ......................... 36

        C.    Defendants Have "Engaged" the Minor Leaguers by Signing Them to
               a Traditional Employment Contract and Treating Them as Employees. ......... 36

    IV.   Minor League Players Perform "Work". ...................................................... 36

|   |   | A. | Players "Work" During Training Seasons Under Florida and Arizona Law. | 36 |
|   |   | B. | Travel Time in the Arizona, Florida, and California Classes is Compensable Work. | 38 |
|   | V. |   | The Creative Artist Exemption Does Not Apply. | 40 |
|   |   | A. | The FLSA's Salary Basis Test Is Not Met Because Minor League Players Are Not Paid a Salary During All Weeks When Any Work Is Performed. | 41 |
|   |   | B. | The FLSA's Primary Duties Test Is Not Met Because Players Perform Physical Work that Is Not in a "Recognized Field of Artistic or Creative Endeavor." | 42 |
|   |   | C. | The Florida Class Is Entitled to Summary Judgment on the Creative Artist Exemption. | 44 |
|   |   | D. | The California Class Is Entitled to Summary Judgment on the Creative Artist Exemption. | 44 |
|   |   | E. | The Creative Artist Exemption Fails Under the Other States' Laws at Issue. | 46 |
|   | VI. |   | The Seasonal and Amusement Exemption Does Not Apply. | 46 |
|   |   | A. | All Places Where Minor Leaguers Are Assigned to Work Comprise a Single Establishment. | 47 |
|   |   | B. | The Exemption Must Fail Because Defendants Provided No Evidence of Relevant Receipts, and the Establishment Operates More Than Seven Months in a Year. | 51 |
|   | VII. |   | Players Are Entitled to Treble Damages Under Arizona's Minimum Wage Law and Defendants Have Willfully Violated the Law. | 53 |
|   | VIII. |   | Judgment is Warranted on Wage Statement and Recordkeeping Claims. | 54 |
|   | IX. |   | Defendants' Affirmative Defense Seeking Wage Credits Fails. | 57 |
| CONCLUSION | | | | 60 |

**Motion for Partial Summary Judgment**

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alvarez v. IBP, Inc.,*
   339 F.3d 894 (9th Cir. 2003) ............................................................................................54

*Am. Title Ins. Co. v. Lacelaw Corp.,*
   861 F.2d 224 (9th Cir. 1988) ............................................................................................12

*Antenor v. D & S Farms,*
   88 F.3d 925 (11th Cir. 1996) .......................................................................................*passim*

*Arredondo v. Delano Farms Co.,*
   922 F. Supp. 2d 1071 (E.D. Cal. 2013) ....................................................................31, 35

*Auer v. Robbins,*
   519 U.S. 452 (1997) ..........................................................................................................42

*Barfield v. NYC Health & Hosps.*
   537 F.3d 132 (2d Cir. 2008) .................................................................................20, 31, 33

*Biggs v. Wilson,*
   1 F.3d 1537 (9th Cir. 1993) .........................................................................................59, 60

*Bonnette v. Cal. Health & Welfare Agency,*
   704 F.2d 1465 (9th Cir. 1983) ....................................................................................*passim*

*Bothell v. Phase Metrics, Inc.,*
   299 F.3d 1120 (9th Cir. 2002) ..........................................................................................40

*Brennan v. Goose Creek Consolidated Independent School District,*
   519 F.2d 53 (5th Cir. 1975) .........................................................................................48, 49

*Bridewell v. Cincinnati Reds,*
   155 F.3d 828 (6th Cir. 1998) ............................................................................................52

*Bridewell v. Cincinnati Reds,*
   68 F.3d 136 (6th Cir. 1995) .........................................................................................52, 53

*Brinker Rest. Corp. v. Superior Ct.,*
   53 Cal. 4th 1004 (2012) ....................................................................................................39

*Brock v. Carrion, Ltd.,*
   332 F. Supp. 2d 1320 (E.D. Cal. 2004) ....................................................................57, 58

*Brooks v. Great Atl. & Pac. Tea Co.,*
   92 F.2d 794 (9th Cir. 1937) ..............................................................................................12

*Castaneda v. Ensign Grp., Inc.,*
    229 Cal. App. 4th 1015 (2014) .................................................................35

*Chao v. A-One Med. Servs., Inc.,*
    346 F.3d 908 (9th Cir. 2003)............................................................... 1, 19

*Charbonneau v. Mortg. Lenders of Am. L.L.C.,*
    487 F. Supp. 3d 1081 (D. Kan. 2020) .......................................................41

*Chavez v. Arancedo,*
    No. 17-20003-CIV, 2018 WL 4610567 (S.D. Fla. Sept. 24, 2018)....................58

*Cleveland v. Groceryworks.com, LLC,*
    200 F. Supp. 3d 924 (N.D. Cal. 2016).......................................................39

*Collins v. Dollar Tree Stores, Inc.,*
    788 F. Supp. 2d 1328 (N.D. Ala. 2011)......................................................48

*Craig v. Far W. Eng'g Co.,*
    265 F.2d 251 (9th Cir. 1959).................................................................41

*Cramton v. Grabbagreen Franchising LLC,*
    No. CV-17-04663-PHX-DWL, 2021 WL 2562332 (D. Ariz. June 23, 2021) ................. 57, 60

*Doe v. Butler Amusements, Inc.,*
    71 F. Supp. 3d 1125 (N.D. Cal. 2014).......................................................48

*Donovan v. New Floridian Hotel, Inc.,*
    676 F.2d 468 (11th Cir. 1982)................................................................58

*Donovan v. Williams Chem. Co.,*
    682 F.2d 185 (8th Cir. 1982).................................................................58

*Duffey v. Tender Heart Home Care Agency, LLC,*
    31 Cal. App. 5th 232 (2019)..................................................................35

*Dynamex Operations W. v. Superior Court,*
    4 Cal. 5th 903 (2018).........................................................................34

*E.E.O.C. v. Maricopa Cnty. Cmty. Coll. Dist.,*
    No. CIV. 81-1018 PHXEHC, 1982 WL 289 (D. Ariz. Apr. 8, 1982) .....................49

*Edwards v. KB Home,*
    No. 3:11-CV-240, 2015 WL 6965387 (S.D. Tex. Nov. 10, 2015) ......................41

*In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.,*
    683 F.3d 462 (3d Cir. 2012)..................................................................20

*F.T.C. v. Stefanchik,*
    559 F.3d 924 (9th Cir. 2009).................................................................11

*Flores v. City of San Gabriel*,
   824 F.3d 890 (9th Cir. 2016) .................................................................................54

*Forsberg v. Pac. Nw. Bell Tel. Co.*,
   622 F. Supp. 1150 (D. Or. 1985) ...........................................................................49

*Garcia v. Pancho Villa's of Huntington Vill., Inc.*,
   No. CV 09-486 ETB, 2011 WL 1431978 (E.D.N.Y. Apr. 14, 2011) ...................42

*Goldberg v. Whitaker House Coop., Inc.*,
   366 U.S. 28 (1961) ................................................................................................15

*Great Am. Ins. Co. v. Roadway Eng'g Works, Inc.*,
   No. 1:16-00070 WBS SKO, 2016 WL 5157651 (E.D. Cal. Sept. 21, 2016) .......12

*Guerrero v. Superior Court*,
   213 Cal. App. 4th 912 (2013) ...............................................................................35

*Hanna v. CFL Pizza, LLC*,
   No. 6:11-CV-1837-ORL-22DAB, 2012 WL 515875 (M.D. Fla. Jan. 30, 2012)...........14

*Harvey v. Dunlop*,
   No. 73-874, 1975 WL 1204 (W.D. Pa. Nov. 28, 1975) ........................................48

*Hurst v. Youngelson*,
   354 F. Supp. 3d 1362 (N.D. Ga. 2019) .................................................................42

*Kao v. Holiday*,
   12 Cal. App. 5th 947 (2017) ..............................................................34, 35, 36, 55

*Khan v. S & C Elec. Co.*,
   No. 3:11-CV-03621-JCS, 2012 WL 4062811 (N.D. Cal. Sept. 14, 2012)...........14

*Lambert v. Ackerley*,
   180 F.3d 997 (9th Cir. 1999) ........................................................................1, 19, 34

*Lemus v. Timberland Apartments, L.L.C.*,
   No. 3:10-CV-01071-PK, 2011 WL 7069078 (D. Or. Dec. 21, 2011), *report and recommendation adopted*, 2012 WL 174787 (D. Or. Jan. 20, 2012) .......................25

*Lenihan v. Boeing Co.*,
   994 F. Supp. 776 (S.D. Tex. 1998).......................................................................49

*Liebesman v. Competitor Grp., Inc.*,
   No. 4:14-CV-1653 RLW, 2015 WL 2195093 (E.D. Mo. May 11, 2015)..............48

*Marshall v. Dallas Indep. Sch. Dist.*,
   605 F.2d 191 (5th Cir. 1979) ................................................................................48

**Motion for Partial Summary Judgment**

*Marshall v. Sam Dell's Dodge Corp.*,
  451 F. Supp. 294 (N.D.N.Y. 1978) ...................................................................... 59

*Martinez v. Combs*,
  49 Cal. 4th 35 (2010), *as modified* (June 9, 2010) .................................... 34, 36

*Martinez v. Ehrenberg Fire Dist.*,
  No. CV-14-00299-PHX-DGC, 2015 WL 3604191 (D. Ariz. June 8, 2015) ...................... 14, 16, 18

*Massie v. Bd. of Trustees, Haywood Cmty. Coll.*,
  357 F. Supp. 2d 8783 (W.D.N.C. 2005) ..................................................................... 46

*Medepalli v. Maximus, Inc.*,
  No. CIV S-06-2774 FCD EF, 2008 WL 958045 (E.D. Cal. Apr. 8, 2008) .......................... 45

*Medina v. Equilon Enter., LLC*,
  68 Cal. App. 5th 868 (2021) ..................................................................................... 36

*Miranda v. Selig*,
  860 F.3d 1237 (9th Cir. 2017) ......................................................................... 13, 18

*Miranda v. Selig., et al.*,
  No. 15-16938, 2016 WL 873683 (9th Cir. Mar. 4, 2016) ................................. 13, 49

*Mitchell v. Kroger Co.*,
  248 F.2d 935 (8th Cir. 1957) ..................................................................................... 49

*Morillion v. Royal Packing Co.*,
  22 Cal.4th 575 (2000) ............................................................................................... 39

*Mudgett v. Univ. of Pittsburgh Med. Ctr.*,
  No. CIV.A.09-254, 2010 WL 1838413 (W.D. Pa. May 6, 2010) ............................ 46

*Mulhall v. Advance Sec., Inc.*,
  19 F.3d 586 (11th Cir. 1994) ............................................................................ 48, 51

*Nat'l Lacrosse League*,
  No. 2-CA-36675-1, 2005 WL 4674278 (July 5, 2005) ...................................... 21

*Nationwide Mut. Ins. Co. v. Darden*,
  503 U.S. 318 (1992) .......................................................................................... 14, 18

*Negri v. Koning & Assocs.*,
  216 Cal. App. 4th 392 (2013) ................................................................................... 44

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) .......................................................................................... 13, 14

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*,
  210 F.3d 1099 (9th Cir. 2000) ................................................................................. 11

*Nobles v. State Farm Mut. Auto. Ins. Co.*,
   No. 10-04175-CV-C-NKL, 2013 WL 12153517 (W.D. Mo. June 5, 2013) ...................................56

*North American Soccer League v. N.L.R.B.*,
   613 F.2d 1379 (5th Cir. 1980) ........................................................................................ 20, 33

*Peterson v. Snodgrass*,
   683 F. Supp. 2d 1107 (D. Or. 2010) ................................................................................46

*Reyes v. LaFarga*,
   No. CV-11-1998-PHX-SMM, 2013 WL 12098794 (D. Ariz. Nov. 20, 2013) .........................57

*Reyes v. Remington Hybrid Seed Co.*,
   495 F.3d 403 (7th Cir. 2007), *as amended* (Aug. 30, 2007) .............................................19

*Rogers v. Sav. First Mortg., LLC*,
   362 F. Supp. 2d 624 (D. Md. 2005) .................................................................................59

*Roland Elec. Co. v. Black*,
   163 F.2d 417 (4th Cir. 1947) ..........................................................................................59

*Ruiz v. Fernandez*,
   949 F. Supp. 2d 1055 (E.D. Wash. 2013) ..........................................................21, 26, 31

*Russell v. Placeware, Inc.*,
   No. CIV. 03-836-MO, 2004 WL 2359971 (D. Or. Oct. 15, 2004) .....................................47

*Rutherford Food Corp. v. McComb*,
   331 U.S. 722 (1947) ................................................................................................ 14, 15

*Salinas v. Com. Interiors, Inc.*,
   848 F.3d 125 (4th Cir. 2017) .......................................................................................... 20, 33

*Sao v. Pro-Tech Prod. Inc.*,
   No. CV-19-05261-PHX-JJT, 2019 WL 6909566 (D. Ariz. Dec. 19, 2019) ......................... 13, 16

*Senne v. Kansas City Royals Baseball Corp.*,
   934 F.3d 918 (9th Cir. 2019).....................................................................................*passim*

*Sethi v. Narod*,
   974 F. Supp. 2d 162 (E.D.N.Y. 2013) ..............................................................................46

*Sharp v. CGG Land (U.S.) Inc.*,
   840 F.3d 1211 (10th Cir. 2016) .......................................................................................58

*Shultz v. Hasam Realty Corp.*,
   316 F. Supp. 1136 (S.D. Fla. 1970) ..................................................................................49

**Motion for Partial Summary Judgment**

*Smith v. Allstate Ins. Corp.*,
   24 F. Supp. 2d 870 (N.D. Ill. 1998), *aff'd sub nom. Smith v. Allstate Ins. Co.*, 202 F.3d
   274 (7th Cir. 1999) ............................................................................................................ 48

*Solis v. Washington*,
   656 F.3d 1079 (9th Cir. 2011) .......................................................................................... 40

*Soo Line R.R. Co. v. St. Louis Sw. Ry. Co.*,
   125 F.3d 481 (7th Cir. 1997) ............................................................................................ 12

*Stone v. I.N.S.*,
   514 U.S. 386 (1995) ........................................................................................................... 2

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
   471 U.S. 290 (1985) ............................................................................................... 12, 15, 16

*Torres v. Air to Ground Servs., Inc.*,
   300 F.R.D. 386 (C.D. Cal. 2014) ............................................................................... 34, 35

*Torres-Lopez v. May*,
   111 F.3d 633 (9th Cir. 1997) .....................................................................................*passim*

*U.S. Dep't of Lab. v. Shenandoah Baptist Church*,
   707 F. Supp. 1450 (W.D. Va. 1989), *aff'd sub nom. Dole v. Shenandoah Baptist Church*,
   899 F.2d 1389 (4th Cir. 1990) .......................................................................................... 60

*U.S. Football League Players Ass'n, AFL-CIO v. U.S. Football League*,
   650 F. Supp. 12 (D. Or. 1986) .......................................................................................... 20

*Ugorji v. Cty. of Lake*,
   No. 4:20-CV-01448-YGR, 2020 WL 3639647 (N.D. Cal. July 6, 2020) ..................... 41, 44

*United States v. Darby*,
   312 U.S. 100 (1941) ......................................................................................................... 12

*United States v. Rosenwasser*,
   323 U.S. 360 (1945) ......................................................................................................... 14

*Vaquero v. Stoneledge Furniture LLC*,
   9 Cal. App. 5th 98 (2017) ................................................................................................. 60

*Walling v. Portland Terminal Co.*,
   330 U.S. 148 (1947) ............................................................................................... 15, 16, 17

*Williams v. GENEX Servs., Inc.*,
   No. CIV.A. MJG-13-1942, 2014 WL 4388360 (D. Md. Sept. 4, 2014) ........................... 46

*Wright v. Adventures Rolling Cross Country, Inc.*,
   No. C-12-0982 EMC, 2013 WL 1758815 (N.D. Cal. Apr. 24, 2013) .............................. 46

*Zachary v. ResCare Oklahoma, Inc.*,
    471 F. Supp. 2d 1175 (N.D. Okla. 2006)................................................................29

**Statutory and Regulatory Authorities**

29 C.F.R. § 516.27........................................................................................................58

29 C.F.R. § 541.2..........................................................................................................40

29 C.F.R. § 541.3.....................................................................................................43, 44

29 C.F.R. § 541.300......................................................................................................40

29 C.F.R. § 541.302(a).................................................................................................42

29 C.F.R. § 541.302(b).................................................................................................42

29 C.F.R. § 541.302(c).................................................................................................42

29 C.F.R. § 541.602(a)(1)........................................................................................1, 41

29 C.F.R. § 541.603..................................................................................................1, 41

29 C.F.R. § 778.217(b)(3)............................................................................................58

29 C.F.R. § 778.223......................................................................................................37

29 C.F.R. § 779.23........................................................................................................47

29 C.F.R. § 785.38........................................................................................................38

29 C.F.R. § 1620.9(b)...................................................................................................48

29 U.S.C. § 203(d)........................................................................................................19

29 U.S.C. § 203(e)........................................................................................................14

29 U.S.C. § 203(g)........................................................................................................14

29 U.S.C. § 213(a)(1)...................................................................................................40

29 U.S.C. § 213(a)(3)...................................................................................................47

34 Pa. Code § 231.81....................................................................................................46

34 Pa. Code § 231.84....................................................................................................46

43 Pa. Stat. § 333.103(f)...............................................................................................14

43 Pa. Stat. § 333.105(a)(9).........................................................................................47

Ariz. Admin. Code R20-5-1202. ................................................................................................57

Ariz. Admin. Code R20-5-1210 .................................................................................................56

Ariz. Admin. Code § 20-5-1206(D) ...........................................................................................60

Ariz. Rev. Stat. § 23-364(H) .............................................................................................. 54, 56

Ariz. Rev. Stat. § 23-351 ...........................................................................................................60

Ariz. Rev. Stat. § 23-362 .................................................................................................... 14, 57

Ariz. Rev. Stat. § 23-364(F) ......................................................................................................56

Ariz. Rev. Stat. § 23-364(G) .....................................................................................................54

Cal. Code Regs., Title 8, § 11000 ..............................................................................................57

IWC Wage Order 4-2001(1)(3), Cal. Code Regs., Title 8, § 11040. .........................................45

IWC Wage Order 4-2001(1)(3)(d), Cal. Code Regs., Title 8, § 11040 .....................................45

IWC Wage Order 14 (2001), Cal. Code Regs., Title 8, § 11140 ...............................................34

Cal. Lab. Code § 226(a)(2) & (a)(9) ..........................................................................................54

DLSE O.L. 2002.02.21, https://www.dir.ca.gov/dlse/opinions/2002-02-21.pdf ........................39

DOL Administrator's Interpretation No. 2016-1, *Joint employment under the Fair Labor
    Standards Ac and Migrant and Seasonal Agricultural Worker Protection Act*, Jan. 20, 2016 ......................20

DOL Field Operations Handbook § 22h04 (Jan. 19, 2021), https://www.dol.gov/
    whd/FOH/FOH_Ch22.pdf ....................................................................................................41

DOL Field Operations Handbook § 30b05(c)(3)(d) (Jan. 19, 2021),
    https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-
    30#B30b01 ..........................................................................................................................60

DOL Field Assistance Bulletin No. 2015-1,
    https://www.dol.gov/agencies/whd/field-assistance-bulletins/2015-1#_ftnref4 ....................58

Fla. Stat. § 448.110(3) .....................................................................................................14, 44, 46

Md. Code Lab. & Empl. § 3-101 ................................................................................................14

Md. Code Lab. & Empl. §§ 3-413(d)(2) .....................................................................................47

Md. Code Regs. 09.12.41.17 ......................................................................................................46

N.C. Gen. Stat. § 95-25.2(3) ......................................................................................................14

N.C. Gen. Stat. § 95-25.2(13) ...........................................................................................46

N.C. Gen. Stat. § 95-25.3(e) .............................................................................................46

N.C. Gen. Stat. § 95-25.4(a) .............................................................................................46

N.C. Gen. Stat. § 95-25.14(b)(4) ......................................................................................46

N.Y. Comp. Codes R. & Regs. § 142-2.2 .........................................................................47

N.Y. Comp. Codes R. & Regs. 142-2.14(c)(4)(iii) ...........................................................46

N.Y. Lab. Law § 651 .........................................................................................................14

Or. Admin. R. 839-020-0005 ............................................................................................46

Or. Rev. Stat. § 653.010 ....................................................................................................14

**Court Rules**

Rule 56(a) ..........................................................................................................................11

**Other Authorities**

Restatement of Employment Law § 1.04 (2015) ................................................................20

## MEMORANDUM OF POINTS AND AUTHORITIES

Seven years ago, Defendants admitted in their Answers that each of the MLB Clubs "employs and has employed certain minor league baseball players," including Plaintiffs. *See, e.g.*, ECF 68 at ¶¶ 62-91. Since then, Defendants have amended their Answers several times, but have stood by that admission. They have also continued to treat players as employees for purposes of pension, health care, and workers' compensation benefits. And they have continued to use the same uniform contract which, on its face, states that players are employed to provide services in exchange for compensation. There has never been any dispute that minor league baseball players are employees of the MLB Clubs within the meaning of wage-and-hour laws, and on that question the players are entitled to judgment as a matter of law.

Nor is there any genuine dispute that MLB jointly employs minor league players. Wage laws, with their intent to have the broadest concept of "employ" ever conceived, have long recognized that more than one entity can employ a worker at once. Such "joint" employment exists when employers are not "completely disassociated" from one another. *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 918 (9th Cir. 2003). "Where an individual exercises 'control over the nature and structure of the employment relationship,' or 'economic control' over the relationship, that individual is an employer within the meaning of the Act, and is subject to liability." *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1999). There is no genuine dispute that MLB exercises control over the employment relationship. MLB performs pre-employment evaluations and screenings (like age verifications and drug testing); requires the use of a uniform contract that it drafted; reviews and co-signs each player's contract; sets salaries for first-year players and salary floors for other players; only allows salaries to be paid during the season; disciplines players who do not abide by a plethora of MLB employment policies; runs the players' pension plan and oversees other employment benefits; and maintains player employment files.

Defendants' other defenses likewise fail as a matter of law. Defendants have attempted to raise a "creative artist" exemption under the FLSA and seven states' laws (not Arizona). But to meet that exemption, a company must pay the workers their "full salary for *any week* in which the employee performs *any work* without regard to the number of days or hours worked." 29 C.F.R. § 541.602(a)(1)

(emphases added). Per the uniform contract, players are *not* paid during spring training and other training season periods, even though they are contractually required to work (and in fact do work) during those periods. *See Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 943 (9th Cir. 2019) ("[T]he team schedules will serve to conclusively demonstrate that the players spent time working for which they were uncompensated."). That inescapable, undisputed fact has long doomed this defense.

Defendants' other main defense, the "seasonal and amusement" exemption, fares no better. It is not available under Arizona or California law. For the FLSA and the six states that do recognize the defense, there are two ways to meet the exemption: a receipts test and a seasonal test. Defendants have not produced any receipts related to the relevant establishment where players work, so they cannot avail themselves of that part of the defense. And the relevant "establishment" operates far longer than the seven-month threshold set by the seasonality test.

The lack of any on-point defense explains why, during the pendency of this litigation, Defendants lobbied Congress for a new exemption from the FLSA specifically for minor league baseball players. Misleadingly dubbed the "Save America's Pastime Act" ("SAP Act"), it was enacted on March 23, 2018, and while it is not retroactive, it admittedly applies to *federal* FLSA claims accruing *after* that date. But it has no effect on any state laws at issue, as discussed in a separate Motion for Partial Judgment on the Pleadings (filed concurrently). By passing the SAP Act, Congress recognized that players are "employees," and that the "creative artist" and "seasonal and amusement" exemptions do not apply to minor leaguers—otherwise there would have been no reason for Congress to enact the SAP in the first place. *See Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").

Resolving Defendants' defenses inexorably resolves other questions as well, including the wage statement and recordkeeping claims. There "is no dispute that Defendants have not kept the records of the activities that Plaintiffs contend are 'work'." ECF 682 at 52. Defendants have never kept track of hours worked or hourly rates or other mandated items, and Plaintiffs are entitled to summary judgment for penalties owed under California and Arizona law.

1   The Court should also find that Defendants' violations of Arizona law are "willful," which

2   lengthens the statute of limitations under Arizona law from two to three years. Defendants have never

3   had *any* defenses available under Arizona law, where half of the training complexes are located and

4   where every year thousands of players work for weeks and often months without pay. That this

5   antiquated practice runs afoul of Arizona's wage law has long been obvious, and it is difficult to

6   imagine a more willful violation.

7   Now is the time to grant judgment as a matter of law for these issues. Liability is certain, and

8   the only questions for the jury should be how many hours the players worked and what Defendants

9   owe for systemic violations of law that must finally come to an end.

10   ## STATEMENT OF FACTS

11   ### I. THE MAJOR LEAGUE RULES AND UNIFORM PLAYER CONTRACT GOVERN THE EMPLOYMENT OF MINOR LEAGUE PLAYERS.

12   MLB and the MLB Clubs are bound together by the MLB Constitution.[1] That founding

13   document created the "unincorporated association also doing business as Major League Baseball"

14   ("MLB"), with its members being "the Major League Baseball Clubs." Ex. 1: MLB002003, Art. II § 1.

15   The MLB Constitution anointed the Commissioner as the "Chief Executive Officer" of baseball and

16   gave the Commissioner far-reaching powers, including "executive responsibility for labor relations"

17   (*id.* at Art. II § 2), the power to investigate and punish those working in the industry (*id.* at Art. II §§ 2-

18   3), and the power to issue regulations and bulletins relating to "games, ballparks, uniforms and other

19   matters" that are "binding on the Major League Clubs" (*id.* at Art. XI § 3).

20   Pursuant to the MLB Constitution, internal regulations promulgated by MLB called the Major

21   League Rules govern the industry, including the minor leagues. *See* Ex. 2: MLB001663.[2] Defendants'

22   "minor league system is governed by the Major League Rules (MLRs), which dictate the terms of

23   _____

24   [1] *See* Broshuis Declaration in Support of Motion for Partial Summary Judgment, Ex. 1: MLB002003.

25   Unless otherwise noted, all exhibits are attached to the Broshuis Declaration.

26   [2] Plaintiffs frequently cite to the MLRs and to the Uniform Player Contract ("UPC"), which is found within the MLRs at Attachment 3. To avoid repeated citations to the exhibit containing the MLRs and

27   the UPC (Ex. 2: MLB001663), this Motion will instead just indicate the relevant Major League Rule or UPC paragraph being referenced.

28

1    employment and compensation for both minor and major league players." *Senne*, 934 F.3d at 923; *see*

2    *also* Ex. 3: Rockies Tr. at 128-29 (MLB issues, interprets, and enforces the MLRs), Ex. 4: Giants Tr. at

3    83-84 (MLB creates the MLRs). The MLRs specify the players eligible to sign minor league contracts

4    (MLR 3) and the number of players a Club may have under contract at any time (MLR 2(b) & 2(c)).

5    The MLRs allow MLB Clubs to assign players to minor league affiliates during the season, but those

6    players remain under contract with the MLB Club—not the minor league affiliate. *See* MLR 56(g)

7    (forbidding minor league affiliates from interfering with minor leaguers' contracts); *see also* MLR

8    Attachment 3, UPC ¶ XVIII.E ("Club may freely direct Player to perform services for any Major

9    League or Minor League Club."). In practice, "MLB and its thirty franchise teams rely heavily on this

10    extensive minor league system, which has nearly 200 affiliates across the country and employs

11    approximately 6,000 minor league players." *Senne*, 934 F.3d at 923.

12        The MLRs specify how MLB and its Clubs contract with these 6,000 players. For amateur

13    players from the United States and Canada, this occurs through a draft governed by MLR 4 (the "Rule

14    4 draft"). MLB conducts the draft annually, and MLB must set a date for the draft by August 31 of

15    the prior year. *See* MLR 4(b). The Commissioner "shall preside over all selections" during the draft

16    and "shall resolve all procedural questions," including "all questions regarding eligibility." *Id.*

17        In the lead-up to the Rule 4 draft, ███████████████████████████████████

18    ███████████████████████████████████████████████████████████████

19    ████████████████████████████████████████████████████

20    ███████████████████████████████████████████████████████

21    ████████████████████████████████████████████████

22    ██████████████████████████████████████████████████████████

23    ████████████████████████████████████████████████████████████

24    ███████████████████████████████████ Ex. 8: Krasik Tr. at 32-36.

25    Once selected by an MLB Club, a player cannot bargain with any other Club because MLB's rules

26    grant the drafting Club exclusive rights to the player. MLR 4(e).

27

28

1       Amateur players outside the United States or Canada are not subject to the Rule 4 draft. MLR

2   3(a) allows MLB Clubs to sign these players as early as age sixteen. ███████████████████

3   ████████████████████████████████████████████████████████████

4   ███████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   ██████████████████████████████████████████████████████████████

7   ███████████████████████ *Id.* at 17089, 17129-30. A player who submits false information "shall

8   be placed on the Disqualified List for a period of one year," and only the Commissioner may reduce

9   the "mandatory sanctions." MLR 3(a)(1)(F).

10       "Under the MLRs, all minor league players are required to sign a seven-year Uniform Player

11   Contract (UPC). Ostensibly, players are required to sign the UPC for 'morale' and 'to produce the

12   similarity of conditions necessary for keen competition.'" *Senne*, 934 F.3d at 923. ████████████

13   ████████████████████ (Ex. 10: Vuch Tr. at 196) and is embedded within the MLRs, found at

14   Attachment 3. *See* Ex. 2: MLB001663, MLR Attachment 3. The UPC's boilerplate language has not

15   changed in any material way during the course of this litigation.

16       MLB centrally administers many of the functions of professional baseball through a software

17   platform created and run by MLB called the Electronic Baseball Information System ("eBIS").[3] ████

18   ███████████████████████████████ Ex. 11: Rangers Tr. at 158-60. Only the

19   Commissioner may modify the UPC: "no clause shall be added or eliminated without the specific

20   written approval of the Commissioner" (UPC ¶ XXVI), otherwise the contract "shall be declared null

21   and void" and the violator "shall be subject to penalties" by MLB. MLR 3(f); *see also* Ex. 12:

22   CHC0000088 ("Verbal" side agreements "are strictly prohibited" and "will subject the Club and any

23   employee involved to severe penalties."). Both the MLB Club and the player sign the UPC, which

24

25   [3] *See* eBIS, *available at* https://www.mlb.com/prospect-development-pipeline/ebis2 (last visited Oct.
26   29, 2021) ("MLB's electronic Baseball Information System is a web-based program facilitating many
     functions of baseball operations for the 30 Major League Clubs and the Office of the Commissioner.
27   The system serves as the core method through which Clubs carry out transactions and processes that
     include scouting and management of the MLB Amateur Draft.").

28

1  must then be submitted to MLB within 24 hours. Ex. 13: MLB000039 at 0041, 2015 MLB Memo.

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ███████████████████ Ex. 13: MLB000039 at 0041.

5  MLB's UPC has a section entitled the "Duration and Conditions of Employment." UPC ¶ VI.

The UPC "obligates Player[s] to perform professional services on a calendar year basis, regardless of the fact that salary payments are to be made only during the actual championship playing season." It describes its scope as setting "the terms and conditions of employment during all periods in which Player is employed by Club as a Minor League Player." Players are paid by the MLB franchise affiliated with the minor league team for which they play. Under the UPC, first-year players are paid a fixed salary of $1,100 per month during the regular ("championship") season that runs from April through September. In addition to their salaries during the championship season, some players receive signing or performance-related bonuses and college scholarships.

*Senne*, 934 F.3d at 923; *see also* MLR 3(c) (specifying that MLB sets first-year salaries and setting forth the permissible bonuses). The UPC dictates how and when the salary will be provided: only during the season and "in two (2) semi-monthly installments on the 15th day and last day of the month after the beginning of Club's championship playing season." UPC ¶ VII.B. The UPC prohibits players from working for any other baseball organization in the world without permission (¶ XVI), forbids players from playing other sports recreationally (¶ XVI), requires a physical examination (¶ XVII), grants the use of the minor leaguer's likeness (¶ XIV), and allows a Club to sell, trade, or release the minor leaguer at will (¶¶ XVIII, XIX). MLB can "suspend" the contract, "including the payment of compensation to Player," during emergencies or a suspension of play. UPC ¶ XXIII.

Because MLB sets the salary for all first-year players (MLR 3(c)(2); Ex. 15: MLB003901), it will

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████

28

NO. 3:14-cv-00608-JCS
**Motion for Partial Summary Judgment**

1    █████████████████████████████████████████████████████████████████

2    ████████████████ and sets the incentive bonuses paid upon advancement to upper levels of the

3    minor leagues (MLR 3(c)).

4         In addition to receiving wages during at least part of the year, players receive employee benefits.

5    █████████████████████████████████████████████████████████████

6    █████████████████████████████████████████████████████████████████

7    ███████████████████████████████████████████████████████

8    ██████████████████████████████████████████████████████████████

9    █████████████████████████████████████████████████████████████████

10    ███████████████████████████████████████████ Ex. 4: Giants Tr. at 16-17, 24-

11    25; Ex. 19: Yankees Tr. at 19-20; Ex. 29: MLB003340 (guide for the scholarship plan).

12         Because MLB sponsors the minor league pension plan, it maintains pension records and sends

13    notices and memos to players about the plan. Ex. 30: MLBKAHA0000005; Ex. 31:

14    MLBODLE0000493; Ex. 32: MLBODLE0000020. As one notice letter sent to players regarding the

15    pension stated, "*employers* are required to notify" plan participants about certain steps in the process.

16    Ex. 31: MLBODLE0000493 (emphasis added). That notice letter sent by the "employers" to the

17    players came from MLB. *Id.*; *see also* Ex. 32: MLBODLE0000020.[6]

18    **II. THE WORK THAT MINOR LEAGUE PLAYERS PERFORM THROUGHOUT THE YEAR.**

19         While the UPC only allows salaries to be paid during the season, it dictates that players must

20    "perform professional services" throughout the "calendar year." UPC ¶ VI.B. That time period

21    includes the "training season" and "instructional, post-season training or winter league games." *Id.*

22

23    ―――――――――――――――――

   [4] *See also* Ex. 17: Dodgers Tr. at 238; Ex. 19: Yankees Tr. at 201-03; Ex. 20: Blue Jays Tr. at 225-26.

24    [5] *See also* Ex. 20: Blue Jays Tr. at 47-48 (████████████████████████████████████

25    MLB); Ex. 3: Rockies Tr. at 75-77; Ex. 4: Giants Tr. at 10-11; Ex. 17: Dodgers Tr. at 199-200, 203;
   Ex. 27: Pirates Tr. at 181-85; Ex. 28: Cubs Tr. at 53-57 (same).

26    [6] This notice came on MLB's letterhead from Rich Hunt, who is employed by MLB as Director of

27    Retirement Services and who testified as a Rule 30(b)(6) witness for MLB. Mr. ████████████
   ███████████████████████████████████ Ex. 18: MLB Tr. at 210-12.

28



1   Pursuant to this provision, Defendants "conduct spring training in Arizona and Florida" each year,

2   where "every MLB franchise operates a minor league training complex." *Senne*, 934 F.3d at 923.

3   "Spring training lasts approximately four weeks, until the championship season begins in April." *Id.*

4   "[T]eams typically have scheduled activities in the morning prior to playing games in the afternoon."

5   *Id.* "Virtually all players are unpaid during spring training." *Id.*

6        "[I]n early April, some players are assigned to minor league affiliates, and begin playing games in

7   the championship season," which "begin[s] in April and end[s] in September." *Id.* at 924. The MLB

8   Club decides which minor leaguers to send to which affiliates, which MLB oversees to ensure the

9   Club complies with MLB roster rules. MLR 56(g)(3). The MLB Club hires the coaches and trainers

10  for the affiliate. MLR 56(g)(4) and (F). The minor league team does not make any decisions regarding

11  the players; its main responsibility is to provide uniforms and the stadium. *See* MLR 56. The MLRs

12  dictate the minor league playing schedule[7] and establish mandatory guidelines for minor league travel

13  itineraries.[8] The MLRs limit the number of players that an MLB Club may assign to each affiliate,

14  ████████████████████. Ex. 13: MLB000039 at 0041, 2015 MLB Memo.

15       Some players are not initially assigned to minor league affiliates when spring training ends. They

16  instead remain "at the Arizona or Florida facilities for 'extended spring training.'" *Senne*, 934 F.3d at

17  924.████████████████████████████████

18  ██████████████████████████ Ex. 5: MLB0008914 at 8933.

19       "After the championship season ends in September, some players participate in the

20  'instructional leagues'" from "mid-September to mid-October." *Senne*, 934 F.3d at 924. "[T]he UPC

21  strongly implies that participation is required." *Id.*; *see* UPC ¶ VI.B (stating that players must perform

22  services during "training" and "instructional" seasons). "Activities and schedules…are similar to

23  spring training. And just as with spring training, players are virtually never paid for participation in the

24  instructional league." *Senne*, 934 F.3d at 924.

25  ───────────────

26  [7] *See* MLR 32(b) ("[T]he schedule of each Minor League and Minor League Club shall comply with the
    standards set forth in [the MLR].").

27  [8] *See* MLR 57.

28



[9] Defendants produced thousands of itineraries showing the work routines performed by players.

> For example, a team spring training schedule for one of the San Francisco Giants' affiliates describes that at 6:30 AM, there was an "Early Van for Treatment and Early Work"; at 7:00 AM, the "Regular Van" departed; at 7:45 AM, the "Early Work" began; and then between 9:00 AM and 11:00 AM, the team would perform activities such as "Stretch," "Throwing Program," and "Batting Practice." Lunch was to be at 11:00 AM, before a 12:10 PM bus to a neighboring city for a 1:00 PM away game.

*Senne*, 934 F.3d at 923-24.

Even after instructional leagues end, some minor leaguers continue working with the MLB Clubs' trainers and strength coaches at the training sites throughout the remainder of the year, and the MLB Clubs often conduct winter strength and conditioning camps that players attend.[10]

A vast number of employment policies govern the players' activities—both on- and off-field.

---

[9] *See also* Ex. 35: Scales Tr. at 147-50; Ex. 36: Owen Tr. at 29; Ex. 37: Bavasi Tr. at 111-16; Ex. 38: Harper Tr. at 41-45; Ex. 39: Sharp Tr. at 110-18; Ex. 10: Vuch Tr. at 67-72.

[10] Ex. 35: Scales Tr. at 283-88 (                                          ); Ex. 40: McCracken Tr. at 48-50 (same); Ex. 41: Davis Tr. at 66-70, 75-77, 233-37 (same); Ex. 42: Rantz Tr. at 206-07 (

).

1  ████████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ████████████████████████████████████████████████

5  ████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ████████████████████████████████████████████

9  ████████████████████████████████████████████████

10 █████████████████████████████████████████████

11 █████████████████ Ex. 14: Seymour Tr. at 161-62; Ex. 18: MLB Tr. at 301-09.

12 **III. MLB RECENTLY TOOK COMPLETE CONTROL OF THE MINOR LEAGUES.**

13     Historically,█████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ██████████████████████████

22   ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 █████████████████████████████████████████████

28



1 ███████████████████████████████████████████████████████

2 ████████

3      The PBA expired after the 2020 season. Since then, MLB has decided to bypass the entity

4 known as Minor League Baseball and to instead deal directly with the owners of the minor league

5 affiliates. As a 2021 press release from MLB states, the "120 Minor League Clubs offered an invitation

6 to become Professional Development League ('PDL') license holders have officially agreed to

7 accept."[11] The MLB Commissioner said that in "unveil[ing] this new model" and "modernizing our

8 Minor League system," MLB "strengthen[ed] how we develop professional athletes on and off the

9 field." *Id.* The press release went on to say that it "ensur[ed] a new set of standards in terms of

10 facilities and player working conditions," including "[p]layer salary increases" and "[i]mproved

11 amenities and working conditions for players and staff." *Id.*

12      Despite this statement, the minor league players have continued to work without pay for weeks

13 and months this year, pursuant to the same UPC and the same dehumanizing industry practices that

14 show no regard for basic wage-and-hour laws. As one current player recently testified, "many of my

15 teammates live in poverty throughout the entire year" and "have struggled to be able to eat even

16 enough to sustain their body." Ex. 64: Sedlock Tr. at 317-18.

17                                    **ARGUMENT**

18      Summary judgment is appropriate when "the movant shows that there is no genuine dispute as

19 to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The

20 moving party must either negate "an essential element of the nonmoving party's claim or defense or

21 show that the nonmoving party does not have enough evidence of an essential element to carry its

22 ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d

23 1099, 1102 (9th Cir. 2000). "Once the moving party meets its initial burden, …the burden shifts to the

24

25

26 _____

27 [11] Ex. 63, *available at* https://www.mlb.com/press-release/press-release-mlb-announces-new-modernized-player-development-system-and-the-120 (last visited Oct. 29, 2021).

28

1  non-moving party to set forth…specific facts showing that there is a genuine issue for trial." *F.T.C. v.*
2  *Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009).

3          Wage-and-hour laws should be construed liberally to accomplish their purposes. *Tony & Susan*
4  *Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985). Indeed, the FLSA represents a
5  "comprehensive legislative scheme" meant to prevent working conditions "detrimental to the
6  maintenance of the minimum standards of living necessary for health and general well-being." *United*
7  *States v. Darby*, 312 U.S. 100, 109 (1941).

8  **I.   MINOR LEAGUE BASEBALL PLAYERS ARE EMPLOYEES.**

9          **A.  Defendants Admitted in Pleadings that Minor League Players Are "Employees."**

10          The first issue in a wage-and-hour case is whether the plaintiffs are employees. This is beyond
11  dispute here: Defendants admitted when answering the complaint that minor league players are
12  employees. *E.g.*, ECF 886 at ¶¶ 73, 150, 582. "[A]dmissions in the pleadings are generally binding on
13  the parties and the Court." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988); *see also*
14  *Brooks v. Great Atl. & Pac. Tea Co.*, 92 F.2d 794, 796 (9th Cir. 1937) ("[A]dmissions in the answer have
15  the force of evidence…."). Being "judicial admissions," they "have the effect of withdrawing a fact
16  from issue and dispensing wholly with the need for proof of the fact." *Am. Title Ins. Co.*, 861 F.2d at
17  226. "Parties cannot later 'controvert these previously admitted facts,' including at summary
18  judgment." *Great Am. Ins. Co. v. Roadway Eng'g Works, Inc.*, No. 1:16-00070 WBS SKO, 2016 WL
19  5157651, at *4 (E.D. Cal. Sept. 21, 2016) (quoting *Yamaha Corp. of Am. v. ABC Int'l Traders, Corp.*, 703
20  F. Supp. 1398, 1402 (C.D. Cal. 1988)). "[J]udicial efficiency demands that a party not be allowed to
21  controvert what it has already unequivocally told a court by the most formal and considered means
22  possible." *Soo Line R.R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997).

23          In their Answers, Defendants have "admit[ted]" that each MLB Club "employs and has
24  employed certain minor league baseball players," including Plaintiffs. *See, e.g.*, ECF 886 at ¶ 73. They
25  have further admitted that "minor league baseball players may agree to be employed pursuant to a
26  minor league contract, which they must agree to and execute." *See, e.g.*, ECF 886 at ¶ 150. And they
27  "admit that certain Defendant Clubs employed and continue to employ minor league baseball players

28

1    in each of the states and during the relevant time periods referenced." *See, e.g.*, ECF 886 at ¶ 582. In

2    affirmative defenses, the Defendant Clubs only claimed that they were not "joint employers" of *other*

3    Clubs' minor leaguers—not that players were not "employees" at all. *See, e.g.*, ECF 886 at 84.

4        Defendants are bound by these admissions, and based on those admissions, Plaintiffs are

5    entitled to summary judgment that they are "employees" under all laws at issue. *Sao v. Pro-Tech Prod.*

6    *Inc.*, No. CV-19-05261-PHX-JJT, 2019 WL 6909566, at *3 (D. Ariz. Dec. 19, 2019) (judgment granted

7    to plaintiff where defendant admitted in pleadings that worker was "employee" even though company

8    later argued the worker was a "trainee").

9        **B.  Defendants Are Estopped from Arguing Otherwise Because They Successfully
           Argued to the Ninth Circuit that Minor League Players Are Their Employees.**

10       Just a few years ago, Defendants took the position before the Ninth Circuit in another case that

11   MLB Clubs "employ[] a number of Minor League players for player-development purposes" and that

12   the "employment agreement is established by filling in terms in a Uniform Player Contract."

13   Answering Brief, *Miranda v. Selig., et al.*, No. 15-16938, 2016 WL 873683 (9th Cir. Mar. 4, 2016), at *5.

14   They then argued that this meant the players were exempt from antitrust laws: "the Curt Flood Act

15   left baseball's antitrust exemption intact for the rest of the business of baseball, including

16   'employment…at the minor league level.'" *Id.* at *20. The answering brief was submitted on behalf of

17   "Major League Baseball and the Clubs," who were all parties to the lawsuit. *See id.* at cover page.

18       The Ninth Circuit adopted Defendants' position. "[I]t is undeniably true that minor league

19   baseball—particularly the employment of minor league baseball players and the requirement that they

20   sign a uniform contract containing a reserve clause—falls squarely within baseball's exemption from

21   federal antitrust laws." *Miranda v. Selig*, 860 F.3d 1237, 1242 (9th Cir. 2017). "Minor league baseball

22   players are employed and paid by MLB…. Therefore, the employment of minor league players is

23   precisely the type of activity that falls within the antitrust exemption for the business of baseball." *Id.*

24       All the elements of judicial estoppel are present here. *See New Hampshire v. Maine*, 532 U.S. 742,

25   750 (2001) (listing factors). Defendants' current position is inconsistent with their prior one that was

26   relied upon and adopted by the Ninth Circuit. Plaintiffs have had to litigate this case to their

27   detriment for years, seeking to establish that the players are employees, all while Defendants have

28

                                              13
                              **Motion for Partial Summary Judgment**

refused to comply with basic wage-and-hour laws. "Having convinced [a] Court to accept one interpretation," Defendants cannot urge this Court to adopt another "without undermining the integrity of the judicial process." *New Hampshire*, 532 U.S. at 755. Defendants are estopped from arguing that minor league players are not employees who are employed by them. *See Khan v. S & C Elec. Co.*, No. 3:11-CV-03621-JCS, 2012 WL 4062811, at *10 (N.D. Cal. Sept. 14, 2012) (party estopped from taking position in disability case that was contrary to position taken in ERISA case).

### C.  In Any Event, Minor League Baseball Players Are "Employees" Under Wage Laws.

Even if Defendants had not already admitted that players are "employees," plaintiffs are still entitled to summary judgment on the issue. With the exception of California (which has a broader concept of "employment," as discussed below), all relevant states define employment similar to the FLSA.[12] If players are employees under the FLSA, they are employees under all relevant laws.

An "employee" is "any individual employed by an employer." 29 U.S.C. § 203(e). To employ a person means to "suffer or permit to work." 29 U.S.C. § 203(g). Because this definition "derives from the child labor statutes," *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947), Congress intended "the broadest definition [of employ] that has ever been included in any one act." *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945). The definition goes beyond the common-law notions of the employer-employee relationship, "requir[ing] its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category.'" *Rutherford*, 331 U.S. at 728. Thus, the "striking breadth" of the definition "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).

---

[12] *See* Fla. Stat. § 448.110(3); Ariz. Rev. Stat. § 23-362 ("'Employ' includes to suffer or permit to work."); N.C. Gen. Stat. § 95-25.2(3) (to "suffer or permit to work"); N.Y. Lab. Law § 651 (employee is anyone "employed or permitted to work"); 43 Pa. Stat. Ann. § 333.103(f) (to "suffer or permit to work"); Md. Code Lab. & Empl. § 3-101 ("Employ means to engage an individual to work" and includes "allowing an individual to work"); Or. Rev. Stat. § 653.010 (to "suffer or permit to work"); *see also Martinez v. Ehrenberg Fire Dist.*, No. CV-14-00299-PHX-DGC, 2015 WL 3604191, at *2 (D. Ariz. June 8, 2015) (Arizona law "looks to the standards of the FLSA to determine whether an individual is an employee"); *Hanna v. CFL Pizza, LLC*, No. 6:11-CV-1837-ORL-22DAB, 2012 WL 515875, at *3 (M.D. Fla. Jan. 30, 2012) (same for Florida law).

### 1. The Court Already Held that the Test for Trainees "Does Not Apply."

Despite this broad concept of "employ," and despite already admitting that players are employees, Defendants argued at class certification that minor leaguers are instead "trainees." The Court reached the merits of this question and ruled against Defendants. After five briefs on the issue during class certification,[13] the Court held: "Because the question of whether Plaintiffs have met the predominance requirement depends, in part, on which test is applied, it is appropriate for the Court to reach the merits as to this issue. The Court concludes that the primary beneficiary test announced in *Walling* does not apply under the circumstances here." ECF 687 at 73.

The Court then discussed the caselaw and reiterated its rejection of Defendants' position.

> [I]t cannot be denied that minor leaguer players expect to receive—and do in fact receive—compensation in return for playing baseball for the Clubs…. These are not unpaid interns, students who were receiving clinical training in connection with licensing requirements, or amateur athletes participating in a long tradition in which no compensation had ever been paid or expected. Rather, like the workers in *Alamo*, these Plaintiffs expected to receive compensation.

ECF 687 at 77-78.

Instead, the standard "economic reality" test for employment applies here. *Id.* at 73; *see also Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961). Under this test, whether an employer-employee relationship exists depends "upon the circumstances of the whole activity"—not on "isolated factors." *Rutherford Food*, 331 U.S. at 730. As the Court previously recognized, "the economic reality of the minor league players' relationship with Defendants depends in large part on the common features of the draft system instituted by MLB and the Clubs, as well as the uniform contract signed by all players and the MLB rules to which they are subject." ECF 687 at 78. These and other facts undoubtedly establish that the players are "employees" under the Act.

### 2. Minor League Players Are Employed Pursuant To An Employment Contract.

There is no dispute that minor league players perform services in exchange for compensation as dictated by an employment contract. The pay provided to players may be terrible, but players still

---

[13] *See* ECF 495 at 21-23; ECF 613 at 28-31; ECF 628 at 16-19; ECF 639 at 2-5; ECF 640 at 6-7.

1    depend on Defendants for the compensation, health care, and other employee benefits that they make

2    best efforts to use to meet some of their basic needs. Nor does it make any difference that minor

3    leaguers perform entry-level positions. The Supreme Court has concluded that "[w]ithout doubt the

4    [FLSA] covers trainees, beginners, apprentices, or learners if they are employed to work for an

5    employer for compensation." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 151 (1947). Thus, if a

6    company "expressly or impliedly agree[s] to pay" a worker compensation, then the worker is a

7    covered employee and the company "must pay them the prescribed" wages. *Id.* at 152.

8         Years later, the Supreme Court made that point even clearer in *Tony & Susan Alamo Foundation v.*

9    *Secretary of Labor*, 471 U.S. 290 (1985). There, a nonprofit foundation claimed that its "volunteer"

10   workers were outside the reach of the FLSA. *Id.* at 299-303. Even though the workers disavowed any

11   expectation of compensation for their work—and did not in fact receive money for their work—they

12   received "food, clothing, shelter, and other benefits." *Id.* at 292. This was enough for them to qualify

13   as employees: the workers "must have expected to receive in-kind benefits—and expected them in

14   exchange for their services"—so they were employees *Id.* at 302.

15        Under *Alamo Foundation*, the "test is whether the individual works either expressly or impliedly

16   'in contemplation of compensation.'" *Martinez v. Ehrenberg Fire Dist.*, No. CV–14–00299–PHX–DGC,

17   2015 WL 3604191, at *2 (D. Ariz. June 8, 2015). And when workers receive employment benefits like

18   health insurance, fill out employment forms, and "receive[] agreed-upon compensation for their

19   work," they are employees entitled to summary judgment. *Id.* at *3, *7 ("volunteer" firefighters held to

20   be employees on summary judgment); *see Sao*, 2019 WL 6909566, at *3 (plaintiff worked for

21   compensation and so was an employee, not trainee).

22        That is the case here. As the Ninth Circuit noted: "The minor league system is governed by the

23   Major League Rules (MLRs), which dictate the terms of employment and compensation for both

24   minor and major league players." *Senne*, 934 F.3d at 923; *see also* UPC ¶ IV (the UPC sets "forth the

25   terms and conditions of the Player's *employment* during periods in which Players are *employed*"

26   (emphases added)). Per the UPC, compensation is provided in exchange for services: "[f]or the

27   performance of all the skilled services by Player…, Club will pay Player." UPC ¶ VII. Addendum C to

28

**Motion for Partial Summary Judgment**

1   the UPC sets forth the amount to be paid; if a player works at more than one minor league level

2   during a pay period, the salary will be "prorated in accordance with the number of days of Player's

3   employment" at each level. *See* UPC Addendum C. Under the "Durations and Conditions of

4   Employment," the UPC states that the "Club hereby *employs* Player to render…skilled services as a

5   Minor League Player in seven (7) separate championship playing seasons." UPC ¶ VI.A. This "term of

6   employment shall extend until Player" has worked the requisite amount of seasons. *Id.*

7        During that time period, the UPC limits the minor leaguer's ability to earn other compensation

8   by prohibiting them from working for any other baseball organization in the world without

9   permission. UPC ¶ XVI. It forbids players from playing other sports (¶ XVI), requires a physical

10  examination (¶ XVII), grants the use of the minor leaguer's likeness to the Club (¶ XIV), and allows

11  the Club to sell or trade the minor leaguer without his permission (¶ XVIII). Players can also be

12  suspended or fined for violating a plethora of disciplinary policies, including drug-testing, tobacco,

13  on-field behavior, and social media policies. *See infra* Part II.A.2. It is difficult to imagine a greater level

14  of control in an employment relationship.

15       That the UPC requires players to work without pay outside the season does not mean that

16  players are only employees during certain times of the year. As the Court has already held: "The case

17  law (including *Walling*) does not suggest that such a narrow focus is permissible." ECF 687 at 78. The

18  UPC makes clear that the employment relationship lasts throughout the year; it "obligates Player to

19  perform professional services on a calendar year basis, regardless of the fact that salary payments are

20  to be made only during the actual championship playing season." UPC ¶ VI.B. Accordingly, the salary

21  is for "considerations in addition to" the services provided during the season, and the UPC's

22  obligations remain in force "throughout the calendar year," including "training" and "instructional"

23  seasons. *Id.* Even during the periods when players are not being paid, the players remain under

24  Defendants' control, and the ███████████████████████████████████

25  ███████████████████████ Ex. 19: Yankees Tr. at 14-15; Ex. 21: Athletics 5/17/16 Tr. at

26  28-30; Ex. 27: Pirates Tr. at 195-97; Ex. 65: NYY0000105 at 109.

27

28

1    The employment relationship is further evidenced by the fact that Defendants treat minor

2  leaguers as "employees" for all other purposes, including for health care benefits (ECF 643-02), for

3  tax purposes (Ex. 66: MLBODLE0000004), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 18: MLB Tr. at

4  90-91), and for pension purposes (Ex. 31: MLBODLE0000493). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  the import of the distinction runs the other way. When it comes to the

8  concept of employment, the FLSA "goes beyond its ERISA counterpart." *Nationwide Mut. Ins. Co. v.*

9  *Darden*, 503 U.S. 318, 326 (1992).

10    The economic reality is undisputable. Minor league players perform services in exchange for

11  compensation pursuant to a long-term, written employment contract. They rely on Defendants for

12  employment benefits. They work when told to do so. They can be suspended or fined. They can be

13  sold or traded. They are indisputably employees as a matter of law under all laws at issue. *See Martinez*,

14  2015 WL 3604191, at *2 (granting summary judgment to "volunteer" firefighters).

15  **II.   MLB AND ITS CLUBS JOINTLY EMPLOY MINOR LEAGUE PLAYERS.**

16    Because there is no genuine issue of material fact that the players are employees under the wage

17  laws, the next issue is determining who employs them. That too is beyond dispute: MLB and the MLB

18  Clubs are the joint employers of minor leaguers. The Ninth Circuit has already recognized as much.

19  *See Senne*, 934 F.3d at 923 ("MLB and its thirty franchise teams…employ[] approximately 6,000 minor

20  league players"); *Miranda v. Selig*, 860 F.3d 1237, 1242 (9th Cir. 2017) ("Minor league baseball players

21  are employed and paid by MLB."). For all the reasons discussed above, the MLB Clubs' employment

22  of minor leaguers has never been in doubt, *see supra* Part I, and the Court should grant summary

23  judgment on this issue.[14]

24

25

26  ──────────────

27  [14] As one of the San Francisco Giants' designees testified about minor leaguers in the organization:
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 4: Giants Tr. at 12-13.

28

1    The players are likewise entitled to summary judgment that MLB jointly employs them

2  alongside the MLB Clubs. *See Torres-Lopez v. May*, 111 F.3d 633, 641 (9th Cir. 1997) (holding that "a

3  worker may be employed by more than one entity at the same time"). Documents drafted by MLB

4  show that it considers itself to be an "employer" of players. *See* Ex. 31: MLBODLE0000493; Ex. 32:

5  MLBODLE0000020 (notice from MLB to all "employees" in MLB's "Minor League Players Pension

6  Plan" and using MLB's "Employer Identification Number"). And the relevant factors for the joint

7  employment analysis support this finding.

8    An employer is any person acting directly or indirectly in the interest of an employer in relation

9  to an employee. 29 U.S.C. § 203(d). Courts have long recognized that a worker may be employed by

10  two or more employers at the same time, such as when two entities "are not completely disassociated"

11  from each other with respect to the worker. *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 918 (9th Cir.

12  2003) (quoting 29 C.F.R. § 791.2(a), pre-2020 version). "[T]he concept of joint employment should be

13  defined expansively." *Torres-Lopez v. May*, 111 F.3d 633, 639 (9th Cir. 1997). When two possible

14  entities are involved, the issue is not whether an employee "is *more* dependent" on one company than

15  the other, *id.* at 641, "with the winner avoiding responsibility as an employer," *Antenor v. D & S Farms*,

16  88 F.3d 925, 932 (11th Cir. 1996). Instead, the focus is on the "economic reality of the particular

17  relationship between the [worker] and the alleged joint employer." *Torres-Lopez*, 111 F.3d at 641.

18  "Where an individual exercises 'control over the nature and structure of the employment relationship,'

19  or 'economic control' over the relationship, that individual is an employer within the meaning of the

20  Act, and is subject to liability." *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1999).

21    Some factors to consider include whether the alleged employer "(1) had the power to hire and

22  fire the employees, (2) supervised and controlled employee work schedules or conditions of

23  employment, (3) determined the rate and method of payment, and (4) maintained employment

24  records." *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983). These factors

25  are not "etched in stone," *Bonnette*, 704 F.2d at 1470, and the analysis is not a matter of tallying—a

26  "score of 5 to 3 decides a baseball game, but this regulation does not work that way." *Reyes v.*

27  *Remington Hybrid Seed Co.*, 495 F.3d 403, 407 (7th Cir. 2007), *as amended* (Aug. 30, 2007); *see also Antenor*

28

*v. D & S Farms*, 88 F.3d 925, 933 (11th Cir. 1996) ("[A] joint employment relationship is not determined by a mathematical formula. … The purpose of weighing the factors is not to place each in either [worker's or company's] column, but to view them qualitatively to assess the evidence of economic dependence."). The four *Bonnette* factors are "sufficient to establish" joint employment, but not every factor is necessary. *Barfield v. NYC Health & Hosps.* 537 F.3d 132, 143 (2d Cir. 2008).[15]

### A. Professional Sports Leagues Are Generally Joint Employers of Players Under Employment Laws, and the *Bonnette* Factors Confirm that MLB Is an Employer.

Because of the control that sports leagues exert over their players, courts and agencies have viewed them as joint employers under labor and employment laws. *See* Restatement of Employment Law § 1.04 (2015) (illustration 8 of section on joint employment states: "Each player in the league is an employee of one of the six teams and of the [sports league]."). That has long been the case in labor law, which courts have looked to for guidance on the issue of joint employment under wage laws. *See In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 683 F.3d 462, 468 (3d Cir. 2012) (calling labor law the "starting point" for the joint employment analysis). Indeed, the National Labor Relations Act "defines employment more narrowly than the FLSA," *Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 145 (4th Cir. 2017), so a finding of joint employment in labor law is highly instructive.

The Fifth Circuit decided this issue in the labor context four decades ago in *North American Soccer League v. N.L.R.B.*, 613 F.2d 1379 (5th Cir. 1980). Like here, the soccer league in that case presided over a player draft, required standard contracts that had to be approved by the league, and had the shared ability to discipline players. *Id.* at 1382. Under these facts, the court held that the league was a joint employer because it had a "significant degree of control over essential aspects" of the relationship, including "the terms of individual player contracts, dispute resolution and player discipline." *Id.*; *see also U.S. Football League Players Ass'n, AFL-CIO v. U.S. Football League*, 650 F. Supp. 12, 15 (D. Or. 1986) ("[T]he Board determined that the League and member clubs are joint employers, finding that the League exercises a significant degree of authority over the labor relations

---

[15] *See also* DOL Administrator's Interpretation No. 2016-1, *Joint employment under the Fair Labor Standards Ac and Migrant and Seasonal Agricultural Worker Protection Act*, Jan. 20, 2016.

1  of the clubs."); *Nat'l Lacrosse League*, No. 2-CA-36675-1, 2005 WL 4674278, at *4 (July 5, 2005) ("We

2  note that the teams share control over essential terms and conditions of employment of the players

3  and thus are joint employers with the NLL.").

4      Outside of sports, courts have reached the same conclusion under analogous circumstances.

5  For example, in *Ruiz v. Fernandez*, 949 F. Supp. 2d 1055 (E.D. Wash. 2013), the court entered

6  summary judgment in favor of the plaintiffs based on essentially the same facts at issue here. Plaintiffs

7  were sheepherders who sued Western Range Association, a "membership organization made up of

8  approximately 200 sheep ranches." *Id.* at 1059. Looking at the Ninth Circuit's *Bonnette* factors, the

9  court found that Western Range exerted control over hiring by acting "as the gatekeeper" by helping

10  recruit sheepherders, providing pre-employment information, and requiring uniform employment

11  agreements. *Id.* at 1066-67. Western Range argued that it had not actually terminated any

12  sheepherders, but "Western Range ha[d] the *power*" to fire, *id.* at 1067, so this factor weighed "heavily

13  in support" of joint employment. *Id.* Moreover, Western Range had influence over the conditions of

14  employment by requiring a uniform employment agreement. *Id.* at 1068. Western Range argued that it

15  did not pay the sheepherders and did not set the rates of pay, but the court found that Western Range

16  had "some involvement" because it assured that ranches paid at least the minimum required wage rate

17  set by the DOL. *Id.* at 1069. Western Range also provided health insurance through a "group

18  insurance plan." *Id.* And it kept a variety of records on the sheepherders, including employment

19  contracts, records of transfers between ranches, and records of complaints. *Id.* at 1069-70. The court

20  granted summary judgment to the sheepherders, finding that Western Range jointly employed them

21  alongside the individual sheep ranches for whom they worked. *Id.* at 1071.

22      In *Torres-Lopez*, the Ninth Circuit likewise held as a matter of law that farmworkers were jointly

23  employed by both a labor contractor and a cucumber farm. 111 F.3d at 644. The district court had

24  granted summary judgment to the cucumber farm on the issue because there was "no evidence" the

25  farm "had the right to hire or fire" the workers, or to determine their hours, direct which rows to

26  pick, or otherwise oversee their work, *id.* at 642, and the labor contractor (not the farm) paid the

27  workers and set the rate of pay, *id.* at 643. The Ninth Circuit reversed. While the farm did not control

28

the daily schedule or oversee all the activities of the workers, the farm "controlled the overall harvest schedule" and "had the power to decide which days were suitable for harvesting; for example, it called off the harvest one day because of a shortage of bins." *Id.* at 642. The farm also had the "right to inspect" the work. *Id.* And while the farm did not pay the workers, it had "some power in determining the pay rates" by negotiating the percentage of revenue paid to the labor contractor. *Id.* at 643. The district court "did not adequately consider" that evidence, *id.* at 642, which, along with other evidence particular to farmworkers, led the Ninth Circuit to "conclude as a matter of law that Bear Creek Farms was a joint employer of the farmworkers." *Id.* at 644; *accord Antenor*, 88 F.3d at 938 (reversing summary judgment granted to farm and holding as a matter of law that farm was joint employer).

The same result is called for here. As the Court previously recognized:

> Plaintiffs will look to the UPC and MLRs to show that MLB controls the amateur draft system and other aspects of hiring and firing, that MLB establishes policies that affect the conditions of employment, including drug and tobacco policies and social media policies, that MLB sets the rate of pay for first year minor leaguers and sets salary guidelines for non-first-year players, as well as dictating when salaries are paid, and that it maintains extensive employee records including roster moves and contracts.

ECF 687 at 79. These facts and others establish that MLB jointly employs minor league players as a matter of law.

### 1. The first *Bonnette* factor: MLB exerts control over hiring and firing.

MLB's power over players is pervasive and plenary. That power begins when players are still amateurs, as MLB controls the entryway into the profession. An arm of MLB called the Major League Scouting Bureau—its network of scouts—identifies and evaluates amateur players.[16] The Bureau:



---

[16] Ex. 8: Krasik Tr. at 59-60; Ex. 37: Bavasi Tr. at 156-57, 167 ███████████████████████████
████████████████████████████████████████████████████.

1

2

Ex. 5: MLB0008914 at 8922.[17]

3

4     Through a ████████████████████████████████

████████████████████████████████████████████

5     ████████████████████████████████████████

6     ████████████████████████████████████████

7     ████████████████████████████████████████████

8     ████████████████████████████████████████████

9     ████████████████████████████████████████

10    ████████████████████████████████████████

11    ████████████████████████████████████████████

12    ████████████████████████████████████████████

13    ████████████████████████████████████

14    ████████████████████████████  Ex. 8: Krasik Tr. at 36-37.

15    For players not subject to the Rule 4 draft (i.e., amateur players not from the U.S. or Canada),

16    MLB's control goes even further. ████████████████████████

17    ████████████████████████████████████████

18    ████████████████████████████████████████

19    ████████████████████████████████████████████

20    ████████████████████████████████████████

21    ██████████████████████████████████████

22    ████████████████████████████████████████████

23    ████████████████████████████████████████

24    ████████████████████████████████████████

25    _____

26    [17] *See also* Ex. 67: MLBSMIT0000448 ████████████████

27    ████████████████████████████████████████████ .

28

1     ████████████████████████████████████ *See, e.g.,* Ex.

2     19: Yankees Tr. at 187-88.

3        After screening players for potential employment, ██████████████████

4     ██████████████ [19] While each individual MLB Club selects particular players for employment,

5     MLB has its hands on everything. ████████████████████████████

6     ████████████████████████████████████████████

7     ██████████████████████████████████

8     ████████████████████████████████████████

9     █████████████████████████████████████████

10    █████████████████████████████████████████

11    ██████████████████████████████████████████

12    ██████████████████████████████████████

13    ████████████████████████████████████████

14    █████████████████████████████████████████

15    █████████████████████████████████████████

16    ████████████████████████████████████████████

17    ██████████████████████████████████████

18    █████████████████████████████████████████

19    ████████████████

20        These powers are not just theoretical. ████████████████████

21    ████████████████████████████████████████

22    ████████████████████████████████████████

23    ██████████████████████████████████████

24    ████████████████████████████████████████

25    ————————————————

26    [18] *See also* Ex. 68: Royals Tr. at 288-90 ████████████████████

27    ██████████████████████ ).

      [19] Ex. 3: Rockies Tr. at 128-29 (████████████████████████ ).

28



1 ████████████████████████████████████████████████

2 ████████████████████████ This was entirely up to MLB, not any individual MLB Club.

3       Regarding the ability to fire, MLB and the MLB Clubs again share this power. The MLB Club

4 can release players at-will. *See* UPC ¶ XIX. MLB can likewise fire players by banning them from the

5 industry for a variety of reasons. For anything the Commissioner deems "not to be in the best

6 interests of Baseball," the penalty can be "permanent ineligibility of a player" or whatever the

7 "Commissioner may deem appropriate." Ex. 1: MLB002003, MLB Constitution § 3. A player will also

8 be "declared permanently ineligible" for "misconduct in playing baseball" or for providing gifts to an

9 umpire. MLR 21. And repeat violations of MLB's drug program ████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████ *Id.* at 3223. *See Lemus v. Timberland Apartments, L.L.C.,*

13 No. 3:10-CV-01071-PK, 2011 WL 7069078, at *19 (D. Or. Dec. 21, 2011), *report and recommendation*

14 *adopted,* 2012 WL 174787 (D. Or. Jan. 20, 2012) (summary judgment granted when alleged joint

15 employer had limited ability to fire workers for tobacco use).

16       MLB further controls the ████████████████████████████

17 ████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ████████); Ex. 72: MLB003352. One class representative, Matt Lawson, decided to retire in June

20 2011 due to having difficulties paying bills. Ex. 73: Lawson Tr. at 97. He decided to return to

21 professional baseball in October 2011 after his wife obtained a job and some lingering injuries had

22 healed. *Id.* at 98-99. MLB, however, made him wait until March 2012 to un-retire. *Id.* at 99. "Major

23 League Baseball did not want to set a precedent for players coming out of retirement. … In my

24 understanding, there were certain requirements asked of me that I would have to agree upon to come

25 back." *Id.* at 100. One of these was that Mr. Lawson would not break camp at the end of spring

26 training, but would instead be required to remain in extended spring training. *Id.*

27

28

MLB exerts control over the hiring of players (by identifying and screening prospects, collecting documents, administering the draft, and approving UPCs), the termination of players (through MLB's ability to terminate players for violating policies or anything not in the "best interest of baseball"), and the re-hiring of retired players. While Defendants may argue that the MLB Clubs ultimately choose which players to employ, that is not determinative on this factor. *See Torres-Lopez*, 111 F.3d at 644 (farm held to be joint employer even though it did not directly hire or fire the workers); *Antenor*, 88 F.3d at 935 (farm did not hire workers but had "veto" power over hiring). Even more so than the farms in those cases or the sheep farm association in *Ruiz*, MLB indisputably acts as the "gatekeeper" to the industry, and that fact strongly supports entry of summary judgment regarding joint employment. *See Ruiz*, 949 F. Supp. 2d at 1065-67.

### 2. The second *Bonnette* factor: MLB's control over schedules and conditions of employment.

MLB's control over the conditions of employment begins with the UPC that MLB requires all players to sign. *See Ruiz*, 949 F. Supp. at 1068-69 (standard contracts setting terms of employment showed that association "exercised considerable control over Plaintiffs' conditions of employment even though they did not supervise Plaintiffs' day-to-day activities"). A section aptly entitled "Duration and Conditions of Employment" specifies when services are to be performed ("on a calendar year basis") and when wages are to be paid ("only during the actual championship playing season"). *See* UPC ¶ VI.B. The same section dictates the length of the employment (seven seasons) (¶ VI.A), requires compliance with "all decisions of the Commissioner" (¶ VI.C), and specifies that compliance with MLB's tobacco policy "is a material term" of the contract (¶ VI.E). For the latter, MLB sends its agents into minor league stadiums and clubhouses to search for tobacco products, and ejections or fines of up to $2,500 can result from violations. Ex. 54: MLB002671; Ex. 74: MLB0007486; Ex. 14: Seymour Tr. at 108-10, 115-22; Ex. 19: Yankees Tr. at 143-46.

MLB regulates far more than tobacco use, however, as a player must abide by a host of additional MLB policies to remain employed as a minor leaguer. ███████████████████ ██████████████████████████████. Ex. 18: MLB Tr. at 296-99. MLB conducts random testing during the season to gather both urine and blood samples. Ex. 52: MLB003208, 2015 Drug

**Motion for Partial Summary Judgment**

1   Program. Even during the winter, players must alert MLB's drug agents to their whereabouts at all

2   times. *Id.* at 3216-17. If players are selected for testing and cannot be reached, ████████████

3   ██████████████████████████████████████████████ Ex. 53: MIA00649 at 659-60. The

4   suspensions can last up to a lifetime ban. Ex. 52: MLB003208 at 3222. MLB sends interpretations of

5   the policy to all players and asks them to contact MLB with any questions. Ex. 75: MLB003310, 2015

6   Diamino Memo. ████████████████████████████████████████████████

7   ████████████████████████████ Ex. 76: CWS0000194.

8       Each year ████████████████████████████████████████ Ex. 14:

9   Seymour Tr. at 122-23; *see* Ex. 49: MLB0007488, 2016 On-Field Behavior Policy. Players must also

10  comply with MLB's social media policy (Ex. 55: MLB002655), ████████████████████

11  ████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████ Ex. 58:

14  MLBSENN0000323, Ex. 8: Krasik Tr. at 137-38 (bats); Ex. 59: ARI0011305, Ex. 8: Krasik Tr. at 128-

15  30 (baseballs); Ex. 60: TOR0010583, Ex. 61: MIN0003625 (helmets).[20] Further, MLB has concussion

16  rules that do not allow a concussed player to return to work until cleared by MLB's medical director

17  (Ex. 13: MLB000039 at 0042-43; Ex. 77: Chattin Tr. at 235-37), and rules for clubhouse and playing

18  surface standards. *See* MLR Attachment 58; Ex. 14: Seymour Tr. at 88-89 ████████████████

19  ████████████████████████████████████████████ ).

20      As for scheduling, it is jointly controlled by MLB and the Clubs. The MLB Clubs may have

21  greater responsibility for overseeing a player's activities on a given day, but they do so within the

22  confines of MLB's rules. MLB controls when and how many games can be scheduled. *See* MLR 32.

23  MLB's ████████████████████████████████████████████████████████

24  ████████████████████████████████████████ . *See* Ex. 50: ARI0035184, 2014 Minor League

25  ────────────────────────

26  [20] *Cf.* Ex. 3: Rockies Tr. at 245-51 (████████████████████████████████████████

27  ████████████████████ ); Ex. 19: Yankees Tr. at 143-48 (same); Ex. 68: Royals Tr. at
    213-224 (same).

28

1  Pre-Game Work Memo; Ex. 51: MLB0007485, 2016 Memo; Ex. 14: Seymour Tr. at 138-41. MLB

2  ████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████ Ex. 37:

7  Bavasi Tr. at 220-21; Ex. 41: Davis Tr. at 107-09, 250-52; Ex. 78: Angels Tr. at 154-55.

8     MLB's control over the conditions of employment continues even *after* a player is released from

9  his UPC. One Plaintiff, Bryan Henry, was released in October 2012, yet MLB still contacted him and

10  subjected him to a drug test after his release. Ex. 79: Henry Tr. at 128. He tested positive for a

11  stimulant "equivalent to caffeine" that happened to be in a "basic pre-workout" drink that he had

12  bought at GNC. *Id.* at 135-36. He received a letter from MLB, informing him he was suspended even

13  though he had already been released. *Id.* at 126. His representatives unsuccessfully appealed the

14  suspension to MLB. Ex. 80: MLBHENRB0000117. Sometime later, two MLB teams expressed

15  interest in re-signing Mr. Henry, but upon learning of his suspension, they withdrew interest. Ex. 79:

16  Henry Tr. at 132-33. MLB's suspension effectively ended Mr. Henry's professional baseball career.

17     The plenary nature of MLB's power was exhibited during the pandemic. In March 2020, ████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████

23  ████████  The point is not that minor league baseball was suspended during the pandemic—that is

24  a sensible approach that hopefully would have taken place even if MLB did not have the express

25  power to do so. The point is that MLB itself had the power to suspend the Minor Leagues

26  indefinitely, pursuant to the UPC, and exercised it. *See Torres-Lopez,* 111 F.3d at 642 (farm exercised

27  control by canceling one day of the harvest).

28

**Motion for Partial Summary Judgment**

1   With that type of power, it is no wonder that sports leagues have long been treated as joint

2   employers under labor laws. MLB's tentacles reach nearly every aspect of the employment of minor

3   leaguers. One of Defendant's witnesses summed it up like this: ████████████████████

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ██████████████ These facts strongly favor summary judgment as to joint employment. *See Zachary v.*

8   *ResCare Oklahoma, Inc.*, 471 F. Supp. 2d 1175, 1181 (N.D. Okla. 2006) (granting summary judgment in

9   large part because "the testimony before the Court indicates that ResCare executives were actively

10  involved in setting and implementing policies that governed Plaintiffs' employment").

11        **3. The third *Bonnette* factor: MLB's control over the rate and method of pay.**

12  MLB's pay policies are at the forefront of this case. ████████████████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████ Ex. 8: Krasik Tr. at 103. And per MLB's UPC, players must work

17  throughout the year, including during "training" and "instructional" seasons, even though players may

18  only be paid during the season. UPC ¶ VI.B. ████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████ That same UPC dictates how and when the salary

22

23  _____

24  [21] *See also* Ex. 20: Blue Jays Tr. at 115-16 ████████████████████████

25  ████████████████████████████████████████████████████████

26  ████████████████████████████████████████ ; Ex. 3: Ex. 4: Giants Tr. at 100;

27  Ex. 7: Mariners Tr. at 282; Ex. 17: Dodgers Tr. at 241, 266; Ex. 27: Pirates Tr. at 89; Ex. 68: Royals
    Tr. at 309.

28

1  will be provided: "in two (2) semi-monthly installments on the 15th day and last day of the month

2  after the beginning of Club's championship playing season." UPC ¶ VII.B.

3      Beyond the first-year, MLB Clubs have some flexibility to set in-season salaries, but they ███

4  ██████████████████████████████████. Ex. 15: MLB003901; Ex. 16:

5  Broadway Tr. at 88-89; Ex. 17: Dodgers Tr. at 244-47. ████████████████

6  ████████████████████████████████████████████

7  ████████████████████████████████████

8  ████████████████████████████████████

9  ████████████████████████████████████████

10 █████████████████████ In doing so, MLB did not

11 change the policies at the heart of this case: the requirement that players work for weeks and months

12 every year without pay, and that they never receive overtime no matter how many hours they work.

13 And even with the change, most players still make less than $15,000 per year. But the unilateral salary

14 increase, however meager and insufficient, shows that when MLB desires to change player pay

15 practices, it has the power to do so—and has done so.

16      MLB's power extends beyond just the payment of salaries. ██████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████████

19 ████████████████████████████████████████

20 ████████████████████████████████████████████

21 ████████████████████████████████████

22 ████████████████████████████

23 ████████████████ Ex. 22: MLB0007431 at 7433; Ex. 23: Mets Tr. at 9-14; *cf. Antenor*, 88

24 F.3d at 936 (farm did not directly pay workers but did provide workers' compensation insurance).

25 ████████████████████████████████████████

26 ████████████████████████████████████████

27 ████████████████████████████████

28

1  ██████████████████████████████████████████████████████████

2  █████████ ██████████████████████████████████████ Ex. 4: Giants Tr. at 16-17, 24-

3  25; Ex. 19: Yankees Tr. at 19-20; Ex. 29: MLB003340.

4       Defendants may argue that the MLB Clubs actually pay player salaries instead of MLB, but

5  courts have rejected similar arguments. The economic reality of the employment relationship controls

6  the joint employment analysis, not which entity cuts the checks. *See Barfield*, 537 F.3d at 144 (summary

7  judgment affirmed even though another entity paid the wages to the workers); *Torres-Lopez*, 111 F.3d

8  at 643 (farm was a joint employer even though labor contractor paid wages because farm had "some

9  power" over determining pay rates). That is especially true when an entity such as MLB sets the

10  salaries for some players, sets the salary floors for all other players, and controls when and how wages

11  are paid. *See Ruiz*, 949 F. Supp. 2d at 1069 (even though Western Range did not pay wages, it ensured

12  ranches complied with wage laws and provided health insurance); *Arredondo v. Delano Farms Co.*, 922 F.

13  Supp. 2d 1071, 1085-86 (E.D. Cal. 2013) (contractor had some influence over wages of workers and

14  contracts were consistent with the industry). These facts strongly supports a finding of joint

15  employment as a matter of law.

16       **4. The fourth *Bonnette* factor: MLB maintains extensive employment records.**

17       MLB's recordkeeping begins when players are still amateurs. ████████████████

18  ██████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████████

20  ██████████████████████████████████████████████████████████

21  ██████ ████████████████████████████████████████████████████

22  ██████████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████████

24  _____

25  [22] *See also* Ex. 3: Rockies Tr. at 75-77; Ex. 4: Giants Tr. at 10-11; Ex. 17: Dodgers Tr. at 199-200, 203;

26  Ex. 27: Pirates Tr. at 181-85; Ex. 28: Cubs Tr. at 53-57.

27  [23] *See also* Ex. 8: Krasik Tr. at 59-60; Ex. 18: MLB Tr. at 378-79; Ex. 67: MLBSMIT0000448 (email

from MLB Scouting Bureau employee).

28

**Motion for Partial Summary Judgment**



10   Ex. 8: Krasik Tr. at 165-67.

17   The
18   recordkeeping continues even after the player's employment ends. Because MLB sponsors the minor
19   league pension plan, it maintains pension records and sends notices and memos to players about the
20   plan. Ex. 30: MLBKAHA0000005; Ex. 31: MLBODLE0000493; Ex. 32: MLBODLE0000020.

**5. Other factors show that MLB jointly employs players.**

Although not strictly part of the four *Bonnette* factors, the Professional Baseball Agreement that
MLB negotiates provides further support for a finding of joint employment.

**Motion for Partial Summary Judgment**

1 ██████████████████████████████████████████████████████████

2 ████████████████████████████████ Ex. 62: MLB002634 at 2642.

3      The PBA expired after the 2020 season, and MLB decided to not negotiate another PBA with

4 the entity representing minor league owners. It took everything in-house, renaming and restructuring

5 minor leagues, and offering invitations directly to minor league owners to take part in the re-

6 structuring. In a press release, MLB said that the changes "ensur[ed] a new set of standards in terms

7 of facilities and player working conditions," including "[p]layer salary increases" and "[i]mproved

8 amenities and working conditions for players and staff." MLB's own press release touts its ability to

9 alter what it calls "player working conditions" and to provide "salary increases" to players.[24] In terms

10 of the factors that determine joint employment, MLB speaks for itself.

11                   *             *             *             *             *             *

12      While not all four *Bonnette* factors need to be met for a company to be deemed a joint employer,

13 MLB meets all four of them. MLB may argue that the Clubs exert more control than MLB under

14 certain *Bonnette* factors, but the issue is not whether an employee "is *more* dependent" on one company

15 than the other. *See Torres-Lopez*, 111 F.3d at 641 (reversing summary judgment in a farm's favor and

16 holding as a matter of law that the farm was a joint employer even though a labor contractor exerted

17 more control); *Antenor*, 88 F.3d at 938 (same); *Barfield*, 537 F.3d at 144 (affirming summary judgment

18 even though it was undisputed that another entity was also an employer). What *is* important is the

19 level of control that MLB exerts over players. Unlike some cases that have found joint employment

20 lacking, like certain franchisee/franchisor cases, MLB exerts extensive control—if not omnipotent

21 control—over nearly every aspect of players' employment relationship, and sometimes their lives.

22      That is why for over four decades professional sports leagues have been deemed joint

23 employers under labor law. *See N. Am. Soccer League*, 613 F.2d at 1382. The same should be true under

24 the FLSA, with its broader view of "employment" than labor law. *Salinas*, 848 F.3d at 145; *see also*

25

26 ─────────────────────

27 [24] Ex. 63, *available at* https://www.mlb.com/press-release/press-release-mlb-announces-new-modernized-player-development-system-and-the-120.

28

1   *Torres-Lopez*, 111 F.3d at 639 (joint employment analysis should be viewed "expansively"). MLB's

2   control is ubiquitous and intentional—to, as the MLR describes the purpose of the UPC, "produce

3   the similarity of conditions necessary for keen competition." MLR 3(b). "Where an individual

4   exercises control over the nature and structure of the employment relationship, or economic control

5   over the relationship, that individual is an employer within the meaning of the Act, and is subject to

6   liability." *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1999). There is no genuine dispute that

7   MLB is a joint employer under all wage laws at issue, and Plaintiffs are entitled to summary judgment.

8   **III.   MINOR LEAGUERS ARE "EMPLOYEES" AND ARE JOINTLY "EMPLOYED" BY MLB AND
        THE MLB CLUBS UNDER CALIFORNIA'S WAGE LAWS.**

9
10      All states at issue except California generally follow the FLSA's concept of "employ." The main

    difference between the FLSA and California law on the issue is "that the California wage orders are

11  intended to provide broader protection than that accorded workers under the federal standard."

12  *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 956 (2018); *see also Torres v. Air to Ground Servs.,*

13  *Inc.*, 300 F.R.D. 386, 394 (C.D. Cal. 2014) (California "afford[s] greater protection to employees than

14  the FLSA's definition of that term."). The Industrial Welfare Commission ("IWC"), the California

15  agency that issues wage-and-hour regulations, defines "employer" as a person who "employs or

16  exercises control over the wages, hours, or working conditions of any person." *Martinez v. Combs*, 49

17  Cal. 4th 35, 59 (2010), *as modified* (June 9, 2010) (quoting Wage Order No. 14 (Cal. Code Regs., tit. 8, §

18  11140, subd. 2(F)). "[P]hrased as it is in the alternative (i.e., 'wages, hours, *or* working conditions'),

19  the…definition has the obvious utility of reaching situations in which multiple entities control

20  different aspects of the employment relationship." *Id*.

21      [U]nder California law, once a plaintiff comes forward with evidence that he provided
22      services for an employer, the employee has established a prima facie case that the
        relationship was one of employer/employee. … Once the employee establishes a
23      prima facie case, the burden shifts to the employer, which may prove, if it can, that the
        presumed employee was an independent contractor" (*Narayan v. EGL, Inc.* (9th Cir.
24      2010) 616 F.3d 895, 900) or, in this case, a non-employee trainee.

25  *Kao v. Holiday*, 12 Cal. App. 5th 947, 956-57 (2017). Minor league players undoubtedly perform

26  services for Defendants, so they are presumptive employees and Defendants bear the burden of

27

28

1    proving otherwise. "No such proof exists here; all evidence points to an employer-employee

2    relationship." *Kao*, 12 Cal. App. at 957.

3        California's Supreme Court has announced three ways of "'employ[ing]' someone: '[1] to

4    exercise control over the wages, hours or working conditions, or [2] to suffer or permit to work, or [3]

5    to engage, thereby creating a common law employment relationship.'" *Torres*, 300 F.R.D. at 395

6    (quoting *Martinez*, 49 Cal. 4th at 64). "The definitions are sufficiently broad to encompass a proprietor

7    who employs a worker by contract, permits work by acquiescence, or suffers work to be performed by

8    a failure to hinder." *Kao*, 12 Cal. App. 5th at 956.

9        **A.  Defendants Jointly Control Wages, Hours, or Working Conditions.**

10       The first method—control over wages, hours, or working conditions—itself uses a disjunctive

11   test. Thus, control over "any one of the three aspects—wages, hours, or working conditions—is

12   sufficient to impute employer liability under California wage and hour law." *Torres*, 300 F.R.D. at 395;

13   *Duffey v. Tender Heart Home Care Agency, LLC*, 31 Cal. App. 5th 232, 254 (2019) ("control over any one

14   of the three creates an employment relationship"). MLB sets first-year salaries, sets minimum salaries

15   for subsequent seasons, and dictates (through the UPC) when wages will be paid. *See supra* Part II.A.3.

16   The MLB Club then pays the salaries. *Id.* This alone is sufficient to find that MLB and its Clubs jointly

17   employ minor leaguers. *Arredondo v. Delano Farms Co.*, 922 F. Supp. 2d 1071, 1088 (E.D. Cal. 2013)

18   ("'control over wages' means that a person or entity has the power or authority to negotiate and set an

19   employee's rate of pay, and not that a person or entity is physically involved in the preparation of an

20   employee's paycheck"). And Defendants jointly control the hours worked and working conditions. *See*

21   *supra* Part II.A.2.

22       While any of the three criteria is sufficient, MLB and its Clubs meet all three. *See Guerrero v.*

23   *Superior Court*, 213 Cal. App. 4th 912, 950 (2013) (even though it did not "directly hire, fire or

24   supervise" workers, government body employed worker by exercising control over eligibility);

25   *Castaneda v. Ensign Grp., Inc.*, 229 Cal. App. 4th 1015, 1023 (2014) (parent company was an employer

26   because it exerted influence over policies, benefits, and discipline).

27

28

**B. Defendants Jointly Suffer or Permit Minor Leaguers to Work.**

The second formulation—whether Defendants suffer or permit minor leaguers to work—is also satisfied for both MLB and its Clubs. An employment relationship will be found when a defendant "knows that persons are working" and "suffers or permits that work by failing to prevent it, while having the power to do so." *Martinez*, 49 Cal. 4th at 69. There can be no doubt that the MLB teams meet this standard given their level of oversight over the work players perform. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ *See supra* Parts II.A.2, 4. And if it desires, MLB can (and has) prevented work from occurring: in 2020, it suspended players' contracts and canceled the entire season—including for the California League. *See Medina v. Equilon Enter., LLC*, 68 Cal. App. 5th 868, 876 (2021) (Shell "could have stopped plaintiff from working in their stations through a variety of means").

**C. Defendants Have "Engaged" the Minor Leaguers by Signing Them to a Traditional Employment Contract and Treating Them as Employees.**

The third method of "employ"—to "engage" someone—is also satisfied. To "engage'" means "to create a common law employment relationship." *Martinez*, 49 Cal. 4th at 64. This "encompass[es] a proprietor who employs a worker by contract." *Kao*, 12 Cal. App. 5th at 956. That is what happens here. MLB has drafted an employment contract that calls for services to be performed in exchange for the payment of money. MLB, the MLB Club, and the player all sign it. Thus, both MLB and the MLB Clubs are employers. Finally, Defendants treat players as employees for all other purposes: for preserving their antitrust exemption, for health care, for ERISA, for workers' compensation, and for taxes. *See supra* Part I. So players are also "employees" at common law.

**IV. MINOR LEAGUE PLAYERS PERFORM "WORK" UNDER ALL WAGE LAWS AT ISSUE.**

**A. Players "Work" During Training Seasons Under Florida and Arizona Law.**

Having established that minor league players are employees, the next issue is whether they perform any "work." For the training seasons—"periods during which virtually all players are completely unpaid for their participation"—there is no doubt that players perform at least some

1   "work." The UPC requires players to "perform professional services on a calendar year basis" (UPC ¶

2   VI.B), and the obligations "continue in full force and effect" during "*Club's training season*, Club's

3   exhibition games, *Club's instructional*, post-season training or winter league games." *Id.* (emphases

4   added). This led the Ninth Circuit to conclude that "the UPC strongly indicates that [spring training]

5   is mandatory" and "strongly implies that participation [in instructional leagues] is required." *Senne*, 934

6   F.3d at 923-24; *see also* Ex. 77: Chattin Tr. at 99 ███████████████████████████████

7   ████████████████████████████████████████████████████████████████ Ex. 92:

8   Liberto Tr. at 240 ("Q: Was spring training mandatory? A: Yes."); Ex. 93: Pahuta Tr. at 150 ("Q:

9   [W]as spring training required? A: Oh, yeah.").

10       Ultimately, however, whether training seasons are required or not is immaterial, because under

11   the broad definition of "work," the test is simply whether the employee is "suffered or permitted" to

12   work. *See Senne*, 934 F.3d at 943 (citing Ariz. Rev. Stat. § 23-362; Ariz. Admin. Code § R20-5-1202(19)

13   ("'Hours worked' means all hours for which an employee covered under the Act is employed and

14   required to give to the employer, including all time during which an employee is on duty or at a

15   prescribed work place and all time the employee is suffered or permitted to work.")); 29 C.F.R. §

16   778.223 ("As a general rule the term 'hours worked' will include: (1) All time during which an

17   employee is required to be on duty or to be on the employer's premises or at a prescribed workplace

18   and (2) all time during which an employee is suffered or permitted to work whether or not he is

19   required to do so."). There is no genuine dispute that players were permitted to work during training

20   seasons. As the Ninth Circuit held, during the training seasons "the team schedules will serve to

21   conclusively demonstrate that the players spent time working for which they were uncompensated."

22   *Senne*, 934 F.3d at 942-43.

23       Defendants ████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████████

25   █████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████████

27

28

**See id.** at ¶¶ 107-18 & pp. 195-96. As one Plaintiff testified: "I was scheduled to be at spring training from X date to X date, and that was my job to be there. I wasn't on my own time. I was on their time to be there." Ex. 98: Dott Tr. at 222-23. Moreover, "under our contract, we are not on our own time to be at spring training or extended spring training or instructs, and…it would make sense that we should be compensated for it." *Id.* at 224; *see also* Ex. 99: SFG0028633

There is no dispute that players perform supervised activities for Defendants during training seasons, and thus no genuine dispute that players perform at least some "work" during these seasons.

**B. Travel Time in the Arizona, Florida, and California Classes Is Compensable Work.**

For the Arizona and Florida Classes, there can be no dispute that travel time to away games is compensable. That's because during the training seasons, the travel takes place after the workday has already begun. *See* 29 C.F.R. § 785.38 ("Time spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked."). When playing away games during training seasons,

---

[25] *See, e.g.*, ECF 553-7 & 555-1 (examples of itineraries); *see also* Ex. 19: Yankees Tr. at 238 ("

.

[26] *See, e.g.*, Ex. 7: Mariners Tr. at 374; Ex. 35: Scales Tr. at 204; Ex. 96: Brewers Tr. at 197; Ex. 97: Marlins Tr. at 124.

1  ████████████████████████████████████████████████████████████

2  ████████████████████████████████████████████████ This travel

3  from one job site to another and back is all part of the continuous workday.

4      The travel time during the California Class is likewise compensable. In *Morillion v. Royal Packing*

5  *Co.*, 22 Cal.4th 575, 586-88 (2000), the court held that employees who were required to meet at a

6  designated site and then travel together to the worksite had to be paid for that travel time. "The

7  *Morillion* court explained, the 'level of the employer's control over its employees, rather than the mere

8  fact that the employer requires the employees' activity, is determinative of whether time is on duty.'"

9  *Cleveland v. Groceryworks.com, LLC*, 200 F. Supp. 3d 924, 951 (N.D. Cal. 2016) (Spero, J.). Unlike in a

10  normal commute situation, where employees are free to "decide when to leave, which route to take to

11  work, and which mode of transportation to use…[and] may be able to run errands before work and to

12  leave from work early for personal appointments," the "employers thereby subject those employees to

13  its control by determining when, where, and how they are to travel." *Morillion*, 22 Cal. 4th at 586-88.

14      It makes no difference whether the trip is a single-day trip or an overnight one for multiple days

15  of work. As a California Division of Labor Standards Enforcement ("DLSE") opinion letter explains,

16  "if an employer requires an employee to attend an out-of-town business meeting, training session, or

17  any other event, the employer cannot disclaim an obligation to pay for the employee's time in getting

18  to and from the location of that event." DLSE O.L. 2002.02.21.[28] "Such compelled travel time

19  therefore constitutes compensable 'hours worked.'" *Id.*

20      The UPC requires players to "use the mode of transportation furnished by Club to and from all

21  'abroad' games at all times." UPC ¶ X. ████████████████████████████████████

22  ██████████████████████████████████████████████████████████████

23

24  _____

25  [27] *See, e.g.*, Ex. 91: Orioles Tr. at 55-58 (█████████████████████████████████

    ██████████████████████████).

26  [28] *Available at* https://www.dir.ca.gov/dlse/opinions/2002-02-21.pdf. DLSE letters are not binding,

27  but they "constitute a body of experience and informed judgment to which courts and litigants may
    properly resort for guidance." *Brinker Rest. Corp. v. Superior Ct.*, 53 Cal. 4th 1004, 1029 (2012).

28

1    ███████████████ [29] This travel time is controlled by Defendants, and it is compensable under

2    California law.

3        **V. THE CREATIVE ARTIST EXEMPTION DOES NOT APPLY.**

4        Because minor league players perform at least some work in the training seasons without being

5    paid, one of Defendants' affirmative defenses—the creative artists defense—must fail as a matter of

6    law. There is no factual dispute that players perform supervised, team-related activities during the

7    training seasons that qualify as work, as a matter of law, for all the reasons discussed in Part IV above.

8    There is also no factual dispute that players are not paid salaries during the training seasons. Those

9    two facts doom the creative artist exemption.

10       Defendants have asserted this exemption under the FLSA and under California, Florida,

11   Maryland, New York, North Carolina, Oregon, and Pennsylvania law. The FLSA will be discussed

12   first. It exempts workers "employed in a bona fide…professional capacity…as such terms are defined

13   and delimited from time to time by regulations of the Secretary." 29 U.S.C. § 213(a)(1). Under the

14   Department of Labor's exacting test for this exemption, workers are not exempt unless they are:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week…
>     exclusive of board, lodging, or other facilities; and
> (2) Whose primary duty is the performance of work…[r]equiring invention, imagination,
>     originality or talent in a recognized field of artistic or creative endeavor.

29 C.F.R. § 541.300.[30] "The criteria provided by regulations are absolute and the employer must prove

that any particular employee meets every requirement." *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120,

1125 (9th Cir. 2002); *Solis v. Washington*, 656 F.3d 1079, 1083 (9th Cir. 2011) (employer bears the

burden). An employee's job title does not matter for the exemption; instead, the employer must

establish that both portions of the test are met: the salaries test and the primary duties test. 29 C.F.R.

§ 541.2. "The regulations of the Administrator are worded in the conjunctive, therefore, [the] failure

_____

[29] *See* Ex. 68: Royals Tr. at 196 ("[T]ravel will be [by] bus…. We don't allow our players to drive to other facilities."); Ex. 100: Athletics 5/19/16 Tr. at 59-61 (Class A affiliates in the California League travel by bus to away games, and the players are required to travel with the team).

[30] The minimum weekly rate rose to $684 in 2019.

to comply with one of the standards provided is dispositive of the question." *Craig v. Far W. Eng'g Co.*, 265 F.2d 251, 260 (9th Cir. 1959).

### A. The FLSA's Salary Basis Test Is Not Met Because Minor League Players Are Not Paid a Salary During All Weeks When Any Work Is Performed.

The obvious and inescapable problem for Defendants is that they necessarily fail the salary basis test. Per the regulation, a person is paid on a salary basis by receiving the same amount weekly or less frequently. 29 C.F.R. § 541.602(a)(1). The employee "must receive the full salary for *any week* in which the employee performs *any work* without regard to the number of days or hours worked." *Id.* (emphases added). If an employer has a practice of failing to pay the employee the full amount when any work is performed, then the employer loses the exemption. *Id.* at § 541.603. That is indisputably the practice here.

"[T]his particular regulation pertaining to 'salary basis' compensation must be taken to mean precisely what it says." *Craig v. Far W. Eng'g Co.*, 265 F.2d 251, 259 (9th Cir. 1959 ). Cases make clear that companies that run afoul of this rule are not entitled to the exemption. *See Ugorji v. Cty. of Lake*, No. 4:20-CV-01448-YGR, 2020 WL 3639647, at *12 (N.D. Cal. July 6, 2020); *Charbonneau v. Mortg. Lenders of Am. L.L.C.*, 487 F. Supp. 3d 1081, 1087 (D. Kan. 2020); *Edwards v. KB Home*, No. 3:11-CV-240, 2015 WL 6965387, at *3 (S.D. Tex. Nov. 10, 2015). As the Department of Labor's Field Operations Handbook explains, the predetermined amount "cannot be reduced because of variations in the quality or quantity of work performed by the employee. …Exempt employees must receive the full salary for every week in which they perform work, regardless of the number of days or hours worked. …If the employer makes deductions from the employee's predetermined salary because of…the business's operating requirements, the employee is not paid on a salary basis."[31]

As already established, minor leaguers perform at least some work during the training seasons, "periods during which virtually all players are completely unpaid for their participation." *Senne*, 934 F.3d at 942. The UPC plainly states that minor leaguers are only to be paid "during the championship

---

[31] DOL Field Operations Handbook § 22h04 (Jan. 19, 2021), *available at* https://www.dol.gov/whd/FOH/FOH_Ch22.pdf.

season" (UPC ¶ VII.B), while simultaneously obligating players to perform "services on a calendar year basis," including during "training" and "instructional" seasons (UPC ¶ VI.B). *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (workers not exempt "if there is either an actual practice of making such deductions or an employment policy that creates a 'significant likelihood' of such deductions"). The pay practices flow from this contractual language.[32] As one MLB executive testified, ███████████ ███████████████████████████████████████████████ Ex. 37: Bavasi Tr. at 188-89.[33]

## B. The FLSA's Primary Duties Test Is Not Met Because Players Perform Physical Work that Is Not in a "Recognized Field of Artistic or Creative Endeavor."

A second problem for Defendants is that players' duties do not fall within the exemption. "[A]n employee's primary duty must be the performance of work requiring invention, imagination, originality or talent *in a recognized field of artistic or creative endeavor as opposed to routine mental, manual, mechanical or physical work*." 29 C.F.R. § 541.302(a) (emphasis added). Recognized fields of artistic or creative endeavors include "music, writing, acting and the graphic arts." *Id.* at § 541.302(b). Examples of what the exemption is intended to cover include "actors, musicians, composers, conductors, and soloists," "cartoonists," "essayists, novelists, short-story writers and screen play writers," and certain other types of writers. *Id.* at § 541.302(c). Jobs that do not fall within a recognized field are outside the exemption. *Hurst v. Youngelson*, 354 F. Supp. 3d 1362, 1383 (N.D. Ga. 2019) (adult entertainers not creative professionals); *Garcia v. Pancho Villa's of Huntington Vill., Inc.*, No. CV 09-486 ETB, 2011 WL 1431978, at *3 (E.D.N.Y. Apr. 14, 2011) ("Nothing in the regulations even remotely pertains to Garcia's position as a cook.").

The regulations do not mention any sports-related (or athletics-related) job in the enumerated list of recognized fields. Further, Plaintiffs' labor economist expert, Dr. Erica Groshen, the former

---

[32] *See* ECF 270 at ¶ 164; Ex. 20: Blue Jays Tr. at 131-32 (minor leaguers are paid according to the UPC, so they are not paid during spring training or instructional leagues).

[33] *See also* Ex. 94: Kriegler Supp. Report at ¶ 18 ████████████████████████ ████████████████████████████████████████████████████████ Ex. 4: Giants Tr. at 145-46; Ex. 11: Rangers Tr. at 65-66; Ex. 17: Dodgers Tr. at 264-65, 268; Ex. 23: Mets Tr. at 337-38.

chair of the Bureau of Labor Statistics ("BLS"), examined federal data on the skills required to be a baseball player or athlete and found them to be very different from those required of the examples of jobs listed in the regulation. Ex. 101: Groshen Report at pp. 28-36. Athletes are not listed "in any of the occupation groups that are commonly considered creative" by the BLS, *id.* at ¶ 83, and "creativity is not listed as a key quality for professional athletes," *id.* at ¶ 85. The need to be creative was not even in the top 10 listed work attributes for athletes. *Id.* at ¶ 89. This was in stark contrast to the jobs actually listed by the DOL as being in recognized artistic or creative fields. *Id.* Defendants' expert did nothing to contradict this opinion, as she instead just focused on the "talent" exhibited by players without opining on whether that talent was in a recognized field of artistic or creative endeavor.

Unlike the recognized artistic or creative jobs, a baseball player relies on physical skills. *See id.* at pp. 28-36 (federal data lists static strength, stamina, explosive strength, dynamic strength, gross body coordination, and near vision as skills required of professional athletes). And the "section 13(a)(1) exemptions…do not apply" to laborers "who perform work involving repetitive operations with their hands, physical skill and energy." 29 C.F.R. § 541.3. Such employees typically "gain the skills and knowledge" required "through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt" professions. *Id.*

[34] Ex. 28: Cubs Tr. at 246-48; Ex. 38: Harper Tr. at 184-85.

[35] *See also* Ex. 96: Brewers Tr. at 272-73 ███████████████████████████.

[36] Ex. 19: Yankees Tr. at 73-74 ██████████████████████████████.

1 ███████████████████████████████████████████████

2 ███████████████████████████████████████████████

3 ███████████████████████████████████████████████

4 ███████████████████████████████████████████████

5 ████████████████████████████ Or as one player testified, the work is "manual labor

6 work," "things that are going to physically fatigue your body." Ex. 71: Loux Tr. at 94. That's the

7 purpose of the work, to provide the type of "on-the-job" training that the regulations say is not meant

8 to be exempt. 29 C.F.R. § 541.3 (professions that involve "on-the-job" training as opposed prolonged

9 intellectual course of study are not within the exemption); *see also* Ex. 42: Rantz Tr. at 251 ████████

10 ████████████████████████

11        Defendants cannot meet the salary basis test as a matter of law, and the undisputed facts show

12 that the players' duties are not within a recognized field of artistic or creative endeavor. Baseball

13 players are athletes, not artists. The exemption fails and the players are entitled to summary judgment

14 on the "creative artist" defense.

15        **C.  The Florida Class Is Entitled to Summary Judgment on the Creative Artist**

16             **Exemption.**

17        For purposes of this exemption, Florida follows federal law. *See* Fla. Stat. § 448.110(3). The

   FLSA analysis applies, and the Florida Class is entitled to summary judgment on this exemption.

18

19        **D.  The California Class Is Entitled to Summary Judgment on the Creative Artist**
             **Exemption.**

20        The California Class is also entitled to summary judgment for multiple reasons. For starters,

21 California law recognizes that its wage law "must be at least as protective of the employee as the

22 corresponding federal standards." *Negri v. Koning & Assocs.*, 216 Cal. App. 4th 392, 398 (2013).

23 Because players are not creative artists under federal law, they cannot be exempt under California law

24 either. Defendants flunk both of the FLSA's tests (salary and duties), either of which is fatal, so by

25 extension the exemption fails under California law as well.

26        More to the point, California courts also use "the federal salary-basis test for purposes of

27 determining whether an employee is exempt or nonexempt." *Id.*; *Ugorji v. Cty. of Lake*, No. 4:20-CV-

28

1   01448-YGR, 2020 WL 3639647, at *12 (N.D. Cal. July 6, 2020) ("California courts follow the federal

2   'salary basis' test."). Thus, a worker must be paid the same amount for any week during which work is

3   performed to fall within the exemption. As already illustrated, however, minor leaguers are not paid

4   for work performed outside the season, so they are not paid on a "salary basis."

5       Beyond this, nearly all California Class members cannot qualify for the exemption for yet

6   another reason. In California, the salary paid must be "no less than two (2) times the state minimum

7   wage for full-time employment" of 40 hours per week. IWC Wage Order 4-2001(1)(3)(d). Based on

8   the minimum wage in a given year, that means a class member would have had to have been paid at

9   least $640 per week in 2010 (or roughly $2560 per month) and at least $1120 per week in 2021 (or

10  roughly $4480 per month). An analysis of the payroll data, however, reveals that 98.1 percent of the

11  time players' paychecks failed to meet these requirements. Ex. 94: Kriegler Supp. Report at ¶ 157.

12      Finally, Defendants fail California's version of the duties test. Similar to the FLSA,[37] the work

13  must be in "a recognized field of artistic endeavor," as discussed above. But California adds an extra

14  wrinkle: the work must also be "predominantly intellectual and varied in character," and the worker

15  must "regularly exercise[] discretion and independent judgment." IWC Wage Order 4-2001(1)(3). No

16  one could seriously claim that minor league baseball players perform "predominately intellectual"

17  work, nor do they regularly exercise "discretion and independent judgment" because they work under

18  the constant supervision of coaches, strength coaches, trainers, coordinators, and other superiors.[38]

19      The California Class is entitled to summary judgment on the creative artist exemption.

---

[37] *See Medepalli v. Maximus, Inc.*, No. CIV S-06-2774 FCD EF, 2008 WL 958045, at *7 (E.D. Cal. Apr. 8, 2008) (noting that California's IWC wage orders incorporated parts of the DOL's regulations for the professional exemption).

[38] As one assistant general manager testified, 

").

**E.  The Creative Artist Exemption Fails Under the Other States' Laws at Issue.**

Defendants have also raised the creative artist exemption as a defense to the individual claims under the laws of North Carolina, Maryland, New York, Oregon, and Pennsylvania. But North Carolina, Maryland, Oregon, and Pennsylvania all have salary basis requirements, so the exemption must fail.[39] All five states also have duties tests that are at least as difficult to meet as the FLSA's.[40] The named plaintiffs are entitled to summary judgment on this issue under each of these states' laws.

## VI.  THE SEASONAL AND AMUSEMENT EXEMPTION DOES NOT APPLY.

Defendants' other defense is a "seasonal and amusement" exemption under the FLSA and under the laws of Florida, Maryland, New York, North Carolina, and Pennsylvania. Defendants listed California when raising this affirmative defense in pleadings, but California (like Arizona and Oregon) does not recognize the exemption, so the Court should enter judgment on this defense under California law.[41] For the other five states, the test for the exemption is similar to that for the FLSA.[42]

---

[39] *See* 34 Pa. Code § 231.84; Or. Admin. R. 839-020-0005; N.C. Gen. Stat. § 95-25.14(b)(4) (adopting FLSA regulation); Md. Code Regs. 09.12.41.17 (adopting FLSA regulation); *see also Massie v. Bd. of Trustees, Haywood Cmty. Coll.*, 357 F. Supp. 2d 878, 881-83 (W.D.N.C. 2005) (applying the DOL regulations on the professional exemption to both FLSA claims and North Carolina state law claims); *Williams v. GENEX Servs., Inc.*, No. CIV.A. MJG-13-1942, 2014 WL 4388360, at *2 (D. Md. Sept. 4, 2014) ("'Professional capacity' and 'administrative capacity' have the same meanings under the regulations governing the MWHL as they do under the FLSA regulations.").

[40] New York's, Pennsylvania's, and Oregon's professional exemptions contain substantially similar duties tests, but they are even harder to satisfy than the FLSA because the work must call for the exercise of discretion and judgment and (in Pennsylvania and Oregon) be "predominately intellectual." 12 N.Y. Comp. Codes R. & Regs. 142-2.14(c)(4)(iii); 34 Pa. Code § 231.81; Or. Admin. R. 839-020-0005(3). *See also Sethi v. Narod*, 974 F. Supp. 2d 162, 184 (E.D.N.Y. 2013) (finding employees not professionals under both the FLSA and New York law, and finding the analysis very similar); *Mudgett v. Univ. of Pittsburgh Med. Ctr.*, No. CIV.A.09-254, 2010 WL 1838413, at *3 (W.D. Pa. May 6, 2010) (merging the analysis under the FLSA and Pennsylvania law); *Peterson v. Snodgrass*, 683 F. Supp. 2d 1107, 1122 (D. Or. 2010) (finding that if the federal exemption does not apply, then the employee cannot be exempt under Oregon law because the most favorable law to employee controls).

[41] *See Wright v. Adventures Rolling Cross Country, Inc.*, No. C-12-0982 EMC, 2013 WL 1758815, at *4 (N.D. Cal. Apr. 24, 2013) (noting that "an exemption for recreational establishments" "is provided for in federal law only"—not California law).

[42] These five states either adopt the FLSA's seasonal and amusement exemption or rely on functionally similar tests, with most still requiring some of the states' minimum wage and overtime requirements to be met even if the exemption applies. *See* Fla. Stat. § 448.110(3) (adopting the FLSA's defenses); N.C. Gen. Stat. §§ 95-25.2(13), 95-25.3(e), 95-25.4(a) (adopting similar test, but still

46

1    The FLSA exempts "any employee employed by an establishment which is an amusement or

2  recreational establishment…if (A) it does not operate for more than seven months in any calendar

3  year, or (B) during the preceding calendar year, its average receipts for any six months of such year

4  were not more than 33 1/3 per centum of its average receipts for the other six months of the year."

5  29 U.S.C. § 213(a)(3). Defendants first must prove that minor leaguers are employed by an

6  amusement or recreational establishment. Second, Defendants must prove that the establishment

7  meets one of two tests: the length-of-operation test or the receipts test.

8    Defendants initially told the Court that they "do not intend to rely on the 'receipts' prong of the

9  exemption." ECF 403. After the appeal—and after overwhelming evidence showed that players work

10  at worksites operating more than seven months a year—they changed their tune, saying they would

11  not invoke the receipts test if the establishment was found to be anything more than the spring

12  training facilities.[43] The Court should hold them to that, as the relevant establishment is indeed more

13  than the spring training facilities, and the players are entitled to summary judgment on the defense.

### A.  All Places Where Minor Leaguers Are Assigned to Work Comprise a Single Establishment.

16    Because the minor league players perform the same work for the same employers at multiple

17  locations, all the places where the players are assigned to work comprise the "establishment" for the

18  defense.[44] The DOL generally defines establishment as a "distinct physical place of business" rather

19  than "an entire business or enterprise." 29 C.F.R. § 779.23. Yet this is "not an absolute rule." *Russell v.*

---

requiring wages of at least 85% of minimum in the state and still requiring overtime pay); Md. Code Lab. & Empl. §§ 3-413(d)(2); 3-415(b)(3) (adopting similar test, but still requiring wages of at least 85% of minimum in the state while exempting from overtime requirements); 12 N.Y. Comp. Codes R. & Regs. § 142-2.2 (adopting the FLSA's overtime exemptions with exceptions, but still requiring wages of "one and one-half times the basic minimum hourly rate" even if the seasonal/amusement test is met); 43 Penn. Stat. § 333.105(a)(9) (adopting a similar test).

[43] Ex. 107: Nov. 9, 2020 Letter from E. Bloom to G. Broshuis, at p. 2 ("As we have stated previously, in the event the Court defines the 'establishment' more broadly than those facilities, Defendants will not invoke the 'receipts' prong of the exemption.").

[44] Plaintiffs do not concede that this combined establishment qualifies as an "amusement or recreational" one, but the Court need not reach that threshold requirement because, as explained *infra*, Plaintiffs are entitled to summary judgment regardless.

1    *Placeware, Inc.*, No. CIV. 03-836-MO, 2004 WL 2359971, at *8 (D. Or. Oct. 15, 2004). Rather, there are

2    times when "two or more distinct physical portions of a business enterprise" should be "treated as a

3    single establishment." 29 C.F.R. § 1620.9(b).[45] "For example, a central administrative unit may hire all

4    employees, set wages, and assign the location of employment; employees may frequently interchange

5    work locations; and daily duties may be virtually identical and performed under similar working

6    conditions." *Id.* As such, "central control and administration of disparate job sites can support a

7    finding of a single establishment." *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 591 (11th Cir. 1994). "The

8    hallmarks of this standard are centralized control of job descriptions, salary administration, and job

9    assignments or functions." *Id.*; *see also Smith v. Allstate Ins. Corp.*, 24 F. Supp. 2d 870, 879 (N.D. Ill.

10   1998), *affd sub nom. Smith v. Allstate Ins. Co.*, 202 F.3d 274 (7th Cir. 1999) (all offices in a region

11   constituted the "establishment" because control was exercised on a regional basis).

12       A widely-followed case involving school janitors illustrates the concept. In *Brennan v. Goose Creek

13   Consolidated Independent School District*, 519 F.2d 53 (5th Cir. 1975), a school district contended that each

14   school was a separate establishment, but the court disagreed. *Id.* at 56. "The central administration of

15   the school district (not the principals of the schools) hired the janitors, determined their wages,

16   assigned them to the school building in which they were to work, and sometimes switched their

17   assignments from one building to another." *Id.* Thus, all the schools formed a single establishment. *Id.*

18   at 58; *see also Marshall v. Dallas Indep. Sch. Dist.*, 605 F.2d 191, 194 (5th Cir. 1979) (following *Goose Creek*

19   in concluding that 182 schools were a single establishment); *Collins v. Dollar Tree Stores, Inc.*, 788 F.

20   Supp. 2d 1328, 1340-41 (N.D. Ala. 2011) (since decisions on pay and assignments were made at the

21   regional level, all stores within the region constituted the establishment); *Harvey v. Dunlop*, No. 73-874,

22   1975 WL 1204, at *6-7 (W.D. Pa. Nov. 28, 1975) (horse grooms performed work controlled by a

---

[45] These regulations issue from the Equal Employment Opportunity Commission interpreting the Equal Pay Act, which is part of the FLSA. These regulations are relevant in the overtime and minimum wage context since the EPA is part of the FLSA and since the guidelines are consistent with the DOL's guidelines. *See Doe v. Butler Amusements, Inc.*, 71 F. Supp. 3d 1125, 1134 n.5 (N.D. Cal. 2014) (Spero, J.); *see also Liebesman v. Competitor Grp., Inc.*, No. 4:14-CV-1653 RLW, 2015 WL 2195093, at *4 (E.D. Mo. May 11, 2015) (finding the regulations applicable in the FLSA context).

1  horse stable at both race tracks and the horse stable, so the non-exempt horse stable was the relevant

2  establishment in wage-and-hour action rather than the exempt race tracks).[46]

3      This case is essentially the same as *Goose Creek*, and the same rule should apply. It is MLB and

4  the MLB Clubs that jointly control the hiring of the players—not the minor league team. MLR 56(g)

5  makes explicit that the MLB Club "shall provide" the "active roster of skilled players for the Minor

6  League Club." So "[e]ven though a Minor League player may train with—and play games for—a

7  Minor League Club, that player is still employed by the Major League Club."[47] The player "shall be

8  under contract exclusively to the Major League Club," and the minor league team shall "not interfere"

9  with the player's contract. MLR 56(g). The MLB Club (as regulated by MLB) makes the player

10  assignments—not the minor league team. *See* MLR 56(g)(3) (the MLB Club may assign players to

11  various minor league teams, and the minor league team "shall not interfere" with the assignments).

12  The MLB team also hires the coaches and trainers. MLR 56(g)(4) and (F). So the local minor league

13  team plays no part in choosing the players or in assigning or overseeing the work. Instead, the minor

14  league team's main responsibility is simply to provide uniforms and the facility.

15      In furtherance of MLR 56, ██████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ██████████████████████████████████████████████████████████

18  ────────────────────

19  [46] *See also Shultz v. Hasam Realty Corp.*, 316 F. Supp. 1136, 1143-44 (S.D. Fla. 1970) (five separate

20  facilities treated as single establishment where employees were employed by resort as whole and were
   interchanged amongst facilities); *Forsberg v. Pac. Nw. Bell Tel. Co.*, 622 F. Supp. 1150, 1153 (D. Or.

21  1985); *Lenihan v. Boeing Co.*, 994 F. Supp. 776, 800 (S.D. Tex. 1998); *E.E.O.C. v. Maricopa Cnty. Cmty.
   *Coll. Dist.*, No. CIV. 81-1018 PHXEHC, 1982 WL 289, at *2 (D. Ariz. Apr. 8, 1982); *cf. Mitchell v.*

22  *Kroger Co.*, 248 F.2d 935, 940-41 (8th Cir. 1957) (auditors employed by central operator of chain stores,
   even though they did much of work at the level of individual stores).

23  [47] Answering Brief, *Miranda v. Selig., et al.*, No. 15-16938, 2016 WL 873683 (9th Cir. Mar. 4 2016), at 5.

24  [48] *See* Ex. 41: Davis Tr. at 29-31, 119-21 ██████████████████████████

25  ████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████

28

1  ██████████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  █████████████████████████████████████████████████

5  ██████████████████████████████████████████████████

6  ████████████████

7       Another factor to consider under the regulations is whether a central entity sets the wages. MLB

8  centrally ████████████████████████████████████████████████

9  ████████████████████████████████████████████

10  ████████████████████████████████████████████

11  ████████████████  *See supra* Part II.A.3.

12

13

14  ─────────────────────

15  █████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████).

17  [49] *See, e.g.*, Ex. 5: MLB0008914 at 8930██████

18  █████████████████████████████████████████████████████

19  █████████████████████████████████████████████████████

20  █████████████████████████████████████████████████████

21  ██████████████████████████████████████████████████████

22  ██████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████

24  ██████████████████████████████████████████████████████

25  ██████████████████████████████████████████████████████

26  ██████████████████████████████████████████████████████

27  ████████████████████████████████████████████

28

NO. 3:14-cv-00608-JCS
**Motion for Partial Summary Judgment**

1    It also cannot be disputed that minor leaguers frequently change work locations. At minimum,

2  they go from their homes to spring training and then to their in-season affiliate (or affiliates), and

3  often report back to the spring training site for instructional leagues. *See* Ex. 111: Diamondbacks Tr.

4  at 35 ████████████████████████████████████████ *see also* ECF 726 at 15

5  (Defendants' expert calling players a "highly mobile group" and analyzing in-season transfers). And of

6  course, when they switch work locations, they perform the same job duties as a minor leaguer: they do

7  pre-game activities and they play games.

8    This case has all the "hallmarks of…centralized control of job descriptions, salary

9  administration, and job assignments or functions." *Mulhall*, 19 F.3d at 591. The Court should

10  therefore conclude that all the places where minor leaguers are assigned to work should be analyzed

11  collectively as the relevant "establishment"—i.e., the training facilities in Arizona and Florida

12  combined with the minor league affiliates.

13    **B.  The Exemption Must Fail Because Defendants Provided No Evidence of Relevant
      Receipts, and the Establishment Operates More Than Seven Months in a Year.**

14    Because the relevant "establishment" is the combined places where minor leaguers work, that is

15  the "establishment" that must be analyzed. Defendants bear the burden of proving the defense but

16  they have no evidence supporting it.

17    Starting with the receipts test, Defendants failed to produce receipts related to this exemption

18  before the first close of discovery because they initially told the Court that they "do not intend to rely

19  on the 'receipts' prong of the exemption." ECF 403. They should be precluded from relying on

20  purported receipts that pre-date the first close of discovery (June 2016) but that were not produced

21  until the post-appeal supplemental discovery period. It was then that Defendants changed their

22  position, now saying that they would not rely on the receipts test if—as is indeed the case—the

23  establishment is broader than the spring training facilities.[50] Regardless, the only receipts Defendants

24

25  _____

26  [50] Ex. 107: Nov. 9, 2020 Letter from E. Bloom to G. Broshuis, at p. 2 ("[I]n the event the Court
    defines the 'establishment' more broadly than those facilities, Defendants will not invoke the 'receipts'
27  prong of the exemption.").

28

1  produced are not relevant to this issue. Defendants have not produced any receipts for the minor

2  league affiliates or for minor league spring training, extended spring training, or instructional

3  leagues[51]—the places where they assign minor league players to work. The receipts prong therefore

4  must also fail because Defendants have not provided receipts for the proper establishment—

5  something that they bear the burden of on this affirmative defense. *See Bridewell v. Cincinnati Reds*, 155

6  F.3d 828, 830 (6th Cir. 1998) (exemption failed because Reds did not provide correct receipts).

7      It is also beyond dispute that the "establishment" operates more than seven months in any

8  given year. "The proper inquiry is, assuming arguendo that the Reds are an amusement or recreational

9  establishment, whether the Reds operate for more than seven months per year, not whether they are

10  an entity that provides amusement or recreation for its customers for more than seven months per

11  year." *Bridewell v. Cincinnati Reds*, 68 F.3d 136, 138-39 (6th Cir. 1995). Ample evidence shows that

12  ████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  _____

16  [51] Defendants do not sell tickets or engage in revenue-producing activities during minor league spring

17  training, extended spring training, or instructional leagues.

[52] *E.g.*, Ex. 40: McCracken Tr. at 48-50 (████████████████████); Ex. 7:

18  Mariners Tr. at 315-18; Ex. 10: Vuch Tr. at 84-87, 90, 136-38, 147; Ex. 11: Rangers Tr. at 308-15; Ex.

19  16: Broadway Tr. at 94-95, 264-65, 281-83, 290-91; Ex. 23: Mets Tr. at 315-19; Ex. 26: Levin Tr. at

    103-05, 181-82, 203-04; Ex. 28: Cubs Tr. at 204-13; Ex. 35: Scales Tr. at 283-88; Ex. 36: Owen Tr. at

20  95-98; Ex. 37: Bavasi Tr. at 186-87, 271-72; Ex. 38: Harper Tr. at 144-49, 179-80; Ex. 39: Sharp Tr. at

    245-47; Ex. 41: Davis Tr. at 66-70, 75-77, 233-37; Ex. 42: Rantz Tr. at 206-07; Ex. 68: Royals Tr. at

21  224-30; Ex. 77: Chattin Tr. at 35-36, 93-98, 122-23, 128, 174-76; Ex. 78: Angels Tr. at 170-73; Ex. 95:

    Reed Tr. at 65-66, 84, 113-15; Ex. 106: Diggs Tr. at 39-42, 74-76, 86, 92-94, 102-06, 137-38, 147-50,

22  221-22, 233-34; Ex. 112: Candaele Tr. at 89-92, 215-17; Ex. 43: MIN0009362 (████████████

    ████████████████████).

23  [53] Ex. 44: MIN0002319 (████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████).

28

1  ███████████████████████████████████████████████

2  ███████████████████████████████████████████████

3  ██████████████████████████████████████████████

4  ████████████████████████████████████████

5  ██████████████████████████████████ *Id.* at 8931.

6      Aside from the training seasons, players of course work during the championship season at

7  minor league stadiums from April until September. Thus, Defendants shuffle the players between the

8  worksites making up the establishment from February until October—a total of nine months. And

9  that is just the formal, team-related work. █████████████████████████████

10 ██████████████████████████████████████████████

11 ████████████████████████████████████████ ████

12 ████████████████████████████████[55]

13     Defendants fail the receipts test and they fail the seven-month test, so the players are entitled to

14 summary judgment on the exemption. *See Bridewell II*, 68 F.3d at 39 (6th Cir. 1995) (Reds did not

15 qualify for exemption because they operated year-round even though they only held games at the

16 stadium during the six-month period from April to September).

17 **VII.  PLAYERS ARE ENTITLED TO TREBLE DAMAGES UNDER ARIZONA'S MINIMUM WAGE LAW**
        **AND DEFENDANTS HAVE WILLFULLY VIOLATED THE LAW.**

18     Because Defendants have no affirmative defenses under Arizona law, there are only two liability

19 questions for the Arizona Class: "(1) are the players employees of defendants, and (2) do the minor

20 league team activities during these periods constitute compensable work" under Arizona law? *Senne*,

21 934 F.3d at 942. There is no genuine dispute that minor leaguers are "employees" who perform at

22 least some "work" in Arizona. *See supra* Parts I & IV. The only question that remains is the magnitude

23 of underpaid wages. On that count, it should be held that Plaintiffs and the Arizona Class are entitled

24

25 _____

26 [54] *See supra* notes 52, 53.

27 [55] *See supra* notes 52, 53.

28

1  to "an additional amount equal to twice the underpaid wages," plus interest and "reasonable attorneys'

2  fees" and costs. Ariz. Rev. Stat. § 23-364(G); *see also* ECF 382 (Count 13).

3  There is no genuine dispute that the violations were willful either. In Arizona, willfulness

4  extends the statute of limitations from two years to three years (and all violations occurring as part of

5  a continuing course of conduct regardless of date are reachable). Ariz. Lab. Code § 23-364(H). The

6  Ninth Circuit has interpreted an analogous concept from the FLSA to mean "the employer knew or

7  showed reckless disregard for the matter of whether its conduct was prohibited." *Flores v. City of San*

8  *Gabriel*, 824 F.3d 890, 906 (9th Cir. 2016) (internal quotations omitted). Actual knowledge, though, is

9  not required. *Id.* It is enough that the "employer disregarded the very 'possibility' that it was violating

10  the statute." *Id.* (internal quotations omitted).

11  "The absence of binding authority directly on point is not dispositive here. It is likely to be the

12  exception, rather than the rule, that controlling case law addresses the precise question faced by an

13  employer trying to determine its obligations." *Id.*; *see also Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th

14  Cir. 2003) ("[Defendant] 'could easily have inquired into' the meaning of the relevant FLSA terms and

15  the type of steps necessary to comply therewith" but did not, so willfulness found).

16  This is a textbook example of a willful violation of a wage-and-hour law. There have never been

17  any affirmative defenses available in Arizona, and Defendants admitted in pleadings that players are

18  "employees." Moreover, even though several years have passed since the Court held that the "trainee"

19  argument failed, Defendants have done nothing in the interim to comply with Arizona law. They have

20  acted in reckless disregard of the law, and the Court should hold that they acted willfully.

21  **VIII.   Judgment is Warranted on Wage Statement and Recordkeeping Claims.**

22  Because the only affirmative defense available in California (the creative artist exemption) fails,

23  judgment should also be entered on the California wage statement claims. *See* ECF 382 (Counts 7 &

24  14). Employers must list on wage statements the "total hours worked," "all applicable hourly rates in

25  effect during the pay period," and the number of hours worked at each rate. Cal. Lab. Code §

26  226(a)(2) & (a)(9). An "employee is deemed to suffer injury" if the required information is not

27  provided, and if the required information cannot be "easily determine[d]" from the wage statement

28

**Motion for Partial Summary Judgment**

1  alone. A knowing and intentional failure to provide this information results in a penalty of $50 for the

2  first violation and $100 for each subsequent violation, collectible by the employee. *Id.* at § 226(e). A

3  knowing and intentional violation is established when an employer is "aware of the factual predicate

4  underlying the violation"; i.e., the omission was not "accidental" or "isolated and unintentional" due

5  to a clerical error. *Kao v. Holiday*, 12 Cal. App. 5th 947, 961-62 (2017). It also is no defense that an

6  employer believes that the worker is a "nonemployee trainee outside wage statement requirements or

7  an exempt employee with lesser wage statement requirements." *Id.*

8      The Court already held that there "is no dispute that Defendants have not kept the records of

9  the activities that Plaintiffs contend are 'work' under any potentially applicable wage and hour laws,

10 state or federal." ECF 682 at 52. Defendants have never tried to keep this information—much less

11 accurately record it in a wage statement.[56] Defendants instead simply ████████████████████

12 ███████████████████████████[57] This is no clerical or isolated error. It is knowing and

13 intentional within the meaning of the statute, and Plaintiffs are entitled to summary judgment on their

14 California wage statement claims. *Kao*, 12 Cal. App. 5th at 962. In his expert report, Dr. Brian Kriegler

15 ██████████████████████████████████████████

16 ██████████████████████████████████████ Ex. 94:

17 Kriegler Supp. Report at ¶ 153. Defendants' experts did not rebut this calculation, and the California

18 Class should be awarded this amount.

19

----

20 [56] *See* Ex. 4: Giants Tr. at 147 ███████████████████████████

21 ████████████████████████████████████████

22 ████████████████████████████████████████

23 ███████████████████████████████████

24 [57] *See, e.g.*, Ex. 7: Mariners Tr. at 188-89 ████████████████████

25 ████████████████████████████████████████

26 ████████████████████████████████████████

27 ██████████████████████████████████

28

**Motion for Partial Summary Judgment**

1   Judgment should also be entered on the Arizona recordkeeping claims. There, employers must

2   keep records, *inter alia*, of "[h]ours worked each workday and total hours worked each workweek,"

3   "[r]egular hourly rate of pay for any workweek," and "[t]otal daily or weekly straight-time wages due

4   for hours worked during the workday or workweek." Ariz. Admin. Code R20-5-1210. As "Arizona

5   law mandates, 'Employers shall maintain payroll records showing the hours worked for each day

6   worked, and the wages paid to all employees for a period of four years.'" *Nobles v. State Farm Mut.*

7   *Auto. Ins. Co.*, No. 10-04175-CV-C-NKL, 2013 WL 12153517, at *4 (W.D. Mo. June 5, 2013) (quoting

8   Ariz. Rev. Stat. § 23-364(D)). "Any employer who violates recordkeeping, posting, or other

9   requirements that the commission may establish under this article shall be subject to a civil penalty of

10   at least $250 dollars for a first violation, and at least $1000 dollars for each subsequent or willful

11   violation." Ariz. Rev. Stat. § 23-364(F). "The law permits a civil action by 'any private party injured by

12   a violation of this article.'" *Nobles*, 2013 WL 12153517, at *4.

13   Defendants issue no wage statements during the work periods at issue in the Arizona Class, and

14   it is undisputed that they do not keep track of hours worked, rate of pay, or wages due by reason of

15   hours worked. They do not even try to collect or maintain this information, so the violations are all

16   willful. This means a $1000 penalty should apply to what would have been every pay period for each

17   player. Ariz. Rev. Stat. § 23-364(F).[58] Every would-be pay period is a new violation because the injury

18   to the player is repeated by the failure to track and maintain this information. Since the violations are

19   willful, the statute of limitations for these Arizona claims dates to February 7, 2011. Ariz. Rev. Stat. §

20   23-364(H). Dr. Kriegler ███████████████████████████████████████████████████

21   ████████████████████████████   Ex. 94: Kriegler Supp. Report at ¶ 153. Defendants'

22   experts again did not rebut this calculation, and Plaintiffs respectfully ask the Court to enter summary

23   judgment to the Arizona Class on these claims.

24   ─────────────────────

25   [58] To the extent the Court determines there is a disputed issue as to whether the violation is willful,
    this would merely reduce the penalty during a player's first pay period from $1000 to $250, and

26   Plaintiffs would still be entitled to summary judgment on liability for the claims because there would
    still be no dispute that Defendants failed to maintain the required records. The amount owed could be

27   easily adjusted if needed.

28

## IX. DEFENDANTS' AFFIRMATIVE DEFENSE SEEKING WAGE CREDITS FAILS.

Defendants claim in an affirmative defense they are entitled to "set off" any "compensation or remuneration of any kind" from a "minimum wage and/or overtime" recovery. *See, e.g.*, ECF 908 at 82 (Eighth Affirmative Defense). It unclear what Defendants mean by this exactly, but in a recent expert report, they claimed meals, lodging, signing bonuses, and College Scholarship Plan payments should count as wages. That is incorrect as a matter of law, and summary judgment is warranted.

Starting with meals and lodging, Arizona and California law bar such wage credits. Arizona defines "wage" as "monetary compensation due to an employee by reason of employment, including an employee's commissions, but not tips or gratuities." Ariz. Rev. Stat. § 23-362, Version 2. The regulations define "minimum wage" as the "lowest rate of monetary compensation required under the Act." Ariz. Admin. Code R20-5-1202. "Monetary compensation" is "cash or its equivalent due to an employee by reason of employment." *Id.* Defendants' own expert confirmed players do not receive "monetary compensation" during the training seasons (Ex. 114: Martin Tr. at 51-52), and "[i]t is clear that evidence of non-monetary compensation" is "irrelevant" under Arizona's minimum wage law. *See Reyes v. LaFarga*, No. CV-11-1998-PHX-SMM, 2013 WL 12098794, at *2 (D. Ariz. Nov. 20, 2013). So there are no credits for meals, lodging, or anything similar in Arizona. *Id.*; *Cramton v. Grabbagreen Franchising LLC*, No. CV-17-04663-PHX-DWL, 2021 WL 2562332, at *13 (D. Ariz. June 23, 2021). The Court should hold that Defendants cannot claim a credit for meals or lodging under Arizona law.

In California, "[m]eals or lodging may not be credited against the minimum wage without a voluntary written agreement between the employer and the employee." Cal. Code Regs. tit. 8, § 11000. "Consistent with the statutory language, the DLSE requires that the written agreement 'explicitly reference that such credits are being applied toward the minimum wage obligation of the employer.'" *Brock v. Carrion, Ltd.*, 332 F. Supp. 2d 1320, 1330 (E.D. Cal. 2004) (quoting 2002 Update of the DLSE Enforcement Policies and Interpretations Manual, at § 45.4.5). Defendants have not produced any evidence of such a written agreement, because none exists. Defendants cannot claim such a credit.

Finally, for the Florida Class and the FLSA Collective—assuming Defendants ever provided players something that could arguably be considered compensation under the FLSA—Defendants are

not entitled to a credit for at least two reasons. First, players are working away from their homes during the training seasons, and the FLSA regulations dictate that payments of on-the-road expenses should not be counted towards the minimum wage. *See Sharp v. CGG Land (U.S.) Inc.*, 840 F.3d 1211, 1215 (10th Cir. 2016) (interpreting 29 C.F.R. § 778.217(b)(3) and concluding: "The term 'traveling' includes more than the time spent in transit to or from the remote job site."). Second, Defendants did not keep the type of records required to entitle them to a credit. The burden is on the employer to prove entitlement to a wage credit under the FLSA. *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 474 (11th Cir. 1982). If an employer is claiming a credit that would otherwise result in wages falling below the required minimum, which is undoubtedly the case during the training seasons, "the employer shall maintain records showing on a workweek basis those additions to or deductions from wages." 29 C.F.R. § 516.27; *see also Donovan v. Williams Chem. Co.*, 682 F.2d 185, 189 (8th Cir. 1982) ("The regulations require employees to keep certain records of the cost incurred in furnishing board, lodging or other facilities, [and] require the employer to maintain records showing additions or deductions from wages paid for board, lodging or other facilities on a work week basis.").

"Courts routinely deny employers offsets under the FLSA for failure to keep adequate records." *Brock v. Carrion, Ltd.*, 332 F. Supp. 2d 1320, 1326 (E.D. Cal. 2004); *see also Chavez v. Arancedo*, No. 17-20003-CIV, 2018 WL 4610567, at *5 (S.D. Fla. Sept. 24, 2018) ("In situations where an employer has been unable to meet his or her burden, courts have denied these costs altogether.").[59] Defendants have not produced records showing "additions to or deductions from wages" on "a workweek basis" during the training seasons when no payroll information is kept and paystubs are not provided. As Defendants' expert put it, "very few per diem, lodging, and meal payments seem to appear in payroll." Ex. 115: Guryan Report at 14. Defendants' expert did not even try to match players to the supposed meals or lodging payments. *Id.* Instead, the expert used "policy documents" and assumed the "per

---

[59] DOL Field Assistance Bulletin No. 2015-1, https://www.dol.gov/agencies/whd/field-assistance-bulletins/2015-1#_ftnref4 ("A number of courts have denied employers' attempts to claim a section 3(m) credit in circumstances in which those employers have not maintained proper records of costs or wage calculations.").

1  diem or meal payment policies for a given season and year" were followed, almost always without any

2  actual record of any payment being made. *Id.* When no policy documents were provided for a given

3  year, the expert looked at policies from other years. *Id.* at 15. Similarly, the expert based his calculation

4  of lodging credits almost entirely on summary documents, which (at best) show payments to hotels

5  without any indication of which players they apply to or in what amounts. *Id.* at 14. As detailed in a

6  corresponding *Daubert* motion (filed concurrently), there are even several instances where the expert

7  included the cost of lodging for coaches and other staff in the calculation. All of which is to say that

8  these calculations are plainly insufficient for Defendants to meet their burden of coming forward with

9  contemporaneous documents showing on a per workweek basis the additions to or subtractions from

10  the minimum wage required. Because Defendants have not met their burden, they are not entitled to a

11  credit for meals or lodging for the Florida Class or the FLSA Collective.

12      Defendants' expert also attempts to re-calculate damages by spreading out the value of signing

13  bonuses over the life of a UPC—up to *seven years*. Ex. 115: Guryan Report at 15. That too is improper

14  as a matter of law, particularly when it comes to meeting minimum wage obligations. A signing bonus

15  is just that—a bonus for signing the contract, not wages for work performed. *See* MLR 3(c)(5)(A)

16  ("Bonus Payments for Signing Contract."). But at most, it can only count towards the minimum wage

17  during the pay period when it is paid. "[P]ayments in excess of the amount required by the statute to

18  an employee for work done in certain weeks do not relieve the employer from the obligation to

19  compensate the employee for deficiencies in other weeks." *Roland Elec. Co. v. Black*, 163 F.2d 417, 420

20  (4th Cir. 1947). "[T]he payment of bonuses can only be considered in connection with the minimum

21  wages for the week in which they are paid." *Marshall v. Sam Dell's Dodge Corp.*, 451 F. Supp. 294, 304

22  (N.D.N.Y. 1978). "[O]nce a pay period is established, it cannot be retroactively modified to escape

23  FLSA liability." *Rogers v. Sav. First Mortg., LLC*, 362 F. Supp. 2d 624, 630-32 (D. Md. 2005); *see also*

24  *Biggs v. Wilson*, 1 F.3d 1537, 1539-40 (9th Cir. 1993) (discussing an Eleventh Circuit case that adopted

25  this position and discussed the DOL's Field Operations Handbook).[60] Thus, Defendants cannot

26  _____

27  [60] DOL's Field Operations Handbook discusses the concept in the context of commissions, saying

28  that an employer cannot apply the "excess earned and paid the previous month" to a subsequent

1  retroactively average out signing bonuses to make up for the fact that they—months or years later—

2  failed to pay any wages during extended periods of work.

3      The proposition that college payments should count towards meeting minimum wage

4  requirements is even more off-target. Under Arizona law, making college payments does not count

5  towards the minimum wage any more than making car payments. *See Cramton*, 2021 WL 2562332, at

6  *13. Nor would the FLSA treat college payments as a credit towards meeting the minimum wage. *U.S.*

7  *Dep't of Lab. v. Shenandoah Baptist Church*, 707 F. Supp. 1450, 1464 (W.D. Va. 1989), *aff'd sub nom. Dole v.*

8  *Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir. 1990) (tuition payments "did not reflect

9  compensation for work"). Even if they could, the sum received certainly cannot be spread

10  retroactively "over all weeks that the player had played…prior to the time the [College Scholarship

11  Plan] payment was made." Ex. 115: Guryan Report at 16-17. The Ninth Circuit reached this

12  conclusion in *Biggs* when discussing the late payment of wages: "If a payday has passed without

13  payment, the employer cannot have met his obligation to 'pay.'" 1 F.3d at 1539; *see also* Ariz. Rev. Stat.

14  23-351 ("Each employer, on each of the regular paydays, shall pay to the employees all wages due the

15  employees up to that date."). Paying for college tuition several years later is no substitute for actually

16  receiving a minimum wage for work performed during the pay period when the work was performed.

17  The Court should grant summary judgment on the issue of wage credits under all the laws at issue.

**CONCLUSION**

18

19      For years, Defendants have brazenly violated our country's basic wage laws. Now is the time

20  to hold Defendants accountable for their wrongdoing, and to sensibly narrow the issues for trial, by

21  granting Plaintiffs' motion for partial summary judgment on all the issues discussed herein.

22

23

24

25  month to meet minimum wage obligations. § 30b05(c)(3)(d), https://www.dol.gov/agencies/whd/
    field-operations-handbook/Chapter-30#B30b01. *See also* Ariz. Admin. Code § 20-5-1206(D) ("In

26  computing the minimum wage, an employer shall consider only monetary compensation and shall
    count tips and commissions in the workweek in which the tip or commission is earned."); *Vaquero v.*

27  *Stoneledge Furniture LLC*, 9 Cal. App. 5th 98, 109 (2017), as modified (Mar. 20, 2017) ("employers
    cannot comply with minimum wage obligations by averaging wages across multiple pay periods").

28

1    DATED: Oct. 29, 2021                     Respectfully submitted,

2
                                              _/s/ Garrett R. Broshuis_____
3
                                              PEARSON, SIMON & WARSHAW LLP
4                                             CLIFFORD H. PEARSON
                                              THOMAS J. NOLAN
5                                             DANIEL L. WARSHAW
                                              BOBBY POUYA
6                                             BENJAMIN E. SHIFTAN

7                                             KOREIN TILLERY, LLC
                                              STEPHEN M. TILLERY (pro hac vice)
8                                             GARRETT R. BROSHUIS
                                              MARC WALLENSTEIN (pro hac vice)
9                                             DIANE MOORE

10                                            *Plaintiffs Co-Lead Class Counsel*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

3        I hereby certify that on October 29, 2021, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of

4

record registered for electronic filing.

5

6

7                            /s/ *Garrett R. Broshuis*
                              Garrett R. Broshuis

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28