| | |
|---|---|
| **PROSKAUER ROSE LLP** | |
| ELISE M. BLOOM (admitted *pro hac vice*) | |
| ebloom@proskauer.com | |
| NEIL H. ABRAMSON (admitted *pro hac vice*) | |
| nabramson@proskauer.com | |
| ADAM M. LUPION (admitted *pro hac vice*) | |
| alupion@proskauer.com | |
| RACHEL S. PHILION (admitted *pro hac vice*) | |
| rphilion@proskauer.com | |
| NOA M. BADDISH (admitted *pro hac vice*) | |
| nbaddish@proskauer.com | |
| JOSHUA S. FOX (admitted *pro hac vice*) | |
| jfox@proskauer.com | |
| Eleven Times Square | |
| New York, NY 10036 | |
| Telephone: (212) 969-3000 | |
| Facsimile: (212) 969-2900 | |

**PROSKAUER ROSE LLP**
PHILIPPE A. LEBEL (SBN 274032)
plebel@proskauer.com
2029 Century Park East, 24th Floor
Los Angeles, CA 90067-3010
Telephone: (310) 557-2900
Facsimile: (310) 557-2193

**PROSKAUER ROSE LLP**
MARK W. BATTEN (admitted *pro hac vice*)
mbatten@proskauer.com
SAMANTHA R. MANELIN (admitted *pro hac vice*)
smanelin@proskauer.com
One International Place
Boston, MA 02110-2600
Telephone: (617) 526-9600
Facsimile: (617) 526-9899

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AARON SENNE, *et al*., | Case No. CV 14-00608 JCS (consolidated with 3:14-cv-03289-JCS) |
| Plaintiffs, | |
| vs. | Hon. Joseph C. Spero |
| OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as MAJOR LEAGUE BASEBALL, *et al*. | **DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT DECLARATIONS, REPORTS, AND TESTIMONY OF BRIAN KRIEGLER, PH.D.** |
| Defendants. | Date: February 11, 2022<br>Time: 9:30 am<br>Place: Courtroom G, 15th Floor |

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................................................1

ARGUMENT .........................................................................................................................................3

A. The Court Has Not Yet Considered The Admissibility of Kriegler's Analysis. ........................3

B. Kriegler's Failure To Account For The Variability of the Survey Data Renders His Estimates Unreliable. ..................................................................................................................4

C. Kriegler's Analysis Is Unreliable As to the California League. ................................................7

D. Kriegler's Use of Only Data at the 10th and 25th Percentiles for Damages Calculations Was Not "Conservative," and the Itineraries and Deposition Data Do Not Validate That Decision. .........................................................................................................10

E. Kriegler's Failure To Report Standard Errors or Confidence Intervals Departs From Accepted Practice and Renders His Analysis Unreliable. ........................................................12

F. The *Mt. Clemens* Rule Does Not Excuse Compliance With *Daubert*. ....................................13

G. The New Analyses And Conclusions Provided In The Kriegler Declaration Are Untimely And Must Be Stricken................................................................................................14

CONCLUSION....................................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Anderson v. Mt. Clemens Pottery Co.*,
    328 U.S. 680 (1946) ................................................................................................... 13, 14

*Chavez v. IBP, Inc.*,
    2004 WL 5520002 (E.D. Wash. Dec. 8, 2004) ................................................................. 14

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ..................................................................................................... passim

*Fujifilm Corp. v. Motorola Mobility LLC*,
    2015 WL 1737951 (N.D. Cal. Apr. 8, 2015) ....................................................................... 9

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ............................................................................................................. 7

*Hamm v. Mercedes-Benz U.S.A., LLC*,
    2021 WL 1238304 (N.D. Cal. Apr. 2, 2021) ....................................................................... 9

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ........................................................................................................... 13

*Obrey v. Johnson*,
    400 F.3d 691 (9th Cir. 2005) ............................................................................................... 9

*PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*,
    2011 WL 5417090 (N.D. Cal. Oct. 27, 2011) ................................................................... 13

*Plumley v. Mockett*,
    836 F. Supp. 2d 1053 (C.D. Cal. 2010) ............................................................................. 15

*Reinsdorf v. Skechers U.S.A.*,
    922 F. Supp. 2d 866 (C.D. Cal. 2013) ............................................................................ 9, 10

*Rojas v. Marko Zaninovich, Inc.*,
    2011 WL 4375297 (E.D. Cal. Sept. 19, 2011) ................................................................... 15

*Senne v. Kan. City Royals Baseball Corp.*,
    934 F.3d 918 (9th Cir. 2019) ....................................................................................... 3, 4, 14

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ................................................................................................... 6, 7, 13

*Villalpando v. Exel Direct Inc.*,
    2016 WL 1598663 (N.D. Cal. Apr. 21, 2016) (Spero, J.) ................................................. 14

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
   259 F.3d 1101 (9th Cir. 2001) ..................................................................................................15

**RULES**

Fed. R. Civ. P. 23..............................................................................................................................6

Fed R. Civ. P. 26............................................................................................................................15

Fed. R. Civ. P. 37(c)(1)...................................................................................................................15

**OTHER AUTHORITIES**

Bradley Efron and Robert J. Tibshirani, AN INTRODUCTION TO THE BOOTSTRAP
   New York: Chapman & Hall (1993) ....................................................................................12, 13

David H. Kaye and David A. Freedman, "Reference Guide on Statistics"
   REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 3rd Edition (2011).............................................12

Shari Seidman Diamond, "Reference Guide on Survey Research,"
   REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 3rd Edition (2011).............................................12

iii

DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS, REPORTS, AND TESTIMONY OF BRIAN KRIEGLER, PH.D. – CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

**PRELIMINARY STATEMENT**

Unable to defend Dr. Brian Kriegler's work on the merits, Plaintiffs primarily propose various reasons that the Court should ignore its many shortcomings. They insist that the Court has already endorsed Kriegler's methodology and so need not think about it now; that his 10th and 25th percentile approach eliminates any need to evaluate the flaws of the Main Survey or the wide variations in the survey responses; that his report may be applied to the California League class even though it considers essentially no data from those players, because Kriegler says so; and that the lack of contemporaneous time records permits proof of damages under some lower standard that makes his report admissible even if it otherwise would not be. None of these dodges follows the law or accepted statistical principles.

First, neither this Court nor the Ninth Circuit has approved Kriegler's methodology for any purpose other than class certification; indeed, Kriegler had presented no more than a proposal at the time of those opinions. Those decisions expressly note that his work would be subject to challenge at summary judgment and at trial. That time has now come.

Second, like Kriegler, Plaintiffs decline to wrestle with the wide variation in survey responses, even among players on the same team, or the likelihood that those variations prevent reliable conclusions about hours worked across the classes, or raise fundamental questions about Kriegler's assumption in his calculations that all players in all Clubs at all minor league levels work the same number of hours. Instead they simply assume that all of the responses are accurate despite their inconsistencies, that players spent time on team-related activities from the moment of their arrival at the ballpark, and that all respondents were reporting compensable time, so that Kriegler's use of responses at the arbitrarily-selected 10th and 25th percentiles is "conservative." There is no basis for any of those assumptions, and Kriegler made no effort to determine why the responses varied as they did; he simply concluded that "some people work more than others," without any investigation.

Third, and similarly, Kriegler declares that responses from players outside the California League may be used to calculate hours worked for players in the California class, again without any statistical analysis. Ignoring their own data reflecting wide variability even among players on the

same team, Plaintiffs essentially insist that unless there is proof that California League players are different, they must be assumed to have played under the same conditions as everyone else. But the burden of proof to establish the reliability of Kriegler's analysis is theirs, and in any case there is not enough data to evaluate Kriegler's conclusion even if he had been inclined to do so.

Fourth, Kriegler's adoption of the percentile approach as a cure-all for deficiencies in the survey data merely uses one slice of unreliable data instead of the full dataset. There is no reason, and again Kriegler offers none, to believe that responses at the 10th or 25th percentile are any less affected by those deficiencies than any other responses. Plaintiffs emphasize that those percentiles – plucked out of thin air – match up with hours suggested by team itineraries, but in fact the figures do not match, and Kriegler performed no statistical analysis to confirm that the other data validated his approach. He simply eyeballed that other data against the two percentiles he had arbitrarily selected and declared them to be close enough.

Fifth, in response to Kriegler's failure to calculate standard error or confidence intervals, Plaintiffs take a page from Kriegler's *ipse dixit* approach to waving off criticism and announce without citation to any authority that there is no requirement for such calculations. In fact, such measures are established industry practice, and Kriegler's failure to cite a confidence interval amounts to a contention that his damages figures are precisely accurate, which they cannot be.

Sixth, Plaintiffs' repeated suggestion that they need only prove damages by "just and reasonable inference," and so can be forgiven for otherwise inadequate methodology or unreliable conclusions, confuses *Daubert*'s admissibility standard with the overall burden of proof for damages. They first must show that Kriegler's work is admissible, and it is not.

Finally, Plaintiffs have submitted a new declaration from Kriegler purporting to respond to the issues that Defendants have identified in their motion (the "Kriegler Declaration"). (Dkt. 1023 ("Kriegler Decl.").) Much of the Kriegler Declaration consists of original analyses and conclusions regarding the survey data that Dr. Kriegler has possessed for years. Those portions containing new analyses and conclusions are untimely and should be stricken.

# ARGUMENT

**A.   THE COURT HAS NOT YET CONSIDERED THE ADMISSIBILITY OF KRIEGLER'S ANALYSIS.**

Despite Plaintiffs' lengthy quotations from earlier decisions of this Court and the Ninth Circuit, (Dkt. 1022 ("Pls. Opp.") at 2-3, 7-8), neither Court has considered, much less decided, the admissibility of Kriegler's report for any purpose other than class certification. Kriegler had not even performed his analysis, after all, when those opinions were written, and Plaintiffs' extraordinary suggestion that the Court blessed his methodology in advance for all time, without even seeing his report, misrepresents the import of those holdings.

The only issue before this Court and the Ninth Circuit at the time of the earlier opinions was class certification, and – contrary to Plaintiffs' implication – both Courts carefully noted the limits of their commentary on what was then a mere proposal from Kriegler. In the paragraph of this Court's March 2017 Order that immediately follows Plaintiffs' first quotation, (Pls. Opp. at 2-3), the Court noted: "certification of the proposed classes will not preclude Defendants from challenging the sufficiency of the Main Survey and Plaintiffs' damages model on summary judgment and/or at trial. At that point, it is likely that the Court also will be in a better position to evaluate the overarching theory of Plaintiffs' claims and whether they will be able to prove their claims on a classwide basis." (Dkt. 782 at 56.) The Ninth Circuit, similarly – after noting that "[d]amages may well vary, and may require individualized calculations" – emphasized the legitimacy of the problems Defendants noted with the Main Survey, noted the need for other "representative evidence," and deferred entirely the question of whether "plaintiffs can persuade a jury that their workday began at a particular time." *Senne v. Kan. City Royals Baseball Corp.*, 934 F.3d 918, 943-44 (9th Cir. 2019).

Both decisions also anticipated that Plaintiffs would not rely so heavily on the problematic survey, but would use other evidence to move from the class certification question of *whether* the classes performed any work at all to the summary judgment and trial questions of *how much* work the classes performed and whether Plaintiffs can present reliable, admissible proof of the individual damages that the Ninth Circuit predicted. (Dkt. 782 at 56); *Senne*, 934 F.3d at 945.

Now we have Kriegler's actual report, rather than merely an outline of the analysis he proposed to do, along with his deposition testimony and the identity of the survey respondents. In its

concrete form, that report disappoints the expectations that this Court and the Ninth Circuit hypothesized for overcoming the shortcomings of the Main Survey with other evidence.  As it turns out (despite Plaintiffs' protestations in their Opposition, *see* Pls. Opp. at 6-7), Kriegler made almost no use of material other than the survey results for the central calculation of hours worked.  (*See* Dkt. 971 ("Defs. Br.") at 6.)  Plaintiffs imply that he relied mainly on schedules, eBis data, and rosters, and then merely used the survey data "to fill remaining evidentiary gaps." (Pls. Opp. at 7.)  In fact it was quite directly the opposite: Kriegler used a slice of the survey data to perform all of the "Hours Worked" calculations other than Championship Season game and travel time, and then (as it relates to "Hours Worked") used the other materials solely for the purpose of "validating" calculations that had been drawn exclusively from the survey.[1]  (Defs. Br. at 6, 14-16.)  That validation fails, as described in Defendants' moving brief at pages 14-16 and below in Section D.  For now, though, the point is that Plaintiffs' attempt to describe Kriegler's analysis as something that this Court and the Ninth Circuit foresaw and approved before it even existed misunderstands the prior opinions and ignores the mismatch between what those opinions expected to see and what Kriegler ultimately produced.  Kriegler's report must be tested on its own merits, not under some presumption of reliability from orders issued before he first picked up his calculator.

**B.   KRIEGLER'S FAILURE TO ACCOUNT FOR THE VARIABILITY OF THE SURVEY DATA RENDERS HIS ESTIMATES UNRELIABLE.**

Plaintiffs essentially do not contest that players' survey responses varied widely as to hours worked, not only among players on different teams but even among players on the same team.[2]

---

[1] Plaintiffs' effort to diminish Kriegler's near-exclusive reliance on the survey data for his Hours Worked calculation, indeed to paint the survey as something of an afterthought in a report based primarily on other data, implicitly acknowledges the unreliability of the survey data standing alone (as did the Ninth Circuit, (*see Senne*, 934 F.3d at 943)).  But they cannot so easily escape Kriegler's own explanation of his work, which establishes that the survey was the only basis for most of his calculations and that his limited use of the other data must be evaluated as he did – only with respect to its capacity to validate calculations that he made based on the survey data.  (*See* Dkt. 971-04 ("Martin Report") ¶¶ 20-23.)

[2] They do quote the Court's years-ago comment that the variations "are not so significant as to preclude a jury from addressing Plaintiffs' claims on a classwide basis," (Pls. Opp. at 11 (quoting Dkt. 782 at 55)), but that comment again was directed at class certification, not at the merits.  On the very next page the Court noted that "the sufficiency of the Main Survey and Plaintiffs' damages model" would be revisited on summary judgment and at trial.  (Dkt. 782 at 56.)

4

DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS, REPORTS, AND TESTIMONY OF BRIAN KRIEGLER, PH.D. – CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

Instead, they insist that Kriegler accounted for such variations by basing his damages calculations only on hours reported at the 10th and 25th percentiles of the survey responses. (Pls. Opp. at 10.) As Plaintiffs acknowledge, that maneuver rests on Kriegler's assumption that the variations were caused by "some people work[ing] more than others" – in other words, that all of the players, regardless of their different answers, were reporting only compensable time. (*See id.* (quoting Kriegler Deposition).) But neither Plaintiffs nor Kriegler articulates a justification for deciding that the variations are explained by different amounts of compensable work, rather than by such alternative explanations as faulty memories, self-interest bias, or different amounts of working time from player to player and from Club to Club. (*See* Defs. Br. at 8.) If one of those actually drove the variation in responses, then Kriegler's damages analysis is unreliable and therefore inadmissible, because those alternative explanations would undermine the accuracy of the responses at the 10th and 25th percentiles just as they would the responses at higher and lower percentiles. There is nothing "conservative" about choosing responses toward the lower end of uniformly compromised data.

Moreover, even though Plaintiffs narrowed their class and collective claims to only those activities performed on a team-wide basis – supposedly to eliminate individual issues that defeated predominance – Kriegler expressly admits that he has no data that measures those team-related activities. (Dkt. 971-03 ("Kriegler Tr."), 67:3-23.) His conclusion that comparing the 10th and 25th percentile of responses to team schedules and deposition testimony proves the existence of "minimum expectations for hours worked" across Clubs, (Pls. Opp. at 10), similarly is an assumption without any reliable basis. There is no evidence at all that these minimums were team-related rather than individual activities. (*See* Defs. Br. at 6-7.) And as discussed further in Section D below, the information derived from the schedules and testimony does not actually match the chosen percentiles of survey data, but Kriegler conducted no statistical comparison of the two data sets, simply declaring them to be close enough for his taste.

Defendants do not contend, as Plaintiffs insist, that "Kriegler should have examined the data across clubs," (Pls. Opp. at 10); rather, Kriegler must offer a reliable basis to conclude that the wide variation in survey responses from Club to Club, and even among players on the same team during

5

the same season, is not caused by the various shortcomings of the survey or by a mismatch between arrival and departure times, on one hand, and periods of compensable work, on the other. Defendants agree that sample sizes would be too small to conduct a statistical analysis Club by Club, but that does not excuse Plaintiffs from failing to collect enough data or Kriegler from offering a sound basis on which a jury could find that his report actually measures hours worked.

To defer this inquiry to the jury, Plaintiffs rely on a line from *Tyson Foods, Inc. v. Bouaphakeo*, that whether an expert's calculations are probative of hours worked is the "near-exclusive province of the jury." (Pls. Opp. at 11 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016).) But the Court's observation was limited to the context of considering whether representative evidence satisfied Rule 23 – not whether that evidence was reliable or admissible in the first place. Plaintiffs omit the preceding sentences:

> Representative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate of the uncompensated hours an employee has worked. ***Petitioner, however, did not raise a challenge to respondents' experts' methodology under Daubert***; and, as a result, there is no basis in the record to conclude it was legal error to admit that evidence. ***Once a district court finds evidence to be admissible***, its persuasiveness is, in general, a matter for the jury.

*Tyson Foods*, 577 U.S. at 459 (emphasis added). There was no *Daubert* motion in *Tyson*; Tyson Foods chose instead to let the evidence be admitted, and then to argue to the jury that the variability of the data undermined the expert's conclusion. On appeal, the company still did not contend that the expert's work was inadmissible; it merely argued that the variations in the data suggested a lack of predominance that should have precluded class certification.[3] By this motion, Defendants raise the deficiency not raised in *Tyson*: that expert opinions failing to account for variations in data are not admissible in the first place. Because Kriegler conducted no investigation into the variations in survey responses, and in particular did not determine whether they represent differences in compensable time or result from faulty data or independent player choices, his analysis is, to use *Tyson Food*'s phrase above, "statistically inadequate." *Id.* His conclusion that there was a common

---

[3] As the Court said in the sentence immediately following the one Plaintiffs quote: "The District Court could have **denied class certification on this ground** only if it concluded that no reasonable juror could have believed that the employees spent roughly equal time donning and doffing." *Id.* (emphasis added).

minimum expectation for hours worked for the tens of thousands of players at all minor league levels on all thirty Clubs in all years has no elucidated basis, cannot be tested, and therefore is "implausible." *Id.* His report and testimony must be excluded.

### C. KRIEGLER'S ANALYSIS IS UNRELIABLE AS TO THE CALIFORNIA LEAGUE.

When Dennis selected the survey population for the Main Survey, there was no California League class. (*See* **Exhibit 1**,[4] 71:25-72:14 (Dr. Dennis testifying that at the time he "wrote [his] report . . . this litigation development regarding the California League had not occurred.")).) Once that class came into existence, Dennis and Kriegler faced the challenge of retrofitting already-collected data to a new population. Yet neither of them took any particular steps to ensure that their respective studies could draw reliable conclusions about work conditions in the California League.[5] (Defs. Br. at 10-12.) Instead, Plaintiffs rely on Kriegler's naked assertion that "based on everything that I've seen, and everything that I know in this case," responses provided by players who never played in the California League may be used to calculate damages for the California League class. (Pls. Opp. at 14.)

Kriegler performed no analysis to back up that hand-waving. There is no question that, as Plaintiffs say, Kriegler "***does have*** 'confidence that the survey results provide useful information'" about the California League, (*Id.* at 14 (original emphasis) (quoting Defs. Br. at 11)), but he has not so much as articulated, let alone demonstrated statistically, any ***basis*** for that confidence, which is what Defendants said in the reference that Plaintiffs partially quote. It is another instance of the bald *ipse dixit* that characterizes so much of Kriegler's report, and that fails to meet the standards of *Daubert*. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Considering the extent of variation in the survey

---

[4] All exhibits referenced herein are annexed to the Declaration of Elise M. Bloom In Support Of Defendants' Reply Memorandum Of Law In Further Support Of Defendants' Motion To Exclude Plaintiffs' Expert Declarations, Reports, And Testimony Of Dr. Brian Kriegler, Ph.D. and are referred to as "Exhibit __" or "Ex. __."

[5] Dennis testified, "I'm telling you categorically I have not done analyses related to the Minor League players that participated in the California League." (Dkt. 971-06, 131:24-132:3.) Kriegler testified that he "didn't see the need" to investigate whether hours spent at the ballpark were different for California League players than for others. (Kriegler Tr. 132:9-20.)

responses from Club to Club and even within the same teams, *Daubert* requires more than such pronouncements to establish that the survey data can be applied to players whose information Kriegler largely excluded from consideration.

In essence, Plaintiffs take the position that without proof that the California League was different, we must assume that work experiences were all the same.[6] As with their repeated suggestions that Defendants should have conducted their own survey or presented a competing analysis,[7] Plaintiffs ignore the rather basic notion that as the parties with the burden of proof, and as the proponents of Kriegler's calculations, it is their obligation to establish that Kriegler's methodology follows accepted statistical principles and reliably represents the real-world experience they purport to capture.

In any case, the question of whether Kriegler can reliably apply his calculations to California League players does not turn merely on the burden of proof, because regardless of which party attempted to answer that question, Plaintiffs simply failed to collect the data to do it. Kriegler draws conclusions about the work hours of California League players without, so far as anyone knows, virtually any data from those players. (Defs. Br. at 11.) There are only nine or ten California League respondents in the stripped-down subset he used for his calculation, and eight of those played for other affiliates during the same time period and so were not necessarily responding about their California League experience. (*See* Martin Report ¶¶ 14(c), 60; Dkt. 971-05, at 8.) So there simply is not enough data from California League players to know how many hours those 3,376 players might have worked, or whether that experience bore any resemblance to players in other leagues.

---

[6] What that shared experience would be is itself impossible to say because of the wide variations in responses across the survey population. (*See* Section B, *supra*.)

[7] (*See* Pls. Opp. at 1 (chastising Defendants for "brazenly criticiz[ing] Dr. Kriegler's estimates as imprecise without putting forth any estimates of their own"); 9 (arguing that Defendants should not criticize Kriegler's methodology because "Defendants' experts did not do this"); 19 (complaining that Defendants have not analyzed the California League "despite having seven years and significant resources to do so"); 21-22 (faulting Defendants' experts for not conducting their own standard error analysis); 25 (again arguing that Defendants should not be permitted to criticize the Main Survey "given that Defendants never conducted their own survey").)

Nor does the much-touted comparison to team itineraries assuage the concern, because Kriegler's sample included only one California League itinerary for the year from which his survey data was derived, and that one was for a team that none of the respondents played for that year. (Martin Report ¶ 13(a)(iii).)[8]

Thus, while Kriegler says, without explanation, that he sees no reason to think California League players were different, there equally is no reason to think the California League players followed the same schedules as others. Plaintiffs insist that the lack of representation of California League players in Kriegler's data should be ignored because concerns about small sample size go to evidentiary weight, rather than admissibility (Pls. Opp. at 11-12), though the cases they cite do not stand for that proposition.[9] In any event, the problem here runs deeper than a question only of sample size, because Kriegler lacks any scientific foundation for the proposition that survey responses from players outside the California League can be used to calculate damages for the California class. That is a *Daubert* question. The court in *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878 (C.D. Cal. 2013), rejected a similar suggestion that a mismatch between the population surveyed and the population for which conclusions were being drawn was "a question of weight to be determined at trial." The court concluded instead that the survey "was not conducted according to accepted scientific principles" because the expert "did not identify any basis, save for his own undocumented research, for selecting the survey population that he used." *Id*. Similarly, here, Kriegler uses almost exclusively data from sources other than California League players to draw conclusions about those players, and offers no basis to do so other than his own unsupported

---

[8] Plaintiffs insist Kriegler's conclusion is backed by "extensive evidence," (Pls. Opp. at 14), but then cite just one ambiguous example from four depositions, along with the general list of materials Kriegler relied upon (most of which have nothing to do with the California League). (*Id*. at 14 n.10.)

[9] In *Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005), sample size was not at issue; the defendant challenged the report because it "failed to account for the relative qualifications of the applicants being studied." In *Fujifilm Corp. v. Motorola Mobility LLC*, 2015 WL 1737951, at *10 (N.D. Cal. Apr. 8, 2015), a patent infringement case, the court rejected a challenge to sample size not because such issues never bear on admissibility, but because the defendant failed to explain why the sample size was too small. And in *Hamm v. Mercedes-Benz U.S.A., LLC*, 2021 WL 1238304, at *14 (N.D. Cal. Apr. 2, 2021), a consumer class action based on faulty cars, the court held that "an expert's selection of certain variables to include within a regression analysis" was not a *Daubert* issue. That is not, of course, the nature of the problem here.

say-so. Here, as in *Reinsdorf*, "[t]here is no indication that the survey population had any relationship to the relevant population." *Id*. Such an inadequacy "speak[s] not merely to the weight that should be accorded the survey, but rather to the fundamental reliability of [the expert's] approach." *Id*. His analysis must be excluded.

### D. KRIEGLER'S USE OF ONLY DATA AT THE 10TH AND 25TH PERCENTILES FOR DAMAGES CALCULATIONS WAS NOT "CONSERVATIVE," AND THE ITINERARIES AND DEPOSITION DATA DO NOT VALIDATE THAT DECISION.

Plaintiffs repeatedly try to wipe away the multiple deficiencies of the survey data by assuming, as Kriegler does, that by using lower-end percentiles as the basis for calculations, any shortcomings in the data can be forgiven. They label Kriegler's damages estimates "conservative," implying that the real damages are actually higher than the estimates, offsetting the many problems with and variations in the data. But there is nothing conservative about basing calculations on the 10th or 25th percentiles, because those data points are no more reliable than any other responses. Plaintiffs in their opposition simply repeat the same arguments that they make as to all of the survey data, (Pls. Opp. at 16-18), and so do nothing to defend their insistence elsewhere that use of the lower percentiles somehow generates a more reliable estimate.[10]

Nor does the percentile approach gain any reliability from the comparison to itineraries and deposition testimony, as Plaintiffs also insist. They have no answer to the problem that Kriegler did not conduct any statistical analysis to determine whether the hours indicated by these other data sources – which do not match the survey data – actually validate his reliance on the 10th and 25th percentile survey responses as a scientific matter. Although the itineraries are Club-specific, Kriegler made no effort whatsoever to validate survey responses that corresponded with the respondent's Club, much less affiliate. Kriegler just decided, by fiat and without justification or even an explanation, that all of the survey responses were close enough to all of the Clubs' itineraries without regard to any of the differences across Clubs, and declared the survey data (which

---

[10] (*See, e.g.*, Pls. Opp. at 4 (use of 10th percentile "signifies a conservative estimate"); 9 (reliance on percentiles helpfully excludes "outliers who may have reported earlier than expected"); 10 (use of percentiles demonstrates "that '[t]here are minimum expectations for hours worked'"); 11 n.7 (use of percentiles "ensure[s] that his hours worked conclusions are not overstated"); 24 ("confused responses" to survey questions only matter if 90% or 75% of respondents were confused).)

10

DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS, REPORTS, AND TESTIMONY OF BRIAN KRIEGLER, PH.D. – CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)

is all he actually used to calculated hours worked) to be validated. (Defs. Br. at 14-16.) That sheer *ipse dixit* lacks all of the criteria for admissibility under *Daubert*: that the methodology "can be (and has been) tested," that it have a tolerable "known or potential rate of error," and that it has been accepted in the relevant scientific community. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993). Plaintiffs offer none of this sort of confirmation. Instead they say twice that the survey data "tracks very closely" the hours derived from the itineraries, (Pls. Opp. at 4), that the two "aligned closely," (*id.* at 19), and that the deposition testimony serves as a "cross-check," (*id.* at 21), but do not say what any of that means, much less make any effort to justify it with a statistical measure.

Use of the 10th and 25th percentiles thus does not excuse Kriegler from grappling with the variability of the data and its various other methodological problems. In particular, Kriegler's decision only to use responses at certain percentiles and ignore all of the others above and below those points renders his damages conclusions unreliable, because they are formed from work hours that the vast majority of the survey responses did not report. Plaintiffs take issue with the idea that Kriegler "disregarded" the other survey responses, making only the obvious point that to know which survey responses represent the 10th and 25th percentiles, one must sort all of the responses from lowest to highest. (Pls. Opp. at 18.) But Kriegler *does* then discard the other responses, because all of his damages calculations are based solely on the responses from those players who reported hours that turned out to be at the selected percentiles. All of the players who reported more work hours – by definition, the overwhelming majority of the respondents – *do* have their responses discarded, because under Kriegler's model they will not receive damages for any hours reported in excess of, at most, the 25th percentile, hours that Plaintiffs elsewhere argue were all compensable. (*See* Pls. Opp. at 10, 17 (arguing that most players reported hours above the 25th percentile because "some people work more than others").) Players who reported hours below the 10th percentile are credited with hours they did not claim to have worked.

For these reasons, basing damages calculations on the 10th and 25th percentile responses is not "conservative" (Pls. Opp. at 16); it is arbitrary, and is made no more reliable by Kriegler's unscientific eyeball comparison with itinerary data that he did not even consider Club by Club. Not

11

merely a matter for cross-examination, Kriegler's methodology lacks "a valid scientific connection to the pertinent inquiry," and must be excluded. *Daubert*, 509 U.S. at 592.[11]

### E. KRIEGLER'S FAILURE TO REPORT STANDARD ERRORS OR CONFIDENCE INTERVALS DEPARTS FROM ACCEPTED PRACTICE AND RENDERS HIS ANALYSIS UNRELIABLE.

Plaintiffs cite no authority for their notion that "there is no requirement that a statistician must always calculate a standard error or confidence interval." (Pls. Opp. at 21.) Actually, as noted in Defendants' opening brief, these techniques are part of the accepted scientific practice for surveys, especially those used in litigation and where there is significant variability in the data. As also noted in Defendants' motion, the Reference Manual on Scientific Evidence, a treatise on which both sides have relied as authoritative, emphasizes that norm more than once. (*See* Defs. Br. at 16 (citing Martin Report ¶ 52, in turn citing David H. Kaye and David A. Freedman, "Reference Guide on Statistics" in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 3rd Edition, at 243-246 (2011); Shari Seidman Diamond, "Reference Guide on Survey Research," in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 3rd Edition, pp. 415-416 (2011)); Dkt. 969-12, ¶ 17 n.22.; Dkt. 971-02 ¶ 113 n.75)

Thus, Defendants do not "refer exclusively to articles that Dr. Kriegler himself put out," as Plaintiffs inexplicably argue, (Pls. Opp. at 22), but primarily to the authoritative survey treatise. Plaintiffs offer no response to the Reference Manual. And while they quibble with the characterization of Kriegler's articles on standard error techniques, they never contest (other than, as usual, with Kriegler's own *ipse dixit*) that the statistical literature endorses use of the "bootstrap" method to calculate standard error and confidence intervals for a percentile. (*See, e.g.*, Martin Report ¶ 56 (citing Bradley Efron and Robert J. Tibshirani, AN INTRODUCTION TO THE BOOTSTRAP,

---

[11] Struggling to make these problems a "battle of the experts" rather than a *Daubert* issue, Plaintiffs mischaracterize Defendants' argument as saying that Kriegler should have done an analysis by team at the 50th percentile. (Pls. Opp. at 20-21.) That is not Defendants' position, and in fact Defendants agree that sample sizes based on the data Plaintiffs collected would be too small to draw conclusions on a team-by-team basis. The point was that Kriegler made no effort to investigate the reason why the 50th percentile of survey responses, as one example, were consistently higher than the hours in the itinerary documents, which called into question his reliance on the itineraries to validate his approach (and the survey data itself). But the inability to create a reliable statistical analysis based on the 50th percentile or on a team-by-team basis does not thereby mean that Kriegler's approach is reliable. It may be, instead, that no reliable damages analysis is possible with the data derived from the Main Survey. Answering that question, however, is Plaintiffs' task, not Defendants'.

12-16, 168-74 New York: Chapman & Hall (1993), and noting that "Stata, a widely used statistical software analysis software package," permits the user to apply the bootstrap technique to a percentile).) Plaintiffs merely point out Kriegler's deposition testimony that he "can't recall a time that – of computing a margin of error on a percentile," (Pls. Opp. at 22) but Kriegler cannot justify his failure to use a standard and expected statistical technique by saying that he has never done it.[12]

*Daubert*'s reliability requirement ensures, among other things, "that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Experts in this "relevant field" – statistical analysis based on surveys – calculate standard error and confidence intervals when evaluating survey results, as the literature cited above establishes. Hoping to defer the issue to cross-examination, Plaintiffs cite only *Tyson*, where again there was no *Daubert* challenge and the admissibility of the expert evidence was not in question, and one other decision that did not concern standard error or confidence intervals.[13]

### F. THE *MT. CLEMENS* RULE DOES NOT EXCUSE COMPLIANCE WITH *DAUBERT*.

Plaintiffs repeatedly emphasize that they would not have bothered with Kriegler's analysis but for the lack of traditional time records. (Pls. Opp. at 1, 5, 7, 17.) In fact they actually take umbrage at criticism of Kriegler considering the data he had to work with. (*See id.* at 13 ("Dr. Kriegler should hardly be criticized for using the most reliable data available.").) But the "just and reasonable inference" rule of *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), does not somehow excuse Kriegler's report from *Daubert*'s gatekeeping standards. As this Court has held, interpreting *Tyson*, "the standard under *Daubert* is the same regardless of whether or not the

---

[12] Plaintiffs also complain that Dr. Martin did not calculate standard errors or confidence intervals for the prices of baseball camps in her merits declaration. (*Id*. (citing Dkt. 990-04 at 10-12).) But Dr. Martin was not attempting to put a particular value on the baseball camps or on minor league training; she was only providing a minimum valuation for the benefits that players receive. Kriegler, by contrast, purports to calculate specific amounts of alleged damages, and with no standard error, effectively asserts that his calculated figures are precisely accurate – which as a matter of accepted statistical theory, they cannot be.

[13] In *PixArt Imaging, Inc. v. Avago Technologies General IP (Singapore) Pte. Ltd*., 2011 WL 5417090, at *5 (N.D. Cal. Oct. 27, 2011), the defendant asserted several challenges to "technical considerations" that did not include standard error or confidence intervals. The case accordingly is distinguishable because here the lack of standard error analysis ignores established industry practice rather than merely challenging implementation details.

*Mt. Clemens* rule applies." *Villalpando v. Exel Direct Inc.*, 2016 WL 1598663, at *8 (N.D. Cal. Apr. 21, 2016) (Spero, J.); *see also Chavez v. IBP, Inc.*, 2004 WL 5520002, at *2 (E.D. Wash. Dec. 8, 2004) (rejecting an argument that *Mt. Clemens* entitles plaintiffs' expert to a "relaxed *Daubert* standard" in wage and hour cases, because "[t]he burden of proof for damages at trial . . . does nothing to alter *Daubert*'s requirement of reliability"). The lack of time records, and the availability of *Mt. Clemens*' proof standards, thus has no bearing on this motion. Before Plaintiffs can argue about whether their evidence proves damages by a "just and reasonable inference," they must first establish that that evidence is admissible. And that foundational question is governed by the same standards in wage and hour cases as in any other.

Plaintiffs' suggestion that Kriegler is due some sympathy for having to spin gold out of straw, (Pls. Opp. at 13), also forgets that the straw was supplied by their other expert, Dr. Dennis. After what the Ninth Circuit called "a number of legitimate questions" about the survey pressed Kriegler into using only a subset of the responses,[14] (*Senne*, 934 F.3d at 943), he chose to base his calculations not on the full range of that subset or even an average, but rather only on responses at low percentiles, in a further effort to be "conservative" and minimize the impact of other problems with the survey.[15] *Daubert* requires more than merely making the best use of whatever happens to be "the most reliable data available" (Pls. Opp. at 13); it requires analysis that follows accepted industry practice and uses reliable methods to ensure that it is measuring what it claims to measure. Kriegler's work does not meet that standard, and must be excluded.

**G. THE NEW ANALYSES AND CONCLUSIONS PROVIDED IN THE KRIEGLER DECLARATION ARE UNTIMELY AND MUST BE STRICKEN.**

In his new declaration, Kriegler presents new analyses and conclusions in an attempt to bolster the reliability of his report. Kriegler writes himself that "this declaration includes numerous re-calculations of estimated hours worked." (Kriegler Decl. ¶ 42.) Kriegler "re-examined" the survey data to test whether it accounts for "under-represented sub-groups" (*Id.* ¶ 10, 16-26, Appendix A, Attachments 1, 2) and accurately represents the California class. (*Id.* ¶¶ 10, 28-33.)

---

[14] (*See* Pls. Opp. at 13 (acknowledging that Kriegler used only a subset of the survey data in an effort to "eliminate any argument regarding self-interest or recall bias").)

[15] (*See* Pls. Opp. at 24 n.23 (citing Kriegler's testimony that he chose to use low percentiles in part because of potential "confusion by survey respondents").)

Kriegler uses these new analyses to offer original conclusions that he alleges "re-enforce the stability of the 10th and 25th percentiles of hours worked." (*See id.* ¶¶ 9-11, 42.)

Kriegler's "re-calculations" offered after expert discovery closed violates Federal Rule of Civil Procedure 26 and accordingly must be stricken. *See* Fed. R. Civ. P. 37(c)(1); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) gives teeth to [Rule 26(a)] requirements") (internal citation omitted). Defendants' motion did not provide Kriegler an opportunity to serve new analyses and conclusions beyond those contained in his Supplemental Report. *Plumley v. Mockett*, 836 F. Supp. 2d 1053, 1062 (C.D. Cal. 2010) ("[A] supplemental expert report that states additional opinions or seeks to strengthen or deepen opinions expressed in the original expert report is beyond the scope of proper supplementation and subject to exclusion.") (quotation marks omitted); *Rojas v. Marko Zaninovich, Inc.*, 2011 WL 4375297, at *6 (E.D. Cal. Sept. 19, 2011) ("[A] party may not rely on supplementation as a way to remedy a deficient expert report as a means of getting in, in effect, a brand new report").

There is no justification for Kriegler's failure to include these calculations in his Supplemental Report as they are based on survey data available to him since August 2016. (*See* Dkt. 696.) Nor was the late disclosure harmless, as Defendants were deprived of the opportunity to depose Kriegler regarding these opinions or for their experts to rebut them. The Court should strike Paragraphs 8-11, 16-33, and 42, Appendix A, and Attachments 1 and 2 of the Kriegler Declaration. Even if the Court declines to strike these portions of the Kriegler Declaration, they should be excluded with the rest of Kriegler's declarations and reports for the reasons described above and in Defendants' moving brief.

## CONCLUSION

For the foregoing reasons and those set forth in Defendants' moving brief (Dkt. 971), Defendants respectfully request that the Court grant Defendants' motion, exclude from evidence the declarations and reports of Brian Kriegler, Ph.D. and the evidence upon which he relies, preclude him from testifying, and strike Paragraphs 8-11, 16-33, and 42, Appendix A, and Attachments 1 and 2 of the Kriegler Declaration.

Dated: December 10, 2021

PROSKAUER ROSE LLP
ELISE M. BLOOM (*pro hac vice*)
NEIL H. ABRAMSON (*pro hac vice*)
ADAM M. LUPION (*pro hac vice*)
MARK W. BATTEN (*pro hac vice*)
RACHEL S. PHILION (*pro hac vice*)
NOA M. BADDISH (*pro hac vice*)
JOSHUA S. FOX (*pro hac vice*)
PHILIPPE A. LEBEL
SAMANTHA R. MANELIN (*pro hac vice*)

By: */s/ Elise M. Bloom*
    Elise M. Bloom
    *Attorneys for Defendants*