1  **PROSKAUER ROSE LLP**
ELISE M. BLOOM (admitted *pro hac vice*)
2  ebloom@proskauer.com
NEIL H. ABRAMSON (admitted *pro hac vice*)
3  nabramson@proskauer.com
ADAM M. LUPION (admitted *pro hac vice*)
4  alupion@proskauer.com
RACHEL S. PHILION (admitted *pro hac vice*)
5  rphilion@proskauer.com
NOA M. BADDISH (admitted *pro hac vice*)
6  nbaddish@proskauer.com
JOSHUA S. FOX (admitted *pro hac vice*)
7  jfox@proskauer.com
Eleven Times Square
8  New York, NY 10036
Telephone:  (212) 969-3000
9  Facsimile:   (212) 969-2900

10 **PROSKAUER ROSE LLP**            **PROSKAUER ROSE LLP**
PHILIPPE A. LEBEL (SBN 274032)    MARK W. BATTEN (admitted *pro hac vice*)
11 plebel@proskauer.com              mbatten@proskauer.com
2029 Century Park East, 24th Floor  SAMANTHA R. MANELIN (admitted *pro hac vice*)
12 Los Angeles, CA  90067-3010       smanelin@proskauer.com
Telephone:  (310) 557-2900        One International Place
13 Facsimile:   (310) 557-2193       Boston, MA 02110-2600
                                  Telephone:  (617) 526-9600
14                                   Facsimile:   (617) 526-9899

15           UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF CALIFORNIA
16

17 | AARON SENNE, *et al.*, | Case No. CV 14-00608 JCS (consolidated with 3:14-cv-03289-JCS) |
|---|---|
18 |                Plaintiffs, | |
|   | Hon. Joseph C. Spero |
19 | vs. | |
20 | OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as MAJOR LEAGUE BASEBALL, *et al.* | **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE A MOTION FOR DECERTIFICATION OF THE RULE 23 CLASSES AND FLSA COLLECTIVE** |
21 | | |
22 |                Defendants. | |
23 | | Date:  February 11, 2022 Time: 9:30 am Place: Courtroom G, 15th Floor |

24

25

26

27

28

1

2

## <u>TABLE OF CONTENTS</u>

3
<u>Page</u>

4

PRELIMINARY STATEMENT ..........................................................................................1

RELEVANT BACKGROUND ..........................................................................................4

LEGAL ARGUMENT.........................................................................................................7

    I.      PLAINTIFFS FAIL TO SATISFY COMMONALITY AND
           PREDOMINANCE BECAUSE THEIR DAMAGES MODEL DOES NOT
           CORRESPOND TO THEIR "TEAM-RELATED" THEORY OF
           LIABILITY..........................................................................................................7

    II.     PLAINTIFFS' OWN EVIDENCE SHOWS THAT PLAYERS DID NOT
           SPEND "ROUGHLY EQUAL" TIME PERFORMING TEAM-RELATED
           ACTIVITIES AND THEREFORE PLAINTIFFS' APPROACH VIOLATES
           THE RULES ENABLING ACT...........................................................................13

          A.      Plaintiffs' Own Evidence Establishes That Players Did Not Spend
                 "Roughly Equal Time" On Compensable Activities. ......................................14

          B.      Permitting Resolution Of Plaintiffs' Claims On A Class Basis Would
                 Abridge Defendants' Substantive Rights.........................................................16

          C.      Plaintiffs' Survey Abridges Players' Right to Recover Damages They
                 Contend That They Are Owed..........................................................................17

    III.    THE CALIFORNIA CLASS MUST BE DECERTIFIED BECAUSE THE
           SURVEY DOES NOT REPRESENT THE CALIFORNIA CLASS
           POPULATION. ...................................................................................................18

CONCLUSION...................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aldapa v. Fowler Packing Co.*,
No. 1:15-cv-00420-DAD-SAB, 2019 U.S. Dist. LEXIS 35284 (E.D. Cal. Mar. 5,
2019) ................................................................................................................................7

*Bahamas Surgery Ctr., LLC v. Kimberly-Clark Corp.*,
820 F. App'x 563 (9th Cir. 2020) ...............................................................3, 4, 19, 20

*Bamonte v. City of Mesa*,
598 F.3d 1217 (9th Cir. 2010) .......................................................................................8

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)............................................................................................. passim

*Cruz v. Dollar Tree Stores, Inc.*,
Nos. 07–2050 SC, 07–4012 SC, 2011 WL 2682967 (N.D. Cal. July 8, 2011) ......19, 20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)......................................................................................................11

*Davidson v. Apple, Inc.*,
No. 16-CV-04942-LHK, 2018 WL 2325426 (N.D. Cal. May 8, 2018) .....................8, 9

*Dzielak v. Whirlpool Corp.*,
No. 2:12–89 (KM)(JBC), 2017 WL 6513347 (D.N.J. Dec. 20, 2017) .........................18

*Green v. Fed. Express Corp.*,
614 F. App'x 905 (9th Cir. 2015) ..................................................................................8

*Howard v. CVS Caremark Corp.*,
628 F. App'x 537 (9th Cir. 2016) ................................................................................14

*In re Methionine Antitrust Litig.*,
No. 00–1311, 2003 WL 22048232 (N.D. Cal. Aug. 26, 2003).....................................19

*Kazi v. PNC Bank, N.A.*,
No. 18-cv-04810-JCS, 2020 WL 3414709 (N.D. Cal. June 22, 2020) (Spero, J.) .......14

*Marlo v. United Parcel Serv., Inc.*,
639 F.3d 942 (9th Cir. 2011) .........................................................................................3

*Marlo v. United Parcel Serv., Inc.*,
251 F.R.D. 476 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011) .......................19

*McMorrow v. Mondelez Int'l Inc.*,
   No. 17-cv-2327-BAS-JLB, 2020 WL 1157191 (S.D. Cal. Mar. 9, 2020) .................................. 11

*Risinger v. SOC LLC*,
   No. 12-cv-00063-MMD-PAL, 2019 WL 3400645 (D. Nev. July 26, 2019) ................................ 7

*Senne v. Kan. City Royals Baseball Corp.*,
   934 F.3d 918 (9th Cir. 2019) .......................................................................................... 5, 11, 15

*Stiller v. Costco Wholesale Corp.*,
   673 F. App'x 783 (9th Cir. 2017) ............................................................................................. 14

*Tyson Foods v. Bouaphakeo*,
   577 U.S. 442 (2016) ................................................................................................................passim

*Vizcarra v. Unilever United States, Inc.*,
   No. 4:20-cv-02777 YGR, 2021 WL 5370754 (N.D. Cal. Oct. 27, 2021) .............................. 8, 11

*Wal-Mart Stores, Inc., v. Dukes*,
   564 U.S. 338 (2011) ......................................................................................................... 13, 16

**STATUTES**

FLSA ............................................................................................................................................passim

Rules Enabling Act ........................................................................................................ 2, 13, 16, 18

**RULES**

Fed. R. Civ. P. 23(b)(2) ............................................................................................................... 6

Fed. R. Civ. P. 23(b)(3) ............................................................................................................... 4

Fed R. Civ. P. 23(c)(1)(C) ........................................................................................................ 4, 7

Fed. R. Civ. P. 23(d)(1)(D) ...................................................................................................... 4, 7

**REGULATIONS**

29 C.F.R. § 785.16 ........................................................................................................................ 8

- iii -

**NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE A MOTION FOR
<u>DECERTIFICATION OF THE RULE 23 CLASSES AND FLSA COLLECTIVE</u>**

**PLEASE TAKE NOTICE** that on February 11, 2022 at 9:30 a.m. or as soon thereafter as counsel may be heard, Defendants[1] will and hereby do move this Court for leave to file a Motion for Decertification of the classes certified under Federal Rule of Civil Procedure ("Rule") 23 and the collective certified under the Fair Labor Standards Act ("FLSA").

This Motion is based on this Notice, the Memorandum of Points and Authorities, the Declaration of Elise M. Bloom ("Bloom Decl."), accompanying Exhibits, the pleadings and records on file with this Court, all matters of which the Court must or may take judicial notice, and such evidence and argument as may be presented at or before the hearing on this matter.

---

[1] "Defendants" refers to all Defendants named in the Second Consolidated Amended Complaint, with the exception of the MLB Clubs that have been dismissed for lack of personal jurisdiction.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**PRELIMINARY STATEMENT**

Defendants respectfully request leave to file a motion to decertify the Rule 23 classes and FLSA collective based on developments in this case following the Ninth Circuit's class certification ruling. Since that ruling, the record has been developed further, and evidence that did not exist at the time of the Ninth Circuit's decision—including Plaintiffs' damages report and its near-exclusive reliance on a subset of survey data to calculate hours worked for all Players for all Clubs for all years—now confirms that class and collective treatment is incompatible with Supreme Court and Ninth Circuit precedent. In addition to Plaintiffs' damages report, this Court now has the benefit of the recent deposition testimony of Plaintiffs' damages expert, Dr. Brian Kriegler, and their survey expert, Dr. J. Michael Dennis—evidence that further reinforces the impropriety of class- and collective-wide treatment that the Ninth Circuit obviously did not have an opportunity to consider.

In 2017, after having denied Plaintiffs' motion for class and collective certification in full, upon Plaintiffs' motion for reconsideration, the Court certified a Rule 23 class under California law and an FLSA collective, and the Ninth Circuit subsequently certified additional Rule 23 classes under Arizona and Florida laws, based on several essential assurances made by Plaintiffs: that they would limit their theory of classwide liability to only "team-related" activities; that their survey and a yet-to-be-disclosed damages model would constitute representative evidence of the hours spent by Players[2] performing those "team-related" activities; and that the survey would be just one of myriad *other* sources of purportedly "representative" evidence that would be used to establish the number of hours spent on "team-related activities" for purposes of calculating liability and/or damages.

Evidence that did not exist when the Ninth Circuit reviewed this Court's certification order conclusively demonstrates that Plaintiffs failed to deliver on any of those assurances, which warrants decertification now on at least three new grounds.

First, it is now clear that Plaintiffs' amended theory of liability – minimum wage and overtime recovery for only "team-related" activities – does not correspond to their recently disclosed

---

[2] Defendants incorporate the defined terms from Defendants' Motion for Partial Summary Judgment. *See* Dkt. 980.

damages model, which is not limited to team-related activities but instead calculates alleged

damages pursuant to survey respondents' estimates regarding *all* time spent at the ballpark, whether

training individually or with the team, and regardless of whether such time is compensable or not.

This disconnect warrants decertification based on the Supreme Court's ruling in *Comcast Corp. v.*

*Behrend*, 569 U.S. 27 (2013) ("*Comcast*"), which establishes the "unremarkable premise" that a

damages model must "measure only those damages attributable to [Plaintiffs'] theory [of liability]"

in order for a class to be certified. *Id.* at 35. The Ninth Circuit acknowledged this defect in the survey

in reviewing the Court's decision, but nonetheless affirmed certification on the promise that

Plaintiffs would rely on "other" representative evidence in the record to supplement the survey and

provide the connection between the damages model and liability theory that *Comcast* demands.

Discovery has confirmed that Plaintiffs' experts do not rely on any such "other" evidence, but

indeed that no such evidence exists, for purposes of establishing alleged hours of "work" on a

representative basis.

Second, expert discovery (including the recent disclosure of the identities of survey

respondents) has now underscored the drastic variability in Players' responses to the survey,

including with respect to Players who played for the same teams at the same time, and that neither

Dr. Dennis nor Dr. Kriegler accounted for this variability in the course of their analyses. Nor is there

any other evidence in the record that provides any purportedly representative evidence as to the

hours of alleged work performed by Players, despite this Court's and the Ninth Circuit's reliance on

Plaintiffs' representations as to the existence of such evidence to excuse the variability in survey

responses and therefore certify classes. Plaintiffs' experts have now confirmed that Plaintiffs rely

exclusively on the survey and derivative damages model as a "one size fits all" source of evidence of

liability with respect to each of the 22 individual Club Defendants (not to mention with respect to

each of the Players, and each of the multiple minor league affiliates with whom they played

baseball). This violates the Rules Enabling Act, because Plaintiffs' expert evidence attempts to hold

individual Club Defendants liable for more hours of alleged "work" performed than actually

occurred, relying as they do on arrival and departure times, rather than their participation in "team-

related" activities. That approach imposes greater liability and damages than in separate trials against

each Club individually, thereby violating the Supreme Court's ruling in *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 455 (2016).

The Players fare no better: even though the Players have testified that they seek recovery with respect to *all* hours of training, their supposed representatives, the Plaintiffs, have chosen to discard most of the hours that the Players claim to have worked, instead attempting to establish liability based only on the 10th and 25th percentiles of a small subset of survey responses regarding Players' arrival and departure times. As a result, the survey's legitimacy as "representative" evidence is fundamentally compromised. No Player could, and nearly all would choose not to, rely on Dr. Dennis's survey or Dr. Kriegler's calculations as evidence of liability in his individual trial. The survey's inquiry into arrivals and departures rather than team-related activities, and the wildly varying responses to those questions, make the survey meaningless in establishing any individual Player's claims, and Dr. Kriegler's adoption of a uniform damages figure for all Players on all Clubs at all affiliates in all years contradicts Plaintiffs' own evidence and discards most of the hours that the Players claim to have worked.

Finally, the California Class must be decertified, not just for the preceding reasons but also because of a unique failure of proof. Expert discovery demonstrates that Plaintiffs' survey cannot be used as representative evidence especially for proving liability during the Championship Season for the California Class. Plaintiffs' expert, Dr. Dennis, admitted that the survey was never designed or intended to be representative of the California League, and that he would have designed it differently had that been his objective. Plaintiffs' disclosure of the identities of survey respondents has demonstrated that the subset of responses used to calculate damages include almost no responses from individuals who actually played in the California League. Accordingly, without any representative evidence applicable to the California Class, and in light of the variability in survey responses from those individuals who did respond to the survey, decertification is necessary because there is no evidence representative of the hours Players spent "working" in California. *See, e.g.*, *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 948–49 (9th Cir. 2011) (affirming decertification of class where survey evidence was not representative of the class population); *Bahamas Surgery Ctr., LLC v. Kimberly-Clark Corp.*, 820 F. App'x 563, 566 (9th Cir. 2020) (district court abused its

discretion in failing to decertify a class where it became clear that proffered evidence applied to only some, but not all, of proposed class).

As discussed in more detail below, recent expert discovery has shined a stark spotlight on these critical defects in the certified classes and collective. Defendants therefore respectfully request leave to file a Motion for Decertification.[3]

## RELEVANT BACKGROUND

The Court denied Rule 23 class certification and decertified the FLSA collective in July 2016 (Dkt. 687), in part due to an essential problem: in a wage-and-hour case such as this one, the Court must be able to evaluate the number of hours in which class members performed compensable "work" on a classwide basis. That was impossible in light of the "wide variations among the players as to the types of activities in which they engaged and the circumstances under which they engaged in them." *Id.* at 95. Plaintiffs sought reconsideration of that decision, and proposed narrowed Rule 23 classes and FLSA collective, predicated on a new theory of liability: they sought to eliminate the "wide variations" by limiting their claims to time spent in "team-related activities" performed by Players (as opposed to individual activities). They insisted that their purportedly representative evidence – a "Main Survey" (hereafter "the survey") conducted by their purported expert, Dr. Dennis – would provide a representative measure of such "team-related activities." Dkt. 720 at 1, 14-15.

Accepting Plaintiffs' new theory and the promise of evidence tailored to team-related activities, in 2017, the Court certified a Rule 23(b)(3) class under California law for the time Players spent playing during the Championship Season in the California League (hereafter, the "California Class"). Dkt. 782. While noting that Dr. Dennis' survey "may or not be sufficient to establish the ultimate issue of how much actual work was performed" because, as Defendants pointed out, it only evaluated arrival and departure times rather than team-related activities, the Court concluded that the survey might nonetheless turn out to be helpful "especially when considered in combination with

---

[3] While Rule 23 grants parties the right to move to decertify at any time it is warranted in the litigation, *see* Fed. R. Civ. P. 23(c)(1)(C), 23(d)(1)(D), Defendants respectfully seek leave of the Court to move for decertification of the classes and collective in light of the Court's instructions to do so.

other evidence such as the daily schedules and witness testimony." *Id.* at 42. In the same vein, the

Court underscored that Plaintiffs' "representative evidence can be combined with actual records of

time spent engaged in the various activities," because Plaintiffs would be using the survey data "in

combination with other evidence that may be sufficient to allow a jury to draw conclusions based on

reasonable inference as to when players were required to be at the ballpark…[including] the

transactional histories of the players, the daily schedules, and records of games that were played…"

*Id.* at 56.

On appeal, the Ninth Circuit also acknowledged Defendants' "legitimate questions" about

the persuasiveness of the survey. *Senne v. Kan. City Royals Baseball Corp.*, 934 F.3d 918, 943 (9th

Cir. 2019). The Court underscored that its holding was not intended to "minimize defendants'

criticisms" of the survey, including that a jury may be persuaded that "players did not begin

compensable work upon arriving at the ballpark or that players stopped engaging in compensable

work long before they left the ballpark, such that the Main Survey's estimated arrival and departure

times are insufficient to clear the preponderance hurdle." 934 F.3d at 945. Nonetheless, the Ninth

Circuit affirmed the Court's certification order based on the same promise that the Plaintiffs'

evidence would "not [be] limited to just the Main Survey." *Id.* at 942. Rather, because the survey

would be "but one piece of the plaintiffs' representative evidence," *id.* at 943, "the schedules,

testimony, and payroll data" could permit a "just and reasonable inference" as to the hours players

"actually worked" when used in conjunction with the survey, *id.* at 949. Even relying on that

promise of evidence from multiple sources, the Ninth Circuit held that the outcome of the issue

might be a "closer call" under de novo review, but concluded that the deferential abuse of discretion

standard resulted in the "tie" going in favor of affirmance. *Id.* at 947. The Ninth Circuit also reversed

the Court's denial of certification of two 23(b)(3) classes under Arizona and Florida law for the time

Players spent in those states with their respective Clubs during the Training Seasons (spring training,

extended spring training, and instructional league) (hereafter, the "Arizona Class" and "Florida

Class," respectively).[4]

---

[4] An FLSA collective was also certified with respect to the same activities as those covered by the
California, Arizona, and Florida classes. In subsequent decisions issued in 2021, the Court also

1    Since then, the parties have completed both supplemental fact discovery and expert

2    discovery, including depositions of Dr. Kriegler and Dr. Dennis which were conducted in September

3    2021. Dr. Kriegler's report, disclosed in August 2021, confirms that he uses Dr. Dennis' survey as

4    his exclusive source of information about the alleged hours of "work" during the Training Seasons

5    (for purposes of the Florida and Arizona classes), and for more than 90% of the damages he

6    calculated for the California Class. Dkt 971 at 6. This means that as a starting point, Dr. Kriegler

7    relied upon a subset of survey respondents whom Dr. Dennis had selected, comprised of 284 survey

8    responses out of the 720 total that were received (after the survey was sent to 7,806 players). Dkt.

9    969 at 23. But Dr. Kriegler went a drastic step further, further reducing the universe of responses to

10   inform his damages model. To paper over the implicit unreliability of the survey data, he based his

11   damages calculations only on the responses at the 25th and 10th percentiles of the subset, thereby

12   excluding 75%-90% of the survey responses from his calculations. Dkt. 971 at 13-14. However, Dr.

13   Kriegler provided no explanation as to why the survey responses at or below the 10th or 25th

14   percentiles were somehow more reliable than those respondents who answered outside those

15   percentiles or in any way mitigated the huge variability of reported arrival and departure times (even

16   between players for the same teams during the same season) across the data set. *Id.* Nor did Dr.

17   Kriegler offer any explanation as to how the 10th or 25th percentiles of survey responses regarding

18   arrival or departure times could reflect the Players' time spent in "team-related activities" – the

19   central premise of Plaintiffs' theory of liability – when the survey asked exclusively about arrival

20   and departure times rather than the time spent in any activities (not to mention team-related ones).

21   *Id.* Dr. Kriegler also failed to justify how the survey (or his damages calculations) could possibly

22   apply to the California Class, since only a maximum of nine or ten participants in the California

23   League were included in the subset (and eight of those also played for affiliates outside the

24   California League, and the survey never asked respondents to specify for which affiliate they were

25   responding). *Id.* at 10-12.

26

27

28   certified a class under Rule 23(b)(2) to include any person who is, or will in the future, participate in
     the Training Seasons or Championship Season in Florida or Arizona. Dkt. 946; Dkt. 949.

1

**LEGAL ARGUMENT**

2       Rule 23(c)(1)(C) permits decertification of a class at any point during a litigation. *See* Rule

3   23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before

4   final judgment."); *see also* Rule 23(d)(1)(D) (authorizing the court to "issue orders that . . . require

5   that the pleadings be amended to eliminate allegations about representation of absent persons and

6   that the action proceed accordingly").

7       A motion for decertification is "an accepted, and necessary, part of class action litigation"

8   whenever new evidence is revealed that certified classes are "incompatible with class adjudication."

9   *Aldapa v. Fowler Packing Co.*, No. 1:15-cv-00420-DAD-SAB, 2019 U.S. Dist. LEXIS 35284, at

10  *52-53 (E.D. Cal. Mar. 5, 2019). Indeed, a court is obligated to monitor class decisions "in light of

11  the evidentiary development of the case." *Risinger v. SOC LLC*, No. 12-cv-00063-MMD-PAL, 2019

12  WL 3400645, at *1 (D. Nev. July 26, 2019) (internal quotations omitted). "Any fact that develops or

13  comes to light between the certification decision and entry of final judgment that calls into serious

14  question the satisfaction of [Rule 23]…will justify immediate decertification or revision of the

15  class." 1 McLaughlin on Class Actions § 3:6 (17th ed.). In light of the fatal flaws undermining class

16  and collective certification newly revealed by recent expert discovery, it has now become

17  appropriate – and necessary – for the Court to grant Defendants leave to file a Motion for

18  Decertification.

19  **I.   PLAINTIFFS FAIL TO SATISFY COMMONALITY AND PREDOMINANCE
         BECAUSE THEIR DAMAGES MODEL DOES NOT CORRESPOND TO THEIR**
20       **"TEAM-RELATED" THEORY OF LIABILITY.**

21       While Plaintiffs changed their liability theory to obtain class certification, their damages

22  model did not change along with it. Plaintiffs limited their theory of liability to Players' participation

23  in "team-related" activities, but the damages model, in process before they changed the liability

24  theory, did not adapt to measure those activities. Plaintiffs' experts admit that their damages model

25  calculates minimum wage and overtime liability based on all time spent at the ballpark, regardless of

26  whether the Player spent that time individually or with the team, and regardless of whether it

27

28

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE A MOTION FOR
DECERTIFICATION OF THE RULE 23 CLASSES AND FLSA COLLECTIVE – CASE NO. 3:14-cv-00608-JCS
(consolidated with 3:14-cv-03289-JCS)

captures time during which Players were not performing compensable "work."[5] Even under the "continuous workday" rule on which Plaintiffs have relied to excuse the analytical gap between the survey results and the issue to be determined, an individual's compensable time does not begin on a workday until he or she performs the first task that is "integral and indispensable" to the job. *See, e.g.*, *Bamonte v. City of Mesa*, 598 F.3d 1217, 1222, 1225-26 (9th Cir. 2010). Under Plaintiffs' theory of liability, the continuous workday is bookended by the first team-related activity and the last, which the record shows does not correspond to arrival at or departure from the workplace. Further, even once a compensable workday begins, breaks that are long enough to allow an individual to use the time for his or her own purposes (that is, to engage in non-team-related activities) are excluded from hours worked. *See, e.g.*, 29 C.F.R. §785.16. The survey thus necessarily overestimates time spent on team-related activities, and therefore "hours worked," to an unknowable degree.

This misalignment warrants decertification pursuant to *Comcast Corp. v. Behrend*. There, the Supreme Court reversed the certification of a class of plaintiffs who alleged violations of federal antitrust laws, based on an "unremarkable premise": a model that purports to serve as evidence of damages in a class action "must measure only those damages attributable" to Plaintiffs' theory of liability. 569 U.S. at 35. The Court decertified the class because the damages model proffered by the plaintiffs in *Comcast* "failed to measure damages resulting from the particular…injury on which petitioners' liability in [the] action is premised." *Id.*; *see also Green v. Fed. Express Corp.*, 614 F. App'x 905, 907 (9th Cir. 2015) (affirming district court's denial of class certification where plaintiffs' purportedly common evidence did not "adequately tie" their theory of liability to a "proper and reliable measure of damages"). Courts in this District have followed suit. *See, e.g.*, *Vizcarra*, 2021 WL 5370754, at *11, 18 (denying class certification because survey-based damages model did not measure damages flowing from Plaintiffs' theory of liability and therefore did not satisfy *Comcast*); *Davidson v. Apple, Inc.*, No. 16-CV-04942-LHK, 2018 WL 2325426, at *23 (N.D.

---

[5] This flaw not only undermines predominance under *Comcast*, but also defeats commonality, because where a plaintiff's purportedly representative evidence does not align with their theory of liability, there is no "common proof" that may resolve common questions, thus further warranting decertification. *See Vizcarra v. Unilever United States, Inc.*, No. 4:20-cv-02777 YGR, 2021 WL 5370754, at *11 (N.D. Cal. Oct. 27, 2021).

1   Cal. May 8, 2018) (denying class certification in part because the damages model was predicated on

2   a survey incorporating assumptions and measurements that are "at odds" with plaintiffs' theory of

3   liability and thus failing to satisfy *Comcast*).

4         The certified classes and collective present a textbook failure to satisfy *Comcast*. Ever since

5   Plaintiffs' first bid at certification failed, Plaintiffs have represented to the Court that their theory of

6   liability is premised on recovering minimum wage and overtime for "hours worked" performing

7   "team activities." *See* Dkt. 720 at 1, 6, 8, 14, 15. For instance, Plaintiffs assured the Court that their

8   new theory obviated the individualized inquiries that originally defeated predominance because the

9   proposed classes were "focused exclusively on work class members performed **as teams** at team

10  complexes, under the direct control and supervision of Defendants." *Id.* at 1 (emphasis added).

11  Plaintiffs further assured the Court that they had satisfied their burden under Rule 23 insofar as they

12  provided a basis to judge "when **team activities** began" and that the Court need not be concerned

13  with "variations among class members as to the types of activities in which they engaged and the

14  time spent performing those activities" because of Plaintiffs' "**renewed focus exclusively on team**

15  **work periods**." *Id.* at 14 (emphasis added). This theory limiting liability to only "team-related

16  activities" was the foundation on which Plaintiffs based their renewed proposal for class

17  certification, because otherwise, there was no way to satisfy predominance. Without limiting the

18  "continuous work day" to hours bookended by the first team-related activity and the last, the Court

19  would have to conduct "a multitude of individualized inquiries relating to the types of [individual]

20  activities that might have constituted 'work' and the circumstances necessary to make these

21  activities compensable under the relevant states' laws." Dkt. 687 at 81.

22        Expert discovery has now confirmed, however, that Dr. Kriegler's damages model – which

23  relies nearly exclusively on Dr. Dennis' survey – in no way attempts to limit damages to "team-

24  related" activities. Instead, Dr. Kriegler's model (and the underlying survey) captures all hours

25  between Players' arrival and departure times, thus including their individual training activities and

26  non-compensable time in addition to activities performed as a team. Indeed, Dr. Dennis conceded at

27  his deposition that the Main Survey did not measure "team-related activities" but rather all time

28  spent at the ballpark. Bloom Decl. Ex. 6 (Dennis Tr. 24:17-25:4; 29:21-30:13; 172:22-177:8). Dr.

1    Dennis also testified that he did not compare survey responses from players on the same team during

2    the same year to determine whether the survey reflected team-related activities – and said, in fact,

3    that he could not do so with the data he collected. *Id.* (135:20-136:22; 242:12-245:19). Dr. Kriegler

4    testified to the same effect: he considered **every** hour reported in the Main Survey, i.e., every hour

5    spent at the ballpark, to be an hour worked. Bloom Decl. Ex. 7 (Kriegler Tr. 112:3-11; 197:4-19);

6    *see also id.* (166:16-168:12). He further testified that his inclusion of compensable time was far

7    broader than just team-related activities, and included "hours at the ballpark, travel time, time spent

8    doing team-related activities, conceptually, from the time that they arrive…until they leave their

9    place of work." *Id.* (37:7-17). Dr. Kriegler also acknowledged that the survey did not ask how much

10   time players spent on team-related activities during the Training Seasons or the Championship

11   Season and that he did not use any other data that provided him with hours spent at the ballpark for a

12   certain type of day in his damages calculations. *Id.* (66:20-68:12); Dkt. 971-3 at 72:16-25. Rather, he

13   relied entirely on data regarding a subset of survey respondents' arrival and departure times. Dkt.

14   969 at 23; Dkt. 971 at 6-7.

15        There is simply no way to discern the amount of time spent on team-related activities based

16   on Plaintiffs' data. Although Plaintiffs purport to rely solely on the 10th or 25th percentiles of survey

17   data, that does not solve the *Comcast* problem. Those data points, like all of the others, are arrival

18   and departure times, and are no more likely to correspond to time spent on team-related activities

19   than any other data point. Any suggestion that those data points (or any others) correspond to team-

20   related activities is rank speculation. It is literally impossible for Dr. Kriegler to so conclude because

21   the survey did not ask about **any** activities, much less team-related activities. *See* Dkt. 971 at 13-14;

22   Dkt. 1027 at 10-12; *see also* Dkt. 969-3 ¶ 31 ("…while Dr. Kriegler asserts that he has controlled for

23   this variability by using the 10th Percentile or 25th Percentile responses…he merely masks these

24   problems by throwing away 75% or 90% of the survey responses from the Kriegler

25   Subset…[without any] way to evaluate whether the purported 'Hours Worked' estimated at these

26   arbitrary points are reliable estimates of hours spent on team baseball-related activities…").

27        Decertification is warranted regardless of the outcome of Defendants' Motions to Exclude

28   the Expert Reports of Dr. Dennis and Dr. Kriegler (Dkts. 969; 971). Whether they are admissible or

not as an evidentiary matter (and to be sure, they are not), there is nonetheless an irremediable mismatch between Plaintiffs' liability theory and damages model. Judge Rodgers recently confirmed this very point in *Vizcarra v. Unilever United States, Inc.*, denying certification to a class of plaintiffs who brought consumer claims regarding alleged misrepresentations in advertising. Plaintiffs relied upon purportedly representative survey evidence conducted by the same Dr. Dennis who has conducted the survey in this case. Although the Court held that Dr. Dennis' report did not warrant exclusion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), it failed to correspond to the plaintiffs' theory of liability and thus did not satisfy the requirements set forth in *Comcast*, compelling the denial of class certification. 2021 WL 5370754, at *18-20. The *Vizcarra* plaintiffs alleged that Unilever had misrepresented that the vanilla flavor of certain ice cream was sourced from vanilla plant extracts, and had overcharged consumers based on that false claim. *Id.*, at *3. But Dr. Dennis's survey did not measure the price premium resulting from those representations; instead, he measured the premium associated with a more general attribute that he called "source of vanilla flavor." *Id.*, at *18. The Court held that the disconnect between plaintiffs' liability theory (that a class of purchasers had been misled by representations on Unilever's packaging about the source of vanilla) and what Dr. Dennis measured (the price premium attributable to the source of vanilla flavor) failed to satisfy *Comcast*'s requirements. *Id.* at *19; *see also McMorrow v. Mondelez Int'l Inc.*, No. 17-cv-2327-BAS-JLB, 2020 WL 1157191, at *8-9 (S.D. Cal. Mar. 9, 2020) (denying class certification in part because a survey conducted by Dr. Dennis did not correspond to plaintiffs' theory of liability and therefore did not comport with *Comcast*). So here: Dr. Dennis's survey, and Dr. Kriegler's analysis relying on it, do not measure the team-related activities for which Plaintiffs seek recovery, and therefore fail to satisfy *Comcast*.

Nor can Plaintiffs align their damages model with their liability theory, as *Comcast* requires, by pointing to evidence beyond their experts' testimony, such as depositions and team itineraries. That was the promise they made in their motion for reconsideration to secure class certification in this Court, and to the Ninth Circuit on appeal. Expert discovery has now provided the ultimate "tie breaker" to the near "tie" that the Ninth Circuit identified. 934 F.3d at 947. It has since become clear that the other evidence does not play the role in Plaintiffs' damages model that they promised or that

1   this Court and the Ninth Circuit relied upon. Instead, the model depends nearly exclusively on the

2   survey to measure "hours worked." None of the "thousands of documents" that Plaintiffs contend

3   show "work performed" show **how many** hours were worked. That leaves the Main Survey as the

4   sole purported representative evidence of "hours worked" – and it measures no such thing.

5          For instance, Dr. Kriegler used game schedules and Training Season schedules (also referred

6   to as "itineraries") to identify the players who participated in the seasons, not to calculate the amount

7   of work performed. He used deposition testimony to confirm that Players "perform substantial

8   amounts of work during each training season" (Dkt. 1019 at 17) – but of course, such testimony does

9   not actually permit Dr. Kriegler to approximate the hours **actually** worked for purposes of a

10  damages model.[6] To the contrary, this Court already found that the deposition testimony revealed

11  substantial variations in alleged hours worked that defeated predominance. *See* Dkt. 687 at 84. Nor

12  do daily itineraries shed light on actual hours of work, since Plaintiffs admit they are purely

13  "aspirational" and do not show what any Player did on a given day. Dkt. 1019 at 19; Dkt. 965. In

14  fact, Plaintiffs expressly disavowed relying on the schedules to calculate hours worked on a class-

15  and collective-wide basis. Dkt. 712, 33:11-22. *See* Dkt. 1029 at 1-3. Notably, Dr. Kriegler admits

16  that he did not use itineraries to calculate hours worked for purposes of his model.[7] *Id.* at 2.

17         The survey is therefore the exclusive source of purportedly representative evidence that

18  Plaintiffs have proffered to quantify hours of "work" for the Florida and Arizona Classes (including

19  all of the Training Seasons), and for more than 90% of damages calculated for purposes of the

20  California Class. Accordingly, Plaintiffs' damages model fails to correspond to their "team-related"

21  theory of liability and contravenes the Supreme Court's requirements set forth in *Comcast*, thus

22  requiring decertification of both the classes and collective.

23  _____

24  [6] Despite referring to it as such, Dr. Dennis did not actually use any 30(b)(6) witness testimony in
    the course of "validating" the survey – all of the testimony he cited was from a fact witness
    testifying from personal experience, and he relied on someone from "Kriegler's staff" to select ten
25  deposition transcripts as the basis for his "validation." Dkt. 969 at 15. Regardless, the testimony
    from the fact witnesses underscored the variability in Players' arrival and departure times; according
26  to testimony, Players could arrive as little as 2.75 hours prior to the start of a home game played at
    night, but as much as 5 hours early. Dkt. 696-4.

27  [7] In fact, Dr. Kriegler only referenced a single California League itinerary for the year from which
    his survey data was derived – and that itinerary was for a Club for which none of the respondents
28  played that year. Dkt. 969-3 ¶ 13(a)(iii).

## II.     PLAINTIFFS' OWN EVIDENCE SHOWS THAT PLAYERS DID NOT SPEND "ROUGHLY EQUAL" TIME PERFORMING TEAM-RELATED ACTIVITIES AND THEREFORE PLAINTIFFS' APPROACH VIOLATES THE RULES ENABLING ACT.

It is black-letter law that the Rules Enabling Act "forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'" *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 367 (2011); *Tyson*, 577 U.S. at 455. The Supreme Court has therefore confirmed that class certification is inappropriate where a class member could not have "relied on [a representative evidentiary sample] to establish liability if he or she had brought an individual action," *Tyson*, 577 U.S. at 455. In other words, class certification is not appropriate if it would "giv[e] plaintiffs and defendants different rights…than they could have asserted in an individual action." *Id.* at 458.

And while, in a wage and hour class action, the evidence claimed to be representative need only establish liability and/or damages as a matter of "just and reasonable inference," *id.* at 456, there are two caveats. First, "[not] all inferences drawn from representative evidence in an FLSA case are 'just and reasonable,'" and that concern is the proper subject of a *Daubert* motion, like those Defendants have filed in this case. *Id.* at 459. Second, for claimed representative evidence to be admissible in a wage and hour class action as it would be in an individual action, that evidence must be sufficient to permit a reasonable jury to conclude that the class spent "roughly equal time" on the compensable activity in question. *Id.* The *Tyson* Court distinguished *Dukes*, where employees were not similarly situated and so could not have used each other's deposition testimony to establish their claims in individual actions, from the facts in *Tyson*, where the employees all worked in the same facility under the same working conditions, such that the "roughly equal time" requirement was satisfied, and so "the experiences of a subset of employees can be probative as to the experience of all of them." *Id*. at 459.

This case is more like *Dukes* than *Tyson*, and Plaintiffs' own proffered evidence proves it: the Players most certainly did not spend "roughly equal time" on compensable activities. Plaintiffs' one source of purportedly representative evidence, the survey, is fatal to class certification not only because it fails to measure team-related activities, but also because the survey responses vary so widely in their reported hours, from Club to Club and even within a single team, that such

undifferentiated evidence of the hours purportedly "worked" by **all** minor league baseball players, regardless of Club affiliation, could not be used to establish liability or damages with respect to any single Club Defendant in an action brought by an individual Player. In *Kazi v. PNC Bank, N.A.*, No. 18-cv-04810-JCS, 2020 WL 3414709 (N.D. Cal. June 22, 2020) (Spero, J.), a case involving allegations of uncompensated training time, this Court emphasized that decertification is warranted if the plaintiffs fail to present evidence that they spent "roughly equal time" participating in the training activities, pursuant to the ruling in *Tyson*. *Id.* at *9; *see also Stiller v. Costco Wholesale Corp.*, 673 F. App'x 783, 784-85 (9th Cir. 2017) (affirming district court's decertification decision where variability in determinations of whether class members performed unpaid work defeated predominance); *Howard v. CVS Caremark Corp.*, 628 F. App'x 537, 538 (9th Cir. 2016) (agreeing that the district court properly denied class certification where Plaintiffs' proposed methodology for providing common proof did not answer the question of whether plaintiffs engaged in compensable work on a classwide basis).

### A. Plaintiffs' Own Evidence Establishes That Players Did Not Spend "Roughly Equal Time" On Compensable Activities.

There can be no doubt that Players were expected to perform training for different lengths of time depending on the Clubs or affiliates for which they played (and even when they played for the same Clubs or affiliates) as now made especially evident by the recent disclosures of the survey-takers' identities, and that Players arrived and departed for reasons unrelated to training. *See* Dkt. 969 at 11 (citing examples of variability across the survey respondents from one Club to the next); *see also* Dkt. 969-3 ¶¶ 28, 46 (confirming that the survey responses demonstrate "pronounced variability across teams" and that "the proper comparison to assess the validity of the survey would have been conducted by team."). In fact, Dr. Kriegler implicitly acknowledged in his damages report that Clubs differ in their policies and practices regarding training time, since he stratified his analysis of itineraries by Club (even though he never examined how the responses to the survey from a particular Club aligned with the Club's itineraries, and even though he ultimately declined to stratify any of his damages analysis by Club). *See* Dkt. 969-4 at 10-12; Dkt. 971-3, 91:19-92:14. Both Dr. Dennis and Dr. Kriegler testified in their depositions that they willfully chose to turn a blind eye to

1    this issue: they both confirmed that the survey and the derivative damages model do not assess

2    alleged hours worked on a Club-by-Club basis, and that in fact they lacked the data to do so. Dkt.

3    971 at 8 (attaching testimony from Dr. Kriegler confirming that he performed no such analysis in

4    calculating damages, and from Dr. Dennis that a Club-by-Club analysis would not have been

5    possible because it would have yielded inadequate sample sizes). Dr. Dennis expressly testified that

6    it was never his "mission" to evaluate survey results at the "team level," despite having known the

7    identities of the survey respondents which would have permitted such an analysis. Dkt. 969 at 11-12;

8    Dkt. 969-2, 167:22-168:16.

9            The Court previously acknowledged the variations in survey responses relating to arrival and

10   departure times, but found it "of particular significance" that "Plaintiffs will be able to use the

11   survey data in combination with other evidence that may be sufficient to allow a jury to draw

12   conclusions based on reasonable inference as to when players were required to be at the ballpark and

13   [for how long]." Dkt. 782 at 56. Similarly, the Ninth Circuit emphasized that while the survey

14   revealed "meaningful variations" in arrival and departure times, the defects would only defeat class

15   certification if **all** of the representative evidence "offered," including "the Main Survey, schedules,

16   testimony and the like" could not sustain a reasonable jury finding as to hours worked "in each

17   employee's individual action." 934 F.3d at 940. However, as set forth *supra* in Section I, expert

18   discovery has now confirmed that Plaintiffs' experts never, in fact, used this "other evidence" – such

19   as transactional histories, daily schedules, and game records, *see id.* – to bolster the survey with

20   respect to the calculation of each Player's time spent "working." Nor could Plaintiffs, independent of

21   their experts, proffer any "other" representative evidence at trial to prove the numbers of hours

22   "worked" on a classwide basis, since all of that "other" evidence – including itineraries and

23   deposition testimony – is similarly reflective of the huge variability of hours "worked" both between

24   Clubs and between Players. *See, e.g.*, Dkt. 969-3 ¶¶ 46-47 (concluding that there is no correlation

25   between survey results and hours reflected on sampled itineraries and testimony given during

26   depositions). Whereas the prior record suggested that Plaintiffs would rely on a whole universe of

27   evidence outside the survey in order to establish hours of "work," it is now clear that it is the survey,

28

and the survey alone, which serves as Plaintiffs' evidence of liability – and which constitutes the near-exclusive basis of their damages analysis.

Here, there is not just an absence of evidence that Players spent "roughly equal time" (as to one another, or even on from a Club-to-Club basis) engaging in the activities for which they seek compensation. Rather, Plaintiffs' experts have now **affirmatively established** that no reasonable juror could presume Players spent "roughly equal time," according to the significant variability made manifest in their own survey data. *See* Dkt. 971 at 7-9; Dkt. 969 at 10-13; Dkt. 1027 at 4-7 (explaining how Plaintiffs' experts failed to account for the significant variations in Players' answers to survey questions, both from one team to the next and among players on the same team).

**B.     Permitting Resolution Of Plaintiffs' Claims On A Class Basis Would Abridge Defendants' Substantive Rights.**

Because the survey affirmatively establishes that there is significant variability in the time each Player spent training, and because the damages model based on that survey bluntly aggregates the calculations of hours "worked" based on that survey, it is now clear that using Plaintiffs' homogenized analysis on a classwide basis would abridge the Club Defendants' substantive rights in violation of the Rules Enabling Act. Evaluating minimum wage liability (and damages) for the Training Seasons, during which signing bonuses and college scholarships were paid[8], as well as during the California League, during which salaries were paid, necessarily requires a calculation of the hours of compensable "work" performed by each player against the compensation paid to each player. The variability in the survey responses (and thus the variability incorporated in the damages model) confirms that the necessary calculation of hours of "work" cannot be evaluated on a classwide, representative basis. For that reason, neither the survey nor Dr. Kriegler's analysis would be admissible in an individual action by one Player against one Club, and the Rules Enabling Act prohibits the Plaintiffs from avoiding that problem by aggregating the individual claims into a class action. *Dukes*, 564 U.S. at 367; *Tyson Foods*, 577 U.S. at 455-57.

---

[8] Defendants' expert, Dr. Jonathan Guryan, confirmed that numerous Players have no minimum wage claims when signing bonuses and/or college payments are factored into the calculations. Dkt. 971-5 at 17; Tables 4 and 5.

C. **Plaintiffs' Survey Abridges Players' Right to Recover Damages They Contend That They Are Owed.**

The Plaintiffs' methodology also abridges the rights of the Players, including absent class members. Players testified that they seek recovery of minimum wages and overtime for all hours they spent training throughout the entire year.[9] Nonetheless, ever since Plaintiffs attempted to rehabilitate their failed bid at certification by limiting their theory of liability to "team-related" activities and by eliminating all claims for time spent training during the Championship Season except with respect to the California Class and the Named Plaintiffs, Plaintiffs made it clear that they were willing to sacrifice Players' perceived entitlement to year-round recovery for all activities, for the sake of class certification.

The subsequent disclosure of Dr. Kriegler's damages report and the recently-concluded expert depositions have now underscored the full extent to which class certification compromises Players' claims. In an implicit acknowledgment of the unreliability of the survey, Dr. Kriegler calculated damages based on only the 25th and 10th percentiles of responses regarding arrival and departure times. This means that 75% or 90% of the Players in the subset claim higher hours (albeit arrival and departure times rather than "team-related" activities) than Dr. Kriegler used to calculate hours of "work"; he has only incorporated some of the lowest reported hours by survey respondents in his analysis.[10] Dkt. 971 at 13-14. This evidence could not be used by a Player in an individual litigation because it simply has no bearing on how much time any particular Player actually spent at the ballpark (not to mention "team-related" or compensable activities). In *Tyson*, the Court permitted an expert analysis concerning donning and doffing times at a single facility – where the times varied

---

[9] *See, e.g.*, Bloom Decl. Exs. 4 (Kahaulelio Tr. 298:21-299:10 ("I'm seeking compensation for all work-related activities: training, strength training, when I was supposed to do it. … compensation for all training that I've done.")); 2 (Henry Tr. 163:19-25 (Plaintiff testifying that he is "[s]eeking compensation for any time relative to the – to my career, my playing")); 3 (Hilligoss Tr. 146:12-15 ("I'm seeking compensation for my baseball-related stuff")); 1 (Hart Tr. 130:7-11 (testifying that he is "[s]eeking compensation for the time I put in everywhere")); 5 (Watts Tr. 278:19-279:3 (seeking compensation for time spent lifting weights, running, throwing, fielding, hitting, and performing other baseball related activities)).

[10] This purportedly "conservative" measure does not, however, mitigate any of the dispositive flaws in Plaintiffs' purportedly representative evidence, since it does nothing to ensure accuracy – and actually exacerbates the survey's inaccuracy, insofar as it fails to reflect the data as a whole. Dkt. 971 at 13-14.

by 18 to 21 minutes, and all of which time was considered to be compensable – to serve as representative evidence, and explained that the expert's work would have been admissible in individual cases. 577 U.S. at 450. Here, in contrast, Kriegler's report would be inadmissible in an individual action, because it would offer no more than an arbitrary cross-section of the experiences of Players on other teams, in other leagues, each of which not only had its own set of expectations but where reported hours varied widely from one Player to the next, and varied widely even within a single team, and which included time that is not necessarily compensable under the relevant wage-and-hour laws and Plaintiffs' own theory.[11] Thus, this is just the type of situation prohibited by the Rules Enabling Act, insofar as it would give the Players "different rights…than they could have asserted in an individual action" and involves purportedly representative evidence that an individual class member could not have "relied on…to establish liability" in an individual action. *Tyson Foods*, 577 U.S. at 455, 458; *see also Dzielak v. Whirlpool Corp.*, No. 2:12–89 (KM)(JBC), 2017 WL 6513347, at *11-12 (D.N.J. Dec. 20, 2017) (denying class certification in part because the representative evidence of the "average value" of plaintiffs' claims was neither representative of the class members nor could be used in an individual action, and thus did not square with *Tyson*).

## III.  THE CALIFORNIA CLASS MUST BE DECERTIFIED BECAUSE THE SURVEY DOES NOT REPRESENT THE CALIFORNIA CLASS POPULATION.

Expert discovery has now also confirmed that the California Class has unique shortcomings in addition to sharing the deficiencies discussed above that affect all of the classes. The California Class must be decertified for the reasons described above in Sections I and II, and also because the survey in no way represents the Players who are members of that class. It is incumbent upon Plaintiffs to provide "common proof to support a class-wide judgment as to liability"; thus, where survey evidence is not representative (and no other evidence suffices as representative),[12]

---

[11] Nor, for that matter, would it make any sense for most Players to offer the survey or Dr. Kriegler's damages model in an individual action, even if it were admissible. For instance, one Player recalled having spent 9.75 hours at spring training home games in 2016, whereas the survey reveals that others recalled spending as little as 1.25 hours during spring training home games in 2016 (*see* Dkt. 971 at 8); under no circumstances would that Player rely on Dr. Dennis' survey or Dr. Kriegler's damages report to establish his damages in his individual litigation, even though that is exactly what Plaintiffs intend to do in the context of a class action.

[12] Other than the survey, Plaintiffs have not proffered any other purportedly representative evidence of the time spent by Players engaging in "team-related" activities in the California League. For the

1   decertification is warranted. *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 480 (C.D. Cal.

2   2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011); *see also Bahamas Surgery Ctr.*, 820 F. App'x at 563, 566

3   (district court abused its discretion in failing to decertify a class because the plaintiffs' proffered

4   evidence only applied to a "subset" of the class). The "failure…to offer a basis for extrapolation of

5   representative testimony to the class as a whole is fatal to continued certification." *Cruz v. Dollar

6   Tree Stores, Inc.*, Nos. 07–2050 SC, 07–4012 SC, 2011 WL 2682967, at *8 (N.D. Cal. July 8, 2011);

7   *see also In re Methionine Antitrust Litig.*, No. 00–1311, 2003 WL 22048232, at *5 (N.D. Cal. Aug.

8   26, 2003) (decertifying a class in part because the plaintiffs' expert's methodology involved samples

9   that were "not representative" of the actual population at issue). That is exactly the situation here.

10          Dr. Dennis testified that the survey was not, and was never designed to be, representative of

11   the California Class – indeed, Plaintiffs did not even propose the certification of a California Class

12   until after the survey was already under way. Dkt. 969 at 17; Dkt. 969-2, 69:21-70:2, 72:6-8. Dr.

13   Dennis testified that if he had wanted to ensure that the survey was representative of the California

14   Class, he would have "oversample[d]" California League participants, such that a census would have

15   been taken of all eligible California League players. Dkt. 969 at 17; Dkt. 969-2, 159:11-23. Needless

16   to say, no such "oversampling" occurred, and Dr. Kriegler confirmed that he performed no analysis

17   related to Players who participated in the California League. Dkt. 969 at 18-19; Dkt. 971 at 10-11.

18   To the contrary: depending on the question, a maximum of just nine or ten participants in the

19   California League for the one year (2015) about which the survey inquired were included in the

20   subset on which damages calculations were based. Dkt. 969 at 18. Further, eight of those participants

21   also played for affiliates outside the California League, and the survey never asked respondents to

22   specify with respect to which affiliate they were responding. *Id.* As a result there is no way to

23   determine whether even those few respondents were actually answering the questions about arrival

24   and departure times with respect to their experiences in the California League. *Id.* When pressed on

25   the issue of whether the survey was representative of the California League, Dr. Dennis invoked his

26   "experience of data in doing consumer surveys" and his "understanding" of baseball, neither of

27   _____

28   California Class only, Dr. Kriegler used publicly available Google maps information and box scores
     to attempt to measure the lengths of games and travel time, but relied on the survey to provide the
     outer bounds of the "workday." Dkt. 1029 at 2.

19

1    which provide any legitimate basis from which one could conclude that the survey actually

2    represents the California League. *Id.* at 18-19. Accordingly, Plaintiffs are left trying to extrapolate

3    from a sample of only nine or ten respondents who participated in the California League – only one

4    or two of whom who were definitively responding with respect to their experiences in the California

5    League rather than with other affiliates – to a class of over 2,000 players. This plainly contravenes

6    the requirement that Plaintiffs show how representative testimony may be "extrapolat[ed]…to the

7    class as a whole" and warrants decertification of the California Class. *Bahamas Surgery Ctr.*, 820 F.

8    App'x at 566; *Cruz*, 2011 WL 2682967, at *8.

9                                        **<u>CONCLUSION</u>**

10           For the foregoing reasons, Defendants respectfully request that the Court grant Defendants'

11   Motion for Leave to File a Motion for Decertification of the Rule 23 Classes and FLSA Collective.

12

13   Dated:  January 4, 2022          PROSKAUER ROSE LLP
                                      ELISE M. BLOOM (*pro hac vice*)
14                                    NEIL H. ABRAMSON (*pro hac vice*)
                                      ADAM M. LUPION (*pro hac vice*)
15                                    MARK W. BATTEN (*pro hac vice*)
                                      RACHEL PHILION (*pro hac vice*)
16                                    JOSHUA S. FOX (*pro hac vice*)
                                      NOA M. BADDISH (*pro hac vice*)
17                                    PHILIPPE A. LEBEL
                                      SAMANTHA R. MANELIN (*pro hac vice*)

18

19                                    By:   */s/ Elise M. Bloom*
                                           Elise M. Bloom
20                                         Attorneys for Defendants

21

22

23

24

25

26

27

28

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE A MOTION FOR
DECERTIFICATION OF THE RULE 23 CLASSES AND FLSA COLLECTIVE – CASE NO. 3:14-cv-00608-JCS
(consolidated with 3:14-cv-03289-JCS)