1  STEPHEN M. TILLERY (*pro hac vice*)
     stillery@koreintillery.com
2  GARRETT R. BROSHUIS (Bar No. 329924)
     gbroshuis@koreintillery.com
3  MARC WALLENSTEIN (*pro hac vice*)
     mwallenstein@koreintillery.com
4  DIANE MOORE (Bar No. 214903)
     dmoore@koreintillery.com
5  **KOREIN TILLERY, LLC**
   505 North 7th Street, Suite 3600
6  St. Louis, MO 63101
   Telephone:  (314) 241-4844
7  Facsimile: (314) 241-3525

8

   CLIFFORD H. PEARSON (Bar No. 108523)
9    cpearson@pswlaw.com
   DANIEL L. WARSHAW (Bar No. 185365)
10    dwarshaw@pswlaw.com
   BOBBY POUYA (Bar No. 245527)
11    bpouya@pswlaw.com
   THOMAS J. NOLAN (Bar No. 66992)          BENJAMIN E. SHIFTAN (Bar No. 265767)
12    tnolan@pswlaw.com                        bshiftan@pswlaw.com
   **PEARSON, SIMON & WARSHAW, LLP**       **PEARSON, SIMON & WARSHAW, LLP**
13 15165 Ventura Boulevard, Suite 400      350 Sansome Street, Suite 680
   Sherman Oaks, CA 91403                  San Francisco, CA 94104
14 Telephone: (818) 788-8300               Telephone: (415) 433-9000
   Facsimile:  (818) 788-8104              Facsimile: (415) 433-9008

15

16 Plaintiffs' Co-Lead Class Counsel

17

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| AARON SENNE, et al., Individually and on Behalf of All Those Similarly Situated; | CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS) |
| Plaintiffs, | |
| vs. | **CLASS ACTION** |
| OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as MAJOR LEAGUE BASEBALL; et al.; | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE A MOTION FOR DECERTIFICATION OF THE RULE 23 CLASSES AND FLSA COLLECTIVE** |
| Defendants. | Hearing date: Feb. 11, 2022 |
| | Hearing Time: 9:30 a.m. |
| | Courtroom: F, 15th Floor |
| | Judge: Honorable Joseph C. Spero |

1

**TABLE OF CONTENTS**

2

TABLE OF AUTHORITIES..................................................................................................ii

3

INTRODUCTION ..............................................................................................................1

4

RELEVANT PROCEDURAL HISTORY...............................................................................2

5

ARGUMENT.....................................................................................................................5

6
7

    I.     The Court and the Ninth Circuit Have Already Held that Plaintiffs' Evidence Is Tied to The Theory of Liability.........................................................................6

8
9

    II.    The Court and the Ninth Circuit Already Held that Variance in Hours Worked Does Not Lead to a Rules Enabling Act Violation. ......................................... 14

10

    III.   The Court and the Ninth Circuit Already Held that Plaintiffs' Evidence Supports Certification of the California Class..................................................... 19

11

CONCLUSION ............................................................................................................... 20

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE A MOTION FOR DECERTIFICATION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Mt. Clemens Pottery Co.,*
    328 U.S. 687 (1946) ..................................................................................... 9, 13, 14

*Arredondo v. Delano Farms Co.,*
    301 F.R.D. 493 (E.D. Cal. 2014) .......................................................................... 13, 17

*Bowerman v. Field Asset Servs., Inc.,*
    242 F. Supp. 3d 910 (N.D. Cal. 2017) ........................................................................ 5

*Brown v. Wal-Mart Store, Inc.,*
    No. 09-CV-03339-EJD, 2018 WL 1993434 (N.D. Cal. Apr. 27, 2018) ................................. 5, 14, 20

*Busby v. JRHBW Realty, Inc.,*
    No. 2:04-CV-2799-VEH, 2008 WL 11476071 (N.D. Ala. Sept. 17, 2008) ............................... 5, 21

*Day v. Celadon Trucking Servs., Inc.,*
    827 F.3d 817 (8th Cir. 2016) ............................................................................... 5

*Edwards v. First Am. Corp.,*
    289 F.R.D. 296 (C.D. Cal. 2012) ........................................................................... 5

*Ischay v. Barnhart,*
    383 F. Supp. 2d 1199 (C.D. Cal. 2005) ..................................................................... 2

*Kazi v. PNC Bank, N.A.,*
    No. 18-CV-04810-JCS, 2020 WL 3414709 (N.D. Cal. June 22, 2020) ................................... 16

*Marlo v. United Parcel Serv., Inc.,*
    639 F.3d 942--49 (9th Cir. 2011) ...................................................................... 14, 19

*McLaughlin v. Ho Fat Seto,*
    850 F.2d 586 (9th Cir. 1988) .............................................................................. 13

*Munoz v. PHH Mortg. Corp.,*
    478 F. Supp. 3d 945 (E.D. Cal. 2020) ....................................................................... 5

*Ridgeway v. Wal-Mart Stores, Inc.,*
    No. 08-CV-05221-SI, 2016 WL 4529430 (N.D. Cal. Aug. 30, 2016) .................................... 16

*Ridgeway v. Walmart Inc,*
    946 F.3d 1066 (9th Cir. 2020) ...................................................................... 13, 16, 17, 18

*Risto v. Screen Actors Guild-Am. Fed'n of Television & Radio Artists,*
    No. 218CV07241CASPLAX, 2021 WL 4143242 (C.D. Cal. July 19, 2021) ................................ 20

*Senne v. Kansas City Royals Baseball Corp.*,
    934 F.3d 918 (9th Cir. 2019)..........................................................................................*passim*

*Solis v. Best Miracle Corp.*,
    709 F. Supp. 2d 843 (C.D. Cal. 2010) *aff'd,* 464 F. App'x 649 (9th Cir. 2011) .................13

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442, 136 S. Ct. 1046-47 (2016) .......................................................................*passim*

*Vaquero v. Ashley Furniture Indus., Inc.*,
    824 F.3d 1150 (9th Cir. 2016)........................................................................... 9, 14, 18

*Vizcarra v. Unilever United States, Inc.*,
    No. 4:20-CV-02777 YGR, 2021 WL 5370754 (N.D. Cal. Oct. 27, 2021) .......................14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).......................................................................................................14

**Other Authorities**

3 Newberg on Class Actions § 7:37 (5th ed.)................................................................5

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE A MOTION FOR DECERTIFICATION

# INTRODUCTION

Defendants ask this Court to ignore the Ninth Circuit's opinion in this case. There is no other way to characterize Defendants' motion. They are requesting to re-hash arguments already made and rejected multiple times. Both this Court and the Ninth Circuit rejected Defendants' arguments and held that Rule 23's requirements for class certification had been satisfied.

The defense arguments focus on the same final survey that was disclosed before the second round of class certification briefing over five years ago. Take the argument that Plaintiffs' survey asked about arrival and departure times and not about specific activities performed by players. Defendants made the same argument—that there is a supposed disconnect between the survey's questions and the theory of hours worked—five years ago and were rebuffed by this Court and the Ninth Circuit. *See* March 2017 Order, ECF No. 782, at 17 ("Defendants argue that the Main Survey does not address 'team related activities,' contrary to Plaintiffs' assertions, pointing out that it does not ask minor league players about the specific activities which they engaged while at the ballpark.").

The same can be said for the purported variance in the survey data. Defendants hired three experts to criticize the survey and the resulting data in 2016, and much of the criticism focused on supposed variance, both for players across Clubs and within Clubs. *See infra* at 14-15 (summarizing prior arguments about variance). The Court discussed the purported variance, denied the *Daubert* motion, and held that Rule 23 had been satisfied. *See* ECF No. 782 at 43, 56. The Ninth Circuit affirmed. *See Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 945, 945 (9th Cir. 2019) ("the same was true of the employees' donning and doffing times in *Tyson*—yet such variation did not preclude certification there."). The 2021 expert depositions revealed nothing new on this point.

And the same can be said for Defendants' argument that the survey does not include enough California League players. In September 2016, *after* Plaintiffs had disclosed the final survey, Plaintiffs narrowed their proposed Rule 23(b)(3) classes to include only a single minor league, the California League. When it came to the championship season, Defendants criticized the survey years ago for being overgeneralized, arguing that it surveyed players throughout all championship season leagues rather than just the California League. *See infra* at 19. The 2021 expert depositions revealed nothing new on this point either.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE A MOTION FOR DECERTIFICATION

1    Nor has Plaintiffs' damages model changed. Plaintiffs' expert, Dr. Brian Kriegler, described

2    the model he would use in great detail during class certification briefing over five years ago. He

3    described how he would use MLB's roster data, Defendants' game schedules, travel data, and game

4    duration data. He has used those materials just as he said he would. And he described how he would

5    use the survey data to fill gaps, and even included a proposal to use a conservative percentile of the

6    survey data, like the 10th percentile, as a marker for the start of the minimum required workday. He

7    has done just that. The deposition testimony cited by Defendants revealed nothing new.

8    In short, Defendants already made all these arguments, and this Court and the Ninth Circuit

9    considered and rejected them. Nothing "new" came to light in the recent expert depositions. Plaintiffs

10   acknowledge that Rule 23 allows a district court to modify a class certification order "in light of

11   subsequent developments in the litigation." But that does not give Defendants free reign to re-argue

12   issues already resolved on appeal. "The rule of mandate requires that, on remand, the lower court's

13   actions must be consistent with both the letter and the spirit of the higher court's decision." *Ischay v.*

14   *Barnhart*, 383 F. Supp. 2d 1199, 1214 (C.D. Cal. 2005) (citing *Quern v. Jordan*, 440 U.S. 332, 347 n.18

15   (1979)). Defendants' motion disregards this backbone principle of our judicial system, and it should

16   be denied.

17                           **RELEVANT PROCEDURAL HISTORY**

18   In March 2016, Plaintiffs moved for class certification, seeking to certify eight Rule 23(b)(3)

19   state classes. The Court found Rule 23(a)'s commonality requirement satisfied because "common

20   evidence" can be used "to show that all minor league players are subject" to the policies at issue. ECF

21   No. 687 at 62-63. The Court, however, found a lack of Rule 23(b)(3) predominance in Plaintiffs'

22   original class certification proposal. As later explained by the Court, that was in large part because the

23   original proposal "asserted claims that were based not only on activities in which they engaged at the

24   ballpark but also winter conditioning activities performed individually." ECF No. 782 at 54.

25   Plaintiffs' second class certification proposal eliminated these concerns. By dropping the

26   winter work from the class claims, Plaintiffs "significantly reduced the variations that led the Court to

27   conclude that Plaintiffs were attempting to stretch the holding of *Tyson Foods* too far." *Id.* While

28   Defendants presented evidence of variations between class members, the Court concluded that they

1   were "not so significant as to preclude a jury from addressing Plaintiffs' claims on a classwide basis."

2   *Id.* at 54-55. Plaintiffs had "narrowed the range of activities on which they base their class claims by

3   eliminating winter conditioning, instead focusing on activities that are conducted primarily on a team

4   basis." *Id.* at 55. So while "some individualized issues" might remain regarding whether "certain types

5   of activities should be included under the continuous work-day rule," they do not "overwhelm the

6   common issues raised by Plaintiffs' claims." *Id.* The Ninth Circuit affirmed, reaching the same

7   conclusion on appeal. *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 945 (9th Cir. 2019), *cert.*

8   *denied*, 141 S. Ct. 248, (2020).

9          How Plaintiffs intend to measure "hours worked" and prove their damages was the subject of

10  voluminous briefing during the class certification proceedings, both before this Court and the Ninth

11  Circuit. Plaintiffs spelled out exactly how their model would work. Unlike some wage-and-hour cases,

12  where an expert describes a study that could in the future measure hours worked without actually

13  performing the study itself at the class certification stage, Plaintiffs' survey expert (Dr. J. Michael

14  Dennis) had actually conducted his final survey before the parties engaged in the second round of

15  class certification briefing. *See* Aug. 4, 2016 Dennis Decl., ECF No. 696. Plaintiffs' damages expert,

16  Dr. Kriegler, also detailed how he would combine that survey data with other evidence to calculate

17  classwide measures of hours worked, and ultimately damages. *See* ECF Nos. 497, 641, 755. Over five

18  years ago, Dr. Kriegler explained that he intended to use a conservative percentile from the survey

19  data, such as the 10th percentile, to capture the "required minimum" hours worked when performing

20  his calculations. *See* ECF No. 755 at 2 & n.2 (proposing to use "a relatively low percentile" to capture

21  the "common denominator" of hours worked); *see also id.* at 13-16 (providing detailed analyses of the

22  10th percentile of the data). Dr. Kriegler opined at that time that "the 10th percentile" from the survey

23  data "closely tracks (and in some instances is lower than) the required work hours according to daily

24  schedules and depositions." *Id.* at 5. Dr. Dennis agreed that a "conservative measure of the survey

25  data, such as the tenth percentile," could be used by Dr. Kriegler in this fashion. ECF No. 696 at 13.

26  And Dr. Kriegler opined that he could rely "solely on the responses that are least susceptible" to

27  Defendants' claims of self-interest and recall bias, by using responses from non-opt-ins who had

28  played in 2015 and 2016. ECF No. 755 at 12-13. Dr. Kriegler then provided several "survey data

1  analyses that I show are based on 2015-2016 non-opt ins only." *Id.* at 13; *see also* ECF No. 696

2  (providing further analyses from Dr. Dennis on the 2015-2016 non-opt-in respondents).

3       During the fall 2016 briefing, Defendants submitted five lengthy declarations from three

4  different experts attacking the survey data and Plaintiffs' model for measuring hours worked. ECF

5  Nos. 727, 748, 749, 750, 761. Relying on these declarations, a big chunk of Defendants' arguments—

6  both before this Court and the Ninth Circuit—focused on the variance in the survey data between

7  players and across clubs, and the fact that the survey asked about arrival and departure times instead

8  of activities performed. Defendants also criticized the proposal to use a conservative percentile of the

9  survey data, and criticized the survey data for not including enough players from the California

10  League. *See infra* at 14-15, 19 (further summarizing prior arguments).

11       The Court rejected these arguments. *See* March 2017 Order, ECF No. 782. So did the Ninth

12  Circuit when it affirmed this Court's holding that Plaintiffs' evidence will allow a jury to draw

13  reasonable inferences as to the amount of time worked by class members. *Senne*, 934 F.3d at 945, 949

14  (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 136 S. Ct. 1046-47 (2016) ("[W]e believe a

15  reasonable jury could find that all of plaintiffs' evidence—not just the Main Survey, but also the

16  schedules, testimony, and payroll data—sustains a 'just and reasonable inference' as to the hours

17  players actually worked.")). Defendants petitioned for a re-hearing en banc. The Ninth Circuit denied

18  that petition. Defendants petitioned the Supreme Court for review. The Supreme Court denied the

19  petition. The Ninth Circuit's mandate issued on October 6, 2020. *See* ECF No. 832.

20       After remand, Plaintiffs renewed their motion for a Rule 23(b)(2) class for injunctive or

21  declaratory relief. Defendants claimed that there was a lack of commonality. For a third time, the

22  Court held that commonality existed. July 2021 Order, ECF No. 946, at 33. Although the Court

23  narrowed Plaintiffs' proposed (b)(2) class, the Court found the rest of Rule 23's requirements had

24  been met. Defendants petitioned for another interlocutory appeal, but the Ninth Circuit denied the

25  petition. *See* ECF No. 1034.

26       The same common issues that have led the Court to find commonality three times remain at

27  the heart of the case today. Whether players are employees within the meaning of wage laws, whether

28  players perform work, and whether any exemptions apply—all of those issues are common ones. And

1  all are the focus of Plaintiffs' recent summary judgment motion that relied on common evidence.

2  ECF No. 986.

3  **ARGUMENT**

4       "[A] court may modify or decertify" a previously certified class at any time, but "decertification

5  is a 'drastic step,' not to be taken lightly." 3 Newberg on Class Actions § 7:37 (5th ed.). "Parties

6  should be able to rely on a certification order and in the normal course of events it will not be altered

7  except for good cause, such as discovery of new facts or changes in the parties or in the substantive or

8  procedural law." *Bowerman v. Field Asset Servs., Inc.*, 242 F. Supp. 3d 910, 927 (N.D. Cal. 2017) (quoting

9  *Ramirez v. Trans Union, LLC*, No. 12-cv-00632, 2016 WL 6070490, at *2 (N.D. Cal. Oct. 17, 2016))

10  (internal citations omitted). "If the defendant makes the requisite showing of changed circumstances,

11  the plaintiff, of course, has the ultimate burden to show that Rule 23's requirements are met." *Brown v.

12  Wal-Mart Store, Inc.*, No. 09-CV-03339-EJD, 2018 WL 1993434, at *2 (N.D. Cal. Apr. 27, 2018).

13  "[T]he 'law of the case' doctrine is also relevant," *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 832

14  (8th Cir. 2016), particularly when an appellate court has already decided a Rule 23 issue on appeal. *See

15  Edwards v. First Am. Corp.*, 289 F.R.D. 296, 303 (C.D. Cal. 2012) (even for class certification issues, law

16  of the case bars re-examining Ninth Circuit opinion unless showing of  "intervening change in

17  controlling authority [or] new evidence"); *Busby v. JRHBW Realty, Inc.*, No. 2:04-CV-2799-VEH, 2008

18  WL 11476071, at *6 (N.D. Ala. Sept. 17, 2008) (law of case doctrine applied because "[t]he Defendant

19  is arguing an old issue, one that this Court and the Eleventh Circuit rejected - whether the class as

20  proposed meets Rule 23(b)(3)'s standards").

21       "Under that standard, [Defendants] do[] not have a leg to stand on." *Brown*, 2018 WL 1993434,

22  at *2. There has been no change in the law—most of the cases cited by Defendants are the same ones

23  they cited over five years ago. And Defendants' supposedly new evidence is not really new at all; it is

24  simply deposition testimony discussing matters already known to Defendants and already the subject

25  of briefing *ad nauseum*. Defendants use this evidence to "simply rehash[] arguments already addressed

26  by this Court and affirmed on appeal." *Id.* (denying motion to decertify since district court and Ninth

27  Circuit already settled the issues of commonality and predominance). There is nothing to re-examine.

28  The motion for leave should be denied. *See Munoz v. PHH Mortg. Corp.*, 478 F. Supp. 3d 945, 987

1  (E.D. Cal. 2020) ("Defendants previously advanced these same arguments in their opposition to

2  plaintiffs' motion for class certification, all of which were rejected by the assigned magistrate judge

3  and ultimately by the then-assigned district judge.").

**I.   THE COURT AND THE NINTH CIRCUIT HAVE ALREADY HELD THAT PLAINTIFFS' EVIDENCE IS TIED TO THE THEORY OF LIABILITY.**

6  Defendants first argue (at 7) that while Plaintiffs "changed their liability theory to obtain class

7  certification, their damages model did not change along with it." This opening sentence concedes the

8  truth of the matter: neither Plaintiffs' theory of liability nor their damages model has changed since

9  the Court's March 2017 Order and the Ninth Circuit's opinion. Plaintiffs made clear exactly what they

10  would be relying on to prove their case, Defendants made hundreds of pages of arguments before

11  multiple courts, and both this Court and the Ninth Circuit rejected all of them.

12  Defendants' main criticism focuses on the same final survey that, in fall 2016, was the subject of

13  eight expert declarations (five from Defendants) and a motion to exclude, and that was a focal point

14  of class certification briefing in this Court and on appeal. Defendants currently argue (at 7-8) that

15  Plaintiffs' "damages model calculates minimum wage and overtime liability based on all time spent at

16  the ballpark, regardless of whether the Player spent that time individually or with the team, and

17  regardless of whether it captures time during which Players were not performing compensable

18  'work.'" This is a nearly verbatim recycling of previous arguments. The Court summarized this prior

19  argument throughout its March 2017 Order:

20  
21  Defendants argue that the Main Survey does not address 'team related activities,' contrary to Plaintiffs' assertions, pointing out that it does not ask minor league players about the specific activities which they engaged while at the ballpark."

22  …

23  [Dr. Martin] opines that variability among responses as to arrival and departure times

24  is a reflection of the discretionary activities in which players engage before and after

25  team-related activities; to the extent the Main Survey results include these activities, 'the inclusion of such hours in any formulaic model would inflate the estimate of any

26  hours worked to an unknowable degree.'

27  …

28

> [Defendants] challenge Dr. Kriegler's model on the basis that it relies on a survey that does not attempt to assess 'team-related' activities and therefore does not provide a reliable measure of 'work' for the proposed classes.

…

> Defendants contend the Main Survey does not … ask about team-related activities.

…

> [Defendants argue] the Main Survey asks players only about arrival times, departure times and meal times and assumes that all time spent at the ballpark except meal times constituted 'hours worked' instead of attempting to measure players' 'baseball-related' or 'team-related' activities."

…

> Defendants reiterate their argument that the Main Survey is flawed and irrelevant because it does not attempt to measure team-related activities, even though Plaintiffs claim they are seeking to establish the amount of time worked by class members by looking at such activities.

ECF No. 782 at 17, 19, 29, 31, 34. After considering these arguments, the Court rejected them, concluding that the survey did fit Plaintiffs' theory of liability:

> Dr. Dennis's questions in the Main Survey are premised on the 'whistle-to-whistle' or continuous workday doctrine … Consistent with this doctrine, Dr. Dennis used arrival and departure times as an indicator of when ball players' principal activities began and ended. While the data Dr. Dennis obtained may or not be sufficient to establish the ultimate issue of how much actual work was performed by the putative classes, it will allow the jury to ascertain *whether* the class members performed work and will provide estimates of the amounts of time they worked.

*Id.* at 42.

Defendants try to argue that for an activity to count as "team-related," a player must spend every minute of every day alongside every teammate. That view, however, does real violence to both the meaning of the phrase and the prior orders of this Court and the Ninth Circuit. As the Court held in its March 2017 Order, the removal of the winter offseason work from the classes eliminated the more individualized work, allowing the focus to be on work periods where activities are "conducted primarily on a team basis":

> Plaintiffs' original classes asserted claims that were based not only on activities in which they engaged at the ballpark but also winter conditioning activities performed individually. … Under these circumstances, the continuous workday doctrine was of little assistance for measuring the amount of work they performed, at least for the winter conditioning work …

Under their new proposal, Plaintiffs no longer seek to assert claims on behalf of the proposed classes based on winter conditioning work. In dropping these claims, they have significantly reduced the variations that led the Court to conclude that Plaintiffs were attempting to stretch the holding of *Tyson Foods* too far. To be sure, Defendants' experts have identified variations in the survey responses relating to arrival and departure times, hours worked by players affiliated with different clubs and even hours worked reported by players affiliated with the same clubs. … The Court concludes, however, that the remaining variations are not so significant as to preclude a jury from addressing Plaintiffs' claims on a classwide basis.

As discussed above, Plaintiffs have narrowed the range of activities on which they base their class claims by eliminating winter conditioning, instead focusing on activities that are conducted primarily on a team basis. In addition, Plaintiffs' theory of liability as to the new classes reduces the need to focus on the players' specific activities in order to quantify the amount of work performed to the extent they rely on the continuous workday doctrine. While it is likely that some individualized issues will remain as to whether certain types of activities should be included under the continuous work-day rules or are properly considered 'work' under the applicable law, the Court is not persuaded that they will overwhelm the common issues raised by Plaintiff's claims.

ECF No. 782 at 55.

On appeal, Defendants argued the same thing, claiming that under *Comcast*, the classes should not be certified because there was an "analytical gap between what the survey purported to measure ('most often' arrival and departure times) and Plaintiffs' theory of liability (team-related activities under the continuous workday theory)." Defendants' Consolidated Principal and Response Brief, *Senne*, 2017 WL 6557613, at 45. Not so, the Ninth Circuit decided: "This is not the 'rare[ ]' case where predominance is defeated despite the existence of an employer's 'common practice or policy.'" *Senne*, 934 F.3d at 943. "[M]any of defendants' protests go to damages, not liability. Damages may well vary, and may require individualized calculations. But 'the rule is clear: the need for individual damages calculations does not, alone, defeat class certification.'" *Id.* The Ninth Circuit also criticized Defendants' myopic focus on the survey: "the Main Survey was but one piece of the plaintiffs' representative evidence—evidence that also included hundreds of internal team schedules and public game schedules, payroll data, and the testimony of both players and league officials." *Id.* As the Ninth Circuit held, *liability* can often be established without even considering the survey. *Id.*

1     Ultimately, the Ninth Circuit held that the issue of how much work players perform is one for

2   the jury. "[I]f plaintiffs can persuade a jury that their workday began at a particular time—either

3   because they were required to report at that time, or because they arrived of their own volition but

4   engaged in work activities upon arriving (i.e., were 'permitted' to work)—the continuous workday

5   doctrine eliminates the need for plaintiffs to prove which activities they engaged in throughout the

6   day." *Id.* at 943-44. Addressing the same criticisms Defendants again raise, the Ninth Circuit

7   acknowledged the possibility that a "jury may be persuaded by defendants' arguments that players did

8   not begin compensable work upon arriving at the ballpark or that players stopped engaging in

9   compensable work long before they left the ballpark," but to take that decision away from the jury

10  would be to invade the province of the jury. *Id.* at 945-46; *see also Vaquero v. Ashley Furniture Indus., Inc.*,

11  824 F.3d 1150, 1155 (9th Cir. 2016) (rejecting a similar *Comcast* argument because "[i]n a wage and

12  hour case, unlike in an antitrust class action, the employer-defendant's actions necessarily caused the

13  class members' injury.").

14      To hold otherwise would ignore Supreme Court precedent and the Ninth Circuit's mandate in

15  this case. As *Mt. Clemens* held, when the employer keeps inaccurate records of work hours, the

16  solution is not to penalize the employee and reward the employer for shoddy record-keeping; rather,

17  the solution is to shift the burden to the employer to prove the actual hours worked or disprove the

18  reasonableness of the inference to be drawn from the plaintiff's estimate. *Mt. Clemens*, 328 U.S. at

19  687–88. "If the employer fails to produce such evidence, the court may then award damages to the

20  employee, even though the result be only approximate." *Id.* The Ninth Circuit, examining this and

21  other Supreme Court precedent (including *Tyson*), held that Plaintiffs' model for estimating hours

22  worked is sufficient to proceed on a classwide basis. *Senne*, 934 F.3d at 939-45.

23      Nothing has changed to warrant Defendants' extraordinary request for this Court to depart

24  from the Ninth Circuit's holding. Defendants' current argument (at 9) that "Dr. Kriegler's model (and

25  the underlying survey) captures all hours between Players' arrival and departure times" not only

26  ignores the Ninth Circuit's holding but it is also untrue: Dr. Kriegler removed meal periods from the

27  hours worked (which were captured by the survey), just as he said he would. Defendants then argue

28  that "Dr. Dennis conceded at his deposition that the Main Survey did not measure 'team related'

1   activities' but rather all time spent at the ballpark." Yet in the portion of the transcript that

2   Defendants cited, Dr. Dennis did not concede that the survey failed to measure team-related activities;

3   he actually testified that "presumably when they're at work there's some activities there that are team

4   related." ECF 1038-7, Dennis Dep. Tr. at 25:2-4. And regardless, testimony from Dr. Dennis or Dr.

5   Kriegler to the effect that the survey measured arrival and departure times is not earth shifting—that

6   was apparent five years ago and served as fuel for Defendants' prior criticisms, all of which were

7   rejected.

8        As for the argument (at 11) that Plaintiffs have not relied on "other evidence"—such as daily

9   itineraries and deposition testimony—in their "damages model," that likewise fails for multiple

10  reasons. First, the argument acknowledges that this is about proving damages. As the Ninth Circuit

11  affirmed, "the rule is clear: the need for individual damages calculations does not, alone, defeat class

12  certification." *Senne*, 934 F.3d at 943. That is especially true since Defendants failed to maintain

13  accurate records, and the players need to only provide sufficient evidence to show hours worked as a

14  matter of "just and reasonable inference." *Senne*, 934 F.3d at 939-40, 944.

15       Second, Defendants misrepresent Dr. Kriegler's model, for he relies on much more than the

16  survey. As Dr. Kriegler explained in his deposition when discussing the Arizona and Florida classes,

17  "Again, as I've stated many times now, the hours spent at the ballpark for a certain type of day, that

18  comes from the survey, but determining the applicability of those calculations requires many other

19  data sources -- that are in addition to the survey, including eBIS, including the rosters, including

20  schedules." ECF 1038-8, Kriegler Tr. at 68:5-12. For the California Class, that documentary evidence

21  played an even more central role: Dr. Kriegler used the exact length of games (close to three hours)

22  and durations of time spent on buses going to road games (which often take several hours), and only

23  used the survey data for pre- and post-game work.[1]

24

25  _____

26  [1] Defendants claim that 90% of the damages during the California Class can be attributed to the
27  survey data. This is misleading. Since the survey data is stacked upon the duration of games and
    duration of travel, it would be just as accurate to say that 90% of the damages can be attributed to the
28  duration of the games.

1    Nor is this argument anything new. Defendants argued five years ago that the survey was

2    "Plaintiffs' proposed source of 100% of the hours for spring training, extended spring training and

3    instructional league, as well as all of the pre- and post-game hours for the Championship season."

4    March 2017 Order, ECF 782 at 19. That argument from five years ago proves that Plaintiffs' damages

5    model is exactly as promised. Dr. Kriegler previously explained that he would use MLB's transaction

6    data to determine a player's status and the Club the player was assigned to. *See id.* at 24. He did so. He

7    explained that he would use game schedules to determine the type of workday for a player on a

8    particular day (e.g., championship versus spring training, home versus away, and day versus night). *Id.*

9    He did so. He explained that he would then insert the estimated number of hours for that particular

10   workday for that particular player. *Id.* He did so. Defendants argue (at 12) that Dr. Kriegler somehow

11   unexpectedly used schedules "to identify the players who participated in the seasons"—but that was

12   exactly what he said he would do.

13   The argument (at 11) that Dr. Kriegler provided "no explanation" for his use of the 10th and

14   25th percentiles fares no better. Dr. Kriegler has repeatedly explained his basis for using conservative

15   percentiles in great detail. In fall 2016, in response to Defendants' arguments about variance, Dr.

16   Kriegler stated that he intended to use a conservative percentile to establish the minimum required

17   workday, and opined that "the 10th percentile" from the survey data "closely tracks (and in some

18   instances is lower than) the required work hours according to daily schedules and depositions." Oct.

19   28, 2016 Kriegler Rebuttal Decl., ECF No. 755 at 5; *see also id.* at 12-13 (discussing the approach

20   further and providing analyses). Dr. Dennis agreed that this approach could be taken. ECF 696 at 13.

21   Five years later, Dr. Kriegler did in fact use the 10th percentile when measuring hours worked,

22   along with another conservative percentile (the 25th). And he again explained exactly why he decided

23   to use those percentiles: they are tied to his review of thousands of daily itineraries showing activities

24   performed by players. Dr. Kriegler used two methods "to identify the start of baseball- or team-

25   related activities" according to the daily itineraries. Kriegler Supp. Rep., ECF No. 984-2, at ¶ 115.

26        The first method utilizes the time by which all players on a given team are expected to

27        participate in a baseball- or team-related activity ("Latest Start Time"). Oftentimes this

          is the team stretch.

28

> The second method utilizes the earliest time at which baseball- or team-related activities begin ("Earliest Start Time"). For example, this may be a group meeting or some type of early work.

*Id.* He then compared the results of that itinerary analysis to the survey data. *Id.* ¶¶ 116-18.

> Using the Latest Start Time … the average durations of pre-game work align with the 10th percentile from the survey. These results confirm that the 10th percentile is a conservative estimate of hours worked in a given workday.

> Using the Earliest Start Time … the average durations of pre-game work align with the 25th percentile from the survey. These results align with the 25th percentile and the deposition testimony that Minor Leaguers typically performed additional work. *Id.*

The analysis of daily itineraries thus directly informed Dr. Kriegler's choice of percentiles. And they provide powerful evidence that these percentiles *are* representative of when the required workday began for players. That conclusion is further buttressed by the mountain of deposition testimony that Dr. Kriegler analyzed, both from players and Defendants' representatives. *Id.* ¶¶ 119-22. That testimony "corroborate[d] and confirm[ed] the reliability of the 10th and 25th percentiles for hours worked." *Id.* at ¶ 122. From this evidence, the jury could easily determine that players "were required to report" at the time reflected by the 10th percentiles and the itineraries' Latest Start Time; or the jury could conclude that players generally arrived at the time reflected by the 25th percentile and the itineraries' Earliest Start Time to "engage[] in work activities upon arriving (i.e., were 'permitted' to work)." *Senne*, 934 F.3d at 943-44. As the Ninth Circuit held, either method will suffice for determining the start of the workday and will eliminate the need for an activity-by-activity inquiry. *Id.*

Defendants argue (at 12) that Dr. Kriegler did not actually use the numbers from the daily itineraries as a stand-alone measure of damages. But he did not need to because they generally aligned with the percentiles from the survey data anyway. And Dr. Kriegler's methodology for the daily itineraries and deposition testimony is hardly a surprise given that Dr. Dennis conducted a similar exercise five years ago: Dr. Dennis corroborated his survey by examining deposition testimony and daily itineraries. *See* ECF Nos. 696-03 & 696-04 (providing results of this analysis). Dr. Kriegler took that process a step further, analyzing all the deposition testimony and thousands of daily itineraries.

Further, the daily itineraries and deposition testimony are themselves evidence. As the Ninth Circuit held, there are "several overlapping ways that plaintiffs may be able to rely on their

1   representative evidence" to establish liability, even without the survey. *Senne*, 934 F.3d at 949. The

2   Ninth Circuit also already rejected Defendants' argument that the schedules are merely aspirational,

3   instead finding them indicative of hours worked and in most cases sufficient to establish liability. *See*

4   *Senne*, 934 F.3d at 943 ("[T]he team schedules will serve to conclusively demonstrate that the players

5   spent time working for which they were uncompensated."); *id.* at 944 ("[T]he team schedules alone—

6   independent of the Main Survey or any other evidence—may suffice to show overtime liability."); *id.*

7   at 950 n.29 ("Given the internal team schedules in the record, this may be an easy task, particularly for

8   spring training and extended spring training. For example, a spring training schedule for one of the

9   San Francisco Giants' affiliates involved a workday beginning at 6:30 AM on the day of a 1:00 PM

10  away game, with a 50 minute window provided for transit between the training facility and the

11  ballpark. Assuming for the sake of argument that the 1:00 PM game lasted 2.5 hours and that the

12  return trip to the training facility took the same amount of time—50 minutes—as the outgoing trip,

13  that day alone entailed approximately 10 hours of work if the players left the training facility

14  immediately upon their return (and based on the testimony in the record, that assumption seems

15  implausible).").

16      That Dr. Kriegler did not use the numbers drawn from the daily itineraries and depositions as

17  independent inputs when calculating his damages numbers does not change the status of these

18  materials as representative evidence that can be presented to the jury. They still reflect hours worked.

19  And if needed, the jury could rely upon the daily itineraries and deposition testimony as a measure of

20  damages as well. *See Ridgeway v. Walmart Inc*, 946 F.3d 1066, 1087 (9th Cir. 2020) ("testimony from

21  Wal-Mart drivers can amount to representative evidence"). Indeed, it is not uncommon for deposition

22  testimony or documentary summaries to fill the evidentiary gap created by imperfect records of hours

23  worked. *See McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988) ("We hold that the *Mt. Clemens*

24  *Pottery* standard allows district courts to award back wages under the FLSA to non-testifying

25  employees based upon the fairly representative testimony of other employees."); *Solis v. Best Miracle*

26  *Corp.*, 709 F. Supp. 2d 843, 852 (C.D. Cal. 2010) *aff'd*, 464 F. App'x 649 (9th Cir. 2011) (representative

27  testimony from employees used to establish the average workweek); *see also Arredondo v. Delano Farms*

28  *Co.*, 301 F.R.D. 493, 540 (E.D. Cal. 2014) (denying motion to decertify and distinguishing one of the

1    cases Defendants rely upon, saying: "To the extent that Defendants assert that *Marlo* stands for the

2    proposition that anecdotal evidence of class members cannot be sufficient to represent the experience

3    of the whole and establish predominance, Defendants read too far."). All of the evidence can be

4    presented to the jury, which will make its determinations as to the damages that have been proven.[2]

5          Defendants are of course free to argue at trial that the testimony, survey, itineraries, and other

6    evidence of hours worked is not sufficient to meet the just-and-reasonable-inference burden. But the

7    Ninth Circuit has already considered these arguments in the class certification context and found Rule

8    23 to be satisfied. In the end, Defendants' motion rests on the same "cramped reading" of Supreme

9    Court precedent that the Ninth Circuit already rejected. *Senne*, 934 F.3d at 942. There is no truly new

10   evidence and no new law to evaluate. It is time to let the jury hear this evidence and decide for

11   themselves the extent of Defendants' wage-and-hour violations.

### II.    THE COURT AND THE NINTH CIRCUIT ALREADY HELD THAT VARIANCE IN HOURS WORKED DOES NOT LEAD TO A RULES ENABLING ACT VIOLATION.

14         Defendants next argue that the Rules Enabling Act and the Supreme Court's *Wal-Mart* decision

15   should allow them to move for decertification. This is again the same drum Defendants were banging

16   five years ago. Defendants inexplicably argue (at 13) that this case is "more like *Dukes* than *Tyson*." But

17   the Ninth Circuit already held exactly the opposite: "Given the similarities between this case and

18   *Tyson*, the rule set forward in *Tyson* controls, and '[defendants'] reliance on Wal-Mart is misplaced.'"

19   *Senne*, 934 F.3d at 947 (quoting *Tyson*, 136 S. Ct. at 1048); *see also Vaquero*, 824 F.3d at 1155 (rejecting a

20   similar Rules Enabling Act argument in a wage-and-hour case).

21         The next argument (at 13), that the survey is Plaintiffs' only "purportedly representative

22   evidence," is also recycled. Both this Court and the Ninth Circuit have already rejected it. *See Senne*,

23   934 F.3d at 942 ("[W]e note that despite defendants' repeated suggestions to the contrary, the

---

25   [2] One of the only new cases chiefly relied upon by Defendants, *Vizcarra v. Unilever United States, Inc.*, is far different from the circumstances here. No. 4:20-CV-02777 YGR, 2021 WL 5370754, at *10 (N.D.

26   Cal. Oct. 27, 2021). A false advertising case involving an image of vanilla wafers on an ice cream box says nothing about how a court should treat evidence of hours worked under the burden-shifting

27   framework of *Mt. Clemens* and *Tyson*. It certainly cannot be used as a basis for overriding the Ninth

28   Circuit's determination that Plaintiffs' evidence of hours worked satisfies Rule 23's requirements.

1   representative evidence offered by plaintiffs was not limited to just the Main Survey."). And the

2   argument about variance in the survey data is also recycled:

3       According to Defendants, even if the Main Survey survived scrutiny under Daubert, it
        cannot properly be used for this this purpose because it does not take into account
4       variations in player circumstances. … Dr. Guryan opines that there is substantial
        variation among respondents to the Main Survey as to arrival and departure times for
5       each of the types of day at issue … Dr. Guryan also finds significant differences for
        hours reported across Clubs and from year to year. Finally, he finds significant
6       variations even among players who played for the same Club in the same year

7   …

8       Moreover, Defendants assert, comparison of the survey results with the team
        schedules shows that the survey results 'are not correlated with the schedules by team
9       and there are substantial differences in the hours individual respondents reported
        while playing for the same Club in the same year.
10

    …
11
        Defendants contend the unreliability of the results of the Main Survey can be seen in
12      the variability of the responses from players who played for different Clubs. These
        variations show that the survey responses do not provide reliable evidence of 'team
13      activities,' Defendants contend.

14  ECF 782 at 17-18, 29, 34.

15      This Court considered and rejected these arguments, determining "that in *Tyson Foods* itself,

16  there were variations among class members with respect" to estimated hours worked, "but these were

17  not found to preclude reliance on representative evidence." *Id.* at 56. And the Ninth Circuit held the

18  same: "while defendants correctly point out that the Main Survey revealed meaningful variations in

19  players' arrival and departure times, the same was true of the employees' donning and doffing times in

20  *Tyson*—yet such variation did not preclude certification there." *Senne*, 934 F.3d at 945.

21      Both this Court and the Ninth Circuit held that *Tyson*'s "no reasonable juror" standard had been

22  met. *Id.* at 945-46. That conclusion was based not just on the survey viewed in isolation, but all the

23  evidence. As was the case five years ago, Defendants remain blind to any evidence but the survey.

24  They argue (at 15) that Plaintiffs' experts never used other evidence to "bolster the survey," but that is

25  exactly what Plaintiffs' experts did, both then and now. Five years ago, Dr. Dennis used a sample of

26  daily itineraries and deposition testimony to show the reliability of the survey data. Dr. Kriegler then

27  expanded the analysis, reviewing thousands of daily itineraries and all the deposition testimony. The

28  evidence corroborated the survey data. *See supra* at 11-12.

1    The daily itineraries and deposition testimony provide two more layers of representative

2    evidence, each of which Plaintiffs can use at trial to establish liability—and to evince hours worked.

3    Presenting that evidence alongside the survey data will indeed "allow a jury to draw conclusions based

4    on reasonable inference as to when players were required to be at the ballpark and how long after

5    games they were required to remain at the ballpark." March 2017 Order, ECF 782 at 56. Given the

6    broad definition of hours worked, the Ninth Circuit agreed, saying that it was "satisfied that we

7    should not disturb the district court's determination." *Senne*, 934 F.3d at 945-46.

8    Defendants point to this Court's decision in *Kazi v. PNC Bank, N.A.*, No. 18-CV-04810-JCS,

9    2020 WL 3414709, at *9-10 (N.D. Cal. June 22, 2020), but that decision is of no aid. There the

10   problem was that the plaintiffs had not come forward with *any* expert testimony of hours worked and

11   had only offered testimony from one person. Citing the Ninth Circuit's opinion in this case, the Court

12   stated that the plaintiffs' "burden on this issue is not heavy," and noted that "an expert might prepare

13   such a report after conducting a study or reviewing the training materials themselves, or that other

14   employees might testify in a manner consistent with" the one employee. *Id.* But unlike here—where

15   the players have woven a multi-layered rope of proof to be offered at trial—the *Kazi* plaintiffs had not

16   even tried to collect the needed evidence.

17   In *Kazi*, the Court discussed another recent Ninth Circuit case that is much more on point. In

18   *Ridgeway v. Wal-Mart Stores, Inc.*, Wal-Mart similarly argued "that variation among whether class

19   members performed certain activities, and for how long, and whether they were paid for them,

20   precluded certification." No. 08-CV-05221-SI, 2016 WL 4529430, at *13 (N.D. Cal. Aug. 30, 2016).

21   The district court rejected these arguments when it denied a motion for decertification, finding it

22   important that a uniform policy had been challenged "for not paying drivers for certain tasks," and

23   that Wal-Mart's arguments mostly went to damages and "thus do not prevent certification." *Id.*

24   After a jury trial in the drivers' favor, Wal-Mart again raised the arguments on appeal. *Ridgeway*,

25   946 F.3d at 1086. Wal-Mart argued that "that truckers differed on how much time they spent on rest

26   breaks, completing inspections, and on layovers" so the truckers could not "use representative

27   testimony to prove the elements of their case." *Id.* And Wal-Mart "argue[d] that, given the broad

28   range of experiences among drivers, Phillips's testimony and other evidence could not prove classwide

16

1   damages. For example, some truckers took shorter rest breaks than others. Some inspections took

2   longer than others. Variation abounded." *Id.*

3   But "Wal-Mart's argument misse[d] the mark." *Id.* at 1088. "Time and time again, this court

4   has reaffirmed the principle that the need for individual damages calculations does not doom a class

5   action." *Id.* at 1086.

6   > Drivers need not prove that they all took the same time to complete required

7   > inspections. All that is required is enough representative evidence to allow a jury to
   > draw a reasonable inference about the unpaid hours worked. Here, plenty of evidence

8   > supported the fifteen-minute determination. For example, the jury considered
   > evidence from forty class member deponents, a Wal-Mart training video, and Wal-

9   > Mart manager depositions. … [T]he jury did not have to accept Phillips's fifteen-

10  > minute inspection calculation. But the jury had ample evidence to do so. Again,
   > Phillips's sample was concerned with the amount of damages, not the fact that

11  > damages are due.

12  > The same is true for rest breaks. Despite variations, which are common in class action
   > damage calculations, introduction of the representative sample and representative

13  > testimony was proper because plaintiffs had no other practicable way to prove how

14  > much Wal-Mart owed them. *Tyson Foods*, 136 S. Ct. at 1046–48. And plenty of
   > evidence supported the jury's conclusion.

15  > In the end, the district court properly admitted representative testimony and the

16  > representative sample. Wal-Mart's quarrel with the jury's finding on liability is
   > misplaced. The jury weighed evidence presented by the parties and found for plaintiffs

17  > on layovers, rest breaks, and inspections. Phillips's sample, surveys, Wal-Mart's data,

18  > and testimony from the named plaintiffs provided ample evidence regarding the extent
   > of classwide damages.

19

20  *Id.* at 1088 (internal citations and quotations partially omitted).

21  This Court and the Ninth Circuit have already held that similar arguments fail here as well.

22  There is no need to re-visit the same arguments based on the same survey and the same classes and

23  the same cases relied upon. *See Arredondo*, 301 F.R.D. at 542 (denying motion to decertify because:

24  "Defendants raise a number of arguments based on variation in amount of pre-shift work performed

25  by individual Plaintiffs. However, as explained recently by the Ninth Circuit, such variation does not

26  preclude a finding of predominance under Rule 23(b)(3).").

27  Nor is there anything to the Rules Enabling Act argument. Defendants, in a single paragraph,

28  claim that the variance means that Dr. Kriegler's analysis would not be admissible in an individual

1   action. Plaintiffs attempted the same arguments years ago, contending that "permitting Plaintiffs to

2   use the survey to prove their claims on a classwide basis when the same survey would be inadmissible

3   in an individual action violates the Rules Enabling Act." Defendants' Opening Brief, 2017 WL

4   6557613, at 37. The Ninth Circuit found no merit to that argument, quoting *Tyson* when deciding that

5   Defendants' arguments could have defeated certification only if all the evidence "could not have

6   'sustained a reasonable jury finding as to hours worked in each employee's individual action." *Senne*,

7   934 at 945. This Court "found the opposite," however, and the Ninth Circuit affirmed. *Id.*; *see also*

8   *Ridgeway*, 946 F.3d at 1087 (rejecting similar argument because even in individual cases, the

9   representative evidence "would strengthen and corroborate all plaintiffs' claims"); *Vaquero*, 824 F.3d

10  at 1155 (rejecting a Rules Enabling Act argument in a wage-and-hour case).

11      Defendants also previously raised the argument that some class members may not receive every

12  penny that they are owed because of Defendants' widespread wage violations. Plaintiffs told the Court

13  that Dr. Kriegler would likely use a conservative percentile of the survey data when calculating

14  damages. *See* March 2017 Order, ECF 782 at 26 ("Plaintiffs argue further that conservative estimates

15  can be used to measure this time, such as the 10th percentile. … [T]he 10th percentile can be used to

16  reveal when the *required* team work began because it represents the time by which 90% of respondents

17  had already arrived to work."). Defendants responded by arguing (as they do now) that "Dr. Kriegler's

18  reliance on a percentile approach to correct for the variations in the survey results" would

19  "'shortchange' 90% of minor league players. … Defendants contend this approach also raises

20  questions as to superiority and adequacy to the extent Plaintiffs are essentially seeking less than the

21  amount to which they claim they are entitled." *Id.* at 29. The Court rejected the argument: "As in any

22  class action, Plaintiffs must make judgment calls about what claims can be addressed on a classwide

23  basis and what relief should be pursued for the class." *Id.* at 50.

24      Ironically, if Defendants were truly concerned about paying players for all hours actually

25  worked, then they should keep time records and pay them in accordance with the law instead of

26  requiring them to work for months of the year for free. The legality of not paying them for required

27  work and never paying overtime is at the forefront of this case, and the across-the-board adjudication

28  of those policies gives rise to the glue that continues to make this case appropriate for class resolution.

III.  **THE COURT AND THE NINTH CIRCUIT ALREADY HELD THAT PLAINTIFFS' EVIDENCE SUPPORTS CERTIFICATION OF THE CALIFORNIA CLASS.**

In their final argument, Defendants contend the California Class should be decertified because, for the championship season, the survey focused on all leagues rather than just the California League. This too is nothing revelatory. It is self-evident that the survey did not focus just on the California League. That allowed Defendants to make these same arguments years ago, based on the same case (*Marlo*) that they cite now:

> [U]nlike in *Tyson Foods*, the survey is not representative evidence for the California class because there is no indication that the sample of survey respondents included a single player from the California League or that any survey responses correspond to time spent, if any, in the California League. … Thus, Plaintiffs cannot establish that the survey is representative of the California class in the most basic sense. *See Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 948--49 (9th Cir. 2011) (affirming lower court's decertification order; survey that was not limited to full-time supervisors in the class was not representative in class action brought by full-time supervisors).

Defendants' Opening Brief, 2017 WL 6557613, at 36-37. Defendants further argued:

> [T]here is no evidence that a single California League player responded to the survey. … At best, the survey shows most often arrival and departure times of players in other leagues, at different skill levels, for different MLB Clubs at different positions in different seasons. … Accordingly, because no member of the California class could rely on the survey to establish liability, allowing the class to do so would run afoul of the Rules Enabling Act.

Defendants' Reply Brief, 2018 WL 2165612, at 16-17. Defendants made their argument, and it failed. When it comes to work routines, Defendants have never shown any reason to treat the California League differently than other leagues. The California Class focuses on the California League because of choice-of-law concerns, not concerns about work routines differing from league to league.

Defendants point to the deposition testimony, but there is nothing new there. Defendants contort Dr. Dennis's testimony, suggesting (at 19) that he testified that the survey was not "representative of the California Class." As Dr. Dennis actually testified, however, "I have confidence that my results can be reliably generalized to, and projectable to, the California League." Broshuis Decl. Ex. 1: Dennis Tr. at 71. "I base that on my understanding of also the subject matter, which involved these routines and the routinization that Minor League players experienced as players in the championship season… these were routines that allow, in many ways, for my national-level data to be

1   projectable to and relevant to the different leagues." Dennis Tr., ECF No. 1021-3 at 72-73. Dr.

2   Kriegler testified the same: "[B]ased on all of the deposition testimony, as well as documents that I've

3   reviewed, the only thing that I can tell that distinguishes the California League from other leagues is

4   that they're in California; they play games in California." Kriegler Tr., ECF No. 1021-4 at 131:15-20;

5   *see also* Pltfs' Opp. to Defs.' Mot. to Exclude Kriegler Report, ECF No. 1022 at 14-15 (further

6   discussing the lack of evidence on differences between the California League and other leagues).

7        Defendants have never been able to point to any differences in pregame work routines in the

8   California League as compared to other minor leagues because none exist. Batting practice begins

9   around the same time whether a player plays in the California League or the Eastern League, and as a

10  result, other pregame activities take place around the same time as well. *See* Nov. 21, 2021 Kriegler

11  Decl., ECF 1023 at 9-13 (showing no difference between California League respondents and all

12  respondents to the survey); *see also* March 2017 Order at 45 ("Plaintiffs have also introduced evidence

13  that activities of minor league players are, in fact, routinized.").

14       This is yet another recycled argument that was rejected by the Ninth Circuit. And it is yet

15  another example of an issue left to the trier of fact to decide when weighing the evidence. *See Risto v.*

16  *Screen Actors Guild-Am. Fed'n of Television & Radio Artists*, No. 218CV07241CASPLAX, 2021 WL

17  4143242, at *4 (C.D. Cal. July 19, 2021) ("[W]hether or not an expert's extrapolation from a small and

18  purportedly non-representative data set is persuasive and credible evidence is a question for the trier

19  of fact and properly a subject for cross examination.") (citing *Alaska Rent-A-Car, Inc. v. Avis Budget*

20  *Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013)).

21                                **CONCLUSION**

22       This is not a case where the record was undeveloped before the Court issued its class

23  certification ruling. The record was voluminous, the briefing was voluminous, the final survey had

24  been disclosed, and both this Court and the Ninth Circuit held that Rule 23 had been satisfied.

25  Defendants long ago made arguments related to "Rule 23(a) requirements of commonality and

26  typicality and the Rule 23(b)(3) requirement of predominance." *Brown*, 2018 WL 1993434, at *2. As in

27  *Brown*, the Court's March 2017 "order dealt with those same three requirements, and the Ninth

28  Circuit's [2019] decision affirmed." *Id.* Defendants' motion thus "violates the principle that courts are

1  'generally precluded from reconsidering an issue that has already been decided by ... a higher court in

2  the identical case.'" *Id.*; *see also Busby*, 2008 WL 11476071, at *6  (law of case barred re-litigating class

3  certification after issues had already been decided on appeal). The Ninth Circuit has spoken, and it is

4  time for the class members' claims to be heard by a jury. Defendants' motion should be denied.

5  DATED: January 18, 2022                                        Respectfully submitted,

6

7                                                                     */s/ Garrett R. Broshuis*

8                                                        PEARSON, SIMON & WARSHAW LLP
                                                         CLIFFORD H. PEARSON
9                                                        THOMAS J. NOLAN
                                                         DANIEL L. WARSHAW
10                                                       BOBBY POUYA
                                                         BENJAMIN E. SHIFTAN
11
                                                         KOREIN TILLERY, LLC
12                                                       STEPHEN M. TILLERY (pro hac vice)
                                                         GARRETT R. BROSHUIS
13                                                       MARC WALLENSTEIN (pro hac vice)
                                                         DIANE MOORE
14
                                                         *Plaintiffs Co-Lead Class Counsel*
15

16                                  **CERTIFICATE OF SERVICE**

17          I hereby certify that on January 18, 2022, I electronically filed the foregoing with the Clerk of

18  the Court using the CM/ECF system, which will send notification of such filing to all attorneys of

19  record registered for electronic filing.

20

21                                  */s/ Garrett R. Broshuis*
                                    Garrett R. Broshuis

22

23

24

25

26

27

28