UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AARON SENNE, et al.,

Plaintiffs,

v.

KANSAS CITY ROYALS BASEBALL
CORP., et al.,

Defendants.

Case No.  14-cv-00608-JCS

**ORDER RE DISPOSITIVE MOTIONS,
MOTIONS TO EXCLUDE, AND
MOTION TO STRIKE**

Re: Dkt. Nos. 969, 971, 979, 980, 986, 987,
988, 1025

## I.    INTRODUCTION

Presently before the Court are the following motions: 1) Defendants' Motion to Exclude Plaintiffs' Expert Declarations and Testimony of J. Michael Dennis, Ph.D. (dkt. no. 969) ("Defendants' Motion to Exclude (Dennis)"); 2) Defendants' Motion to Exclude Plaintiffs' Expert Declarations, Reports, and Testimony of Brian Kriegler, Ph.D. (dkt. no. 971) ("Defendants' Motion to Exclude (Kriegler)"); 3) Plaintiffs' Motion for Partial Judgment on the Pleadings with Respect to "Save America's Pastime Act" Defense (dkt. no. 979) ("Plaintiffs' SAP Act Motion"); 4) Defendants' Motion for Partial Summary Judgment (dkt. no. 980) ("Defendants' Partial Summary Judgment Motion"); 5) Plaintiffs' Motion For Partial Summary Judgment (dkt. no. 986) ("Plaintiffs' Partial Summary Judgment Motion"); 6) Defendants' Motion to Exclude the Expert Rebuttal Report and Testimony of Erica L. Groshen, Ph.D.  (dkt.  no. 987) ("Defendants' Motion to Exclude (Groshen)"); 7) Plaintiffs' Daubert Motion to Exclude Certain Expert Testimony Disclosed by Defendants (dkt. no. 988) ("Plaintiffs' Motion to Exclude"); and 8) Plaintiffs' Motion to Strike Defendants' Daubert Motions and Improper Rebuttal Report (dkt. no. 1025)

United States District Court
Northern District of California

("Plaintiffs' Motion to Strike").   The Court's rulings are set forth below.[1]

## II.      PROCEDURAL BACKGROUND

### A.  The Second Consolidated Amended Complaint

The operative complaint in this case is the Second Consolidated Amended Complaint ("SCAC"), dkt. no. 382. In it, Plaintiffs, who are minor league baseball players ("the Players"), assert claims against the Office of the Commissioner of Baseball, former Commissioner Bud Selig and 22[2] Major League Baseball ("MLB") franchises ("the Clubs" or the "Franchise Defendants") under the Fair Labor Standards Act ("FLSA") for minimum wage and overtime violations (Count 1) and recordkeeping violations (Count 2) on behalf of an FLSA collective.  SCAC ¶¶ 568-580.  In addition, Plaintiffs assert state law wage and hour claims on behalf of Rule 23 classes under the laws of California (Counts 3-10, SCAC ¶¶ 583-620), Florida (Counts 11-12, SCAC ¶¶ 621-633), Arizona (Counts 13-15, SCAC ¶¶ 634-648), North Carolina (Counts 16-18, SCAC ¶¶ 649-666), New York (Counts 19-22, SCAC ¶¶ 667-686), Pennsylvania (Counts 23-25, SCAC ¶¶ 687-704), Maryland (Counts 26-28, SCAC ¶¶ 705-722) and Oregon (Counts 29-31, SCAC ¶¶ 723-740). Plaintiffs allege in the SCAC that they were not paid minimum wage and/or overtime for services performed during spring training, extended spring training, the Championship Season, fall instructional leagues, and for off-season training activities.  SCAC 382 ¶¶ 568-740.

### B.  Procedural Background re Certification of FLSA Collective and Rule 23 Classes

On October 20, 2015, the Court conditionally certified an FLSA collective in this case. Dkt. no. 446.  Subsequently, however, the Court denied Plaintiffs' request for class certification under Rule 23 and decertified the FLSA collective.  Dkt. no. 687 ("July 21, 2016 Order").  The Court's ruling as to class certification under Rule 23(b)(3) was based on the conclusion that "the individualized inquiries that [would] be required to determine which class members are owed compensation, for both unpaid minimum wages and overtime, would overwhelm the litigation

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).
[2] While there are currently 22 Franchise Defendants, Plaintiffs originally named 30 franchises as defendants.  The Court dismissed eight of the franchises for lack of personal jurisdiction in its May 20, 2015 Order, dkt. no. 379.

United States District Court
Northern District of California

because of the wide variations among class members regarding: (1) the types of activities in which they engaged (which would only be compensable if they were found to constitute work); (2) the time they spent engaged in these activities; and (3) how much each class member has been compensated, which would also require the Court to make determinations about which forms of additional compensation should be considered in determining the class members' regular wage rate and overtime rate." *Id.* at 80-81. The Court also pointed to the "myriad" choice of law issues that were likely to arise, especially as to off-season training, which can be performed by players in any state or even in multiple states. *Id.* at 87. The Court found that class certification under Rule 23(b)(2) was inappropriate because there were no named Plaintiffs who were current minor league players and thus, no named Plaintiff had standing to seek injunctive or declaratory relief on behalf of a (b)(2) class. *Id.* at 92.

In the July 21, 2016 Order, the Court further found that the FLSA's "similarly situated" requirement for certification was not satisfied for reasons similar to those that precluded class certification under Rule 23(b)(3). In particular, it found that there were "wide variations among the players as to the types of activities in which they engaged and the circumstances under which they engaged in them, which [would] give rise to a plethora of individualized inquiries relating to the determination of the amount of compensable work Plaintiffs performed." *Id.* at 95. The Court also found that "[a]djudication of Plaintiffs' FLSA claims [would] . . . involve numerous individualized inquiries regarding the amount of compensation received by class members and the applicability of various defenses, including the amusement exemption and the creative professional[ ] exemption." *Id.*

The Court rejected Plaintiffs' argument that they could satisfy the requirements of Rule 23(b)(3) and the FLSA by offering common proof in the form of survey results to be obtained by their expert, Dr. J. Michael Dennis, who had conducted a Pilot Survey of minor league players and who intended to conduct a more detailed survey to determine the amount of time minor league players engaged in various types of activities. *Id.* at 97-103. The Court found that "both the methodology and the results of the Pilot Survey [were] unreliable and that any future survey that applie[d] a similar methodology [was] likely to yield unreliable results as well[.]" *Id.* It therefore

excluded under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 590 U.S. 579 (1993) ("*Daubert*") the declaration and testimony of Dr. Dennis offered by Plaintiffs, as well as the declaration and testimony of Dr. Brian Kriegler, Plaintiffs' damages expert, to the extent that it relied on Dr. Dennis's testimony and the Pilot Survey. *Id.*

Plaintiffs brought a motion for reconsideration of the July 21, 2016 Order, dkt. no. 720 ("Motion for Reconsideration"), and extensive briefing ensued. In the Motion for Reconsideration, Plaintiffs proposed narrower classes, dropping their request for certification as to off-season training work and instead proposing certification of a California class as to claims for work performed during the Championship Season in the California League, and Arizona and Florida classes for claims based on work performed in those states during spring training, extended spring training and instructional leagues. Motion for Reconsideration at i-ii, 3-10. They narrowed the definition of the proposed FLSA collective in the same manner. *Id.* They argued that the more "streamlined" classes would eliminate the individual inquiries cited by the Court in the July 21, 2016 Order, including those associated with choice-of-law, because the Court could simply apply the laws of California, Arizona and Florida to the claims of the three proposed classes. *Id.* Plaintiffs also argued that the Court should reconsider its conclusions as to the admissibility of Dr. Dennis's survey evidence, pointing to the results of the now-completed final survey ("Main Survey"), which they asserted addressed the shortcomings the Court had identified with respect to the Pilot Survey. *Id.* at 10-17. In support of the Motion for Reconsideration, Plaintiffs filed a new declaration by Dr. Dennis in which he responded to the concerns expressed by the Court in its July 21, 2016 Order and described the findings, methodology and results of the Main Survey. Dkt. no. 696.

Defendants opposed the modified proposed class and collective definitions, arguing that the problem of individualized issues persisted and that even if the results of the Main Survey were admissible, they did not provide common proof of the amount of work performed by putative class members. Dkt. no. 740 ("Opposition to Motion for Reconsideration"). They also brought a motion to exclude the new Dennis declaration and the Main Survey results under Rule 702 and

4

1   *Daubert*, dkt. no. 724, supported by a declaration from their own expert, Dr. Eugene Ericksen, dkt.

2   no. 726. In addition, they argued that the four new proposed plaintiffs should not be permitted to

3   intervene to represent the proposed (b)(2) classes.  Opposition to Motion for Reconsideration at

4   19-20.

5           On March 7, 2017, the Court granted in part and denied in part the Motion for

6   Reconsideration, certifying a California class under Rule 23(b)(3) and a similar FLSA collective,

7   but declining to certify the proposed Arizona and Florida classes due to its continued concern

8   about individualized choice of law questions.  Dkt. no. 782 ("March 7, 2017 Order").  After

9   conducting a full *Daubert* analysis, the Court found that the Main Survey was admissible, denying

10  Defendants' motion to exclude it, and concluded that in combination with other evidence, it was

11  sufficient to show that Rule 23(b)(3)'s predominance requirement was met as to the proposed

12  California class.  *Id.* at 56-57.  The Court also found that as to all of the proposed classes, Rule

13  23(a)'s numerosity, commonality and typicality requirements were met.  *Id.* at 49.  The Court

14  found, however, that with respect to the Florida and Arizona classes, the adequacy requirement of

15  Rule 23(a) and the predominance requirement of Rule 23(b)(3) were defeated by choice of law

16  concerns.  *Id.* at 50-51, 63-65.  Similarly, the Court concluded that certification of Plaintiffs'

17  proposed Rule 23(b)(2) classes was inappropriate because the Court "could not necessarily

18  adjudicate the claims of the Rule 23(b)(2) classes or fashion a remedy . . . based on the law of only

19  one or two states" but instead "could potentially be required to apply the law of numerous states to

20  Plaintiffs' claims, which undermine[d] the cohesiveness of the class."  *Id.* at 66.

21          At Defendants' request, the Court certified the March 7, 2017 Order for interlocutory

22  review under 28 U.S.C. § 1292.  The Ninth Circuit granted both Defendants' petition for

23  permission to appeal the certification of the California class and Plaintiffs' petition for permission

24  to appeal the denial of certification for the Arizona, Florida, and Rule 23(b)(2) classes, and the

25  appeals were consolidated. The Ninth Circuit affirmed this Court's certification of the California

26  class but reversed as to its denial of certification of the Arizona, Florida, and (b)(2) classes,

27  concluding that the Court's choice of law analysis was incorrect.  *Senne v. Kansas City Royals*

28  *Baseball Corp.*, 934 F.3d 918, 933-937 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 248 (2020).

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9

In its decision, the Ninth Circuit found that Plaintiffs' proposed Florida and Arizona (b)(3) classes would not present choice of law problems because the claims for each of these classes would be governed by the law where the work occurred for all class members, that is, the laws of Florida and Arizona. *Id.* It further found that the Court's "errors in its choice-of-law analysis relating to the proposed Arizona and Florida Rule 23(b)(3) classes appl[ied] equally to its refusal to certify the proposed Rule 23(b)(2) class." *Id.* at 937. In addition, it concluded the Court "erred in imposing a 'cohesiveness' requirement for the proposed Rule 23(b)(2) class." *Id.* at 937-938. For these reasons, the Ninth Circuit reversed this Court's denial of certification of the Rule 23(b)(2) classes and remanded for further consideration of whether they should be certified.

10
11
12
13
14
15

On remand, the Court permitted Plaintiffs to disclose an updated report by Dr. Kriegler, which could "be different from his original report by (1) including opinions as to the class[es] [the Ninth Circuit found should have been certified], and by (2) including the final survey or other information not available to him at the time of his original report." Dkt. no. 842 (Minutes, November 13, 2020 Case Management Conference). It also permitted Defendants to disclose an expert report in rebuttal to the updated Kriegler report. *Id.*

16
17
18
19
20
21
22
23
24
25
26

Consistent with the Ninth Circuit's order remanding the case, the Court also revisited the question of class certification under Rule 23(b)(2). On April 23, 2021, Plaintiffs brought a motion for Rule 23(b)(2) class certification, offering Mr. Cody Sedlock, a current minor league player who plays for an affiliate of the Baltimore Orioles, as a proposed class representative because the four players previously proposed to represent a (b)(2) class were no longer playing minor league baseball. Dkt. no. 923. The Court granted that motion in part and denied it in part, finding that Plaintiffs did not meet the requirements of Rule 23(b)(2) for claims based on services performed under the Uniform Players Contract ("UPC") during the off-season or in California but did satisfy Rule 23(b)(2) as to a narrowed (b)(2) class that limits membership to individuals who perform services under the UPC during spring training, the championship season and the instructional leagues in Florida and Arizona. Dkt. no. 946 ("July 23, 2021 Order") at 32-41.

27

**C.    Current Class and Collective Definitions**

28

The classes and collective are defined as follows:

6

- **California (b)(3) Class**:

    Any person who, while signed to a Minor League Uniform Player Contract, participated in the California League of Professional Baseball (the "California League") on or after February 7, 2010 for at least seven consecutive days, and had not signed a Major League Uniform Player Contract at any time before their time of participation in the California League. Excluded from the class are Defendants and their officers, directors, and successors; any person who has (or during the class period had) a controlling interest in Defendants; any judge presiding over this action and members of the immediate family of any such judge; and counsel for Plaintiffs. Also excluded from the class are all persons who submit a timely request for exclusion.

Dkt. no. 799.

- **Arizona (b)(3) Class**:

    Any person who, while signed to a Minor League Uniform Player Contract, participated in spring training, instructional leagues, or extended spring training in Arizona on or after February 7, 2011, and had not signed a Major League Uniform Player Contract before then.

March 7, 2017 Order at 10.

- **Florida (b)(3) Class**:

    Any person who, while signed to a Minor League Uniform Player Contract, participated in spring training, instructional leagues, or extended spring training in Florida on or after February 7, 2009, and had not signed a Major League Uniform Player Contract before then.

*Id.*

- **The (b)(2) Class**:

    Any person who is or will in the future be signed to a Minor League Uniform Player Contract and participates in spring training, extended spring training, the championship season, or instructional leagues in Florida or Arizona.

Dkt. no. 950 at 1.

- **The FLSA Collective**:

    Any person who, while signed to a Minor League Uniform Player Contract, participated in the California League, or in spring training, instructional leagues, or extended spring training, on or after February 7, 2011, and who had not signed a Major League Uniform Player Contract before then.

March 7, 2017 Order at 11.

1    At the February 11, 2022 motion hearing, the parties agreed that the claims of the Rule 23

2  classes are as follows:

- The (b)(2) class and the Arizona and Florida (b)(3) classes assert claims under Arizona and
  Florida law concerning the work that minor leaguers perform during spring training,
  extended spring training, and instructional leagues in those two states.  The claims of the
  (b)(2) class also cover work performed during the Championship Season in Arizona and
  Florida.  Because Arizona and Florida do not have overtime laws, the claims asserted by
  these classes only involve alleged minimum wage violations and derivative claims.

- The California (b)(3) class asserts claims under California law concerning the work that
  minor leaguers perform during the regular Championship Season in the California League.
  The claims asserted by this class involve both minimum wage and overtime violations.  It
  also asserts derivative claims under California's Labor Code, such as waiting time
  penalties (§§ 201-203) and wage statement penalties (§ 226).

The parties also agreed that the claims of the FLSA collective cover the same scope of work as

is captured in the Rule 23(b)(3) classes and include both minimum wage and overtime claims

under the FLSA.

### D.    The Major League Constitution, Major League Rules and Uniform Players Contract

Defendant Commissioner of Baseball does business as Major League Baseball ("MLB"),

which is an unincorporated association that was created by the MLB Clubs in the Major League

Constitution.  *See* Broshuis Declaration in Support of Motion for Partial Summary Judgment

("Broshuis MPSJ Decl."), Ex. 1 (MLB Constitution), Art. II § 1; MLB's Answer (Dkt. No. 386) at

15 ¶ 62 (admitting that the Office of the Commissioner of Baseball, d/b/a MLB, is "an

unincorporated association, also doing business as Major League Baseball").  The Major League

Constitution designates the Commissioner of Baseball as the "Chief Executive Officer"  of

baseball and sets forth the Commissioner's functions, which include "executive responsibility for

labor relations[,]" the investigation of "transaction[s] or practice[s]" that are "not in the best

interests of the national game of Baseball" (including the authority to "summon persons and order

8

United States District Court
Northern District of California

1    the production of documents" in connection with such investigations and impose penalties for

2    failure to comply), and the determination and imposition of appropriate "preventive, remedial or

3    punitive actions" based on the results of those investigations.  Broshuis MPSJ Decl., Ex. 1 (MLB

4    Constitution), Art. II § 2.

5    The Major League Constitution further sets forth the types of punitive actions that may be

6    imposed by the Commissioner on "Major League Clubs, owners, officers, employees or players"

7    deemed to have engaged in conduct contrary to the "best interests of Baseball."  *Id.*, Art. II § 3.

8    As to players, this includes "temporary or permanent ineligibility."  *Id.*

9    The Major League Constitution also authorizes the Commissioner to "adopt a set of Major

10   League Regulations relating to games, ballparks, uniforms and other matters relating to the

11   Commissioner's functions and may otherwise promulgate bulletins and directives binding on the

12   Major League Clubs (including without limitation their owners, officers, directors and employees)

13   in matters relating to the Commissioner's functions and the administration of the game of

14   Baseball" that are not inconsistent with the Major League Constitution.  *Id.*, Art. XI, § 3.  These

15   Major League Rules ("MLRs") "dictate the terms of employment and compensation for both

16   minor and major league players."  *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 923

17   (9th Cir. 2019); *see also* Broshuis MPSJ Decl., Ex. 2 (MLRs).  The MLRs establish a draft system

18   for the selection of major and minor league players (MLR 4) and eligibility requirements for

19   participation in the major and minor leagues (MLR 3).  Further, "[t]o preserve morale among

20   Minor League Players and to produce the similarity of conditions necessary for keen competition,

21   all contracts between either Major or Minor League Clubs and players on Minor League Reserve

22   Lists" must be "in the form of the Minor League Uniform Player Contract" attached to the MLRs.

23   Broshuis MPSJ Decl., Ex. 2  (MLR(3)(b) & Attachment 3 (Minor League Uniform Player

24   Contract ("UPC"))).  The term of the UPC for minor league players who have not previously

25   played under a contract with a Club is seven years.  *Id.* (MLR 3(b)(2) & UPC § VI(A)).

26   The UPC is between the minor league player and the major league club and "set[s] the

27   terms and conditions of Player's employment during all periods in which Player is employed by

28   Club as a Minor League Player."  *Id.* (UPC § IV)  It provides that although players receive a

salary "only during the actual championship playing season[,]" they are "obligated to perform professional services on a calendar year basis[.]" *Id.* (UPC § VI(B)). It further states:

> The salary paid is in part based on considerations in addition to the actual performance of services during the championship playing season. Player therefore understands and agrees that Player's duties and obligations under this Minor League Uniform Player Contract continue in full force and effect throughout the calendar year, including Club's championship playing season, Club's training season, Club's exhibition games, Club's instructional, post-season training or winter league games, any official play-off series, any other official post-season series in which Club shall be required to participate, any other game or games in the receipts of which Player may be entitled to a share, and any remaining portions of the calendar year. Player's duties and obligations shall continue in full force and effect until October 15 of the calendar year of the last championship playing season covered by this Minor League Uniform Player Contract.

*Id.*

Under UPC § XIX, the Club can terminate a player for failure to maintain adequate standards of personal conduct, stay in "first-class physical condition," obey the Club's requirements regarding "conduct and services," "exhibit sufficient skill or competitive ability," or perform services. *Id.* § XIX. The Clubs also may terminate players for any material breach of the UPC. *Id.*

The MLRs also address the relationship between the major league clubs and minor league affiliates, providing that "[i]n order for any Major League Club and any Minor League Club . . . to establish or maintain any form of working agreement or other contractual relationship, they both must sign a standard form letter . . . binding them both to the terms and conditions of the standard Player Development Contract ('PDC') set forth in this Rule 56." *See* Broshuis MPSJ Decl., Ex. 2 (MLR 56 & MLR Attachment 56). No amendments or additions to the PDC are permitted. *Id.* Under the standard PDC, the major league clubs maintain all player lists for the minor league affiliate and during the Championship Season and any post-season play also maintain "an active roster of skilled players for the Minor League Club." *Id.* (MLR 56(g)(1)). Players listed on the active roster are "under contract exclusivity to the Major League Club[.]" *Id.* Further, the PDC gives the major league club the authority to "assign, direct, designate or otherwise transfer any player to the various players lists that it files and maintains for the Minor League Club." *Id.*

1    (MLR Rule 56(g)(3)).

2    **III.      PLAINTIFFS' MOTION TO STRIKE**

3            In their Motion to Strike, Plaintiffs ask the Court to strike all of Defendants' Motions to

4    Exclude on the grounds that the Court permitted only one *Daubert* motion per side and not three.

5    Plaintiffs further contend Defendants' Motion to Exclude (Dennis) should be stricken because it

6    raises arguments that the Court already rejected when it addressed Defendants' previous *Daubert*

7    challenge to Dr. Dennis's Main Survey and ignores the Court's admonition that Defendants would

8    not be given another "free shot" at it.  Finally, Plaintiffs contend the new declaration of Dr.

9    Ericksen offered by Defendants in support of their Dennis and Kriegler Motions to Exclude [dkt.

10   no. 969-12] should be stricken because it constitutes a new rebuttal report, in violation of the

11   Court's Case Management Order.  For the reasons stated below, the Motion to Strike is DENIED.

12           First, although Plaintiffs are correct that Defendants violated the Court's November 17,

13   2020 case management order specifically limiting each side to one *Daubert* motion, the Court

14   concludes that striking all of Defendants' *Daubert* motions on this basis is a disproportionately

15   harsh penalty.  These motions raise serious challenges, some of which go to the heart of the case.

16   As it appears that Defendants' failure to follow the Court's order was inadvertent, the preferable

17   course is to address these motions on the merits.  The Court cautions Defendants, however, that it

18   may strike any future filings in this case that are not in compliance with its orders with respect to

19   deadlines, page limits, or other limitations.  The parties may, of course, request relief from such

20   requirements and limitations for good cause.

21           The Court also declines to strike the Motion to Exclude (Dennis) and the Ericksen

22   Declaration filed in support of that motion.  The Court does not take Plaintiffs' challenges lightly.

23   While Defendants point to new information they have obtained about the Main Survey recipients

24   and how Dr. Kriegler intends to use the Main Survey for his damages calculation to justify their

25   renewed *Daubert* challenge to Dr. Dennis's opinions and the Main Survey, it is apparent that some

26   of their arguments are virtually the same as arguments that the Court previously rejected.

27   Furthermore, Dr. Ericksen's declaration filed in connection with Defendants' Motion to Exclude

28   (Dennis) offered rebuttal opinions aimed at the Main Survey even though the deadline for rebuttal

1   opinions had already passed and the Court had specified that it would permit rebuttal opinions

2   only as to the opinions of experts that had not already been rebutted.

3          The difficulty is that while some of Defendants' challenges appear to be an attempt to

4   reargue questions the Court has already decided, others raise issues related to reliability that

5   Defendants arguably could not have anticipated prior to the Ninth Circuit's decision on appeal and

6   Defendants' receipt of other discovery upon remand.  Nor is the line between these two categories

7   always clear-cut.  Consequently, the Court concludes that sanctioning Defendants by striking their

8   Motion to Exclude (Dennis) and the opinions of Dr. Ericksen in support of that motion is an

9   excessive penalty.  Further, to the extent that there is any prejudice to Plaintiffs resulting from

10  allowing the new rebuttal opinions expressed by Dr. Ericksen in his recent declaration, that

11  prejudice is sufficiently mitigated by the fact that Plaintiffs have submitted a response from Dr.

12  Kriegler (dkt. no. 1023), which the Court will also allow.[3]  As discussed below, the Court finds

13  that Defendants' challenges to the Main Survey and Dr. Kriegler's use of it go to the weight of the

14  evidence, not its admissibility.  Those challenges are weighty, however, and the stakes are high.

15  Both sides should have a fair opportunity to present their experts' opinions to the jury entrusted

16  with deciding these difficult questions.  That said, no further declarations or reports by the parties'

17  experts shall be filed without the Court's express permission.  Any further expert opinions offered

18  without the Court's permission, whether styled as a declaration or a report, will be stricken.

19  **IV.    MOTIONS TO EXCLUDE**

20      **A.    Legal Standards Under Rule 702 and *Daubert***

21          Under Rule 702 of the Federal Rules of Evidence, a witness may offer expert testimony if

22  the following requirements are met:

23              (a) the expert's scientific, technical, or other specialized knowledge
                will help the trier of fact to understand the evidence or to determine a
24              fact in issue;

25  _____

26  [3] The Court notes that Defendants requested the exclusion of Dr. Kriegler's declaration in their
    Reply on the Motion to Exclude (Kriegler) (dkt. no. 1027) at 14-16.  Because the request was not
27  made in a separate sanctions motion, as is required under Civil Local Rule 7-8(a), the request is
    procedurally improper.  In an event, the Court declines to strike any opinions offered in Dr.
28  Kriegler's declaration as his opinions were offered to address rebuttal opinions set forth for the
    first time in Dr. Ericksen's declaration, in violation of the Court's order.

United States District Court
Northern District of California

> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In determining whether expert testimony meets the requirements of Rule 702, courts follow the approach set forth in *Daubert v. Merrell Dow Pharms., Inc.*, in which the Supreme Court described the relevant inquiry as follows:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. 579, 590 (1993).

With respect to the first requirement, that an expert must testify to "scientific knowledge," the Court in *Daubert* explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science . . . [while] the word 'knowledge' connotes more than subjective belief or unsupported speculation  . . . [and] 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'"  *Id*. (quoting Webster's Third New International Dictionary 1252 (1986)).  The Court declined to set forth a definitive test but offered some "general observations" about the types of factors that might be considered in determining whether this requirement is met.  *Id*. at 593.  These include: 1) whether the methodology can be or has been tested; 2) whether the theory and technique has been subjected to peer review; 3) if a "particular scientific technique" is involved, the known or potential rate of error; and 4) the degree of acceptance in the relevant scientific community.  *Daubert*, 509 U.S. at 592-94.

The Ninth Circuit has noted that the "scientific knowledge" requirement is usually met by "[e]stablishing that an expert's proffered testimony grows out of pre-litigation research or that the expert's research has been subjected to peer review."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*").  However, when such evidence is not

13

1    available, the proponent's experts may satisfy this requirement by "explain[ing] precisely how

2    they went about reaching their conclusions and point[ing] to some objective source – a learned

3    treatise, the policy statement of a professional association, a published article in a reputable

4    scientific journal or the like – to show that they have followed the scientific method, as it is

5    practiced by (at least) a recognized minority of scientists in their field." *Id*. at 1319.

6         The second requirement under Rule 702, that expert testimony must "assist the trier of fact

7    to understand the evidence or to determine a fact in issue," "goes primarily to relevance." *Id*. at

8    591.  This is a question of "fit," and "is not always obvious." *Daubert*, 509 U.S. at 591.  The

9    Court cautioned that "scientific validity for one purpose is not necessarily scientific validity for

10   other, unrelated purposes." *Id*.  To meet this requirement there must be "a valid scientific

11   connection to the pertinent inquiry." *Id*.  In other words, the expert testimony must "logically

12   advance[ ] a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315.  This

13   requirement is more stringent than the relevancy requirement of Rule 402 of the Federal Rules of

14   Evidence, "reflecting the special dangers inherent in scientific expert testimony." *Jones v. U.S.*,

15   933 F. Supp. 894, 900 (N.D. Cal. 1996) (citing *Daubert*, 509 U.S. at 591; *Daubert II*, 43 F.3d at

16   1321 n. 17).  In particular, expert testimony " 'can be both powerful and quite misleading because

17   of the difficulty in evaluating it.' " *Id*. (quoting *Daubert*, 509 U.S. at 595 (citation omitted)).

18   Therefore, federal judges should exclude scientific expert testimony under the second prong of the

19   *Daubert* standard unless they are "convinced that it speaks clearly and directly to an issue in

20   dispute in the case." *Id*. (quoting *Daubert II*, 43 F.3d at 1321 n. 17).

21        "[A] major principle underlying the *Daubert* gatekeeping function is that the trier of fact

22   should not be unduly prejudiced by testimony that is based on foreign concepts." *Volk v. United*

23   *States*, 57 F. Supp. 2d 888, 896 (N.D. Cal. 1999); *see also Stilwell v. Smith & Nephew, Inc*., 482

24   F.3d 1187, 1192 (9th Cir. 2007) ("In *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

25   119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court described the district court's

26   'gatekeeping role,' and required that 'all forms of expert testimony, not just scientific testimony'

27   survive scrutiny under Rule 702.") (quoting *White v. Ford Motor Co*., 312 F.3d 998, 1007 (9th

28   Cir. 2002)).

**B.    Defendants' Motions to Exclude**

    **1.  Motion to Exclude (Dennis)**

        a.  Background

As discussed above, Dr. Dennis provided his report on the Main Survey results in a declaration filed in support of Plaintiffs' Motion for Reconsideration of the Court's initial denial of Plaintiffs' class certification motion.  That declaration was filed on August 4, 2016 (dkt. no. 696) ("Dennis Report") and it is the merits report that Plaintiffs rely upon in this case.  Defendants brought a *Daubert* motion seeking to exclude Dr. Dennis's Report and the Main Survey results (dkt. no. 724) ("first *Daubert* motion"), which the Court denied in its March 7, 2017 Order.

Among other things, in its March 7, 2017 Order, the Court rejected Defendants' contentions that the Main Survey results suffered from recall bias, self-interest bias and non-response bias.  *See* March 7, 2017 Order at 43-47.  The Court also found that Plaintiffs would "be able to use the survey data in combination with other evidence that may be sufficient to allow a jury to draw conclusions based on reasonable inference as to when players were required to be at the ballpark and how long after games they were required to remain at the ballpark[,]" citing as examples of such evidence "the transactional histories of the players, the daily schedules, and records of games that were played, including where the games were played and how long they lasted." *Id.* at 56.  Finally, it noted that "certification of the proposed classes [would] not preclude Defendants from challenging the sufficiency of the Main Survey and Plaintiffs' damages model on summary judgment and/or at trial." *Id.*

Although Dr. Dennis has not offered any further reports, he was deposed in 2021, after the Ninth Circuit appeal, and he has produced additional information about the identities of the Main Survey respondents in compliance with the Court's August 27, 2021 Order (dkt. no. 956).

At the August 27, 2021 proceeding, the Court advised Defendants that although they would be permitted to bring a *Daubert* challenge to the supplemental Kriegler Report addressing "how Kriegler uses the [Dennis Report]," they would not be "getting another free shot" at the Dennis Report, making clear that Defendants would not be permitted to challenge the "underlying methodology or validity of the [Main] [S]urvey." Transcript of August 27, 2021 Proceeding, dkt.

no. 1007, at 13.

In their Motion to Exclude (Dennis), Defendants challenge the Dennis Report on the following grounds:  1) the Dennis Report does not measure the "team-related activities" that are the subject of Plaintiffs' claims; 2) Dr. Dennis failed to account for widespread variability in the players' arrival and departure times, both by failing to conduct any analysis of the variability and by failing to validate the survey responses; 3) Dr. Dennis did not design the Main Survey to be representative of the California class and the "Control Group" he identified (and upon which Dr. Kriegler relied in his updated damages report) included only a handful of players who had actually played for the California League, rendering the survey results especially unreliable as to the California class; and 4) poor survey design resulted in non-response bias, recall bias and self-interest bias.

Defendants further contend that their motion does not run afoul of the Court's admonition that they would not be allowed "another free shot" at the Dennis Report because the Court did not conduct a full-blown *Daubert* analysis in its order denying the first *Daubert* motion and expressly stated in its March 7, 2017 Order that Defendants would be permitted to "challeng[e] the sufficiency of the Main Survey and Plaintiffs' damages model on summary judgment and/or at trial."  They also contend the new evidence they have obtained following the appeal, namely, the identities of the survey respondents and Dr. Dennis's deposition testimony, justify revisiting issues that Defendants raised in their first *Daubert* motion and raising issues that they did not address in that motion but arguably could have raised at that time.

b.  Discussion

As a preliminary matter, the Court rejects Defendants' argument that the Court's prior *Daubert* ruling with respect to the Dennis Report and Main Survey applied a less rigorous standard in determining whether Dr. Dennis's methodology in conducting the Main Survey meets the requirements of Rule 702 than is applied on summary judgment or for purposes of trial.  While the Court's analysis focused on the issues most relevant to class certification, it did not apply a relaxed standard of any kind.  Defendants also misconstrue the Court's statement that Defendants could challenge the "sufficiency" of the Main Survey on summary judgment or at trial.  The Court

1    was simply referring to Defendants' ability to counter the opinions of Dr. Dennis on summary

2    judgment or at trial in order to show that Plaintiffs cannot meet their evidentiary burden – not that

3    Defendants could bring a second *Daubert* motion challenging the admissibility of the Dennis

4    Report and Main Survey.  To the extent there was any ambiguity on this question, the Court

5    clarified at the August 27, 2021 proceeding that Defendants were not to bring any additional

6    *Daubert* challenges that were based on arguments they already made or could have been made in

7    their first *Daubert* motion.  Therefore, the Court rejects a number of Defendants' arguments on the

8    grounds that it has already ruled on these issues, as set forth below. The Court further finds that all

9    of Defendants' substantive arguments, at best, go to the weight of the evidence and not

10   admissibility.

11          First, the Court has already rejected Defendants' argument that the Main Survey did not

12   measure "team-related activities" because it did not contain questions that actually addressed the

13   players' activities while at the ballpark.  In particular, in the March 7, 2017 Order, it addressed the

14   same argument and concluded that to the extent Dr. Dennis's questions in the Main Survey were

15   premised on the continuous workday doctrine, his opinions based on the survey may be helpful to

16   the jury, both in ascertaining whether the Plaintiffs performed work *and* in estimating the amount

17   of work they performed.  March 7, 2017 Order at 41-42.  Therefore, the Court rejects Defendants'

18   challenge because it violates the Court's Order prohibiting arguments the Court has already ruled

19   on as to the admissibility of the Dennis Report and for the reasons already stated in the Court's

20   March 7, 2017 Order.

21          Defendants attempt to justify raising this issue again by pointing to deposition testimony

22   by Dr. Dennis that confirms that the Main Survey did not include any questions about the Players'

23   activities at the ballpark and that he did not design the Main Survey to elicit such information, *see*

24   Motion to Exclude (Dennis) at 7-8, but that deposition testimony is not the sort of new information

25   that would warrant revisiting this question; it was obvious from the survey itself that it did not ask

26   questions about the specific activities the players engaged in at the ballpark and Dr. Dennis's

27   testimony confirming that – or that he did not design the survey to capture that information – does

28   not undermine the Court's previous conclusion in any way.

United States District Court
Northern District of California

The Court also rejects Defendants' suggestion that the Court should revisit its conclusion in the March 7, 2017 Order that the Main Survey results in combination with other evidence, such as team schedules, could be helpful to the jury as to hours worked because "Plaintiffs decided not to use any of that other evidence to calculate hours worked." *Id.* at 10 (citing Bloom Motion to Exclude (Dennis) Decl., Ex. 2 (Sept. 27, 2021 Martin Report) ¶¶ 20-24). The evidence Defendants cite is Dr. Martin's opinion that in his updated damages report Dr. Kriegler did not attempt to develop "separate estimates" of purported hours worked using itineraries or testimony of the named Plaintiffs, but she concedes Dr. Kriegler used such evidence to *validate* the estimate he arrived at using the Main Survey results. As the Court discussed in its March 7, 2017 Order, Dr. Dennis also used this evidence to validate the results of the Main Survey. Therefore, the Court rejects Defendants' assertion that the schedules and testimony are not offered as evidence of hours worked and declines to revisit its previous holding on this question.

The Court also rejects Defendants' challenge based on the variability in the Main Survey responses with respect to arrival and departure times. First, this argument was already made in the first *Daubert* motion and the Court rejected it. Second, to the extent that Defendants dispute that Dr. Kriegler's use of the 10th and 25th percentile approach to his damages calculation adequately accounted for the variability in the Main Survey results, this challenge goes to the weight of the evidence and not admissibility. Third, to the extent that information about the survey respondents produced to Defendants has allowed them to develop this argument further to show variations between Clubs, this additional information does not persuade the Court that Dr. Dennis's report is so unreliable that it must be excluded. Rather, the Court finds that this challenge goes to the weight of Dr. Dennis's opinions, which can be challenged by Defendants' experts. *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) ("we have made clear that technical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.") (citations and quotations omitted).

The Court reaches the same conclusion as to Defendants' challenges based on what they contend is underrepresentation of California League Players and foreign players in Dr. Dennis's

1   Control Group.  While Defendants' experts argue these cast doubt upon the reliability of the Main

2   Survey results, Plaintiffs point to Dr. Kriegler's opinions that there is little evidence that things

3   were done differently from Club to Club and analysis indicating that the responses of the

4   individuals who played for the California league are in line with the survey responses generally.

5   This is a dispute that should be resolved by the jury and goes to the weight of the evidence.  The

6   Court reaches the same conclusion with respect Defendants' assertion, based on the information it

7   has obtained about the identities of the survey respondents, that the Court should revisit its

8   previous conclusion that questions related to survey design, non-response bias, recall bias, and

9   self-interest bias, go to the weight of the evidence and not its admissibility.

10          For these reasons, the Motion to Exclude (Dennis) is DENIED.

11                  **2.  Motion to Exclude (Kriegler)**

12                      a.   Background

13          As discussed above, following remand from the Ninth Circuit, the Court permitted

14   Plaintiffs to submit an updated damages report by Dr. Kriegler.  *See* Broshuis MPSJ Decl., Ex. 94

15   (August 13, 2021 Supplemental Expert Report of Brian Kriegler, PhD ("Kriegler Supp. Report" or

16   "updated damages report")).  In it, Dr. Kriegler set forth, *inter alia*, his methodology and

17   calculations of classwide damages.  Because Defendants do not maintain accurate records of the

18   hours worked by minor league players, Dr. Kriegler used historical records (*e.g.*, MLB's eBis

19   transactional database and game schedules); publicly available data (*e.g.*, recorded durations of

20   Championship Season games and Google Maps estimates for travel time to away games); class

21   member survey data obtained by Dr. Dennis related to hours at the ballpark during training season

22   and pre-game and post-game hours at the ballpark during the Championship season; deposition

23   testimony of the named Plaintiffs and Defendants' witnesses; and more than a thousand daily

24   itineraries to estimate hours worked and class-wide damages.  *See id*. at 10-26 ("Summary of

25   Data/Documents Used to Calculate Damages") and 55-70 ("Damages Methodology").[4]

26   ─────────────────

27   [4] Dr. Kriegler had previously described how he intended to calculate class damages in a rebuttal declaration offered in support of Plaintiffs' Motion for Reconsideration.  *See* dkt. no. 755

28   ("Kriegler Rebuttal Decl.").  The methodology he described in that declaration was essentially the

United States District Court
Northern District of California

In their Motion to Exclude (Kriegler), Defendants contend Dr. Kriegler should not be permitted to offer the opinions in his updated damages report because his analysis does not meet the requirements of Rule 702 and *Daubert*.  First, they contend Dr. Kriegler's reliance on the Main Survey to determine hours worked during spring training, extended spring training, and the instructional leagues, and to determine pre- and post-game hours worked during the Championship Season, renders his conclusions unreliable because the Main Survey does not measure team-related activities at all.  Motion to Exclude (Kriegler) at 6-7.  Second, Defendants contend the variability of the responses to the Main Survey as to arrival and departure times, both among players on the same team and from team to team, renders the results of the Main Survey with respect to hours worked unreliable.  *Id.* at 6-7.  Third, Defendants argue that Dr. Kriegler's damages methodology and results are fatally flawed because he used the survey responses from only a subset of the total survey respondents,[5] resulting in sample sizes for the different training periods and for the California League that are too small to permit reliable conclusions.  *Id.* at 9-12.

Defendants also challenge Dr. Kriegler's reliance on the 10th and 25th percentiles of respondents, arguing that "ignor[ing] the vast majority of the data" does not make his results more reliable.  *Id.* at 13-14.  Defendants argue that Dr. Kriegler's attempts to validate his results through reliance on daily itineraries and deposition testimony of players also falls short.  *Id.* at 14-16.  For example, they argue that Dr. Kriegler conducted no statistical analysis that attempted to link the itineraries with the survey responses at the Club level and that their own expert found "no statistically significant correlation between the survey responses and the testimony provided by players on the same team."  *Id.* at 16.  Defendants also fault Dr. Kriegler for failing to calculate standard errors and confidence intervals, which they contend is an accepted scientific practice for surveys.  *Id.* at 16-17.  Finally, Defendants argue that because Dr. Kriegler relied on the Main Survey, his opinions must be excluded for all the reasons Defendants contend Dr. Dennis's

same as the one he used for his updated damages report but he had not yet prepared his damages calculation.

[5] Although Defendants label this subset the "Kriegler Subset" it is, in fact, the subset of survey respondents that Dr. Dennis referred to as the "control group."  *See* Dennis Report ¶ 5.  To avoid confusion, the Court refers to this group as the Control Group.

1    opinions are inadmissible.  *Id.* at 17-18.

2                b.   Discussion

3          Many of Defendants' challenges to the admissibility of Dr. Kriegler's updated damages

4    report mirror their challenges to the admissibility of the Dennis Report.  The Court finds that all of

5    them go to the weight of the evidence and not their admissibility.  First, the Court has already

6    rejected Defendants' argument that the Main Survey does not provide a reliable basis to determine

7    hours worked because it does not address team-related activities.  To the extent Defendants assert

8    the same challenge to Dr. Kriegler's opinions, the Court rejects it for the reasons previously set

9    forth, both in this Order in its discussion of the Defendants' Motion to Exclude (Dennis) and in its

10   March 7, 2017 Order.  Similarly, the Court finds Defendants' argument based on variability of

11   survey results and their challenge based on small sample sizes go to the weight of the evidence

12   rather than its admissibility for the reasons discussed above.

13         The Court notes that Defendants' related argument challenging Dr. Kriegler's use of the

14   10th and 25th percentile approach to address the variability in survey responses is based on a

15   mischaracterization of that approach to the extent Defendants contend it involves "discard[ing]

16   most of the data (90% and 75% for his 10th and 25th percentile analyses, respectively)."  Motion

17   to Exclude (Kriegler) at 14.  As Dr. Kriegler explains, a percentile can *only* be calculated by

18   looking at the entire data set.  Dkt. no. 1023 ¶¶ 34-35.  Defendants' repeated assertions in their

19   motion that Plaintiffs' expert simply ignored most of the survey results makes no sense.

20          The Court also rejects Defendants' argument that Dr. Kriegler's opinions should be

21   excluded because he failed to validate his results by conducting a team-by-team statistical analysis

22   of survey results and itineraries, as Defendants' expert, Dr. Martin, contends should have been

23   done.  Dr. Kriegler took a different approach, relying on sampling of itineraries;  he did not

24   conduct a team-by-team analysis because his review of extensive discovery in the case led him to

25   conclude that the schedules of minor league players are largely the same, regardless of which Club

26   a player is playing for.  At trial, Defendants will have the opportunity to present evidence and

27   expert opinion challenging that approach.  Defendants have pointed to nothing, however, that

28   suggests that Dr. Kriegler's methodology was so defective that his opinions cannot be presented to

United States District Court
Northern District of California

21

the jury.  Similarly, the Court is not persuaded that Dr. Kriegler's failure to calculate standard errors and confidence intervals renders his analysis inadmissible.  Finally, because the Court does not find Dr. Dennis's opinions to be inadmissible, the Court also rejects Defendants' argument that Dr. Kriegler's opinions must be excluded for the same reasons Dr. Dennis's opinions are inadmissible.

For the reasons stated above, the Motion to Exclude (Kriegler) is DENIED.

### 3.  Motion to Exclude (Groshen)

#### a.  Background

Plaintiffs offered the expert opinions of Erica Groshen to rebut opinions offered by Defendants' expert, Denise Martin.[6]  *See* dkt. no. 990-4 (August 16, 2016 Martin Report).  In her report, Dr. Martin opined that: 1) Plaintiffs receive substantial economic benefits from their participation in minor league baseball (cited by Defendants in support of their argument that Plaintiffs are trainees rather than employees); and 2) Plaintiffs "demonstrate unique and individualized talent as baseball players" (cited by Defendants to establish that Plaintiffs are creative professionals for the purposes of that exemption).

With respect to the first opinion, Dr. Martin pointed to the payment of base salary and signing bonuses; the provision of meals, lodging and health insurance; the "benefits associated with access to high quality training and facilities"; and the economic benefit associated with participation in a tournament or contest.  *Id.* at 2-3.  She further opined that "[a]ccording to principles of labor economics, each plaintiff's decision to participate in the minor leagues is objective evidence that he valued the training, experience and opportunities provided by that participation."  *Id.* at 3.

In support of her opinion that Plaintiffs demonstrate "unique and individualized talents," Dr. Martin points to "economic models" and "empirical literature" showing that "there is no evidence of a formulaic link between hours spent practicing or playing and performance metrics" and that "other factors including individual talent and temperament affect players' performance

---

[6] As discussed below, Plaintiffs ask the Court to exclude Dr. Martin's opinions in their own *Daubert* motion.

United States District Court
Northern District of California

outcomes." *Id.* She also compares "performance statistics" for minor league players with statistics for players who were not selected to participate in minor league baseball, finding that the former players were "often on the higher end of the distribution." *Id.* She further found variability in talent level across Plaintiffs, which she opined reflected that "each player [was] using his talents differentially in an attempt to maximize his performance." *Id.*

In rebuttal, Plaintiffs provided an expert report by Erica Groshen. *See* dkt. no. 990-6 (9/27/2021 Groshen Rebuttal Report). Regarding the question of whether Plaintiffs are trainees, Dr. Groshen challenges Dr. Martin's "underlying assumption that the labor market for minor league players is a normal, competitive market." *Id.* at 4. Instead, Dr. Groshen opines, it is a "monopsonistic" or "oligopolistic" market in which outside opportunities for playing professional baseball are limited or nonexistent, meaning that Plaintiffs' willingness to participate in minor league baseball is not evidence that they do so because they value the benefits they receive, contrary to Dr. Martin's opinion. *Id.* Dr. Groshen also opines that the training and fringe benefits upon which Dr. Martin relied are commonly offered by employers who pay at least minimum wage and that Plaintiffs' willingness to play is not a reflection that they are satisfied with these benefits but instead, of the monopsonistic labor market with respect to professional baseball. *Id.* Furthermore, she opines, minor leaguers provide "considerable value to major league Clubs, which exceeds the benefits they received." *Id.* at 28.

Dr. Groshen rejects Dr. Martin's opinions related to the creative professional exemption on the basis that Dr. Martin improperly equates "talent" with "creativity." *Id.* She observes that if "talent" were the same as "creativity" many skilled workers would be creative professionals and further, that variations in the degree of talent between workers does not indicate that a profession requires creativity. *Id.* at 5. In support of her opinion that playing baseball is not a "creative" profession, Dr. Groshen points out that baseball is not listed as an example of a creative profession in the regulations. *Id.* She also considers the criteria of creativity listed in the regulations, which she opines do not support finding baseball to involve creativity. *Id.* In addition, she points to the "[p]rofessional athletes' classification in the federal Standard Occupational Classification (SOC) system[,]" which "allows comparisons with occupations commonly considered creative" and

which does not classify baseball in the same category.  *Id.*  Likewise, she opines, the Bureau of Labor Statistics Occupational Outlook Handbook "does not list creativity as a key quality needed by professional athletes, while it does for six of seven occupations more commonly considered creative."  *Id.* at 5-6.  And, according to Dr. Groshen, "[t]he Department of Labor's Occupational Information Network (O*NET) data on ability requirements scores athletes notably lower than those seven creative occupations on the need for two attributes associated with creativity (originality and fluency of ideas – that is, the ability to come up with many ideas to address topics)."  *Id.* at 6.

In their Motion to Exclude (Groshen), Defendants seek the exclusion of Dr. Groshen's opinions related to both the trainee/employee question and their creative professional exemption defense.  First, they contend Dr. Groshen mischaracterizes Dr. Martin's opinions to the extent Dr. Groshen suggests that Dr. Martin opined on the ultimate questions of whether Plaintiffs are trainees (as opposed to employees) and whether they are creative professionals.  Motion to Exclude (Groshen) at 4.  According to Defendants, Dr. Martin did not reach those ultimate questions.  *Id.*  Defendants further contend Dr. Groshen's opinions related to the benefits player receive from participation in minor league baseball are not proper rebuttal because Dr. Groshen offers her own "different and unsupported theory" rather than rebutting Dr. Martin's opinions about the benefits players receive.  *Id.*  Defendants also argue that Dr. Groshen's conclusion that the Clubs receive more benefit from the players than the players receive from the Clubs and MLB should be excluded because it is not supported by any statistical analysis.  *Id.* at 10.

With respect to Dr. Groshen's opinions addressing Dr. Martin's opinion that baseball requires "unique talent," Defendants reject Dr. Groshen's assertion that Dr. Martin "implicitly" uses the word "talent" as a synonym for creativity.  *Id.* at 11.  Defendants contend Dr. Martin's report does not express opinions about "creativity" or express an opinion on the ultimate question of whether Plaintiffs are creative professionals.  *Id.*  Therefore, Defendants argue, Dr. Groshen's opinions on this question are not proper rebuttal.  *Id.*  Further, Defendants challenge Dr. Groshen's reliance on DOL regulations and federal labor statistics that classify occupations and occupational attributes on the basis that her analysis applying these attributes to baseball "does not appear to

have utilized any particular methodology." *Id.* at 12.  Finally, Defendants challenge Dr. Groshen's opinions on both the trainee and creative professionals issues on the basis that she offers legal conclusions, which must be left to the Court.  *Id.* at 13-14.

              b.    Discussion

As discussed below, the Court finds based on the undisputed facts that Plaintiffs are entitled to summary judgment on Defendants' creative professional exemption defense as to all of their claims.  It also finds, as a matter of law, that Plaintiffs are employees throughout the calendar year.  As the Court's conclusions do not rely on the opinions of Drs. Martin or Groshen on these questions and those opinions have no bearing on the issues that remain in the case, the Court finds that Defendants' Motion to Exclude (Groshen) is moot and denies it without prejudice on that basis.

**C.**    **Plaintiffs' Motion to Exclude**

        **1.**   **Plaintiffs' Arguments**

In their Motion to Exclude, Plaintiffs challenge opinions offered by Defendants' experts Denise Martin and Jonathan Guryan.  With respect to Dr. Martin, Plaintiffs challenge opinions set forth in her original expert report, in which she opines about the benefits minor league players receive from playing minor league baseball and the talent exhibited by minor league baseball players (discussed above).  *See* Broshuis Motion to Exclude Decl., Ex. A (August 16, 2016 Martin Report).  Plaintiffs also ask the Court to exclude opinions offered by Dr. Martin in her Supplemental Rebuttal Report, dated September 27, 2021 ("2021 Martin Report"), in which she addresses, *inter alia*, the updated damages report of Plaintiffs' expert, Dr. Kriegler.  *Id.* at 13-16. *See* Broshuis Motion to Exclude Decl., Ex. C.  According to Plaintiffs, in the 2021 Martin Report, she improperly offers opinions about purported flaws in Dr. Dennis's survey regarding hours worked even though the Court made clear "that it will not entertain additional rebuttal of Plaintiffs' survey evidence."  *Id.* at 2, 15.  They further assert that Dr. Martin is not qualified to offer such opinions because she admits that she is not a survey expert and contend she "merely parrots" the opinions of Dr. Ericksen, which is improper.  *Id.* at 14-16.  Therefore, Plaintiffs ask that Dr. Martin be precluded from offering these opinions on the ground that they are outside of

1    her expertise; alternatively, Plaintiffs ask that Dr. Martin be barred from offering opinions in

2    contravention of the Court's order that no further rebuttal of Dr. Dennis's survey would be

3    permitted. *Id.* at 16.

4         Plaintiffs also ask the Court to exclude Dr. Guryan's opinions relating to offsets based on

5    Defendants' payments of per diem, meals, and lodgings, found in Section 5 of Dr. Guryan's

6    September 27, 2021 Rebuttal Report. *Id.* at 16-21; *see also* Broshuis Motion to Exclude Decl., Ex.

7    D. First, Plaintiffs argue that Dr. Guryan improperly assumes per diem, meal, and lodging

8    payments, signing bonuses, and college tuition payments count as wages earned when, in fact,

9    they are not wages and therefore cannot be offset against minimum wage liability. *Id.* at 16-17. In

10   addition, they contend, Dr. Guryan's calculation of the amounts of the purported offsets for per

11   diem, meal, and lodging payments is unreliable because of the lack of records reflecting these

12   payments and Dr. Guryan's approach of estimating amounts based on evidence of "spending

13   totals" supplied by 16 Clubs and policy documents about per diem and meal payments during

14   various training periods supplied by 18 Clubs. *Id.* at 17-19. Plaintiffs further assert Dr. Guryan's

15   calculations are "suspect" because he did not take into account payments Plaintiffs are required to

16   make, such as clubhouse dues. *Id.* at 19. Finally, Plaintiffs contend Dr. Guryan's calculations

17   relating to signing bonuses and college tuition payments must be rejected because they are not

18   wages and because such amounts cannot be considered outside the pay period in which they are

19   received. *Id.* at 20-21.

20        **2. Discussion**

21        Because the Court grants Plaintiffs' request for summary judgment on Plaintiffs' employee

22   status and as to the creative professional exemption, Plaintiffs' challenges to Dr. Martin's opinions

23   on that question are now moot and therefore the Court denies Plaintiffs' request without prejudice

24   as to those opinions.[7] On the other hand, the Court grants Plaintiffs' request as to the opinions in

25   Dr. Martin's 2021 Report that challenge Plaintiffs' survey evidence (paragraphs 15 and 16 and

26   Section VII of Dr. Martin's report) on the ground that Dr. Dennis is not qualified to opine as an

27

28   _____
     [7] These opinions are found in the 2016 Martin Report ¶¶ 11-15, 17-49, 60-61 (benefits received);
     50-59, 62 (talent).

United States District Court
Northern District of California

1    expert on survey design.

2         Dr. Martin is an expert in statistics.  *In re NJOY, Inc. Consumer Class Action Litig.*, No. CV

3    14-428-JFW (JEMX), 2016 WL 787415, at *5 (C.D. Cal. Feb. 2, 2016).  She concedes that she is

4    not an expert in "survey design" or "fielding" surveys.  Broshuis Motion to Exclude Decl., Ex. F

5    (Martin Dep.) at 10-11.  And although Defendants represent that "other federal courts have held

6    Dr. Martin to be qualified to opine on the reliability of surveys[,]" neither of the cases Defendants

7    cite support that representation.  *See* Opposition to Motion to Exclude at 17-18 (citing *In re NJOY,*

8    *Inc. Consumer Class Action Litig.*, No. 14-cv-428-JFW (JEMx), 2016 WL 787415, at *4-5 (C. D.

9    Cal. Feb. 2, 2016) (finding that Dr. Martin was qualified to offer opinions on Bayesian hedonic

10   regression analysis and hedonic regression); *In re Simply Orange Orange Juice Mktg. & Sales*

11   *Pracs. Litig.*, No. 4:12-MD-02361-FJG, 2017 WL 3142095, at *1 (W.D. Mo. July 24, 2017),

12   vacated, No. 4:12-MD-02361-FJG, 2018 WL 3589456 (W.D. Mo. Apr. 26, 2018) (granting a

13   motion for class certification and making no mention of Dr. Martin or indeed, any expert)).[8]

14   Defendants also point to Dr. Martin's "experience with surveys" "in her coursework."  Opposition

15   to Plaintiffs' Motion to Exclude at 17; *see also* Broshuis Motion to Exclude Decl., Ex. F (Martin

16   Dep.) at 10 ("I've taken courses that deal with surveys").  But they have not provided any details

17   as to that coursework or established that it is sufficient to make her an expert on surveys – and she

18   has admitted that she is not.

19        Finally, the Court grants in part and denies in part Plaintiffs' request to exclude the opinions

20   expressed in Section 5 of Dr. Guryan's report, addressing wage offsets for per diem and meal

21   payments, signing bonuses and college scholarship payments.  First, as discussed below, there are

22   factual disputes as to whether any of these categories of payments constitute wages as opposed to

23   reimbursement or other types of benefits.  Although Defendants will be permitted to present

24   _____

25   [8] Plaintiffs supply a copy of the order Defendants may have meant to cite in the same case, which
     also does not bear out Defendants' representation.  *See* Broshuis Motion to Exclude Reply Decl.,
26   Ex. A.  In that order, issued after the class certification order, the court in *In re Simply Orange*
     denied all of the motions to exclude expert reports that had been filed in connection with the class
27   certification motions (including one by Dr. Martin) "subject to reconsideration at a later date" on
     the basis that although the court "at first believed it would be necessary to analyze some or all of
28   these reports as part of its analysis of the plaintiffs' motion for class certification . . . this turned
     out to be unnecessary."

United States District Court
Northern District of California

evidence to support their position that these payments are wages, Dr. Guryan may not offer any opinions as to this ultimate legal question.  Second, as discussed below, the Court concludes that Dr. Guryan's method of method of allocating offsets against minimum wage is incorrect as a matter of law.  As a result, all of his calculations using that method are inadmissible under *Daubert* and Rule 702.

On the other hand, the Court finds that Plaintiffs' challenges to the evidence Dr. Guryan used to estimate the amount of the payments made to Players as per diems goes to the weight of the evidence rather than its admissibility.[9]  Therefore, to the extent Dr. Guryan has adequately disclosed opinions that may permit the calculation of offsets using a methodology that is consistent with this opinion, he may be permitted to offer those opinions at trial.[10]

## V.   PLAINTIFFS' SAP ACT MOTION

### A.   Background

#### 1.   The SAP Act

In March 2018, Congress passed the Save America's Pastime Act ("SAP Act"), which amended the FLSA to exempt baseball players from the statute's minimum wage and overtime requirements.  In particular, the amendment exempted from sections 206 and 207 of the FLSA:

> any employee employed to play baseball who is compensated pursuant to a contract that provides for a weekly salary for services performed during the league's championship season (but not spring training or the off season) at a rate that is not less than a weekly salary equal to the minimum wage under section 206(a) of this title for a workweek of 40 hours, irrespective of the number of hours the employee devotes to baseball related activities.

29 U.S.C. § 213(a)(19).  The amendment went into effect on March 23, 2018.  *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348, at *1127 (2018).

Following the enactment of the SAP Act, Defendants filed supplemental answers asserting an affirmative defense in which they contend the SAP Act bars in whole or in part Plaintiffs'

---

[9] Plaintiffs challenged Dr. Guryan's estimates of meal payments and lodgings but Defendants have stipulated that they do not seek to offset unpaid wages based on lodgings and that the only meal offsets they seek are based on per diems made to the Players during the training season.
[10] The Court's ruling, however, is without prejudice to Plaintiffs' right to object to such evidence at trial or in a motion in limine.

United States District Court
Northern District of California

1   FLSA claims and their claims under all state laws that follow the FLSA and/or incorporate the

2   FLSA exemptions, including New York and Florida law.  *See* dkt. nos. 886-908.

3        Plaintiffs now seek judgment on the pleadings under Rule 12(c) of the Federal Rules of

4   Civil Procedure that the SAP Act has no impact on their state law claims, including their claims

5   under Florida and New York law, and that it does not bar Plaintiffs' FLSA claims for work

6   occurring before March 23, 2018.[11]  Defendants stipulated at the February 11, 2022 motion

7   hearing that they are not asserting an SAP Act defense under any of the state laws asserted in this

8   case except Florida law.  They also do not dispute that the SAP Act has no impact on Plaintiffs'

9   claims under the FLSA based on conduct before March 23, 2018.  As to Plaintiffs' claims under

10  Florida law, however, Defendants oppose the motion, asserting that they are barred by the SAP

11  Act.

### 2.  Florida Wage and Hour Law

13       In 2004, a Florida ballot measure was approved amending the state constitution to adopt a

14  minimum wage requirement.  Fla. Const. art. 10, § 24 ("Section 24").  Section 24 provides,

15  "Employers shall pay Employees Wages no less than the Minimum Wage for all hours worked in

16  Florida."  *Id.* § 24(c).  The subsection defining the terms "Employer," "Employee," and "Wage"

17  provides that these terms "shall have the meanings established under the federal [FLSA] and its

18  implementing regulations."  *Id.* § 24(b).  Section 24 also contains the following provision

19  addressing its implementation:

> (f)  **Additional legislation, implementation and construction**.
> Implementing legislation is not required in order to enforce this
> amendment. The state legislature may by statute establish additional
> remedies or fines for violations of this amendment, raise the
> applicable Minimum Wage rate, reduce the tip credit, or extend
> coverage of the Minimum Wage to employers or employees not
> covered by this amendment. The state legislature may by statute or
> the state Agency for Workforce Innovation may by regulation adopt
> any measures appropriate for the implementation of this amendment.
> This amendment provides for payment of a minimum wage and shall
> not be construed to preempt or otherwise limit the authority of the
> state legislature or any other public body to adopt or enforce any other
> law, regulation, requirement, policy or standard that provides for

---

[11] Plaintiffs stipulated at the February 11, 2022 motion hearing that the SAP Act cuts off their
FLSA claims to the extent that they are based on conduct that occurred after March 23, 2018.

United States District Court
Northern District of California

> payment of higher or supplemental wages or benefits, or that extends such protections to employers or employees not covered by this amendment. It is intended that case law, administrative interpretations, and other guiding standards developed under the federal FLSA shall guide the construction of this amendment and any implementing statutes or regulations.

*Id.* § 24(f).

In 2005, the Florida legislature enacted the Florida Minimum Wage Act ("FMWA"), which provides the "exclusive remedy under state law for violations" of Section 24. Fla. Stat. § 448.110(10). That statute established a minimum wage of $6.15 an hour, effective May 2, 2005, "for all hours worked in Florida" and further provided:

> Only those individuals entitled to receive the federal minimum wage under the federal Fair Labor Standards Act and its implementing regulations shall be eligible to receive the state minimum wage pursuant to s. 24, Art. X of the State Constitution and this section." Fla. Stat. § 448.110(3). The provisions of §§ 213 and 214 of the federal Fair Labor Standards Act, as interpreted by applicable federal regulations and implemented by the Secretary of Labor, are incorporated herein.

Fla. Stat. § 448.110(3).

### 3.  Contentions of the Parties[12]

a.  Motion

Plaintiffs seek judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure that the SAP Act has no impact on their Florida law claims because neither Section 24 of the Florida Constitution nor the FMWA incorporates the amendment to the FLSA enacted under the SAP Act. Plaintiffs' SAP Act Motion at 5-7. In particular, Plaintiffs contend "Florida's constitution prohibits the adoption of a future federal amendment without a subsequent act from the state legislature adopting the amendment." *Id.* at 5-6 (citing *Freimuth v. State*, 272 So. 2d 473, 476 (Fla. 1972); *State v. Rodriquez*, 365 So. 2d 157, 160 (Fla. 1978); 10 Fla. Jur. 2d Constitutional Law § 180). Thus, Plaintiffs assert, " '[w]here a statute generally incorporates a federal law or regulation, to avoid holding the subject statute unconstitutional, Florida courts interpret the statute

---

[12] Because Defendants do not dispute that the SAP Act does not apply retroactively and only challenge Plaintiffs' arguments that the SAP Act does not affect their state law claims with respect to the claims asserted under Florida law, the Court only summarizes here the parties' contentions with respect to the impact of the SAP Act on Plaintiffs' Florida law claims.

as incorporating only the federal law in effect on the date of adoption of the Florida Statute.' " *Id.* at 6 (quoting *Abbott Labs. v. Mylan Pharm., Inc.*, 15 So. 3d 642, 655 (Fla. Ct. App. 2009) (collecting cases)).  Plaintiffs point to *Cloyd v. State*, 943 So. 2d 149, 163 (Fla. Dist. Ct. App. 2006), as an example of a case where this non-delegation principle was applied.  *Id.*

Plaintiffs argue further that the non-delegation principle applies even though Florida's minimum wage guarantee arose from a constitutional amendment rather than a statute.  *Id.*  They point to the fact that Section 24 incorporates the FLSA's definitions of "employer," "employee," and "wage" but that it did not incorporate the exemptions of section 213 of the FLSA; instead, those exemptions were incorporated in the subsequently enacted FMWA.  *Id.*  Plaintiffs assert that the FMWA can be read only to incorporate the exemptions that were in effect in 2005, when the FMWA was enacted.  *Id.* Therefore, Plaintiffs argue, the Court should hold as a matter of law that the SAP Act has no effect on Plaintiffs' claims under Florida law.  *Id.*

b.  Opposition

In their Opposition, Defendants argue that Section 24 incorporates not only the FLSA's definitions of "employer," "employee," and "wage" but the entirety of the FLSA, including its exemptions. Dkt. 1008 ("Opposition to SAP Act Motion").  In support of this contention, they point to the following language in Section 24(f): " '[I]t is intended that case law, administrative interpretations, and other guiding standards developed under the federal FLSA shall guide the construction of this  amendment and any implementing statutes or regulations.' "  *Id.* (quoting Section 24(f)).  Defendants further point to an advisory opinion issued by the Florida Supreme Court before Section 24 was enacted, *In re Advisory Op. to the Att'y Gen. re Fla. Minimum Wage Amendment*, 880 So. 2d 636 (Fla. 2004) (per curiam), in which they assert the court rejected the argument that Section 24 did not incorporate the FLSA's exemptions, instead finding that "Section 24 'includes both the definition of employee, found in section 203 of the FLSA, the exemptions found in section 213 of the FLSA, and any other relevant provision within the FLSA or its implementing regulations.' "  *Id.* (quoting 880 So. 2d at 642).

Defendants contend additional guidance found in a Florida Attorney General opinion and federal court decisions interpreting Florida law confirm that Section 24 incorporates the entire

FLSA and not just the definitions found in section 203.  *Id.* at 4-5 (citing Fla. Att'y Gen. Op. 2005-64, 2005 WL 3132090, at *1 (Fla. A.G. Nov. 23, 2005); *Anagnos v. Nelson Residence, Inc*., 721 F. App'x 901, 902 (11th Cir. 2018) (per curiam); *Llorca v. Sheriff, Collier Cnty., Fla*., 893 F.3d 1319, 1328 (11th Cir. 2018); *Edgecombe v. Lowes Home Ctrs., L.L.C*., 391 F. Supp. 3d 1142, 1149 n.2 (S.D. Fla. 2019); *Ison v. Happy Chef Diner*, LLC, 17-cv-14279, 2018 WL 2688802, at *3 (S.D. Fla. Apr. 23, 2018); *Lee v. Askin Trucking, Inc*., No. 05-14335-CIVMARRA/ LYNCH, 2006 WL 8430906, at *3 (S.D. Fla. Feb. 8, 2006)).  Further, they argue, because the entire FLSA was incorporated into Section 24 – a constitutional amendment rather than a statute enacted by the legislature – the non-delegation principle cited by Plaintiffs does not apply.  *Id.* at 5.  According to Defendants, all of the cases cited by Plaintiffs involve legislative enactments and they have pointed to no authority suggesting that this principle applies to constitutional amendments.  *Id.*

Because the people of Florida are not a branch of government, Defendants contend, they can " 'amend any portion or portions of the Constitution in any way they see fit.' "  *Id.* at 6 (quoting *Smathers v. Smith*, 338 So. 2d 825, 827 (Fla. 1976)).  Thus, the Court must look to the plain language of Section 24, Defendants argue.  *Id.*  According to Defendants, "for state laws passed by public ballot, courts look to the plain language of the law to determine whether future changes to a referenced law are incorporated – and have concluded that prospective changes are incorporated unless the plain text of the law provides otherwise."  *Id.* (citing *Ariz. Citizens Clean Elections Comm'n v. Brain*, 322 P.3d 139, 145 (Ariz. 2014); *People v. Superior Court* (*Gooden*), 42 Cal. App. 270, 283-84 (2019)).  Moreover, they contend, because the FMWA was enacted to implement Section 24, it must incorporate future amendments of the FLSA to the same degree that Section 24 does because to hold otherwise would amount to legislatively overruling a constitutional amendment.  *Id.* at 7 (citing *Browning v. Fla. Hometown Democracy, Inc., PAC*, 29 So. 3d 1053, 1064 (Fla. 2010)).

Defendants contend the plain language of Section 24 makes clear that it incorporated the entire FLSA without any temporal limitation.  *Id.* at 7-9.  They point to the use of the word "developed" in the last sentence of Section 24(f), which they contend would be rendered "mere

surplusage" if interpreted to incorporate the FLSA only as it existed at the time Section 24 was enacted given that Section 24(b) already incorporates the entire FLSA. *Id.* at 8. Defendants also argue that the framers of Section 24 could have written it to expressly limit the incorporation of the FLSA to the version that was in existence at the time Section 24 was adopted but did not do so, indicating that that was not their intent. *Id.* Further, they assert, reading such a limitation into Section 24 would be inconsistent with the rule under Florida law that "constitutional provisions 'receive a broader and more liberal construction than statutes.' " *Id.* (citing *Coastal Fla. Police Benev. Ass'n, Inc. v. Williams*, 838 So. 2d 543, 548–49 (Fla. 2003)). Similarly, they assert, the FMWA does not include a temporal limitation, instead stating "that Sections 213 and 214 of the FLSA are incorporated 'as interpreted by applicable federal regulations and implemented by the Secretary of Labor.' " *Id.* (quoting Fla. Stat. Ann. § 448.110(3)). Defendants also point to the use of the word "meanings" in the plural in Section 24(b) as an indication that "the drafters of Section 24 again expressed their intent to incorporate the entirety of the FLSA." *Id.* at 8-9.

Finally, Defendants assert that "at least one federal court in Florida has construed the FMWA as incorporating guidance under the FLSA that was promulgated more than fifteen years after the FMWA's enactment." *Id.* at 9 (citing *Free v. Littlefield Corp.*, No. 3:20CV4326-TKW-HTC, 2020 WL 7421751, at *4 (N.D. Fla. Dec 11, 2020)).

c. Reply

In their Reply, Plaintiffs reject Defendants' argument that the plain language of Section 24 incorporates future amendments to the FLSA. Dkt. 1033 ("SAP Act Reply") at 1. They point to the word "established" in Section 24(b), arguing that the use of the past tense indicates that the definitions from the FLSA incorporated in that section are the ones in existence at the time Section 24 was adopted. *Id.* at 2 (citing *Miami-Dade Cty. v. Fla. Power & Light Co.*, 208 So. 3d 111, 118 (Fla. Dist. Ct. App. 2016)). They further assert that whether Section 24(b) incorporates future changes to the definitions in that section has no bearing on their claims because those definitions are set forth Section 3 of the FLSA, 29 U.S.C. § 203, and no amendment of that section is at issue here. *Id.* at 2. In particular, they assert, the SAP Act did not change the meaning of the terms "Employer," "Employee," or "Wage" in the FLSA when it added an exemption under Section 213

because § 213 creates exceptions to §§ 206 and 207 (the minimum wage and maximum hour requirements) rather than changing the meaning of the terms "Employer," "Employee," and "Wage," which are defined in § 203. *Id.*

Plaintiffs argue that the plain language of Section 24(f) also supports their position that Section 24 does not incorporate future statutory amendments to the FLSA. *Id.* at 2-3. In particular, they point to the sentence stating that " 'case law, administrative interpretations, and other guiding standards developed under the federal FLSA' shall guide the construction of Section 24." *Id.* at 2 (quoting Section 24(f)). According to Plaintiffs, under the principle of statutory construction *noscitur a sociis* – a word is known by the company it keeps – the term "guiding standards" "means other interpretive guidance, like case law and administrative interpretations, not future statutory amendments." *Id.* at 3. In other words, Plaintiffs contend, Section 24(f) "does not incorporate new statutory amendments that create brand new exemptions." *Id.* Furthermore, they assert, the Court need not decide whether Section 24(f) "incorporates future interpretive guidance about preexisting statutory provisions in the FLSA that were in place at the time Section 24 was enacted, because no such future interpretive guidance is at issue in this case." *Id.*

Plaintiffs reject Defendants' reliance on a Florida Attorney General opinion and federal case law finding that Section 24 incorporates the entire FLSA because these merely found that Section 24 incorporated the FLSA as it existed at the time that constitutional amendment was adopted; according to Plaintiffs, none of these decisions held that Section 24 incorporated future amendments to the FLSA. *Id.* at 3-5 (distinguishing cases cited by Defendants).

Plaintiffs argue further that because Section 24 does not incorporate future amendments to the FLSA, neither does the FMWA, because a statute cannot overrule the will of the people of Florida, who approved Section 24. *Id.* at 5. Plaintiffs also reject "Defendants' claim . . . that 'courts look to the plain language of the law to determine whether future changes to a referenced law are incorporated – and have concluded that prospective changes are incorporated unless the plain text of the law provides otherwise.' " *Id.* at 6 (citing Opposition to SAP Act Motion at 6). According to Plaintiffs, "[t]he second half of this sentence is false" as "[n]one of the cases cited by Defendants create[s] a legal presumption in favor of incorporating future changes to a referenced

34

1  statute." *Id.* at 6-7 (distinguishing *People v. Superior Court* (*Gooden*), 42 Cal. App. 5th 270

2  (2019); *Ariz. Citizens Clean Elec. Comm'n v. Brain*, 234 Ariz. 322 (2014)).

3      Plaintiffs argue that there is "also a strong textual basis to read the FMWA as incorporating

4  (at most) only FLSA exemptions that existed at the time the FMWA was enacted in 2005, not

5  future exemptions created after the enactment of the FMWA like the SAP Act." *Id.* at 8.  In

6  particular, they point out that "[t]he FMWA, unlike Section 24, does specifically cite particular

7  statutory provisions, namely, 'ss. 213 and 214 of the Federal Fair Labor Standards Act,' which is

8  where the FLSA's exemptions are located." *Id.* (quoting Fla. Stat. Ann. § 448.110).  According to

9  Plaintiffs, "[b]y citing specific statutory provisions, the drafters of the FMWA indicated that they

10  were incorporating Sections 213 and 214 of the FLSA as they existed at the time of the enactment

11  of the FMWA, not as they might exist at some point in the future." *Id.*  (citing *Gooden*, 42 Cal.

12  App. 5th at 283; *Abbott Labs. v. Mylan Pharm., Inc*., 15 So. 3d 642, 655 (Fla. Ct. App. 2009)).

13      Plaintiffs reject Defendants' argument that the last sentence of Section 24(f) would be

14  rendered superfluous, in light of Section 24(b), if it were not read to incorporate future

15  amendments to the FLSA.  *Id.* at 9.  According to Plaintiffs, "Section 24(f) is not superfluous,

16  because it deals with interpretive guidance not referenced in Section 24(b)." *Id.*  In particular,

17  they assert, "Section 24(b) incorporates the meanings of key terms in the FLSA, as well as the

18  FLSA's formal implementing regulations" while "Section 24(f) incorporates less formal

19  interpretive guidance like case law and administrative interpretations." *Id.*  Neither section

20  incorporates future amendments to the FLSA, Plaintiffs contend.  *Id.*

21      Plaintiffs argue further that Defendants' proposed reading of Section 24 is not a "liberal"

22  interpretation of that amendment, contrary to their contention.  *Id.* (citing *Coastal Fla. Police*

23  *Benev. Ass'n, Inc. v. Williams*, 838 So. 2d 543, 548-49 (Fla. 2003)); *see also* Opposition to SAP

24  Act Motion at 8.  According to Plaintiffs, "*Williams* stands for the proposition that the rights

25  created by the Florida Constitution are to be afforded a more liberal reading, so that the rights of

26  the people are better protected, and are not improperly limited by an overly narrow reading of the

27  provision at issue, which could 'defeat their underlying objectives.' " SAP Act Reply at 9

28  (quoting *Williams*, 838 So. 2d at 548-49).  Applying that principle here, Plaintiffs assert, it

United States District Court
Northern District of California

35

supports Plaintiffs' interpretation of Section 24 and not Defendants'.  *Id.* at 9-10.

Plaintiffs also reject Defendants' reliance on the use of the plural "meanings" in Section 24(b), which they contend simply refers to the meanings of the three terms defined in that section: "The plural 'meanings' refers to the three separate meanings of those three separate terms. It does not mean that each term has multiple different meanings within the FLSA, and that Section 24(b) somehow incorporates all of those myriad different meanings of the same term." *Id.* at 10.

Finally, Plaintiffs argue that Defendants' reliance on *Free v. Littlefield Corp*., No. 3:20CV4326-TKW-HTC, 2020 WL 7421751, at *4 (N.D. Fla. Dec. 11, 2020), is misplaced because "that case applied case law about a DOL regulation that was enacted after Section 24, not a new statutory exemption." *Id.*

### 4.   Legal Standards Under Rule 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c).  "Analysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (citation and internal quotation marks omitted).  In ruling on a motion under Rule 12(c), the Court must accept all factual allegations in the complaint as true and view them in the light most favorable to the non-moving party.  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).

### B.   Discussion

The question of whether the exemption adopted in the SAP Act applies to Plaintiffs' claims under Florida law requires the Court to delve into the law of incorporation, the various canons of construction applied to determine the plain meaning of statutes and ballot initiatives, and the limitations on the state legislature's authority to delegate its functions to other legislative bodies under the Florida constitution.  The analysis is complicated by the fact that Florida's minimum wage law is set forth in both a constitutional amendment and a statute enacted by the Florida legislature.  This takes the Court into relatively uncharted territory, and the issue presents a close call.  The Court concludes, however, that the SAP Act is not part of Florida law and that it

United States District Court
Northern District of California

has no impact on Plaintiffs' Florida law claims.

### 1. General Rules of Construction and the Non-Delegation Doctrine

The Florida Supreme Court has held that "[t]he rules which govern the construction of statutes are generally applicable to the construction of constitutional provisions." *Coastal Fla. Police Benev. Ass'n, Inc. v. Williams*, 838 So. 2d 543, 548 (Fla. 2003) (citing *State ex rel. McKay v. Keller*, 140 Fla. 346, 191 So. 542, 545 (1939)). "Accordingly, the basic rule requiring that the intent of the framers and adopters be given effect equally controls in construing constitutional provisions." *Id.* (citing *State ex rel. Dade County v. Dickinson*, 230 So. 2d 130, 135 (Fla. 1969)). In order to determine intent, courts "must give effect to the plain meaning of the words actually used in the Constitution[.]" *Id.* " '[C]ourts are far less circumscribed in construing language in the area of constitutional interpretation than in the realm of statutory construction[,]" however, because "'Constitutions are "living documents," not easily amended, which demand greater flexibility in interpretation than that required by legislatively enacted statutes.' " *Id.* (quoting *Fla. Soc'y of Ophthalmology v. Fla. Optometric Ass'n,* 489 So. 2d 1118, 1119 (Fla. 1986)). Thus, the Florida Supreme Court has instructed that courts "have an obligation to provide 'a broader and more liberal construction' of constitutional provisions, as well as being certain not to construe the provisions 'so as to defeat their underlying objectives.' " *Id.* (quoting *Fla. Soc'y of Ophthalmology*, 489 So. 2d at 1119).

Another distinction between constitutional amendments and statutes enacted by the legislature relates to the principle of non-delegation, which applies to statutes enacted by the legislature but not to constitutional amendments. Under Florida law, the source of this rule is Article II, section 3 of the Florida Constitution, which "provides that no person belonging to one branch of the government may exercise any power belonging to the other branches." *Cloyd v. State*, 943 So. 2d 149, 163 (Fla. Dist. Ct. App. 2006) (citing Fla. Const. art. II, § 3). As the court in *Cloyd* explains, "[b]ecause the legislature has the sole authority and responsibility to make laws, this provision has been construed to prohibit the legislature from delegating its power to others." *Id.* (citing *Gallagher v. Motors Ins. Corp.*, 605 So. 2d 62, 71 (Fla. 1992); *Adoue v. State*, 408 So. 2d 567, 570 (Fla. 1981)). "Therefore, although the legislature may adopt or incorporate

regulatory and statutory standards existing at the time of the adoption, any attempt to adopt or incorporate standards that will arise in the future is unconstitutional as an improper delegation of legislative power." *Id.*; *see also Abbott Lab'ys v. Mylan Pharms., Inc.*, 15 So. 3d 642, 654–55 (Fla. Dist. Ct. App. 2009) ("Under this non-delegation principle, Florida courts have long held that while the legislature may enact laws that adopt provisions of federal statutes or other regulations of a federal administrative body that are in existence and in effect at the time the legislature acts, where the legislature incorporates in a Florida statute a future federal act or ruling of a federal administrative body, such incorporation constitutes unconstitutional delegation of legislative power."). No such limitation applies to constitutional amendments, however, as these are adopted by a vote of the people of Florida, who "have a right to change, abrogate or modify [their constitution] in any manner they see fit so long as they keep within the confines of the Federal Constitution." *Smathers v. Smith*, 338 So. 2d 825, 826–27 (Fla. 1976).

### 2. Section 24

Because the non-delegation rule does not apply to Section 24, the Court begins its analysis by addressing the intent of the adopters of that section as reflected in the plain meaning of the words used therein. As a preliminary matter, the Court rejects Defendants' suggestion that in the case of a law passed by public ballot, there is a presumption that "prospective changes are incorporated unless the plain text of the law provides otherwise." *See* Opposition to SAP Act Motion at 6. Defendants cite two cases in support of this assertion, *Ariz. Citizens Clean Elections Comm'n v. Brain*, 322 P.3d 139, 145 (Ariz. 2014), and *People v. Superior Court (Gooden),* 42 Cal. App. 270, 283-84 (2019). In *Gooden*, the court addressed whether a statute enacted by the California legislature amending the *mens rea* requirement for murder impermissibly amended a proposition that had previously been enacted by California voters, Proposition 7, imposing harsher punishments for murder. 42 Cal. App. 4th at 280. The court concluded that the statute did not amend Proposition 7 because it related to the *elements* of murder whereas the voters approved Proposition 7 to enhance *punishments* for murder, "a subject related to, but distinct from, an area addressed by [the] initiative." *Id.* at 282. This case did not rely on any presumption with respect to the voter's intent to incorporate prospective statutory changes in determining the plain meaning

of Proposition 7.

*Brain* involved a complicated set of Arizona campaign reform voter initiatives and legislative enactments, including a 1986 law passed by voter initiative, A.R.S. § 16-905, imposing campaign contribution limits for elected officials – which was amended by the state legislature in 1993, 1994, 1997, 2007 and 2013 to increase those limits; a law passed by voter initiative in 1998, the Citizens Clean Elections Act "CCEA"), which established an alternative campaign financing system and in A.R.S. § 16-941 prohibited non-participating candidates from "accept[ing] contributions in excess of an amount that is twenty per cent less than the limits specified in § 16–905"; and a 1998 initiative, the Voter Protection Act ("VPA"), which "limit[ed] the legislature's authority to modify laws enacted by voters at or after the November 1998 general election." 234 Ariz. at 323-326.  The issue before the court was whether the legislature's 2013 amendment to § 16-905 increasing the campaign contribution limits amended § 16-941 of the CCEA and thus violated the VPA, which required the court to decide whether the § 16-941 "fixe[d] campaign contribution limits at eighty percent of the amounts that existed in 1998 or instead provide[d] a formula for calculating limits." *Id.* at 326.

The *Brain* court concluded that the voters intended to establish a formula when they adopted § 16-941 rather than a fixed dollar amount reflecting a percentage of the limit that existed in 1998 under § 16-905. *Id.* at 326.  The court pointed to the fact that the relevant provision itself specifies the use of a percentage (*i.e.*, a formula) rather than a flat dollar amount, in contrast to other provisions in the CCEA where flat dollar amounts were established. *Id.*  As to the latter, the court noted, the CCEA included an inflation adjustment mechanism while the limits established in § 16-941 had no such mechanism. *Id.* at 326.

The court in *Brain* also pointed to the fact that if § 16-941 were construed to freeze at 1998 levels the amount that nonparticipating candidates would receive, this would "widen the voter-approved gap between these limits and those for candidates not subject to the [CCEA]." *Id.*  The court found that "nothing indicate[d] that voters wanted to widen" the twenty percent gap between limits for nonparticipating candidates and candidates not subject to the CCEA established when the initiative was adopted. *Id.*  It reasoned further that voters likely did not intend this outcome,

1   finding that "[v]oters in 1998 constructively knew that the legislature would at some point likely

2   amend § 16–905 to increase campaign contribution limits, as it had done three times in the

3   preceding twelve years, including the year before the election." *Id.* The court also found that

4   interpreting § 16-941 as establishing a formula likely reflected the intent of the voters because that

5   construction was less confusing in the context of the CCEA as a whole and because nothing in the

6   publicity pamphlets issued in connection with the 1998 initiative informed voters that the initiative

7   would permanently fix contribution limits at 80% of 1998 levels. *Id.* at 327.

8       In sum, the conclusion of the court in *Brain* with regard to the intent of the voters was not

9   based on any presumption but rather, on specific language in the CCEA as well as the implications

10  of the competing constructions for carrying out the broader principles and goals of that initiative.

11      Turning to Section 24, it is reasonable to construe it as incorporating not only the

12  definitions of "employer," "employee," and "wage" (found in § 203 of the FLSA) but also the

13  exemptions found in § 213 of the FLSA. The Court finds the reasoning of the Florida Supreme

14  Court in its 2004 advisory opinion to be persuasive:

> As an initial matter, it is important to point out that the proposed
> amendment does not make a specific reference to section 203, but
> instead incorporates a reference to the entire body of law under the
> FLSA. Moreover, the proposed amendment does not state that it is
> adopting the FLSA's *definition* of the term "employee," but provides
> that it is adopting the *meaning* of the term "employee," which is a
> much broader concept. Compare The American Heritage Dictionary
> 775 (2d ed.1985) (defining "meaning" as "something that is
> interpreted to be the goal, intent, or end") with The American
> Heritage Dictionary 375 (2d ed.1985) (defining "definition" as "the
> act of stating a precise meaning or significance"). Thus, the
> amendment includes both the definition of employee, found in section
> 203 of the FLSA, the exemptions found in section 213 of the FLSA,
> and any other relevant provision within the FLSA or its implementing
> regulations. In further support of this construction, section (f) of the
> proposed amendment clearly states, "It is intended that case law,
> administrative interpretations, and other guiding standards developed
> under the federal FLSA *shall guide the construction* of this
> amendment and any implementing statutes or regulations."
> (Emphasis added.) Accordingly, we find the summary accurately
> reflects the scope of the amendment because both the summary and
> the amendment clearly state that employees covered under federal
> minimum wage will be the same employees covered under the state
> minimum wage.

28  *In re Advisory Opinion to the Atty. Gen. re Fla. Minimum Wage Amend.*, 880 So. 2d 636, 641–42

United States District Court
Northern District of California

40

(Fla. 2004) ("2004 Advisory Opinion") (emphasis added); *see also Anagnos v. Nelsen Residence, Inc.*, 721 F. App'x 901, 903 (11th Cir. 2018) (holding that district court properly instructed jury that plaintiff who brought Florida minimum wage claim had to establish that the defendant was a covered employer under the FLSA and adopting the reasoning of the 2004 Advisory Opinion); *Llorca v. Sheriff, Collier Cty., Fla.,* 893 F.3d 1319, 1328 (11th Cir. 2018) (holding that because the plaintiffs were not entitled to compensation under the FLSA for their donning and doffing or commuting time their Florida law claims also failed and pointing to the last sentence of Section 24(f)); *Ison v. Happy Chef Diner, LLC*, No. 17-CV-14279, 2018 WL 2688802, at *2 (S.D. Fla. Apr. 23, 2018) (holding that because defendant was not a covered enterprise under the FLSA it also could not be sued under Florida minimum wage law); *Edgecombe v. Lowes Home Centers, L.L.C.*, 391 F. Supp. 3d 1142, 1150 (S.D. Fla. 2019) (holding that the Florida Constitution and FMWA adopt the meanings "promulgated by the . . . [FLSA]" and citing *Anagnos* for the principle that "employees receive the same protection under  state law that they enjoy under the [FLSA]").

However, neither the 2004 Advisory Opinion nor the cases cited above in which courts have found that Florida minimum wage law mirrors the FLSA addressed the question here, namely, whether Florida voters intended to incorporate *future* exemptions to the FLSA adopted by Congress.  While no court has yet addressed that question, the Court concludes that they did not. First, there is no specific language in Section 24 supporting such an intent.  The Court has no difficulty concluding that the last sentence of Section 24(f) does not reflect an intent to incorporate future statutory amendments.  That sentence states that "case law, administrative interpretations, and other guiding standards developed *under* the federal FLSA shall guide the construction of Section 24."  Clearly, a new statutory exemption does not fall into any of these categories. Nor does the Court find persuasive Defendants' argument that this sentence would be rendered superfluous in light of Section 24(b) if the Court were to adopt Plaintiffs' proposed construction. Section 24(f) goes beyond subsection (b), which incorporates the meaning of certain terms under the FLSA, by addressing the *types* of interpretive guidance that should be used to determine the scope of Section 24.

Likewise, the Court rejects Defendants' reliance on the use of the word "meanings" in

United States District Court
Northern District of California

Section 24(b).  The most straightforward explanation of the plural form of that word is simply that the section refers to *meanings* of the three terms listed in that section.  The suggestion that it was meant to reflect changing meanings over time resulting from future amendments to the FLSA appears far-fetched – especially as the framers of the initiative could easily have stated as much but failed to do so.

This conclusion finds further support in the fact that Congress has rarely adopted new exemptions to the FLSA and prior to the adoption of Section 24, in 2004, no new exemption had been adopted since 1996.[13]  This historical context is in marked contrast to the facts in *Brain*, where voters had constructive knowledge that the legislature had amended the incorporated statute on several occasions in the years leading up to the adoption of the voter initiative at issue in that case.

The Court also finds that the rules of construction that govern the interpretation of constitutional amendments support its conclusion that the voters of Florida did not intend to incorporate future statutory amendments to the FLSA limiting its scope.  As discussed above, the Florida Supreme Court has instructed that courts "have an obligation to provide 'a broader and more liberal construction' of constitutional provisions, as well as being certain not to construe the provisions 'so as to defeat their underlying objectives.' "  *Coastal Fla. Police Benev. Assn*, 838 So. 2d at 549 (quoting *Fla. Soc'y of Ophthalmology*, 489 So. 2d at 1119).  The objective of Florida's minimum wage amendment is set forth in Section 24(a), which states as follows:

> (a) **Public policy**. All working Floridians are entitled to be paid a minimum wage that is sufficient to provide a decent and healthy life for them and their families, that protects their employers from unfair low-wage competition, and that does not force them to rely on taxpayer-funded public services in order to avoid economic hardship.

Fla. Const. art. X, § 24(a).  While Defendants contend a "liberal" construction of Section 24 supports a construction that incorporates the exemption adopted in the SAP Act, the Court finds

---

[13] At the February 11, 2022 motion hearing, the parties agreed that other than the SAP Act, only one new exemption has been adopted by Congress since 1996, the Border Patrol Act, and that law was passed in 2014, many years after Florida voters adopted Section 24.

that the opposite is true.  As is clear from the stated policy objectives of Section 24, that amendment was intended to be remedial; thus, a liberal construction points away from incorporating an amendment to the FLSA that reduces the protection afforded by Section 24.

This conclusion finds further support in the language in Section 24(f) that precedes the final sentence, which specifically authorizes the "state legislature or any other public body to adopt or enforce any other law, regulation, requirement, policy or standard that provides for payment of higher or supplemental wages or benefits, *or that extends such protections to employers or employees not covered by this amendment*."  Fla. Const. art. X, § 24(f) (emphasis added).  Tellingly, it does not authorize the state legislature or any other public body to *reduce* minimum wage coverage by excluding employees or employers who fell under the minimum wage requirement of Section 24 at the time of its enactment.  Nor is there any suggestion that Florida voters intended to extend to Congress the authority to reduce minimum wage protection under Florida law even while declining to authorize their own legislature to do so.

### 3.  The FMWA

Because the FMWA was enacted to implement Section 24, the Court's conclusion that Section 24 does not incorporate exemptions to coverage under the FLSA added by Congress after Florida voters approved Section 24 applies equally to the FMWA.  Furthermore, nothing in the language of the FMWA suggests the Florida legislature intended to amend Section 24 in this respect.  Indeed, had the legislature done so, the statute likely would have been unconstitutional under the non-delegation principle discussed above.  Finally, Defendants' reliance on *Free v. Littlefield Corp.*, No. 3:20CV4326-TKW-HTC, 2020 WL 7421751, at *4 (N.D. Fla. Dec 11, 2020), is misplaced.  Defendants are correct that in that case, a federal court in Florida construed the FMWA as incorporating *guidance under* the FLSA that was promulgated many years after the FMWA's enactment.  The question here, however, is whether the FMWA incorporates amendments to the FLSA itself that reduce the scope of coverage by exempting new categories of individuals from coverage as "employees."  As discussed above, the Court finds that it does not.

Accordingly, the Court concludes that the FMWA, like Section 24, does not incorporate the SAP Act into Florida minimum wage law.

United States District Court
Northern District of California

### 4. Conclusion

For the reasons stated above, the Court concludes that Plaintiffs are entitled to judgment on the pleadings under Rule 12(c) that Defendants' SAP Act affirmative defense fails as to Plaintiffs' claims under Florida law. Therefore, the Court GRANTS Plaintiffs' SAP Act Motion and dismisses Defendants' SAP Act defenses as to all of Plaintiffs' state law claims and to the extent it is asserted as a defense to Plaintiffs' FLSA claims based on conduct before March 23, 2018.

## VI.   MOTIONS FOR PARTIAL SUMMARY JUDGMENT

### A.   Plaintiffs' Partial Summary Judgment Motion

In their Partial Summary Judgment Motion, Plaintiffs argue that they are entitled to summary judgment on a number of Defendants' defenses and further, that because these defenses fail the Court should also enter judgment in Plaintiffs' favor on their wage statement and record-keeping claims under Arizona and California law. Plaintiffs' Partial Summary Judgment Motion at 1-2. Plaintiffs also ask the Court to hold as a matter of law that Defendants' violations of Arizona law were willful because they have never had any defenses under Arizona law, which lengthens the limitations period from two years to three years. *Id.* at 3.

With respect to Defendants' defenses, Plaintiffs make the following arguments. First, they argue that the Court should hold, as a matter of law, that Plaintiffs are "employees" under all laws at issue in this case because: 1) Defendants admitted Plaintiffs were employees when they answered the complaint and those judicial admissions are binding, *id.* at 12-13; 2) Defendants are estopped from arguing that Plaintiffs are not employees based on the position Defendants took before the Ninth Circuit in a separate case, *Miranda v. Selig*, in which they asserted that "MLB Clubs 'employ[] a number of Minor League players for player-development purposes' and that the 'employment agreement is established by filling in terms in a Uniform Player Contract[,]' " *id.* at 13-14 (quoting Answering Brief, *Miranda v. Selig., et al*., No. 15-16938, 2016 WL 873683, at *5 (9th Cir. Mar. 4, 2016)); and 3) the undisputed evidence establishes on the merits that Plaintiffs are employees under the FLSA and under all of the relevant state laws, *id.* at 14-18.

Second, Plaintiffs assert that the undisputed evidence establishes that MLB and the Clubs are joint employers of minor league players under the FLSA and all of the relevant state laws that

follow the FLSA, that is, the laws of Florida, Arizona, New York, Maryland, Pennsylvania and Oregon.  *Id.* at 14, 18-34.  They contend the Ninth Circuit already recognized as much.  *Id.* at 18 (citing *Senne*, 934 F.3d at 923; *Miranda v. Selig*, 860 F.3d 1237, 1242 (9th Cir. 2017)).   In addition, Plaintiffs point to a handful of cases in which courts have found that sports leagues were joint employers under the National Labor Relations Act, placing particular emphasis on *N. Am. Soccer League v. N.L.R.B.*, 613 F.2d 1379 (5th Cir. 1980) ("*NASL*").  *Id.* at 20-21 (citing *NASL*, 613 F.2d at 1382-83; *U.S. Football League Players Ass'n, AFL-CIO v. U.S. Football League*, 650 F. Supp. 12, 15 (D. Or. 1986); *Nat'l Lacrosse League*, No. Case 2-CA-36675-1, 2005 WL 4674278 (N.L.R.B. July 5, 2005)).  Plaintiffs contend "the National Labor Relations Act 'defines employment more narrowly than the FLSA . . . so a finding of joint employment in labor law is highly instructive.' "  *Id.* at 20 (quoting *Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 145 (4th Cir. 2017)).  Plaintiffs further assert that the undisputed facts establishes that MLB is a joint employer under *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), which sets forth factors courts consider to determine when an entity is a joint employer under the FLSA.  *Id.* at 19-34.  Finally, they argue that they are entitled to summary judgment that Plaintiffs are employees and that MLB is a joint employer under California law as well.  *Id.* at 34-36.

Third, Plaintiffs argue that they are entitled to summary judgment that the certified FLSA collective and Rule 23 classes performed at least some "work" during the Florida and Arizona training season under the FLSA and the laws of Florida and Arizona; and further, that travel time for the Arizona, Florida, and California classes is compensable work under the FLSA and the laws of California, Florida, and Arizona.  *Id.* at 36-40.

Fourth, Plaintiffs contend Defendants' creative professional exemption defense, which in their answers they asserted under the FLSA and California, Florida,[14] Maryland, New York, North Carolina, Oregon, and Pennsylvania law, fails as a matter of law because the undisputed evidence establishes that Plaintiffs perform some work during the training season and are not paid salaries

---

[14] Although Defendants asserted this defense to Plaintiffs' Florida law claims in their supplemental answers, *see, e.g.*, dkt. no. 886 at p. 81, they stipulated at the February 11, 2022 motion hearing that are not asserting the creative professional exemption as a defense under Florida law.

United States District Court
Northern District of California

1   during that period. *Id.* at 40-41. In addition, Plaintiffs assert, this defense fails because their work

2   is not in a recognized field of artistic or creative endeavor, as required under the "primary duties"

3   test that applies to this exemption. *Id.* at 42-46.

4          Fifth, Plaintiffs ask for summary judgment in their favor on Defendants' seasonal

5   amusement or recreational establishment exemption ("amusement exemption") defense, which

6   Defendants asserted as to Plaintiffs' claims under the FLSA and the laws of California, Florida,

7   Maryland, New York, North Carolina, and Maryland. *Id.* at 46-53. As to the claims asserted

8   under California law, Plaintiffs contend California does not recognize this defense and therefore,

9   that they are entitled to judgment on the pleadings that this defense fails. *Id.* at 46. As to the

10  FLSA claims and the remaining state law claims, which Plaintiffs contend apply a test similar to

11  the test applied under the FLSA, Plaintiffs argue that the amusement exemption defense fails

12  because the relevant "establishment" for the purposes of this defense is all of the places where

13  minor leaguer activities are conducted rather than the individual stadiums where the teams play.

14  *Id.* at 47-51.

15         Further, Plaintiffs assert, neither of the tests that apply to these establishments – that their

16  "average receipts for any six months of such year were not more than 33 1/3 per centum of its

17  average receipts for the other six months of the year" ("the receipts test") or that they do not

18  operate for more than seven calendar months in a year ("the seasonal test") – is met. *Id.* at 51. In

19  particular, as to the receipts test, Plaintiffs argue that Defendants failed to produce receipts related

20  to this exemption before the first close of discovery and did not produce receipts for the proper

21  establishment during the discovery that occurred in 2021, following the Ninth Circuit appeal. *Id.*

22  at 51-52. Plaintiffs contend Defendants also cannot satisfy the seasonal test because the

23  undisputed evidence establishes that minor league baseball operates throughout the year. *Id.* at 52-

24  53.

25         Sixth, with respect to Plaintiffs' claims under Arizona law, Plaintiffs contend they are

26  entitled to summary judgment that Defendants' violations were willful and that Plaintiffs are

27  entitled to treble damages. *Id.* at 53-54.

28         Seventh, Plaintiffs seek summary judgment on their wage statement and record-keeping

claims under Arizona and California law because there are no disputed issues of material fact as to any of the defenses Defendants assert to those claims. *Id.* at 54-56.

Finally, Plaintiffs ask the Court to grant summary judgment on Defendants' offset affirmative defense seeking wage credits for covering such expenses as meals and lodging, signing bonuses, and college payments. *Id.* at 57-60. According to Plaintiffs, Defendants have not adequately documented these payments and as to some of them, Defendants' experts have calculated them in a manner inconsistent with the various laws at issue with respect to offsets. *Id.*

### B. Defendants' Motion for Partial Summary Judgment

Defendants seek summary judgment with respect to six issues, some of which mirror the issues raised in Plaintiffs' Partial Summary Judgment Motion and SAP Act Motion. First, Defendants contend they are entitled to summary judgment on all of Plaintiffs' minimum wage and overtime claims on the grounds that Plaintiffs have not offered admissible testimony to calculate "hours worked" and corresponding damages. Defendants' Partial Summary Judgment Motion at 1, 13-15. Defendants point to what they contend are serious flaws in the analysis and opinions offered by Plaintiffs' experts Dr. Dennis and Dr. Kriegler, which are the subject of separate *Daubert* motions brought by Defendants, discussed above. *Id.* at 13-15.

Second, Defendants argue that they are entitled to summary judgment as to Plaintiffs' minimum wage and overtime claims under the FLSA and as to Plaintiffs' minimum wage claims under Florida law to the extent that Plaintiffs assert those claims based on Defendants' failure to pay minimum wage and/or overtime after March 23, 2018, when the SAP Act went into effect. *Id.* at 1, 16-20.[15]

Third, Defendants contend they are entitled to summary judgment on the minimum wage and overtime claims against the Clubs asserted under the FLSA and minimum wage and/or overtime claims asserted under the laws of Florida, Pennsylvania, and Maryland because the

---

[15] As discussed above, the Court finds that the SAP Act does not apply under Florida law and therefore denies Defendants' request for summary judgment on this ground with respect to the Florida law claims. On the other hand, Plaintiffs do not dispute that the SAP Act bars their minimum wage and overtime claims under the FLSA for conduct that occurred after March 23, 2018 and therefore the Court grants summary judgment in Defendants' favor to the extent the FLSA claims are based on such conduct.

United States District Court
Northern District of California

undisputed facts establish that the amusement exemption bars these claims. *Id.* at 1, 20-33. Defendants contend the relevant establishments are: 1) as to the claims based on spring training, extended spring training and instructional leagues, the individual training facilities; and 2) as to the claims based on work performed during the Championship Season, the minor league affiliate stadiums where games are played; they further contend these establishments meet either the seasonal test (as to the stadiums) or the receipts test (as to the training facilities) for this exemption as a matter of law. *Id.*

Fourth, Defendants argue that Plaintiffs are not entitled to minimum wage and/or overtime under the FLSA and the state wage-and-hour laws pled in the Complaint outside of the Championship Season because the undisputed facts establish that they are not "employees" within the meaning of the applicable laws at any other time. *Id.* at 2, 33-42.

Fifth, Defendants contend they are entitled to summary judgment that the former Commissioner Selig was never Plaintiffs' "employer" under the FLSA or the laws of Florida, Oregon, Pennsylvania, Maryland, North Carolina, and New York. *Id.* at 2, 42-52.[16]

Sixth, Defendants seek summary judgment on Plaintiffs' claim for violation of "payday" requirements under California Labor Code section 204, *see* SCAC at ¶¶ 595-98, on the basis that that provision does not provide a private right of action. *Id.* at 2, 52-53.

Finally, Defendants argue that they are entitled to summary judgment on Plaintiffs' claim for penalties under the California Private Attorneys General Act ("PAGA"), *see* SCAC ¶¶ 611-614, because Plaintiffs failed to satisfy PAGA's administrative exhaustion requirement, *see* Cal. Lab. Code § 2699, which is jurisdictional. *Id.* at 2, 53-55.

### C.   Analysis

#### 1.   Legal Standards under Rule 56

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[16] Plaintiffs stipulated at the February 11, 2022 motion hearing that they have dropped their claims as to Defendant Selig (the former Commissioner) as an individual, who is dismissed from this case. The Office of the Commissioner of Baseball remains a defendant in the case.

United States District Court
Northern District of California

law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

### 2. Whether Plaintiffs' Claims Fail for Lack of Admissible Evidence of Damages

Defendants argue that they are entitled to summary judgment on all of Plaintiffs' claims for minimum wage and overtime because Plaintiffs rely exclusively on the expert opinions of Dr. Dennis and Dr. Kriegler to establish "hours worked" and damages, which Defendants contend are inadmissible. According to Defendants, without this inadmissible evidence, Plaintiffs cannot

49

1  prove essential elements of their claims.  The Court rejects this argument, however, because it

2  finds that the opinions of Dr. Kriegler and Dr. Dennis are sufficient to satisfy the requirements of

3  *Daubert* and Rule 702, as discussed above.  The Court therefore DENIES Defendants' request for

4  summary judgment on this basis.

### 3.  Whether Plaintiffs Are "Employees"

#### a.  Background

7  In its July 21, 2016 Order, the Court explained that the "primary dispute" between the

8  parties with respect to whether the putative class and collective members were "employees" under

9  the FLSA and relevant state laws was whether the primary beneficiary test set forth in *Walling v.*

10 *Portland Terminal Co.*, 330 U.S. 148 (1947), applied or if instead, the applicable test was the

11 economic realities test that was applied in *Tony and Susan Alamo Foundation v. Secretary of*

12 *Labor* (*Alamo*), 471 U.S. 290 (1985).  Dkt. no. 687 at 73.  *Id.*  The Court found that it was

13 "appropriate . . . to reach the merits as to this issue" because the question of "whether Plaintiffs

14 met the predominance requirement depend[ed], in part, on which test [was] applied[.]"  *Id.*

15 The Court concluded that "the primary beneficiary test announced in *Walling* does not

16 apply under the circumstances here" and that the economic reality test set forth in *Alamo* applies

17 instead.  *Id.*  It reasoned as follows:

> First, to the extent that minor league players have always entered into
> contracts with MLB to receive a salary and other forms of
> compensation (including bonuses and college scholarship benefits),
> and that they often negotiate with the Clubs over the terms of their
> compensation (as Defendants have emphasized), it cannot be denied
> that minor league players expect to receive – and do in fact receive –
> compensation in return for playing baseball for the Clubs. This basic
> fact distinguishes this case from all of the cases discussed above that
> applied *Walling*. These are not unpaid interns, students who were
> receiving clinical training in connection with licensing requirements,
> or amateur student athletes participating in a long tradition in which
> no compensation had ever been paid or expected. Rather, like the
> workers in *Alamo*, these Plaintiffs expected to receive compensation,
> both in the form of money payments and other benefits. See *Martinez
> v. Ehrenberg Fire Dist.*, No. CV-14-00299-PHX-DGC, 2015 WL
> 3604191, at *3 (D. Ariz. June 8, 2015) (finding that "volunteer"
> firefighters were employees under the FLSA on the basis that they
> expected to receive compensation for their work).

28 *Id.* at 77-78.

United States District Court
Northern District of California

The Court went on to reject "Defendants' attempt to distinguish *Alamo* on the basis that the workers in that case were 'entirely dependent' on the defendant whereas the players here are not dependent on MLB and the Clubs." *Id.* at 78. It explained that "[t]he dependency of the workers in *Alamo* was cited only to show that they did, in fact, expect some form of compensation in return for their work, notwithstanding their assertions to the contrary" whereas in this case "there is little doubt that the players expected to be compensated[.]" *Id.* The Court further stated that it was not "persuaded by Defendants' assertion that the players did not expect to be compensated because they understood they would not be paid during the off-season[,]" finding that "[t]he case law (including *Walling*) does not suggest that such a narrow focus is permissible." *Id.*

### b. Discussion

For the reasons set forth below, the Court concludes that Plaintiffs are entitled to summary judgment in their favor on the threshold question of whether the members of the FLSA collective and the Rule 23 classes meet the definition of "employee" under the FLSA and the relevant state laws. Conversely, the Court finds that Defendants are not entitled to summary judgment that outside of the Championship Season the class and collective members are not "employees."

### i. Judicial Admissions

"A statement in a complaint, answer or pretrial order is a judicial admission, as is a failure in an answer to deny an allegation." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). Here, Defendants filed supplemental answers to the SCAC admitting that each of the Club Defendants "employed" Plaintiffs. For example, in Paragraph 73 of the SCAC, Plaintiffs alleged:

> *Kansas City Royals*. Kansas City Royals Baseball Corp. (d/b/a "Kansas City Royals") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Kansas City Royals employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

SCAC ¶ 73. In the Supplemental Answer filed by the Kansas City Royals, dkt. no. 892, that defendant responded:

> Denies the allegations set forth in Paragraph 73 of the Second Consolidated Amended Complaint, except admits that the entity known as the Kansas City Royals is a member Club of Major League

United States District Court
Northern District of California

Baseball and employs and has employed certain minor league baseball players, including Plaintiff Michael Liberto.

Defendant Kansas City Royals Baseball Club LLC's Supplemental Answer to The Second Consolidated Amended Complaint ¶ 73.  Defendants stipulated at the February 11, 2022 motion hearing that the SCAC and corresponding supplemental answers contain the same language as to all of the Club Defendants.

Defendants deny admitting that Plaintiffs are "employees" and contend they "used the term to distinguish between MLB, on the one hand, and the Clubs, on the other."  Opposition to Plaintiffs Partial Summary Judgment Motion at 31.  They point out that in their supplemental answers, they denied outright Paragraph 63 of the SCAC – alleging that "[u]nder the broad meaning of' 'employ' used by the FLSA and the applicable state laws, MLB employed (and/or continues to employ) Plaintiffs, all similarly situated employees, and all employees of the proposed classes."  Defendant AZPB L.P.'s Supplemental Answer to The Second Consolidated Amended Complaint, dkt. no. 886, ¶ 63. Defendants do not explain, however, why their admissions that the *Clubs* employ or employed Plaintiffs but MLB did (or does) not, do not support Plaintiffs' position, that is, that they have admitted that Plaintiffs are employees of the Clubs even if they have *not* admitted the Clubs and MLB are joint employers or that MLB employs Plaintiffs.  Nor does Defendants' explanation account for admissions elsewhere in their supplemental answers that Plaintiffs were employees of the Clubs.  *See, e.g.*, dkt. no. 886 ¶ 150 (admitting that "minor league baseball players may agree to be employed pursuant to a minor league contract, which they must agree to and execute, whether after an amateur draft or as a free agent"), ¶ 582 (admitting that certain Defendant Clubs employed and continue to employ minor league baseball players in each of the states and during the relevant time periods referenced in the paragraph).

Defendants also point out that in their supplemental answers, they denied that the named Plaintiffs were "covered employee[s]" under the FLSA.  *See, e.g.*, dkt. no. 886 ¶¶ 19-61.  Given that Defendants admitted elsewhere in their supplemental answers that the Clubs "employed" Plaintiffs, however, the most reasonable reading of these paragraphs is that Defendants denied that Plaintiffs were "covered" by the FLSA, not that they were "employees" within the meaning of the

FLSA.  Likewise, Defendants' reliance on Paragraph 10 of their affirmative defenses in their supplemental answers is misplaced.  There, Defendants assert an affirmative defense entitled "Not 'Hours Worked'" in which they assert that some of the time for which Plaintiffs seek compensation, including time spent training, traveling and commuting, do not constitute hours "worked."  Dkt. no. 886 at 83, Affirmative Defenses ¶ 10.  The question of whether activities are compensable "work" however, is distinct from the question of whether an individual is an "employee" under the FLSA and the relevant state wage and hour laws.

Finally, the Court is not persuaded by Defendants' assertion that they "preserved" the argument that Plaintiffs were not employees by raising it in litigation.  Opposition to Plaintiffs' Partial Summary Judgment Motion at 31 n. 76 (citing dkt. no. 430 at pp. 1, 7 and 10 as an example).  While it is true that Defendants argued in opposition to Plaintiffs' request for certification of an FLSA collective and Rule 23 classes that the question of whether the proposed class or collective members are "employees" requires individualized inquiries, Defendants have pointed to no authority that suggests that arguments in motion papers inconsistent with prior admissions serve to retract those admission.  Nor do they point to authority that suggests that Plaintiffs' failure to invoke Defendants' admissions as to their employee status in response to Defendants' arguments precludes them from relying on those admissions now.  In any event, Defendants subsequently reiterated the admissions that the Clubs employed Plaintiffs, so any possible argument based on such a waiver must fail.

Therefore, the Court concludes that Defendants' admissions that Plaintiffs were or are "employees" of the Clubs are binding.[17]

### ii.  The Merits

As discussed above, the Court has previously held that Plaintiffs are employees rather than trainees and that *Alamo* rather than *Walling* governs this question under the FLSA and the relevant state laws.  Defendants did not bring a motion to reconsider or challenge the Court's holding on

---

[17] Because the Court finds that Defendants are bound by their admissions in this case, it does not reach Plaintiffs' argument that Defendants are also bound under the doctrine of judicial estoppel based on their arguments in *Miranda v. Selig*.

appeal.  Therefore, the Court declines to revisit that question.  To reiterate the Court's previous

holding, under *Alamo*, the test of employment is one of "economic reality" and the primary

consideration in applying that test is whether services are provided "in contemplation of

compensation."  471 U.S. at 301, 306.  In this case, "the economic reality of the minor league

players' relationship with Defendants depends in large part on the common features of the draft

system instituted by MLB and the Clubs, as well as the uniform contract signed by all players and

the MLB rules to which they are subject."  July 21, 2016 Order at 78.  As the Court previously

concluded, Plaintiffs "expected to receive compensation, both in the form of money payments and

other benefits."  *Id.*  This is particularly clear from the UPC that Plaintiffs signed, which expressly

states that it "set[s] the terms and conditions of Player's employment during all periods in which

Player is employed by Club as a Minor League Player," UPC § IV, and makes clear that the

players' "duties and obligations" under the UPC are in "full force and effect throughout the

calendar year[,]" UPC § VI(B).

Defendants argue that the Court should revisit its conclusion in light of an unpublished

Fourth Circuit case that was issued after this Court's decision, *Armento v. Asheville Buncombe

Cmty. Christian Ministry, Inc.*, 856 F. App'x 445, 455-56 (4th Cir. 2021), asserting that that case

"clarified that the extent to which individuals expect to receive (or do receive) compensation is not

dispositive as to whether individuals are covered 'employees' under the relevant wage-and-hour

laws."  Dkt. no. 1013 at 36 n. 83.  Even if the Court were to revisit this issue, *Armento* would not

change the Court's conclusion.

In *Armento*, the plaintiff (Armento) sought to recover minimum wage and overtime

payments under North Carolina law for services he provided as a resident of a homeless shelter

operated by the defendant (ABCCM) for homeless veterans.  856 Fed. App'x. at 447.  Armento

was a participant in the defendant's transitional housing program, which also required that he

participate in a Service Hours Program and a Transitional Employment Program.  *Id.* at 448.

While Armento asserted that he was an employee under the latter two programs, the court

disagreed, finding that "neither the Service Hours Program nor the Transitional Employment

Program reflect[ed] a 'traditional understanding of employment' under the proper economic

reality test." *Id*. at 453. In reaching this conclusion, the court distinguished *Alamo* with respect to the Service Hours Program on the basis that that program was intended to benefit the residents and was not to "turn a profit" for ABCCM. *Id.* at 453. The court pointed out that the residents could even meet the requirements of this program by performing service hours for some other charity organization. *Id.* at 454. The court further found that Armento "neither expected nor received compensation—explicit or implicit—through the Service Hours Program" and in contrast to the plaintiffs in *Alamo*, did "not perform service hours in direct exchange for room and board." Rather, the court found that the Service Hour Program was "part of the overall rehabilitative relationship" and that there were many exemptions to the program, which in no way "changed the allocation of benefits." *Id.*

The court in *Armento* went on to find that the plaintiff's participation in the Transitional Employment Program also did not make him an "employee" within the meaning of the FLSA and North Carolina law, even though the plaintiff was paid an hourly wage for his participation in that program. *Id*. at 455. Citing *Alamo*, the Court noted that "[a]lthough compensation is an important factor in considering whether an individual is an employee . . . it is not dispositive[.]" *Id*. The court continued, "Finding compensation dispositive would be contrary to the Supreme Court's instruction to focus on ' "the circumstances of the whole activity," rather than "isolated factors." ' " *Id*. (quoting *Steelman v. Hirsch*, 473 F.3d 124, 128 (4th Cir. 2007) (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)). The court went on to conclude that the circumstances of the "whole activity" did not support the conclusion that the plaintiff was an employee:

> Here, "the circumstances of the whole activity" establish that ABCCM did not compensate Armento pursuant to an employment relationship. . . . The compensation Armento received did not reflect the " 'bargained-for exchange of labor' for mutual economic gain that occurs in a true employer-employee relationship." *Harker*, 990 F.2d at 133 (quoting *Vanskike*, 974 F.2d at 809; *Gilbreath*, 931 F.2d at 1325). Unlike in *Alamo Foundation*, Armento was not "entirely dependent upon" ABCCM by virtue of the compensation. 471 U.S. at 301, 105 S.Ct. 1953 (quoting *Donovan*, 567 F. Supp. at 562). ABCCM provided room and board to Armento independent of his participation in the program. Indeed, the entire purpose of the Transitional Employment Program is to eliminate dependence upon ABCCM's free resources. It does so by creating an artificial job

55

1

market available only to Armento and those similarly classified and by capping participation at 1,000 hours.

2

*Id*. The court in *Armento* went on to recognize the "risks at stake" in its ruling, stating that it did

3

"not condone the use of shelter residents as an unprotected labor pool available at substandard

4

wages or uncompensated hours" and limiting its holding to "the specific facts at issue" in that

5

case, where the relationship "did not reflect a bargained-for exchange of labor for value and did

6

not foster dependence upon ABCCM" despite the payment of an hourly wage. *Id.*

7

This Court is not persuaded that the holding in *Armento* is consistent with the Supreme

8

Court's reasoning in *Alamo*. In particular, the holding in *Armento* appears to be at odds with

9

*Alamo* to the extent that it minimizes the significance of the hourly wage that was paid to Armento

10

by ABCCM, which would appear to reflect an expectation that Armento would be compensated

11

for his services. Even assuming that the reasoning and holding of *Armento* is consistent with

12

*Alamo*, however, the Court finds that it is not on point. In contrast to *Armento*, there is no

13

evidence here that Plaintiffs' participation in minor league baseball falls outside the "traditional

14

understanding of employment" where the players' participation is solely for their own benefit and

15

where the salaries they are paid are unrelated to any expectation of compensation.

16

Finally, the Court rejects Defendants' argument that even if Plaintiffs are employees

17

during the Championship Season, when they are paid a salary, they are not employees the rest of

18

the year. Defendants rely on *Eberline v. Douglas J. Holdings, Inc*., 982 F.3d 1006, 1016 (6th Cir.

19

2020), *cert. denied*, 141 S. Ct. 2747 (2021), in support of this "segmented" approach to the

20

question of whether Plaintiffs' are employees or trainees, but the facts of that case are quite

21

different from the facts here. *Eberline* involved cosmetology students who were required as part

22

of the training school's curriculum to work in "clinic salons" to obtain practical experience hours

23

necessary for a cosmetology license. 982 F.3d at 1109. During the time students worked at the

24

clinic salons, they were asked to perform general cleaning and janitorial tasks unrelated to their

25

training, and the students complained that for this time they should have been compensated as

26

employees under the FLSA. *Id.* Because the services were performed in the context of a

27

vocational program, the court applied the primary beneficiary test to the question of whether the

28

students were "employees." *Id.* at 1012-13. The primary dispute related to the application of the

United States District Court
Northern District of California

test was whether it should be applied "to only that targeted segment of the program at issue or to the educational program as a whole." *Id.* at 1013.

The *Eberline* court concluded "when a plaintiff asserts an entitlement to compensation based only on a portion of the work performed in the course of an educational relationship, courts should apply the primary-beneficiary test . . . only to that part of the relationship, not to the broader relationship as a whole." *Id.* at 1014.   Thus, the court found, "relationships can be segmented for purposes of an FLSA analysis such that a person is an employee in one part of the relationship but not another." *Id.* at 1015.   It reasoned as follows:

> Through this test, we advance the FLSA's stated objective of ensuring that a minimum wage is paid to all employees "engaged in commerce." 29 U.S.C. § 206(a). Adopting [the defendant's] proposed approach of applying the primary-beneficiary test to the whole educational program as opposed to the portion of the program actually at issue runs counter to the purpose of the primary-beneficiary test. It would raise the potential of zones of exploitation in which schools could use their students in place of paid employees to complete work unrelated to the educational purpose of the program, so long as the amount of extra work was not so large as to render the school the primary beneficiary of the overall relationship. Nothing in our case law, nor in the language of the statute, indicates that Congress intended or anticipated this outcome under the FLSA. *Cf. Alamo*, 471 U.S. at 301–02, 105 S.Ct. 1953 (noting that permitting an enterprise to use a workforce of volunteers who otherwise meet the criteria for employee status might have a wage-depressing effect across the market, which would be contrary to the purpose of the FLSA).

*Id.* at 1016.

There are several reasons why *Eberline* does not apply here.   First, it is not clear that the Sixth Circuit's decision in *Eberline* is in line with the Ninth Circuit's holding in *Benjamin v. B & H Educ., Inc.*, 877 F.3d 1139, 1141 (9th Cir. 2017).   Although the *Eberline* majority opinion attempts to reconcile its approach with the Ninth Circuit's *Benjamin* decision, *see* 982 F.3d at 1015, the undersigned agrees with the dissenting judge in *Eberline* that in fact, the Ninth Circuit in *Benjamin* applied the approach that the majority in *Eberline* rejected, applying the primary beneficiary test to the entire relationship between the cosmetology students and the vocational school.   *See id.* at 1025; *Benjamin*, 877 F.3d at 1147-48.   Even assuming that *Eberline* does not conflict with Ninth Circuit authority, however, it does not support Defendants' application of a segmented approach because the reasoning of *Eberline* does not apply to the facts of this case.   In

57

particular, the court in *Eberline* found that a segmented approach was necessary to ensure that the FLSA's objective of ensuring that minimum wage would be paid to all employees and to avoid the creation of "zones of exploitation."   The segmentation Defendants ask the Court to apply here would achieve the opposite result, allowing employers to avoid paying minimum wage for employee training and creating the type of "zone of exploitation" the Sixth Circuit warned against in *Eberline*.

The most striking difference between this case and *Eberline*, however, is that the Plaintiffs here have an employment contract with Defendants that provides for the payment of compensation and expressly requires that Plaintiffs perform service throughout the calendar year for a period of seven years.  These are not students who have enrolled in a vocational school with the understanding that they would perform services, without compensation, as part of the practical training necessary to compete the training and obtain a license.  Nor are they comparable to the individuals in *Walling* – the seminal decision establishing the primary beneficiary test – where the plaintiffs received training before being hired with no guarantee that they would be hired at the end of the training and the trainees did not displace the company's regular employees, who performed most of the work of the company, or expedite the company's business.  *Walling*, 330 U.S. at 149;  *see also Donovan v. Am. Airlines, Inc*., 686 F.2d 267, 269 (5th Cir. 1982) (same).

Similarly, in *Petroski v. H & R Block Enterprises, LLC*, cited by Defendants in support of their "segmentation" argument, the plaintiffs were H&R Block tax preparers who were hired only for a single tax season and signed employment agreements that specifically stated that the terms of the agreement ended at the end of that tax season.  750 F.3d 976, 980 (8th Cir. 2014).  To be rehired for the next tax season, the tax preparer was required to complete the rehire training, file an application, sit for an interview and be offered a position.  *Id.*  Thus, although tax preparers completed "rehire training" between tax seasons so that they might be hired again for the next tax season, that training was not completed as part of the employment relationship.  *Id.*  Rather, the tax preparers were free to engage in other employment during the 8 or 9 months of the year between tax seasons.  *Id.* Unlike the tax preparers in *Petroski*, Plaintiffs here were obligated under the UPC to perform services throughout the calendar year over a period of years.

58

United States District Court
Northern District of California

1    In sum, the Court finds no authority that suggests that the segmented approach taken in

2    *Eberline* should be applied here to treat Plaintiffs as trainees rather than employees outside of the

3    Championship Season for the purposes of the FLSA and the state laws that follow the FLSA.

4    Accordingly, the Court GRANTS Plaintiffs' Partial Summary Judgment Motion and DENIES

5    Defendants' Partial Summary Judgment Motion on this issue.

### 4.   Whether MLB is a Joint Employer under the FLSA and relevant State Laws[18]

8    The FLSA defines "employer" as "any person acting directly or indirectly in the interest of

9    an employer in relation to an employee."  29 U.S.C. § 203(d).  The Ninth Circuit has "recognized

10   that the concept of joint employment should be defined expansively under the FLSA" to effectuate

11   its "broad remedial purpose."  *Torres-Lopez v. May*, 111 F.3d 633, 639 (9th Cir. 1997) (citations

12   omitted).  "[T]he definition of 'employer' under the FLSA is not limited by the common law

13   concept of 'employer.' "  *Lambert v. Ackerley*, 180 F.3d 997, 1011–12 (9th Cir. 1999).  "Where an

14   individual exercises 'control over the nature and structure of the employment relationship,' or

15   'economic control' over the relationship, that individual is an employer within the meaning of the

16   [FLSA] and is subject to liability."  *Id.* at 1012 (quoting *Bonnette v. Cal. Health & Welfare*

17   *Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983)).

18   To determine if a joint employment relationship exists, courts apply an "economic reality"

19   test.  *Bonnette*, 704 F.2d at 1470, disapproved of on other grounds by *Garcia v. San Antonio*

20   *Metro. Transit Auth.*, 469 U.S. 528 (1985).  This test "does not depend on 'isolated factors but

21   rather upon the circumstances of the whole activity.' "  *Id.* at 1469 (quoting *Rutherford Food*

22   *Corp. v. McComb*, 331 U.S. 722, 730 (1947)).  Among the factors courts consider in applying the

23   economic reality test are whether the alleged employer "(1) had the power to hire and fire the

24   employees, (2) supervised and controlled employee work schedules or conditions of employment,

25

26   ─────────────────

27   [18] The parties are in agreement that the standards that govern whether MLB is a joint employer
     under the FLSA are the same as those that are applied under the laws of Arizona, Florida, Oregon,
     Pennsylvania, Maryland, North Carolina, and New York.  Defendants' Opposition to Plaintiffs'
28   Partial Summary Judgment Motion at 2 n. 3.  As discussed below, California applies a different
     test.

(3) determined the rate and method of payment, and (4) maintained employment records." *Bonnette*, 704 F.2d at 1470. "The four factors . . . provide a useful framework for analysis . . . but they are not etched in stone" and are not to be "blindly applied." *Id.* The question of whether an entity is a joint employer is fact-intensive, *see e.g., Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1155 (C.D. Cal. 2003), but whether an entity is a "joint employer" under the FLSA is a question of law. *Torres-Lopez v. May*, 111 F.3d at 638. "[S]ummary judgment [on the joint employer question] may be proper even when some factors favor joint employment and others do not. *Johnson v. Serenity Transportation, Inc.*, No. 15-CV-02004-JSC, 2017 WL 1365112, at *5 (N.D. Cal. Apr. 14, 2017) (citing *Moreau v. Air France*, 356 F.3d 942, 952 (9th Cir. 2004)).

As a preliminary matter, the Court rejects Plaintiffs' assertion that the Ninth Circuit has already decided this question. In support of this assertion, Plaintiffs point to the following sentence in the Ninth Circuit's decision in this case: "MLB and its thirty franchise teams rely heavily on this extensive minor league system, which has nearly 200 affiliates across the country and employs approximately 6,000 minor league players." 934 F.3d at 923. In their brief, however, Plaintiffs provide only part of the sentence, supplying the following parenthetical: "MLB and its thirty franchise teams . . . employ[ ] approximately 6,000 minor league players." Plaintiffs' parenthetical is misleading as it is apparent that the quoted sentence, read in its entirety, states that "the minor league system . . . employs" minor league players. It does not clearly state that MLB employs the minor league players, as Plaintiffs suggest. Further, while Plaintiffs' interpretation of that sentence might be plausible if the Ninth Circuit had gone on to squarely address the joint employer issue, it did not do so. Therefore, the Court concludes that this question was not decided by the Ninth Circuit when it decided the appeal of the Court's class certification order.

Likewise, the Court concludes that the Ninth Circuit did not decide in *Miranda v. Selig* whether MLB is a joint employer of minor league players. It is true that the court in that case stated that "[m]inor league baseball players are employed and paid by MLB, and MLB employs minor league players with the hope that some of them will develop into major league players." 860 F.3d at 1242. The court was not addressing the question of whether MLB was a joint

employer, however, and in the fact section of the order it stated that "[e]ach *franchise* . . . employs 150 to 250 players who compete at the minor league level." *Id.* at 1238 (emphasis added).  Thus, the Court concludes the former statement was not intended to be a binding determination that MLB is a joint employer of minor league players.

Nor does the Court find that there is a firmly establish rule that sports leagues are joint employers of players who play for the affiliate members of a league, either under the National Labor Relations Act ("NLRA") or the FLSA, though there is no doubt that they may be.[19]  Rather, that question depends on the specific facts regarding the relationship between the players and league.  *See NASL*, 613 F.2d at 1382-1383 (recognizing "that minor differences in the underlying facts might justify different findings on the joint employer issue").

Here, Plaintiffs argue that the Fifth Circuit's decision in *NASL*, in which the court found that a sports league was a joint employer under the NLRA, is on point.  On the other hand, Defendants point to *Dawson v. Nat'l Collegiate Athletic Ass'n*, 932 F.3d 905, 910 (9th Cir. 2019), in which the Ninth Circuit found that the National Collegiate Athletic Association does not employ college athletes, in support of their argument that MLB is not a joint employer.  An

---

[19]For example, Plaintiffs point to Restatement of Employment Law § 1.04, illustration 8 (2015). Section 1.04(b) provides: " b) An individual is an employee of two or more joint employers if (i) the individual renders services to at least one of the employers and (ii) that employer and the other joint employers each control or supervise such rendering of services as provided in § 1.01(a)(3)." Section 1.01(a)(3), in turn, provides that "an individual renders services as an employee of an employer if . . . the employer controls the manner and means by which the individual renders services, or the employer otherwise effectively prevents the individual from rendering those services as an independent businessperson."  Illustration 8 of Section 1.04(b) states as follows:

> 8. Six entrepreneurs start a professional Women's Hockey League (WHL). Each secures the right to use a stadium appropriate for hockey in his or her respective city. Together they choose and hire a commissioner who is given the power to operate a draft to assign players to different teams, to set minimum and maximum salary levels, to develop procedures for the initiation and termination of player contracts, to establish a standard player's contract, and to arbitrate disputes between individual clubs and players. Control over player discipline is divided between the commissioner and the individual teams.

> Each player in the league is an employee of one of the six teams and of the WHL. Each team along with the WHL determines the working conditions and compensation of the team's players. The players offer joint service to the league and to the individual teams.

Restatement of Employment Law § 1.04 illus. 8 (2015).

United States District Court
Northern District of California

analysis of the reasoning and facts in those cases is instructive.

In *NASL*, the court addressed whether the National American Soccer League ("League") was a joint employer under the NLRA. 613 F.2d at 1382. Under the NLRA, "the existence of a joint employer relationship depends on the control which one employer exercises, or potentially exercises, over the labor relations policy of the other." *Id.* The court in that case upheld the NLRB's finding that the League and the member clubs were joint employers because the League "exercise[d] a significant degree of control over essential aspects of the clubs' labor relations, including but not limited to the selection, retention, and termination of the players, the terms of individual player contracts, dispute resolution and player discipline." *Id.* It further observed that "each club granted the [League] authority over not only its own labor relations but also, on its behalf, authority over the labor relations of the other member clubs." *Id.*

The court in *NASL* described the relationship between the League and the clubs as follows:

> The League's purpose is to promote the game of soccer through its supervision of competition among member clubs. Club activities are governed by the League constitution, and the regulations promulgated thereunder by a majority vote of the clubs. The commissioner, selected and compensated by the clubs, is the League's chief executive officer. A board of directors composed of one representative of each club assists him in managing the League.

*Id.* It went on to cite the following specific facts in support of its conclusion that the League was a joint employer: 1) the League imposed "restrictions on the means by which players [were] acquired" through "[a]n annual college draft . . . conducted by the commissioner pursuant to the regulations," though "the League exercise[d] less control over the acquisition of 'free agent' players and players 'on loan' from soccer clubs abroad"; 2) "the regulations govern[ed] interclub player trades and empower[ed] the commissioner to void trades not deemed to be in the best interest of the League"; 3) "[t]ermination of player contracts [was] conducted through a waiver system in accordance with procedures specified in the regulations"; 4) "[t]he League . . . exercise[d] considerable control over the contractual relationships between the clubs and their players" by requiring players to "sign a standard player contract adopted by the League [that] govern[ed] the player's relationship with his club"; requiring that clubs obtain the permission of the commissioner to alter any terms of the standard contract; and giving the Commissioner the

power to disapprove any contract deemed not in the best interest of the League; and 5) the League shared control over player discipline with the clubs and had "broad powers to discipline players for misconduct" "from fines to suspension to termination of the player's contract." *Id.*

In *Dawson v. Nat'l Collegiate Athletic Ass'n*, 932 F.3d 905, 910 (9th Cir. 2019), cited by Defendants, the plaintiff was a student athlete who played football at the University of Southern California ("USC") and asserted claims against the National Collegiate Athletic Association ("NCAA") and PAC-12 Conference ("PAC-12") under the FLSA and California labor law. The Ninth Circuit addressed whether the district court properly dismissed the plaintiff's FLSA claims on a motion to dismiss because the NCAA and PAC-12 were not his employers under the FLSA and found that it had. *Id.* at 908. The court noted that the plaintiff did not assert that USC was his employer and therefore, the "pure question of employment" was not before the court; thus, the court did not decide whether the plaintiff "had employment status as a football player" or if USC was his employer. *Id.* at 907.

The court in *Dawson* described the NCAA as "an 'unincorporated not-for-profit educational organization' comprised of more than 1,100 colleges and universities throughout the United States" and PAC-12 as "an unincorporated association which operates a multi-sport collegiate athletic conference[.]" *Id.* at 907. The relationship between the NCAA, the member institutions and the players is described as follows:

> NCAA member schools "agree to administer their athletics programs in accordance with the constitution, bylaws, and other legislation of the [NCAA]." The NCAA's constitution and bylaws establish academic eligibility requirements, provide guidelines and restrictions for recruitment, impose limits on the number and size of athletic scholarships, and regulate the scheduling and conditions of practice and games.

> The NCAA bylaws also govern financial aid and prohibit compensation for student-athletes. Bylaw 15.1 provides that student-athletes may receive financial aid on the basis of athletic ability, but that the amount of aid must not exceed "the value of his or her cost of attendance." Student-athletes receiving aid in excess of the cost of attendance limitation "shall not be eligible to participate in intercollegiate athletics."

> NCAA Bylaw 12.1.4 provides that financial aid is "not considered to be pay or the promise of pay for athletics skill." Bylaw 12.1.2 further prohibits any payment to a student-athlete for athletic services.

United States District Court
Northern District of California

> Student-athletes who accept payments may be subject to revocation
> of their amateur status and eligibility under seven conditions.

*Id.* at 907-908.

Applying the economic reality test, the court in *Dawson* listed three factors relevant to whether the NCAA and PAC-12 were the plaintiff's employers: 1) whether there was an "expectation of compensation"; 2) whether they had the power to hire and fire; and 3) whether there was evidence that an arrangement was "conceived or carried out" to evade the law, within the meaning of the FLSA and California labor law. *Id.* at 909 (citations omitted). As to the first factor, the court found that although the plaintiff received financial aid, there was no expectation of compensation as to the NCAA and PAC-12 because under the NCAA bylaws, the member schools awarded and paid the financial aid the plaintiff received. *Id.*

The court also found that the NCAA and PAC-12 did not have the power to hire and fire the plaintiff. *Id.* at 910. In reaching this conclusion, the court rejected the plaintiff's reliance on the NCAA's "pervasive regulation of college athletics." *Id.* It explained:

> The complaint . . . does not allege that the NCAA/PAC-12 "hire and fire," or exercise any other analogous control, over student-athletes. The complaint does not allege, and moreover, the record does not demonstrate, that the NCAA and PAC-12 choose the players on any Division I football team, nor that they engage in the actual supervision of the players' performance. Rather, the allegations of the complaint, taken as true, demonstrate that the NCAA functions as a regulator, and that the NCAA member schools, for whom the student-athletes allegedly render services, enforce regulations.

*Id.* The court further concluded that there was "no evidence tendered by Dawson that the NCAA rules were 'conceived or carried out' to evade the law." *Id.* It also rejected the plaintiff's argument that the NCAA was an employer because it profited from student athletes, finding that "revenue does not automatically engender or foreclose the existence of an employment relationship under the FLSA." *Id.* (citing *Alamo*, 471 U.S. at 296–97).

Finally, the court in *Dawson* found that the *Bonnette* factors pointed to the same conclusion. *Id.* at 911. The court observed that the *Bonnette* factors "prove particularly appropriate where (as in *Bonnette* itself) it is clear that some entity is an 'employer' and the question is which one." *Id.* at 911 (quotations and citation omitted). As this was not clear in *Dawson,* the court did not conduct a full-blown *Bonnette* analysis. Rather, its application of the

64

*Bonnette* factors consisted of the following brief discussion:

> They do not admit him to the school or pick him for the team; they cannot remove him from the team; they do not supervise his schedules or activities in practices or games; they do not maintain his scholastic records; and, although they put caps on what he may receive as a scholarship, they do not determine whether he gets a scholarship or in what amount.

*Id.* In sum, the court concluded that the NCAA and PAC-12 were not the plaintiff's employer but instead, "regulatory bodies." *Id.*

Plaintiffs contend MLB's relationship to Plaintiffs is like the relationship between the League and the players in *NASL* and that the Court here should reach the same conclusion that the Fifth Circuit reached in that case, albeit under the NLRA, namely, that MLB and the Clubs are joint employers of minor league players. Defendants argue that MLB, like the NCAA and PAC-12, is a regulatory body rather than Plaintiffs' joint employer. They further contend there are factual disputes relevant to the *Bonnette* factors that preclude summary judgment on this question. The Court finds, however, that there are many undisputed facts with respect to key features of MLB's relationship with Plaintiffs that are distinguishable from the facts of *Dawson* and that strongly support the conclusion that considering the "economic reality," MLB jointly employs minor league players and is not merely a regulatory body. Below, the Court considers the undisputed facts regarding the economic reality of MLB's relationship with minor league players and in particular, the four *Bonnette* factors.

a. Power to Hire and Fire

i. Contentions of the parties

Plaintiffs' Arguments

Plaintiffs argue that this factor points towards the conclusion that MLB is a joint employer because "MLB exerts control over the hiring of players (by identifying and screening prospects, collecting documents, administering the draft, and approving UPCs), the termination of players (through MLB's ability to terminate players for violating policies or anything not in the 'best interest of baseball'), and the re-hiring of retired players." Plaintiffs' Partial Summary Judgment Motion at 26. In particular, Plaintiffs point to evidence that MLB controls hiring in the following

respects:[20]

- **MLB's scouting activities**:  Plaintiffs point to evidence that MLB has its own scouting department, the Major League Scouting Bureau ("Scouting Bureau"), that assists the Clubs in identifying and evaluating amateur players in preparation for the First Year Draft.  *Id.* (citing, *inter alia*, Broshuis MPSJ Decl., Ex. 5 MLB0008914 at 8922 (MLB publication describing the scouting process and stating that the Scouting Bureau "seeks to provide the Clubs with as much information as it can on players it identifies as professional prospects[,]" "identif[ying] and report[ing] on more than 900 amateur players each year in preparation for the First Year Draft")).

- **Rule 4 Draft:**   Plaintiffs point to evidence that MLB conducts the First Year Player Draft pursuant to Rule 4 of the MLRs.  According to Plaintiffs, MLB uses a Draft Prospects Link requiring amateur players to upload required forms, including medical documents and a social media screening form allowing MLB to obtain consumer reports on the players' social media posts.  *Id.* at 23 (citing Broshuis MPSJ Decl., Ex. 6, MLB0031357 (survey regarding satisfaction with Draft Prospect Link platform); Ex. 69, MLB0031373 (description of  MLB's 2020 Pre-Draft Medical Program, requiring players to provide MLB with all medical records except those relating to medical conditions "that would not reasonably affect [the player's] ability to perform services as a baseball player")).  Plaintiffs also point to evidence that MLB: (1) "requires the top 200 amateur players that it selects to take a drug test or MLB will not allow them to sign a contract, *id.* (citing Broshuis MPSJ Decl., Ex. 5, MLB0008914 at 8922, 8928 (MLB publication stating that refusal to submit to drug testing upon request or to participate in MLB's Drug Prevention Program will render a player ineligible to participate in the draft or to sign a contract with any Club)); (2) assigns draft ID numbers to amateurs, *id.* (citing Broshuis MPSJ Decl., Ex. 7 (Mariners Tr. at 79-812)); (3) resolves all procedural and eligibility requirements (citing MLR 4(b)); (4) actually conducts the draft, *id.* (citing Broshuis MPSJ Decl., Ex. 5,

---

[20] The Court does not repeat here all of the extensive evidence cited by the parties but rather, provides only a sampling of significant evidence with respect to each of the *Bonnette* factors.

United States District Court
Northern District of California

MLB0008914 at 8923; Ex. 17, (Dodgers Tr. at 256)); and (5) broadcasts the draft on its own TV network, *id.* (citing Broshuis MPSJ Decl., Ex. 5, MLB0008914 at 8923; Ex. 8 (Krasik Tr. at 32-36)).

- **Control over selection of players not subject to Rule 4 draft:**  Plaintiffs points to evidence that MLB requires players not subject to Rule 4 (*i.e.*, players from outside of the United States and Canada) to undergo an age/identity verification process; if players do not pass, their contract is cancelled and they become ineligible to sign a contract for one year. *Id.* at 23-24 (citing evidence).

- **MLB control over contracting process**:  Plaintiffs acknowledge that it is the Clubs that actually select players for employment but contend MLB "has its hands on everything." *Id.* at 4.  They point to evidence that the language in the UPC is the same for every player and cannot be modified without MLB approval.  *Id.* (citing Broshuis MPSJ Decl., Ex. 5 at 8926 (MLB publication stating that all players selected under the Rule 4 draft must sign the UPC and that "[t]he language contained in every Minor League Player's UPC is identical and cannot be modified.")).  Plaintiffs also cite evidence that MLB reviews all UPCs for compliance and that a player cannot play for a Club until MLB has approved that player's UPC.  *Id.* (citing evidence).

Plaintiffs further contend MLB has significant control over the right to fire employees, sharing the power to fire players with the Clubs.  *Id.* at 25.  They point to Section 3 of the Major League Constitution, which authorizes the Commissioner to take "punitive action" against players, including declaring a player temporarily or permanently ineligible to play baseball with an MLB Club.  *Id.* (citing Broshuis MPSJ Decl., Ex. 1, Major League Constitution, § 3(a)).  Similarly, Plaintiffs contend, MLR 21 allows a player to be declared permanently ineligible to play baseball if he is found to have engaged in misconduct.  *Id.* (citing Broshuis MPSJ Decl., Ex. 2, MLR 21).  Moreover, a player may be suspended from baseball either temporarily or permanently, for violations of MLB's Drug Prevention Program, and if the suspension is permanent only the Commissioner has the discretion to reinstate a player who has successfully completed a treatment program.  *Id.* (citing Broshuis MPSJ Decl., Ex. 52, MLB publication describing "Major League

67

Baseball's Minor League Drug Prevention and Treatment Program," MLB003208 at 3222).

Finally, Plaintiffs cite evidence that it is up to the Commissioner to decide whether a player who has retired from minor league baseball can "un-retire." *Id.* (citing evidence).

Defendants' Arguments

In their Opposition to Plaintiffs' Partial Summary Judgment Motion, dkt. no. 1013, Defendants dispute that MLB has the power to hire and fire players. They argue instead that "[t]o the extent any facts are undisputed, they indicate that MLB does not have the power to hire or fire Players." Opposition to Plaintiffs' Partial Summary Judgment Motion at 7. They point out that it is the Clubs that decide which players to draft or sign and they provide evidence that MLB does not have the power to draft or sign a player to play for any particular Club. *Id.* (citing Declaration of Peter Woodfork, Senior Vice President, Minor League Operations & Development with the Office of the Commissioner of Baseball ("MLB Decl."), stating that "[s]ince 2008, MLB has had no power or authority to draft or sign any player to the roster of any MLB Club or any minor league affiliate"). They also cite evidence that it is the Clubs that decide whether to fire players. *Id.* (citing evidence).

Defendants minimize the role of the Scouting Bureau in drafting amateur players, arguing that it "plays a limited role in compiling information to assist individual Clubs assess Players before making their own draft selections." *Id.* (citing evidence). According to Defendants, the "[i]nformation collected by the Scouting Bureau is not determinative in Clubs' draft decisions and, in fact, Clubs independently research and scout high school and college athletes before the draft." *Id.* (citing evidence). As to MLB's role in drug testing and age and identity verification, Defendants contend this merely reflects MLB's regulatory role and does not demonstrate control over hiring that subjects them to liability under the FLSA as a joint employer. *Id.* at 7-8 (citing *Dawson*, 932 F.3d at 907-08, 910; *Montoya v. 3PD, Inc.*, 2014 WL 3385116, at *3 (D. Ariz. July 10, 2014)).

Defendants also argue that there are numerous factual disputes about the degree to which MLB was involved in minor league players' "scouting, recruitment, hiring, and/or terminations at all," citing player testimony "that they were signed by their respective Clubs, in most cases,

1    without any MLB involvement" and also released by the Clubs rather than by MLB.  *Id.* at 8

2    (citing evidence).  Although Defendants concede MLB has the power under the Major League

3    Constitution and/or the MLRs to deem players ineligible to play based on misconduct, it contends

4    that power is "very limited" and that "those circumstances are insufficient as a matter of law to

5    render MLB an employer within the meaning of the FLSA."  *Id.*  In particular, Defendants argue

6    that "the right to determine eligibility to play in a league is not equivalent to the authority to

7    hire or fire, as the Ninth Circuit has recognized specifically in the context of a sports association."

8    *Id.* (citing *Dawson*, 932 F.3d at 909).

9                        ii.  Discussion

10         In considering whether an entity has the power to hire and fire under *Bonnette*, the Ninth

11   Circuit takes a broad approach.  *See Torres-Lopez v. May*, 111 F.3d 633, 640 (9th Cir. 1997)

12   (considering whether the defendant had the "right*, directly or indirectly*, to hire, fire, or modify the

13   employment conditions of the workers") (quoting 29 C.F.R. § 500.20(h)(4)(ii)) (emphasis added).

14   This approach is illustrated in *Ruiz v. Fernandez*, 949 F. Supp. 2d 1055 (E.D. Wash. 2013).  In

15   that case, a ranching association made up of 200 sheep ranches was found to have had sufficient

16   control over hiring of sheepherders to be deemed a joint employer under the FLSA based, in part,

17   on its roles as a "gatekeeper" of the workers' employment.  *Ruiz v. Fernandez*, 949 F. Supp. 2d at

18   1067.  The ranching association in *Ruiz* recruited sheepherders from Chile and Peru through

19   recruitment coordinators, handled the workers' applications for H2-A visas with the Department

20   of Homeland Security and "set[ ] all key terms of the Plaintiffs' employment through the Pre–

21   Employment Notice that workers [were] required to sign before being transported to the member

22   ranch in the United States."  *Id.* at 1065-1067.  The Pre-Employment Notice set the wage the

23   sheepherders would be paid and informed them of the benefits they would receive; it also

24   informed them that they could be transferred between ranches.  *Id.*  Further, the court found that

25   the ranching association had sufficient control over firing to support the conclusion that it was a

26   joint employer because the association conceded that it could terminate the sheepherder's

27   employment, even though it did so in very "limited circumstances" and had not terminated any

28   worker "in recent memory."  *Id.* at 1067.

United States District Court
Northern District of California

United States District Court
Northern District of California

1       Here, the undisputed evidence establishes that MLB has significant control over hiring and

2   firing.  As to hiring, one of the most prominent features of MLB's role as a joint employer is that

3   it conducts the First-Year Player Draft, including requiring amateur players to upload forms and

4   provide medical records though MLB's online portal and undergo drug testing, among other

5   things.  In *NASL*, the court recognized that a college draft similar to the one conducted by MLB

6   was a reflection that the North American Soccer League exercised "a significant degree of control

7   over . . . the selection . . . of players" for the purposes of determining whether that entity was a

8   joint employer.  613 F.2d at 1382.  Likewise, the Restatement has offered such an arrangement as

9   an example of a joint employer relationship.  *See* Restatement of Employment Law § 1.04 illus. 8

10  (2015).  While neither *NASL* nor the Restatement applied the *Bonnette* factors, the Ninth Circuit

11  has repeatedly emphasized that the definition of "joint employer" under the FLSA is broad.  *See,*

12  *e.g., Lambert v. Ackerley*, 180 F.3d 997, 1011–12 (9th Cir. 1999).  Conversely, the Court has

13  found no case where the concept of a "joint employer" was found to be narrower under the FLSA

14  than under common law or the NLRA.

15      Further, the reasoning and holding in *Ruiz* support the conclusion that MLB's role in

16  conducting the First Year Player Draft is the sort of control over hiring that supports a finding

17  under *Bonnette* that an entity is a joint employer.  Although Defendants point to factual disputes as

18  to how much MLB is actually involved in the recruitment of any particular player, there can be no

19  doubt that MLB engages in formal recruiting on a significant scale and serves as a "gatekeeper"

20  for amateur players, who must comply with the rules established by MLB in order to participate in

21  the draft.  Nor is it of particular significance that it is the Clubs that actually select the players and

22  sign the contracts, especially as it is MLB that drafts the UPC and also must approve each player's

23  UPC before they are permitted to play.  *See Torres-Lopez v. May*, 111 F.3d at 637 (finding under

24  the FLSA that a farm was the joint employer of laborers who were supplied by an agricultural

25  contractor even though the contractor and not the farm hired the laborers, based in part on the fact

26  that the farm "controlled the overall harvest schedule and the number of workers needed for

27  harvesting by staggering the planting dates of the cucumbers" as well as "when to begin the

28  harvest"); *see also Antenor v. D & S Farms*, 88 F.3d 925, 935 (11th Cir. 1996) (holding that power

United States District Court
Northern District of California

1 to veto hiring decision of another employer supported finding that defendant was joint employer).

2 While the degree of control over hiring MLB exercises over players who do not participate

3 in the draft is somewhat less, it is still significant as these players must be cleared by MLB under

4 its age and identity verification program to be eligible to sign with any club.  Further, as to these

5 players MLB controls other important aspects of their employment, as discussed further below.

6 As to firing, the Court also finds that the undisputed facts establish that MLB has

7 significant control over all minor league players.  In particular, the Major League Constitution

8 gives the Commissioner the authority to take punitive action against a player for conduct deemed

9 by the Commissioner "not to be in the best interests of Baseball," including declaring a player

10 permanently ineligible to play.  *See* Major League Constitution, Art. II § 3.  As the court in *Ruiz*

11 found, it is not the frequency with which this occurs but the fact that MLB holds this power that is

12 significant, which supports a finding that MLB is a joint employer.

13 The Court rejects Defendants' argument based on *Dawson* that MLB's role with respect to

14 hiring and firing is merely "regulatory."  In *Dawson,* there was no allegation or finding that the

15 NCAA and PAC-12 engaged in the sort of "gatekeeping" function described above.  Nor was there

16 any allegation that the student athletes were offered admission to the colleges where they played

17 through a draft system.  And while NCAA could impose punishments on student athletes that

18 included declaring them ineligible to play, that punishment was not akin to "firing" them because

19 the students were not playing under a contract or receiving a salary; indeed, the court left open the

20 question of whether the players were employees at all.  *See* 932 F.3d at 907-910.

21 Therefore, the Court concludes that this factor strongly supports the conclusion that MLB

22 is a joint employer under the FLSA.

23 b.   Supervision of Work Schedules, Conditions of Employment

24 i.   Contentions of the Parties

25 Plaintiffs' Arguments

26 Plaintiffs contend the second *Bonnette* factor, control over schedules and the terms and

27 conditions of employment, also points to the conclusion that MLB is a joint employer.  Plaintiffs'

28 Partial Summary Judgment Motion at 26-29.  First, it points to the UPC that all first year players

must sign, which specifies "when services are to be performed ('on a calendar year basis'),"

"when wages are to be paid ('only during the actual championship playing season')[,]" and the

"length of employment (seven seasons)." *Id.* at 26 (citing UPC §§ VI.A & B). Plaintiffs further

assert that the UPC "requires compliance with 'all decisions of the Commissioner' . . . and

specifies that compliance with MLB's tobacco policy 'is a material term' of the contract." *Id.*

(citing UPC § VI.C. & E.). Plaintiffs also point to evidence that MLB controls the conditions of

employment through its drug testing program, *id.* at 26-27 (citing evidence), its On-Field Behavior

Policy, *id.* at 27 (citing evidence), its concussion rules, *id.* (citing evidence) and its playing surface

standards. *Id.* (citing evidence).

According to Plaintiffs, MLB also exercises joint control with the Clubs over scheduling.

*Id.* Plaintiffs concede that "MLB Clubs may have greater responsibility for overseeing a player's

activities on a given day, but they do so within the confines of MLB's rules." *Id.* In particular,

Plaintiffs point to MLR 32, governing "when and how many games can be scheduled[,]" its "pre-

game work policy[,]" which "governs the time allotted to each team for certain standard pre-game

activities like batting practice, stretching, and throwing," and recently enacted "pace of play" rules

that are applied to minor league games. *Id.* at 27-28 (citing evidence). Plaintiffs also point to two

examples of MLB's control over conditions of employment – a suspension by MLB of a player

due to a positive drug test *after* his release, which prevented him from re-signing with an MLB

club and ended his baseball career; and MLB's decision to suspend all minor league play in March

2020 in response to the pandemic. *Id.* at 28 (citing evidence).

Defendants' Arguments

Defendants argue this factor supports the conclusion that it is *not* a joint employer, citing

evidence that MLB does not control players' daily schedules or activities but instead, that these

matters are handled by the Clubs. Opposition to Plaintiffs' Partial Summary Judgment Motion at

9-10 (citing evidence). Defendants concede that the UPCs are "technically approved by MLB

after the Club and Player agree on terms" but contend "the evidence demonstrates that MLB's

approval is designed to ensure that Clubs are not signing Players to minor league UPCs in a

manner that circumvents the roster limitations for the Clubs' 40-man Major League Roster." *Id.*

at 10-11 (citing evidence).  Thus, they assert, "there is no evidence that MLB's imprimatur on Player contracts was for anything other than its role as a regulator (like the NCAA) to ensure a level playing field among the Clubs."  *Id.*  Moreover, they argue, "the UPC template is 'uniform' for administrative ease, and it reserves to Clubs the ability to negotiate material terms of their contract with each Player, including how much a Player is paid."  *Id.* at 11 (citing evidence). Finally, Defendants argue that "MLB's rules regarding drugs and tobacco use, safety (e.g., regarding protocols for return to play after a concussion), and game conditions to ensure fairness (e.g., regulating the types of bats, balls, and surface standards, etc.) also do not move the needle on joint employment" because "[t]hese types of regulatory and quality-control functions are insufficient to establish a joint-employer relationship under the FLSA."  *Id.*at 11-12 (citing *Singh v. 7-Eleven, Inc.*, No. C-05-04534RMW, 2007 WL 715488, at *5 (N.D. Cal. Mar. 8, 2007); *Dawson*, 932 F.3d at 902-910; *Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1161 (C.D. Cal. 2003)).

## ii.  Discussion

Under this factor, the Court must consider whether MLB "supervised and controlled employee work schedules or conditions of employment."  *Bonnette,* 704 F.2d at 1470.  As the use of the disjunctive suggests, this factor may support a finding that an entity is a joint employer even if it not involved in day-to-day scheduling and supervision of workers.  In *Bonnette*, for example, the state social service agencies that provided chore workers to in-home care recipients were found to exercise "considerable control over the structure and conditions of employment" even though the care recipients – and not the state agencies – were responsible for day-to-day supervision of the chore workers.  704 F.2d at 1470.  Therefore, this factor pointed toward a finding that the state agencies were joint employers.  *Id.*

Similarly, in *Ruiz,* it was undisputed that the sheepherding association did not supervise or control the sheepherders' day-to-day activities, which were handled by the ranches where the sheepherders worked, but the court nonetheless found that this factor pointed towards a joint employer relationship because it "exercised considerable control over the terms and conditions of [the sheepherders'] employment" with the ranches.  949 F. Supp. 2d at 1068.  The court pointed in

1    particular to the Pre-Employment Notice the association required the sheepherders to sign setting

2    forth "the general terms and conditions of the workers' employment with the member ranches."

3    *Id.*

4           Certain types of oversight or monitoring have been found insufficient to establish a joint

5    employer relationship where the entity does not control the workers' day-to-day activities.  For

6    example, in *Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1160 (C.D. Cal. 2003), the court

7    found that a manufacturer that purchased garments from a garment factory was not a joint

8    employer merely by virtue of the fact that it monitored the labor practices of the garment factory

9    under an anti-sweat shop initiative by the U.S. Department of Labor.  The court reasoned that

10   "holding [the manufacturer] to have exercised 'control' over [the garment factory] on the basis of

11   its monitoring activities, and therefore to be a joint employer with [the garment factory], would be

12   counterproductive and would create a disincentive for clothing designers and manufacturers to

13   monitor contractor shops to ensure compliance with the FLSA."  247 F. Supp. 2d at 1161.  On the

14   other hand, in *Torres*, the court found that the farm where the laborers worked exercised a

15   substantial degree of supervision over the laborers based on its "right to inspect all the work

16   performed by the farmworkers" and the fact that an official of the farm was in the fields on a daily

17   basis "to ensure that the farmworkers performed satisfactorily."  111 F.3d at 642.

18          Defendants cite as another example *Singh v. 7-Eleven, Inc.*, No. C-05-04534RMW, 2007

19   WL 715488 (N.D. Cal. Mar. 8, 2007).  In that case, an employee of an individual 7-Eleven store

20   sought to hold 7-Eleven (the owner of the franchise) liable for violations of the FLSA under a joint

21   employer theory.  The franchisee supervised all of the plaintiff's day-to-day activities, but the

22   plaintiff argued that 7-Eleven was a joint employer because it "controlled the terms and conditions

23   of the training, on-going training, and satisfaction of 7-Eleven service standards."  *Id.* at *4.  The

24   court disagreed, however, finding that 7-Eleven had only limited ability to enforce these terms and

25   conditions under the franchise agreement because it was not permitted under that agreement to

26   interfere with day-to-day operations.  *Id.* at *5.  Thus, the only remedy for violations of the service

27   standards by the employee was to terminate the franchise agreement entirely.  *Id.*

28          There appears to be no dispute that it is largely the Clubs and not MLB that supervise and

United States District Court
Northern District of California

74

control minor league players' day-to-day activities.  The question, then, is whether this factor supports a joint employer relationship because MLB has significant control over the terms and conditions of Plaintiffs' employment.  The Court finds that it does.  The Court places particular weight on MLB's imposition of a uniform contract on all First Year Players, which specifies that players will be obligated to provide services throughout the year for seven seasons but will only receive a salary during the championship seasons; and that players must "comply with all decisions of the Commissioner" under the MLRs.  UPC § VI.A., B. & C.  As in *Ruiz*, the use of a standard UPC drafted by MLB reflects significant control by MLB over the terms and conditions of employment.  Further, although not essential to the Court's conclusion, the undisputed evidence that MLB monitors and enforces tobacco and drug use policies, its On-Field Behavior Policy, and various other policies related to players' off-field conduct, lends further support to the Court's conclusion that this factor points towards the conclusion that MLB is a joint employer.

The Court is not persuaded by Defendants' argument that MLB's role is comparable to the monitoring role of the NCAA in *Dawson*, the garment manufacturer in *Zhao v. Bebe Stores, Inc.*, or 7-Eleven in *Singh v. 7-Eleven, Inc.*  In all of these cases, the facts are distinguishable because the alleged joint employers exercised much more limited control over the terms and conditions of the plaintiffs' employments.  Indeed, MLB's power to control the conditions of Plaintiffs' employment is so broad that it was able to unilaterally suspend all minor league play at the outset of the pandemic.  *See Torres*, 111 F.3d at 642 (citing as evidence that farm "exercised a substantial degree of supervision over the work performed by the farmworkers" the fact that the farm "called off the harvest one day because of a shortage of bins").

c.  Rate and Method of Payment

i.  Contentions of the Parties

Plaintiffs' Arguments

Plaintiffs argue that the third *Bonnette* factor demonstrates that MLB is a joint employer because MLB sets the salary for first-year players under the UPC and will not approve a higher salary.  Plaintiffs' Partial Summary Judgment Motion at 29 (citing, *inter alia*, MLR(c)(3)(2); Broshuis MPSJ Decl., Ex. 15, MLB003901 & Ex. 82, MLB0007429 (memoranda from MLB

listing 2015 and 2016 minor league salary limits)).  Likewise, Plaintiffs assert, the Clubs may not deviate from the standard provision under the UPC that players receive a salary only during the championship season.  *Id.* (citing evidence).  Further, according to Plaintiffs, even though there is more flexibility as to salary levels beyond the first year, MLB sets salary floors for such players that the Clubs must follow.  *Id.* at 30 (citing evidence).

Plaintiffs contend MLB also regulates the amount of signing bonuses, "sets the incentive bonuses paid upon advancement to upper levels of the minor leagues[,] … requires disability payments to be made if a player is disabled" and "sponsors a multiple employer pension plan . . . to provide benefits to eligible minor leaguers employed . . . with any Club."  *Id.* (citing evidence).  Further, Plaintiffs point to evidence that MLB "established and oversees the minor leaguers' joint insurance program that provides health, vision, and life insurance."  *Id.* (citing evidence).

Defendants' Arguments

Defendants contend "MLB's involvement in Player compensation decisions is, at most, extremely limited" and not sufficient to establish a joint employer relationship.  Opposition to Plaintiffs' Partial Summary Judgment Motion at 12.  According to Defendants, "MLB's limited involvement in Players' compensation or benefits administration is attenuated, at best, and to ensure fairness or compliance with league rules."  *Id.*  Defendants point out that it is the Clubs rather than MLB that actually pay Plaintiffs' salaries, signing bonuses, incentive bonuses, expenses, and benefits.  *Id.* (citing evidence).  As to Plaintiffs' assertion that MLB sets the salary of first-year players, Defendants argue that that fact is disputed.  *Id.*  In particular, Defendants contend, "the minimum salary for first-year Players is set by the Clubs, pursuant to a process in which MLB (*i.e.*, the Commissioner's Office) has no vote – MLB merely codifies in the Major League Rules the Clubs' collective determination regarding first-year salaries."  *Id.* (citing evidence).  Defendants argue that this level of control is even less than the control that was exercised in *Dawson* by the NCAA, which placed caps on the amount of the scholarship that the plaintiff could receive from the University, and therefore this evidence is insufficient to establish that MLB is a joint employer.  *Id.* at 12-13.

Defendants further assert that there is conflicting evidence as to whether the UPC

United States District Court
Northern District of California

precludes payment of players throughout the year, with Clubs "interpret[ing] for themselves whether salaries can be paid during extended spring training." *Id.* at 13 (citing evidence). Defendants also argue that the UPC "does not address whether payments besides salary (such as per diem, stipends, meal money, housing, etc.) can be made to Players outside of the Championship Season, which many Clubs provide to their Players." *Id.* Similarly, Defendants argue that the evidence is disputed as to whether "MLB established minimum salary standards beyond the first-year and 'unilaterally' increased the salary floors in 2020[,]" as Plaintiffs contend. *Id.* (citing Broshuis MPSJ Decl., Ex. 83, MLB0030694 (Feb. 14, 2020 memorandum from MLB to Club Owners and others entitled "Minor League Compensation" and stating, "After receiving input from each Club, beginning with the 2021 season, we will increase the minimum weekly minor league salaries as set forth below") ("February 14, 2020 MLB Memo")). They also point out that the February 14, 2020 MLB Memo makes clear that "Clubs . . . can exceed the minimum scale at their discretion for non-first year players" and argue that Clubs do, in fact, set their own salary scales and independently decide what to pay players. *Id.* (citing evidence). In any event, Defendants assert, evidence that MLB sets minimum salary levels is "insufficient to establish a joint-employer finding." *Id.* (citing *Abel v. Bridgeway Advantage Sols., Inc*., 2019 WL 160439, at *5-7 (D. Ariz. Jan. 10, 2019)). In addition, Defendants contend "Clubs also have authority to issue additional bonuses or special payments, without obtaining MLB's permission." *Id.* (citing evidence).

With respect to Plaintiffs' assertion that MLB regulates the amount of signing bonuses, Defendants argue that there are also disputed facts. *Id.* at 14. According to Defendants, "[w]hile MLB negotiates total signing bonus pools that Clubs can spend on all of their Players selected in the Rule 4 Draft, MLB does so 'acting on behalf of the 30 Clubs in collective bargaining with the Major League Players Association', which promotes competitive balance among the thirty Clubs." *Id.* (quoting Bloom Summary Judgment Opposition Decl., Ex. 80 (deposition of 30(b)(6) witness for Office of the Baseball Commissioner) at 264-265 (testifying about MLR(3)(c)(4), addressing signing bonus pools); and citing MLB Decl. ¶ 10 ("The thirty (30) MLB Clubs and the Major League Baseball Players Association agreed in collective bargaining to the implementation of

1    'signing bonus pools' with respect to the Rule 4 Draft.  Signing bonus pools promote competitive

2    balance among the thirty (30) MLB Clubs.")).  Moreover, Defendants assert, it is the Clubs that

3    negotiate and pay the signing bonuses.  *Id.* (citing evidence).

4        Defendants argue that it is irrelevant that MLB "was involved in sponsoring or

5    administering retirement or other benefit plans in which Players were eligible to participate"

6    because "[t]hese plans were funded . . . by Clubs and/or the Players themselves – not MLB."  *Id.*

7    (citing evidence).

8        Finally, Defendants contend none of the cases upon which Plaintiffs rely is on point

9    because all involved "alleged joint employers who furnished or guaranteed funds –  directly or

10   indirectly – used for purposes of paying employees' wages."  *Id.* at 14-15 (citing *Barfield v.*

11   *N.Y.C. Health & Hosps. Corp*., 537 F. 3d 132, 144 (2nd Cir. 2008); *Torres-Lopez*, 111 F.3d at

12   643; *Ruiz*, 949 F. Supp. 2d at 1069; *Arredondo v. Delano Farms Co*., 922 F. Supp. 2d 1071, 1085

13   (E.D. Cal. 2013)).

                                    ii.  Discussion

15       Under the third *Bonnette* factor, courts consider whether the alleged joint employer

16   "determined the rate and method of payment."  *Bonnette*, 704 F.2d at 1470.  While this factor

17   clearly supports a joint employer finding where an entity actually pays the workers' wage or salary

18   and handles the payroll, the Ninth Circuit defines this factor broadly to encompass other types of

19   "control of payment and the payroll" as well, including "the power to determine the pay rates or

20   the methods of payment of the workers."  *Torres-Lopez*, 111 F.3d at 643.  Thus, in *Torres-Lopez*,

21   the court found that this factor supported the conclusion that the farm where the laborers worked

22   was a joint employer, even though the labor contractor paid the laborers' wages and the farm "was

23   not involved in preparing the farmworkers' payroll or directly paying their wages," because the

24   farm "exercised *some power* in determining the pay rates for the farmworkers[.]"  *Id.* at 643

25   (emphasis added).

26       The facts of *Torres-Lopez* indicate that the alleged joint employer need not have the

27   ultimate authority to set workers' pay rate in order for this factor to support a finding of joint

28   employment.  To the contrary, in *Torres-Lopez*, the power the farm exercised over the

United States District Court
Northern District of California

78

determination of wages was quite limited.  The district court found that this factor did not support a finding that the farm was a joint employer, citing undisputed evidence that the farm was required to pay the labor contractor half of the proceeds that the farm received for the cucumbers the laborers picked and that if the farm paid the contractor more than 50% of its proceeds the contractor was "free to retain the increase" rather than raise the laborers' wages.  *Id.*  The district court made clear that the farm had "no influence" over the labor contractor in determining whether the excess payment would be passed on to the laborers in the form of higher wages.  *Id.*  Nonetheless, the Ninth Circuit disagreed with the district court's legal conclusion, citing the undisputed fact that the farm increased the *labor contractor's* compensation during the early part of the harvest "in order *to allow the farmworkers* to draw higher wages."  *Id.* (emphasis added).  Indeed, Judge Aldisert highlighted in his dissent that although the farm at one point expressed concern to the contractor that the laborers be paid at least minimum wage and increased its payments to the contractor during the early part of the harvest, there was  "no evidence" that the farm required the contractor "to pay at any particular rate"; rather, the contractor "had the sole power to determine the pay rates and the methods of payment for the workers."  *Id.* at 647.

Defendants here attempt to establish a myriad of factual disputes with respect to this factor, but their arguments are unpersuasive because they are based on a rigid interpretation of this factor that assumes a greater degree of control is required than is consistent with the case law discussed above.  Applying the proper standard, the Court concludes that even Defendants' version of the facts establishes that this factor favors Plaintiffs' position.  First, there can be no doubt that MLB exercises some power with respect to setting the amount to be paid to first-year players under the UPC.  The payment of a uniform rate for first-year minor leaguers is required under the MLRs, which are themselves promulgated by MLB.  *See* Broshuis MPSJ Decl., Ex. 2, MLR 3.  In particular, the setting of this rate is governed by MLR 3(b)(2), which provides that "[t]he minimum salary in each season covered by a Minor League Uniform Player Contract shall be the minimum amount established from time to time by the Major League Clubs for each Minor League classification or League."  *Id.*  The fact that the salary rates that are established under this rule are the product of a vote by the Clubs – and that MLB does not have a vote of its own – does

United States District Court
Northern District of California

1   not change the fact that the adoption of these uniform salary rates is itself an act of MLB because a

2   vote taken by an association in compliance with its bylaws and rules is a binding act of the

3   association, as Defendants conceded at the February 11, 2022 motion hearing.  *See* 7 C.J.S.

4   Associations § 17.  Further, Defendants concede that MLB does not allow Clubs to pay first-year

5   players a salary that is higher than the uniform salary adopted by MLB for all first-year players.

6          Second, Defendants do not meaningfully dispute that MLB has significant control with

7   respect to setting minimum salaries for all players.  The primary evidence the parties cite on this

8   issue is the February 14, 2020 Memo.  *See* Broshuis MPSJ Decl., Ex. 83, MLB0030694 (Feb. 14,

9   2020 MLB Memo).  In that memorandum, MLB discussed its goal to "modernize MLB's player

10  development system in order to provide a better experience for minor league players."  *Id.*  It

11  stated that some of its specific objectives "only can be achieved with agreement of the National

12  Association" but that it could "move forward unilaterally" with the goal of "improving

13  compensation for minor league players."  *Id.*  The memorandum went on to state:  "[A]fter

14  receiving input from each Club, beginning with the 2021 season, we will increase the minimum

15  weekly minor league salaries as set forth below.  Clubs, of course, can exceed the minimum scale

16  at their discretion for non-first year players."  *Id.*  A chart followed, listing the current minimum

17  rates and the amount each rate was to be increased.  *Id.*  Although Defendants point to the

18  reference to receiving "input" from the Clubs on the new rates, it is clear that MLB made the

19  ultimate determination as to the new minimum rates.  Even to the extent the memorandum

20  indicates the same issue was "discussed at the owners meeting" this could at most establish that

21  the Clubs ratified the decision, which would still be a decision by MLB.  Therefore, the Court

22  finds MLB exercised substantial control in setting minimum salary rates for minor league players.

23         Third, there is no dispute that MLB sponsors a variety of benefit programs for minor

24  league players.  This reflects control over player benefits even if it is the Clubs that actually fund

25  these benefit plans (which is also undisputed).

26         Therefore, the Court concludes that this *Bonnette* factor supports the conclusion the MLB

27  is Plaintiffs' joint employer.

28

1                          d.   Maintenance of Employment Records

2                                i.   Contentions of the Parties

3    Plaintiffs' Arguments

4          Plaintiffs contend the fourth *Bonnette* factor also establishes that MLB is a joint employer

5    because the undisputed evidence shows that MLB collects and stores a multitude of records

6    relating to minor league players.  Plaintiffs' Partial Summary Judgment Motion at 31-32.  In

7    particular, they assert that the Scouting Bureau scouts "collect eligibility questionnaires, health

8    information, age verification documents, and draft written assessments on players that are

9    maintained by MLB."  *Id.* at 31 (citing evidence).  Plaintiffs further assert that "[t]he

10   recordkeeping mushrooms after the player signs a UPC" and those records are maintained in

11   MLB's record repository, its Electronic Baseball Information System ("eBIS").  *Id.* (citing

12   evidence).  According to Plaintiffs, all UPCs and salary addenda are stored in eBIS; also stored in

13   eBIS are "player biographical information, transaction history, contracts, rosters, payroll

14   information, potential free agent information, statistical information[,]" "records tracking drug and

15   tobacco violations and suspensions[,]" "medical records[,]" "records tracking  College

16   Scholarship Plan payments[,]" and pension records related to the pension plan MLB sponsors.  *Id.*

17   at 31-32 (citing evidence).

18   Defendants' Arguments

19         Defendants argue that the evidence as to this factor is insufficient and that there are factual

20   disputes that preclude summary judgment.  Opposition to Plaintiffs' Partial Summary Judgment

21   Motion at 15-16.  They contend "the individual Clubs – not MLB – maintain personnel and

22   payroll records, and all other human resources-type information, such as IRS documents,

23   documents related to health and retirement benefits, beneficiary designations, immigration forms,

24   emergency contact information, and the like."  *Id.* at 15 (citing evidence).  They further assert that

25   "the Clubs – not MLB – maintain documentation with respect to participation in the Training

26   Seasons, and arrangements for transportation and lodging [them][,]" which is stored in "player

27   files."  *Id.* (citing evidence).   According to Defendants, Plaintiffs "grossly exaggerate the

28   significance" of eBIS, which is a repository for information that is "essential to the administration

of a sports league—not that of an employer." *Id.*  In particular, they assert, eBIS is a "central repository of Player transactions and contract information for purposes of tracking Player movement between affiliates and across different Clubs" and "does not contain any information with respect to Players' hours, daily activities, the manner and method of payment, and other forms of remuneration." *Id.* (citing evidence).  Defendants further assert that "eBIS says nothing about Players' participation in any of the Training season." *Id.* at 15-16.  Such record-keeping is merely "ministerial," Defendants contend, and therefore is insufficient as a matter of law to satisfy this *Bonnette* factor.  *Id.* at 16 (citing *Singh*, 2007 WL 715488, at *6; *Johnson v. Serenity Transp., Inc.*, 2017 WL 1365112, at *10 (N.D. Cal. Apr. 14, 2017); *Gessele v. Jack in the Box, Inc.*, 2016 WL 7223324, at *13 (D. Or. Dec. 13, 2016)).

ii.   Discussion

The fourth *Bonnette* factor asks whether the alleged joint employer "maintained employment records." *Bonnette*, 704 F.2d at 1470 (9th Cir. 1983).  Here, there are many categories of documents that MLB undisputedly maintains relating to minor league players;[21] the dispute is whether they are "employment" documents.

Defendants' position is based on a narrow understanding of what constitutes an "employment" record.  They argued at the motion hearing that employment records are limited to the types of documents that are typically found in an employee personnel file, such as paperwork relating to intake, immigration status, and payroll. Plaintiffs do not disagree that those sorts of documents are employment records, but contend the term sweeps more broadly, encompassing the types of documents that were found to point in favor of a joint employer relationship in *Ruiz*, which included "employment contracts, labor certifications, travel information," records of

---

[21] At the February 11, 2022 motion hearing, Defendants stipulated that MLB maintains a file in the eBIS system on each player that contains, *inter alia*, the player's UPC and any addenda to it, the draft date and transactional history of the player, and whether he appeared on the "injured" list or was released.  Defendants also did not dispute that they collect and maintain (though not necessarily in the eBis system) medical records of the players, records relating any drug or tobacco violations and records of any discipline or suspensions of the player.  Finally, Defendants conceded that they maintain records relating to MLB's role as the sponsor of the players' health insurance plan, though they contend the players' enrollment documents are maintained by the Clubs.

workers' transfers between work locations, and complaints by or about a worker.  949 F. Supp. 2d at 1070.  The Court concludes that Plaintiffs are correct.  As discussed above, the Ninth Circuit has "recognized that the concept of joint employment should be defined expansively under the FLSA[.]"  *Torres-Lopez v. May*, 111 F.3d at 639.  Defendants' position flies in the face of that established rule and they have pointed to no authority suggesting that their constricted interpretation of the term is correct.  This Court agrees with the Court in *Ruiz* that a worker's employment contract is an employment record, as are documents related to the workers' job assignments and transfers and records of past infractions or discipline.  The Court therefore concludes based on the undisputed evidence that MLB maintains some employment records for minor league players and that this factor supports the conclusion that it is a joint employer.

Defendants' reliance on *Johnson v. Serenity Transportation, Inc*., No. 15-CV-02004-JSC, 2017 WL 1365112, at *10 (N.D. Cal. Apr. 14, 2017), to avoid this result is misplaced because the facts are distinguishable.  In *Johnson*, the court explained that "[m]aintaining records for purposes of ensuring regulatory compliance or monitoring safety does not constitute maintenance of employment records to satisfy this *Bonnette* factor."  *Johnson v. Serenity Transportation, Inc*., No. 15-CV-02004-JSC, 2017 WL 1365112 (N.D. Cal. Apr. 14, 2017).  In that case, FLSA claims were asserted by mortuary drivers who worked as removal technicians for a mortuary service (Serenity) under contracts that classified them as independent contractors.  *Id.*  at *1.  Serenity, in turn, entered into a contract with a company (SCI) that operated funeral homes and cemeteries, among other things, for the services of Serenity's mortuary drivers.  *Id.* at *2.  The court in *Johnson* was faced with the question of whether SCI was the drivers' joint employer.  *Id.* at *4.  In applying the fourth *Bonette* factor, the court found that certain forms the drivers were required to provide SCI for each removal – "Witness of Removal," "Chain of Custody and Identification Confirmation," and "Personal Effects Inventory" forms – were not employment records for the purposes of *Bonnette* even though they could be used to determine which driver performed each removal.  *Id.*  The court reasoned that these records were not used for monitoring and disciplining drivers but instead, primarily for quality control, accepting the company's argument that "the purposes of all of this paperwork was 'simply to keep track of the identity of the decedents delivered,' as the

California funeral code requires, 'not to keep track of the delivery drivers.' " *Id.* (citation

omitted). The court found that there were only two occasions where these documents were used to

resolve a problem relating to a particular technician and that the company did not maintain

individual files on the drivers and therefore concluded that the evidence relating to records

maintained by the company was "not enough to draw a reasonable inference that [it] maintained

employee records on the removal technicians." *Id.*

In *Johnson*, in contrast to the undisputed facts here, there is no suggestion that SCI

maintained individual files for each driver that contained each driver's employment contract. Nor

is there any indication that SCI maintained a systematic record of the drivers' assignments and

disciplinary records. Likewise, SCI did not require all applicants to submit medical records and

did not maintain any documents at all about employee benefits sponsored by Serenity or SCI. And

although the documents maintained by SCI incidentally disclosed drivers' names, the types of

documents it maintained and the way they were stored (*i.e.*, not in individual files for each driver),

reflected little control over the drivers by SCI. The opposite is true of the documents maintained

by MLB.

Finally, the Court rejects Defendants' reliance on *Singh*, 2007 WL 715488 (N.D. Cal. Mar.

8, 2007), and *Gessele v. Jack in the Box, Inc.*, 2016 WL 7223324 (D. Or. Dec. 13, 2016). Both

cases involved the relationship between a franchisor and a franchisee, applying the rule that

providing a "payroll service to a franchisee's employees does not in any manner create an indicia

of control over labor relations sufficient to demonstrate that the franchisor is a joint employer."

*Singh v. 7-Eleven, Inc.*, 2007 WL 715488, at *6 (quoting *Hatcher v. Augustus*, 956 F. Supp. 387,

392 (E.D.N.Y.1997); and citing *Scales v. Sonic Indus., Inc.*, 887 F. Supp. 1435, 1439 (E.D. Okla.

1995)); *see also Gessele v. Jack in the Box, Inc.*, No. 3:14-CV-1092-BR, 2016 WL 7223324, at

*11 (D. Or. Dec. 13, 2016) (holding that franchisor was not joint employer based on facts that the

court found were similar to the facts in *Singh*). The records maintained by the franchisors in those

cases were not comparable to the records maintained by MLB here and therefore, these cases do

not support Defendants' position.

1

e.   Conclusion

2

In sum, based on the facts that are not disputed, the Court concludes that the economic

3

reality and the *Bonnette* factors establish, as a matter of law, that MLB is a joint employer under

4

the FLSA and all asserted state laws, other than California which is addressed in the next section.

5

### 5.   Whether MLB is a Joint Employer under California Law

6

Under California labor law, courts look to the definition of "employer" promulgated by the

7

Industrial Welfare Commission ("IWC") when deciding state wage and hour claims.  *Torres v. Air*

8

*to Ground Servs., Inc.*, 300 F.R.D. 386, 394 (C.D. Cal. 2014) (citing *Martinez v. Combs*, 49 Cal.

9

4th 35, 68 (2010), as modified (June 9, 2010)).  In *Martinez*, the California Supreme Court

10

admonished that "[c]ourts must give the IWC's wage orders independent effect in order to protect

11

the commission's delegated authority to enforce the state's wage laws and, as appropriate, to

12

provide greater protection to workers than federal law affords."  49 Cal. 4th at 68.  The IWC

13

defines "employer" as a person who "employs or exercises control over the wages, hours, or

14

working conditions of any person."  *Id.* at 59 (quoting Wage Order No. 14 (Cal. Code Regs., tit. 8,

15

§ 11140, subd. 2(F)).  "To employ, then, under the IWC's definition, has three alternative

16

definitions. It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to

17

suffer or permit to work, *or* (c) to engage, thereby creating a common law employment

18

relationship."  *Id.* at 64 (emphasis in original).  The Court finds that Plaintiffs have satisfied the

19

first test based on undisputed evidence for the same reasons it concludes that the *Bonnette* factors

20

support a finding that MLB is a joint employer under federal law.  The Court need not reach the

21

other two tests that may be applied to this question under California law.  Therefore, Plaintiffs are

22

entitled to summary judgment on this issue as well.

23

### 6.   Whether Plaintiffs Performed "Work" During the Training Season

24

a.  Contentions of the Parties

25

Plaintiffs assert that they are entitled to summary judgment finding that they performed at

26

least *some* work during Arizona and Florida training.  Plaintiffs' Partial Summary Judgment

27

Motion at 36-37.  They point out that the UPC requires players to perform services on a calendar

28

year basis and specifically provides that it is in "full force and effect throughout the calendar year,

United States District Court
Northern District of California

including . . . Club's training season[.]" *Id.* at 36 (citing UPC § VI.B.).  Plaintiffs note that on

appeal, the Ninth Circuit found that this language "strongly indicates that [spring training] is

mandatory[.]" *Id.* (quoting *Senne*, 934 F.3d at 923-924, and citing player testimony that

attendance is mandatory).  Plaintiffs argue that regardless of whether participation is required,

however, the undisputed evidence establishes that they performed some work during training

season because under all of the relevant laws (the FLSA, Arizona and Florida law), "work" occurs

when an employee is "suffered or permitted" to work.  *Id.* at 37 (citing *Senne*, 934 F.3d at 943

(citing Ariz. Rev. Stat. Ann. § 23-362; Ariz. Admin. Code. § R20-5-1202(19); 29 C.F.R. §

778.223)).  Plaintiffs contend there is no genuine dispute that they were permitted to work during

spring training, pointing to thousands of spring training itineraries and schedules produced by

Defendants.  *Id.* (citing Broshuis MPSJ Decl., Ex. 94, Kriegler Supp. Report at ¶¶ 107-18 & pp.

195-96 (summarizing data)).  They also point to the Ninth Circuit's observation on appeal that

"the team schedules will serve to conclusively demonstrate that the players spent time working for

which they were uncompensated."  *Id.* (quoting 934 F.3d at 943).

Plaintiffs contend the schedules and itineraries produced by Defendants "consistently show

extensive, team-related activities, including – at minimum – supervised activities like team

stretches, followed by team throwing, team defense, team hitting, and very often games against

other teams."  *Id.* at 37-38 (citing Broshuis MPSJ Decl., Ex. 94, Kriegler Supp. Report at ¶ 44).

They further contend "Defendants' witnesses consistently testified that, while the itineraries are

not perfect, they could think of no better indicator of the activities that took place on a given day."

*Id.* at 38 (citing evidence).

Defendants oppose summary judgment on the question of whether Plaintiffs performed at

least some work during the training season.  First, they argue that Plaintiffs' request for summary

judgment on this question fails because Defendants are entitled to summary judgment that

Plaintiffs are not employees during the training season.  Opposition to Plaintiffs' Partial Summary

Judgment Motion at 37.  Even if Plaintiffs are employees during the training season, Defendants

assert, there are material disputes of fact about whether they performed "work" under 29 C.F.R. §

785.27.  *Id.*

b. Discussion

Under the FLSA, "[a]s a general rule the term 'hours worked' will include: (a) All time during which an employee is required to be on duty or to be on the employer's premises or at a prescribed workplace and (b) all time during which an employee is suffered or permitted to work whether or not he is required to do so." *Senne*, 934 F.3d at 943 (quoting 29 C.F.R. § 778.223). The Ninth Circuit has found in this case that the same standard applies under Florida law. *See id.* at n. 22 (relying on FLSA with respect to Florida law governing "hours worked" based on Section 24 of the Florida Constitution). Under Arizona law, " '[h]ours worked' means all hours for which an employee covered under the Act is employed and required to give to the employer, including all time during which an employee is on duty or at a prescribed work place and all time the employee is suffered or permitted to work." *Id.* (citing Ariz. Rev. Stat. Ann. § 23-362; Ariz. Admin. Code. § R20-5-1202(19)).

The Ninth Circuit has already found that under this broad definition of "work," if the players are "employees" "and defendants are unable to prove that any affirmative defenses apply, the team schedules will serve to conclusively demonstrate that the players spent time working for which they were uncompensated." *Id.* Further, the undersigned has found in favor of Plaintiffs on the "employee" question and agrees that the schedules and itineraries are evidence that some work was performed during spring training. Defendants' challenges to the accuracy of these schedules and itineraries may be legitimate with respect to damages but they have pointed to no evidence from which a reasonable jury could conclude that no work at all was performed during spring training.

Defendants' reliance on 29 C.F.R. § 785.27 is misplaced. This regulation sets forth four requirements, all of which must be met in order for job-related training to be non-compensable under the FLSA, providing as follows:

> Attendance at lectures, meetings, training programs and similar activities need not be counted as working time if the following four criteria are met:
>
> (a)  Attendance is outside of the employee's regular working hours;
>
> (b)  Attendance is in fact voluntary;

(c) The course, lecture, or meeting is not directly related to the employee's job; and

(d) The employee does not perform any productive work during such attendance.

29 C.F.R. § 785.27.  Defendants contend there are disputed issues of fact as to each of the four factors of this test but the Court finds that there is no genuine dispute of fact that at least some of the activities reflected on the team schedules and itineraries, involving on-field team training, is directly related to the minor league players' job.  Because the third requirement of this regulation is not satisfied, the regulation does not apply and the Court does not reach the remaining requirements.  Therefore, the Court finds, as a matter of law, that *some* work was performed during the Arizona and Florida training seasons.

### 7.  Whether Travel Time is Compensable

a.   Contentions of the parties

Plaintiffs contend they are entitled to summary judgment that time spent travelling to and from away games during the Arizona and Florida training seasons and during the California League is compensable for the Arizona, Florida, and California Classes and the FLSA Collective. Plaintiffs' Partial Summary Judgment Motion at 38-40.  As to the Arizona and Florida classes, Plaintiffs point to the rule that "[t]ime spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked."  *Id.* at 38 (quoting 29 C.F.R. § 785.38).  Plaintiffs contend that during spring training, "players arrive at the home stadium first and perform activities throughout the morning" and then they "travel by team bus to the away game."  *Id.* at 38-39 (citing Broshuis MPSJ Decl., Ex. 91 at 55-58 (deposition of Baltimore Orioles 30(b)(6) witness testifying that during spring training, "[g]enerally, the games are at one o'clock" and typically players arrive at the field at 8:30 or 9:00 and engage in various types of training in the morning before taking a bus to the opposing team if that day's game is an away game)).  According to Plaintiffs, the players also return in the bus to the home field and therefore, all of this travel time is part of the players' continuous work day.  *Id.* at 39.

Similarly, as to the California class, Plaintiffs contend, travel time is compensable because

88

1    under California law, "employees who [are] required to meet at a designated site and then travel

2    together to the worksite [have] to be paid for that travel time." *Id.* (citing *Morillion v. Royal*

3    *Packing Co.*, 22 Cal. 4th 575, 586-88 (2000)).  According to Plaintiffs, it is the level of the

4    employers' control over the employee during travel time that is determinative.  *Id.* (citing

5    *Morillion*, 22 Cal. 4th at 586-588; *Cleveland v. Groceryworks.com, LLC.*, 200 F. Supp. 3d 924,

6    951 (N.D. Cal. 2016)).  Plaintiffs contend this is true even for overnight trips involving multiple

7    days of away work.  *Id.* (citing California Division of Labor Standards Enforcement ("DLSE")

8    Opinion Letter 2002.02.21 ("2002 Opinion Letter")).

9        In support of their argument that travel to away games is compensable work, Plaintiffs

10   point to the UPC, which requires players to "use the mode of transportation furnished by Club to

11   and from all 'abroad' games at all times."  *Id.* (quoting UPC § X).  They further assert that "[i]n

12   the California League, this is done by bus; players are required to meet at a designated location

13   (the stadium) and travel on team buses to the location where the game will be played."  *Id.* at 39-

14   40 (citing Broshuis MPSJ Decl., Ex. 68 at 196 (Kansas City Royals 30(b)(6) witness testimony

15   that during spring training, travel to away games is on "a bus provided for the players' safety" and

16   further testifying, "[w]e don't allow our players to drive to other facilities. We make sure

17   everybody gets there together, it's a team."); Ex. 100 at 59-61 (Oakland Athletics' 30(b)(6)

18   witness testifying that teams were required to travel together to away games and that either vans or

19   buses were provided for that purpose)).

20       Defendants contend Plaintiffs have presented insufficient evidence to establish as a matter

21   of law that during the training season, players travel by bus from the home stadium to away games

22   *after* engaging in training activities at the home stadium in the morning.  Opposition to Plaintiffs'

23   Partial Summary Judgment Motion at 39.  They note that the single deposition cited by Plaintiffs

24   in connection with spring training travel (Broshuis MPSJ Decl., Ex. 91, testimony of Baltimore

25   Orioles 30(b)(6) witness) was offered by a Club that has been dismissed from the case and in any

26   event, that witness testified only as to what "generally" occurs during spring training.  *Id.* at 39-40.

27   According to Defendants, "[i]t is impossible for this Court to determine that 'travel takes place

28   after the workday has already begun' . . . for every away game, in every Training Season, for

every single Club, from this singular excerpt of murky testimony." *Id.* (quoting Plaintiffs' Partial Summary Judgment Motion at 38).

Defendants further assert that the schedules themselves undermine Plaintiffs' assertion, pointing to four examples in which away games were scheduled in the morning, before any training activities occurred at the home stadium. *Id.* at 40 (citing Bloom Summary Judgment Opposition Decl., Ex. 101, MIN0017504 (spring training schedule for a day when away game was scheduled for 10 a.m. and two affiliates were scheduled to depart on a 7 a.m. bus, before any listed activities); Ex. 104, OAK0009829 (spring training schedule for a day when away game was scheduled for 10 a.m. and bus was scheduled to depart at 7:45 a.m., before any listed activities); Ex. 100, KAN0027769 (spring training schedule for a day when away game was scheduled to begin at 10 a.m. and bus was schedule to depart at 8:30 a.m., before any listed activities); Ex. 99, CHC0031519 (bus for Extended Spring Training day when away game was scheduled to begin at 10 a.m. and bus was scheduled to depart at 9:10 a.m., before any listed activities)). According to Defendants, because there is a genuine dispute of fact as to "whether all travel during the Training Seasons occurred after performing activities in the morning, Plaintiffs have not established that all travel is part of the 'continuous workday' or that it is compensable." *Id.* (citing *Levias v. Pac. Maritime Ass'n*, 760 F. Supp. 2d 1036, 1052-53 (W.D. Wash. 2011)).

Defendants argue further that even if Plaintiffs were correct that all travel time is compensable, "this issue is irrelevant because Plaintiffs have absolutely no record evidence of travel time in the Training Seasons." *Id.* at 40. This challenge is based on Defendants' position (also asserted in Defendants' *Daubert* motions) that "Plaintiffs' entire calculation of alleged 'hours worked' during the Training Seasons rests exclusively on the survey, which did not separately quantify travel time, but instead only asked Players for the time they 'most often' arrived at and departed their training facility." *Id.* (citing dkt. no 696 ¶ 37, Attachment 5; dkt. no. 969 at 7-10; dkt. no. 971 at 6-7; Bloom Summary Judgment Opposition Decl., Ex. 95 (Dennis 99:16-101:13), Ex. 96 (Kriegler 67:3-23)).

Defendants also reject Plaintiffs' argument that travel time of the California League Players is compensable "because it is done by team bus, and under their reading of California law,

travel using employer-provided transportation is compensable." *Id.* at 40 (citing Plaintiffs' Partial Summary Judgment Motion at 39-40).  Defendants contend the "snippet" of deposition testimony of the Oakland Athletics' 30(b)(6) witness offered by Plaintiffs in support of their position is insufficient to establish that all travel occurs on a Club-provided bus – especially as that witness testified "only that the '[m]ajority' of their affiliates travelled by bus." *Id.* (citing Broshuis MPSJ Decl., Ex. 100 at 59-60).

Defendants further assert that there are material disputes of fact as to whether minor league players in the California League always take the team bus to the game, citing evidence that in some cases players use their own vehicles to travel to away games. *Id.* at 41 (citing Bloom Summary Judgment Opposition Decl., Ex. 11 at 219-220 (deposition testimony of named Plaintiff Lauren Gagnier that one of the affiliates allowed players to sign a waiver and take their own cars on "road trips" rather than the team bus but that he did not remember if he had ever used his own car); Ex. 123, MLBGAGN0000544-45 (email from Club stating, "if you are driving on the next road trip, please sign a release waiver" and alerting players that the hotels charged parking fees); Ex. 53 at 254 (testimony of Larry Broadway that "more often than not" players were required to take the team bus but exceptions were made when players were "[t]ransferred in between affiliates and they  drove their vehicle to the new site and they met the team on the road[,]" or where players were "traded, promoted, demoted, [or had] special circumstance with [their] wife")).

In their Reply, Plaintiffs argue that Defendants do not dispute that it is the general practice during the training season for players to perform morning activities before traveling to away games and that such time is compensable as part of the continuous workday.  Reply in Support of Plaintiffs' Motion for Partial Summary Judgment at 17 (citing deposition testimony).  As to the four schedules cited by Defendants where away games were scheduled earlier in the day and players were transported to the away game before any listed morning activities, Plaintiffs argue that "even these exceptional schedules show that the players were still required to meet by a set time at the Arizona and Florida complexes – the first job site – where they had to change into uniforms and load the bus before going to the second job site, and then return to the home complex after the game." *Id.* at 18 (citing deposition testimony).  Thus, Plaintiffs contend, this

1    travel time also is compensable. *Id.* (citing 29 CFR § 785.38) ("[w]here an employee is required

2    to report at a meeting place to receive instructions or to perform other work there, or to pick up

3    and to carry tools, the travel from the designated place to the work place is part of the day's work,

4    and must be counted as hours worked.").

5          With respect to the California League travel, Plaintiffs assert that while Defendants "focus

6    entirely on whether California League travel 'universally occurs on a Club-provided bus[,]' [they]

7    did not actually identify a single instance of a California League player traveling by any other

8    mode other than the team bus[.]" *Id.* Plaintiffs also contend it is undisputed that "the UPC

9    requires players to 'use the mode of transportation furnished by Club to and from all "abroad"

10   games at all times.' " *Id.* (citing UPC § X). In any event, Plaintiffs assert, they are entitled to

11   summary judgment as to the California League even if some players did not take the team bus

12   because under California law, any compelled travel gives rise to an obligation on the part of the

13   employer to compensate the employee for the time spent getting to and from that event. *Id.*

14   (citing 2002 Opinion Letter).

15              b.   Discussion

16                  i.   Compensability of Travel Time Under the FLSA, Florida and Arizona

17                       Law[22]

18          To establish that they are entitled to summary judgment that travel time during the training

19   seasons is compensable, Plaintiffs rely on the continuous workday rule, which is an exception to

20   the general rule that travel is not compensable unless it is part of the employee's "principal

21   activity." 29 C.F.R. § 785.38. Under the continuous workday exception, even if the travel is not

22   part of the employee's principal activity, it is compensable if it "occur[s] after the employee

23   commences to perform the first principal activity on a particular workday and before he ceases the

24   performance of the last principal activity on a particular workday." 29 C.F.R. § 790.6(a); *see also*

25   *IBP, Inc. v. Alvarez*, 546 U.S. 21, 28–29 (2005) (noting that "the Department of Labor has adopted

26   the continuous workday rule, which means that the 'workday' is generally defined as 'the period

27   _____

28   [22] The parties stipulated at the February 16, 2022 motion hearing that for the purposes of travel
     time, Florida and Arizona law mirror the FLSA.

1    between the commencement and completion on the same workday of an employee's principal

2    activity or activities.' ").

3         Here, the undisputed facts establish that during the training season, minor league players

4    are required to take the team bus (or some other mode of team transport) to away games.  In

5    particular, Section X of the UPC provides, in relevant part:

> Club will provide Player with the mode and class of transportation of
> its choice from "home" to "abroad" games and back. Player agrees to
> use the mode of transportation furnished by Club to and from all
> "abroad" games at all times.

9    Broshuis MPSJ Decl., Ex. 2, MLR Attachment 3 (UPC) § X.  Nor have Defendants pointed to any

10   evidence that players take other forms of transportation to away games during the training season.

11   Rather, the only evidence they offered to defeat summary judgment on this issue were a handful of

12   schedules showing that on occasion, the team bus left before any scheduled activities and

13   therefore, that not *all* team travel to away games falls under the continuous workday rule.

14        The Court partially agrees with Defendants.  As there is evidence that in some instances

15   buses to away games left before any scheduled activities, the Court cannot hold as a matter of law

16   that *all* travel to away games during the training season is compensable.  Rather, as to travel to

17   away games that occurred before any scheduled activities there are factual disputes as to whether

18   the players performed any of their principal activities (even if not reflected on the itineraries) after

19   they arrived at the stadium to take the bus.  *See* 29 C.F.R. § 785.38 ("Where an employee is

20   required to report at a meeting place to receive instructions or to perform other work there, or to

21   pick up and to carry tools, the travel from the designated place to the work place is part of the

22   day's work, and must be counted as hours worked.").  The Court notes that at the February 16,

23   2022 motion hearing, the parties agreed that team buses always leave from the home stadium,

24   even if there are no scheduled activities before the bus departs, but Defendants did *not* agree with

25   Plaintiffs' assertion that players always change into their uniforms at the stadium before leaving

26   on the bus.  Further, Plaintiffs did not support that assertion with specific evidence.  Plaintiff also

27   did not point to undisputed facts showing that the players performed any other activities on these

28   early game days that were not listed on the itineraries and that started the continuous work day.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Nonetheless, the Court finds that the Plaintiffs are entitled to summary judgment of a more

2    limited nature on this issue.  In particular, the Court finds that Plaintiffs are entitled to summary

3    judgment that travel time on team buses (or other modes of team transport, such as vans) to away

4    games during the training season is compensable so long as the bus was not scheduled to leave

5    before any other scheduled activities.  Therefore, the Court grants in part and denies in part

6    Plaintiffs' request for summary judgment on this issue with respect to the FLSA, Florida and

7    Arizona claims as set forth above.

8    ii.   Compensability of Travel Time Under California Law

9    Under California law, whether travel time is compensable depends on "[t]he level of the

10   employer's control over its employees."  *Morillion v. Royal Packing Co*., 22 Cal. 4th 575, 587

11   (2000), as modified (May 10, 2000).  Thus, in *Morillion*, the court found that where employees

12   were required to meet for work each day at a specified location to be picked up by buses provided

13   by the employer and transported to the fields where they would spend their work day, the time

14   they spent traveling on the bus was compensable.  *Id.* at 578.  The court explained that the

15   employees were under the control of the employer while riding the bus, even though they could

16   use the time to read or sleep, because they could not "use the time effectively for their own

17   purposes."  *Id.*  at 586 (internal quotation and citation omitted).  For example, "during the bus ride

18   [the] plaintiffs could not drop off their children at school, stop for breakfast before work, or run

19   other errands requiring the use of a car."  *Id.*  The court rejected the employer's argument that its

20   definition of "hours worked" was so broad that it would encompass any activity that was required

21   by the employer, such as shaving to comply with an employer's grooming policy.  *Id.*  The court

22   emphasized that it was the *level* of control that mattered, contrasting the employees in that case

23   with employee who "commute to work on their own" and thus can "decide when to leave, which

24   route to take to work, and which mode of transportation to use."  *Id.*   The court noted that

25   employees who commute on their own also "may be able to run errands before work and to leave

26   from work early for personal appointments."  *Id.*

27   Plaintiffs have also pointed to a DLSE Opinion letter concluding that under California law

28   and *Morillion*, a California employee who flew to Texas for a required multi-day training program

United States District Court
Northern District of California

was entitled to be compensated for the time he spent traveling to and from Texas, though not for

time spent taking breaks from travel.  The 2002 Opinion Letter characterized California law on

this issue as follows:

> Under state law, if an employer requires an employee to attend an out-of-town business meeting, training session, or any other event, the employer cannot disclaim an obligation to pay for the employee's time in getting to and from the location of that event. Time spent driving, or as a passenger on an airplane, train, bus, taxi cab or car, or other mode of transport, in traveling to and from this out-of-town event, and time spent waiting to purchase a ticket, check baggage, or get on board, is, under such circumstances, time spent carrying out the employer's directives, and thus, can only be characterized as time in which the employee is subject to the employer's control. Such compelled travel time therefore constitutes compensable "hours worked." On the other hand, time spent taking a break from travel in order to eat a meal, sleep, or engage in purely personal pursuits not connected with traveling or making necessary travel connections (such as, for example, spending an extra day in a city before the start or following the conclusion of a conference in order to sightsee), is not compensable.

2002 Opinion Letter at p.3.  The 2002 Opinion Letter also states that under California law, travel

time to attend required business meetings or events is considered "hours worked" "whether or not

the travel takes place during regular work hours, and whether or not the business trip includes an

overnight stay." *Id.* at p. 2.

There is some tension between the broad language of the 2002 Opinion Letter– which

Defendants did not address in their brief – and the court's discussion of travel time in *Morillion*.

In *Morillion*, the court implied that where employees have the option of commuting to work in

their own cars, the time spent commuting is not compensable because the employer does not

exercise sufficient control over the employee to qualify that time as "hours worked." 22 Cal. 4th at

578;  *see also  Overton v. Walt Disney Co*., 136 Cal. App. 4th 263, 271 (2006), as modified (Feb.

1, 2006) ("employers may provide optional free transportation to employees without having to pay

them for their travel time, as long as employers do not require employees to use this

transportation.").  Thus, the statement in the Opinion Letter that even same-day travel where the

employee travels by car constitutes "hours worked" so long as the travel is in connection with a

required meeting or event cannot mean that California law treats the regular commute time of an

employee who travels to work in their own car as compensable (even though the employer

United States District Court
Northern District of California

1   requires the employee to come to work). Rather, the 2002 Opinion Letter must be read in a more

2   limited manner as applying to required meetings and events that are not part of employees' regular

3   commute.  Where or how this distinction should be drawn in the context of this case was not been

4   addressed by the parties in their briefs.

5          The Court has no difficulty concluding that under *Morillon*, Plaintiffs are entitled to

6   summary judgment that travel to away games by the California Class members on team-supplied

7   transportation (whether buses or vans or some other vehicle) constitutes compensable time.  The

8   only issue is whether a fact question remains as to travel to away games by players who may have

9   been permitted to drive their own cars to away games.  Though a close call, the Court concludes

10  Plaintiffs are entitled to summary judgment on that question as well.

11         Although Defendants assert that Plaintiffs are not entitled to summary judgment as to the

12  California class because some players did not take the team bus, the evidence they cite on this

13  point is extremely thin.  First, Defendants contend the deposition testimony cited by Plaintiffs on

14  this issue by the 30(b)(6) witness for the Oakland Athletics shows that players did not *always* take

15  the team bus, pointing to that witness's statement that a "majority" of the teams use buses to travel

16  to away games.  *See* Broshuis MPSJ Decl., Ex. 100 at 59-61.  Read in context, however, this

17  statement appears merely to have been referencing the fact that some affiliates use vans rather than

18  buses.  *See id.*  In the deposition excerpt provided, this witness offered no testimony suggesting

19  that minor league players are permitted to travel to away games on their own during the

20  Championship Season.

21         Second, although Defendants point to some evidence suggesting that there may be

22  circumstances when players during the Championship Season are permitted to sign a waiver and

23  travel to away games using their own cars, they have not offered any specific evidence of a player

24  ever having actually done so.  This omission is particularly significant in light of Defendants'

25  failure to respond to Plaintiffs' argument based on the 2002 Opinion Letter that even travel in a

26  players' own car is compensable time under California law to the extent it constitutes travel to a

27  required work event.  As discussed above, the Court concludes that under California law this rule

28  likely does not encompass regular commute time, but Defendants offered neither evidence nor

96

United States District Court
Northern District of California

1  authority demonstrating that California class members traveled to *any* away games in their own

2  cars at all, much less under circumstances where that travel would constitute the player's regular

3  commute.   Because Defendants failed to point to any specific facts from which a jury could

4  conclude that any minor league players traveled to away games during the Championship Season

5  using their own cars where that travel could be found to constitute the player's regular commute,

6  the Court rejects Defendants' argument at the motion hearing that summary judgment on this issue

7  would be improper.

8  　　Therefore, the Court grants Plaintiffs' request for summary judgment that travel to away

9  games in the California League during the Championship season is compensable.

10  　　**8.   Whether Creative Professional Exemption Applies**

11  　　　　a.  Contentions of the Parties

12  Plaintiffs' Arguments

13  　　Plaintiffs argue that the creative professional exemption defense,[23] which Defendants

14  assert under the FLSA and the laws of California, Maryland, New York, North Carolina, Oregon,

15  and Pennsylvania, fails as a matter of law because the undisputed evidence establishes that the

16  requirements for that exemption are not met.  Plaintiffs' Partial Summary Judgment Motion at 40-

17  46.

18  　　First, Plaintiffs contend Defendants cannot meet the "salary basis test" under the FLSA,

19  which requires the worker must be "[c]ompensated on a salary or fee basis at a rate of not less than

20  $455 per week." *Id.* at 40 (quoting 29 C.F.R. § 541.300).[24] According to Plaintiffs, "a person is

21  paid on a salary basis by receiving the same amount weekly or less frequently." *Id.* at 41 (citing

22  29 C.F.R. § 541.602(a)(1)). Moreover, they assert, "[t]he employee 'must receive the full salary

23  for *any week* in which the employee performs *any work* without regard to the number of days or

24  hours worked.' " *Id.* (quoting 29 C.F.R. § 541.602(a)(1) (emphasis added by Plaintiffs)).

25  Plaintiffs argue that because all minor league players perform at least some work during the

26  

27  ────────────

[23] Plaintiffs refer to this defense as the "creative artist exemption" while Defendants use "creative professional exemption."  While the Court uses the latter terminology, there appears to be no meaningful difference between these terms.

28  [24] According to Plaintiffs, the weekly minimum increased to $684 in 2019.  *Id.*

training season and are not compensated for that work (because no salary is paid outside of the Championship Season), Defendants cannot satisfy this requirement. *Id.* at 41-42.

Plaintiffs argue further that Defendants cannot satisfy the second requirement of the FLSA's creative professional exemption, which requires that the "employee's primary duty must be the performance of work requiring invention, imagination, originality or talent *in a recognized field of artistic or creative endeavor as opposed to routine mental manual mechanical or physical work*." *Id.* at 42 (quoting 29 C.F.R. § 541.302(a) (emphasis added by Plaintiffs)). According to Plaintiffs, "[r]ecognized fields of artistic or creative endeavors include 'music, writing, acting and the graphic arts.' " *Id.* (quoting 29 C.F.R. § 541.302(b)). They further point out that the examples offered in the regulation "include 'actors, musicians, composers, conductors, and soloists,' 'cartoonists,' 'essayists, novelists, short-story writers and screen play writers,' and certain other types of writers" while failing to mention "any sports-related (or athletics-related) job in the enumerated list of recognized fields." *Id.* (quoting 29 C.F.R. § 541.302(c)).

In addition, Plaintiffs cite the opinions of their expert, Dr. Erica Groshen, who has opined that the skills involved in being a baseball player or athlete are "very different from those required of the examples of jobs listed in the regulation." *Id.* at 42-43 (citing Broshuis MPSJ Decl., Ex. 101 (Expert Rebuttal Report of Erica Groshen ("Groshen Report") at 28-36). Based on Dr. Groshen's opinions, Plaintiffs argue that "[u]nlike the recognized artistic or creative jobs, a baseball player relies on physical skills." *Id.* at 43 (citing evidence). Plaintiffs further contend the work of a baseball player involves repetitive actions and therefore, their work falls outside of the creative artist exemption under 29 C.F.R. § 541.3 (providing that "[t]he section 13(a)(1) exemptions and the regulations in this part do not apply to manual laborers or other 'blue collar' workers who perform work involving repetitive operations with their hands, physical skill and energy."). *Id.* at 43-44 (citing evidence).

Third, Plaintiffs argue that the creative professional exemption defense also fails under Florida law for the reasons discussed above because Florida follows the FLSA on this issue. *Id.* at

United States District Court
Northern District of California

44.[25]

Finally, as to the California class, Plaintiffs contend the creative professional exemption fails for several additional reasons. *Id.* at 44-46. As a preliminary matter, Plaintiffs contend that to the extent the exemption does not apply under the FLSA it also cannot apply under California wage law, which "must be at least as protective of the employee as the corresponding federal standards." *Id.* at 44 (quoting *Negri v. Koning & Assocs.*, 216 Cal. App. 4th 392, 398 (2013)). Further, Plaintiffs assert, California follows the federal salary basis test and therefore, Defendants cannot satisfy this requirement under California law for the same reason they cannot meet this requirement under the FLSA, namely, minor leaguers are not paid any salary outside of the championship season even though they perform training work during that time. *Id.* (citing *Negri v. Koning & Assocs.*, 216 Cal. 4th at 398; *Ugorji v. Cty. of Lake*, No. 4:20-CV-01448-YGR, 2020 WL 3639647, at *12 (N.D. Cal. July 6, 2020)).

Plaintiffs also point to the fact that California law provides that the salary paid "must be 'no less than two (2) times the state minimum wage for full-time employment' of 40 hours per week." *Id.* at 45 (quoting IWC Wage Order 4-2001(1)(3)(d)). According to Plaintiffs, "[b]ased on the minimum wage in a given year, that means a class member would have had to have been paid at least $640 per week in 2010 (or roughly $2560 per month) and at least $1120 per week in 2021 (or roughly $4480 per month)." *Id.* But Plaintiffs contend their expert found based on an analysis of the payroll data "that 98.1 percent of the time players' paychecks failed to meet these requirements." *Id.* (citing Broshuis MPSJ Decl., Ex. 94 (Kriegler Supp. Report) ¶ 157).

Plaintiffs contend Defendants also cannot satisfy California's version of the primary duty test, which like the FLSA requires that work must be in "a recognized field of artistic endeavor" but also requires that work must be "predominantly intellectual and varied in character" and the worker "must regularly exercise[ ] discretion and independent judgment." *Id.* (quoting IWC Wage Order 4-2001(1)(3)). Plaintiffs assert that "[n]o one could seriously claim that minor league baseball players perform 'predominately intellectual' work, nor do they regularly exercise

---

[25] As noted above, however, Defendants stipulated at the motion hearing that they are not asserting this defense as to Plaintiffs' Florida law claims.

'discretion and independent judgment' because the work under the constant supervision of coaches, strength coaches, trainers, coordinators, and other superiors." *Id.* (citing evidence).

Defendants' Arguments

Defendants contend there are material disputes of fact as to both requirements of the creative professional exemption, that is, the salary basis test and the primary duty test. Opposition to Plaintiffs' Partial Summary Judgment Motion at 41-49. Defendants contend courts "routinely deny motions seeking summary judgment" on the primary duty question because "this difficult and intensive factual inquiry is inappropriate at summary judgment." *Id.* at 42 (quoting *DeLuca v. Sirius XM Radio, Inc.,* No. 12-CV-8239 (CM), 2017 WL 3671038, at *26 (S.D.N.Y. Aug. 7, 2017)). According to Defendants, Plaintiffs do not dispute that minor league players satisfy the first part of the primary duty requirement, that they "perform[ ] . . .work requiring invention, imagination, originality or talent[.]" *Id.* (quoting 29 CFR § 541.302(a)). Rather, Plaintiffs argue that baseball is not a "recognized field of artistic or creative endeavor opposed to routine mental, manual, mechanical or physical work" – an issue that is "hotly contested." *Id.*

Defendants argue Plaintiffs' reliance on the fact that baseball is not listed in the regulations as an example of a creative profession is misplaced because that list is not exhaustive. *Id .*(citing § 541.302(b)). For example, they contend that in one of the cases cited by Plaintiffs, *Hurst v. Youngelson*, 354 F. Supp. 3d 1362, 1383 (N.D. Ga. 2019), the court found that exotic dancing was a creative profession even though that profession was not listed in the examples in the regulations. *Id.* Defendants further assert that there is "ample" evidence that baseball is a creative endeavor. *Id.* at 43. According to Defendants, " 'creative' endeavors are distinct from those for which 'can be produced by a person with general . . . training.' " *Id.* (quoting 29 C.F.R. § 541.302(a)). Applying this distinction, "Defendants dispute that any ordinary person can become a professional baseball player simply through training alone" and cite the testimony of "numerous Players" "as to the intrinsic, natural talent required in order to succeed in professional baseball." *Id.* at 43-44.

Defendants also challenge Plaintiffs' argument that minor league players "are engaged in a profession involving 'repetitive operations' as opposed to a creative endeavor." *Id.* at 44 (citing 29 C.F.R. § 541.3(a)). Rather than performing repetitive tasks, they contend, the players are

United States District Court
Northern District of California

"constantly tweaking and adjusting their approaches in an effort to improve their skills and to account for nuances in the game." *Id.* (citing evidence). Defendants also dispute that baseball is exclusively physical under 29 C.F.R. § 541.3(a) rather than creative. *Id.* at 45 (citing evidence). Defendants further challenge Plaintiffs' reliance on the opinions of their expert, Dr. Groshen, arguing that her opinions on this issue should be excluded (for the reasons set forth in Defendants' *Daubert* motion). *Id.* In any event, they assert, Dr. Groshen's opinion that minor league players' duties are not *primarily* creative implicates factual questions about the creative aspect of the players' activities that are not suitable for resolution on summary judgment. *Id.* at 45-46. Defendants also criticize Dr. Groshen's opinion that baseball players' duties are not creative because "creativity" "is not listed as a top trait amongst athletes" by the Bureau of Labor Standards. *Id.* at 46. They contend this reasoning is flawed because the Bureau of Labor Standards also does not list creativity as a top trait for musicians and yet that profession is presumptively creative under the regulations. *Id.* (citing 29 C.F.R. § 541.302; Groshen Report at ¶¶ 86-87).

Defendants argue that California law imposes additional requirements with respect to the primary duties test that are fact intensive and therefore further support the conclusion that summary judgment in favor of Plaintiffs is inappropriate. *Id.* In particular, it requires that "exempt individuals exercise 'discretion and independent judgment' in the performance of their duties; and that their duties should be 'predominantly intellectual and varied in character.' " *Id.* (citing Plaintiffs' Partial Summary Judgment Motion at 45-46; IWC Wage Order 4-2001(1)(A)(3)(b)(iii)). According to Defendants, these requirements "exacerbate" the factual disputes on this question. *Id.* (citing *Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 832-33 (9th Cir. 2011)). Defendants cite evidence they contend shows that minor league players "exhibited a great deal of discretion and independent judgment in the performance of their duties." *Id.* at 47 (citing evidence).

Defendants also contend "certain players" meet the FLSA's salary basis test because during the Championship Season, they were paid more than the minimum required weekly salary under the FLSA and relevant state laws. *Id.* at 48-49 (citing evidence). They note in a footnote

1    that New York law does not impose a minimum salary requirement for this defense and therefore

2    their affirmative defense as to claims under New York law turn only on whether the primary duties

3    test is met.[26]  *Id.* n. 118.  In another footnote, Defendants reject Plaintiffs' argument that the salary

4    basis test is not met because players receive no salary outside of the Championship Season,

5    stating:

6           To be clear, Defendants do not maintain that the exemption applies to
            any portion of the year outside the Championship Season to the extent
7           Players are not paid on a salary basis during those periods. Because
            Players indisputably are not "employees" performing "work" under
8           the relevant laws outside the Championship Season, it is irrelevant
            that they do not receive a salary during these times of the year.
9

10   *Id.* n. 119.

11              b. Discussion

12          The FLSA exempts from minimum wage and overtime requirements "any employee

13   employed in a bona fide . . . professional capacity . . . as such terms are defined and delimited

14   from time to time by regulations of the Secretary[.]"  29 U.S.C. § 213(a)(1).  "An 'employer who

15   claims an exemption from the FLSA has the burden of showing that the exemption applies.' "

16   *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1124–25 (9th Cir. 2002) (quoting *Donovan v.*

17   *Nekton, Inc.*, 703 F.2d 1148, 1151 (9th Cir. 1983)).  FLSA exemptions should be given a "fair"

18   interpretation.  *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

19          As relevant here, the regulations define "employee employed in a bona fide professional

20   capacity" as any employee:

21          1)  Compensated on a salary or fee basis pursuant to § 541.600 at a
                rate of not less than $684 per week (or $455 per week if employed
22              in the Commonwealth of the Northern Mariana Islands, Guam,
                Puerto Rico, or the U.S. Virgin Islands by employers other than
23              the Federal government, or $380 per week if employed in
                American Samoa by employers other than the Federal
24              government), exclusive of board, lodging or other facilities; and

25          2)  Whose primary duty is the performance of work:

26              . . .

27   _____

28   [26] At the February 16, 2022 motion hearing, Plaintiffs stipulated that there is no salary basis test
     under New York law.

United States District Court
Northern District of California

1

2

      (ii) Requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor.

3   29 C.F.R. § 541.300.   Because the regulation is "worded in the conjunctive, . . . failure to comply

4   with one of the standards provided is dispositive of the question, and it is unnecessary to consider

5   the other requirements." *Craig v. Far W. Eng'g Co*., 265 F.2d 251, 260 (9th Cir. 1959).

6        Here, the Court finds that the undisputed facts establish that the salary basis test under the

7   FLSA and all of the asserted state laws except New York (which does not have a salary basis test)

8   is not satisfied as to the FLSA collective and Rule 23 classes because: 1) it is undisputed that

9   under the minor league UPC these players receive *no*  salary outside of the Championship Season;

10   and 2) for the reasons discussed above, the players are employees throughout the calendar year

11   and perform work outside of the Championship Season, pursuant to the requirements of the UPC.

12   Defendants attempt to avoid this result by limiting the defense to the Championship Season, when

13   players receive a salary, *see*  Opposition to Plaintiffs' Partial Summary Judgment Motion at 48 n.

14   119,  but they do not point to any authority that suggests that such a reading of the exemption is

15   proper. Nor has the Court found any authority that suggests that an employee may be

16   simultaneously classified as a qualifying creative professional during one portion of the year and a

17   non-qualifying employee during another portion of the year where that employee is bound by a

18   contract that governs the relationship between the employee and the employer for the entire

19   calendar year.

20        The regulations also plainly contradict Defendants' argument. The regulations provide that

21   as a "[g]eneral rule [ ] [a]n employee will be considered to be paid on a 'salary basis' . . . if the

22   employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined

23   amount constituting all or part of the employee's compensation, which amount is not subject to

24   reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. §

25   541.602(a).  Thus, with limited exceptions not relevant here, "an exempt employee must receive

26   the full salary for any week in which the employee performs any work without regard to the

27   number of days or hours worked."  29 C.F.R. § 541.602(a)(1).  Instead, Plaintiffs are year-round

28   employees who are, pursuant to the UPC, paid a salary only during the period of the year when

United States District Court
Northern District of California

their work involves playing championship games and who are not paid a salary when they engage in training work.  In other words, their compensation is reduced (to nothing) based on the "quality . . . of the work performed."  This undisputed fact precludes Defendants from asserting this exemption as a defense to any claims asserted by the FLSA collective or the Rule 23 classes or any individual claims asserted under the laws of California, Maryland, North Carolina, Oregon, and Pennsylvania.

The Court further finds, as a matter of law, that although Plaintiffs' work certainly requires talent, their primary duties are not in "a *recognized* field of artistic or creative endeavor."  29 C.F.R. § 541.302(a) (emphasis added).  While this determination must be made on a "case-by-case basis," the lengthy list of examples offered in the regulations is indicative of the types of professions that meet this requirement.  29 C.F.R. § 541.302(c).  In particular, it lists "actors, musicians, composers, conductors, and soloists; painters who at most are given the subject matter of their painting; cartoonists who are merely told the title or underlying concept of a cartoon and must rely on their own creative ability to express the concept; essayists, novelists, short-story writers and screen-play writers who choose their own subjects and hand in a finished piece of work to their employers (the majority of such persons are, of course, not employees but self-employed); and persons holding the more responsible writing positions in advertising agencies." *Id.* The omission of any type of professional sport in the regulation is a strong indication that professional baseball is not a "recognized" field of artistic or creative endeavor and that professional athletes were not intended to fall under this exemption. *See Garcia v. Pancho Villa's of Huntington Vill., Inc*., No. CV 09-486 ETB, 2011 WL 1431978, at *3 (E.D.N.Y. Apr. 14, 2011) (granting summary judgment in favor of plaintiff on creative professional defense based on list of examples in the regulations, observing that "[n]othing in the regulations even remotely pertains to Garcia's position as a cook").  This conclusion finds further support in the fact that Defendants have not been able to cite to a single case in which this exemption was found to apply to any professional sport, and the Court has found no such authority. Therefore, the Court finds that Defendants' creative professionals defense fails as to all of the claims as to which it asserted, including New York law, on this basis.

104

United States District Court
Northern District of California

Accordingly, the Court grants summary judgment in Plaintiffs' favor that the creative professional exemption does not apply to any of the claims asserted in this case.

### 9.  Whether the Seasonal Amusement or Recreational Establishment Exemption Applies

a.   Contentions of the Parties

Plaintiffs' Arguments in Support of Summary Judgment

Plaintiffs contend Defendants' defense based on the amusement exemption, asserted as an affirmative defense to Plaintiffs' claims under the FLSA and the laws of Florida, Maryland, New York, North Carolina and Pennsylvania,[27] fails as a matter of law. Plaintiffs' Partial Summary Judgment Motion at 46-53.  In particular, they assert that Defendants cannot establish that Plaintiffs are employed by an amusement or recreational establishment that meets either of the two possible tests, the seasonal test or the receipts test, required under the FLSA.  *Id.* at 47 (citing 29 U.S.C. § 213(a)(3)).

As a preliminary matter, Plaintiffs contend Defendants represented prior to the Ninth Circuit appeal that they did not intend to rely on the receipts prong of the exemption.  *Id.* (citing dkt. no. 403 (May 29, 2015 joint letter discovery brief)).[28] According to Plaintiffs, after the appeal "and after overwhelming evidence showed that players work at worksites operating more than

---

[27] Defendants do not dispute that this defense is not available under California law.  Therefore, the Court GRANTS summary judgment in Plaintiffs' favor as to this defense to the extent Defendants asserted it as a defense to Plaintiffs' California law claims.

[28] In the letter brief, the parties addressed, *inter alia*, whether Defendants should be required to produce discovery requested by Plaintiffs related to the receipts test for the amusement exemption. On this subject, Defendants stated:

> Plaintiffs' request for the immediate production of vast revenue-related information should be denied for several reasons. First, Defendants have advised Plaintiffs that they do not intend to rely on the "receipts" prong of the exemption. Defendants further advised Plaintiffs that, in the event that position changes, Defendants would produce receipts-related information sufficiently in advance of any motion practice on that subject. Defendants suggested discussing a mutually acceptable timeframe for such production (not a time of Defendants' "choosing" as Plaintiffs mistakenly suggest), but Plaintiffs refused to engage and have instead insisted on a "stipulation" that Defendants be precluded from relying on the "receipts" prong now and forever.

Dkt. no. 403 at p. 5.  The Court subsequently required production of some documents related to the receipts test, ordering that the "Parties shall work out a schedule for starting off with smaller understanding of amusements and work outwards to amusement exception."  Dkt. no. 419.

seven months a year – they changed their tune, saying they would not invoke the receipts test if the establishment was found to be anything more than the spring training facilities." *Id.* Players ask the Court to "hold [Defendants] to that as the relevant establishment is indeed more than the spring training facilities, and the players are entitled to summary judgment on the defense." *Id.*

Plaintiffs' challenges to Defendants' assertion of the amusement exemption defense under both the seasonal test and the receipts test turn largely on one issue, namely, what constitutes the "establishment" for the purposes of this defense. *Id.* at 47-53. Plaintiffs argue that "[b]ecause the minor league players perform the same work for the same employers at multiple locations, all the places where the players are assigned to work comprise the 'establishment' for the defense." *Id.* at 47. They acknowledge that as a general rule, an establishment is defined as a "distinct physical place of business" rather than "an entire business or enterprise." *Id.* (quoting 29 C.F.R. § 779.23). They contend, however, that there are "times when 'two or more distinct physical portions of a business enterprise' should be 'treated as a single establishment.'" *Id.* (quoting 29 C.F.R. § 1620.9(b)). According to Plaintiffs, this is the case where there is "central control and administration of disparate job sites." *Id.* at 47-48 (citing 29 C.F.R. § 1620.9(b)[29]; *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 591 (11th Cir. 1994)).

As an example of a "widely-followed case" illustrating this principal, Plaintiffs point to *Brennan v. Goose Creek Consolidated Independent School District*, 519 F.2d 53 (5th Cir. 1975) ("*Goose Creek*"). According to Plaintiffs, in that case a school district asserted the exemption as to school janitors, taking the position that each school was a separate establishment, but the court instead found that all the schools formed a single establishment, pointing to the central administration of the school district with respect to hiring, setting wages, assigning janitors to the

---

[29]These regulations were issued by the Equal Employment Opportunity Commission ("EEOC") interpreting the Equal Pay Act ("EPA"), which is part of the FLSA. Plaintiffs contend "[t]hese regulations are relevant in the overtime and minimum wage context since the EPA is part of the FLSA and since the guidelines are consistent with the DOL's guidelines." *Id.* n. 45 (citing *Doe v. Butler Amusements, Inc.*, 71 F. Supp. 3d 1125, 1134 n.5 (N.D. Cal. 2014); *Liebesman v. Competitor Grp., Inc.*, No. 4:14-CV-1653 RLW, 2015 WL 2195093, at *4 (E.D. Mo. May 11, 2015) (finding the regulations applicable in the FLSA context)).

United States District Court
Northern District of California

school buildings where they would work and sometimes reassigning them. *Id.* at 48 (citing 519 F.2d at 56-58).

Plaintiffs argue that this case is "essentially the same as *Goose Creek* and the same rule should apply." *Id.* at 49. In particular, Plaintiffs point to evidence of the following aspects of central administration:

- Evidence that MLB and the MLB Clubs (and not the minor league teams) control hiring and player assignments. *Id.* at 49-50 (citing MLR 56(g)(3), providing that the MLB Club "shall provide" the "active roster of skilled players for the Minor League Club[;]" that the player "shall be under contract exclusively to the Major League Club," and the minor league team shall "not interfere" with the player's contract; and citing deposition testimony that "central executives of the MLB Club (like general managers, assistant general managers, scouting directors, and farm directors) decide which players to hire," as well as "whether players will be promoted, demoted or fired or sent to the instructional leagues.").

- Evidence that the MLB Clubs (and not the minor league teams) hire the coaches and trainers that oversee the minor league players. *Id.* at 49 (citing MLR 56(g)(4) & (f)).

- Evidence that MLB approves the hiring decisions and also identifies amateur players, determines their eligibility, administers the draft and approves contracts and roster moves. *Id.* at 49-50.

- Evidence that a central entity (MLB) sets the salary for first year players and sets salary floors for subsequent years; and that the player's paycheck is issued by the MLB Club.

- Evidence that minor league players "frequently change work locations[,]" "[a]t minimum . . . go[ing] from their homes to spring training and then to their in-season affiliate (or affiliates), and often report[ing] back to the spring training site for instructional leagues." *Id.* at 51 (citing evidence).

Based on the evidence of central administration, Plaintiffs contend "that all the places where minor leaguers are assigned to work should be analyzed collectively as the relevant 'establishment' – *i.e.*, the training facilities in Arizona and Florida combined with the minor league affiliates." *Id.*

United States District Court
Northern District of California

1  Plaintiffs argue further that because the relevant "establishment" consists of "the combined

2  places where minor leaguers work[,]" Defendants cannot meet either the seasonal test or the

3  receipts test to show that the amusement exemption applies.  *Id.* at 51-53.  As to the receipts test,

4  Plaintiffs argue that Defendants should be barred from relying on "purported receipts that pre-date

5  the first close of discovery (June 2016) but that were not produced until the post-appeal

6  supplemental discovery period" as Defendants represented that they were not going to rely on the

7  receipts test as a justification for refusing to produce this evidence.  *Id.* at 51.  In any event, they

8  assert, Defendants cannot meet their burden because the only receipts they produced are not

9  relevant to the issue.  *Id.*  In particular, Plaintiffs represent that "Defendants have not produced

10  any receipts for the minor league affiliates or for minor league spring training, extended spring

11  training, or instructional leagues – the places where they assign minor league players to work."  *Id.*

12  at 52.  Because Defendants "did not produce receipts for the proper establishment" and it is their

13  burden to do so, Plaintiffs contend they are entitled to summary judgment that Defendants have

14  not met the receipts test.  *Id.* at 52.

15  Plaintiffs further assert that it is "beyond dispute" that the "establishment" operates more

16  than seven months in any given year.  *Id.*  They contend the "proper inquiry" is whether the

17  "establishment" operates more than seven months a year, "not whether they are an entity that

18  provides amusement or recreation for its customers for more than seven months per

19  year." *Id.* (quoting *Bridewell v. Cincinnati Reds*, 68 F.3d 136, 138-39 (6th Cir. 1995)).  They

20  further assert that minor league operations are continuous:

21  Beginning with the training sites, some minor league players are often
asked to report to spring training in early-to-mid February, and others

22  are not asked but voluntarily report then as well. That early camp rolls
into regular minor league spring training in late-February or early

23  March. Once minor league spring training ends in early April, players
are "assigned to a full-season Minor League team or to extended

24  spring training[,] [Broshuis MPSJ Decl.,] Ex. 5: MLB0008914 at 8933.
"Players assigned to extended spring training will continue working

25  out at the spring training facility until the short-season leagues begin
in mid-June." *Id*. After the season ends, instructional leagues at the

26  training sites go from mid-September to mid-October. *Id*. at 8931.
Aside from the training seasons, players of course work during the

27  championship season at minor league stadiums from April until
September. Thus, Defendants shuffle the players between the

28  worksites making up the establishment from February until October-

1

2

3

> - a total of nine months. And that is just the formal, team-related work. Even in the other three months of the year, injured and non-injured minor leaguers continue working with trainers and strength coaches at the training sites, and teams sometimes have winter strength and conditioning camps that players attend. As deponents regularly testified, the training sites only close for holidays.

4

*Id.* at 52-53 (citing evidence).   Because Defendants fail both the receipts test and the seasonal test,

5

Plaintiffs contend they are entitled to summary judgment that the amusement exemption does not

6

apply to any of their claims.

7

8

Defendants' Arguments in Opposition to Plaintiffs' Request for Summary Judgment and in

9

Support of their Own Request for Summary Judgment

10

Defendants oppose Plaintiffs' request for summary judgment as to the amusement

11

exemption and argue that instead, they are entitled to summary judgment that the amusement

12

exemption is satisfied as a matter of law.  Opposition to Plaintiffs' Partial Summary Judgment

13

Motion at 22-31; Defendants' Partial Summary Judgment Motion at 20-32.   Defendants contend

14

Plaintiffs' definition of "establishment" in the context of this case is overbroad and inconsistent

15

with the rule that an "establishment" for the purposes of this exemption is a "distinct, physical

16

place of business" – "a definition that the courts and the DOL have applied consistently for

17

decades to baseball stadiums, spring training facilities and MLB-hosted baseball events."

18

Defendants' Opposition to Plaintiffs' Partial Summary Judgment Motion at 23 (citing *Chen v.*

19

*Major League Baseball Props., Inc.*, 798 F.3d 72, 78-79 (2d Cir. 2015); *Bridewell v. Cincinnati*

20

*Reds*, 68 F.3d 136, 138 (6th Cir. 1995); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 595 (11th

21

Cir. 1995); *Hill v. Del. N. Cos. Sportservice, Inc.*, 2014 U.S. Dist. LEXIS 185057, at *6

22

(W.D.N.Y. July 28, 2014), report recommendation adopted by, 2015 U.S. Dist. LEXIS 73131

23

(W.D.N.Y. June 4, 2015), aff'd, 838 F.3d 281 (2d Cir. 2016); *Adams v. Detroit Tigers, Inc.*, 961 F.

24

Supp. 176, 179 (E.D. Mich. 1997)).  According to Defendants, "[t]he 'establishments' at issue in

25

this case are the spring training facilities where Players play and train, and the minor league

26

stadiums where they play Championship Season games."  *Id.*

27

Defendants reject Plaintiffs' reliance on 29 C.F.R. § 1620.9(b), a regulation promulgated

28

by the EEOC in connection with the EPA that makes an exception to the general rule defining an

United States District Court
Northern District of California

109

establishment as a "distinct, physical location" under "unusual circumstances[,]" arguing that "[u]nlike the EEOC, the DOL – the federal agency responsible for the administration, enforcement and interpretation of FLSA exemptions, including the amusement exemption – has never adopted the 'unusual circumstances' factors to the amusement exemption's definition of 'establishment.' " *Id.* at 23-24. They note that in a recent opinion letter addressing the amusement exemption, DOL did not "even referenc[e] the 'unusual circumstances' factors, notwithstanding recent litigation advancing the theory that these factors should apply." *Id.* at 24 (citing U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., 2021 WL 240824 (Jan. 15, 2021) ("2021 Opinion Letter")).

Defendants argue that the "unusual circumstances" factors in *Goose Creek,* which involved a discrimination claim asserted under the EPA, were intended to "address a unique proof problem in the EPA context, that if an 'establishment' were defined too narrowly based solely on physical location, a plaintiff may not be able to identify potential comparators subject to the same pay practices at other locations of the employer." *Id.* at 24-25 (citing 519 F.2d at 57). Defendants argue that "[t]hat rationale plainly does not apply here, where the issue is whether the 'establishment' itself – each location where Players perform services – satisfies the criteria for the amusement exemption, such that Players who perform services are exempt from minimum wage and overtime." *Id.* at 25.

Defendants further assert that the facts here are distinguishable from those in *Goose Creek*; unlike the janitors in that case who performed the same activities at the schools within the school district, "[p]layers at spring training facilities do not perform identical activities as [p]layers at minor league affiliate stadiums, and those distinct, physical places of business are not indistinguishable." *Id.* at 25-26 (citing evidence). According to Defendants, because "it is clear that the Clubs' activities at their spring training facilities and the Championship Season games presented at their affiliate stadiums involve different activities, for different purposes, at defined periods of the year, with different Club and Player expectations, and different compensation provided to the Players[,]" the "undisputed facts . . . foreclose a finding of a single 'establishment.' " *Id.* at 27.

Defendants also point to Plaintiffs' damages model to make this point. *Id.* They contend

United States District Court
Northern District of California

"Plaintiffs apportion alleged damages to Players' participation during different times of the year, breaking down damages based on participation in spring training, extended spring training, Championship Season and the instructional league[,]" indicating that "[e]ven according to Plaintiffs, these are different activities with different expectations involving different Players that take place at different distinct, physical places of business for defined periods of time." *Id.* (citing Bloom Motion to Exclude (Dennis) Decl., Ex. 4;  Bloom Motion to Exclude (Kriegler) Decl., Ex. 1;  Bloom Summary Judgment Decl., Ex. 234).

To the extent that Plaintiffs rely on evidence that the Clubs and MLB "control the hiring of players," "player assignments," and "set[] wages[,]" Defendants contend that even if the facts were undisputed on these questions, "the factors on which Plaintiffs rely are not unusual and do not weigh in favor of defining the 'establishment' at the 'enterprise' level." *Id.* at 27-28 (citing *Renstrom v. Nash Finch Co*., 787 F. Supp. 2d 961, 965 (D. Minn. 2011)).  Defendants also reject Plaintiffs' assertion that the players' schedules are centrally controlled, pointing to a "multitude of evidence that Players' schedules are determined by the managers at each minor league affiliate during the Championship Season, and during the Training Seasons, by the field coordinators with principal oversight of the training." *Id.* at 28 (citing evidence).

Furthermore, Defendants contend, Plaintiffs' argument that minor league players frequently change work locations "misses the mark" because when players are transferred between affiliates those transfers are promotions or demotions that bring with them changes in duties, expectations and oversight. *Id.*  at 28-29.  Defendants also argue that "the fact that individuals may provide services to more than one 'establishment' does not warrant a definition of 'establishment' beyond each distinct physical place of business." *Id.* at 29 (citing *Brennan v. Yellowstone Park Lines, Inc*., 478 F.2d 285, 290 (10th Cir. 1973), *cert denied*, 414 U.S. 909 (1973); *Chessin v. Keystone Resort Mgmt., Inc*., 184 F.3d 1188, 1192 (10th Cir. 1999)). Defendants contend Plaintiffs' arguments as to both the receipts test and the seasonal test should be rejected because Plaintiffs do not use the appropriate "establishment." *Id.* at 29.  They further assert that the seasonal test is met as to the minor league affiliate stadiums and the receipts test is met as to the training facilities, which are separate establishments, as also set forth in Defendants'

1   summary judgment motion.  *Id.*

2        Defendants reject Plaintiffs' argument that they should be precluded from offering

3   evidence of receipts that pre-dates the pre-appeal discovery deadline, representing that "[p]rior to

4   the close of fact discovery in June 2016, the Clubs provided Plaintiffs with their gross receipts, on

5   a cash accounting basis, by month, for their spring training facility 'establishments' during the

6   relevant time period."  *Id.* at 30 (citing Bloom Summary Judgment Opposition Decl. ¶ 4).

7   According to Defendants, they also produced underlying source documents related to receipts

8   when discovery was reopened after the appeal.  *Id.* (citing Bloom Summary Judgment Opposition

9   Decl. ¶¶ 5, 7, 9).

10        In Defendants' Partial Summary Judgment Motion, they argue that the Court should grant

11   summary judgment in their favor that the Clubs are exempt from minimum wage and overtime

12   under the FLSA and the state laws of Florida, Pennsylvania and Maryland (which follow the

13   FLSA) based on the amusement exemption.  Defendants contend the "establishments" for the

14   purposes of this exemption are the spring training facilities in Florida and Arizona and the minor

15   league stadiums where the Championship Season games are played, for the reasons discussed

16   above.  Defendants' Partial Summary Judgment Motion at 21-26;  *see also* Bloom Summary

17   Judgment Decl., Exs. 1-2 (charts summarizing the "establishments" that Defendants contend

18   satisfy the "seasonal" prong and the "receipts" prong of the amusement exemption, respectively,

19   and referring to source documents).

20        Defendants argue further that the nature of these establishments is, as a matter of law,

21   "amusement or recreational" as is required in order to qualify for this exemption, because these

22   facilities are used for the presentation of games and training activities to the public.  Defendants'

23   Partial Summary Judgment Motion at 26-27 (citing *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d

24   590, 594 (11th Cir. 1995);  *Hill v. Delaware N. Companies Sportservice, Inc.*, 838 F.3d 281, 292

25   (2d Cir. 2016);  *Adams v. Detroit Tigers, Inc.*, 961 F. Supp. 176, 179 (E.D. Mich. 1997);

26   *Brennan v. Tx. City Dike & Marina, Inc.*, 492 F.2d 1115, 1118 (5th Cir. 1974)).

27        Defendants further assert that the minor league players are "employed by" these

28   establishments for the purposes of the amusement exemption.  *Id.* at 27-28.  In particular, they

United States District Court
Northern District of California

contend that *if* the players are found to be employees (though they dispute that they should) they should be deemed to be employed by the establishments where they perform services. *Id*. Defendants contend "[i]t is not relevant for purposes of the amusement exemption that Players may be employed by the Clubs, not the minor league affiliates or the owner(s)/operator(s) of the 'establishment.' " *Id*. at 28. In support of their position, Defendants point to *Jeffery v. Sarasota White Sox*, where the court "held that grounds crew employees at the White Sox spring training facility in Sarasota, Florida were 'employed by the establishment' (the stadium), even though they were employed by the Sarasota White Sox, rather than the owner of the stadium itself." *Id*. (citing 64 F.3d at 595).

Finally, Defendants argue that as to all of the establishments, properly defined, the undisputed facts establish that either the seasonal test or the receipts test is satisfied. *Id*. at 28-32 (citing evidence). As to the seasonal test, which Defendants contend is satisfied as to the affiliate stadiums where minor league Championship Season games are played, Defendants argue that "what matters is the duration of the operation of the 'establishment,' and not the operation of the 'employer' as a whole." *Id*. at 29 (citing *Chen*, 6 F. Supp. 3d at 459, n.8). Defendants also point to the discussion of *Jeffery* –"the only other case involving the exempt status of an MLB Club's minor league stadium" – by the district court in *Chen*, describing the holding in *Jeffery* as follows*:* "the relevant duration of operations. . . was the time that the Sarasota White Sox and the parent Chicago White Sox operated at the baseball complex in Florida – not the duration of the Chicago White Sox's operations as a whole." *Id*. (quoting *Chen*, 6 F. Supp. 3d at 459 n. 8). Defendants contend that here, as in *Jeffery*, "the duration of each Club's operations at their minor league affiliate stadiums . . . is limited to the Championship Season –which indisputably lasts less than seven (7) months each year." *Id*. at 29-30 (citing Bloom Summary Judgment Decl., Ex. 1 (Summary of Club "Establishments" at Minor League Affiliate Stadiums) ("Stadium Summary Chart").

The Stadium Summary Chart lists each purported "establishment" in this category (*ie.*, the stadiums where minor league Championship Season games are played), along with the years in which the purported "establishment" operated, the number of months out of the year Defendants

United States District Court
Northern District of California

contend the "establishment" operates, and the number of year-round employees employed by the Clubs at each stadium.  *See* Bloom Summary Judgment Decl. ¶ 4 & Ex. 1.  According to Defendants, "the documents relied upon in creating the summary chart include the Clubs' Interrogatory Answers and Objections and/or sworn declarations, game schedules and media guide excerpts."  Bloom Summary Judgment Decl. ¶ 4.

In their summary judgment motion, Defendants argue that the seasonal exemption "does not require [a defendant] to completely shut down or to terminate every employee at the end of each baseball season." *Id.* at 30 (quoting *Jeffery*, 64 F.3d at 596).  Thus, they assert, even though "some courts have considered the number of year-round employees (if any) employed at the 'establishments' by the companies against whom the wage-and-hour violations are asserted" in determining whether the establishments were seasonal, the evidence here shows that as to most of the "establishments" the Clubs employed *no* year-round employees and even the establishments where the Clubs maintained year-round employees, the number of employees was too small to establish that year-round operations were conducted there.  *Id.* (citing *Marshall v. New Hampshire Jockey Club, Inc.*, 562 F.2d 1323, 1328 (1st Cir. 1977)).  Defendants point out that in *Bridewell*, 68 F.3d at 139, where the court found that operations at a baseball stadium extended beyond the period when training and games occurred based in part on evidence that year-round employees worked there, there were 120 year-round workers whereas here, the Clubs that employed year-round workers employed a much smaller number of them.  *Id.* at 30.

Defendants further contend that the training facilities "indisputably" satisfy the receipts test, which involves "a straightforward arithmetic calculation" comparing the receipts, calculated using a cash accounting method rather than an accrual method, for the highest six months and the lowest six months, which need not be consecutive.  *Id.* at 31 (citing 29 U.S.C. § 213(a); *Butler Amusements, Inc.*, 71 F. Supp. 3d at 1135; *Bridewell v. Cincinnati Reds*, 155 F.3d 828, 830 (6th Cir. 1998); U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., 2021 WL 240824 (Jan. 15, 2021)).  According to Defendants, "[r]eceipts include fees from admissions, parking, concessions, promotional sponsorships, publications sales, and advertising."  *Id.* (citing *Jeffery*, 64 F.3d at 595; U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., 1986 DOLWH LEXIS 69 (May 12, 1986)).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Further, Defendants assert that "the undisputed record evidence is that the Clubs' Florida and

2    Arizona spring training facility 'establishments' had average gross receipts (on a cash accounting

3    basis) during the lowest six months of each calendar year that were demonstrably lower than one-

4    third of their gross receipts during the other six months of each year." *Id.* (citing Bloom Summary

5    Judgment Decl., Ex. 2 (Gross Receipts Summary of Club "Establishments" at Spring Training

6    Facilities in Arizona and Florida) ("Training Facilities Summary Chart").

7            Defendants explain that the receipts listed in the Training Facilities Summary Chart reflect

8    "revenue derived from ticket sales and other sources from Major League activities at the spring

9    training facility, such as Major League Spring Training, as well as any other baseball-related

10   activities by the Club at the facilities" because "the Clubs' spring training facility 'establishments'

11   in Florida and Arizona include all of their baseball-related activities at the 'distinct, physical

12   places of business' (including the main stadiums, back-fields and facilities at the complex)." *Id.* at

13   31-32. The "documents relied upon in creating the summary chart include the Clubs'

14   Interrogatory Answers and Objections, sworn declarations, maps and media guide excerpts."

15   Bloom Summary Judgment Decl. ¶ 5; *see also id*. Exs. 120-149 at ¶¶ 3-5 (according to

16   Defendants, "collecting Club declarations identifying the gross receipts derived from the

17   presentation of baseball-related activities at the Arizona and Florida training complexes, the

18   underlying documents reflecting those receipts, and the types of receipts."). Based on this

19   evidence, Defendants contend the Court should find, as a matter of law, that the receipts test is

20   satisfied as to the spring training facility establishments listed in the Training Facilities Summary

21   Chart. *Id.* at 31-32.

22           For these reasons, Defendants contend they are entitled to summary judgment on all of

23   Plaintiffs' FLSA claims based on the amusement exemption. *Id.* Further, Defendants assert,

24   because Pennsylvania, Florida and Maryland follow the FLSA, summary judgment should be

25   entered as to all individual claims asserted under the laws of those states as well as the class claims

26   asserted under Florida law. *Id.* at 32-33.

27   <u>Plaintiffs' Arguments in Opposition to Defendants' Request for Summary Judgment</u>

28           In their response to Defendants' Partial Summary Judgment Motion, Plaintiffs reiterate the

arguments in their own summary judgment motion regarding the proper "establishment" and Defendants' failure to offer evidence sufficient to demonstrate a material dispute of fact under the seasonal test or the receipts test.  Opposition to Defendants' Partial Summary Judgment Motion at 26-31.

In response to Defendants' assertion that they did, eventually, produce documents reflecting receipts, Plaintiffs argue that the production was incomplete because the documents Defendants "belatedly" produced in 2021 showed the revenues of the *major league* spring training stadiums.  *Id.*  According to Plaintiffs,

> Defendants claim the documents cover (1) tickets for major league spring training games (not minor league spring training games), (2) concessions and merchandise sold at major league spring training games (there are no concessions or merchandise sold at minor league spring training games), (3) advertising revenue from major league spring training (there is no advertising revenue from minor league spring training). The foregoing material is incomplete, because it is mostly just summary ledgers (not actual receipts) and there are several gaps for several teams. And Defendants indisputably have not produced receipts for television revenue at all[.]

*Id.*  at 30.  Plaintiffs contend Defendants have "never produced receipts for the minor league affiliates, where minor league players play minor league baseball games[]" even though minor league affiliates generate revenues from ticket sales and concessions, among other things.  *Id*. Plaintiffs further assert that Defendants have not produced "any receipts for the minor league training facilities in Florida and Arizona, which are separate from the major league spring training stadium."  *Id.*  As to these, Plaintiffs note, "[s]uch receipts may very well not exist" because "[t]ickets to such games are not sold" and "[c]oncessions are not sold."  *Id.* at 30-31.  According to Plaintiffs, minor league spring training, extended spring training and instructional leagues are not "revenue-generating" activities.  *Id.* Thus, Plaintiffs contend, "Defendants never produced any receipts for the places where minor league players actually work: the minor league affiliates, and the minor league training facilities."  *Id.* at 31.

Plaintiffs argue further that even if Defendants' position as to the "establishment" is adopted, they are not entitled to summary judgment because "[t]hey have not shown why the major league spring training stadiums should be included in their proposed establishment, as

116

opposed to only the minor league training facilities (the "back fields"); have not sufficiently

shown that all establishments are of an amusement character; have not produced sufficient

receipts; and have not sufficiently shown that minor league affiliates operate for less than seven

months out of the year." *Id.* at 31-32.

Plaintiffs argue that it is ironic that Defendants focus on the physical location of the

"establishment" but fail to acknowledge extensive evidence that as a general rule, the complexes

where minor leaguers conduct spring training in Florida and Arizona are physically separate from

the facilities where major league training occurs. *Id.* at 32-33. As a consequence, Plaintiffs

contend, Defendants also have not shown that the "establishment" is for an amusement purpose

because even if a company generally offers amusement services, "the exemption will not be met if

the particular establishment at issue is not for an amusement purpose. *Id.* at 33 (citing *Wright v.*

*Adventures Rolling Cross Country, Inc*., No. C-12-0982 EMC, 2013 WL 1758815, at *1, *5 (N.D.

Cal. Apr. 24, 2013)). According to Plaintiffs, the minor league back fields serve no amusement

purpose as no tickets or concessions are sold there, and although "technically the back fields may

be open to the public, few people ever attend, apart from an occasional family member of a minor

league player." *Id.* at 34. Because a recreational establishment must "sell recreation or

entertainment as its 'principal activity[,]' " Plaintiffs contend, Defendants cannot show that the

back fields where minor league players train are for an amusement purpose. *Id.* (citing *Mann v.*

*Falk*, No. 2:11-CV-14432-KMM, 2012 WL 4896726, at *4 (S.D. Fla. Oct. 15, 2012), aff'd, 523 F.

App'x 549 (11th Cir. 2013)).

Plaintiffs further assert that Defendants' reliance on the receipts test to establish that the

Florida and Arizona training facilities qualify for the exemption fails because Defendants did not

produce sufficient evidence to meet their burden. *Id.* at 35-36. In particular, they assert,

Defendants did not provide any receipts in support of their summary judgment motion, instead

only providing a chart that purports to summarize those receipts, and the amounts listed in the

summary chart are themselves based on Club declarations summarizing their gross receipts. *Id.* at

35 (citing Defendants' Partial Summary Judgment Motion at 31 n. 73). Furthermore, Plaintiffs

observe, Defendants did not "provide an expert report sorting through the receipts to ensure that a

'cash accounting method' was actually followed and that appropriate receipts were considered."

*Id.* at 36.  Instead, Defendants "just provide a 'summary chart' in an attorney declaration[,]" which

is "woefully insufficient to support summary judgment[,]" Plaintiffs contend.  *Id.* at 36-37 (citing

*Wilson v. Greetan*, 571 F. Supp. 2d 948, 952 27 (W.D. Wis. 2007) ("To the extent a witness relies

on documents instead of his own observations those documents must be offered as exhibits.").

Plaintiffs further challenge the reliability of the information contained in the summary

chart because of shortcomings in the underlying documents they believe Defendants relied upon:

> The documents are often summaries themselves (like ledgers or bank
> statements) rather than actual receipts, so that alone makes them
> insufficient because there is no way to verify them. Based on
> Plaintiffs' review, sometimes the numbers in the documents do not
> add up to the amount claimed in the declarations; other times they
> contain heavy redactions, making it impossible to perform the
> calculations or tell what all is discussed; and still other times entire
> years of or certain types of supporting documents were missing. For
> instance, the Cincinnati Reds conducted spring training in Florida in
> 2009 (within the class period), but the Reds produced no receipts for
> 2009 (or even a declaration covering 2009).  Boston's declaration
> purports to cover revenues for 2008 to 2020, but no documents for
> early years could be found. Several Clubs appear have produced ad
> revenue for certain years but not others.

*Id.* at 37.

In addition, Plaintiffs assert, the receipts summarized in Defendants' chart do not include

revenue from selling broadcast rights, which other courts have taken into account in determining

whether the receipts test is met.  *Id.* (citing *Bridewell v. Cincinnati Reds*, No. C-1-93-203, 1997

WL 1764776, at *5 (S.D. Ohio Mar. 20 5, 1997), aff'd,155 F.3d 828 (6th Cir. 1998)).  According

to Plaintiffs, Defendants have negotiated individual broadcast agreements between Clubs and local

broadcasters and national agreement between MLB and national broadcasting networks.  *Id.*

(citing evidence).  Plaintiffs contend, "[i]f Defendants' receipts from major league spring training

are relevant, then Defendants should have included revenue related to the television and radio

rights to those spring games."  *Id.* at 37-38 (citing *West v. City of Ft. Pierce, Fla*., No. 07-14335-

CIV, 2008 WL 3270849, at *7 (S.D. Fla. Aug. 8, 2008)).

Plaintiffs also assert that Defendants' summary of receipts does not include "additional

revenue from the Major League Central Fund, which is revenue received by MLB and distributed

United States District Court
Northern District of California

1    from MLB to the Clubs." *Id.*at 38.  Likewise, Plaintiffs assert, there is evidence that Clubs

2    participate in a revenue sharing pool, with some Clubs paying money and others receiving money,

3    and that some of this money "undoubtedly can be linked to spring training" but is not mentioned

4    by the Clubs.  *Id.* at 38-39.

5         Plaintiffs also reject Defendants' contention that the undisputed facts show that for the

6    affiliate clubs the seasonal test is met because the minor league season extends only from April to

7    early or mid-September.  *Id.*  The length of the season is not the same as the length of operations,

8    Plaintiffs assert, and there is evidence that the affiliates employ numerous people on a year-round

9    basis.  *Id.* at 39.  Thus, declarations provided by Defendants offered to show that "nearly all of the

10   Clubs have not employed anyone at the affiliate 'establishments' on a year-round basis" are not to

11   the point, Plaintiffs argue.  *Id.* (citing Defendants Partial Summary Judgment Motion at 30).   For

12   example, "[t]he Braves admit that they employ between 21 and 26 year-round employees at their

13   Gwinnett minor league affiliate, and between 15 and 22 year-round employees at their Mississippi

14   Braves affiliate" and "[o]ther Clubs (like the Brewers) reported similar numbers for minor league

15   teams that they wholly own."  *Id.* at 40 (citing Defendants' Partial Summary Judgment Motion at

16   6 n.14).[30]  According to Plaintiffs, "[t]his evidence strongly tends to suggest that the non-Club-

17   owned minor league affiliates also employ a similar number of year-round employees" even if the

18   Club itself may not employ any year-round employees to work at those affiliates.  *Id.*  In fact,

19   _____

20   [30] Note 14 states as follows:

21        Among the 30 Clubs, the only Clubs that have employed any year-round staff at the minor
         league affiliate Championship Season "establishments" listed in Bloom Decl. Ex. 1 are as
22        follows: the Houston Astros employed up to 9 year-round employees (generally, between 4
         and 5) at Pioneer Park for the Greeneville Astros between 2011 and 2017; since 2011, the
23        Atlanta Braves have employed between 21 and 26 year-round employees at Coolray Field
         for the Gwinnett Braves; between 15 and 22 year-round employees at Trustmark Park for
24        the Mississippi Braves; between 14 and 23 year-round employees at State Mutual Stadium
         for the Rome Braves; and between 5 and 7 year-round employees at American Legion Post
25        325 Field for the Danville Braves; and since October 2017, the Milwaukee Brewers
         employed between 13 and 24 year-round employees at Five County Stadium in Zebulon,
26        North Carolina for the Carolina Mudcats. See Bloom Decl. Exs. 1 (summary chart of
         Championship Season "establishments"); 103 (Houston Astros Interrogatory
27        Answers and Objections); Declaration of Greg Heller at ¶¶ 2-4; and Declaration of Daniel
         Fumai at ¶¶ 2-4.

28   Defendants' Partial Summary Judgment Motion at 6 n. 14.

United States District Court
Northern District of California

1  Plaintiffs contend, "it is common for minor league affiliates to host events far beyond the season –

2  which is the reason the minor league affiliates need year-round employees of their own." *Id.* at 40

3  (citing evidence).  Plaintiffs argue that because Defendants have not offered sufficient evidence to

4  establish the affiliates do not operate more than seven months of the year, they are not entitled to

5  summary judgment on the basis of this exemption.  *Id.*

6              b.  Discussion

7                   i.  Legal Standards

8       The amusement exemption of the FLSA is set forth in 29 U.S.C. § 213(a)(3), which

9  provides that 29 U.S.C. §§ 206 and 207 do not apply with respect to:

10              any employee employed by an establishment which is an amusement
               or recreational establishment . . . if (A) it does not operate for more
11              than seven months in any calendar year, or (B) during the preceding
               calendar year, its average receipts for any six months of such year
12              were not more than 33 per centum of its average receipts for the other
               six months of such year . . . .
13

14  29 U.S.C. § 213(a)(3).  Although the term "establishment" is not defined in the FLSA, the

15  Supreme Court addressed the meaning of that word as used in another, now-repealed FLSA

16  exemption, the retail establishment exemption, in *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490

17  (1945).   In *A.H. Phillips, Inc. v. Walling*, the Court found that employees working in the

18  warehouse and central office of an interstate grocery chain store system did not work at a "retail

19  establishment" within the meaning of the FLSA because the retail stores, central office and

20  warehouse were separate establishments and no retail activity occurred at the warehouse or the

21  central office.  *Id.* at 491.  The Court reasoned that "Congress used the word 'establishment' as it

22  is normally used in business and in government—as meaning a distinct physical place of

23  business." *Id.*  While the Supreme Court in *A.H. Phillips, Inc. v. Walling* construed

24  "establishment" for purposes of the retail establishment exemption, courts have found that it has

25  the same meaning in the context of the amusement exemption.  *See, e.g.,* C*hen v. Major League*

26  *Baseball Properties, Inc.*, 798 F.3d 72, 78 (2d Cir. 2015) (concluding that *A.H. Phillips v. Walling*

27  continues to be applicable to the amusement exemption).

28       Similarly, the DOL defines establishment as "a 'distinct physical place of business' rather

United States District Court
Northern District of California

120

than . . . 'an entire business or enterprise' which may include several separate places of business."

29 C.F.R. § 779.23. The DOL regulations also provide the following guidance on the distinction

between an "enterprise" and an "establishment":

> The "enterprise," by reason of the definition contained in section 3(r) of the Act and the tests enumerated in section 3(s) of the Act, may be composed of a single establishment. The term "establishment," however, is not synonymous with the words "business" or "enterprise" when those terms are used to describe multiunit operations. In such a multiunit operation some of the establishments may qualify for exemption, others may not. For example, a manufacturer may operate a plant for production of its goods, a separate warehouse for storage and distribution, and several stores from which its products are sold. Each such physically separate place of business is a separate establishment. In the case of chain store systems, branch stores, groups of independent stores organized to carry on business in a manner similar to chain store systems, and retail outlets operated by manufacturing or distributing concerns, each separate place of business ordinarily is a separate establishment.

29 C.F.R. § 779.303.

While an "establishment" is generally defined with reference to the physical location

where business is conducted, there may be circumstances where separate establishments are found

to occupy the same premises.  The regulations explain:

> Although . . . two or more departments of a business may constitute a single establishment, two or more physically separated portions of a business though located on the same premises, and even under the same roof in some circumstances may constitute more than one establishment for purposes of exemptions. In order to effect such a result physical separation is a prerequisite. In addition, the physically separated portions of the business also must be engaged in operations which are functionally separated from each other. . . . For retailing and other functionally unrelated activities performed on the same premises to be considered as performed in separate establishments, a distinct physical place of business engaged in each category of activities must be identifiable. The retail portion of the business must be distinct and separate from and unrelated to that portion of the business devoted to other activities. . . . In other words, the retail portion of an establishment would be considered a separate establishment from the unrelated portion for the purpose of the exemption if (a) It is physically separated from the other activities; and (b) it is functionally operated as a separate unit having separate records, and separate bookkeeping; and (c) there is no interchange of employees between the units. The requirement that there be no interchange of employees between the units does not mean that an employee of one unit may not occasionally, when circumstances require it, render some help in the other units or that one employee of one unit may not be transferred to work in the other unit. The requirement has reference to the indiscriminate use of the employee

United States District Court
Northern District of California

in both units without regard to the segregated functions of such units.

29 C.F.R. § 779.305.  In *Chen*, the Second Circuit found that the three-factor test discussed in this regulation is applied only where "potentially separate establishments operate[ ] at the same physical location."  798 F.3d at 80;  *see also Alvarez Perez v. Sanford-Orlando Kennel Club, Inc*., 515 F.3d 1150, 1158 (11th Cir. 2008) (finding that "while 29 C.F.R. § 779.305 . . .  explicitly applies to the retail and service exemptions, its three-requirement definition of an establishment may be borrowed to define establishment for purposes of other exemptions.").

Conversely, despite the general rule that distinct units of a multiunit organization are separate establishments when they operate at separate, distinct physical locations, regulations promulgated by the EEOC with reference to the Equal Pay Act – which is part of the FLSA – indicate that "unusual circumstances may call for two or more distinct physical portions of a business enterprise being treated as a single establishment." 29 C.F.R. § 1620.9(a). Section 1620.9 is entitled "Meaning of 'establishment' " and offers the following example of circumstances in which two or more distinct portion of an enterprise may be considered a single establishment:

> For example, a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions.

29 C.F.R. § 1620.9.

This principal was applied in *Brennan v. Goose Creek Consol. Independent School Dist*., 519 F.2d 53, 57 (5th Cir.1975), a case brought by school janitors who asserted claims of discriminatory pay practices in violation of the equal pay provisions of the FLSA.  In that case, the court found that the "establishment" was the entire school district rather than the individual schools within the district because "a central authority was responsible for the janitors' employment and wages and often transferred them from one school to another" and "[t]he school district failed to show any difference in the janitors' working conditions" at the individual schools. 519 F.2d at 58.  In reaching this conclusion, the Court looked to the case law (including *A.H. Phillips, Inc. v. Walling*) and regulations (including 29 C.F.R. § 779) addressing the concept of an "establishment" in the context of the retail exemption.  *Id.*  at 56-58.  This Court has found that

United States District Court
Northern District of California

United States District Court
Northern District of California

although the "unusual circumstances" exception discussed above was contained in a regulation promulgated by the EEOC rather than the DOL it is consistent with the definition of "establishment" that has been found to apply to FLSA exemptions and applies to the amusement exemption. *See Doe v. Butler Amusements, Inc.*, 71 F. Supp. 3d 1125, 1134 n. 5 (N.D. Cal. 2014); *see also Renstrom v. Nash Finch Co.*, 787 F. Supp. 2d 961, 964 (D. Minn. 2011) ("There is absolutely no evidence that, in using the term 'establishment,' Congress intended the term to have a broader meaning in the EPA than it had in the rest of the FLSA.").

Pursuant to 29 U.S.C. § 213(a)(3), the amusement exemption applies if a defendant can show that: 1) the "establishment" satisfies either the seasonal test or the receipts test; 2) the employee is "employed by" the establishment; and 3) the establishment has an amusement or recreational purpose. In order to be employed "by" an establishment, "an employee, whether performing his duties inside or outside the establishment, must be employed by his employer in the work of the exempt establishment itself in activities within the scope of its exempt business." 29 C.F.R. § 779.308. The regulations further distinguish between employees who are employed "by" the establishment and those who work "in" it:

> Since the exemptions by their terms apply to the employees "employed by" the exempt establishment, it follows that those exemptions will not extend to other employees who, although actually working in the establishment and even though employed by the same person who is the employer of all under section 3(d) of the Act, are not "employed by" the exempt establishment. Thus, traveling auditors, manufacturers' demonstrators, display-window arrangers, sales instructors, etc., who are not "employed by" an exempt establishment in which they work will not be exempt merely because they happen to be working in such an exempt establishment, whether or not they work for the same employer.

29 C.F.R. § 779.309. The regulations further provide that "[a]musement or recreational establishments" as used in [29 U.S.C. § 213(a)(3)] are establishments frequented by the public for its amusement or recreation." 29 C.F.R. § 779.385.

### ii.  The "Establishments"

Plaintiffs and Defendants offer widely different characterizations of the relevant "establishments" for the purposes of Defendants' amusement exemption defense, with Plaintiffs seeking to include *all* the places where minor league players train or play games into a single

123

United States District Court
Northern District of California

"establishment" and Defendants arguing that each stadium where minor league players play games and each spring training facility is a separate "establishment."  For the reasons set forth below, the Court concludes, as a matter of law, that Plaintiffs' proposed definition of the "establishment" is overly inclusive.  The Court further finds that Defendants are correct that the relevant establishments with respect to the Championship Season are the individual stadiums where the minor league affiliates play, but that there are factual disputes related to how the training establishments should be defined.

First, the Court rejects Plaintiffs' argument that the relevant "establishment" for the purposes of Defendants' amusement exemption defense consists of "all the places where minor leaguers are assigned to work . . . , *i.e.*, the training facilities in Arizona and Florida combined with the minor league affiliates."  Plaintiffs' Partial Summary Judgment Motion at 51.  This definition would sweep a vast number of separate physical locations where players train and play championship games into a single establishment.  While the "unusual circumstances" exception discussed above allows for such a deviation from the general rule under appropriate circumstances, that exception only applies where a company's operations at different locations are "identical[,]" the duties and working conditions of the workers are the same, and there is central administration of the workers, including hiring, determining wage rates and determining work assignments.  *Goose Creek,* 519 F. at 56-58;  *cf. Brennan v. Yellowstone Park Lines, Inc*., 478 F.2d 285, 290 (10th Cir. 1973) (holding that company that operated concessions in Yellowstone National Park that included hotels, inns, lodges, cabins and restaurants was not a single establishment for purposes of the amusement exemption due to distance between them and the heterogeneous nature of the operations).

Here, Plaintiffs have not pointed to undisputed evidence establishing that the operations of the stadiums where affiliates play and the facilities where spring training, extended spring training and instructional leagues occur are identical.  To the contrary, the undisputed evidence indicates that the activities conducted at the training facilities (focused on training) are not the same as the activities conducted at the affiliate stadiums during the Championship Season (focused on playing championship games). Nor does it appear to be disputed that the affiliates

124

based out of different stadiums during the Championship Season play at different levels.

Therefore, the Court concludes that the exception in *Goose Creek* does not justify treating all of

the places where minor leaguers play or train as a single establishment.  Rather, the Court

concludes that the establishments in this case must be defined with reference to the physical

locations where minor league activities occur, as Defendants assert.  As to the Championship

Season, the Court concludes that the relevant operations take place at the stadiums, which the

Court finds to be the establishments.

On the other hand, there are disputed facts as to whether the training facilities Defendants'

identified, which include the facilities used by *both* major and minor league players,  are the

correct establishments.  In particular, Plaintiffs have pointed to evidence that at some facilities

minor league training is conducted at an entirely separate location and that at others, minor

leaguers train on "back fields" that are at least physically distinct from the major league facilities

even if located on the same premises and that minor league players are barred from using parts of

the major league facilities.  Indeed, Defendants concede that as to the Blue Jays, Giants, Yankees

and Red Sox, the main stadium and minor league complex are (or at some point were) "between a

half-mile and up to three miles away from each other."  Defendants Reply to Partial Summary

Judgment Motion at 15.

As to the training facilities where minor league and major league players train at separate

or distinct locations, Defendants contend the facilities are nonetheless one establishment based on

the "record evidence show[ing] extensive functional integration in use of facilities by major and

minor league players and staff."  *Id.* (citing *Shultz v. Hasam Realty Corp.*, 316 F.Supp. 1136,

1143–1144 (D.C.Fla.1970) (holding that resort that was housed in "five separate facilities" and

which included a golf course that was located "some distance from the main complex" constituted

a single establishment under the FLSA where the employees were employed by the resort as a

whole, the resort operated as a "functional, cohesive unit," "[n]o separate records [were]

maintained, and employees [were] interchanged among the hotel facilities, as needed").  There is

conflicting evidence, however, as to the degree to which these minor league spring training

facilities are integrated with the major league facilities.  Based on this evidence, it may be that as

to some of the facilities where minor league spring training, extended spring training and instructional leagues are held, the minor league facilities and the major league facilities constitute separate establishments.  Therefore, Defendants are not entitled to summary judgment that training facilities (major league and minor league facilities combined) are the correct "establishments" for the purposes of the amusement exemption.[31]

iii. Seasonal Test

Defendants rely on the seasonal test in connection with the affiliate stadiums where Championship Season games are played to establish that the amusement exemption applies to them.  Although the Court finds that these are properly considered separate establishments, as discussed above, the Court concludes that Defendants have misapplied the seasonal test by failing to address all of the relevant operations of these establishments.  In particular, Defendants have offered no evidence concerning the activities at the stadium establishments of the employees of the minor league affiliates, even though Defendants concede that the affiliates employ year-round staff at the stadiums and that these individuals – along with the Club employees – are engaged in putting on minor league Championship games.  Defendants exclude these employees from consideration on the ground that the establishments' operations involve the presentation of minor league games by the *Clubs only* and that whatever activities are performed by employees of the minor league affiliate at the stadium outside of the Championship season are not relevant. However, the Court finds no basis for applying this cramped understanding of the establishments' operations with respect to the Championship Season claims.

First, the Court addresses what appears to be a split of authority between the Sixth Circuit's decision in *Bridewell* and the Eleventh Circuit's decision in *Jeffery* as to what types of activities are relevant in applying the seasonal test in the context of a sport league operating at a stadium.  In particular, in *Jeffery*, the court found that the focus of the inquiry should be "the

---

[31] The Court has asked the parties to submit additional briefing and evidence as to whether major and minor league training at the individual facilities should be considered a single establishment or instead, two separate establishments.  To the extent that the Court finds that this question can be resolved based on undisputed facts for any of the training facilities, the Court may revise its summary judgment holding on this question based on the additional briefing and evidence.

United States District Court
Northern District of California

revenue-producing operation" of a team's activities and not how long an employee actually worked, 64 F.3d at 596, whereas in *Bridewell*, the court reached the opposite conclusion, holding that the proper inquiry was whether the team "operate[d] for more than seven months per year, not whether [it] provide[d] amusement or recreation for its customers for more than seven months per year." 68 F.3d at 138. The Court finds the reasoning of *Bridewell* to be more persuasive.

In *Bridewell*, maintenance employees of the Cincinnati Reds ("Reds"), which operated a major league baseball franchise, asserted FLSA claims for overtime. 68 F.3d at 137-138. The Reds leased the Riverfront Stadium ("Riverfront"), where the plaintiffs performed maintenance work, from the City of Cincinnati. Id. at 137. Although the Reds' regular season ran from April to September or October, the maintenance workers began working at Riverfront in March to prepare the stadium for the regular season. *Id*. In addition, the "Reds' activities at Riverfront [were] not limited to playing baseball." *Id*. at 138. In particular, the lease with the City gave the Reds the "exclusive right to sell advertising on signs at Riverfront throughout the year, to operate the scoreboard during both their games and the games of the Cincinnati Bengals football club, and to contract with a concessionaire to operate at both Reds' and Bengals' games." *Id*. "Also, under contracts with the Bengals, the Reds [were] obligated to clean parts of the stadium when the Bengals play[ed] there." *Id*. It was undisputed that the Reds used their employees to perform all of these functions. *Id*.

The court in *Bridewell* assumed (but did not decide) that the Reds were an amusement or recreational establishment but found that the seasonal test was not met, explaining its conclusion as follows:

> In view of the stipulated facts, it seems to us that the parties incorrectly focus on the duration of the Reds' activities at Riverfront rather than on the duration of the Reds' overall operation. An entity seeking to invoke the § 213(a)(3) exemption must both be an amusement or recreational establishment and operate for fewer than eight months per year. The Reds would have us conflate these separate requirements and instead ask whether the Reds are an establishment that stages amusement activities for fewer than eight months per year. There is nothing in the Act that would suggest that this is the correct approach. The proper inquiry is, assuming arguendo that the Reds are an amusement or recreational establishment, whether the Reds operate for more than seven months per year, not whether they are an entity that provides amusement or recreation for its customers for more than seven months per year.

*Id.* at 138-39.  In reaching this conclusion, the Sixth Circuit overturned the decision of the district court, which adopted in part the report and recommendation of a magistrate judge finding that the amusement exemption applied.  The magistrate judge reasoned that "[t]he fact that some of the Reds' employees may have been employed in March relative to the preparation of Riverfront Stadium is not inconsistent with this holding, because it is the revenue-producing operation of the Reds as a major league baseball franchise which affords them the protection of the exemption." *Bridewell v. Cincinnati Reds*, No. C-1-93-203, 1994 WL 854075, at *4 (S.D. Ohio Feb. 14, 1994), report and recommendation adopted in part, No. C-1-93-203, 1994 WL 866091 (S.D. Ohio Mar. 24, 1994), rev'd, 68 F.3d 136 (6th Cir. 1995).

In *Jeffery*, the defendant, Sarasota White Sox Inc., owned a minor league baseball franchise affiliated with the Chicago White Sox (a major league club) and used a baseball complex owned by the City of Sarasota pursuant to a lease that gave the defendant the right to use the entire sports complex for major league spring training as well as minor league activities. 64 F.3d at 593. Under the lease, the defendant was "fully responsible for the performance of all maintenance on the baseball fields." *Id.* The lease further provided that other organizations could use the facilities when the complex was not being used by the defendant.  *Id.*  The court in *Jeffery* held that the owner of the minor league affiliate, the Sarasota White Sox, Inc., was an "amusement or recreational establishment" because it sponsored sports events.  *Id.* at 595.  The court further found that the seasonal test was met because spring training occurred in March and games were played from April to the end of August.  *Id.* at 596.  In particular, the court concluded that the defendant's "operation at the baseball complex in Sarasota last[ed] approximately five months each year which is two months less than the seven month period afforded under 29 U.S.C. § 213(a)(3)." *Id.* at 596.

The court explained that its conclusion was not altered by the fact that the plaintiff "was employed in the off-season months relative to the preparation and maintenance of the baseball fields."  *Id.*  Citing the (subsequently reversed) report and recommendation of the magistrate judge in *Bridewell*, the *Jeffery* court reasoned that "[t]he focus on the exemption is not on the length of time [the plaintiff] performed his work. Rather, the focus is on length of the Defendant's seasonal

operation." *Id.* It stated further, "[i]t is the revenue-producing operation of the Sarasota White Sox as a professional baseball franchise which affords it the protection of the exemption. . . . 29 U.S.C. § 213(a)(3) does not require Defendant to completely shut down or to terminate every employee at the end of each baseball season." *Id.* (citations omitted).

This Court concludes that the Sixth Circuit's reasoning in *Bridewell* is more persuasive than the reasoning in *Jeffery* because the amusement exemption, on its face, sets forth *separate* requirements that the establishment must be "an establishment which is an amusement or recreational establishment" *and* must either meet the receipts test or "operate for [no] more than seven months in any calendar year." 29 U.S.C. § 213(a)(3). Therefore, the Court rejects Defendants' assertion, based on *Jeffery*, that only the length of the Championship Season at each stadium establishment should be considered. Rather, the Court must consider the overall operations at the championship stadiums. Thus, under the circumstances of this case, to the extent the affiliate stadiums are separate establishments, the number of months they are used by the minor league affiliates for games is not dispositive of whether the seasonal test is met. Rather, other operations that occur at the stadium throughout the year, such as ongoing maintenance or operating score boards for games that are hosted by the affiliate at the stadium, must also be considered.

Plaintiffs have pointed to Defendants' own evidence reflecting that the handful of affiliates that are owned by Clubs rather than third parties have year-round employees and contend affiliates owned by third parties likely also have year-round staff. Indeed, Defendants do not dispute that that is the case but contend these employees' activities have no bearing on the application of the seasonal test. The cases they rely upon point to the opposite conclusion, however. As Defendants themselves point out, in *Jeffery* – "the only other case involving the exempt status of an MLB Club's minor league stadium" – "the relevant duration of operations. . . was the time that the Sarasota White Sox *and* the parent Chicago White Sox operated at the baseball complex in Florida – not the duration of the Chicago White Sox's operations as a whole." Defendants' Partial Summary Judgment Motion at 29 (quoting *Chen*, 6 F. Supp. 3d at 459 n. 8). Likewise, the relevant duration of operations here is the time that the Clubs *and* their affiliates operate at the

United States District Court
Northern District of California

1   Championship Season stadiums.

2        *Bridewell* also does not support Defendants' position that only the activities of Club

3   employees matter in determining whether the stadium establishments are seasonal.  Defendants

4   point to the fact that in that case, the court considered only the activities of Cincinnati Reds

5   employees at the Riverfront Stadium and did not consider the activities of employees of the

6   Bengals, who also used the stadium to put on their own games.  *See* 68 F.3d at 138.  The court in

7   *Bridewell* did not, however, hold that only the activities of the entity claiming the exemption (in

8   that case, the Reds) were relevant to the question of whether the establishment was seasonal.  At

9   most, it appears that the *Bridewell* court may have assumed that the Bengals operated a separate

10  establishment out of the Riverfront Stadium.  But there is nothing in the reasoning of *Bridewell*

11  indicating that the court would have disregarded evidence that year-round employees engaged in

12  activities integral to the *Reds'* presentation of baseball in determining whether the establishment

13  was seasonal simply because those employees were not employed by the Reds but instead by some

14  other entity.  To the extent there is evidence here that the minor league affiliates may maintain

15  such employees year-round, *Bridewell* does not support Defendants' position.

16       Defendants also rely heavily on the Second Circuit's decision in *Chen v. Major League*

17  *Baseball Properties, Inc.*, 798 F.3d 72, 74 (2d Cir. 2015) in support of their assertion that

18  employees of the minor league affiliates should be ignored but that case also does not help

19  Defendants.  In *Chen*, the Second Circuit held that FanFest, a two-week event akin to a baseball

20  theme park that was held at the Javits Center and run by MLB, was the relevant establishment for

21  the purposes of the seasonal exemption, rejecting the plaintiff's argument that the establishment

22  was MLB as a whole.  798 F.3d at 81.  The court reasoned that FanFest occurred at a separate

23  physical location from MLB's administrative office and the stadiums where regular games were

24  held and that that physical separation was "determinative" of its conclusion that FanFest was a

25  separate establishment.  *Id.*  It agreed with the district court that it was "of no consequence that the

26  plaintiff was employed by MLB rather than by FanFest; for the purposes of Section 13(a)(3), an

27  individual is employed by the establishment at which he works, regardless of any enterprise that

28  may operate or control the establishment."  6 F. Supp. 3d at 458; 798 F.3d at 81.

United States District Court
Northern District of California

Two things stand out about *Chen*.  First, the question it addressed was whether FanFest was a separate establishment from MLB and the court relied on the fact that FanFest was conducted at a separate *physical location* from MLB headquarters and ballparks in concluding that it was.  The question here, however, is whether employees of minor league affiliates are part of the relevant establishment where they operate out of the *same* physical locations as the Clubs, namely, the championship stadiums. Second, *Chen* makes clear that the question of whether an individual is employed by a particular establishment for the purposes of this exemption requires courts to look beyond the question of what entity formally employs the individual as a matter of contract. Indeed, Defendants concede as much when they argue that "[i]t is not relevant for purposes of the amusement exemption that Players may be employed by the Clubs, not the minor league affiliates or the owner(s)/operator(s) of the 'establishment.'."  Defendants' Partial Summary Judgment Motion at 28.

At the motion hearing, Defendants argued that *Chen* nonetheless supported their position because there were likely employees of the Javits Center who assisted in putting on FanFest but who were not considered by the court in its determination that FanFest met the seasonal test.  But there is no indication that this issue was raised in *Chen* and the court certainly didn't address it. Assuming that Defendants are correct, the *Chen* court's failure to consider these employees in determining whether the operation was seasonal still does not support the conclusion that employees of the minor league affiliates here should be ignored in this case as a matter of law. There are various reasons why such employees might not have been considered to be part of the FanFest establishment, including the possibility that they were not engaged in the work of the exempt establishment itself in activities within the scope of its business.  For example, the DOL has recognized that custodians who provided cleaning services at a racetrack that operated seasonally were not "employed by" the establishment because the "janitorial services [were] not services to the patrons of the race track as [were] the amusement or recreational services which the race track provide[d] its patrons." *Doe v. Butler Amusements, Inc*., 71 F. Supp. 3d 1125, 1134–36 (N.D. Cal. 2014) (quoting DOL Opinion Letter 760 (dated January 17, 1968)).

Regardless, the point here is not that the employees of the minor league affiliates might not

131

ultimately be found to be part of a separate establishment or to have been employed "in" but not "by" by the stadium establishments – rather, it is that Defendants have pointed to no undisputed evidence or authority that either of these scenarios applies as a matter of law. Given that they have conceded that the minor league affiliates have year-round employees at the stadiums who are involved in the presentation of baseball by the major league Clubs, there is at least a fact question as to whether the stadium establishments are seasonal.

Finally, the Court rejects Defendants' argument that as to the Club-owned affiliates who have year-round workers, reflected in the Stadium Summary Chart, the number of such employees is, as a matter of law, too insignificant to establish that the establishments operate outside of the championship season. Defendants rely on the *Bridewell* court's observation that "[w]hile a truly seasonal business that employs an insignificant number of workers year-round could conceivably qualify for the exemption, the fact that the Reds employ 120 year-round workers compels the conclusion that they 'operate' year-round." 68 F.3d 139. Yet this dicta offers little guidance on what number of employees would be "insignificant" as a matter of law. Moreover, DOL guidance that the Court finds persuasive indicates that the work of even one or two employees might be significant, depending on the nature of the work. In particular, in an August 4, 2004 Opinion Letter, the DOL found that a summer camp that employed 15-20 camp counselors and was run by a charitable organization was not a separate establishment from the charitable organization for the purposes of the amusement exemption because the camp was located on the same premises as the charitable organization's year-round operations and two year-round employees – the camp director and an administrative assistant – spent a substantial amount of time administering the camp throughout the year. 2004 WL 5303034, at *1. Consequently, DOL found, the third requirement of 29 U.S.C. § 779.305, requiring no interchange of employees between the units, was not met. *Id.*

As far as the Court can tell, the number of year-round employees employed by the Club-owned affiliates with year-round staff appears to be in the twenties.[32] Defendants have provided

---

[32] The Stadium Summary Chart does not, however, indicate which affiliates are owned by the

1    no information, however, about the types of activities they engage in or how these activities relate

2    to the overall operation of the establishments with respect to the presentation of baseball by the

3    Clubs at these stadiums.  Consequently, there is no basis for the Court to conclude as a matter of

4    law that their activities in presenting baseball games are so insignificant that these establishments

5    are "truly seasonal."

6           For these reasons, the Court concludes that there are material disputes of fact that preclude

7    summary judgment in favor of Defendants that the stadium establishments meet the seasonal test.

8                                   iv.  Receipts Test

9           The Court also finds that there are material disputes of fact with respect to the receipts test,

10   upon which Defendants rely in connection with the training facilities.  Most importantly,

11   Defendants have not shown that as a matter of law their definition of the relevant spring training

12   establishments – which treats major league and minor league facilities as a single establishment –

13   is correct.  Consequently, the evidence of receipts they point to does not necessarily match the

14   relevant spring training "establishments" and cannot support summary judgment in Defendants'

15   favor that the receipts test is satisfied.

16          Further, Defendants' suggestion that Plaintiffs must come up with their own calculations of

17   receipts to demonstrate a material dispute of fact is incorrect.  *See* Defendants' Reply on Partial

18   Summary Judgment Motion at 19 (arguing that Plaintiffs' challenges to Defendants' gross-receipt

19   evidence is a "manufactured dispute" because Plaintiffs do not claim based on their own

20   calculations that any of the Clubs fail the receipts test.").  "When the party moving for summary

21   judgment would bear the burden of proof at trial, it must come forward with evidence which

22   would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp.*

23   *Brokerage Co. v. Darden Restaurants, Inc*., 213 F.3d 474, 480 (9th Cir. 2000) (internal quotations

24   and citation omitted).   It is only when the moving party has met that initial burden that the party

25

26   _____

27   Clubs and which are owned by third parties.  Thus, the Court relies on Defendants' representation
     at the February 16, 2022 motion hearing that all of the stadium establishments listed on the chart
     that are shown as having year-round employees are Club-owned. This, of course, does not answer

28   the question of how many (if any) of the stadiums listed in the chart as having no year-round
     employees are Club owned.

United States District Court
Northern District of California

opposing summary judgment must come up with significant probative evidence in support of the claim or defense. *Id.* As it is Defendants' burden to prove that the amusement exemption applies, Plaintiffs may be able to defeat summary judgment by demonstrating gaps and shortcomings in Defendants' calculations and thus demonstrate that Defendants have not met their initial burden. *See West v. City of Ft. Pierce, Fla*., No. 07-14335-CIV, 2008 WL 3270849, at *7 (S.D. Fla. Aug. 8, 2008) (holding that where the defendant's calculation of the establishment's receipts did not include certain sources of revenue that should have been included there were material disputes of fact as to whether the seasonal test was met that precluded summary judgment on that question). Plaintiffs have raised sufficient questions about the facts contained in the Training Facilities Summary Chart to persuade the Court that the amounts reflected in it are subject to reasonable dispute (even assuming that receipts from major league activities were properly included for all of the training establishments).

The Court also finds that to the extent major league spring training revenues *should* be included in receipts to determine if the training establishments meet the receipts test, Defendants' failure to include revenues from television and broadcast rights for spring training games casts doubt on the accuracy of Defendants' calculations. Defendants do not dispute that they receive television and radio broadcast revenues in connection with major league spring training games, instead arguing that these revenues need not be included in receipts because they are not associated with the physical use of the establishments by the public. This argument is unpersuasive, however. As Plaintiffs note, the district court in *Bridewell* explicitly listed revenues from television rights as one type of receipt for the purposes of the amusement exemption. *See Bridewell v. Cincinnati Reds,* No. C-1-93-203, 1997 WL 1764776, at *5 (S.D. Ohio Mar. 5, 1997), aff'd, 155 F.3d 828 (6th Cir. 1998). Although Defendants are correct that the district court in *Bridewell* did not actually decide this specific question, *see* Defendants' Reply on Partial Summary Judgment Motion at 20, they have pointed to no authority that suggests that the court in that case did not reasonably conclude that revenues from broadcast rights should be included in receipts. To the contrary, on appeal, the Sixth Circuit agreed with the district court's conclusion that under the FLSA, "receipts" simply means "money which is actually received at the time it is

134

actually received." 155 F.3d at 830.

Further, Defendants' reliance on a 2021 Opinion Letter by the Wage and Hour Division of the DOL in support of their argument is misplaced. There, DOL concluded that charitable donations are not "receipts" for the purposes of the amusement exemption, reasoning that they are not a reflection of the *seasonal* nature of the establishment:

> Ultimately, however, the context and purpose of the Receipts Test presents the strongest evidence that "receipts" does not include charitable donations, even after 1977. [The Receipts] test is one of two ways Congress allowed for an amusement or recreational establishment to demonstrate that it is, in fact, a seasonal entity for which the exemption is designed. See Legal Principles § C; *Brock*, 817 F.2d at 1259; *Chen*, 798 F.3d at 77; *Brennan*, 478 F.2d at 288. The Receipts Test achieves this objective by examining the timing of average receipts to determine whether the public patronizes the entity overwhelmingly during certain months and far less so in others. But the Receipts Test fulfills this purpose only when the receipts in question are those paid for the amusement and recreational experience, goods, or service provided by the establishment. In contrast, charitable gifts are by definition not given in exchange for an amusement and recreational experience, good, or service. See generally IRS Pub. 526. Moreover, they may be given at any time, frequently near the conclusion of the giver's tax or fiscal year. Regardless, the timing of the receipt of a charitable gift often bears little connection with, and is therefore not indicative of, the seasonality of the establishment.

Opinion Letter Fair Labor Standards Act (FLSA), 2021 WL 240824, at *13.

Unlike charitable donations, broadcast revenue is generated in connection with particular events, as Defendants conceded at the February 16, 2022 motion hearing. Thus, it is likely that such revenue provides a measure of whether or not the establishment operates on a seasonal basis. Although there is no evidence in the record reflecting how or when broadcast revenue is paid, the fact that the Clubs indisputably do receive such revenue also raises a material dispute of fact as to whether the training facilities meet the receipts test.

For these reasons, the Court finds that there are material disputes of fact as to whether Defendants have satisfied the receipts test as to the training facilities establishments that preclude summary judgment on that question.[33]

---

[33] The Court rejects Plaintiffs' argument that Defendants should be precluded from relying on

United States District Court
Northern District of California

v.   Recreational Nature of Establishment(s)

There is no dispute that the stadiums where affiliates play games during the Championship Season are recreational in nature because sports games are played there.  *See Jeffery*, 64 F.3d at 595 ("Sports events are among those types of recreational activities specifically considered by Congress to be covered by the exemption.") (internal quotations and citations omitted).  Plaintiffs argue, however, that to the extent that minor league training facilities are, at least in some cases, separate establishments from the major league training facilities, the minor league facilities are not recreational in nature.  In particular, while Plaintiffs concede that minor league training activities are open to the public, they assert that the public does not, in fact, come to watch minor league training or games at the backfields where minor league training occurs; nor are tickets or concessions sold in connection with the activities that occur there.   The Court concludes that this question cannot be resolved on summary judgment, both because the preliminary question of whether major and minor league spring training facilities should be treated as a single establishment has not been resolved and because the evidence is mixed as to the recreational nature of the minor league facilities if those should be determined to be separate establishments.

The regulations provide that "[a]musement or recreational establishments" as used in 29 U.S.C. § 213(a)(3) are establishments 1) "frequented by the public" 2) "for its amusement or recreation."  29 C.F.R. § 779.385.  DOL Opinion Letters indicate that the first requirement is easy

---

evidence of receipts that predates the pre-appeal discovery cut-off.  The time to challenge any shortcomings in Defendants' production of receipts evidence that predates the first discovery cut-off is past and therefore the Court declines to impose the wholesale exclusion Plaintiffs request.  Furthermore, Defendants have stipulated that they do not rely on the receipts tests as to the affiliate stadiums where championship games are played, relying instead on the seasonal test.  As a consequence, Defendants have waived any defense they might have that depends on evidence of the receipts received by the affiliates during the Championship Season, such as revenues from tickets or concessions sold at minor league games.  As to Plaintiffs' assertion that Defendants failed to produce evidence relating to receipts associated with minor league spring training, it is not clear that this will have any impact on Plaintiffs' ability to challenge this defense as Plaintiffs have recognized that the minor league teams do not generate any meaningful revenue in connection with the training season.  In any event, Defendants conceded at the February 16, 2022 motion hearing that if the Court finds that any minor league training facility is a separate establishment from the major league facility, the receipts test will not be met as to the minor league establishment.  Nonetheless, Plaintiffs will not be precluded from objecting to the introduction at trial of specific evidence of receipts based on untimely production where they can demonstrate that specific prejudice resulted from the late production.

to meet: "An establishment is 'frequented by the public' if it is generally accessible to the public." Opinion Letter Fair Labor Standards Act (FLSA), 2021 WL 240824, at *6. As it is undisputed that the back fields used for minor league spring training are generally open to the public, the Court concludes that this requirement is met regardless of whether or not the minor league training facilities are separate establishments or instead part of a single establishment that includes the major league training facilities. The more difficult question is whether the minor league spring training facilities – if they are separate establishments that do not include the major league facilities – are "for [the public's] amusement or recreation."

It is "[t]he nature of the employer's business – not the work of a particular employee – [that] determines an entity's purpose." *Id.* (citation omitted). Defendants argue that as a matter of law, the "nature of the Club's business" is the "presentation of baseball activities to the public (including games and training activities)" and therefore, that the spring training facilities are for the public's amusement or recreation. Defendants Reply on Motion for Partial Summary Judgment at 17. Defendants' broad characterization of the nature of the business, however, does not establish as a matter of law that the nature of the specific businesses operated at the minor league spring training facilities – should they be found to be separate establishments – is for the purpose of providing amusement or recreation to the public.

Plaintiffs, on the other hand, rely on the fact that no recreation or entertainment is sold at the minor league training facilities to argue that this test is not met, citing *Mann v. Falk*, No. 2:11-CV-14432-KMM, 2012 WL 4896726, at *4 (S.D. Fla. Oct. 15, 2012), aff'd in part, 523 F. App'x 549 (11th Cir. 2013). But the fact that those facilities do not *sell* recreation does not establish as a matter of law that they are not recreational. *Mann* does not stand for the proposition that an establishment is for a recreational purpose only if the business charges the public or otherwise makes money from entertaining the public. Rather, that case involved the question of whether an RV park's business was for the public's amusement or recreation where some recreational activities were offered at the park but they generated no revenues. *Mann v. Falk*, 2012 WL 4896726, at *1. The court in *Mann* relied on the fact that all of the park's revenues came from lot rentals or the sale of RVs and none from recreational activities as a measure of the establishment's

principal activity.  *Id.*  at *4.  However, such a comparison sheds little light on the question here to the extent that the minor league facilities appear to generate no revenues whatsoever, whether related to providing entertainment to the public or anything else.

The 2021 DOL opinion letter cited by Defendants explains that the determination of whether an establishment meets the "recreational purpose" requirement "takes into account all relevant circumstances."  2021 WL 240824, at *6. The Court concludes that neither side has demonstrated that their position is supported as a matter of law and therefore the Court declines to resolve this issue on summary judgment.

vi.  Conclusion

For the reasons stated above, the Court finds that there are fact questions as to whether Defendants will be able to prevail on their amusement exemption defense and therefore denies both parties' requests for summary judgment on this issue.

### 10. Whether the Court Should Find as a Matter of Law that Violations of Arizona Law were Willful

a.   Contentions of the Parties

Plaintiffs assert that because Defendants have no affirmative defenses under Arizona law there are only two liability questions with respect to the Arizona class:  1) whether Plaintiffs are "employees"; and 2) whether the team activities during spring training are compensable work under Arizona law.  Plaintiffs' Partial Summary Judgment Motion at 53 (citing *Senne*, 934 F.3d. at 942).  For the reasons Plaintiffs contend they are entitled to summary judgment on both questions, discussed above, they argue the Court should enter summary judgment with respect to the minimum wage claim asserted by the Arizona Class (Count 13).  *Id.*   Because they are entitled to summary judgment that Defendants violated Arizona law, Plaintiffs contend, the Court should hold that Plaintiffs and the Arizona Class are entitled to " 'an additional amount equal to twice the underpaid wages,' plus interest and 'reasonable attorneys' fees' and costs."  *Id.*  at 53-54 (citing Ariz. Rev. Stat. § 23-364(G)).

Plaintiffs further assert the Court should enter summary judgment that Defendants' violation of Arizona law was willful, which would "extend[ ] the statute of limitations from two

United States District Court
Northern District of California

years to three years (and all violations occurring as part of a continuing course of conduct regardless of date are reachable)." *Id.* at 54 (citing Ariz. Lab. Code § 23-364(H)).  Plaintiffs point to a Ninth Circuit decision construing what they contend is a similar provision in the FLSA, "interpret[ing] an analogous concept from the FLSA to mean 'the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited.' " *Id.* (quoting *Flores v. City of San Gabriel*, 824 F.3d 890, 906 (9th Cir. 2016) (internal quotations omitted)). According to Plaintiffs, under *Flores* actual knowledge is not required and it is "enough that the 'employer disregarded the very "possibility" that it was violating the statute.' " *Id.* (quoting *Flores*, 824 F.3d at 906). Furthermore, Plaintiffs argue, this standard does not require authority that is directly on point establishing that the conduct at issue is prohibited. *Id.* (citing *Flores*, 824 F.3d at 906; *Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th Cir. 2003)).   According to Plaintiffs, this case presents a "textbook case" of willful violation of Arizona law because: 1) there have never been any affirmative defenses under Arizona law and Defendants admitted in their pleadings that Plaintiffs are "employees"; and 2) several years have passed since the Court found that Plaintiffs are not "trainees" and yet Defendants have done "nothing in the interim to comply with Arizona law." *Id.* at 55.

Defendants assert that the Court should deny summary judgment on Plaintiffs' minimum wage claim under Arizona law for the same reasons it should find that Plaintiffs have not established as a matter of law that Plaintiffs are "employees" or that they perform compensable work during the training season.   Opposition to Plaintiffs' Partial Summary Judgment Motion at 56.  Nor have Plaintiffs demonstrated willfulness as a matter of law, Defendants argue.  *Id.* at 56-57.  According to Defendants, to prevail on this issue "Plaintiffs must proffer undisputed material facts which demonstrate that Defendants knew that they were acting in violation of the law, or showed reckless disregard for the matter, as opposed to having acted negligently or unreasonably." *Id.* at 57 (citing *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 132-33 (1988)).   Inaction or merely knowing the FLSA was "in the picture" is not enough to meet this standard, Defendants assert.  *Id.* (citing *McLaughlin*, 486 U.S. at 132-33; *Robinson v. Open Top Sightseeing San Francisco, LLC*, 2017 U.S. Dist. LEXIS 79969, at *31 (N.D. Cal. May 24, 2017)).   Moreover,

United States District Court
Northern District of California

1   they argue, the willfulness inquiry is fact-intensive and usually inappropriate for resolution on

2   summary judgment – especially where there is a "dearth of settled law on the issue." *Id.* (citations

3   omitted).  Defendants argue that under these standards, Plaintiffs have not met their burden,

4   offering no evidence of willfulness and simply relying on Defendants' disagreement with

5   Plaintiffs on the merits based on Defendants' "legitimate understanding that minor leaguers are

6   **not** 'employees' who performed compensable 'work' under Arizona law." *Id.* at 58 (emphasis in

7   original).

8                  b.   Discussion

9          In Count 13 of the SCAC, ¶¶ 634-639, Plaintiffs asserts a claim for violation of Arizona's

10  minimum wage law, requiring that "[e]mployers shall pay employees no less than the minimum

11  wage[.]"  Ariz. Rev. Stat. §§ 23-363.  Under Ariz. Rev. Stat. § 23-364(G), "[a]ny employer who

12  fails to pay the wages or earned paid sick time required under [§ 23-363] shall be required to pay

13  the employee the balance of the wages or earned paid sick time owed, including interest thereon,

14  and an additional amount equal to twice the underpaid wages or earned paid sick time."  That

15  section further provides that a prevailing plaintiff "shall be entitled to reasonable attorney's fees

16  and costs of suit." Ariz. Rev. Stat. § 23-364(G).  Plaintiffs further allege in Count 13 that

17  Defendants' violation of the Arizona minimum wage law was willful.  SCAC ¶ 639.  Arizona

18  minimum wage law provides that a civil action to enforce a minimum wage violation "may be

19  commenced no later than two years after a violation last occurs, or three years in the case of a

20  willful violation, and may encompass all violations that occurred as part of a continuing course of

21  employer conduct regardless of their date."  Ariz. Rev. Stat. § 23-364(H).

22         As the Ninth Circuit has recognized, liability on Plaintiffs' Arizona minimum wage claim

23  "can be established simply by showing that the class members performed any compensable work"

24  and that question, in turn, can be resolved "by answering two questions: (1) are the players

25  employees of defendants, and (2) do the minor league team activities during these periods

26  constitute compensable work" under Arizona law.  *Senne*, 934 F.3d at 942.  For the reasons

27  discussed above, the Court has found that Plaintiffs have established based on undisputed

28  evidence that they are "employees" under Arizona law and that they performed at least some

United States District Court
Northern District of California

140

1    compensable work.  For the same reasons, the Court concludes that Plaintiffs are entitled to

2    summary judgment on their claim for violation of Arizona's minimum wage law and therefore are

3    liable for treble the amount of unpaid wages, attorneys' fees and costs as to that claim.

4           The Court declines, however, Plaintiffs' request for summary judgment on the question of

5    whether Defendants' violation of Arizona law was willful. The parties agree that the standard for

6    willfulness under Arizona's minimum wage law is the same as the standard under the FLSA.

7    Under the FLSA, a violation is willful if the "employer either knew or showed reckless disregard

8    for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe*

9    *Co.*, 486 U.S. 128, 133 (1988).  That standard is not satisfied where "nothing more than

10   negligence" is established.  *Id.* at 135.  Likewise, a "good-faith but incorrect assumption" that

11   conduct was lawful does not rise to the level of willfulness.  *Id.*

12          *"*Reckless disregard includes 'failure to make adequate inquiry into whether conduct is in

13   compliance' with the FLSA, 5 C.F.R. § 551.104, and an employer thus acts willfully by

14   'disregard[ing] the very 'possibility' that it was violating the statute.'" *Terrazas v. Carla Vista*

15   *Sober Living LLC*, No. CV-19-04340-PHX-GMS, 2021 WL 4149725, at *3 (D. Ariz. Sept. 13,

16   2021) (quoting *Alvarez v. IBP, Inc.*, 339 F.3d 894, 908 (9th Cir. 2003), aff'd, 546 U.S. 21 (2005)).

17   However, courts may not "presume that conduct was willful in the absence of evidence."  *Alvarez*,

18   339 F.3d at 909. " 'Whether or not a violation of the FLSA was willful is a question of fact

19   properly submitted to a jury' so long as there is a genuine issue of material fact." *Terrazas*, 2021

20   WL 4149725 at *3 (quoting *Huss v. City of Huntington Beach*, 317 F. Supp. 2d 1151, 1160–61

21   (C.D. Cal. 2000) (citing *Brinkman v. Dep't of Corr.*, 21 F.3d 370, 373 (10th Cir. 1994)); *Acosta v.*

22   *Zhao Zeng Hong*, 704 F. App'x 661, 664 (9th Cir. 2017)).

23          Here, Plaintiffs point to evidence that Defendants treated minor league players as

24   "employees" in a wide variety of contexts, including workers' compensation, ERISA, health

25   insurance and taxes, supporting the conclusion that Defendants acted recklessly with respect to

26   their obligation to pay minimum wage.  *See* Reply on Plaintiffs' Partial Summary Judgment

27   Motion at 25.  They also point to past DOL investigations of defendants' wage practices in support

28   of their position.  *Id.* (citing evidence).  Defendants, in turn, have offered declarations from Club

United States District Court
Northern District of California

141

officials addressing their good-faith belief that minor league players were not "employees" for the purposes of the FLSA and state minimum wage law.  *See* Opposition to Plaintiffs' Partial Summary Judgment Motion at 58 (citing evidence).  Because the evidence on this question is disputed, the Court finds that this issue should be resolved by the jury.

### 11.  Whether Plaintiffs are Entitled to Summary Judgment on Wage Statement and Record-Keeping Claims Under California and Arizona Law

#### a.  Contentions of the Parties

Plaintiffs argue that they are entitled to summary judgment on their California wage statement claim (Count 7) and their Arizona recordkeeping claim (Count 14) because the undisputed facts establish that Defendants have not complied with the laws asserted in these claims.  Plaintiffs' Partial Summary Judgment Motion at 54-56. With respect to the California wage statement claim, Plaintiffs contend they are entitled to summary judgment because the only affirmative defense asserted under California law, the creative professional exemption, fails as a matter of law.  *Id.*  at 54.  According to Plaintiffs, California's wage statement law requires that employers list on wage statements the "total hours worked," "all applicable hourly rates in effect during the pay period," and the number of hours worked at each rate. *Id.* (citing Cal. Lab. Code §§ 226(a)(2) & (a)(9)).   Further, they assert, "an 'employee is deemed to suffer injury' if the required information is not provided, and if the required information cannot be 'easily determine[d]' from the wage statement alone." *Id.* at 54-55. Plaintiffs contend a "knowing and intentional" violation of these requirements – that is, one where the employer is "aware of the factual predicate underlying the violation" – carries a penalty of $50 for the first violation and $100 for each subsequent violation.  *Id.* at 55 (citing Cal. Lab. Code § 226(e); *Kao v. Holiday*, 12 Cal. App. 5th 947, 961-62 (2017)).

Plaintiffs contend the undisputed facts establish that Defendants have not complied with California's wage statement requirements.  *Id.*  First, they point to the Court's finding in its March 7, 2017 Order (dkt. no. 782, inadvertently cited as dkt. no. 682 in Plaintiffs' brief) that "[t]here is no dispute that Defendants have not kept the records of the activities that Plaintiffs contend are 'work' under any potentially applicable wage and hour laws, state or federal."  *Id.*

142

(quoting March 7, 2017 Order at 52). Second, they cite evidence that "Defendants have never tried to keep this information – much less accurately record it in a wage statement" and have "simply provide[d] default numbers bearing no resemblance to actual hours worked." *Id.* (citing evidence). Because this conduct is intentional, Plaintiffs contend, they are entitled to summary judgment on this claim. *Id.* Further, they cite the opinion of their expert, Dr. Kriegler, that there "were 19,991 pay periods in the California Class [period] where California Class members were not provided the information required under California law, resulting in penalties of $1,882,650." *Id.* (citing Broshuis MPSJ Decl., Ex. 94 (Kriegler Supp. Report at ¶ 153)).  According to Plaintiffs, Defendants did not rebut this calculation and therefore the Court should award this amount on their California wage statement claim. *Id.*

As to the Arizona recordkeeping claim, Plaintiffs contend Arizona employers must "keep records, *inter alia*, of '[h]ours worked each workday and total hours worked each workweek,' '[r]egular hourly rate of pay for any workweek,' and '[t]otal daily or weekly straight-time wages due for hours worked during the workday or workweek.' " *Id.* at 56 (citing Ariz. Admin. Code R20-5-1210).  Further, they assert, "Arizona law mandates that 'Employers shall maintain payroll records showing the hours worked for each day worked, and the wages paid to all employees for a period of four years.' " *Id.* (quoting *Nobles v. State Farm Mut. Auto. Ins. Co.,* No. 10-04175-CV-C-NKL, 2013 WL 12153517, at *4 (W.D. Mo. June 5, 2013) (quoting Ariz. Rev. Stat. § 23-364(D)). The penalty for violation of these requirements, they contend, is "$250 dollars for a first violation, and at least $1000 dollars for each subsequent or willful violation." *Id.* (quoting Ariz. Rev. Stat. § 23-364(F)).

Plaintiffs argue that they are entitled to summary judgment on this claim because "Defendants issue no wage statements during the work periods at issue in the Arizona Class, and it is undisputed that they do not keep track of hours worked, rate of pay, or wages due by reason of hours worked." *Id.*  They further contend these violations are willful because Defendants "do not even try to collect or maintain this information[.]" *Id.* Therefore, Plaintiffs argue, the Court should award a $1,000 penalty for "what would have been every pay period for each player." *Id.* (citing Ariz. Rev. Stat. § 23-364(F)). Based on the extended limitations period Plaintiffs contend

United States District Court
Northern District of California

applies to their Arizona law claims, Plaintiffs contend the actionable claims date back to February 7, 2011, giving rise to total penalties in the amount of $110,323,000. *Id.* (citing Broshuis MPSJ Decl., Ex. 94 (Kriegler Supp. Report) ¶ 153). Plaintiffs note that if the Court finds that there are disputed issues of facts as to the question of willfulness, if can easily adjust this amount to award $250 per violation instead of $1,000 per violation.

In their response, Defendants oppose Plaintiffs' request for summary judgment on the California wage statement claim on the basis that there are disputed issues of fact as to whether Plaintiffs are exempt under California's creative professional exemption. Opposition to Plaintiffs' Partial Summary Judgment Motion at 60 (citing Cal. Lab. Code § 226(j)). They also argue in a footnote that "even if Players were misclassified, Plaintiffs have failed to demonstrate the absence of disputed issues regarding whether Clubs had a good faith belief that Players were exempt." *Id.* at 60 n. 150 (citing *Boyd v. Bank of Am. Corp.*, 109 F. Supp. 3d 1273, 1308 (C.D. Cal. 2015) ("[I]f Defendants had a good faith belief that the Plaintiffs were properly classified as exempt … , Defendants did not 'knowing[ly] and intentional[ly]' fail to provide adequate wage statements.")).

With respect to the Arizona recordkeeping claim, Defendants do not dispute that they do not keep track of hours worked, rate of pay, or wages due during spring training or issue wage statements but contend Plaintiffs' calculation of the amount of penalties on this claim is incorrect. *Id.* at 59-60. First, they argue that Plaintiffs' reading of Arizona law as imposing a penalty for each player for each pay period is incorrect. They point to "the plain language of the statute" ("[a]ny employer who violates recordkeeping … shall be subject to a civil penalty of at least $250 for a first violation, and at least $1000 for each subsequent or willful violation….") and the definition of "violation" in the regulations ("a transgression of any statute or rule, or any part of a statute or rule, including both acts and omissions"), arguing that if the Arizona legislature had intended that the statutory penalty apply for each pay period it would have specified that intent in the statutory language. *Id.* (citing Ariz. Rev. Stat. § 23-364(F); Ariz. Admin. Code § 20-5-1202(28)). As an example, they cite Ariz. Rev. Stat. § 23-364(G), providing that statutory penalties for retaliation shall be "not less than one hundred fifty dollars for each day that the violation continued or until legal judgment is final." *Id.*

144

1    Defendants also note that in *Nobles v. State Farm Mut. Auto. Ins. Co*., 2013 WL 12153517,

2    at *6 (W.D. Mo. June 5, 2013), which is "one of the only cases to even mention the application of

3    Ariz. Rev. Stat. § 23-364(F)," the court observed that the per plaintiff recovery in that case would

4    be "quite small[,]" which Defendants contends implied "that each plaintiff would recover a small

5    civil penalty for the recordkeeping violation – not accrue penalties for each pay period, which

6    would aggregate to a significant sum." *Id.*

7    Finally, Defendants argue that the $1,000/per violation rate Plaintiffs request on their

8    Arizona recordkeeping claim should be denied because there are factual disputes that preclude a

9    finding of willfulness and further, employers cannot be penalized at the higher rate for

10   "subsequent violations" until they have received notice that a violation has occurred.  *Id.* at 60

11   (citing *George Hyman Constr. Co. v. OSHRC*, 582 F.2d 834, 841 (4th Cir. 1978)).  Here, they

12   assert, "there is zero evidence that Defendants have received notice of an 'actual violation,' and

13   the Court should not impose an enhanced penalty." *Id.*

14       b.   Discussion

15           i.   California Wage Statement Claim

16   Plaintiffs assert their California wage statement claim under Cal. Lab. Code section 226,

17   which requires employers to provide "at the time of each payment of wages" an "itemized

18   statement in writing" that shows, *inter alia*, "total hours worked by the employee" (except if the

19   employee is covered by an exemption) and "all applicable hourly rates in effect during the pay

20   period and the corresponding number of hours worked at each hourly rate by the employee."  Cal.

21   Lab. Code section 226(a)(2) & (9). This section further provides for the imposition of penalties as

22   follows:

23           An employee suffering injury as a result of a knowing and intentional
             failure by an employer to comply with subdivision (a) is entitled to
24           recover the greater of all actual damages or fifty dollars ($50) for the
             initial pay period in which a violation occurs and one hundred dollars
25           ($100) per employee for each violation in a subsequent pay period,
             not to exceed an aggregate penalty of four thousand dollars ($4,000),
26           and is entitled to an award of costs and reasonable attorney's fees.

27   Cal. Lab. Code § 226(e)(1).  Further, "[a]n employee is deemed to suffer injury for purposes of

28   this subdivision if the employer fails to provide a wage statement."  Cal. Lab. Code § 226(e)(2).

145

United States District Court
Northern District of California

1    It is undisputed that Defendants do not provide itemized wage statements with the

2  information listed in sections 226(a)(2) and (9).  Further, for the reasons discussed above, the

3  Court finds, as a matter of law, that Plaintiffs are not exempt as creative professionals, which is

4  the only exemption asserted under California law.  The Court also finds, as a matter of law, that

5  the failure to comply with the wage statement requirements discussed above was "knowing and

6  intentional."  This requirement was addressed in *Kao v. Holiday*, in which the court held that this

7  requirement is met "if the employer 'knew that facts existed that brought its actions or omissions

8  within the provisions of [the statute]' (*Willner v. Manpower, Inc*. (N.D. Cal. 2014) 35 F.Supp.3d

9  1116, 1131) or, in other words, 'was aware of the factual predicate underlying the violation'

10  (*Novoa v. Charter Communications, LLC* (E.D. Cal. 2015) 100 F.Supp.3d 1013, 1028).' " 12 Cal.

11  App. 5th 947, 961 (2017).  The court in *Kao* explained that a violation of the wage statement

12  requirements is "knowing and intentional" unless it is the result of "accidental omissions, such as

13  'an isolated and unintentional payroll error due to a clerical or inadvertent mistake.' " *Id.* (citing

14  Cal. Lab. Code, § 226(e)(3)).  Thus, even if an employer "believed, in good faith" that the

15  employee was exempt or fell outside of the wage statement requirement, this would not establish

16  that the violation was not "knowing and intentional" because "[s]uch a belief amounts to a mistake

17  of law that is not excused under the statute mandating itemized wage statements." *Id.* (citing

18  *Navoa*, 100 F. Supp. 3d at 1028-29).

19    Defendants argue in a footnote that there are disputed facts as to whether they had a good

20  faith belief that they were not required to comply with the wage statement requirements, citing

21  *Boyd v. Bank of Am. Corp*., 109 F. Supp. 3d 1273 (C.D. Cal. 2015).  That case misstated the

22  standard, however, citing to *Willner* in support of the proposition that a violation of section 226 "is

23  'knowing and intentional' where the defendants knew or should have known that their conduct

24  violated the law."  109 F. Supp. 3d at 1308 (citing *Willner v. Manpower Inc*., 35 F. Supp. 3d 1116,

25  1131-32 (N.D. Cal. 2014)).  Based on that mistaken reading of *Willner*, the court in *Boyd*

26  concluded that an employer who violates section 226 does not do so "knowing[ly] and

27  intentional[ly]" if the employer had a good faith belief that an employee is exempt.  *Id.*  The court

28  in *Willner*, however, expressly held that the "knowing and intentional requirement" merely

146

requires that the defendant knew "that facts existed that brought its actions or omissions within the provisions of section 226(a)—i.e., that [the employer] knew that its wage statements did not contain" the required information. 35 F. Supp. at 1131.  It emphasized that the plaintiff in that case was "not required to demonstrate that [the employer] knew that this conduct, if otherwise proven, was unlawful." *Id.* Therefore, the Court rejects Defendants' suggestion that a good faith belief that Plaintiffs are exempt would establish that their violation of Section 226 was not "knowing and intentional."  Accordingly, the Court concludes Plaintiffs are entitled to summary judgment on the California wage statement claim.

Further, the Court grants Plaintiffs' request for penalties on this claim, which it awards in the amount of $1,882,650.  *See* Kriegler Supp. Report ¶ 153.[34]

### ii.  Arizona Recordkeeping Claim

Plaintiffs assert their Arizona recordkeeping claim under Ariz. Rev. Stat. Ann. § 23-364, which governs the enforcement of Arizona's recordkeeping requirements, including regulations promulgated by Arizona's industrial commission.   Section 23-364(D) sets forth employers' recordkeeping obligations, stating as follows:

> Employers shall post notices in the workplace, in such format specified by the commission, notifying employees of their rights under this article. Employers shall provide their business name, address, and telephone number in writing to employees upon hire. Employers shall maintain payroll records showing the hours worked for each day worked, and the wages and earned paid sick time paid to all employees for a period of four years. Failure to do so shall raise a rebuttable presumption that the employer did not pay the required minimum wage rate or earned paid sick time. The commission may by regulation reduce or waive the recordkeeping and posting requirements herein for any categories of small employers whom it finds would be unreasonably burdened by such requirements. Employers shall permit the commission or a law enforcement officer to inspect and copy payroll or other business records, shall permit them to interview employees away from the worksite, and shall not hinder any investigation. Such information provided shall keep confidential except as is required to prosecute violations of this

---

[34]At the February 16, 2022 motion hearing, Defendants stipulated that while they challenge Plaintiffs' request for summary judgment on their California wage statement claim, they do not dispute that if the Court rejects their arguments, Dr. Kriegler's calculation of the amount of penalties to which Plaintiffs would be entitled on this claim is correct.

United States District Court
Northern District of California

1    article. Employers shall permit an employee or his or her designated
     representative to inspect and copy payroll records pertaining to that
2    employee.

3    Ariz. Rev. Stat. Ann. § 23-364(D).

4        Section 23-364(E) allows an enforcement action to be brought by "any private party

5    injured by a violation of this article" and further provides for penalties as follows:

6        Any employer who violates recordkeeping, posting, or other
         requirements that the commission may establish under this article
7        shall be subject to a civil penalty of at least $250 dollars for a first
         violation, and at least $1000 dollars for each subsequent or willful
8        violation and may, if the commission or court determines appropriate,
         be subject to special monitoring and inspections.
9

10   Ariz. Rev. Stat. Ann. § 23-364(F); *see also* Ariz. Rev. Stat. Ann. § 23-362 (defining "commission"

11   as the industrial commission of Arizona).

12       The implementing regulation governing Arizona's recordkeeping requirement requires that

13   "every employer shall maintain and preserve payroll or other records containing the following

14   information and data with respect to each employee to whom the Act applies:

15       1. Name in full, and on the same record, the employee's identifying
            symbol or number if it is used in place of the employee's name on
16          any time, work, or payroll record;

17       2. Home address, including zip code;

18       3. Date of birth, if under 19;

19       4. Occupation in which employed;

20       5. Time of day and day of week on which the employee's workweek
            begins. If the employee is part of a workforce or employed in or
21          by an establishment all of whose workers have a workweek
            beginning at the same time on the same day, then a single notation
22          of the time of the day and beginning day of the workweek for the
            whole workforce or establishment is permitted;
23

24       6. Regular hourly rate of pay for any workweek and an explanation
            of the basis of pay by indicating the monetary amount paid on a
25          per hour, per day, per week, per piece, commission on sales, or
            other basis, including the amount and nature of each payment;

26       7. Hours worked each workday and total hours worked each
            workweek;
27

28       8. Total daily or weekly straight-time wages due for hours worked

during the workday or workweek, exclusive of premium overtime compensation;

9.  Total premium pay for overtime hours and an explanation of how the premium pay was calculated exclusive of straight-time wages for overtime hours recorded under subsection (B)(8) of this Section;

10. Total additions to or deductions from wages paid each pay period including employee purchase orders or wage assignments, including, for individual employee records, the dates, amounts, and nature of the items that make up the total additions and deductions;

11. Total wages paid each pay period;

12. Date of payment and the pay period covered by payment;

13. The amount of earned paid sick time available to the employee;

14. The amount of earned paid sick time taken by the employee to date in the year;

15. The amount of pay the employee has received as earned paid sick time; and

16. The employee's earned paid sick time balance. "The employee's earned paid sick time balance" means the sum of earned paid sick time or equivalent paid time off that is: (1) carried over to the current year; (2) accrued to date in the current year; and (3) provided to date in the current year pursuant to A.R.S. § 23-372(D)(4) or A.A.C. R20-5-1206(F), (G), or (H).

Ariz. Admin. Code R20-5-1210(B).

There is no dispute that Defendants do not keep track of hours worked, rate of pay, or wages due by reason of hours worked in connections with Plaintiffs' activities in Arizona. Further, for the reasons discussed above, the Court finds that Plaintiffs are entitled to summary judgment that Plaintiffs, including the Arizona Class members and named Plaintiffs asserting individual claims under Arizona law, are "employees" who have performed some "work" in Arizona.  Therefore, Plaintiffs are entitled to summary judgment in their favor as to liability on this claim.

The Court also finds that Plaintiffs are entitled to summary judgment that Arizona law imposes recordkeeping obligations as to each employee and therefore rejects Defendants' suggestion that an employer's violation of its recordkeeping obligations as to multiple employees

149

1    could constitute a single violation.   Under the regulations, a "violation" is a "transgression of any

2    statute or rule, or any part of a statute or rule, including both acts and omissions."  Ariz. Admin.

3    Code R20-5-1202(28)."  While the recordkeeping provision could be read to allow for

4    Defendants' interpretation to the extent that it requires employers to maintain payroll records

5    "showing the hours worked for each day worked, and the wages and earned paid sick time paid to

6    *all* employees for a period of four years[,]" Ariz. Rev. Stat. Ann. § 23-364(D) (emphasis added),

7    the implementing regulation makes clear that this requirement applies to "each employee."

8    Ariz. Admin. Code R20-5-1210(B).  Therefore, the Court concludes that an employer commits a

9    separate violation of Arizona's recordkeeping requirement for each employee whose payroll

10   records are not maintained as required.

11        The Court also concludes that the word "subsequent" in Ariz. Rev. Stat. Ann. § 23-364(F)

12   should be given its plain meaning:  "subsequent" simply means "following in time, order, or

13   place."  *See* https://www.merriam-webster.com/dictionary/subsequent.  Defendants argue that the

14   Court should read into the statute an actual notice requirement based on *George Hyman Const. Co.*

15   *v. Occupational Safety & Health Rev. Comm'n*, 582 F.2d 834, 836 (4th Cir. 1978) but the Court is

16   not persuaded that the holding of that case applies here.

17        In *Hyman Construction*, the provision at issue imposed a penalty on "[a]ny employer who

18   willfully or repeatedly" violated the Occupational Safety and Health Act and the question the court

19   grappled with was the meaning of "repeatedly."  *Id.*  at 837.  The court in that case concluded that

20   "repeatedly" required only one prior violation, but it further found that in light of the disjunctive

21   construction (willfully *or* repeatedly) of the penalty provision, "a meaningful differentiation

22   between willful and repeated violations appear[ed] more consistent with the Act's enforcement

23   scheme as well as the literal terms" of the section."  *Id.* at 839–40.  Looking to the legislative

24   history of the Occupational Safety and Health Act, the court concluded that "Congress intended to

25   provide for enhanced penalties when an employer committed recurrent violations that did not

26   necessarily rise to the level of willfulness."  *Id.*  at 840.  The court declined to offer a "rigid"

27   definition of "repeatedly," citing "the desirability of allowing the [Occupational Health and Safety

28   Review Commission] flexibility in working out reasonable guidelines in enforcing the Act."  *Id.* at

United States District Court
Northern District of California

150

841. Nonetheless, it went on to offer the following guidance:

> Intrinsic within the statutory scheme of enforcement is the overall policy of providing employers with incentive to comply with the safety requirements of the Act. The system of penalties contained in § 17 allows for increased fines when the need arises to provide an employer with added incentive. To effectuate this policy, before a repeated violation may be found it is essential that the employer receive actual notice of the prior violation. For unless the employer has previously been made aware that his safety precautions are inadequate, there is no basis for concluding that a subsequent violation indicates the employer requires a greater than normal incentive to comply with the Act. Similarly, a reasonable time should elapse from the receipt of the notice of the original citation in order that employers be enabled to take corrective action. The two criteria preclude a purely inadvertent recurrence of a violation from being the basis for a repeated violation citation and require a reasonable opportunity be provided to the employer to correct safety and health hazards.

*Id.* Defendants here would have the Court read into Arizona law an actual notice requirement based on a federal statute that uses different language and a case that relied on the specific statutory scheme adopted by Congress in connection with that provision to determine Congress's intent. In the absence of any Arizona authority that suggests a similar intent on the part of the Arizona legislature, however, the Court concludes that the reading Defendants propose strays too far from the plain language of the statute.

Based on the above, the Court concludes that for every Arizona class member whose payroll records were not maintained by Defendants, Defendants are liable for a penalty of $250 for the first violation and $1,000 for each violation that occurred thereafter. The problem is determining what is meant by a "violation" in this context. Plaintiffs maintain that where it is undisputed that Defendants did not maintain records or issue wage statements in connection with any of the work performed by minor leaguers during the training season, a reasonable approach is to treat the failure to provide a wage statement for each "would-be" pay period as a separate violation, using the semi-monthly pay periods that apply to the Championship Season to calculate the number of violations. Defendants contend that an employer's failure to maintain records is a single, ongoing violation and that there is no indication the legislature intended that the penalty should be multiplied according to the period of time that it continues. While Plaintiffs' position does not seem unreasonable, the Court concludes that Defendants are correct on this question.

United States District Court
Northern District of California

1    The parties have pointed to no authority that is on point and the Court has found none.

2    Thus, the Court can only look to the plain language of the statute and, if the language is

3    ambiguous, any clues to the legislature's intent that might be contained in the statutory scheme as

4    a whole. *See Hughes v. Jorgenson*, 203 Ariz. 71, 73 (2002) ("Generally, if a statute is clear, we

5    simply apply it without using other means of construction, . . . assuming that the legislature has

6    said what it means.  When a statute is ambiguous or unclear, however, we attempt to determine

7    legislative intent by interpreting the statutory scheme as a whole and consider the statute's context,

8    subject matter, historical background, effects and consequences, and spirit and purpose.") (internal

9    quotations and citations omitted).

10    The requirement Plaintiffs contend Defendants have failed to meet is set forth in Section

11    23-364(D), requiring that "[e]mployers shall maintain payroll records showing the hours worked

12    for each day worked, and the wages and earned paid sick time paid to all employees for a period of

13    four years." The language in this section appears to treat an employer's failure to maintain payroll

14    records for an employee over a period of time as an ongoing violation rather than a series of

15    discrete violations  The penalty provision is in a separate section of the statute, subsection (F), and

16    is framed as a catch-all to cover violations of "recordkeeping, posting, or other requirements that

17    the commission may establish under this article."  Although it is apparent that this penalty

18    provision was intended to address repeat violations by employers, establishing a lower penalty for

19    the first violation than for subsequent violations, the Court finds nothing in the language of the

20    penalty provision that suggests that it was intended to impose additional penalties based on the

21    time that an ongoing violation continues.  In contrast, in subsection (G), setting forth penalties for

22    other types of violations of Ariz. Rev. Stat. § 23-264, the legislature clearly specified that for

23    retaliation, penalties would be imposed based on how long the ongoing conduct persisted,

24    imposing penalties of "not less than one hundred fifty dollars for each day that the violation

25    continued or until legal judgment is final."

26    Further, the Court finds Plaintiffs' proposed interpretation of the language of Ariz. Rev.

27    Stat. § 23-364 somewhat arbitrary.  As Plaintiffs concede, to the extent that the law imposes

28    recordkeeping requirements that apply to "each day worked," it could just as plausibly be argued

under Plaintiffs' approach that every day worked where Defendants failed to maintain records constitutes a separate violation, giving rise to potentially astronomical penalties. While Plaintiffs argue that they have taken a more reasonable approach by calculating the number of violations based on pay periods rather than work days, they have not pointed to language that justifies this approach any more than an approach that treats a failure to keep records for each work day as a separate violation.

The Court also notes that the monetary penalties established in Ariz. Rev. Stat. § 23-364(F) for recordkeeping violations are not the only remedy established under Ariz. Rev. Stat. § 23-364. In addition, "[f]ailure to [maintain payroll records showing the hours worked for each day worked, and the wages and earned paid sick time paid to all employees] raise[s] a rebuttable presumption that the employer did not pay the required minimum wage rate or earned paid sick time." Ariz. Rev. Stat. § 23-364(D). Moreover, an employee may bring a civil action based on the employer's failure to meet these obligations to obtain "the balance of the wages or earned paid sick time owed, including interest thereon, and an additional amount equal to twice the underpaid wages or earned paid sick time." Ariz. Rev. Stat. Ann. § 23-364(G). Thus, even apart from the monetary penalties available under Ariz. Rev. Stat. Ann. § 23-364(F), the Arizona legislature appears to have enacted a remedial scheme with robust remedies for employees whose employers do not abide by their recordkeeping obligations under Arizona law. For these reasons, the Court finds that the approach used by Plaintiffs' expert to calculate the amount of penalties Plaintiffs are entitled to on their Arizona recordkeeping claim is not consistent with Arizona law.

As Plaintiffs have not presented a damages calculation consistent with the Court's conclusions, the Court declines to grant summary judgment as to the amount of the penalty; rather, Plaintiffs may present evidence at trial consistent with this opinion to establish the amount of the penalty to which they are entitled. On the other hand, the Court finds that Plaintiffs are entitled to summary judgment with respect to liability on the Arizona recordkeeping claim for the reasons stated above.

### 12. Whether Plaintiffs are Entitled to Summary Judgment on Defendants' Offset Affirmative Defense

a.   Contentions of the Parties

Plaintiffs contend they are entitled to summary judgment with respect to Defendants' eighth affirmative defense, that wage credits, or "offsets," should be permitted under the FLSA and under Arizona, Florida, and California law. Plaintiffs' Partial Summary Judgment Motion at 57-60.  According to Plaintiffs, neither Arizona nor California law permits wage credits, and Defendants cannot establish that they are entitled to any credits for the Florida Class or the FLSA Collective.  *Id.*, Notice of Motion at ii.

Pointing as an example to the "Equitable Set Off" affirmative defense asserted in a supplemental answer filed by the Blue Jays (dkt. no. 908 at pp. 82-83),[35] Plaintiffs contend it is unclear what Defendants seek to count as wages under this affirmative defense but that they understand from the report of Dr. Guryan, one of Defendants' experts, that Defendants claim that "meals, lodging, signing bonuses, and College Scholarship Plan payments should count as wages." *Id.* at 57.  According to Plaintiffs, they are entitled to summary judgment as to all of these.  *Id.*

With respect to meals and lodgings, Plaintiffs argue that both Arizona and California law bar such wage credits.  *Id.* Under Arizona law, Plaintiffs assert, "wages" are defined as "monetary compensation due to an employee by reason of employment, including an employee's commissions, but not tips or gratuities."  *Id.* (quoting Ariz. Rev. Stat. § 23-362, Version 2). Plaintiffs argue that because "monetary compensation" is defined in the regulations as "cash or its equivalent due to an employee by reason of employment" – and the evidence establishes that Plaintiffs do not receive monetary compensation during the training season – Plaintiffs are entitled to summary judgment that Defendants may not claim offsets for "meals, lodging, or anything

---

[35] In this supplemental answer, the Equitable Set-Off affirmative defense states, in its entirety, as follows:

> To the extent Defendant provided Plaintiffs and the putative class and collective members with compensation or remuneration of any kind to which Plaintiffs and the putative class and collective members had no legal entitlement, Defendant are entitled as a matter of equity to set off any recovery for minimum wage and/or overtime.

Dkt. no. 908, pp. 81-82.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    similar in Arizona." *Id.* (citing Ariz. Admin. Code R20-5-1202; and citing evidence).

2          According to Plaintiffs, under California law offsets for meals or lodging may not be

3    credited against minimum wage without a voluntary written agreement between the employer and

4    the employee." *Id.* (quoting Cal. Code Regs. tit. 8, § 11000).[36]  Further, Plaintiffs assert, "the

5    DLSE requires that the written agreement 'explicitly reference that such credits are being applied

6    toward the minimum wage obligation of the employer.' " *Id.* (quoting *Brock v. Carrion, Ltd.*, 332

7    F. Supp. 2d 1320, 1330 (E.D. Cal. 2004) (citation omitted).  Defendants have produced no

8    evidence of such agreements, Plaintiffs contend, because it does not exist. *Id.*  Therefore, meal

9    and lodging offsets also are not available under California law, Plaintiffs argue. *Id.*

10         Plaintiffs contend Defendants also cannot claim offsets for meals and lodgings under the

11   FLSA and Florida law because the FLSA does not permit "on-the-road expenses to be credited

12   against wages and meal and lodging expenses fall into that category because players are away

13   from home when they attend spring training. *Id.* at 58 (citing *Sharp v. CGG Land (U.S.) Inc.*, 840

14   F.3d 1211, 1215 (10th Cir. 2016) (interpreting 29 C.F.R. § 778.217(b)(3)).

15         In addition, Plaintiffs contend, "Defendants did not keep the type of records required to

16   entitle them to a credit" and it is their burden to prove they are entitled to it. *Id.* (citing *Donovan v.*

17   *New Floridian Hotel, Inc.*, 676 F.2d 468, 474 (11th Cir. 1982); 29 C.F.R. § 516.27).  According to

18   Plaintiffs, "[c]ourts routinely deny employers offsets under the FLSA for failure to keep adequate

19   records." *Id.* (quoting *Brock v. Carrion, Ltd.*, 332 F. Supp. 2d 1320, 1326 (E.D. Cal. 2004);  and

20   citing *Chavez v. Arancedo*, No. 17- 20003-CIV, 2018 WL 4610567, at *5 (S.D. Fla. Sept. 24,

21   2018)).  They note that Defendants' expert conceded that "very few per diem, lodging, and meal

22   payments seem to appear in payroll" and that Dr. Guryan instead relied on "policy documents"

23   relating to per diem and meal payments and assumed that these were followed, making no attempt

24   to link these assumed payments to any particular player or to actual evidence that a payment was

---

[36] This section provides, in relevant part, as follows:

     Meals and Lodging – Meals or lodging may not be credited against the minimum wage
     without a voluntary written agreement between the employer and the employee.

Cal. Code Regs. tit. 8, § 11000(3).

made. *Id.* at 58-59 (citing Broshuis MPSJ Decl., Ex. 115 (Guryan Rebuttal Report) at 14). Likewise, Plaintiffs contend, Dr. Guryan "based his calculation of lodging credits almost entirely on summary documents, which (at best) show payments to hotels without any indication of which players they apply to or in what amounts." *Id.* at 59 (citing Broshuis MPSJ Decl., Ex. 115 (Guryan Rebuttal Report) at 14).[37]   This evidence is insufficient, Plaintiffs contend, to meet Defendants' burden of "coming forward with contemporaneous documents showing on a per workweek basis the additions to or subtractions from the minimum wage required." *Id.* Therefore, Plaintiffs argue, they are entitled to summary judgment that Defendants are not entitled to offsets under the FLSA or Florida law for meals and lodgings provided to Plaintiffs during training season. *Id.*

Plaintiffs also challenge Dr. Guryan's "attempts to re-calculate damages by spreading out the value of signing bonuses over the life of a UPC—up to *seven years*." *Id.* (citing Broshuis MPSJ Decl., Ex. 115 (Guryan Rebuttal Report) at 14) (emphasis in original).  Plaintiffs argue that a signing bonus is not "wages for work performed," citing MLR 3(C)(5)(A), but that even if it were, it "can only count towards the minimum wage during the pay period when it is paid." *Id.* (citing *Roland Elec. Co. v. Black*, 163 F.2d 417, 420 (4th Cir. 1947); *Marshall v. Sam Dell's Dodge Corp.*, 451 F. Supp. 294, 304 (N.D.N.Y. 1978); *Rogers v. Sav. First Mortg., LLC*, 362 F. Supp. 2d 624, 630-32 (D. Md. 2005); *Biggs v. Wilson*, 1 F.3d 1537, 1539-40 (9th Cir. 1993)). Therefore, Plaintiffs argue, Defendants "cannot retroactively average out signing bonuses to make up for the fact that they – months or years later – failed to pay any wages during extended periods of work." *Id.* at 59-60.

Plaintiffs also reject Defendants' claim that they are entitled to wage offsets for college tuition payments, arguing that they are entitled to summary judgment on that defense as well. *Id.* at 60.  According to Plaintiffs, "[u]nder Arizona law, making college payments does not count towards the minimum wage any more than making car payments." *Id.* (citing *Cramton v. Grabbagreen Franchising LLC*, No. CV-17-04663-PHX-DWL, 2021 WL 2562332, at *13 (D.

---

[37] As discussed above, Plaintiffs also assert a *Daubert* challenge to Guryan's report that raises this issue.

Ariz. June 23, 2021)). Similarly, Plaintiffs assert, the FLSA would not treat college tuition payments as a credit towards meeting the minimum wage. *Id.* (citing *U.S. Dep't of Lab. v. Shenandoah Baptist Church*, 707 F. Supp. 1450, 1464 (W.D. Va. 1989), aff'd sub nom. *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir. 1990) (tuition payments "did not reflect compensation for work")). Plaintiffs argue further that even if such payments could be treated as wages, they "cannot be spread retroactively over all weeks that the player had played… prior to the time the [College Scholarship Plan] payment was made.' " *Id.* (quoting Broshuis MPSJ Decl., Ex. 115 (Guryan Rebuttal Report) at 16-17; and citing *Biggs v. Wilson*, 1 F.3d 1537, 1539 (9th Cir. 1993) ("If a payday has passed without payment, the employer cannot have met his obligation to 'pay.' "). Plaintiffs contend, "[p]aying for college tuition several years later is no substitute for actually receiving a minimum wage for work performed during the pay period when the work was performed." *Id.*

In their Opposition, Defendants state that they are seeking to offset minimum wage obligations only as to per diem payments, signing bonuses and College Scholarship Plan ("CSP") payments. Opposition to Plaintiffs' Partial Summary Judgment Motion at 49 ("Plaintiffs cannot meet their burden on summary judgment regarding Defendants' ability to offset minimum wage liability under the FLSA and certain state laws based on per diem, signing bonuses and College Scholarship Plan ("CSP") payments."). Defendants do not seek to rely on offsets with respect to "lodging or payments made by the Clubs." *Id.* n. 122. Nor do they seek to offset overtime liability based on wage credits. *Id.* n. 121. In addition, they stipulate that they do not seek to offset minimum wage and/or overtime liability under California law for per diems. *Id.* n. 123.[38]

With respect to Plaintiffs' reliance on Arizona's requirement that wages must take the form of monetary compensation, Defendants argue that Plaintiffs have cited no authority establishing that that rule applies to per diem payments. *Id.* Instead, Defendants assert, it is reasonable to interpret Arizona statutes and regulations as permitting such cash payments to be treated as wages.

---

[38] At the February 16, 2022 motion hearing, Defendants further stipulated that the only meal payments for which they seek to offset minimum wage liability are those that are paid directly to the players in the form of per diems.

United States District Court
Northern District of California

*Id.* at 49-50 (citing Ariz. Rev. Stat. § 23-350(7); Ariz. Admin. Code § R20-5-1202, 1206).

Therefore, Defendants contend, Plaintiffs are not entitled to summary judgment that per diem payments during the training season cannot offset minimum wage liability.  *Id.*

Defendants reject Plaintiffs' argument that per diem payments during the training season cannot be offsets because they are "on the road expenses."  *Id.*  at 50.  They contend that courts must conduct a case-specific and fact-intensive inquiry to determine whether a per diem paid to an employee while traveling "serve[d] to reimburse expenses or compensate for hours worked."  *Id.* (citing *Clarke v. AMN Servs., LLC*, 987 F.3d 848, 856 (9th Cir.), *cert. denied*, 142 S. Ct. 710 (2021)).   Defendants contend Plaintiffs have failed to offer "dispositive evidence regarding the 'function' of the varying types of per diem payments provided by each Club, during each Training Season" and that there is evidence that "for many Clubs, per diem or meal money payments were provided to Players for days they participated during the Clubs' Training Seasons expressly in lieu of the payment of salaries, and there was no requirement that Players actually incurred expenses in order to receive the payments."  *Id.* at 50-51 (citing evidence).  These factual disputes preclude summary judgment on this issue, Defendants contend.  *Id.* at 51.

Defendants also reject Plaintiffs' argument that Defendants have not maintained sufficient records to establish that they are entitled to a wage credit.  *Id.* at 51.  Defendants contend "there is record evidence that Defendants maintained payroll records reflecting wages and deductions related to per diem, housing and travel payments[,]" pointing to the fact that Plaintiffs' expert, Dr. Kriegler, acknowledged that "such deductions were reflected in certain Clubs' payroll records."  *Id.* (citing Bloom Motion to Exclude (Kriegler) Decl., Ex. 1 (Kriegler Supplemental Report) at 71 n. 87).[39]   According to Defendants, these records comply with DOL regulations.  *Id.* (citing 29

---

[39] In this footnote, Dr. Kriegler stated:

> The Earnings Data production includes occasional payments pertaining to player appearances, per diem, housing, and travel ("Additional Possible Compensation"). At this time, Plaintiffs' counsel has instructed me not to categorize Additional Possible Compensation as wages. Nevertheless, I have calculated the amount of Additional Possible Compensation appearing in the Earnings Data.

Kriegler Supplemental Report at 71 n. 87.  Dr. Kriegler went on to provide the specific amounts of

158

1  C.F.R. § 516.27(b)).

2       Furthermore, Defendants argue that while Plaintiffs rely on the DOL regulations "requiring

3  employers to maintain 'records showing on a workweek basis those additions to or deductions

4  from wages,' " they do not address authority where courts have awarded wage credits based on

5  "credible evidence of reasonable costs of meals and payments made to the employees" even

6  though the employer "did not keep records of wages and deductions for meals because they do not

7  treat individuals as "employees[.]" *Id.* (citing *Archie v. Grand Central Partnership, Inc.,* 86 F.

8  Supp. 2d 262, 266 (S.D.N.Y. 2000); *Roces v. Reno Hous. Auth.*, 300 F. Supp. 3d 1172, 1193 (D.

9  Nev. 2018); *Donovan v. Williams Chemical Co.*, 682 F.2d 185, 190 (8th Cir. 1982)). According

10 to Defendants, "the record is replete with evidence substantiating the reasonable cost of meals, as

11 well as per diem payments made to Players, including: (i) contemporaneous source records

12 reflecting actual per diem payments made to Players, including the amounts, the dates and Players'

13 signatures reflecting that they received such payments; (ii) summary documents reflecting costs

14 incurred by the Clubs for meals; and (iii) policy documents reflecting payments Clubs intended to

15 make to Players for per diem or meals, along with testimony from Club witnesses and Plaintiffs

16 confirming that such payments were made." *Id.* at 52 (citing evidence). Defendants argue that

17 this evidence provides a sufficient basis to allow Defendants to "proffer Dr. Guryan's revised

18 damages calculations accounting for payment of per diems at trial" and defeat Plaintiffs' request

19 for summary judgment. *Id.*

20      Next, Defendants contend Plaintiffs are incorrect in their assertion that signing bonuses

21 cannot be used to meet Defendants' minimum wage obligations. *Id.* According to Defendants,

22 Plaintiffs failed to address the "relevant inquiry for determining minimum wage compliance[,]"

23 which is "whether the bonus is includable as part of the regular rate." *Id.* (citing U.S. DOL Field

24 Operations Handbook § 30b07(a)). Defendants contend that under the FLSA, "all remuneration

25 for employment paid to, or on behalf of the employee" is considered part of an employee's regular

26 rate "except payments specifically excluded by 29 U.S.C. § 207(e)(1) through (8)." *Id.* at 53.

27  _____

28 Additional Possible Compensation for the Florida, Arizona and California Classes. *Id.*

United States District Court
Northern District of California

1    Defendants further assert, "[b]onuses are included in the regular rate when they are non-

2    discretionary in nature, including when they are "promised to employees upon hiring." *Id.* (citing

3    29 C.F.R. § 778.211(c).  Further, they argue, because the players' contracts include a right to

4    recoup a proportional part of the bonus if the player does not remain for a certain period of time,

5    the bonuses are "akin to longevity or retention bonuses, and when such bonuses are paid pursuant

6    to a contract, they are included in the regular rate of pay." *Id.* (citing 29 C.F.R. § 778.211(c);

7    U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., 2005 WL 3308618 (Nov. 4, 2005); U.S. Dep't

8    of Labor, Wage & Hour Div., Op. Ltr., 2020 WL 1640073 (Mar. 26, 2020)).  Moreover, they

9    contend, because signing bonuses "are tied to longevity, and are not fully earned until the

10   conclusion of the recoupment period[,]" they "constitute compensation for services performed,

11   which are includable in the regular rate proportionately throughout the recoupment period." *Id.*

12        Defendants assert Plaintiffs also "ignore relevant legal authority holding that tuition

13   payments can be considered wage credits under the FLSA when they primarily benefit the

14   employee, rather than the employer." *Id.* at 53-54 (citing U.S. DOL Field Operations Handbook

15   30c03(5); *Adoma v. Univ. of Phoenix, Inc.*, 779 F. Supp. 2d 1126, 1137 (E.D. Cal. 2011)).

16   According to Defendants, summary judgment must be denied on the question of whether tuition

17   payments can be counted as wages because there are disputed material facts as to whether those

18   payments primarily benefit the players rather than the Clubs. *Id.*  In particular, Defendants point

19   to evidence that "the terms of the CSP provide that benefits can be used for any classes taken 'as

20   part of an undergraduate degree program or [to] satisfy an elective requirement for an

21   undergraduate degree'– and there is no requirement that the classes taken have any relationship to

22   baseball." *Id.* (citing evidence).  Defendants also cite evidence that players have "utilized CSP

23   benefits years after retiring from baseball[,]" which they contend "further demonstrates that the

24   Clubs do not benefit from the Players' education." *Id.* (citing evidence).

25        Finally, Defendants argue that Dr. Guryan properly allocated bonuses and CSP payments

26   towards wages in determining the amount of the wage credits Defendants are entitled to. *Id.*  at

27   54-56.

28

United States District Court
Northern District of California

1
   b.   Discussion

2
      i.   Wage Offset Defense Under Arizona Law

3      Under Arizona law, " '[m]onetary compensation' means cash or its equivalent due to an

4   employee by reason of employment." Ariz. Admin. Code R20-5-1202. Because Defendants have

5   stipulated that they do not seek to offset minimum wage obligations based on the direct provision

6   of meals to minor league players by the Clubs,[40] the only question is whether Plaintiffs are entitled

7   to summary judgment on the basis that per diem payments, as a matter of law, due not constitute

8   payments that are due to the players "by reason of employment." Plaintiffs contend that "[u]nder

9   Arizona law, a meal per diem is best considered a non-wage 'benefit' rather than a wage paid in

10  exchange for labor." Reply on Plaintiffs' Partial Summary Judgment Motion at 28 (citing *Cramton*

11  *v. Grabbagreen Franchising LLC*, No. CV-17- 5 04663-PHX-D\VL, 2021 WL, 2562332, at *13

12  (D. Ariz. June 23, 2021). The same is true, they assert, for signing bonuses and college tuition

13  payments. *Id.* The Court finds no authority, however, that establishes *as a matter of law* that such

14  payments cannot be considered wages, or that they must be classified as benefits rather than

15  wages.

16      The single case Plaintiffs cite, *Cramton v. Grabbagreen Franchising LLC*, No. CV-17-

17  04663-PHX-DWL, 2021 WL 2562332, at *13 (D. Ariz. June 23, 2021), does not establish that

18  Plaintiffs are entitled to summary judgment on this defense. That case involved paid health

19  insurance premiums, employer monthly payments for the plaintiff's car, and employer paid tax

20  gross ups, which the court found were employee benefits rather than wages. But this case does not

21  involve wage credits for any such items; nor did the court in *Cramton* explain its conclusion that

22  these things were benefits rather than wages. Consequently, that case sheds little light on whether

23  per diem payments, signing bonuses or tuition payments constitute wages under Arizona law.

24

25  ───────────────
    [40] Defendants do not dispute that Arizona law does not allow for wage offsets based on the direct
26  provision of meals to employees by an employer. *See Reyes v. LaFarga*, No. CV-11-1998-PHX-
    SMM, 2013 WL 12098794, at *1 (D. Ariz. Nov. 20, 2013) ("Any doubt about whether non-
27  monetary compensation is included in Arizona's minimum wage is extinguished by the ICA's
    explanation that '[c]redit for the value of lodging and other items is not allowed when computing
28  an individual's entitlement to receive minimum wages under the act.'" (quoting Indus. Comm'n
    Ariz., Arizona Minimum Wage Act: Frequently Asked Questions & Answers at *5 (Jan. 1, 2013)).

Therefore, Plaintiffs have not demonstrated that they are entitled to summary judgment as to Defendants' wage offset defense (as limited by Defendants in their briefs and at the motion hearing) under Arizona law.

### ii.   Wage Offset Defense Under the FLSA and Florida Law[41]

Per Diem

Plaintiffs seek summary judgment on Defendants' per diem offset defense under the FLSA and Florida law on two grounds.  First, they argue that per diem payments are not considered to be wages under the FLSA because they are reimbursement for travel expenses.  Second, they contend they are entitled to summary judgment on this defense because Defendants did not keep required records of them and therefore, they are not adequately documented.  The Court is not persuaded that Plaintiffs are entitled to summary judgment on either ground.

Under the FLSA, an employee's "regular rate of pay" is "deemed to include all remuneration for employment paid to, or on behalf of, the employee" unless it falls under one of eight exceptions.  *See* 29 U.S.C. § 207(e)(1) through (8).  One of these exceptions is for "reasonable payments for traveling expenses, or other expenses, incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer; and other similar payments to an employee which are not made as compensation for his hours of employment."  29 U.S.C. § 207(e)(2).  "This exception applies '[w]here an employee incurs expenses on his employer's behalf or where he is required to expend sums solely by reason of action taken for the convenience of his employer.' "  *Sharp v. CGG Land (U.S.) Inc*., 840 F.3d 1211, 1215 (10th Cir. 2016) (quoting 29 C.F.R. § 778.217(a)). "For instance, this exception includes the 'reasonably approximate amount expended by an employee, who is traveling 'over the road' on his employer's business, for . . . living expenses away from home. . . ."  *Id*. (quoting 29 C.F.R. § 778.217(b)(3)).  In *Sharp*, the court found that "living expenses" included meals while away from home, and that "traveling" means "time 'away from home,' not just time in transit."

---

[41] Under Florida law, " '[e]mployer,' 'employee,' and 'wage' have the meanings as established under the federal Fair Labor Standards Act and its implementing regulations."  Fla. Stat. Ann. § 448.109.  The parties agree that the Court's conclusions on this issue under the FLSA also apply to Defendants' offset defense under Florida law.

United States District Court
Northern District of California

840 F.3d at 1215 (citing Wage and Hour Division Opinion Letter, FLSA 2004–3 (May 13, 2004)).

Whether a payment is excludable from the regular rate under § 207(e)(2) depends on its function, that is, whether it functions as compensation for work or as reimbursement. *Clarke v. AMN Servs., LLC*, 987 F.3d 848, 853 (9th Cir.), cert. denied, 142 S. Ct. 710 (2021). The court in *Clark* described the analysis of this issue with respect to per diem payments as follows:

> In the context of per diem payments in particular, the function test requires a case-specific inquiry based on the particular formula used for determining the amount of the per diem. Along with the monetary relationship between payment and hours, other relevant—but certainly not dispositive—considerations include whether the payments are made regardless of whether any costs are actually incurred, and whether the employer requires any attestation that costs were incurred by the employee, . . . . In some cases, the amount of the per diem payment relative to the regular rate of pay may be relevant to whether the purported per diem functions as compensation or reimbursement. . . . And the function analysis may also consider whether the payments are tethered specifically to days or periods spent away from home or instead are paid without regard to whether the employer is away from home.

987 F.3d at 854. The "tie between payments and time worked is relevant but not determinative in assessing whether those payments are properly excludable from the regular rate under § 207(e)(2)." *Id.* "[W]hether payments increase, decrease, or both based on time worked provides an important indication as to whether the payments are functioning as compensation rather than reimbursement" but there may be circumstances where "[p]ayments not tied to hours worked may function as compensation for work." *Id.*

Plaintiffs point to evidence that during spring training, minor league players receive flat per diem payments for every day they are away from home, arguing that this establishes that the function of the payments is to reimburse them for travel expenses. They note that in *Clark*, the Ninth Circuit cited with approval a Tenth Circuit case, *Sharp v. CGG Land (U.S.), Inc*., 840 F.3d 1211 (10th Cir. 2016), in which the court "held that a flat meal per diem, provided for each day an employee was required to be away from home, was properly excluded from the regular rate of pay." 987 F.3d at 855 (citing *Sharp*, 840 F.3d at 1213). Defendants, on the other hand, point to evidence that: 1)"for many Clubs, per diem or meal money payments were provided to Players for days they participated during the Clubs' Training Seasons expressly in lieu of the payment of

United States District Court
Northern District of California

salaries"; and 2) "there was no requirement that Players actually incurred expenses in order to receive the payments."  Opposition to Plaintiffs' Partial Summary Judgment Motion at 50-51. The court concludes in light of the case-specific inquiry required to determine the function of per diem payments, that there are disputes of material fact on this question that preclude summary judgment in Plaintiffs' favor.

First, with respect to *Sharp*, the court in *Clark* identified additional facts that established that the payments at issue in that case were not wages, including the fact that per diem payments were withheld when meals were provided to employees working away from home and that the parties stipulated that the amount of the per diem payment was "a reasonable meal allowance." *Clarke*, 987 F.3d at 855 (discussing *Sharp*, 840 F.3d at 1215).  As it is not clear from the undisputed facts that the same is true in this case, *Sharp* does not establish *as a matter of law*, that the per diems paid to minor league players are reimbursement for meals while away from home rather than wages.

The Court also rejects Plaintiffs' attempt to distinguish *Clark* on the basis that it involved determination of the employees' "regular rate" in connection with overtime claims instead of offsets against minimum wage liability.  Reply on Plaintiffs' Partial Summary Judgment Motion at 28 ("Defendants cite no case that has credited on-the-road per diems towards the minimum wage.").  Plaintiffs do not offer any reasoning for drawing such a distinction.  Nor have they cited any authority that suggests that the rules governing what payments may be considered part of an employee's regular rate for the purposes of determining overtime pay differ from those that are applied in determining whether payments to employees may be counted as offsets against the employer's minimum wage liability.  Rather, the FLSA appears to apply the same rules for both, expressly providing that "sums excluded from the regular rate . . . shall not be creditable toward wages required under section 206 of this title or overtime compensation required under this section." 29 U.S.C.A. § 207(h)(1).

The Court also rejects Plaintiffs' argument that they are entitled to summary judgment on Defendants' per diem offset defense because Defendants have not maintained adequate records of those payments.  While employers are required to keep records, on a work week basis, of the

payments that they make to employees as part of their wages, 29 C.F.R. § 516.27, payroll records are not the only way that an employer can establish what payments were made.  As the court in *Archie v. Grand Central Partnership, Inc*. explained:

> [T]hat defendants did not maintain records showing deductions from wages on a workweek basis, as required under 29 C.F.R. § 516.27(b) for employers who provide benefits as wages, does not mandate denial of deductions now. Of course defendants did not keep such records, as they did not view plaintiffs in the status of employees until Judge Sotomayor held them to have been so. Moreover, plaintiffs offer no authority that the failure to have kept records by itself mandates denial of deductions. Plaintiffs rely on *Donovan v. New Floridian Hotel, Inc*., 676 F.2d 468 (11th Cir.1982), where the court rejected the defendants' effort to deduct the cost of meals and lodging when the defendants had not kept the records required by the regulations. However, the court in that case did not rest its decision on the absence of the required records, but rather on the fact that the defendants had not put forward evidence that supported their claims as to the costs to them of the room and board.

86 F. Supp. 2d 262, 266 (S.D.N.Y. 2000).

Likewise, although the court in *Brock v. Carrion, Ltd*., cited by Plaintiffs, made the broad statement that "[c]ourts routinely deny employers offsets under the FLSA for failure to keep adequate records[,]"  332 F. Supp. 2d 1320, 1326 (E.D. Cal. 2004), all of the cases cited in support of that statement involved not only a failure to comply with the FLSA's recordkeeping requirements but also an absence of *any* credible evidence of the amount of the payments at issue. *See Donovan v. Williams Chem. Co*., 682 F.2d 185, 189 (8th Cir. 1982) (rejecting employer's argument that it was entitled to a credit against its wage liability based on its provision of a trailer for the employee to live in where it was "undisputed that the employer did not keep the required records and offered no evidence except its own statement as to what the company considered the worth of the trailers to be" and the "company did not attempt to substantiate the valuation by explaining how the value was reached or indicate whether or not it included profit");  *Marshall v. Debord*, 1978 WL 1705, at *7 (E.D.Okla.), 84 Lab. Cas. ¶ 33,721 (rejecting employer's argument that it was entitled to a credit against wage liability based on provision of meals and lodging where the employer "not only failed to keep any records to substantiate his meal costs but did not even attempt to make an estimate regarding those costs" and the limited evidence offered  was "utterly incompetent and totally insufficient to establish the reasonable cost to the defendant for providing

United States District Court
Northern District of California

room and board to his employees."); *Cuevas v. Bill Tsagalis, Inc.*, 149 Ill.App.3d 977, 102 Ill.Dec. 946, 500 N.E.2d 1047 (1986)) (rejecting employer's argument that it was entitled to a credit against wages for the cost of lodgings it provided employee where the employer "failed to keep the type of records called for by the regulations" and the evidence in the record undercut the employer's claim).

Here, Defendants point to some evidence reflecting per diems that were paid to minor league players, as well as evidence of the costs incurred by the Clubs for meals, which may be relevant to whether the amounts of the per diems were reasonable. This evidence is sufficient to warrant presenting this issue to the jury. Therefore, the Court denies summary judgment on Defendants' per diem defense under the FLSA and Florida law.

Signing Bonuses

Plaintiffs assert two broad challenges to Defendants' reliance on signing bonuses to offset their wage liability: 1) the bonuses are not part of the players' wages; and 2) the manner in which Defendants' expert allocated the bonuses over time to determine the amount of the offset is incorrect. The Court concludes that there are factual disputes as to the first question but that Plaintiffs are correct on the second.

As discussed above, under the FLSA, "remuneration for employment paid to . . . an employee" is considered part of the employee's regular rate of pay unless it falls under one of eight categories of "excludable payments," which include discretionary bonuses. 29 U.S.C. § 207(e); *see also* 29 C.F.R. § 778.208 ("Among these excludable payments are discretionary bonuses, gifts and payments in the nature of gifts on special occasions, contributions by the employer to certain welfare plans and payments made by the employer pursuant to certain profit-sharing, thrift and savings plans."). The regulations explain that a bonus is "discretionary" under the following circumstances:

> In order for a bonus to qualify for exclusion as a discretionary bonus under section 7(e)(3)(a) the employer must retain discretion both as to the fact of payment and as to the amount until a time quite close to the end of the period for which the bonus is paid. The sum, if any, to be paid as a bonus is determined by the employer without prior promise or agreement. The employee has no contract right, express or implied, to any amount.

29 C.F.R. § 778.211(b).   On the other hand, "[p]romised bonus[es]" are not excluded from the

regular rate.  29 C.F.R. § 778.211(c).  Thus, "any bonus which is promised to employees upon

hiring . . .  would not be excluded from the regular rate under this provision of the Act."  *Id.*

"Bonuses which are announced to employees to induce them to work more steadily or more

rapidly or more efficiently or to remain with the firm are regarded as part of the regular rate of

pay."  *Id.* Further, "bonuses contingent upon the employee's continuing in employment until the

time the payment is to be made and the like are in this category; in such circumstances they must

be included in the regular rate of pay."  *Id.*

Here, Plaintiffs contend the signing bonuses are not wages for the purposes of Defendants'

minimum wage liability, citing a single case, *Minizza v. Stone Container Corp. Corrugated

Container Div. E. Plant*, 842 F.2d 1456, 1460 (3d Cir. 1988), for the proposition that the signing

bonuses are an inducement to enter into an agreement with the Club rather than wages.  In that

case, the employees received a lump sum payment when they had been employed six months

pursuant to the terms of a collective bargaining agreement and argued that it should be included as

part of their regular rate for the purposes of computing overtime.  The court disagreed, however,

finding that the payments did not "relat[e] to hours of employment or service."  842 F.2d at 1462.

Instead, the court found, "[t]he facts show that these payments were nothing more or less than an

inducement by the employers to the employees to ratify the [collective bargaining] agreement on

the terms proposed by the employers."  *Id.*  Given that these lump sum payments were made

pursuant to a contractual obligation, the court's holding in *Minizza* appears to be at odds with the

regulations.  *See* 29 C.F.R. § 778.211 ("For example, any bonus which is promised to employees

upon hiring or which is the result of collective bargaining would not be excluded from the regular

rate under this provision of the Act.").

Even assuming, however, Plaintiffs are correct that a signing bonus that is offered solely to

induce a player to accept the job is discretionary and therefore not properly considered part of the

player's regular rate, there is evidence here that the bonuses were also offered as an inducement

for the player to *continue* to perform for the full term of the contract.  *See* Bloom Summary

Judgment Opposition Decl., Ex. 121 (MLB Policy describing recoupment provisions in UPCs

167

obligating players to repay a portion of the signing bonus if a player abandons the contract before completing four seasons). Plaintiffs assert that "[a] recoupment clause does not change the inducement nature of the payment – it simply provides for contractual protection in the event the player does not remain with the Club for all seven years." Reply on Partial Summary Judgment Motion at 30.  Plaintiffs do not explain, however, why such "contractual protections" would not tend to show that the signing bonuses are non-discretionary under the regulations discussed above.

Therefore, the Court concludes there are disputed issues of fact that preclude summary judgment in Plaintiffs' favor on the question of whether signing bonuses can be excluded from Plaintiffs' wages for the purposes of Defendants' offset defense.

Plaintiffs further contend that even if the signing bonuses are wages, they cannot be allocated beyond the pay period they were received for the purposes of minimum wage offsets. The Court agrees.

As a general rule, under the FLSA, "payments in excess of the amount required by the statute to an employee for work done in certain weeks do not relieve the employer from the obligation to compensate the employee for deficiencies in other weeks, or from the obligation to pay him in addition an equal sum for liquidated damages." *Roland Elec. Co. v. Black*, 163 F.2d 417, 420 (4th Cir. 1947);  *see also Herman v. Fabri-Centers of Am., Inc*., 308 F.3d 580, 592 (6th Cir. 2002) ("Although *Roland* was decided before § 207(h) was enacted in 1949, and thus did not address the issue of crediting, it enunciated the broad principle that the workweek or work period is central to the understanding of the FLSA."); *Marshall v. Sam Dell's Dodge Corp*., 451 F. Supp. 294, 304 (N.D.N.Y. 1978) ("In any event, the payment of bonuses can only be considered in connection with the minimum wages for the week in which they are paid. Under the facts in this case, any other recognition of the bonus payments would obviously be a deferred payment of wages which could not be credited against the minimum wage requirement for any prior week."); *Rogers v. Sav. First Mortg., LLC*, 362 F. Supp. 2d 624, 630 (D. Md. 2005) (rejecting defendants' argument that "the methodology of allocating commissions can vary depending upon whether the allocation is for minimum wage purposes only, for overtime purposes only, or for both overtime and minimum wage purposes" and observing that the defendants "acknowledge[d], as they must,

168

1    that if only minimum wage payments are at issue, the wages paid on a prescribed payday must be

2    allocated to the workweeks within that pay period where the pay period is greater than a week").

3         Defendants attempt to distinguish these cases, arguing that "in each of the cases cited by

4    Plaintiffs, the courts disallowed payments to be used to offset minimum wage liability because

5    such payments were made **after** the regular payday. Here, signing bonuses were generally paid

6    shortly after the contracts were signed, and thus were effectively pre-payments for services not yet

7    performed, which could be recouped by the Clubs if Players abandoned their Clubs during the

8    terms of the UPCs." Opposition to Plaintiffs' Partial Summary Judgment Motion at 55 n. 138

9    (emphasis in original). Defendants mischaracterize these cases, however, to the extent that they

10   state that the holdings of those cases depended on the timing of the bonus payments.[42]

11        In *Marshall v. Sam Dell's Dodge Corp*., for example, the plaintiffs were car salesmen who

12   were paid commissions on sales and various bonuses but received only $56 in compensation for

13   weeks when they made no sales, which fell below the minimum wage. 451 F. Supp. 294, 301

14   (N.D.N.Y. 1978). The employer argued that its compliance with the minimum wage requirement

15   should be measured by averaging the compensation paid to employees over a month, effectively

16   offsetting the deficient weeks with the ones in which compensation exceeded the minimum wage,

17   but the court rejected the employer's argument, concluding that the relevant period for analyzing

18   compliance was the workweek. *Id.* at 303. In reaching that conclusion, it pointed to the focus on

19   the workweek in the regulations and further observed that "[t]he Supreme Court has emphasized

20   the importance of paying an employee's minimum wage on a weekly basis." *Id.* at 1302. The

21   court did not limit its holding to circumstances where the excess payments were made *after* the

22   pay periods when the plaintiffs' compensation dropped below the minimum wage; nor is it

23   apparent from the description of the facts in that case that the weeks involving underpayments

24   preceded the ones in which the plaintiffs received higher compensation.

25        Similarly, in *Roland Electric*, the court disapproved not only of the employer's reliance on

26   a year-end bonus to offset wages but also the employer's attempt to offset deficient wages in some

27

28   ───────────────
     [42] The Court notes that Defendants did not specifically address or cite any of the cases in their
     brief other than a single reference in a footnote to *Roland Electric*.

weeks with excess payments in others. 163 F.2d at 420. In particular, the court held that

"payments in excess of the amount required by the statute to an employee for work done in certain

weeks do not relieve the employer from the obligation to compensate the employee for

deficiencies in other weeks." *Id.* The court did not limit its holding to weeks where the

overpayment *followed* the underpayment, that is where the higher amount was not a "pre-

payment" of wages. Rather, it found without reference to the timing of the under- and over-

payments that the employer's practice did not comport with "public policy embodied in the

[FLSA] with respect to minimum wages and maximum hours alike." *Id.* at 421.

The general principle articulated in these cases is in accord with the Ninth Circuit's

holding that under the FLSA, "wages become 'unpaid' . . . when they are not paid at the time

work has been done, the minimum wage is due, and wages are ordinarily paid – on payday."

*Biggs v. Wilson*, 1 F.3d 1537, 1540 (9th Cir. 1993).[43] Ignoring this principle, Defendants rely on a

regulation governing the allocation of bonuses for the purposes of computing and paying

overtime, 29 C.F.R. § 77.209(a). That regulation, however, does not justify Defendants' position

because it addresses a scenario quite different from the facts here, stating as follows:

> Under many bonus plans, however, calculations of the bonus may
> necessarily be deferred over a period of time longer than a workweek.
> In such a case the employer may disregard the bonus in computing
> the regular hourly rate until such time as the amount of the bonus can
> be ascertained. Until that is done he may pay compensation for
> overtime at one and one-half times the hourly rate paid by the
> employee, exclusive of the bonus. When the amount of the bonus can
> be ascertained, it must be apportioned back over the workweeks of

---

[43] An example in the DOL Field Operations Handbook lends further support to the conclusion that
an overpayment may not be used to offset a subsequent underpayment on a theory that the
minimum wage has been "pre-paid":

> A salesperson is paid four weekly draws of $150 each for a total of $600 for the monthly
> pay (settlement) period. At the end of the month, the salesperson's commission earnings
> total $1,000. The employer deducts the $600 in draws from this amount and pays the
> remainder (or excess) of $400 to the salesperson. The following month, the salesperson is
> paid $600 in draws and earns no commissions. To meet the minimum wage obligation for
> the salesperson, the employer applies $70 from the $400 excess earned and paid the
> previous month. This practice is not in compliance with the requirements of the FLSA.
> *Any part of a commission that is actually paid to the employee may not be carried forward*
> *as a credit into subsequent pay (settlement) periods.*

DOL Field Operations Handbook § 30b05(c)(3)(d) (emphasis added).

United States District Court
Northern District of California

> the period during which it may be said to have been earned. The employee must then receive an additional amount of compensation for each workweek that he worked overtime during the period equal to one-half of the hourly rate of pay allocable to the bonus for that week multiplied by the number of statutory overtime hours worked during the week.

29 C.F.R. § 778.209.  In other words, while an employer must continue to meet its minimum wage obligations for every pay period *and* pay overtime at least as to the employee's basic rate that can be ascertained, the employer may wait to make any upward adjustments required as a result of a bonus until the amount of the bonus is ascertainable.

While Defendants have made a colorable argument that the amount of the signing bonuses in this case cannot be ascertained until the end of the recoupment period, their application of the allocation method described in Section 778.209(a) to their minimum wage liability would result in excusing their obligation under the FLSA to pay their employees at least minimum wage *every* pay period.  There is nothing in the regulation that authorizes that result and as discussed above, the case law supports the conclusion that this sort of averaging to meet an employer's minimum wage obligations is not permitted under the FLSA.  For the same reason, Defendants' reliance on a DOL opinion letter authorizing an employer to apportion backwards the amount of a retention bonus for the purposes of determining overtime due to employees is not on point.  *See* Opinion Letter Fair Labor Standards Act (FLSA), 2005 WL 3308618, at *1.

Accordingly, the Court finds, as a matter of law, that to the extent the signing bonuses at issue in this case are found to be wages, they may only be applied to offset minimum wage liability in the pay period in which they were received.

Tuition Payments

Under the FLSA, " 'wage' paid to any employee includes the reasonable cost . . . to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees."  29 U.S.C.§ 203(m).  College tuition may fall within the meaning of "other facilities."  29 C.F.R. § 531.32(a).  However, tuition payments may fall under the exemption in 29 U.S.C. § 207(e)(2) for "other similar payments" if the tuition payments are "not made as compensation for [the employee's] hours of employment."  *See Adoma v. Univ. of Phoenix, Inc.*, 779 F. Supp. 2d 1126,

1134 (E.D. Cal. 2011). Thus, "tuition payments for course work that primarily or exclusively benefits the employer is excludable as an 'other similar payment.' However, tuition payments for course work that the employee would normally incur or which are primarily for the benefit or convenience of the employee must be included in the regular rate of pay." *Id.*; *see also* DOL Field Operations Handbook § 30c03(a)(5) ("Tuition furnished to an employee for courses or training for the individual's own personal benefit is a bona fide facility for which a wage credit may be taken, unless the training is related to employment or is required to retain employment.").

Here, Plaintiffs have not established as a matter of law that the tuition payments received by Plaintiffs are primarily for the benefit of their employers and thus excludable. In particular, Defendants have pointed to evidence that the CSP benefits can be used for any classes taken "as part of an undergraduate degree program or [to] satisfy an elective requirement for an undergraduate degree" and do not require that the classes have any relationship to baseball. *See* Bloom Summary Judgment Opposition Decl., Ex. 135 (MLBKAN0002290-2303 at 2291-2293; MLBKAN0002275-2289 at 2276-2278, MLBKAN2258-2263 at 2259-2262); Ex. 137 MLBSFG000031-37 at 34-36)). Therefore, the Court declines to enter summary judgment in Plaintiffs' favor on this question.

On the other hand, for the reasons discussed above, the Court concludes that to the extent these payments are "wages" that may offset Defendants' minimum wage liability, these payments, as a matter of law, may only be applied to the pay periods when they were received and may not be allocated retroactively to satisfy Defendants' minimum wage obligations. *See U.S. Dep't of Lab. v. Shenandoah Baptist Church*, 707 F. Supp. 1450, 1464 (W.D. Va. 1989), aff'd sub nom. *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir. 1990) (holding that tuition that was provided "after the period in which the church was paying employees less than the minimum wage" could not be used to offset back pay award and citing *Roland Electrical* for the rule that "[t]he fact that an employer has paid an employee wages above the statutory minimum in one period will not cure its failure to pay the employee at the minimum rate in another.").

United States District Court
Northern District of California

### 13. Whether Defendants are Entitled to Summary Judgment that there is no Private Cause of Action for Violation of California's Payday Law

Defendants challenge Plaintiffs' Count 5, for violation of California's "payday" law, Cal. Lab. Code section 204, on the basis that it does not grant employees a private right of action. Defendants' Partial Summary Judgment Motion at 52-53 (citing *Wood v. N. Am. Van Lines, Inc.*, No. 8:20-CV-02092-JLS-ADS, 2021 WL 3134203, at *6 (C.D. Cal. July 23, 2021); *Caldwell v. OS Rest. Servs., LLC*, No. ED CV 19-00754-DMG (MRWx), 2021 WL 3264306, at *11 (C.D. Cal. May 13, 2021); *Johnson v. Hewlett-Packard Co.*, 809 F. Supp. 2d 1114, 1136 (N.D. Cal. 2011), aff'd, 546 F. App'x 613 (9th Cir. 2013). They further assert that to the extent that the remedy for a violation of section 204 is found in Cal. Lab. Code section 210, Plaintiffs may not seek penalties under section 210 because that section does not allow an employee to recover "duplicative civil penalties under the PAGA for the same alleged violations of the wage payment timing requirements." *Id.* (citing Cal. Lab. Code § 210(c)). Plaintiffs respond that Defendants' argument is "off target" because they pursue their payday claims only through the PAGA, "which is routine and permissible." Opposition to Defendants' Summary Judgment Motion at 3.

As Plaintiffs do not dispute that they may not assert a stand-alone claim under section 204 and their PAGA claim for civil penalties based on violation of section 204 is asserted in Count 9 of the SCAC, *see* SCAC ¶ 612, the Court grants summary judgment in Defendants' favor on this issue and dismisses Count 5 of the SCAC.

### 14. Whether Defendants are Entitled to Summary Judgment on Plaintiffs' Claim for PAGA Penalties Due to Failure to Exhaust Administrative Remedies

#### a. Contentions of the Parties

Defendants challenge Count 9, asserted under PAGA, on the basis that Plaintiffs have not satisfied PAGA's notice requirement, which is jurisdictional. Defendants' Partial Summary Judgment Motion at 53-55. In particular, they contend the January 30, 2014 letter Plaintiffs sent to the LWDA giving notice of the alleged violations asserted in their PAGA claim (SCAC, Ex. C, dkt. no. 382 at ECF pp. 414-15 ("LWDA Notice Letter"))[44] did not exhaust their administrative

---

[44] The LWDA Notice Letter states as follows:

remedies because it "provided no factual allegations regarding purported violations of Labor Code section 201-204, 208, and 226." *Id.* at 54. (Defendants admit, however, that "Plaintiffs summarized the factual allegations purportedly giving rise to the alleged violations of Labor Code sections 510, 1194, and 1197. *Id.* at 12.) According to Defendants, to satisfy PAGA's notice requirement, Plaintiffs were required to "set forth the specific factual allegations and legal theories that related to the alleged Labor Code violations." *Id.* (citing Cal. Lab. Code § 2699.3(a)(1)(A); *Brown v. Ralphs Grocery Co.*, 28 Cal. App. 5th 824, 837-38 (2018); *Mitchell v. Corelogic, Inc.*, No. SA CV 17-2274-DOC (DFMx), 2019 WL 7172978, at *7 (C.D. Cal. Nov. 20, 2019); *Alcantar*

---

To Whom It May Concern:

Pursuant to California Labor Code§ 2699, this letter serves as notice of an intent to bring a civil action under California's Private Attorney General Act on behalf of minor league baseball players ("minor leaguers"). Major League Baseball, its agent entities, the Office of the Commissioner of Baseball, Allan H. "Bud" Selig, and all thirty of its constituent franchises ("the Defendants") are violating Labor Code sections covered by Labor Code § 2699, including, but not limited to, Labor Code §§ 201, 202, 203, 204, 208, 226, 510, 1194, and 1197.

The allegations comprising this claim are more fully set forth in the complaint styled *Aaron Senne, et al. v. Major League Baseball, et al.*, which will soon be filed in the U.S. District Court for the Northern District of California. Please contact us if you are willing to accept service of the complaint in lieu of formal service of process.

To summarize the facts and theories supporting the claims, the Defendants employ hundreds of minor leaguers in the state of California. Work periods include, inter alia, minor league championship seasons, offseason periods, and training periods. The Defendants direct this work, which is required by contract. Minor leaguers are not represented by a union.

During the championship seasons, the minor leaguers routinely work in excess of forty hours a week yet the Defendants pay salaries below the minimum wage and pay no overtime wages. During other work periods, the Defendants pay no salaries at all. These practices violate, inter alia, Labor Code §§ 510, 1194, and 1197.

By failing to pay adequate wages and subsequently withholding these wages, the Defendants also violate California's "payday" requirements (Labor Code § 204). When the employment relationship ceases, the conduct also violates California's rules regarding the immediate payment of wages upon discharge (Labor Code §§ 201-03) and the place of payment of wages (Labor Code § 208). Moreover, the Defendants violate Labor Code § 226 by failing to include adequate information in itemized wage statements.

As a result of these violations, the Defendants are subject to statutory penalties of $100 per pay period per employee for initial violations and $200 per pay period per employee for subsequent violations.

Dkt. no. 382 at ECF pp. 414-15.

*v. Hobart Serv.*, 800 F.3d 1047, 1057 (9th Cir. 2015)).

Plaintiffs reject Defendants' argument, asserting that PAGA's notice requirement is met so long as the notice "contains some basic facts about the violations, such as which provision was allegedly violated and who was allegedly harmed[,]" and that standard is met by their LWDA Notice Letter. Opposition to Defendants' Partial Summary Judgment Motion at 53-55 (citing *Stevens v. Datascan Field Servs. LLC*, No. 2:15-CV-00839-TLN-AC, 2016 WL 627362, at *4 (E.D. Cal. Feb. 17, 2016); *Green v. Bank of Am., NA*., 634 F. App'x 188, 191 (9th Cir. 2015)). Plaintiffs further contend the cases relied upon by Defendants are distinguishable because in those cases the notices merely provided a list of statutory violations whereas the LWDA Notice Letter here summarized the factual allegations of the alleged violations. *Id.* at 55.

> b.  Discussion

Under California law, the Labor and Workforce Development Agency ("LWDA") "is authorized to assess and collect civil penalties for specified violations of the Labor Code committed by an employer." *Caliber Bodyworks, Inc. v. Superior Ct*., 134 Cal. App. 4th 365, 370 (2005), disapproved of on other grounds by *ZB, N.A. v. Superior Ct.*, 8 Cal. 5th 175 (2019) (citations omitted). "With a stated goal of improving enforcement of existing Labor Code obligations, the Legislature adopted the Labor Code Private Attorneys General Act of 2004 (Act) (§ 2698 *et seq*.), permitting, as an alternative, an aggrieved employee to initiate a private civil action on behalf of himself or herself and other current or former employees to recover civil penalties if the LWDA does not do so." *Id.* "By expanding the universe of those who might enforce the law, and the sanctions violators might be subject to, the Legislature sought to remediate present violations and deter future ones." *Williams v. Superior Ct*., 3 Cal. 5th 531, 546 (2017).

Before an employee may file an action seeking to recover civil penalties for violations of any of the Labor Code provisions enumerated in section 2699.5, however, the employee must comply with PAGA's administrative procedures, including providing notice to the LWDA and the employer and waiting a prescribed period of time to permit the LWDA to investigate and to decide whether to cite the employer for the alleged violations." Cal. Lab. Code § 2699.3. PAGA's notice

United States District Court
Northern District of California

1  requirement states as follows:

2  > The aggrieved employee or representative shall give written notice by
3  > online filing with the Labor and Workforce Development Agency and
4  > by certified mail to the employer of the specific provisions of this
   > code alleged to have been violated, including the facts and theories to
   > support the alleged violation.

5  Cal. Lab. Code § 2699.3(a)(1)(A). "Nothing in Labor Code section 2699.3, subdivision (a)(1)(A),

6  indicates the 'facts and theories' provided in support of 'alleged' violations must satisfy a

7  particular threshold of weightiness, beyond the requirements of nonfrivolousness generally

8  applicable to any civil filing." *Williams*, 3 Cal. 5th at 545–46 (citing Cal. Code Civ. Proc., §

9  128.7). "The evident purpose of the notice requirement is to afford the . . . . [LWDA] the

10 opportunity to decide whether to allocate scarce resources to an investigation, a decision better

11 made with knowledge of the allegations an aggrieved employee is making and any basis for those

12 allegations." *Id.*

13      "Under California's Labor Code, a written notice is sufficient so long as it contains some

14 basic facts about the violations, such as which provision was allegedly violated and who was

15 allegedly harmed." *Stevens v. Datascan Field Servs. LLC*, No. 2:15-CV-00839-TLN-AC, 2016

16 WL 627362, at *4 (E.D. Cal. Feb. 17, 2016) (quoting *Green v. Bank of Am., N.A.*, 634 F. App'x

17 188, 191 (9th Cir. 2015)); *see also Cardenas v. McLane FoodServices, Inc.,* 796 F. Supp. 2d

18 1246, 1260 (C.D. Cal. 2011) (holding that PAGA's notice requirement does not require "inclusion

19 of every potential fact or every future theory" and rejecting the employer's attempt to "bind" the

20 plaintiffs to the "facts and theories exactly as laid out" in the notice letter as this would give rise to

21 "absurd results" and would "undermine the principles of PAGA" to the extent that the plaintiffs

22 could not file suit or obtain discovery until after they gave the required notice). On the other hand,

23 "a string of legal conclusions with no factual allegations or theories of liability to support them . . .

24 is insufficient to allow the [LWDA] to intelligently assess the seriousness of the alleged

25 violations" and therefore does not satisfy PAGA's notice requirement. *Alcantar v. Hobart Serv.*,

26 800 F.3d 1047, 1057 (9th Cir. 2015).

27      These principles are illustrated in *Brown v. Ralphs Grocery Co*., cited by Defendants. In

28 that case, the notice letter stated that the plaintiff "was an hourly-paid security guard employed by

United States District Court
Northern District of California

176

defendants at Los Angeles County business locations." 28 Cal. App. 5th 824, 837 (2018). It went on to identify the specific provisions of the Labor Code alleged to have been violated but "with one exception, the [notice] was a string of legal conclusions that parroted the allegedly violated Labor Code provisions" and "did not state facts and theories supporting the alleged violations not implied by reference to the Labor Code." 28 Cal. App. 5th at 837. The one exception related to an alleged violation of Cal. Labor Code section 226(a), "requiring employers to maintain accurate and complete wage statements." *Id.* at 838. As to that violation, the plaintiff alleged that "[t]he violations include, without limitation, the failure to include the name and address of the legal entity that is the employer." *Id.* (quoting notice letter). As to the former violations, the court found that the plaintiff had not given adequate notice under PAGA because the notice letter did not contain "facts and theories supporting the alleged violations not implied by reference to the Labor Code." *Id.* On the other hand, the court found that the "minimal fact" contained in the notice letter in support of the section 226(a) violation was sufficient to satisfy PAGA's notice requirement. *Id.*

Likewise, in *Mitchell v. Corelogic, Inc.*, the court, while recognizing that even "seemingly minimal factual allegations" can be sufficient, found that as to the alleged violations that merely parroted the statute, notice under PAGA was insufficient but that as to other alleged violations the plaintiff had given adequate notice because the letters contained "minimal facts" in support of them. No. SACV172274DOCDFMX, 2019 WL 7172978, at *7-8 (C.D. Cal. Nov. 20, 2019) (citing *Brown*, 28 Cal. App. 5th at 836).

Defendants do not dispute that Plaintiffs gave sufficient notice as to the alleged violations of Cal. Lab. Code section 510, 1194 and 1197 based on the allegations contained in the LWDA Notice Letter that "[d]uring the championship seasons, the minor leaguers routinely work in excess of forty hours a week yet the Defendants pay salaries below the minimum wage and pay no overtime wages. During other work periods, the Defendants pay no salaries at all." Defendants' Partial Summary Judgment Motion at 12. As to the alleged violations of Labor Code section 201-204, 208, and 226, however, they assert that Plaintiffs merely listed these provisions without providing any facts beyond the bare fact of their violation. The Court addresses each of

177

the alleged violations at issue.

Cal. Lab. Code section 201 requires that when "an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Cal. Lab. Code section 202 requires prompt payment of wages when an employee "quits his or her employment[.]"  And Cal. Lab. Code section 203 provides for the imposition of penalties on employers who fail to meet these requirements. The LWDA Notice Letter states as to these violations, "When the employment relationship ceases, the conduct also violates California's rules regarding the immediate payment of wages upon discharge (Labor Code §§ 201-03)."  In context, it is clear that the "conduct" referred to is Defendants' failure to pay minimum wage and overtime during the championship season or any wage at all during other periods, described in the third and fourth paragraphs of the LWDA Notice Letter.  In other words, these claims are derivative of the minimum wage and overtime violations.  Thus, the facts that are articulated as to those violations are also sufficient to give notice as to Sections 201-203. Similarly, it is clear that the alleged violation of Cal. Lab. Code section 204, requiring that wages be paid semimonthly, is also based on Defendants' failure to page wages outside of the Championship Season.

Cal. Lab. Code section 208 requires that "[e]very employee who is discharged shall be paid at the place of discharge, and every employee who quits shall be paid at the office or agency of the employer in the county where the employee has been performing labor."  Again, it is clear from the LWDA Notice that the theory underpinning this claim is that players are not paid "at the place of discharge" because as to at least some periods of the year, they are paid "no salaries at all." That minimum factual allegation is, therefore, sufficient to provide notice of the alleged violation of Section 208.

Finally, Cal. Lab. Code section 226 requires employers to furnish employees "semimonthly or at the time of each payment of wages" "an accurate itemized statement in writing" that includes, among other things, "gross wages earned" and "total hours worked by the employee."  As discussed above, in *Brown*, this requirement was met where the notice letter stated that the wage statements did not include the name and address of the employer, required under section 226(a)(8).  Here, the LWDA Notice Letter, however, gives notice of a different theory,

United States District Court
Northern District of California

1   namely, that as a factual matter the players receive "no salaries at all" for their work during certain

2   periods, giving rise to a plausible inference that rather than receiving wage statements with

3   missing information (as in *Brown*) they received no wage statements at all for their work, in

4   violation of section 226.  Again, the Court finds that Plaintiffs' summary of the underlying facts in

5   the LWDA Notice Letter is sufficient to put the LWDA on notice of the nature of the violation of

6   section 226 alleged by Plaintiffs.[45]

7        For these reasons, the Court finds that Defendants are not entitled to summary judgment

8   that Plaintiffs failed to exhaust their PAGA claim.

9   **VII.**           **CONCLUSION**

10        For the reasons set forth above, the Court rules are as follows:

11   •  Defendants' Motion to Exclude (Dennis) (dkt. no. 969) is DENIED.

12   •  Defendants' Motion to Exclude (Kriegler) (dkt. no. 971) is DENIED.

13   •  Plaintiffs' SAP Act Motion (dkt. no. 979) is GRANTED.

14   •  Defendants' Partial Summary Judgment Motion (dkt. no.980) is GRANTED as to

15       Count 5 and all claims asserted against Defendant Selig, which are dismissed with

16       prejudice.  The Court also GRANTS summary judgment in favor of Defendants as

17       to Plaintiffs' FLSA claims to the extent they are based on conduct that occurred

18       after March 23, 2018, when the SAP Act went into effect.   In all other respects, the

19

20   [45] In their Reply brief, Defendants also contend Plaintiffs seek to demonstrate that they satisfied the PAGA notice requirement based on the reference in the LWDA Notice Letter to the complaint in this action and argue that there is no authority suggesting that the PAGA notice requirement can be met in this manner.  *See* Reply on Defendants' Partial Summary Judgment Motion at 30.  The Court declines to reach that argument because it finds that the "facts and theories" contained in the LWDA Notice Letter itself gave sufficient notice of Plaintiffs' claims. The Court also rejects Defendants' argument, made for the first time in their Reply, that Plaintiffs were required to include specific facts in the LWDA Notice Letter establishing that MLB was a joint employer. *Id.* at 30.  Plaintiffs state in the LWDA Notice Letter that Defendants (defined to include MLB, the Officer of the Commissioner, Commissioner Selig and the "constituent franchises") "employ hundreds of minor leaguers in the State of California" and "direct" their work during "minor league championship seasons, offseason periods, and training periods."  SCAC, Ex. C.  Thus, the theory and factual basis of the alleged violations as to MLB are clear, namely, that MLB is an employer of the minor leaguers because it directs their work.  Defendants point to no authority that suggests that Plaintiffs' notice to the LWDA must detail the specific facts that give rise to a joint employer relationship.  Indeed, as the court in *Cardenas* observed, imposing such a requirement before discovery has occurred as a prerequisite for bringing suit would lead to absurd results.   796 F. Supp. 2d at 1260.

United States District Court
Northern District of California

1    motion is DENIED.

2    • Plaintiffs' Partial Summary Judgment Motion (dkt. no. 986) is GRANTED in part

3    and DENIED in part. In particular, the Court finds, as a matter of law, that 1)

4    Plaintiffs are "employees" under the FLSA and the relevant state laws throughout

5    the calendar year; 2) that MLB is a joint employer under the FLSA and all relevant

6    state laws; 3) that Plaintiffs performed "work" during Arizona and Florida training;

7    4) that travel time on team buses (or other modes of team transport) to away games

8    during the training season is compensable under the FLSA, Florida and Arizona

9    law so long as the bus was not scheduled to leave before any other scheduled

10   activities; 5) that all travel time by the California League players to away games is

11   compensable under California law; 6) that Defendants' creative professional

12   exemption defense fails as to all of Plaintiffs' claims; 7) that there are disputed

13   issues of fact that preclude summary judgment as to Defendants' amusement

14   exemption defense; 8) that there are disputed issues of fact that preclude summary

15   judgment as to whether Defendants' violation of Arizona's minimum wage law was

16   willful; 9) that Defendants are liable as to Plaintiffs' California wage statement

17   claim and that Plaintiffs are entitled $1,882,650 in penalties on that claim; 10) that

18   Defendants are liable as to Plaintiffs' Arizona recordkeeping claim but that

19   disputed issues of fact preclude summary judgment as to the amount of the penalty

20   to which they are entitled; 11) that there are disputed issues of fact that preclude

21   summary judgment on the question of whether per diems, signing bonuses or

22   tuition payments are "wages" that may be offset against minimum wage liability

23   under the FLSA, Florida and Arizona law but that Defendants' method of

24   allocating signing bonuses and tuition payments to offset minimum wage liability is

25   incorrect as a matter of law.

26   • Defendants' Motion to Exclude (Groshen) (dkt. no. 987) is DENIED without

27   prejudice on the basis that it is moot.

28   • Plaintiffs' Motion to Exclude (dkt. no. 988) is GRANTED in part and DENIED in

United States District Court
Northern District of California

part.  In particular, it is DENIED without prejudice as to challenges to the 2016 Martin Report, which are moot.  It is GRANTED as to the opinions challenged in Dr. Martin's 2021 Report and in Dr. Guryan's report as set forth above.

- Plaintiffs' Motion to Strike (dkt. no. 1025) is DENIED.

**IT IS SO ORDERED.**

Dated:  March 10, 2022

_____
JOSEPH C. SPERO
Chief Magistrate Judge