1  STEPHEN M. TILLERY (*pro hac vice*)
     stillery@koreintillery.com
2  GARRETT R. BROSHUIS (Bar No. 329924)
     gbroshuis@koreintillery.com
3  MARC WALLENSTEIN (*pro hac vice*)
     mwallenstein@koreintillery.com
4  DIANE MOORE (Bar No. 214903)
     dmoore@koreintillery.com
5  **KOREIN TILLERY, LLC**
   505 North 7th Street, Suite 3600
6  St. Louis, MO 63101
   Telephone:  (314) 241-4844
7  Facsimile: (314) 241-3525

8  CLIFFORD H. PEARSON (Bar No. 108523)
     cpearson@pswlaw.com
9  DANIEL L. WARSHAW (Bar No. 185365)
     dwarshaw@pswlaw.com
10 BOBBY POUYA (Bar No. 245527)              BENJAMIN E. SHIFTAN (Bar No. 265767)
     bpouya@pswlaw.com                         bshiftan@pswlaw.com
11 THOMAS J. NOLAN (Bar No. 66992)           JILL M. MANNING (Bar No. 178849)
     tnolan@pswlaw.com                         jmanning@pswlaw.com
12 **PEARSON, SIMON & WARSHAW, LLP**        **PEARSON, SIMON & WARSHAW, LLP**
   15165 Ventura Boulevard, Suite 400         350 Sansome Street, Suite 680
13 Sherman Oaks, CA 91403                     San Francisco, CA 94104
   Telephone: (818) 788-8300                  Telephone: (415) 433-9000
14 Facsimile:  (818) 788-8104                 Facsimile: (415) 433-9008

16 Plaintiffs' Co-Lead Class Counsel

17                     **UNITED STATES DISTRICT COURT**

18          **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| 19  AARON SENNE, et al., Individually and on Behalf of All Those Similarly Situated; | CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS) |
| 20 | |
| 21                     Plaintiffs, | **CLASS ACTION** |
| 22          vs. | **JOINT SUBMISSION CONCERNING THE TRIAL PLAN** |
| 23  OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as MAJOR LEAGUE BASEBALL; et al.; | Courtroom: F, 15th Floor |
| 24 | Judge: Honorable Joseph C. Spero |
| 25                     Defendants. | |

The parties have met and conferred and make this joint submission concerning the trial plan.[1]

## I.   PLAINTIFFS' PROPOSED TRIAL PLAN

### A. Plaintiffs' Statement of The Issues that Remain to Be Tried for the Classes and Collective.

Two recent orders from the Court have significantly reduced the number of issues to be resolved at the June 1, 2022 trial. First, on February 11, 2022, the Court bifurcated Plaintiffs' individual claims from the class and collective claims for purposes of pretrial matters and trial. ECF No. 1047. The June 1 trial will focus solely on the class and collective claims, while the individual claims will be tried at a later date. This trial plan therefore focuses on the class and collective claims that are the subject of the June 1 trial.[2]

Second, the Court's summary judgment order (ECF No. 1071) resolved key liability issues and most of Defendants' defenses. The Court held that players are "employees," that they perform at least some "work," and that MLB jointly employs players. *See id.* Liability has been established for the

---

[1] This trial plan presents a roadmap of the parties' current plan based on their current understanding of the issues in dispute and the evidence that will be presented at trial, and  is not intended to limit or change the scope of the trial. The parties reserve the right to present additional or different evidence or arguments not set forth herein during the course of the trial as permitted by the Court or authorized by law. The parties understand that each side will have approximately 70 hours to present its case-in-chief, for a total of not more than 140 hours. ECF No. 843, at 1:24 ("The length of trial will be not more than seven (7) weeks").

[2] There are three Rule 23(b)(3) classes, an FLSA collective, and a (b)(2) class. In its summary judgment order, the Court summarized the classes as follows: "The (b)(2) class and the Arizona and Florida (b)(3) classes assert claims under Arizona and Florida law concerning the work that minor leaguers perform during spring training, extended spring training, and instructional leagues in those two states. The claims of the (b)(2) class also cover work performed during the Championship Season in Arizona and Florida. Because Arizona and Florida do not have overtime laws, the claims asserted by these classes only involve alleged minimum wage violations and derivative claims. The California (b)(3) class asserts claims under California law concerning the work that minor leaguers perform during the regular Championship Season in the California League. The claims asserted by this class involve both minimum wage and overtime violations. It also asserts derivative claims under California's Labor Code, such as waiting time penalties (§§ 201-203) and wage statement penalties (§ 226)." ECF No. 1071 at 8. The FLSA collective covers "the same scope of work as is captured in the Rule 23(b)(3) classes and include both minimum wage and overtime claims under the FLSA." *Id.*

Arizona Class: "[T]he Court concludes that Plaintiffs are entitled to summary judgment on their claim for violation of Arizona's minimum wage law and therefore are liable for treble the amount of unpaid wages, attorneys' fees and costs as to that claim." *Id.* at 141. The jury will be asked to determine the amount of damages and penalties owed. For the California Class, the Court has ruled in favor of Plaintiffs on the threshold liability issues and on the wage statement claims. All that remains for the jury to decide are hours worked and the amount of damages and penalties owed. For the Florida Class and the FLSA Collective, Defendants' seasonal and amusement defense, 29 U.S.C. § 213(a)(3), remains to be tried, along with the amount of damages.

The (b)(3) claims and FLSA Collective claims are summarized as follows:

| | Training Seasons | Championship Season | Minimum Wage | Overtime | Other Statutory Violations | Statutory Liquidated Damages | Seasonal and Amusement Defense? |
|---|---|---|---|---|---|---|---|
| **AZ** | Yes | No | Yes | No | **Recordkeeping** (§23-364) | Yes (treble damages) | No |
| **CA** | No | Yes | Yes | Yes | **Waiting Time** (§201, 202 and 203); **Wage Statement** (§226) | Yes (double damages on minimum wage claims) | No |
| **FL** | Yes | No | Yes | No | No | Yes (double damages) | Yes |
| **FLSA** | Yes | No | Yes | Yes | **Recordkeeping** (29 U.S.C. § 211(c)) | Yes (double damages) | Yes |

For the class and collective claims, the following are issues for the jury to decide:

- Whether Defendants' conduct was willful;

- The amount of work performed by class members;

- The damages for the minimum wage violations in all Classes and the FLSA Collective;

- The overtime violations for the California Class and FLSA Collective;

- Whether Defendants are entitled to any wage credits;

- Arizona recordkeeping penalties under A.R.S. § 23-364; and

- Whether Defendants' seasonal and amusement exemption defense (29 U.S.C. § 213(a)(3)) bars any claims.

Plaintiffs propose that the Court will decide the following issues for the class and collective claims:

- Liquidated damages, prejudgment and post-judgment interest, attorneys' fees and costs as permitted by law for all Classes and the Collective;

- An updated amount of wage statement penalties under California Labor Code § 226 to take into account the 2021 California League season (the Court already awarded these penalties through 2020);

- Waiting time penalties under California Labor Code § 203;

- What injunctive or declaratory relief to award to the (b)(2) class after the jury reaches its verdict; and

- The penalties to award under California's Private Attorneys General Act for Defendants' violations of Labor Code §§ 201-204, 208, 226, 510, 558, 1194, and 1197.

**B. Plaintiffs' Plan for Trying the Class and Collective Claims.**

**1. Trial Structure.**

For the issues to be tried to the jury, Plaintiffs propose the following order: First, Plaintiffs will present evidence regarding liability and damages, primarily from live fact and expert witnesses, in their case-in-chief. Fact witnesses will testify regarding player work routines, training worksites, and how the players were not paid minimum wage or overtime. Fact witnesses will further testify that minor league spring training takes place at minor league facilities that are separate from major league spring training facilities, for purposes of the seasonal and amusement exemption. Some deposition testimony may also be played in Plaintiffs' case-in-chief, primarily about player work routines. Plaintiffs may also request that interrogatory responses, admissions, and any stipulations entered into by the parties will be read into the record at this stage. Plaintiffs will call two expert witnesses to testify live: a survey expert and an expert statistician who will provide testimony regarding the hours worked by the Class Members and the amount of damages owed to the Classes and Collective.

Second, Defendants will present their evidence regarding liability, damages, and offset defenses in their case-in-chief, along with their presentation of the seasonal and amusement exemption.

Third, Plaintiffs will present rebuttal evidence regarding the seasonal and amusement exemption and other issues presented in Defendant's case-in-chief, as necessary. Rebuttal evidence regarding the seasonal and amusement exemption would likely be comprised primarily of video excerpts from the depositions of current and former MLB and Club employees (*i.e.*, defense witnesses) who are outside the subpoena power of the Court. It could also include some live witness testimony, either from defense witnesses who are within the subpoena power of the Court, or additional plaintiff witnesses.

The advantage of this approach is that it will avoid (or at least minimize) witnesses testifying multiple times throughout the course of the trial. Plaintiffs' live witnesses will testify primarily (and potentially exclusively) during Plaintiffs' case-in-chief.  Defendants' witnesses will testify in their case-in-chief. And rebuttal witnesses will be primarily video clips of deposition testimony.

Plaintiffs do not believe that a phased approach is appropriate in this case, meaning an approach that addresses, *e.g.*, the seasonal and amusement exemption first, before liability and damages. A phased approach would likely require witnesses to testify multiple times. It would increase the burden on witnesses and likely result in a lengthier trial. It would also increase the risk of jury confusion, especially if the seasonal and amusement exemption were tried first. That exemption is not relevant to the majority of claims that remain to be tried, and it should not be the subject of the jury's initial focus. Instead, Plaintiffs should be accorded the opportunity to present their case-in-chief first, in the typical fashion.

Plaintiffs will put forward evidence relating to all Defendants during their case-in-chief, but Plaintiffs do not plan to split their case-in-chief by Defendant or by "establishment."  There is no need to do so in the case-in-chief. The core policies and related evidence are common across all work locations and defendants, including: the failure to pay salaries outside of the championship season, the failure to pay overtime, and the failure to keep records of hours worked. Plaintiffs' damages model measuring hours worked likewise applies to each Defendant and is best heard by the jury as a single damages estimate for all defendants collectively. The certified classes are not subdivided by MLB Club, and the liability and damages issues that will arise during the Plaintiffs' case-in-chief are best addressed witness-by-witness rather than club-by-club or location-by-location. Indeed, many of

Plaintiffs' witnesses worked for multiple MLB Clubs, so they will be testifying about multiple Defendants at once—and will testify that work routines and policies were consistent across teams.

Defendants are free to stage their evidence in their case-in-chief as they wish, and Plaintiffs understand that they may proceed Defendant-by-Defendant. That approach is sensible, because Defendants bear the burden of proof for each purported establishment at issue. But Plaintiffs' case-in-chief need only address the seasonal and amusement exemption witness-by-witness—the Club-by-Club analysis can come during the defense case and in rebuttal.

For purposes of the exemption, there are roughly 15 training complexes[3] in Florida that will be at issue during the trial with respect to the Florida (b)(3) class. Of those, four involve physical separation of at least half a mile between the minor league training facilities and the major league training facilities.[4] The other 11 involve physically adjacent minor league and major league training facilities, but Plaintiffs will show that the minor league facilities are separate from the major league facilities for purposes of the exemption, because the facilities are functionally separate and players only occasionally interchange between them. Plaintiffs will also show that Defendants have failed to meet the exemption's receipts test.

During the recent case management conference, the Court inquired about possible additional worksites in Florida that would need to be analyzed for purposes of the (b)(2) class. Plaintiffs believe that the (b)(2) class presents just three possible additional worksites to examine: Jackie Robinson Ballpark (used by a Cincinnati Reds minor league affiliate), 121 Financial Park (used by a Miami Marlins minor league affiliate), and Admiral Fetterman Field (used by a Cincinnati Reds affiliate and then later by a Minnesota Twins affiliate). *See* ECF 973-1 (Defendants' list of purported establishments). Other minor league affiliates based in Florida use the same roughly 15 worksites described above that are already the subject of the (b)(3) class.  The (b)(2) class involves injunctive or

---

[3] Defendants claim that the Cardinals' and Marlins' Florida facilities should be combined into a single establishment, which Plaintiffs dispute.

[4] The physically separated spring training facilities include the following Clubs: Yankees, Blue Jays, Orioles, and Pirates (along with the Red Sox's previous facility).

declaratory relief that will be resolved by the Court, not the jury. *See Paradise Valley Investigation & Patrol Servs., Inc. v. U.S. Dist. Ct., Dist. of Arizona*, 521 F.2d 1342, 1342–43 (9th Cir. 1975) (no right to jury trial in wage-and-hour action for injunctive relief); *Unidisc Music, Inc. v. Shelby*, No. 17-CV-04287, 2019 WL 3291578, at *5 (C.D. Cal. Mar. 19, 2019) (no right to jury trial on count for injunctive and declaratory relief). Accordingly, Plaintiffs propose that any evidence that goes solely to these three additional worksites should be presented to the Court after the jury returns its verdict, ideally through post-trial briefing, or if necessary, through live witness testimony during a short evidentiary hearing. The Court can then decide any fact issues regarding those three establishments. There is no need to burden the jury with factfinding regarding these three additional worksites, because that factfinding is only pertinent for injunctive relief that will be decided by the Court. When combined with the evidence solicited during the jury trial regarding the roughly 15 training complexes that are at issue for the Florida (b)(3) class, the Court will have all the evidence it needs to determine the appropriate scope of injunctive or declaratory relief for the (b)(2) class.

### 2. The Evidence To Be Presented.

Plaintiffs' case-in-chief will focus on the issues that will be tried to the jury for which Plaintiffs have the burden of proof: the amount of work performed by players, and the minimum wage violations, overtime violations, and damages and penalties that result.

The evidence of hours worked will match the legal principles set forth by the Ninth Circuit in this case. As the Ninth Circuit held, the continuous workday rule eliminates any need for an activity-by-activity tracing of the workday because the workday includes all time between the beginning and end of the workday "whether or not the employee actually engages in work throughout that entire period." *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 941 (9th Cir. 2019). The Ninth Circuit further explained that under the "suffer or permit" standard of hours worked, there are two possible ways for the workday to begin: (1) if players "were required to report" at a certain time, then the workday would begin. *Id.* at 943; or (2) if players "arrived of their own volition but engaged in work activities," then the workday would begin. *Id.* at 943-44. Either way, "the continuous workday doctrine eliminates the need for plaintiffs to prove which activities they engaged in throughout the day." *Id.* at 944. And the Ninth Circuit noted the possibility that the jury could decide that activities

like early "hitting practice with coaches" or "supervised weightlifting" started the workday. *Id.* at 944 n.24. The Ninth Circuit approved of Plaintiffs' plan to use representative evidence and averages to prove these matters for the Classes and Collective. *Id.* at 943-47.

Because Defendants did not keep records of the hours worked by a particular player on a given day, the estimate of hours worked need not be precise. "Defendants should not 'be heard to complain that the damages lack the exactness and precision of measurement that would be possible had [they] kept records in accordance with the [statutory] requirements,' even if their 'lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work.'" *Id.* at 944 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946)).

Plaintiffs will offer multiple layers of evidence to meet their burden. Witnesses, including minor league players and their supervisors, will provide testimony regarding the work performed during the work periods at issue. Class representatives will confirm what is commonly known in the industry: players work long hours during the work periods at issue, quite often without pay. Such testimony from the named Plaintiffs will be the starting point of evidence of work routines.

Testimony from Defendants' own witnesses will also be presented; indeed, many of those witnesses already confirmed that there is a core work routine in each of the work periods at issue. *See* Kriegler Supp. Rep. at Exs. 10A-10D, ECF No. 984-2 (summarizing testimony on work routines from Defendant witnesses). Some of that testimony will be presented through deposition designations, and some of it will be presented live. Plaintiffs anticipate that certain former minor league coaches and other personnel will willingly testify live at trial, and Plaintiffs anticipate calling other coaches and supervisors by trial subpoena.

Another layer of evidence will be presented through Plaintiffs' experts. Plaintiffs' survey expert, Dr. J. Michael Dennis, collected responses from 720 Minor Leaguers. ECF No. 782 at 6. The survey collected data for each type of season, for home versus away game days, and for game days versus non-game days during the training seasons. Plaintiffs' expert statistician, Dr. Brian Kriegler, then created a model of hours worked by combining the survey evidence with several other types of evidence, including game schedules (showing when games took place and the type of game that took

1  place), eBIS data and rosters, travel data, and game lengths. The resulting model shows the hours

2  worked by players for every type of workday at issue.

3       Plaintiffs will explain to the jury that when computing hours worked and the resulting damages,

4  Dr. Kriegler used two conservative percentiles of the survey data: the 10th and 25th percentiles. He

5  validated his use of those percentiles by comparing them to data drawn from another layer of

6  evidence—daily itineraries showing the work that took place on a given day. Dr. Kriegler analyzed

7  over 1,600 daily itineraries and coded the first required activity performed by any player according to

8  the itinerary and the first required activity performed by *every* player according to the itinerary. *See*

9  Kriegler Supp. Rep. at 50-53, ECF No. 984-2. The latter evinced the latest possible start of the

10  workday for *all* players on a given day, while the former evinced the time by which at least some

11  players began work on a given day according to an itinerary. Although the daily itineraries do not

12  include all work routinely performed by players,[5] the data drawn from them matched the percentiles

13  used by Dr. Kriegler. The average latest start time from the itineraries matched the survey data's 10th

14  percentile, while the average earlier start times from the itineraries matched the survey data's 25th

15  percentile. Dr. Kriegler further supports his methodology with analysis of other evidence in the

16  record, such as an examination of the deposition testimony.

17       In addition to Dr. Kriegler's summary of his daily itinerary analysis, actual daily itineraries will

18  be submitted into evidence. Defendants' own witnesses have already confirmed that they could think

19  of no better document to show what took place on a given day. Witnesses will further confirm that

20  the events on the daily itineraries typically took place, and additional work typically occurred outside

21  the itineraries as well.

22       That proof of hours worked will be compared to Dr. Kriegler's analysis of payroll data, and

23  both liability and damages will be established. Dr. Kriegler's analyses show rampant minimum wage

24  violations in the Arizona and Florida Classes (during which wages were hardly ever paid), and

25  

---

26  [5] Daily itineraries generally do not include time spent donning and doffing, performing strength

27  training that is supervised by coaches, and certain types of early work that regularly take place (like early hitting in the cages with coaches or early bullpen work for pitchers). *See* Kriegler Supp. Rep. at

28  25 n.36, ECF No. 984-2.

1  rampant minimum wage and overtime violations in the California Class. Through Dr. Kriegler,

2  Plaintiffs will also present evidence of the number of Arizona recordkeeping penalties.

3      In their own case-in-chief, Defendants will have a chance to try to show that Plaintiffs' evidence

4  of hours worked is not reasonable. And Defendants can present evidence going to the seasonal and

5  amusement exemption recognized under Florida law and the FLSA. Because it is an affirmative

6  defense, Defendants will have the burden of proving what the establishments are, that the

7  establishments are "frequented" by the public for an "amusement" or "recreational" purpose, and

8  that "during the preceding calendar year, its average receipts for any six months of such year were not

9  more than 33 1/3 per centum of its average receipts for the other six months of the year." *See* ECF

10  No. 1071 at 125-38 (Court's summary judgment order on the defense).[6] Defendants will also have the

11  burden of showing that they are entitled to any wage credits from per diems that were purportedly

12  provided during training seasons. *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 474 (11th Cir.

13  1982) (defendant has burden of showing wage credits). To do so, they must show that the per diems

14  qualify as wages, and that they have provided sufficient evidence of the amount in per diems provided

15  and any debits made from them.

16      Plaintiffs believe that Defendants will not meet their burden on some or all of these issues, and

17  plan to move for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 as necessary. Plaintiffs

18  plan to reserve time for a rebuttal case to, if needed, present evidence rebutting the seasonal and

19  amusement exemption, Defendants' wage credit defense and any other issues raised during

20  Defendant's case-in-chief.

21      After the jury enters its verdict, the Court will adjudicate the remaining issues: liquidated

22  damages, prejudgment and post-judgment interest, attorneys' fees and costs permitted by law; the

[6] Of note, Defendants are not invoking the seven-month operational test for the purported establishments at issue in this initial trial, which will focus on the training seasons and the California League. *See* ECF No. 1071 at 126, 133 (explaining that Defendants rely on the seven-month operational test with respect to the minor league affiliates during the championship season, but are relying on the receipts test with respect to the training seasons); *see also id.* at 105 n.27 (granting summary judgment on the defense with respect to the California League because California law does not recognize the defense).

1  additional wage statement penalties under Labor Code § 226 owed for the 2021 California League

2  season (the Court already awarded these penalties through 2020); the waiting time penalties under

3  California Labor Code § 203; the injunctive or declaratory relief to award to the (b)(2) class; and the

4  California PAGA penalties to award.

5  **II.    DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED TRIAL PLAN**

6        As the proponents of a class trial, the burden rests on the Plaintiffs alone to show that this case

7  can be tried fairly on a class basis. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir.

8  2001) (plaintiff "bears the burden of demonstrating a suitable and realistic plan for trial of the class

9  claims").[7]  The few summary pages that Plaintiffs present here fail at that obligation, in part because

10  this case has too many separate defendants, too many individualized damages issues, and too many

11  varying state and federal laws to be tried in a manageable way.  In Part III below, Plaintiffs again trot

12  out the old chestnut that individual damages do not preclude class treatment, but this case is now at a

13  different stage.  Cases affirming class certification despite individual damage variations contemplate a

14  later proceeding, after the class trial, where individual damage claims will be determined.[8]  But

15  Plaintiffs are proposing to resolve damages in this current trial, and to do that without the

16  individualized evidence that the case law universally contemplates, they must present a trial plan that

17  demonstrates they can prove those damages reliably and fairly without it.  The plan presented here

---

[7] *See also Feltzs v. Cox Commc'ns Cal., LLC*, CV 19-2002 JVS (JDEx), 2021 WL 4947306, at *8 (C.D. Cal. Oct. 21, 2021) (rejecting plaintiffs' trial plan and denying leave to present another because "[w]hile the Court is not requiring [plaintiffs] to present a fully formed workable trial plan, he is also not able to sit back and wait for [defendants] to do the same"); *Gartin v. S & M Nutec LLC*, 245 F.R.D. 429 (C.D. Cal. 2007); *Sweet v. Pfizer*, 232 F.R.D. 360, 370 (C.D. Cal. 2005) ("The Ninth Circuit has clearly stated that plaintiffs seeking certification of a nationwide class in which numerous state laws apply bear the burden of demonstrating a trial plan."); *In re Paxil Litig.*, 212 F.R.D. 539 (C.D. Cal. 2003).

[8] Indeed, the Ninth Circuit noted that likelihood here.  *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 943 (9th Cir. 2019) ("Damages may well vary, and may require individualized calculations."); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (noting that certification may be appropriate "even though other important matters will have to be tried separately, such as damages"); Vaquero v. Ashley Furniture Industries, Inc., 824 F. 3d 1150, 1155 (9th Cir. 2016) ("the 'amount of damages is invariably an individual question'") (quoting *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)).

1    does not do that.  Plaintiffs note that Dr. Kriegler has invented a "methodology for distribution" of

2    his aggregated damages figures to individual players, but (a) there is a significant difference – a

3    difference that invokes the Rules Enabling Act – between a mere distribution methodology and proof

4    of damages actually incurred by an individual class member; and (b) Kriegler's creation does not offer

5    a method to allocate liability among the Club Defendants.  That, too, runs afoul of the Rules Enabling

6    Act, as described further in Part B below.

7           The purpose of a class action trial plan is not merely to describe the proposed course of the

8    case and the evidence to be presented, but to establish that the evidence will be common to the class

9    and representative of all class members, so that the jury can extrapolate from that evidence to draw

10   reliable and fair conclusions about liability and damages for the entire class.  That problem is even

11   more acute here than in most large class actions, because Plaintiffs have brought their claims not

12   against a single defendant, but against 23 separate entities, each of which is entitled to an assessment

13   of its own liability and the damages that defendant should be required to pay.  (The parties met and

14   conferred over Plaintiffs' original trial plan proposal, but Plaintiffs maintained, as they do here, that

15   they had no interest in trying the case in phases, whether by claim, by state law, or by Club).

16   Plaintiffs' summary outline offers no basis to conclude that the evidence will be representative, as

17   discussed in Part A below, or that it will support a verdict against each defendant under each

18   applicable jurisdiction's law, as explained in Part B.  Finally, because the Court directed the parties to

19   consider the trial plan jointly, Defendants offer some suggestions in Part C, but ultimately it is now

20   clear, if it was not before, that this case cannot be fairly tried on a class basis.

21          **A. Plaintiffs' Cursory Trial Plan Does Not Establish That the Case Will Be Tried With**
             **Representative Evidence.**

22

23          Instead of wrestling with the complexities of this multiple-defendant, multiple-jurisdiction class

24   action seeking hundreds of millions of dollars in damages on behalf of multiple classes numbering in

25   the thousands, Plaintiffs' "trial structure" amounts to little more than "Plaintiffs will go first, then

26   Defendants, then Plaintiffs again."  They say in Part I.A. that they will call "fact witnesses," described

27   in I.B. as including some unknown number of minor league players, coaches, and others, but without

28   any showing or even an indication that the testimony of those hand-selected witnesses will be fairly

representative of the several classes, or even that they will have personal knowledge relevant to each

of the Defendants.  Nor do they offer any other reason to conclude that the hours these unidentified

witnesses testify to having worked can be extrapolated to the classes as a whole to permit a reliable

calculation of damages against each Club.[9]  As usual, Plaintiffs hope to sweep such objections away

with the broom of *Anderson v. Mt. Clemens* and its "just and reasonable inference" standard, but that

rule does not go as far as Plaintiffs wish it did.  As the Seventh Circuit has explained, hours worked

> could be reconstructed from memory, inferred from the particulars of the jobs the [class members] did, or estimated in other ways — any method that enables the trier of fact to draw a "just and reasonable inference" concerning the amount of time the employee had worked would suffice. But what can't support an inference about the work time of thousands of workers is evidence of the experience of a small, unrepresentative sample of them.

*Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013) (citations omitted); see also *Cruz*

*v. Dollar Tree Stores, Inc.*, No. 07-2050 SC, 2011 WL 2682967, at *8 (N.D. Cal. July 8, 2011) (finding

trial plan inadequate because the plaintiffs "have provided no reliable means of extrapolating from the

testimony of a few exemplar class members to the class as a whole"); *Weigele v. FedEx Ground Package*

*Sys., Inc.*, 267 F.R.D. 614, 624-25 (S.D. Cal. 2010) (rejecting trial plan in FLSA exempt

misclassification case because the jury would hear testimony on individuals' job duties but "will then

need to extrapolate from all of the testifying witnesses to the entire class. But it is unclear which . . .

tools they will have to perform that extrapolation. At worst it appears that they would be left to guess.

This is too amorphous to expect a reasonable and rational result from any jury").  The lack of

specificity about Plaintiffs' trial plan with respect to witness testimony, and the lack of any guarantee

that the evidence will be sufficiently representative to extrapolate those conclusions to the class as a

whole, accordingly renders the plan inadequate.

Plaintiffs similarly say they will supplement that unspecified testimony with some number of

daily itineraries, but again without even a suggestion that those documents will be sufficiently

---

[9] The concern about whether Plaintiffs' planned witness testimony for trial will be sufficient to establish hours worked for the entire class is deepened by the comment in their motion to bifurcate that they envision using "a smaller number of witnesses" to prove their class claims than their individual claims.  ECF No. 1041 at 6.

1   representative to be relied upon to establish the schedules that players actually worked for each

2   affiliate or Club in each year.

3          Ultimately, as it has been since the beginning, they intend to rely entirely on the Survey and Dr.

4   Kriegler's analysis as their purportedly representative evidence.  But the expert testimony suffers from

5   fairness and manageability problems wholly separate from the scientific reliability questions that the

6   Court resolved in ruling on the *Daubert* motions.  First, the survey responses on which Dr. Kriegler

7   exclusively relies to calculate hours worked are inadmissible hearsay; Defendants will have no

8   opportunity to cross-examine survey respondents on their (unsworn) estimates of arrival and

9   departure times.  And while an expert may rely on inadmissible material in formulating an opinion, the

10  underlying data does not thereby become admissible.  *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254,

11  1261-62 (9th Cir. 1984); *V5 Technologies, LLC v. Switch, Ltd.*, 501 F. Supp. 3d 960 (D. Nev. 2020).

12  Thus, under Plaintiffs' plan, the admissible evidence from class members of hours they worked will

13  come only from the carefully curated list of individuals whose testimony Plaintiffs elect to offer.

14  Again, there is no basis to conclude from Plaintiffs' curt overview above that that evidence will be at

15  all representative.

16         Instead, the verdicts Plaintiffs seek against each Club defendant on behalf of absent, non-

17  testifying class members will depend entirely on Dr. Kriegler's testimony.  That is not permissible.

18  The plaintiffs in *McCleery v. Allstate Ins. Co.*, 37 Cal. App. 4th 434, 2019 WL 3072621 (Cal. App. 2019),

19  attempted the same thing: lacking common proof that would establish liability of each defendant, they

20  relied on an expert witness's analysis of otherwise inadmissible survey results.[10]  The court rejected

21  that trial plan as "inadequate an unfair," noting that defendants could not cross-examine the survey

22  respondents and that the expert's opinion was too thin a reed on which to rest a judgment in favor of

23  all class members against all defendants. *Id.* at 453-54 ("no case of which we are aware, and plaintiffs

24  _____

25  [10] Although *McCleery* was decided under California rules of procedure, the California standards for
    class certification closely parallel those of Fed. R. Civ. P. 23, and the requirement that plaintiffs

26  present a trial plan demonstrating that "the claims [are] susceptible of resolution on a common basis"
    and that "individual questions can be managed with an appropriate trial plan" mirrors federal law.  *See*

27  *id.* at 449 (quoting *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 529-30 (Cal. App. 2014),

28  451.

refer us to none, suggest a trial may be conducted solely on the evidence of an expert witness relying on an anonymous double-blind survey, no matter how scientific the survey may be").

### B. Plaintiffs' Plan Does Not Account For Material Differences Among Parties and Applicable Laws.

Plaintiffs' "plan," such as it is, also would blur all of the state and federal laws at issue and the differences among the classes, and throw evidence relevant only to the seasonal exemption into the same undifferentiated mass – a "shapeless, freewheeling trial," *Espenscheid*, 705 F.3d at 776, that leaves to the jury the labor of sorting out those differences and the team-by-team applicability of the exemption (or, more likely, hopes that the jury will overlook such distinctions). In individual trials, though, the Defendants would be entitled to separate verdicts on their liability (and damages) under Florida, Arizona, California, and federal law, and separate consideration of each Club's qualification for the seasonal exemption. The Rules Enabling Act prohibits a sacrifice of those separate verdicts and separate jury consideration of each claim and defense as to each Club in the name of convenience or manageability.

This proposed lumping together of Plaintiffs' claims is one aspect of a larger problem. There is no defendant class in this case, nor could there be. The Defendants are 22 separate corporate entities, and MLB. Each of those entities, as a matter of due process, is entitled to its own verdict, and to demand that the Plaintiffs prove, by just and reasonable inference, both the hours they worked for that entity and the damages that that entity is obligated to pay. *See, e.g.*, Ninth Circuit Model Civil Jury Instruction 1.8 ("You should decide the case as to each [defendant] separately."). Plaintiffs, unsurprisingly, declare that their damages evidence "is best heard by the jury as a single damages estimate for all defendants collectively," *supra* at 4, but offer no authority for that reductive approach nor even articulate a theory as to how damages can be accurately or fairly awarded against the Defendants "collectively." They also note that the classes are not subdivided by Club, *id.*, but that is not the point: the Court's choice to aggregate the class members' claims does not aggregate the Defendants or reduce the Plaintiffs' obligation to prove their case against each Defendant individually.

**C. If The Case Is To Be Tried on a Class Basis, The Seasonal Exemption Should Be Tried First, Followed By The State Law Claims Seriatim.**

Defendants have no obligation to construct a workable trial plan out of Plaintiffs' generalities, and the fact is that this case cannot be manageably – or, more importantly, fairly – tried on a class basis.  Not infrequently, courts that have certified classes or collectives revisit that decision when the plaintiffs finally must specify how the trial will be conducted, and the new focus on the particulars of trial makes plain that it cannot be done in a manageable way.[11]

At the March 25, 2022 case management conference, however, the Court directed the parties to consider the trial plan jointly.  In an effort to be responsive to that directive, and without waiving our position that the case cannot be appropriately tried on a class basis for the reasons described above, Defendants offer the following suggestions as a means at least of reducing the jury confusion likely to result from Plaintiffs' hodgepodge.

**1. The Court Can Try The Seasonal Exemption Before Empaneling A Jury.**

Rather than simply throwing all of the issues and laws of several jurisdictions into a monolithic presentation for the jury, Defendants propose that the Court try any remaining issues as to the seasonal exemption—remotely, if the Court so preferred—and that a jury be empaneled after the Court rules on the application of the exemption.  Doing so could streamline the jury trial that followed, and save the jury from having to consider detailed evidence that is relevant to this highly technical defense, but not to any other issue in the case.

---

[11] *See, e.g, Hamilton v. Wal-Mart Stores, Inc.*, No. 5:17-cv-01415-AB (KKx), 2019 WL 1949457, at *16 (C.D. Cal. Mar. 4, 2019) (decertifying class because "even at this very late stage of the case, Plaintiffs still have not articulated their method or plan to try this case"); *Rollins v. Taylor Bros Inc.*, No. C14-1414 JCC, 2016 WL 59242943, at *1 (W.D. Wash. May 3, 2016) (noting that the court had certified a class, "[b]ut the Court's holding was predicated on the parties submitting a manageable trial plan"); *Cruz*, 2011 WL 2682967, at *8; *Weigele*, 267 F.R.D. at 624-25; *Marlo v. UPS*, 251 F.R.D. 476, 487 (C.D. Cal. 2008) ("The Court has broad discretion to manage class action practice, but this does not relieve a party of its responsibilities to articulate a clear trial plan when requested. . . . It is possible through development of reliable common proof and clearer vision for how to try this case that Plaintiff could have avoided this situation. However, the Court must review the fairness and efficiency of class treatment based on the record before it. Here, there is a lack of common proof to support a class-wide judgment. The Court concludes that individualized issues will predominate if this case were to proceed to trial.").

1    The seasonal exemption is an affirmative defense with respect to the claims of the:  (i) FLSA

2    collective for minimum wage and overtime during the training periods at each Club's spring training

3    facility establishment in Arizona or Florida (through March 23, 2018, when SAPA passed); (ii) Rule

4    23(b)(3) Florida class for minimum wage, during the training periods at the spring training facility

5    establishments in Florida; and (iii) Rule 23(b)(2) class, covering the same claims as the Rule 23 (b)(3)

6    Florida class, plus claims under Florida law for the championship season at 3 additional

7    establishments in Florida where only championship season games are played.

8    At the outset, Defendants submit that even with a bench trial on the seasonal exemption, it is

9    virtually impossible to solve the manageability problems that exist with this case.  The seasonal

10   exemption is evaluated on a year-by-year basis for each of the relevant establishments.  There are a

11   total of 40 establishments at issue in this case that will require 40 mini-trials to determine what the

12   scope of the establishment is (*i.e.,* whether the major and minor league operations at the spring

13   training facilities are considered single or separate establishments), and whether the establishment

14   meets the gross receipts or seasonal test for *each year* at issue, spanning 14 years for the Florida

15   establishments and 8 years for the Arizona establishments.[12]  Indeed, the Court recognized the patent

16   unmanageability of trying the seasonal exemption for this number of establishments at the recent

17   March 25, 2022 conference.

18   Defendants have summarized below the relevant establishments for purposes of the seasonal

19   exemption, which include:  (i) 19 spring training facility establishments in Florida, where Defendants

20   intend to rely upon the gross receipts test for each year; (ii) 1 spring training facility establishment in

21   Florida for the Baltimore Orioles, where Defendants intend to rely upon the seasonal test for each

22   year; (iii) 3 championship season affiliate establishments in Florida, where Defendants intend to rely

---

[12] The gross receipts test considers the establishment's average gross receipts for the "preceding calendar year."  29 U.S.C. § 213(a)(3).  Therefore, Defendants will present evidence regarding the receipts prong from 2008 through 2021 with respect to Plaintiffs' claims under Florida law as to the Florida-based establishments (because the limitations period under Florida law is February 2009 through the present); and from 2010 through 2017 with respect to Plaintiffs' claims under the FLSA as to the Arizona-based establishments (because the limitations period under the FLSA is February 2011 through March 23, 2018, when SAPA passed).

upon the seasonal test for purposes of the Rule 23(b)(2) class only; and (iv) 17 spring training facility establishments in Arizona,  where Defendants intend to rely upon the gross receipts test for each year.

**Florida Spring Training Facility Establishments – Gross Receipts Test**

| MLB Club(s) | Establishment | Rule 23(b)(2), (b)(3), FLSA | Applicable Limitations Period |
|---|---|---|---|
| Atlanta Braves | Champion Stadium | (b)(3) and FLSA | February 2009 – December 2019 |
| Atlanta Braves | CoolToday Park | (b)(2), (b)(3) and FLSA | February 2020 – present |
| Baltimore Orioles | Ed Smith Stadium | (b)(2), (b)(3) and FLSA | February 2009 – present |
| Boston Red Sox | City of Palms Park and Player Development Complex | (b)(3) and FLSA | February 2009 – December 2011 |
| Boston Red Sox | JetBlue Park | (b)(2), (b)(3) and FLSA | February 2012 –  present |
| Detroit Tigers | Publix Field at Joker Marchant Stadium and Tigertown Minor League Complex | (b)(2), (b)(3) and FLSA | February 2009 – present |
| Houston Astros | Osceola County Stadium and surrounding practice fields and facility | (b)(3), FLSA | February 2009 –  December 2016 |
| Houston Astros | The Fitteam Ballpark of the Palm Beaches | (b)(2), (b)(3), FLSA | February 2017 – present |
| Miami Marlins / St. Louis Cardinals | Roger Dean Chevrolet Stadium | (b)(2), (b)(3), FLSA | February 2009 – present |

| MLB Club(s) | Establishment | Rule 23(b)(2), (b)(3), FLSA | Applicable Limitations Period |
|---|---|---|---|
| Minnesota Twins | CenturyLink Sports Complex and Hammond Stadium | (b)(2), (b)(3), FLSA | February 2009 – present |
| New York Mets | Clover Park | (b)(2), (b)(3) and FLSA | February 2009 – present |
| New York Yankees | George M. Steinbrenner Field and Yankees Complex | (b)(2), (b)(3), FLSA | February 2009 – present |
| Philadelphia Phillies | BayCare Park and Carpenter Complex | (b)(2), (b)(3), FLSA | February 2009 – present |
| Pittsburgh Pirates | LECOM Park and Pirate City | (b)(2), (b)(3), FLSA | February 2009 – present |
| Tampa Bay Rays | Charlotte Sports Park | b)(2), (b)(3), FLSA | February 2009 – present |
| Toronto Blue Jays | TD Ballpark and Bobby Mattick Training Center | (b)(2), (b)(3), FLSA | February 2009 – December 2018; February 2020 - present |
| Toronto Blue Jays | Jack Russell Memorial Stadium | (b)(3), FLSA | 2019 |
| Washington Nationals | USSSA Space Coast Complex and Space Coast Stadium | (b)(3), FLSA | February 2009 – December 2016 |
| Washington Nationals | The Ballpark of the Palm Beaches | (b)(2), (b)(3), FLSA | February 2017 – present |

**Florida Spring Training Facility Establishment – Seasonal Operations Test**

| MLB Club(s) | Establishment | Rule 23(b)(2), (b)(3),  FLSA | Applicable Limitations Period |
|---|---|---|---|
| Baltimore Orioles | Buck O'Neill Complex at Twins Lake Park | (b)(2), (b)(3) and FLSA | February 2009 – present |

**Florida Championship Season Establishments – Seasonal Operations Test**

| Minor League Affiliate (MLB Club) | Establishment | Rule 23(b)(2), (b)(3), FLSA | Applicable Limitations Period |
|---|---|---|---|
| Daytona Tortugas (Cincinnati Reds) | Jackie Robinson Ballpark | (b)(2) only | Present |
| Jacksonville Jumbo Shrimp (Miami Marlins) | The Baseball Grounds of Jacksonville | (b)(2) only | Present |
| Pensacola Blue Wahoos (Miami Marlins) | Blue Wahoos Stadium | (b)(2) only | Present |

**Arizona Spring Training Facility Establishments – Gross Receipts Test**

| MLB Club(s) | Establishment | Rule 23(b)(2), (b)(3), FLSA | Applicable Limitations Period |
|---|---|---|---|
| Arizona Diamondbacks | Salt River Fields at Talking Stick | FLSA | February 2011 – March 2018 |
| Chicago Cubs | HoHoKam Stadium and Fitch Park | FLSA | February 2011 – December 2013 |
| Chicago Cubs | Sloan Park/Cubs Park | FLSA | February 2014 –  March 2018 |
| Chicago White Sox | Camelback Ranch-Glendale | FLSA | February 2011 – March 2018 |
| Cincinnati Reds | Goodyear Ballpark and practice fields | FLSA | February 2011 – March 2018 |

| MLB Club(s) | Establishment | Rule 23(b)(2), (b)(3), FLSA | Applicable Limitations Period |
|---|---|---|---|
| Cleveland Guardians/ Indians | Goodyear Ballpark and Player Development Complex | FLSA | February 2011 – March 2018 |
| Colorado Rockies | Salt River Fields at Talking Stick | FLSA | February 2011 – March 2018 |
| Kansas City Royals | Surprise Stadium | FLSA | February 2011 – March 2018 |
| Los Angeles Angels | Tempe Diablo Stadium | FLSA | February 2011 – March 2018 |
| Los Angeles Dodgers | Camelback Ranch-Glendale | FLSA | February 2011 – March 2018 |
| Milwaukee Brewers | American Family Fields of Phoenix/Maryvale Baseball Park | FLSA | February 2011 – March 2018 |
| Oakland Athletics | Papago Park Sports Facility and Phoenix Municipal Stadium | FLSA | February 2011 – December 2014 |
| Oakland Athletics | Fitch Park | FLSA | February 2015 – March 2018 |
| San Diego Padres | Peoria Sports Complex | FLSA | February 2011 – March 2018 |
| San Francisco Giants | Scottsdale Stadium and Indian School Park | FLSA | February 2011 – March 2018 |
| Seattle Mariners | Peoria Sports Complex | FLSA | February 2011 – March 2018 |
| Texas Rangers | Surprise Stadium | FLSA | February 2011 – March 2018 |

The seasonal exemption will be tried on a Club-by-Club basis and evidence presented for each year as required under the statute. The evidence will consist of testimony from witnesses for each Club regarding the scope of the establishments at issue, and the gross receipts or seasonal operations of each establishment, for each year, and possibly some testimony from MLB witnesses.

1    <u>Determining the Scope of the Spring Training Facility Establishments</u>.  The first issue to be

2    tried is the scope of the spring training facility establishments.  Defendants moved for summary

3    judgment on this issue and presented evidence that each Club's spring training facility was a separate

4    establishment that satisfied the exemption because the facilities (including the main stadiums and

5    back-fields where training and games are also held) were "distinct, physical places of business."  (Dkt.

6    980 at 21-26.)  In opposition, Plaintiffs maintained that major league spring training and minor league

7    spring training were separate establishments on the same premises for all 30 Clubs; however, the only

8    evidence Plaintiffs cited (and only for some Clubs) was that the main stadium and back-fields were

9    physically separated from each other.  (Dkt. 1019 at 32-33.)  On reply, Defendants explained that

10   Plaintiffs needed to establish *all three of the factors* under 29 C.F.R. § 779.305 to demonstrate that there

11   was more than one establishment at a single location, specifically:  (i) physical separation; (ii)

12   functional separation, having separate records and bookkeeping; and (iii) no interchange of employees

13   between the unit.  (Dkt. 1029 at 13-15.)

14   Defendants submitted evidence that Plaintiffs did not—and indeed, could not—make such a

15   showing.  (*Id.*)  Thereafter, at the Court's direction, the parties submitted a joint stipulation of all

16   undisputed facts as to the establishment issue, but limited to those facts contained in the summary

17   judgment record.  (Dkt. 1062.)  Because Plaintiffs cannot satisfy all three factors for any of the

18   establishments on that record, Defendants respectfully submit that they are entitled to summary

19   judgment on this issue.  However, if the Court disagrees and denies summary judgment, then all 22

20   Defendants Clubs, as well as the 8 Dismissed Clubs will present additional evidence from the media

21   guides which are part of the record in this case but for which only sections had been submitted on

22   summary judgment, plus testimony from Club employees as to (i) physical integration between major

23   and minor league facilities at the spring training establishments; (ii) functional integration, including

24   centralized books and records covering major and minor league players by each Club; and (iii)

25   interchange of employees between each Club's major and minor league operations at the spring

26   training facilities.

27   <u>Gross Receipts Test for Spring Training Facility Establishments.</u>  Once the scope of the spring

28   training facility establishments is determined, each of the 22 Defendant Clubs and the 8 Dismissed

1   Clubs will present evidence that the average gross receipts at the 19 Florida and 17 Arizona spring

2   training facility establishments outlined above satisfy the receipts test for each year covered by the

3   exemption.  The Clubs will rely on the previously-submitted evidence, but also will provide evidence

4   that there is no broadcast revenue from spring training games (although Defendants respectfully

5   submit that any broadcast revenue is not relevant to the gross receipts analysis[13]).  During summary

6   judgment briefing, Plaintiffs failed to demonstrate that the gross receipts records the Clubs produced

7   resulted in any establishment failing the gross receipts test for any year during the limitations period,

8   and Defendants submit that Plaintiffs will be unable to make such a showing at trial on this issue.

9       <u>Seasonal Operations Test for the Remaining Establishments.</u>  There are 4 separate

10  establishments where Defendants intend to rely upon the seasonal operations test—not the gross

11  receipts test—to meet the exemption:  as explained below, 3 championship season affiliate

12  establishments in Florida (2 affiliates for the Miami Marlins and 1 affiliate for the Cincinnati Reds),

13  and 1 spring training facility establishment in Florida for the Baltimore Orioles, where minor league

14  spring training is held each year.

15      *First,* the Rule 23(b)(2) class includes claims under Florida law with respect to activities

16  performed during the championship season in Florida, among other claims.  As noted above, there

17  are 3 minor league affiliate establishments in Florida where championship season games are held that

18  are distinct physical places of business from the Clubs' spring training facility establishments:  Dayton

19  Tortugas (Cincinnati Reds affiliate), Jacksonville Jumbo Shrimp (Miami Marlins affiliate), and

20  Pensacola Blue Wahoos (also a Marlins affiliate).  All other championship season activities in Florida

21  take place at Clubs' spring training facility establishments, and the Clubs will rely upon the gross

22  receipts test for those establishments.  As to these 3 championship season establishments, Defendants

---

23

24  [13] Broadcast revenue does not arise from patronage of the physical premises by the public, and was

25  not considered in the only other prior case applying the receipts test to a MLB Club's spring training
    facility establishment.  *See Jeffrey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 595 (11th Cir. 1995) (discussing

26  the six months receipts test under section 213(a)(3) for a Club's spring training facility establishment,
    and considering only revenue "from ticket sales, concession and parking revenues, promotional

27  sponsorships, publication sales, advertising and other miscellaneous items," with no mention of

28  broadcast revenue).

1  intend to satisfy the seasonal test by presenting witness testimony regarding the seasonal nature of the

2  championship season schedule, the length that each Club presents baseball activities at that

3  establishment, the number of year-round Club employees at each of the establishments at issue, as

4  well as the number of affiliate employees at the establishments and their responsibilities during the

5  off-season (though Defendants respectfully submit the latter is legally irrelevant).

6      *Second,* as set forth in Defendants' summary judgment motion (*see* Dkt. 973-1 at 7), the

7  Baltimore Orioles hold minor league spring training at the Buck O'Neil Complex, which is a separate

8  establishment from the Ed Smith Stadium (that is approximately 10 miles away), where the Orioles

9  hold major league spring training, extended spring training and instructional league.  Plaintiffs do not

10  dispute this.  The Orioles will present a witness to testify that the establishment is seasonal because it

11  operates for only 2 months each year (February/March), and the Orioles have only 3 year-round

12  employees at the establishment, plus a limited number of groundskeepers.

13      In their reply below, Plaintiffs do not agree to a bench trial regarding the seasonal exemption,

14  which contradicts what they previously represented to the Court.   At the February 16, 2022

15  conference, Plaintiffs stated that they are amenable to the Court deciding this exemption.  (*See*

16  Hearing Tr. at 43 (2/16/22).)  Plaintiffs offer no justification for sending this complex, technical

17  defense, with very few (if any) disputed material facts to the jury, except by stating—devoid of any

18  specifics consistent with the rest of their plan—that "the exemption presents material factual issues

19  that the parties have the right to have a jury resolve."  However, the Court has already acknowledged

20  during oral argument on the parties' cross-summary judgment motions that there do not appear to be

21  any material disputed facts on the issue of the scope of the establishment, and thus this issue could be

22  decided by the Court based on a more complete factual record.  (*See, e.g.,* Hearing Tr. at 48-49

23  (2/16/22).)  Defendants' proposal presents an opportunity to streamline the issues for the jury to

24  consider, sparing the jury from having to consider a highly-technical defense that applies only to the

25  claims under the FLSA and Florida law.

26      Plaintiffs are also wrong in several respects regarding the purported inefficiencies of

27  Defendants' phased approach to the trial.

28

1      *First*, Plaintiffs' assertion that witnesses will have to appear multiple times is vastly exaggerated.

2      As noted above, this phase of the trial could be tried remotely (if the Court preferred), which would

3      eliminate the need for witnesses to travel to and appear for live testimony on multiple occasions—

4      Plaintiffs provide no response to this aspect of Defendants' proposal.  Moreover, a number of

5      Defendants' witnesses will only be designated to testify regarding the seasonal exemption—*e.g.,* the

6      witnesses related to the Clubs' gross receipts, witnesses concerning the seasonal nature of certain

7      establishments, and the Clubs' payroll records.  The parties could also stipulate as to the undisputed

8      facts outside of the summary judgment record (as they did with respect to the facts submitted with the

9      summary judgment record, which revealed no disputed facts), including but not limited to, facts

10     derived from payroll records the Clubs produced during discovery, the Clubs' media guides for each

11     year, and business record documents like player guides and rosters.  The contents of these

12     documents—which cannot be disputed—will establish that payroll records contain information for

13     both major and minor league players; minor league players participate in major league spring training;

14     and front office executives, coaches and managers for major and minor league players are all

15     employed by the Club.  These facts, which bear on the factors relevant to the scope of the

16     establishment, cannot reasonably be disputed and would streamline a trial on the seasonal exemption

17     significantly.

18     *Second*, Plaintiffs are wrong that Defendants' proposed phased approach will result in a longer

19     trial.  On the contrary, Defendants' approach will result in a more efficient proceeding because even if

20     Plaintiffs demonstrate liability under Florida law and the FLSA, Defendants will be entitled to satisfy

21     the seasonal exemption as to those claims for each year.  Thus, even if Plaintiffs satisfy their burden in

22     their case-in-chief regarding these claims, the seasonal exemption will have to be tried.  However, if

23     Defendants prevail regarding the seasonal exemption, then the jury trial that follows will no longer

24     include Plaintiffs' claims under Florida law and the FLSA—thus streamlining the subsequent jury trial

25     considerably.

26     *Third*, Plaintiffs' contention that Defendants' phased approach is improper because it

27     "divorce[s] the evidence about the defense from the anchoring contextual facts regarding liability and

28     damages" misses the mark.  Unlike the questions in this case regarding liability and damages, which

1  consider the activities performed by minor league players, the length, nature and frequency of such

2  activities, and whether they are compensable, the seasonal exemption "depend[s] on the character of

3  the establishment by which an employee is employed," not the "nature of the conditions of the

4  employment of the particular employee." *See* 29 C.F.R. 779.302.  Thus, the evidence and

5  considerations by the Court (or the jury) regarding the seasonal exemption depend on the nature of

6  the establishments, which are vastly different than the evidence in the remainder of the case, which

7  focuses on the players' activities.

8       *Finally*, Defendants do not agree to Plaintiffs' proposal to have a "bellwether" trial regarding the

9  seasonal exemption, by cherry-picking two or more establishments.  Unlike a mass tort litigation,

10  where thousands of individual plaintiffs bring similar product liability claims for the same

11  pharmaceutical drug, the seasonal exemption is not susceptible to a "bellwether" trial because it

12  involves an analysis of each of the establishments at issue in this case, which in turn must be analyzed

13  for each year during the limitations period.  The resolution of the issues to be tried for one Club's

14  establishment for a particular year may not be the same for other years for that Club's establishment,

15  or for a different Club's establishment.  Indeed, the scope of the establishments may vary and the

16  nature of the receipts or seasonal operations could differ by establishment, by year.  There is simply

17  no justification under the law (and Plaintiffs provide none) for Plaintiffs to shoehorn a trial regarding

18  the seasonal exemption in a manner that would deprive each Club from presenting establishment-

19  specific evidence to satisfy the exemption.  Indeed, Plaintiffs' proposal would violate the Rules

20  Enabling Act because it would plainly deprive the Clubs of their ability to present individual evidence

21  to meet the exemption.  Plaintiffs' proposal would also violate the seasonal exemption itself, which

22  mandates an establishment-by-establishment and year-by-year analysis.  The Court acknowledged the

23  unmanageability of such a trial, but also acknowledged that it will not deprive the Clubs of their right

24  to present evidence regarding this exemption.  (*See* Hearing Tr. 48 (2/16/22).)

25  
26       **2.  After Resolving the Seasonal Exemption, the Court Must Try The Remaining Claims State By State and Team By Team.**

27       As explained in Defendants' opposition to Plaintiffs' bifurcation motion, in which Defendants

28  proposed to bifurcate the California claims from the Arizona and Florida claims, it will be clearest for

1   the jury — and compelled by concerns of fairness to the Defendants — to try the case in phases.

2   Trial could begin with the Florida claims, if they survive the preliminary trial of the seasonal

3   exemption, as the state law issues are the simplest.  Plaintiffs would be obligated to present evidence

4   to prove hours worked by team and by workweek; Defendants would present evidence to challenge

5   the amount of compensable time and to prove offsets against any such amounts from the per diem

6   payments.  The trial of the California Class's claims could follow, and then the trial could turn to the

7   Arizona claims.

8   **III.    PLAINTIFFS' REPLY TO DEFENDANTS' TRIAL PLAN**

9     Defendant's trial plan is not appropriate and should not be adopted by the Court for the

10   reasons set forth below.

11     **A. Defendants' Improper Decertification Arguments.**

12     Defendants begin their portion of this joint trial plan by recycling class certification and

13   decertification arguments that have already been rejected by the Court multiple times. Moreover, the

14   Ninth Circuit already has held that this case may proceed to trial as a class action. Raising those

15   arguments in this document is both improper and at odds with the Court's instruction that the parties

16   work jointly and constructively to prepare a trial plan.

17     Defendants' primary plan for trying this class action is to not try it as a class action at all. As

18   with their improper motion for leave to move for decertification, Defendants again ignore the Ninth

19   Circuit's decision in this case: "This is not the rare case where predominance is defeated despite the

20   existence of an employer's 'common practice or policy.'" *Senne v. Kansas City Royals Baseball Corp.*, 934

21   F.3d 918, 943 (9th Cir. 2019). Nearly all of Defendants' issues go to determining the amount of

22   damages owed—something that the Ninth Circuit has repeatedly held cannot defeat class certification,

23   *including in this case. Id.*

24     Classwide liability has already been established in Arizona. But for the seasonal and amusement

25   exemption, classwide liability has already been established in Florida. While that exemption is not an

26   easy one for Defendants to prove at trial, it in no way requires a class-member-by-class-member

27   inquiry. That is why the Ninth Circuit concluded in this case that the Florida and Arizona claims can

28   be "easily resolved on a classwide basis." *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 942

1   (9th Cir. 2019). With respect to the California Class claims, now that the Court has eliminated the

2   creative artists exemption, the California Class claims are straightforward, because there are no

3   defenses left for the jury to resolve. All that remains is for the jury to decide how many hours

4   California Class members worked, and how much is owed. Plaintiffs may use "their representative

5   evidence—especially the Main Survey and the testimony of players and league officials"—to make

6   that showing. *Id.* at 947.

7        Defendants also reassert the unsuccessful argument that the survey is Plaintiffs' only

8   representative evidence of hours worked, again ignoring the schedules, evidence of game lengths,

9   travel data, testimony, and other evidence, all of which will be sufficient to extrapolate to the classes.

10  Defendants' claim that they cannot determine whether the daily itineraries presented to the jury will

11  be "representative," is belied by the evidence. Dr. Kriegler chose a random sample of over 1,600 daily

12  itineraries that his team coded. That random sample of itineraries has long been known to

13  Defendants, and Defendants did not raise any concerns about the sampling methodology in their

14  *Daubert* motion aimed at Dr. Kriegler. Plaintiffs intend to introduce other examples of daily itineraries

15  that witnesses have either already testified about during depositions, and will testify about at trial.

16       Defendants' related argument that the testimony will be "representative" is also incorrect. First,

17  many of Defendants' own witnesses have already confirmed the core workday that players perform.

18  With respect to spring training, that is typically practice in the morning, and a game in the afternoon.

19  Admissions from Defendants about the work that players typically perform is representative evidence.

20  Second, the class representatives and over 20 opt-in plaintiffs in this case—who have been known to

21  Defendants for years— provided consistent and straightforward testimony about standardized work

22  routines in depositions. *See DeLuca v. Farmers Ins. Exch.*, No. 17-CV-00034-EDL, 2019 WL 4307940, at

23  *7 (N.D. Cal. Sept. 11, 2019) ("[T]here is no magic formula for the number or percentage of plaintiffs

24  who must testify, and instead, it is axiomatic that the weight to be accorded evidence is a function not

25  of quantity but of quality." (Internal quotations omitted)). There is no mystery about the

26  representative nature of that testimony from the pool of over 60 players (class representatives and

27  deposed opt-ins), including which worksites or work periods that the testimony pertains to. Third, an

28  additional layer of testimony will come from some former managers who Plaintiffs anticipate will

1   willingly testify in Plaintiffs' case-in-chief, providing additional powerful, representative evidence that

2   is sufficient to apply to the classes as a whole. Finally, Defendants misleadingly claim that Dr.

3   Kriegler's model does not allow for individual damage calculations when Dr. Kriegler has proposed

4   an unchallenged methodology for distributing the amount recoverable for individual class members

5   based on the amount of work they performed during the class periods. *See e.g.* Kriegler Report (ECF

6   No. 984-2) at Section IX, p. 79.

7          The main case Defendants rely upon, *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th

8   Cir. 2013), precedes the Supreme Court's *Tyson Foods* case, is at odds with the Ninth Circuit's holding

9   that individualized damages inquiries do not defeat certification, and is factually distinguishable. In

10  *Espenscheid*, the plaintiffs were satellite technicians who worked alone—not baseball players who work

11  as a team according to an orchestrated work script that has been followed across the industry for

12  decades. The plaintiffs relied solely on witness testimony—not a sample of 1,600 daily itineraries, and

13  not a survey of hundreds of class members buttressed by testimony. Further, the case involved only

14  overtime; liability had not been established yet. Here, by contrast, liability has already been established

15  for one of the classes and has almost been established for the other two.[14]

16         Moreover, *Espenscheid* has been distinguished and criticized by a number of courts on several

17  grounds. *See, e.g., Campbell v. City of Los Angeles*, 903 F.3d 1090, 1111 (9th Cir. 2018) (criticizing

18  *Espenscheid* and its aim for "simplification"). In *Dilts v. Penske Logistics, LLC*, No. 08CV318-CAB

19  (BLM), 2013 WL 12095058, at *1 (S.D. Cal. Mar. 5, 2013), the defendants relied on *Espenscheid* to

20  make the same argument, that "a class wide trial cannot productively go forward because Plaintiffs

21  have no evidence, admissible or otherwise, that would establish class wide liability and no plan for

22

23  _____

24  [14] Other cases relied upon by Defendants are distinguishable as well. *See Cruz v. Dollar Tree Stores, Inc.*,
    No. 07-2050 SC, 2011 WL 2682967, at *4 (N.D. Cal. July 8, 2011) (case involved the executive

25  exemption, not at issue here, which required individualized inquiry for purposes of the defense);
    *Weigele v. FedEx Ground Package Sys., Inc.*, 267 F.R.D. 614, 622 (S.D. Cal. 2010) (same defense); *Feltzs v.*

26  *Cox Comm'ns Cal., LLC*, No. CV192002JVSJDEX, 2021 WL 4947306, at *5 (C.D. Cal. Oct. 21, 2021)
    (PAGA claims involved "an individualized defense" not at issue here); *Sweet v. Pfizer*, 232 F.R.D. 360,

27  363 (C.D. Cal. 2005) (plaintiffs proposed a nationwide class for nine different potential types of tort

28  liability).

1    proving the damage claims of individual class members." The *Dilts* court held that *Espenscheid* "is not

2    binding on this Court, and it is factually distinct because this Court has already found that there triable

3    issues subject to common proof." *Id.* Similarly in *Balasanyan v. Nordstrom, Inc.*, 294 F.R.D. 550, 572

4    (S.D. Cal. 2013), the court rejected the argument—based on *Espenscheid*—that "a survey of putative

5    class members," who numbered around 27,000 and worked at 32 different stores, would violate due

6    process, reasoning that *Espenscheid* involved more "subjective assessments." *Id*; *see also Braun v. Wal-*

7    *Mart Stores, Inc.*, 630 Pa. 292, 310, 106 A.3d 656, 667 (2014), *cert. denied*, 136 S. Ct. 1512 (2016)

8    (rejecting argument that the class action had "run amok," resulting in a "trial by formula" for 187,979

9    workers who were awarded over $180 million in damages for unpaid work).

10       There will be no "shapeless, freewheeling trial," in this case, as Defendants argue. It will be a

11   straightforward trial shaped by indisputably common evidence of liability, like the Uniform Player

12   Contract, and common evidence of damages in the form of documents and testimony from players,

13   managers, schedules, and experts—all confirming that players work long hours for little or no pay in

14   these work periods.

15       **B.  Defendants Are Jointly and Severally Liable.**

16       Defendants next argue that Plaintiffs must "prove their case against each Defendant

17   individually" and that there is no "defendant class" because each Defendant is a separate entity. They

18   ignore, however, that (1) all 30 Major League Clubs are members of the unincorporated association

19   that is Major League Baseball, and  (2) all engaged in a common scheme as part of that association,

20   and (3) MLB has been held to be a joint employer. It is inappropriate to break out damages

21   defendant-by-defendant where, as here, one Defendant is an unincorporated association of (and is

22   jointly and severally liable with) the other Defendants.

23       First, because Major League Baseball is a joint employer, it is liable for *all* the damages at issue.

24   "In keeping with the general rule that an unincorporated association is not a legal entity apart from its

25   members, the members of an unincorporated association may be held civilly liable as individuals for

26   the acts or omissions of the association." 6 Am. Jur. 2d Associations and Clubs § 27. That means each

27   Club, as a member of the unincorporated association, is civilly liable for all those damages caused by

28   the actions of Major League Baseball. That is the nature of joint and several liability for the acts of an

1    unincorporated association. *See also Guyton v. Howard*, 525 So.2d 948, 956 (Fla. Ct App. 1988)

2    ("unincorporated associations whose functions are . . . business or profit . . . are governed by

3    partnership law."); Fla. Stat. Ann. § 620.8306 ("all partners are liable jointly and severally for all

4    obligations of the partnership unless otherwise agreed by a claimant or provided by law.");

5    Restatement (Third) of Torts: Apportionment Liab. § 15 (2000) ("The joint and several liability of

6    those engaged in concerted activity is for the total comparative responsibility assigned to all who

7    engage in the concerted activity."). Plaintiffs' trial plan—proceeding with liability and damages in its

8    case-in-chief for all classes and against all defendants—is therefore appropriate, and there is no need

9    to try the case against each Defendant one after the next.

10        Moreover, it would be inappropriate to break out the damages amount by Defendant on the

11   verdict form, because doing so is highly likely to cause juror confusion. When joint and several

12   liability applies,

13           [t]he form should not be structured in a way that would invite the jury to divide the
             damages for a single injury among defendants or theories of recovery. A verdict form
14           that takes a jury through these steps in this sequence—reinforced by clear instructions
             from the court not to duplicate damages or divide the amount among defendants—
15           will go far to help future litigants avoid the problems that arose in this case. Tort
             concepts of single indivisible injuries and joint and several liability are potentially
16           confusing for a jury, and verdict forms should help remedy potential confusion, not
             add to it.
17

18   *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 311 (7th Cir. 2010); *Louis Vuitton Malletier, S.A. v.*

19   *Akanoc Sols., Inc.*, 658 F.3d 936, 947 (9th Cir. 2011) (error in jury instructions to separate out liability

20   per defendant when defendants were jointly and severally liable and only one award should have been

21   awarded).

22        As for the seasonal and amusement exemption, the jury will be informed as to how much is at

23   stake for each putative establishment. To the extent the parties disagree on the exact amounts, each

24   can present their own numbers. To the extent the jury finds an establishment is exempt, the jury will

25   simply subtract that amount from the damages award on the verdict form.

26

27

28

1 **C. Defendants' Proposed Phased Approach Is Inefficient and Would Waste the Jury's**
2 **Time and Judicial Resources.**

3     Two days before this submission was due, Defendants proposed for the first time a phased trial

4 structure, whereby the seasonal amusement and recreational establishment exemption would be tried

5 first (to the Court), before a jury trial on liability and damages.[15]

6     The seasonal amusement exemption involves factual issues for the jury, which prevent Plaintiffs

7 from agreeing to a bench trial on Defendants' affirmative defense.[16] To the extent the seasonal

8 amusement exemption is not resolved by further order of the Court on summary judgment in advance

9 of trial,[17] the exemption presents material factual issues that the parties have the right to have a jury

10 resolve. Plaintiffs respectfully choose to exercise their right to a jury trial on those issues. *See Begolli v.*

11 *Home Depot U.S.A., Inc.*, 701 F.3d 1158, 1160 (7th Cir. 2012) ("[I]n a case in which a party is entitled

12

13 [15] Following the status conference on March 25, 2022, the parties conducted a meet and confer call on
14 Monday, March 28. During that call, Plaintiffs understood Defendants to say that they did not intend
to propose a phased approach, and instead planned to try the seasonal and amusement exemption
during the defense case-in-chief, because they agreed that it would be inefficient to call multiple
15 witnesses multiple times. Plaintiffs do not fault Defendants for changing their position, but note that
Plaintiffs first became aware of the above proposal regarding a phased approach trying the seasonal
16 and amusement exemption separately (and first) on April 6, two days prior to the April 8 filing
deadline.

17

18 [16] Defendants incorrectly attempt to fault Plaintiffs for exercising their right to have a jury decide this
defense, arguing that Plaintiffs have been inconsistent. During the summary judgment hearings,
19 Defendants first agreed to have the Court resolve the issue based on the summary judgment record
only to then reverse course days later, after Plaintiffs agreed to do so. Plaintiffs were happy to have
20 the Court decide the issue *on the record at summary judgment*. But some of the factual questions at issue
for the exemption have not been the subject of as significant discovery as the other issues in the case
21 (or, in the case of television receipts, any discovery at all since those receipts were never produced).
Plaintiffs choose to exercise their right to a jury trial on those questions. Plaintiffs have proposed a
22 way to accomplish that without undue complexity: bellwether trials. It is Defendants' prerogative to
decline that invitation—Plaintiffs agree that the Court cannot force them to use two bellwether
23 facilities. By declining that option, it is Defendants who are making this trial unnecessarily complex,
not Plaintiffs.
24

25 [17] Plaintiffs maintain their position that the Court should grant summary judgment that the seasonal
and amusement exemption does not apply, for all the reasons set forth in their summary judgment
26 briefing, including that: (1) the minor league spring training facilities are not for an "amusement"
purpose because no tickets are sold and no fans attend, and (2) because major and minor league
27 facilities are separate establishments, particularly the facilities that are physically separated by between
a half mile and nine miles, including the facilities of the Giants, Yankees, Blue Jays, Pirates, Athletics,
28 Red Sox (pre-2012), and Orioles.

1  to, and demands, a jury trial, defenses are tried to the jury along with the case in chief."); *Kuehner v.*

2  *Dickinson & Co.*, 84 F.3d 316, 320 (9th Cir. 1996), *as amended* (July 5, 1996).[18]

3        Plaintiffs oppose Defendants' proposal to proceed with a phased trial, with trial on the

4  seasonal amusement exemption proceeding first, followed by trial on liability and damages second.

5  The phased approach proposed by Defendants is inefficient and inferior to the non-phased approach

6  proposed by Plaintiffs for numerous reasons. The phased approach will require the parties to call the

7  same witnesses multiple times—first during the initial trial on the seasonal and amusement exemption,

8  and second during the subsequent trial on liability and damages. The burden on plaintiff witnesses

9  from having to appear multiple times is significant and unnecessary. It makes no sense to have, *e.g.*, a

10 player testify first about the lack of interchange of employees between the major league and minor

11 league spring training facilities, and then come back weeks later to testify again about his work

12 activities at those same minor league training facilities. Those facts go hand-in-hand. It is likely that

13 Defendants would call the same witnesses multiple times as well to first testify about interchange of

14 employees and training facilities, and then later about work activities at those same facilities, both of

15 which involve testimony about the work activities of the same players at the same places. The phased

16 approach is also inferior because will result in a much longer trial. There will be multiple openings and

17 closings, overlapping witness testimony that will end up longer than it would be in a single trial, and

18 multiple sets of jury deliberations. The seasonal and amusement exemption will not become less

19 complex simply by putting it first—it will simply divorce the evidence about the defense from the

20 anchoring contextual facts regarding liability and damages. Defendants argue otherwise by pointing

21 out that the nature of the purported establishment is at issue, but determining what the appropriate

22 establishment is will require an inquiry into where the players performed activities (at minor league

---

23

24 [18] *See Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1160 (11th Cir. 2008) (affirming
25 district court's denial of defense motion for judgment as a matter of law on amusement exemption
   because "the jury reasonably could have found, as it did, that [defendants] failed to carry their burden
26 of establishing that they were entitled to the recreational and amusement exemption"); *Feagley v. Tampa
   Bay Downs, Inc.*, No. 8:11-CV-564-EAK-MAP, 2012 WL 2178857, at *5–6 (M.D. Fla. June 13, 2012);
27 *see also Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (discussing right to jury trial in FLSA actions); *Kuehner
   v. Dickinson & Co.*, 84 F.3d 316, 320 (9th Cir. 1996), *as amended* (July 5, 1996) (same).
28

1    facilities, not major league facilities), which will necessarily involve a discussion of those activities—

2    which will significantly overlap with testimony about the same activities for purposes of establishing

3    hours worked. Trying the seasonal and amusement exemption first would be inefficient and highly

4    likely to cause juror confusion.

5          The Court should follow the standard approach: Plaintiffs put on their case-in-chief,

6    Defendants put on their case-in-chief, and Plaintiffs put on a rebuttal case, if necessary.

7          To reduce the complexity of the seasonal and amusement exemption for the jury, and to reduce

8    the length of the trial, Plaintiffs propose that the parties agree to try two or more "bellwether"

9    establishments after Plaintiffs present their case-in-chief. Plaintiffs propose that the parties attempt to

10   reach agreement regarding two establishments—one for which major league and minor league spring

11   training facilities are physically distant from each other, and a second for which the major league and

12   minor league spring training facilities are physically adjacent, but on the same parcel of land. The

13   parties may mutually agree in advance that whatever findings the jury reaches with respect to the

14   "bellwether" establishments apply to all the other establishments of that type. This would dramatically

15   reduce the number of witnesses, volume of evidence, duration of trial, and complexity of trial on the

16   seasonal and amusement exemption. Defendants currently disagree with this proposal, which is their

17   prerogative.  But the complexity and duration of the ensuing trial falls on their shoulders.  They do

18   not explain how a purported establishment could vary by year. The physical layout and the

19   interchange of employees is unlikely to vary by year, its purpose is unlikely to change, and the receipts

20   issue is unlikely to change by year. Neither do Defendants explain how two bellwether establishments

21   would not adequately capture all the factual questions at issue.  Plaintiffs are amenable to continuing

22   to meet and confer with Defendants in the hopes the parties' differences on this proposal can be

23   resolved, so the issue can be tried to the jury in an efficient and sensible fashion.

24         Plaintiffs also oppose Defendants' proposal to try the Florida claims first, followed by the

25   California claims, and then the Arizona claims in a separate trial. This approach is inefficient and

26   would waste judicial resources. The factual issues overlap significantly across the claims, and many of

27   the witnesses will be testifying about claims in multiple states—and sometimes all three states. That is

28

1    because numerous players and coaches worked in multiple states. Expert testimony addresses all three

2    claims as well. Liability and damages on all claims should be tried together.

3

4    DATED: April 8, 2022                                    Respectfully submitted,

5

6                                                              /s/ Bobby Pouya

7                                                            **PEARSON, SIMON & WARSHAW LLP**
                                                             CLIFFORD H. PEARSON
8                                                            THOMAS J. NOLAN
                                                             DANIEL L. WARSHAW
9                                                            BOBBY POUYA
                                                             BENJAMIN E. SHIFTAN
10                                                           JILL M. MANNING

11                                                           **KOREIN TILLERY, LLC**
                                                             STEPHEN M. TILLERY (pro hac vice)
12                                                           GARRETT R. BROSHUIS
                                                             MARC WALLENSTEIN (pro hac vice)
13                                                           DIANE MOORE

14                                                           *Plaintiffs' Co-Lead Class Counsel*

15                                                             /s/ Elise M. Bloom

16                                                           **PROSKAUER ROSE LLP**
                                                             ELISE M. BLOOM (pro hac vice)
17                                                           NEIL H. ABRAMSON (pro hac vice)
                                                             ADAM M. LUPION (pro hac vice)
18                                                           MARK W. BATTEN (pro hac vice)
                                                             RACHEL S. PHILION (pro hac vice)
19                                                           NOA M. BADDISH (pro hac vice)
                                                             JOSHUA S. FOX (pro hac vice)
20                                                           PHILIPPE A. LEBEL
                                                             SAMANTHA R. MANELIN (pro hac vice)
21
                                                             *Attorneys for Defendants*
22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.


/s/ *Bobby Pouya*
Bobby Pouya