STEPHEN M. TILLERY (*pro hac vice*)
  stillery@koreintillery.com
GARRETT R. BROSHUIS (*Bar No. 329924*)(*pro hac vice*)
  gbroshuis@koreintillery.com
MARC WALLENSTEIN (*pro hac vice*)
  mwallenstein@koreintillery.com
DIANE MOORE (Bar No. 214903)
  dmoore@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:  (314) 241-4844
Facsimile: (314) 241-3525


CLIFFORD H. PEARSON (Bar No. 108523)
  cpearson@pswlaw.com
DANIEL L. WARSHAW (Bar No. 185365)      JILL M. MANNING (Bar No. 178849)
  dwarshaw@pswlaw.com                     jmanning@pswlaw.com
BOBBY POUYA (Bar No. 245527)            BENJAMIN E. SHIFTAN (Bar No. 265767)
  bpouya@pswlaw.com                       bshiftan@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**       **PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400      555 Montgomery St., Suite 1205
Sherman Oaks, CA 91403                  San Francisco, CA 94111
Telephone: (818) 788-8300               Telephone: (415) 433-9000
Facsimile:  (818) 788-8104              Facsimile: (415) 433-9008


Plaintiffs' Co-Lead Class Counsel

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| AARON SENNE, et al., Individually and on Behalf of All Those Similarly Situated;<br><br>Plaintiffs,<br><br>vs.<br><br>OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as MAJOR LEAGUE BASEBALL; et al.;<br><br>Defendants. | CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)<br><br>**CLASS ACTION**<br><br>**NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR AWARD OF ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**<br><br>Hearing date: Feb. 17, 2023<br>Hearing Time: 9:30 a.m.<br>Courtroom: F, 15th Floor<br>Judge: Honorable Joseph C. Spero |

## NOTICE OF MOTION AND MOTION

Please take notice that Plaintiffs, on behalf of themselves, the certified classes, and the FLSA collective, and together with Class Counsel, will and hereby do move for an award of attorneys' fees, litigation costs, and incentive awards in this case. Plaintiffs request that this Motion be heard on February 17, 2023 at 9:30 a.m., in Courtroom F, 15th Floor of the U.S. District Court for the Northern District of California, San Francisco Division, before the Honorable Joseph C. Spero.

This Motion is made pursuant to Federal Rules of Civil Procedure 23(h) and 54(d). This Motion is based upon this Notice of Motion and the accompanying Memorandum of Points and Authorities; the Declaration of Garrett Broshuis ("Broshuis Decl."); the Declaration of Daniel L. Warshaw ("Warshaw Decl."); the Declaration of Brian T. Fitzpatrick, Ph.D. ("Fitzpatrick Decl."); the declarations of the 45 named plaintiffs in support of the request for incentive awards (collectively, the "Named Plaintiff Decls."); the declarations of additional counsel who performed work on this case, including the Declaration of Randall K. Pulliam, the Declaration of Raymond P. Boucher, the Declaration of Rachel Geman, the Declaration of Brian P. Murray, and the Declaration of Vito Bochicchio (collectively, the "Additional Counsel Declarations"); the Declaration of Alexander S. Williams ("Williams Decl."); the records on file in this action; and upon additional argument as may be presented at or before the hearing on this Motion.

## STATEMENT OF THE ISSUES TO BE DECIDED

Plaintiffs move the Court to:

- Award attorneys' fees to counsel in the amount of 30% of the common fund;
- Reimburse the costs incurred by counsel in the amount of $4,654,538.33, and set aside $995,000 in anticipated settlement administration costs;
- Grant incentive awards in the amount of $15,000 for each settlement class representative and $7,500 for each of the five named plaintiffs who ultimately did not serve as a class representative.

**Motion for Attorneys' Fees, Litigation Costs, and Incentive Awards**

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ...................................................................................... i

STATEMENT OF THE ISSUES TO BE DECIDED ................................................................ i

TABLE OF AUTHORITIES ..................................................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

STATEMENT OF FACTS ........................................................................................................ 2

        A.     Obstacles overcome before class certification ......................................... 3

        B.     Obstacles overcome during discovery and the first two rounds of class certification ................................................................................................. 4

        C.     Obstacles overcome on appeal ................................................................. 6

        D.     Obstacles overcome after the appeal ....................................................... 6

        E.     The outstanding settlement achieved in the face of these obstacles ...... 8

        F.     The significant work performed and risks incurred by the named Plaintiffs ................................................................................................. 8

ARGUMENT ............................................................................................................................ 10

    I.     The Court Should Use the Percentage-of-the-Fund Method and Award 30% in Attorneys' Fees .................................................................................................. 11

        A.     The results achieved support the fee request ........................................ 11

        B.     The significant risks in the litigation support the fee request ............. 13

        C.     The complexity of this case, skill required, and high quality of work support the fee request. ......................................................................... 14

        D.     The contingent nature of the fee and financial burden support the fee request. .................................................................................................. 16

        E.     Awards made in similar cases support the fee request. ....................... 16

    II.    A Lodestar Cross-Check Confirms that the Proposed Fee Is Reasonable. ................. 18

    III.    Litigation Costs Should Be Reimbursed from the Common Fund ............................. 20

    IV.    Incentive Payments Should Be Awarded to the Named Plaintiffs.............................. 21

CONCLUSION ........................................................................................................................ 25

APPENDIX ........................................................................................................................... A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allapattah Servs., Inc. v. Exxon Corp.,*
   454 F. Supp. 2d 1185 (S.D. Fla. 2006) ...................................................................................11

*Alvarado v. Nederend,*
   No. 1:08-CV-01099 OWW DL, 2011 WL 1883188 (E.D. Cal. May 17, 2011) .............................24

*Andrews v. Plains All Am. Pipeline L.P.,*
   No. CV154113PSGJEMX, 2022 WL 4453864 (C.D. Cal. Sept. 20, 2022)........................17, 18, 24

*In re Anthem, Inc. Data Breach Litig.,*
   No. 15-MD-02617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ........................................18

*In re Apple Inc. Device Performance Litig.,*
   No. 5:18-MD-02827-EJD, 2021 WL 1022866 (N.D. Cal. Mar. 17, 2021) .....................................16

*Bellinghausen v. Tractor Supply Co.,*
   306 F.R.D. 245 (N.D. Cal. 2015) ....................................................................................... 18, 22

*In re Bluetooth Headset Prod. Liab. Litig.,*
   654 F.3d 935 (9th Cir. 2011)......................................................................................................10

*Boeing Co. v. Van Gemert,*
   444 U.S. 472 (1980)....................................................................................................................10

*Boyd v. Bank of Am. Corp.,*
   No. SACV 13-0561-DOC, 2014 WL 6473804 (C.D. Cal. Nov. 18, 2014) ...............................*passim*

*Burke v. Arizona State Ret. Sys.,*
   77 P.3d 444 (Ariz. Ct. App. 2003) .............................................................................................11

*Carlin v. DairyAmerica, Inc.,*
   380 F. Supp. 3d 998 (E.D. Cal. 2019) .............................................................................12, 14, 16, 18

*In re: Cathode Ray Tube (Crt) Antitrust Litig.,*
   No. C-07-5944 JST, 2016 WL 183285 (N.D. Cal. Jan. 14, 2016).......................................... 1, 17

*In re Checking Acct. Overdraft Litig.,*
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) .....................................................................................11

*Frelkin v. Apple Inc.,*
   No. 3:13-cv-03451-WHA (ECF No. 475) (N.D. Cal. Aug. 13, 2022)..................................... 1, 16

*Glass v. UBS Fin. Servs., Inc.,*
   No. C-06-4068 MMC, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007), aff'd, 331 F.
   App'x 452 (9th Cir. 2009) ...........................................................................................................21

*In re Heritage Bond Litig.*,
    No. 02-ML-1475 DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ............................12

*In re High-Tech Emp. Antitrust Litig.*,
    No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ...........................21

*Jacobs v. California State Auto. Ass'n Inter-Ins. Bureau*,
    No. C 07-00362 MHP, 2009 WL 3562871 (N.D. Cal. Oct. 27, 2009) ..............................23

*Kang v. Wells Fargo Bank, N.A.*,
    No. 17-CV-06220-BLF, 2021 WL 5826230 (N.D. Cal. Dec. 8, 2021) ..................... 11, 19

*In re Korean Air Lines Co., Ltd. Antitrust Litig.*,
    No. CV 07-05107 SJO AGRX, 2013 WL 7985367 (C.D. Cal. Dec. 23, 2013) ..............10

*Kuhnlein v. Dep't of Revenue*,
    662 So. 2d 309 (Fla. 1995)..............................................................................................11

*Laffitte v. Robert Half Internat. Inc.*,
    376 P.3d 672 (Cal. 2016) ................................................................................................11

*In re Lidoderm Antitrust Litig.*,
    No. 14-MD-02521-WHO, 2018 WL 4620695 (N.D. Cal. Sept. 20, 2018) ............... 12, 19

*McMorrow v. Mondelez Int'l, Inc.*,
    No. 17-CV-02327-BAS-JLB, 2022 WL 1056098 (S.D. Cal. Apr. 8, 2022) .....................12

*MHC Fin., Ltd v. City of San Rafael*,
    No. C 00-3785 VRW, 2009 WL 10696045 (N.D. Cal. Apr. 17, 2009)..............................18

*Monterrubio v. Best Buy Stores, L.P.*,
    291 F.R.D. 443 (E.D. Cal. 2013).....................................................................................25

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    No. 14-MD-02541-CW (NC), 2019 WL 12194763 (N.D. Cal. Dec. 6, 2019) ...............19

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    No. 4:14-MD-2541-CW, 2017 WL 6040065 (N.D. Cal. Dec. 6, 2017), aff'd, 768 F.
    App'x 651 (9th Cir. 2019) ...............................................................................................19

*Navarro v. Servisair*,
    No. C 08-02716 MHP, 2010 WL 1729538 (N.D. Cal. Apr. 27, 2010) .............................22

*Nitsch v. DreamWorks Animation SKG Inc.*,
    No. 14-CV-04062-LHK, 2017 WL 2423161 (N.D. Cal. June 5, 2017)............................20

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008)..........................................................................11

*Ridgeway v. Wal-Mart Stores Inc.*,
   269 F. Supp. 3d 975 (N.D. Cal. 2017) ................................................................. 2, 21, 24

*Rodriguez v. Nike Retail Servs., Inc.*,
   No. 14-CV-01508-BLF, 2022 WL 254349 (N.D. Cal. Jan. 27, 2022) .................................. 2, 11, 16

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ........................................................................... 21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. M 07-1827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ..................................... 2, 24

*Van Vranken v. Atl. Richfield Co.*,
   901 F. Supp. 294 (N.D. Cal. 1995) ..................................................................... 21

*Villalpando v. Exel Direct Inc.*,
   No. 3:12-CV-04137-JCS, 2016 WL 7740854 (N.D. Cal. Dec. 12, 2016) ................................. 2, 17

*Villalpando v. Exel Direct Inc.*,
   No. 3:12-CV-04137-JCS, 2016 WL 7785852 (N.D. Cal. Dec. 9, 2016) ........................... 2, 22, 24, 25

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ....................................................................*passim*

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
   19 F.3d 1291 (9th Cir. 1994) ........................................................................... 16

*Whiteway v. FedEx Kinkos Off. & Print Servs., Inc.*,
   No. C 05-2320SBA, 2007 WL 4531783 (N.D. Cal. Dec. 17, 2007) ..................................... 22

*Wren v. RGIS Inventory Specialists*,
   No. C-06-05778 JCS, 2011 WL 1230826 (N.D. Cal.  Apr. 1, 2011) ..................................... 19

**Other Authorities**

5 Newberg on Class Actions § 17:6 (5th ed.) ....................................................... 24

Table C-5—U.S. District Courts—Median Time from Filing to Disposition of Civil
   Cases, by Action Taken—During the 12-Month Period Ending June 30, 2022,
   uscourts.gov, *available at* https://www.uscourts.gov/statistics/table/c-5/statistical-
   tables-federal-judiciary/2022/06/30 ................................................................. 22

**Motion for Attorneys' Fees, Litigation Costs, and Incentive Awards**

## MEMORANDUM OF POINTS AND AUTHORITIES

The Ninth Circuit benchmark for attorneys' fees is 25% of the common fund under ordinary circumstances. This is not an ordinary case. Plaintiffs began from a blank slate here. No professional athlete had ever brought a wage-and-hour case, much less a case arising under multiple state laws with over a score of potential employers and a complex joint employment relationship. In turn, no athlete had ever litigated the potential defenses in play. Add to that the fact that Defendants had neglected to keep time records, and it is easy to see why this case entailed far more risk than a normal case.

In turn, the case demanded much more work and skill than normal. By the time the Court hears this Motion, nine years will have passed since Plaintiffs' initial filing. In the first year of the case, Plaintiffs overcame venue motions and serial motions to dismiss. During discovery, Plaintiffs took or defended 137 depositions spread throughout the country and responded to hundreds of sets of production requests and interrogatories. That led to a multi-year fight over class certification, with this Court resolving complex *Daubert* and class certification motions and a motion for reconsideration, and with Plaintiffs navigating a successful appeal that included the denial of a Supreme Court petition.

After the appeal, the parties completed fact and expert discovery and cross moved for summary judgment. In a 181-page summary judgment order, and as a matter of first impression on nearly every topic, the Court sided with Plaintiffs on critical issues: the players' employment and joint employment status, the effect of the Save America's Pastime Act on state laws, the applicability of the creative artist exemption, and the suitability of Plaintiffs' model for estimating hours worked. After eight years of hurdling roadblocks, the trial date approached with Plaintiffs well-positioned for success. That strong positioning led to a landmark settlement of $185 million that includes important prospective relief. Given the many complexities, that is a terrific result.

Under such circumstances, courts have discretion to award a higher amount, *see Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) (affirming award of 28%), and they regularly do so, *see, e.g.*, *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, No. C-07-5944 JST, 2016 WL 183285, at *2 (N.D. Cal. Jan. 14, 2016) (collecting cases and awarding fee of 30% of $128 million settlement fund in eight-year-old case); *Frelkin v. Apple Inc.*, No. 3:13-cv-03451-WHA (ECF No. 475) (N.D. Cal. Aug. 13, 2022)

**Motion for Attorneys' Fees, Litigation Costs, and Incentive Awards**

(awarding 30% in eight-year-old wage-and-hour case); *Rodriguez v. Nike Retail Servs., Inc.*, No. 14-CV-01508-BLF, 2022 WL 254349, at *6 (N.D. Cal. Jan. 27, 2022) (awarding 33% in wage-and-hour case involving "unsettled" law); *Villalpando v. Exel Direct Inc.*, No. 3:12-CV-04137-JCS, 2016 WL 7740854, at *2 (N.D. Cal. Dec. 12, 2016) (awarding 33% in attorneys' fees). That Plaintiffs achieved important injunctive relief makes this case all the more inordinate, as only a small percentage of cases include such relief. While Plaintiffs have not put a value on that relief, it will benefit players for years to come.

Plaintiffs thus respectfully request that the Court award 30% of the $185 million common fund as attorneys' fees. A lodestar crosscheck confirms the reasonableness of this fee request. Plaintiffs' counsel expended over 57,000 hours on the case, resulting in a lodestar of over $36 million. A 30% fee would yield a multiplier of only 1.53, well within what courts have deemed reasonable.

Plaintiffs also request incentive awards of $15,000 for each of the class representatives and $7,500 for each of the five additional named plaintiffs who ultimately did not serve as class representatives. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900, at *17 (N.D. Cal. Apr. 3, 2013) (approving incentive awards of $15,000 to each of the 40 class representatives and $7,500 for eight additional named plaintiffs each). These individuals chose to take action when no other ballplayer had done so. They faced great reputational risk in taking on a well-known employer in a much-publicized case. And they expended very real effort in doing so, responding to extensive discovery requests, sitting for lengthy depositions, preparing for an important trial, and staying informed about the case over all those years. That makes these requested awards reasonable. *See Villalpando v. Exel Direct Inc.*, No. 3:12-CV-04137-JCS, 2016 WL 7785852, at *2 (N.D. Cal. Dec. 9, 2016) (approving of $15,000 incentive awards in a wage-and-hour case); *Boyd v. Bank of Am. Corp.*, No. SACV 13-0561-DOC, 2014 WL 6473804, at *7 (C.D. Cal. Nov. 18, 2014) (same); *Ridgeway v. Wal-Mart Stores Inc.*, 269 F. Supp. 3d 975, 1003 (N.D. Cal. 2017) (same).

The Court should grant this motion for attorneys' fees and costs, and for incentive awards.

## STATEMENT OF FACTS

Plaintiffs previously summarized the case's lengthy procedural history when moving for preliminary approval. ECF No. 1128. This statement of facts supplements that summary by focusing on the obstacles overcome by Class Counsel and the work performed by the named plaintiffs.

**A.  Obstacles overcome before class certification.**

February 7, 2014 marked the day Plaintiffs filed their case in this Court. It was entirely novel. No professional athlete had ever brought a wage-and-hour case, and no class action had ever been brought on behalf of minor league baseball players. *See* Broshuis Decl. at ¶ 36. Recognizing the novelty of the case, Class Counsel engaged in exhaustive research and investigation before filing. *Id.* at ¶ 4. That research and investigation identified likely obstacles, including the potential defenses that Defendants eventually attempted to raise, and possible paths around them. *Id.* A strategy came into being, and counsel drafted and filed a novel and lengthy complaint. *See also* Warshaw Decl. at ¶ 10.

Three plaintiffs brought the initial complaint against Major League Baseball ("MLB"), three MLB Clubs, and the then-Commissioner, Bud Selig. Over the next two months, Plaintiffs amended the complaint twice. The basic claims remained the same, but the complaint grew from three plaintiffs to over 30, and all 30 MLB Clubs were added as defendants. *See* ECF No. 39. That led to 11 MLB Clubs moving to dismiss for lack of personal jurisdiction. ECF Nos. 115; 129. At the same time, all Defendants moved to transfer the action to the Middle District of Florida. ECF No. 118. Plaintiffs moved for jurisdictional and venue discovery, which the Court permitted. ECF No. 144.

As Plaintiffs began engaging in that discovery, the law firms of Korein Tillery, LLC and Pearson, Simon & Warshaw LLP moved to be named interim lead counsel. ECF No. 180. Several prominent litigation firms supported that motion, including Lieff, Cabraser, Heimann, & Bernstein, LLP; Carney, Bates & Pulliam, PLLC; and Glancy, Binkow & Goldberg, LLP. *Id.* at ¶ 7. At a case management conference a week later, an attorney for other minor leaguers announced that he intended to oppose the motion for appointment of interim lead counsel, and that he would soon be filing a complaint. ECF No. 187. Once he did, he declined to consent to this Court's jurisdiction, and the case was re-assigned to the Hon. Richard Seeborg. ECF No. 198.

Plaintiffs moved to consolidate the new case with the existing one, and to protect players' interests as the procedural issues played out, reached an FLSA tolling agreement with Defendants. ECF No. 231. In October 2014, the Court (Seeborg, J.) consolidated the cases and appointed the current Class Counsel as interim lead counsel. ECF Nos. 235, 236. Soon thereafter, the parties in the

1  second, now-consolidated case withdrew their declinations to proceed before this Court, and the case

2  returned to this Court. ECF No. 248.

3      In February 2015, the Court held a hearing on the motions to transfer and to dismiss for lack

4  of personal jurisdiction, and directed Plaintiffs to file another amended complaint and a supplemental

5  brief. ECF No. 353. Plaintiffs filed the operative Second Consolidated Amended Complaint, which

6  added additional named plaintiffs with further ties to the State of California. On May 20, 2015, the

7  Court denied the motion to transfer, and granted in part and denied in part the motion to dismiss for

8  lack of personal jurisdiction; the Court dismissed eight MLB Clubs from the case. ECF No. 379.

9      Just two days before that, Defendants moved to dismiss again, this time for a supposed lack of

10  subject matter jurisdiction and failure to state a claim. That motion asked the Court to limit the reach

11  of Plaintiffs' claims by arguing that a player who worked in a particular state only had standing against

12  the particular Club for which he worked, and not against the other MLB Clubs. *See* ECF No. 420.

13  After briefing, the Court denied the motion, holding that Plaintiffs had standing to bring the claims

14  asserted, and the reach of those claims should be reserved for class certification. *Id.* at 25.

15      **B.  Obstacles overcome during discovery and the first two rounds of class certification.**

16      After over a year of procedural motions, the parties focused on the monumental task of fact

17  discovery. The sheer volume of discovery reflected the number of parties involved: over 40 named

18  plaintiffs, over 20 defendants, and 8 dismissed clubs from which discovery was sought. Every party

19  sat for a deposition and responded to discovery, and the 8 dismissed Clubs sat for depositions and

20  produced documents. Warshaw Decl. at ¶¶ 15-17.

21      The workload increased further when Defendants sought discovery from players who had

22  opted into the case. The Court conditionally certified the FLSA collective in October 2015, and over

23  2,200 players opted into the case. Defendants sought to depose and serve interrogatories on 180 opt-

24  ins, and to serve requests for production on *every* opt-in. ECF No. 461. Plaintiffs opposed that plan.

25  *Id.* In February 2016, the Court permitted Defendants to serve discovery on up to 60 opt-ins and to

26  depose up to 30 opt-ins. ECF No. 488. Class Counsel represented these opt-ins with respect to this

27  discovery.

28

**Motion for Attorneys' Fees, Litigation Costs, and Incentive Awards**

1    Meanwhile the named plaintiffs responded to more than 60 requests for production each,

2    seeking emails, social media postings, text messages, and many other items. Broshuis Decl. at ¶ 9.

3    Plaintiffs engaged vendors and devoted an entire team of attorneys and support staff to gathering,

4    organizing, and reviewing the documents to be produced. *Id*; Warshaw Decl. at ¶¶ 15-17. Another

5    team of attorneys and support staff was tasked with reviewing Defendants' documents, and yet

6    another team spent much of 2015 and 2016 on the road taking and defending depositions. *Id.* The

7    parties ultimately conducted 137 depositions, served hundreds of sets of interrogatories and requests

8    for production (totaling over 4,000 production requests and over a thousand interrogatories),

9    presented over a dozen discovery disputes to the Court, and produced approximately 230,000

10   documents, spanning over a million pages. *Id.*

11   As discovery proceeded, and after the Court conditionally certified the FLSA collective in

12   October 2015, the parties turned to the certification of the Rule 23 classes under state laws. In March

13   2016, while in the throes of taking and defending depositions, Plaintiffs moved to certify Rule 23(b)(2)

14   and (b)(3) classes under eight states' laws during the training seasons, the championship season, and

15   the off-season. Warshaw Decl. at ¶ 21. Defendants opposed and moved to decertify the FLSA

16   collective. The parties disputed many issues, including how to estimate hours worked in the absence

17   of time records, the suitability of Plaintiffs' expert models, and what state law to apply to the work. In

18   July 2016, this Court decertified the FLSA collective and denied Rule 23 class certification. ECF No.

19   687.

20   Plaintiffs moved for reconsideration, narrowing the scope of their certification request by

21   focusing on just the training seasons and a single league during the championship season (the

22   California League). To support the motion, Plaintiffs presented a final survey of alleged hours worked

23   by Dr. J. Michael Dennis. Defendants opposed and moved to exclude Dr. Dennis's survey. In March

24   2017, the Court recertified a narrowed FLSA collective and certified a California (b)(3) class for the

25   California League, but held that certification of Arizona and Florida (b)(3) classes and a (b)(2) class

26   was inappropriate based largely on choice-of-law concerns. ECF No. 782. Both sides sought to appeal

27   that order. In July 2017, the Ninth Circuit granted the petitions to appeal.

28

**C.   Obstacles overcome on appeal.**

A loss on appeal would have been devastating for players, as the case could have proceeded on behalf of individuals only. Yet because Plaintiffs made the decision to cross appeal, there was the opportunity to expand the scope of the classes certified by this Court. The parties briefed the appeals in 2017, and they were argued and submitted on June 13, 2018. On August 16, 2019, the Ninth Circuit issued its opinion. It affirmed this Court's certification of the FLSA collective and California class. And it held that the Arizona and Florida (b)(3) classes, covering the training seasons, met the requirements of Rule 23 as well. It remanded for further consideration of a (b)(2) class in accordance with the opinion. The published opinion provides important guidance to class action litigants on choice-of-law issues, the use of representative evidence, and the standard for (b)(2) certification.

Defendants sought rehearing *en banc*, which was denied several months later. They then petitioned the U.S. Supreme Court for a writ of certiorari. To do so, they engaged one of the most well-known Supreme Court specialists (Paul Clement). Warshaw Decl. at ¶ 30. Plaintiffs opposed the cert petition, and the Supreme Court denied it on October 5, 2020.

**D.   Obstacles overcome after the appeal.**

Three-and-a-half years after the March 2017 class certification order, the case returned to this Court. Plaintiffs worked to craft a notice plan for the certified classes, which the Court approved in January 2021. Warshaw Decl. ¶ 32. In April 2021, Plaintiffs moved to certify a Rule 23(b)(2) class. A current player intervened to ensure Plaintiffs had standing to do so. In July 2021, the Court certified a (b)(2) class against MLB (not the other Defendants), but limited it to activities in Florida and Arizona during training seasons and the championship season. ECF No. 946.

The parties also worked to finish discovery that had been tabled during the appeal. While fact discovery was largely complete, Plaintiffs had not yet deposed the eight dismissed MLB Clubs. Defendants also deposed the players who had intervened, and the parties updated document productions.

After that, the parties worked with their experts to serve reports. *See* Warshaw Decl. ¶¶ 36-38. Each side retained three experts to provide merits reports. (Additional experts provided declarations at class certification.) Plaintiffs' statistician, Dr. Brian Kriegler, submitted an 81-page report focused

on damages (279 pages when including exhibits). It contained a highly detailed model for estimating hours worked that relied upon several sources of data, including, inter alia, the final survey conducted by Dr. Dennis, game schedules, daily itineraries, eBIS data, and travel times supplied by Google Maps. Broshuis Decl. ¶ 15. The work that went into it was substantial, to say the least. *See id.* Plaintiffs' labor economist, Dr. Erica Groshen, also submitted a detailed rebuttal report addressing the players' employment status and the creative artist exemption.

The parties then deposed experts and prepared summary judgment motions. Both parties filed 60-page summary judgment motions raising numerous complex and often novel legal issues. Both parties also sought to exclude the other side's experts. The Court heard argument over the course of two days, and requested supplemental briefing on Defendants' seasonal and amusement or recreational establishment exemption.

On March 10, 2022, the Court issued a 181-page ruling on the motions. ECF No. 1063. Plaintiffs won on several important issues, including: that minor league baseball players are "employees" under wage laws, and that MLB jointly employs them; that players are not "creative artists" within the meaning of wage laws; and that Defendants had not kept the records required under Arizona and California law. The Court also held that Defendants' newly minted exemption under the FLSA, granted by the Save America's Pastime Act in 2018, did not bar claims under state law, such as in Florida. And the Court denied Defendants' motions to exclude Plaintiffs' experts.

On nearly every one of those issues, the Court cut new ground. *See* Broshuis Decl. ¶¶ 16-17. It was a significant achievement for minor league players that reverberated throughout the sports industry. But despite the significance, it did not finally dispose of the case. Defendants vowed to appeal, and several issues remained unresolved, like the amount of hours worked by players and whether the seasonal and amusement or recreational establishment exemption barred claims under certain laws. *See* ECF No. 1101 (proposed pretrial order). Plaintiffs thus prepared for a June 1, 2022 trial. Class counsel completed almost all of the pre-trial work before the case settled: drafting trial plans, trial briefs, motions *in limine*, exhibit lists, jury instructions and verdict forms, and a proposed juror questionnaire and additional voir dire questions. Class counsel also prepared fact and expert

**Motion for Attorneys' Fees, Litigation Costs, and Incentive Awards**

1   witnesses to testify, conducted mock exercises, and crafted outlines for an opening statement and

2   direct and cross-examinations. *See* Broshuis Decl. at ¶ 18; Warshaw Decl. at ¶¶ 46-48.

3       **E.  The outstanding settlement achieved in the face of these obstacles.**

4           Plaintiffs and Class Counsel overcame all those obstacles to achieve a landmark settlement.

5   The parties did not begin mediating until after the Court's summary judgment order. Warshaw Decl.

6   ¶¶ 49-50. After a month of mediating, with three full days of formal sessions with a respected

7   mediator (David Geronemus), one of which lasted more than 15 hours, and after countless emails and

8   calls and a settlement conference with U.S. District Court Judge Jacqueline Scott Corley, the parties

9   reached an agreement just before the final pre-trial conference. *Id.*

10          Defendants have agreed to pay $185 million to resolve the case. ECF No. 1128-1 (Ex. 1), SA

11  at ¶ 11. The amount of each class member's settlement payment will vary according to his length of

12  employment, the seasons during which he worked, and the state in which he worked; yet the average

13  payout, after deducting attorneys' fees and costs, is expected to be between $5,000 and $5,500 per

14  class member if the Court awards the attorneys' fees sought here. Broshuis Decl. at ¶ 39. By way of

15  comparison, most players made less than $10,000 per year during the class period, and most worked

16  for less than 3 years. *Id.*

17          The settlement will also usher in important changes to the Minor League Uniform Player

18  Contract. Throughout modern baseball's history, the UPC has prohibited the payment of salaries to

19  players outside the season. That will cease after this settlement. MLB has also agreed to issue a memo

20  to MLB Clubs informing them that MLB has rescinded those contractual limitations, and directing

21  Clubs to comply with wage-and-hour laws during the training seasons. *Id.* at ¶ 21.

22      **F.  The significant work performed and risks incurred by the named Plaintiffs.**

23          These results would not have occurred without the diligent work of counsel—and the diligent

24  work of the named plaintiffs. Nearly all of the named plaintiffs joined the case more than seven years

25  ago, and the majority joined the case over eight-and-a-half years ago. *See generally* Named Plaintiff

26  Decls., ¶¶ 3-5. To put that in perspective, most of these men have been named plaintiffs in this case

27  for close to 25% of their lives (nearly all are in their 30s). They joined this case knowing that it was

28  novel and that there was no guarantee of success. *Id.* They did so because they believed in the cause.

1  They also understood the responsibilities that came with being a named plaintiff and took
2  those responsibilities seriously. The work began even before they joined the case, with informational
3  calls with attorneys and the review of draft complaints. *Id.* at section entitled "Decision and Effort to
4  Join the Lawsuit." By joining, they subjected themselves to extensive discovery. Defendants served
5  multiple sets of requests for production that sought to discover nearly everything about these men's
6  lives. The named plaintiffs spent many hours searching for paper documents, often in multiple places,
7  when responding to these invasive requests. *Id.* at section entitled "Discovery." They also assisted in
8  the search for electronic documents. *Id.* Defendants sought production of text messages, emails, and
9  social media. Searching for and producing these documents was a tedious process that often took
10 multiple days, and meant searching through what were often very private messages. *Id.* Relatedly, the
11 plaintiffs responded to multiple sets of interrogatories. *Id.* The answers were amended multiple times,
12 and each time required phone calls and the review of each set of answers.

13 Then there were the depositions. Defendants deposed every named plaintiff, often for the
14 maximum amount of time. Defendants interrogated the plaintiffs on subjects often going back to little
15 league, and pried into private and sensitive matters. The plaintiffs prepared with counsel before the
16 depositions, and they nearly always had to travel some distance to the deposition site. *See id.* Some
17 traveled more than five hours each way. *See, e.g.*, Justin Murray Decl. at ¶ 15 (6.5 hours each way). The
18 plaintiffs generally estimated that, when including prep work and travel, the depositions consumed
19 between 20 and 30 hours. *See generally* Named Plaintiff Decls. at section entitled "Discovery."

20 The named plaintiffs provided declarations to support important motions, *id.* at section
21 entitled "Prior Declarations," and they diligently stayed abreast of the case's progress, *id.* at section
22 entitled "General Work to Stay Informed." That was no easy task given the length of the case and all
23 its ups and downs. The named plaintiffs remained committed throughout the class certification saga,
24 and stayed informed all the way through summary judgment and the cusp of trial. The plaintiffs
25 generally estimated that they spent between 20 and 30 hours just on generally staying informed over
26 the years, though some spent much more. *See id.* Then, as trial approached, they began the process of
27 preparing to testify, reviewing documents and meeting with counsel. *See id.* at section entitled "Trial
28 Preparations and Settlement."

**Motion for Attorneys' Fees, Litigation Costs, and Incentive Awards**

1    They did all this work despite incurring significant reputational risks. *See id.* at section entitled

2  "Reputational Risks." Every employment lawsuit bears reputational risk for the plaintiff, but that was

3  particularly true here. Bringing a novel case against a beloved and high-profile employer heightened

4  the risks significantly. Many of the named plaintiffs desired to stay in the baseball industry—a fact

5  Defendants stressed throughout the case as part of their trainee defense—and the named plaintiffs

6  knew that potential employers, both within and outside the industry, could become aware of their

7  involvement in the case. *Id.* The named plaintiffs accepted those risks, bravely attaching their names

8  to a case that has bettered the working conditions for generations of ballplayers.

9                                            **ARGUMENT**

10    The Supreme Court "has recognized consistently that a litigant or a lawyer who recovers a

11  common fund for the benefit of persons other than himself or his client is entitled to a reasonable

12  attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "The

13  doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing

14  to its cost are unjustly enriched at the successful litigant's expense." *Id.*

15    The Ninth Circuit has endorsed two methods of awarding fees in class actions: the lodestar

16  method and the percentage-of-the-fund method. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d

17  935, 941 (9th Cir. 2011). The first is more appropriate in cases where the relief sought is "often

18  primarily injunctive in nature and thus not easily monetized." *Id.* In a common fund case where the

19  benefit can be quantified, courts regularly use the percentage-of-the-fund method "in lieu of the often

20  more time-consuming task of calculating the lodestar." *Id.* "The use of the percentage-of-the-fund

21  method in common-fund cases is the prevailing practice in the Ninth Circuit for awarding attorneys'

22  fees and permits the Court to focus on showing that a fund conferring benefits on a class was created

23  through the efforts of plaintiffs' counsel." *In re Korean Air Lines Co., Ltd. Antitrust Litig.*, No. CV 07-

24  05107 SJO AGRX, 2013 WL 7985367, at *1 (C.D. Cal. Dec. 23, 2013).[1]

25

26  _____

[1] There is caselaw saying that when state law governs underlying claims, that state's law should also

27  govern attorneys' fees. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002). That
becomes more complicated in a common fund class action settlement involving claims arising under

28  multiple state laws and federal law; some courts have concluded that under the *Erie* doctrine federal

**I.   The Court Should Use the Percentage-of-the-Fund Method and Award 30% in Attorneys' Fees.**

Because this settlement results in a true common fund, the Court should use the percentage-of-the-fund method. *See Kang v. Wells Fargo Bank, N.A.*, No. 17-CV-06220-BLF, 2021 WL 5826230, at *16 (N.D. Cal. Dec. 8, 2021) ("[I]t is appropriate to use a percentage calculation with a lodestar cross-check to determine an attorneys' fees award."); *see also In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008) (calling the percentage-of-fees-method in common funds cases the "dominant" approach); *see also* Fitzpatrick Decl. at ¶¶ 10-11 (calling it "more widely utilized").

The Ninth Circuit "benchmark" for fees is 25% of the fund, but courts may award a higher percentage when merited. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) (affirming award of 28%). Citing *Vizcaino*, courts often consider the following factors when assessing the reasonableness of the percentage requested: (1) the results achieved, (2) the risks of litigation, (3) the complexity of the case, the skill required, and the quality of work performed by plaintiffs' counsel, (4) the contingent nature of the fee and the financial burden carried by plaintiffs' counsel, and (5) awards made in similar cases. *Rodriguez v. Nike Retail Servs., Inc.*, No. 14-CV-01508-BLF, 2022 WL 254349, at *5 (N.D. Cal. Jan. 27, 2022). These factors support a 30% fee here.

**A.   The results achieved support the fee request.**

The settlement confers significant relief on class members, both in the form of backpay and prospective changes. It establishes a non-reversionary fund of $185 million. That amounts to around 50% of the total post-summary-judgment amount recoverable at trial (including penalties and

---

law on fees should control under the circumstances. *See In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1362 (S.D. Fla. 2011) (collecting cases). The point is usually academic because "[m]ost states," including California and Arizona, have concluded that "the percentage method of calculating a fee award is either preferred or within the trial court's discretion in a common fund case." *Laffitte v. Robert Half Internat. Inc.*, 376 P.3d 672, 680 (Cal. 2016); *see also Burke v. Arizona State Ret. Sys.*, 77 P.3d 444, 447 (Ariz. Ct. App. 2003) ("[A] fee award may be calculated as a percentage of the fund created or by using the hourly lodestar method."). Florida appears to be an exception, which has led Florida's federal courts to not follow Florida state law on this point. *See Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1200 (S.D. Fla. 2006). Regardless, even Florida law allows for a lodestar multiplier of up to five, *Kuhnlein v. Dep't of Revenue*, 662 So. 2d 309, 315 (Fla. 1995), which is far above the multiplier of 1.53 that would result from awarding the requested fees in this case. *See infra* Part II.

**Motion for Attorneys' Fees, Litigation Costs, and Incentive Awards**

1   liquidated damages), and around 137% of the alleged unpaid wages. ECF No. 1128-3, Kriegler Decl.

2   at ¶¶ 15, 17; *see also* Fitzpatrick Decl. at ¶ 27 ("the recovery here is extraordinary"). Even after

3   deduction of the proposed fee award, incentive awards, and costs, the net relief will be nearly 90% of

4   the amount of the alleged, post-summary judgment unpaid wages for the classes. *Id.* at ¶¶ 18. The net

5   fund will provide an anticipated average recovery of between $5,000 and $5,500. *Id.* at ¶¶ 18. Given

6   that most players made less than $10,000 per year and only played for a couple of years, that is a

7   meaningful and significant recovery. And it supports an award of 30% of the fund in this case. *See*

8   Fitzpatrick Decl. at ¶ 27 (typical recovery is less than that recovered here); *see also Carlin v.*

9   *DairyAmerica, Inc.*, 380 F. Supp. 3d 998, 1019 (E.D. Cal. 2019) (settlement providing for 48% of gross

10  recovery supported 33% fee request); *In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL

11  1594403, at *19 (C.D. Cal. June 10, 2005) (settlement providing for 36% of gross recovery supported

12  33% fee request); *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2018 WL 4620695, at *2-3

13  (N.D. Cal. Sept. 20, 2018) (recovery of 46% of gross damages supported 33% fee request).

14      That this settlement secures important injunctive relief further supports the request. Professor

15  Brian Fitzpatrick, a leading class action scholar, discusses research indicating that "[o]nly a minority of

16  class action settlements include non-monetary relief like this," which is "another way in which this

17  settlement is exceptional and it is another way in which class counsel deserves an above-benchmark

18  fee." Fitzpatrick Decl. at ¶ 33. As a result of this case, the decades-old restraint on payments to

19  players outside of the season will finally come to an end. Indeed, important changes to working

20  conditions have already come into being. At this case's inception, a small minority of teams

21  compensated players during extended spring training. After the Court's summary judgment ruling in

22  March 2022, the reverse happened: all but a handful of teams began compensating players during

23  extended spring training. Players have also begun receiving housing benefits, and the antiquated

24  system of requiring clubhouse dues has ceased. While it is difficult to quantify all these benefits, they

25  are indeed benefits that players now enjoy, and that are relevant to the inquiry. *See Vizcaino*, 290 F.3d

26  at 1049 ("Incidental or non-monetary benefits conferred by the litigation are a relevant

27  circumstance."); *see McMorrow v. Mondelez Int'l, Inc.*, No. 17-CV-02327-BAS-JLB, 2022 WL 1056098, at

28

1  *6 (S.D. Cal. Apr. 8, 2022) ("[W]hile the injunctive relief is difficult to value monetarily, it supports

2  this Court's conclusion that the settlement is an exceptional result for the class.").

3  **B.  The significant risks in the litigation support the fee request.**

4  Defendants' pay practices had been in place for as long as anyone can remember. Yet there

5  was a reason this case had never been brought: it was incredibly risky. *See Fitzpatrick Decl.* at ¶ 28

6  (discussing the "mountains" of risk in the case). No professional athlete had ever brought a wage-and-

7  hour case. Their status under wage laws was a blank slate. *See Boyd v. Bank of Am. Corp.*, No. SACV 13-

8  0561-DOC, 2014 WL 6473804, at *9 (C.D. Cal. Nov. 18, 2014) ("the classification of real estate

9  appraisers" had "not yet [been] addressed by the Ninth Circuit," which supported 33% fee request).

10  Class Counsel thoroughly investigated and researched the case before bringing it, and they were fully

11  aware of the purported defenses that Defendants would raise, like the employment status of players,

12  the seasonal and amusement exemption under certain laws, and the creative artist exemption.

13  And plaintiffs sought to bring this case not just against one Club for work in one state, but

14  against *all* Clubs for work in multiple states. Doing so resulted in a tremendous benefit to the class, as

15  it maximized the amount of claims that could be brought in a single litigation. Seeking that efficiency

16  for the class, however, heightened the risk. It required further work to demonstrate that venue was

17  proper, that jurisdiction was proper, and that standing existed for the claims in multiple states against

18  all Clubs.

19  The class certification risks magnified as well. Defendants mounted a fierce opposition to class

20  certification aimed mostly at choice-of-law issues resulting from players working in multiple states,

21  and from the vacuum created by the lack of time records. The Court of course originally denied class

22  certification. That would have spelled the end of many cases. But Class Counsel persisted, directing

23  their survey expert to continue his work, and using the final survey and simplified classes to support a

24  motion for reconsideration. That led the Court to certify a California class. At that point, many

25  attorneys would have accepted the partial victory and moved on. But Class Counsel knew that

26  Defendants would attempt to appeal, and thus made the difficult decision to attempt a cross appeal

27  seeking to certify the additional classes. That too succeeded, and greatly benefitted class members.

28

1    The risks in this case even extended into legislative halls. In 2016, the baseball industry

2  announced it would lobby Congress for an exemption from the FLSA for minor league players. Two

3  years later, Congress added the Save America's Pastime Act towards the end of an over 2,000-page

4  omnibus spending bill. Recognizing that the federal amendment did not change state laws, however,

5  Class Counsel remained vigilant of lobbying by the baseball industry at the state level, including the

6  industry's unsuccessful lobbying effort in Arizona for a state-law exemption. *See* Broshuis Decl. at ¶

7  37. Counsel's persistence again paid off, and it also demonstrated the wisdom of focusing on state

8  laws in places where substantial amounts of work took place: Arizona, Florida, and California.

9    At summary judgment, the Court agreed with Plaintiffs in holding that the Save America's

10  Pastime Act did not change these state laws. And it agreed with Plaintiffs on a number of other key

11  and novel issues. None of those successes came easily, and none were guaranteed. Success in this case

12  in many ways mirrored the sport of baseball itself, coming in fits and spurts and by navigating a maze

13  of adversity, tackling issues regarding jurisdiction and standing, discovery disputes, class certification,

14  an appeal, and complicated expert reports. The maze continued all the way through summary

15  judgment and to the eve of trial. All against one of the most well-known and powerful businesses in

16  the country, represented by experienced attorneys. *See Carlin*, 380 F. Supp. 3d at 1020 ( "vigorous

17  opposition of claims" by skilled opposing counsel in "complex litigation with unresolved legal issues"

18  supported increased fee award) (citing *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs.,*

19  *& Prod. Liab. Litig.*, No. 810ML02151JVSFMOX, 2013 WL 12327929 (C.D. Cal. July 24, 2013)).

20    There can be no other way to describe this case but "extremely risky." *See Vizcaino*, 290 F.3d

21  at 1048. Class Counsel undertook that extreme risk and successfully litigated a case that had never

22  been brought in the history of baseball. That strongly supports the fee request here.

23    **C.  The complexity of this case, skill required, and high quality of work support the**

24       **fee request.**

25    "[I]f Counsel has represented intimate knowledge of the case, and applied their unique skills

26  to obtain favorable results, this factor should weigh in favor of an increase in the benchmark rate."

27  *Carlin*, 380 F. Supp. 3d at 1021." That aptly applies here, where counsel combined unique knowledge

28  of the industry with notable knowledge of the law. According to Professor Fitzpatrick, an expert on

class action research, this case was "one of the most complex and extensively litigated class actions I have ever seen." Fitzpatrick Decl. at ¶ 6. Both procedurally and substantively, the case required an enormous amount of attorney skill. It implicated complicated issues of venue, jurisdiction, and standing. It required Class Counsel to wade through a dense Rule 23 thicket, ranging from the propriety of both (b)(2) and (b)(3) classes to the sufficiency of proof of hours worked needed to determining what law should apply when an employee works in multiple states.

The case's docket reflects that complexity: over 1,100 entries before this Court and many more on appeal. The discovery does as well: 137 depositions and thousands of discovery requests involving over 60 parties and many non-parties. Class Counsel filed a number of nuanced motions to compel that discovery, beginning with jurisdictional discovery, and defended against motions to compel to protect plaintiffs and opt-ins from overly intrusive requests.

The complexities continued on appeal, and had implications not only for this case but for class action litigants in general. A decision to the contrary would have potentially resulted in greater barriers for plaintiffs seeking to bring multi-state class actions, and could have resulted in heightened requirements for bringing wage-related cases when an employer failed to keep track of hours worked. Instead, Plaintiffs succeeded in gaining a win that will benefit workers in class actions for years to come. *See Vizcaino*, 290 F.3d at 1049 (noting that the litigation would benefit other workers also). And Class Counsel preserved that win by opposing a petition for a re-hearing *en banc* and a Supreme Court cert petition from a well-known appellate advocate.

The summary judgment stage presented just as many obstacles. Novel issues abounded, and Plaintiffs' advocacy resulted in the Court's landmark 181-page decision. For the first time in the long history of baseball, a federal court held that minor leaguers are employees under wage laws; that MLB jointly employs them; that the creative artist exemption does not apply to minor leaguers; and that the federal Save America's Pastime Act did not amend state wage laws. ECF No. 1071 at 180. At the same time, the Court denied another round of *Daubert* motions aimed at Plaintiffs' experts, *id.*, and another attempt to decertify the classes, ECF No. 1044. Plaintiffs prevailed on these issues—along with all the earlier procedural complexities—despite facing well-resourced Defendants represented by defense counsel from a prestigious firm with significant experience in complex litigation and in the industry.

1    *See In re Apple Inc. Device Performance Litig.*, No. 5:18-MD-02827-EJD, 2021 WL 1022866, at *6 (N.D.

2    Cal. Mar. 17, 2021) (when discussing the skill and quality of work, noting that "Class Counsel faced a

3    company with significant financial and legal resources" represented by respected defense counsel).

4         The twists and turns of this case required a nimbleness befitting the athletes that Class

5    Counsel represented. From appellate advocacy to deposition skills, and from procedural prowess to

6    summary judgment briefing and everything in between, Class Counsel exhibited far-ranging adeptness

7    in all facets of complex litigation. This factor strongly supports Plaintiffs' requested fee.

8         **D.  The contingent nature of the fee and financial burden support the fee request.**

9         Fee orders should "reward attorneys for taking the risk of non-payment by paying them a

10   premium … for winning contingency cases," which "assur[es] competent representation for plaintiffs

11   who could not afford to pay on an hourly basis." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19

12   F.3d 1291, 1299-300 (9th Cir. 1994). "A higher-than-benchmark award exists to reward counsel for

13   investing 'substantial time, effort, and money, especially in light of the risks of recovering nothing.'"

14   *Carlin*, 380 F. Supp. 3d at 1021 (quoting *In re Washington Pub. Power Supply*, 19 F.3d at 1299-300).

15        Despite all the novel, potential hazards that the case brought with it, Plaintiffs' counsel

16   undertook this litigation on a pure contingency basis. *E.g.*, Broshuis Decl. at ¶ 38. For over eight

17   years, Class Counsel expended tens of thousands of hours in professional time and fronted millions of

18   dollars in costs. *See id.* at ¶¶ 30-33. Giving this case the attention it deserved meant that Class Counsel

19   declined other potentially remunerative work. *Vizcaino*, 290 F.3d at 1050 (contingency agreement

20   "required counsel to forgo significant other work," which supported enhanced fee award). This factor

21   supports Plaintiffs' fee request.

22        **E.  Awards made in similar cases support the fee request.**

23        If the benchmark fee percentage is for a normal case, then by extension, an abnormally

24   complex and lengthy case should warrant more than the benchmark. Fee decisions in this Circuit bear

25   that out, as courts overseeing complex or lengthy cases have frequently awarded more than the

26   benchmark of 25%. *See Boyd*, 2014 WL 6473804, at *10 (collecting wage-and-hour cases awarding 33%

27   or more); *Frelkin v. Apple Inc.*, No. 3:13-cv-03451-WHA (ECF No. 475) (N.D. Cal. Aug. 13, 2022)

28   (awarding 30% in over eight-year-old wage-and-hour case); *Rodriguez v. Nike Retail Servs., Inc.*, No. 14-

CV-01508-BLF, 2022 WL 254349, at *6 (N.D. Cal. Jan. 27, 2022) (awarding 33% in wage-and-hour case "in light of the significant amount of work Class Counsel performed in this case, including for the appeal to the Ninth Circuit, and the excellent results achieved" in the face of "unsettled" law); *Villalpando v. Exel Direct Inc.*, No. 3:12-CV-04137-JCS, 2016 WL 7740854, at *2 (N.D. Cal. Dec. 12, 2016) (33% in attorneys' fees "is reasonable under both applicable law, and in light of the contingent risk, Counsel's documented lodestar, the complex and protracted nature of the case, and strong result for the Class"); *Boyd*, 2014 WL 6473804, at *9 (awarding 33% in fees when case involved unsettled classification status of workers); *see also* Fitzpatrick Decl. at ¶ 19 (explaining that this request falls within the "second most common range of fees in the Ninth Circuit" and is warranted given the length and complexity of the case).

The average class action lasts around three years. Fitzpatrick Decl. at ¶ 32. This case is almost three times as old—a reflection of the complexities of the case and the amount of work and risk incurred by counsel. That wait in turn reduces the effective rate of the requested fee. *See* Fitzpatrick Decl. at ¶ 32 (stating that the "longer class counsel must wait to get paid for their work, the lower their 'effective' fee becomes."). And these principles apply equally to settlements large and small. *See In re: Cathode Ray Tube (Crt) Antitrust Litig.*, No. C-07-5944 JST, 2016 WL 183285, at *2 (N.D. Cal. Jan. 14, 2016) (collecting cases and awarding fee of 30% of $128 million settlement fund in antitrust case also litigated for eight years). As Professor Fitzpatrick points out, reducing the attorney fee recovery in a high-value settlement creates disincentives to achieve the best results, which undermines the principles behind the percentage-of-the-fund approach. Fitzpatrick Decl. at ¶ 22.

A fee decision from just a few months ago illustrates the point. In *Andrews v. Plains All Am. Pipeline L.P.*, No. CV154113PSGJEMX, 2022 WL 4453864, at *1 (C.D. Cal. Sept. 20, 2022), the parties "engaged in almost seven years of hard-fought litigation in order to arrive at the $230 million Settlement before the Court." The parties took over 100 depositions and had a lengthy battle over class certification, which resulted in two certified classes. *Id.* The settlement achieved between 25% and 65% of the potential recovery (depending on the class and the years used for consideration). *Id.* at *2. Those circumstances resulted in the court awarding 32% of the $230 million fund in fees. *Id.* at *3.

This case has those same ingredients and then some: significant procedural hurdles, extensive discovery that included over 100 depositions, an appeal that went to the verge of the Supreme Court, a largely successful summary judgment decision, and a noteworthy settlement achieved on the eve of trial. The seven-year *Andrews* case warranted a 32% fee, and Plaintiffs respectfully believe that a 30% fee in this nine-year-old case is eminently reasonable.

## II.   A Lodestar Cross-Check Confirms that the Proposed Fee Is Reasonable.

Under the right circumstances, a district court need not perform a lodestar cross-check. *See Andrews*, 2022 WL 4453864, at *1 ("Based on the unique circumstances of this case and because all of the *Vizcaino* factors considered under the percentage-of-recovery method heavily support Plaintiffs' requested fee, the Court forgoes cross-checking the reasonableness of the fee against the lodestar method."). Indeed, "only a minority of courts nationwide perform the crosscheck with the percentage method." Fitzpatrick Decl. at ¶ 35. Yet a lodestar crosscheck "may provide a useful perspective on the reasonableness of a given percentage award." *Vizcaino*, 290 F.3d at 1050. "[T]he lodestar calculation can be helpful in suggesting a higher percentage when litigation has been protracted." *Id.* Where "the lodestar is being used as a cross-check, courts may do a rough calculation with a less exhaustive cataloging and review of counsel's hours." *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *16 (N.D. Cal. Aug. 17, 2018) (internal quotations omitted); *see also Carlin*, 380 F. Supp. 3d at 1022 (quoting *In re Anthem*). "The 'relevant community' for the purposes of determining the reasonable hourly rate is the district in which the lawsuit proceeds." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 262 (N.D. Cal. 2015).

Class Counsel's lodestar through October 31, 2022 is $34,789,719.50. Broshuis Decl. at ¶ 30. They have devoted 54,988.2 hours to the case thus far. *Id.* Other law firms offered assistance and worked additional hours on the case, resulting in a total combined lodestar of $36,322,371.75 based on 57,072.7 total combined hours. *Id.*; *see also* Warshaw Decl. at ¶ 58.

The current hourly rates used in the lodestar calculations range from $350 for non-partner attorneys to $1,295 for senior partners. *See MHC Fin., Ltd v. City of San Rafael*, No. C 00-3785 VRW, 2009 WL 10696045, at *12 (N.D. Cal. Apr. 17, 2009) (concluding that current hourly rates should be used instead of historical rates because it "simplifies the calculation and accounts for the time value of

money in that the attorney fees were not paid contemporaneously with the work) (relying on *Vizcaino*, 290 F.3d at 1051 ("Calculating fees at prevailing rates to compensate for delay in receipt of payment was within the district court's discretion.")). Courts have approved of similar rates when performing lodestar calculations. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 14-MD-02541-CW (NC), 2019 WL 12194763, at *3 (N.D. Cal. Dec. 6, 2019), *adopted* (Feb. 24, 2020) (finding that rates up to $1,515 in a similarly complex sports case "are reasonable"); *Kang v. Wells Fargo Bank, N.A.*, No. 17-CV-06220-BLF, 2021 WL 5826230, at *17 (N.D. Cal. Dec. 8, 2021) (in a wage/hour case, approving of rates between $325 and $1,150 per hour); *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2018 WL 4620695, at *2 (N.D. Cal. Sept. 20, 2018) (finding four years ago rates ranging from "$350 to $1,050 for partners and senior counsel, $300 to $675 for associates, and $100 to $400 for paralegals and other litigation staff (including senior cases managers)" were reasonable); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-MD-2541-CW, 2017 WL 6040065, at *9 (N.D. Cal. Dec. 6, 2017), aff'd, 768 F. App'x 651 (9th Cir. 2019) (finding five years ago that rates of up to $1,035 were reasonable, and citing a "reputable" 2015 survey of rates in San Francisco showing billing rates of between $200 and $1,080); *see also Wren*, 2011 WL 1230826, at *20 (in wage/hour case over 11 years ago, approving range of $375 to $725 per hour).

The resulting multiplier is just 1.53. "The Ninth Circuit has recognized that multipliers generally range from 1 to 4." *Kang*, 2021 WL 5826230, at *17. "[C]ourts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases." *Vizcaino*, 290 F.3d at 1051 (affirming a lodestar multiplier of 3.65); *see also Kang*, 2021 WL 5826230, at *17 ("District courts within the Ninth Circuit commonly apply multipliers in that range in California wage and hour class actions."). This lodestar multiplier of 1.53 is "a fraction of the lodestar multipliers in complex cases with large recoveries like the settlement here." Fitzpatrick Decl. at ¶ 36 (collecting cases and concluding that the "multiplier is so modest and the wait for fees has been so long that there is no conceivable basis to think that anything like a 'windfall' could result here").

The 1.53 multiplier is well within the range of multipliers commonly approved of by courts, and very reasonable given the "substantial risk class counsel faced, compounded by the litigation's duration and complexity." *Vizcaino*, 290 F.3d at 1051. And of course, Class Counsel's work is not fully

1    finished. Throughout the settlement administration process, Class Counsel will expend many

2    additional hours communicating with class members, working with the administrator, drafting final

3    approval papers, and addressing any other issues that might arise.

4            A lodestar check therefore confirms that Plaintiffs have requested a reasonable fee.

5    **III.    Litigation Costs Should Be Reimbursed from the Common Fund.**

6            "In common fund cases, the Ninth Circuit has stated that the reasonable expenses of acquiring

7    the fund can be reimbursed to counsel who has incurred the expense." *Nitsch v. DreamWorks Animation*

8    *SKG Inc.*, No. 14-CV-04062-LHK, 2017 WL 2423161, at *13 (N.D. Cal. June 5, 2017) (citing *Vincent v.*

9    *Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977)). That includes "[a]ll expenses that are typically

10   billed by attorneys to paying clients in the marketplace." *Id.*

11           The Settlement Agreement calls for up to $5.5 million to be set aside for litigation costs

12   incurred by counsel. To date, counsel has incurred costs totaling $4,654,538.33. Broshuis Decl. at ¶ 32

13   (chart). These costs are summarized in counsel's supporting declarations.[2] Counsel incurred those

14   costs—including transcript costs from the over 100 depositions, travel costs, expert fees, and myriad

15   other necessary costs—while prosecuting this case for nearly nine years. They directly benefitted the

16   class in this complex case and are of the type that would have been charged to a paying client in a

17   non-contingency case. Broshuis Decl. at ¶ 34; Warshaw Decl. at ¶ 59. Plaintiffs thus respectfully ask

18   that the Court award these costs.

19           Plaintiffs also request that the Court set aside $995,000 from the common fund in estimated

20   costs to be paid to the settlement administrator for administration costs. *See* Williams Decl. at ¶ 8. The

21   settlement notice provided a preliminary estimate of $450,000 for administration costs based on good-

22   faith assumptions. The administrator has indicated that several factors are driving costs much higher

23   than anticipated: (1) the volume of class member communications has been extraordinarily high (more

24   than seven times anticipated), (2) tax reporting requirements are more complex than initially

25   anticipated, and (3) the data has been more complex than initially anticipated. *Id.* Class Counsel will

26

27   _____

28   [2] *See* Broshuis Decl. at ¶¶ 32-35; Warshaw Decl. at ¶ 59; *see also* Additional Counsel Decls.

1    review the administrator's bills, and additional documentation will be provided before any hearing at

2    which the Court considers approval of the administrator's actual costs. *Id.* at ¶ 10. Also noteworthy,

3    Plaintiffs' litigation costs, requested earlier in this section, are about $850,000 lower than the initial

4    estimate set forth in the class notice ($4.65 million requested versus $5.5 million estimated), which

5    more than offsets any increased amounts to be set aside for settlement administration.

6    **IV.    Incentive Payments Should Be Awarded to the Named Plaintiffs.**

7         Plaintiffs also request that the Court award incentive payments of $15,000 to each named

8    plaintiff serving as a class representative, and $7,500 to each of the five named plaintiffs who did not

9    ultimately serve as class representatives. *See infra* Appendix (table showing class representatives and

10   additional named plaintiffs). Such incentive awards "are fairly typical in class action cases." *Rodriguez v.*

11   *W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). Courts award them "to compensate class

12   representatives for work done on behalf of the class, to make up for financial or reputational risk

13   undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private

14   attorney general." *Id.*

15        "Incentive awards are particularly appropriate in wage-and-hour actions where plaintiffs

16   undertake a significant 'reputational risk' by bringing suit against their former employers." *Ridgeway v.*

17   *Wal-Mart Stores Inc.*, 269 F. Supp. 3d 975, 1003 (N.D. Cal. 2017) (approving $15,000 incentive awards).

18   A court has great discretion in determining the amount to award, and while awards tend to be smaller

19   when the settlement is smaller, higher awards are justified for larger settlements or when the case was

20   lengthy and required the plaintiffs to invest more time. *See, e.g., In re High-Tech Emp. Antitrust Litig.*, No.

21   11-CV-02509-LHK, 2015 WL 5158730, at *17 (N.D. Cal. Sept. 2, 2015) (approving incentive awards

22   of $120,000 and $80,000 in $415 million settlement); *Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068

23   MMC, 2007 WL 221862, at *17 (N.D. Cal. Jan. 26, 2007), aff'd, 331 F. App'x 452 (9th Cir. 2009)

24   (approving incentive award of $25,000 in $45 million settlement); *Van Vranken v. Atl. Richfield Co.*, 901

25   F. Supp. 294, 300 (N.D. Cal. 1995) (approving incentive award of $50,000 in $67.5 million settlement).

26        Oft-considered factors include the risk undertaken, the notoriety involved in the case, the time

27   and effort expended, the duration of the case, and the benefit (or lack thereof) enjoyed by the plaintiff

28

as a result of the case. *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015). These factors support the requested awards.

*Notoriety and risks.* This case has received a substantial amount of notoriety from its inception, and so the possible reputational risks are much higher than the average case. That includes reputational risks both within and outside the industry. These named plaintiffs took the brave step of joining this case against a powerful and beloved organization. They did so despite knowing that their names would not just be in the Court's public record, but would also likely appear in the media. *See generally* Named Plaintiff Decls. at section entitled "Reputational Risks." They are quite proud to have their names attached to this landmark case, but at the same time, the risk was (and is) quite real given Defendants' stranglehold on the industry, and since any prospective employer can easily determine they participated in this employment case. Indeed, "[a]n employee who lends his name to a lawsuit against a current or former employer is placed in a financially vulnerable position. Plaintiffs who take on this risk for the genuine enforcement of wage and hour provisions should be encouraged." *Navarro v. Servisair*, No. C 08-02716 MHP, 2010 WL 1729538, at *4 (N.D. Cal. Apr. 27, 2010).

That, however, was not the only risk incurred. There was the risk of being responsible for costs awarded to Defendants in the event of a loss. *See Whiteway v. FedEx Kinkos Off. & Print Servs., Inc.*, No. C 05-2320SBA, 2007 WL 4531783, at *4 (N.D. Cal. Dec. 17, 2007) (awarding Rule 54 costs to defendant in a wage-and-hour case); *see also Villalpando*, 2016 WL 7785852, at *2 ("each bore the risk that they might have to pay defense costs if they lost the case"). Given the case's novelty, that too carried a higher amount of risk than is typical.

This factor thus supports the awards requested.

*Duration and effort expended.* The duration of this case was also much longer than average. The median case in this District lasts 10.1 months.[3] This case has lasted over ten times that (102 months and counting). And it was more than three times as long as the typical class action. Fitzpatrick Decl. at

---

[3] *See* Table C-5—U.S. District Courts—Median Time from Filing to Disposition of Civil Cases, by Action Taken—During the 12-Month Period Ending June 30, 2022, uscourts.gov (last visited Sep. 9, 2022), *available at* https://www.uscourts.gov/statistics/table/c-5/statistical-tables-federal-judiciary/2022/06/30.

1    ¶ 32. In turn, the time and effort expended by these individuals was higher than average. *Cf. Jacobs v.*

2    *California State Auto. Ass'n Inter-Ins. Bureau*, No. C 07-00362 MHP, 2009 WL 3562871, at *5 (N.D. Cal.

3    Oct. 27, 2009) (citing cases supporting the proposition that a more typical case entails around 40-50

4    hours of work to help recover far less, and also citing cases awarding a higher incentive award when

5    more time was spent "or the case resulted in a far larger overall recovery"). Each named plaintiff has

6    submitted a declaration detailing their efforts spent working on the case and estimating the time

7    required of them. *See generally* Named Plaintiff Decls. Most plaintiffs estimated that the depositions

8    alone entailed between 20-30 hours of work (including prep sessions, travel, a full-day deposition, and

9    reviewing the transcript). *See id.* at section entitled "Discovery." They also spent dozens of hours

10   searching for documents related to the multiple sets of production requests and answering the

11   multiple sets of interrogatories. *Id.* The extensive discovery requests included the search of and

12   production of many private communications from social media, text messages, and emails.

13   Additionally, just keeping up with all the ups and downs of the case for the better part of a decade

14   entailed significant effort. Most named plaintiffs estimated that staying informed about the lengthy

15   case required between 20 and 30 hours of time. *See id.* at section entitled "General Work to Stay

16   Informed." And then, as trial approached, they began the process of preparing with counsel to testify

17   at trial, and also conferred with counsel regarding the settlement process. *See, e.g.*, Senne Decl. at ¶¶

18   23-24 (estimating that he spent 20 hours preparing to testify and 10 hours involved in the settlement

19   process). This factor thus supports the requested awards as well.

20          *The relative benefit.* The final factor, the relative benefit received by the named plaintiffs, also

21   supports the request. By the terms of the settlement, the named plaintiffs' payouts will be calculated

22   the same way as all class members'. They will receive no preferential treatment despite all the work

23   that went into creating this class fund. Yet the named plaintiffs, if they had proceeded to trial, also

24   stood to possibly recover from individual claims tied to alleged offseason work. These claims often

25   amounted to several thousand dollars. *See* Broshuis Decl. at ¶ 47. The named plaintiffs selflessly

26   agreed to forego these individual claims so that all class members could benefit.

27          As a result of that selflessness, the work put into the case, and the reputational risks endured,

28   each class member is set to receive an average *net* payment of $5,000 to $5,500. That is a strong result

**Motion for Attorneys' Fees, Litigation Costs, and Incentive Awards**

1   in a wage-and-hour case, especially in a case where the class members made so little to begin with. *See*

2   *Alvarado v. Nederend*, No. 1:08-CV-01099 OWW DL, 2011 WL 1883188, at *9 (E.D. Cal. May 17,

3   2011) (saying that a net recovery of $4,000 per class member in a wage-and-hour case was

4   "substantial").

5          The 40 class representatives therefore deserve an incentive award of $15,000, and the five

6   named plaintiffs not serving as class representatives deserve a $7,500 award. *See infra* Appendix

7   (showing the five named plaintiffs who are not serving as class representatives). Indeed, "in some

8   cases, a named plaintiff will not serve as a formal class representative, but by virtue of having been

9   named in the complaint, she may have undertaken some of the tasks that would make her eligible for

10  an incentive award." 5 Newberg on Class Actions § 17:6 (5th ed.). That is true for these five

11  individuals here, who performed much of the same work as the class representatives in service of

12  creating this common fund. This approach and these exact amounts have been approved in this

13  District in another case that resulted in a large common fund. *See In re TFT-LCD (Flat Panel) Antitrust*

14  *Litig.*, No. M 07-1827 SI, 2013 WL 1365900, at *17 (N.D. Cal. Apr. 3, 2013) ("The Court approves

15  incentive awards of $15,000 to each of the 40 court-appointed class representatives, and $7,500 for

16  each of eight additional named plaintiffs."); *see also Andrews*, 2022 WL 4453864, at *5 (awarding

17  $15,000 to each of 14 class representatives).

18         The requested awards are also well within the boundaries of what this Court and others have

19  deemed reasonable in wage-and-hour cases. *See Villalpando*, 2016 WL 7785852, at *2 (approving of

20  $15,000 incentive awards in a wage-and-hour case); *Boyd*, 2014 WL 6473804, at *7 (in a wage-and-hour

21  case: "[T]he Court finds that incentive awards of $15,000 to Mr. Galaz is reasonable in light of the

22  time and effort he expended for the benefit of the class and the risks associated with representing the

23  class."); *Ridgeway v. Wal-Mart Stores Inc.*, 269 F. Supp. 3d 975, 1003 (N.D. Cal. 2017) (approving

24  $15,000 incentive awards to each of nine plaintiffs in a wage-and-hour case). And while the number of

25  named plaintiffs may be higher than in most cases, that simply reflects the number of MLB Clubs and

26  claims. On average, there are only 1.5 named plaintiffs per MLB Club, which demonstrates the

27  efficiency gained by litigating the case in a unified fashion. And the total amount sought in incentive

28  awards represents only .3% of the common fund, which is within the bounds of what other courts

have found acceptable. *See Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 462 (E.D. Cal. 2013) (collecting cases that approved incentive payments totaling .5% of the fund, .81% of the fund, .56% of the fund, .2% of the fund, and 7.5% of the fund); *see also Villalpando*, 2016 WL 7785852, at *2 (incentive awards amounted to .33% of the fund).

For decades, ballplayers have simply moved on with their lives after their time in professional baseball ended, leaving a new crop of ballplayers to inherit an unchanged, unfair, and antiquated work environment. It would have been much easier for these named plaintiffs to take that same path—to go on with their lives and to allow someone else to deal with the problem. But these named plaintiffs made the bold choice to not take that path. They attached their names to a lawsuit that has corrected past harms and blazed a trail towards better conditions for today's players. Each named plaintiff put in the work needed to create this fund and to affect change, and each named plaintiff incurred the associated risks. Thus, Plaintiffs respectfully request that the Court grant the requested awards.

## CONCLUSION

Class Counsel has diligently represented the interests of the class since before this case even began. Plaintiffs thus respectfully request that the Court award 30% of the common fund in attorneys' fees ($55,500,000) in recognition of the nearly nine years of work that went into creating that fund. Plaintiffs also request reimbursement of the litigation costs that counsel has incurred ($4,654,538.33), and that the Court set aside $995,000 for anticipated administration costs. The named plaintiffs have likewise diligently represented the interests of the class for the better part of a decade. In recognition of their service, the Court should grant the requested incentive awards.

DATED: November 23, 2022                    Respectfully submitted,

                                            */s/ Garrett R. Broshuis*

                                            KOREIN TILLERY, LLC
                                            STEPHEN M. TILLERY (pro hac vice)
                                            GARRETT R. BROSHUIS
                                            MARC WALLENSTEIN (pro hac vice)
                                            DIANE MOORE

**Motion for Attorneys' Fees, Litigation Costs, and Incentive Awards**

PEARSON, SIMON & WARSHAW LLP
CLIFFORD H. PEARSON
DANIEL L. WARSHAW
BOBBY POUYA
JILL M. MANNING
BENJAMIN E. SHIFTAN

*Plaintiffs Co-Lead Class Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.

/s/ *Garrett R. Broshuis*
Garrett R. Broshuis

1

**APPENDIX**

2

**Table of Class Representatives and Additional Named Plaintiffs**

3

| Class Representatives (Seeking $15,000 Incentive Awards) | Additional Named Plaintiffs (Seeking $7,500 Incentive Awards) |
|---|---|
| Craig Bennigson, Daniel Britt, Matthew Daly, Aaron Dott, Grant Duff, Matthew Frevert, Lauren Gagnier, Jonathan Gaston, Nicholas Giarraputo, Brandon Henderson, Bryan Henry, Mitchell Hilligoss, Ryan Hutson, Kyle Johnson, Jake Kahaulelio, Ryan Khoury, Ryan Kiel, Matthew Lawson, Michael Liberto, Barret Loux, Aaron Meade, Justin Murray, Jeffrey Nadeau, Joseph Newby, Brett Newsome, Kyle Nicholson, Oliver Odle, Tim Pahuta, Dustin Pease, Brandon Pinckney, David Quinowksi, Gaspar Santiago, Cody Sedlock, Aaron Senne, Leslie Smith, Bradley Stone, Mark Wagner, Kristopher Watts, Joel Weeks, and Kyle Woodruff | Omar Aguilar, Leonard Davis, Witer Jimenez, Bradley McAtee, Roberto Ortiz |