STEPHEN M. TILLERY (*pro hac vice*)
  stillery@koreintillery.com
GARRETT R. BROSHUIS (Bar No. 329924)
  gbroshuis@koreintillery.com
MARC A. WALLENSTEIN (*pro hac vice*)
  mwallenstein@koreintillery.com
DIANE MOORE (Bar No. 214903)
  dmoore@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:  (314) 241-4844
Facsimile: (314) 241-3525

CLIFFORD H. PEARSON (Bar No. 108523)
  cpearson@pswlaw.com
DANIEL L. WARSHAW (Bar No. 185365)        JILL M. MANNING (Bar No. 178849)
  dwarshaw@pswlaw.com                       jmanning@pswlaw.com
BOBBY POUYA (Bar No. 245527)              BENJAMIN E. SHIFTAN (Bar No. 265767)
  bpouya@pswlaw.com                         bshiftan@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**        **PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400        555 Montgomery St., Suite 1205
Sherman Oaks, CA 91403                    San Francisco, CA 94111
Telephone: (818) 788-8300                 Telephone: (415) 433-9000
Facsimile: (818) 788-8104                 Facsimile: (415) 433-9008

Plaintiffs' Co-Lead Class Counsel

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| AARON SENNE, et al., Individually and on Behalf of All Those Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as MAJOR LEAGUE BASEBALL, et al.,<br><br>Defendants. | CASE NO. 3:14-cv-00608-JCS (consolidated with 3:14-cv-03289-JCS)<br><br>**CLASS ACTION**<br><br>**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF MOTION FOR AWARD OF ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**<br><br>Hearing Date and Time: Feb. 17, 2023, 9:30 a.m.<br>Courtroom: F, 15th Floor<br>Judge: Honorable Joseph C. Spero |

NO. 3:14-cv-00608-JCS

**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF**
**MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**

I, Garrett R. Broshuis, hereby declare as follows:

1. I am one of the attorneys principally responsible for the handling of this matter. I submit this Declaration in support of Plaintiffs' Motion for Award of Attorneys' Fees, Litigation Costs, and Incentive Awards.

2. I am personally familiar with the facts set forth in this Declaration. If called as a witness, I could and would competently testify to the matters stated herein.

3. I am now a partner at the law firm of Korein Tillery, LLC, though for much of this case I worked as an associate at the firm. Our firm regularly works on some of the most complex cases in the country (in both class and non-class cases) and has been appointed as class counsel in over 50 class actions. A description of the firm's experience and notable results, and the bios of key attorneys who worked on the case, is attached as Exhibit A.

## SUMMARY OF WORK PERFORMED

4. The firms of Korein Tillery, LLC and Pearson, Simon & Warshaw LLP ("Class Counsel") have been working on this case for approximately nine years. Although the case was filed on February 7, 2014, Class Counsel began their investigation of the case months before that. Recognizing the importance and novelty of the issues, our firm, with the assistance of co-counsel, spent months researching the case. We identified potential obstacles and defenses, and began devising a strategy for overcoming those obstacles. We conducted pre-filing interviews with players, scrutinized the UPC and Major League Rules, and familiarized ourselves with the industry. That was aided by my background in the industry as a former player, which gave our team a unique combination of industry knowledge and legal expertise.

5. After this investigation, Class Counsel drafted a lengthy complaint. Because of the novelty of the case, the time spent on the complaint was extensive. The complaint initially included just three plaintiffs, and named MLB, three MLB Clubs and the then-Commissioner of Baseball as defendants. In the first two months, additional plaintiffs joined the case, resulting in Class Counsel filing two amended complaints. The number of plaintiffs grew to over 30 by April 2014, and the complaint included all 30 MLB Clubs as defendants.

6. Class Counsel then began opposing the procedural motions brought by Defendants. Defendants initially contested personal jurisdiction and venue. Class Counsel sought and received the right to conduct jurisdictional and venue discovery from the Court, and Class Counsel then conducted that discovery.

7. As jurisdictional and venue discovery took place, Class Counsel moved to be named interim lead counsel. Several respected complex litigation firms supported that motion, including Lieff, Cabraser, Heimann, & Bernstein, LLP; Carney, Bates & Pulliam, PLLC; and Glancy, Binkow & Goldberg, LLP.  Shortly after Class Counsel filed that motion, an attorney for other minor leaguers announced at a case management conference that he would oppose Class Counsel's motion and would be filing a complaint. He did so shortly thereafter, and when he declined to consent to this Court's jurisdiction, the case was re-assigned to the Hon. Richard Seeborg. Judge Seeborg consolidated the cases and appointed Class Counsel as interim lead counsel. ECF Nos. 235, 236. The case returned to this Court a short time later.

8. In May 2015, the Court denied Defendants' venue motion and granted in part and denied in part the motion to dismiss for lack of personal jurisdiction. ECF No. 379. Around the same time, Defendants filed another motion to dismiss, this time for purported lack of standing. The motion took aim at the breadth of the claims, seeking to cabin the reach of the classes by arguing that a player only had standing to bring a claim against a particular Club for which he worked in a particular state, and not against other MLB Clubs. Class Counsel opposed that motion, and the Court denied it, ECF No. 420, which greatly benefitted the then-putative classes.

9. Fact discovery ensued, and it was remarkably extensive. The parties took 137 depositions, served hundreds of sets of interrogatories and document requests—which totaled over 4,000 requests for production and over a thousand interrogatories—and presented over a dozen discovery disputes to the Court. The named plaintiffs responded to over 60 requests for production (each) seeking emails, social media postings, text messages, and a variety of other items. Plaintiffs engaged vendors, and a team of attorneys and staff worked to gather, organize, and review plaintiff documents for production. Another team worked to review Defendants' productions, and another team worked to take and defend depositions. The parties produced approximately 230,000 documents

**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**

that contained over a million pages. Class Counsel negotiated an ESI protocol with opposing counsel, and we devised a protocol for reviewing documents efficiently. Our firm housed the documents on our in-house Relativity servers and relied upon our in-house Relativity expertise to reduce costs when possible. I, along with other attorneys, oversaw much of the review process, and I (along with co-counsel) oversaw the creation of deposition outlines and the assignments for depositions.

10. As discovery took place, Class Counsel also prepared class certification briefing. The battle over class certification lasted five years. The Court preliminarily certified the FLSA Collective in October 2015. In March 2016, the Court decertified the FLSA Collective and denied Plaintiffs' motion for certification under Rule 23. Despite that ruling, Class Counsel directed an expert to finish his work on a survey. Class Counsel then used the final survey and narrower proposed classes as the a bases for a motion for reconsideration. That resulted in the Court partially granting class certification in March 2017. ECF No. 782.

11. Both sides appealed, and the Ninth Circuit issued its order on August 16, 2019. Class Counsel's decision to appeal was slightly unorthodox. Many firms would have been satisfied that the Court had partially granted class certification. But Class Counsel knew that Defendants would likely appeal, and thus made the decision to cross-appeal in order to try to broaden the scope of the certified classes.

12. In the end, that decision greatly benefitted class members because the Ninth Circuit sided with Plaintiffs on the appeal. That resulted in certified classes under Arizona, Florida, and California law, and a certified FLSA collective.

13. Defendants filed petitions for rehearing *en banc* and for a writ of certiorari. In doing so, Defendants engaged one of the most well-known Supreme Court specialists in the country, Paul Clement. Class Counsel opposed both petitions, which were denied.

14. The case finally returned to this Court in October 2020. Class Counsel worked diligently to complete discovery, and to devise a notice plan and oversee the class notice sent to the class members. Class Counsel also moved to certify a Rule 23(b)(2) class, representing a current player who intervened to ensure Plaintiffs had standing to do so. The Court certified a (b)(2) class in July 2021. ECF No. 946.

**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF**
**MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**

15.     Shortly after that, Class Counsel completed expert discovery. The damages model was particularly complex—far more complex than in a normal wage-and-hour case. Class Counsel presented experts that set forth an admissible model of hours worked, which was no easy task given that Defendants had not kept time records. Class counsel had innumerable phone calls with their experts to ensure that the model adequately captured the work at issue, and which involved an intricate understanding of the industry and of the standard for admissibility of expert evidence. In the end, the model was a combination of Defendants' records (such as game schedules, eBIS data, rosters, and itineraries), publicly available records (such as travel data), and survey data.

16.     Class Counsel then prepared summary judgment and *Daubert* briefing. Doing so required mastery of the voluminous record, along with mastery of nearly a dozen legal issues that often were a matter of first impression. I worked with our team and co-counsel to identify key documents and key deposition testimony to use as exhibits, and worked to distill the facts and apply them to the legal disputes at issue—and to ultimately draft a brief that would hopefully be both persuasive and digestable. It took a massive effort to do so given the volume of discovery that had taken place and the number of issues in dispute. In the end, each side filed 60-page opening summary judgment briefs, along with *Daubert* motions. The motions presented many complex and novel issues. After hearing two days of argument, the Court granted partial summary judgment for Plaintiffs on a number of issues, holding that minor league baseball players are "employees" under wage laws, that MLB jointly employs them, that players are not "creative artists" within the meaning of wage laws, that Defendants had not kept the records required under Arizona and California law, and that the Save America's Pastime Act did not bar claims under state law. ECF No. 1063. At the same time, the Court denied Defendants' motions to exclude Plaintiffs' experts.

17.     The order was monumental for minor league baseball players, and it reverberated across the industry. Several issues remained unresolved, however, and so Class Counsel continued to prepare for trial.

18.     As the June 1, 2022 trial date approached, Class Counsel intensely prepared the case for a complex trial, including: (1) creating outlines for witnesses and opening statements and conducting mock exercises; (2) performing designations from the nearly 140 depositions; and (3)

**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**

preparing pre-trial filings such as exhibit lists, trial plans, trial briefs, motions *in limine*, jury instructions, verdict forms, a proposed juror questionnaire, and voir dire questions. We also begin preparing witnesses to testify, which involved a very large number of prep sessions due to the volume of possible witnesses.

19.     The parties did not engage in substantive settlement talks until after the summary judgment order. Before agreeing to the terms of the Settlement Agreement, the parties engaged in formal mediation with David Geronemus, a renowned dispute resolution specialist with JAMS. Mr. Geronemus, a former Supreme Court clerk, has worked as a full-time mediator since 1994. The parties participated in three formal sessions with Mr. Geronemus in April and May 2022. One session lasted more than 15 hours. The parties also conducted several calls and exchanged countless emails during the mediation process. In addition, the parties participated in a settlement conference with U.S. District Judge Jacqueline Scott Corley. The process lasted around a month and culminated in the landmark settlement now at issue before this Court.

20.     Since then, Class Counsel has diligently worked with the settlement administrator, JND Legal Administration, to prepare notice documents and to oversee the notice process, and has worked to ensure that the allocation model will fairly compensate class members. Class Counsel has also already responded to a significant number of class member inquiries; those inquiries are currently consuming considerable time on a nearly daily basis.

21.     Class Counsel anticipates that the firms will perform substantial further work associated with settlement approval. Class Counsel will continue to respond to a high number of class member inquiries, and will continue to work with the administrator to resolve disputes from class members regarding work periods. Class counsel will also prepare the motion for final approval. If granted, additional work may be needed in relation to the allocation model and ensuring that class members receive their settlement shares. If not all class members cash checks, a second disbursement will likely take place several months after the first disbursement. Assuming the Court grants final approval around the time of the February 2023 hearing, Class Counsel expects to continue to expend many more hours of work throughout 2023.

**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**

## SUMMARY OF THE RESULTING LODESTAR

22.     As of October 31, 2022, Class Counsel has already expended 54,988.2 hours prosecuting this case. Of those hours, 41,166.8 are from Korein Tillery. In Exhibit B, I have attached a chart summarizing the number of hours worked by each attorney and staff member of the firm, along with the billing rates. The chart reflects contemporaneous computerized time records that the firm maintains in the ordinary course of business.

23.     The billing rates provided in Exhibit B are the usual rates charged in similar complex litigation. Stephen Tillery, as the managing partner of the firm, set these rates. They reflect current billing rates, which have been adjusted slightly over the course of the litigation in order to continue to reflect market demands. Based on our experience and a review of caselaw, the prevailing practice is to use current billing rates when submitting billing information for a fee motion because the firm has not yet been paid for work that occurred in the past. With slight modifications to adjust for current market demands, these rates have been approved in other complex matters that our firm has been involved in. For instance, our firm submitted similar rates in support of a fee motion in a complex class action in the Southern District of New York in 2018, which were approved. *See In re Foreign Exchange Benchmark Rates Antitrust Litig.*, Case No. 1:13-cv-07789-LGS (ECF 1140) (S.D.N.Y. Nov. 18, 2018); *see also id.* at ECF 939-4 (showing rates of $1,200 for Stephen Tillery and $900 for partner Robert King (who also worked on this case), and associate rate of $700 for Diane Moore (who also worked on this case)). Nearly five years have passed, and yet Mr. Tillery has only increased the hourly rates by $50 during that time for most attorneys, and $95 for himself. The rates reflected in Exhibit B to this declaration range from $350 per hour for staff attorneys, to $525 per hour for my time as an associate ($725 per hour for my time as a partner), to $1,295 per hour for Mr. Tillery.

24.     Based on Mr. Tillery's experience and my experience and discussions with attorneys at other firms who work in complex litigation in this District, we believe the rates are reasonable and in line with rates charged for similar work by professionals with similar levels of experience and comparable reputations. A review of cases in this District support that. *See, e.g.*, *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 14-MD-02541-CW (NC), 2019 WL 12194763, at *3 (N.D. Cal. Dec. 6, 2019), *adopted* (Feb. 24, 2020) (approving rates of up to $1,515 in a

**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**

similarly complex sports case); *Kang v. Wells Fargo Bank, N.A.*, No. 17-CV-06220-BLF, 2021 WL 5826230, at *17 (N.D. Cal. Dec. 8, 2021) (in a wage/hour case, approving of rates between $325 and $1,150 per hour); *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2018 WL 4620695, at *2 (N.D. Cal. Sept. 20, 2018) (finding four years ago that rates ranging "from $350 to $1,050 for partners and senior counsel, $300 to $675 for associates, and $100 to $400 for paralegals and other litigation staff (including senior cases managers)" were reasonable); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-MD-2541-CW, 2017 WL 6040065, at *9 (N.D. Cal. Dec. 6, 2017), aff'd, 768 F. App'x 651 (9th Cir. 2019) (finding five years ago that rates of up to $1,035 were reasonable, and citing a "reputable" 2015 survey of rates in San Francisco showing billing rates of between $200 and $1,080); *see also Wren*, 2011 WL 1230826, at *20 (in wage/hour case over 11 years ago, approving range of $375 to $725 per hour).

25.     Articles that have reviewed legal filings show that several large law firms now charge over $2,000 for their most experienced partners working on complex matters.[1] For instance, Neal Katyal charged $2,465 per hour last year; he is a Supreme Court litigator who likely charges rates similar to those charged by Paul Clement, who Defendants hired on appeal.[2] Further, data from a legal analytics company showed that in 2021, the *average* rate billed nationally by law firms stood at $728 per hour for partners, and at $535 per hour for associates.[3]

---

[1] *Big Law Rates Topping $2,000 Leave Value 'In Eye of Beholder,'* Bloomberg Law (June 9, 2022), *available at* https://news.bloomberglaw.com/business-and-practice/big-law-rates-topping-2-000-leave-value-in-eye-of-beholder; *see also As Billing Rates Skyrocket, Historic Fee Leaders Find Company at $2,000 Per Hour*, The American Lawyer (July 28, 2022), *available at* https://www.law.com/americanlawyer/2022/07/28/as-bankruptcy-rates-skyrocket-historic-fee-leaders-find-company-at-2000-per-hour/?slreturn=20221003115254 (showing that the top-billing partners at the top Am Law 100 firms charged an average of $1,838 per hour in 2021).

[2] Clement reportedly charged $1,350 per hour seven years ago, in 2015. *SCOTUS litigators charge as much as $1,800 an hour, filing says*, ABA Journal (Aug. 10, 2015), *available at* https://www.abajournal.com/news/article/scotus_litigators_charge_as_much_as_1800_an_hour_filing_says#:~:text=Paul%20Clement%20of%20Bancroft%20charges,%241%2C800%20an%20hour%2C%20and%20E.

[3] *Associate Billing Rates Are Growing Faster Than Partner Rates*, The American Lawyer (Feb. 3, 2022), *available at* https://www.law.com/americanlawyer/2022/02/03/associates-billing-rates-are-growing-faster-than-partner-rates/.

**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF**
**MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**

26.     Some senior partners at the firm performed considerable work on this case. That includes Mr. Tillery, who has over 40 years of experience working in complex litigation and who has tried hundreds of cases to verdict—including his role as lead trial counsel in a class action trial that resuled in a $10.1 billion verdict. (More details about Mr. Tillery's experience and the experience of the other main attorneys working on the case (including myself) can be found in the firm resume, attached as Exhibit A). Yet our firm ensured that associates performed substantial work on the case as well. For most of the years that I worked on the case, I was an associate rather than a partner. For those hours, we have used my billing rate as an associate rather than as a partner. That has ensured that the blended rate for our firm remains reasonable under the circumstances, at $480 per hour blended for all timekeepers, or $620 per hour when blended for just attorneys.

27.     Our firm also worked with our co-counsel to ensure adequate but non-redundant staffing, and to ensure that the firms achieved efficiencies when possible. The two firms very much worked as a team, meeting regularly to make assignments and to strategize. Given the length of the case and all its complexities, the result in my experience is a very reasonable number of hours expended when compared to other cases of similar length and complexity.

28.     Other law firms also performed certain tasks for the benefit of the class at Class Counsel's direction. These firms have submitted their own declarations describing the work performed and the hours expended.

29.     Class Counsel has reviewed the hours expended by these firms and finds them to be reasonable and that they benefitted the class.

30.     Including those hours, and through October 31, 2022, the total number of hours amounts to 57,072.7. That results in a current lodestar of $36,322,371.75. If this motion is granted, that would result in a lodestar multiplier of 1.53. The following chart summarizes the total hours and lodestar figures of the firms collectively:

**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF**
**MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**

| Firm | Hours | Lodestar |
|------|-------|----------|
| Korein Tillery, LLC | 41,166.8 | $22,795,282.00 |
| Pearson, Simon & Warshaw LLP | 13,821.4 | $11,994,437.50 |
| Glancy Prongay & Murray LLP | 154.4 | $140,122.00 |
| Boucher LLP | 225.6 | $252,609.00 |
| Lieff Cabraser Heimann & Bernstein, LLP | 198.3 | $129,023.50 |
| Carney Bates & Pulliam, PLLC | 231.4 | $186,061.75 |
| Rulis & Bochicchio, LLC | 1274.8 (approximate)[4] | $824,836.00 |
| **Totals** | 57,072.7 | $36,322,371.75 |

31.     Again, I am of the firm opinion that when one considers the length, complexity, and novelty of the case—along with the large number of parties—that the number of hours and the resulting lodestar are very reasonable. Every step in the lawsuit, no matter how small, was contested. The legal research and resulting work was extensive because the novelty and complexity of the case commanded it. With this many parties and the nature of the action, discovery was laborous and intensive. The parties battled over class certification for five years. An interlocutory appeal proceeded all the way to the steps of the U.S. Supreme Court. Cross motions for summary judgment and multiple rounds of *Daubert* briefing took place. And the parties were just three weeks from trial when they reached a settlement.

## SUMMARY OF THE LITIGATION COSTS

32.     To date, Class Counsel has incurred 4,609,574.06 in litigation costs. The other firms that performed some work on the case incurred additional costs of $44,964.27. Thus, the total expended litigation costs amount to $4,654,538.33, as summarized in this chart:

---

[4] As explained in the accompanying Declaration of Vito Bochiccio, his firm had a billing system failure for a small portion of time, so the hours are not exact. Yet Mr. Bochiccio attests that the hours are as accurate as possible.

**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF**
**MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**

| Firm | Costs |
| --- | --- |
| Korein Tillery, LLC | $2,865,483.65 |
| Pearson, Simon & Warshaw LLP | $1,744,090.41 |
| Glancy Prongay & Murray LLP | $7,677.26 |
| Boucher LLP | $21,900.10 |
| Lieff Cabraser Heimann & Bernstein, LLP | $3,009.64 |
| Carney Bates & Pulliam, PLLC | $537.72 |
| Rulis & Bochicchio, LLC | $11,839.55 |
| **Total** | $4,654,538.33 |

33.     Of these costs, Korein Tillery incurred $2,865,483.65 (after reimbursement of some costs by Pearson, Simon & Warshaw LLP). I have included a chart detailing Korein Tilery's litigation costs at Exhibit C.

34.     All costs reflect the usual and customary charges for the expenses incurred and are reflected in the firm's records. These records are prepared from check records, receipts, and other source materials. The costs have not been reimbursed from any other source and are of the type that would have been billed to the client if this had been a non-contingency matter.

35.     Some of the larger expenses include:

    a.  Research expenses, primarily from Westlaw. The firm also incurred Pacer costs when searching for and pulling copies of filings in other federal court matters that counsel deemed relevant.

    b.  Experts/consultants. This case required a substantial amount of work performed by multiple experts and consultants—much more than in a more typical wage-and-hour case. Based on work that our firm has done in other complex cases, I am of the opinion that the amount billed by these experts was reasonable and necessary, directly benefitted the classes, and is of the type that would be billed to a client.

NO. 3:14-cv-00608-JCS
**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**

c. Mediation costs. The parties engaged a highly respected and experienced mediator, David Geronemus, when mediating. Mr. Geronemus expended extensive time in his role, which assisted the parties in reaching the Settlement Agreement.

d. Travel. Depositions occurred at locations throughout the country, including in Puerto Rico. Counsel also attended numerous in-person court proceedings, which required travel, and also traveled for in-person meet-and-confer sessions in accordance with the Court's rules on resolving discovery disputes. The costs include airfare, which was at coach class fare rates, along with hotel, meals, and ground transportation expenses.

e. Transcripts. Given that over 100 video depositions took place, the firm incurred substantial costs on transcripts and the related videos.

**CLASS COUNSEL TOOK ON SIGNIFICANT CONTINGENCY RISK**

36.     Class Counsel litigated this case on a pure contingency basis. When our firm undertook this case, we knew that it would involve significant risk and require substantial resources. Everything about the case was novel. No minor league baseball player—or even a professional athlete—had tested their employment status under wage-and-hour laws, and no minor leaguer had brought a class action against MLB and its thirty Clubs.

37.     As a result, no one had ever litigated the potential issues in this context. There were complex and novel issues at every turn: in the procedural matters handled early in the case, during discovery, during class certification and on appeal, during expert discovery and in *Daubert* motions, and during summary judgment briefing and all the way up to the verge of trial. The risks even extended to legislative halls, as proven by Defendants' lobbying for the Save America's Pastime Act and unsuccessful lobbying for changes to Arizona's minimum wage law. Every phase of the case presented potential pitfalls that could have proven ruinous.

38.     Despite all those risks, we performed our work on a contingency basis. We did so against a well-funded and beloved organization represented by one of the largest law firms in the country and with attorneys specializing in labor and employment matters pertaining to sports and entertainment. And of course, committing the firm to this case for most of a decade meant turning

**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF**
**MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**

1  down other potentially lucrative opportunities for the firm given that the firm had to expend immense

2  resources on this case.

3        **CLASS COUNSEL ACHIEVED A TERRIFIC RESULT FOR THE CLASSES**

4        39.    Class Counsel overcame all of those obstacles to achive a terrific result for the classes.

5  Class Counsel worked vigorously to ensure that class members would receive as much compensation

6  as possible and the best potential forward-looking relief. The Settlement Agreement calls for a

7  payment of $185 million by Defendants. Based on research that Class Counsel has performed in

8  regards to other wage-and-hour cases, that fund will provide above-average results for class members,

9  and if approved, will fairly compensate them when taking into consideration the unique legal issues in

10 this case and uncertainties of trial and appeal. It is expected to amount to, on average, between $5,000

11 and $5,500 per player, which is substantial given that most players made less than $10,000 per year

12 during the class period.

13       40.    The Settlement Agreement also provides significant forward-looking relief. As part of

14 the Agreement, MLB will be required to remove the part of the player contract that has always

15 forbidden MLB Clubs from paying players outside of the championship season. Those contractual

16 provisions are a chief reason for why we are here today, and the removal of them will be monumental.

17 MLB has also agreed to direct MLB Clubs to comply with minimum wage laws during the training

18 seasons.

19       41.    Our firm has litigated some of the most complex cases (class and non-class) in the

20 country in recent decades. (The firm bio for Korein Tillery is attached as Exhibit A.) Based on our

21 experience, we are of the strong opinion that Class Counsel has achieved excellent results—far above

22 average—in the face of extraordinary obstacles.

23       **SUMMARY OF THE SERVICES PROVIDED BY THE NAMED PLAINTIFFS**

24       42.    I fully support the proposed incentive awards for the named plaintiffs. Considering

25 the service provided to the class, I believe it is appropriate to award $15,000 to the class

26 representatives and $7,500 awards to the other five named plaintiffs who did not serve as class

27 representatives. These individuals showed great commitment in seeing this case to its end. Most of

28 them have been involved since the first months of the case, meaning that they have lived with this

**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF**
**MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**

case for nearly nine years. These men are almost all in their 30s, so they have lived with this case for around 25% of their lives.

43.     It would have been far easier for these men to simply allow the status quo to continue in the industry. Many players had come before them, but these men were the first to bring a lawsuit seeking to require MLB and its Clubs to comply with wage-and-hour laws. There would be no *Senne* case without them, and relatedly, no backpay for the thousands of class members and no contractual changes for current players.

44.     Because MLB consists of 30 Clubs, the case required a larger number of named plaintiffs than normal. The case drew upon the collective experiences of these individuals when pursuing discovery, formulating case strategy, and rebutting defenses.

45.     Each of these individuals put in the work needed to ensure success. They searched for documents, which included invasively digging into private electronic documents like text messages and emails. They prepared for and sat for depositions; the depositions often went a full day and often required travel. They provided declarations to assist motions and reviewed important filings. They prepared to testify at trial.

46.     They also incurred substantial reputational risks when attaching their names to this case. This case has included a high level of media coverage, and the names of these plaintiffs were public. Many of these players desired to remain in the baseball industry after they finished their playing days. Current and potential employers, both within baseball and outside of it, could easily ascertain that these men had brought this case.

47.     Finally, these individuals sacrificed additional individual claims as part of the lawsuit. Although the Court determined that claims for offseason work could not be litigated as a class, the named plaintiffs still had individual claims for this work that often amounted to several thousand dollars. As part of the settlement, the named plaintiffs will release these claims without receiving additional money for them.

48.     For these reasons, the case posed significantly higher reputational risks than normal. Yet these men selflessly devoted themselves to this case to the benefit of thousands of other players.

**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3    Executed on November 23, 2022, in St. Louis, Missouri

4

5    _____

6    Garrett R. Broshuis

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND INCENTIVE AWARDS**

# EXHIBIT A

# KOREIN TILLERY

*Attorneys at Law*

One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, Missouri  63101
Tel.: 314.241.4844
Fax: 314.241.3525

205 North Michigan, Suite 1950
Chicago, Illinois 60601-4269
Tel: 312.641.9750
Fax: 312.641.9751

www.koreintillery.com

Korein Tillery — based in Chicago and St. Louis — is one of the country's leading and most successful plaintiffs' complex-litigation firms, representing a broad array of clients in high-stakes lawsuits and delivering over $18 billion in verdicts and settlements over the last 14 years. Most of our attorneys have represented both plaintiffs and defendants at some point in their careers, and, combined, we've handled cases covering virtually every conceivable substantive area of the law. We've litigated cases for clients ranging from individuals and certified classes to governmental entities and billion-dollar, multi-national corporations. Collectively, we've tried hundreds of cases to verdict, with several verdicts exceeding 10 figures. Our attorneys have been nominated for numerous regional and national trial lawyer awards, and we've won many landmark decisions in state and federal appellate courts, including the Supreme Court of the United States.

The National Law Journal has consistently deemed Korein Tillery to be one of the country's top plaintiffs' firms by naming it to its "Plaintiffs' Hot List" seven times in the past 15 years. In 2014 and 2015, Korein Tillery was named by the NLJ as a member of its top 50 Elite Trial Lawyers. The American Bar Association's Securities Litigation Journal deemed two of Korein Tillery's cases, *Kircher v. Putnam Funds Trust,* 547 U.S. 633 (2006) and *Merrill Lynch Pierce Fenner & Smth, Inc. v. Dabit,* 547 U.S. 71 (2006), the two most important securities law decisions in 2006. Securities Litigation Journal, *Top 10 Securities Law Decisions of 2006* (Winter 2006). In *Kircher,* Korein Tillery served as lead counsel for the plaintiffs' class from the initial trial court filing to the Supreme Court of the United States, where the Court reversed the Seventh Circuit in a 9-0 decision.

Korein Tillery has been appointed as class counsel in more than fifty class actions and has successfully negotiated some of the country's largest class action settlements. *See, e.g., Parker v. Sears Roebuck & Co.,* Case No. 04-L-716 (Ill. Cir. Ct. Jan. 16, 2008) (settlement valued at $544.5 million); *Cooper v. The IBM Pers. Pension Plan*, 2005 WL 1981501, 35 Employee Benefits Cas. 2488 (S.D. Ill. Aug. 8, 2005) ($325 million settlement); *Sparks v. AT&T Corp.*, 96-LM-983 (Ill. Cir. Ct. Nov. 4, 2002) ($350 million settlement); *Sullivan v. DB Investments, Inc.*, 04-2819 (D.N.J. May 22, 2008) ($323 million settlement); *Folkerts v. Illinois Bell Tel. Co.*, 95-L-912 (Ill. Cir. Ct. July 7, 1998) ($252 million settlement); *Berger v. Xerox Corp. Ret. Income Guar. Plan*, 2004 WL 287902, 32 Employee Benefits Cas. 1362 (S.D. Ill. Jan. 22, 2004) ($240 million settlement); *Malloy v. Ameritech*, 98-488-GPM (S.D. Ill. July 21, 2000) ($180 million settlement); *City of Greenville v. Syngenta Crop Prot., Inc.*, 3:10-CV-188-JPG-PMF, 2012 WL 1948153 (S.D. Ill. May 30, 2012) ($105 million settlement); *In Re: MCI Non-Subscriber Tel. Rates Litig.*, MDL 1275 (S.D. Ill. Apr. 19, 2001) ($99 million settlement); and *Dunn v. BOC*

*Group Pension Plan*, 01-CV-382-DRH (S.D. Ill. Mar. 12, 2004) ($70 million settlement); *Axiom Investment Advisors, LLC v. Barclays Bank PLC*, No. 15-cv-9323-LGS (S.D.N.Y. July 19, 2017) ($50 million settlement); *City of Winchester, Missouri and City of Creve Coeur, Missouri v. Union Electric Company d/b/a Ameren Missouri,* 11SL-CC04561 (St. Louis County Circuit Court) ($20.5 million settlement in 2017); *City of Maryland Heights, Missouri and City of Winchester, Missouri v. TracFone Wireless, Inc.,* 12SL-CC00648-01 (St. Louis County Circuit Court) ($10.27 million settlement in 2016); *City of O'Fallon, Missouri, City of Troy, Missouri; and City of Orrick, Missouri v. CenturyLink, Inc., et al.,* 12SL-CC01723-01 (St. Louis County Circuit Court) ($17 million settlement in 2014); *City of University City, Missouri, et al. v. AT&T Wireless Services, Inc., et al.* (T-Mobile), 01-CC-004454 (St. Louis County Circuit Court) ($55 million settlement in 2010); *State of Missouri, ex rel. v. SBC Communications n/k/a AT&T, Inc., et al.* (St. Louis City Circuit Court) ($65 million settlement in 2009); *City of University City, Missouri, et al. v. AT&T Wireless Services, Inc., et al.* (Sprint-Nextel), 01-CC-004454 (St. Louis County Circuit Court) ($52 million settlement in 2007); *City of University City, Missouri, et al. v. AT&T Wireless Services, Inc., et al.* (Verizon Wireless), 01-CC-004454 (St. Louis County Circuit Court) ($25 million settlement in 2007).

**Example of Past Class Action Settlement: *City of Greenville v. Syngenta Crop Prot., Inc.,* 3:10-CV-188-JPG-PMF (S.D. Ill.).**

An example of one of Korein Tillery's past class action settlements is *City of Greenville v. Syngenta Crop Prot., Inc.,* 3:10-CV-188-JPG-PMF (S.D. Ill.). The case resulted in a $105 million class-action settlement designed to compensate Community Water Systems throughout the United States for the cost of removing the pesticide atrazine from public drinking water. Atrazine is used to control broadleaf and grassy weeds in a variety of crops, but is applied primarily to corn fields. Atrazine has been one of the most heavily used pesticides in the U.S. Two of atrazine's key chemical characteristics—that it does not readily bind to soil and that it persists in the environment—dramatically increase atrazine's effectiveness as an herbicide. However, because atrazine does not bind to soil, it easily runs off of fields with rainfall and contaminates surface waters such as rivers, lakes, and reservoirs that act as drinking-water supplies for public water providers.

Plaintiffs alleged that atrazine had continuously entered their water supplies, and, as a result of this contamination, they had to filter atrazine from their water sources. After eight years of litigation, Korein Tillery secured a $105 million settlement fund to be distributed among the class members—consisting of 1,930 Community Water Systems. *City of Greenville v. Syngenta Crop Prot., Inc.,* No. 3:10-CV-188-JPG-PMF, 2012 WL 1948153 (S.D. Ill. May 30, 2012); *see also* 904 F. Supp. 2d 902 (S.D. Ill. 2012) (granting final approval of settlement and attorneys' fees of 33%). The settlement amounted to approximately 76 percent of the $139 million estimated to be the Class's maximum potential recovery. The settlement formula awarded each claimant a payment of $5,000, and then allocated a percentage of the remaining fund based on the extent of atrazine present in the water and the size of the

claimant. Hundreds of water providers received more than $50,000, and some received more than $1.5 million.

To facilitate the settlement claims process, Korein Tillery lawyers collected 20 years of atrazine testing data into a database that was made available to each class member through a settlement website. From there, Claimants were able to view the test data already collected for their system and provide additional evidence of atrazine contamination to claim their share of the settlement fund.

Korein Tillery attorneys went the extra mile to ensure that class members received notice. Notice was sent multiple times by mail and by email, and Korein Tillery lawyers also placed personal phone calls to many class members. The lawyers were able to reach more than 99 percent of class members with estimated claims greater than $10,000. Because of this work, the court noted that the settlement "experienced an unusually high claims rate." *City of Greenville*, 904 F. Supp. 2d at 904. Although many class actions experience claims rates of less than 15 percent, in this case virtually all settlement funds were distributed to class members.

Public Justice honored the Korein Tillery lawyers representing the plaintiffs in this case as finalists for its Trial Lawyer of the Year award.

**Other Recent Work in Class Actions and Complex Litigation:**

***In re: Foreign Exchange Benchmark Rates Antitrust Litigation***: Korein Tillery, working with co-counsel, developed and filed a class action on behalf of individuals who entered into foreign exchange transactions in over-the-counter exchanges and/or on exchanges with dealers, alleging violations of the Sherman Antitrust Act and Commodity Exchange Act. After almost 6 years of work, $2.3 billion in court-approved settlements were reached with 15 of the 16 defendants, constituting one of the largest antitrust class action recoveries in history. Mediator Kenneth Feinberg concluded this settlement "represent[ed] some of the finest lawyering toward a negotiated resolution that I have witnessed in my career," and described Korein Tillery and its co-counsel as "superlative, sophisticated, and determined plaintiffs' lawyers."

***In re GSE Bonds Antitrust Litig.***: Korein Tillery, along with co-counsel, alleged antitrust violations arising from coordinated price-fixing in the secondary market for bonds issued by the government-sponsored entities Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Federal Farm Credit Banks, and Federal Home Loan Banks ("GSE Bonds"). Plaintiffs defeated two motions to dismiss and reached a settlement with all defendants, including Deutsche Bank Securities Inc., First Tennessee Bank, N.A., FTN Financial Securities Corp., Goldman Sachs & Co. LLC, Barclays Capital Inc., BNP Paribas Securities Corp., Cantor Fitzgerald & Co., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, HSBC Securities (USA) Inc., J. P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co., LLC, Nomura Securities International, Inc., SG Americas Securities LLC, TD Securities (USA) LLC, and UBS

Securities LLC. The combined settlement provided $386.5 million to class members and was approved by the court on June 18, 2020.

***Sullivan v. DB Investments, Inc.:*** Korein Tillery represented a nationwide class of diamond purchasers in an antitrust case against the country's largest diamond distributor. That case was consolidated with others in the Eastern District of Pennsylvania and Korein Tillery was appointed co-lead counsel. In that role, the firm helped negotiate injunctive relief and a nationwide settlement that created a $323 million fund to compensate diamond purchasers.

***In re: Google Play Consumer Antitrust Litigation:*** Korein Tillery, working with co-counsel, filed the first consumer class action in the nation alleging that Google's operation of Google Play Store and Google Play Billing, among other actions, created a wrongful monopoly over the distribution of applications and payment for in-application purchases in the Android ecosystem. Over ten similar complaints followed and are now consolidated before Judge James Donato in the Northern District of California, where Korein Tillery serves as a member of the consumer class steering committee.

***National Credit Union Administration Mortgage-Backed Securities Litigation.***
The National Credit Union Administration ("NCUA") is the independent federal agency created by the U.S. Congress to regulate, charter, and supervise federal credit unions. On behalf of the NCUA, Korein Tillery and co-counsel Kellogg, Hansen, Todd, Figel & Frederick filed approximately 20 federal lawsuits throughout 2011-2013 alleging that Wall Street investment banks misled credit unions about the quality of certain residential mortgage-backed securities ("RMBS"), causing billions of dollars of losses that the NCUA insured. More specifically, NCUA alleged that these banks violated the Federal Securities Act by representing in federally-regulated offering documents that all loans backing the RMBS complied with originator underwriting guidelines or had sufficient compensating factors to allow exceptions to the guidelines when in fact the majority of the loans did not.

Throughout several years of contentious litigation, involving several successful appeals, Korein Tillery and Kellogg Hansen obtained more than $5.1 billion in legal settlements on NCUA's behalf, including but not limited to:

- *NCUA v. JP Morgan Chase Bank*, 2:13-cv-02012-JWL (D. Kan.) (obtained $1.4 billion settlement in Dec. 2013);
- *NCUA v. RBS Sec., Inc.*, 1:13-cv-06726-DLC (S.D.N.Y.) (accepted offer of judgment for $129.6 million plus fees in Sept. 2015);
- *NCUA v. Barclays Capital, Inc.*, 1:13-cv-06727-DLC (S.D.N.Y.) & 2:12-cv-02631-JWL (D. Kan.) (obtained $325 million combined settlement in Oct. 2015);
- *NCUA v. Wachovia Capital Markets LLC*, 1:13-cv-06719-DLC (S.D.N.Y.) & 2:11-cv-02649-JWL (D. Kan.) (obtained $53 million combined settlement in Oct. 2015);
- *NCUA v. Morgan Stanley & Co., Inc.*, 1:13-cv-06705-DLC (S.D.N.Y.) & 2:13-cv-02418-JWL (D. Kan.) (obtained $225 million combined settlement in Dec. 2015);

- *NCUA v. Goldman Sachs and Co.*, 1:13-cv-06721-DLC (S.D.N.Y.) & 2:11-cv-06521-GW-JEM (C.D. Cal.) (obtained $575 million combined settlement in Apr. 2016);
- *NCUA v. RBS Sec., Inc. et al.*, 11-cv-2340- JWL-JPO (D. Kan.) & 2:11-cv-05887 GW-JEM (C.D. Cal.) (obtained $1.1 billion combined settlement in Sept. 2016);
- *NCUA v. UBS Securities, LLC*, 2:12-cv-02591-JWL (D. Kan.) (obtained $445 million settlement in Mar. 2017); and
- *NCUA v. Credit Suisse Sec. (USA) LLC*, 2:12-cv-02648-JWL (D. Kan.) (obtained $400 million settlement in Mar. 2017).

NCUA was the first federal regulatory agency for depository institutions to recover losses from investments in these securities on behalf of failed financial institutions. NCUA uses the net proceeds to reduce Temporary Corporate Credit Union Stabilization Fund (Stabilization Fund) assessments charged to federally insured credit unions to pay for the losses caused by the failure of five corporate credit unions.

Korein Tillery and Kellogg Hansen continue to prosecute several lawsuits on behalf of the NCUA against certain RMBS trustees regarding their alleged failure to perform their duties.

### *United States ex rel. Garbe v. Kmart Corp.*, 3:12-cv-00881-NJR-PMF (S.D. Ill.).

Since 2004, Kmart pharmacies have charged low, flat-rate prices for certain generic drug prescriptions when those drugs are purchased by customers who paid entirely out of their own pockets with no insurance coverage. Since the beginning of the Medicare Part D drug program on January 1, 2006, however, Kmart has charged higher prices—often significantly higher prices—to customers with Medicare Part D coverage than it charges self-paying customers for the same prescription. For example, Kmart charged cash customers $10 for a 60-day supply of 500 mg Naproxen (available in non-prescription strength as Aleve®), but charged the Government $58.79 for the same prescription.

Korein Tillery and co-counsel Phillips & Cohen filed a False Claims Act case against Kmart after the Government declined to intervene. In the litigation, Kmart never disputed that it charges cash-paying customers lower prices than it charges to the Government. Instead, Kmart contended that it was never required to charge the Government the lower prices because those are not the prices Kmart charges to "the general public." Rather, Kmart claimed its cash-customers are not the "general public" but rather members of an exclusive "club" through which they are offered the discount prices, even though as a practical matter the discount prices are the prices Kmart charges to all its cash customers. Kmart also has no record of denying any cash-paying customer "membership" in Kmart's "club." The U.S. District Court for the Southern District of Illinois rejected Kmart's arguments and denied its motions for summary judgment. Kmart appealed, but the Seventh Circuit affirmed the district court in large part. *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016). After remand, the case settled in late 2017 with Kmart agreeing to pay approximately $59 million.

***Lightfoot v. Arkema, Inc. Ret. Benefits Plan,*** **CIV. 12-773 JBS/JS (D.N.J.).**
After the court certified a class of present and former retirement benefits plan participants, plaintiffs filed a motion for partial summary judgment on the issue of whether the COLAs the Plan promised to participants who elected annuities were part of participants' "accrued benefit" under ERISA. The Plan countered with a motion for summary judgment arguing the statute of limitations had run on all class members' claims owing to statements in a 1994 Summary Plan Description (SPD) and other plan documents. Although the same judge had previously ruled that the statements in the SPD and Plan were "clear repudiations" in a companion case, Korein Tillery convinced the court to deny the Plan's motion for summary judgment and to grant plaintiffs' motion for partial summary judgment, finding that the COLAs promised annuitants were accrued benefits. 2013 WL 3283951 (D.N.J. June 27, 2013). The case settled in 2014 with the average class member receiving $11,000 in cash that could be rolled into a retirement account.

***Missouri Utility Tax Litigation***
Since 2007, Korein Tillery has represented Missouri municipalities in class action litigation that sought to recover unpaid license taxes. In suits against wireless and wireline carriers, Korein Tillery attorneys recovered hundreds of millions of dollars of license tax revenues—both retrospectively and prospectively—for more than 350 cities throughout Missouri. Korein Tillery has recovered more than $1 billion for Missouri municipalities. As a result of their work in these cases, the Missouri Lawyers Weekly recognized Korein Tillery partners John W. Hoffman and Douglas R. Sprong with awards in the "largest plaintiff wins" category in 2007, 2009, 2010, 2015, and 2017, and John W. Hoffman and Garrett Broshuis with the award of "largest judgment or bench award" in Missouri in 2021.

In 2012, Korein Tillery was successful in persuading the Supreme Court of Missouri to issue an extraordinary writ (mandamus) declaring unconstitutional a state statute that sought to sweep away this litigation by barring cities and towns from serving as class representatives. *State ex rel. Collector of Winchester v. Jamison*, 357 S.W.3d 589 (Mo. 2012).

***Mansfield v. ALPA,*** **06-c-6869 (N.D. Ill.).**
Beginning in 2001, United Airlines encountered financial difficulties that ultimately culminated in its filing for bankruptcy protection. During the course of United's reorganization in bankruptcy, United sought to terminate its pilots' defined benefit pension plan. In exchange for ALPA's agreement not to oppose the termination of the pension plan, United agreed to provide ALPA with $550 million in convertible notes. ALPA, through its United Airlines Master Executive Council ("MEC"), was tasked with allocating the proceeds from the sale of the convertible notes among the pilots. The MEC selected an allocation method that divided the note proceeds based upon each pilot's lost accrued benefits and lost projected benefits.

Korein Tillery filed this case in 2006 contending that ALPA breached its duty of fair representation in discriminating between its members in allocating the proceeds from the sale of $550 million in convertible notes. Korein Tillery prevailed on a number of complex

and novel issues in the trial court. For example, ALPA moved to exclude retirees from the class, arguing that a union owes no duties to retired pilots under the Railway Labor Act. The court denied ALPA's motion, agreeing with plaintiffs that because ALPA represented the retirees when it negotiated the convertible notes, it owed them a duty even though the retirees were no longer a part of the bargaining unit. *Mansfield v. ALPA*, 2007 WL 2903074 (N.D. Ill. Oct. 1, 2007). After Korein Tillery also successfully opposed motions for summary judgment, 2009 WL 2386281 (N.D. Ill. Jul. 29, 2009), and to decertify the class, 2009 WL 2601296 (N.D. Ill. Aug. 20, 2009), the parties reached a settlement two weeks before trial. Per the settlement, ALPA funded an aggregate settlement fund of $44 million to be paid directly to class members. *Mansfield v. ALPA*, No. 06C6869 (N.D. Ill. Dec. 14, 2009). The settlement is believed to be one of the largest ever in a duty of fair representation case, in which unions are sued over their responsibility to fairly represent their members.

### *Williams v. Rohm & Haas Pension Plan*, 4:04-cv-0078-SEB-WGH (S.D. Ind.).

Korein Tillery filed this class action in 2002 alleging that the Rohm & Haas Pension Plan violated ERISA by failing to include the value of future cost-of-living adjustments (COLA) in calculating lump-sum distributions from the Plan. After eight years of litigation, Korein Tillery obtained one of the largest settlements in the history of ERISA—$180 million. In 2006, the case was certified and Korein Tillery won summary judgment convincing the district court that the terms of the Plan violated ERISA because a COLA is an "accrued benefit" requiring that it be included in lump-sum distributions. The district court's decision was affirmed on interlocutory appeal. *Williams v. Rohm & Haas Pension Plan*, 497 F.3d 710, 714 (7th Cir. 2007) ("If a defined benefit plan entitles an annuitant to a COLA, it must also provide the COLA's actuarial equivalent to a participant who chooses instead to receive his pension in the form of a one-time lump sum distribution."), *cert. denied*, 128 S. Ct. 1657 (2008). Settlement approval and the fee award were later affirmed. 658 F.3d 629 (7th Cir. 2011).

### *Parker v. Sears, Roebuck & Co.*, Case No.: 04-L-716 (Ill. Cir. Ct. Sept. 18, 2007).

Korein Tillery brought this action against Sears in 2004 to remedy Sears's failure to install anti-tip safety devices, which prevent ranges from tipping over and severely burning or injuring unsuspecting consumers, on ranges that it sold, delivered, and set-up in customers' homes. In the 1960s and 1970s, kitchen range manufacturers started reducing the weight of metal in an effort to competitively lower the price of kitchen ranges. Over the course of several years, advances in materials allowed manufacturers to produce ranges which were durable and light weight. However, because the oven doors on the front of the ranges serve as a lever and fulcrum, the light weight of the new ranges created an extremely dangerous tipping hazard. For example, if a person were to place a turkey roaster on an open and horizontal oven door, the added weight would cause these newly designed ranges to tip forward, spilling the hot contents onto anyone standing in the vicinity. Children who opened the range and used the door as a step could unwittingly tip boiling liquids onto themselves. Dozens of people had been killed and hundreds had been maimed as a result of this problem.

Recognizing the need for a solution to this dangerous hazard, manufacturers and regulators began requiring installation of an anti-tip bracket that could be attached to the wall or floor at the back end of the range, preventing any forward tipping and maintaining complete stability. The installation is simple and the lightweight bracket costs pennies. The rule making bodies of most codes (BOCA Code, National Electrical Code; numerous other industry codes) thereafter required the installation of anti-tip brackets in all range installations in the United States. Even Sears acknowledged that a properly installed anti-tip bracket completely eliminates the hazards of tipping stoves.

Sears, Roebuck & Company at the time was the largest retail seller of kitchen ranges in the United States—averaging more than 800,000 ranges sold every year. When selling a gas or electric range, Sears generally includes delivery, installation, and hookup in customers' homes; thus, Sears became the largest installer of kitchen ranges in the United States. To increase its profits, Sears adopted a policy of refusing to install anti-tip brackets during normal installation unless the customer agreed to incur a substantial cost. At the same time, Sears failed to disclose the hazards associated with forgoing anti-tip bracket installation.

In January 2008, the Court granted final approval of a settlement which provided complete relief to the class by requiring Sears to install anti-tip brackets for the affected members of the class as well as requiring the installation of such brackets in the future. The settlement is valued at more than $544.5 million.

This settlement was touted by the public interest organization Public Citizen as an example of how consumer class actions benefit society. Public Citizen nominated Stephen Tillery as Trial Lawyers for Public Justice's Trial Lawyer of the Year based upon his role in this case.

***Hoormann v. SmithKline Beecham Corp.*, 04-L-715 (Ill. Cir. Ct. May 17, 2007).**
In July 2004, Korein Tillery filed suit on behalf of a nationwide class of purchasers alleging that SmithKline Beecham promoted Paxil® and Paxil CR™ for prescription to children and adolescents despite having actual knowledge that these drugs exposed children and adolescents to dangerous side effects while failing to treat their symptoms. Following three years of litigation, Korein Tillery obtained a settlement that established a $63.8 million dollar fund to reimburse class members 100 percent of their out-of-pocket expenses. This case was featured in The American Lawyer, Aruna Viswanatha, *King & Spalding Lawyer Stirs State Judge's Ire*, [29] 1 Am.Law., Jan. 2007, at 50, and mentioned in the National Law Journal. *The Plaintiffs' Hot List*, 30 Nat'l L.J. S8 (Nov. 22, 2007).

**CUNA Mutual Mortgage-Backed Securities Litigation.**
CMFG Life Insurance Company, CUMIS Insurance Society, Inc., and MEMBERS Life Insurance Company (collectively referred to as "CUNA Mutual") are financial services and insurance firms that offer insurance, investment, and retirement products and services to credit unions and their members. Korein Tillery and Kellogg Hansen filed a series of individual lawsuits in 2011 and 2013 on behalf of CUNA Mutual against eight Wall Street

investment banks seeking to recover losses on $300 million of RMBS purchases using the novel common-law theory of contract rescission.

As in NCUA, CUNA Mutual alleged that the banks misrepresented in offering documents that all loans backing the RMBS complied with originator underwriting guidelines or had sufficient compensating factors to allow exceptions to the guidelines. CUNA Mutual also alleged that the banks misrepresented that it conducted due diligence to verify the accuracy of its offering document representations. In mid-2015, an appellate court issued a favorable opinion in CUNA Mutual's bellwether case approving of CUNA Mutual's primary litigation arguments. *CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729 (7th Cir. 2015). On remand, the case settled in December 2015 for a confidential amount. CUNA Mutual eventually settled its remaining RMBS cases over the next two years for confidential amounts. *See, e.g., CMFG Life Ins. Co. v. Credit Suisse Sec. (USA) LLC*, 3:14-cv-00249-wmc (W.D. Wis.) (settled in Oct. 2017); *CMFG Life Ins. Co. v. Morgan Stanley & Co., LLC*, 3:13-cv-00577-jdp (W.D. Wis.) (settled in Sept. 2017); *CMFG Life Ins. Co. v. J.P. Morgan Sec, LLC*, 3:13-cv-00580-wmc (W.D. Wis.) (settled in Mar. 2016).

**Axiom Investment Advisors, LLC v. Barclays Bank PLC, No. 15-cv-9323-LGS (S.D.N.Y.) (Schofield, J.).**
From 2008 to 2015, Barclays Bank PLC acted as both a buyer and seller of various foreign and domestic currencies through various trading platforms. Instead of executing foreign exchange orders placed by Barclays' customers on these platforms, Barclays instituted a secret "last look" policy that delayed execution of matched trades for several hundred milliseconds or even several seconds which allowed Barclays to determine through its algorithms whether the trade would be unfavorable to its position. If the matched trade would be unfavorable, Barclays reneged on the agreed price and rejected the trade or placed the order at a worse price. Barclays used last look to reject millions of trades that would otherwise have been executed.

Korein Tillery, along with its co-counsel Scott+Scott, Attorneys at Law, LLP and Hausfeld LLP, filed a class action against Barclays Bank PLC regarding its use of "last look," raising breach of contract and other claims. The court appointed Korein Tillery and Scott+Scott as class counsel. Counsel was successful in securing a $50 million settlement from Barclays on behalf of the class, which the court ultimately approved.

**Key Team Members:**

*Stephen M. Tillery*

Stephen Tillery is the senior and founding member of the firm. With more than 35 years of trial experience, Mr. Tillery has acted as lead counsel in hundreds of complex cases at both the trial and appellate levels that have resulted in some of the largest trial verdicts and settlements in the United States. Steve has been appointed lead counsel in more than 40 class action lawsuits. In March 2003, Steve served as plaintiff's lead trial counsel in a class action trial that resulted in a $10.1 billion verdict. *Price v. Philip Morris Inc.*, 2003 WL 22597608 (Ill.Cir. Mar 21, 2003), rev'd, 848 N.E.2d 1 (Ill. Dec 15, 2005), reh'g denied, 846 N.E.2d 597 (Ill. May 5, 2006), cert denied, 127 S.Ct. 685 (Nov. 27, 2006).

Mr. Tillery completed his undergraduate studies at Illinois College (B.A. *magna cum laude*, Phi Beta Kappa) in 1972. Thereafter he attended Saint Louis University School of Law (J.D. *cum laude*, Order of the Woolsack, 1976). While obtaining his law degree, Mr. Tillery was a law clerk for the Honorable James L. Foreman, United States District Court for the Southern District of Illinois. Following graduation from law school, he was a law clerk to the Honorable George J. Moran, Fifth District Court of Appeals of Illinois.

Mr. Tillery is a member of the Illinois Trial Lawyers Association, where he has been one of the elected Board of Managers since 1987, and for which he has chaired and served on numerous committees. Mr. Tillery is also a member of the Illinois Bar Association, the Missouri Association of Trial Attorneys, the St. Louis Metropolitan Bar Association, the St. Clair County Bar Association, and the American Association for Justice. He serves as a board member of Public Justice. He was named Litigation Daily's Litigator of the Week on May 1, 2014, for successfully reinstating the trial court's $10.1 billion verdict in *Price v. Philip Morris, Inc.*, 2014 IL App (5th) 130017, 2014 WL 1696280 (Ill. App. Ct. Apr. 29, 2014).

Mr. Tillery has written numerous legal articles and has served as lecturer, moderator, and panel member at dozens of legal seminars relating to litigation and trial practice. He was an adjunct professor at Saint Louis University School of Law for eleven years, and was Co-Director of the Advanced Trial Advocacy Program there from 1983 to 1988.

*Garrett R. Broshuis*

Garrett Broshuis, a partner at Korein Tillery, received his J.D. from Saint Louis University, where he graduated valedictorian and served as Editor-in-Chief of the school's Law Journal. Since joining Korein Tillery, Garrett has performed prominent roles in some of the most complex cases in the country. In addition to his lead role in *Senne*, he currently represents a class of pensioners in the Northern District of Georgia challenging the termination of their defined benefit plans, and in the past has worked on securities cases emanating from the failure of the mortgage-backed securities market during the financial crisis.

Garrett also represents classes of Missouri municipalities in actions against Fortune 500 and other large companies, and putative classes of Indiana municipalities in similar cases. In one

case, Garrett successfully represented Indiana cities before the Seventh Circuit Court of Appeals, both arguing and serving as lead brief writer on the appeal. *City of Fishers, Indiana v. DIRECTV*, 5 F.4th 750, 751 (7th Cir. 2021). In another, he was part of a trial team that recently achieved a nearly $40 million verdict on behalf of Missouri cities. The team earned an award for largest judgment in Missouri in 2021.

He is also an adjunct professor at Saint Louis University School of Law and often speaks at conferences and law school symposia.

Before law school, Garrett played six years as a pitcher in the San Francisco Giants' organization, working at all levels of minor league baseball. For four of those years, he wrote regular columns on life in minor league baseball for *The Sporting News* and *Baseball America*. Garrett received his undergraduate degree from the University of Missouri, where he graduated *summa cum laude* and was inducted into Phi Beta Kappa. In 2004, he earned both All-American and Academic All-American honors in baseball and was a finalist for the Big 12 Conference Male Athlete of the Year. He also earned the University of Missouri's Total Person Program Excellence Award three times.

### Marc A. Wallenstein

Marc Wallenstein is a partner at the firm. He is a former federal prosecutor who has more than a decade of experience in federal public service. Marc has tried numerous cases to verdict and appeared in court on a daily or weekly basis for much of his career.

Marc is a graduate of Harvard College and Yale Law School. After law school, he served as a law clerk in the Southern District of New York and on the United States Court of Appeals for the Ninth Circuit.

In addition to his work on this case, Marc is currently on the lead or co-lead class counsel teams in four class action lawsuits against Google.

Before joining Korein Tillery, Marc served for six years as an Assistant U.S. Attorney in the District of Hawaii, where he gained expertise in national security matters, financial crime, procurement fraud, health care fraud, public corruption, cyber crime, environmental crime, and crimes against children. Marc served as Computer Hacking and Intellectual Property (CHIP) Coordinator, responsible for complex issues related to computer crime and electronically stored information, as an Anti-Terrorism Advisory Coordinator (ATAC), responsible for national security investigations and prosecutions, and as a member of the Department of Justice's Cryptocurrency Working Group. Marc prosecuted the first terrorism case against an active duty member of the U.S. military, and obtained record fines in numerous environmental cases, including the largest marine pollution fine in District history. Marc has received several awards from the Department of Justice and the Federal Bureau of Investigation for his work.

Prior to his time at the Department of Justice, Marc served for three years as a Prosecutor at the Office of the Chief Prosecutor of Military Commissions, U.S. Department of Defense.  In that capacity, Marc prosecuted violations of the law of war committed by enemy alien belligerents before a military commission in Guantanamo Bay, Cuba.  Among other responsibilities, Marc served as a litigation team chief, managing attorneys, paralegals, FBI agents, analysts, and staff.  Marc also served as an appellate and pretrial motions attorney on a range of cases, including the prosecution of Khalid Shaikh Mohammed and four others accused of perpetrating the attacks of September 11, 2001.

Marc previously worked for three years at Kellogg, Hansen, Todd, Figel, and Frederick PLLC, in Washington DC, where he conducted complex civil litigation. Among other matters, he represented the National Credit Union Administration against Wall Street banks for failed investments in residential mortgage-backed securities, with co-counsel from Korein Tillery.

Marc maintained an active Top Secret/SCI security clearance throughout his federal employment.

Before he became an attorney, Marc worked as a travel writer in Italy, Australia, and Hawaii. Marc works from his home in Honolulu, Hawaii, and is an avid surfer.

### Diane Moore

Diane Moore has devoted her career to representing plaintiffs in complex litigation. Since joining Korein Tillery in 2000, she has worked on all aspects of a variety of complex cases, from inception through appeal, including cases under federal and state securities laws, the Real Estate Settlement Procedures Act (RESPA), the Employee Retirement Income Security Act (ERISA), and the Telephone Consumer Protection Act (TCPA).

Most recently, Diane spent the last five years working to obtain compensation for hundreds of individual clients who claimed they developed Parkinson's disease as a result of long-term, low-dose exposure to a pesticide in coordinated actions pending in state court in Illinois and California. The case involved complex issues regarding preemption under the Federal Insecticide, Fungicide and Rodenticide Act and complex issues regarding proof of causation of neurological injury as a result of occupational/environmental exposure to agricultural chemicals.

Diane previously worked on the team of attorneys who represented the National Credit Union Administration in residential mortgage-backed securities (RMBS) litigation against many of the largest Wall Street investment banks, resulting in over $5 billion in settlements. Earlier in her career with Korein Tillery, Diane assisted on numerous successful ERISA cases challenging the calculation of retirees' lump sum pension benefits under "cash balance" pension plans that resulted in hundreds of millions of dollars of additional pension benefits for retirees of several Fortune 500 companies. She was also appointed class counsel in several TCPA class actions.

Diane received her Bachelor of Arts magna cum laude from St. Louis University in 1993 and her Juris Doctor cum laude from St. Louis University School of Law in 1998, where she was awarded Order of the Woolsack and where she served as Associate Editor of the St. Louis-Warsaw Transatlantic Law Journal. She spent the two years following law school as a judicial clerk for the Honorable Lawrence Mooney, Missouri Court of Appeals Eastern District.

Diane is an avid reader and enjoys travel and painting. For many years, Diane volunteered as an English as a second language tutor for Catholic Charities.  Diane works from home in San Diego, California.

# EXHIBIT B

## Korein Tillery Lodestar

| Name | Status | Rate | Hours | Amount |
|------|--------|-----:|------:|-------:|
| Steve Tillery | Partner | $ 1,295 | 1,220.10 | $ 1,580,029.50 |
| George Zelcs | Partner | $ 1,200 | 547.70 | $ 657,240.00 |
| Robert Litan | Partner | $ 1,150 | 10.40 | $ 11,960.00 |
| John Hoffman | Partner | $ 950 | 15.00 | $ 14,250.00 |
| Robert King | Partner | $ 950 | 1,361.70 | $ 1,293,615.00 |
| Marc Wallenstein | Partner | $ 950 | 779.80 | $ 740,810.00 |
| Aaron Zigler | Partner | $ 900 | 3,497.50 | $ 3,147,750.00 |
| John Libra | Partner | $ 900 | 7.80 | $ 7,020.00 |
| Steve Berezney | Partner | $ 850 | 4.50 | $ 3,825.00 |
| Giuseppe Giardina | Partner | $ 800 | 444.30 | $ 355,440.00 |
| Jamie Boyer | Partner | $ 800 | 305.20 | $ 244,160.00 |
| Garrett Broshuis | Partner | $ 725 | 3,297.90 | $ 2,390,977.50 |
| Garrett Broshuis | Associate | $ 525 | 7,363.90 | $ 3,866,047.50 |
| Diane Moore | Associate | $ 700 | 968.30 | $ 677,810.00 |
| Andrew Ellis | Associate | $ 650 | 8.00 | $ 5,200.00 |
| Chad Bell | Associate | $ 575 | 4.20 | $ 2,415.00 |
| Jeanine Bermel | Associate | $ 550 | 1,154.70 | $ 635,085.00 |
| Jo Dee Farve | Associate | $ 525 | 568.80 | $ 298,620.00 |
| Justin Stephens | Associate | $ 525 | 451.90 | $ 237,247.50 |
| Chris Hoffman | Associate | $ 500 | 20.10 | $ 10,050.00 |
| Matthew Davies | Associate | $ 500 | 46.30 | $ 23,150.00 |
| Michael Forrest | Associate | $ 500 | 1,631.60 | $ 815,800.00 |
| Peter Rocque | Associate | $ 500 | 1,008.60 | $ 504,300.00 |
| Devin Dippold | Associate | $ 450 | 403.70 | $ 181,665.00 |
| Heidi Johnson | Associate | $ 450 | 1,899.60 | $ 854,820.00 |
| Noah Smith-Drelich | Associate | $ 450 | 196.40 | $ 88,380.00 |
| Stephanie Clerkin | Dir. of Lit. Support | $ 400 | 494.30 | $ 197,720.00 |
| Charles Clark | Staff Attorney | $ 350 | 704.10 | $ 246,435.00 |
| Ian Moody | Staff Attorney | $ 350 | 152.50 | $ 53,375.00 |
| Jennie Simons | Staff Attorney | $ 350 | 553.20 | $ 193,620.00 |
| Josephine Dudek | Staff Attorney | $ 350 | 581.10 | $ 203,385.00 |
| Kyle Bass | Staff Attorney | $ 350 | 1,665.40 | $ 582,890.00 |
| Lynn Preece | Staff Attorney | $ 350 | 629.00 | $ 220,150.00 |
| Paige Tungate | Staff Attorney | $ 350 | 98.10 | $ 34,335.00 |
| Ryan White | Staff Attorney | $ 350 | 594.80 | $ 208,180.00 |
| Stephen Bruno | Staff Attorney | $ 350 | 1,543.60 | $ 540,260.00 |
| Tori Tobin | Staff Attorney | $ 350 | 1,833.80 | $ 641,830.00 |
| Marissa Sims | Law Clerk | $ 250 | 23.50 | $ 5,875.00 |
| Rob Iversen | Law Clerk | $ 250 | 132.00 | $ 33,000.00 |
| Zach Miller | Law Clerk | $ 250 | 94.30 | $ 23,575.00 |
| Jerry Brown | Sr. Investigator | $ 225 | 605.00 | $ 136,125.00 |
| Juanita Brumitt | Paralegal | $ 200 | 56.10 | $ 11,220.00 |
| Leann Eckhardt | Paralegal | $ 200 | 809.00 | $ 161,800.00 |
| Lisa Greiner | Paralegal | $ 200 | 933.20 | $ 186,640.00 |
| Lisa Lucas | Paralegal | $ 200 | 596.20 | $ 119,240.00 |
| Megan Epperson | Paralegal | $ 200 | 230.10 | $ 46,020.00 |
| Sheila Sortor | Paralegal | $ 200 | 97.90 | $ 19,580.00 |
| Tracee Tidwell | Paralegal | $ 200 | 17.60 | $ 3,520.00 |
| Alicia Alvero Koski | Analyst | $ 200 | 27.50 | $ 5,500.00 |
| Amelia Earnest | Analyst | $ 200 | 595.80 | $ 119,160.00 |
| James McGanney | Analyst | $ 200 | 2.30 | $ 460.00 |

### Korein Tillery Lodestar

| Name | Status | Rate | Hours | Amount |
|------|--------|------|-------|--------|
| Jason Lese | Analyst | $ 175 | 7.00 | $ 1,225.00 |
| Jenifer Hartley | Analyst | $ 175 | 7.30 | $ 1,277.50 |
| Jocelyn Perry | Analyst | $ 175 | 80.00 | $ 14,000.00 |
| Elliot Brown | Jr. Investigator | $ 175 | 784.10 | $ 137,217.50 |
| | | | 41,166.80 | $ 22,795,282.00 |

# EXHIBIT C

Korein Tillery Costs

**Expense Summary**

| | | |
|---|---|---:|
| Miscellaneous | $ | 7,667.44 |
| Research | $ | 238,203.41 |
| Postage/Shipping | $ | 24,904.31 |
| E Discovery | $ | 98,695.01 |
| Record Duplication | $ | 26,686.63 |
| Travel, Lodging, Meals, etc. | $ | 248,420.07 |
| Expert Services | $ | 2,870,363.09 |
| Court Costs | $ | 6,195.30 |
| Depositions/Transcripts | $ | 433,727.67 |
| Conference Calls | $ | 2,548.84 |
| Funds Received | $ | (1,091,928.12) |
| **Total Expenses** | **$** | **2,865,483.65** |