UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON SENNE, et al., | Case No.  14-cv-00608 JCS |
| Plaintiffs, | |
| v. | **ORDER RE:** |
| KANSAS CITY ROYALS BASEBALL CORP., et al., | **MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; RESPONSE TO OBJECTIONS** |
| Defendants. | **MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS AND INCENTIVE AWARDS** |
| | [Dkt. Nos. 1147, 1173] |

## I.       INTRODUCTION

        The parties in this case have entered into a class action settlement.  Following preliminary approval of the settlement by the Court, *see* dkt. no. 1147, on August 26, 2022, notice was sent to class members, who were given the opportunity to object to the settlement or opt out. Objections have been received from class member Eddy Vizcaino, *see* dkt. no. 1163, and a group of individuals who describe themselves as "*Marti* plaintiffs,"[1] *see* dkt. no. 1158 (collectively,

---

[1] The objections in dkt. no. 1158 are asserted on behalf of twelve individuals:  Yadel Marti, Helder Velazquez, Jose Diaz, Braham Maldonado, Anthony Garcia, Daniel Concepcion, Sidney Dupre Conde, Aldemar Burgos, Sergio Miranda, Jorge Charry, Juan Valdez, and Cirilo Cruz. Dkt. no. 1158 at 1. They are described as "named plaintiff class members" in the later-filed case *Marti v. Office of the Commissioner of Baseball*, No. 3:14-cv-03289, which was consolidated with this case in 2014.  Dkt. no. 235. However, only four of these individuals are named plaintiffs in the *Marti* action: Yadel Marti, Helder Velazquez, Jose Diaz, and Braham Maldonado.  Of the remaining eight individuals, one – Jorge Charry – has opted out of the Rule 23(b)(3) class, *see* dkt. no. 1160; another – Cirilo Cruz – does not appear to be a class member. *See* Defendants' Response to the Objections to Final Approval of Settlement and Notice of Intent to Object ("Defendants' Response to *Marti* Objections"), dkt. no. 1174 at 3 n. 3 ("There is also no dispute regarding one Objector, Cirilo Cruz, who Plaintiffs assert in the Final Approval Motion is not a class member according to records and lacks standing to object."). For convenience, the Court refers to these individuals as the "*Marti* Objectors."  However, the Court's use of that term is not intended to

"Objections"). Presently before the Court are Plaintiffs' Motion for Final Approval of Class Action Settlement; Response to Objections ("Final Approval Motion") and a Motion for Attorneys' Fees, Litigation Costs and Incentive Awards ("Fee Motion"). A Final Fairness Hearing was held on February 17, 2023 at 9:30 a.m.[2] At the hearing, attorneys Samuel Kornhauser and Brian David appeared on behalf of the *Marti* Objectors. Mr. Vizcaino did not appear at the hearing. For the reasons set forth below, the Court GRANTS both motions and overrules the Objections.[3]

## II.   BACKGROUND

### A.   Overview of Settlement Agreement Terms

The proposed settlement consolidates the Court's already-certified Rule 23(b)(3) classes into a single (b)(3) class, with a class membership cutoff of the date of preliminary approval, defining the (b)(3) class as follows:

> All persons who: while signed to a Minor League Uniform Player Contract, participated in the California League for at least seven days on or after February 7, 2010 through the date of preliminary approval, participated in spring training, instructional leagues, or extended spring training in Florida on or after February 7, 2009 through the date of preliminary approval, or participated in spring training, instructional leagues, or extended spring training in Arizona on or after February 7, 2011 through the date of preliminary approval. Provided, however, that participation in the activities set forth above must have occurred prior to that person's signing a Major League Uniform Player Contract.

reflect a finding that all of them are *Marti* named plaintiffs, or even class members in this case. The Court notes that at the fairness hearing, *Marti* counsel stipulated that Jorge Charry has opted out of the class. He also conceded that he had no evidence to suggest that Class Counsel is incorrect in their assertion that Cirilo Cruz is not a member of the class.

[2] On February 6, 2023, shortly before the fairness hearing was scheduled to occur, the parties alerted the Court that they had discovered a small group of class members (approximately 350 individuals) who had been omitted from the class list provided to the settlement administrator. Dkt. no. 1178. The Court approved a schedule for giving notice to these newly discovered class members, including a deadline of March 23, 2023 to opt out or object to the settlement. Dkt. no. 1179. According to the Submission Regarding Supplemental Notice Statistics filed by Plaintiffs on March 28, 2023 (dkt. no. 1189) ("Supplemental Notice Submission"), notice was given to these class members in accordance with the Court's order and none of these class members objected to the settlement or opted out. Therefore, the Court finds that it is not necessary to conduct a supplemental fairness hearing. At the February 17, 2023 fairness hearing, Class Counsel and counsel for Defendants agreed that no further hearing would be required in connection with the pending motions if none of the recently-discovered class members objected to the settlement.

[3] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

2

1   Settlement Agreement (dkt. no. 1128-1) ¶ 1(nn).  It further calls for the Court to maintain the

2   certification of the previously certified Rule 23(b)(2) class and the FLSA collective. *Id.* ¶¶ 1(s) &

3   (mm).

4       The Settlement Agreement creates a gross settlement fund of $185 million (defined in the

5   Settlement Agreement as the "Maximum Settlement amount").  *Id.* ¶ 1(x).  The Net Settlement

6   Amount, which is to be distributed to the Rule 23 class and FLSA collective members (defined,

7   collectively, as "Class Members," *id.* ¶ 1(h)), is the gross amount minus the following: 1)

8   attorneys' fees (an award of up to one third of the gross settlement amount is permitted under the

9   Settlement Agreement), *id.* ¶ 1(o); 2) costs not to exceed $5.5 million, *id.*;  3) incentive awards of

10  $15,000 for each class representative and $7,500 for named plaintiffs who are not be proposed as

11  class representatives, *id.* ¶ 1(t); 4) administration costs of the settlement, *id.* ¶ 1(z); and 5) 75

12  percent of the agreed settlement amount of $2,315,200.00 under the California Labor Code Private

13  Attorneys General Act of 2004, Cal. Lab. Code §§ 2698, *et seq*. ("PAGA"), which will be paid to

14  the California Labor and Workforce Development Agency ("LWDA").[4] *Id.* ¶ 1(ss).

15      The settlement amount is non-reversionary and class members are not required to file a

16  claim to receive an award.  *Id.*  ¶¶ 1(x), 14-16.  The Settlement Agreement establishes a method

17  for calculating each class member's award using Defendants' records relating to the periods when

18  the class member worked and the location of the work:

19          (a) Defendants' records will be used to determine the work periods
            that each Participating Class Member participated in during the
20          relevant years. The work periods include: (1) spring training,
            extended spring training, and instructional league from either
21          2009 to the date of Preliminary Approval in Florida, or 2011 to
            the date of Preliminary Approval in Arizona; (2) the California
22          League, from 2010 to the date of Preliminary Approval; and (3)
            championship seasons outside the California League, from the
23          start of the statute of limitations for the state in which the class
            member's minor league team is located to the date of Preliminary
24          Approval. For each workweek within a work period, an estimate
            of hours worked will be applied. Minimum wage rates in effect at
25          the time the work occurred will be taken into account when
            calculating the amount of damages owed in a workweek. Each
26          person's "individual damages" will be the difference between

27  _____

28  [4] The remaining 25 percent of the PAGA Amount will be included in the Net Settlement Amount
    to be paid to class members.  *Id.*

what he allegedly should have been paid versus what he was actually paid according to Defendants' records; for work performed during relevant years during the championship season outside the California League, a 50% reduction will be applied. Any liquidated damages available under Arizona, Florida, and California law will be taken into account when calculating a person's individual damages, as will any statutory penalties under Arizona and California law.

(b) The calculation of Settlement Award determinations pursuant to this Section 16 shall be based on the pro rata portion of the Net Settlement Fund that each Participating Class Member is entitled to. The pro rata payment will be calculated by multiplying the proportional share that each Participating Class Member is entitled to by the Net Settlement Fund. That proportional share will be determined by dividing the aggregate total of all Participating Class Member's alleged individual damages by the individual Participating Class Member's damages.

*Id.* ¶ 16. Class members will have ninety days to cash their checks and unclaimed funds are to be distributed in a second round of payments, pro rata, to participating Class Members who timely cashed their checks unless, "in the sole discretion of Class Counsel, the amount remaining is too small to justify the expense of a redistribution[.]" *Id.* ¶¶ 18-19. In that case, the unclaimed funds will be donated to the *cy pres* designated by the parties in the Settlement Agreement, Legal Aid at Work. *Id.* ¶¶ 1(e), 19.

Rule 23(b)(3) class members, who were previously allowed to opt out after class certification, were given another opportunity to opt out, with the deadline for this opt-out period set at sixty days after the settlement notice. *Id.* ¶ 1(kk). The Settlement Agreement also includes a provision allowing class members to correct their employment information and/or challenge the calculation of their settlement award. *Id.* ¶ 5.

The Settlement Agreement provides for the following injunctive relief for the Rule 23(b)(2) class:

a) within ten (10) business days of the Effective Date of the Agreement, MLB will rescind any and all contractual prohibitions against Major League Clubs paying wages to minor league players outside of the championship season.

b) Within ten (10) business days of the Effective Date of the Agreement, MLB will send a memorandum to the Major League Clubs specifically stating that, "The Office of the Commissioner has rescinded any and all contractual prohibitions against Clubs paying wages to minor league players outside of the championship season, and accordingly, each Club is advised that

it must compensate minor league players in compliance with wage-and-hour laws in effect in Arizona and Florida during spring training, extended spring training, instructional leagues, and the championship season in those states, including any minimum wage laws that apply."

*Id.* ¶¶ 21(a) & (b).  The Settlement Agreement further provides that "[t]he Court shall retain jurisdiction over MLB with respect to the Rule 23(b)(2) Class to enforce MLB's obligations under this Section 21." *Id.* ¶ 21(d).

The Settlement Agreement contains the following release provision:

10. **Releases**. Provided there is Final Approval of the Settlement by the Court, in exchange for the consideration set forth in this Agreement, each Named Plaintiff, Class Representative, Participating Class Member, Rule 23(b)(2) Class Member, and Aggrieved Employee, individually and on behalf of all of their respective successors, assigns, agents, attorneys, executors, heirs and personal representatives, shall fully and finally release and discharge the Released Parties as set forth herein.

a. **The "Released Claims."** All Named Plaintiffs, Class Representatives, and Rule 23(b)(3) Class Members who do not timely submit a valid Request for Exclusion, consistent with the terms set forth in this Agreement, will release the Released Parties from any and all claims pled, or which could have been pled, in the Second Consolidated Amended Complaint (the "SCAC") arising out of and/or based on the facts alleged in the SCAC, whether known or unknown, for any wage-and-hour claims based on the performance of services pursuant to a Minor League Uniform Player Contract. This release includes claims for wages, penalties, interest, attorneys' fees, restitution, and/or costs, and including, without limitation, claims for: unpaid minimum wages, unpaid overtime, failure to provide meal periods or unpaid meal period premiums, failure to provide rest periods or unpaid rest period premiums, untimely final wages, untimely wages during employment, non-compliant itemized wage statements, failure to maintain required payroll records, and unreimbursed business expenses under any state, territory, or local wage-and-hour-law and/or common law on behalf of the Named Plaintiffs, Class Representatives, and Participating Class Members. In addition, the FLSA Collective Members will release the Released Parties from any and all claims pled or which could have been pled in the SCAC arising out of and/or based on the facts alleged in the SCAC, whether known or unknown, for any services rendered pursuant to a Minor League Uniform Player Contract, under the FLSA. The Rule 23(b)(2) Class Members will release the Released Parties from any wage-and-hour claims for injunctive and/or declaratory relief which were pled, or could have been pled, in the SCAC arising out of and/or based on the facts alleged in the SCAC, whether known or unknown, for any services rendered pursuant to a Minor League Uniform Player Contract. The release period for the Released Claims is the beginning of time through October 31, 2022.

5

Settlement Agreement ¶ 10.

### B.    Notice

At preliminary approval, the Court approved the notice proposed by the parties and appointed JND Legal Administration LLC ("JND") as settlement administrator.  Dkt. no. 1141 at 4. JND sent the court-approved notice to class members as directed: by mail to last-known mailing addresses, and by email to last-known email addresses. Williams Final Approval Decl. (dkt. 1173-3) ¶¶ 7-10.  In total, JND sent the notice by mail to 24,152 class members, using standard industry technology to try to identify changes of address. *Id.* ¶ 9. The United States Postal Service ("USPS") returned 1,440 notices as undeliverable. *Id*. ¶ 10. After conducting address verification searches, 817 notices were re-mailed. *Id*.  JND also re-sent notices to many class members who emailed JND to update their contact information. JND sent the notice via email to 20,375 class members. *Id*. ¶ 7.  Of those, 1,507 notices (7 percent), were undeliverable. *Id*. ¶ 8. The notice included the date of the final approval hearing and explained all the essential elements in plain language in both English and Spanish. *Id.*  ¶¶ 7, 9 & Exs. A, B.

JND also personalized each notice. The first page notified each class member of their work periods and the address on file; it also provided a unique ID and passcode that allowed the class member to log into the website to: 1) dispute the work periods; 2) update the address on file; or 3) select an electronic payment. *See id*. Exs. A, B.  The log-in credentials also allowed the class member to view an estimate of their anticipated payout.  *Id.*  ¶ 13. The website included important documents on it and provided answers to frequently asked questions.  *Id.* Class members could view the website forms and materials in either English or Spanish. *Id.*

### C.    Response of Class Members to The Settlement

JND received a huge response to the notice of settlement:  As of January 11, 2023, JND had received 13,106 calls to the toll-free telephone line and 23,942 emails to the email address. *Id.*  ¶¶ 18, 20.  Williams states that this is an atypically high number of communications from class members, and "[t]he vast majority of these communications involved individuals who expressed an interest in participating in the class action settlement."  *Id.*  ¶ 20. Williams also states that since settlement payment estimates were posted on the settlement website, on November 14, 2022, there

6

have been 16,359 unique pageviews of the estimated payment amounts by class members.  *Id.*  ¶ 14.[5]  More generally, between October 28, 2022 and January 10, 2023, the website tracked 49,187 unique visitors who registered 386,546 pageviews.  *Id.* ¶ 16. With all this class member interest, JND received only twenty-one Settlement exclusion requests after the players were given notice of the settlement.  *Id.*  ¶ 29.  One of these was untimely and another one was withdrawn, leaving nineteen valid and timely post-settlement exclusion requests.  *Id.*[6]  The only objections were those asserted by Eddy Vizcaino and by the *Marti* Objectors, discussed below.

With respect to work-period disputes, Williams states that "[a]s of November 30, 2022, JND received 1,049 timely work period disputes [and] JND sent a dispute resolution email regarding each of these disputes by December 15, 2022."  *Id*. ¶ 22.  He states further that JND kept the dispute resolution portal open after it was required to do so, at the instructions of counsel, and that after November 30, 2022 an additional 234 work period disputes were filed.  *Id.* ¶ 24. According to Williams, "[o]f these, 95 were responded to by December 15, 2022. The remaining 139 will be responded to by January 18, 2023."  *Id*.  At the February 17, 2023 fairness hearing, Class Counsel confirmed that all of the work period disputes that had been filed as of that date had been resolved, whether or not they were timely.  In addition, JND received and resolved 20 more work period disputes in connection with the notices that were sent to newly discovered class members.  Supplemental Notice Submission at 1.

## III.  CLASS CERTIFICATION AND NOTICE

Rule 23(e) of the Federal Rules of Civil Procedure provides that "[t]he claims, issues, or defenses of a certified class – or a class proposed to be certified for purposes of settlement – may be settled, voluntarily dismissed, or compromised only with the court's approval."  It goes on to set forth the procedural requirements for approving a class settlement.  Where, as here, the Court has already certified a Rule 23 class (or classes), "the only information . . . necessary [to certify a

---

[5] According to Plaintiffs, the average recovery per player is expected to be between $5,000 and $5,500.  Broshuis Fee Motion Decl. (dkt. no. 1147-1) ¶ 39.
[6] Exhibit C to the Williams Final Approval Declaration lists all of the players who opted out during the case (there are 65 of them) and indicates which requests for exclusion were withdrawn and which ones were untimely. Dkt. no. 1173-3 at ECF pp. 60-61.  It indicates that there are 57 valid and timely opt-outs.

settlement class under Rule 23] is whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted." Fed. R. Civ. P. 23 Advisory Committee's Note to 2018 Amendment.

In the Court's Preliminary Approval Order, the Court granted Plaintiffs' request to combine the (b)(3) classes and change the cut-off date to the date of preliminary approval. Dkt. no. 1141 at 3-4. Otherwise, the Rule 23 classes and FLSA collective are the same as those that the Court already certified. Nothing in the current submission gives the Court reason to reconsider its prior certification order.

Further, the Court is satisfied that the requirements of Rule 23(c)(2)(A) and (B), governing class notice, have been met, both as to the content of the notices and their distribution. *See Churchill Village, L.L.C. v. General Electric,* 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.") (internal quotation marks and citation omitted); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 253 (N.D. Cal. 2015) ("The notice must be 'reasonably certain to inform the absent members of the plaintiff class,' but Rule 23 does not require actual notice.") (quoting *Silber v. Mabon,* 18 F.3d 1449, 1454 (9th Cir. 1994)).

## IV.   FINAL APPROVAL

To grant final approval, the Court must find that the terms of the parties' settlement are fair, reasonable, and adequate under Rule 23(e)(2). Further, following Congress's December 2018 revision of Rule 23(e), the Court must also consider whether the settlement resulted from collusion among the parties. *See Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (holding that courts must apply the collusion factors set forth in *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 941 (9th Cir. 2011), to post-class certification settlements as well as those settled before certification.)

### A.  Fairness Factors

Judicial policy strongly favors settlement of class actions, "particularly where complex class action litigation is concerned."  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th

Cir. 1992). "[H]owever, judges have the responsibility of ensuring fairness to all members of the class presented for certification." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Under Rule 23 of the Federal Rules of Civil Procedure, a district court may approve a class action settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate . . . ." Fed. R. Civ. P. 23(e)(2).  In the Ninth Circuit, "a district court examining whether a proposed settlement comports with Rule 23(e)(2) is guided by the eight '*Churchill* factors,' *viz.*, '(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.'" *Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021) (quoting *In re Bluetooth Headset Prods. Liab.*, 654 F.3d at 946 (citing *Churchill Vill. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004)));  *see also Quiruz v. Specialty Commodities, Inc.*, No. 17-CV-03300-BLF, 2020 WL 6562334, at *2 (N.D. Cal. Nov. 9, 2020) ("'[T]he factors that courts consider when evaluating a collective action settlement are essentially the same as those that courts consider when evaluating a [class action] settlement under Rule 23(e).'") (quoting *De Leon v. Ricoh USA, Inc.*, No. 18-CV-03725-JSC, 2020 WL 1531331, at *6 (N.D. Cal. Mar. 31, 2020)).

The Court tentatively found at the preliminary approval stage that the *Churchill* factors favored approval of the settlement. Dkt. no. 1141 at 1-2. The Court now concludes, definitively, that these factors strongly support approval of the settlement, which is fair, reasonable and adequate.

The first three *Churchill* factors favor approval because while Plaintiffs scored some significant wins on summary judgment, the Court had yet to decide a number of thorny issues, including those related to Defendants' seasonal amusement or recreational establishment affirmative defense.  Moreover, numerous issues of first impression decided by the Court or still to be decided at trial raised the specter of a lengthy appeals process and the possibility that Plaintiffs' successes on summary judgment (or potential successes at trial) might be undone on appeal.

United States District Court
Northern District of California

1    The amount offered in settlement also favors approval.  In particular, according to

2    calculations by Plaintiffs' expert, Dr. Brian Kriegler, the Net Settlement Amount that will be

3    distributed among the class members is approximately 89 percent of the unpaid wages of the class

4    members.  Final Approval Motion at 2; Kriegler Preliminary Approval Decl. (dkt. no. 1128-3) ¶

5    15.  This is an excellent result for the class.  *See Rodriguez v. W. Publ'g Corp.,* 563 F.3d 948, 964

6    (9th Cir. 2009) (holding that where amount to be paid into settlement fund was approximately

7    thirty percent of the damages estimated by the class expert, not including statutory penalties, the

8    negotiated amount of the settlement was "fair and reasonable no matter how you slice it").

9    Even if the estimated Net Settlement Amount is compared to the total damages Plaintiffs

10   might have obtained, including statutory penalties – an approach that is permitted in the Ninth

11   Circuit even though it is not typical, *see id*. at 964-965 – the class members' recovery would be

12   adequate to support approval.  In *Rodriguez,* for example, the settlement fund was approximately

13   ten percent of alleged damages when taking into account the availability of treble damages on

14   some of the plaintiffs' claims, which the court found to be reasonable. *Id.* at 965.  Here, using two

15   possible methods for estimating class damages, Dr. Kriegler estimated extrapolated damages as

16   either $495,963,837 or $371,246,067.  Kriegler Preliminary Approval Decl. (dkt. no. 1128-3) ¶¶

17   16-17.  Comparing these numbers to Dr. Kriegler's estimated Net Settlement Amount of

18   $120,197,300, *see id.* ¶ 15, gives rise to a recovery of 24% or 32%.  This is within the range that

19   courts have found to be fair and reasonable. *See, e.g., Rodriguez*, 563 F.3d at 965 (finding that

20   recovery of 10% of total damages was fair and reasonable); *Frlekin v. Apple Inc*., No. C 13-03451

21   WHA, 2021 WL 6126961, at *3 (N.D. Cal. Dec. 28, 2021) (approving settlement that awarded

22   "20.2% of the maximum recovery"); *Toolajian v. Air Methods Corp*., No. 18-CV-06722-AGT,

23   2020 WL 8674094, at *10 (N.D. Cal. Apr. 24, 2020) (approving settlement that awarded

24   "approximately 18% of the total potential recovery").  Therefore, this factor supports approval of

25   the parties' settlement.

26   The Court also finds that the Settlement Agreement provides for suitable prospective relief

27   to resolve the claims of the Rule 23(b)(2) Class, as it calls for MLB to rescind portions of the

28   Uniform Player Contract at issue in the case.  In addition, MLB will send a memorandum to the

10

Major League Clubs stating that MLB has rescinded any and all contractual obligations against Clubs paying wages to minor league players outside of the championship season, and advising each Club that it must compensate minor league players in compliance with wage-and-hour laws in effect in Arizona and Florida during spring training, extended spring training, instructional leagues and the championship season in those states, including any minimum wage laws that apply.

The stage of the proceedings also strongly favors final approval. "Class settlements are presumed fair when they are reached following sufficient discovery and genuine arms-length negotiation." *Foster v. Adams & Assocs., Inc*., No. 18-CV-02723-JSC, 2022 WL 425559, at *6 (N.D. Cal. Feb. 11, 2022) (internal quotations omitted). This case did not settle until the eve of trial, after more than eight years of vigorous litigation.  The parties conducted over a hundred depositions and traded thousands of discovery requests resulting in over a million pages of produced documents. When the parties reached a settlement, they had completed complicated and extensive expert discovery, and the Court had resolved *Daubert* and summary judgment motions. The parties had drafted and filed pre-trial materials, including fourteen motions in limine, and had prepared numerous trial witnesses. "All of this indicates that Plaintiffs were armed with sufficient information about the case to broker a fair settlement." *Id.* at *6 (internal quotations omitted).

The experience and views of class counsel also strongly favor final approval. The Ninth Circuit has recognized that "parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *Rodriguez*, 563 F.3d at 967 (internal modifications omitted).  At the outset of this case, Judge Seeborg appointed Korein Tillery, LLC and Pearson, Simon & Warshaw, LLP as interim co-lead class counsel ("Class Counsel") based on his conclusion that these firms satisfied the requirements of Rule 23(g) of the Federal Rules of Civil Procedure.  Dkt. no. 236.  In particular, based on the declarations and evidence supplied by counsel, he concluded that these firms were "qualified, including by way of their experience in handling complex litigation and employment class actions; [were] highly knowledgeable about the applicable law; [had] done significant work in researching and investigating the claims in this action; [were] willing and able to dedicate the time and

1    resources necessary to prosecute this action; and [were] able, and [had] committed, to work

2    cooperatively with others." *Id.* For the same reasons, the undersigned formally appointed these

3    firms as class counsel after granting class certification.  Dkt. no. 954.

4         Judge Seeborg's conclusions have been borne out; Class Counsel has handled this case

5    skillfully and with professionalism, diligently pursuing the interests of the players.  The significant

6    relief they have obtained under the Settlement Agreement is, in no small part, due to their

7    expertise and dedication.  Under these circumstances, the Court gives significant weight to the

8    opinion of class counsel that the settlement is fair, reasonable, and adequate.  *See* Broshuis Final

9    Approval Decl. (dkt. no. 1173-1) ¶¶ 5-7.  This factor favors approval.

10        Final approval is also appropriate because no governmental entity has intervened in the

11   case or expressed concerns about the settlement after being given required notice under the Class

12   Action Fairness Act ("CAFA"), 28 U.S.C. § 1715(b), and PAGA.  *See* Broshuis Final Approval

13   Decl. ¶ 11;  *In re Linkedin User Priv. Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015) (finding that

14   this factor supported approval of class action settlement where required CAFA notice was given to

15   appropriate state and federal officials and "[n]one of these officials . . . raised any objection or

16   concern regarding the settlement").

17        Finally, the response of the class strongly supports approval of the settlement.  As

18   discussed above, the response of the class members has been overwhelmingly positive, with only a

19   very small percentage of the class of over 24,000 players opting out (57) or objecting (a total of

20   12, assuming that all of the *Marti* Objectors who did not opt out are class members).  *See Nat'l*

21   *Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D.Cal.2004) ("It is

22   established that the absence of a large number of objections to a proposed class action settlement

23   raises a strong presumption that the terms of a proposed class settlement . . . are favorable to the

24   class members.").

25        Accordingly, the Court finds that the *Churchill* factors favor final approval.

26   **B.    *Bluetooth* Factors**

27        In addition to the *Churchill* factors, the Court must also determine whether the settlement

28   was the result of good faith, arms-length negotiations or fraud and collusion. *Briseno v.*

United States District Court
Northern District of California

1   *Henderson*, 998 F.3d at 1025.  In determining whether the settlement is the result of collusion,

2   courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs

3   that class counsel have allowed pursuit of their own self-interest and that of certain class members

4   to infect the negotiations." *In re Bluetooth Headset Prod. Liab. Litig*., 654 F.3d at 947. The Ninth

5   Circuit has identified three such signs:

6           (1) when counsel receive a disproportionate distribution of the
7           settlement, or when the class receives no monetary distribution but
        class counsel are amply rewarded;

8           (2) when the parties negotiate a "clear sailing" arrangement providing
9           for the payment of attorneys' fees separate and apart from class funds,
        which carries the potential of enabling a defendant to pay class
10          counsel excessive fees and costs in exchange for counsel accepting an
        unfair settlement on behalf of the class; and

11          (3) when the parties arrange for fees not awarded to revert to
12          defendants rather than be added to the class fund.

13  *Id*. (internal quotation marks and citations omitted).

14         With respect to the first *Bluetooth* factor, the Court compares the payout to the class (actual

15  and expected) with class counsel's unopposed claim for fees. *See Harris v. Vector Mktg. Corp*.,

16  No. C–08–5198 EMC, 2011 WL 4831157, at *6 (N.D. Cal. Oct. 12, 2011).  Based on Dr.

17  Kriegler's estimate, the former will be approximately $120,197,300. Kriegler Preliminary

18  Approval Decl. (dkt. no. 1128-3) ¶ 15.  Class counsel seek $55,500,000 in attorney's fees, that is,

19  one-third of the gross settlement fund. Thus, the ratio of the actual and expected class payout

20  compared to attorneys' fees is more than two to one.  This is in sharp contrast to the facts of *In re*

21  *Bluetooth*, where Class Counsel sought approximately $800,00 in attorneys' fees, there was *no*

22  class payout and a *cy pres* payout of only $100,000.  654 F.3d at 939-940.  Similarly, in *Harris*,

23  the amount of the fee request was approximately four times what the parties anticipated would

24  actually be paid out to the class in light of the claims requirement that was part of the settlement

25  and the low participation rate that was expected in that case.  *Harris v. Vector Mktg. Corp*., 2011

26  WL 4831157, at *6.  Therefore, the settlement in this case is not characterized by the kind of

27  disproportionate fee award to class counsel that is a sign of possible collusion.  Moreover, the

28  Settlement Agreement does not provide for a separate fee award independent of the class recovery;

United States District Court
Northern District of California

13

nor does it contain a "clear sailing" provision.[7] Finally, unpaid settlement funds will not revert to Defendants under any circumstances.  Therefore, the Court finds that the Settlement Agreement survives the heightened scrutiny required under *In re Bluetooth.*

### C.    Objections

#### 1.  Vizcaino

Eddy Vizcaino is a class member whose estimated settlement amount is $135.54, based on his participation in extended spring training for the Pittsburgh Pirates in 2017 and 2018.  Dkt. no. 1163. He objects to the amount of his estimated settlement award, which he believes should be higher in light of the effort he put in and the long hours he worked during those extended spring training sessions.  *Id.* Class Counsel respond that Mr. Vizcaino's award was calculated using the same formula that was used for every class member. Final Approval Motion at 25 (citing Kriegler Final Approval Decl. (dkt. 1173-2) ¶ 17).  They also explain that the amount of Mr. Vizcaino's payout reflects the fact that his Club paid him his salary during these periods, which greatly reduced his anticipated payout. *Id.* (citing Kriegler Final Approval Decl. (dkt. 1173-2) ¶ 18). Further, Dr. Kriegler observes in his declaration that "[s]uch result applies generally to players who attended Extended Spring Training" because "MLB Clubs already paid [their] players for these qualifying work periods extended spring trainings."  Kriegler Final Approval Decl. ¶ 18.

Because the Court finds that the formula used to calculate class member awards is fair and reasonable as to the class as a whole, and that all class members must be treated equitably, the Court finds that the amount of Mr. Vizcaino's award is fair and does not justify denial of final approval of the class action settlement.  Therefore, the Court overrules Mr. Vizcaino's objection.

#### 2.  *Marti* Objectors

##### a.   Whether *Marti* Named Plaintiffs Have Standing

Class Counsel assert in their Final Approval Motion that the four *Marti* named plaintiffs

---

[7] "A clear-sailing agreement is a provision sometimes included in class action settlements in which the defendant promises not to contest the amount of attorney's fees so long as it falls beneath a negotiated cap."  *In re Home Depot Inc.*, 931 F.3d 1065, 1081 (11th Cir. 2019) (citing *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1293 n.3 (11th Cir. 1999)).

who object to the settlement – Yadel Marti, Helder Velazquez, Jose Diaz, and Brahiam

Maldonado – lack standing to object to the settlement because of a statement by their attorney,

Samuel Kornhauser, indicating that these individuals have opted out of the *Senne* class, even

though they did not formally opt out.  Final Approval Motion at 13.  Class counsel contends courts

"look beyond formalistic procedures to evaluate whether a class member has reasonably expressed

a desire to be excluded from a class suit," including whether a person filed their own case.  *Id.*

(citing *McCubbrey v. Boise Cascade Home & Land Corp.*, 71 F.R.D. 62, 70–71 (N.D. Cal. 1976)

(person who filed own case "clearly made substantial efforts towards communicating a request for

exclusion" from the class)).  They argue that the *Marti* named plaintiffs expressed such a desire by

filing a separate action, pointing to the following statement by Mr. Kornhauser on behalf of the

*Marti* plaintiffs in April 2022:

> Class members can "opt out" by choosing to file their own litigation,
> rather than being bound by the class litigation. The *Marti* Plaintiffs
> have already asserted their individual California, Arizona, and Florida
> wage claims, by filing a separate lawsuit asserting those individual
> claims. They don't need to be and are not, represented by the *Senne*
> Plaintiffs or their counsel as class members. Their claims are already
> being presented and pursued in the consolidated but separate *Marti*
> case.

*Id.* (quoting *Marti* Plaintiffs' Reply on Motion for Leave for Reconsideration (dkt. no. 1112) at

12).

Defendants reject Class Counsel's argument, however, pointing out that the *Marti* case was

filed over eight years before the settlement opt-out period in *Senne* commenced.  *See* Defendants'

Response to the Objections to Final Approval of Settlement and Notice of Intent to Object (dkt.

no. 1174) at 3.  Likewise, they assert that the statement by Mr. Kornhauser cited by Class Counsel

was made before a settlement had been reached and months before the exclusion period and

therefore also does not reflect a desire to opt out of the settlement.  *Id.*  They distinguish

*McCubbrey*, cited by Class Counsel, on the basis that "the individuals at issue in *McCubbrey* filed

suit during the exclusion period of the settlement" and "[a]s such, the Court concluded that 'no

reasonable person could view their conduct as expressing a desire to participate in the proposed

settlement.'" *Id.*  at 2-3 (quoting *McCubbrey*, 71 F.R.D. at 71). Defendants point to several cases

1   in which courts have found that the filing of a separate case before the case had settled and the

2   opt-out period had commenced did *not* support an inference that the individual intended to opt out.

3   *Id.* at 2 (citing *Jackson v. SPS Techs., LLC*, No. 15-9854, 2018 WL 4440804, at \*3 (C.D. Cal.

4   Sept. 4, 2018); *In re Cathode Ray Tube (CRT) Antitrust Litig*., No. C–07–5944–SC, 2014 WL

5   4181732, at \*5 (N.D. Cal. Aug. 20, 2014); *Bowman v. UBS Fin. Servs., Inc*., No. C-04-3525

6   MMC, 2007 WL 1456037, at \*2; (N.D. Cal. May 17, 2007)). Defendants further point out that one

7   of the *Marti* Objectors (Jorge Charry) did, in fact, formally opt out of the class, indicating that

8   counsel for the *Marti* Objectors "knew how to submit an opt-out request on behalf of their clients

9   if they so desired." *Id.*

10        The Court finds Defendants' position to be persuasive. In particular, the undersigned

11   agrees with Judge Chesney's conclusion in *Bowman* that "'the mere pendency and continued

12   prosecution of a separate suit, which the litigant instituted *before* commencement of the "opt-out"

13   period in a related class action, neither registers nor preserves a litigant's election to "opt out" of

14   the related class action.'" 2007 WL 1456037, at \*2 (quoting *Demint v. NationsBank Corp*., 208

15   F.R.D. 639, 641 (M.D.Fla. 2002) (emphasis in original); and citing *In re Prudential Securities Inc.*

16   *Ltd. Partnerships Litigation*, 164 F.R.D. 362, 370 (S.D.N.Y.1996) ("It is well-established that

17   pendency of an individual action does not excuse a class member from filing a valid request for

18   exclusion.") (internal quotation and citation omitted); *Holmes v. CSX Transportation*, 1999 WL

19   447087 (E.D. La. 1999) ("Simply continuing with the present lawsuit, in a different court than the

20   class action suit, is not sufficient to provide the court with notice of plaintiff's intent to opt-out of

21   the class."); and distinguishing *McCubbrey*, 71 F.R.D. at 69, on the basis that suit was filed

22   *during* the opt-out period and therefore "constituted an effective expression of a class member's

23   desire to opt out").

24        The Court also finds unpersuasive Class Counsel's reliance on cases holding that formal

25   requests to opt out of a class are binding even where they were made prior to settlement and that a

26   settlement need not afford class members another opportunity to opt out. Final Approval Motion

27   at 14 (citing *In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 28–29 (D.C. Cir. 2000); *Low v.*

28   *Trump Univ*., LLC, 881 F.3d 1111, 1121 (9th Cir. 2018)). Both of the cases cited by Class

United States District Court
Northern District of California

Counsel involved formal requests to opt out of the class; neither addressed the circumstances under which an intent to opt out can be inferred from class member conduct.  These cases shed no light on whether the conduct of the *Marti* named plaintiffs who objected to the settlement but did not file a formal request for exclusion (or their attorney, acting on their behalf) gives rise to an inference that they intended to opt out of the settlement.  For the reasons discussed above, the Court finds that it does not.

Therefore, the Court concludes the four *Marti* Objectors who are named plaintiffs in that case have not opted out of the *Senne* settlement, have standing to object to the settlement and are bound by its terms.  On the other hand, Jorge Charry (who opted out) and Cirilo Cruz (who is not a class member) do not have standing to object.  *See In re Wachovia Corp. "Pick-A-Payment" Mortg. Mktg. & Sales Pracs. Litig*., No. 5:09-MD-02015-JF, 2011 WL 1877630, at *4 n. 3 (N.D. Cal. May 17, 2011) ("Class members who opt out lack standing to object to a settlement.") (citation omitted).

b.   Whether the Objections of the *Marti* Objectors Have Merit

The *Marti* Objectors contend the *Senne* settlement is not fair, reasonable and adequate for the following reasons:

- <u>Release and Notice</u>: The *Marti*  Objectors contend the release provision of the Settlement Agreement, Paragraph 10(a), "is overly broad and vague and needs to be clarified and narrowed so that it is clear that no settlement class member is releasing any federal or state antitrust claims, or their constitutional challenges to the Sherman Act [15 U.S.C. §§1 and 2] or to the Curt Flood Act [15 U.S.C. §26], or their equal protection claims, including but not limited to, the antitrust claims asserted in *Daniel Concepcion v. Commissioner of Baseball*, Case No. 3:22-cv-01017-ADC, now pending in the United States District Court, District of Puerto Rico." Dkt. no. 1158 at 1-4. They argue that to the extent the release extends beyond wage and hour claims it is unfair because it releases claims that were not brought in this case.  *Id.* at 1.  In particular, they state that they are "concerned that Defendants could try to construe . . . language [in Paragraph 10(a)] as releasing antitrust, wage fixing, and non-competitive wage or compensation claims."  *Id.* at 4. Further, to the extent the release is not limited to wage and hour claims, the *Marti* Objectors object "on behalf of the entire settlement class, because the class notice did not adequately explain that possible, non-wage hour claims, such as antitrust claims, might be released if they do [not] opt out or successfully object." *Id.*  at 5.

- <u>"Outside" Players and Claims</u>: The *Marti* Objectors object to the settlement on behalf of "outside" players, that is, players who "played championship season

17

United States District Court
Northern District of California

baseball in states outside of the California League, *i.e.*, Nebraska, Wisconsin, Tennessee, Montana, Indiana, Arkansas, Iowa, Michigan, New Jersey, New York, Oregon, North Carolina, Pennsylvania, Maryland, and Washington." *Id.* at 5. They contend that while "*Marti* counsel putatively represent those 'outside' players for wage and hour claims for championship season work in those states, the settlement seeks to settle those claims by counsel who do not represent such outside minor leaguers and seeks to settle those claims without the approval of or consultation with [*Marti* counsel]." *Id.* They assert that "Class counsel cannot settle claims for persons they do not represent and who are putatively represented by other counsel." *Id.* (citing generally *Koby v. ARS National Services, Inc.*, 846 F.3d 1071, 1080-1081 (9th Cir. 2017)). Moreover, the *Marti* Objectors assert, the amount that the outside claims were settled for – according to the objectors, "12.45% of their damages, which is less than the 49.8% of the damages the California League players" – is unfair and inadequate. *Id.*

- Overall Settlement Amount and Inadequate Discovery: The *Marti* Objectors object that the overall amount expected to be paid out to the class is inadequate.[8] *Id.* at 7. In particular, they assert that "the anticipated net settlement amount of $120,197,300 for 23,000 players is inadequate to compensate all members of the settlement class." *Id.* Further, according to the Objectors, "[i]t is not clear how or why there was an eight (8) million-dollar settlement of the outside players' $16 Million claim . . . when those claims were not certified, and settlement class counsel had no authority to settle those players' claims." *Id.* They contend "the settlement class members are being asked to agree to a settlement without sufficient discovery and evidence of the value of their claims." *Id.* at 6. In connection with this objection, the *Marti* Objectors represent that *Marti* counsel requested that Class Counsel provide "narrow and limited discovery . . . so they could advise their clients and so that all other settlement class members could make informed decisions as to whether the settlement was fair, reasonable, and adequate" but that "settlement class counsel did not provide that information and Brian Kreigler's conclusory declaration (Docket No. 1128-3) does not adequately provide that information." *Id.* at 6-7.

- Attorneys' Fees: The *Marti* Objectors contend the amount requested by class counsel in attorneys' fees – 30 percent of the common fund, or $55.5 million – is excessive given that "settlement counsel make no effort to provide a breakdown of the time spent on discrete tasks, whether there was unnecessary duplication by numerous attorneys, and whether some actively contributed to the creation of the

---

[8] At 8:00 p.m. on the evening before the fairness hearing, the *Marti* Objectors filed another brief entitled "Guide To Marti Plaintiffs Objectors' Objections To Be Orally Argued At Fairness Hearing." Dkt. no. 1180 ("*Marti* Guide"). Although improper, the Court considered the *Marti* Guide along with the earlier objections of the *Marti* Objectors. The Guide did not change the Court's conclusions as to whether it should approve the settlement. In the Guide, the *Marti* Objectors appear to withdraw their objection to the overall amount of the settlement fund, instead focusing on their belief that the *allocation* of the settlement funds under the settlement agreement is unfair. To the extent that it is not entirely clear that the *Marti* Objectors have dropped their objection to the overall amount of the settlement, however, the Court addresses that objection herein.

18

common [fund]." *Id.* at 8-9. They argue that "there should be some reduction in the fees, say from $55 Million to $49 Million, so that $6 Million can be allocated to pay the outside class an equal proportion (49% instead of 24.9% of the wages they were owed[).]" *Id.* at 9. They further contend "that they should be paid $1.2 Million [in attorneys' fees] for the 10% of the contribution they made to the common fund, *i.e.*, $14 Million ($8 Million plus $6 Million to the 'outside' class)." *Id.*

- <u>Incentive Payments</u>:  In their Notice of Intent to Object, dkt. no. 1146, the *Marti* Objectors state that they "may also object because the proposed settlement does not compensate them for their expenses or provide for incentive payments for the work and benefits they individually have conferred and will confer in creating and increasing the common fund for the classes." Dkt. no. 1146 at 1.

                 i.   Release and Notice

The *Marti* Objectors' objection to the release provision in the Settlement Agreement, and the related objection concerning the adequacy of notice, have no merit.  The relevant sentence in Paragraph 10, on its face, limits the release to wage and hour claims:

> All Named Plaintiffs, Class Representatives, and Rule 23(b)(3) Class Members who do not timely submit a valid Request for Exclusion, consistent with the terms set forth in this Agreement, will release the Released Parties from any and all claims pled, or which could have been pled, in the Second Consolidated Amended Complaint (the "SCAC") arising out of and/or based on the facts alleged in the SCAC, whether known or unknown, *for any wage-and-hour claims based on the performance of services pursuant to a Minor League Uniform Player Contract.*

Settlement Agreement ¶ 10(a) (emphasis added).   Even if the provision were ambiguous as to the scope of the release, Class Counsel and Defendants' counsel have confirmed that the release is limited to wage and hour claims and does not release antitrust claims.  Broshuis Final Approval Decl. ¶ 9 ("With regards to the first two *Marti* objections, the Settlement expressly limits the release to 'wage-and-hour claims.' While the plain language makes clear that it is a comprehensive release of wage-and-hour claims, not antitrust claims, I can confirm that the parties never intended the release to extend to antitrust claims, and Defendants' counsel has indicated that they will confirm that fact as needed.").  Class Counsel reiterated this statement at the fairness hearing.  Therefore, the Court overrules these objections.

               ii.  Settlement of "Outside" Player Claims

As discussed above, the Settlement Agreement provides that class members' awards will

United States District Court
Northern District of California

be based on their work in three categories: "(1) spring training, extended spring training, and instructional league from either 2009 to the date of Preliminary Approval in Florida, or 2011 to the date of Preliminary Approval in Arizona; (2) the California League, from 2010 to the date of Preliminary Approval; and (3) championship seasons outside the California League, from the start of the statute of limitations for the state in which the class member's minor league team is located to the date of Preliminary Approval."  Settlement Agreement ¶ 16(a).  The objections of the *Marti* Objectors concerning "outside" claims and players relate to the last category, as to which "a 50% reduction will be applied."  *Id.*

      *Marti* Objectors object to the Settlement Agreement's treatment of "outside" claims on two grounds.  First, they suggest that it was improper for Class Counsel to include in the settlement a provision purporting to settle the "outside" claims that are asserted in *Marti*, which the objectors characterize as "putative class action wage and hour claims" that should be handled by counsel in *Marti*.  Dkt. 1158 at 5.  This argument is, in essence, a rehash of earlier arguments by *Marti* counsel opposing the Court's consolidation of the two cases and appointment of Korein Tillery, LLC and Pearson, Simon & Warshaw as co-lead class counsel in this case in 2014. *See* dkt. no. 206 (arguing that because the *Marti* plaintiffs were "asserting class action claims for violations of Pennsylvania, Maryland, and Oregon state laws which are not asserted by the *Senne* Plaintiffs . . . it would be 'problematic' and an abuse of discretion for [the] Court to consolidate 'for all purposes' the *Senne* and the *Marti* cases.").  Judge Seeborg rejected those arguments, however, finding that the complaints in the two cases looked "pretty much the same" and observing that "it's not just a question of you add a state. I mean, you know, anybody can add a state."   Dkt. no. 240 (transcript of 10/9/2014 hearing) at 9, 15-16. The undersigned agreed with Judge Seeborg, denying a subsequent motion for reconsideration of Judge Seeborg's order consolidating the cases and appointing Class Counsel.  Dkt. no. 427.

      Furthermore, there are no "outside" claims in *Marti* that are "putative class action claims," contrary to the objection of the *Marti* Objectors.  Notably, the Second Consolidated Amended Complaint in *Senne*, dkt. no. 382, included wage and hour claims under the laws of all eight states listed in the original *Marti* complaint but the Court denied class certification for states other than

1    Arizona, Florida, and California. Dkt. no. 687.  As to the remaining states listed by the *Marti*

2    Objectors, no class claims were properly asserted under the laws of these states; rather, the

3    putative class claims the *Marti* plaintiffs sought to assert under the laws of these states were

4    contained in their First Amended Complaint, which was improperly filed after the two cases were

5    consolidated and stricken by the Court. *Marti* dkt. no. 76.

6           Finally, this challenge fails because "the Ninth Circuit allows federal courts to release not

7    only those claims alleged in the complaint, but also claims 'based on the identical factual predicate

8    as that underlying the claims in the settled class action.'" *In re Anthem, Inc. Data Breach Litig*.,

9    327 F.R.D. 299, 327 (N.D. Cal. 2018) (quoting *Hesse v. Sprint Corp*., 598 F.3d 581, 590 (9th Cir.

10   2010)); *see also  Cotter v. Lyft, Inc*., 193 F. Supp. 3d 1030, 1038 (N.D. Cal. 2016) ("Nor is there

11   anything necessarily unseemly (or unusual) about a class action settlement agreement that releases

12   claims the plaintiff did not originally bring. What matters is whether the released claims arise from

13   the same facts as those alleged in the lawsuit, and whether the settlement as a whole is reasonable

14   in light of the strength and value of all the claims being released.")

15          The release here covers "any and all claims pled, or which could have been pled, in the

16   Second Consolidated Amended Complaint (the 'SCAC') arising out of and/or based on the facts

17   alleged in the SCAC, whether known or unknown, for any wage-and-hour claims based on the

18   performance of services pursuant to a Minor League Uniform Player Contract."  Settlement

19   Agreement ¶10(a). Equivalent language has been approved by numerous courts in this district.

20   *See, e.g*., *Sandoval Ortega v. Aho Enterprises, Inc*., No. 19-CV-00404-DMR, 2021 WL 5584761,

21   at *11 (N.D. Cal. Nov. 30, 2021) (approving release of "all claims alleged in the operative

22   complaint in the Action, and any additional wage-and-hour claims that could have been brought

23   based on the facts alleged therein"); *Uschold v. NSMG Shared Servs., LLC*, 333 F.R.D. 157, 166

24   (N.D. Cal. 2019) (granting preliminary approval to wage and hour class action settlement that

25   released all claims "that are asserted in the FAC or could have been asserted based on the same

26   nucleus of operative facts."); *Custom LED, LLC v. eBay, Inc*., No. 12-CV-00350-JST, 2013 WL

27   6114379, at *4 (N.D. Cal. Nov. 20, 2013) (approving release of claims "arising out of or relating

28   in any way to any of the legal, factual, or other allegations made in the Action, or any legal

United States District Court
Northern District of California

theories that could have been raised based on the allegations of the Action").

Moreover, to the extent that the *Marti* Objectors object to the release of state law claims that were not asserted in this case or certified, those claims are based on the same factual predicate as the claims asserted by the Class, namely, the legality of the provisions of the UPC that limited the players' compensation during both the championship season and during other periods of the year.  Thus, those claims are the type of claims that the Ninth Circuit has found may be released under a class action settlement.

Second, the *Marti* Objectors contend the amount Class Counsel settled the outside claims for is not fair and reasonable, asserting that there is no explanation for the 50 percent reduction for non-California League claims. Dkt. no. 1158 at 6.  In fact, the outside claims are much weaker than the California League claims because the Court denied class certification for any championship season claims outside of the California League. Therefore, it was appropriate that the parties applied a discount to these claims in setting the settlement amount and allocating settlement funds among the class members.  In light of the fact that class members would likely recover nothing for these claims but for the class settlement in this case, the Court finds the 50 percent reduction to be fair and reasonable. *See Campbell v. Facebook, Inc*., 951 F.3d 1106, 1123 (9th Cir. 2020) (finding that "[t]he district court did not err to the extent it concluded that class members' claims were weak enough that the class was fairly likely to end up receiving nothing at all had this litigation proceeded further" and concluding that  "the class did not need to receive much for the settlement to be fair because the class gave up very little.").

### iii.  Overall Settlement Amount and Adequacy of Discovery

The *Marti* Objectors – describing Defendants as "billionaires"—challenge the overall amount of the settlement, saying that it is "difficult to imagine that the 30 teams would not pay another $4 Million per team ($120,000,000) to settle this case and would still walk away happy." Dkt. no. 1158 at 8. This assertion is entirely speculative as well as highly questionable given the vigorous litigation of this case on both sides.  As discussed above, in its discussion of the *Churchill* factors, the Court finds the amount of the settlement to be fair and reasonable.  For the same reasons, the Court rejects the assertion of the *Marti* Objectors that the Court should deny

United States District Court
Northern District of California

final approval on the basis that the overall amount of the settlement is inadequate.

Likewise, the Court rejects the assertion of the *Marti* Objectors that the class members are "being asked to agree to a settlement without sufficient discovery and evidence of the value of their claims." Dkt. no. 1158 at 8. "Class members who object to a class action settlement do not have an absolute right to discovery; the Court may, in its discretion, limit the discovery or presentation of evidence to that which may assist it in determining the fairness and adequacy of the settlement." *Jaffe v. Morgan Stanley & Co.*, No. C 06-3903 TEH, 2008 WL 346417, at *2 (N.D. Cal. Feb. 7, 2008). Here, class members received detailed notices describing the terms of the settlement, individual estimates of their award amount and sufficient information to investigate further. Moreover, Dr. Kriegler's expert report from August 2021, providing a detailed explanation of how class damages were calculated, was unsealed in July 2022 and thus available to any class member seeking additional information about Plaintiffs' damages calculations. *See* dkt. no. 1133-51. The Court finds that the class members have received or have access to ample information about the value of their claims and that further discovery is not necessary to allow either the Court or the class members to "intelligently approve or disapprove the settlement." *Jaffe*, 2008 WL 346417, at *2. Therefore, the Court overrules this objection.

### iv.  Attorneys' Fees

The *Marti* Objectors challenge Plaintiffs' request for an award of thirty percent of the common fund in attorneys' fees, citing the fact that no breakdown of the time Class Counsel spent working on the case has been provided and arguing further that "57,072.7 hours spent by over 30 attorneys was excessive, unnecessary, and duplicative." Dkt. no. 1158 at 8-9. At least, they contend, the requested amount should be reduced by $6 million, which should be allocated to "the outside class." Dkt. no.1158 at 8-9. They further assert *Marti* counsel should be awarded $1.2 million in fees for their contribution to the common fund. The Court does not find that any of these objections justifies denying final approval of the settlement and rejects the assertion of *Marti* counsel that they are entitled to attorneys' fees for their contribution to the class settlement.

In common fund cases, the 25 percent benchmark for fee awards is merely a "starting point for analysis." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002). "Selection of the

benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." *Id.* Among the factors courts consider are the results obtained for the class, including non-monetary benefits of the settlement, and the degree of risk counsel took on in taking on the case. *Id.*

In complex or lengthy cases, courts have frequently awarded more than the benchmark of 25 percent and awards of 30 to 33 percent are common in such cases. *Boyd v. Bank of Am. Corp.*, No. SACV 13-0561-DOC, 2014 WL 6473804, at *10 (C.D. Cal. Nov. 18, 2014) ("Decisions in analogous wage and hour suits have found awards of one third of the common fund appropriate."); *Frelkin v. Apple Inc.*, No. 3:13-cv-03451-WHA (ECF No. 475) (N.D. Cal. Aug. 13, 2022) (awarding 30 percent in over eight-year-old wage-and-hour case); *Rodriguez v. Nike Retail Servs.*, Inc., No. 14- CV-01508-BLF, 2022 WL 254349, at *6 (N.D. Cal. Jan. 27, 2022) (awarding 33 percent in wage-and-hour case "in light of the significant amount of work Class Counsel performed in this case, including for the appeal to the Ninth Circuit, and the excellent results achieved" in the face of "unsettled" law); *Villalpando v. Exel Direct Inc.*, No. 3:12-CV-04137-JCS, 2016 WL 7740854, at *2 (N.D. Cal. Dec. 12, 2016) (finding 33 percent in attorneys' fees was "reasonable under both applicable law, and in light of the contingent risk, Counsel's documented lodestar, the complex and protracted nature of the case, and strong result for the Class"). As discussed further below, in the Court's discussion of the Fee Motion, the Court finds that the circumstances here warrant an award of 30 percent of the common fund in attorneys' fees.

The Court also finds that the declarations supplied in support of Class Counsel's fee request are sufficient even though they do not include a detailed breakdown of the hours billed. Where a fee award is based on a percentage of a common fund, the lodestar is used only as a cross-check and "courts may do a rough calculation 'with a less exhaustive cataloging and review of counsel's hours.'" *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *16 (N.D. Cal. Aug. 17, 2018) (quoting *Young v. Polo Retail, LLC*, No. 02-CV-04546-VRW, 2007 WL 951821, at *6 (N.D. Cal. Mar. 28, 2007)). The declarations supplied in this case are adequate to allow the Court to perform a rough cross-check and that is all that is required. Furthermore, the *Marti* Objectors have offered no specifics in support of their assertion

United States District Court
Northern District of California

1    that Class Counsel's hours were "excessive, unnecessary and duplicative."  Dkt. no. 1158 at 9.

2          Likewise, the suggestion that the fee award should be reduced by six million dollars

3    (ostensibly to be awarded to "outside class members") is based on a misunderstanding of Dr.

4    Kriegler's calculations and the incorrect supposition that there is a separate "outside class" whose

5    members are not part of the certified class. As Dr. Kriegler explains in his declaration in support

6    of final approval, there is no such class.  Kriegler Final Approval Decl. ¶¶ 14-16.  Moreover, as

7    discussed above, the Court finds that the terms of the settlement as it relates to outside claims are

8    fair and reasonable.

9          The Court also rejects the *Marti* Objector's assertion that *Marti* counsel should be paid

10   "$1.2 Million for the 10% of the contribution they made to the common fund, *i.e.*, $14 Million ($8

11   Million plus $6 Million to the 'outside' class)." "Objectors to a class or derivative action

12   settlement are entitled to attorney's fees from the settlement fund where their objections 'result in

13   an increase to the common fund' or otherwise 'substantially benefit the class members.'" *In re*

14   *Wells Fargo & Co. S'holder Derivative Litig.*, 523 F. Supp. 3d 1108, 1111 (N.D. Cal. 2021)

15   (quoting *Rodriguez v. Disner*, 688 F.3d 645, 658 (9th Cir. 2012) (quoting *Vizcaino v. Microsoft*

16   *Corp.*, 290 F.3d at 1051)).  On the other hand, a court may "deny fees to objectors whose work is

17   duplicative, or who merely echo each others' arguments and confer no unique benefit to the class."

18   *Id.* (citing *Rodriguez*, 688 F.3d at 658-59).

19         Here, *Marti* counsel seeks an award of attorneys' fees based on two amounts they say

20   resulted from their efforts, $8 million and $6 million.  Together, they assert, their contribution is

21   10 percent of the net settlement amount, justifying an award of $1.2 million to *Marti* counsel for

22   their attorneys' fees.  The first figure may be based on Dr. Kriegler's computation of class

23   members' unpaid wages for work during the championship season outside of California – he

24   estimates about $16 million, *see* Kriegler Final Approval Decl. ¶ 12 – with the 50 percent

25   reduction provided for in Paragraph 16(a) of the Settlement Agreement.  That amount is not,

26   however, a reflection of how much Defendants agreed to *pay* under the Settlement Agreement for

27   those claims.  Nor is there any evidence in the record suggesting that any additional amount

28   Defendants *did* agree to pay for these claims was the result of efforts by *Marti* counsel.

The second number appears to be based on the *Marti* Objectors' misuse of some of the numbers contained in the Kriegler Preliminary Approval Declaration, as discussed above, and apparently assumes the Court will accept the invitation of the *Marti* Objectors to reduce the fee award to Class Counsel, thereby increasing the net settlement amount that will be left to the class members. As discussed elsewhere in this Order, the Court does not accept that invitation.

Further, even apart from the problems with the numbers the *Marti* Objectors offer to justify their argument that they are entitled to a fee award, the Court finds that this argument fails because *Marti* counsel has conferred little or no benefit on the class members. From the earliest stages of the case, *Marti* counsel failed to work collaboratively with Class Counsel, filing repeated motions for reconsideration challenging the appointment of Class Counsel and their handling of the class claims. Not one of these motions was successful. They did not assist in the prosecution of the class's claims but instead, hindered it, multiplying the work of Class Counsel, Defendants and the Court without obtaining any positive results for the class. While the court has no quarrel with the right of any class member to object to the settlement, or the right of counsel to vigorously represent their clients, none of the efforts by counsel for the Marti plaintiffs resulted in any benefit for the class.

For these reasons the Court finds that the objections of the *Marti* Objectors related to attorneys' fees do not warrant denial of final approval of the Settlement Agreement.

### v. Incentive Payments

The *Marti* Notice of Intent to Object states: "The *Marti* Plaintiffs may also object because the proposed settlement does not compensate them for their expenses or provide for incentive payments for the work and benefits they individually have conferred and will confer in creating and increasing the common fund for the classes." Dkt. no. 1146 at 1. In their actual objections, however, the *Marti* Objectors did not address the question of incentive payments. Clearly, an objection based on the fact that the Settlement Agreement does not award incentive payments to the *Marti* Objectors who are not named plaintiffs in that case would, if asserted, have no merit. Even as to the four *Marti* named plaintiffs who joined in the objections, there is no evidence documenting the work that they performed in the case or how that work benefited the class. While

the Court has no reason to question the good intentions of the players who volunteered to serve as named plaintiffs in *Marti*, whatever efforts they may have made do not appear to have conferred any additional benefits on the *Senne* class that would warrant an award of incentive payments. Therefore, to the extent the *Marti* Objectors object to the settlement on this ground, the Court finds that the objection has no merit.

### D.    Conclusion

For the reasons stated above, the Court adopts the modified definition of the Rule 23(b)(3) class contained in the Settlement Agreement and retains the definitions of the (b)(2) class and FLSA collective previously adopted.  Further, the Court overrules the objections of Mr. Vizcaino and the *Marti* Objectors and approves the Settlement Agreement, both as it relates to the claims of the Rule 23 classes and the FLSA claims, and finds that the agreed-upon resolution of the PAGA claims meets the statutory requirements set forth by PAGA.

The Court previously appointed the following named Plaintiffs as Class Representatives of the Rule 23(b)(3) Class, and finds that they should continue to serve as Class Representatives for purposes of final approval: Craig Bennigson, Daniel Britt, Matt Daly, Aaron Dott, Grant Duff, Matt Frevert, Lauren Gagnier, Jonathan Gaston, Nick Giarraputo, Brandon Henderson, Bryan Henry, Mitch Hilligoss, Ryan Hutson, Kyle Johnson, Jake Kahaulelio, Ryan Khoury, Ryan Kiel, Matt Lawson, Michael Liberto, Barret Loux, Aaron Meade, Justin Murray, Jeff Nadeau, Joseph Newby, Brett Newsome, Kyle Nicholson, Oliver Odle, Tim Pahuta, Dustin Pease, Brandon Pinckney, David Quinowksi, Gaspar Santiago, Cody Sedlock, Aaron Senne, Les Smith, Brad Stone, Kris Watts, Mark Wagner, Joel Weeks, and Kyle Woodruff.

The Court previously appointed Korein Tillery, LLC and Pearson, Simon & Warshaw LLP as Class Counsel for all classes and the FLSA Collective, and finds that they should maintain that appointment for purposes of final approval.

The Court previously appointed JND as Settlement Administrator. The Court finds that they should maintain that appointment for purposes of final approval.

Other than the 57 opt-outs listed in docket no. 1173-3, all individuals who fall within the

scope of the certified classes and/or opted in to the FLSA collective[9] are subject to the terms of the Settlement and the releases set forth therein.

## V.    ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS

In the Fee Motion¸ Class Counsel ask the Court to award the following amounts:  1) 30 percent of the common fund in attorneys' fees, that is, $55.5 million; 2) $4,654,538.33 in litigation costs;  and 3)  incentive awards of $15,000 to each of the 40 class representatives[10] and $7,500 to each of the 5 named plaintiffs who are not class representatives. [11]  They further request that the Court order that $995,000 be set aside from the common fund for settlement administration expenses.

### A.    Legal Standards

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed.R.Civ.P. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount."  *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011) (citing *Staton v. Boeing Co.*, 327 F.3d 938, 963–64 (9th Cir. 2003); *Knisley v. Network Assoc.*, 312 F.3d 1123, 1125 (9th Cir. 2002); *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328–29 & n. 20 (9th Cir.1999)).  The Ninth Circuit has approved two different methods for calculating a reasonable attorneys' fee depending on the circumstances: the lodestar method and the percentage-of-recovery method. *Id.* at 941-942.

The lodestar is obtained by "multiplying the number of hours the prevailing party

---

[9] The final list of FLSA opt-ins is found in docket no. 1186.

[10] These individuals are: Craig Bennigson, Daniel Britt, Matthew Daly, Aaron Dott, Grant Duff, Matthew Frevert, Lauren Gagnier, Jonathan Gaston, Nicholas Giarraputo, Brandon Henderson, Bryan Henry, Mitchell Hilligoss, Ryan Hutson, Kyle Johnson, Jake Kahaulelio, Ryan Khoury, Ryan Kiel, Matthew Lawson, Michael Liberto, Barret Loux, Aaron Meade, Justin Murray, Jeffrey Nadeau, Joseph Newby, Brett Newsome, Kyle Nicholson, Oliver Odle, Tim Pahuta, Dustin Pease, Brandon Pinckney, David Quinowksi, Gaspar Santiago, Cody Sedlock, Aaron Senne, Leslie Smith, Bradley Stone, Mark Wagner, Kristopher Watts, Joel Weeks, and Kyle Woodruff. The Court notes that at the fairness hearing, Class Counsel confirmed that Mark Wagner was inadvertently omitted from the list of class representatives appointed by the Court in its preliminary approval order. *See* dkt. no. 1141 at p. 4 ¶ 13.  Therefore, to the extent that Wagner was not previously appointed as a class representative, the Court appoints him as such herein.

[11] These individuals are: Omar Aguilar, Leonard Davis, Witer Jimenez, Bradley McAtee, Roberto Ortiz.

United States District Court
Northern District of California

reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer" and can be adjusted upwards or downwards based on various "reasonableness" factors; this approach is "appropriate in class actions brought under fee-shifting statutes (such as federal civil rights, securities, antitrust, copyright, and patent acts), where the relief sought—and obtained—is often primarily injunctive in nature and thus not easily monetized, but where the legislature has authorized the award of fees to ensure compensation for counsel undertaking socially beneficial litigation." *Id.* at 941.

Alternatively, where a settlement produces a common fund for the benefit of the entire class, courts have discretion to use the percentage-of-recovery method. *Id.* at 942 (citing *In re Mercury Interactive Corp.*, 618 F.3d 988, 992 (9th Cir. 2010) (citing *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000))). The Ninth Circuit has explained that "[b]ecause the benefit to the class is easily quantified in common-fund settlements, [it] allow[s] courts to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar." *Id.* The benchmark for a reasonable fee award using the common fund approach is 25 percent, but courts may adjust this amount upward or downward where there are "special circumstances." *Id.* (citing *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990)). "Relevant factors to a determination of the percentage ultimately awarded include: '(1) the results achieved; (2) the risk of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases.'" *Rodriguez v. Nike Retail Servs., Inc.*, No. 14-CV-01508-BLF, 2022 WL 254349, at *5 (N.D. Cal. Jan. 27, 2022) (quoting *Tarlecki v. bebe Stores, Inc.*, No. C 05–1777 MHP, 2009 WL 3720872, at *4 (N.D. Cal. Nov. 3, 2009) (citations omitted)).[12]

---

[12] Courts applying federal common law often cite to *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) for these factors. *See, e.g., Tarlecki v. bebe Stores, Inc.*, No. C 05-1777 MHP, 2009 WL 3720872, at *4 (N.D. Cal. Nov. 3, 2009) (applying *Vizcaino* factors in case involving fee request in connection with common fund settlement of federal FLSA claims). Although *Vizcaino* applied Washington law to the fee request in that case, which involved a common fund settlement of wage and hour claims asserted under Washington law, the court "followed the Washington practice of looking to federal law for guidance in this area." 290 F.3d at 1047. Thus, the undersigned, like many other courts, finds that the factors relied upon by the Ninth Circuit in *Vizcaino* are consistent with federal common law as well as Washington state law. Here, Plaintiffs' fee request is made pursuant to a settlement agreement that settles claims asserted

United States District Court
Northern District of California

1    Courts have discretion as to which method they will use to determine whether a fee request

2  is reasonable, but "their discretion must be exercised so as to achieve a reasonable result." *Id.*

3  (citations omitted).  For example, it might not be reasonable to rely on the percentage-of-recovery

4  approach if the settlement creates a "megafund" such that awarding 25 percent of the fund will

5  result in a windfall to counsel.  *Id.*  Whichever of the two approaches a court uses to determine

6  whether a fee request is reasonable, the Ninth Circuit encourages the court to perform a "cross-

7  check" by considering the reasonableness of the amount under the other approach.  *Id.* at 945.

8  However, a cross-check is not required so long as the court achieves a reasonable result using the

9  method it selects.  *See Fischel v. Equitable Life Assur. Soc'y of U.S.,* 307 F.3d 997, 1007 (9th Cir.

10  2002) (finding that district court that used lodestar method to determine fees in a class action that

11  settled early in the case did not err by failing to compare the lodestar result to the 25 percent

12  benchmark); *Andrews v. Plains All Am. Pipeline L.P.*, 2022 WL 4453864, at *2 (finding under

13  *Fischel* that it was unnecessary to perform lodestar cross-check in light of the court's "extensive

14  involvement in supervising the last seven years of litigation.").

15    **B.    Attorneys' Fees**

16    The Court concludes that it is appropriate to use the percentage-of-fund method when

17  calculating attorneys' fees in this case because Plaintiffs have created a common fund that is

18  ascertainable. *See Kang v. Wells Fargo Bank, N.A.*, No. 17-CV-06220-BLF, 2021 WL 5826230, at

19  *16 (N.D. Cal. Dec. 8, 2021). The Court further concludes that it is appropriate to award a

20

21  under federal law (the FLSA) and the laws of California, Arizona and Florida, raising a question
    of what law applies to the Court's evaluation of Plaintiffs' fee request.  The Court concludes that
22  under these circumstances, it may apply federal common law to evaluate whether the fees
    requested by Plaintiffs are reasonable.  *See Allapattah Servs., Inc. v. Exxon Corp.,* 454 F. Supp. 2d
23  1185, 1200 (S.D. Fla. 2006) ("The district court presiding over a diversity-based class action
    pursuant to Fed.R.Civ.P. 23 has equitable power to apply federal common law in determining fee
24  awards irrespective of state law.").  In any event, even under the laws of the states whose law
    might be applied it would reach the same result. In particular, like all circuit courts and most state
25  courts, California and Arizona courts have concluded that "the percentage method of calculating a
    fee award is either preferred or within the trial court's discretion in a common fund case." *Laffitte*
26  *v. Robert Half Internat. Inc.*, 1 Cal. 5th 480, 493 (2016); *see also Burke v. Arizona State Ret. Sys.*,
    206 Ariz. 269, 272 (Ct. App. 2003) ("[A] fee award may be calculated as a percentage of the fund
27  created or by using the hourly lodestar method."). Florida appears to be an exception, but Florida
    law allows for a lodestar multiplier of up to five, *Kuhnlein v. Dep't of Revenue*, 662 So. 2d 309,
28  315 (Fla. 1995), which is far above the multiplier of 1.53 that would result from awarding the
    requested fees in this case.

30

1   percentage that is higher than the benchmark of 25 percent due to the circumstances of this case.

2   *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) (affirming award of 28

3   percent). The Court determines that attorneys' fees in the amount of 30 percent of the common

4   fund ($55,500,000) are proper for the following reasons.

5          First, as discussed above, Class Counsel have achieved exceptional results for the class.

6   With respect to the monetary recovery, the Settlement Agreement creates a net settlement amount

7   that is likely to be in the range of $120 million and is about 89 percent of the class members'

8   unpaid wages on their class claims. The settlement also secures meaningful and significant

9   injunctive relief for the (b)(2) class.  "The overall result and benefit to the class from the litigation

10  is the most critical factor in granting a fee award." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d at

11  1046. Therefore, this factor strongly supports the requested award.

12         Second, Plaintiffs secured these results despite facing far more risks than average. Having

13  presided over the lengthy class certification battle, the Court is well aware of the risks at class

14  certification. The substantive issues were just as risky, as this case presented a multitude of novel

15  questions that were critical to Plaintiffs' ultimate success in the case. This factor strongly supports

16  the requested award.

17         Third, this case was very complex and required a high level of skill on the part of Class

18  Counsel. It involved nearly 70 parties and multiple state and federal laws in an unsettled area of

19  law. It required a complex method of estimating hours worked in the absence of time records. It

20  required the ability to overcome procedural motions and to conduct complicated and extensive

21  discovery. It required deft appellate advocacy and the ability to distill the case for summary

22  judgment and to prepare for a trial that nearly took place. This factor strongly supports the

23  requested award.

24         Fourth, the contingent nature of the fee likewise supports the requested award. For

25  approximately nine years, Class Counsel have litigated this case on a contingency basis without a

26  guarantee of success and fronted millions of dollars in costs.

27         Fifth, the requested award is similar to that awarded in other cases that, like this one,

28  involved complex and protracted litigation. *See, e.g., Andrews v. Plains All Am. Pipeline L.P.*, No.

United States District Court
Northern District of California

31

CV154113PSGJEMX, 2022 WL 4453864, at *1 (C.D. Cal. Sept. 20, 2022) (approving a fee award of 32 percent of the $230 million common fund where the parties "engaged in almost seven years of hard-fought litigation" and conducted extensive discovery, "includ[ing] among other things exchanging more than 360,000 documents, disclosing 17 experts and producing 52 expert reports, and taking over 100 depositions."); *Frelkin v. Apple Inc*., No. 3:13-cv-03451-WHA (dkt.  no. 475) (N.D. Cal. Aug. 13, 2022) (approving a fee award of 30 percent of common fund in wage-and-hour case that was litigated for over eight years); *Rodriguez v. Nike Retail Servs., Inc.,* No. 14-CV-01508-BLF, 2022 WL 254349, at *6 (N.D. Cal. Jan. 27, 2022) (approving a fee award of 33 percent of common fund in wage-and-hour case "in light of the significant amount of work Class Counsel performed in this case, including for the appeal to the Ninth Circuit, and the excellent results achieved" in the face of "unsettled" law); *Villalpando v. Exel Direct Inc*., No. 3:12-CV-04137-JCS, 2016 WL 7740854, at *2 (N.D. Cal. Dec. 12, 2016) (holding that 33 percent in attorneys' fees was "reasonable under both applicable law, and in light of the contingent risk, Counsel's documented lodestar, the complex and protracted nature of the case, and strong result for the Class").

Sixth, a lodestar crosscheck shows that the requested fee is reasonable. Arguably, a lodestar cross-check is not required here because the Court has been extensively involved in supervising this litigation and has observed first-hand the monumental effort Class Counsel has put into this case. The Court has nevertheless performed a rough calculation of Class Counsel's lodestar to evaluate whether the percentage-of-recovery method gives rise to a reasonable result.

Class Counsel have devoted 54,988.2 hours to the case thus far, giving rise to a lodestar through October 31, 2022 of $34,789,719.50.  Broshuis Fee Motion Decl. (dkt. no. 1147-1) ¶ 30. Other law firms offered assistance and worked additional hours on the case, resulting in a total combined lodestar of $36,322,371.75 based on 57,072.7 total combined hours. *Id*.; *see also* Warshaw Fee Motion Decl. (dkt. no. 1147-2) ¶ 58. The Court has reviewed the hours and rates submitted by Plaintiffs' counsel and finds them to be reasonable given the complexities and length of the case. The total lodestar results in a multiplier of 1.53, which falls well within the range commonly approved by courts. *Kang v. Wells Fargo Bank, N.A*., , 2021 WL 5826230, at *17

1    (observing that the "Ninth Circuit has recognized that multipliers generally range from 1 to 4")

2    (citing *Vizcaino*, 290 F.3d at 1051 n.6);  *Uschold v. NSMG Shared Servs., LLC*, No. 18-CV-

3    01039-JSC, 2020 WL 3035776, at *16 (N.D. Cal. June 5, 2020) (applying multiplier of 4 to fee

4    award in wage and hour class action settlement); *De Leon v. Ricoh USA, Inc*., No. 18-CV-03725-

5    JSC, 2020 WL 1531331, at *18 (N.D. Cal. Mar. 31, 2020) (applying multiplier of 1.09 to fee

6    award in wage and hour class action settlement); *Ridgeway v. Wal-Mart Stores Inc*., 269 F. Supp.

7    3d 975, 999 (N.D. Cal. 2017) (applying multiplier of 2.0 to fee award in wage and hour class

8    action settlement).

9         For these reasons, the Court approves Plaintiffs' request for an award of 30 percent of the

10   common fund in fees ($55,500,000), which shall be allocated by Class Counsel in the manner they

11   consider equitable.

12        **C.     Litigation Costs**

13        Class Counsel have shown that they incurred $4,654,538.33 in litigation costs, for which

14   they ask to be reimbursed.  Broshuis Fee Motion Decl. (dkt. no. 1147-1) ¶ 32.  The bulk of

15   Plaintiffs' litigation costs were incurred by class counsel, Korein Tillery ($2,865,483.65) and

16   Pearson, Simon & Warshaw ("PSW") ($1,744,090.41), while $44,964.27 was incurred by other

17   law firms in the following amounts: 1) Glancy Prongay & Murray LLP ($7,677.26); 2) Boucher

18   LLP ($21,900.10); 3) Lieff Cabraser Heimann & Bernstein, LLP ($3,009.64); 4) Carney Bates &

19   Pulliam, PLLC ($537.72); and 5) Rulis & Bochicchio, LLC ($11,839.55).  *Id*.  The total amount of

20   requested costs on final approval is in line with the amount of costs incurred at the time of

21   preliminary approval, when costs incurred to date were $4.63 million.  Broshuis Preliminary

22   Approval Declaration (dkt. no. 1128-1) ¶ 15(d)).  The amount Plaintiffs request for litigation costs

23   is also significantly less than the $5.5 million upper limit stated in the notices that were sent to

24   class members.  *See* dkt. no. 1140-3 at p. 8. The Court has reviewed the costs and finds them to be

25   reasonable and of the type typically billed by attorneys to paying clients in the marketplace. The

26   Court thus grants the request to have these costs reimbursed from the common fund.

27        **D.     Settlement Administration Costs**

28        Plaintiffs have asked that the Court set aside $995,000 from the common fund for

United States District Court
Northern District of California

settlement administration costs – a significant increase from the $450,000 they requested be set aside at preliminary approval.  The previous amount was based on Plaintiffs' expectation that the cost of the services provided by JND, the settlement administrator, would be $148,000 and the cost of the settlement administration work to be performed by expert Brian Kriegler's firm, EconOne, would be $175,000.   Broshuis Preliminary Approval Decl. ¶ 15(a).   According to Plaintiffs, the number has increased because they previously underestimated JND's administration costs.  Fee Motion at 20.  The settlement administrator explains that the higher-than-expected administration costs are the result of the following factors: "(1) the volume of class member communications has been extraordinarily high (more than seven times anticipated), (2) tax reporting requirements are more complex than initially anticipated, and (3) the data has been more complex than initially anticipated." Williams Fee Motion Decl. (dkt. no. 1147-4) ¶ 7.

The Court finds that Plaintiffs have provided an adequate justification for increasing the amount they ask to be set aside for settlement administration costs and that the overall amount of $995,000 is reasonable in light of the challenges associated with implementing such an ambitious settlement.  Therefore, the Court approves Plaintiffs' request that $995,000 be set aside to cover the costs of settlement administration.  The Court will make a final determination as to JND's reasonable settlement administration costs after the administration process is complete.

**E.    Incentive Awards**

Incentive awards are intended "to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). They are "particularly appropriate in wage-and-hour actions where plaintiffs undertake a significant 'reputational risk' by bringing suit against their former employers." *Ridgeway v. Wal-Mart Stores Inc.*, 269 F. Supp. 3d 975, 1003 (N.D. Cal. 2017) (approving $15,000 incentive awards). In determining the size of the award, some of the factors courts consider include the risk undertaken, the notoriety involved in the case, the time and effort expended, the duration of the case, and the benefit (or lack thereof) enjoyed by the plaintiff as a result of the case. *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266

34

United States District Court
Northern District of California

1  (N.D. Cal. 2015). These factors support the amounts requested by Plaintiffs here for the named

2  plaintiffs and class representatives.

3          This case received substantial notoriety—more than most class actions—creating

4  significant reputational risks for the named plaintiffs. Given the length of the case, the named

5  plaintiffs also expended an above average amount of work, as their declarations establish. *See* dkt.

6  no. 1147-10 through 1147-54. This work included preparing for, traveling to and sitting for

7  depositions; searching for documents in response to multiple requests for production; responding

8  to interrogatories;  keeping up with the developments of the case for a period of over eight years;

9  and ultimately preparing for trial.  *Id.*  Finally, the work of these individuals greatly beneffitted the

10  class.  In light of these factors, the amounts of the requested incentive awards – $15,000 for the

11  plaintiffs designated as class representatives and $7,500 for the 5 named plaintiffs who did not

12  serve as class representatives – are easily justified and in line with awards in other class action

13  settlements in complex cases. *See Ridgeway v. Wal-Mart Stores Inc*., 269 F. Supp. 3d 975, 1003

14  (N.D. Cal. 2017) (approving $15,000 incentive awards to each of nine plaintiffs in a wage-and-

15  hour case); *Villalpando v. Exel Direct Inc*., No. 3:12-CV-04137-JCS, 2016 WL 7785852, at *2

16  (N.D. Cal. Dec. 9, 2016) (approving of $15,000 incentive awards in a wage-and-hour case); *Boyd*

17  *v. Bank of Am. Corp*., No. SACV 13-0561-DOC, 2014 WL 6473804, at *7 (C.D. Cal. Nov. 18,

18  2014) (in a wage-and-hour case: "[T]he Court finds that incentive awards of $15,000 to Mr. Galaz

19  is reasonable in light of the time and effort he expended for the benefit of the class and the risks

20  associated with representing the class."); *In re TFT-LCD (Flat Panel) Antitrust Litig*., No. M 07-

21  1827 SI, 2013 WL 1365900, at *17 (N.D. Cal. Apr. 3, 2013) (awarding $15,000 to each of the 40

22  court-appointed class representatives, and $7,500 for each of eight additional named plaintiffs).

23  The Court therefore approves the incentive awards requested by Plaintiffs for the named plaintiffs

24  and class representatives.

25      **F.    Conclusion**

26          For the reasons stated above, the Court GRANTS Plaintiffs' Fee Motion and awards the

27  following amounts: 1)  30 percent  of the common fund in attorneys' fees ($55,500,000); 2)

28  litigation costs in the amount of $4,654,538.33; 3) incentive payments in the amount of $15,000

each for the class representatives (see footnote 10, above), and $7,500 each for the named

plaintiffs who are not class representatives (see footnote 11, above). The Court further orders that

$995,000 be set aside from the common fund for settlement administration expenses.  The Court

will make a final determination as to the reasonable amount of administration fees as set forth in

its March 6, 2023 Order Regarding Deadlines for Requesting Disbursement of Administration

Fees by Administrator.  In particular, JND will make its initial request for disbursement of

administration fees within fourteen days of effectuating the initial class member distribution from

the settlement fund.  JND will make its final request for disbursement of administration fees at

least fourteen days before the anticipated final class member distribution from the fund.

The parties are requested to meet and confer and file a joint proposed judgment consistent

with this Order.


Date:  March 29, 2023


Joseph C. Spero
United States Magistrate Judge